Paul M. Basta, P.C.
Jonathan S. Henes, P.C.
Christopher Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (*pro hac vice* pending)
Brad Weiland (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) Case No. 15-11835 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF MICHAEL MAGILTON (I) IN SUPPORT OF FIRST DAY MOTIONS AND (II) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

I, Michael Magilton, hereby declare under penalty of perjury:

1.     I am the Senior Vice President and Chief Financial Officer of Sabine Oil & Gas Corporation ("Sabine"), a corporation organized under the laws of the state of New York and a debtor and debtor in possession in the above-captioned cases of Sabine and certain of its affiliates as debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, the "Company"). I have served the Debtors as Senior Vice President and Chief Financial Officer since January 2015. I am generally familiar with the Debtors'

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corporation (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440). The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is: 1415 Louisiana, Suite 1600, Houston, Texas 77002.

day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age and I am competent to testify.

2.      I submit this declaration (this "Declaration") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") to assist this court (the "Court") and parties in interest in understanding the circumstances that compelled the commencement of the chapter 11 cases and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"); and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Pleadings").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

4.      To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized in five sections. The first section provides background on the Debtors and the oil and gas industry in which the Debtors compete. The second section provides detailed information on the Debtors' history, operations, and organizational and capital structure. The third section describes the Debtors' recent negotiations leading up to the commencement of these chapter 11 cases. The fourth section sets

forth the relevant facts in support of each of the pleadings filed in connection with these chapter 11 cases (collectively, the "First Day Motions"). The final section provides an overview of the exhibits attached hereto that set forth certain additional information about the Debtors as required by the Local Bankruptcy Rules.

## I.      Background

5.      The Company is an independent energy company engaged in the acquisition, production, exploration, and development of onshore oil and natural gas properties in the U.S. The Company's current operations are principally located in the Cotton Valley Sand and Haynesville Shale in East Texas, the Eagle Ford Shale in South Texas, the Granite Wash in the Texas Panhandle, and the North Louisiana Haynesville.



6.      As of the Petition Date, the Company operates, or has joint working interests in, approximately 2,100 oil and gas production sites (approximately 1,800 operating and approximately 315 non-operating) and has approximately 165 full-time employees.

7.     As discussed in greater detail herein, the Company's operations have been significantly impacted by the recent and dramatic decline in oil prices, the continued low prices of natural gas, and general uncertainty in the energy market.  These macro-economic factors, coupled with the Company's substantial debt obligations, have pushed the limits of the Company's ability to sustain the weight of its capital structure and devote capital needed to maintain and grow its business.  The decline in the price of oil and natural gas has also affected the Company's ability to effectuate certain asset sales that could otherwise alleviate its increasing near-term liquidity problems.

8.     As a result of this confluence of factors, the Debtors—like many other similarly situated exploration and production companies ("E&P Companies")—had no choice but to commence these chapter 11 cases to implement court-supervised restructurings of their outsized debt obligations, thereby allowing them to move forward in a drastically changed economic landscape.

9.     The Debtors enter chapter 11 having made meaningful restructuring progress. Indeed, the Debtors' management has spent approximately five months exploring strategic restructuring alternatives, including disposition of non-core assets, debt repurchases, debt-for-debt exchanges, debt-for-equity exchanges, secured financing, joint ventures, minimizing capital expenditures, and obtaining necessary waivers or amendments from the Debtors' lenders.  To that end, the Debtors entered into forbearance agreements with the RBL Agent (as defined herein) and lenders under the Revolving Credit Agreement (as defined herein) (collectively, the "RBL Lenders"), and the Second Lien Agent (as defined herein) and lenders under the Second Lien Term Loan Facility (as defined herein) (collectively, the "Second Lien Lenders").  Unfortunately, none of these efforts was able to sufficiently address the breadth of the Debtors'

4

financial troubles.  What the Debtors need is a meaningful deleveraging of their debt structure, which is only possible through a chapter 11 process.

### A.    History of the Oil and Gas Industry.

10.    The existence of oil in the U.S. has been documented since the 1600s.  However, the American oil industry did not begin in earnest until 1859, when the first well was drilled specifically to produce oil.  Within two years, oil production in the U.S. increased from approximately 15 barrels per day to over 3 million barrels per day.  The explosion in production, coupled with increased demand and lack of structure surrounding the supply and refining of oil, created an economically volatile industry.

11.    The quest to control the volatility of the oil market has been, and remains, a constant power struggle among oil producers.  Stability was first achieved by Standard Oil, which, at its peak in 1890, controlled almost 90 percent of the refined oil flows in the U.S. Through its dominance of the market, Standard Oil was able to control the price at which oil was sold and the price that producers received for their oil.  However, the Supreme Court ordered Standard Oil's dissolution in 1911 after declaring that it operated to monopolize and restrain trade.

12.    Shortly thereafter and partially as a result thereof, the Texas Railroad Commission emerged as the regulatory authority for the oil industry, after being vested with the authority to regulate oil and gas by the Texas legislature.  The stability created by the Texas Railroad Commission allowed American oil production to continue at high rates over the next several decades.

13.    In the years leading up to World War II, as domestic reserves declined and worldwide consumption increased, American oil companies embarked on ambitious international exploration programs in order to keep up with increasing international and domestic demand.

These programs resulted in the creation of powerful international oil companies ("IOCs").  IOCs expanded across the globe, including into oil-rich Middle Eastern countries such as Iran, Iraq, Kuwait, and Saudi Arabia.

14.     As the strategic and political importance of oil supplies became clear, Middle Eastern governments began pressuring IOCs to enter into profit sharing arrangements. While many IOCs entered into such agreements, they largely retained ownership and control of reserves located in Middle Eastern nations.  As a result, producing countries, including Iran, Iraq, Kuwait, Saudi Arabia, and Venezuela, created the Organization of Petroleum Exporting Countries ("OPEC") in 1960 in an effort to gain greater control and ownership over resources located within their own countries.

**B.      OPEC.**

15.     OPEC's objective since its inception has been to coordinate and unify petroleum policies among member countries in order to secure fair and stable prices for petroleum producers and a fair return on capital for those investing in the industry.  Initially of limited influence, OPEC's power increased in the 1970s after an embargo enacted on oil exports to the U.S. resulted in a sudden and devastating increase in oil prices.  Understanding their power, oil producing nations nationalized their oil industries throughout the 1970's, displacing the IOCs.

16.     OPEC continues to assert its influence over the price of oil, with the price of crude oil increasing steadily over time from OPEC's inception through 2011.  Between 2003 and 2011, the price of crude oil rose from approximately $20 per barrel to over $100 per barrel.  One unintended consequence of this price increase is that sustained higher oil and gas prices made previously uneconomic resource types, such as tight and shale oil and gas, financially viable.[2]

---

[2]   Tight oil and tight gas refers to oil and gas that are trapped in reservoirs that have low porosity and permeability.  Tight oil and tight gas are known as a non-conventional resource because simply drilling a

17.     Not all oil producing countries have been able to take advantage of this development equally.  The U.S., in general, and smaller E&P Companies, in particular, have been at the forefront of exploration in unconventional resources.  U.S. dominance in the tight and shale oil and gas industry is due, in part, to a well-developed oil field services industry, fewer environmental restrictions as compared to Europe, and a property rights regime incentivizing land owners to allow access to the land.

18.     The recent ability of E&P Companies to access unconventional energy sources has reduced American dependence on foreign oil and, as a result, OPEC's power.  As overall supply increased, the price of oil and gas decreased.  Tight and shale oil and gas exploration and production is a capital intensive process that depends on substantial cash flows to fund exploration.  In a move many believe was intended to put pressure on domestic E&P Companies and shift power back to OPEC, OPEC has not decreased production quotas for its member countries.  The resulting continued low price of oil and gas and decreased cash flows have put a strain on E&P Companies', such as the Debtors, ability to operate in a capital intensive industry.

**C.     The Exploration and Production Process.**

19.     In order to understand the Debtors' capital requirements, it is important to first understand the process by which E&P Companies produce oil.  The life cycle of an oil field has five primary stages:  (a) identifying the target; (b) drilling an exploration well; (c) drilling appraisal wells; (d) developing the field; and (e) extending the field life.  Each step of the exploration and production process requires different personnel and equipment and carries a

---

conventional well through the middle of such reservoirs will not result in enough oil or gas production to make the well economic.  Shale oil and shale gas are similar to tight oil and tight gas, the key difference being that the source rock for shale oil or shale gas is shale, as opposed to limestone or sandstone.

different level of uncertainty and risk.   The early stages of developing an oil field are often the most uncertain and the most expensive.

### 1.      Identifying the Target.

20.      The first step of the exploration process is to identify the appropriate target for drilling.  E&P Companies use several techniques to determine where oil and gas is located below the earth's surface, including seismic techniques.  Seismic operations use sound waves to create an image of subsurface rock layers.  During a seismic survey, sound waves are generated by either a vibrator truck or the explosion of dynamite within a hole dug in the ground.



21.      The sound waves move down through the earth and are then partially reflected back to the surface by each rock strata.  Geophones placed at the surface record such reflections, which are then sorted and decoded.  Sound waves reflect differently off of oil than off of water or gas, indicating where oil may be located.  The decoding process is not perfect as there are multiple variables that contribute to the reflection of sound waves back to the surface.  As a

result, the assumptions used when decoding seismic data can have a significant impact on the resulting image.

### 2.    Drilling an Exploration Well.

22.    Once a set of targets has been identified, the next step is to assess the likelihood of discovering an active hydrocarbon system at each target.   This is accomplished through drilling or "spudding" an exploration well.   The purpose of an exploration well is to accumulate additional information regarding the surrounding rock formation.

23.    Wells usually are drilled by rotary drilling.   Rotary drilling uses a hollow pipe with a drill bit on the end.   To facilitate the drilling process, a mixture of chemicals, referred to as "mud," is pumped down the middle of the drill pipe.   Mud then exits through the drill bit and circulates back up to the surface between the drill pipe and the walls of the well.   The purpose of mud is to carry away cuttings from the drill bit, provide lubrication to prevent the drill pipe from getting stuck in the well bore, provide hydraulic pressure to prevent oil from "blowing out" of the well, and deposit a thin, impermeable layer of mud over reservoir zones to prevent further invasion and/or damage of the reservoir by drilling fluids.

24.    Wells generally are drilled in stages.   When the bottom of each stage is reached, the freshly drilled hole, known as an "open-hole," is cased off with steel pipe, converting the "open-hole" to a "cased-hole."   Casing is used to prevent the hole from collapsing on top of the drill pipe.   The below illustrates the various components of a well.



25.     Simply drilling a hole into the ground rarely conclusively reveals whether the well has intersected an oil or gas reservoir.  This is especially true with respect to shale or tight oil or gas wells, which often require additional operations, including fracking, to start the flow of oil and gas.  As a result, once the exploration well is drilled, the E&P Company begins a set of operations designed to acquire additional information regarding the presence, quantity, and location of hydrocarbons in the surrounding area.

26.     Such information can be acquired through a combination of mud analysis, coring, and wirelogging.  Mud analysis consists of geologists analyzing the returned mud cuttings to identify what type of rock has been drilled through.  However, mud analysis does not shed any light on the depth of each type of rock as cuttings do not necessarily rise to the surface in a uniform manner.  Coring involves bringing physical samples from the well to the surface for

analysis.  Although coring is a more accurate way to assess the formation being drilled through, it is also more expensive.

27.     Wirelogging involves lowering an electrode on the end of a long cable to the bottom of a well and continuously recording the voltage difference between the electrode and the surface while slowly pulling the electrode up to the surface.  This process capitalizes on the fact that reservoirs bearing water or hydrocarbon react differently to the drilling mud, producing different voltage responses as the wire-line log moves through the well.  Because wirelogging requires access to the well, no drilling may take place while wirelogging is ongoing.

28.     The only way to definitively determine whether oil or gas exists in economic quantities is a well test.  A well test involves setting up equipment so that reservoirs can flow oil and gas in a controlled manner.  Measurement of flow rates, properties of the fluids or gas produced, and fluid surface pressures will provide an E&P Company with definitive information about the permeability, content, and potential flow rate of a reservoir.

### 3.     Drilling Appraisal Wells.

29.     To get a more fulsome picture of the target area, E&P Companies often drill several appraisal wells following the completion of an exploration well, using the same techniques as described above.  The purpose of appraisal wells is to delineate the physical size of the reservoir and to gather as much additional information as possible.

### 4.     Developing the Field.

30.     Once an E&P Company has sufficient data to understand the field and determine locations of producing wells, it is time to begin producing oil and gas.  For onshore oil, the architecture of an oil field is relatively straightforward.  Development wells are drilled at specified locations based upon information gleaned from the exploration and appraisal wells.  Oil is gathered by a network of pipes into a central treatment plan where any associated gas or water

is removed.  The crude oil is then either piped or trucked to a refinery or export terminal.  The water or gas removed from the oil will either be reinjected into the field from which it came or be sent to the local gas market.

31.     In the case of onshore gas, gas is piped back to a central processing station, where any water, sulphur, or other impurities are removed.  If gas is destined for local market distribution, it is usually treated before being sent to the market.  If there is not a sufficient local market for the gas, the gas may be transmitted to a plant for treatment and potentially cooled for export as a liquid.

### 5.     Extending the Life of the Field.

32.     As oil and gas is produced from a reservoir, pressure within the reservoir may drop.  As pressure drops, flow rates also tend to drop.  Additionally, as pressure decreases, the amount of water produced from the targeted zones increases, increasing the volume of water required to be treated.  There are several techniques an E&P Company can employ to maintain higher flow rates after pressure begins to drop.  One such method is waterflooding, a technique first introduced by Forest Oil (as defined herein) in 1916.



33.    As shown above, waterflooding involves the injection of water into one or more wells, arranged in a pattern around the production well.  The injection of water in the area surrounding the well mimics the pressure created by the previously-extracted oil.  Increased pressure in the reservoir allows oil to continue flow to the surface at higher rates than would otherwise be possible absent the injection of water.

## II.    The Company's History, Operations, and Capital Structure.

### A.    The Debtors' Corporate History.

34.    The Company is the surviving business from the business combination (the "Combination") of Forest Oil Corporation ("Forest Oil") and Sabine Oil & Gas LLC ("Old Sabine") first announced in May 2014 and consummated in December 2014.  Forest Oil was founded in 1916 in Pennsylvania and was known for inventing the "waterflooding" technique described above to initiate secondary recovery of oil.  In contrast, Old Sabine was founded in 2007 and primarily has been focused on shale oil and gas since its inception.  Today, the

Company is focused on the acquisition, production, exploration, and development of onshore oil and natural gas with assets principally located in the Cotton Valley Sand and Haynesville Shale in East Texas, the Eagle Ford Shale in South Texas, the Granite Wash in the Texas Panhandle, and the North Louisiana Haynesville.

**B.      The Company's Business Operations.**

35.      The Company generates the majority of its revenue through sales of oil and natural gas.  The majority of the Company's oil and natural gas sales are made to midstream oil and natural gas companies throughout the U.S.

36.      As of December 31, 2014, the Company held interests in approximately 278,500 gross (219,200 net) acres in East Texas, 88,100 gross (58,700 net) acres in South Texas, and 51,400 gross (36,900 net) acres in North Texas.  The Company generally does not hold 100 percent of the interests in any piece of land in which it has interests.  Instead, the Company is one of several parties with an interest in the land.  The Company and the other interest holders usually enter into joint operating agreements to govern the parties' responsibilities with respect to the land, including which party (the "Operator") will be responsible for the exploration and production of oil and gas thereon.  As of December 31, 2014, the Company was the Operator for 88 percent, 99 percent, and 92 percent of its gross producing wells in East Texas, South Texas, and North Texas, respectively.

**1.      East Texas**

37.      The East Texas properties are characterized by several productive horizons, such as the Cotton Valley Sand, Haynesville Shale, Haynesville Lime, Pettet, Bossier Shale, Travis Peak, and other formations.  The Company's primary operational focus is directed at the Cotton Valley Sand and Haynesville Shale formations.  The East Texas properties primarily are located in Harrison, Panola, and Rusk Counties in Texas and Red River Parish in Northern Louisiana.

14

As of December 31, 2014, the East Texas properties were producing from 1,282 wells in East Texas, and the Company was the Operator for 1,125, or 88 percent, of those wells.

38.   In East Texas, as of December 31, 2014, the Company sells approximately 60 percent of its natural gas production under one-year contracts to a variety of midstream companies.   The remainder of its natural gas production is sold under short-term contracts or spot gas purchase contracts ranging anywhere from one month to one year terms at competitive market prices.   Approximately 85 percent of the Company's natural gas liquids, as of December 31, 2014, are sold under three to five year gathering and processing contracts to a variety of midstream companies with the remainder sold month-to-month.   The Company's East Texas crude oil production is sold to one purchaser under a month-to-month contract at competitive market prices.

### 2.   South Texas.

39.   The Company's South Texas properties are primarily prospective for the Eagle Ford Shale formation.  The Company's primary operations in South Texas are in the Sugarkane Area, the Shiner Area, and the Eagleville Area.  As of December 31, 2014, the Company's South Texas properties represented interests in approximately 88,100 gross (58,700 net) acres.  As of December 31, 2014, the Company's properties were producing from 186 wells in South Texas, and the Company was the Operator for 184, or 99 percent, of those wells.

40.   In South Texas, the Company sells a majority of its natural gas production under one-year contracts to multiple purchasers.   The majority of contracts are month to month beginning July 1, 2015, with 30-day notice of cancellation terms thereafter.  The Company's South Texas crude oil production is sold to various purchasers under contracts ranging from 30 to 90 days in duration.  The Company sells its Sugarkane natural gas liquids under a five-year

gathering and processing contract. The Company's North Shiner and South Shiner natural gas liquids are sold under five year contracts.

### 3. North Texas.

41.     The North Texas properties are located in the Anadarko Basin, with the Granite Wash as the target horizon. As of December 31, 2014, the Company held rights to develop approximately 51,400 gross (36,900 net) acres in North Texas, primarily in Roberts County. The North Texas acreage includes approximately 32,200 net acres that are subject to a continuous drilling clause that requires the Company to drill one gross well every 180 days to hold the entire approximately 32,200 net acre position. As of December 31, 2014, the Company's properties were producing from 49 wells in North Texas. The Company is the Operator for 92 percent of such wells.

42.     In North Texas, under the terms of a field acreage dedication agreement, the Company sells all of its natural gas and natural gas liquids production under a long-term contract to one midstream company. The Company's crude oil production is sold under a three-year contract that expires in 2016.

### 4. Other.

43.     As of December 31, 2014, the Company's position outside of its three core geographic areas included approximately 77,800 gross (35,300 net) acres primarily located in North Dakota, South Dakota, Mississippi, and Wyoming.

### C. The Company's Employees.

44.     The Company employs 165 employees, all of whom are employed on a full-time basis. Six of the Company's employees are paid on an hourly basis and 159 receive a salary. The Company's workforce also includes contractors who are employed either directly or through temporary staffing agencies. The Company's highly-skilled employees occupy a variety of

positions.  The employees' skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  None of the Company's workers are subject to a collective bargaining agreement.

###### D.     The Company's Working Capital.

45.     The Company's working capital balance fluctuates as a result of timing and amount of borrowings or repayments under its Credit Documents (as defined herein), changes in the fair value of its outstanding Hedges (as defined herein), the timing of receiving reimbursement of amounts paid by the Company for the benefit of joint venture partners, timing of accounts payable, as well as changes in revenue receivables as a result of price and volume fluctuations.  Historically, if the Company's capital investment levels exceed its estimate of cash flows from operations, the Company generally will use available capacity under its Credit Documents.

###### E.     Old Sabine's Pre-Combination Capital Structure.

###### 1.     The Revolving Credit Facility.

46.     Prior to the Combination, Old Sabine was a borrower under an Amended and Restated Credit Agreement, dated as of April 28, 2009, by and among a predecessor to Old Sabine, as borrower, Wells Fargo Bank, National Association, as successor administrative agent (the "RBL Agent"), the RBL Lenders, and other parties thereto (the "Revolving Credit Agreement").  The Revolving Credit Agreement provided Old Sabine with a revolving credit facility (the "Revolving Credit Facility") with an initial borrowing base of $225 million.  The Revolving Credit Facility originally was guaranteed by Old Sabine's direct and indirect subsidiaries (other than certain immaterial subsidiaries).  To secure the Revolving Credit Facility, Old Sabine and such subsidiaries granted a first priority lien on at least 80 percent of the

PV-9 of their proved reserves, certain personal property, and the capital stock of substantially all of their direct and indirect subsidiaries, among other things.

### 2.    The Second Lien Term Loan Agreement.

47.    On December 14, 2012, Old Sabine entered into a $500 million second lien term loan agreement, by and among a predecessor to Old Sabine, as borrower, Bank of America, N.A., as administrative agent (the "Second Lien Agent"), the Second Lien Lenders, and other parties thereto (the "Second Lien Term Loan Agreement").   On January 23, 2013, Old Sabine secured $150 million of funding from proceeds of an additional syndicated loan under the Second Lien Term Loan Agreement pursuant to the first amendment to the Second Lien Term Loan Agreement.

### 3.    The Intercreditor Agreement.

48.    Old Sabine and its subsidiaries, the RBL Agent, and the Second Lien Agent entered into an intercreditor agreement, dated as of December 14, 2012 (as amended from time to time and with all supplements and exhibits thereto, the "Intercreditor Agreement").   The Intercreditor Agreement governs certain of the respective rights and interests of lenders under the Revolving Credit Agreement and the Second Lien Term Loan Agreement relating to, among other things, their rights with respect to the exercise of remedies in connection with any Event of Default (as defined in the Intercreditor Agreement).   More specifically, the Intercreditor Agreement sets forth the rights and responsibilities of the parties thereto with respect to enforcement and turnover provisions in the event of a bankruptcy filing.

### 4.    The 2017 Notes.

49.    On February 12, 2010, Old Sabine, formerly NFR Energy LLC, and Sabine Oil & Gas Finance Corporation, formerly NFR Energy Finance Corporation, co-issued $200 million in 9.75 percent senior unsecured notes due 2017 (the "2017 Notes").   On April 14, 2010, Old

Sabine and Sabine Oil & Gas Finance Corporation issued an additional $150 million in 2017 Notes.  The 2017 Notes bear interest at a rate of 9.75 percent per annum, payable semi-annually on February 15 and August 15 each year commencing August 15, 2010.  The 2017 Notes were issued under and are governed by that certain indenture dated February 12, 2010, by and among Old Sabine, Sabine Oil & Gas Finance Corporation, The Bank of New York Mellon Trust Company, N.A., as trustee, and the guarantors party thereto (the "2017 Notes Indenture").

F.      **Forest Oil's Pre-Combination Capital Structure.**

1.      **First Lien Debt**

50.     Prior to the Combination, Forest Oil was the borrower under a revolving credit agreement (the "Forest Oil RBL") that was secured by a first priority lien on property of the Debtors, including at least 75 percent of Forest Oil's proved oil and gas reserves together with certain personal property.  Immediately prior to the Combination, there was approximately $105 million outstanding under the Forest Oil RBL.

2.      **The 2019 Notes.**

51.     On June 6, 2007, Forest Oil issued approximately $750 million in 7.25 percent senior unsecured notes due 2019 (the "2019 Notes").  Forest Oil issued an additional $250 million in principal in 2019 Notes on May 22, 2008.  Interest on the 2019 Notes is payable semi-annually on June 15 and December 15.  The 2019 Notes were issued under and are governed by an indenture dated June 6, 2007, by and among Sabine, formerly known as Forest Oil, and U.S. Bank National Association, as indenture trustee (the "2019 Notes Indenture").  Immediately prior to the Combination, there was approximately $577.9 million of 2019 Notes outstanding.

### 3.    The 2020 Notes.

52.    Forest Oil issued approximately $500 million in 7.5 percent senior unsecured notes due 2020 (the "2020 Notes") on September 17, 2012.  Interest on the 2020 Notes is payable semi-annually on March 15 and September 15.  The 2020 Notes were issued under and are governed by that certain indenture dated September 17, 2012, by and among Sabine, formerly known as Forest Oil, and U.S. Bank National Association, as indenture trustee (the "2020 Notes Indenture" and, together with the Revolving Credit Agreement, the Second Lien Term Loan Agreement, the Intercreditor Agreement, the 2017 Notes Indenture, and the 2019 Notes Indenture, the "Credit Documents").  Immediately prior to the Combination, there was approximately $222.1 million of 2020 Notes outstanding.

### G.    The Debtors' Prepetition Capital Structure.

53.    On December 16, 2014, Forest Oil and Old Sabine consummated the Combination, pursuant to which Old Sabine and certain of its affiliates were combined with and into Forest Oil.  As a result of the Combination, the Debtors now are borrowers or issuers under all of the Credit Documents.  As of May 31, 2015, the Debtors reported approximately $2.5 billion in total assets and approximately $2.9 billion in total liabilities.  As described in greater detail below, as of the Petition Date, the principal amount of the Debtors' consolidated funded debt obligations (the "Prepetition Debt Obligations") totaled approximately $2.77 billion and was comprised of:  (a) approximately $927 million of obligations under the Revolving Credit Facility;  (b) $700 million of obligations under the Second Lien Term Loan Facility; (c) $350 million of obligations under the 2017 Notes; (d) $578 million under the 2019 Notes; and (e) $222 million under the 2020 Notes.  As set forth on **Exhibit A**, approximately 73.5 percent of the economic interests and 49.9 percent of the voting interest in Sabine are held by Sabine

Investor Holdings LLC, with the remainder owned by public shareholders. The Prepetition Debt Obligations are described in greater detail herein.

54.    In connection with the Combination, the Debtors entered into a new amended and restated revolving credit agreement and amended certain of the Credit Documents. Sabine and its subsidiaries became the obligor under the 2019 Notes and 2020 Notes by operation of law and supplemental indentures, respectively.

### 1.    The Revolving Credit Facility.

55.    On December 16, 2014, the Debtors amended and restated the Revolving Credit Facility to (a) increase credit facility to $2 billion, with an initial borrowing base of $1 billion, up to $100 million of which is available as letters of credit, (b) jointly and severally guaranty the Debtors obligations thereunder and (c) secure the Debtors' obligations with (i) a lien on property of the Debtors, including at least 80 percent of the PV-9 of the borrowing base properties evaluated in the most recent reserve report and delivered to the administrative agent, and certain personal property and (ii) a pledge of all the capital stock of the Debtors' restricted subsidiaries, subject to certain customary grace periods and exceptions (collectively, the "Collateral"). Immediately prior to the automatic acceleration of the Revolving Credit Facility on the Petition Date, the maturity date with respect to the Revolving Credit Facility was April 7, 2016.

56.    The Revolving Credit Facility borrowing base is subject to redeterminations by the RBL Lenders at least semi-annually, each April 1 and October 1, beginning April 1, 2015. The borrowing base under the Revolving Credit Facility can increase or decrease in connection with a redetermination, with increases being subject to the approval of all RBL Lenders and decreases (and redeterminations maintaining the borrowing base) being subject to the approval of two-thirds of the RBL Lenders, as measured by credit exposure. A reduction of the borrowing base requires the Debtors to repay outstanding loans under the Revolving Credit Facility in

excess of the new borrowing base in one payment or six equal monthly installments, and/or provide additional mortgages over oil and gas properties to support a larger borrowing base, at the Debtors' option.

57.     On December 16, 2014, the Debtors increased their borrowings to $750.8 million under the Revolving Credit Facility, which primarily was used to, among other things, refinance borrowings under the prior revolving credit agreements of Forest Oil and Old Sabine and to fund costs and expenses incurred in connection with the Combination.  On December 18, 2014, the Debtors repaid approximately $205.8 million of the outstanding borrowing under the Revolving Credit Facility.  Since that time, the Debtors have drawn an additional $426 million under the Revolving Credit Facility, including $356 million on February 25, 2015.  On July 3, 2015, a beneficiary to a letter of credit outstanding under the Revolving Facility drew down on approximately $0.9 million.

58.     On April 27, 2015, the borrowing base was redetermined down to $750 million from $1 billion.  Pursuant to the terms of the Revolving Credit Agreement, repayment of the approximately $250 million deficiency was set to begin on May 27, 2015.  However, pursuant to the forbearance agreement between the Debtors, the RBL Agent, and the RBL Lenders, the RBL Agent and RBL Lenders agreed to forbear from exercising remedies on account of any such missed payments that were due on May 27, 2015 or June 29, 2015.  As of the Petition Date, approximately $927 million of the Revolving Credit Facility is outstanding.  Approximately $26 million of the Revolving Credit Facility is outstanding in the form of letters of credit.

### 2.     The Second Lien Term Loan Facility.

59.     Also in connection with the consummation of the Combination, on December 16, 2014, Old Sabine entered into a second amendment to the Second Lien Term Loan Agreement to provide for $50 million of incremental new term loans, which agreement as amended was then

assumed by the Debtors.  The Second Lien Term Loan Agreement is guaranteed by the Debtors and secured by second priority liens on the Collateral.  On April 21, 2015, the Debtors elected not to make the $15.3 million interest payment due under the Second Lien Term Loan.

### 3.    The Notes.

60.    Following the Combination, all of the Debtors, with the exception of Sabine, are guarantors of the 2017 Notes, the 2019 Notes, and the 2020 Notes.  Wilmington Savings Fund Society, FSB has succeeded U.S. Bank National Association as indenture trustee for the 2019 Notes and Delaware Trust Company has succeeded U.S. Bank National Association, as indenture trustee as indenture trustee for the 2020 Notes.  On June 15, 2015, the Debtors elected not to make the $20.95 million interest payment on the 2019 Notes.

### 4.    Equity Interests.

61.    On December 16, 2014, in connection with the Combination, certain indirect equity holders of Old Sabine contributed their equity interests to Sabine in exchange for approximately 2.5 million Series A Preferred Shares (the "Series A Preferred Shares") and approximately 79.2 million shares of Sabine common stock (the "Common Shares"), collectively representing an approximately 73.5 percent economic interest in Sabine and 40 percent of the total voting power.  The Series A Preferred Shares are convertible and non-voting.  As of the Petition Date, approximately 2.5 million Series A Preferred Shares are issued and outstanding of the 10 million authorized shares.

62.    Holders of Forest Oil common stock immediately prior to the closing of the Combination continued to hold their common stock following the closing of the Combination, representing an approximately 26.5 percent economic interest in the Company and 60 percent of the total voting power in Sabine.  Holders of Forest Oil common stock hold 118.9 million

Common Shares as of the Petition Date.  As of the Petition Date, approximately 213.9 million Common Shares were issues and outstanding of the 650 million authorized shares.

### 5.    The Debtors' Other Obligations.

#### i.    Hedging Arrangements.

63.    To provide partial protection against declines in oil and natural gas prices, the Debtors routinely enter into hedging arrangements ("Hedges") with certain counterparties (the "Hedge Counterparties").  The Debtors' decision on the quantity and price at which they choose to hedge their production is based upon their view of existing and forecasted production volumes, budgeted drilling projections, and current and future market conditions.  Hedges typically take the form of oil and natural gas price collars and swap agreements.

64.    The majority of the Hedge Counterparties are, or prior to the Combination were, parties to the Revolving Credit Agreement.  Pursuant to the Revolving Credit Agreement, the Debtors may hedge up to 100 percent of current production for 24 months, 75 percent of current production for months 25 through 36, and 50 percent of current production for months 37 through 60.

#### ii.    Other Secured Claims.

65.    In the ordinary course of business, the Debtors routinely transact business with a number of third-party contractors and vendors who may be able to assert liens against the Debtors and their property (such as equipment and, in certain circumstances, mineral interests) if the Debtors fail to pay for the goods delivered or services rendered.  These parties perform various services for the Debtors, including manufacturing and repairing equipment and component parts necessary for the Debtors' oil field activities, contracting, drilling, hauling, and supplying oil and gas related services, as well as shipping the Debtors' products.

III.    **The Debtor's Reorganization Efforts.**

66.    As described above, as of June 30, 2015, the Debtors have outstanding Prepetition Debt Obligations of approximately $2.77 billion.  During 2014 and continuing through the first quarter of 2015, the Debtors' revenues fell sharply as a result of the significant downturn in oil and natural gas prices, which were caused in part by a surplus of domestic crude production coupled with OPEC's decision not to reduce production quotas.  Notwithstanding certain anticipated long-term cost savings and operational synergies resulting from the Combination, the significant decline in revenue paired with a decreased borrowing base and increased debt capital structure, including two additional notes issuances, resulting from the Combination strained the Debtors' liquidity and their ability to meet their anticipated working capital, debt service, and other liquidity needs.

67.    The Debtors' current management has taken a series of operational and financial measures in an attempt to respond to these challenging market conditions.  These include certain asset divestitures, reduction in capital expenditures associated with drilling and completion costs for new wells, salary freezes, and reductions in force.  Nevertheless, given the severity of the current market conditions and their impact on the Company's cash flow situation, the Company has been unable to right-size its balance sheet through cost-cutting and self-help measures alone.

A.    **Qualified Opinion.**

68.    The Debtors announced the presence of a "going concern" qualification in their 2014 audited annual financial statements.  Additionally, the Debtors provided requisite notice of such opinion to the RBL Agent and the Second Lien Agent.  On May 4, 2015, the Debtors, the RBL Agent, and the RBL Lenders entered into a forbearance agreement (the "First Lien Forbearance Agreement"), pursuant to which the RBL Agent and the RBL Lenders agreed to forbear from exercising remedies until the earlier of (a) certain events of default under the

forbearance agreement or Revolving Credit Agreement, (b) the acceleration or exercise of remedies by any other lender or creditor, and (c) June 30, 2015 (collectively, the "Forbearance Period").  On May 20, 2015, the Debtors, the Second Lien Agent, and the Second Lien Lenders entered into a forbearance agreement (the "Second Lien Forbearance Agreement"), pursuant to which the Second Lien Agent and Second Lien Lenders agreed to forbear from exercising during the Forbearance Period.  On June 30, 2015, the Debtors, the RBL Agent, and the RBL Lenders entered into the first amendment to the First Lien Forbearance Agreement, pursuant to which the RBL Agent and RBL Lenders agreed to extend the Forbearance Period to July 15, 2015.  Additionally, on July 8, 2015, the Debtors, the Second Lien Agent, and the Second Lien Lenders entered into the first amendment to the Second Lien Forbearance Agreement, pursuant to which the Second Lien Agent and Second Lien Lenders agreed to extend the Forbearance Period to July 15, 2015.

**B.      The Pending Bondholder Litigation.**

69.      On February 26, 2015, the Company was served with a complaint (the "Complaint") concerning the 2019 Notes Indenture.  The Complaint generally alleges that certain events of default had occurred with respect to the 2019 Notes due to the Combination. More specifically, the Complaint alleges that the Combination constituted a change of control under the 2019 Notes Indenture that  required the Company to offer to purchase the 2019 Notes at 101 percent of the outstanding principal, plus accrued and outstanding interest.   The Complaint also alleges claims for breach of contract, breach of implied covenant of good faith and fair dealing, and indemnification.   The Company also received a notice of default and acceleration from the 2019 Notes trustee with respect to the 2019 Notes containing similar allegations.

### C.       Potential Claims Investigation.

70.      In May 2015, the Board of Directors of Sabine established an independent

committee (the "<u>Investigation Committee</u>") to conduct and oversee the investigation of potential

legal claims and causes of action that the Debtors and/or certain of their stakeholders may

possess against creditors and equity holders related to or arising from the Combination.   The

Investigation Committee, with the assistance of its advisors, conducted an investigation into

potential fraudulent transfer claims.   In connection with the investigation, the Investigation

Committee, with the assistance of its advisors, reviewed over 100,000 documents.   The Debtors

reviewed and analyzed all of these materials and used them to develop and evaluate potential

claims.   Additionally, the Investigation Committee conducted interviews with approximately 11

individuals.   The Investigation Committee, with the assistance of its advisors, is continuing to

investigate certain potential claims that belong to the Debtors, including other fraudulent-transfer

theories and fiduciary-breach claims, that creditor groups have threatened to pursue themselves.

### D.       Creditor Negotiations and Chapter 11 Filing.

71.      Prior to the Petition Date, the Debtors engaged in discussions with various

creditor constituencies.   In connection with such discussions, the Debtors entered into the First

Lien Forbearance Agreement, the Second Lien Forbearance Agreement, and amendments

thereto.   Additionally, the Debtors engaged in discussions with advisors for various creditor

constituencies regarding parties' views with respect to valuation, debt capacity, potential pro

forma capital structures, and the effect of potential litigation claims on potential creditor

recoveries.

72.      While productive, such discussions did not lead to a comprehensive out-of-court

solution or prearranged chapter 11 plan for right-sizing the Debtors' balance sheet.   In light of

the Debtors' need for a comprehensive deleveraging and resolution of currently pending

litigation and potential claims, the Debtors determined to commence these chapter 11 cases. The Debtors hope and expect that these discussions will continue and will provide the framework for an efficient and effective consensual restructuring.

## IV.   Relief Sought in the Debtors' First Day Motions

73.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions[3] in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet. I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

### A.     Administrative and Procedural Pleadings.

#### 1.     Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("Joint Administration Motion").

74.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity. For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of the these chapter 11 cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of 10 independent chapter 11 cases.

75.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

> **2.     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors and (II) Approving the Form and Manner of Notifying Creditors of Commencement of these Chapter 11 Cases ("<u>Creditor Matrix Motion</u>").**

76.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor.  The Debtors propose to retain Prime Clerk LLC as notice and claims agent to assist the Debtors in preparing creditor lists and mailing initial notices in these chapter 11 cases.  With such assistance, the Debtors can file a computer-readable, consolidated list of creditors upon request and will be capable of undertaking all necessary mailings.  Indeed, because the Debtors have thousands of creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

77.   I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit Prime Clerk LLC to promptly notice those parties.   Maintaining electronic-format lists of creditors rather than preparing and filing separate matrices will maximize efficiency and accuracy and reduce costs.   Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Creditor Matrix Motion should be granted.

     **3.**      **Debtors' Motion for the Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures ("<u>Case Management Motion</u>").**

78.   I expect there will be numerous parties in interest in these chapter 11 cases and anticipate that a significant number of parties will file requests for service of filings.   I also expect that numerous motions and applications will be filed in these chapter 11 cases.   The costs and burdens that might arise absent adoption of the proposed procedures—such as, for example, those associated with multiple hearings per month, plus the costs associated with copying, mailing, delivering, or otherwise serving paper copies of all such documents—could impose significant economic and administrative burdens on our estates and the Court.

79.   Given the size and scope of the chapter 11 cases, I believe that the proposed Case Management Procedures will facilitate service of Court Papers in a manner that will be less burdensome and costly than serving such pleadings on every potentially interested party, which, in turn, will maximize the efficiency and orderly administration of these chapter 11 cases.

80.   I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be approved.

4.     **Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs ("Schedules Extension Motion").**

81.     The Debtors request an additional 30 days to file their Schedules and Statements, without prejudice to the Debtors' ability to request additional time, should it become necessary. The requested extension would give the Debtors a total of 44 days from the Petition Date to file their Schedules and Statements.

82.     To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, and contracts from each Debtor entity.   Accordingly, collecting the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees, and the Debtors anticipate that they will be unable to complete their Schedules and Statements in the 14 days provided under Bankruptcy Rule 1007(c).   Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the required information to prepare the Schedules and Statements.   This task is further complicated by the fact that the Debtors must continue to operate while responding to the demands of these bankruptcy cases.

83.     I believe that the relief requested in the Schedules Extension Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules Extension Motion should be approved.

     **5.**     **Debtors' Application for Entry of an Order Authorizing and Approving Employment and Retention of Prime Clerk LLC as Claims and Noticing Agent for the Debtors and Debtors in Possession ("<u>Notice and Claims Agent Application</u>").**

84.     Pursuant to the Notice and Claims Agent Application, the Debtors are seeking authority to retain Prime Clerk as their Claims and Noticing Agent. The Debtors have evaluated several potential candidates to serve as their Claims and Noticing Agent. Following that review, and in consideration of the number of anticipated claimants and parties in interest, the nature of the Debtors' business, and the scope of tasks for which the Debtors will require the assistance of a Claims and Noticing Agent, I submit that the appointment of Prime Clerk as Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates.

85.     Based on Prime Clerk's experience in providing similar services in large chapter 11 cases, I believe that Prime Clerk is eminently qualified to serve as Claims and Noticing Agent in these chapter 11 cases. A detailed description of the services that Prime Clerk has agreed to render and the compensation and other terms of the engagement are provided in the Notice and Claims Agent Application. I have reviewed the terms of the engagement and believe that the Debtors' estates, creditors, parties in interest, and the Court will benefit as a result of Prime Clerk's experience and cost-effective methods.

86.     I believe that the relief requested in the Notice and Claims Agent Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Notice and Claims Agent Application should be approved.

6.    **Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business ("OCP Motion").**

87.    Pursuant to the OCP Motion, the Debtors request that the Court enter an order authorizing the Debtors to continue to retain and compensate the OCPs on a postpetition basis in accordance with the OCP Procedures, without the need for each OCP to file formal applications for retention and compensation, and granting related relief.

88.    The Debtors retain various attorneys in the ordinary course of their businesses. The OCPs render a wide range of services to the Debtors in a variety of matters unrelated to these chapter 11 cases, including litigation, regulatory, labor and employment, intellectual property, general corporate, and franchise matters, as well as other services for the Debtors in relation to issues that have a direct and significant impact on the Debtors' day-to-day operations.

89.    Due to the number of OCPs that are regularly retained by the Debtors, I believe it would be unwieldy and burdensome to both the Debtors and the Court to request each such OCP to apply separately for approval of its employment and compensation.  While I believe that some OCPs may wish to continue to represent the Debtors on an ongoing basis, others may be unwilling to do so if the Debtors cannot pay them on a regular basis.  Without the background knowledge, expertise, and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations.  Moreover, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business.

90.    The Debtors have prepared, and submit to the Court for approval, the OCP Procedures which are included in the OCP Motion.  I believe that the continued retention and

payment of the OCPs in accordance with the OCP Procedures, will allow the Debtors to continue to utilize and benefit from the OCPs' services. I believe that the continued retention and compensation of the OCPs is in the best interests of the Debtors' estates, creditors, and other parties in interest, and that the OCP Motion should be granted.

> **B.    Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 361, 362, 363, and 507, Bankruptcy Rule 4001, and Local Bankruptcy Rule 4001-(2) (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing ("<u>Cash Collateral Motion</u>")**

91.    I believe that the Debtors have an immediate need to use Cash Collateral and the Disputed Cash (which, as defined in the Interim Order, is certain cash held by the Debtors that may constitute Cash Collateral), without which the Debtors cannot maintain the value of their estates during these chapter 11 cases. The Debtors require access to their cash to procure goods and services from vendors, pay their employees and satisfy other working capital needs. Such access is critical to the Debtors' ability to operate their businesses as going concerns and to finance the costs of administering these chapter 11 cases. As a result, I believe that immediate and irreparable harm to the Debtors and their estates will occur absent access to Cash Collateral and the Disputed Cash. Therefore, I believe that the Debtors' ability to finance their operations at this critical time through the use of Cash Collateral and the Disputed Cash is vital to preserving Debtors' estates and avoiding the devastating consequences that any disruption to their businesses would have.

92.    In light of the Debtors' need to access liquidity during a chapter 11 restructuring, the Debtors entered into discussions with the RBL Agent. Following extensive good-faith, arm's-length prepetition discussions during which the parties engaged in multiple telephonic and in-person meetings and exchanged multiple drafts of the Interim Order and related materials, the

Debtors and the RBL Agent reached an agreement that provides the Debtors with consensual use of Cash Collateral and the Disputed Cash. This agreement, which is memorialized in the Interim Order, provides the Debtors with the liquidity necessary to continue operations and fund these chapter 11 cases in the near term.

93.     The Debtors' agreement with the RBL Agent regarding Cash Collateral and the Disputed Cash is subject to certain conditions, including that the Debtors: (a) provide adequate protection to the Prepetition Secured Parties and make disbursements pursuant to the Budget attached thereto, subject to any permitted variances as set forth therein and (b) establish certain procedures to segregate and trace Cash Collateral and the Disputed Cash. However, the Debtors recognize that certain issues require further investigation, including issues related to the Disputed Cash and the scope of the Prepetition Secured Parties' liens. Accordingly, the Interim Order reserves the Debtors' rights, claims, and defenses with respect to such matters. Further, the Interim Order does not prejudice the rights of the unsecured creditors with respect to any stipulations that the Debtors have made. I believe that using the Disputed Cash to pay certain expenses, as set form in paragraphs 11 and 13 of the Cash Collateral Order, and using the non-Disputed Cash held in the Debtors' main operating account (the "Segregated Cash Collateral") for Capital Expenditures and Lease Operating Expenses related to the Prepetition Collateral, combined with the aforementioned reservations of rights, strikes a fair compromise and is in the best interests of the Debtors, their estates, and their creditors.

94.     The Debtors propose to provide the Prepetition Secured Parties with adequate protection under the Interim Order. More specifically, the Debtors have agreed to make disbursements in accordance with the Budget. This will provide parties in interest with clarity

around the Debtors' proposed uses of Cash Collateral and the Disputed Cash pending the Final

Hearing.

95.    The Debtors also propose to provide the First Lien Secured Parties with the

following adequate protection package.

- ***First***, the Debtors will provide adequate protection liens to the First Lien Secured Parties to the extent of any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, subject to the Carve Out.

- ***Second***, the Debtors will grant the First Lien Secured Parties allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code, which superpriority claims shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, subject to the Carve Out.

- ***Third***, the Debtors shall make adequate protection payments in an amount equal to all accrued and unpaid prepetition or postpetition interest, fees and costs due and payable under the First Lien Credit Agreement on the last business day of each calendar month after the entry of the Interim Order based on the Alternate Base Rate (as defined in the First Lien Credit Agreement) plus 1.50 percent, which is the Applicable Margin under the First Lien Credit Agreement.

- ***Fourth***, the Debtors will pay the reasonable and documented fees and expenses incurred by the RBL Agent, including the reasonable professional fees, expenses, and disbursements (of counsel and other third-party consultants) incurred by the RBL Agent under the Revolving Credit Agreement.

- ***Fifth***, the Debtors will continue to comply with the financial reporting requirements set forth in the Revolving Credit Agreement and will provide certain additional financial reporting, as further described in the Interim Order.

- ***Sixth***, the Debtors will comply with the Budget, subject to certain variances set forth in the Interim Order.

- ***Seventh***, the Debtors have agreed to provide the RBL Agent with consent rights over certain sales, property exchanges, and other dispositions (including casualty and condemnation events) of Collateral and to deposit net cash proceeds of any such Collateral Sale into a segregated account.

- ***Eighth***, the Debtors will comply with additional covenants regarding the operation of their postpetition cash management system.

- ***Ninth***, the Debtors have agreed to use the cash proceeds from certain swap termination or unwinding events to permanently reduce the First Lien Indebtedness.

96.     The Debtors also propose to provide the Second Lien Secured Parties with the following adequate protection package.

- ***First***, the Debtors will provide adequate protection liens to the Second Lien Secured Parties to the extent of any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, subject to the Carve Out and the adequate protection liens granted to the First Lien Secured Parties.

- ***Second***, the Debtors will grant the Second Lien Secured Parties allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code, which superpriority claims shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, subject to the Carve Out and the First Lien Secured Parties' allowed superpriority administrative claims.

- ***Third***, the Debtors will simultaneously provide the Second Lien Agent with the financial materials provided to the RBL Agent as part of the RBL Agent's adequate protection package.

- ***Fourth***, the Debtors will pay the reasonable and documented fees and expenses incurred by the Second Lien Agent, including the reasonable professional fees, expenses, and disbursements (of counsel and other third-party consultants) incurred by the Second Lien Agent under the Second Lien Credit Agreement.

97.     I understand that courts in this and other jurisdictions have approved similar adequate protection packages in other, recent chapter 11 cases.  Accordingly, I believe that the Debtors' agreed-upon adequate protection package is fair and appropriate on an interim basis under the circumstances of these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

**C.**     **Operational Motions Requesting Immediate Relief.**

**1.**     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms, (C) Continue Intercompany Transactions, and (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Payments ("Cash Management Motion").**

98.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order (a) authorizing the Debtors to continue (i) using the Cash Management System, including the continued maintenance of existing bank accounts at the existing banks consistent with prepetition practices, (ii) honoring certain prepetition obligations related to the Cash Management System, and (iii) maintaining existing business forms (without reference to the Debtors' status as debtors in possession), (b) waiving the requirements of section 345(b) of the Bankruptcy Code, and (c) granting related relief.

99.     I believe that the Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.   The Debtors use the Cash Management System in the ordinary course of their businesses to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.   The Debtors' finance department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.

100.     The Debtors' Cash Management System is comprised of a total of 11 Bank Accounts.   However, following the Combination, the Debtors' primary Bank Accounts include: the Master Account, the Payable Account, the Royalty and Working Interest Payment Account, the Payroll Account, the Mid-Continent Gathering Operating Account, the Cash Collateral Account, and the Adequate Assurance Account.   The Operational Accounts are currently

maintained with BBVA and Wells Fargo. Prior to the Combination, Old Sabine held bank accounts at BBVA and Forest Oil held bank accounts at JPMorgan, US Bank, and Bank of America. The Debtors presently are in the process of closing these Bank Accounts in an orderly and prudent manner.

101.    The Debtors incur periodic Bank Fees, which average approximately $55,000 per month on a gross basis and $8,000 per month on a net basis. The Bank Fees for each month are paid in arrears on the 15th day of the following month and are automatically deducted from the Debtors' Bank Accounts as they are assessed by their respective Banks.

102.    In the ordinary course of their businesses, the Debtors use a variety of preprinted Business Forms. The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information. To avoid a significant disruption to their business operations that would result from a disruption of the Cash Management System and to avoid unnecessary expense, I believe the Court should authorize the Debtors to continue to use their Business Forms and Books and Records in use immediately before the Petition Date, subject to the Debtors' best reasonable efforts to incorporate a reference to their status as debtors in possession on checks issued subsequent to the Petition Date, rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms and creating new Books and Records.

103.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

2. **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (II) Continue Employee Benefits Programs ("Wages Motion").**

104.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses; and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

105.    As of the Petition Date, the Debtors employ 165 individuals on a full-time basis. Six Employees are paid on an hourly basis and 159 are paid on an annual salaried basis. In addition, the Debtors from time to time rely on specialized Contractors to complete discrete projects in furtherance of the Debtors' businesses.

106.    The Employees and Contractors perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Employees and Contractors include highly trained personnel who cannot be easily replaced. Without the continued, uninterrupted services of the Employees and Contractors, I believe that an effective reorganization of the Debtors will be materially impaired.

107.    At the same time, the vast majority of Employees and Contractors rely exclusively on their compensation and benefits to pay their daily living expenses and support their families, and will be exposed to significant financial constraints if the Debtors are not permitted to continue paying wages and salaries, provide employee benefits, and maintain certain programs benefiting the Employees.

108.     The Debtors seek to minimize the personal hardship the Employees and Contractors would suffer if prepetition Employee- and/or Contractor-related obligations are not paid or remitted when due or as expected.  By the Wages Motion, the Debtors are seeking authority to pay and honor certain prepetition claims and/or continue to honor obligations on a postpetition basis, as applicable, relating to, among other things, wages, salaries, contractor fees, staffing agency fees, payroll processing, reimbursable expenses, corporate credit cards, non-employee director compensation, counteroffer and sign-on payments, the combination payment program, the employee equity programs, severance payments, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), health insurance benefits, health savings accounts, government health care expenses, standard life and AD&D insurance, voluntary life insurance, voluntary AD&D insurance, short- and long-term disability benefits, the workers' compensation program, the 401(k) plan, the employee assistance program, retiree health and welfare benefits, the health club program, the tuition reimbursement program, relocation benefits, other miscellaneous employee benefits, and paid time off benefits including, but not limited to vacation time, sick leave, and parental leave, and other benefits that the Debtors have historically directly or indirectly provided to the Employees and/or Contractors in the ordinary course of business and as further described in the Wages Motion.  In addition, the Debtors seek authority to pay all costs incident to the Employee Compensation and Benefits.

109.     More specifically, with respect to Director Compensation, Sabine's board of directors includes seven non-Employee Directors, each of whom is compensated between approximately $175,000 and $245,000 on an annual basis.  These Directors provide critical services to the Debtors and ensure that the Debtors are able to make disinterested decisions

regarding the best courses of action or inaction to maximize value for the Debtors' estates.  The

Director Compensation is in line with market compensation of disinterested directors at other

companies of similar size and complexity to the Debtors.

110.    I believe that paying prepetition amounts owed on account of the Employee

Compensation and Benefits will benefit the Debtors' estates and their stakeholders by allowing

the Debtors' business operations to continue without interruption.  Indeed, I believe that without

the requested relief, the Employees and Contractors may seek alternative opportunities, perhaps

with the Debtors' competitors.   Such a development would deplete the Debtors' workforce,

hindering the Debtors' ability to successfully reorganize.  The loss of valuable Employees and

Contractors and the resulting need to recruit new personnel to replenish the Debtors' workforce

would be distracting and counterproductive at this critical time in chapter 11.   Further, if the

Debtors lose valuable Employees and Contractors, they will incur recruiting expenses in locating

replacements.  Accordingly, there can be no doubt that the Debtors must do their utmost to retain

their workforce by, among other things, continuing to honor the Employee Compensation and

Benefits that accrued prepetition.  Based on the foregoing, I respectfully submit that the Wages

Motion should be approved.

      **3.**      **Debtors' Motion for Entry of Interim and Final Orders Authorizing
Payment of (I) Working Interest Disbursements and (II) Royalty
Payments in the Ordinary Course of Business ("<u>Royalty and Working
Interest Motion</u>").**

111.    Pursuant to the Royalty and Working Interest Motion, the Debtors seek entry of

interim and final orders authorizing the Debtors to pay in the ordinary course of business,

(i) Working Interest Disbursements and (ii) any and all amounts owed to Royalty Interest

Holders on account of their Royalty Interests.  For the reasons set forth below, I believe that the

relief requested in the Royalty and Working Interest Motion is in the best interests of the

Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Royalty and Working Interest Motion should be approved.

112.    The Debtors hold Working Interests in various Oil and Gas Leases in Louisiana, Michigan, North Dakota, Texas, and Wyoming.  On average in 2014, the Debtors generated approximately $58 million of revenue from their Oil and Gas Leases in the U.S. each month.

113.    The Debtors are the Operators for a number of their Oil and Gas Leases, many under Joint Operating Agreements with other parties.  I understand that, as an Operator, the Debtors are responsible for making Working Interest Disbursements.  In the twelve months preceding the Petition Date, the Debtors remitted approximately $194.2 million in Working Interest Disbursements.  I understand that failure to timely pay the Working Interest Disbursements could expose the Debtors to statutory enforcement mechanisms, and that holders of Non-Operating Working Interests often have contractual remedies under the applicable Joint Operating Agreement, including the grant of a security interest in production, the right to remove the Debtors as Operator, and the right to interest on the amount owed.  And, the Working Interest Disbursements held by the Debtors prior to remittance to the appropriate Working Interest holders may not be property of the Debtors' estates.  I understand that as of the Petition Date, the Debtors estimate that they have approximately $23.5 million of Working Interest Disbursements outstanding,[4] including approximately $10.5 million in such disbursements due in the next three weeks.

---

[4]    Included in this amount is approximately $900,000 of Working Interest Disbursements that the Debtors may have mistakenly withheld from certain Non-Operating Working Interest holders due to discrepancies in the amount of Operating Expenses attributable to the applicable Oil and Gas Leases.  In the ordinary course, if the Debtors determine that they have overbilled a particular Non-Operating Working Interest holder for such

114.    It is my understanding that each Oil and Gas Lease in which the Debtors hold Working Interests is subject to Royalty Interests.  It is my understanding that in the states in which the Debtors have Working Interests, Royalty Interests are interests in real property and the Debtors have no equitable interest in such property.   Similar to their Working Interest Disbursements, the Debtors only take possession of the proceeds from the Royalty Interest Holders' share of oil and gas production because they market and sell the oil and gas production on behalf of the Royalty Interest Holders prior to remitting the Royalty Payments to them.  I have been informed that such an arrangement establishes a resulting trust on behalf of the Royalty Interests and that property held on account of another (such as in a resulting trust) is not property of the Debtors' estates and must be remitted to the rightful owner.

115.    In general, the Debtors make approximately 7,000 Royalty Payments per month to the Royalty Interests Holders.   Though the Royalty Payments are subject to variation in any given month based on actual production, the Debtors generally pay approximately $21.8 million in Royalty Payments per month, mostly from their operations in Texas and Louisiana.[5]  As part of their Royalty Payments, the Debtors pay approximately $9,000 per month to Trinity Petroleum Management, Inc. to administer Royalty Payments made to certain of the Debtors' former employees.  The Debtors estimate that, as of the Petition Date, there is approximately

---

holder's share of Operating Expenses (and thus have not remitted such holder's full Working Interest Disbursement), the Debtors remit the remaining Working Interest Disbursement owed to such holder.  Also included in this amount is approximately $2.25 million of Suspended Funds.

[5]    Specifically, in the last four months, the Debtors made total Royalty Payments based on their U.S. production of approximately:  $15.7 million February, $10.1 million in March, $9.3 million in April, and $18.2 million in May.

$56.5 million in as-yet unpaid Royalty Payments,[6] including approximately $18.5 million in such payments due in the next three weeks.

116.    I believe that failure to pay the Obligations could materially jeopardize the Debtors' production ability and reliability.    Failing to pay the Obligations would have a devastating impact on the Debtors' operations and would undoubtedly force the Debtors to spend significant time and resources resolving disputes with the very parties on whom they depend.    If the relationships established by the Debtors with the parties that are owed these payments are harmed, whether through non-payment or perceived difficulties of working with a chapter 11 debtor, the Debtors may be unable to secure future opportunities with those parties and other third-parties may be unwilling to engage in new business with the Debtors going forward. If that were to occur, the negative impact on the Debtors' business, estates, and creditors would be substantial.    Based on the foregoing, I believe that the relief requested in the Royalty and Working Interests Motion is in the best interest of the Debtors, their estates, their creditors, and all parties in interest.

> **4.    Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of (I) Operating Expenses, (II) Joint Interest Billings, (III) Shipper and Warehousemen Claims, and (IV) Section 503(b)(9) Claims ("<u>Lienholder Motion</u>").**

117.    Pursuant to the Lienholder Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to pay in the ordinary course of business, (i) Operating Expenses,

---

[6]    Included in this amount is approximately $29 million of Suspended Funds.    The Suspended Funds represent amounts that are due and owing to certain Royalty Interest Holders and Working Interest Holders but are otherwise unpayable for a variety of reasons, including ongoing disputes over ownership of the underlying interest, incorrect contact information, and the delay that accompanies entering newly drilled wells into the Debtors' accounting system. Additionally, the Debtors do not make Royalty Payments until more than $50 of Royalty Payments have accrued.    When and to the extent the issue preventing payment of the Suspended Funds to a particular interest holder is resolved, the Debtors release the Suspended Funds in question.    The Debtors estimate that approximately $20 million of the outstanding Suspended Funds will be paid out over the next 12–18 months.

(ii) Joint Interest Billings, (iii) the Shipper and Warehousemen Claims, and (iv) the 503(b)(9) Claims.  For the reasons set forth below, I believe that the relief requested in the Lienholder Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the ordinary course without disruption.

118.    If the Mineral Contractors, Shippers, Warehousemen, or 503(b)(9) Claimants are unwilling to provide the Debtors with materials and services postpetition because of their outstanding prepetition claims, the Debtors' operations would suffer, compromising the value of the Debtors' estates to the detriment of all parties in interest.  A lack of drilling materials, vital transportation services, and access to a limited universe of specialized service providers would grind the Debtors' exploration and production activities to a halt.  Additionally, failing to pay the Joint Interest Billings would have a devastating impact on the Debtors' operations and would undoubtedly force the Debtors to spend significant time and resources resolving disputes with the very parties upon whom they depend.  If the long-standing relationships established by the Debtors with the parties that are owed these payments are harmed, whether through non-payment or perceived difficulties of working with a chapter 11 debtor, the Debtors may be unable to secure future opportunities with those parties and other third-parties may be unwilling to engage in new business with the Debtors going forward.  If that were to occur, the negative impact on the Debtors' business, their estates and creditors would be substantial, making prospects for reorganization more elusive.  Accordingly, on behalf of the Debtors, I respectfully submit that the Lienholder Motion should be approved.

119.    Where the Debtors serve as an Operator, the Debtors are responsible for making Operating Expense payments.  Additionally, where the Debtors hold Non-Operating Working

Interests, they are responsible for paying the Operators for the Joint Interest Billings in accordance with their Joint Operating Agreements.

120.    The Debtors typically pay Operating Expenses within 30–45 days of receipt of an invoice from the Mineral Contractors.  In turn, 15 days after the end of each calendar month, the Debtors generate a Joint Interest Billing invoice for each holder of a Non-Operating Working Interest.  Non-Operating Working Interest holders typically remit payment to the Debtors within 15 days following the receipt of their Joint Interest Billings.  The operating cycle from service date through Non-Operating Working Interest holder payment will average as much as 90 days. In the twelve months preceding the Petition Date, the Debtors paid Mineral Contractors approximately $905 million in Operating Expenses.  Non-Operating Working Interest holders reimbursed the Debtors for approximately $190 million on account of Joint Interest Billings.

121.    I understand that failure to timely pay the Operating Expenses may provide grounds for removal of the Debtors as Operator under the Joint Operating Agreement and may result in perfection by Mineral Contractors of liens on the Debtors' Working Interests and proceeds of the Oil and Gas Lease.

122.    I believe that the Debtors conducted a thorough review of the goods and services provided by their Mineral Contractors to determine which Mineral Contractors likely would be able to assert liens under state law.  The Debtors are seeking relief only to pay the Operating Expenses owed to Mineral Contractors who likely can seek remedies under applicable state mineral lien statutes.  Paying the Operating Expenses will allow the Debtors to avoid protracted disputes with vendors asserting lien rights, and will facilitate a smooth entry into chapter 11.

123.    Moreover, paying the Operating Expenses is necessary to ensure a continuous supply of the critical goods and services necessary to maintain the Debtors' operations.  The

Mineral Contractors play an integral role in the Debtors' oil and gas production, and the Debtors cannot afford to alienate them at this critical juncture. If the Debtors are forced to scale back or shut down operations because their Mineral Contractors cease performing, the value of the Debtors' estates will significantly erode to the detriment of all of the Debtors' stakeholders.

124.    As of the Petition Date, the Debtors estimate that they have approximately $53.0 million of Operating Expenses outstanding, for which they will be reimbursed approximately $15.0 million by holders of Non-Operating Working Interests. Pursuant to the Lienholder Motion, the Debtors request approval to pay up to $20.5 million of the prepetition Operating Expenses on an interim basis, up to $53.0 million upon entry of the Final Order, and to continue paying Operating Expenses in the ordinary course of business on a postpetition basis.

125.    The Debtors also hold Non-Operating Working Interests in many Oil and Gas Leases where they share working interests with third parties and third parties serve as Operator. Where the Debtors hold a Non-Operating Working Interest, the Joint Operating Agreement and/or applicable law often grant the Operator the right to a contractual or statutory lien on Non-Operating Working Interest holders' interests in the Oil and Gas Lease to secure the obligations owed to the Operator on account of the Debtors' interest in the lease. I understand that failure to timely pay the Joint Interest Billings owing by the Debtors is likely to result in Operators asserting lien rights under applicable state laws on the Debtors' interests in the Oil and Gas Leases or the production therefrom.

126.    In the twelve months preceding the Petition Date, the Debtors paid approximately $4 million in Joint Interest Billings. As of the Petition Date, the Debtors estimate that they have approximately $0.8 million of prepetition Joint Interest Billings outstanding under the terms of their Joint Operating Agreements. To continue receiving their share of production and revenue

from these properties and maintain their relationships with the Operators of these properties, both during and after the pendency of these chapter 11 cases, the Debtors request approval to pay up to $0.5 million in prepetition Joint Interest Billings on an interim basis, up to $0.8 million upon entry of the Final Order, and to continue paying such Joint Interest Billings in the ordinary course of business on a postpetition basis.

127.    The Debtors also engage Shippers to transport, process, and deliver Gas from the wellhead to sales points where such Gas is sold.   As a result of the foregoing, the Shippers regularly possess Gas belonging to the Debtors and certain of the Debtors' partners.   Without the services provided by the Shippers, the Debtors production would be halted and their operations significantly impacted.   The average monthly amount paid by the Debtors to the Shippers on behalf of the Debtors and their partners is approximately $2.0 million.[7]   As of the Petition Date, the Debtors estimate that they may owe the Shippers up to approximately $3.5 million. Additionally, in the ordinary course of business, the Debtors use approximately seven Warehousemen to store tubing, casing, drilling pipe, and well-head equipment when not being used.   The average monthly amount paid by the Debtors to the Warehousemen is approximately $9,000.

128.    I understand that under certain state' laws, a Shipper or a Warehouseman may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of the goods.   In addition, I understand that, pursuant to section 363(e) of the Bankruptcy Code, the Shippers and Warehousemen, as bailees, may be entitled to adequate protection for any valid possessory lien.   The Debtors estimate that

---

[7]    Where the Shipper is a "first purchaser" of Gas—i.e., where the Shipper purchases the Gas directly from the Debtors—the Shippers may deduct the cost of their services from the amount they pay the Debtors for the Gas. In these circumstances, there is no cash outlay from the Debtors.

approximately $3.5 million on account the Shipper and Warehousemen Claims have accrued as of the Petition Date.   Additionally, the Debtors do not operate under long-term contracts with certain of their Shippers, and instead pay daily spot prices for their shipping needs.   This practice allows the Debtors to take advantage of the best rates available to ship goods; however, it also means that the Shippers may not have a long-term interest in doing business with the Debtors and may therefore look to exercise their liens for short-term benefit.   Accordingly, to maintain access to materials, goods, equipment, and services that are critical to the continued viability of the Debtors' business operations, the Debtors seek authority pursuant to the Lienholder Motion, but not direction, to honor outstanding invoices related to prepetition services provided by the Shippers and Warehousemen up to $2.3 million on an interim basis and up to a maximum aggregate amount of $3.5 million on a final basis.

129.   Additionally, the Debtors may have received goods from 503(b)(9) Claimants within the 20 days before the Petition Date. Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.   The Debtors also believe certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' limited liquidity.   Absent payment of the Section 503(b)(9) Claims at the outset of these chapter 11 cases—which I am advised merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the equipment and goods necessary to maintain the Debtors' business operations.

130.   Because each of the 503(b)(9) Claimants provides equipment that the Debtors use in their oil and gas operations, I understand that such vendors are Mineral Contractors and could

seek to assert statutory liens on the Debtors' interests in the Oil and Gas Leases. However, the Debtors seek separate relief for the 503(b)(9) Claimants because the value of the goods the Debtors have received from the 503(b)(9) Claimants may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code. By the Lienholder Motion, the Debtors seek authority, but not direction, to pay up to $1.1 million to the 503(b)(9) Claimants on account of their prepetition claims on an interim basis and up to a maximum aggregate amount of $1.2 million on account of their prepetition claims on a final basis.

131. Finally, the Debtors may have placed Outstanding Order for goods which will not be delivered until after the Petition Date. To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition. To prevent any disruption to the Debtors' business operations, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the postpetition acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

     **5.**     **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition Taxes and Fees ("<u>Taxes and Fees Motion</u>").**

132. Pursuant to the Taxes and Fees Motion, the Debtors seek the authority for the Debtors to make payment and remittance of Taxes and Fees that accrued prior to the Petition Date and that will become payable during the pendency of these chapter 11 cases in an aggregate amount not to exceed $9,312,500. The Debtors also request that the Court authorize and direct applicable financial institutions, when the Debtors in their sole discretion so request, to receive,

process, honor, and pay any and all checks or wire transfer requests in respect of the Taxes and Fees.

133.    In the ordinary course of business, the Debtors collect, withhold, and incur income, sales, use, franchise, business, severance, environmental and safety, and property taxes, as well as other fees and assessments as more fully described in the Taxes and Fees Motion, and occasionally are the subject of audit investigations on account of prior year tax returns.   The Debtors estimate that approximately $9,312,500 in Taxes and Fees relating to the prepetition period will become due and owing to the Authorities after the Petition Date.   Payment of the Taxes and Fees is critical to the Debtors' continued and uninterrupted operations.   The Debtors' failure to pay prepetition Taxes and Fees may cause the Governmental Authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, preventing the Debtors from doing business in certain jurisdictions, seeking to lift the automatic stay, or pursuing payment of the Taxes and Fees from the Debtors' officers and directors, all of which would greatly disrupt the Debtors' operations and ability to focus on their reorganization efforts.

134.    I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

   6. **Debtors' Motion for Entry an Order Determining Adequate Assurance of Payment for Future Utility Services ("<u>Utilities Motion</u>").**

135.    Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) determining that the Debtors' Proposed Adequate Assurance provides Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code,

(b) prohibiting Utility Providers from altering, refusing, or discontinuing services, and (c) approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Proposed Adequate Assurance.

136.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, water and sewage, waste disposal, telephone, internet, cable, and other similar services from a number of utility companies or brokers.  On average, the Debtors pay approximately $200,000 each month for third party Utility Services, calculated as a historical average the first five months of 2015.

137.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.   Indeed, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations and explore and produce oil and gas.  I believe this disruption would adversely impact customer relationships and result in a decline in the Debtors' revenues and profits.   Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is critical, therefore, that Utility Services continue uninterrupted during these chapter 11 cases.   Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

**7.      Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto and (II) Renew, Supplement, or Purchase Insurance Policies ("<u>Insurance Motion</u>").**

138.    Pursuant to the Insurance Motion, the Debtors seek entry of an order (a) authorizing the Debtors to continue insurance coverage entered into prepetition and satisfy payment of prepetition obligations related thereto in the ordinary course of business and (b) renew, supplement, or purchase insurance coverage in the ordinary course of business.

139.   In the ordinary course of business, the Debtors maintain approximately 30 Insurance Policies that are administered by multiple third-party Insurance Carriers.   The Insurance Policies provide coverage for both general commercial business risks and risks specific to the oil and gas industry, such as well blowouts, inland marine property damage, and pollution.  In addition, the Insurance Policies include several layers of excess liability coverage.

140.   Continuation and renewal of the Insurance Policies and entry into new insurance policies is essential to preserving the value of the Debtors' businesses, properties, and assets. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee.

141.   I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

    **8.**    **Debtors' Motion for Entry of an Order Approving Continuation of Surety Bond Program ("Surety Bond Motion").**

142.   Pursuant to the Surety Bond Motion, the Debtors seek entry of an order authorizing the Debtors to continue and renew their Surety Bond Program on an uninterrupted basis, including paying surety premiums as they come due, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their businesses, and executing other agreements in connection with the Surety Bond Program.

143.   In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies.  These include, among others:

(a) workers' compensation obligations; (b) obligations relating to obtaining and maintaining permits or licenses; and (c) obligations related to plugging and abandonment obligations. Often, statutes or ordinances require the Debtors to post surety bonds to secure such obligations. As such, failure to provide, maintain, or timely replace their surety bonds may prevent the Debtors from undertaking essential functions related to their operations. As of the Petition Date, the Debtors have approximately $34.6 million in outstanding surety bonds.

144.    To continue their business operations during the reorganization, the Debtors must be able to provide financial assurances to local governments, regulatory agencies, and other third parties. This in turn requires the Debtors to maintain the existing Surety Bond Program and potentially to acquire additional bonding capacity as needed in the ordinary course of the Debtors' businesses.

145.    Continuing the Surety Bond Program is thus necessary in order to maintain the Debtors' current terms and existing relationships with their Sureties. Based on the Debtors' current circumstances, I do not believe that it is likely that the Debtors will be able to renew, or obtain replacement of, existing bonds on terms more favorable than those offered by the Sureties. The process of establishing a new surety bond program, moreover, would be burdensome to the Debtors, and it is doubtful that the Debtors could replace all of the surety bonds in time to avoid defaults or other consequences of the applicable obligations.

146.    I believe that the relief requested in the Surety Bond Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Surety Bond Motion should be granted.

9.    **Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock ("Equity Trading Motion").**

147.    Pursuant to the Equity Trading Motion, the Debtors seek entry of orders (a) approving the Procedures related to transfers of Common Stock and Preferred Stock, (b) directing that any purchase, sale, or other transfer of, or declaration of worthlessness with respect to Common Stock or Preferred Stock in violation of the Procedures shall be null and void *ab initio*, and (c) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of the Equity Trading Motion on a final basis.

148.    As of June 1, 2015, the Debtors had NOLs in an amount of approximately $1 billion.  I understand that utilization of the NOLs in future tax years may generate up to approximately $360 million in cash savings from reduced taxes considering an assumed effective tax rate of 36 percent for the post-emergence company.  The value of the NOLs will inure to the benefit of all of the Debtors' stakeholders.

149.    The NOLs are substantial and I believe that any termination or limitation of the NOLs including during the first month of these chapter 11 cases, could cause significant and irreparable damage to the Debtors' estates and stakeholders.  The Procedures are the mechanism by which the Debtors will monitor and object to certain transfers of and declarations of worthlessness with respect to Common Stock or Preferred Stock to ensure preservation of the NOLs.  I further believe that the Procedures and other relief requested in the Equity Trading Motion are critical for maximizing estate value and will help ensure a meaningful recovery for creditors.  If no restrictions on trading or worthlessness deductions are imposed as requested in the Equity Trading Motion, such trading or deductions could severely limit or even eliminate the

Debtors' ability to utilize the NOLs.  I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process.  Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the Equity Trading Motion.

> **10.  Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts Effective as of the Petition Date ("<u>Contract Rejection Motion</u>").**

150.    Pursuant to the Contract Rejection Motion, the Debtors seek entry of an order (a) authorizing the Debtors to reject certain executory contracts and unexpired leases effective as of the Petition Date and (b) granting related relief.

151.    I understand that, in connection with their restructuring efforts, the Debtors undertook a comprehensive review and analysis of their executory contracts and unexpired leases and that, as a result of this analysis, the Debtors determined, in their business judgment, that rejection of the Contracts identified in the exhibits to the Contract Rejection Motion is in their best interests.  I believe that the Debtors' continued compliance with the terms of the Contracts would be burdensome and would provide no corresponding benefit to the Debtors, their estates, or their stakeholders.  I further believe that immediate rejection of the Contracts will prevent the estates from incurring significant and unnecessary administrative expenses on account thereof.

152.    I further understand that the Debtors have reviewed the market value of the Contracts and determined that marketing the Contracts for assumption and assignment to a third party would not generate material value for the estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Contract Rejection Motion should be granted.

11.   **Debtors' Motion for Entry of an Order Authorizing and Approving Expedited Procedures to Reject or Assume Executory Contracts and Unexpired Leases ("Contract Procedures Motion").**

153.   Pursuant to the Contracts Procedures Motion, the Debtors seek entry of an order approving procedures for rejecting or assuming Contracts.  I understand that the Debtors are in the process of evaluating all of their Contracts to determine whether such Contracts should be (a) rejected as unfavorable to the Debtors, or (b) assumed or assumed and assigned, including those Contracts to be assumed as amended through consensual negotiations with the relevant counterparties.

154.   I further understand that absent the relief requested in the Contract Procedures Motion, the Debtors would be required to file separate motions to reject or assume individual Contracts, resulting in substantial costs to, and administrative burdens on, the Debtors' estates— not to mention the attendant burden on the Court's docket.  Accordingly, on behalf of the Debtors, I respectfully submit that the Contract Procedures Motion should be approved.

12.   **Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals ("Interim Compensation Motion").**

155.   Given the number of parties in interest who will seek to retain Professionals in these chapter 11 cases, I believe that establishing orderly procedures for payment of Professionals will streamline the administration of these chapter 11 cases and otherwise promote efficiency for the Court, the U.S. Trustee, and all parties in interest.  Specifically, a streamlined process for serving interim fee applications and notices thereof is in the best interests of the Debtors because it will facilitate efficient review of the Professionals' fees and expenses while saving the Debtors' estates unnecessary administrative expenses.

156.   Moreover, the proposed Compensation Procedures will allow the Court and parties in interest to ensure the reasonableness and necessity of the compensation and

reimbursement of expenses sought by Professionals.   Accordingly, I believe that the relief requested in the Interim Compensation Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and should be approved.

### D.   Retention Related Pleadings

1.   **Debtors' Application for Entry of an Order Authorizing and Approving Employment and Retention of Prime Clerk LLC as Administrative Advisor for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date ("<u>Prime Clerk Administrative Advisor Application</u>").**

157.   The Debtors seek to retain Prime Clerk as administrative advisor in these chapter 11 cases.   I believe that the Debtors' estates and creditors will benefit from Prime Clerk's services.   Prime Clerk specializes in solicitation, balloting, and other administrative tasks necessary to operate these chapter 11 cases effectively.   It is my understanding that Prime Clerk is fully equipped to assist in the preparation of the schedules of assets and liabilities and statements of financial affairs and to solicit, ballot, and tabulate votes as required in support of the confirmation of a chapter 11 plan in these chapter 11 cases and, therefore, I respectfully submit that the Prime Clerk Administrative Advisor Retention Application should be approved.

2.   **Debtors' Application for Entry of an Order Authorizing and Approving the Retention of Lazard Frères & Co. LLC, as Investment Banker *Nunc Pro Tunc* to the Petition Date ("<u>Lazard Retention Application</u>").**

158.   Given the size and complexity of these chapter 11 cases, I believe the Debtors require a qualified and experienced investment banker with the resources, capabilities, and experience of Lazard to assist them in their current restructuring efforts.   Further, I believe that the Debtors' estates, and particularly their creditors, will benefit from Lazard's services.   Lazard is a preeminent investment banking, financial advisory, and asset management firm that has considerable experience in advising financially distressed companies both in and out of court.

Accordingly, I believe that the investment banking services provided by Lazard are crucial to the Debtors during these chapter 11 cases and, therefore, I respectfully submit that the Court approve the Application seeking to employ Lazard as investment banker to the Debtors.

> **3.    Debtors' Application for entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors In Possession Effective *Nunc Pro Tunc* to the Petition Date ("<u>Kirkland Retention Application</u>").**

159.    The Debtors seek to retain K&E as their restructuring attorneys. K&E has extensive experience and knowledge in, and an excellent reputation for providing, high-quality legal services in the field of debtor protections, creditor rights, and business reorganizations under chapter 11 of the Bankruptcy Code. In preparing for these chapter 11 cases, K&E has become familiar with the Debtors' businesses and the legal issues that may arise in these chapter 11 cases. I believe that K&E is well-qualified and uniquely able to represent the Debtors in these chapter 11 cases and respectfully submit that the Kirkland Retention Application should be approved.

> **4.    Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Retain Zolfo Cooper Management, LLC To Provide the Debtors with a Chief Restructuring Officer and Certain Additional Personnel and (II) Designate Jonathan A. Mitchell As Chief Restructuring Officer For the Debtors *Nunc Pro Tunc* To the Petition Date ("<u>Zolfo Cooper Retention Application</u>").**

160.    The Debtors seek to retain Zolfo Cooper to provide the debtors with a CRO and certain additional personnel and to designate Jonathan A. Mitchell as CRO. I believe that by retaining Zolfo Cooper and Mr. Mitchell, the Debtors' estates and creditors will benefit from Zolfo Cooper's and Mr. Mitchell's services. Zolfo Cooper specializes in assisting and advising debtors, creditors, investors, and court-appointed officials in formal bankruptcy proceedings and out-of-court workouts, and has played key roles in numerous public engagements. It is my

understanding that Zolfo Cooper is fully equipped to perform the functions related to cash flow

projections, business plans, long-term capital restructuring, contingency planning, and litigation

support and, therefore, I respectfully submit that the Zolfo Cooper Retention Application should

be approved.

## V.      Information Required By Local Bankruptcy Rule 1007-2

161.    Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors,

which I have provided in the exhibits attached hereto as **Exhibit B** through **Exhibit M**.

Specifically, these exhibits contain the following information with respect to the Debtors (on a

consolidated basis, unless otherwise noted):[8]

- Pursuant to Local bankruptcy Rule 1007-2(a)(3), **Exhibit B** hereto provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee and the date of the formation.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Exhibit C** hereto provides the following information with respect to each of the holders of the Debtors' fifty (50) largest unsecured claims, excluding claims of insiders:  the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Exhibit D** hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors:  the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the

---

[8]    The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Exhibit E** hereto provides a summary of the Debtors' assets and liabilities.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(7), **Exhibit F** hereto provides a summary of the publicly held securities of the Debtors.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(8), **Exhibit G** hereto provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity:  the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Exhibit H** hereto provides a list of property comprising the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(10), **Exhibit I** hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the U.S.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(11), **Exhibit J** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(12), **Exhibit K** hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), **Exhibit L** hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and equityholders) and the estimated amounts to be paid to officers, equityholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(3), **Exhibit M** hereto provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 15, 2015

_____

Michael Magilton
Senior Vice President and Chief Financial Officer

## __EXHIBIT A__

**Corporate Organizational Chart**



*KE DRAFT May 15, 2015*
*Attorney Work Product*
*Privileged & Confidential*

**Total Debt Outstanding: $2.85 billion**
**Secured Debt: $1.70 billion**
**Unsecured Debt: $1.15 billion**

## RBL Credit Facility
### $1.0 billion

Borrower: Sabine Oil & Gas Corp. (f/k/a Forest Oil Corp.)
Security: First Lien on 80% of PV-9 and stock of subsidiaries
Administrative Agent: Wells Fargo Bank, N.A.
Commitment Amount (Borrowing Base): $2,000,000,000 ($1,000,000,000)
Outstanding: $971,000,000 + $29,000,000 in letters of credit
Maturity Date: April 7, 2016, or, with consent of Second Lien agent, the earlier of (i) December 19, 2016 or (ii) 91 days prior to Second Lien Term Loan maturity date
Interest Rate: LIBOR + 150 - 250 bps (based on borrowing base)
Interest Payment Date: last day of March, June, September, and December or end of each LIBOR interest period
Borrowing Base Redetermination Date: April 1, October 1

## Second Lien Term Loan Facility
### $700 million

Borrower: Sabine Oil & Gas Corp. (original issuer: NFR Energy LLC†)
Security: Second Lien on 80% of PV-9 and stock of subsidiaries
Administrative Agent: Bank of America, N.A.
Principal Amount: $650,000,000 + $50,000,000 incremental
Maturity Date: December 31, 2018, or, if Senior Notes not refinanced with debt that matures no earlier than April 1, 2019, November 16, 2016
Interest Rate: LIBOR + 750 bps (floor of 1.25%)
Interest Payment Date: last day of March, June, September, and December or end of each LIBOR interest period

## 9.75% Senior Notes Due 2017
### $350 million

Issuer: Sabine Oil & Gas Corp. (original issuer: NFR Energy LLC†)
Indenture Trustee: Bank of New York Mellon Trust Company, N.A.
Commitment: $350,000,000
Outstanding: $350,000,000
Maturity Date: February 15, 2017
Interest Rate: 9.75%
Interest Payment Dates: February 15, August 15

## 7.25% Senior Notes Due 2019
### $577.9 million

Issuer: Sabine Oil & Gas Corp. (f/k/a Forest Oil Corp.)
Indenture Trustee: Wilmington Savings Fund Society, FSB
Commitment: $750,000,000
Outstanding: $577,914,000
Maturity Date: June 15, 2019
Interest Rate: 7.25%
Interest Payment Dates: June 15, December 15

## 7.50% Senior Notes Due 2020
### $222.1 million

Issuer: Sabine Oil & Gas Corp. (f/k/a Forest Oil Corp.)
Indenture Trustee: Delaware Trust Company
Commitment: $500,000,000
Outstanding: $222,087,000
Maturity Date: September 15, 2020
Interest Rate: 7.50%
Interest Payment Dates: March 15, September 15

†NFR Energy LLC was the predecessor entity to Sabine Oil & Gas LLC, which was combined with Forest Oil Corp. on Dec. 16, 2014.

## **EXHIBIT B**

**Committees Organized Prepetition**

Ad Hoc Group of Legacy Sabine Noteholders

Ad Hoc Group of Legacy Forest Noteholders

## EXHIBIT C

**Consolidated List of the Holders of the Debtors' 50 Largest Unsecured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 50 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 50 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Rank | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|------|------------------|-----------------------------------------------------------------------------------|------------------------------------------------------|--------------------------------------------|---------------------------------------------|
| 1 | WILMINGTON SAVINGS FUND SOCIETY, FSB | WILMINGTON SAVINGS FUND SOCIETY, FSB ATTN BANKRUPTCY DEPT 500 DELAWARE AVENUE WILMINGTON, DE 19801 FAX: 302-421-9137 PHONE: 302-888-7420 | Unsecured Notes | | $577,914,000.00 |
| 2 | BANK OF NEW YORK MELLON TRUST COMPANY, N.A. | BANK OF NEW YORK MELLON TRUST COMPANY, N.A. ATTN BANKRUPTCY DEPT 101 BARCLAY ST FL 4 EAST NEW YORK, NY 10286 PHONE: 212-495-1784 | Unsecured Notes | | $350,000,000.00 |

| 3 | DELAWARE TRUST COMPANY | DELAWARE TRUST COMPANY<br>ATTN BANKRUPTCY DEPT<br>2711 CENTERVILLE ROAD<br>WILMINGTON, DE 19808<br>FAX: 877-374-6010 ext. 62412; 302-636-8666<br>PHONE: 302-636-8666 | Unsecured Notes | | $222,057,000.00 |
| 4 | EL RUCIO LAND & CATTLE CO., INC. | JON CHRISTIAN AMBERSON, P.C.<br>2135 EAST HILDEBRAND AVE.<br>SAN ANTONIO, TX 78209<br>PHONE: (210) 826-3339<br><br>JOHN F. CARROLL<br>ATTORNEY AT LAW<br>111 WEST OLMOS DR.<br>SAN ANTONIO, TX 78212<br>PHONE: (210) 829-7183<br><br>FERNANDO MANCIAS<br>LAW OFFICES OF FERNANDO G. MANCIAS, P.L.L.C<br>1305 EAST NOLANA LOOP STE A<br>MCALLEN, TX 78504<br>PHONE: (956) 686-0385 | Litigation Claim | Contingent and Disputed | $23,000,000.00 |
| 5 | BAKER HUGHES | BAKER HUGHES<br>ATTN: ALAN CRAIN, SENIOR VICE PRESIDENT, CHIEF LEGAL AND GOVERNANCE OFFICER<br>2929 ALLEN PARKWAY<br>SUITE 2100<br>HOUSTON, TX 77019-2118<br>EMAIL: ALAN.CRAIN@BAKERHUGHES.COM<br>PHONE: 713-439-8600 | Trade Payable | | $2,294,560.56 |
| 6 | PREMIER VACUUM SERVICE INC | PREMIER VACUUM SERVICE INC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>303 S 5TH ST<br>KINGSVILLE, TX 78363<br>EMAIL: PREMIERVACUUM@YAHOO.COM<br>FAX: 361-592-4224<br>PHONE: 361-221-9509 | Trade Payable | | $570,275.25 |
| 7 | GLOBE ENERGY SERVICES LLC | GLOBE ENERGY SERVICES LLC<br>ATTN: TROY BOTTS, CEO & PRESIDENT<br>3204 WEST HIGHWAY 180<br>SNYDER, TX 79549<br>FAX: 325-574-2639<br>PHONE: 325-573-1310 | Trade Payable | | $560,195.85 |

| | | | | | |
|---|---|---|---|---|---|
| 8 | GEONIX LP | GEONIX LP<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>2008 NORTH LONGVIEW STREET<br>KILGORE, TX 75662<br>PHONE: 903-983-3249 | Trade Payable | | $485,157.28 |
| 9 | BIGFOOT ENERGY SERVICES LLC | BIGFOOT ENERGY SERVICES LLC<br>ATTN: DOUG GILE, GENERAL MANGER<br>312 W SABINE<br>CARTHAGE, TX 75633<br>EMAIL:  JSPURLOCK@BIGFOOTENERGYSERVICES.COM<br>FAX: 903-898-2256<br>PHONE: 903-693-2206 | Trade Payable | | $303,374.35 |
| 10 | M-I LLC | M-I LLC<br>ATTN: GENERAL COUNSEL<br>5950 NORTH COURSE DRIVE<br>HOUSTON, TX 77072<br>FAX: 832-295-2560<br>PHONE: 832-295-2559 | Trade Payable | | $280,193.54 |
| 11 | MAVERICK WELL SERVICE LLC | MAVERICK WELL SERVICE LLC<br>ATTN: KARL EDMONDS, OWNER<br>300 FM 1252 EAST<br>KILGORE, TX 75662<br>FAX: 903-984-4358<br>PHONE: 903-983-6050 | Trade Payable | | $277,613.06 |
| 12 | PRECISION EXCAVATING SERVICES | PRECISION EXCAVATING SERVICES<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>1734 COUNTY ROAD 186 E<br>KILGORE, TX 75662<br>EMAIL: PRECISIONEXCAVATING1@YAHOO.COM<br>FAX: 903-984-5385<br>PHONE: 903-987-1478 | Trade Payable | | $272,587.50 |

| 13 | BASIC ENERGY SERVICES LP | BASIC ENERGY SERVICES LP<br>ATTN: T.M. "ROE" PATTERSON, PRESIDENT, CHIEF EXECUTIVE OFFICER AND DIRECTOR<br>801 CHERRY STREET<br>SUITE 2100<br>FORTH WORTH, TX 76102<br>EMAIL: INFO@BASICENERGYSERVICES.COM<br>PHONE: 817-334-4100 | Trade Payable | | $268,187.43 |
|----|--------------------------|---------------------------------------------------------|---------------|--|-------------|
| 14 | AEGIS CHEMICAL SOLUTIONS LLC | AEGIS CHEMICAL SOLUTIONS LLC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>4560 KENDRICK PLAZA DR #190<br>HOUSTON, TX 77032<br>EMAIL: INFO@AEGISCHEMICAL.COM<br>PHONE: 855-532-2033 | Trade Payable | | $263,833.50 |
| 15 | UNIT DRILLING COMPANY | UNIT DRILLING COMPANY<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>DEPARTMENT 247<br>TULSA, OK 74182<br>FAX: 918-493-7711<br>PHONE: 918-493-7700 | Trade Payable | | $256,652.08 |
| 16 | MICROSEISMIC INC | MICROSEISMIC INC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>10777 WESTHEIMER, SUITE 500<br>EMAIL: BILLING@MICROSEISMIC.COM<br>FAX: 713-781-2326<br>PHONE: 713-781-2323 | Trade Payable | | $250,097.75 |
| 17 | PINNERGY LTD | PINNERGY LTD<br>ATTN: BARBARA MAYFIELD, GENERAL COUNSEL<br>111 CONGRESS AVE<br>SUITE 2020<br>AUSTIN, TX 78701<br>EMAIL: BMAYFIELD@PINNERGY.COM<br>FAX: 512-343-8885<br>PHONE: 903-693-6110; 512-628-2807 | Trade Payable | | $249,533.33 |

| 18 | SABINE PIPE INC | SABINE PIPE INC<br>ATTN: WILL ADAMSON, PRESIDENT<br>1108 N KILGORE ST<br>KILGORE, TX 75662<br>EMAIL: WILLADAMSON@SABINEPIPE.COM<br>FAX: 903-986-7605<br>PHONE:  903-984-3094 | Trade Payable | | $224,066.25 |
| 19 | KEY ENERGY SERVICES INC | KEY ENERGY SERVICES INC<br>ATTN: KIMBERLY T. FRYE, SENIOR VICE PRESIDENT AND GENERAL COUNSEL<br>1301 MCKINNEY<br>STE 1800<br>HOUSTON, TX 77010<br>PHONE: 713-651-4300 | Trade Payable | | $223,879.65 |
| 20 | REEF SERVICES LLC | REEF SERVICES LLC<br>ATTN: MR. CLAY BATEN, CHIEF EXECUTIVE OFFICER<br>7906 WEST HIGHWAY 80<br>MIDLAND, TX 79706<br>FAX: 432-560-5633<br>PHONE: 432-560-5600 | Trade Payable | | $217,963.48 |
| 21 | SUPREME PRODUCTION SERVS INC | SUPREME PRODUCTION SERVS INC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>5901 STATE HWY 44<br>CORPUS CHRISTI, TX 78406<br>FAX: 361-299-2705<br>PHONE: 361-299-2700 | Trade Payable | | $213,631.68 |
| 22 | ACE CONSULTING SERVICES INC | ACE CONSULTING SERVICES INC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>131 CR 4083<br>CARTHAGE, TX 75633<br>FAX: 903-693-3425<br>PHONE: 903-391-1310 | Trade Payable | | $209,767.27 |

| 23 | NEWPARK DRILLING FLUIDS LLC | NEWPARK DRILLING FLUIDS LLC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>PO BOX 973167<br>DALLAS, TX 75397-3167<br>PHONE: 800-444-0682 | Trade Payable | | $198,327.37 |
| 24 | PRIORITY ENERGY HOLDINGS LLC | PRIORITY ENERGY HOLDINGS LLC<br>ATTN: CHRIS ABIDE, PRESIDENT & CEO<br>681 RIVER HIGHLANDS BLVD<br>COVINGTON, LA 70433<br>FAX: 985-400-5085<br>PHONE: 877-317-7467 | Trade Payable | | $191,442.90 |
| 25 | NCS MULTISTAGE, LLC | NCS MULTISTAGE, LLC<br>ATTN: JOE DEGEARE, PRESIDENT<br>19450 STATE HIGHWAY 249, SUITE 200<br>HOUSTON, TX 77070<br>EMAIL: JDEGEARE@NCSMULTISTAGE.COM<br>FAX: 281-652-5846<br>PHONE: 281-453-2222 | Trade Payable | | $187,148.50 |
| 26 | XCHEM | XCHEM<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>PO BOX 971433<br>DALLAS, TX 75397-1433<br>EMAIL: CONTACT@X-CHEM.COM<br>PHONE: 855-829-0001 | Trade Payable | | $185,057.35 |
| 27 | GLOBAL VESSEL & TANK | GLOBAL VESSEL & TANK<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>117 LIBERTY AVENUE<br>LAFAYETTE, LA 70509<br>FAX: 337-534-8927<br>PHONE: 337-534-8925 | Trade Payable | $182,548.84 | $182,548.84 |

| 28 | CACTUS WELLHEAD LLC | CACTUS WELLHEAD LLC<br>ATTN: SCOTT BENDER, CEO<br>1 GREENWAY PLAZA<br>SUITE 200<br>HOUSTON, TX 77046<br>FAX: 713-439-0411<br>PHONE: 713-626-8800 | Trade Payable | | $169,659.86 |
| 29 | MONUMENT RESOURCES LLC | MONUMENT RESOURCES LLC<br>ATTN: LISA CASTLEBERRY<br>1125 JUDSON ROAD<br>SUITE 100<br>LONGVIEW, TX 75601<br>EMAIL: INFO@MONUMENTRESOURCES.COM<br>FAX: 903-653-1696<br>PHONE: 903-653-1695 | Trade Payable | | $160,183.83 |
| 30 | TKO RENTALS & SERVICES LLC | TKO RENTALS & SERVICES LLC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>5607 SOUTH AVENUE Q<br>LUBBOCK, TX 75633<br>FAX: 903-693-4919<br>PHONE: 903-693-5727 | Trade Payable | | $155,979.90 |
| 31 | MAGNUM SERVICES INC | MAGNUM SERVICES INC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>1565 US HWY 59 SOUTH<br>EDNA, TX 77957<br>EMAIL:  MAGNUM@MAGNUMSERVICESINC.COM<br>FAX: 361-781-0965<br>PHONE: 361-781-0964 | Trade Payable | | $150,867.64 |
| 32 | 5J OILDFIELD SERVICES, LLC | 5J OILFIELD SERVICES, LLC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>4090 N. HWY 79<br>PALESTINE, TX 75801<br>FAX: 903-729-2051<br>PHONE: 903-729-0969 | Trade Payable | | $140,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| 33 | PRESSER CONSTRUCTION INC | PRESSER CONSTRUCTION INC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>12605 W I-20 SERVICE RD<br>HALLSVILLE, TX 75650<br>PHONE: 903-660-2069 | Trade Payable | | $139,192.87 |
| 34 | OMNI INDUSTRIAL SOLUTIONS LLC | OMNI INDUSTRIAL SOLUTIONS LLC<br>CELESTE SMITH<br>P.O. BOX 731675<br>DALLAS, TX 75373-1675<br>EMAIL: CMSITH@OSP.CC<br>PHONE: 225-261-6559 | Trade Payable | | $138,605.15 |
| 35 | ALINET CORPORATION | ALINET CORPORATION<br>ATTN: BONNIE MCKENZIE<br>110 N LONGVIEW ST<br>KILGORE, TX 75662<br>FAX: 903-988-0113<br>PHONE: 903-984-2307 | Trade Payable | | $137,167.12 |
| 36 | WEATHERFORD ARTIFICIAL LIFT | WEATHERFORD ARTIFICIAL LIFT<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>2000 ST JAMES PLACE<br>HOUSTON, TX 77056<br>PHONE: 713-836-4000 | Trade Payable | | $128,880.19 |
| 37 | CASEDHOLE SOLUTIONS INC | CASEDHOLE SOLUTIONS INC<br>ATTN: TEDD MOORE, EXECUTIVE VICE PRESIDENT,<br>GENERAL COUNSEL & CHIEF RISK OFFICER<br>3990 ROGERDALE<br>HOUSTON, TX 77042<br>PHONE: 713-325-6000 | Trade Payable | | $127,750.00 |

| | | | | | |
|---|---|---|---|---|---|
| 38 | FREEMAN MILLS PC | FREEMAN MILLS PC<br>ATTN: Ashley Holmgren<br>110 N COLLEGE AVE<br>SUITE 1400<br>TYLER, TX 75702<br>EMAIL: AHOLMGREN@FREEMANMILLSPC.COM<br>FAX: 903-592-7787<br>PHONE: 903-592-755 | Trade Payable | | $123,997.94 |
| 39 | SIMMONS PETROLEUM | SIMMONS PETROLEUM<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>PO BOX 676686<br>DALLAS, TX 75267-6686<br>PHONE: 405-848-3500 | Trade Payable | | $121,765.85 |
| 40 | ASSET RISK MANAGEMENT LLC | ASSET RISK MANAGEMENT LLC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>20329 STATE HIGHWAY 240<br>SUITE 450<br>HOUSTON, TX 77070<br>EMAIL: INFO@ASSET-RISK.COM<br>FAX: 281-664-0029<br>PHONE: 281-655-3200 | Trade Payable | | $118,615.51 |
| 41 | DISTRIBUTION NOW | DNOW LP<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>PO BOX 200822<br>DALLAS, TX 75320-1160 | Trade Payable | | $116,459.71 |
| 42 | CANRIG DRILLING TECHNOLOGY LTD | CANRIG DRILLING TECHNOLOGY LTD<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>PO BOX 973608<br>DALLAS, TX 75397-3608<br>PHONE: 281-259-8887 | Trade Payable | | $115,823.77 |

| 43 | VALLEY PLAINS, LLC | VALLEY PLAINS, LLC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>1251 BEREA 3<br>JEFFERSON, TX 75657<br>FAX: 903-665-7771<br>PHONE: 903-665-7779 | Trade Payable | | $108,170.69 |
| 44 | COMMERCIAL ELECTRIC CO | COMMERCIAL ELECTRIC CO.<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>P.O. BOX 754<br>GIDDINGS, TX 78942<br>PHONE: 979-542-5617 | Trade Payable | | $105,048.59 |
| 45 | COURTNEY CONSTRUCTION INC | COURTNEY CONSTRUCTION INC<br>ATTN: COURTNEY<br>2617 US HWY 79N<br>CARTHAGE, TX 75633<br>FAX: 903-694-2921<br>PHONE: 903-694-2911 | Trade Payable | | $102,721.37 |
| 46 | EXTERRAN PARTNERS LP | EXTERRAN PARTNERS LP<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>P O BOX 201160<br>DALLAS, TX 75320-1160<br>FAX: 713-466-0326<br>PHONE: 713-758-2222 | Trade Payable | | $97,847.75 |
| 47 | ENERGY COMPLETION SERVICES LP | ENERGY COMPLETION SERVICES LP<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>41212 PARK 290<br>SUITE A<br>WALLER, TX 77484<br>FAX: 985-876-8741<br>PHONE: 903-693-3377 | Trade Payable | | $97,165.64 |

| 48 | J-W POWER COMPANY | J-W POWER COMPANY<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>PO BOX 970490<br>DALLAS, TX 75397-0490<br>EMAIL: SALES@JWOPERATING.COM<br>PHONE: 972-233-8191 | Trade Payable | | $95,677.76 |
| 49 | QUAIL TOOLS LP | QUAIL TOOLS LP<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>P O BOX 10739<br>NEW IBERIA, LA 70562<br>PHONE: 337-364-0407<br>FAX: 337-365-9997 | Trade Payable | | $92,718.60 |
| 50 | QUALITY FOAMER | QUALITY FOAMER<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>PO BOX 3215<br>KILGORE, TX 75663<br>EMAIL: CHRIS_CARTER@QUALITYFOAMER.COM<br>PHONE: 903-987-0731 | Trade Payable | | $91,842.84 |

## <u>EXHIBIT D</u>

### Consolidated List of the Holders of the Debtors' Five Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of Creditor | Creditor Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Amount of Claim | Collateral Description and Value |
|---|---|---|---|---|

| 1. | Wells Fargo Bank, National Association, as administrative agent for a syndicate of lenders | Attn: Brian M. Malone<br>1000 Louisiana Street, 8th Floor<br>Houston, TX 77002<br>(713) 319-1837<br><br>and<br><br>Attn: Stephanie Harrell<br>333 Clay Road<br>Suite 2400<br>Houston, TX 77024 | $926,917,359 | Collateral: Valid, binding, perfected and enforceable first priority liens upon and security interests in the real and personal property of borrower and guarantors under the Revolving Credit Agreement, including, without limitation, all rights, titles, interests and estates in and to oil and gas leases and/or oil, gas and other mineral leases and other interests and estates and the lands and premises covered or affected thereby as described therein (the "Hydrocarbon Properties") and properties pooled or unitized with the Hydrocarbon Properties, all oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom and all other minerals in and under and which may be produced and saved from or attributable to the Hydrocarbon Properties (collectively, the "Hydrocarbons"), the cash and noncash proceeds and other rights arising from all prepetition collateral (including any cash held by the Debtors that constitutes cash collateral and the setoff rights described in certain of the first lien loan documents, the Swap Agreements (as defined in the Revolving Credit Agreement), or arising by operation of law collectively, the "Prepetition Collateral")<br><br>Collateral Value: Uncertain |

| 2. | Wilmington Trust, National Association | Attn: Joseph Feil, as Agent<br>1100 North Market Street<br>Wilmington, DE 19890<br>(302) 636-6466 | $700,000,000 | Collateral: Valid, binding, perfected and enforceable second priority liens upon and security interests in the Prepetition Collateral (other than Prepetition Collateral constituting setoff rights of certain first lien secured parties), subject in each case to the Intercreditor Agreement and permitted exceptions under the Revolving Credit Agreement, certain collateral documents related thereto, the Second Lien Term Loan Agreement, and certain collateral documents related thereto.<br><br>Collateral Value: Uncertain |

## EXHIBIT E

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its affiliated Debtors and non-Debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets (Book Value as of May 31, 2015) | $2,483,373,000 |
| Total Liabilities (Book Value as of May 31, 2015) | $2,906,350,000 |

## EXHIBIT F

### Summary of the Publicly Held Securities of the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the number of holders thereof as of the Petition Date.

| Equity Security | Number of Shares Outstanding | Number of Holders |
|---|---|---|
| Common Stock of Sabine Oil & Gas Corporation | 213,915,937 | 787 |
| Preferred Stock of Sabine Oil & Gas Corporation | 2,508,945 | 1 |

| Debt Security | Value Outstanding | Approximate Number of Holders |
|---|---|---|
| 2017 Notes | $350,000,000 | 32[9] |
| 2019 Notes | $577,914,000 | 71[9] |
| 2020 Notes | $222,087,000 | 43[9] |

---

[9]   Represents numbers of holders measured at nominee level.

## EXHIBIT G

### Summary of Debtors' Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## EXHIBIT H

**Summary of Debtors' Property From Which the Debtors' Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 1415 Louisiana, Suite 1600 | Houston | Texas | USA | Leased |
| 1520 Marvin A. Smith Drive | Kilgore | Texas | USA | Owned |
| 5159 FM108 South | Cost | Texas | USA | Leased |
| 104 Crockett | Cuero | Texas | USA | Leased |
| 1925 North Hobart | Pampa | Texas | USA | Leased |
| 3639 Ambassador Caffery, Suite 401 | Lafayette | Louisiana | USA | Leased |
| 707 17th Street, Suite 3600 | Denver | Colorado | USA | Leased |
| 500 Dallas Street, Suite 2700 | Houston | Texas | USA | Leased |

## <u>EXHIBIT I</u>

**Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location of Debtors' Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| Debtors' Assets | Location |
|---|---|
| Books and Records | 1415 Louisiana, Suite 1600, Houston, TX 77002 |

## <u>EXHIBIT J</u>

## Summary of Legal Actions Against the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date. This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| Forest Oil Corporation Sabine Oil & Gas LLC First Reserve Corporation FR XI Onshore AIV, L.L.C. Sabine Investor Holdings LLC Sabine Oil & Gas Holdings LLC Sabine Oil & Gas Holdings II LLC New Forest Oil Inc. Forest Oil Merger Sub Inc.[10] | Stourbridge Investments LLC David Raul as custodian for Malka Raul UTMA NY Manuel Dos Santos Meir Rothenberg Joseph Gawlikowski Randall A. Edwards Hubert Bruce Mohamad Jabri | Alleged breaches of fiduciary duties related to the business combination between Old Sabine and FOC | Parties have agreed to Stipulation of Settlement | 651418/2014; 651446/2014; 651449/2014; 651506/2014; 651523/2014; 651551/2014 | Supreme Court of the State of New York, New York County |
| Forest Oil Corporation New Forest Oil Inc. Forest Oil Merger Sub Inc. Sabine Oil & Gas LLC Sabine Investor Holdings LLC Sabine Oil & Gas Holdings LLC Sabine Oil & Gas Holdings II LLC[11] | Robert Olinatz George Sirois | Shareholder class action related to the business combination between Old Sabine and FOC; claims for breach of fiduciary duties and aiding and abetting | Court entered an order on October 14, 2014 approving joint motion for administrative closure, pending the outcome of the above shareholder litigation; parties have agreed to Stipulation of Settlement | 1:14-cv-01409 | U.S. District Court for the District of Colorado |

---

[10]   Individual FOC director defendants include: Patrick McDonald (President & CEO); James Lee; Dod Fraser; James Lightner; Loren Carroll; Richard Carty; Raymond Wilcox.

[11]   See n.3.

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|--------|--------------|---------------------|--------|----------|------------------------|
| Forest Oil Corporation c/k/a Sabine Oil & Gas Corporation | Wilmington Savings Fund Society, FSB, in its capacity as successor Indenture Trustee (the "Trustee") for the 7.25% Senior Notes Due 2019 | Bondholder action related to the business combination between Old Sabine and FOC; claims for breach of contract, declaratory judgment, breach of implied covenant of good faith and fair dealing and indemnity | Case, which was filed in February 2015, is in discovery. | 650584/2015 | Supreme Court of the State of New York, New York County |
| Forest Oil Corporation | El Rucio Land & Cattle, et al. | Claims, which were compelled into arbitration, for environmental damages and various other torts | Arbitration panel awarded plaintiffs $24.5 million in combined damages and attorneys' fees; district and appellate state courts affirmed; FOC's petition for review is pending before the state supreme court | 14-0979 | Texas Supreme Court |
| Forest Oil Corporation | Plaquemines Parish State of Louisiana *ex rel.* Parish of Plaquemines | Plaintiffs allege that certain of FOC's and other defendants' oil and gas operations were conducted in violation of Louisiana's Coastal Resource Management Act and associated rules, causing damage to land and waterbodies located in the area | Recently remanded to state court; in early stages of litigation | 60-982 | 25th Judicial District, Parish of Plaquemines, Louisiana |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| Forest Oil Corporation | Jefferson Parish State of Louisiana *ex rel.* Parish of Jefferson | Plaintiffs allege that certain of FOC's and other defendants' oil and gas operations were conducted in violation of Louisiana's Coastal Resource Management Act and associated rules, causing damage to land and waterbodies located in the area | Court considering remand; in early stages of litigation | 732-770 | U.S. District Court for the Eastern District of Louisiana |
| Forest Oil Corporation | HPIP Gonzalez Holdings, LLC | Arbitration proceeding involving a contract dispute regarding a Gathering, Treating, and Processing Agreement and Water and Acid Gas Handling Agreement; claims for breach of contract and breach of duty of good faith and fair dealing | Arbitration scheduled to take place July 28, 2015–August 4, 2015 | Cause No. 01-14-0001-9347 | American Arbitration Association |
| Forest Oil Corporation | Catherine P. Alford Margaret Perez Barton James L. Carrere Richard J. Carrere, Jr. Thomas A. Carrere Paula Perez Landrem Leander H. Perez III Citrus Realty, LLC | Plaintiffs claim damage to land caused by defendants' operations | In discovery | 60-488, Div. "B" | 25th Judicial District Court, Parish of Plaquemines, Louisiana |
| Forest Oil Corporation | J.A. Beddingfield Nancy Beddingfield | Various causes of action regarding various leases in Texas in which plaintiffs claim they own an interest | Dormant since April 2009 | O-09-110 | 12th Judicial District, Leon County, Texas |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| Forest Oil Corporation | Ensight III Energy Management, LLC Ensight III Energy Partners, LP | Suit for declaratory judgment to clear title on certain leases | Dormant since November 2010 | O-07-399 | 87th Judicial District, Leon County, Texas |
| Sabine Oil & Gas LLC | Kenneth R. Fielden Sarah Fielden | Action for declaratory relief to quiet title, reformation and rescission, slander of title, and attorneys' fees | Dormant | 14-0057 | 71st Judicial District, Harrison County, Texas |
| Forest Oil Corporation | Sandra Horob Steven Poeckes Steve Shae Mike Shae Paul Shae | Suit for declaratory relief and to quiet title over leases plaintiff alleges have terminated as a result of cessation of production | Summary judgment granted in favor of Forest Oil on May 13, 2015; Plaintiffs have 60 days to appeal | 53-2014-cv-00157 | District Court, County of Williams, North Dakota |
| Forest Oil Corporation | Dr. Rupert Madden Judith Ward Madden | Suit for lost royalties and cancellation of surface lease | Settlement discussions ongoing | 35782 | 39th Judicial District Court, Red River Parish, Louisiana |
| Forest Oil Corporation | Evanston Insurance Company | Insurance company seeks declaratory judgment that its insurance policy does not cover losses incurred while drilling directional well | Evanston has filed motion for summary judgment | 5:13-cv-00238 | U.S. District Court, Western District of Louisiana |
| Sabine Oil & Gas LLC | Katie Moseley | Claim to recover alleged property damage on plaintiff's land | General denial filed | 2014-297 | 4th Judicial District, Rusk County, Texas |
| Forest Oil Corporation | James Seglund J.A. Seglund Inc. | Claim for alleged failure to assign overriding royalty interests and theft of trade secrets | Parties recently submitted agreed consent motion to continue trial set for July 28, 2015 | 59-824 | 25th Judicial District, Parish of Plaquemines, Louisiana |
| Forest Oil Corporation | Margaret Minor Shaffer Milhado Lee Shaffer, Jr. | Claims for alleged environmental damage to plaintiff's property | Plaintiffs dismissing Forest Oil Corporation without prejudice | 167505 | 32nd Judicial District, Parish of Terrebonne, Louisiana |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| Forest Oil Corporation | Union Oil Company of California | Indemnity | UNOCAL has sought leave of court to file cross-claim | 167505 | 32nd Judicial District, Parish of Terrebonne, Louisiana |
| Forest Oil Corporation | Jimmy Springs Debra J. Springs | Claim for alleged damage to real property and non-payment of royalties under oil and gas lease | Dormant | 25,342 | 25th District Court, Gonzales County, Texas |
| Forest Oil Corporation | John T. Wright | Suit seeking declaration of termination and release and breach of duty to develop | In discovery | 6714 | 31st District Court, Hemphill County, Texas |
| Forest Oil Corporation Lantern Drilling Company | Blaylock | Defendant has filed cross-claim for defense and indemnity against Sabine | Dormant | 25362 | 25th Judicial District, Gonzalez County, Texas |
| Forest Oil Corporation | Hernandez | Personal injury | Dismissed with prejudice following settlement | 2013-64906 | 270th Judicial District, Harris County, Texas |
| Forest Oil Corporation Lantern Drilling Company | Jacob McGehee | Personal injury | Answer filed; recently removed to federal court; in discovery | CJ-2014-652W | U.S. District Court for the Western District of Oklahoma |
| Sabine Oil & Gas LLC | Carmen Johnson, individually and as representative of the Estate of James Hopkins | Premises liability | Dismissed with prejudice | 140420 | 71st District Court, Harrison County, Texas |
| Forest Oil Corporation | Juan Luis Longoria | Personal injury suit arising from alleged chemical exposure | Trial set for September 2015 | C-203-05-D | 206th Judicial District Court, Hidalgo County, Texas |
| Forest Oil Corporation | Billy Swift | Personal injury suit arising from alleged chemical exposure | Defendants' motion to dismiss or transfer on forum *non conveniens* under advisement | 2008-11627 | Judicial District Court, Orleans Parish, Louisiana |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| Forest Oil Corporation | Cynthia Waller | Personal injury | Motion for summary judgment pending; no trial date set | 08-5619; 08-6252 | Judicial District Court, Orleans Parish, Louisiana |
| Forest Oil Corporation | Primeaux | Alleged property damage | Dismissed | 62860 | 18th District Court, Iberville, Louisiana |
| Forest Oil Corporation | Valentina North Dakota LLC | Plaintiffs seeking declaratory relief and to quiet title with respect to leases in Williams County, North Dakota | Trial set for January 2016 | 53-2013-CV-01100 | District Court, Northwest Judicial District, Williams County, North Dakota |
| Sabine Oil & Gas LLC | Gemini Insurance Co. | Plaintiffs seeking declaratory judgment regarding parties' agreement | In discovery | 2014-16568 | 295th Judicial District, Harris County, Texas |
| Forest Oil Corporation | Olympia Minerals The Wiser Oil Co. | Suit arising from alleged breaches of parties' agreement | On appeal | 2005-0297 | 36th Judicial District Court, Beauregard Parish, Louisiana |
| Forest Oil Corporation | Michael Bradbury Henry Bradbury Vincent Bradbury Sabina Bradbury | Royalty dispute | Dormant | 12-0632 | 71st Judicial District Court, Harrison County, Texas |
| Forest Oil Corporation | Kangerga Interests, Ltd. | Royalty dispute | Settlement of undisputed amounts complete; discussions continue regarding disputed amounts | 2014-069 | 4th Judicial District Court, Rusk County, Texas |
| Forest Oil Corporation | Leon Independent School District | Property tax dispute | Dormant | T-13-330 | 369th Judicial District Court, Leon County, Texas |
| Sabine Oil & Gas Corporation | Patrick R. McDonald | Claims for alleged breach of severance agreement and violation of Colorado Wage Act | In discovery | 15-cv-00910 | U.S. District Court for the District of Colorado |

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| Sabine Oil & Gas LLC<br><br>Sabine Mid-Continent Gathering LLC | T. Boone Pickens | Claims for trespass, breach of contract, fraud by nondisclosure, and tortious interference | Answer filed | 2122 | 31st Judicial District, Roberts County, Texas |
| Sabine Oil & Gas Corporation | Le Norman Operating, LLC | Indemnification | Answer filed | 7170 | 31st Judicial District, Hemphill County, Texas |
| Forest Oil Corporation[12] | Lee Perry | Pro se complaint alleging violation of Safe Drinking Water Act | A lawsuit has been filed, but Forest Oil has not been served | A-15-cv-0111-SS | U.S. District Court for the Western District of Texas |
| Forest Oil Corporation | Juan Pruneda & Maria Pruneda, individually and as representatives of the Estate of Matias Pruneda | Negligence | Served on June 22, 2015 | 2014-49240 | 270th Judicial District, Harris County, Texas |
| Sabine Oil & Gas Corporation | John T. Wright | Plaintiff seeks a declaration of his ownership interest in certain properties | Answer filed | 6928 | 31st Judicial District, Hemphill County, Texas |
| Sabine Oil & Gas LLC<br><br>Sabine Bear Paw Basin LLC | Textana, Inc.<br><br>Sandtana, Inc.<br><br>Sandra Lee Brown | Plaintiffs claim a royalty interest in numerous mineral interests in Montana | Settlement discussions ongoing | DV-02-215 | 12th District Court, Hill County, Montana |
| Sabine Oil & Gas Corporation | EGR Partnership<br><br>KOS Q Holdings, LLC | Claims for breach of contract, declaratory judgment, and money had and received | Answer filed | 15-0383 | 71st Judicial District, Harrison County, Texas |
| Sabine Mid-Continent LLC | John T. Wright | Claims for trespass and try title and breach of contract | Dormant | 6947 | 31st Judicial District, Hemphill County, Texas |

---

[12]    Patrick McDonald is an individual defendant.

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| Forest Oil Corporation | John Lieux | Alleged property damage | Dormant | 63638 | 18th District Court, Iberville Parish, Louisiana |
| Sabine Oil & Gas Corporation | Fifth Third Equipment Finance Co. | Plaintiff alleges breach of contract and seeks turnover of leased equipment | Answer filed | D-139,553 | 385th Judicial District, Ector County, Texas |
| Sabine Oil & Gas Corporation | Tristate ETX LLC | Contract dispute | Not yet filed | N/A | N/A |
| Sabine Oil & Gas Corporation | Le Norman Operating LLC | Indemnification | Not yet filed | N/A | N/A |
| Sabine Oil & Gas Corporation | Michael Watz Watz Farms | Damage to property | Not yet filed | N/A | N/A |
| Sabine Oil & Gas Corporation | Jimmy Wales Adams Bobbye Carol Adams Hill | Breach of oil & gas lease | Not yet filed | N/A | N/A |
| Sabine Oil & Gas Corporation | Devon Energy Corporation | Indemnification | Not yet filed | N/A | N/A |
| Sabine Oil & Gas Corporation | Arthur Charles Anderson | Severance dispute | Not yet filed | N/A | N/A |
| Sabine Oil & Gas Corporation | Larry Busnardo | Severance dispute | Not yet filed | N/A | N/A |
| Sabine Oil & Gas Corporation | Michael Dern | Severance dispute | Not yet filed | N/A | N/A |
| Sabine Oil & Gas Corporation | Paul Dusha | Severance dispute | Not yet filed | N/A | N/A |
| Sabine Oil & Gas Corporation | Scott Laverde | Severance dispute | Not yet filed | N/A | N/A |
| Sabine Oil & Gas Corporation | Timothy Savoy | Severance dispute | Not yet filed | N/A | N/A |

## EXHIBIT K

### Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| David Sambrooks<br>President and Chief Executive Officer | Oversees all business and operating units. Determines overall company objectives, major strategies, and general policies, activities and organization of the company. | 2007-Present |
| Todd Levesque<br>Executive Vice President and Chief Operating Officer | Oversees and directs exploration and production activities as well as business development, asset development, operations, information technology and environmental, health & safety. | 2007-Present |
| Michael Magilton<br>Senior Vice President and Chief Financial Officer | Oversees financial and accounting activities as well as controller activities, budgets, treasury, tax and investor relations. | 2015-Present |
| Cheryl Levesque<br>Senior Vice President, Asset Development | Responsible for reservoir engineering, geosciences and asset development activities. | 2008-Present |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Tim Yang<br>Senior Vice President, Land & Legal, General Counsel | Oversees legal activities including corporate, SEC, transactional and litigation as well as the land department. | 2011-Present |
| Yamoria Miller<br>Vice President, Human Resources & Administration | Responsible for human resources activities including payroll, benefits, employee matters, recruiting and office administration functions. | 2013-Present |
| Kurt Butler<br>Vice President, Operations | Responsible for drilling, production, field operations and completions. | 2008-Present |
| Tim Pownell<br>Vice President, Corporate Engineering | Responsible for corporate reservoir engineering activities. | 2015-Present |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Lindsay Bourg<br>Vice President and Controller, Chief Administrative Officer | Responsible for accounting, controller and financial reporting activities of the company. | 2009-Present |
| Rob Reasoner<br>Vice President, Land Administration & Information Technology | Responsible for information technology and land administration departments including the management of company land, lease and lease-related records. | 2013-Present |
| Jonathan A. Mitchell<br>Chief Restructuring Officer | Responsible for performing functions related to coordination, communication, negotiation, cash-flow projections, the business plan, long-term capital restructuring, and contingency planning. | July 2015-Present |

## <u>EXHIBIT L</u>

**Debtors' Payroll for the 30 Day Period Following the Filing of the
Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $1,421,397 |
| Payments to officers, directors, and stockholders | $249,830 |
| Payments to financial and business consultants | $0 |

## EXHIBIT M

**Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day Period
Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|------|--------|
| Cash Receipts | $51,093,981 |
| Cash Disbursements | $63,106,220 |
| Net Cash Loss | $(12,012,240) |
| Unpaid Obligations (excluding professional fees) | $(33,659,739) |
| Unpaid Receivables (excluding professional fees) | $47,455,807 |