Paul M. Basta, P.C.
Jonathan S. Henes, P.C.
Christopher Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (*pro hac vice* pending)
Brad Weiland (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) ) ) ) ) ) ) ) ) | Chapter 11 |

In re:                                              )    Chapter 11
                                                    )
SABINE OIL & GAS CORPORATION, *et al.*,[1]          )    Case No. 15-[_____] (___)
                                                    )
                              Debtors.              )    (Joint Administration Requested)
                                                    )

**DEBTORS' MOTION FOR THE ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 507, BANKRUPTCY RULES 2002,
4001, AND 9014, AND LOCAL BANKRUPTCY RULE 4001-2 (I) AUTHORIZING
DEBTORS' LIMITED USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE
PROTECTION TO THE PREPETITION SECURED PARTIES, (III) MODIFYING
THE AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):[2]

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corporation (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440). The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is: 1415 Louisiana, Suite 1600, Houston, Texas 77002.

[2]    The facts and circumstances supporting this Motion are set forth in the *Declaration of Michael Magilton (A) in Support of First Day Motions and (B) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

### Relief Requested

1.      By this Motion, the Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"),[3] and a final order (the "Final Order"), (a) authorizing the Debtors' use of Cash Collateral and Disputed Cash on an interim basis pending a final hearing on the Motion (the "Final Hearing"), (b) granting adequate protection to the Prepetition Secured Parties, (c) modifying the automatic stay, and (d) scheduling the Final Hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of the Final Order.

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules").

### Background

5.      Sabine Oil & Gas Corporation, together with its Debtor and non-Debtor affiliates, is an independent energy company engaged in the acquisition, production, exploration, and development of onshore oil and natural gas properties in the United States.  The Debtors' current

---

[3]     Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to such terms in the Interim Order or the Final Order, as applicable.

2

operations are principally located in the Cotton Valley Sand and Haynesville Shale in East Texas, the Eagle Ford Shale in South Texas, the Granite Wash in the Texas Panhandle, and the North Louisiana Haynesville.

6.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

### The Debtors Have an Immediate Need<br>to Access Cash Collateral and the Disputed Cash

7.      Following extensive good-faith, arm's-length prepetition discussions between the Debtors, the First Lien Agent, and the Second Lien Agent and their respective advisors, the parties have reached an agreement that provides the Debtors with consensual use of Cash Collateral and the Disputed Cash (which is cash held by the Debtors that may constitute Cash Collateral),[4] providing the Debtors with the liquidity necessary to continue operations and fund these chapter 11 cases in the near term.  Without access to Cash Collateral and the Disputed Cash, the Debtors' ability to operate and ultimately restructure as a going concern will be jeopardized to the detriment of *all* of the Debtors' stakeholders.

8.      Specifically, in exchange for consensual access to Cash Collateral and the Disputed Cash, the Debtors have agreed to provide certain forms of adequate protection to the

---

[4]   "Disputed Cash" means cash, including the proceeds of the Debtors' borrowing under the First Lien Credit Agreement on February 25, 2015, in the Debtors' main operating account (the "Operating Account"), as of the Petition Date.

KE 36672016

Prepetition Secured Parties and to make disbursements pursuant to a budget annexed to the Interim Order as **Exhibit A** (subject to permitted variances set forth therein, the "Budget").  The Budget provides parties in interest with clarity around the Debtors' proposed uses of Cash Collateral and the Disputed Cash pending the Final Hearing, while the Debtors, the First Lien Agent, the Second Lien Agent, and the Debtors' other significant creditor constituencies continue to discuss the terms of the Final Order, as well as a possible framework for the Debtors' chapter 11 exit strategy.

9.      In addition to providing the Debtors with liquidity necessary to fund their operations, the Interim Order also preserves the Debtors' ability to continue to evaluate and pursue potentially valuable claims and estate causes of action related to the December 2014 merger between Forest Oil Corporation ("Forest Oil") and Sabine Oil & Gas LLC ("Old Sabine") (such transaction, the "Combination").  In May 2015, the Board of Directors of Debtor Sabine Oil & Gas Corporation (NY) established an independent committee (the "Investigation Committee") to investigate potential legal claims and estate causes of action that the Debtors may possess against creditors, equity holders, and other parties, related to the Combination, including, among other things, the validity, perfection, and enforceability of certain liens granted by the Debtors to the Prepetition Secured Parties in connection with the Combination.

10.      While the Debtors are acknowledging the amount of the Prepetition Secured Parties' claims and the validity, priority, and/or enforceability of the Prepetition Secured Parties' pre-Combination liens under the Interim Order, the Interim Order reserves for the Debtors certain discrete issues regarding the validity of the liens and scope of the Prepetition Secured Parties' Prepetition Collateral.  The Interim Order provides that the Debtors, and only the Debtors, shall retain the right to challenge the validity, priority, and/or enforceability of any liens

4

and security interests granted to the Prepetition Secured Parties on the assets of Forest Oil and its direct and indirect subsidiaries that were not subject to their respective liens and security interest prior to the Combination, provided that the Debtors must file an adversary proceeding or contested matter asserting any such challenge within 75 days of entry of the Interim Order.  This 75-day period will provide the Investigation Committee with the time necessary to complete its investigation and allow the Debtors to determine whether to pursue any such claims.

11.    In addition, on February 25, 2015, the Debtors drew down substantially all of the remaining availability under the First Lien Credit Facility.  The Debtors deposited the revolver draw proceeds in the Operating Account.  The Debtors believe that all or substantially all of the cash held in the Operating Account as of the Petition Date, including the February 25, 2015 revolver draw proceeds, may not be subject to the Prepetition Secured Parties' liens and security interests.  The Debtors reserve the right to contest the extent to which cash held the Operating Account is Cash Collateral.  The Prepetition Secured Parties contend that all or substantially all of the cash held in the Operating Account constitutes Prepetition Collateral or proceeds thereof and reserve their rights with respect to the foregoing.

12.    Recognizing that the Debtors have an immediate need to access the cash held in the Operating Account, the First Lien Agent, on behalf of itself and the other First Lien Secured Parties, has agreed to allow the Debtors to continue to access Cash Collateral and the Disputed Cash.  The First Lien Agent, however, has conditioned the Debtors' continued access to Cash Collateral and the Disputed Cash on the Debtors' commitment to provide certain forms of adequate protection to the First Lien Secured Parties, including reservations of rights in favor of the Debtors and the First Lien Secured Parties regarding whether the Disputed Cash constitutes Cash Collateral as well as regular reporting regarding receipts and disbursements from its

5

operations, payment of certain professional fees and expenses of the Prepetition Secured Parties' counsel and professional advisors, and a commitment to periodically transfer Cash Collateral held in the Operating Account to a segregated bank account.

13.     The Interim Order's proposed treatment of Cash Collateral and the Disputed Cash provides a host of benefits to the Debtors and their stakeholders. More specifically, this resolution allows the Debtors to access Cash Collateral and the Disputed Cash on a consensual basis during the critical early days of these chapter 11 cases when the Debtors' management team is focused on stabilizing their business enterprise during its transition into bankruptcy.

14.     Accordingly, the Debtors respectfully request that the Court enter the Interim Order and the other relief requested by this Motion.

### The Debtors' Prepetition Capital Structure[5]

15.     On December 16, 2014, Debtor Sabine Oil & Gas Corporation ("Sabine") (then known as Forest Oil) and Old Sabine consummated the Combination, pursuant to which Old Sabine and certain of its affiliates were combined with and into Forest Oil.  Forest Oil was subsequently renamed Sabine Oil & Gas Corporation on December 19, 2014.

---

[5]     The descriptions of the Debtors' prepetition debt facilities and the collateral securing those facilities provided herein does not constitute, and should not be construed as, an admission by the Debtors regarding the validity, priority, and/or enforceability of any liens and security interests granted in connection therewith, and the Debtors reserve all rights to challenge or dispute any of the foregoing on any basis whatsoever.  Capitalized terms used within this summary of lenders with liens on Cash Collateral but not otherwise defined herein shall have the meanings set forth in the Interim Order or the First Day Declaration, as applicable.

6

## I.      The Debtors' Prepetition Pre-Combination Secured Debt.[6]

### A.      Old Sabine's Pre-Combination Secured Debt.

#### 1.      The Revolving Credit Facility.

16.      Prior to the Combination, Old Sabine was a borrower under a $225-million Amended and Restated Credit Agreement, dated as of April 28, 2009, by and among Old Sabine's predecessor in interest, as borrower, Wells Fargo Bank, National Association, as successor administrative agent to a syndicate of lenders (in its capacity as such, the "First Lien Agent"), and the lenders and other parties thereto (as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "First Lien Credit Agreement," and, the revolving credit facility thereunder, the "First Lien Credit Facility").   The First Lien Credit Facility originally was guaranteed by Old Sabine's direct and indirect subsidiaries (other than certain immaterial subsidiaries).   To secure the First Lien Credit Facility, Old Sabine and such subsidiaries granted a first-priority lien on certain property of the Debtors, including at least 80 percent of their proved reserves, certain personal property, and the capital stock of substantially all of their direct and indirect subsidiaries.

#### 2.      The Second Lien Term Loan Agreement.

17.      On December 14, 2012, Old Sabine entered into a $500 million second-lien term loan agreement, by and among a predecessor to Old Sabine, as borrower, Bank of America, N.A., as administrative agent (in its capacity as such, the "Second Lien Agent"), and the lenders and other parties thereto (as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Second Lien Credit Agreement").   On January 23, 2013,

---

[6]      In addition to its pre-Combination secured indebtedness, on February 12, 2010, Old Sabine (formerly known as NFR Energy LLC), and Sabine Oil & Gas Finance Corporation (formerly known as NFR Energy Finance Corporation) issued $200 million in 9.75 percent senior unsecured notes due 2017 (the "2017 Notes").   On April 14, 2010, Old Sabine and Sabine Oil & Gas Finance Corporation issued an additional $150 million in 2017 Notes.

7

Old Sabine secured $150 million of funding from the proceeds of an additional syndicated loan under the Second Lien Credit Agreement pursuant to the first amendment to the Second Lien Term Loan Agreement.

### 3.    The Intercreditor Agreement.

18.    Old Sabine, the First Lien Agent, and the Second Lien Agent are parties to that certain Intercreditor Agreement, dated as of December 14, 2012 (as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Intercreditor Agreement"). The Intercreditor Agreement governs certain of the respective rights and interests among the secured parties under the First Lien Credit Agreement and the Second Lien Credit Agreement, including, among other things, any Second Lien Secured Party's right to object to the Debtors' proposed use of cash collateral in connection with a chapter 11 proceeding where the First Lien Agent, on behalf of itself and the First Lien Secured Parties, has consented to such use of cash collateral  (*See* Intercreditor Agreement, §§ 6.1, 6.3.)

### B.    Forest Oil's Pre-Combination Secured Debt.

19.    Prior to the Combination, Forest Oil was the borrower under that certain revolving credit agreement (the "Forest Oil RBL," and, together with the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Intercreditor Agreement, the "Secured Credit Documents") that was secured by a first-priority lien on property of the Debtors, including at least 75 percent of Forest Oil's proved oil and gas reserves together with certain personal property. Immediately prior to the Combination, there was approximately $105 million outstanding under the Forest Oil RBL.[7]

---

[7]    In addition to its pre-Combination secured indebtedness, on June 6, 2007, Forest Oil issued approximately $750 million in 7.25 percent senior unsecured notes due 2019 (the "2019 Notes"). Forest Oil issued an additional $250 million in principal of 2019 Notes on May 22, 2008. Immediately prior to the Combination, there was approximately $577.9 million of 2019 Notes outstanding. In addition, Forest Oil issued

8

## II.    The Debtors' Prepetition Post-Combination Secured Debt.

20.    In connection with the Combination, the Forest Oil RBL was terminated and Old Sabine and certain of its affiliates were combined with and into Forest Oil, at which time the Debtors became obligors or guarantors under the Secured Credit Documents (other than those related to the Forest Oil RBL).  As of the Petition Date, the principal amount of the Debtors' consolidated funded secured indebtedness totaled approximately $1.7 billion and generally consisted of approximately $1 billion of obligations under the First Lien Credit Facility and $700 million of obligations under the Second Lien Credit Agreement.[8]

### A.    The First Lien Credit Agreement.

21.    In connection with the Combination, the Debtors amended and restated the First Lien Credit Agreement, with Sabine becoming the borrower thereunder.   Following the Combination, the borrowing base under the First Lien Credit Facility was $1 billion, including up to $100 million in letters of credit, and the First Lien Credit Facility was secured by a first-priority lien on at least 80 percent of the PV-9 of certain of Sabine's proved reserves (the "Borrowing Base Properties"), certain personal property related thereto and a pledge of the capital stock of substantially all of the former direct and indirect subsidiaries of Sabine, which are now direct and indirect subsidiaries of Sabine.   The Debtors immediately borrowed approximately $750 million under the First Lien Credit Facility, which proceeds were used to, among other things, refinance the prior amounts outstanding under the First Lien Credit Facility and the Forest Oil RBL.  The First Lien Credit Facility matures on April 7, 2016.

---

approximately $500 million in 7.5 percent senior unsecured notes due 2020 (the "2020 Notes") on September 17, 2012.  Immediately prior to the Combination, there was approximately $222.1 million of 2020 Notes outstanding.

[8]    As described above, following the Combination, the principal amount of the Debtors' consolidated funded unsecured indebtedness generally consisted of approximately $350 million of obligations under the 2017 Notes, approximately $578 million under the 2019 Notes, and approximately $222 million under the 2020 Notes.

22.     The First Lien Credit Facility borrowing base is subject to redetermination by the lenders thereunder at least semi-annually, each April 1 and October 1.  A reduction of the borrowing base requires the Debtors to repay outstanding loans under the First Lien Credit Facility in excess of the new borrowing base in one payment or six equal monthly installments and/or provide additional mortgages over oil and gas properties to support a larger borrowing base, at Sabine's option.

23.     On February 25, 2015, the Debtors drew an additional $356 million under the First Lien Credit Facility.  On April 27, 2015, the borrowing base was redetermined from $1 billion to $750 million.  Pursuant to the terms of the First Lien Credit Facility, repayment of the $250-million deficiency was set to begin on May 27, 2015.  The Debtors and First Lien Agent, however, entered into a forbearance agreement (as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Forbearance Agreement") on May 4, 2015, pursuant to which the First Lien Secured Parties agreed to forbear through June 30, 2015, from taking any action in connection with the Debtors' failure to make borrowing base deficiency repayments.  The Forbearance Agreement was subsequently extended through July 15, 2015.  As of the Petition Date, claims in an outstanding principal amount of approximately $900.6 million, including approximately $27 million in the form of letters of credit, remain outstanding under the First Lien Credit Agreement.

**B.     The Second Lien Credit Agreement**.

24.     In connection with the Combination, on December 16, 2014, Old Sabine entered into the second amendment to the Second Lien Credit Agreement, which provided for an incremental $50-million term loan to Old Sabine, resulting in a total amount outstanding of $700 million, as well as additional security interests in assets of the combined Sabine.  Forest Oil then assumed Old Sabine's obligations under the Second Lien Credit Agreement.  Accordingly,

10

Sabine is currently the borrower under the Second Lien Credit Agreement.  The Second Lien Credit Agreement matures on December 31, 2018, and is secured by a second priority lien on the Borrowing Base Properties and certain related personal property and a second priority pledge of the capital stock of substantially all of the former direct and indirect subsidiaries of Old Sabine, which are now direct and indirect subsidiaries of Sabine.  As of the Petition Date, approximately $700 million is outstanding under the Second Lien Credit Agreement.

### C.    The Debtors' Other Secured Obligations.

#### 1.    Hedging Arrangements.

25.    To provide partial protection against declines in oil and natural gas prices, the Debtors routinely enter into hedging arrangements (each, a "Hedge," and, collectively, the "Hedges")) with certain counterparties (each, a "Hedge Counterparty," and, collectively, the "Hedge Counterparties").  The Debtors' decision on the quantity and price at which they choose to hedge their production is based upon their view of existing and forecasted production volumes, budgeted drilling projections, and current and future market conditions and by the First Lien Credit Agreement.  Hedges typically take the form of oil and natural gas price collars and swap agreements.

26.    Certain Hedge Counterparties or their affiliates are also parties under the First Lien Credit Agreement, which authorizes the Debtors to hedge up to 100 percent of current production for 24 months, 75 percent of current production for months 25 through 36, and 50 percent of current production for months 37 through 60.

#### 2.    Other Secured Claims.

27.    In the ordinary course of business, the Debtors routinely transact business with a number of third-party contractors and vendors who may seek to assert liens against the Debtors and their property (such as equipment and, in certain circumstances, mineral interests) if the

Debtors fail to pay for the goods delivered or services rendered. These parties perform various services for the Debtors, including manufacturing and repairing equipment and component parts necessary for the Debtors' oil field activities, contracting, drilling, hauling, and supplying oil and gas related services, as well as shipping the Debtors' products.

### Concise Statement of the
### Material Terms of the Interim Order

28.    Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2(a), the material provisions of the Interim Order, and the location of such provisions therein are summarized below.[9]

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Entities with an Interest in Cash Collateral**<br><br>(Fed. R. Bankr. P. 4001(b)(1)(B)(i)) | The First Lien Agent, the First Lien Secured Parties, the Second Lien Agent, and the Second Lien Secured Parties have an interest in the Debtors' Cash Collateral. | ¶ (a) |
| **Purpose for Use of Cash Collateral**<br><br>(Fed. R. Bankr. P. 4001(b)(1)(B)(ii)) | The Debtors are authorized to use the Cash Collateral, the Disputed Cash, and the cash proceeds of any property of the Debtors that is not Prepetition Collateral for the disbursements set forth in the Budget. | ¶ I. |
| **Duration of Use of Cash Collateral / Termination Events**<br><br>(Fed. Bankr. R. P. 4001(b)(1)(B)(iii) and S.D.N.Y. Bankr. L.R. 4001-2(a)(10)) | The Debtors' access to Cash Collateral and the Disputed Cash will expire occur upon the earlier of: (i) the date that is forty five (45) days after the Petition Date (unless such period is extended by mutual agreement of the First Lien Agent and the Debtors) if the Final Order has not been entered by the Court on or before such date, (ii) January 15, 2016 (unless extended to February 15, 2016, with the consent of the Debtors and the First Lien Agent, in the exercise of their respective sole discretion); (iii) the occurrence of any an event that constitutes an immediate Termination Event; and (iv) five business days following the delivery of a written notice by the First Lien Agent to the Debtors and certain other parties in interest of an event that, if not cured, shall constitute a Termination Event unless such Termination Event is cured by the Debtors during the notice period of waived by the First Lien Agent in its sole discretion. | ¶ 10 |

---

[9]    This summary is qualified in its entirety by the provisions of the Interim Order. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Interim Order. To the extent there are any conflicts between this summary and the Interim Order, the terms of the Interim Order shall govern.

KE 36672016

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Immediate Termination Events.  The occurrence of any of the following shall constitute an immediate Termination Event unless waived by the First Lien Agent:  the dismissal of the these chapter 11 cases or the conversion of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; the entry by the Court of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than the Prepetition Agents or the Prepetition Secured Parties with respect to the Prepetition Collateral or the Collateral without the written consent of the First Lien Agent, which consent may be withheld in its sole discretion; the appointment or election of a trustee, examiner with expanded powers or any other representative with expanded powers relating to the operation of the businesses in these chapter 11 cases; the occurrence of the effective date of a plan of reorganization for the Debtors; the Debtors shall create, incur or suffer to exist any postpetition liens or security interests other than those permitted pursuant to paragraph 6 of the Interim Order; the Debtors shall create, incur or suffer any other claim which is pari passu with or senior to the Adequate Protection Claims; except as permitted by paragraphs 11 or 23(a) of the Interim Order, a filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the First Lien Indebtedness or asserting any other cause of action against and/or with respect to the First Lien Indebtedness, the Prepetition Collateral securing the First Lien Indebtedness or any of the First Lien Secured Parties (or if the Debtors support any such motion, pleading, application or adversary proceeding commenced by any third party);  except as permitted by paragraphs 11 or 23(b) of the Interim Order, a filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the Second Lien Indebtedness or asserting any other cause of action against and/or with respect to the Second Lien Indebtedness, the Prepetition Collateral securing the Second Lien Indebtedness or any of the Second Lien Secured Parties (or if the Debtors support any such motion, pleading, application or adversary proceeding commenced by any third party);  the Debtors' failure to file an application to employ a chief restructuring officer on the Petition Date; the Debtors' failure to employ a chief restructuring officer that is reasonably acceptable to the First Lien Agent within twenty (20) business days of the resignation or incapacity of any chief restructuring officer retained by the Debtors on or after the Petition Date; or the entry of an order reversing, staying, vacating or otherwise modifying in any material respect the terms of the Interim Order.  Default Notice Period Termination Events.  The occurrence of any of the following, if not cured by the Debtors within five business days of notice thereof by the First Lien Agent or waived by the First Lien Agent in its discretion, shall constitute a Termination Event:  the failure by the Debtors to make any payment required pursuant to the Interim Order when due; the failure by the Debtors to deliver to the Prepetition Agents any of the documents or other information required to be delivered pursuant to the Interim Order when due or any such documents or other information shall contain a material misrepresentation; the failure by the Debtors to adhere to the Budget except, in each instance, with respect to Permitted Deviations or Non-Conforming Uses; or the failure by the Debtors to observe or perform any of the material terms or material provisions contained herein. | |

KE 36672016

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Proposed Adequate Protection**<br><br>(Fed. Bankr. R. P. 4001(b)(1)(B)(iv))<br><br>**Economic Terms Including Fees and Expenses of the Lenders, Agents, and Their Respective Professionals**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(3)). | <u>First Lien Secured Parties' Adequate Protection Package.</u>  The Debtors have agreed to provide the First Lien Secured Parties with the following adequate protection package to the extent of any Collateral Diminution of a First Lien Secured Party's interest in the Prepetition Collateral:   (a) the Debtors will provide adequate protection liens to the First Lien Secured Parties to the extent of any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, subject to the Carve Out; (b) the Debtors will grant the First Lien Secured Parties allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code, which superpriority claims shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, subject to the Carve Out; (c) the Debtors shall make adequate protection payments in an amount equal to all accrued and unpaid prepetition or postpetition interest, fees and costs due and payable under the First Lien Credit Agreement on the last business day of each calendar month after the entry of the Interim Order based on the Alternate Base Rate (as defined in the First Lien Credit Agreement) plus 1.50 percent, which is the Applicable Margin under the First Lien Credit Agreement; (d) the Debtors will pay the reasonable and documented fees and expenses incurred by the First Lien Agent; (e) the Debtors will continue to comply with the financial reporting requirements set forth in the First Lien Credit Agreement and will provide certain additional financial reporting, as further described in the Interim Order; (f) the Debtors will comply with the Budget, subject to certain variances set forth in the Interim Order; (g) the Debtors have agreed to provide the First Lien Agent with consent rights over certain sales, property exchanges, and other dispositions (including casualty and condemnation events) of Collateral and to deposit net cash proceeds of any such Collateral Sale into a segregated account; (h) the Debtors will comply with additional covenants regarding the operation of their postpetition cash management system; and (i) the Debtors have agreed to use the cash proceeds from certain swap termination or unwinding events to permanently reduce the First Lien Indebtedness.<br><br><u>Second Lien Secured Parties' Adequate Protection Package.</u>  The Debtors have agreed to provide the Second Lien Secured Parties with the following adequate protection package to the extent of any Collateral Diminution of a First Lien Secured Party's interest in the Prepetition Collateral:   (a) the Debtors will provide adequate protection liens to the Second Lien Secured Parties to the extent of any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, subject to the Carve Out and the adequate protection liens granted to the First Lien Secured Parties; (b) the Debtors will grant the Second Lien Secured Parties an allowed administrative claim against each of the Debtors on a joint and several basis with priority over any and all other administrative claims against the Debtors now existing or hereafter arising in the Cases, including all claims of the kind specified under sections 503(b) and 507(b) of the Bankruptcy Code (subject and subordinate only to the Carve Out and the First Lien Adequate Protection Claims); (c) the Debtors will provide the Second Lien Agent with the reporting materials provided to the First Lien Agent as part of the First Lien Agent's adequate protection package; and (d) the Debtors will pay the reasonable and documented fees and expenses incurred by the Second Lien Agent.<br><br><u>Collateral Diminution.</u>  "Collateral Diminution" shall mean an amount equal to | ¶¶ 3, 4, 5 |

KE 36672016

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | the diminution of the value of the Prepetition Secured Parties' interest in the Prepetition Collateral from and after the Petition Date for any reason, including the use of Cash Collateral, the use, sale, lease, consumption, or disposition of Prepetition Collateral, or the imposition of the automatic stay. | |
| **Amount of Cash Collateral to be Used** <br><br> (S.D.N.Y. Bankr. L.R. 4001-2(a)(1)) | The Debtors are authorized, subject to the terms and conditions of the Interim Order, to use Cash Collateral and the Disputed Cash.[10] | |
| **Material Conditions to Closing and Borrowing, Including Budget Provisions** <br><br> (S.D.N.Y. Bankr. L.R. 4001-2(a)(2)) | <u>The Budget</u>.  The Debtors shall adhere to the Budget during the Budget Period, provided that, during any four-week period, the Debtors may carry forward any Positive Variance (as defined below) to the future periods in the Budget. <br><br> <u>Positive Variance</u>.  For purposes of the Interim Order, "Positive Variance" shall mean that amount by which either (i) the Total Net Receipts (designated in the Budget) as "Total Receipts (Net)") exceeds 100% of the budgeted amount (the "Excess Receipts") or (ii) Total Operating Disbursements (as designated in the Budget) are in an amount less than 100% of the budgeted amount (the "Unpaid Disbursements"). <br><br> <u>Permitted Deviation</u>.   For purposes of the Interim Order, the "Permitted Deviation" shall mean that, for any four-week period set forth in the Budget commencing the week of July 20, 2015, the Total Net Receipts shall not be less than 85% of the budgeted amount and the Total Operating Disbursements shall not exceed 115% of the budgeted amount. <br><br> <u>Non-Conforming Use</u>.  The First Lien Agent may, in its sole discretion, agree in writing to the use of the Cash Collateral in a manner or amount which does not conform to the manner or amount, as applicable, set forth in the Budget (including, for the avoidance of doubt, after giving effect to the Permitted Deviation) (each such approved non-conforming use of Cash Collateral, a "Non-Conforming Use").  If such written consent is given, the Debtors shall be authorized pursuant to the Interim Order to use Cash Collateral for any such Non-Conforming Use without further Court approval, and the Prepetition Secured Parties shall be entitled to all of the protections specified in the Interim Order for any such Non-Conforming Use. <br><br> <u>Debtors' Obligations Under Section 363(c)(4)</u>.  The Debtors shall establish and implement procedures reasonably acceptable to the First Lien Agent and the Debtors to segregate and account for all cash proceeds of the Prepetition Collateral, (other than the Disputed Cash) held in the Operating Account on the Petition Date (including the proceeds of joint interest billings arising under joint operating agreements related to the Hydrocarbon Properties) or received by the Debtors on or after the Petition Date as determined based on net lease operating statements and net accrued capital expenditures beginning with the month of June 2015. <br><br> <u>Limited Usage of Segregated Cash Collateral</u>.  The Debtors are authorized to | ¶¶ 2, 11, 12, 13 |

---

[10]   As described in the Motion and the Interim Order, the Disputed Cash may constitute Cash Collateral.

KE 36672016

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | use Segregated Cash Collateral solely to pay Capital Expenditures (as designated in the Budget) and Lease Operating Expenses (as designated in the Budget) related to the Prepetition Collateral, in each case, as permitted by and in accordance with the Budget, and for such other expenses as may be ordered by the Court after notice and a hearing or as may be agreed to by the First Lien Agent in its sole discretion. | |
| **Effect on the Existing Liens of the Adequate Protection**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(4)) | Priority of Adequate Protection Liens and Adequate Protection Claims. Except to the extent of the Carve Out, the Adequate Protection Liens and Adequate Protection Claims granted to the Prepetition Secured Parties pursuant to paragraphs 3 and 4 of the Interim Order shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Codes and shall not be subordinated to or made pari passu with any lien, security interest or administrative claim under section 364 of the Bankruptcy Code or otherwise; provided that the Debtors shall not create, incur or suffer to exist any postpetition liens or security interests other than:  (i) those granted pursuant to the Interim Order; (ii) carriers', mechanics', operator's, warehousemen's, repairmen's or other similar liens arising in the ordinary course of business; (iii) pledges and deposits in connection with workers' compensation, unemployment insurance and other social security legislation; and (iv) deposits to secure the payment of any postpetition statutory obligations and performance bonds. | ¶ 6 |
| **Carve-Out Provisions**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(5)) | Carve Out.  As used in the Interim Order, "Carve Out" means the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; plus (ii) fees and expenses up to $100,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code; plus (iii) all allowed unpaid fees and expenses (whether allowed before or after the delivery of a Carve Out Notice (as defined herein), and whether allowed by interim order, procedural order, or otherwise) incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (any such persons or firms, collectively, the "Debtor Professionals") and the Committee (any such persons or firms, together with the Debtor Professionals, collectively, the "Professional Persons") at any time before the first business day following delivery by the First Lien Agent (via electronic mail, overnight delivery or hand delivery) to each of Sabine's Senior Vice President and Chief Financial Officer, Kirkland& Ellis LLP, the U.S. Trustee, counsel to the Second Lien Agent and counsel to the Committee of a written notice (the "Carve Out Notice"), which notice may be delivered at any time following the occurrence of the Termination Date or a Termination Event (as defined below), stating that a Termination Date has occurred or a Termination Event has occurred; and (iv) the allowed fees and expenses (whether allowed by interim order, procedural order, or otherwise) of Professional Persons in an aggregate amount not to exceed $1,000,000 (the "Post-Carve Out Notice Cap") incurred after the first business day following delivery by the First Lien Agent of the Carve Out Notice as set forth above; provided that (x) other than fees and expenses incurred by the Debtors' Professionals in connection with paragraphs 11 and 23(a) of the Interim Order, the Carve Out shall not be available to pay the fees or expenses of Professional Persons incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the First Lien Agent or the other First Lien Secured | ¶ 7 |

16

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Parties; (y) so long as a Carve Out Notice has not been delivered, the Carve Out shall not be reduced by the payment of fees and expenses of Professional Persons allowed at any time by the Court and payable under sections 328, 330 or 331 of the Bankruptcy Code; and (z) without prejudice to the rights of Professional Persons or the Debtors to contest any such objection, nothing in the Interim Order shall be construed to impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any Professional Persons.  Subject to entry of the Final Order, upon delivery of the Carve Out Notice as set forth above, the Debtors shall establish a reserve account with the First Lien Agent (the "Carve Out Reserve") in an amount equal to the sum of (i) all billed and unpaid monthly fees and expenses of all Professional Persons (including any outstanding holdbacks); (ii) all unbilled fees and expenses of Professional Persons incurred prior to the delivery of the Carve Out Notice, and (iii) the Post Carve-Out Notice Cap (collectively, the "Carve Out Professional Fees").

Carve Out Reserve.  The Carve Out Reserve shall be funded in cash, and the payment of the Carve Out Professional Fees from the Carve Out Reserve shall be deemed to have been satisfied: (x) first, from cash, if any, that is not Cash Collateral; (y) second, from Disputed Cash, and (z) third, only if there is no cash remaining in respect of (x) and (y) above, from Segregated Cash Collateral.  After payment in full of the allowed amount of the Carve Out Professional Fees from the Carve Out Reserve, any funds remaining in the Carve Out Reserve shall be applied as follows:  (i) first, cash up to the amount of Segregated Cash Collateral, if any, used to fund the Carve Out Reserve shall be returned to the Segregated Account and shall constitute Segregated Cash Collateral; (ii) second, cash up to the amount of the Disputed Cash used to fund the Carve Out Reserve shall be transferred to the Operating Account and shall constitute Disputed Cash pending further Court order; and (iii) third, any funds remaining in the Carve Out Reserve thereafter shall be transferred to the Operating Account and shall constitute cash that is not Cash Collateral. | |
| **Provisions that Could Restrict the Rights and Powers of the Debtor In Possession**

(S.D.N.Y. Bankr. L.R. 4001-2(a)(8)); and

**Limitations on the Lender's Obligation to Fund Certain Activities of the Debtors or Any Committee Appointed Under Sections 1102 or 1114 of the** | Debtors' Admissions with Respect to the First Lien Prepetition Indebtedness and Second Lien Prepetition Indebtedness.  As part of the Interim Order, the Debtors have stipulated to the validity of the First Lien Prepetition Indebtedness and the Second Lien Prepetition Indebtedness.

Debtors' Admissions with Respect to the First Lien Prepetition Indebtedness.  The Debtors have also admitted, stipulated, and agreed, subject to their rights under paragraphs 11 and 23 of the Interim Order that under the First Lien Collateral Documents, they have granted valid, binding, perfected, and enforceable first priority liens upon and security interests in the Prepetition Collateral to the First Lien Agent for the benefit of the First Lien Secured Parties to secure the First Lien Prepetition Indebtedness, subject only to specific permitted exceptions under the First Lien Credit Agreement and First Lien Collateral Documents.

Debtors' Admissions with Respect to the Second Lien Prepetition Indebtedness.  The Debtors have also admitted, stipulated, and agreed, subject to their rights under paragraphs 11 and 23 of the Interim Order that under the Second Lien Collateral Documents, they have granted valid, binding, perfected, and enforceable second priority liens upon and security interests in the Prepetition Collateral (other than Prepetition Collateral constituting setoff rights of the First | ¶¶ D, E, F, G, H, 22, 23, 24 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Bankruptcy Code**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(9)) | Lien Secured Parties), subject in each case to the Intercreditor Agreement and permitted exceptions under the First Lien Credit Agreement, the First Lien Collateral Documents, the Second Lien Credit Agreement, and the Second Lien Collateral Documents to the Second Lien Agent for the benefit of the Second Lien Secured Parties to secure the Second Lien Prepetition Indebtedness.<br><br>Debtors' Admissions With Respect to Cash Collateral.  Subject to the Debtors' rights set forth in paragraph 11 of the Interim Order, and without prejudice to the rights, if any, of any other party (but subject to the limitations thereon described herein in paragraphs 22 and 24), the Debtors admit, stipulate and agree that all cash proceeds of the Prepetition Collateral, including all such cash proceeds of such Prepetition Collateral held in any of the Debtors' banking, checking or other deposit accounts with financial institutions (in each case, other than trust, escrow and custodial funds held as of the Petition Date in properly established trust, escrow and custodial accounts), are Cash Collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.  The Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including the Cash Collateral, for any Collateral Diminution (as defined herein) and all cash in the Operating Account as of the Petition Date or deposited into the Operating Account after the Petition Date constitutes Cash Collateral except for cash that is not property of the Debtors and cash proceeds of any property of the Debtors that is not Prepetition Collateral.<br><br>Releases; Investigation.  Subject to the Debtors' rights under paragraphs 11 and 23 of the Interim Order, and without prejudice to the rights of any other party (but subject to the limitations thereon described herein in paragraphs 22 and 24), each Debtor hereby forever waives and releases any and all Claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against each of the Prepetition Secured Parties, whether arising at law or in equity, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or Chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.<br><br>Reservation of Certain Third Party Rights and Bar of Challenge and Claims.  Subject only to the Debtors' rights under paragraphs 11 and 23 of the Interim Order, the Debtors' admissions and releases contained in paragraphs D, E, F, G and H of the Interim Order:  (i) shall be binding upon the Debtors for all purposes; and (ii) shall be binding upon all other parties in interest, including the Committee, for all purposes unless (1) a party (subject in all respects to any agreement or applicable law which may limit or affect such entities right or ability to do so) has properly filed an adversary proceeding or contested matter by no later than the date that is seventy-five (75) days from the date of entry of the Interim Order (or, in the case of the Committee, sixty (60) days from the entry of the Final Order (the "Committee Challenge Deadline"), (x) challenging the amount, validity, enforceability, priority, or extent of the First Lien Prepetition Indebtedness, the Second Lien Prepetition Indebtedness or the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral, or (y) otherwise asserting any claims or causes of action against the Prepetition Secured Parties on behalf of the Debtors' estates, and (2) the Court rules in favor of the plaintiff in any such timely and properly filed adversary |  |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | proceeding or contested matter. If no such adversary proceeding or contested matter is properly filed as of such dates or the Court does not rule in favor of the plaintiff in any such proceeding, then subject only to the Debtors' rights under paragraph 11 and 23 of the Interim Order: (a) the Debtors' admissions and releases contained in paragraphs D, E, F, G and H of the Interim Order shall be binding on all parties in interest, including the Committee; (b) the obligations of the Debtors under the First Lien Loan Documents and Second Lien Loan Documents shall constitute allowed claims for all purposes in these chapter 11 cases, and any subsequent chapter 7 case(s); (c) the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral shall be deemed to have been, as of Petition Date, legal, valid, binding, and perfected first priority security interests and liens, not subject to recharacterization, subordination or otherwise avoidable; and (d) the First Lien Prepetition Indebtedness, the Second Lien Indebtedness and the Prepetition Secured Parties' security interests in and liens on the Prepetition Collateral shall not be subject to any other or further challenge by the Committee or any other party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto. If any such adversary proceeding or contested matter is properly filed as of such dates, the Debtors' admissions and releases contained in paragraphs D, E, F, G and H of the Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) except to the extent that such admissions and releases were expressly challenged in such adversary proceeding or contested matter. Nothing contained in the Interim Order shall be deemed to grant standing to the Committee or any other party to commence any such adversary proceeding or contested matter.<br><br>Limitation on Use of Cash Collateral. Notwithstanding the foregoing or any other provision of the Interim Order, no Disputed Cash or other Cash Collateral may be used to: (a) object to, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of the Prepetition Indebtedness, or the liens or claims granted under the Interim Order or the Prepetition Loan Documents and/or assert any claims, defenses or causes of action against the Prepetition Secured Parties or their respective agents, affiliates, representatives, attorneys, or advisors, except by the Debtors in accordance with the Budget and as set forth in paragraph 23 of the Interim Order; (b) prevent, hinder, or otherwise delay the First Lien Agent's assertion, enforcement, or realization on the Cash Collateral or the Collateral in accordance with the First Lien Loan Documents or the Interim Order; (c) seek to modify any of the rights granted in the Interim Order or the First Lien Loan Documents without the First Lien Agent's prior written consent; or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are both approved by an Order of the Court and in accordance with the Budget. Notwithstanding the foregoing, advisors to the Committee may investigate the claims and liens of the Prepetition Secured Parties prior to the Committee Challenge Deadline at an aggregate expense not to exceed $50,000. | |

## Basis for Relief

I.  **The Debtors' Request to Use Cash Collateral and Proposed Adequate Protection are Appropriate**.

   A.  **The Use of Cash Collateral Is Warranted and Should Be Approved**.

29.  The Debtors' use of property of their estates, including Cash Collateral (including Disputed Cash, which may constitute Cash Collateral), is governed by section 363 of the Bankruptcy Code.[11]  Section 363(c)(2) of the Bankruptcy Code provides that a debtor may use cash collateral as long as either "each entity that has an interest in such cash collateral consents" or "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2)(A)-(B).

30.  Here, the Debtors have negotiated consensual use of Cash Collateral and the Disputed Cash with the First Lien Agent (on behalf of the First Lien Secured Parties) and the Second Lien Agent (on behalf of the Second Lien Secured Parties). Because the Debtors have the consent of the entities with an interest in the Cash Collateral and the Disputed Cash, the Court should approve such use under section 363(c)(2)(A) of the Bankruptcy Code.

   B.  **The Court Should Approve the Agreed Adequate Protection Package**.

      1.  **A Secured Creditor Is Entitled to Adequate Protection to the Extent of Any Diminution in Value of Its Collateral**.

31.  Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. *See* 11 U.S.C. § 363(e); *In re Beker*

---

[11]  The Bankruptcy Code defines "cash collateral" as follows:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

KE 36672016

*Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).  Further, section 362(d)(1) of the

Bankruptcy Code provides for adequate protection of interests in property due to the imposition

of the automatic stay.  *See* 11 U.S.C. § 362(d)(1); *In re Cont'l Airlines*, 91 F.3d 553, 556

(3d Cir. 1996).  Section 361 of the Bankruptcy Code provides examples of forms of adequate

protection, such as cash payment or periodic cash payments, additional liens, replacement liens,

or the "indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.  The

list set forth in section 361 of the Bankruptcy Code, however, is non-exhaustive, and courts

decide what constitutes sufficient adequate protection on a case-by-case basis.  *See In re Beker*

*Indus. Corp.*, 58 B.R. at 736.

33.    The concept of adequate protection is designed to shield a secured creditor from

diminution in the value of its interest in collateral during the period of a debtor's use.  *See In re*

*Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured

party's interest is protected from diminution or decrease as a result of the proposed use of cash

collateral."); *see also In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The

legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate

protection may be provided under section 363, makes clear that the purpose is to insure that the

secured creditor receives the value for which the creditor bargained for prior to the debtor's

bankruptcy.").  "However, neither the legislative history nor the Bankruptcy Code requires the

Court to protect a creditor beyond what was bargained for by the parties."  *Id.* at 619; *see Beker*,

58 B.R. at 741 ("Adequate protection, not absolute protection, is the statutory standard.").

33.    As a result, the determination of adequate protection is an inherently "fact specific

inquiry."  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the

vagaries of each case . . . .") (citation omitted).  The focus of the adequate protection requirement

is to preserve the secured creditor's position at the time of the bankruptcy filing and protect the secured creditor from diminution in the value of its collateral during the reorganization process. *Id.* at 288 (citation omitted); *Beker*, 58 B.R. at 736; *see also In re WorldCom, Inc.*, 304 B.R. 611, 618–19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy."). "However, neither the legislative history nor the Bankruptcy Code requires the Court to protect a creditor beyond what was bargained for by the parties." *WorldCom*, 304 B.R. at 619; *see also Beker*, 58 B.R. at 741 ("Adequate protection, not absolute protection, is the statutory standard.").

34.     What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Monroe Park*, 17 B.R. 934 (D. Del. 1982) (noting that adequate protection requires a debtor to propose some form of relief that will preserve the secured creditor's interest in collateral pending the outcome of the bankruptcy proceedings); *see also In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Mosello*, 195 B.R. at 289; *In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).

### 2.     The Debtors Plan to Provide the Prepetition Secured Parties with Various Forms of Adequate Protection on Account of Any Diminution in Value of Their Respective Interests in Their Collateral.

35.     The Debtors propose to provide the First Lien Secured Parties with the following adequate protection package.

- *First*, the Debtors will provide adequate protection liens to the First Lien Secured Parties to the extent of any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, subject to the Carve Out.

22

- *Second*, the Debtors will grant the First Lien Secured Parties allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code, which superpriority claims shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, subject to the Carve Out.

- *Third*, the Debtors shall make adequate protection payments in an amount equal to all accrued and unpaid prepetition or postpetition interest, fees and costs due and payable under the First Lien Credit Agreement on the last business day of each calendar month after the entry of the Interim Order based on the Alternate Base Rate (as defined in the First Lien Credit Agreement) plus 1.50 percent, which is the Applicable Margin under the First Lien Credit Agreement.

- *Fourth*, the Debtors will pay the reasonable and documented fees and expenses incurred by the First Lien Agent, including the reasonable professional fees, expenses and disbursements (of counsel and other third-party consultants) incurred by the First Lien Agent under the First Lien Credit Agreement.

- *Fifth*, the Debtors will continue to comply with the financial reporting requirements set forth in the First Lien Credit Agreement and will provide certain additional financial reporting to the First Lien Agent, as further described in the Interim Order.

- *Sixth*, the Debtors will comply with the Budget, subject to certain variances set forth in the Interim Order.

- *Seventh*, the Debtors have agreed to provide the First Lien Agent with consent rights over certain sales, property exchanges, and other dispositions (including casualty and condemnation events) of Collateral and to deposit net cash proceeds of any such Collateral Sale into a segregated account.

- *Eighth*, the Debtors will comply with additional covenants regarding the operation of their postpetition cash management system.

- *Finally*, the Debtors have agreed to use the cash proceeds from certain swap termination or unwinding events to permanently reduce the First Lien Indebtedness.

36.     Here, the Debtors propose to provide the Second Lien Secured Parties with the following adequate protection package.

- *First*, the Debtors will provide adequate protection liens to the Second Lien Secured Parties to the extent of any diminution in value of their

23

interests in the Prepetition Collateral, including Cash Collateral, subject to the Carve Out and the adequate protection liens granted to the First Lien Secured Parties.

- **Second**, the Debtors will grant the Second Lien Secured Parties allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code, which superpriority claims shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, subject to the Carve Out and the First Lien Secured Parties' allowed superpriority administrative claims.

- **Third**, the Debtors will provide the Second Lien Agent with the financial materials provided to the First Lien Agent as part of the First Lien Agent's adequate protection package.

- **Finally**, the Debtors will pay the reasonable and documented fees and expenses incurred by the Second Lien Agent, including the reasonable professional fees, expenses and disbursements (of counsel and other third-party consultants) incurred by the Second Lien Agent under the Second Lien Credit Agreement.

### 3.      The Prepetition Secured Parties Are Adequately Protected by the Adequate Protection Package.

37.      The Debtors respectfully submit that the proposed adequate protection package is sufficient to protect the First Lien Secured Parties and the Second Lien Secured Parties from any diminution in value to the Prepetition Collateral during the interim period. *See, e.g.*, *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (evaluating "whether the value of the debtor's property will increase as a result of the" use of collateral in determining sufficiency of adequate protection); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).[12]

---

[12]    Moreover, as a general matter, continued operations are far more likely to maintain, or even increase, the value of the underlying collateral as compared with the catastrophic loss of value that could result from denial of this Motion. *See In re Jim Kelly Ford of Dundee, Ltd.*, 14 B.R. 812 (N.D. Ill. 1980) (lender was adequately protected and debtor was authorized to use cash collateral to fund operations because the lender benefited from the difference between the average sale price of car sold at retail and the average sale price if the same vehicle

24

38.     Moreover, courts in this and other jurisdictions have approved similar adequate

protection packages in other recent chapter 11 cases.    *See, e.g., In re Cengage Learning, Inc.*,

No. 13-44106 (ESS) (Bankr. E.D.N.Y. July 3, 2013) (approving an adequate protection package

consisting of replacement liens, superpriority claims to the extent of any diminution of value of

the interests of the prepetition secured creditors in prepetition collateral, payment of professional

fees, additional covenants, and additional reporting); *In re Citadel Broad. Corp.*, No. 09-17442

(Bankr. S.D.N.Y. Mar. 3, 2010) (approving adequate protection liens, section 507(b) claims, and

fees and expenses of the prepetition agent, among other things, as sufficient adequate

protection); *In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (Bankr. S.D.N.Y. Oct. 6, 2009)

(same); *In re Extended Stay Inc.*, No. 09-13764 (Bankr. S.D.N.Y. July 23, 2009) (approving

adequate protection liens and 507(b) claims, among other things, as sufficient adequate

protection); *In re ION Media Networks, Inc.*, No. 09-13125 (Bankr. S.D.N.Y June 2, 2009)

(approving adequate protection liens, 507(b) claims, reimbursement of fees and expenses of the

prepetition agent, and financial reporting, among other things, as sufficient adequate protection);

*In re General Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving

adequate protection liens and 507(b) claims, among other things, as sufficient adequate

protection).[13]

39.     Thus, the Debtors' proposed adequate protection is not only necessary to protect

the Prepetition Secured Parties against any diminution in value of their respective interest in the

---

was sold at a wholesale auction); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716-18 (Bankr. D. Del. 1996) (lender with a secured interest in all cash collateral of the debtor was adequately protected where the ongoing operation of the debtor's business was profitable postpetition).

[13]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

KE 36672016

Prepetition Collateral, but is also fair and appropriate on an interim basis under the circumstances of these chapter 11 cases.

## II.    Failure to Obtain the Immediate Interim Use of Cash Collateral and the Disputed Cash Would Cause Immediate and Irreparable Harm.

40.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to Section 363 may not be commenced earlier than 14 days after the service of such motion.  However, the Court is authorized to conduct a preliminary expedited hearing on the Motion and authorize the Debtors' proposed use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Fed. R. Bankr. P. 4001(b)(2).

41.    The Debtors have an immediate postpetition need to use Cash Collateral and the Disputed Cash.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to Cash Collateral and the Disputed Case.  The Debtors will use Cash Collateral and the Disputed Case to, among other things, procure goods and services from vendors, pay their employees, and satisfy other working capital needs during these chapter 11 cases.  The Debtors will, therefore, be unable to operate their business as a going concern or finance the costs of administering these chapter 11 estates without the ability to use Cash Collateral and the Disputed Cash.

42.    The Debtors, therefore, seek immediate authority to use Cash Collateral and the Disputed Cash on an interim basis and as set forth in this Motion and to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).  Accordingly, to the extent that the Debtors require the use of Cash Collateral and the Disputed Cash, the Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate Cash Collateral and the Disputed Cash availability on an interim basis.

KE 36672016

### III.    The Debtors' Admissions Regarding the Validity, Enforceability, Priority, or Extent of the Prepetition Secured Parties' Claims and Liens on and Security Interests in the Prepetition Collateral Are Appropriate Under the Facts and Circumstances of These Chapter 11 Cases.

43.    Local Rule 4001-2(a)(8) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor.    *See* S.D.N.Y. Bankr. L.R. 4001-2(a)(8)).

44.    As part of the Interim Order, the Debtors have stipulated to the validity of the First Lien Prepetition Indebtedness and the Second Lien Prepetition Indebtedness. (*See* Interim Order, at ¶ D, E.)  The Debtors have also admitted, stipulated, and agreed, subject to their rights under paragraphs 11 and 23 of the Interim Order, that:   (a) under the First Lien Collateral Documents, they have granted valid, binding, perfected, and enforceable first priority liens upon and security interests in the Prepetition Collateral to the First Lien Agent for the benefit of the First Lien Secured Parties to secure the First Lien Prepetition Indebtedness, subject only to specific permitted exceptions under the First Lien Credit Agreement and First Lien Collateral Documents (Interim Order, at ¶ D); and (b) under the Second Lien Collateral Documents, they have granted valid, binding, perfected, and enforceable second priority liens upon and security interests in the Prepetition Collateral (other than Prepetition Collateral constituting setoff rights of the First Lien Secured Parties), subject in each case to the Intercreditor Agreement and permitted exceptions under the First Lien Credit Agreement, the First Lien Collateral Documents, the Second Lien Credit Agreement, and the Second Lien Collateral Documents to the Second Lien Agent for the benefit of the Second Lien Secured Parties to secure the Second Lien Prepetition Indebtedness.  (Interim Order, at ¶ E.)

KE 36672016

45.     The Debtors' admissions, stipulations, and agreements set forth in the Interim Order are subject to certain usage restrictions and reservations of rights with respect to the Disputed Cash.  (*See* Interim Order, at ¶ 11.)

46.     The Debtors' admissions, stipulations, and agreements set forth in the Interim Order are also subject to a limited reservation of rights and limitation on challenges to the validity, priority, and/or enforceability of any liens and security interests granted to the Prepetition Secured Parties.  More specifically, the Debtors shall retain the right to challenge the validity, priority and/or enforceability of any liens and security interests granted to the First Lien Secured Parties or the Second Lien Secured Parties on the assets of Forest Oil and its direct and indirect subsidiaries that were not subject to the First Lien Secured Parties or Second Lien Secured Parties' liens and security interest, as applicable, prior to the Combination.  If the Debtors fail to file an adversary proceeding or contested matter asserting such challenge by the date that is 75 days from the date of entry of the Interim Order, or the Court does not rule in favor of the Debtors in any such proceeding, then the applicable liens and security interests granted to the Prepetition Secured Parties shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected first priority security interests and liens, not subject to recharacterization, subordination or otherwise avoidable and such liens and security interests shall not be subject to any other or further challenge by the Debtors, including, without limitation, any successor thereto.  (*See* Interim Order, at ¶ 23.)[14]

---

[14]    The Debtors' admissions, stipulations, and agreements regarding the validity, enforceability, priority, or extent of the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral are without prejudice to the rights of the Committee.  More specifically, the proposed Interim Order provides that the Committee shall have 60 days from the date of entry of the Final Order to seek to challenge the amount, validity, enforceability, priority, or extent of the First Lien Prepetition Indebtedness, the Second Lien Prepetition Indebtedness or the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral or otherwise assert any claims or causes of action against the Prepetition Secured Parties on behalf of the Debtors' estates.  The Debtors believe that the proposed Committee challenge period is appropriate under

28

47.     This 75-day period will provide the Investigation Committee with the runway necessary to complete its investigation and allow the Debtors to determine whether to pursue any such claims.   The Debtors believe that this reasonable compromise providess the Investigation Committee with the appropriate time to determine whether to prosecute viable claims that the Debtors' estates may have against their creditors while also securing access to Cash Collateral and the Disputed Cash on a consensual basis.

## IV.     The Proposed Cash Segregation and Tracing Procedures Are Appropriate.

48.     Generally speaking, what constitutes adequate protection is decided on a case-by-case basis.  *See, e.g.*, *In re Continental Airlines Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993) (explaining that courts have a great deal of discretion in determining what form of adequate protection relief to grant); *In re Mosello*, 195 B.R. at 289 ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case") (citing *In re Beker Industries Corp*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Moreover, in determining whether a creditor's interest is adequately protected, "the adequate protection standard must only be applied in light of all facts surrounding each case and upon equitable considerations therefrom." *In re Pannell*, 12 B.R. 51, 54 (Bankr. E.D. Pa. 1981).

49.     Paragraph 11 of the Interim Order requires the Debtors to maintain the Disputed Cash in the Operating Account and use the Disputed Cash to fund all adequate protection payments required to be paid pursuant to the Interim Order, all Restructuring Professional Fees (as designated in the Budget), all Capital Expenditures (as designated in the Budget), and Lease Operating Expenses (as designated in the Budget) related to the Debtors' assets that are not Prepetition Collateral and 100 percent of the Debtors' other general and administrative expenses

---

the facts and circumstances of these chapter 11 cases and in light of similar relief granted by courts in other complex chapter 11 restructurings in the Southern District of New York.

KE 36672016

(the "Unallocated G&A"), in each case, as permitted by and in accordance with the Budget. (Interim Order, at ¶ 11.)  The Interim Order further provides that the Debtors and the First Lien Agent (on behalf of the First Lien Secured Parties) reserve their respective rights to assert claims or seek any other relief with respect to the Disputed Cash.  Finally, the Interim Order provides that the Debtors further reserve their right to assert that a portion of the Unallocated G&A should be payable from the Segregated Cash Collateral.  (*Id.*)

50.     Paragraph 12 of the Interim Order also requires the Debtors to establish and implement procedures reasonably acceptable to the First Lien Agent and the Debtors to segregate and account for all cash proceeds of the Prepetition Collateral (other than the Disputed Cash) held in the Operating Account on the Petition Date (including the proceeds of joint interest billings arising under joint operating agreements related to the Hydrocarbon Properties) or received by the Debtors on or after the Petition Date as determined based on net lease operating statements and net accrued capital expenditures beginning with the month of June 2015 (collectively, the "Segregated Cash Collateral").  (*See* Interim Order, at ¶ 12.)  The Segregated Cash Collateral procedures shall include the requirement that, not later than 14 days after delivery of each set of monthly financial statements required to be delivered pursuant to paragraph 3(f)(vi) of the Interim Order, the Debtors shall transfer all Segregated Cash Collateral out of the Operating Account into the Segregated Account.  (*Id.*)

51.     Under the facts and circumstances of these chapter 11 cases, the equities and practical realities weigh in favor of authorizing the proposed allocation of Disputed Cash and Segregated Cash Collateral as set forth in the Interim order.  Moreover, the First Lien Agent has conditioned its consent to the Debtors' continued access to Cash Collateral and the Disputed Cash on the proposed use of Disputed Cash as described above.  As such, absent approval of the

30

relief requested by the Motion, the Debtors would need to secure access to Cash Collateral and the Disputed Cash on a contested basis and/or secure third-party financing, which would be difficult to obtain in light of the Debtors' substantial funded secured indebtedness. Accordingly, under the facts and circumstances of these chapter 11 cases, and given the fact that the Prepetition Secured Parties will be adequately protected by the adequate protection proposed to be provided in the Interim Order, the Debtors respectfully submit that the proposed use of Cash Collateral is fair and equitable.

## V.    The Scope of the Carve Out is Appropriate.

52.    The Interim Order subjects the security interests and administrative expense claims of the Prepetition Secured Parties to the Carve Out. Courts have regularly held that carve outs for professional fees are reasonable and necessary to ensure that a debtor's estate and any statutory committee may retain assistance from counsel of its choice. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990). The Interim Order does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *Id.* at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced"). In addition, the Carve Out ensures that Cash Collateral and the Disputed Cash may be used for the payment of U.S. Trustee fees and professional fees of the Debtors and the Committee.

## VI.    The Automatic Stay Should Be Modified on a Limited Basis.

53.    The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Prepetition Agents to file any financing statements, notice of liens, or similar instruments in order to validate and perfect the liens and

31

security interests granted to the Prepetition Secured Parties under the Interim Order. The Interim Order further provides that the automatic stay is modified and vacated to the extent necessary to permit the Prepetition Agents to exercise, upon the occurrence of the Termination Date, certain rights and remedies provided for in the Interim Order.

54.     Stay modifications of this kind are ordinary and standard features of secured parties' consents to use cash collateral and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See*, *e.g.*, *In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. June 1, 2012); *In re Velo Holdings Inc.*, No. 12-11384 (MG) (Bankr. S.D.N.Y. Apr. 23, 2012); *In re United Retail Grp., Inc.*, No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 23, 2012); *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012); *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Reader's Digest Assoc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009), *In re Lear Corp.*, No. 14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009); *In re Gen. Growth Props. Inc.*, No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. April 23, 2009); *In re Wellman, Inc.*, No. 08-10595 (SMB) (Bankr. S.D.N.Y. April 7, 2008).

### Request for Final Hearing

55.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 25 days following the entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

### Motion Practice

56.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion.    Accordingly, the Debtors submit that this Motion satisfies Local Bankruptcy Rule 9013-1(a).

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

57.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

58.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' first lien credit facility; (d) counsel to the agent under the Debtors' first lien credit facility; (e) the administrative agent under the Debtors' second lien credit facility; (f) counsel to the agent under the Debtors' second lien credit facility; (g) the indenture trustee under the Debtors' 9.75% senior notes due 2017; (h) counsel to certain holders of the 2017 senior notes; (i) the indenture trustee under the Debtors' 7.25% senior notes due 2019; (j) counsel to certain holders of the 2019 senior notes; (k) the indenture trustee under the Debtors' 7.5% senior notes due 2020; (l) counsel to certain holders of the 2020 senior notes; (m) the United States Attorney's Office for the Southern District of New York; (n) the Internal Revenue Service; (o) the United States Securities and Exchange Commission; (p) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct

33

business; (q) the state attorneys general for states in which the Debtors conduct business; and (r) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

59.     No prior request for the relief sought in this Motion has been made to this or any other court.

KE 36672016

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially

in the form attached hereto as **Exhibit A**, and granting such other relief as is just and proper.

Dated: July 15, 2015          */s/ Jonathan S. Henes, P.C.*
     New York, New York      Paul M. Basta, P.C.
                                     Jonathan S. Henes, P.C.
                                     Christopher Marcus, P.C.
                                     **KIRKLAND & ELLIS LLP**
                                     **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                     601 Lexington Avenue
                                     New York, New York 10022
                                     Telephone:    (212) 446-4800
                                     Facsimile:    (212) 446-4900

                                     - and -

                                     James H.M. Sprayregen, P.C.
                                     Ryan Blaine Bennett (*pro hac vice* admission pending)
                                     Brad Weiland (*pro hac vice* admission pending)
                                     **KIRKLAND & ELLIS LLP**
                                     **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                     300 North LaSalle Street
                                     Chicago, Illinois 60654
                                     Telephone:    (312) 862-2000
                                     Facsimile:    (312) 862-2200

                                     *Proposed Counsel to the Debtors and Debtors in Possession*

## Exhibit A

### Proposed Interim Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

In re:                                                          x
                                                                :
SABINE OIL & GAS CORPORATION,                                   :          Chapter 11
*et al.*,[1]                                                     :
                                                                :          Case No. 15-[_____] (___)
                          Debtors.                              :
                                                                x          (Joint Administration Requested)

------------------------------------------------------------

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361,**
**362, 363 AND 507, BANKRUPTCY RULES 2002, 4001 AND 9014**
**AND LOCAL BANKRUPTCY RULE 4001-2 (I) AUTHORIZING DEBTORS'**
**LIMITED USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE**
**PROTECTION TO THE PREPETITION SECURED PARTIES, (III) MODIFYING**
**THE AUTOMATIC STAY AND (IV) SCHEDULING A FINAL HEARING**

Upon the motion (the "Motion"), dated July 15, 2015, of the above-referenced

debtors, as debtors in possession (collectively, the "Debtors") in the above-captioned cases

(collectively, the "Cases"), pursuant to sections 105, 361, 362, 363 and 507 of title 11 of the

United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules

for the Southern District of New York (the "Local Bankruptcy Rules"), seeking, among other

things:

      (a)      authorization for the Debtors, pursuant to Bankruptcy Code sections 105, 361,
362, 363 and 507 to (i) use cash collateral, as such term is defined in section
363(a) of the Bankruptcy Code ("Cash Collateral"), and all other Prepetition

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gathering LLC (3438);
Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent
Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil Gas Finance Corp. (2567); Sabine
South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC
(4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors'
service address is 1415 Louisiana, Suite 1600, Houston, Texas 77002.

Collateral (as defined herein), solely in accordance with the terms of this order (this "Interim Order"), and (ii) provide adequate protection to:

(1)     Wells Fargo Bank, National Association, as Administrative Agent (in such capacity, the "First Lien Agent") under the First Lien Credit Agreement (as defined herein), and the other First Lien Secured Parties (as defined herein); and

(2)     Wilmington Trust, National Association, as Administrative Agent (in such capacity, the "Second Lien Agent" and, collectively with the First Lien Agent, the "Prepetition Agents") under the Second Lien Credit Agreement (as defined herein), and the other Second Lien Secured Parties (as defined herein);

(b)     subject to entry of the Final Order (as defined herein), authorization to grant adequate protection liens on the proceeds and property recovered in respect of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under Bankruptcy Code sections 544, 545, 547, 548 and 550 or any other similar state or federal law (collectively, the "Avoidance Actions");

(c)     modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the Final Order;

(d)     subject to entry of the Final Order, except to the extent of the Carve Out (as defined herein) the waiver of all rights to surcharge any Prepetition Collateral or Collateral (as defined herein) under sections 506(c) or 552(b) of the Bankruptcy Code or any other applicable principle of equity or law;

(e)     that this Court hold an interim hearing (the "Interim Hearing") to consider the relief sought in the Motion and entry of the proposed Interim Order;

(f)     that this Court schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") granting the relief requested in the Motion on a final basis; and

(g)     waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order or the Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h));

and the Interim Hearing having been held by the Court on July [____], 2015; and pursuant to

Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2, due and sufficient notice of the

Motion and the relief sought at the Interim Hearing having been given under the particular

circumstances by the Debtors to counsel to the First Lien Agent, the Second Lien Agent, the

other Prepetition Secured Parties, the Debtors' thirty (30) largest unsecured creditors (on a consolidated basis), the indenture trustee under the Debtors' 9.75% senior notes due 2017, counsel to certain holders of the 2017 senior notes, the indenture trustee under the Debtors' 7.25% senior notes due 2019, counsel to certain holders of the 2019 senior notes, the indenture trustee under the Debtors' 7.5% senior notes due 2020, counsel to certain holders of the 2020 senior notes, the United States Trustee for the Southern District of New York (the "United States Trustee"), the United States Securities and Exchange Commission, the United States Internal Revenue Service, and all other parties with a particularized interest in the Motion; and the Court having considered the offers of proof, evidence adduced, and the statements of counsel at the Interim Hearing; and it appearing to the Court that granting the relief sought in the Motion on the terms and conditions herein contained is necessary and essential to enable the Debtors to preserve the value of the Debtors' businesses and assets and that such relief is fair and reasonable and that entry of this Interim Order is in the best interest of the Debtors and their respective estates and creditors; and due deliberation and good cause has been shown to grant the relief sought in the Motion,

## IT IS HEREBY FOUND AND DETERMINED THAT:

A.     **Petition Date**.  On July 15, 2015 (the "Petition Date"), Sabine Oil & Gas Corporation ("Sabine") and each of the other Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Court").  Each Debtor has continued with the management and operation of its respective businesses and properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Cases.

- 3 -

B.      **First Lien Credit Agreement**.  Prior to the Petition Date, the First Lien Secured Lenders (as defined herein) made certain loans and advances pursuant to and in accordance with the terms and conditions of that certain Second Amended and Restated Credit Agreement, dated as of December 16, 2014 (as heretofore amended, restated, or otherwise modified from time to time, the "First Lien Credit Agreement," and, together with all other documentation executed in connection therewith, the "First Lien Loan Documents"), among, *inter alia*, Sabine, as Borrower, the First Lien Agent, and the lenders from time to time party thereto (such lenders, the "First Lien Secured Lenders," and, together with the First Lien Agent and each "Issuing Bank," "Secured Swap Party" and "Cash Management Bank" (as such terms are defined in the First Lien Credit Agreement), collectively, the "First Lien Secured Parties").

C.      **Second Lien Credit Agreement**.  Prior to the Petition Date, the Second Lien Secured Lenders (as defined herein) made certain loans and advances pursuant to and in accordance with the terms and conditions of that certain Second Lien Credit Agreement, dated as of December 14, 2012 (as heretofore amended, restated, or otherwise modified from time to time, the "Second Lien Credit Agreement," and, together with all other documentation executed in connection therewith, the "Second Lien Loan Documents"), among *inter alia*, Sabine, as Borrower, the Second Lien Agent, and the lenders from time to time party thereto (such lenders, the "Second Lien Secured Lenders," and together with the Second Lien Agent, the "Second Lien Secured Parties").  The First Lien Loan Documents and the Second Lien Loan Documents are referred to collectively in this Interim Order as the "Prepetition Loan Documents," and the First Lien Secured Parties and Second Lien Secured Parties are referred to herein collectively as the "Prepetition Secured Parties."

D.     **Debtors' Admissions With Respect to the First Lien Prepetition Indebtedness**.  Without prejudice to the rights, if any, of any other party (but subject to the limitations thereon described herein in paragraphs 22 and 24), the Debtors admit, stipulate and agree that:

        i.     As of the Petition Date, the Debtors that are the Borrower and the Guarantors (as such terms are defined in the First Lien Loan Documents) under the First Lien Loan Documents were justly and lawfully indebted and liable, without defense, counterclaim, or offset of any kind, to the (x) First Lien Secured Lenders in the aggregate principal amount of approximately $900,597,359 in respect of loans and other financial accommodations made and in the aggregate face amount of $26,320,000 in respect of letters of credit issued by the Issuing Banks pursuant to, and in accordance with, the First Lien Loan Documents, (y) holders of Secured Swap Obligations (as defined in the First Lien Credit Agreement) in amounts yet to be determined, and (z) holders of Secured Cash Management Obligations (as defined in the First Lien Credit Agreement) in amounts yet to be determined, plus accrued and unpaid interest, fees and costs and expenses including, without limitation, attorney's fees, agent's fees, other professional fees and disbursements and other obligations owing under the First Lien Loan Documents (collectively, the "<u>First Lien Prepetition Indebtedness</u>").  Each of the First Lien Loan Documents is valid,

- 5 -

binding, and subject to applicable bankruptcy law, enforceable against the Debtors in accordance with its terms.

ii.    Immediately prior to the automatic acceleration of the First Lien Prepetition Indebtedness on the Petition Date, pursuant to the First Lien Loan Documents and the Intercreditor Agreement, dated as of December 14, 2012, among Sabine, the First Lien Agent and the Second Lien Agent (the "Intercreditor Agreement"), the maturity date with respect to the First Lien Prepetition Indebtedness was April 7, 2016.

iii.    The First Lien Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms, and no portion of the First Lien Prepetition Indebtedness or any amounts paid to the First Lien Secured Parties or applied to the obligations owing under the First Lien Loan Documents prior to the Petition Date is subject to avoidance, subordination (whether equitable or otherwise), recharacterization, recovery, attack, offset, counterclaim, defense, challenge or Claim (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

iv.    As of April 27, 2015, the Borrowing Base (as defined in the First Lien Credit Agreement) was $750,000,000, and a Borrowing Base Deficiency (as defined in the First Lien Credit Agreement) existed

in the amount of $249,252,490 (the "Borrowing Base Deficiency"). The Debtors further admit that, in order to cure such Borrowing Base Deficiency, they were required to prepay the Loans (as defined in the First Lien Credit Agreement) commencing May 27, 2015 in six equal monthly installments equal to $1/6^{th}$ of the aggregate principal amount of such Borrowing Base Deficiency in accordance with Section 3.04(c)(iii) of the First Lien Credit Agreement and in accordance with that certain Forbearance Agreement and First Amendment to Credit Agreement, dated as of May 4, 2015 (as amended, modified, or supplemented from time to time, the "Forbearance Agreement"), among Sabine, the First Lien Lenders and the First Lien Agent. The Debtors admit that the first two such prepayments of the Loans came due on May 27, 2015 and June 29, 2015, respectively, and neither prepayment was made.

E.     **Debtors' Admissions with Respect to the Second Lien Prepetition Indebtedness**.  Without prejudice to the rights, if any, of any other party (but subject to the limitations thereon described herein in paragraphs 22 and 24), the Debtors admit, stipulate and agree that:

i.          As of the Petition Date, the Debtors that are the Borrower and the Guarantors (as such terms are defined in the Second Lien Loan Documents) were justly and lawfully indebted and liable, without defense, counterclaim, or offset of any kind, to the Second Lien

- 7 -

Secured Lenders in the aggregate principal amount of $700,000,000 in respect of loans and other financial accommodations made by the Second Lien Secured Lenders pursuant to, and in accordance with, the Second Lien Loan Documents, plus accrued and unpaid interest, fees and costs and expenses, including, without limitation, attorney's fees, agent's fees, other professional fees and disbursements and other obligations owing under the Second Lien Loan Documents (collectively, the "<u>Second Lien Prepetition Indebtedness</u>").

i.   The Second Lien Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms, and no portion of the Second Lien Prepetition Indebtedness or any amounts paid to the Second Lien Secured Parties or applied to the obligations owing under the Second Lien Loan Documents prior to the Petition Date is subject to avoidance, subordination (whether equitable or otherwise), recharacterization, recovery, attack, offset, counterclaim, defense, challenge or Claim (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

F.   **Debtors' Admissions With Respect to Prepetition Collateral and Liens**.  Subject to the Debtors' rights under paragraphs 11 and 23 of this Interim Order, and

without prejudice to the rights, if any, of any other party (but subject to the limitations thereon described herein in paragraphs 22 and 24), the Debtors admit, stipulate and agree that:

i.   Pursuant to (a) that certain Second Amended and Restated Guaranty and Pledge Agreement, dated as of December 16, 2014, by the Borrower and the Guarantors (as such terms are defined in the First Lien Loan Documents) in favor of the First Lien Agent and (b) certain mortgages, deeds of trust or similar security documents entered into by any loan party and the First Lien Agent in respect of the properties owned by such loan party (each as heretofore amended, restated or otherwise modified from time to time, and, collectively with any and all other agreements, instruments, certificates, fixture filings, transmitting utility filings, financing statements, consents, assignments or other similar documents, the "First Lien Collateral Documents"), they have granted valid, binding, perfected and enforceable first priority liens upon and security interests in the real and personal property of the Borrower and Guarantors described in the First Lien Collateral Documents, including, without limitation, all rights, titles, interests and estates in and to oil and gas leases and/or oil, gas and other mineral leases and other interests and estates and the lands and premises covered or affected thereby as described therein (the "Hydrocarbon Properties") and properties pooled or unitized with the Hydrocarbon Properties, all oil, gas, casinghead

gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom and all other minerals in and under and which may be produced and saved from or attributable to the Hydrocarbon Properties (collectively, the "Hydrocarbons"), the cash and noncash proceeds and other rights arising from all prepetition collateral (including any cash held by the Debtors that constitutes Cash Collateral and the setoff rights described in the First Lien Loan Documents, the Swap Agreements (as defined in the First Lien Credit Agreement), or arising by operation of law, collectively, the "Prepetition Collateral") to the First Lien Agent for the benefit of the First Lien Secured Parties to secure the First Lien Prepetition Indebtedness, subject only to specific permitted exceptions under the First Lien Credit Agreement and First Lien Collateral Documents.

ii.    Pursuant to (a) that certain Amended and Restated Guaranty and Pledge Agreement, dated as of December 14, 2012, by the Borrower and the Guarantors (as such terms are defined in the Second Lien Loan Documents) in favor of the Second Lien Agent and (b) certain mortgages, deeds of trust or similar security documents entered into by any loan party and the Second Lien Agent for the benefit of the Second Lien Secured Parties in respect of the properties owned by such loan party (as heretofore

amended, restated, or otherwise modified from time to time, and, collectively with any and all other agreements, instruments, certificates, fixture filings, transmitting utility filings, financing statements, consents, assignments or other similar documents, the "Second Lien Collateral Documents"), they have granted valid, binding, perfected and enforceable second priority liens upon and security interests in the Prepetition Collateral (other than Prepetition Collateral constituting setoff rights of the First Lien Secured Parties), subject in each case to the Intercreditor Agreement (as defined herein) and permitted exceptions under the First Lien Credit Agreement, the First Lien Collateral Documents, the Second Lien Credit Agreement, and the Second Lien Collateral Documents to the Second Lien Agent for the benefit of the Second Lien Secured Parties to secure the Second Lien Prepetition Indebtedness.

iii.    The First Lien Agent's first priority liens upon and security interests in the Prepetition Collateral, for the ratable benefit of the First Lien Secured Parties, and the Second Lien Agent's second priority liens upon and security interests in the Prepetition Collateral, for the ratable benefit of the Second Lien Secured Parties, are not subject to avoidance, subordination (whether equitable or otherwise), recharacterization, recovery, attack, offset, counterclaim, defense, challenge or Claim (as defined in

section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

G. **Debtors' Admissions With Respect to Cash Collateral**. Subject to the Debtors' rights set forth in paragraph 11 of this Interim Order, and without prejudice to the rights, if any, of any other party (but subject to the limitations thereon described herein in paragraphs 22 and 24), the Debtors admit, stipulate and agree that:

      i.      All cash proceeds of the Prepetition Collateral, including all such cash proceeds of such Prepetition Collateral held in any of the Debtors' banking, checking or other deposit accounts with financial institutions (in each case, other than trust, escrow and custodial funds held as of the Petition Date in properly established trust, escrow and custodial accounts), are Cash Collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code. The Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including the Cash Collateral, for any Collateral Diminution (as defined herein); and

     ii.      All cash in the Debtors' main operating account (the "Operating Account") as of the Petition Date or deposited into the Operating Account after the Petition Date constitutes Cash Collateral except for (a) cash that is not property of the Debtors and (b) cash

proceeds of any property of the Debtors that is not Prepetition Collateral.

H.     **Releases; Investigation**. Subject to the Debtors' rights under paragraphs 11 and 23 of this Interim Order, and without prejudice to the rights of any other party (but subject to the limitations thereon described herein in paragraphs 22 and 24), each Debtor hereby forever waives and releases any and all Claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against each of the Prepetition Secured Parties, whether arising at law or in equity, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or Chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law. The admissions, stipulations, agreements and releases set forth in paragraphs D, E, F, G, and H of this Interim Order are based upon and consistent with the Debtors' investigation of the Prepetition Secured Parties' liens and claims and determination that subject to the rights reserved in paragraphs 11 and 23 of this Interim Order, the Debtors have no claims (as defined in section 101(5) of the Bankruptcy Code), defenses or counterclaims with respect thereto.

I.     **Need to Use Cash Collateral**.   The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Bankruptcy Rule 4001-2 and have an immediate need to obtain use of the Collateral, including the Cash Collateral (in the amount and in the manner set forth in the Budget (as defined herein)) in order to, among other things, preserve and maintain the value of their assets and businesses and maximize the return to all creditors.   An immediate and critical need exists for the Debtors to use the Cash Collateral, consistent with the Budget (as defined herein), for working capital purposes, other

general corporate purposes of the Debtors, and the satisfaction of costs and expenses of administering the Cases.  The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The ability of the Debtors to obtain liquidity through the use of the Cash Collateral is vital to the Debtors and their efforts to maximize the value of their assets.  Absent entry of this Interim Order, the Debtors' estates and reorganization efforts will be immediately and irreparably harmed.

J.      **Notice**.  Notice of the requested relief sought at the Interim Hearing was provided by the Debtors to:  (1) the United States Trustee; (2) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (3) the First Lien Agent; (4) counsel to the First Lien Agent; (5) the Second Lien Agent; (6) counsel to the Second Lien Agent; (7) the indenture trustee under the Debtors' 9.75% senior notes due 2017; (8) counsel to certain holders of the 2017 senior notes; (9) the indenture trustee under the Debtors' 7.25% senior notes due 2019; (10) counsel to certain holders of the 2019 senior notes; (11) the indenture trustee under the Debtors' 7.5% senior notes due 2020; (12) counsel to certain holders of the 2020 senior notes; (13) the United States Attorney's Office for the Southern District of New York; (14) the Internal Revenue Service; (15) the United States Securities and Exchange Commission; (16) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (17) the state attorneys general for states in which the Debtors conduct business; and (18) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Given the nature of the relief sought, the foregoing notice of the Interim Hearing was, in the Debtors' good-faith belief, the best available under the circumstances and complies with Bankruptcy Rules 2002, 4001(b) and (d) and 9014, Local Bankruptcy Rule 4001-2 and section 102(1) of the Bankruptcy Code as required by sections 361

and 363 of the Bankruptcy Code.  No further notice of, or hearing on, the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

K.    **Consent by Prepetition Secured Parties**.  The First Lien Agent consents to the Debtors' use of Cash Collateral, in accordance with and subject to the terms and conditions provided for in this Interim Order.  Pursuant to the Intercreditor Agreement, as a result of the First Lien Agent's consent to the use of Cash Collateral as provided in this Interim Order, the Second Lien Secured Parties are deemed to have consented to entry of this Interim Order.

L.    **Jurisdiction and Venue**.  Consideration of the Motion constitutes a "core-proceeding" as defined in 28 U.S.C. § 157(b)(2).  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue for the Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

M.    **Relief Essential; Best Interest**.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Bankruptcy Rule 4001-2.  The relief requested in the Motion (and as provided in this Interim Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and the property of their estates.  It is in the best interest of the Debtors' estates that the Debtors be allowed to use the Cash Collateral under the terms hereof.  The Debtors have demonstrated good and sufficient cause for the relief granted herein.

N.    **Arm's-Length, Good-Faith Negotiations**.    The terms of this Interim Order were negotiated in good-faith and at arm's-length between the Debtors and the First Lien Secured Parties.

**NOW, THEREFORE, UPON THE RECORD OF THE PROCEEDINGS HERETOFORE HELD BEFORE THIS COURT WITH RESPECT TO THE MOTION, THE EVIDENCE ADDUCED AT THE INTERIM HEARING, AND THE STATEMENTS OF COUNSEL THEREAT, IT IS HEREBY ORDERED THAT:**

1.    **Motion Granted**.    The Motion is granted in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled and all reservations of rights included therein, are hereby denied and overruled.

2.    **Authorization to Use Cash Collateral**. Subject to the terms and conditions of this Interim Order, the Court hereby authorizes the Debtors to use the Segregated Cash Collateral (as defined herein), the Disputed Cash (as defined herein), and the cash proceeds of any property of the Debtors that is not Prepetition Collateral (collectively, the "Debtors' Cash") during the period beginning with the Petition Date and ending on the Termination Date (as defined herein) (such period, the "Budget Period"), for the disbursements set forth in the 13-week cash disbursements and receipts budget attached as **Exhibit A** hereto (as such budget may be modified from time to time by the Debtors with the prior written consent of the First Lien Agent as set forth in this paragraph and in paragraph 3(f)(v) of this Interim Order (the "Budget"), subject in each case to any Permitted Deviation and Non-Conforming Use permitted herein (as each such term is defined below).  The Debtors shall adhere to the Budget during the Budget Period, *provided* that, during any four-week period, the Debtors may carry forward any Positive

- 16 -

Variance (as defined below) to the future periods in the Budget.  For purposes of this Interim Order, "Positive Variance" shall mean the amount by which either (i) the Total Net Receipts (designated in the Budget as "Total Receipts (Net)") exceeds 100% of the budgeted amount (the "Excess Receipts") or (ii) Total Operating Disbursements (as designated in the Budget) are in an amount less than 100% of the budgeted amount (the "Unpaid Disbursements").  For purposes of this Interim Order, the "Permitted Deviation" shall mean that, for any four-week period set forth in the Budget commencing the week of July 20, 2015, the Total Net Receipts shall not be less than 85% of the budgeted amount and the Total Operating Disbursements shall not exceed 115% of the budgeted amount.   The First Lien Agent may, in its sole discretion, agree in writing to the use of the Cash Collateral in a manner or amount which does not conform to the manner or amount, as applicable, set forth in the Budget (including, for the avoidance of doubt, after giving effect to the Permitted Deviation) (each such approved non-conforming use of Cash Collateral, a "Non-Conforming Use").  If such written consent is given, the Debtors shall be authorized pursuant to this Interim Order to use Cash Collateral for any such Non-Conforming Use without further Court approval, and the Prepetition Secured Parties shall be entitled to all of the protections specified in this Interim Order for any such Non-Conforming Use.  The Debtors shall provide notice of any Non-Conforming Use to counsel for the official committee of unsecured creditors appointed in the Cases (the "Committee"), the Second Lien Agent, and the United States Trustee.

3.        **Adequate Protection for the First Lien Secured Parties**.  In addition to all the existing security interests and liens granted to or for the benefit of the First Lien Secured Parties in and with respect to the Prepetition Collateral, including the Cash Collateral, as adequate protection for, and to secure payment of an amount equal to the Collateral Diminution

(as defined herein), and as an inducement to the First Lien Secured Parties to permit the Debtors'

use of the Cash Collateral as provided for in this Interim Order, the Debtors hereby grant the

following:

(a) **Adequate Protection Liens**.  Effective as of the Petition Date and in each case perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or by possession or control, the following security interests and liens are hereby granted to the First Lien Agent, for the benefit of the First Lien Secured Parties, (all property identified in clauses (i) and (ii) of this paragraph 3(a) being collectively referred to as the "Collateral"), subject only to the Carve Out (as defined herein) (all such liens and security interests, the "First Lien Adequate Protection Liens"):

i. **Liens Senior to Other Liens**.  A valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien on the Prepetition Collateral and all of the Debtors' now owned and hereafter-acquired real and personal property, assets and rights of any kind or nature, wherever located, including, without limitation, all prepetition and postpetition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, oil and gas properties (and as-extracted collateral, goods, fixtures and hydrocarbons relating thereto), accounts receivable, other rights to payment, cash, inventory, general intangibles, contracts, servicing rights, servicing receivables, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, claims and causes of action (including those arising under section 549 of the Bankruptcy Code) and all proceeds of the foregoing, other than causes of action arising under the Bankruptcy Code, including, all Avoidance Actions, which First Lien Adequate Protection Liens, subject to entry of the Final Order, shall have recourse to the proceeds or property recovered in respect of any Avoidance Actions, senior to any other security interests or liens, subject only to valid, perfected and enforceable prepetition liens (if any) which are senior to the First Lien Secured Parties' liens or security

- 18 -

interests as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

ii.   **Liens Junior to Existing Liens**.   A valid, binding, continuing, enforceable, fully-perfected junior lien on and security interest in all prepetition and postpetition property of the Debtors (other than the property described in clause (i) of this paragraph 3(a)), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

(b)   **Adequate Protection Claims**.   An allowed administrative claim against each of the Debtors on a joint and several basis with priority over any and all other administrative claims against the Debtors now existing or hereafter arising in the Cases (subject only to the Carve Out (as defined herein)), including all claims of the kind specified under sections 503(b) and 507(b) of the Bankruptcy Code (the "First Lien Adequate Protection Claims"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors including, without limitation, subject to entry of the Final Order, the proceeds or property recovered in respect of any Avoidance Actions.

(c)   **Adequate Protection Payments**.   The Debtors are authorized and directed to pay to the First Lien Agent for the ratable benefit of the First Lien Secured Parties, adequate protection payments on the last business day of each calendar month after the entry of this Interim Order, in each case, in an amount equal to all accrued and unpaid prepetition or postpetition interest, fees and costs due and payable under the First Lien Credit Agreement (including, without limitation, interest on loans, breakage costs and accrued fees owing to the First Lien Agent), and in each case, such payments calculated based on the Alternate Base Rate (as defined in the First Lien Credit Agreement) plus 1.50%, which is the Applicable Margin under the First Lien Credit Agreement.   The First Lien Agent and the First Lien Secured Parties reserve their rights to assert claims for additional interest on the First Lien Prepetition Indebtedness at the post-default rate of two percent (2%) as provided in section 3.01(c) of the Credit Agreement (the "Default Spread") and that such amount should be added to the aggregate allowed amount of the First Lien Prepetition Indebtedness.   For the

avoidance of doubt, the payment of interest pursuant to this paragraph shall be without prejudice to the rights of the First Lien Agent and the First Lien Secured Parties to assert claims for payment of additional interest at any other rates in accordance with the First Lien Credit Agreement and/or to request current payment of the Default Spread. The Debtors reserve their rights to argue that, to the extent that any cash payment of interest, fees, and/or expenses as adequate protection to the First Lien Secured Parties is not allowed under Bankruptcy Code section 506(b) and not allowed on any other basis (including, without limitation, on account of the Debtors' use of Prepetition Collateral), such payments should be recharacterized and applied to reduce permanently the principal owed under the applicable First Lien Loan Documents; *provided, however*, that the First Lien Secured Parties reserve their rights to assert defenses to any such arguments and to otherwise oppose any such recharacterization or application.

(d)     **Other Covenants**.    The Debtors shall maintain their cash management arrangements in a manner consistent with the interim order granting the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms, (C) Maintain Existing Investment Practices, (D) Continue Intercompany Transactions and (E) Grant Superpriority Status to Postpetition Intercompany Transactions*, entered or to be entered substantially contemporaneously herewith. The Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Court to do any of the foregoing, without prior consultation with the First Lien Agent at least five (5) business days prior to the date on which the Debtors seek the authority of this Court for such use, sale or lease. The Debtors shall comply with the covenants contained in Sections 8.05 and 8.06 of the First Lien Credit Agreement and the Second Lien Credit Agreement regarding the maintenance and insurance of the Prepetition Collateral and the Collateral.

(e)     **Fees and Expenses**.    As additional adequate protection, the Debtors shall pay in cash: (i) immediately upon the entry of this Interim Order, the reasonable professional fees, expenses and disbursements (including, but not limited to, the fees, expenses and disbursements of counsel, third-party consultants, including financial consultants and auditors) incurred by the First Lien Agent under the First Lien Credit Agreement arising prior to the Petition Date; and (ii) the reasonable professional fees, expenses and disbursements (including, but not limited to, the fees, expenses and disbursements of counsel, third-party consultants, including financial consultants and auditors) incurred by the First Lien Agent

under the First Lien Credit Agreement arising subsequent to the Petition Date. The payment of the fees, expenses and disbursements set forth in this paragraph 3(e) of this Interim Order (including professional fees and expenses of Willkie Farr & Gallagher LLP, FTI Consulting, Inc. and any other professionals or advisors retained by or on behalf of the First Lien Agent) shall be made within ten (10) business days after the receipt by the Debtors, the Committee and the United States Trustee (the "Review Period") of invoices thereof (the "Invoiced Fees") (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing formal fee applications, including such amounts arising before and after the Petition Date; provided, however, that the Debtors, the Committee and the United States Trustee may preserve their right to dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, (i) the Debtors pay in full the Invoiced Fees, including the Disputed Invoiced Fees, and (ii) the Debtors, the Committee or the United States Trustee file with the Court a motion or other pleading, on at least ten (10) days prior written notice to the First Lien Agent of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees.

(f)    **Reporting**. As additional adequate protection to the First Lien Secured Parties, the Debtors shall comply with the reporting requirements set forth in Sections 8.01(a), 8.01(b), 8.01(e), 8.01(j), 8.01(l), 8.01(o) and 8.11 of the First Lien Credit Agreement and shall provide the following additional reporting to the First Lien Agent:

i.    Weekly (or less frequently as may be agreed to between the Debtors and the First Lien Agent) calls with the First Lien Agent and its advisors;

ii.    A copy of each update to the Debtors' business plan as soon as reasonably practicable after it becomes available, together with a reconciliation to the prior business plan;

iii.    Presentations by the Debtors and/or their advisors during normal business hours to the First Lien Secured Parties at times and places as the First Lien Agent may reasonably request in writing (including via electronic mail) with reasonable prior notice;

iv.    Promptly, but in any event no later than the twentieth (20th) day of each calendar month, a report as of the last day of the preceding calendar month, in form and detail

reasonably acceptable to the First Lien Agent, of (a) the Debtors' accounts payable and payments, (b) an accounts payable aging and an accounts receivable aging, and (c) all written demands or claims related to or asserting any liens in respect of property or assets of the Borrower or any Credit Party (as such terms are defined in the First Lien Credit Agreement) (including liens imposed by law, such as landlord's, vendors', suppliers', carriers', warehousmen's, repairmen's, construction contractors', workers' and mechanics' liens and other similar liens) if the amount demanded or claimed exceeds $1,000,000 individually or $5,000,000 in the aggregate;

v.    (A) On or before the twentieth (20th) day of each calendar month, an updated rolling 13-week cash flow forecast of the Debtors and their subsidiaries substantially in the form of the Budget (each, a "Proposed Budget"), which Proposed Budget, upon written approval by the First Lien Agent, shall become the Budget effective as of the first day of the next calendar month; and (B) on or before each Wednesday of each calendar week, (1) a weekly report of receipts, disbursements and a reconciliation of actual expenditures and disbursements with those set forth in the Budget for the prior week, which report and reconciliation shall be in form and detail reasonably satisfactory to the First Lien Agent (the "Budget Reconciliation") and (2) a statement setting forth in reasonable detail the cash balance for each deposit account of the Debtor and its subsidiaries as of the previous Friday;

vi.    Promptly, and in any event no later than the thirtieth (30th) day of each month, beginning with the year-to-date period ended June 30, 2015, a monthly and year-to-date income statement, balance sheet and monthly and year-to-date detail of capital expenditures and workovers;

vii.    A list of all Swap Agreements of the Debtors in place as of the first business day of the month, to be provided by the 10th business day of the following month; which list contains (A) the material terms thereof (including type, remaining term, counterparty and mark-to-market value as of the first business day of the month (as reflected in the statements provided by the counterparties under such Swap Agreements)), and (B) information on any such Swap Agreement terminated or unwound during the prior month as soon as practicable after any such Swap Agreement is terminated or unwound.

- 22 -

viii.  Such other reports and information as the First Lien Agent may reasonably request.

(g)  **Application of Certain Swap Proceeds**.  If any Debtor receives cash proceeds as a result of (i) changes to the material terms of any commodity-price Swap Agreement, (ii) termination or unwinding of any such Swap Agreement or (iii) creation of any off-setting positions in respect of any hedge positions under any such Swap Agreement (whether evidenced by a floor, put or Swap Agreement), then, the Debtors shall pay such cash proceeds within one (1) business day following receipt thereof to the First Lien Agent, which proceeds shall be applied to permanently reduce the First Lien Indebtedness; *provided, however*, that any monthly or other scheduled payments to the Debtors under any Swap Agreements that have not been terminated shall constitute Disputed Cash.

(h)  **Asset Sales; Application of Proceeds**.  Unless otherwise agreed to by the First Lien Agent in writing, all sales and other dispositions (including casualty and condemnation events) of Collateral ("Collateral Sales") shall be in exchange for 100% cash consideration.  The Debtors shall deposit 100% of the net cash proceeds of any such Collateral Sale into the Segregated Account. Any proposed property exchange with respect to Collateral that is not in exchange for 100% cash consideration shall be subject to the First Lien Agent's prior written consent, which shall not be unreasonably withheld.

4.  **Adequate Protection for the Second Lien Secured Parties**.  As adequate protection, the Second Lien Agent, for the benefit of the Second Lien Secured Parties, is hereby granted the following claims, liens, rights and benefits:

(a)  **Adequate Protection Liens**.  Effective as of the Petition Date and in each case perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or by possession or control, the Second Lien Agent, for the benefit of the Second Lien Secured Parties, is hereby granted security interests in and liens on the Collateral, subject only to (i) the Carve Out, (ii) the First Lien Adequate Protection Liens and (iii) the liens and security interests securing the First Lien Prepetition Indebtedness, and subject further to the Intercreditor Agreement (all such liens and security interests, the "Second Lien Adequate Protection Liens", and

- 23 -

collectively with the First Lien Adequate Protection Liens, the "Adequate Protection Liens").

**(b)**     **Adequate Protection Claims**.  An allowed administrative claim against each of the Debtors on a joint and several basis with priority over any and all other administrative claims against the Debtors now existing or hereafter arising in the Cases (subject and subordinate only to the Carve Out and the First Lien Adequate Protection Claims), including all claims of the kind specified under sections 503(b) and 507(b) of the Bankruptcy Code (the "Second Lien Adequate Protection Claims", collectively with the First Lien Adequate Protection Claims, the "Adequate Protection Claims"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors including, without limitation, the proceeds or property recovered in respect of any Avoidance Actions, subject to entry of the Final Order.

**(c)**     **Fees and Expenses**.    As additional adequate protection, the Debtors shall pay in cash:  (i) immediately upon the entry of this Interim Order, the reasonable professional fees, expenses and disbursements (including, but not limited to, the fees, expenses and disbursements of counsel and other third-party consultants) incurred by the Second Lien Agent under the Second Lien Credit Agreement arising prior to the Petition Date; and (ii) the reasonable professional fees, expenses and disbursements (including, but not limited to, the fees, expenses and disbursements of counsel and other third-party consultants) incurred by the Second Lien Agent under the Second Lien Credit Agreement arising subsequent to the Petition Date.  The payment of the fees, expenses and disbursements set forth in this paragraph 4(c) of this Interim Order shall be made within the Review Period of the Invoiced Fees (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing formal fee applications, including such amounts arising before and after the Petition Date; *provided*, *however*, that the Debtors, the Committee and the United States Trustee may preserve their right to dispute the payment of any portion of the Invoiced Fees if, within the Review Period, (i) the Debtors pay in full the Invoiced Fees, including the Disputed Invoiced Fees, and (ii) the Debtors, the Committee or the United States Trustee file with the Court a motion or other pleading, on at least ten (10) days prior written notice to the Second Lien Agent of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees.  The Debtors reserve their rights to argue that, to the extent that any cash payment, including on account of interest, fees, and/or expenses, as adequate protection to the Second Lien

Secured Parties is not allowed under Bankruptcy Code section 506(b) and not allowed on any other basis (including, without limitation, on account of the Debtors' use of Prepetition Collateral), such payments should be recharacterized and applied to reduce permanently the principal owed under the applicable Second Lien Loan Documents; *provided, however*, that the Second Lien Secured Parties reserve their rights to assert defenses to any such arguments and to otherwise oppose any such recharacterization or application.

(d)  **Reporting**.  As additional adequate protection to the Second Lien Secured Parties, the Debtors shall provide the Second Lien Agent with all reporting materials provided by the Debtors to the First Lien Agent under section 3(f) of this Interim Order.

5.  **Collateral Diminution**.  For purposes of this Interim Order, "Collateral Diminution" shall mean an amount equal to the diminution of the value of the Prepetition Secured Parties' interest in the Prepetition Collateral from and after the Petition Date for any reason, including the use of Cash Collateral, the use, sale, lease, consumption, or disposition of Prepetition Collateral, or the imposition of the automatic stay.  Cash Payments from the proceeds of the Prepetition Collateral made to the First Lien Agent pursuant to paragraph 3 of this Interim Order shall not constitute Collateral Diminution.

6.  **Priority of Adequate Protection Liens and Adequate Protection Claims**.  Except to the extent of the Carve Out, the Adequate Protection Liens and Adequate Protection Claims granted to the Prepetition Secured Parties pursuant to paragraphs 3 and 4 of this Interim Order shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Codes and shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under section 364 of the Bankruptcy Code or otherwise; *provided* that the Debtors shall not create, incur or suffer to exist any postpetition liens or security interests other than:  (i) those granted pursuant to this Interim Order; (ii) carriers', mechanics', operator's, warehousemen's,

repairmen's or other similar liens arising in the ordinary course of business; (iii) pledges and

deposits in connection with workers' compensation, unemployment insurance and other social

security legislation; and (iv) deposits to secure the payment of any postpetition statutory

obligations and performance bonds.

       7.     **Carve Out**.

       (a)     As used in this Interim Order, "<u>Carve Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; <u>plus</u> (ii) fees and expenses up to $100,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code; <u>plus</u> (iii) all allowed unpaid fees and expenses (whether allowed before or after the delivery of a Carve Out Notice (as defined herein), and whether allowed by interim order, procedural order, or otherwise) incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (any such persons or firms, collectively, the "<u>Debtor Professionals</u>") and the Committee (any such persons or firms, together with the Debtor Professionals, collectively, the "<u>Professional Persons</u>") at any time before the first business day following delivery by the First Lien Agent (via electronic mail, overnight delivery or hand delivery) to each of Sabine's Senior Vice President and Chief Financial Officer, Kirkland& Ellis LLP, the U.S. Trustee, counsel to the Second Lien Agent and counsel to the Committee of a written notice (the "<u>Carve Out Notice</u>"), which notice may be delivered at any time following the occurrence of the Termination Date or a Termination Event (as defined below), stating that a Termination Date has occurred or a Termination Event has occurred; and (iv) the allowed fees and expenses (whether allowed by interim order, procedural order, or otherwise) of Professional Persons in an aggregate amount not to exceed $1,000,000 (the "<u>Post-Carve Out Notice Cap</u>") incurred after the first business day following delivery by the First Lien Agent of the Carve Out  Notice as set forth above; provided that (x) other than fees and expenses incurred by the Debtors' Professionals in connection with paragraphs 11 and 23(a) of this Interim Order, the Carve Out shall not be available to pay the fees or expenses of Professional Persons incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the First Lien Agent or the other First Lien Secured Parties; (y) so long as a Carve Out Notice has not been delivered, the Carve Out shall not

- 26 -

be reduced by the payment of fees and expenses of Professional Persons allowed at any time by this Court and payable under sections 328, 330 or 331 of the Bankruptcy Code; and (z) without prejudice to the rights of Professional Persons or the Debtors to contest any such objection, nothing in this Interim Order shall be construed to impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any Professional Persons.   Subject to entry of the Final Order, upon delivery of the Carve Out Notice as set forth above, the Debtors shall establish a reserve account with the First Lien Agent (the "Carve Out Reserve") in an amount equal to the sum of (i) all billed and unpaid monthly fees and expenses of all Professional Persons (including any outstanding holdbacks); (ii) all unbilled fees and expenses of Professional Persons incurred prior to the delivery of the Carve Out Notice, and (iii) the Post Carve-Out Notice Cap (collectively, the "Carve Out Professional Fees"). The Carve Out Reserve shall be funded in cash, and the payment of the Carve Out Professional Fees from the Carve Out Reserve shall be deemed to have been satisfied: (x) first, from cash, if any, that is not Cash Collateral; (y) second, from Disputed Cash, and (z) third, only if there is no cash remaining in respect of (x) and (y) above, from Segregated Cash Collateral. After payment in full of the allowed amount of the Carve Out Professional Fees from the Carve Out Reserve, any funds remaining in the Carve Out Reserve shall be applied as follows: (i) first, cash up to the amount of Segregated Cash Collateral, if any, used to fund the Carve Out Reserve shall be returned to the Segregated Account and shall constitute Segregated Cash Collateral;  (ii) second, cash up to the amount of the Disputed Cash used to fund the Carve Out Reserve shall be transferred to the Operating Account and shall constitute Disputed Cash pending further Court order; and (iii) third, any funds remaining in the Carve Out Reserve thereafter shall be transferred to the Operating Account and shall constitute cash that is not Cash Collateral.

8.    **Postpetition Lien Perfection**.   Without the necessity of the filing of financing statements, security agreements, federal or state notices, pledge agreements, recordings, mortgages or other documents or taking possession or control of any Collateral, this Interim Order shall be sufficient evidence of the Prepetition Secured Parties' perfected security interests and liens granted in the Collateral pursuant to this Interim Order.  Notwithstanding the foregoing, the Debtors are authorized and directed to execute such documents including, without

limitation, mortgages, pledges and Uniform Commercial Code financing statements and to use Cash Collateral to pay such costs and expenses as may be reasonably requested by the Prepetition Agents to provide further evidence of the perfection of the Prepetition Secured Parties' security interests and liens in the Collateral as provided for herein.  All such documents shall be deemed to have been recorded and filed as of the Petition Date.

9.      **Inspection Rights**.  In addition to, and without limiting, whatever rights to access the Prepetition Secured Parties have under their respective Prepetition Loan Documents, upon reasonable prior written notice (including via electronic mail) during normal business hours, the Debtors shall permit representatives, agents and employees of the Prepetition Agents to (i) have access to and inspect and copy the Debtors' books and records, including all records and files of the Debtors pertaining to the Prepetition Collateral, (ii) have access to and inspect the Debtors' properties and (iii) to discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors.

10.      **Termination**.  The Debtors' right to use the Cash Collateral pursuant to this Interim Order shall terminate (the date of any such termination, the "Termination Date") without further notice or court proceeding on the earlier to occur of:  (i) the date that is forty-five (45) days after the Petition Date (unless such period is extended by mutual agreement of the First Lien Agent and the Debtors) if the Final Order has not been entered by this Court on or before such date, (ii) January 15, 2016 (the "Expiration Date"); *provided*, that with the consent of the Debtors and the First Lien Agent, in the exercise of their respective sole discretion, the Expiration Date may be extended to February 15, 2016 without further Court approval; (iii) the occurrence of any of the events set forth in clauses (a), (b), (c) (d), (i), (j), (k), (l), (m), (n), and (o) below; and (iv) five (5) business days following the delivery of a written notice (any such

notice, a "Default Notice") by the First Lien Agent to the Debtors, Kirkland & Ellis LLP, the

United States Trustee, counsel to the Second Lien Agent, and counsel to the Committee of

Default Notice (any such five-business-day period of time, the "Default Notice Period") by the

First Lien Agent to the Debtors, Kirkland & Ellis LLP, the United States Trustee, counsel to the

Second Lien Agent, and counsel to the Committee of the occurrence of any of the events set

forth in clauses (e), (f), (g), and (h) below unless such occurrence is cured by the Debtors prior to

the expiration of the Default Notice Period with respect to such clause or such occurrence is

waived by the First Lien Agent in its sole discretion, *provided* that, during the Default Notice

Period, the Debtors shall be entitled to continue to use the Cash Collateral in accordance with the

terms of this Interim Order):

(a)    The dismissal of the Cases or the conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code;

(b)    The entry by this Court of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than the Prepetition Agents or the Prepetition Secured Parties with respect to the Prepetition Collateral or the Collateral without the written consent of the First Lien Agent, which consent may be withheld in its sole discretion;

(c)    The appointment or election of a trustee, examiner with expanded powers or any other representative with expanded powers relating to the operation of the businesses in the Cases;

(d)    The occurrence of the effective date of a plan of reorganization for the Debtors;

(e)    The failure by the Debtors to make any payment required pursuant to this Interim Order when due;

(f)    The failure by the Debtors to deliver to the Prepetition Agents any of the documents or other information required to be delivered pursuant to this Interim Order when due or any such documents or other information shall contain a material misrepresentation;

- 29 -

(g)    The failure by the Debtors to adhere to the Budget except, in each instance, with respect to Permitted Deviations or Non-Conforming Uses;

(h)    The failure by the Debtors to observe or perform any of the material terms or material provisions contained herein;

(i)    The Debtors shall create, incur or suffer to exist any postpetition liens or security interests other than those permitted pursuant to paragraph 6 of this Interim Order;

(j)    The Debtors shall create, incur or suffer any other claim which is *pari passu* with or senior to the Adequate Protection Claims;

(k)    Except as permitted by paragraphs 11 or 23(a) of this Interim Order, a filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the First Lien Indebtedness or asserting any other cause of action against and/or with respect to the First Lien Indebtedness, the Prepetition Collateral securing the First Lien Indebtedness or any of the First Lien Secured Parties (or if the Debtors support any such motion, pleading, application or adversary proceeding commenced by any third party);

(l)    Except as permitted by paragraphs 11 or 23(b) of this Interim Order, a filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the Second Lien Indebtedness or asserting any other cause of action against and/or with respect to the Second Lien Indebtedness, the Prepetition Collateral securing the Second Lien Indebtedness or any of the Second Lien Secured Parties (or if the Debtors support any such motion, pleading, application or adversary proceeding commenced by any third party);

(m)    The Debtors' failure to file an application to employ a chief restructuring officer on the Petition Date;

(n)    The Debtors' failure to employ a chief restructuring officer that is reasonably acceptable to the First Lien Agent within twenty (20) business days of the resignation or incapacity of any chief restructuring officer retained by the Debtors on or after the Petition Date; or

(o)    The entry of an order reversing, staying, vacating or otherwise modifying in any material respect the terms of this Interim Order.

- 30 -

Each of subparagraph (a) through (o) is referred to herein as a "Termination Event." On and after the Termination Date, the Debtors shall immediately cease using Cash Collateral and the First Lien Agent may in accordance with the terms and conditions of this Interim Order, absent further order of the Court, following the applicable Termination Date, exercise the rights and remedies available under the Prepetition Loan Documents, this Interim Order or applicable law, including, without limitation, foreclosing upon and selling all or a portion of the Prepetition Collateral or Collateral in order to collect any amounts payable to the First Lien Secured Parties and the Second Lien Secured Parties pursuant to this Interim Order and apply the same to such obligations. The automatic stay under section 362 of the Bankruptcy Code shall be deemed modified and vacated to the extent necessary to permit such actions. In any hearing regarding any exercise of rights or remedies, the only issues that may be raised by any of the Debtors in opposition thereto shall be (A) whether, in fact, the Termination Date shall have occurred and (y) what is the quantum of the Collateral Diminution, and each of the Debtors hereby waives any right to seek relief, including, without limitation, under Bankruptcy Code section 105, to the extent such relief would in any way impair or restrict the rights and remedies of the First Lien Agent and the First Lien Secured Parties or, subject to the Intercreditor Agreement, the rights and remedies of the Second Lien Secured Parties set forth in this Interim Order, or the Second Lien Loan Documents. Any delay or failure of a Prepetition Secured Party to exercise rights under any First Lien Loan Document or Second Lien Loan Document or this Interim Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise. Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the Prepetition Secured Parties (subject to the Intercreditor Agreement) under this Interim Order shall survive the Termination Date.

- 31 -

11.     **Usage and Reservation of Rights With Respect to Disputed Cash**. Except as provided in paragraphs 12 and 13 of this Interim Order with respect to Segregated Cash Collateral (as defined below), the Debtors and the Prepetition Secured Parties reserve all of their respective rights, claims, and defenses with respect to whether cash, including the proceeds of the Debtors' borrowing under the First Lien Credit Agreement on February 25, 2015, in the Debtors' main operating account (the "Operating Account"), as of the Petition Date or thereafter (collectively, the "Disputed Cash"), constitutes Prepetition Collateral or the proceeds of Prepetition Collateral in which the Prepetition Secured Parties have valid and perfected security interests and/or should be subject to a constructive trust or other equitable trust in favor of the Prepetition Secured Parties; *provided*, *however*, that except as provided in paragraphs 12 and 13 of this Interim Order, the Debtors shall maintain the Disputed Cash in the Operating Account and use the Disputed Cash to fund all adequate protection payments required to be paid pursuant to paragraphs 3(c), 3(e) and 4(c) of this Interim Order, all Restructuring Professional Fees (as designated in the Budget), all Capital Expenditures (as designated in the Budget) and Lease Operating Expenses (as designated in the Budget) related to the Debtors' assets that are not Prepetition Collateral and 100% of the Debtors' other general and administrative expenses (the "Unallocated G&A"), in each case, as permitted by and in accordance with the Budget. The Debtors and the First Lien Agent (on behalf of the First Lien Secured Parties) reserve their respective rights to assert claims or seek any other relief with respect to the Disputed Cash. The Debtors further reserve their right to assert that a portion of the Unallocated G&A should be payable from the Segregated Cash Collateral.

12.     **Debtors' Obligations Under Section 363(c)(4)**.    The Debtors shall establish and implement procedures reasonably acceptable to the First Lien Agent and the

Debtors to segregate and account for all cash proceeds of the Prepetition Collateral (other than the Disputed Cash) (i) held in the Operating Account on the Petition Date (including the proceeds of joint interest billings arising under joint operating agreements related to the Hydrocarbon Properties) or (ii) received by the Debtors on or after the Petition Date as determined based on net lease operating statements and net accrued capital expenditures beginning with the month of June 2015 ((i) and (ii), collectively, the "Segregated Cash Collateral"), which procedures shall include, without limitation, that not later than 14 days after delivery of each set of monthly financial statements required to be delivered pursuant to paragraph 3(f)(vi) of this Interim Order, the Debtors shall transfer all Segregated Cash Collateral out of the Operating Account into the Segregated Account.  The Prepetition Secured Parties shall at all times be deemed to have perfected liens and security interests in all Segregated Cash Collateral irrespective of the commingling of the Segregated Cash Collateral with other cash in the Operating Account prior to its transfer to the Segregated Account.  For the avoidance of doubt, the Debtors' commingling of any Cash Collateral with other cash deposited in the Operating Account before or after the Petition Date shall not be used as a basis to challenge the extent, validity, enforceability or perfection of the liens or security interests of the Prepetition Secured Parties in any such cash.

    13.    **Limited Usage of Segregated Cash Collateral**. The Debtors are authorized to use Segregated Cash Collateral solely to pay Capital Expenditures (as designated in the Budget) and Lease Operating Expenses (as designated in the Budget) related to the Prepetition Collateral, in each case, as permitted by and in accordance with the Budget, and for such other expenses as may be ordered by the Court after notice and a hearing or as may be agreed to by the First Lien Agent in its sole discretion.

- 33 -

14.    **Jurisdiction Over Operating Account Disputes**.  The Court shall retain jurisdiction to resolve any disputes with respect to the extent to which cash deposited into the Operating Account by or for the benefit of the Debtors or any other cash or cash equivalents of the Debtors constitutes Cash Collateral (and subject to the terms of this Interim Order, all rights of the Debtors and the Prepetition Secured Parties with respect to any such dispute are expressly preserved).

15.    **Limitation on Charging Expenses Against Collateral**.  Subject to entry of the Final Order, all rights to surcharge any Prepetition Collateral or Collateral under section 506(c) of the Bankruptcy Code or any other applicable principle or equity or law shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in the Cases.

16.    **Reservation of Rights of the Prepetition Lenders**.  This Interim Order and the transactions contemplated hereby shall be without prejudice to (i) the rights of the Prepetition Secured Parties to seek additional or different adequate protection, move to vacate the automatic stay, move for the appointment of a trustee or examiner, move to dismiss or convert the Cases, or to take another action in the Cases and to appear and be heard in any matter raised in the Cases, and (ii) any and all rights, remedies, claims and causes of action which the Prepetition Agents or the Prepetition Secured Parties may have against any non-Debtor party liable for the First Lien Prepetition Indebtedness or the Second Lien Prepetition Indebtedness.

17.    **Modification of Automatic Stay**.  The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.  The stay of section 362 of the Bankruptcy Code is hereby

- 34 -

modified to permit the Debtors and each of the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order.

18.     **Survival of Interim Order**.  The provisions of this Interim Order shall be binding upon any trustee appointed during the Cases or upon a conversion to cases under Chapter 7 of the Bankruptcy Code, and any actions taken pursuant hereto shall survive entry of any order which may be entered converting the Cases to Chapter 7 cases, dismissing the Cases under section 1112 of the Bankruptcy Code or otherwise, or confirming or consummating any plan(s) of reorganization.   The terms and provisions of this Interim Order, as well as the priorities in payments, liens, and security interests granted pursuant to this Interim Order shall continue notwithstanding any conversion of the Cases to Chapter 7 cases under the Bankruptcy Code, dismissal of the Cases or confirmation or consummation of any plan(s) of reorganization. Subject to the reservation of rights set forth in paragraph 3(c) of this Interim Order and the limitations described in paragraphs 22 and 24 of this Interim Order, the adequate protection payments made pursuant to this Interim Order shall not be subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance in the Cases or any subsequent Chapter 7 cases (other than a defense that the payment has actually been made).

19.     **No Liability to Third Parties**.  Subject to entry of the Final Order, none of the Prepetition Agents or the other Prepetition Secured Parties shall:  (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any similar federal or state statute)."

20.    **Binding Effect**.   The terms of this Interim Order shall be valid and binding upon the Debtors, all creditors of the Debtors and all other parties in interest from and after the entry of this Interim Order by this Court.   In the event the provisions of this Interim Order are reversed, stayed, modified or vacated following any further hearing, such reversals, modifications, stays or vacatur shall not affect the rights and priorities of the Prepetition Secured Parties granted pursuant to this Interim Order.

21.    **Reversal, Stay, Modification or Vacatur**.   Notwithstanding any such reversal, stay, modification or vacatur, any indebtedness, obligation or liability incurred by the Debtors pursuant to this Interim Order arising prior to the Prepetition Agents' receipt of notice of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the Prepetition Secured Parties shall continue to be entitled to all of the rights, remedies, privileges and benefits, including any payments authorized herein and the security interests and liens granted herein, with respect to any such indebtedness, obligation or liability, and the validity of any payments made or obligations owed or credit extended or lien or security interest granted pursuant to this Interim Order is and shall remain subject to the protection afforded under the Bankruptcy Code.

22.    **Reservation of Certain Third Party Rights and Bar of Challenge and Claims**.   Subject only to the Debtors' rights under paragraphs 11 and 23 of this Interim Order, the Debtors' admissions and releases contained in paragraphs D, E, F, G and H of this Interim Order:  (i) shall be binding upon the Debtors for all purposes; and (ii) shall be binding upon all other parties in interest, including the Committee, for all purposes unless (1) a party (subject in all respects to any agreement or applicable law which may limit or affect such entities right or ability to do so) has properly filed an adversary proceeding or contested matter by no later than

the date that is seventy-five (75) days from the date of entry of this Interim Order (or, in the case

of the Committee, sixty (60) days from the date of entry of the Final Order (the "Committee

Challenge Deadline"), (x) challenging the amount, validity, enforceability, priority or extent of

the First Lien Prepetition Indebtedness, the Second Lien Prepetition Indebtedness or the

Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral, or

(y) otherwise asserting any claims or causes of action against the Prepetition Secured Parties on

behalf of the Debtors' estates, and (2) the Court rules in favor of the plaintiff in any such timely

and properly filed adversary proceeding or contested matter.  If no such adversary proceeding or

contested matter is properly filed as of such dates or the Court does not rule in favor of the

plaintiff in any such proceeding, then subject only to the Debtors' rights under paragraph 11 and

23 of this Interim Order:  (a) the Debtors' admissions and releases contained in paragraphs D, E,

F, G and H of this Interim Order shall be binding on all parties in interest, including the

Committee; (b) the obligations of the Debtors under the First Lien Loan Documents and Second

Lien Loan Documents shall constitute allowed claims for all purposes in the Cases, and any

subsequent Chapter 7 case(s); (c) the Prepetition Secured Parties' security interests in and liens

upon the Prepetition Collateral shall be deemed to have been, as of Petition Date, legal, valid,

binding, and perfected first priority security interests and liens, not subject to recharacterization,

subordination or otherwise avoidable; and (d) the First Lien Prepetition Indebtedness, the Second

Lien Indebtedness and the Prepetition Secured Parties' security interests in and liens on the

Prepetition Collateral shall not be subject to any other or further challenge by the Committee or

any other party in interest seeking to exercise the rights of the Debtors' estates, including,

without limitation, any successor thereto.  If any such adversary proceeding or contested matter

is properly filed as of such dates, the Debtors' admissions and releases contained in paragraphs

D, E, F, G and H of this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) except to the extent that such admissions and releases were expressly challenged in such adversary proceeding or contested matter. Nothing contained in this Interim Order shall be deemed to grant standing to the Committee or any other party to commence any such adversary proceeding or contested matter.

23.     **Debtors' Limited Reservation of Rights and Bar of Challenge and Claims**.

(a)     **Debtors' Right to Challenge the Post Merger First Liens**. Notwithstanding anything to the contrary in this Interim Order, the Debtors shall retain the right to challenge the validity, priority and/or enforceability of any liens and security interests granted to the First Lien Secured Parties on the assets of Forest Oil Corporation and its direct and indirect subsidiaries that were not subject to the First Lien Secured Parties' liens and security interest prior to the December 16, 2014 merger (the "Merger," and, such additional liens and security interests, the "Post-Merger First Liens"); *provided, however*, that if the Debtors fail to file an adversary proceeding or contested matter asserting such challenge by the date that is seventy-five (75) days from the date of entry of this Interim Order, or the Court does not rule in favor of the Debtors in any such proceeding, then the Post-Merger First Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected first priority security interests and liens, not subject to recharacterization, subordination or otherwise avoidable; and the Post-Merger First Liens shall not be subject to any other or further challenge by the Debtors, including, without limitation, any successor thereto.

(b)     **Debtors' Rights Against the Second Lien Secured Parties**. Notwithstanding anything to the contrary in this Interim Order, the Debtors shall retain the right to challenge the validity, priority and/or enforceability of any liens and security interests granted to the Second Lien Secured Parties on the assets of Forest Oil Corporation and its direct and indirect subsidiaries that were not subject to the Second Lien Secured Parties' liens and security interest prior to the Merger (such additional liens and security interests, the "Post-Merger Second Liens"), *provided, however*, that if the Debtors fail to file an adversary proceeding or contested matter asserting such challenge by the date that is seventy-five (75) days from the date of entry of this Interim Order, or the Court does

- 38 -

not rule in favor of the Debtors in any such proceeding, then the Post-Merger Second Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected second priority security interests and liens, not subject to recharacterization, subordination or otherwise avoidable; and the Post-Merger Second Liens shall not be subject to any other or further challenge by the Debtors, including, without limitation, any successor thereto.

24.    **Limitation on Use of Collateral**.  Notwithstanding the foregoing or any other provision of this Interim Order, no Disputed Cash or other Cash Collateral may be used to: (a) object to, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of the Prepetition Indebtedness, or the liens or claims granted under this Interim Order or the Prepetition Loan Documents and/or assert any claims, defenses or causes of action against the Prepetition Secured Parties or their respective agents, affiliates, representatives, attorneys, or advisors, except by the Debtors in accordance with the Budget and as set forth in paragraph 23 of this Interim Order; (b) prevent, hinder, or otherwise delay the First Lien Agent's assertion, enforcement, or realization on the Cash Collateral or the Collateral in accordance with the First Lien Loan Documents or this Interim Order; (c) seek to modify any of the rights granted in this Interim Order or the First Lien Loan Documents without the First Lien Agent's prior written consent; or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are both approved by an Order of this Court and in accordance with the Budget.  Notwithstanding the foregoing, advisors to the Committee may investigate the claims and liens of the Prepetition Secured Parties prior to the Committee Challenge Deadline at an aggregate expense not to exceed $50,000.

25.    **Enforceability; Waiver of Any Applicable Stay**.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules or any other

Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

26.     **No Impact on Certain Contracts or Transactions**.  No rights of any entity in connection with a contract or transaction of the kind listed in sections 555, 556, 559, 560 and 561 of the Bankruptcy Code, whatever they might or might not be, are affected by the provisions of this Interim Order.

27.     **Proofs of Claim**.  None of the Prepetition Agents nor the Prepetition Secured Parties will be required to file proofs of claim in any of the Cases or successor cases, and the Debtors' stipulations in paragraphs D, E, F and G herein shall be deemed to constitute a timely filed proof of claim against the applicable Debtors.  Notwithstanding the foregoing, each of the First Lien Agent (on behalf of itself and the other First Lien Secured Parties) and the Second Lien Agent (on behalf of itself and the applicable Second Lien Secured Parties) is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a master proof of claim for any claims of the Prepetition Secured Parties arising from the applicable Prepetition Loan Documents; provided, that nothing herein shall waive the right of any Prepetition Secured Party to file its own proofs of claim against the Debtors.

28.     **Intercreditor Agreement**.  Nothing in this Interim Order shall amend or otherwise modify the terms and enforceability of the Intercreditor Agreement, and the Intercreditor Agreement shall remain in full force and effect.  The rights of the Prepetition Secured Parties shall at all times remain subject to the Intercreditor Agreement.

29.     **Section 552(b) of the Bankruptcy Code**.  The Prepetition Agents and the Prepetition Secured Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Agents and the Prepetition Secured Lenders with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral or the Collateral.

30.     **No Marshaling**.   Neither the Prepetition Agents nor the Prepetition Secured Lenders shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral or Collateral, as applicable.

31.     **Headings**.   The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

32.     **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Interim Order.

33.     **Final Hearing**.   The Final Hearing on the Motion is scheduled for [_____], 2015, at [_____] before this Court.

34.     **Objections**.  The Debtors shall promptly mail copies of this Interim Order to the parties having been given notice of the Interim Hearing and to any other party which has filed a request for notices with this Court.  Any party in interest objecting to the relief sought at the Final Hearing shall submit any such objection in writing and file same with the Court (with a courtesy copy to Chambers) and serve such objection on the following parties so as to be received no later than 4:00 p.m. (Eastern Time) on [_____], 2015:  (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York, 10022, Attention:  Jonathan Henes, P.C. and Christopher Marcus, P.C., and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois

60654, Attention: Ryan Blaine Bennett, Brad Weiland, and Gregory F. Pesce, Proposed Counsel

to the Debtors; (ii) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York,

10019, Attention:  Margot B. Schonholtz, Esq., and Ana M. Alfonso, Esq., Attorneys for the

First Lien Agent; (iii) Paul, Weiss, Rifkind, Wharton & Garrison LLP. Attention: Alan

Kornberg, Esq., Attorneys for the Second Lien Agent; and (iv) the United States Trustee for the

Southern District of New York, 201 Varick Street, Suite 1006, New York, New York, 10014,

Attention:  Paul Kenan Schwartzberg, Esq.

Dated: New York, New York
_____, 2015

_____
THE HONORABLE [_____]
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT A**

**Budget**

**Sabine Oil & Gas  - Weekly Cash Flow Forecast**
**DRAFT - Updated 07/14/15**

*Dollars USD*
*Strip (as of 7/08/15; actuals before)*

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 7/18 | 7/25 | 8/1 | 8/8 | 8/15 | 8/22 | 8/29 | 9/5 | 9/12 | 9/19 | 9/26 | 10/3 | 10/10 | 7/18 |
| | 7/24 | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | 10/2 | 10/9 | 10/16 | 10/16 |
| | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Oil Receipts | 20,377,468 | - | - | - | 18,169,029 | - | - | - | - | 16,509,896 | - | - | - | 55,056,392 |
| Gas, and NGL Receipts | - | 26,448,644 | - | - | - | 16,188,345 | 10,792,230 | - | - | 14,810,323 | 9,873,548 | - | - | 78,113,089 |
| Other Receipts | 267,870 | - | - | - | 253,492 | - | - | - | - | 233,932 | - | - | - | 755,293 |
| **Total Receipts, Gross** | 20,645,337 | 26,448,644 | - | - | 18,422,521 | 16,188,345 | 10,792,230 | - | - | 31,554,151 | 9,873,548 | - | - | 133,924,775 |
| Royalties/Working Interest Paid | - | (23,366,725) | - | - | - | (18,751,520) | - | - | - | (16,587,321) | - | - | - | (58,705,566) |
| Hedge Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Joint Interest Billing (JIB) Receipts | - | 4,000,000 | - | - | - | 5,747,088 | - | - | - | 3,610,657 | - | - | - | 13,357,745 |
| **Total Receipts, Net** | 20,645,337 | 7,081,918 | - | - | 18,422,521 | 3,183,913 | 10,792,230 | - | - | 18,577,487 | 9,873,548 | - | - | 88,576,953 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| **Direct Operating Disbursements (Gross)** | | | | | | | | | | | | | | |
| Lease Operating Expense | 1,969,352 | 1,969,352 | 1,752,263 | 1,752,263 | 1,639,788 | 1,639,788 | 1,833,476 | 1,978,742 | 1,978,742 | 1,978,742 | 1,989,389 | 2,016,006 | 2,016,006 | 24,513,911 |
| Marketing, Transport & Processing | 599,199 | 599,199 | 478,610 | 478,610 | 450,865 | 450,865 | 480,260 | 502,306 | 502,306 | 502,306 | 500,364 | 495,507 | 495,507 | 6,535,903 |
| Production and Ad-Val Taxes | 1,100,000 | - | - | - | 1,100,000 | - | - | - | 1,100,000 | - | - | - | - | 3,300,000 |
| Workover Expenses | 130,471 | 130,471 | 143,928 | 143,928 | 133,714 | 133,714 | 166,758 | 191,541 | 191,541 | 191,541 | 193,181 | 197,278 | 197,278 | 2,145,346 |
| Capital Expenditures | 5,003,630 | 5,003,630 | 3,662,967 | 3,662,967 | 3,506,977 | 3,506,977 | 3,766,728 | 3,961,540 | 3,961,540 | 3,961,540 | 3,928,250 | 3,845,025 | 3,845,025 | 51,616,799 |
| **General & Administrative** | | | | | | | | | | | | | | |
| Payroll (Incl. Taxes, 401k, Severance) | 1,121,554 | - | 1,121,554 | - | 1,121,554 | - | 1,121,554 | - | 1,121,554 | - | 1,121,554 | - | 1,121,554 | 7,850,878 |
| Rent & Utilities | - | - | 612,562 | - | - | - | 478,550 | - | - | 237,517 | - | - | - | 1,328,629 |
| Insurance | - | - | - | - | - | - | - | - | 500 | - | - | - | - | 500 |
| Other G&A* | 583,950 | 742,150 | 578,271 | 578,271 | 578,271 | 578,271 | 881,846 | 647,002 | 647,002 | 647,002 | 769,049 | 499,118 | 499,118 | 8,229,320 |
| **Other Operating Expenses** | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 1,625,000 |
| **(Bounced Checks)/Recut Checks, Net** | 936,000 | 288,000 | 144,000 | 72,000 | - | - | - | - | - | - | - | - | - | 1,440,000 |
| **Total Operating Disbursements** | 11,569,157 | 8,857,803 | 8,619,154 | 6,813,038 | 8,656,170 | 6,434,616 | 8,854,171 | 7,406,132 | 9,627,686 | 7,406,632 | 8,864,304 | 7,177,935 | 8,299,489 | 108,586,286 |
| **OPERATING CASH FLOW** | 9,076,180 | (1,775,885) | (8,619,154) | (6,813,038) | 9,766,351 | (3,250,703) | 1,938,058 | (7,406,132) | (9,627,686) | 11,170,855 | 1,009,245 | (7,177,935) | (8,299,489) | (20,009,333) |
| **Non-Recurring** | | | | | | | | | | | | | | |
| Restructuring Professional Fees | - | - | - | - | 375,000 | 262,500 | 900,000 | 262,500 | 1,020,000 | - | 25,000 | 2,360,000 | 1,532,000 | 6,737,000 |
| Utility Deposits | 100,000 | - | - | - | - | - | - | - | - | - | - | - | - | 100,000 |
| Other (Incl. US Trustee Fees) | - | - | - | - | - | - | - | - | - | - | 45,000 | - | - | 45,000 |
| **Total Non-Recurring Disbursements** | 100,000 | - | - | - | 375,000 | 262,500 | 900,000 | 262,500 | 1,020,000 | - | 70,000 | 2,360,000 | 1,532,000 | 6,882,000 |
| **Debt Service** | | | | | | | | | | | | | | |
| Principal Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Payments and Fees | - | 3,780,343 | - | - | - | 3,834,401 | - | - | - | - | 4,111,804 | - | - | 11,726,547 |
| **Total Debt Service Expenses** | - | 3,780,343 | - | - | - | 3,834,401 | - | - | - | - | 4,111,804 | - | - | 11,726,547 |
| **NET CASH FLOW** | 8,976,180 | (5,556,227) | (8,619,154) | (6,813,038) | 9,391,351 | (7,347,604) | 1,038,058 | (7,668,632) | (10,647,686) | 11,170,855 | (3,172,559) | (9,537,935) | (9,831,489) | (38,617,880) |
| **Cash Balance** | | | | | | | | | | | | | | |
| Beginning Cash Balance | 253,391,174 | 262,367,354 | 256,811,127 | 248,191,973 | 241,378,934 | 250,770,285 | 243,422,682 | 244,460,740 | 236,792,108 | 226,144,422 | 237,315,277 | 234,142,718 | 224,604,783 | 253,391,174 |
| Net Cash Flow | 8,976,180 | (5,556,227) | (8,619,154) | (6,813,038) | 9,391,351 | (7,347,604) | 1,038,058 | (7,668,632) | (10,647,686) | 11,170,855 | (3,172,559) | (9,537,935) | (9,831,489) | (38,617,880) |
| **Ending Cash Balance** | 262,367,354 | 256,811,127 | 248,191,973 | 241,378,934 | 250,770,285 | 243,422,682 | 244,460,740 | 236,792,108 | 226,144,422 | 237,315,277 | 234,142,718 | 224,604,783 | 214,773,294 | 214,773,294 |

* Includes Office Expenses, Contractors, and Other Employee Related Costs (including healthcare related claims)