Hearing Date:  **September 10, 2015 at 12:00 p.m. (prevailing Eastern Time)**
Objection Deadline:  **September 3, 2015 at 4:00 p.m. (prevailing Eastern Time)**

James H.M. Sprayregen, P.C.       Gabor Balassa (admitted *pro hac vice*)
Paul M. Basta, P.C.       Ryan Blaine Bennett (admitted *pro hac vice*)
Jonathan S. Henes, P.C.       A. Katrine Jakola (admitted *pro hac vice*)
Christopher J. Marcus, P.C.       Brad Weiland (admitted *pro hac vice*)

**KIRKLAND & ELLIS LLP**       **KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**       **KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue       300 North LaSalle Street
New York, New York 10022       Chicago, Illinois 60654
Telephone:  (212) 446-4800       Telephone:  (312) 862-2000
Facsimile:  (212) 446-4900       Facsimile:  (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | )   Chapter 11 |
| | ) |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | )   Case No. 15-11835 (SCC) |
| | ) |
| Debtors. | )   (Jointly Administered) |
| | ) |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING AND
AUTHORIZING THE (A) PERFORMANCE AWARD PROGRAM AND
(B) FIXED BONUS AWARD PROGRAM**

      **PLEASE TAKE NOTICE** that a hearing (the "Hearing") on the motion (the "Motion," a

copy of which is attached hereto) of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for the entry of an order approving and authorizing the

(a) performance award program and (b) fixed bonus award program, will be held before the

Honorable Shelley C. Chapman of the United States Bankruptcy Court for the Southern District

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corporation (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is:  1415 Louisiana, Suite 1600, Houston, Texas 77002.

of New York (the "Court"), in Room 623, One Bowling Green, New York, New York 10004-1408, on **September 10, 2015, at 12:00 p.m. (prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that responses or objections to the Motion and the relief requested therein, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall set forth the basis for the response or objection and the specific grounds therefore, and shall be filed with the Court electronically in accordance with General Order M-399 by registered users of the Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Court), with a hard copy delivered directly to chambers pursuant to Local Bankruptcy Rule 9028-1 and served so as to be actually received no later than **September 3, 2015, at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline"), upon: (a) the Debtors, 1415 Louisiana, Suite 1600, Houston, Texas 77002, Attn: Michael Magilton; (b) proposed counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Jonathan S. Henes, P.C. and Christopher Marcus, P.C. and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Ryan Blaine Bennett and Brad Weiland; (c) administrative agent under the Debtors' first lien credit facility, Wells Fargo Bank, National Association, 333 Clay Road, Suite 2400, Houston, Texas 77024, Attn: Stephanie Harrell and Wells Fargo Bank, National Association, 1000 Louisiana Street, 8th Floor, Houston, Texas 77002, Attn: Brian M. Malone; (d) counsel to administrative agent under the Debtors' first lien facility, Willkie Farr & Gallagher LLP, 600 Travis Street, Suite 2310, Houston, Texas 77002, Attn: Kristi Treece, Michael Niebruegge, and Ryan Cicero and Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Margot B. Schonholtz, Ana M. Alfonso, and Penelope J. Jensen;

2

(e) administrative agent under the Debtors' second lien credit facility, Wilmington Trust, National Association, 1100 North Market Street, Wilmington, Delaware 19890, Attn: Joseph Feil; (f) counsel to the agent under the Debtors' second lien credit facility, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Alan W. Kornberg, Brian S. Hermann, Moses Silverman, Kellie A. Cairns, and Brian Kim and Haynes and Boone LLP, 2323 Victory Avenue, Suite 700, Dallas, Texas 75219, Attn: Robert D. Albergotti and Ian T. Peck; (g) indenture trustee under the Debtors' 9.75% senior notes due 2017, Bank of New York Mellon Trust Company, National Association, 101 Barclay Street, Floor 4 East, New York, New York 10286, Attn: Bankruptcy Department; (h) counsel to the indenture trustee under the 2017 senior notes, Akin Gump, One Bryant Park, New York, New York 10036, Attn: Phillip C. Dublin, Daniel H. Golden, Abid Qureshi, and Sara L. Brauner; (i) the indenture trustee under the Debtors' 7.25% senior notes due 2019, Wilmington Savings Fund, FSB, 500 Delaware Avenue, Wilmington, Delaware 19801, Attn: Bankruptcy Department; (j) the indenture trustee under the Debtors' 7.5% senior notes due 2020, Delaware Trust Company, 2711 Centerville Road, Wilmington, Delaware 19808, Attn: Bankruptcy Department; (k) counsel to certain holders of the 2019 and 2020 senior notes, Brown Rudnick, Seven Times Square, New York, New York 10036, Attn: Bob Stark and Sigmund Wissner-Gross; (l) counsel to the Official Committee of Unsecured Creditors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York  10036, Attn: Mark R. Somerstein, Keith H. Wofford, and D. Ross Martin; and (m) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Paul K. Schwartzberg.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Motion may be obtained free of charge by visiting the website of Prime Clerk LLC at http://cases.primeclerk.com/sabine.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or at a later hearing.  The Debtors will file an agenda before the Hearing, which may modify or supplement the Motion to be heard at the Hearing.

**PLEASE TAKE FURTHER NOTICE** that if no objections or other responses are timely filed and served with respect to the Motion, the Debtors shall, on or after the Objection Deadline, submit to the Court an order substantially in the form annexed as **Exhibit A** to the Motion, which order the Court may enter with no further notice or opportunity to be heard.

Dated:  August 21, 2015          */s/ Jonathan S. Henes*
       New York, New York          Paul M. Basta, P.C.
                                    Jonathan S. Henes, P.C.
                                    Christopher Marcus, P.C.
                                    KIRKLAND & ELLIS LLP
                                    KIRKLAND & ELLIS INTERNATIONAL LLP
                                    601 Lexington Avenue
                                    New York, New York 10022
                                    Telephone:     (212) 446-4800
                                    Facsimile:      (212) 446-4900

                                    - and -

                                    James H.M. Sprayregen, P.C.
                                    Gabor Balassa, P.C. (admitted *pro hac vice*)
                                    Ryan Blaine Bennett (admitted *pro hac vice*)
                                    A. Katrine Jakola (admitted *pro hac vice*)
                                    Brad Weiland (admitted *pro hac vice*)
                                    KIRKLAND & ELLIS LLP
                                    KIRKLAND & ELLIS INTERNATIONAL LLP
                                    300 North LaSalle Street
                                    Chicago, Illinois 60654
                                    Telephone:     (312) 862-2000
                                    Facsimile:      (312) 862-2200

                                    *Proposed Counsel to the Debtors and Debtors in Possession*

**Hearing Date:  September 10, 2015 at 12:00 p.m. (prevailing Eastern Time)**
**Objection Deadline:  September 3, 2015 at 4:00 p.m. (prevailing Eastern Time)**

James H.M. Sprayregen, P.C.

Paul M. Basta, P.C.

Jonathan S. Henes, P.C.

Christopher J. Marcus, P.C.

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Gabor Balassa (admitted *pro hac vice*)

Ryan Blaine Bennett (admitted *pro hac vice*)

A. Katrine Jakola (admitted *pro hac vice*)

Brad Weiland (admitted *pro hac vice*)

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) | Case No. 15-11835 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administrated) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING AND**
**AUTHORIZING THE (A) PERFORMANCE AWARD PROGRAM**
**AND (B) FIXED BONUS AWARD PROGRAM**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (the "Motion") for entry of an order, substantially in the form of **Exhibit A**,

approving and authorizing the Debtors to continue two distinct employee incentive programs in

the ordinary course of business on a postpetition basis:  (a) the Performance Award Program and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is:  1415 Louisiana, Suite 1600, Houston, Texas 77002.

(b) the Fixed Bonus Award Program (together, the "Employee Incentive Programs").  In support

of this Motion, the Debtors respectfully submit: (a) the Declaration of Douglas Friske, Managing

Director of Towers Watson, attached hereto as **Exhibit B** (the "Friske Declaration"); (b) the

Declaration of Jonathan A. Mitchell, Senior Managing Director of Zolfo Cooper Management,

LLC and Chief Restructuring Officer of Sabine Oil & Gas Corporation ("Sabine"), attached

hereto as **Exhibit C** (the "Mitchell Declaration"); (c) the Declaration of David Sambrooks,

President and Chief Executive Officer of Sabine, attached hereto as **Exhibit D** (the "Sambrooks

Declaration"); and (d) the Declaration of John Yearwood, Member of the Board and Chairperson

of the Compensation Committee of Sabine, attached hereto as **Exhibit E** (the "Yearwood

Declaration").  In further support of this Motion, the Debtors respectfully state as follows.

### Preliminary Statement

1.    The Debtors are engaged in the exploration and production of onshore oil and

natural gas resources—complex operations that rely on the performance of the Debtors'

relatively small and highly skilled workforce, including their senior leadership team, as the

backbone for their success.  By this Motion, the Debtors seek approval of two Employee

Incentive Programs—the Performance Award Program and the Fixed Bonus Award Program—

which are continuations of the Debtors' historical practices, consistent with industry standards,

and necessary for the Debtors to provide market-based compensation to their employees.

2.    The Performance Award Program provides nine members of the Debtors'

management team with the opportunity to earn quarterly incentive-based cash awards if the

Debtors achieve pre-established financial and operational milestones.  The Fixed Bonus Award

Program provides for the payment of quarterly fixed cash bonus awards to the Debtors' 145

remaining employees.[2]  Both of these programs are in the best interests of the Debtors' 154 employees, the Debtors' estates, and all stakeholders.

3.      Like other exploration and production ("E&P") companies, the Debtors employ a lean and highly specialized workforce, including many employees who have deep knowledge of the Debtors' specific oil and gas assets.  The Debtors rely on their employees' expertise in making decisions and supporting operations that drive the businesses' financial performance. Given the employees' specialized skills and site-specific knowledge, it would be difficult for the Debtors to replace their employees without incurring substantial costs and disrupting operations. As a result of the Debtors' small, high-impact workforce, employee outperformance can substantially enhance value for the Debtors' enterprise, while even small losses to the employee base can significantly erode the Debtors' financial and operational results.  (Sambrooks Decl. ¶ 11)

4.      The Debtors' need to incentivize management and retain other non-insider employees is crucial given recent developments.  The dramatic decline in oil prices and continued depressed prices of natural gas have challenged the Debtors' ability to achieve favorable financial results, magnifying the significance of the employees' operational and capital-deployment decisions.  The consequences of ill-advised or poorly timed decisions about whether or where to drill new wells are exaggerated in the current commodity price environment, in which the Debtors have little room for error.  (Sambrooks Decl. ¶ 12)

5.      At the same time, the December 2014 business combination (the "Combination") of Forest Oil Corporation ("Forest Oil") and Sabine Oil & Gas LLC ("Old Sabine") increased

---

[2]    The Debtors currently employ approximately four individuals who were employed by Forest Oil and whose positions are in the process of being phased out.  These individuals are not participants in the Fixed Bonus Award Program.

responsibilities and uncertainty for the Debtors' employees.  The Combination roughly doubled the number of active wells and land positions that the Debtors' employees were managing, with little corresponding increase to headcount.  Employee workloads have ramped up even more as the Debtors' restructuring efforts have moved forward at an accelerating speed.  (Sambrooks Decl. ¶ 13)

6.    The Debtors have an immediate and compelling need to provide competitive compensation packages for their employees.  Recruiters are actively targeting certain members of the Debtors' management team and other employees.  For example, the Debtors' General Counsel resigned on July 24, 2015 to accept a position at a large E&P company.[3] ████████

████████████████████████████████████████████████████████████████████████

████████████████[4] The loss of a handful of key employees could cascade into broad-based departures across the Debtors' operations, unraveling their restructuring from the inside out. (Sambrooks Decl. ¶ 15)

7.    In addition to answering the Debtors' current need to properly incentivize and reward leadership and retain other non-insider employees, the Employee Incentive Programs are also consistent with the Debtors' prepetition compensation practices.  For years, the Debtors have evaluated executive performance based on a weighted set of financial and operational metrics.  The Debtors likewise have historically provided fixed or performance-based cash bonuses to non-officer employees to maintain the high quality workforce needed to support their operations.  (Yearwood Decl. ¶ 12, 14)  Denying the Debtors the opportunity to continue their

---

[3]    The Debtors' General Counsel was a Tier 1 Participant (as defined herein).

[4]    The Debtors have provided an unredacted version of this motion and the supporting declarations to counsel to the UCC, the administrative agent under the Debtors' first lien credit facility, and the administrative agent under the Debtors' second lien credit facility.  Parties in interest who wish to review an unredacted version of this motion and the supporting declarations should contact proposed counsel to the Debtors.

prepetition practice of offering such bonus opportunities would convey to the Debtors' workforce that, despite management's assurances to the contrary, business is not "as usual" during this restructuring. Such a message would demoralize employees at all levels of the company. (Sambrooks Decl. ¶ 18)

8.      Both the Performance Award Program and the Fixed Bonus Award Program satisfy the requirements of the Bankruptcy Code. Both programs are within the ordinary course of the Debtors' prepetition compensation practices and are in the best interests of the Debtors and all stakeholders. The Debtors worked closely with outside advisors—including compensation experts at Towers Watson—to ensure that the Employee Incentive Programs are in line with market practice both for companies in the E&P industry and those in chapter 11. The Debtors enlisted the help of independent financial advisors at Zolfo Cooper to ensure that the Performance Award Program incorporated key value-driving performance metrics and stretch targets that would incentivize management and align their interests with those of creditors. In collaboration with management and the Debtors' advisors, the compensation committee (the "Compensation Committee") of Sabine's board of directors (the "Board") carefully reviewed, evaluated, and provided guidance on the Employee Incentive Programs, before ultimately approving them. (Yearwood Decl. ¶ 16-23)

9.      The Performance Award Program and the Fixed Bonus Award Program are reasonable and well within the Debtors' business judgment. The Performance Award Program provides market-based bonuses to the Debtors' officer employees if—and only if—the Debtors achieve challenging financial and operational targets that will generate substantial value for the Debtors' constituencies, particularly their creditors. (Mitchell Decl. (Mitchell Decl. ¶ 13, 16, 29, 31)

5

10.     The Performance Award Program is also the only opportunity for direct compensation to the Debtors' leadership team, other than their base salaries. The program is therefore critical to the Debtors' ability to provide competitive compensation to the individuals who drive the success of the business. Even assuming that the Performance Award Program is approved and that the Debtors achieve target level performance, the total direct compensation for the Debtors' leadership team would average roughly ████████████████████ as compared to employees holding comparable positions at peer E&P companies and industry benchmarks. Without the Performance Award Program, the total direct compensation for the Debtors' leadership team falls to ██████████████████████ of that same group. (Friske Decl. ¶ 24)

11.     The Fixed Bonus Award Program is likewise essential to the Debtors' ability to attract and retain quality non-insider employees. The Fixed Bonus Award Program provides a substantial component of participating employees' compensation, and many employees depend on this compensation for living and other expenses. If the Fixed Bonus Award Program was discontinued, the resulting employee attrition would likely be costly and disruptive to the Debtors' operations. (Sambrooks Decl. ¶ 17)

12.     The Debtors have been engaging with creditor groups and other stakeholders for weeks regarding the Employee Incentive Programs. The Debtors' management and advisors have met on multiple occasions with creditor constituencies, including with representatives of the Official Committee of Unsecured Creditors ("UCC"), their advisors, and the U.S. Trustee. The Debtors have proactively provided information to creditors and responded to multiple follow-up inquiries about the Employee Incentive Programs, including about program design,

6

cost, Towers Watson's benchmark analyses, and the financial and operational metrics and targets in the Performance Award Program.

13.    The Debtors' management team, outside advisors, Compensation Committee, and Board have concluded that the Employee Incentive Programs are reasonable and appropriately tailored to incentivize management and retain other employees in a manner that will benefit all stakeholders.  The Debtors stand ready to continue to engage with creditors about the programs.  There can be no serious dispute, however, of the gravity and immediacy of Debtors' business need to continue the Employee Incentive Programs, that the programs are a market response to that need, and that the programs are the products of a diligent process undertaken by a veteran management team, experienced professionals, and an independent Compensation Committee.  The Debtors therefore respectfully request that the Court approve the Performance Award Program and the Fixed Bonus Award Program.

## Jurisdiction and Venue

14.    The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

15.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16.    The statutory bases for the relief requested herein are sections 363(b), 363(c), and 503(c) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

## Relief Requested

17.    By this Motion, the Debtors seek entry of an order, substantially in the form of **Exhibit A**, approving and authorizing the Debtors to continue the (a) Performance Award Program, which provides incentive-based bonus opportunities for nine members of management, including  four  insiders  (the  "Tier 1 Participants")  and  five  non-insiders  (the  "Tier 2

7

Participants"); and (b) Fixed Bonus Award Program, which provides fixed bonus opportunities for the Debtors' remaining 145 employees (the "Tier 3 Participants").[5]  The Debtors seek relief to pay, if earned, the following amounts under these Employee Incentive Programs:

| Program | Employee Status | Participant Count | Estimated Quarterly Target Value | Estimated Annual Target Value | Estimated Maximum Value |
|---|---|---|---|---|---|
| Performance Award Program | **Tier 1 Participants** Insiders | 4 | ███████ | ███████ | ███████ |
| | **Tier 2 Participants** Non-Insiders | 5 | ███████ | ███████ | ███████ |
| **Fixed Bonus Award Program** | **Tier 3 Participants** Non-Insiders | 145 | ███████ | ███████ | ███████ |
| **Total** | | **154** | **$3,250,638** | **$13,002,551** | **$16,008,157** |

## Background

18.     Sabine, together with its Debtor and non-Debtor affiliates, is an independent energy company engaged in the acquisition, production, exploration, and development of onshore oil and natural gas properties in the United States.    On July 15, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  On July 28, 2015, the Office of the

---

[5]    The total number of Tier 3 Participants was calculated as of July 30, 2015, per the Towers Watson report.  This number, and the associated cost, may vary over time as existing employees leave and new employees join the Debtors.  (Friske Decl. ¶ 30)

United States Trustee for the Southern District of New York (the "U.S. Trustee") formed the UCC pursuant to section 1102 of the Bankruptcy Code [Dkt. No. 90].[6]

## I.    Development of the Employee Incentive Programs.

19.    The Debtors employ approximately 154 individuals who perform a wide variety of functions critical to the Debtors' day-to-day operations, financial performance, and ultimately, the Debtors' successful reorganization.  As discussed, like other E&P companies, the Debtors employ a relatively small workforce of highly skilled personnel who have detailed knowledge of the Debtors' specific oil and gas assets. Replacing these employees would be difficult.

20.    Given the importance of attracting and motivating quality personnel, the Debtors have followed two fundamental principles in approaching employee compensation over the years.  *First*, the Debtors have designed compensation packages that ensure that all employees have a stake in, and the opportunity to benefit from, the performance of the company.  *Second*, the Debtors have structured management compensation to include ███████████████████ ████████████████, placing greater emphasis on incentive-based components.  These two principles are reflected in the Debtors' prepetition compensation practices, including the Performance Award Program and Fixed Bonus Award Program that are the subjects of this Motion.  (Yearwood Decl. ¶ 11)

21.    In the years preceding the December 2014 Combination, both Old Sabine and Forest Oil offered compensation programs consisting of three primary components:  (a) an annual base salary; (b) an annual cash bonus plan; and (c) grants of longer-term equity incentive awards (together with the annual cash bonus plan, the "Legacy Incentive Plans").  The Legacy

---

[6]    Further information about the Debtors' business operations and capital structure is set forth in the *Declaration of Michael Magilton (I) In Support of First Day Motion and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Dkt. No. 3].

Incentive Plans were designed to attract, retain, and motivate talented employees to achieve certain financial and operational results. (Yearwood Decl. ¶ 14)

22.    Unfortunately, as a consequence of the Debtors' financial difficulties and decline in the value of the Debtors' stock (including its delisting from the New York Stock Exchange), employees' equity lost a majority of its value, and potential new equity awards represented little or no value to employees.    The precipitous decline in employees' realized compensation amounts, combined with volatility in the energy market, the Debtors' distressed financial situation, and uncertainties with respect to the Debtors' businesses, seriously undercut the Debtors' ability to recruit, retain and incentivize employees. (Yearwood Decl. ¶ 15)

23.    At the same time, the Compensation Committee recognized that a decrease in total compensation would be particularly problematic during the Debtors' transition following the December 2014 Combination, which resulted in significantly increased job responsibilities for many employees.    Accordingly, the Debtors engaged Pearl Meyer & Partners ("<u>Pearl Meyer</u>") in early 2015 to review the Debtors' compensation structure to ensure they would continue to offer competitive, market-based compensation to employees on a go-forward basis. As part of this process, Pearl Meyer performed an overall compensation analysis relying on competitive market data, and prepared a report (the "<u>Pearl Meyer Report</u>") summarizing their findings.    The Pearl Meyer Report concluded that, absent a change to the Debtors' compensation structure, total direct compensation levels for certain employees would ███████████ ███████.    Pearl Meyer recommended alternatives to preserve the Debtors' historical competitive positioning. (Yearwood Decl. ¶¶ 15-16)

24.    Based on this analysis, the Compensation Committee carefully considered an updated compensation structure, which would align with the Debtors' restructuring realities and

ensure target total direct compensation opportunities.  On March 2, 2015, the Board approved an updated incentive structure, which combined the Debtors' annual cash bonus plan and the long-term equity plan into a single cash-based plan.  That plan included the two programs that remain in place today:  (a) the Performance Award Program, which at that time provided quarterly cash performance awards tied solely to the Debtors' quarterly EBITDA results; and (b) the Fixed Bonus Award Program, which provided fixed quarterly cash bonus awards to non-officer employees.  Employees were eligible to participate in only one of these programs.  The Compensation Committee approved participation in these programs and established EBITDA targets for the Performance Award Program on a quarterly basis.  The Debtors paid bonuses under both programs in the first and second quarters of 2015.  (Yearwood Decl. ¶ 17)

25.    In May 2015, as the Debtors experienced mounting financial difficulties, the Debtors began to reevaluate their compensation programs to ensure that employees were properly incentivized to meet the difficult goals ahead and to maximize value for stakeholders. The Debtors engaged independent compensation experts at Towers Watson and financial advisors at Zolfo Cooper to assist with their analysis.  (Yearwood Decl. ¶ 18)

26.    The Compensation Committee and the Board closely oversaw the Debtors' evaluation of the Employee Incentive Programs.  For example, the Compensation Committee convened on multiple occasions between March 2015 and July 2015 to review, evaluate, and provide feedback on the Employee Incentive Programs.  Individual Compensation Committee members, including Mr. John Yearwood, were also in regular contact with the Debtors' management and advisors regarding the status and design of the Employee Incentive Programs.[7] (Yearwood Decl. ¶ 19)

---

[7]    No Compensation Committee member is a participant in either the Performance Award Program or the Fixed
(Continued)

27.     The Compensation Committee requested and received multiple analyses from the Debtors and their advisors, assessing, among other things:  (a) the proposed duration of the Employee Incentive Programs; (b) the performance metrics and targets used in the Performance Award Program; (c) participation in the programs; (d) the total compensation award that would be available to individual employees under both programs; (e) the frequency of payment opportunities under the programs; and (f) the potential business impact if the programs were not implemented.  (Yearwood Decl. ¶ 20)

28.     The Compensation Committee carefully assessed Towers Watson's analysis of the Debtors' compensation opportunities as compared to market levels.  The Compensation Committee also evaluated the performance targets selected for the Performance Award Program in light of the Debtors' historical performance, management plan, and the extent to which these performance targets—if achieved—would demonstrate a material improvement in the Debtors' businesses as a whole.  The Compensation Committee further considered the analysis of Zolfo Cooper, which independently analyzed and validated the appropriateness of the performance metrics and the rigor of the targets identified.  The Compensation Committee also evaluated management's views on the significant employee effort necessary to attain the performance targets in the Performance Award Program and the resulting value created for the Debtors, as well as the need to retain the employees included in the Fixed Bonus Award Program. (Yearwood Decl. ¶ 21)

29.     The Debtors ultimately proposed to continue the Fixed Bonus Award Program under the same construct as the Board had approved in March 2015.  With respect to the

Bonus Award Program.  (Yearwood Decl. ¶ 10)

Performance Award Program, the Debtors proposed certain refinements to the Performance Award Program, adding three of the Debtors' historical performance metrics—Production, Capital, and Operating Expense—to the existing EBITDA measure. This modification provided a balanced set of metrics for which the Debtors could reasonably forecast targets for the entire one-year Performance Period. (Yearwood Decl. ¶ 22)

30.     The Compensation Committee independently and thoroughly deliberated about the Employee Incentive Programs, proposed certain modifications to the Performance Award Program, and recommended that the Board approve the continuation of both programs. On July 31, 2015, after careful consideration, the Board unanimously approved these recommendations. (Yearwood Decl. ¶ 23)

## II.    The Performance Award Program.

31.     The Debtors seek authority to continue the Performance Award Program to incentivize and reward their core leadership team and achieve financial and operational milestones that drive value for the entire enterprise and are necessary to a successful restructuring.

### A.    The Performance Award Participants.

32.     The Performance Award Program includes the nine members of the Debtors' leadership team (the "Performance Award Participants"). The Performance Award Participants are most critical to the Debtors' restructuring efforts and are most capable of maximizing financial performance for the benefit of the Debtors, their estates, and other parties in interest during this critical period. Performance Award Participants are divided into two tiers:

- **Tier 1 Participants:** Tier 1 Participants include the four senior-most executives of the Debtors, including the Debtors' Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, and the Senior Vice President of

Asset Development. These officers generally direct overall strategy and direction of the Debtors' enterprise as a whole.[8] The Tier 1 Participants are "insiders" as defined in section 101(31) of the Bankruptcy Code ("Insiders"). (Sambrooks Decl. ¶ 22)

- **Tier 2 Participants:** Tier 2 Participants include five other of the Debtors' senior employees, none of whom hold a title greater than Vice President. The Tier 2 Participants help carry out daily business operations, including operations, land administration, accounting, and human resource functions. Tier 2 Participants have less control over the Debtors' overall strategic direction, although they are tasked with executing material aspects of the strategic course ultimately directed by the Tier 1 Participants. Tier 2 Participants are not appointed by the Board, do not report directly to the Board, and do not have the authority to dictate general corporate policy. (*Id.*)

### B. Performance Metrics.

33.     The Performance Award Program provides for the payment of incentive-based cash awards (the "Performance Awards") if the Debtors achieve certain financial and operational goals at the end of every quarter during the one-year period covered by the program (the "Performance Period"). The Performance Period begins on July 1, 2015 and ends on June 30, 2016.

34.     The Performance Award Program utilizes four equally-weighted metrics (the "Performance Metrics") to measure employee performance during the Performance Period: (a) Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"); (b) Total Production;[9] (c) Total Operating Expense;[10] and (d) Capital.[11]

---

[8]   A vacancy in the Performance Award Program was created with the departure of the Debtors' General Counsel, who was considered a Tier 1 Participant. The Senior Vice President, Asset Development & Land does not direct overall strategy for the Debtors' business but is a relative of the Chief Operating Officer and is therefore considered a Tier 1 Participant.

[9]   "Production" includes targets for the Debtors' average equivalent daily production of oil, gas, and natural gas liquids.

[10]   "Operating Expense" includes targets for total operating expenses composed of: lease operating expense, marketing transportation and processing expense, workover expense, production and ad valorem taxes, and general and administrative expense.

35.    The Performance Metrics are key value-driving indicators for the Debtors. (Sambrooks Decl. ¶ 26; Mitchell Decl. ¶¶ 11, 28)  The Debtors have historically tracked their performance against the Performance Metrics and have consistently used them to incentivize, measure, and reward employee performance over the years.  (Sambrooks Decl. ¶ 26)  The Performance Metrics also are commonly used in employee compensation programs throughout the oil and gas industry.  (Friske Decl. ¶ 30)

36.    The Performance Metrics link payment of the Performance Awards to key performance levers, including sales volumes, production levels, earnings, and management of lease operating expenses.  As such, the Performance Award Program is incentive-based, tying pay to achievement of near-term goals that are essential to the Debtors' restructuring efforts. (Mitchell Decl. ¶¶ 10, 13, 16, 29, 51, 71)

**C.    The Performance Targets.**

37.    Performance Award Participants qualify for incentive payments if the Debtors achieve specified targets (the "Performance Targets") for each of the four Performance Metrics. The Debtors established three levels of Performance Targets for each Performance Metric:  (a) a threshold performance level; (b) a target performance level; and (c) a maximum performance level.

38.    The Debtors based the target performance level for each Performance Metric on their management plan reforecast (the "Reforecast"), which updated the Debtors' March 2015 business plan to reflect more recent oil and gas price curves and reduced operating expenses.

---

[11]  "Capital" includes capital expended in connection with drilling, completion, and workover operations, land acquisition, and capitalized overhead.  Capital does not include capitalized interest, or asset sales and acquisitions adjustments.

The threshold and maximum performance levels are individually set within a range of 85 to 115 percent of the target performance level for each Performance Metric based on each metrics' underlying volatility.   Performance against each metric is assessed quarterly over the Performance Period, from July 1, 2015 through June 30, 2016.

39.    The performance level achieved for each Performance Metric dictates the amount of any award to be paid to participants.   Payout amounts for threshold and maximum performance outcomes are set within a range of 50 to 150 percent of the target payout levels.[12] If the Debtors fail to achieve the threshold performance level for a Performance Metric, no Performance Award will be paid on account of such Performance Metric.   The Performance Metrics, Performance Targets for each metric, and associated payout levels are summarized below:

| Performance Metric | Performance Target (Annual in $000's) | | | Payout Potential (% of Target Quarterly Incentive Amount Earned) | | |
|---|---|---|---|---|---|---|
| | Threshold | Target | Maximum | Threshold | Target | Maximum |
| EBITDA | 85% | ███ | 115% | 50% | 100% | 150% |
| Total Production | 85% | ███ | 110% | 50% | 100% | 150% |
| Capital | 115% | ███ | 85% | 50% | 100% | 150% |
| Operating Expense | 105% | ███ | 90% | 50% | 100% | 150% |

40.    Additionally, in light of uncertainty and volatility associated with certain Performance Metrics, the Performance Award Program utilizes a cumulative, annual "catch up" target for each Performance Metric to ensure that aggregate pay and performance are aligned.   If performance falls below targeted levels in any given quarter but, in the aggregate, meets the pre-established annual milestones (equal to the sum of the quarterly goals), Performance Award

---

[12]   If performance falls between the threshold and maximum performance levels, the award payouts will be interpolated on a straight-line basis.   Performance Award Participants must reach the maximum performance level to receive the entire payout; otherwise, payouts are reduced on a prorated basis.

Participants will receive a "catch-up" payment at the end of the fourth quarter of the Performance Period. In this way, the Debtors' leadership team is incentivized to continue to strive for annual financial and operational goals even if performance falls short in a particular quarter.

41.    The aggregate cost of the Performance Award Program is approximately ███████ at threshold pay-out levels, ███████ at target pay-out levels, and ███████ at maximum pay-out levels. (Friske Decl. ¶ 19)

### D.    Necessity of the Performance Award Programs.

42.    The Debtors have an immediate need to implement the Performance Award Program because, in addition to running the Debtors' day-to-day affairs, the Performance Award Participants have been, and must continue to be, actively pursuing a complex restructuring with numerous parties in interest. The Performance Award Participants have seen a substantial increase in their workloads in recent months, without any concomitant increase in their compensation. Providing incentive opportunities, such as those contemplated by the Performance Award Program, will enable the Debtors not only to achieve, but possibly to exceed, their near-term operational goals. (Sambrooks Decl. ¶¶ 13-14)

43.    Moreover, as discussed below, failure to continue the Performance Award Program will result in total compensation opportunities for the Performance Award Participants that are ███████████████ and would leave the Debtors vulnerable to departures, causing substantial disruption to the Debtors' operations. The Debtors already have experienced attrition among their senior management team, including their General Counsel who resigned in July 2015. Properly incentivizing, compensating and rewarding the Debtors' leadership at this

critical juncture is in the best interests of the Debtors, the Debtors' estates, and all parties in interest.  (Sambrooks Decl. ¶ 15)

### III.    The Fixed Bonus Award Program.

44.    The Debtors seek authority to continue the Fixed Bonus Award Program to maintain their high quality workforce and ensure a successful and smooth restructuring.

#### A.    The Fixed Bonus Award Participants.

45.    The Debtors' 145 non-insider employees who do not participate in the Performance Award Program are eligible to participate in the Fixed Bonus Award Program (the "Fixed Bonus Award Participants").  The Fixed Bonus Award Participants include employees who work at the Debtors' corporate headquarters in Houston, Texas and in the field.  They perform a variety of functions, including accounting, administration, operations, and finance.

46.    None of the Fixed Bonus Award Participants is an Insider.  No Fixed Bonus Award Participant reports to, or was appointed by, the Board; sets company policy; is part of the Debtors' core leadership team; or is an officer of the Debtors.  All of the Fixed Bonus Award Participants hold positions below the Vice President level on the Debtors' organizational charts. (Sambrooks Decl. ¶ 25)   The Fixed Bonus Award Program is consistent with the Debtors' historical practices of making a cash bonus plan available to all employees.  (*Id.* ¶ 7)

#### B.    Fixed Bonus Awards.

47.    Under the Fixed Bonus Award Program, participants are eligible to receive quarterly fixed cash awards (the "Fixed Bonus Awards") in consideration for their continued employment with the Debtors.  Although Fixed Bonus Award Participants are not required to satisfy any performance-based metrics to receive a Fixed Bonus Award, they must be employed by the Debtors on the date of payment.  The Compensation Committee established the amount of each participant's Fixed Bonus Awards, based on the individual's position and length of service

18

with the Debtors.  Available payout amounts start at approximately ████ per quarter.  As with Performance Award Participants, bonuses are paid to Fixed Bonus Award Participants at the end of each quarter during the Performance Period.

###### C.    Total Cost of the Fixed Bonus Award Program.

48.    The Fixed Bonus Award Program provides a substantial component of Fixed Bonus Award Participants' total compensation and is the only opportunity for cash compensation available to Fixed Bonus Award Participants other than their base salaries.  The aggregate cost associated with the Fixed Bonus Award Program for all 145 participants is approximately ████.  (Friske Decl. ¶ 33)

###### D.    Necessity of the Fixed Bonus Award Program.

49.    The Fixed Bonus Award Participants work across various departments within the Debtors' businesses and will continue to play an indispensable role in these chapter 11 cases.  In conjunction with the Debtors' changing business environment and ongoing restructuring efforts, the Fixed Bonus Award Participants already have been called upon to undertake additional responsibilities and expend significantly more working-hours than contemplated by the normal terms of their employment.  The Fixed Bonus Award Participants have taken on these additional responsibilities without any corresponding increase in compensation.  (Sambrooks Decl. ¶¶ 13-14)

50.    If the Debtors cannot continue the Fixed Bonus Award Program, participants could lose a substantial portion of their total compensation.  The Debtors cannot now afford to risk losing the Fixed Bonus Award Participants, whose continued employment with the Debtors is crucial to their ongoing restructuring efforts.  This is especially true when the Fixed Bonus Award Participants possess special skills, knowledge, and understanding of the Debtors' specific

assets, operations, and infrastructure.  Any sudden attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations.  As a result, the Debtors believe that continuing the Fixed Bonus Award Program is necessary to retain, motivate, and competitively compensate the Fixed Bonus Award Participants, which will drive value at this critical stage of the chapter 11 cases.  (Sambrooks Decl. ¶ 11)

## Basis for Relief

51.    The Debtors respectfully request that the Court grant this Motion for three, independent reasons.  *First*, the Employee Incentive Programs should be approved under section 363(c) of the Bankruptcy Code because they are continuations of the Debtors' prepetition practices and thus are ordinary course transactions entitled to significant deference from the Court.  *See, e.g.*, *In re Dana Corp.*, 358 B.R. 567, 581 (Bankr. S.D.N.Y. 2006).  *Second*, continuing the Employee Incentive Programs is a reasonable exercise of the Debtors' business judgment and is also appropriate under section 363(b) of the Bankruptcy Code.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989).  *Third*, the Employee Incentive Programs are consistent with section 503(c) of the Bankruptcy Code.  The Performance Award Program does not run afoul of section 503(c)(1) of the Bankruptcy Code because the program is primarily incentive-based.  The Fixed Bonus Award Program is not subject to section 503(c)(1) of the Bankruptcy Code because no Insiders are participants in that program.  Both Employee Incentive Programs are justified by the "facts and circumstances" of this case and are therefore authorized under section 503(c)(3) of the Bankruptcy Code.  *See e.g.*, *In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012).

IV.     **The Employee Incentive Programs Are Continuations of the Debtors' Prepetition Practices and Thus Ordinary Course Transactions Under Section 363(c) of the Bankruptcy Code.**

52.     Pursuant to section 363(c)(1) of the Bankruptcy Code, a debtor in possession may "enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).   Courts in this district apply a two-part test to determine whether a transaction is in the ordinary course of a debtor's business.   The test analyzes the transaction on both a horizontal and a vertical basis—the horizontal inquiry focusing on whether the transaction is common to the debtor's industry and the vertical inquiry focusing on comparing the proposed transaction to the debtor's prepetition practices.   *See, In re Dana Corp.*, 358 B.R. at 580; *Chaney v. Official Com. of Unsecured Creditors Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997).   Here, the Employee Incentive Programs are ordinary course transactions because they are consistent with the Debtors' prepetition employee compensation plans as well as industry standards.

A.      **The Performance Award Program.**

53.     The Performance Award Program is a continuation of the Debtors' prepetition practices.   For years, the Debtors have offered incentive-based cash awards to their leadership team based on a weighted set of financial and operational performance metrics.   The Performance Award Program incorporates four metrics—EBITDA, Total Production, Operating Expense, and Capital—that the Debtors (and their predecessors Old Sabine and Forest Oil) have historically used to incentivize, measure, and reward management performance.   (Yearwood Decl. ¶ 22)

54.     The Debtors put the Performance Award Program in place in the first quarter of 2015, shortly after the December 2014 Combination.   The Performance Award Program has

existed in substantially the same form since that time.  The Debtors structured the Performance Award Program to adjust the Debtors' compensation structure in light of the newly combined businesses and evolving industry conditions.   Accordingly, the implementation of the Performance Award Program reflects a continuation of prepetition practices that takes into account the Debtors' operational history, financial performance, and particular business objectives.  (Yearwood Decl. ¶¶ 17, 21); *see also Dana Corp.*, 358 B.R. at 581 (finding that a debtor's postpetition incentive program was a "refinement" of historical practices and therefore within the ordinary course of the debtor's business).

55.     The Debtors, in consultation with Towers Watson, examined the compensation practices and award programs of peer E&P and other energy companies, both in and out of bankruptcy, in assessing and refining the Performance Award Program.  (Friske Decl. ¶ 29) Towers Watson evaluated several aspects of the Performance Award Program, including the participation, form of payment, performance metrics, performance ranges, performance measurement period, and award opportunities under the program.  For each of these elements, Towers Watson concluded that the Performance Award Program is reasonable and consistent with market practice.  (Friske Decl. ¶¶ 30-32)

56.     Not only does the general structure of the Performance Award Program comport with the structure of the incentive programs offered by certain of the Debtors' peer companies, it also aligns with incentive programs approved in recent chapter 11 cases involving similarly situated energy companies.  For example, the Performance Metrics in the Performance Award Program are consistent with peer group E&P practices.  Every peer company uses multiple performance metrics in their incentive plans, as the Debtors do here.  Every peer company also

includes some form of non-financial metric (such as production) in its plan, like the Debtors. (Friske Decl. ¶ 30)

57.     The Performance Award Program is in line with the Debtors' past practices and in line with industry standards.   Accordingly, the Debtors request that the Court approve the continuation of the Performance Award Program as an ordinary course transaction pursuant to section 363(c) of the Bankruptcy Code.  *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012) (approving incentive bonus plans under section 363(c)(1) of the Bankruptcy Code where the debtor sought to continue prepetition plans and incentive-based bonus plans were common in the industry).

### B.     The Fixed Bonus Award Program.

58.     The Fixed Bonus Award Program is also a continuation of the Debtors' prepetition compensation practices.  The terms of the Fixed Bonus Award Program have not changed since the Board approved the program in March, 2015.[13]  (Yearwood Decl. ¶ 22).

59.     Additionally, the Fixed Bonus Award Program is in line with competitive practice.  As discussed below, Towers Watson's analysis determined that the consideration awarded to Fixed Bonus Award Participants, measured as a percentage of base salary, is reasonable to awards offered by companies in the energy industry.  (Friske Decl. ¶ 35)  Because the Fixed Bonus Award Program is consistent with the Debtors' prepetition practices and industry standards, the Fixed Bonus Award Program is an ordinary course transaction and should be approved under section 363(c) of the Bankruptcy Code.  *In re Global Home Prods. LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that proposed compensation programs were "not

---

[13]   The only modification to the Fixed Award Program since the Board approved it in March 2015 is the number of Fixed Award Participants.

'new' compensation programs but, instead, [were] nearly identical to plans previously used, and

approved by a compensation committee and board of directors.").

**V.      Continuing the Employee Incentive Programs Is An Exercise of the Debtors' Sound
         Business Judgment and Is Authorized By Section 363(b) of the Bankruptcy Code.**

60.      Section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and

a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1).  To approve the use of estate property under section 363(b)(1) of

the Bankruptcy Code, the Second Circuit requires a debtor to show that the decision to use the

property outside of the ordinary course of business was based on the debtor's business judgment.

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir.

1983); *Ionosphere Clubs*, 100 B.R. at 675.

61.      The business judgment rule shields a debtor's management's decisions from

judicial second guessing.  *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re

Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of

reasonableness attaches to a debtor's management decisions" and courts will generally not

entertain objections to the debtor's conduct after a reasonable basis is set forth).  Once a debtor

articulates a valid business justification, the law vests the debtor's decision to use property

outside of the ordinary course of business with a strong presumption that "in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action was in the best interests of the company." *Official Comm. of Subordinated

Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y.

1992) (citations and quotations omitted), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  Thus, if a

debtor's actions satisfy the business judgment rule, then the transaction in question should be

approved under section 363(b)(1) of the Bankruptcy Code.

24

A.        **The Performance Award Program.**

62.        Continuation of the Performance Award Program is a proper exercise of the Debtors' business judgment.  As members of the Debtors' leadership team, the Performance Award Participants possess the skills, knowledge, and experience that are critical to the Debtors' ability to increase earnings performance through improved operations and decreased costs.  The Debtors' business performance over the following months will be an important factor driving the ultimate outcome of these chapter 11 cases.  It is therefore essential—and in the best interests of the Debtors and all stakeholders—that the Performance Award Participants receive competitive pay and are properly incentivized to achieve the Debtors' financial and operational objectives.

63.        Significantly, Performance Award Participants only earn awards if the Debtors meet certain difficult-to-attain goals on the key performance measures of EBITDA, Capital, Operating Expense, and Production metrics.  (Mitchell Decl. ¶¶ 12, 30-31)  Achievement of these milestones will result in enhanced value for the Debtors' estates and creditors.  By linking participants' increased compensation opportunities to critical financial and operational indicators for the Debtors' businesses, the Performance Award Program effectively aligns the interests of management with those of creditors.  (Mitchell Decl. ¶¶ 12, 20, 26, 67)  Thus, the Performance Award Program is designed to "achieve the desired performance" to enhance value to all stakeholders.  *See Dana Corp.*, 358 B.R. at 576 (approving incentive plan that required management to achieve superior operating results for the Debtors, particularly in [a] difficult and rapidly deteriorating" industry).

64.        Not only will the Performance Award Program encourage achievement of value-driving performance goals, but the cost of the Program is also reasonable and market-based.  As

detailed in the Friske Declaration, Towers Watson analyzed the Performance Award Program in two main ways—both of which demonstrated the reasonableness of the program.

65.     ***First***, Towers Watson compared the Debtors' threshold, target, and maximum compensation opportunities (reflecting base salary and the Performance Award Program opportunities) to target compensation data for equivalent positions from the competitive market. Towers Watson's analysis confirmed that, without the Performance Award Program, the Debtors' senior executives would be compensated ███████████ competitive levels.  If the Court does not approve the Performance Award Program, ████████████████████████ ██████████████████████████████████████ ████████████████ ██ █████████ of similarly positioned officers at the Debtor's E&P peers and the broader energy sector, on average.  Such a scenario could significantly undermine the Debtors' ability to motivate their senior management to achieve desired business objectives. (Friske Decl. ¶ 24)

66.     Towers Watson's analysis also confirmed the Debtors' need to continue the Performance Award Program to be able to offer competitive pay and incentives to its leadership team.  Indeed, even assuming that the Performance Award Program is approved ***and*** that the Debtors achieve ***all*** of the target performance levels, total direct compensation for Performance Award Participants would average ███████████████ ██ █████████ of the competitive market.  (*Id.* ¶ 24)  If maximum performance levels are achieved, those results improve slightly, with participants still earning on average just ███████████████ ██ █████████ when compared to market practice.  These pay-out levels are more than reasonable in light of market practice. (*Id.*)

26

67. **Second**, Towers Watson also analyzed the aggregate cost of total direct compensation at the Debtors as a percentage of the Debtors' revenue, and compared these ratios to the market. This analysis was conducted to measure the reasonableness of the total "cost of management" for the Performance Award Participants. Towers Watson determined that the total cost of compensation would be positioned between the ████ ██ ██ ████████ (assuming target pay-out levels) and ████████████ ██ ███████ (assuming maximum pay-out levels). This analysis confirmed that the total cost of the Program is appropriate and reasonable given the size of the Debtors' businesses. (Friske Decl. ¶ 26)

68. Courts in this and other jurisdictions have approved employee incentive programs like the Performance Award Program that incentivize management to achieve financial and other performance milestones to maximize value for a debtor's estate at a reasonable cost—a win for all stakeholders. *See, e.g.*, *In re LightSquared, Inc.*, No. 12-12080 (SCC) (Bankr. S.D.N.Y. October 23, 2012) (Dkt. 394) (approving key employee incentive plan for insiders based in part on cash preservation targets); *Velo Holdings*, 472 B.R. at 212 (approving key employee incentive plan with incentive targets tied to financial performance and sales of the debtors' business units); *In re The Great Atlantic & Pacific Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. May 2, 2011) (Dkt. 1479) (approving key employee incentive plan based on financial performance); *In re Borders Grp., Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. Apr. 22, 2011) (Dkt. 697) (same). The Performance Award Program is a valid exercise of the Debtors' sound business judgment and should be approved.

**B.    The Fixed Bonus Award Program.**

69. Continuing the Fixed Bonus Award Program is also a proper exercise of the Debtors' business judgment. The Fixed Bonus Award Program is aimed at retaining the Fixed

27

Bonus Award Participants by providing them with appropriate compensation commensurate with the Debtors' historical practices, thus preventing attrition during these chapter 11 cases and aligning the Fixed Bonus Award Participants' interests with those of the Debtors' stakeholders.

70.    The Fixed Bonus Award Program provides a substantial component of Fixed Bonus Award Participants' total compensation, comprising a median of approximately ██████ of participants' base salaries.  (Friske Decl. ¶ 33)  Without the Fixed Bonus Award Program, the Debtors fear that Fixed Bonus Award Participants may seek alternative career opportunities, which would impede the Debtors' ability to execute on critical business and restructuring initiatives.  (Sambrooks Decl. ¶ 17)  Identifying, recruiting, and training similarly qualified new employees would come at a huge expense.  Put simply, during this crucial time the Debtors cannot afford to lose their talented, valuable, and experienced employees, many of whom possess unique and vital institutional knowledge that is critical to executing day-to-day business operations.  (*Id.* ¶ 11)

71.    In addition, the Fixed Bonus Award Program is reasonable and market-based.  As with the Performance Award Program, Towers Watson assessed the reasonableness of the Fixed Bonus Program opportunities as compared to the energy industry.  Towers Watson determined that the Fixed Bonus Award amounts (as a percentage of base salary) were generally positioned at or below the ████  █████ of the market, on average, for incentive opportunities for comparable positions.  Based on this analysis, Towers Watson concluded that the Fixed Bonus Award Program was reasonable and appropriate in light of competitive market practice.  (Friske Decl. ¶ 35)  The Debtors respectfully request that the Court allow the Fixed Bonus Award Program to continue.

28

**VI.    The Employee Incentive Programs Satisfy the Requirements of Section 503(c) of the Bankruptcy Code.**

72.    The Employee Incentive Programs are permissible under section 503(c) of the Bankruptcy Code.    Section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business"—*i.e.*, those insider plans that are essentially "pay to stay" plans.    *See, e.g.*, *Velo Holdings*, 472 B.R. at 209 (finding that an incentive-based plan alleviated the need for a section 503(c)(1) analysis); *Borders Grp.*, 453 B.R. at 471 (finding that "the Debtors [had] met their burden of establishing that the [compensation program was] incentivizing, thereby alleviating the need for a section 503(c)(1) analysis") (quoting *Dana Corp.*, 358 B.R. at 584).

73.    The Debtors recognize that four Performance Award Participants are Insiders. Because the Performance Award Program is primarily incentivizing, however, section 503(c)(1) of the Bankruptcy Code does not apply.    Likewise, the Fixed Bonus Award Program is not subject to the requirements of section 503(c)(1) of the Bankruptcy Code because none of the participants in that program are Insiders.    Moreover, consistent with section 503(c)(3) of the Bankruptcy Code, both the Performance Award Program and the Fixed Bonus Award Program are "justified by the facts and circumstances" of these chapter 11 cases and should be approved.

**A.    The Employee Incentive Programs Are Permissible Under Section 503(c)(1) of the Bankruptcy Code.**

**1.    The Performance Award Program is Primarily Incentivizing Given the Difficult to Achieve Performance Targets That Trigger Payments.**

74.    The Performance Award Program is primarily incentivizing in nature and is not a retention-based plan subject to section 503(c)(1) of the Bankruptcy Code.    Section 503(c)(1) of the Bankruptcy Code imposes limitations solely with respect to Insider retention plans.    *See* 11 U.S.C. § 503(c)(1).    The provision does not apply to performance-based incentive plans, or to

29

retention plans to non-Insiders.[14]  *See, e.g.*, *Velo Holdings*, 472 B.R. at 209 (finding that an incentive-based plan alleviated the need for a section 503(c)(1) analysis); *Borders Grp.*, 453 B.R. at 471 (finding that "the Debtors [had] met their burden of establishing that the [compensation program was] incentivizing, thereby alleviating the need for a section 503(c)(1) analysis"); *In re Global Aviation Holdings Inc.*, 478 B.R. 142, 150 (Bankr. E.D.N.Y. 2012) (finding that section "503(c)(1) is inapplicable because [plan employees] are not insiders").  In determining whether an employee bonus plan is primarily incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work."  *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).

75.    The Performance Award Program is primarily incentive-based.  The program provides award opportunities if—and only if—the Debtors satisfy a series of operational and financial stretch goals.  The Performance Award Program does not contain retention-based components, as participants are not paid merely for maintaining their employment for a certain time period.  (Mitchell Decl. ¶ 13, 16, 29, 31)

76.    The Performance Targets are difficult to attain.   The Debtors based the Performance Targets in the Performance Award Program on their Reforecast, an update to the Debtors' business plan.  The Reforecast itself was developed over the course of several weeks through an iterative, ground-up process involving multiple rounds of management input, review, and calibration.   (Mitchell Decl. ¶ 12, 24)   From there, the Debtors refined each of the performance thresholds, adjusting the threshold metrics as compared to previous years to ensure that each threshold provided an appropriately challenging goal.  These targets—which are

---

[14]    Section 503(c)(2) of the Bankruptcy Code imposes limitations solely with respect to insider severance plans. That provision does not apply to the Employee Incentive Programs.

especially challenging in an industry as complicated and volatile as the E&P sector and where the Debtors have less than eight months of experience as a newly combined entity following the Combination—were then incorporated directly into the Performance Award Program.  (Mitchell Decl. ¶¶ 24, 26)  The Debtors' management, independent advisors, Compensation Committee, and the rest of the Board rigorously considered and examined these targets.  (Mitchell Decl. ¶¶ 8, 24, 26)

77.     The Debtors also called upon Mr. Mitchell and his Zolfo Cooper team to perform an independent assessment of the reasonableness of the Performance Targets to determine whether they are, in fact, incentivizing.   Mr. Mitchell has considerable experience advising companies in a variety of sectors and situations, developing business plans, and evaluating compensation packages for management teams of distressed businesses. Mr. Mitchell "pressure-tested" the Debtors' Performance Targets and verified that they are stretch goals—not easy-to-achieve milestones—and align the interests of the Debtors' management team with those of creditors.  (Mitchell Decl. ¶¶ 8, 12, 26)

78.     Each of the Performance Targets in the Performance Award Program represents a challenging—and meaningful—performance goal.  *First*, to achieve the Total Production target, the Debtors' management will need to deploy capital effectively toward new drilling programs while maintaining overall production levels.   Attaining these goals will not be easy.   For example, if the Debtors' leadership team fails to deliver the Debtors' projected "uplift" program, the Debtors will not achieve the target production levels for even the first quarter of the Performance Award Program.  (Mitchell Decl. ¶¶ 41-51; Sambrooks Decl. ¶ 28)

79.     *Second*, the Capital target can only be achieved if management accurately identifies and prioritizes profitable drilling opportunities across the Debtors' reserve portfolio.

31

Because developing new wells and achieving uplift production is essential to maintaining production levels, achieving Capital target performance levels necessarily will require balancing trade-offs between the Debtors' desire to develop new wells and managing associated costs. Navigating the tension between Capital investment and Total Production therefore will require efficient deployment of capital, especially given the importance of uplift for the Debtors' businesses. (Mitchell Decl. ¶¶ 68-74; Sambrooks Decl. ¶ 29)

80.    ***Third***, meeting the Operating Expense target will require precise execution on a significant cost-reduction plan, which will reduce costs across a range of Operating Expense outputs, including lease operating expense, marketing transportation and processing expense, workover expense, production and ad valorem taxes, and general administrative expense. The success of such reductions will depend on various factors, including management's ability to retain services of existing vendors, many of which already have provided the Debtors with significant cost reductions over the past 12 months and may push for pricing increases. (Mitchell Decl. ¶¶ 52-59; Sambrooks Decl. ¶ 30)

81.    ***Fourth***, EBITDA is a measure of the Debtors' cash flow, and therefore value for creditors. Achieving the EBITDA target will depend on successfully performing on all three of the other metrics, especially in light of the significant risks posed by fluctuations of oil and gas prices—a factor that management cannot control. (Mitchell Decl. ¶¶ 60-67; Sambrooks Decl. ¶ 31)

82.    The Performance Metrics are also subject to considerable uncertainty. The Debtors face a number of risks that might affect operations and profitability. Significantly, having recently had their hedging program terminated, the Debtors are particularly vulnerable to oil and gas price fluctuations. (Mitchell Decl. ¶ 64) The Debtors are exposed to other significant

32

risks as well, including production downtime, staffing issues, and weather conditions.  (Mitchell Decl. ¶ 42)  Given these risks, in conjunction with other challenges, the Performance Targets will require the Performance Award Participants to achieve optimal performance by balancing various interconnected inputs that affect the Debtors' businesses.  (Mitchell Decl. ¶¶ 28-29)

83.    In short, the Performance Targets challenge the Debtors' leadership team to perform at the highest levels.  Because participants will receive payments under the Performance Award Program only upon the achievement of challenging, value-maximizing Performance Targets, this program is no different in kind than a host of similar incentive-based compensation programs that bankruptcy courts in this district and others have consistently approved.  *See, e.g.*, *Velo Holdings*, 472 B.R. at 211 (approving incentive plan containing revenue and EBITDA targets); *Dana Corp.*, 358 B.R. at 584 (approving management incentive plan); *In re Sbarro, Inc.*, No. 11-11527 (SCC) (Sept. 8, 2011) (Dkt. 512) (approving key employee incentive plan based on EBITDA targets); *In re The Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. May 2, 2011) (Dkt. 1479) (approving key employee incentive plan based on financial performance); *In re Neff Corp.*, No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (Dkt. 211) (approving key employee incentive plan based in part on financial performance); *In re Lear Corp.*, No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 28, 2009) (Dkt. 530) (same); *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. July 28, 2009) (Dkt. 847) (approving key employee incentive plan based in part on achievement of EBITDA targets); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. June 9, 2009) (Dkt. 492).  The Performance Award Program, like those before it, should be approved.

2.      **The Fixed Bonus Award Program Is Not Subject to Section 503(c)(1) of the Bankruptcy Code Because No Participant in that Program Is an Insider.**

84.      Section 503(c)(1) of the Bankruptcy Code does not apply to the Fixed Bonus Award Program because no participant in that program is an Insider.  As discussed, none of the Fixed Bonus Award Participants hold senior management positions or control the Debtors' corporate policies.  *See* ¶ 46, *supra*; (Sambrooks Decl. ¶ 25)

B.      **The Employee Incentive Programs Are Justified by the Facts and Circumstances of These Chapter 11 Cases and Satisfy Section 503(c)(3) of the Bankruptcy Code.**

85.      The Debtors believe that the Employee Incentive Programs are ordinary course transactions and thus must merely constitute an exercise of the Debtors' business judgment.  *See* ¶¶ 62-71, *supra*.  Even if the Employee Incentive Programs are not determined to be in the ordinary course, however, the Debtors need show only that approval of the programs is justified by the facts and circumstances of these chapter 11 cases.  This standard is essentially the same as the business judgment standard that is applied under section 363(b) of the Bankruptcy Code.  *See Velo Holdings*, 472 B.R. at 212 ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *Dana Corp.*, 358 B.R. at 576; *Global Home Prods.*, 369 B.R. at 783 ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *In re Mesa Air Grp.*, No. 10-10018, 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010).

86.      In determining whether a compensation plan satisfies the justified-by-the-facts standard under section 503(c)(3) of the Bankruptcy Code, courts consider several factors, including:  (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential;

34

(c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent counsel in performing due diligence, creating, and authorizing the plan. *See Global Home Prods.*, 369 B.R. at 786; *Dana Corp.*, 358 B.R. at 576–77. Each of these factors favors approval of the Employee Incentive Programs in this case.

87.     ***The Employee Incentive Programs Are Calculated to Achieve the Desired Performance***.  The Performance Award Program incentivizes the Debtors' leadership team to achieve value-driving operational and financial milestones.  (Mitchell Decl. ¶¶ 11, 28)  The Fixed Bonus Award Program enables the Debtors to retain other members of its quality workforce, thereby avoiding disruption to the Debtors' operations and the cost of hiring and training new employees.  (Sambrooks Decl. ¶¶ 7, 26)  Both programs are calibrated to attain results that would benefit the Debtors' estates and all stakeholders.

88.     ***The Cost of the Employee Incentive Programs Is Reasonable***.  The Employee Incentive Programs will cost a total of approximately $10 million at threshold pay-out levels, $13 million at target pay-out levels, and $16 million at maximum pay-out levels.  (Friske Decl. ¶ 16)  These costs are reasonable in the context of the Debtors' assets, liabilities, and earning potential.  The maximum cost of the Employee Incentive Programs is also far outweighed by the estimated incremental cash flow of more than ███████ (net of Employee Incentive Program payouts) if the maximum performance levels are met.  (Mitchell Decl. ¶ 16)

89.     ***The Scope of the Employee Incentive Programs Is Fair and Reasonable***.  The scope of the Employee Incentive Programs is fair, reasonable, and does not discriminate unfairly among employees.  The Performance Award Program includes only those employees who

35

continue to make significant contributions to the Debtors' restructuring efforts and financial achievement—both onerous tasks in light of the current energy market. The Fixed Bonus Award Program continues the Debtors' historical practice of ensuring that all members of the Debtors' highly skilled workforce have a stake in, and the opportunity to benefit from, the performance of the company. (Yearwood Decl. ¶ 11)

90.    ***The Employee Incentive Programs Are Consistent with Industry Standards***.  As discussed, the Debtors' compensation advisors at Towers Watson, including Mr. Doug Friske, worked directly with the Debtors' management and other advisors to ensure that the Employee Incentive Programs are similar in structure, number, and scope to those of other companies in the energy industry.  In conducting their analysis, Mr. Friske and his team reviewed a significant number of compensation programs for similarly-situated companies, as well as compensation programs implemented by chapter 11 debtors. (Friske Decl. ¶¶ 21-22)  Based on this data, Mr. Friske concluded that the design, structure, and award opportunities available under the Performance Award Program and Fixed Bonus Award Program are reasonable and consistent with industry standards. (*See id.* ¶¶ 27, 32, 35)

91.    ***The Debtors Performed Due Diligence in Developing the Employee Incentive Programs***.  As Mr. John Yearwood, the chairperson of the Compensation Committee, details in his declaration, the Debtors actively sought the advice of their advisors at Towers Watson, Zolfo Cooper, and Kirkland & Ellis in assessing the Employee Incentive Programs.  The Compensation Committee and the Board met on multiple occasions to review, evaluate, and provide feedback on the Employee Incentive Programs based on the input of the Debtors' management and independent advisors.  As a result of these efforts, the Debtors concluded that: (a) it was critical to continue the Employee Incentive Programs (with certain refinements) to ensure the

competitiveness of the Debtors' compensation practices; (b) the Employee Incentive Programs are reasonable and consistent with market practice and industry standards; and (c) the Employee Incentive Programs are appropriately tailored to incentivize financial and operational outperformance by the Debtors' leadership team and retain other key employees, thus positioning the Debtors for long-term success. (*See* Friske Decl. ¶¶ 32, 35; Mitchell Decl. ¶ 13; Sambrooks Decl. ¶ 2; Yearwood Decl. ¶ 25)

92.      ***The Debtors Developed the Performance Award Program Based on Independent Advice and Oversight***.   As discussed above, the Debtors received independent counsel from Towers Watson, Zolfo Cooper, and other advisors in benchmarking and evaluating the Employee Incentive Programs, including regarding the participation in each program, the financial and operational targets in the Performance Award Program, and the pay-out levels available to participants in both programs.  The Compensation Committee, which includes three disinterested board members with substantial industry experience, evaluated the Employee Incentive Programs and proposed refinements to the Performance Award Program through an independent, deliberate review process, before ultimately approving the continuation of both programs in July 2015.  (Yearwood Decl. ¶¶ 19-23)

93.      For these reasons, the Debtors respectfully submit that continuing the Employee Incentive Programs is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these chapter 11 cases, and satisfy the requirements of section 503(c)(3) of the Bankruptcy Code.  The Employee Incentive Programs will incentivize employees to achieve the financial results needed to successfully steer the Debtors through these chapter 11 cases for the benefit of all parties in interest.  Accordingly, the Debtors respectfully

request that the Court issue an order approving and authorizing the Debtors to continue the (a) Performance Award Program; and (b) Fixed Bonus Award Program.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

94.     The Debtors have sufficient funds to pay any amounts related to the Employee Award Programs in the ordinary course of business.  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Award Programs, as applicable.  The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.  Thus, the Debtors request that the Court authorize all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Employee Award Programs.

### Motion Practice

95.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion.    Accordingly, the Debtors submit that this Motion satisfies Local Bankruptcy Rule 9013-1(a).

### Reservation of Rights

96.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission

as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

97.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

98.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the UCC; (d) the administrative agent under the Debtors' first lien credit facility; (e) counsel to the agent under the Debtors' first lien credit facility; (f) the administrative agent under the Debtors' second lien credit facility; (g) counsel to the agent under the Debtors' second lien credit facility; (h) the indenture trustee under the Debtors' 9.75% senior notes due 2017; (i) counsel to the indenture trustee under the Debtors' 9.75% senior notes due 2017; (j) the indenture trustee under the Debtors' 7.25% senior notes due 2019; (k) the indenture trustee under the Debtors' 7.5% senior notes due 2020; (l) counsel to certain holders of the 2019 and 2020 senior notes; (m) the United States Attorney's Office for the Southern District of New York; (n) the Internal Revenue Service; (o) the United States Securities and Exchange Commission; (p) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (q) the state attorneys general for states in which the Debtors conduct business; and (r) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

99.     No prior request for the relief sought in this Motion has been made to this or any

other court.

WHEREFORE, the Debtors respectfully request entry of the Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  August 21, 2015          */s/ Jonathan S. Henes*
       New York, New York      Paul M. Basta, P.C.
                                  Jonathan S. Henes, P.C.
                                  Christopher Marcus, P.C.
                                  KIRKLAND & ELLIS LLP
                                  KIRKLAND & ELLIS INTERNATIONAL LLP
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:    (212) 446-4800
                                  Facsimile:    (212) 446-4900
                                  - and -
                                  James H.M. Sprayregen, P.C.
                                  Gabor Balassa, P.C. (admitted *pro hac vice*)
                                  Ryan Blaine Bennett (admitted *pro hac vice*)
                                  A. Katrine Jakola (admitted *pro hac vice*)
                                  Brad Weiland (admitted *pro hac vice*)
                                  KIRKLAND & ELLIS LLP
                                  KIRKLAND & ELLIS INTERNATIONAL LLP
                                  300 North LaSalle Street
                                  Chicago, Illinois 60654
                                  Telephone:    (312) 862-2000
                                  Facsimile:    (312) 862-2200

                                  *Proposed Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) Case No. 15-11835 (SCC) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

### ORDER APPROVING AND AUTHORIZING (I) THE PERFORMANCE
### AWARD PROGRAM AND (II) THE FIXED BONUS AWARD PROGRAM

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) approving and authorizing (i) the Performance Award Program and (ii) the Fixed Bonus Award Program as set forth herein and (b) granting related relief, all as more fully set forth in the Motion; and upon the Friske Declaration, the Mitchell Declaration, the Sambrooks Declaration, the Yearwood Declaration, and the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is:  1415 Louisiana, Suite 1600, Houston, Texas 77002.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing under the circumstances; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Performance Award Program is approved in its entirety.

3.      The Fixed Bonus Award Program is approved in its entirety.

4.      The Debtors are authorized to take all actions necessary to implement the Employee Incentive Programs on the terms and conditions set forth in the Motion, including making any payments that become due pursuant to the terms of the Employee Incentive Programs.

5.      Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in the Motion or this Order or any payment made pursuant to this Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim or lien against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or lien, or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

6.      Nothing in the Motion or this Order shall impair the ability of the Debtors to contest the validity or amount of any payment made pursuant to this Order.

2

7.      Notwithstanding the relief granted herein or any action taken hereunder, nothing contained in this Order shall create any rights in favor of, or enhance the status of any claim held by any Employee or other person or entity.

8.      The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the amounts approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Order.

9.      Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any order regarding the use of cash collateral, or budget in connection therewith, approved by the Court in these chapter 11 cases.

10.     Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

11.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

12.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

13.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2015

_____
THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

3

## **EXHIBIT B**

**Declaration of Douglas Friske**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | Case No. 15-11835 (SCC) |
| Debtors. | (Jointly Administered) |

---

### DECLARATION OF DOUGLAS FRISKE
### IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF
### AN ORDER APPROVING AND AUTHORIZING THE (A) PERFORMANCE
### AWARD PROGRAM AND (B) FIXED BONUS AWARD PROGRAM

---

I, Douglas J. Friske, hereby declare under penalty of perjury:

1.       I am a Managing Director of Executive Compensation at Towers Watson Delaware Inc. ("Towers Watson").   In April 2015, Sabine Oil & Gas Corporation ("Sabine"), one of the above captioned debtors and debtors in possession (the "Debtors") engaged Towers Watson to provide compensation consulting services both before and after the commencement of these chapter 11 cases.  I am familiar with the pre- and postpetition structure of the Debtors' compensation plans as well as the structure of the Debtors' employment incentive programs—the Performance Award Program and the Fixed Bonus Award Program (together, the "Employee Incentive Programs")—as they are set forth in the *Debtors' Motion for Entry of an Order Approving and Authorizing the (A) Performance Award Program and (B) Fixed Bonus Award Program* (the "Motion").

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is:  1415 Louisiana, Suite 1600, Houston, Texas 77002.

2.      I submit this declaration (this "<u>Declaration</u>") on behalf of Towers Watson in support of the Motion.  Except as otherwise indicated, I have personal knowledge of all facts in this declaration, based on my review of the Debtors' operations and finances, my research into compensation practices for companies in the energy industry and those that have recently filed for chapter 11 protection, and information supplied to me by members of the Debtors' management team and the Debtors' other advisors.  For the reasons described below, it is my opinion that the Debtors' Employee Incentive Programs are reasonable and consistent with market practice both for companies in the E&P industry and those in chapter 11.  If called upon to testify, I could and would testify competently to the facts and opinions set forth herein.

**Background and Qualifications**

3.      I received my Bachelor's degree in Finance from the University of Illinois in 1986.  After working at Allstate and Chubb Insurance Companies, I returned to school at Northwestern University.  I received a Master's degree in Management from Northwestern University's J.L. Kellogg Graduate School of Management in 1990.  Since that time, I have been employed by Towers Watson.

4.      Towers Watson is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation.  Towers Watson offers actuarial, compensation, performance management, employee benefits design communication and administration, organizational communication, human resources effectiveness, and reinsurance and risk management services.

5.      My responsibilities at Towers Watson have primarily involved consulting to large companies, specifically with regard to executive compensation.  I have worked with numerous Fortune 1000 companies, and have participated in the development and design of hundreds of management and employee incentive plans for companies inside and outside of bankruptcy.

2

6.      I am frequently retained by large companies to advise them on their employee compensation strategies, programs, and pay levels.  I am also sometimes retained by companies performing specific searches for management personnel, for which I provide guidelines on general market practice and the level and form of current market compensation for those positions.

7.      I am highly experienced in executive, management, and employee compensation matters with more than 25 years of experience in the field.  During this time, I have been the lead or supporting employee compensation expert in more than 30 bankruptcy cases, and have frequently testified as to the reasonableness of a variety of postpetition compensation arrangements.  Specifically, I have been involved in the review and design of key employee incentive plans, management incentive plans, and other similar-type plans in the chapter 11 cases of, among others, American Airlines, AMF, ATA Airlines, Calpine, Chemtura, Collins & Aikman, Conexant, Delta Airlines, Dura Automotive, Energy Future Holdings, Frontier Airlines, The Great Atlantic & Pacific Tea Company, Hayes Lemmerz, Keystone Automotive, Kimball Hill Homes, Lear, Leiner Health Products, Longview Power, Mark IV, Muzak, Neff, Northwest Airlines, Orchard Brands, RadioShack, Reader's Digest Association, Round Table Pizza, Sbarro, School Specialty, TOUSA, United Airlines, Visteon, and Xerium.

**Towers Watson's Collaboration with the Debtors**

8.      Since Towers Watson was retained by Sabine in April 2015, I have familiarized myself with the Debtors' operations and unique business and restructuring challenges.  At the start of our engagement, Towers Watson discussed with the Debtors and their advisors the Debtors' operational history, financial performance, restructuring process, and various issues regarding the Debtors' workforce and employee programs.  Towers Watson reviewed the structure of the Debtors' existing base salary and primary incentive programs, paying specific

3

attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

9.       The Debtors performed significant due diligence in developing the Employee Incentive Programs, and my team and I collaborated closely with the Debtors' management and other outside advisors in reviewing and advising on the Employee Incentive Programs. I presented my analysis of the reasonableness of the Employee Incentive Programs to the Compensation Committee (the "Compensation Committee") of Sabine's board of directors (the "Board"). My team and I provided detailed information about Towers Watson's analysis to certain of the Debtors' creditor constituencies and spoke with certain groups at their request to discuss the Employee Incentive Programs. My primary goal in the course of these interactions with the Debtors, the Compensation Committee, and with creditor groups was to provide an independent assessment of the Debtors' compensation planning that drew directly upon relevant market data as well as my experience in designing comparable programs for similarly-situated companies.

**Employee Incentive Program Background**

10.      The Debtors and their predecessors, Sabine Oil & Gas LLC and Forest Oil Corporation, maintained annual and long-term incentive programs prior to 2015 that were designed to provide appropriate incentives for all of their full-time employees. In particular, I understand that the Debtors (and their predecessors) utilized a variety of critical performance metrics as part of their legacy annual incentive programs in the years preceding the petition date, which, for example, included the following: EBITDA, production, capital, operating expense, safety, and debt-to-EBITDA ratio. I further understand that the Debtors and the Compensation Committee went through a rigorous process to review and refine their compensation programs,

identify those metrics that were most critical to the businesses for the upcoming performance period, and worked to ensure the annual incentive programs reflected these priorities. As part of this design process, I understand that the Debtors also considered (a) market practice in the exploration & production ("E&P") and broader energy services space, (b) total estimated costs, (c) their strategic and operating priorities, and (d) the need to align incentive programs with key stakeholders' interests.

11.    For fiscal year 2015, including through the commencement of these chapter 11 cases, the Debtors adopted a single cash-based plan, which included the two programs that remain in place today:  (a) the Performance Award Program, which at that time provided quarterly cash performance awards tied solely to the Debtors' quarterly EBITDA results; and (b) the Fixed Bonus Award Program, which provided fixed quarterly cash bonus awards to non-insider employees.  These programs were calibrated to align with the Debtors' restructuring realities and ensure competitive compensation opportunities.  Employees were eligible to participate in only one of these programs.

12.    The Performance Award Program is a quarterly performance-based cash program. At the time it was adopted in March 2015, it reflected the following key design features:

a.    participants included various members of management and other senior non-management personnel;

b.    payments were subject to quarterly EBITDA performance goals that contained threshold, target, and maximum performance criteria that were established by the Compensation Committee on a quarterly basis; and

c.    the incentive program was designed to continue on a quarterly basis through June 2016.

13.    The Debtors designed the Performance Award Program to:  (a) incentivize the Debtors' leadership team to achieve a critical pre-established quarterly performance target (EBITDA) that was financially aligned with ongoing restructuring efforts; (b) provide reasonable

5

competitive incentive compensation opportunities for all eligible participants; and (c) reinforce efforts toward sustainable value creation.

14.    In addition, I understand the Debtors enrolled full-time employees who were not eligible for the Performance Award Program into the Fixed Bonus Award Program.  The Fixed Bonus Award Program provided quarterly fixed bonus awards based on each employee's position and years of service with the Debtors.  The Fixed Bonus Award Program reflected the following key design features, which are still applicable today:

a.    participation included non-insider employees, all of whom hold titles below Vice President;

b.    payments were made quarterly, subject to continued employment with the Debtors;

c.    the program served as the sole incentive vehicle for the participating employees; and

d.    the program was intended to continue through June 2016.

15.    The Fixed Bonus Award Program was designed to:  (a) attract and retain the Debtors' skilled and specialized workforce;  (b) provide reasonable competitive award opportunities for all eligible participants;  (c) foster continued engagement;  and (d) avoid disruption and costs associated with employee attrition.

### Employee Incentive Programs Overview

16.    The Debtors seek to continue the Performance Award Program and the Fixed Bonus Award Program on a postpetition basis.  The Performance Award Program provides nine members of the Debtors' management team—including four insiders (the "Tier 1 Participants") and five non-insiders (the "Tier 2 Participants")—with the opportunity to earn quarterly incentive-based cash awards if the Debtors achieve pre-established financial and operational milestones.  The Fixed Bonus Award Program provides fixed quarterly bonus awards to the

Debtors' remaining 145 employees (the "Tier 3 Participants").[2]  The table below summarizes the amounts that employees may earn under both of the programs:

| Program | Employee Status | Participant Count | Estimated Quarterly Target Value | Estimated Annual Threshold Value | Estimated Annual Target Value | Estimated Annual Maximum Value |
|---|---|---|---|---|---|---|
| Performance Award Program | **Tier 1 Participants** Insiders | 4 | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| | **Tier 2 Participants** Non-Insiders | 5 | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| **Fixed Bonus Award Program** | **Tier 3 Participants** Non-Insiders | 145 | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| **Total** | | **154** | **$3,250,638** | **$9,996,946** | **$13,002,551** | **$16,008,157** |

17.    The Performance Award Program and the Fixed Bonus Award Program are discussed in turn below.

**Overview of The Performance Award Program**

18.    The Performance Award Program contains the following primary design features:

a.    quarterly cash incentive plan commencing on July 1, 2015 and planned to run through June 30, 2016 (i.e., four quarters);

b.    four performance metrics will be used to measure quarterly performance: (i) total production, (ii) EBITDA, (iii) total operating expense, and (iv) capital; performance against each metric would be weighted equally (i.e., 25 percent assigned to each metric) to determine overall performance;

c.    threshold and maximum performance outcomes would be established within a range of 5 to 15 percent of target performance for each performance metric;

---

[2]    The total number of Tier 3 Participants was calculated as of July 30, 2015, per the Towers Watson report.  This number, and the associated cost, may vary over time as existing employees leave and new employees join the Debtors.

      d.     threshold and maximum payout levels will be set at 50 percent and 150 percent of target, respectively, for each of the four performance metrics. Payouts will be interpolated within the range, and the overall payout from the Performance Award Program would be the sum of independently calculated payouts from each of the four metrics;

      e.     performance against each of the four metrics would be measured and assessed quarterly. Additionally, quarterly payouts will be trued-up relative to cumulative performance through a "catch up" provision, to ensure aggregate pay and performance is aligned. At the end of the performance period (i.e., the earlier of emergence or June 30, 2016) participants would receive the greater of (i) the sum of the quarterly payments or (ii) the bonus outcome once measured on a cumulative basis; and

      f.     if the Debtors emerge from chapter 11 prior to July 2016, the program would continue until a replacement program is implemented;

19.    If approved, the Performance Award Program would provide aggregate threshold, target, and maximum opportunities of approximately ███████████████████████████ respectively, to be earned through the end of June 2016. The individual award opportunities available to each participant under the Performance Award Program can be summarized as follows:

| Performance Award Program | | | |
|---|---|---|---|
| Participant's Title | Threshold Award Opportunity | Target Award Opportunity | Maximum Award Opportunity |
| Tier I Participants<br>Insiders n = 4 | | | |
| President & CEO | ███████ | ███████ | ███████ |
| Chief Operating Officer | ██████ | ██████ | ██████ |
| SVP Asset Development | ██████ | ██████ | ███████ |
| SVP & CFO | ██████ | ██████ | ██████ |
| Tier II Participants<br>Non-Insiders n = 5 | | | |

8

| Performance Award Program | | | |
|---|---|---|---|
| Participant's Title | Threshold Award Opportunity | Target Award Opportunity | Maximum Award Opportunity |
| VP Operations | ██████ | ██████ | ██████ |
| VP Corporate Engineering | ██████ | ██████ | ██████ |
| VP IT & Land Administration | ██████ | ██████ | ██████ |
| VP HR & Administration | ██████ | ██████ | ██████ |
| VP & Controller, CAO | ██████ | ██████ | ██████ |
| **Total Award Opportunity** | ██████ | ██████ | ██████ |

### Analysis of Total Direct Compensation for Performance Award Participants

20.    In assessing the reasonableness of the Performance Award Program, I worked with my team to analyze competitive target total direct compensation—an industry-standard benchmark that includes the sum of base salary, target annual and long-term incentive grant values—for all participants in the Performance Award Program (the "Performance Award Participants").

21.    A critical initial step in this analysis was to define the relevant market for talent. Before Towers Watson was engaged, the Debtors, in consultation with the compensation consulting firm Pearl Meyers & Partners, had developed a set of 18 publically-traded peer companies operating in the exploration & production and broader energy industry (the "Peer Companies"). The Debtors' peers include: Approach Resources Inc., Cabot Oil & Gas Corp., Carrizo Oil & Gas, Inc., Cimarex Energy Co., Cornstock Resources Inc., Exco Resources Inc., Goodrich Petroleum Corp., Laredo Petroleum, Inc., Oasis Petroleum Inc., Pdc Energy, Inc., Penn

9

Virginia Corp., Qep Resources, Inc., Range Resources Corporation, Rosetta Resources Inc., Sm Energy Co., Swift Energy Co., Ultra Petroleum Corp., and Wpx Energy, Inc. The Debtors selected this group in light of a number of factors, including scope and complexity of operations, industry relevance, and the companies' geographic profile. Importantly, I understand the Peer Companies are reasonably likely to compete with the Debtors for executive talent. Consistent with the Debtors' historical practice, my team and I matched each of the Debtors' four insiders to executives at Peer Companies with similar positions and comparable roles and responsibilities. My team and I then developed competitive total direct compensation benchmarks based on the most recent proxy disclosures from each Peer Company.

22.     With respect to the five non-insider Performance Award Participants, I analyzed market data from two published surveys focused exclusively on E&P firms and companies that operate more broadly in the energy industry. In particular, I reviewed market data from both the 2014 Mercer Energy Survey and a 2014 proprietary Exploration and Production Industry survey. Each of the five non-insider participants were matched to similar survey positions with comparable roles and responsibilities. Wherever possible, the market data were size-adjusted to account for the Debtors' revenue size. On balance, I believe the published survey data to be reasonable, and the benchmarking methodology for all Performance Award Participants to be consistent with my chapter 11 and normal course benchmarking experience.

23.     I compared the Debtors' target and maximum total direct compensation (reflecting base salary and the Performance Award Program opportunities) for Performance Award Participants to target total direct compensation data for equivalent positions from the competitive market. Pay levels for the insiders were compared to pay levels for comparable

roles at the Peer Companies while non-insider participants were compared to pay levels amongst comparable roles from the referenced published survey companies.

24.    If the Debtors do not receive approval from the Court for the Performance Award Program, total direct compensation for the Performance Award Participants will only reflect current base salaries and thus total direct compensation would fall ██████████████ ██ ████████ of the market, on average.  This outcome could significantly undermine the Debtors' ability to motivate their senior management to achieve desired business objectives.  Assuming the Performance Award Program is approved, 2015 annualized target total direct compensation for all Performance Award Participants in aggregate is approximately ██████████████ ██ ████████.  The Debtors' maximum total direct compensation, reflecting the sum of current base salaries and maximum annualized Performance Award Program opportunities would be positioned ████████████ ████ ████████ of the market target total direct compensation levels, on average.  To be clear, this outcome reflects a scenario where the Debtors achieve the maximum amount of potential incentive compensation from the Performance Award Program, and the total direct compensation for Performance Award Participants ███████████████ ████████ ██ ████████.  These outcomes are summarized in the table below:

**Total Direct Compensation for Performance Award Participants**

| Outcome | Relation to ██████████ of Market |
|---|---|
| Base Salaries Only (No Performance Award Program) | █████████ ██ ████████ |
| Base Salaries Plus Target Performance Awards | █████████ ██ ████████ |
| Base Salaries Plus Maximum Performance Awards | █████████ ██ ████████ |

25.    I also analyzed the aggregate cost of total direct compensation at the Debtors as a percentage of the Debtors' revenue, and compared these ratios to the market (using Peer Company data for Tier I participants and energy and E&P industry published survey data as the benchmarks for Tier II participants).  This analysis was conducted in order to measure the reasonableness of the total "cost of management" for the Performance Award Participants.

26.    As shown in the table below, assuming the Performance Award Program is approved, the Debtors' cost of management would be positioned ██████ ██ ██ ██ ██████ (assuming target performance) and ████████████ ██ ██████ (assuming maximum performance).

| Market Target Total Direct Compensation as a Percentage of Revenue | | |
|---|---|---|
| 25th Percentile Market Practice | 50th Percentile Market Practice | 75th Percentile Market Practice |
| ████ | ████ | ████ |
| Debtors' <u>Target</u> Program Cost as a Percent of its Revenue: ████ | | |
| Debtors' <u>Maximum</u> Program Cost as a Percent of its Revenue: ████ | | |

27.    Based on the results of these benchmarking analyses, and my experience in other postpetition incentive compensation arrangements, I believe the Performance Award Program and the threshold, target, and maximum 2015 total direct compensation levels are reasonable in light of competitive market practice for companies, like the Debtors, that operate in the E&P and energy industries.  Critically, the absence of an incentive opportunity for Performance Award Participants would significantly undermine the current competitiveness of the Debtors' compensation structure (as it would be comprised of just base salary), which in turn could impact the Debtors' ability to motivate current management to achieve desired business objectives, as well as the Debtors' ability to attract other skilled senior executives.

12

## Analysis of the Performance Award Program Structure

28.    I believe the overall design and structure of the Performance Award Program is largely consistent with market practice and appropriate in light of the Debtors' particular facts and circumstances.  When reviewing the Debtors' various compensation plans, I recommended linking incentives to financial and operational metrics that would serve the interests of the Debtors' key stakeholders.  To that end, the Performance Award Program places emphasis on achieving total production, EBITDA, total operating expense, and capital expenditure targets.

29.    To assess the reasonableness of the design of the Performance Award Program, I analyzed the incentive plans of two groups of companies that are similarly situated to the Debtors.  *First*, I analyzed incentive plans offered by the Peer Companies, in keeping with the Debtors' and the Compensation Committee's historical use of peer group analysis.  *Second*, I reviewed approved postpetition incentive plans offered by 11 companies that operate either in the energy industry, or more broadly in other commodity driven industries.  In conducting this analysis, I also relied upon my significant consulting experience in the analysis and design of postpetition incentive plans generally at dozens of other companies.

30.    The general structure of the Performance Award Program comports with the findings of my review of annual incentive plans of Peer Companies.  I would note the following key design features:

      a.      every Peer Company used some form of non-financial metric in the plan, with production, exploration, and cost containment all cited;

      b.      over half (56 percent) of the Peer Companies utilize some form of EBITDA;

      c.      when production was used as a metric, it frequently was weighted between 15 percent and 30 percent of the total incentive and EBITDA was weighted 20 percent at the median;

13

d.   each Peer Company uses multiple metrics within their annual incentive plans; and

e.   the most common range of payouts relative to target was 50 percent for threshold performance and 200 percent for maximum performance, which provides for greater upside opportunity than contemplated under the Debtors' Performance Award Program.

31.   The general structure of the Performance Award Program also aligns with incentive-based plans approved in recent chapter 11 proceedings involving companies, like the Debtors, that operate either in the energy industry, or more broadly in other commodity driven industries. Based on my review of incentive plans approved in these proceedings, it is common to implement a blend of various financial and operating performance metrics. Further, non-annual performance metrics are common from a postpetition incentive perspective.

32.   For these reasons, and based on my experience with incentive-based compensation programs employed by companies in chapter 11, the structure of the Debtors' Performance Award Program is reasonable and consistent with market practice.

## Overview of the Fixed Bonus Award Program

33.   The Fixed Bonus Award Program reflects a continuation of the Debtors' prepetition non-insider compensation program and contains the following primary design features:

a.   quarterly cash incentive plan commencing on July 1, 2015 through June 30, 2016 (i.e., four quarters) paid based on continued employment;

b.   participation including the Debtors' 145 regular, full-time, non-insider employees;

c.   The median award opportunity for participants is ███████ of base salary, with a range from ███████ to ███████ of base salary;

d.   Aggregate maximum opportunities of approximately ███████ to be earned through the end of June 2016; and

14

e.    If the Debtors emerge from chapter 11 before July 2016, the plan would continue until a replacement plan is implemented.

## Analysis of the Fixed Bonus Award Program

34.    In evaluating the reasonableness of the Fixed Bonus Award Program, my team and I analyzed incentive compensation award opportunities (expressed as a percentage of base salary) from a proprietary Towers Watson survey that focuses exclusively on the oil and gas industry.  Sixteen companies participated in this survey, which was published in 2014.  I took the following steps to review the proposed award opportunities:

a.    program participants were segmented into five different base salary tiers, with an average fixed award opportunity calculated by tier;

b.    for each tier, competitive 25th, 50th and 75th percentile incentive compensation opportunities (as a percentage of base salary) were developed based on similarly paid (on the basis of salary) employees in the proprietary oil and gas survey;

c.    the Debtors' average fixed award opportunities by tier were compared to market 25th, 50th and 75th percentile incentive opportunities from the Towers Watson oil and gas survey; and

d.    The relationship between the Debtors' proposed fixed award opportunities and the competitive oil and gas industry benchmarks noted above was determined.

35.    Based on this analysis, I observed that the Debtors' fixed award opportunities (as a percentage of base salary) generally were positioned ██████████ ██ ████████ of the market, on average, for incentive opportunities for comparable positions.    Given this relationship, I believe the Fixed Bonus Award Program opportunities are reasonable and appropriate in light of competitive market practice.    Moreover, based on my experience, the structure of the Fixed Bonus Award Program is also consistent with key design elements, such as the frequency of payments, of similar fixed award plans.

15

**Conclusion**

36.    Based on my education, experience, and the work I have done in this case and in similar cases, I believe that the design, structure, and award opportunities available under the Performance Award Program and Fixed Bonus Award Program are reasonable given the facts and circumstances of these chapter 11 cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: August 21, 2015

Douglas J. Priske
Managing Director of Executive Compensation
Towers Watson Delaware Inc.

## EXHIBIT C

**Declaration of Jonathan A. Mitchell**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

In re:                                                                )    Chapter 11
                                                                           )
SABINE OIL & GAS CORPORATION, *et al.*,[1]    )    Case No. 15-11835 (SCC)
                                                                           )
                                                Debtors.    )    Jointly Administered
                                                                           )

———————————————————————

**DECLARATION OF JONATHAN A. MITCHELL IN**
**SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF**
**AN ORDER APPROVING AND AUTHORIZING THE (A) PERFORMANCE**
**AWARD PROGRAM AND (B) FIXED BONUS AWARD PROGRAM**

———————————————————————

I, Jonathan A. Mitchell, declare as follows under penalty of perjury under 28 U.S.C. § 1746:

1.    I am a Senior Managing Director at Zolfo Cooper Management, LLC ("Zolfo Cooper"), and am currently serving as the chief restructuring officer ("CRO") of Sabine Oil & Gas Corporation ("Sabine").  I am intimately familiar with the above-captioned debtors and debtors in possession's (collectively, the "Debtors") day-to-day operations, business affairs, financial performance, and restructuring efforts.  Zolfo Cooper is a leading independent provider of restructuring, financial, and corporate advisory solutions and has been retained by the Debtors in these chapter 11 cases.

2.    I submit this declaration to support the relief requested in the *Debtors' Motion for Entry of an Order Approving and Authorizing the (A) Performance Award Program and (B) Fixed Bonus Award Program*.  Unless otherwise indicated, all facts set forth in this

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is:  1415 Louisiana, Suite 1600, Houston, Texas 77002.

declaration are based upon (a) my personal knowledge of the Debtors' current operations and financial performance, (b) information learned from my review of relevant documents, and (c) information I have received from members of the Debtors' management or advisors. I am not a participant in either the Debtors' Performance Award Program (the "<u>Performance Award Program</u>") or the Debtors' Fixed Bonus Award Program (together, the "<u>Employee Incentive Programs</u>"), and I will receive no payments under either program.

3.     I am authorized to submit this declaration on behalf of the Debtors, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

## <u>Qualifications</u>

4.     As noted above, Zolfo Cooper is a leading provider of restructuring, financial, and corporate advisory services. Specifically, Zolfo Cooper specializes in assisting and advising debtors, creditors, investors, and court-appointed officials in formal bankruptcy proceedings and out-of-court workouts, and has played key roles in numerous public restructuring engagements, including those for The Dolan Company, American Home Mortgage, LandAmerica Financial Group, Inc., Collins & Aikman, Dewey & LeBoeuf, LLP, Enron, TOUSA, Barnes Bay Development, Flying J Inc., Pacific Energy, Penn Traffic, and Hawaiian Telcom.

5.     I am a Senior Managing Director and head of Zolfo Cooper's U.S. practice. I have more than 25 years of management experience across a wide range of industries. My expertise includes acquisitions, debt financing and restructurings, divestitures, and successful bankruptcy reorganizations, and I have previously acted as CRO of Dewey & LeBoeuf, LLP, LandAmerica Financial Group, Inc., and LandAmerica 1031 Exchange Services Inc.

6.     In addition to acting as CRO of distressed companies, I have advised companies in a variety of sectors and situations, developed business plans, and evaluated compensation packages for management teams of distressed businesses. Most recently, I advised the executive

committee of Patton Boggs on working with its lenders and creating a new business plan, while the global law firm completed its merger with Squire Sanders. I also served as CEO and chairman of Entegra Power Group ("Entegra"), which owns the two largest gas-fired merchant power plants in the United States.  As chairman and CEO of Entegra, I led the company's refinancing, raising $1.33 billion, and oversaw the development and implementation of the company's business plan, which was used successfully to navigate both a complex restructuring process and Entegra's post-emergence operations.  I received a Diploma of Management from Auckland University of Technology and am a graduate of the Advanced Management Program at the University of Hawaii.

### Preliminary Statement

7.      In March 2015, the Debtors retained Zolfo Cooper to provide assistance in connection with the Debtors' evaluation of their cash management system, financial forecasting, and contingency planning.  I became increasingly involved in April 2015, advising the Debtors and taking part in negotiations regarding a potential out-of-court restructuring transaction with the Debtors' various constituents.

8.      As the Debtors moved towards a chapter 11 filing, I began to work closely with the Debtors' management and compensation experts at Towers Watson to evaluate and pressure-test the Employee Incentive Programs.  After the Debtors' July 15 chapter 11 filing, I was appointed as the Debtors' CRO.  As CRO, I continued to assess the Employee Incentive Programs and advised the Debtors' management team, the compensation committee (the "Compensation Committee") of Sabine's board of directors (the "Board"), and the Board in connection with those programs.

9.      The Employee Incentive Programs comprise the Performance Award Program and the Fixed Bonus Award Program, which are designed to encourage the Debtors' employees

3

to maximize the value of the Debtors' business, contributing to the Debtors' financial stability and growth as the Debtors both navigate the restructuring process and pursue a long-term business plan.

10.     The Performance Award Program is incentivizing and covers nine members of management—four insiders and five non-insiders.  The Fixed Bonus Award Program is both retentive and incentivizing and covers all the Debtors' other employees—145 in all—none of whom are insiders.[2]

11.     The Performance Award Program sets certain quarterly performance benchmarks under four value-driving metrics (collectively, the "Performance Metrics")—Total Production, Operating Expense, EBITDA, and Capital (each as defined herein)—and ties management compensation to achieving these benchmarks.

12.     The Debtors based the benchmarks for each Performance Metric on their management plan reforecast (the "Reforecast"), which updated the Debtors' March 2015 business plan to reflect updated oil and gas price curves and reduced operating expenses.  As described in detail below, the benchmarks under the Performance Award Program are stretch goals—not easy-to-achieve milestones—and align the interests of the Debtors' management team with those of their stakeholders.

13.     By linking compensation to performance under the three Performance Metrics that together drive EBITDA and control expenditures, the Performance Award Program appropriately incentivizes the management team to improve the Debtors' financial and operational performance, while lowering expenses and streamlining operations.

---

[2]     The Debtors currently employ approximately four individuals who were employed by Forest Oil before the December 2014 Combination (as defined herein) and whose positions are in the process of being phased out.  These four individuals are not participants in the Fixed Bonus Award Program.

14.    The Fixed Bonus Award Program covers the Debtors' other employees, who, as the Debtors' work force, collectively are essential to the Debtors' continuing operations and to maximizing value for the Debtors' stakeholders.  The Fixed Bonus Award Program provides a substantial component of the eligible employees' total compensation, thus many of its participants depend heavily on this compensation.

15.    Because the Debtors' workforce is relatively small, highly skilled, and specialized, the loss of the Fixed Bonus Award Program would likely lead to significant attrition, which would be costly and would materially disrupt the Debtors' operations, harming their business.

16.    In sum, together, the Performance Award Program and the Fixed Bonus Award Program incentivize management to improve the Debtors' operational and financial performance and ensure that other employees crucial to the Debtors' day-to-day operations do not leave for other opportunities, but continue to perform at a high level for the Debtors.  These programs are reasonable and essential to the Debtors' go-forward success.[3]

17.    This declaration consists of two parts.  In Part One, I describe the Performance Award Program, explaining its necessity, that it appropriately incentivizes management to maximize value of the Debtors' business, and that it aligns management's incentives with those of the Debtors' creditors and other stakeholders.  In Part Two, I show why the Fixed Bonus Award Program functions to retain the Debtors' highly skilled employees, preventing damaging, and even potentially catastrophic, attrition.

---

[3]    The cost of the Employee Incentive Programs may range between approximately ███████████████ , depending on whether the Debtors reach certain performance targets under the Performance Award Program.  The maximum cost of the Employee Incentive Programs is far outweighed by the estimated incremental cash flow of more than ██████ (net of Employee Incentive Program payouts) if the maximum performance levels are met.

## The Employee Incentive Programs

**I.    The Performance Award Program**

    **A.    Necessity of the Performance Award Program**

18.    The Debtors' management team has devoted significant attention and effort to addressing the Debtors' restructuring alternatives, while simultaneously running the Debtors' day-to-day business.    A successful restructuring of the Debtors depends on management's success on these parallel paths.

19.    The Debtors' nine-person management team is comprised of the individuals with the greatest ability to influence the performance of the Debtors' business.    Accordingly, the Debtors have an immediate need to implement the Performance Award Program that will incentivize the management team.    Doing so will help the Debtors achieve their near- and long-term operating performance and restructuring goals.

20.    Absent the Performance Award Program, the management team would have no short- or long-term cash or equity compensation incentives.    Nor would they have any form of compensation directly tied to the Debtors' financial performance.    Approving the Performance Award Program, by contrast, would directly align the management team's interests with those of the Debtors and the Debtors' stakeholders.

    **B.    Development of the Performance Award Program**

21.    Historically, the Debtors have sought to attract and motivate talented executives to achieve strong financial and operational results.    To this end, the Debtors—and their predecessor companies Sabine Oil & Gas LLC ("Old Sabine") and Forest Oil Corporation ("Forest Oil")—have historically compensated their core management team not only through base salary, but also through cash bonus and long-term equity programs that tied management's financial rewards to the Debtors' financial and operational performance.    The metrics measured

6

in previous award programs plans have included total production, EBITDA, capital expenditure, project finding and development, total operating expenses and debt/LTM EBITDA, as well as certain qualitative environmental and health and safety performance measurements.

22.     Before the Petition Date, the Debtors recognized that their senior management team would drive the business' performance and would be indispensable to a successful restructuring.  Thus, the Debtors, with the help of compensation experts Towers Watson, began to develop the Performance Award Program to provide those senior managers with compensation tied to the Debtors' financial success.

23.     The Debtors carefully considered mechanisms to incentivize and reward management team members for improving financial and operational results, thus aligning the management team's interests with those of the Debtors' other stakeholders, consistent with historical practice at Old Sabine and Forest Oil and industry norms.

24.     Since late June 2015, I have worked closely with the Debtors' management team and advised the Compensation Committee and the Board on the Employee Incentive Programs. To assess the Performance Award Program, I and other advisors at Zolfo Cooper met with the Debtors' management team, interviewed key employees, and reviewed the Debtors' past and present business plans.  I also conducted an in-depth analysis of the Debtors' Reforecast, which itself was developed over the course of several weeks through an iterative, ground-up process involving multiple rounds of management input, review, and calibration.  Because performance targets set under the Reforecast were incorporated directly into the Performance Award Program, I reviewed the targets to determine if they were appropriately challenging.

25.     Finally, I assessed the Debtors' management team's track record of setting challenging budgets and analyzed potential outcomes and magnitudes of the downside risks for

each aspect of the Performance Award Program under various operational scenarios. This analysis helped me understand whether, and to what extent, performance under each metric increased value for the Debtors' estates, how challenging the established performance targets were, whether the performance targets were incentivizing in nature, and whether they aligned the management team's interests with those of the Debtors' stakeholders.

26.    Based on my review and analysis, I advised the Debtors' management, the Compensation Committee, and the Board regarding the appropriateness of the performance targets, as well as the challenging nature of the Reforecast on which the targets were based. Ultimately, based on my expertise and experience, I determined that the Performance Award Program sets "stretch goals," rather than easy-to-achieve milestones. That is especially true given the complexity and volatility of the E&P sector and given that the Debtors have less than eight months of experience as a newly combined entity following the December 2014 business combination (the "Combination") of Old Sabine and Forest Oil. These goals are primarily incentivizing and align the interests of the Debtors' management team with those of the Debtors' stakeholders.

### C.    Terms of the Performance Award Program

27.    The Performance Award Program provides cash incentives to key members of the Debtors' management team who make the operational and financial decisions that drive the Debtors' performance. To appropriately incentivize these key employees to maximize the value of the Debtors' business, the Performance Award Program establishes quarterly benchmarks under each of the Performance Metrics: the Debtors' (a) total production ("Total Production"); (b) total operating expense ("Operating Expense"); (c) adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") and (d) capital expense ("Capital").

28.     Each of these value-driving Performance Metrics is complimentary, as the Performance Metrics encourage both revenue growth and cost reduction.  The Performance Award Program accords each metric equal weight (25% each) in determining each participant's total award.  The schematic below illustrates the interdependence of the Performance Metrics, as Total Production is dependent on Capital investment and drives revenue and Operating Expense, which in turn, determine EBITDA.



29.     By tying management's compensation to all four of the Performance Metrics, the Performance Award Program ensures that management and other stakeholders share in both upside and downside fluctuations in the Debtors' performance, incentivizing management to pursue a balanced approach that involves cost-cutting under the Operating Expense and Capital metrics, while simultaneously striving to increase Total Production, which determines the Debtors' operational performance and EBITDA—a measure of the a company's financial health.

30.     For each metric, the Performance Award Program establishes a payout range based on varying levels of performance—"Threshold," "Target," and "Maximum."  Threshold and Maximum outcomes are achieved within a +/- 15% of the Target, with the metric-specific variance (ranging from 5% to 15% below or above Target) reflecting each metric's unique characteristics, as discussed below.

9

31.     Threshold payouts are set at 50% of Target payout, and Maximum payouts are at 150% of Target payout.  If actual performance for a given metric does not meet the Threshold level, the Debtors' management team will receive no compensation at all for that metric.  Below is a summary table of the metric targets and potential payouts under the Performance Award Program:

| | KEY PERFORMANCE METRICS | Weighting | Units | METRIC TARGETS Annual in $000's | | | RELATED PAYOUTS | | | | | |
| | | | | Threshold | Target | Maximum | Threshold % | $000's | Target % | $000's | Maximum % | $000's |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | PRODUCTION | 25% | (Mmcfe/d) | ██ | ██ | ██ | 50% | $ ██ | 100% | $ ██ | 150% | $ ██ |
| B | OPERATING EXPENSES | 25% | $000's | ██ | ██ | ██ | 50% | ██ | 100% | ██ | 150% | ██ |
| C | EBITDA | 25% | $000's | ██ | ██ | ██ | 50% | ██ | 100% | ██ | 150% | ██ |
| D | CAPITAL | 25% | $000's | ██ | ██ | ██ | 50% | ██ | 100% | ██ | 150% | ██ |
| | TOTALS | 100% | | | | | | $ ██ | | ██ | | ██ |

32.     The management team's ability to achieve "Uplift" across the Debtors' portfolio of wells significantly affects management's ability to reach performance goals for the Performance Metrics.  Uplift refers to production associated with newly drilled wells in a given period.  For purposes of the Performance Award Program, Uplift refers to the production associated with wells drilled between January 1, 2015 and June 30, 2016.  "Base" production, by contrast, refers to production from wells drilled before January 1, 2015.

33.     In 2014, on a combined basis, Old Sabine and Forest Oil invested approximately $707 million in capital, drilling and completing 134 new wells, accounting for 34% of total production.





34.     Prices of oil in 2014 were relatively higher than gas ($14.47/Mmcfe vs. $4.25/Mmcfe), thus almost half the new wells drilled by the Debtors were oil wells.  In total, Uplift production accounted for approximately 45% of the Debtors' 2014 revenues.

35.     Over time, the Debtors' Base production will decline and newly drilled wells will contribute an increasing portion of the Debtors' Total Production.  The Debtors' Base production, for example, is projected to decrease by ███ from July 2015 through June 2016.



36.     Thus, if the Debtors did not drill new wells and instead relied solely on Base production, their overall production levels would decline materially over the period from July

11

2015 to July 2016.  To maintain production and reserves, the Debtors must continually invest

Capital in new drilling programs.[4]

37.    In short, Total Production goals can only be reached if Uplift production levels

are realized.  If the Debtors fail to achieve any Uplift, however, Total Production will fall well

below even the Performance Award Program's Threshold level.

38.    Capital expenditures and Uplift are also directly related.  A reduction of Capital

means lower investment in new wells and, consequently, a reduction in Uplift.  Thus Uplift is

dependent on, and correlates with, Capital expenditures.

39.    The majority of Operating Expense is associated with maintenance and other

costs of the Debtors' Base production.  But Uplift production also affects Operating Expense, as

outperformance of Uplift production will challenge management's ability to achieve budgeted

Operating Expense targets.

40.    Finally, Uplift drives EBITDA.  After all, Uplift affects Total Production and

Operating Expense, which, in turn, impact EBITDA.

### 1.    Total Production

41.    Production, of course, is the lifeblood of any exploration and production ("E&P")

company.  Total Production refers to the total quantity of natural gas, oil, and natural gas liquids

("NGLs")—measured in millions of cubic feet equivalent ("Mmcfe")—that is extracted from a

well during a given period.  This amount includes both production extracted from a company's

Base and Uplift wells.

42.    The E&P process involves five primary steps: (a) identifying the target;

(b) drilling an exploration well; (c) drilling appraisal wells; (d) developing the field; and

---

[4]    Capital budgeted for drilling Uplift wells through 2Q 2016 is projected to account for approximately ▮ of the Debtors' overall drilling and completion capital. ▮▮▮▮▮ of drilling and completion capital is projected to be deployed towards Base wells, generally to pay for recompletion and abandonment costs.

(e) extending the life of the field.  Each step requires different personnel and equipment and carries a different level of uncertainty and risk.  Base production is subject to "downtime" risk, which refers to lost production time associated with resource extraction risk factors such as machinery failures, staffing issues, weather conditions, third-party transportation outages, and health and safety issues, among others.

43.     Uplift production and the associated development of new wells presents even greater risks associated with accurately predicting precise well characteristics, determining the effects of nearby drilling activity, and mechanical risks related to drilling machinery failures.

44.     To forecast Total Production, the Debtors use a specialized industry process to model a given well's anticipated production profile—the well's "type curve."  Despite the sophisticated nature of this process, however, a well's type curve remains subject to the Base and Uplift production risks stated above.

45.     Given the risks and uncertainties associated with Base and Uplift production, the management team's industry expertise and decision making around identifying targets, drilling efficiency, developing the field, and limiting downtime will drive the Debtors' success in delivering the targeted levels of Total Production.

46.     The Debtors' management team has historically set challenging Total Production targets, as demonstrated by the following table showing how the Debtors' actual production performance compared to their budgeted performance, in 2011, 2012, 2013, and 2014.

| | | | Min | 2011 | Max | Min | 2012 | Max | Min | 2013 | Max | Min | 2014 | Max | OVERALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | PRODUCTION | | | | | | | | | | | | | | |
| | BUDGETED TARGETS | Mmcfe / d | 92.9 | 109.3 | 120.2 | 125.0 | 147.0 | 161.7 | 149.8 | 176.2 | 193.8 | 205.8 | 242.1 | 266.3 | |
| | ACTUAL PERFORMANCE | Mmcfe / d | | 114.1 | | | 131.6 | | | 175.3 | | | 201.9 | | 94% |
| | TARGETS HIT? | | HIT | HIT | MISS | HIT | MISS | MISS | HIT | MISS | MISS | MISS | MISS | MISS | |
| | VARIANCE - B / (W) | Mmcfe / d | | 4.8 | | | (15.4) | | | (0.9) | | | (40.2) | | |
| | Implied Payout Under Current Design | | | 122% | | | 65% | | | 98% | | | 0% | | 72% |
| | | Note: 2011 Results adjusted to exclude El Paso acquisition | | | | | | | | | | | | | | |

**SABINE'S HISTORIC PERFORMANCE - ACTUAL vs. BUDGET**

13

47.     Thus, in the past four years, the Debtors reached their Target Total Production level only once, in 2011.  The Debtors missed their Target level in 2012, 2013, and 2014, and missed even the Threshold level implied by the Performance Award Program in 2014.

48.     The Performance Award Program likewise sets challenging performance targets that will be difficult to achieve.  On an annual basis, the Target for average daily production is approximately ███████████, with a range from -15% for Threshold (███████████) to +10% for Maximum (███████████).



Forecasted Sabine Porduction thru 2Q-2016

■ BASE   ▨ UPLIFT   □ Target

49.     To achieve the Target level of production, the Debtors' management team will have to achieve (a) the budgeted Base production *plus* (b) all of Uplift production, which is subject to significant execution risk.

50.     As described above, meeting the Base production Target will depend primarily on minimizing production downtime.  Historically, the Debtors' estimates assumed the wells would incur approximately 2-4% in downtime over the period being projected.  The Performance Award Program's Target performance level assumes a downtime ███████████ ██ Meeting this ███ projection will require management to continue to monitor and assess closely the Debtors' wells, the number of which increased substantially in December 2014 as a result of the Combination, without a corresponding increase in personnel.

14

51.    With regard to Uplift production, the Performance Award Program incentivizes the Debtors' management team to maximize Uplift production through effective deployment of capital.  The successful execution of the new drilling program to bring new wells online on time and at maximum production levels will require management's expertise to assess the economics of each well and, once selected, to optimize the technical design of the well for drilling and completion purposes.  Because approximately ▮ of the Debtors' Total Production through the second quarter of 2016 is projected to be extracted from Uplift wells, the management team's ability to balance liquidity constraints and deploy sufficient capital to deliver the budgeted drilling program will determine whether Target Total Production levels are ultimately achieved.

### 2.    Operating Expense

52.    Operating Expense is the Debtors' largest use of cash and includes lease operating expense ("LOE"), marketing transportation and processing expense ("MTPE"), workover expense, production and ad valorem taxes, and general and administrative expense ("G&A").

53.    LOE includes various operating expenses related to producing wells such as field personnel, compression, chemicals, and salt water disposal.  MTPE includes expenses incurred after resources are extracted and are effectively those costs payable by the Debtors to midstream companies to transport, process, and market the Debtors' oil, gas, and NGL production so that it can be effectively brought to market.  Workover expense includes cost of well repair and other work essential to maintain base production levels.   Production and ad valorem taxes are mandatory state taxes paid by the Debtors on all oil and gas production.  G&A expenses include fixed costs such as Houston payroll and benefits, rent/office expenses, and contractors.

54.    LOE and G&A are the two largest aspects of Operating Expense, accounting for approximately ▮ of expenditures in the twelve-month period through 2Q 2015, and are

forecast to compose the same portion of Operating Expense in the 12-month period through 2Q 2016.

55.     In their management compensation programs, the Debtors have historically measured Operating Expense on a per unit basis ($/Mmcfe).  As the table below illustrates, Operating Expense targets have incentivized the Debtors' management team to successfully control costs.

| SABINE'S HISTORIC PERFORMANCE - ACTUAL vs. BUDGET | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B  OPERATING EXPENSES | | Min | 2011 | Max | | Min | 2012 | Max | | Min | 2013 | Max | | Min | 2014 | Max | OVERALL |
| BUDGETED TARGETS | $/Mcfe | $  2.16 | $  2.06 | $  1.85 | $  2.00 | $  1.90 | $  1.71 | $  1.95 | $  1.86 | $  1.67 | $  1.67 | $  1.59 | $  1.43 | | | | |
| ACTUAL PERFORMANCE | $/Mcfe | | $  1.84 | | | $  1.85 | | | $  1.70 | | | $  1.65 | | | | | 105% |
| TARGETS HIT? | | HIT | HIT | HIT | HIT | HIT | MISS | HIT | HIT | MISS | HIT | MISS | MISS | | | | |
| VARIANCE - B / (W) | $/Mcfe | | $  0.22 | | | $  0.05 | | | $  0.16 | | | $  (0.06) | | | | | |
| Implied Payout Under Current Design | | | 150% | | | 113% | | | 143% | | | 62% | | | | | 117% |

56.     Significantly, the Performance Award Program sets the Target level for Operating Expense at approximately ██████████, a ██████████ from the $211.7 million of Operating Expense from the last 12 months.  The Threshold benchmark is set at +5% ██████████ and the Maximum benchmark is at -10% ██████████  To reach even Target performance, the Debtors' management team will have to significantly reduce costs, including a decrease of ██████████ in G&A expenses, ██████████ reduction in workover expense, ██████████ in LOE, ██████████ in MTPE, and ██████████ in production and ad valorem taxes.

57.     Management's ability to control Operating Expense depends on various factors, including their ability to retain services of existing vendors, many of whom have already provided the Debtors with significant cost reductions over the past 12 months and may push for pricing increases.  The narrow +5% range for Threshold performance leaves only ██████████ in headroom, allowing little room for error.

16

58.    In addition, management's ability to cut Operating Expense will be hindered by the need to balance trade-offs.  For example, any decrease in expenses such as LOE and workover expense may come at the expense of decreased Base production levels due to longer downtime.  Likewise, cuts in G&A expenses, such as headcount reductions, may adversely affect Total Production and EBITDA.

59.    Thus, the management team's compensation under the Performance Award Program will turn on their ability to effectively reduce Operating Expense, so as not to impair the health of the business and the Performance Award Program's other metrics.  And a "miss" by more than ███████ in calibrating Operating Expense will mean zero bonus associated with that metric.

### 3.    EBITDA

60.    EBITDA is traditionally the key metric used to determine a company's performance in the E&P industry.  Financing documents traditionally include various EBITDA-related covenants, and a company's total estimated value is often calculated using the company's current and projected EBITDA.  The Debtors' EBITDA is directly linked to Total Production and Operating Expense, but is also highly dependent on external factors such as oil and gas pricing and market demand.

61.    The Debtors did not use EBITDA for employee performance assessment purposes in 2011 and 2012, but did include EBITDA in their budget projections for those years.  Like the Performance Award Program, however, the Debtors' 2013 and 2014 performance compensation was tied to EBITDA.

| | | Min | 2011 | Max | Min | 2012 | Max | Min | 2013 | Max | Min | 2014 | Max | OVERALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **C EBITDA** | | | | | | | | | | | | | | |
| BUDGETED TARGETS | ($mm) | $ 138.8 | $ 163.3 | $ 187.8 | $ 172.0 | $ 202.4 | $ 232.8 | $ 248.5 | $ 292.4 | $ 336.3 | $ 343.1 | $ 403.6 | $ 464.1 | |
| ACTUAL PERFORMANCE | ($mm) | | $ 192.1 | | | $ 195.5 | | | $ 295.4 | | | $ 327.3 | | 103% |
| *TARGETS HIT?* | | *HIT* | *HIT* | *HIT* | *HIT* | *MISS* | *MISS* | *HIT* | *HIT* | *MISS* | *MISS* | *MISS* | *MISS* | |
| **VARIANCE - B / (W)** | ($mm) | | $ 28.8 | | | $ (6.9) | | | $ 3.0 | | | $ (76.3) | | |
| *Implied Payout Under Current Design** | | | 150% | | | 89% | | | 103% | | | 0% | | 86% |

Note: EBITDA was not considered for performance measurement purposes in 2011          Note: EBITDA was not considered for performance measurement purposes in 2012

62.     In both those years, the Debtors set challenging benchmarks.  Specifically, in 2013, the Debtors barely achieved the Target level—reaching only about 1% above Target.  And in 2014, the Debtors not only missed the Target level, but would have failed to reach the Threshold level under the Performance Award Program as well.  The 2014 miss was significant, about 19% below Target and about 5% below the implied Threshold.  Although target EBITDA figures were not linked to compensation in 2011 and 2012, the Debtors would have achieved mixed results, hitting budget in 2011 and missing budget in 2012.

63.     EBITDA, like Total Production, is highly sensitive to Uplift, and thus to the various risks associated with Uplift.  The Debtors missed their 2014 EBITDA Target, for example, due to a combination of factors, with a shortfall in projected Uplift production as the key cause.

64.     In 2014, significant declines in the price of oil also negatively affected EBITDA.  But those price declines were partly mitigated by the Debtors' hedging practices, which have since been terminated, exposing the Debtors to significant risk of further fluctuations.

65.     Target performance under the Performance Award Program sets targets under which the majority of EBITDA (███) will be generated by Uplift wells.  Given the exposure to risks associated with Uplift, the Performance Award Program applies a 15% range on either side of █████████ Target performance, with Threshold performance set at ██████████ and Maximum at ████████.

18



Forecasted Sabine EBITDA thru 2Q-2016

■ BASE  ■ UPLIFT  □ TARGET

66.     These targets are stretch goals.  The primary EBITDA-driving factors that management can control are Total Production and Operating Expense.  For example, underperformance on the Debtors' targeted new drilling programs by [REDACTED] over the twelve months through the end of June 2016, holding all other factors constant, would negatively impact EBITDA by approximately [REDACTED], causing the Debtors to miss their Target EBITDA.  The Debtors would likewise miss Target EBITDA if, holding all other factors constant, the Debtors' Operating Expense increased by [REDACTED] as this would negatively impact EBITDA by approximately [REDACTED].

67.     The principal EBITDA-driving factor that is beyond management's control is the price of oil and gas.  A [REDACTED] decline in price, holding all other factors constant, would produce a decline in EBITDA of approximately [REDACTED].  The Performance Award Program does nothing to insulate management from that risk.[5]  Rather, management bonuses would be adversely affected by a decline in oil and gas prices and favorably affected by their increase, as would the Debtors' entire business—further aligning management's interests with those of the Debtors' other stakeholders.

---

[5]  For example, the price of oil hit a 6-year low this week, highlighting the volatility of the market and making the EBITDA Target even more difficult to hit.

### 4.    Capital

68.    In the E&P industry, Capital expenditure drives business value, as it enables companies like the Debtors to drill new wells and maintain production levels in the face of declining type curves.    Thus, if management reduces Capital expenditures, it must simultaneously identify and prioritize profitable drilling opportunities across the Debtors' reserve portfolio, to deliver Uplift and achieve Total Production and EBITDA targets.    Accordingly, management expertise in identifying and prioritizing the Debtors' most profitable drilling opportunities will determine management's ability to reach the Performance Award Program's Capital Target level.

69.    The Debtors have achieved their Capital Target in three of the past four years.

| | | | Min | 2011 | Max | Min | 2012 | Max | Min | 2013 | Max | Min | 2014 | Max | OVERALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | CAPITAL | | | | | | | | | | | | | | |
| | BUDGETED TARGETS | $mm's | $ 390.7 | $ 339.7 | $ 288.7 | $ 190.9 | $ 166.0 | $ 141.1 | $ 409.3 | $ 355.9 | $ 302.5 | $ 701.4 | $ 609.9 | $ 518.4 | |
| | | | | | | | | | | | | | | | |
| | ACTUAL PERFORMANCE | $mm's | | $ 334.5 | | | $ 138.6 | | | $ 385.6 | | | $ 579.5 | | 105% |
| | TARGETS HIT? | | HIT | HIT | MISS | HIT | HIT | HIT | HIT | MISS | MISS | HIT | HIT | MISS | |
| | | | | | | | | | | | | | | | |
| | VARIANCE - B / (W) | $mm's | | $ 5.2 | | | $ 27.4 | | | $ (29.7) | | | $ 30.4 | | |
| | Implied Payout Under Current Design | | | 105% | | | 150% | | | 72% | | | 117% | | 111% |
| | | | Note: Measured 2011 result was adjusted for drilling of 7 unbudgeted wells ($29.5m), which are included in above analysis | | | Note: Measured result adjusted for receipts from insurance claim ($12.7m) and asset sale ($39.2m) to show acutal capital spend | | | | | | | | | | |

**SABINE'S HISTORIC PERFORMANCE - ACTUAL vs. BUDGET**

70.    In 2013, however, the Debtors missed their Capital Target by about 8%. Moreover, in 2014, the Debtors achieved their Capital Target but significantly missed Production and EBITDA estimates, as discussed above.

71.    The proposed Performance Award Program balances management's incentives to keep Capital at or below budget level by simultaneously tying management bonuses to Total Production and EBITDA—metrics that are generally adversely affected by reductions in capital expenditures.

72.    The quarterly Capital Targets and relationship between Capital expenditures and Uplift are illustrated in the graph below.

20



Forecasted Sabine Capital Spend thru 2Q-2016

73.    As shown below, the vast majority of the Debtors' Uplift for the period from 3Q 2015 through 2Q 2016 is projected to be realized in East Texas, where ▇ of the ▇ new wells anticipated to be drilled through 2Q 2016 will be located.

Sabine Drilling & Completion Capital Schedule - NTM thru 2Q-2016

| As of 8/10/2015 in $000's | 2015 | | 2016 | | GRAND | |
|---|---|---|---|---|---|---|
| | 3Q-2015 | 4Q-2015 | 1Q-2016 | 2Q-2016 | TOTAL | % |
| UPLIFT PRODUCTION CAPITAL BUDGET | $▇ | | | | ▇ | |
| East Texas | ▇ | ▇ | ▇ | ▇ | ▇ | |
| North Texas | ▇ | ▇ | ▇ | ▇ | ▇ | |
| South Texas | | ▇ | ▇ | | ▇ | |
| BASE PRODUCTION CAPITAL BUDGET (Combined) | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ |
| TOTAL CAPITAL | $▇ | | | | | |

74.    Thus, if internal or external factors exert downward pressure on Uplift, then management may have to increase Capital to compensate.  Given these risks and variability of Uplift and Capital, the Performance Award Program sets its Threshold and Maximum for Capital by applying a +/-15% range as compared to the ▇▇▇ Target—▇▇▇ for Threshold and ▇▇▇ for Maximum.

## II.    The Fixed Bonus Award Program

### A.    Necessity and Development of the Fixed Bonus Award Program

75.    The Fixed Bonus Award Program is designed to be primarily retentive.  The program provides for the payment of fixed, quarterly cash awards to 145 of the Debtors'

employees not eligible for the Performance Award Program, consistent with Debtors' prepetition practices.[6]   Payments under the Fixed Bonus Award Program will be made quarterly in the month following each quarter end over the period from July 1, 2015 to June 30, 2016.

76.     The Fixed Bonus Award Program provides a substantial component of non-insiders' total compensation and many employees are dependent on this compensation.  Because the Debtors' workforce is relatively small, highly skilled, and given the Debtor is in bankruptcy, there is significant risk that absent the Fixed Bonus Award Program, the Debtors will lose employees, which would be costly and disruptive to the Debtors' operations, harming their business.  The Fixed Bonus Award Program is thus needed to avoid this outcome.

77.     The total amounts available under the Fixed Bonus Award Program are reflected below:

| | Employee Status | Patricipant Count | Estimated Quarterly Target Value ($000's) | Estimated Annual Target Value ($000's) |
|---|---|---|---|---|
| FIXED BONUS AWARD PROGRAM | Non-Insiders | 145 | $ | $ |

78.     Because the Debtors' employees are crucial to the Debtors' business operations, the Fixed Bonus Award Program is reasonable and should be approved by this Court.

*[The Remainder of this Page is Left Intentionally Blank]*

---

[6]   The total number of participants in the Fixed Bonus Award Program was calculated as of July 30, 2015, per the Towers Watson report. This number, and the associated cost, may vary over time as existing employees leave and new employees join the Debtors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information and belief.

Dated: August 21, 2015

New York, New York                         Jonathan A. Mitchell
                                           Chief Restructuring Officer
                                           Sabine Oil & Gas Corporation
                                           1415 Louisiana, Suite 1600
                                           Houston, Texas 77002

## EXHIBIT D

**Declaration of David Sambrooks**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) Case No. 15-11835 (SCC) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

### DECLARATION OF DAVID SAMBROOKS
### IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN
### ORDER APPROVING AND AUTHORIZING THE (A) PERFORMANCE
### AWARD PROGRAM AND (B) FIXED BONUS AWARD PROGRAM

I, David Sambrooks, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.  I am the President, Chief Executive Officer ("CEO"), and Chairman of the board of directors (the "Board") of Sabine Oil & Gas Corporation ("Sabine"), one of the above-captioned debtors and debtors in possession (the "Debtors"). As President and CEO, I am very familiar with the Debtors' workforce, business operations, and employee compensation practices. I have been closely involved in working with other members of the Debtors' management team and outside advisors to develop, analyze, and implement the Debtors' employee incentive programs: the Performance Award Program and the Fixed Bonus Award Program (together, the "Employee Incentive Programs").

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440). The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is: 1415 Louisiana, Suite 1600, Houston, Texas 77002.

2.      I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of an Order Approving and Authorizing the (A) Performance Award Program and (B) Fixed Bonus Award Program* (the "Motion").  For the reasons described below, the Debtors have an immediate and compelling need to continue the Employee Incentive Programs to incentivize the Debtors' leadership team and retain other non-insider employees.  The Employee Incentive Programs are critical to the Debtors' ability to achieve financial and operational objectives that will enhance value for all stakeholders and ensure a successful restructuring.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my experience in managing the Debtors' businesses and in the oil and gas industry generally, my discussions with other members of the Debtors' management team and the Debtors' advisors, and my review of relevant documents and information.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

### Background and Qualifications

4.      I have served as the President, CEO, and as a member of the board of directors for Sabine Oil & Gas LLC ("Old Sabine") since it was founded in 2007.  After the December 2014 business combination (the "Combination") of Forest Oil Corporation ("Forest Oil") and Old Sabine, I continued to serve as the President, CEO and assumed the position of Chairman of the Board of the combined company, Sabine.  In these positions, I have been responsible for overseeing the Debtors' operational and financial performance.  I have been closely involved in the design and implementation of the Debtors' employee compensation programs and strategies since the outset of the business.

5.      I have 35 years of experience in the oil and gas industry.  I have served as an officer of several exploration and production ("E&P") companies over my career.  Before joining Old Sabine, I worked at Devon Energy from 2000 to 2007, where I served in various senior

management positions, including as Vice President and General Manager, Southern Division from 2003 to 2007, Vice President and General Manager, International Division from 2001 to 2003, and Production Manager from 2000 to 2001.  I held other senior management positions at Santa Fe Energy, where I worked from 1990 through 2000.  Prior to joining Santa Fe Energy, I worked for 10 years in various roles with Sun Exploration and Production Company.  I received a Bachelor of Science degree in Mechanical Engineering from the University of Texas at Austin and a Master of Business Administration from the Executive Program at the University of Houston.

### Overview of the Employee Incentive Programs

6.      The Employee Incentive Programs include two separate programs—the Performance Award Program and the Fixed Bonus Award Program.  The Performance Award Program provides the nine members of the Debtors' leadership team with the opportunity to earn quarterly incentive-based cash awards if the Debtors achieve pre-established financial and operational milestones.  The Fixed Bonus Award Program provides for the payment of quarterly fixed cash bonus awards to the Debtors' remaining 145 employees.[2]

7.      The Employee Incentive Programs are consistent with the Debtors' prepetition compensation practices.  For years, the Debtors have incentivized, evaluated, and rewarded executive performance based on a weighted set of financial and production metrics.  The Debtors likewise have historically provided fixed or performance-based cash bonuses to non-insider employees to attract and retain the high-quality workforce needed to support their operations.

---

[2]     The Debtors currently employ approximately four individuals who were employed by Forest Oil and whose positions are in the process of being phased out.  These individuals are not participants in the Fixed Bonus Award Program.

8.      In the first quarter of 2015, facing depressed oil and gas prices and mounting financial difficulties, the Debtors evaluated their compensation practices to ensure that they were offering competitive pay that properly incentivized employees to meet the challenges ahead. Under the direction of the Compensation Committee and the Board, I oversaw efforts to analyze the Employee Incentive Programs.    I have worked closely with others in the Debtors' management and the Debtors' outside advisors—including compensation experts at Towers Watson, financial experts at Zolfo Cooper, and legal counsel at Kirkland & Ellis—to assess the design and structure of the Employee Incentive Programs, including participation in the Performance Award Program and in the Fixed Bonus Award Program, the selection of financial and operational metrics and performance targets in the Performance Award Program, and the payout levels that could be earned by individual participants in the Employee Incentive Programs.    I have also engaged with certain creditor constituencies to provide information about the Employee Incentive Programs in connection with these chapter 11 cases.

9.      Based on my experience as CEO, I believe that the Employee Incentive Programs are continuations of the Debtors' past practices and are appropriate—and necessary—for the Debtors' successful restructuring.

### The Debtors Have An Immediate And Compelling Need
### To Continue The Employee Incentive Programs

10.      The Debtors' employees are not easily replaceable—either individually or as a group.  Like other E&P companies, the Debtors employ a lean and highly specialized workforce, many of whom have deep knowledge of the Debtors' specific oil and gas assets.  The Debtors rely on their employees' expertise in making and executing on the decisions that drive the businesses' financial and operational performance.

4

11.     Given the employees' specialized skills and site-specific knowledge, it would be difficult for the Debtors to replace their employees without incurring substantial costs and disrupting operations.  As a result of the Debtors' small, high-impact workforce, employee outperformance can substantially enhance value for the Debtors' enterprise, while even small losses to the employee base can significantly erode the Debtors' financial and operational results.

12.     Given recent developments, it is vital today that the Debtors incentivize and retain their experienced employee base.  ***First***, the dramatic decline in oil prices and depressed prices of natural gas have challenged the Debtors' ability to achieve favorable financial results, magnifying the significance of the employees' operational and capital-deployment decisions. For instance, the consequences of ill-advised or poorly timed decisions about whether or where to drill new wells are exaggerated in the current commodity price environment, in which the Debtors have little room for error.

13.     ***Second***, the December 2014 Combination of Forest Oil and Old Sabine has added to the challenges facing the Debtors' employees and magnified the consequences of individual decision making.  After all, the Combination roughly doubled the number of active wells and land positions that the Debtors' employees are managing, with little corresponding increase to headcount.  The Debtors' employees, in short, are now shouldering responsibility for a business that operates approximately twice as many wells and manages approximately twice the acreage as before the Combination.

14.     ***Third***, the Debtors' restructuring efforts have burdened their workforce, as many employees have assumed responsibilities "above and beyond" their day-to-day duties, such as navigating the chapter 11 process.

15.    The Debtors' challenging financial circumstances and the resulting bankruptcy filing have intensified the Debtors' need to provide their employees with competitive compensation packages.  A bankruptcy filing can, of course, create a perception of instability or uncertainty around a company's future business prospects, which can make employees' alternatives for employment appear more desirable.    Thus, not surprisingly, it is my understanding that recruiters have actively targeted members of the Debtors' management team and other employees.  For example, the Debtors' General Counsel resigned on July 24, 2015 to accept a position at a larger E&P company.  Other key employees—including the ██████ ████████████████████████████████████████████████████, among others— have also resigned in recent months.  All told, ████████████████████████████ ██████████████████████████████████.  I understand that many of these individuals left the Debtors' employment to accept positions at larger energy companies.

16.    In the face of these challenges, the Debtors have designed and implemented the Employee Incentive Programs to incentivize and reward top management and to retain non-insider employees.  The Performance Award Program is the Debtors' sole program that directly compensates the Debtors' leadership team outside of their base salaries.  Thus, outside this program, the Debtors' top management receives no compensation at all tied to the performance of the Debtors' businesses.  Moreover, without the Performance Award Program, the Debtors' leadership would be ████████████████████ for their positions in the E&P industry.  The program is therefore critical to the Debtors' ability to provide competitive compensation and incentives to the individuals who drive the success of the businesses.

17.    For its part, the Fixed Bonus Award Program is essential to the Debtors' ability to attract and retain high-quality non-insider employees.  Many employees are dependent on this

compensation for living and other expenses.  Discontinuing the Fixed Bonus Award Program would mean attrition of skilled employees and resulting disruption and cost to the businesses, eroding the value of the estates.  In short, without the Employee Incentive Programs, the Debtors' ability to incentivize their top management and to retain the rest of their work force would be crippled.

18.    As CEO and President of Sabine, I have personally hosted several town hall meetings—in Houston and in the field, in July and August 2015—at which I invited employees to voice their concerns about the restructuring.  Many have expressed concerns about their employment status and the restructuring's effect on their compensation.  To address these concerns, I have consistently delivered the message that, notwithstanding the bankruptcy filing, the Debtors will operate "business as usual."  And I have assured employees that the Debtors will continue to supplement the base salaries of non-executive employees with periodic cash bonuses, as the Debtors have done since the businesses' inception.  I have likewise attempted to allay the concerns of top management by assuring them that, consistent with historical practice, they will be eligible for incentive awards tied to the Debtors' financial and operational performance.

19.    Denying the Debtors the opportunity to continue their prepetition practice of offering such bonus opportunities would communicate in no uncertain terms that business is ***not*** as usual and would demoralize employees at all levels of the company.

20.    As CEO, it is my judgment that it is in the best interests of the Debtors and the Debtors' stakeholders to continue both of the Employee Incentive Programs.

## Participation In The Employee Incentive Programs

21.     Employees are eligible to participate in either the Performance Award Program or

the Fixed Bonus Award Program.  I oversaw the Debtors' efforts to identify those employees

who would participate in each program.

22.     ***Performance Award Participants.***  The Performance Award Program includes the

nine members of the Debtors' core leadership team (the "Performance Award Participants").

The Performance Award Participants are most critical to the Debtors' restructuring efforts and

are most capable of maximizing financial performance for the benefit of the Debtors, their

estates, and other parties in interest during this critical period.  Performance Award Participants

are divided into two tiers:

- **Tier 1 Participants:**  Tier 1 Participants include the four senior-most executives of the Debtors, including myself (the Debtors' Chief Executive Officer), the Chief Financial Officer, the Chief Operating Officer, and the Senior Vice President of Asset Development.  These officers generally direct overall strategy and direction of the Debtors' enterprise as a whole.[3]

- **Tier 2 Participants:**  Tier 2 Participants include five other of the Debtors' senior employees, none of whom hold a title greater than Vice President.  The Tier 2 Participants help carry out daily business operations, including operations, land administration, accounting, and human resource functions.  Tier 2 Participants have less direct control over the Debtors' overall strategic direction, although they are tasked with executing material aspects of the strategic course ultimately directed by the Tier 1 Participants.  Tier 2 Participants are not appointed by the Board, do not report directly to the Board, and do not have the authority to dictate general corporate policy.

23.     Each of the Performance Award Participants performs key job functions that drive

the Debtors' operational and financial performance, as summarized below:

---

[3]     A vacancy in the Performance Award Program was created with the departure of the Debtors' General Counsel, who was considered a Tier 1 Participant.  The Senior Vice President, Asset Development & Land does not direct overall strategy for the Debtors' businesses, but is a relative of the Chief Operating Officer and is therefore considered a Tier 1 Participant.

**Performance Award Participants**

| Position | Participant Tier | Responsibilities |
| --- | --- | --- |
| President & CEO | 1 | Oversees all business units of the Debtors; determines overall company objectives and strategies; reports to the Board |
| COO & Executive Vice President | 1 | Manages E&P activities, business and asset development, and other operational activities; helps direct company policy for those areas |
| CFO & Senior Vice President | 1 | Oversees financial and accounting functions, investor relations, marketing and related areas; helps directs company policy in these areas |
| Senior Vice President, Asset Development & Land | 1 | Directs reservoir engineering, geosciences, and other asset development activities; oversees land-related issues |
| Vice President, Operations | 2 | Supervises drilling, completion, production, and field operations activities |
| Vice President, Corporate Engineering | 2 | Supervises corporate budgeting and reservoir engineering activities |
| Vice President, Land Administration and Information Technology | 2 | Supervises information technology and land administration activities including land and lease records |
| Vice President, Human Resources and Administration | 2 | Supervises human resource activities, such as payroll, benefits, employee matters, recruiting, and administration |
| Vice President & Controller, Chief Accounting Officer | 2 | Supervises accounting, controller, and financial reporting activities |

24.     Based on my experience, appropriately incentivizing and rewarding each of these Performance Award Participants with competitive compensation opportunities is essential for the Debtors to achieve their performance objectives and successfully emerge from bankruptcy.

25.     ***Fixed Bonus Award Participants***.    The Debtors' remaining 145 non-insider employees participate in the Fixed Bonus Award Program (the "<u>Fixed Bonus Award</u>

Participants"). I am familiar with the roles and responsibilities of the Fixed Bonus Award Participants. The Fixed Bonus Award Participants include employees who work at the Debtors' headquarters in Houston, Texas and in the field. They perform a variety of functions, including accounting, administration, operations, and finance. All of the Fixed Bonus Award Participants hold positions below the Vice President level on the Debtors' organizational charts. None of the Fixed Bonus Award Participants reports to, or was appointed by, the Board. Likewise, none set company policy, is part of the Debtors' core leadership team, or is an insider of the Debtors.

### The Performance Award Program Incorporates
### Key Value-Driving Metrics for the Debtors' Businesses

26. The Performance Award Program links compensation for the Debtors' leadership team to four key value-driving metrics: total production, capital, operating expense, and EBITDA (the "Performance Metrics"). The Debtors historically have measured their performance against these metrics and have consistently used them to incentivize, measure, and reward employee performance. The targeted performance levels for each of the Performance Metrics are based on the Debtors' July 2015 management plan reforecast.

27. Based on my experience, each of the four Performance Metrics will measure management performance that leads to value creation for all stakeholders, for the reasons described below.

28. **Total Production.** Total production measures the volume of oil and gas that the Debtors produce as part of their operations and represents the Debtors' revenue-generating activity. To perform successfully under this metric, management will need to motivate the workforce, ensure safe and efficient drilling operations, and deploy capital effectively toward new drilling programs while maintaining overall production levels. Attaining these goals will not be easy. For example, if the Debtors' leadership team fails to deliver the Debtors' projected

"uplift"—or new production—program, the Debtors will not achieve the target production levels for even the first quarter of the Performance Award Program.

29.    **Capital.** Capital expenditures are the largest discretionary cash outlay for the Debtors. To achieve target levels under this metric, management will need to balance trade-offs between the Debtors' desire to develop new wells and need to manage associated costs. Navigating the tension between capital investment and total production therefore will require efficient deployment of capital, especially given the importance of uplift for the Debtors' businesses.

30.    **Operating Expense.** Operating expense is a critical component of cash flow and includes costs associated with lease operating expense, marketing transportation and processing expense, workover expense, production and ad valorem taxes, and general administrative expense. Meeting operating expense performance levels will require management to control these costs.

31.    **EBITDA.** EBITDA measures the Debtors' cash flow and is a metric commonly used to evaluate company performance. Achieving the EBITDA target will depend on successfully performing on all three of the other metrics. But because EBITDA may also be significantly affected by fluctuations in the price of oil and gas—a factor that management cannot control—its use as a Performance Metric also aligns management with creditors, with management sharing the risk of both upside and downside price fluctuations.

32.    These four Performance Metrics are complimentary. Total production requires capital investment and drives revenue and operating expense, which in turn, determines EBITDA; cash flow generated by EBITDA then contributes to capital, and so on. By measuring both growth and cost reduction, the Performance Metrics combine to encourage management to

11

pursue a balanced approach to maximizing the value of the Debtors' estates and aligning management's interests with those of other constituents.

## Conclusion

33.    Based on my experience and knowledge of the Debtors' businesses and the oil and gas industry generally, it is my business judgment that continuation of the Employee Incentive Programs is critical for the Debtors to achieve financial and operational objectives that will benefit the Debtors' stakeholders in these chapter 11 cases.  If the Employee Incentive Programs are not approved, I believe that the Debtors' ability to reach these goals would be materially compromised and that the Debtors' restructuring efforts would be exposed to serious risk as well.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  August 21, 2015

Respectfully Submitted,

David Sambrooks
President, CEO and Chairman of the Board
Sabine Oil & Gas Corporation

**<u>EXHIBIT E</u>**

**Declaration of John Yearwood**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) Case No. 15-11835 (SCC) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DECLARATION OF JOHN YEARWOOD**
**IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN**
**ORDER APPROVING AND AUTHORIZING THE (A) PERFORMANCE**
**AWARD PROGRAM AND (B) FIXED BONUS AWARD PROGRAM**

I, John Yearwood, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a non-executive member of the board of directors (the "Board") of Sabine Oil & Gas Corporation ("Sabine"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I have served as chairperson of the Compensation Committee (the "Compensation Committee") of the Board for Sabine and its predecessor, Sabine Oil & Gas LLC ("Old Sabine") since the Compensation Committee was formed.   In that capacity, I have overseen the development and implementation of the compensation practices of Old Sabine and the Debtors.   I have closely overseen the development of both of the Debtors' employee incentive programs:   (a) the Performance Award Program and (b) the Fixed Bonus Award Program (together, the "Employee Incentive Programs").

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is:  1415 Louisiana, Suite 1600, Houston, Texas 77002.

2.      As described below, the Compensation Committee and the Board undertook a thorough, deliberate, and independent process in reviewing, evaluating, and ultimately approving the Employee Incentive Programs.  Based on my knowledge of the Debtors' businesses and compensation practices and my experience in the energy industry generally, it is my business judgment that continuing the Employee Incentive Programs is critical to the Debtors' ability to provide competitive compensation and incentives to their employees and would benefit all stakeholders in these chapter 11 cases.

3.      I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of an Order Approving and Authorizing the (A) Performance Award Program and (B) Fixed Bonus Award Program* (the "Motion"), filed contemporaneously herewith.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information concerning the Debtors' compensation plans, finances, and operations, and information that I have learned through working with members of the Debtors' management team and the Debtors' advisors.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

### Background and Qualifications

5.      I was elected to serve as a member of the board of directors of Old Sabine, one of Debtors' predecessor companies, when it was founded in 2007.  I continued to hold that position until the December 2014 business combination (the "Combination") of Old Sabine and Forest Oil Corporation ("Forest Oil"), at which point I became a member of the Board of the combined company, Sabine—a position I continue to hold today.

6.      I have more than 34 years of experience in the oil and gas industry.  Throughout my career, I have served as a senior executive and director for a number of oil and gas

2

companies.  For example, I served as the Chief Executive Officer, President, and Chief Operating Officer of Smith International, Inc. and M-I SWACO from January 1, 2009 to August 27, 2010.  I served as President of Smith Completion and Production and Executive Vice President of Smith International Inc. from August 20, 2008 to December 31, 2008.  Prior to joining Smith International, I worked for more than 26 years at Schlumberger at various locations across the globe.  I served in a variety of positions during that time, including as the President of North and South America for Schlumberger Oilfield Services, the Financial Controller of Schlumberger Oilfield Services, and as the President of Dowell Schlumberger Corporation.

7.    I have also served on numerous boards of directors of companies in addition to the Debtors throughout my career.  I currently serve as a director on the boards of several other energy related companies, including Barra Energia, Coil Tubing Solutions, Dixie Electric, Foro Energy, Nabors Industries Ltd., Premium Oilfield Services, and Sheridan Production Partners.  I have served on the boards of other energy companies in the past.  For example, I served as a director on the board of Smith International from 2006–2010.

8.    I have had extensive experience with a variety of management, operational, and financial issues in the oil and gas industry.  Throughout my career, including as a director of the Debtors, I have frequently worked with corporate boards and members of management on a variety of financial, operational, and compensation-related matters.  I am also familiar with the compensation practices, including the incentive programs, that companies in the oil and gas industry other than the Debtors have adopted.

9.    I serve as Chairperson of the three-member Compensation Committee.  The Compensation Committee develops and oversees the Debtors' compensation strategy and design

3

planning.  In addition, the Compensation Committee is responsible for reviewing and evaluating the development of the Debtors' compensation programs, including the quarterly performance targets incorporated into the Performance Award Program.  The Compensation Committee has the authority to approve certain compensation proposals and makes recommendations to the Board regarding compensation plans and strategies.

10.     The Compensation Committee is composed exclusively of non-executive directors with significant levels of oil and gas and executive management experience.  No Compensation Committee member is eligible to participate in either of the Employee Incentive Programs.

### The Debtors' Employee Compensation Approach and Strategy

11.     As chairperson of the Compensation Committee, I have been closely involved in developing, evaluating, and implementing compensation strategies for the Debtors.  Two fundamental philosophies have guided the Debtors' approach to employee compensation over the years.  *First*, the Debtors have designed compensation packages to ensure that all employees are invested and have a stake in the performance of the organization.  *Second*, the Debtors have structured management compensation to include ███████████████ as compared to market levels, placing a greater emphasis on incentive-based components.  The Debtors' incentive-based compensation programs have historically been the only opportunity for direct cash compensation offered to employees other than their base salaries.  Without the incentive-based programs, ████████████████████████████████████████████ ████████████████████████████ the compensation packages offered by other oil and gas companies.

12.     Throughout the Debtors' history, incentive-based compensation packages have played a significant role in attracting, retaining, and incentivizing critical employees.  Given the

importance of the Debtors' compensation programs, particularly the incentive-based components, the Compensation Committee and Debtors' management rigorously developed and continuously assessed those programs over the years.  For example, every year from 2007 to the present, the Compensation Committee has reviewed and evaluated the design, cost, competitiveness, and effectiveness of the Debtors' and their predecessors' compensation programs.  In my more than 34 years of experience in the oil and gas industry, I am not aware of any company that has implemented a more rigorous or consistent methodology for benchmarking and assessing compensation packages than the Debtors have.

13.    In addition to developing and evaluating the Debtors' compensation strategy, I have witnessed first-hand the significance and effectiveness of the Debtors' incentive programs in attracting and motivating talented personnel.  As chairperson of the Compensation Committee, I have been involved in the process through which many members of the Debtors' executive management team and other employees were recruited to the Debtors or their predecessor, Old Sabine, over the years.[2]  Indeed, I personally interviewed and helped to recruit many members of the Debtors' management team.  These individuals were incentivized to join the Debtors or Old Sabine on the basis of, among other things, their ability to participate in the companies' compensation programs, through which the companies historically provided employees with incentive cash- and equity-based opportunities comparable to those provided by the Debtors' competitors.  In my view, it simply would not have been possible for the Debtors or Old Sabine to have recruited these individuals without offering the incentive programs.  It is also my experience that some form of incentive-based compensation is customary—if not necessary—to

---

[2]    No member of Forest Oil's executive team is currently employed by the Debtors.  Mr. Patrick McDonald, Forest Oil's Chief Executive Officer at the time December 2014 Combination, currently serves on Sabine's Board.

5

achieve employee outperformance and align the organization with the value drivers for the company.

### Background of the Employee Incentive Programs

14.    In the years preceding the December 2014 Combination, both Old Sabine and Forest Oil offered compensation programs consisting of three primary components:   (a) an annual base salary; (b) an annual cash bonus plan; and (c) grants of longer-term equity incentive awards (together with the annual cash bonus plan, the "Legacy Incentive Plans").  The Legacy Incentive Plans were designed to attract, retain, and motivate talented employees to achieve certain financial and operational results.

15.    Unfortunately, as a consequence of the Debtors' financial difficulties and decline in the value of the Debtors' stock (including its delisting from the New York Stock Exchange), employees' equity lost a majority of its value, and potential new equity awards represented little or no value to employees.  At the same time, the Combination and the Debtors' subsequent restructuring efforts significantly increased workloads and uncertainty for the Debtors' employees.  These developments seriously undercut the Debtors' ability to retain and incentivize employees.

16.    Accordingly, in early 2015, under the direction of the Compensation Committee, the Debtors engaged Pearl Meyer & Partners ("Pearl Meyer") to review the Debtors' compensation structure to ensure that they were offering competitive compensation to employees.  As part of this process, Pearl Meyer performed an overall compensation analysis and prepared a report (the "Pearl Meyer Report") summarizing their findings.  The Pearl Meyer Report concluded that, absent a change to the Debtors' compensation structure, total direct compensation levels for certain employees would ██████████████████████████.

17.     Based on this analysis, the Compensation Committee carefully considered an updated compensation structure, which would align with the Debtors' restructuring realities and ensure target total direct compensation opportunities.  On March 2, 2015, the Board approved an updated structure, which combined the Debtors' annual cash bonus plan and the long-term equity plan into a single cash-based plan, which included the two programs that remain in place today: (a) the Performance Award Program, which at that time provided quarterly cash performance awards tied solely to the Debtors' quarterly EBITDA results; and (b) the Fixed Bonus Award Program, which provided fixed quarterly cash bonus awards to non-officer employees. Employees were eligible to participate in only one of these programs.  The Compensation Committee approved participation in these programs and established EBITDA targets for the Performance Award Program on a quarterly basis.  The Debtors paid bonuses under both programs in the first and second quarters of 2015.

18.     In May 2015, as the Debtors experienced mounting financial difficulties, the Debtors began to reevaluate their compensation structures to ensure that employees were properly incentivized to meet the difficult goals ahead and to maximize value for stakeholders. Under the direction of the Compensation Committee, the Debtors engaged independent compensation experts at Towers Watson and financial advisors at Zolfo Cooper to assist with their analysis.

19.     The Compensation Committee was actively involved in the Debtors' evaluation of the Employee Incentive Programs.  For example, the Compensation Committee convened on multiple occasions between March 2015 and July 2015 to review, evaluate, and provide feedback on the Employee Incentive Programs.  I and other members of the Compensation Committee also

consulted regularly with the Debtors' management and outside advisors regarding the status and design of the Employee Incentive Programs.

20.    During this time, the Compensation Committee carefully considered information and analyses from the Debtors' management and outside advisors regarding the Employee Incentive Programs, including:  (a) the proposed duration of the Employee Incentive Programs; (b) the performance metrics utilized to measure performance under the Performance Award Program; (c) the specified performance targets for each performance metric that determine whether and to what extent participants in the Performance Award Program would receive performance awards; (d) the participants identified for inclusion in the Performance Award Program and the Fixed Bonus Award Program; (e) the total compensation award that would be available to individual employees under both programs; (f) the frequency of payment opportunities under the programs; and (g) the aggregate cost of the programs.

21.    The Compensation Committee carefully assessed Towers Watson's analysis of the Debtors' compensation opportunities as compared to market levels.  The Compensation Committee also evaluated the performance targets selected for the Performance Award Program in light of the Debtors' historical performance, management plan, and the extent to which these performance targets—if achieved—would demonstrate a material improvement in the Debtors' businesses as a whole.  The Compensation Committee further considered the analysis of Zolfo Cooper, which independently analyzed and validated the appropriateness of the performance metrics and the rigor of the targets identified.  The Compensation Committee also evaluated management's views on the significant employee effort necessary to attain the performance targets in the Performance Award Program and the resulting value created for the Debtors, as well as the need to retain the employees included in the Fixed Bonus Award Program.

22.     In July 2015, the Debtors requested that the Compensation Committee approve their proposal to continue the Fixed Bonus Award Program under the same construct as the Board had approved in March 2015. With respect to the Performance Award Program, the Debtors proposed certain refinements to the Performance Award Program, adding three of the Debtors' historical performance metrics—Production, Capital, and Operating Expense—to the existing EBITDA measure. This modification provided a balanced set of metrics for which the Debtors could reasonably forecast targets for the entire one-year Performance Period.

23.     The Compensation Committee independently and thoroughly deliberated about the Employee Incentive Programs. At my suggestion, the Compensation Committee proposed certain modifications to the Performance Award Program, specifically regarding the performance ranges for certain performance metrics. Management agreed to incorporate those changes, and the Compensation Committee recommended that the Board approve the continuation of both programs. On July 31, 2015, the Board unanimously approved those recommendations.

24.     Throughout this process, the Debtors' consideration of the Employee Incentive Programs was subject in all respects to review and approval by the Compensation Committee and ultimately the Board.

## Conclusion

25.     Based on my independent assessment as Chairperson of the Compensation Committee and director of the Board, it is my business judgment that continuing the Employee Incentive Programs postpetition would substantially benefit the Debtors and their stakeholders. The Employee Incentive Programs are necessary for the Debtors to provide competitive compensation to incentivize leadership and maintain their high-quality workforce. Without the Employee Incentive Programs, I am convinced that the Debtors would be exposed to significant business risk, to the detriment of the Debtors, their estates, and stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  August 21, 2015                                    Respectfully Submitted,

                                                           _____
                                                           John Yearwood
                                                           Chairperson, Compensation Committee
                                                           Sabine Oil & Gas Corporation