## Exhibit 4

**HPIP Handling Agreement**

# WATER AND ACID GAS HANDLING AGREEMENT

## BETWEEN

## HPIP GONZALES HOLDINGS, LLC

## AND

## FOREST OIL CORPORATION

## INDEX

I    REPRESENTATIONS OF SELLER ............................................................................................. 1
II   GATHERING AND REDELIVERY .......................................................................................... 2
III  DISPOSAL FACILITIES............................................................................................................ 2
IV   PRESSURE .................................................................................................................................. 5
V    CHARGES AND FEES................................................................................................................ 5
VI   NOTICES ..................................................................................................................................... 8
VII  TERM; SALE AND PURCHASE RIGHTS .............................................................................. 9
IX   MISCELLANEOUS .................................................................................................................... 10

EXHIBIT A – RECORDING MEMORANDUM
EXHIBIT B – PROFILE OF WATER AND ACID GAS
EXHIBIT C – INITIAL CAPITAL EXPENDITURES
EXHIBIT D – INITIAL OPERATING BUDGET

## APPENDIX - GENERAL TERMS AND CONDITIONS

1. DEFINITIONS ............................................................................................................... 1
2. SCHEDULING AND BALANCING ........................................................................... 3
3. CONTROL ..................................................................................................................... 3
4. RESTRICTIONS ........................................................................................................... 3
5. EASEMENTS ................................................................................................................ 4
6. MEASUREMENT AND QUALITY ............................................................................ 4
7. COOPERATION ........................................................................................................... 6
8. TAXES ........................................................................................................................... 6
9. BILLING AND PAYMENT ......................................................................................... 7
10. PRODUCER'S REPRESENTATIVE ......................................................................... 8
11. REGULATORY BODIES ........................................................................................... 8
12. FORCE MAJEURE ..................................................................................................... 9
13. UNECONOMIC OPERATION OF DISPOSAL FACILITIES................................... 10
14. DEFAULTS .................................................................................................................. 11
15. POSSESSION AND CONTROL, LIABILITY; GENERAL INDEMNITY ............... 12
16. GENERAL .................................................................................................................... 13

## WATER AND ACID GAS HANDLING AGREEMENT

THIS WATER AND ACID GAS HANDLING AGREEMENT is entered into this __ day of May 2014 (the *"Effective Date"*) (herein, as the same may be amended from time to time, called this *"Agreement"*) by and between HPIP GONZALES HOLDINGS, LLC, a Delaware limited liability company (*"Gatherer"*) and FOREST OIL CORPORATION, a New York corporation (*"Producer"*), each of which may be referred to herein as a *"Party"* and together as *"Parties"*.

## R E C I T A L S

Producer and Gatherer entered into that certain Production Gathering, Treating and Processing Agreement, dated as of May 3, 2013 (the *"Gathering Agreement"*), pursuant to which Gatherer will construct, own, operate and maintain a combined flow Oil, Gas, NGL and Water gathering system, compression facilities, measurement and treating and processing facilities located in Gonzales County, Texas (the *"Gathering Facilities"*), to enable Gatherer to accept delivery of, gather, treat, process, compress, and redeliver or dispose of Producer's Production produced and saved from the oil and gas leases, wells and/or lands and formations described in the Gathering Agreement (the *"Leases"*); and

Gatherer will construct, own, operate and maintain the systems and infrastructure (*"Disposal Facilities"*, as further defined herein) located in Gonzales County, Texas, capable of receiving Water and Acid Gas (collectively, *"Fluids"*) at 50 psig from the outlet of the processing facility being constructed pursuant to the Gathering Agreement (the *"Central Facility"*) to enable Gatherer to filter, pump, and compress Fluids at a pressure necessary to deliver Fluids into SWDs (as defined in the Appendix) (the *"Services"*, as further described in Section 3.2) in connection with the exploration, development, and operation of Producer's Leases.

Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed in the Appendix; and the plural shall include the singular and the singular shall include the plural.

NOW THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, Producer agrees to deliver and Gatherer agrees to receive and dispose Producer's Fluids in accordance with the following terms and conditions:

## ARTICLE I
## REPRESENTATIONS, WARRANTIES AND COMMITMENT

1.1     Producer's Representations and Warranties.  Producer represents that it holds title to the Leases to the extent set forth in the Gathering Agreement, that it holds title to or that it currently controls all Production therefrom (subject to the rights of other holders of an interest in the Leases), and that it has the right to commit all Fluids produced actions and activities contemplated by the Gathering Agreement to this Agreement.  Producer represents and warrants that its interests in the Leases are not subject to any gathering or processing agreement that would limit the commitment described in Section 1.2. Producer represents and warrants that Producer has the right to deliver to Gatherer for the purposes of

this Agreement all the Fluids produced by the actions and activities contemplated by the Gathering Agreement.

1.2    Producer's Commitment of Production. Producer hereby dedicates and commits to the performance of this Agreement all the Fluids produced by the actions and activities contemplated by the Gathering Agreement, and to ensure the faithful performance of the provisions of this Agreement, Producer covenants to deliver the same to Gatherer at the Central Facility hereto without other disposition; provided however that, Fluids produced from wells that are not connected to the Disposal Facilities, whether because the Disposal Facilities are not capable of accepting the Fluids from such wells or because an uneconomic connection (as defined in the Gathering Agreement) would result, may be delivered to the Disposal Facilities at the option of Producer. Should Gatherer suspend or modify operation of the Central Facilities, Producer may, at its option, terminate the commitment provided for hereinabove. This shall be a covenant attaching to and running with the lands and leasehold interests covered hereby and shall be binding on the successors and assigns of Producer and any interest of Producer in the Leases and the Fluids from Wells of which Producer is the operator. Producer agrees to contemporaneously execute a Recording Memorandum to memorialize the terms of this Agreement in the form attached as Exhibit A.

## ARTICLE II
## GATHERING

2.1    Services. In accordance with the terms and subject to the requirements of this Agreement, Gatherer shall gather Producer's total Fluids and in that regard agrees to construct, own, operate and maintain the Disposal Facilities as described in Article III hereof as necessary to perform the Services identified pursuant to Section 3.2, for one hundred percent (100%) of Producer's Fluids   If for any reason other than Force Majeure, the reasons identified in Section 4.A. of the Appendix hereto or Producer's non-compliance with the terms of this Agreement, Gatherer is unable to perform Services identified pursuant to Section 3.2, for the entire quantity of Producer's Fluids, Gatherer shall identify the problem creating the occurrence and implement a commercially reasonable solution with due dispatch, such as via Future Capital Expenditures pursuant to Section 5.2.

## ARTICLE III
## DISPOSAL FACILITIES

3.1    The Disposal Facilities that the parties contemplate Gatherer shall construct, own, operate and maintain include the following, collectively referred to herein as the "*Disposal Facilities*":

3.1.1 Central Delivery Point, which will be located at Central Facility and capable of receiving Water at 50 psig, filtered to 200 microns, 100 ppm oil, and Acid Gas at 50 psig from the outlet of the Central Facility.

3.1.2    Fluid Delivery Pipelines. The Fluids attributable to Producer's Production shall be delivered to Gatherer's saltwater disposal well(s) (*"SWD(s)"*), some of which will have Acid Gas disposal capability, via pipelines constructed, owned, and operated by Gatherer. Prior to completion of the Disposal Facilities it may be necessary for Producer to truck Fluids to SWDs or other disposal wells.

2

3.1.3 <u>Additional Filtration</u>. The Fluids attributable to Producer's Production shall be filtered to 50-microns via filtration systems constructed, owned and operated by Gatherer. Entrained oil shall be reduced to 100 ppm prior to downhole injection.

3.1.4 <u>Injection Pumps and Wells</u>. The Fluids attributable to Producer's Production shall be injected into SWDs constructed in accordance with this Agreement and owned and operated by Gatherer.

3.2 <u>Design and Construction Responsibilities</u>.

3.2.1 <u>Joint Responsibilities</u>.

- Gatherer and Producer will work together to ensure completion of the Disposal Facilities within a timely manner. Both parties understand that there are factors and issues which have a direct effect on the timeline for construction and operations which are out of the control of the Gatherer. These factors include, but are not limited to, regulatory approvals and permit acquisitions, right of way and landowner consents, and the completion of the SWDs. Gatherer will work to complete construction and begin operations with due diligence while complying with all applicable laws, permit regulation and proper OSHA requirements. Upon execution of this Agreement by all Parties, Gatherer will begin parallel efforts to obtain permits, right of way, engineering services and equipment. Gatherer will make all commercially reasonable efforts to complete the Disposal Facilities as soon as commercially reasonable. Gatherer will commence Services as soon as the Disposal Facilities have been completed, unless, notwithstanding Gatherer's commercially reasonable efforts, weather, right-of-way acquisition and factors described in <u>Section 4.A.</u> of the Appendix hereof prevent such commencement, and provided that Gatherer's failure to commence Services by such date shall not constitute a default under this Agreement.

- Gatherer will determine specifications for necessary pumps and compressors for the provisions of the Services and will consult with Producer on such specification and on the determination whether to lease or purchase such pumps and compressors.

- Gatherer will develop a plan for redundancy and sparing of critical equipment, wells, power supply and water storage and will consult with Producer on such plan.

3.2.2 <u>Producer Responsibilities</u>.

- Producer shall be responsible for providing updates concerning drilling programs, production well performance and operating parameters so as to establish the scope and design basis for the Disposal Facilities.

- Producer shall be responsible for determining spacing requirements and number of SWDs and Acid Gas disposal wells required to meet the projected produced volumes of Water and Acid Gas; *provided, however*, that Gatherer shall have the right to consent to the

locations of such SWDs and Acid Gas disposal wells, such consent to not be unreasonably withheld or delayed.

- Producer shall be responsible for providing Gatherer with initial estimates of well pressure and operating conditions and updating such initial estimates as necessary to account for any changes.

- Producer shall be responsible for applying for and procuring (including the payment of all costs and fees) all permits necessary for the drilling and operation of all SWDs and Producer shall convey at cost all such permits to Gatherer prior to Gatherer beginning to operate the Disposal Facilities and performing the Services. Gatherer shall provide any commercially reasonable assistance requested by Producer. Initially, Producer shall procure all necessary permits for one (1) SWD for Water and one (1) SWD with Water and Acid Gas disposal capability after which Gatherer shall be responsible for such additional permits as are necessary for additional disposal wells. The costs for permitting shall be included in the Initial Capital Expenditures.

- Producer shall be responsible for drilling (including the payment of all costs and fees) all SWDs on lands owned by Gatherer in locations specified by Gatherer. Initially, Producer shall drill, or cause to be drilled, one (1) SWD and one (1) SWD with Water and Acid Gas disposal capability. Producer shall invoice in advance and Gatherer shall pay the estimated cash outlay for the succeeding month's SWD drilling costs within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. If an adjustment is due to the estimate in order to reflect actual costs it shall be added or credited in the next succeeding invoice from Gatherer to Producer. Producer shall convey, free and clear of all liens and encumbrances, such wells to Gatherer prior to Gatherer beginning to operate the Disposal Facilities and performing the Services. The costs for drilling shall be included in the Initial Capital Expenditures.

3.2.3 Gatherer Responsibilities.

- Gatherer shall be responsible for providing project management and engineering support to ensure the Disposal Facilities are designed and operated in a manner consistent with other operations within the Central Facility.

- Gatherer shall be responsible for procuring all equipment and materials, other than well permits, drilling equipment and other items provided pursuant to the provisions of Section 3.2.2.

- Gatherer shall be responsible for procuring the transformers from the local electricity provider necessary to meet power requirements for the Disposal Facilities.

- Gatherer shall be responsible for supervision of construction of all Disposal Facilities other than for the drilling of the SWDs.

4

* Gatherer shall be responsible for all liabilities in connection with owning, and operating the Disposal Facilities effective upon the commencement of the Services.

3.2.4  Disclaimer.  Producer hereby acknowledges and agrees that Gatherer shall not be responsible for the performance and operating capability of the SWDs.

3.2.5  Exclusive Use.  Gatherer hereby acknowledges and agrees that Producer shall have exclusive use of the Disposal Facilities.

3.3  Design Capacity.  Producer and Gatherer shall cooperate to design the Disposal Facilities, including the sizing of all necessary injection equipment, to provide sufficient capacity to receive Water and Acid Gas from the Central Facility at the Disposal Facilities at 50 psig, and to ensure, once completed and subject to Section 3.2.4, that the Disposal Facilities will have sufficient capacity to provide Services for all of Producers initial Water and Acid Gas. To the extent Producer's Water and Acid Gas exceeds the capacity of the SWDs at any point and Gatherer is not able to timely provide the Services on the basis set forth in this Agreement for such excess Water and Acid Gas, Gatherer shall nevertheless not be in breach of this Agreement nor subject to the remedies for failure to provide or maintain certain pressure levels, provided, however, that should Gatherer add Disposal Facilities as provided in Section 3.4 below, once such additional Disposal Facilities have been completed, Gatherer shall again be subject to all the standards of performance set forth in this Agreement.

3.4  Additional Disposal Facilities.  In the event it is necessary to add other facilities to handle the excess Water and Acid Gas, Producer and Gatherer shall cooperate to design such additional facilities. Such additional facilities will be developed as set forth in Section 5.2 and any resulting changes will be made in the fee structure set forth in Article V. Any such additional facilities shall become part of the Disposal Facilities upon completion and readiness for operation thereof.

## ARTICLE IV
## PRESSURE

Gatherer agrees to accept Water and Acid Gas at fifty (50) psig at the outlet of the Central Facility, based on the design standards set forth in Section 3.3.

## ARTICLE V
## CHARGES AND FEES

5.1  Initial Capital Expenditures.  Producer and Gatherer hereby acknowledge and agree that set forth on Exhibit C hereto are the incurred and proposed initial capital expenditures associated with the permitting, engineering and construction of the Disposal Facilities (the "*Initial Capital Expenditures*") and a capital budget scheduling the proposal Initial Capital Expenditures for the construction of the Disposal Facilities (the "*Capital Budget*"). The Capital Budget shall be updated with the Gatherer's actual costs once the construction is complete and the Disposal Facilities begin providing the Services.

5.2  Future Capital Expenditures.  Producer and Gatherer hereby acknowledge and agree that additional capital expenditures ("*Future Capital Expenditures*") may be required as Producer's disposal needs change. The amount of such Future Capital Expenditures shall be mutually agreed upon by Producer and Gatherer in good faith and shall include, but not be limited to, costs associated with

permitting and drilling additional SWDs (for additional capacity required in excess of the initial wells' capacity) and all associated improvements and/or additional Disposal Facilities required for such additional capacity.

5.3     Fees. Producer shall pay to Gatherer each Month the following fees for all Water received at the Disposal Facilities regardless of the method of delivery. There shall be no separate fee for the disposal of Acid Gas:

   5.3.1   Capital Fee:   A Capital Fee, comprised of two (2) tiers will be charged for each barrel of Water injected at the Disposal Facilities by Producer.

      Tier 1 Rate. The Tier 1 Rate shall apply to the Tier 1 Volume of Water received by Gatherer at the Disposal Facilities, regardless of the method of delivery. The *"Tier 1 Rate"* shall be calculated by dividing (i) the Initial Capital Expenditures by (ii) the Tier 1 Volume.

      Tier 1 Volume. The *"Tier 1 Volume"* shall be the smaller of the volume of water as reflected in the production profile in Exhibit B to be disposed of during the first four and one-half (4½) years of Services, or the tested capacities of the initial two SWDs.

      The Tier 1 Volume shall be increased in the event Future Capital Expenditures are incurred. The amount of the increase shall be calculated by dividing (i) the dollar value of any Future Capital Expenditures by (ii) the Tier 1 Rate.

      Tier 2 Rate. The Tier 2 Rate shall apply to all volumes of Water received by Gatherer at the Disposal Facilities, regardless of the method of delivery, in excess of the Tier 1 Volume. The *"Tier 2 Rate"* shall be seventy percent (70%) of the Tier 1 Rate.

      The following examples are for illustrative purposes:

   Assumptions:

      [A]Initial Capital Expenditures = $14 MM

      [B]Production Profile = 61 MM cumulative barrels of water for years 0-4.5, for two 20,000 bpd disposal wells

      [C]Future Capital Expenditures = $2.5 MM

   Capital Fee Calculation:

      [D]Tier 1 Fee (A/B) = $0.229/barrel

      [E]Tier 2 Fee (Dx0.70) = $0.161/barrel - applied for any incremental barrels

   Future Fee Calculation:

6

If Future Capital Expenditures are made, the Tier 1 Volumes will increase by 11 MM barrels (C/D)

5.3.2   Operating Fee:   A monthly fee, based on operating expenses of Gatherer incurred in operating the Disposal Facilities (the *"Operating Fee"*), shall be charged for each barrel of Water injected by Gatherer into an SWD. The Operating Fee shall be calculated by dividing the current Operating Budget by a projection of Water disposal for the coming year to calculate a per barrel Operating Fee. Operating expenses shall include, but not be limited to, labor for employees directly employed at the Disposal Facilities in the conduct of Disposal Facilities operations (fully burdened by insurance, payroll, tax withholdings and other typical benefits), third-party direct expenses, chemicals, maintenance, allocation of insurance costs, real or personal property ad valorem taxes imposed on the Disposal Facilities, all based on industry standards and prudent operating practice (*"Operating Expenses"*); provided, however, that Operating Expenses shall not include the costs of purchased electricity used by the Disposal Facilities or the actual fuel consumed at the Disposal Facilities.

Gatherer has established an initial annual operating budget, attached here to as Exhibit D, for anticipated Operating Expenses (the *"Initial Operating Budget"*). ]

Within thirty (30) days after the completion of a calendar quarter, the first such calendar quarter ending on the last day of the third (3rd) full month in which Gatherer has engaged in Services, Gatherer shall prepare a reconciliation of actual Operating Expenses for such quarter to the total Operating Fees invoiced to Producer for such quarter. If the actual Operating Expenses for such quarter exceeded the total Operating Fees invoiced to Producer for such quarter, Gatherer shall, include the excess amount as a charge on the next succeeding invoice to Producer. If the total Operating Fees invoiced to Producer for such quarter exceeded the actual Operating Expenses for such quarter, Gatherer shall credit Producer the amount by which total Operating Fees invoiced to Producer exceeded the actual Operating Expenses for such quarter on the next succeeding invoice to Producer.

The annual operating budget for each subsequent fiscal year (the "*Operating Budget*") shall be established by mutual agreement, with neither Party unreasonably withholding or delaying approval of the Operating Budget; provided, that if at the end of a calendar year the succeeding year's Operating Budget has not been approved by both parties, the actual costs experienced in the prior year budget shall be increased by 3% shall become the Operating Budget and shall remain in effect until (i) otherwise agreed to by the Parties or (ii) the succeeding annual Operating Budget is agreed to.

5.3.3   Pass Through Expenditures: In addition to the Capital Fees and Operating Fees set forth herein, additional unbudgeted or unforeseen expenses incurred by Gatherer, including but not limited to, repairs and unbudgeted well workovers, shall be invoiced to Producer and shall be paid by Producer within thirty (30) days of the invoice date. Gatherer shall submit to Producer work orders (*"Work Orders"*) detailing any such additional unbudgeted or unforeseen expenses and shall not proceed to incur any such additional unbudgeted or unforeseen expenses without Producers' approval; provided, however, that Producer's approval shall be conclusively deemed

given if Producer fails to object in writing to a given Work Order within ten (10) business days of such Work Order being submitted to Producer.

5.3.4   Other Charges and Reimbursements.

a)      Producer shall reimburse Gatherer for the cost of purchased electricity used by the Disposal Facilities for the services of this Agreement including electric compression. b)
        Producer shall provide, without charge to Gatherer, one hundred percent (100%) of the actual fuel consumed at the Disposal Facilities. Gatherer shall operate the Disposal Facilities in a prudent manner in accordance with industry standards in order to avoid excessive fuel consumption.

5.3.5   Adjustment to Capital Fees. Beginning on the second (2nd) anniversary date of this Agreement and on each subsequent anniversary, the Capital Fees provided in this Section 5.3 shall increase or decrease by the change in the CPI-U during the previous year but shall never decrease below the original fees set out in Section 5.3. CPI-U means the "Consumers Price Index for all Urban Consumers" as determined and published by the Bureau of Labor Statistics of the United States Department of Labor at http://www.bls.gov/cpi or its successor index. For purposes of this Section 5.3, the fees for each year shall be determined by multiplying the fees for the prior year by a fraction, the numerator of which is the CPI-U for the latest available month in the current year, and the denominator of which is the CPI-U for the corresponding month in the previous year. Gatherer shall provide annual notice 90 days prior increase to Producer with the new fee plus the applicable calculation.

5.4     Annual Review. On or near each anniversary date of this Agreement, Producer and Gatherer will review actual Production volumes and revised Production forecast provided by the Producer to determine by mutual agreement (i) whether the fee structure provided in this Article V should be modified and (ii) if the addition of capacity in the Disposal Facilities should be expedited to perform Services in connection with the revised Production forecast. Absent agreement to the contrary pursuant to this Section 5.4, or as otherwise set forth herein, the fee structure and Disposal Facilities shall remain as otherwise provided in this Agreement.

5.5     Audit. Upon written notice to the Gatherer, Producer shall have the right to audit the Gatherer's accounts and records relating to the Disposal Facilities within the twenty-four (24) month period following the end of such calendar year in which such expenses were incurred.

## ARTICLE VI
## NOTICES

6.1     All notices and communications required or permitted under this Agreement shall be in writing and any communication or delivery hereunder shall be deemed to have been duly made when delivered personally or five (5) business days following deposit in the United States mail, certified mail, return receipt requested, or upon receipt as confirmed by a recognized overnight courier service, or upon transmittal by facsimile transmission or other electronic means, provided that receipt by facsimile transmission or other electronic means was delivered during the normal business hours of the receiving Party and delivery thereof is confirmed, in each such case postage or charges prepaid and addressed as follows:

8

**TO GATHERER:**

**TO PRODUCER:**

**Notices:**
HPIP Gonzales Holdings, LLC
**Attn: President**
1400 16th St, Suite 310
Denver, CO 80202
Phone: 720-457-6067
Fax: 720-457-6040
Email:

**Notices:**
Forest Oil Corporation
**Attn: Britt Dearman**
500 Dallas Street #2700
Houston TX 77002
Phone: 713-830-6800
Fax:
Email:

With copy to:
William Mathews, General Counsel
Email: Bmathews@AmericanMidstream.com

**Monthly Production Estimates:**
Same as above (no copy needed)

**Monthly Production Estimates:**
Same as above

**Invoices:**
Same as above (no copy needed)

**Invoices:**
Same as above

**Payments:**
by wire transfer
American Midstream, LLC
Comerica Bank
910 Louisiana, Suite 410, Houston, TX  77210
Beneficiary account – American Midstream, LLC

ABA Route #: 111000753
Acct #: 1881319493

6.2  Notices and correspondence sent by electronic transmission, including the signature of a Party delivered by facsimile or by a pdf.format document sent electronically will constitute original copies thereof and will be binding on the Parties. Upon request, the receiving Party may request an original of any document sent by electronic transmission.

6.3  Either Party may change any of its notice information from time to time which shall be effective as to the other Party within fifteen (15) Days of the notice to the other Party.

ARTICLE VII
TERM AND TERMINATION

7.1    Term. Except as otherwise provided in this Agreement, this Agreement shall be in full force and effect as of the Effective Date and shall remain in full force and effect for the life of the Leases.

7.2   Rights upon Termination. Termination of this Agreement shall not relieve either Party from any of its obligations accruing or accrued as of the time of termination (including indemnity obligations) nor deprive a Party not in Default of any remedy otherwise available to it.

## ARTICLE VII
## MISCELLANEOUS

8.1   The Appendix hereto containing the General Terms and Conditions, together with Exhibits A, B, C and D, all attached to this Agreement, are incorporated into and made a part of this Agreement for all purposes. In event of conflict, Articles I through VIII of this Agreement shall govern.

8.2   Respecting certain rights of the Parties hereto:

8.2.1   This Agreement shall be binding upon and inure to the benefit of the Parties hereto, their successors, assigns, heirs, administrators and/or executors and shall constitute a real right and covenant running with the lands and leasehold interests covered hereby. Either Party may assign his or its right, title, and interest in, to and under this Agreement, including any and all renewals, extensions, amendments, and/or supplements hereto; provided, however, that no such assignment shall in any way operate to enlarge, alter, or change any right or obligation of the other Party hereto. No assignment shall be effective or binding until a copy of same has been furnished to the other Party.

8.2.2   Further, this Agreement, including any and all renewals, extensions, amendments and/or supplements hereto shall be binding upon any purchaser of Gatherer's Disposal Facilities and upon any purchaser of Producer's Leases, or any part thereof or interest therein which are subject to this Agreement. It is agreed that no sale of Producer's Leases, or any part thereof or interest therein, or of all or substantially all of Gatherer's Disposal Facilities, shall be made unless the purchaser thereof shall assume and agree to be bound by this Agreement insofar as the same shall affect and relate to the Leases, Disposal Facilities or interests so sold or conveyed. It is further agreed, however, that nothing herein contained shall in any way prevent either Party hereto from pledging or mortgaging all or any part of such Party's Leases or Disposal Facilities as security under any mortgage, deed of trust, or other similar lien, or from pledging this Agreement or any benefits accruing hereunder to the Party making the pledge, without the assumption of obligations hereunder by the mortgagee, pledgee or other grantee under such an instrument.

8.2.3   Nothing in this Agreement, expressed or implied, confers any rights or remedies on any person or entity not a party hereto other than a Party's Affiliates, and the Parties' successors and assigns, heirs, administrators and executors.

8.3   Producer expressly does not, by the terms of this Agreement, sell, transfer or assign unto Gatherer any title or interest whatsoever in the Leases or any pipe, meters, lines or other equipment of any nature owned or used by Producer in the operation of Producer's wells and the Leases.

8.4   This Agreement constitutes the entire agreement and understanding between the Parties hereto and supersedes and renders null and void and of no further force and effect any prior understandings, negotiations or agreements between the Parties relating to the subject matter hereof, and all amendments and letter agreements in any way relating thereto including, but not limited to, that certain Letter

Agreement, dated as of November 1, 2013, by and between Gatherer and Producer. No provision of this Agreement may be changed, modified, waived or discharged orally, and no change, modification, waiver or amendment of any provision will be effective except by written instrument to be executed and approved by the Parties hereto.

8.5    THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. SHOULD EITHER PARTY INSTITUTE LITIGATION REGARDING ANY ASPECT OF THIS AGREEMENT, EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ALL RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION OR OTHER PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, EACH PARTY ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH PARTY IN ENTERING INTO THIS AGREEMENT.

8.6 Good Faith and Fair Dealing. Both Parties shall have a duty of good faith and fair dealing with regard to this Agreement. Such duty does not confer on either Party the right to bring an action for breach of this duty if such cause of action does not arise in connection with or in the course of the breach of another duty created or conferred by this Agreement.

*[Remainder left intentionally blank; Signature Page follows]*

In witness whereof, the Parties have executed this WATER AND ACID GAS PROCESSING AGREEMENT as of the day and year first above written.

**GATHERER:**

HPIP GONZALES HOLDINGS, LLC

By: _____

Name: Stephen W. Bergstom
Title:   Executive Chairman

**PRODUCER:**

FOREST OIL CORPORATION

By: _____

Name: Britt Dearman
Title:   Senior Vice President

## EXHIBIT A

## RECORDING MEMORANDUM

### Memorandum of Agreement

The undersigned parties have entered into that certain Water and Acid Gas Processing Agreement ("**Agreement**") dated May __, 2014. The Agreement dedicates and commits the leases, wells and gas production therefrom owned or controlled by Forest Oil Corporation for the life of said leases and wells. The names and addresses of the parties are set forth below at the signature line of each. The parties are filing this Memorandum of Agreement as record of the referenced Agreement for all purposes at law and in equity.

Additionally, Forest Oil Corporation has granted licenses, rights-of-way and rights-of-access to HPIP Gonzales Holdings, LLC to own and operate service lines and other equipment on or under the interests set forth on Attachment A, to the extent of Forest Oil Corporation's rights to do so for the term of the Agreement. Said lines and equipment remain the property of HPIP Gonzales Holdings, LLC during and after termination of the Agreement.

RETURN THIS DOCUMENT TO:

Mary Janiszewski
HPIP Gonzales Holdings, LLC
1400 16th Street, Suite 310
Denver, Colorado 80202

HPIP GONZALES HOLDINGS, LLC

FOREST OIL CORPORATION

By:_____

Stephen Bergstrom
Executive Chairman
Address:1400 16th Street, Suite 310
Denver, CO 80202

By:_____

Britt Dearman
Senior Vice President
Address: 500 Dallas Street #2700
Houston TX 77002

STATE OF COLORADO                )
                                 )ss
CITY AND COUNTY OF DENVER        )

The foregoing instrument was acknowledged before me on January ___, 2014, by Stephen Bergstrom, Executive Chairman of HPIP Gonzales Holdings, LLC, a Delaware limited liability company.

Witness my hand and official seal.

My commission expires:          _____
                                Notary Public

STATE OF _____            )
                                )ss
COUNTY OF _____           )

The foregoing instrument was acknowledged before me on January ___, 2014, by Britt Dearman, Senior Vice President of Forest Oil Corporation, a New York corporation.

Witness my hand and official seal.

My commission expires:          _____
                                Notary Public

## EXHIBIT B

## PRODUCER'S PROFILE OF PRODUCTION

[Attached]

**Estimated Water Production Forecast**
**Assuming 4 Rig Program**

| Tier 1 Assumptions | |
|---|---|
| Starting Month | 9/30/14 |
| Ending Month | 3/31/19 |
| Well Capacity | 20,000 |
| # Wells | 2 |
| Total Well Capacity | 40,000 |
| | |
| Tier 1 Volume | 64,131,998 |

| Date | Gross WTR (Bbls/D) | Cumulative Gross Water (Bbls) | Days | Tier 1 | Tier 1 Water (Bbls) |
|---|---|---|---|---|---|
| 1/31/14 | 25,404 | 787,524 | 31 | 0 | - |
| 2/28/14 | 26,380 | 1,526,156 | 28 | 0 | - |
| 3/31/14 | 27,296 | 2,372,324 | 31 | 0 | - |
| 4/30/14 | 28,161 | 3,217,146 | 30 | 0 | |
| 5/31/14 | 28,981 | 4,115,566 | 31 | 0 | - |
| 6/30/14 | 29,763 | 5,008,451 | 30 | 0 | - |
| 7/31/14 | 30,510 | 5,954,252 | 31 | 0 | - |
| 8/31/14 | 31,226 | 6,922,242 | 31 | 0 | - |
| 9/30/14 | 31,913 | 7,879,641 | 30 | 0 | - |
| 10/31/14 | 32,576 | 8,889,485 | 31 | 1 | 1,009,844 |
| 11/30/14 | 33,215 | 9,885,927 | 30 | 1 | 996,442 |
| 12/31/14 | 33,832 | 10,934,734 | 31 | 1 | 1,048,807 |
| 1/31/15 | 34,431 | 12,002,083 | 31 | 1 | 1,067,349 |
| 2/28/15 | 35,011 | 12,982,377 | 28 | 1 | 980,295 |
| 3/31/15 | 35,574 | 14,085,158 | 31 | 1 | 1,102,780 |
| 4/30/15 | 36,121 | 15,168,783 | 30 | 1 | 1,083,626 |
| 5/31/15 | 36,653 | 16,305,040 | 31 | 1 | 1,136,257 |
| 6/30/15 | 37,172 | 17,420,207 | 30 | 1 | 1,115,167 |
| 7/31/15 | 37,678 | 18,588,229 | 31 | 1 | 1,168,021 |
| 8/31/15 | 38,172 | 19,771,554 | 31 | 1 | 1,183,325 |
| 9/30/15 | 38,654 | 20,931,172 | 30 | 1 | 1,159,618 |
| 10/31/15 | 39,125 | 22,144,053 | 31 | 1 | 1,212,882 |
| 11/30/15 | 39,586 | 23,331,639 | 30 | 1 | 1,187,586 |
| 12/31/15 | 40,037 | 24,572,799 | 31 | 1 | 1,240,000 |
| 1/31/16 | 40,479 | 25,827,657 | 31 | 1 | 1,240,000 |
| 2/29/16 | 40,912 | 26,973,204 | 29 | 1 | 1,160,000 |
| 3/31/16 | 41,337 | 28,254,651 | 31 | 1 | 1,240,000 |
| 4/30/16 | 41,754 | 29,507,258 | 30 | 1 | 1,200,000 |
| 5/31/16 | 42,162 | 30,814,295 | 31 | 1 | 1,240,000 |
| 6/30/16 | 42,564 | 32,091,214 | 30 | 1 | 1,200,000 |
| 7/31/16 | 42,958 | 33,422,927 | 31 | 1 | 1,240,000 |
| 8/31/16 | 43,346 | 34,766,657 | 31 | 1 | 1,240,000 |
| 9/30/16 | 43,727 | 36,078,478 | 30 | 1 | 1,200,000 |
| 10/31/16 | 44,102 | 37,445,650 | 31 | 1 | 1,240,000 |
| 11/30/16 | 44,445 | 38,779,004 | 30 | 1 | 1,200,000 |
| 12/31/16 | 44,809 | 40,168,072 | 31 | 1 | 1,240,000 |
| 1/31/17 | 45,167 | 41,568,236 | 31 | 1 | 1,240,000 |
| 2/28/17 | 45,519 | 42,888,292 | 28 | 1 | 1,120,000 |
| 3/31/17 | 45,867 | 44,310,153 | 31 | 1 | 1,240,000 |
| 4/30/17 | 46,209 | 45,696,419 | 30 | 1 | 1,200,000 |
| 5/31/17 | 46,546 | 47,139,356 | 31 | 1 | 1,240,000 |
| 6/30/17 | 46,879 | 48,545,731 | 30 | 1 | 1,200,000 |
| 7/31/17 | 47,207 | 50,009,161 | 31 | 1 | 1,240,000 |
| 8/31/17 | 47,531 | 51,482,631 | 31 | 1 | 1,240,000 |
| 9/30/17 | 47,851 | 52,918,159 | 30 | 1 | 1,200,000 |
| 10/31/17 | 48,166 | 54,411,318 | 31 | 1 | 1,240,000 |
| 11/30/17 | 48,478 | 55,865,655 | 30 | 1 | 1,200,000 |
| 12/31/17 | 48,785 | 57,378,005 | 31 | 1 | 1,240,000 |

**Estimated Water Production Forecast**
**Assuming 4 Rig Program**

| Date | Gross WTR | Cumulative Gross Water | Days | Tier 1 | Tier 1 Water |
|---|---|---|---|---|---|
| 1/31/18 | 49,089 | 58,899,773 | 31 | 1 | 1,240,000 |
| 2/28/18 | 49,389 | 60,282,678 | 28 | 1 | 1,120,000 |
| 3/31/18 | 49,686 | 61,822,946 | 31 | 1 | 1,240,000 |
| 4/30/18 | 49,948 | 63,321,391 | 30 | 1 | 1,200,000 |
| 5/31/18 | 50,238 | 64,878,772 | 31 | 1 | 1,240,000 |
| 6/30/18 | 50,525 | 66,394,515 | 30 | 1 | 1,200,000 |
| 7/31/18 | 50,808 | 67,969,570 | 31 | 1 | 1,240,000 |
| 8/31/18 | 51,089 | 69,553,315 | 31 | 1 | 1,240,000 |
| 9/30/18 | 51,366 | 71,094,291 | 30 | 1 | 1,200,000 |
| 10/31/18 | 51,640 | 72,695,137 | 31 | 1 | 1,240,000 |
| 11/30/18 | 51,912 | 74,252,486 | 30 | 1 | 1,200,000 |
| 12/31/18 | 52,180 | 75,870,074 | 31 | 1 | 1,240,000 |
| 1/31/19 | 52,446 | 77,495,904 | 31 | 1 | 1,240,000 |
| 2/28/19 | 52,709 | 78,971,765 | 28 | 1 | 1,120,000 |
| 3/31/19 | 52,970 | 80,613,831 | 31 | 1 | 1,240,000 |
| 4/30/19 | 53,228 | 82,210,668 | 30 | 0 | - |
| 5/31/19 | 53,483 | 83,868,652 | 31 | 0 | . |
| 6/30/19 | 53,736 | 85,480,744 | 30 | 0 | - |
| 7/31/19 | 53,987 | 87,154,342 | 31 | 0 | |
| 8/31/19 | 54,235 | 88,835,638 | 31 | 0 | |
| 9/30/19 | 54,481 | 90,470,079 | 30 | 0 | - |
| 10/31/19 | 54,725 | 92,166,558 | 31 | 0 | |
| 11/30/19 | 54,967 | 93,815,559 | 30 | 0 | |
| 12/31/19 | 55,206 | 95,526,949 | 31 | 0 | |
| 1/31/20 | 55,443 | 97,245,695 | 31 | 0 | |
| 2/29/20 | 55,679 | 98,804,698 | 29 | 0 | - |
| 3/31/20 | 55,912 | 100,537,966 | 31 | 0 | . |
| 4/30/20 | 56,143 | 102,222,261 | 30 | 0 | |
| 5/31/20 | 56,372 | 103,969,806 | 31 | 0 | - |
| 6/30/20 | 56,600 | 105,657,801 | 30 | 0 | |
| 7/31/20 | 56,825 | 107,429,387 | 31 | 0 | |
| 8/31/20 | 57,049 | 109,197,907 | 31 | 0 | - |
| 9/30/20 | 57,271 | 110,916,085 | 30 | 0 | - |
| 10/31/20 | 57,491 | 112,698,258 | 31 | 0 | |
| 11/30/20 | 57,709 | 114,429,541 | 30 | 0 | |
| 12/31/20 | 57,926 | 116,225,251 | 31 | 0 | |
| 1/31/21 | 58,141 | 118,027,626 | 31 | 0 | - |
| 2/28/21 | 58,351 | 119,719,791 | 28 | 0 | - |
| 3/31/21 | 58,562 | 121,535,222 | 31 | 0 | |
| 4/30/21 | 58,773 | 123,298,398 | 30 | 0 | |
| 5/31/21 | 58,981 | 125,126,815 | 31 | 0 | - |
| 6/30/21 | 59,188 | 126,902,465 | 30 | 0 | - |
| 7/31/21 | 59,394 | 128,743,677 | 31 | 0 | - |
| 8/31/21 | 59,598 | 130,591,218 | 31 | 0 | |
| 9/30/21 | 59,801 | 132,385,241 | 30 | 0 | - |
| 10/31/21 | 60,002 | 134,245,303 | 31 | 0 | - |
| 11/30/21 | 60,202 | 136,051,359 | 30 | 0 | - |
| 12/31/21 | 60,400 | 137,923,769 | 31 | 0 | - |

**Estimated Water Production Forecast**
**Assuming 4 Rig Program**

| Date | Gross WTR | Cumulative Gross Water | Days | Tier 1 | Tier 1 Water |
|------|-----------|------------------------|------|--------|--------------|
| 1/31/22 | 60,597 | 139,802,289 | 31 | 0 | . |
| 2/28/22 | 60,793 | 141,504,497 | 28 | 0 | |
| 3/31/22 | 60,988 | 143,395,112 | 31 | 0 | - |
| 4/30/22 | 61,181 | 145,230,532 | 30 | 0 | - |
| 5/31/22 | 61,373 | 147,133,080 | 31 | 0 | - |
| 6/30/22 | 61,563 | 148,979,972 | 30 | 0 | - |
| 7/31/22 | 61,752 | 150,894,296 | 31 | 0 | - |
| 8/31/22 | 61,940 | 152,814,451 | 31 | 0 | |
| 9/30/22 | 62,127 | 154,678,272 | 30 | 0 | - |
| 10/31/22 | 62,313 | 156,609,977 | 31 | 0 | - |
| 11/30/22 | 62,498 | 158,484,904 | 30 | 0 | |
| 12/31/22 | 62,681 | 160,428,013 | 31 | 0 | - |
| 1/31/23 | 62,863 | 162,376,772 | 31 | 0 | |
| 2/28/23 | 63,044 | 164,142,012 | 28 | 0 | |
| 3/31/23 | 61,034 | 166,034,057 | 31 | 0 | - |
| 4/30/23 | 57,568 | 167,761,095 | 30 | 0 | - |
| 5/31/23 | 54,934 | 169,464,089 | 31 | 0 | |
| 6/30/23 | 52,790 | 171,047,728 | 30 | 0 | - |
| 7/31/23 | 50,974 | 172,627,912 | 31 | 0 | |
| 8/31/23 | 49,395 | 174,159,146 | 31 | 0 | - |
| 9/30/23 | 47,996 | 175,599,017 | 30 | 0 | - |
| 10/31/23 | 46,739 | 177,047,919 | 31 | 0 | - |
| 11/30/23 | 45,597 | 178,415,832 | 30 | 0 | - |
| 12/31/23 | 44,551 | 179,796,911 | 31 | 0 | - |
| 1/31/24 | 62,863 | 181,745,670 | 31 | 0 | |
| 2/29/24 | 63,044 | 183,510,910 | 29 | 0 | |
| 3/31/24 | 61,034 | 185,402,955 | 31 | 0 | |
| 4/30/24 | 57,568 | 187,129,993 | 30 | 0 | |
| 5/31/24 | 54,934 | 188,832,937 | 31 | 0 | |
| 6/30/24 | 52,790 | 190,416,626 | 30 | 0 | - |
| 7/31/24 | 50,974 | 191,996,810 | 31 | 0 | - |
| 8/31/24 | 49,395 | 193,528,044 | 31 | 0 | - |
| 9/30/24 | 47,996 | 194,967,914 | 30 | 0 | - |
| 10/31/24 | 46,739 | 196,416,817 | 31 | 0 | |
| 11/30/24 | 45,597 | 197,784,790 | 30 | 0 | - |
| 12/31/24 | 44,551 | 199,165,809 | 31 | 0 | |

## EXHIBIT C

## CAPITAL BUDGET

[Attached]

apital Cost Estimate

ction Costs

| Well Permitting and Drilling | 4,200,000 |
|---|---|
| Project Management, Engineering, Design, Procurement | 557,176 |
| Equipment Cost | 3,630,515 |
| Construction Cost | 8,353,217 |
| Owner's Engineer | 160,000 |
| Real Estate / Surveys / Geotechnical Study | 90,173 |
| Electric Interconnection | 553,037 |
| Spare Parts | 181,526 |
| onstruction Costs | 17,725,644 |

Development Costs:

| Property Tax During Construction | 1,500 |
|---|---|
| Insurance During Construction | 30,000 |
| Owner's Reimbursements / SG&A | 70,000 |
| Legal (Real Estate, EPC Contract, etc.) | 15,000 |
| Title Insurance | 2,000 |
| Audits | 40,000 |
| wners Costs | 158,500 |

Costs:

| Consumables and Other Utilities | 28,991 |
|---|---|
| O&M Mobilization and Costs | 109,434 |
| tart-Up Costs | 138,425 |

| gency - 10% | 1,802,257 |
|---|---|

| roject Cost | 19,824,826 |
|---|---|

# EXHIBIT D

## INITIAL OPERATING BUDGET

[Attached]

**HPIP Gonzales**
2014 Operating Budget

| | Category | Annual Cost |
|---|---|---|
| 1 | Personnel Costs | $ 656,600 |
| 2 | Safety/Office Supplies | 36,000 |
| 3 | Chemicals | 1,095,600 |
| 4 | Property Taxes | 179,700 . |
| 5 | Insurance | 29,200 |
| 6 | Contract Services | 152,000 |
| 7 | Parts and Equipment | 375,800 |
| 8 | Disposal Costs | 148,800 |
| | Total | $ 2,673,700 |

**APPENDIX**
**TO**
**WATER AND ACID GAS DISPOSAL AGREEMENT**

**GENERAL TERMS AND CONDITIONS**

1.    DEFINITIONS

A.    For the purposes of the Water and Acid Gas Processing Agreement (the *"Agreement"*) to which this Appendix is attached, unless the context of the Agreement requires otherwise, the following terms and expressions used therein and in this Appendix shall be defined as follows:

1)    *"Accounting Period"*, except the initial *"Accounting Period"*, shall mean a period of one calendar month, commencing at 9:00 a.m. Central Clock Time on the first day of each month, and ending at 9:00 a.m. Central Clock Time on the first day of the succeeding calendar month. The initial *"Accounting Period"* shall commence at 9:00 a.m. Central Clock Time on the date of initial deliveries of Production hereunder, continuing for a period of consecutive calendar days until 9:00 a.m. Central Clock Time on the first day of the succeeding calendar month.

2)    *"Acid Gas"* shall mean the Hydrogen Sulfide (H2S) and Carbon Dioxide (CO2)-rich rejection gas stream generated at the Hydrogen Sulfide treating system.

3)    *"Affiliate"* means, with respect to any Person, a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person. *"Person"* means any individual or any corporation, company, partnership, limited partnership, limited liability company, trust, estate, governmental authority or other entity. *"Control"* and its derivatives with respect to any Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

4)    *"Appendix"* shall mean these General Terms and Conditions applicable to this Water and Acid Gas Processing Agreement.

5)    *"Barrel"* or *"Bbl"* shall mean one barrel of liquid, being the equivalent of forty two (42) U. S. gallons.

6)    *"Claims"* means all claims, demands, penalties, suits or actions (including of governmental authorities or agencies), threatened or filed and whether groundless, false or fraudulent, that directly or indirectly relate to the subject matter of the indemnity, and the resulting losses, damages, cost, expenses, attorneys' fees and expert and court costs, including those relating to injury, death and damage to real and personal property and the environment, whether or not suit is brought, whether or not threatened or filed prior to or after the termination hereof, and whether or not incurred by settlement or otherwise.

7)      *"Cubic Foot of Gas"* shall mean the amount of Gas required to fill a cubic foot of space when the Gas is at a base pressure of 14.65 Psia and at a base temperature of sixty degrees (60°) Fahrenheit.

8)      *"Day"* shall mean the 24-hour period beginning and ending at 9:00 a.m. Central Clock Time, and *"Central Clock Time"* shall be the current central time of the United States, as may be adjusted for daylight savings time.

9)      *"Gas"* shall mean the untreated effluent vapor stream including all of the constituents thereof, entrained liquids as produced from a well, whether a gas well or an oil well, and delivered into the Disposal Facilities by Producer at the CDPs.

10)     *"including"* shall mean "including without limitation"

11)     *"MMBtu"* shall mean one million (1,000,000) Btu's.

12)     *"Month"* shall mean the period beginning at 9:00 a.m. Central Clock Time on the first day of a calendar month and ending at 9:00 a.m. Central Clock Time on the first day of the next succeeding calendar month.

13)     *"Oil"* shall mean the crude oil produced and saved from the Leases.

14)     *"Production"* shall mean the full well stream production from a well(s), characterized as Oil, Gas, and Water.

15)     *"Psia"* shall mean pounds per square inch absolute.

16)     *"psig"* shall mean pounds per square inch gauge.

17)     *"SWD(s)"* shall mean a disposal well drilled pursuant to the provisions of this Agreement for the disposal of Water or Water and Acid Gas, as applicable.

18)     *"Water"* shall mean produced water with all dissolved and entrained impurities from a well that is part of the Production filtered by the Central Processing Facility to 200 microns. If, in the reasonable opinion of the Producer, produced water is of such poor quality such that it is reasonably likely to cause damage to the SWDs or associated facilities, such poor quality produced water, and only such poor quality produced water, may be excluded and disposed of elsewhere.

19)     *"Wells"* shall mean the wells located on the Leases for oil and gas production.

## 3.    CONTROL

A.      Producer shall indemnify and hold Gatherer harmless against all Claims. If any claim is made challenging Producer's right to deliver Fluids to Gatherer, Gatherer has the right to suspend receipt or deliveries of such Fluids hereunder until such issue is finally resolved to the reasonable satisfaction of Gatherer or security acceptable to Gatherer is provided by Producer.

2

B.     For avoidance of doubt, Gatherer shall be entitled to provide part or all of the Services pursuant to a business arrangement it deems appropriate in its reasonable discretion and in that regard may contract with others to provide equipment, Disposal Facilities or services in order to provide the Services for Producer as provided in this Agreement; provided however, that regardless of such other business arrangements and contracts with others, Gatherer shall nevertheless remain liable to Producer for the obligations of Gatherer under this Agreement.

4.     RESTRICTIONS

A.     Gatherer's obligation to receive and dispose of the Fluids under the Agreement is subject to interruption or curtailment from time to time for the reasons, and subject to the limitations and conditions, set forth below:

   1) Safe operation of the Disposal Facilities.

   2) Ability of the SWDs to receive additional volumes.

   3) Required maintenance or repairs to the Disposal Facilities, provided Gatherer agrees to provide reasonable notice of the scheduling thereof to the extent practicable.

   4) Events of Force Majeure.

   5) Legal or regulatory requirement.

Notwithstanding anything to the contrary in this Agreement, if receipts of Fluids are curtailed or interrupted for reasons other than those set forth above, those curtailed or interrupted Fluids quantities shall be released from dedication to this Agreement for the time period of such curtailment or interruption.

5.     MEASUREMENT

A.     Measurement. Gatherer shall furnish, install, operate and maintain suitable meters at the Disposal Facilities to measure Producer's Fluids, as a Capital Expenditure. Each meter installed by Gatherer shall be a meter acceptable in the industry.

B.     Check Meters. Producer may, at its option and sole expense, install, maintain and operate check meters and other equipment to check Gatherer's meters; provided, however, that such check meters and other equipment shall be installed by Producer so as not to interfere with the operation of any of the Disposal Facilities. Gatherer and Producer shall have access to each other's measuring equipment at all times during business hours, but the reading, calibrating and adjustment thereof and the changing of charts shall be done only by the employees or agents of Gatherer and Producer, respectively, as to meters or check meters so installed hereunder.

C.     Calibration. At least monthly, Gatherer shall verify the calibration of all meters installed hereunder and make adjustments as necessary. Gatherer shall give notice to Producer of the time of such calibrations sufficiently in advance of conducting same in order that Producer may have its

3

representative present. With respect to any test made hereunder, a registration within two percent (2%) of correct shall be considered correct. However, the meter or meters, when found to be incorrect, shall be adjusted to one hundred percent (100%) accuracy as soon as possible. Settlement for any period during which the meter registration deviates by more than two percent (2%) of correct shall be corrected at the rate of inaccuracy for any period of inaccuracy which is definitely known or agreed upon; but in case the period is not definitely known or agreed upon, then either for a period of fifteen (15) days prior to the date of said test, or for a period calculated from the beginning of the Accounting Period in which the test was conducted, whichever is longer. The rate of the inaccuracy shall be estimated and agreed upon by the Parties hereto on the basis of the best available data, using the first of the following methods which is feasible:

1) By using the registration of any check meter or meters if installed and accurately registering; or, in the absence thereof,

2) By calibration, test, or mathematical calculation; or

3) By estimation based on comparison of the quantity of deliveries with deliveries during preceding periods under similar conditions when the meter was registering accurately.

D.  Gas Procedures.  All fundamental constants, observations, records and procedures involved in the determination and/or verification of the quantity and other characteristics of Gas measured hereunder, unless otherwise specified herein, shall be in accordance with the applicable provisions in ANSI/API 2530, *"Orifice Metering of Natural Gas"* (American Gas Association Gas Measurement Committee Report No. 3) of the Natural Gas Department of the American Gas Association, as amended from time to time, or by any other method commonly used in the industry and mutually acceptable to the Parties. The average local atmospheric pressure shall be assumed to be 14.65 Psia.  The temperature of Gas flowing through each meter shall be determined by a recording thermometer, installed by Gatherer at its sole cost and expense to properly record the temperature of the flowing Gas, and the arithmetical average of the temperature recorded while the Gas is flowing during each meter chart interval shall be used in correcting amounts delivered hereunder to a temperature base of sixty degrees Fahrenheit (60°F) and to a pressure base of 14.65 pounds Psia. Should the recording thermometer malfunction, Gatherer shall assume a reasonable temperature for the period in question. The specific gravity of Producer's Gas shall be determined upon the commencement of gathering hereunder, and at least quarterly thereafter, by means approved by the American Gas Association as set forth in the report of the Gas Measurement Committee or by fractional analysis by the use of a spot or continuous sample taken at the points of measurement. Specific gravities so determined will be used in calculating Gas deliveries hereunder for the Month in which the test is made and all succeeding Months until the Month in which a new sample is taken. If Gas is delivered without dehydration before measurement, a water vapor correction will be applied to the quantity, making the assumption the Gas is saturated with water vapor at the delivery pressure and temperature. The connection will correct to a water vapor content of no more than seven (7) pounds per million standard cubic feet. The number of thousand cubic feet (Mcf) of Gas delivered to Gatherer hereunder multiplied by the Btu content per cubic foot of Gas, determined as described above, and divided by one thousand (1,000), shall determine the MMBtu quantity whose custody is transferred hereunder.

6.  COOPERATION

4

A.      The Parties agree to cooperate with each other in good faith and in a commercially reasonable manner in order to carry out the purposes of this Agreement.

B.      The Parties agree that they will supply data and information at the other's reasonable request, and otherwise cooperate in any regulatory proceeding wherein provisions of this Agreement may be the subject of review. To the extent reasonably available in Producer's accounting and land systems, Producer shall provide to Gatherer all necessary information whereby Gatherer can make the proper allocation herein called for or required by Gatherer's normal and customary accounting practices or required by Gatherer's normal and customary contract administration practices. Neither Party assumes the responsibility for the making of any reports to any governmental authorities that are required to be made by or on behalf of the other Party.

7.      TAXES

A.      As between Producer and Gatherer, Producer shall pay or cause to be paid any sales, use transaction, occupation, service, production, severance, gathering, transmission, superfund, or excise tax, assessment or fee levied, assessed, or fixed, whether by the United States, the State of Texas, or other governmental authority, that relates to or is applicable to the Fluids delivered hereunder. Gatherer shall bear its own income taxes (if any). Any taxes and statutory charges levied or assessed against Producer's properties, Disposal Facilities, or operations shall be borne by Producer. Gatherer and Producer shall bear separately and be individually responsible for any other taxes imposed upon and/or attributable to each Party's properties and/or operations hereunder, except as otherwise specifically provided herein.

B.      In the event a tax is hereafter imposed upon carbon emissions or other greenhouse gases produced in association with the operation of the Disposal Facilities, or the act, right, or privilege of gathering Fluids, or any tax similar in effect is imposed with respect to Gatherer's operations hereunder, the tax attributable and allocable to Producer's Fluids shall be added to the fees to be paid hereunder by Producer.

8.      BILLING AND PAYMENT

A.      Statement. On or before the twentieth (20th) Day of each calendar month, Gatherer shall provide a statement to Producer by mail and electronically showing for the preceding Accounting Period:

> 1) The quantity of Fluids received by Gatherer at the outlet of the Central Facility.
>
> 2) The quantity of Water attributable to the Fluids, including an analysis that provides the basis for the all fees.
>
> 3) The amount in dollars of any other charges or credits by Gatherer to Producer authorized pursuant to this Agreement.
>
> 4) The total amount payable by Producer to Gatherer for the Services.

5

B.     Payment.   Producer shall pay Gatherer the full amount payable according to such statement by wire transfer, in accordance with the account information provided by Gatherer on or before the last day of the month following the receipt thereof by Producer. In the event such quantities are estimated for any period, corrected statements shall be rendered by Gatherer to Producer and paid by Producer or refunded or credited by Gatherer, as the case may be, in each instance in which the actual quantity received or delivered hereunder with respect to a Month shall be determined to be at variance with the estimated quantity theretofore made the basis of billing and payment hereunder. Gatherer shall have the right to charge interest on past due amounts at a rate equal to the prime rate from time to time in effect and charged by the Citibank, N.A., New York, New York, plus two percent (2%) per annum (but in no event greater than the maximum rate of interest permitted by law) with adjustments in such rate to be made on the same Day as any change in such prime rate, for any period during which the same shall be overdue, such interest to be paid when the amount past due is paid. Producer shall be responsible for all costs of collection, whether or not suit is brought.

C.     Disputed Charges.   In the event an error is discovered or there is a disputed charge in the amount contained in any statement rendered by Gatherer, Producer shall timely pay the full those amounts that are undisputed and any adjustment to correct such error or resolve such dispute shall be adjusted within thirty (30) Days after the determination thereof.

D.     Audit.   Upon thirty (30) Days prior written notice and upon execution of the other Party's reasonable confidentiality agreement, each Party shall have the right, at reasonable times during business hours, but no more frequently than once each calendar year, at its own expense, to examine the books and records of the other Party to the extent necessary to audit and verify the accuracy of any statement, charge, computation or demand made under or pursuant to this Agreement. Any statement rendered by Gatherer shall be final as to all parties unless questioned within twenty-four Months after payment thereof has been made. All statements, allocations, measurement, and payments made in any period prior to the twenty-four (24) Months preceding such Month of payment by Producer shall be conclusively deemed true and correct. The Party conducting the audit shall have six (6) Months after commencement of the audit in which to submit a written claim, with supporting detail and all workpapers, for adjustments.

## 9.     PRODUCER'S REPRESENTATIVE

A.     The party set forth in ARTICLE VI, NOTICES, of the Agreement, is designated as Producer's Representative with respect to all matters under the Agreement, including but not limited to the following:

1)     To give and receive all notices;

2)     To make and witness any tests to be made of Fluids and measuring equipment and adjustments to such equipment;

3)     To obtain, execute and deliver to Gatherer such other agreements, reports, permits and information as may be required to carry out the purposes of this Agreement; and

6

4)    To comply with the requirements, rules and regulations of any duly constituted authority having jurisdiction.

B.    Gatherer may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by said Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same.

C.    Producer may change the Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice thereof to Gatherer. The Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though named as such Producer's Representative herein in the first instance.

## 10.    REGULATORY BODIES

A.    The Agreement is subject to all present and future valid laws and lawful orders of all regulatory bodies now or hereafter having jurisdiction of the Parties, or either of them; and should either of the Parties, by force of such law or regulation imposed at any time during the term of the Agreement, be ordered or required to do any act inconsistent with the provisions of the Agreement, the Agreement shall continue nevertheless and shall be deemed modified to conform with the requirements of such law or regulation for that period only during which the requirements of such law or regulation are applicable. Nothing in the Agreement or this Appendix shall prohibit either Party from obtaining or seeking to obtain modification or repeal of such law or regulation or restrict either Party's right to legally contest the validity of such law or regulation.

B.    Without limiting Gatherer's rights under this Section 10, if an federal or state statute or regulation or order by a governmental authority effects a change to a substantive provision of this Agreement that has a material adverse impact upon the performance or benefits of either Party, including the imposition of terms, conditions, or rate restrictions that materially adversely affect the economic positions or expectations of the Parties, then the Parties will enter into good faith negotiations to attempt to revise this Agreement and any other ancillary agreements between them so that (a) performance under this Agreement is no longer impacted in a material adverse fashion and (b) this Agreement and any other ancillary agreements are revised in a manner that preserves, to the maximum extent possible, the respective economic positions of the Parties.

## 11.    FORCE MAJEURE

A.    Except for Gatherer's and Producer's respective obligations to make payments as required under this Agreement, in the event either Gatherer or Producer is rendered unable, by reason of an event of force majeure, to perform, wholly or in part, any obligation or commitment set forth in the Agreement, then upon such Party giving notice and full particulars (including all supporting documentation) of such event as soon as practicable after the occurrence thereof, the obligations of both Parties shall be suspended to the extent and for the period of such force majeure provided that the Party claiming an event of force majeure shall make all reasonable attempts to remedy the same with all reasonable dispatch.

7

B.     The term *"Force Majeure"*, as used herein, shall mean acts of God, strikes, lockouts or industrial disputes or disturbances, civil disturbances, arrest and restraint of rulers or people, interruptions by government or court orders, necessity for compliance with any present and future valid orders of court, or any law, statute, ordinance or regulation promulgated by any governmental or regulatory authority having proper jurisdiction, inability to obtain government approvals, acts of the public enemy, wars, riots, blockades, insurrections, including inability to secure materials by reason of allocations promulgated by authorized governmental agencies, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, electrical outages, failure of communication equipment or services, inclement weather which necessitates extraordinary measures and expense to construct Disposal Facilities and/or maintain operations, explosions, breakage or accident to machinery or lines of pipe, freezing of wells or pipelines, inability to obtain or unavoidable delays in obtaining easements or rights-of-way, the shutting in of Disposal Facilities for the making of repairs, alterations or maintenance to wells, pipelines or Disposal Facilities, the making of repairs, routine maintenance, replacements or alterations to lines of pipe or Disposal Facilities, the interruption or suspension of the receipt of Fluids deliveries hereunder due to the inability of the SWDs to receive additional volumes, curtailments, suspensions, failure to perform or the declaration of force majeure by third-party recipients, service providers, transporters or markets, or any other cause whether of the kind herein enumerated or otherwise, not reasonably within the control of the Party claiming *"Force Majeure"*.

C.     Neither Party shall be entitled to the benefit of the provisions of this Section 11 under either or both of the following circumstances:

> 1)     To the extent that the failure was caused by the Party claiming suspension having failed to remedy the condition by taking all reasonable acts, short of litigation, if such remedy requires litigation, and having failed to resume performance of such commitments or obligations with reasonable dispatch; or,

> 2)     If the failure was caused by lack of funds, or with respect to the payment of any amount or amounts then due hereunder.

D.     Settlement of strikes and lockouts shall be entirely within the discretion of the Party affected, and the duty that any event of force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes and lockouts by acceding to the demands of the Parties directly or indirectly involved in such strikes or lockouts when such course is inadvisable in the discretion of the Party having such difficulty.

## 12.     DEFAULTS

A.     It is covenanted and agreed that if either Party shall be in material Default, in addition to its other rights and remedies, the other Party may terminate the Agreement by proceeding as follows:

> 1)     The Party not in Default shall cause a written notice to be served on the Party in material Default, stating specifically the material Default with all particulars and supporting documentation, and declaring it to be the intention of the Party giving notice to terminate the Agreement due to the material Default; thereupon, the Defaulting Party shall have the Cure Period described below after the service of

8

the aforesaid notice in which to remedy or remove the cause or causes stated in the notice for terminating the Agreement. If within said Cure Period the Party in Default does so remove and remedy said cause or causes (or diligently pursues its cure within said Cure Period if not capable of cure within such period), or fully indemnifies the Party not in Default for any and all consequences of such Default, then such notice shall be withdrawn and the Agreement shall continue in full force and effect.

2)   In case the Party in material Default does not remedy and remove the cause or causes, or does not indemnify the Party giving the notice for any and all consequences of such Default, within said Cure Period, then upon expiration of said Cure Period and upon thirty (30) days further notice by the non-Defaulting Party, at the option of the non-Defaulting Party, the Agreement shall terminate, subject to the Parties' then-accrued obligations.

3)   The *"Cure Period"* shall be (i) thirty (30) days, or (ii) such longer period as may be reasonably necessary to cure said material Default if not reasonably capable of cure within thirty (30) days. Notwithstanding the foregoing, the cure period for payment of undisputed payments shall be seven (7) Business Days, and the cure right with respect to undisputed payments shall only be available three times during any calendar year.

3)   Any termination of the Agreement pursuant to the provisions of this Section 12 shall be without waiver of any remedy to which the Party not in Default may be entitled for violations of the Agreement.

4)   Notwithstanding the foregoing, the aforesaid termination right shall not be available to a Party if that Party is, itself, in material Default under this Agreement.

B.   An event of *"Default"* shall occur if either Party (the *"Defaulting Party"*) shall:

1)   Make an assignment or any general arrangement for the benefit of creditors; file a petition or otherwise commence, authorize, or acquiesce in the commencement of a proceeding or case under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; otherwise become bankrupt or insolvent (however evidenced); be unable to pay its debts as they fall due; have a receiver, provisional liquidator, conservator, custodian, trustee or other similar official appointed with respect to it or substantially all of its assets; or

2)   For reasons other than a Force Majeure Condition as defined in Section 11 of this Appendix, fails or is unable to perform any of the agreements or undertakings on its part contained in this Agreement;

3)   Is in default under the Gathering Agreement; or

9

4)    Engages in any activity prohibited under this Agreement.

C. No waiver by either Producer or Gatherer of any Default of the other under the Agreement shall operate as a waiver of any future Default, whether of like or different character or nature, nor shall any failure to exercise any right hereunder be considered as a waiver of such right in the future.

13.    POSSESSION AND CONTROL, LIABILITY; GENERAL INDEMNITY

A.    Except as to Fluids delivered to the Disposal Facilities by truck until such Fluids are delivered to the Disposal Facilities, as between the Parties, Gatherer shall be in exclusive possession and control of the Fluids deliverable under this Agreement and responsible for any injury, loss, expense, or damage caused thereby, except as may be otherwise provided by the Gathering Agreement. **The Party deemed to be in exclusive control and possession of the Production shall be responsible for and shall indemnify, defend and hold harmless the other party from and against any Claims arising from such control or possession, except with regard to any Claim caused by or arising out of the sole negligence or willful misconduct of the non-possessory party, except as may be otherwise provided by the Gathering Agreement.**

B.    Each Party hereto assumes full responsibility and liability for the maintenance and operation of its respective properties and Disposal Facilities, and each agrees to indemnify, defend and hold harmless the other Party from and against any Claims arising from any act, omission or accident in connection with the installation, presence, maintenance or operation of the property or equipment of the indemnifying Party. Each Party is responsible for compliance with all environmental, safety and health rules, regulations or statutes on its respective properties and Disposal Facilities. This includes, but may not be limited to, air permitting under the Clean Air Act, waste disposition under the Resource Conservation and Recovery Act, and worker safety under the Occupational Health and Safety Administration.

C.    Each Party agrees to indemnify, defend and hold harmless the other Party from and against any Claims arising from the breach by such Party of any representation, warranty or covenant under this Agreement.

D. LIMITATION OF LIABILITY. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY EXEMPLARY OR PUNITIVE DAMAGES OF ANY CHARACTER RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE REASON OR CAUSE OF SUCH DAMAGES, WHETHER SUCH DAMAGES OCCUR DURING OR AFTER THE TERM, OR THAT THE CLAIM FOR SUCH DAMAGES IS BASED ON WARRANTY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE.

E. Arbitration. Any claim, demand, cause of action, dispute or controversy exclusively between the Parties relating to the subject matter of this Agreement, whether sounding in contract, tort or otherwise, at law or in equity, for damages or other relief (in this Paragraph E., a *"Dispute"*) shall be resolved by binding arbitration if senior management of each of the Parties cannot resolve the Dispute within ten (10) days of a notice of arbitration (*"Notice"*) being served by one party upon the other. Within twenty (20) days following service of the Notice (if the Dispute remains unresolved by senior management), the parties shall either agree upon a single arbitrator, or if they have not done so, each

party shall select one arbitrator, who shall together select a third. All arbitrators shall have more than 8 years professional experience in the natural gas gathering industry, be neutral, and have not worked for a Party or Affiliate. The arbitration shall be conducted according to the rules of the Federal Arbitration Act, and to the extent an issue is not addressed thereby, by the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall be conducted in Denver, Colorado. Each party shall be entitled to a reasonable amount of prehearing discovery as allowed by the arbitrator(s), provided the discovery period shall not exceed thirty (30) days; the parties and the arbitrators shall endeavor to hold the arbitration hearing within thirty (30) days thereafter and to render the decision within ten (10) days following the hearing. Each party shall bear its own costs of arbitration. Interpretation of this agreement to arbitrate and procedures shall be decided by the arbitrators, provided the award shall be consistent with this Agreement. The arbitrators shall not modify the terms of this Agreement in rendering their decision. The arbitration and the award shall be final, binding and confidential. Judgment on the award may be entered and enforced by any court of competent jurisdiction.

14.   GENERAL

A.   Producer agrees that Gatherer, its successors and assigns, shall have the right at any time to redeem the interests of Producer, its successors and assigns, or other interest owners by payment of any delinquent taxes, deeds of trust, judgments or other liens on the Leases in the event of default of payment thereof by Producer or other interest owners, and be subrogated to the rights of the holder or holders thereof.

B.   Confidentiality. The Parties agree that the terms of this Agreement shall be considered confidential, shall be kept confidential and shall not be disclosed without the prior written consent of the non-disclosing Party during the term of this Agreement to any Person that is not a Party, except:

1)   to an Affiliate or an owner or indirect owner of a Party;

2)   to the extent such information is required to be furnished in compliance with applicable law or pursuant to any legal proceedings or because of any order of any governmental authority binding upon a Party;

3)   to prospective purchasers of the assets or equity interests of a Party;

4)   to prospective or actual attorneys engaged by any Party where disclosure of such information is essential to such attorney's work for such Party;

5)   to prospective or actual contractors and consultants engaged by any Party where disclosure of such information is essential to such contractor's or consultant's work for such Party;

6)   to a bank or other financial institution or financial advisor to the extent appropriate to a Party arranging for funding;

7)   to the extent such information must be disclosed pursuant to any rules or requirements of any stock exchange having jurisdiction over a Party or its Affiliates;

11

8)    to its respective employees and independent auditors, subject to each Party taking customary precautions to ensure such information is kept confidential;

9)    any information which, through no fault of a Party, becomes a part of the public domain may be disclosed; and

10)   as necessary to enforce this Agreement.

C.    Captions. The captions in this Agreement are for convenience only and shall not be considered a part of, or affect the construction or interpretation of, any provision of this Agreement.

D.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original instrument, and all such counterparts together shall constitute one agreement.

E.    Waivers. Any failure by a Party to comply with any of its obligations, agreements or conditions herein contained may only be waived in writing in an instrument specifically identified as a waiver and signed by the Party to whom such compliance is owed. No waiver of, or consent to a change in, any provision of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in, any other provisions hereof, nor shall such waiver constitute a continuing waiver unless expressly provided in the waiver.

F.    Severability. The invalidity of any one or more provisions of this Agreement will not affect the validity of this Agreement as a whole, and in case of any such invalidity, this Agreement will be construed as if the invalid provision had not been included herein so long as the economic and legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party. Upon such determination that one or more provisions of this Agreement are invalid, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

## END OF GENERAL TERMS AND CONDITIONS