Robert G. Burns
BRACEWELL & GIULIANI LLP
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (800) 404-3970

William A. (Trey) Wood III (*pro hac vice*)
Jason G. Cohen (*pro hac vice*)
BRACEWELL & GIULIANI LLP
711 Louisiana St., Suite 2300
Houston, Texas 77002
Telephone:   (713) 221-2300
Facsimile:   (800) 404-3970

*Counsel for Nordheim Eagle Ford Gathering, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| SABINE OIL & GAS CORPORATION, *et al.* | ) ) Case No. 15-11835 (SCC) |
| Debtors. | ) ) (Jointly Administered) |

**OBJECTION TO DEBTORS' OMNIBUS MOTION FOR ENTRY OF AN ORDER
AUTHORIZING REJECTION OF CERTAIN EXECUTORY CONTRACTS**
(relates to Dkt. No. 371)

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Nordheim Eagle Ford Gathering, LLC ("Nordheim"), by and through its undersigned counsel, files this objection to the Debtors' Omnibus Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts (Dkt. No. 371, the "Motion"). In support thereof, Nordheim respectfully represents as follows:

**I. PRELIMINARY STATEMENT**

1.      Nordheim objects to Sabine's motion to reject the Gas Gathering Agreement and Condensate Gathering Agreement because Sabine has not and cannot meet its burden of showing that rejection will benefit the estate. Specifically, Sabine has encumbered all of its oil and gas

#5013750

real property assets within the dedicated areas with the terms of the Gas Gathering Agreement and Condensate Gathering Agreement that Sabine seeks to reject. Under Texas state law, such terms are covenants that run with the land, which cannot be terminated or avoided by 11 U.S.C. § 365(a). Consequently, rejection of the Gathering Agreements will not relieve Sabine or its successors of the terms of the Gathering Agreements, and rejection will therefore provide no benefit to the estates. In fact, rejection may result in a detriment to the estates in the form of duplicative payment obligations to the extent that Sabine follows through with its stated intention to contract with an alternative gatherer while exclusively obligated to Nordheim. Because rejection will not benefit the estates, Sabine's motion to reject the Gathering Agreements should be denied.

2. Alternatively, if the Court permits Sabine to reject the Gathering Agreements, the rejection should be without prejudice to Nordheim's rights to assert claims or interests under the Gathering Agreements, of any nature whatsoever, against Sabine, any successors, or any other parties. There is no basis for limiting Nordheim's rights to the filing of a general unsecured claim as suggested in Sabine's proposed form of order.

3. Finally, if Nordheim is required to continue to gather Sabine's gas and Condensate through December 31, 2015, as requested by Sabine, then Sabine should be required to pay timely for such services pursuant to the terms of the Gathering Agreements. If Sabine fails to pay timely, Nordheim should be allowed to exercise its remedies under the Gathering Agreements, including the right to shut in the gas and Condensate.

## II.  RELEVANT BACKGROUND

### A.  *The Gas Gathering Agreement*

4.     Sabine Oil and Gas Corporation[1] ("Sabine") and Nordheim are parties to a Gas Gathering Agreement dated January 23, 2014 (the "Gas Gathering Agreement", filed separately under seal).  Under the Gas Gathering Agreement, Sabine has exclusively dedicated to Nordheim's gas gathering system Sabine's entire supply of natural gas attributable to all "Interests" located in a specified geographical area in DeWitt County, Texas.  "Interests" is defined in the Gas Gathering Agreement as:

> any right, title, or interest in lands and the right to produce oil and/or Gas therefrom, whether from fee ownership, working interest ownership, mineral ownership, leasehold ownership, or arising from any pooling, unitization or communitization or any of the foregoing rights.

(Gas Gathering Agreement, Exhibit A § 1.28).

5.     In full reliance on the dedication, Nordheim, as the "gatherer" of gas, has constructed, at its sole cost and expense, a gathering system of pipelines and treatment facilities to serve Sabine.  Nordheim uses this system to gather and transport the dedicated gas from the Interests to predetermined delivery points.  Nordheim treats the gas, dehydrates the gas, and then delivers the gas back to Sabine.  The Gas Gathering Agreement runs for a term of ten years, with automatic yearly renewal thereafter subject to termination upon proper notice.

6.     The gas gathering system used by Nordheim to gather and transport gas for Sabine exists entirely within the State of Texas and is therefore not subject to FERC jurisdiction.

7.     Under the Gas Gathering Agreement, and in exchange for Nordheim shipping the dedicated gas, Sabine pays a monthly gathering fee along with certain costs and expenses.  To

---

[1] As successor-in-interest to Sabine Oil & Gas LLC.

#5013750

the extent that Sabine fails to ship a minimum volume of gas over a year, then it is required to make a deficiency payment to Nordheim on a yearly basis.

### B. *The Condensate Gathering Agreement*

8. Sabine and Nordheim are also parties to a Condensate Gathering Agreement, dated January 23, 2014 (the "Condensate Gathering Agreement", filed separately under seal, and together with the Gas Gathering Agreement, the "Gathering Agreements"). Under the Condensate Gathering Agreement, Sabine has exclusively dedicated all of the liquid hydrocarbons and other liquids produced from "Interests" within a specified geographical area in DeWitt County, Texas ("Condensate") to be shipped on Nordheim's Condensate gathering system. "Interests" is defined in the Condensate Gathering Agreement as:

> any right, title, or interest in lands and the right to produce oil and/or gas therefrom, whether from fee ownership, working interest ownership, mineral ownership, leasehold ownership, or arising from any pooling, unitization or communitization or any of the foregoing rights.

(Condensate Gathering Agreement, Exhibit A § 1.24).

9. In full reliance on the dedication, to transport the dedicated Condensate, Nordheim has constructed, at its sole cost and expense, a condensate gathering system that commences at various receipt points and terminates at a specific delivery point, where Nordheim has also constructed condensate storage tanks, water and slop storage tanks, volume measuring units, gas compression units, and vapor recovery systems, among other things. The Condensate Gathering Agreement extends for a term of ten years, with automatic yearly renewal thereafter subject to termination upon proper notice.

10. The condensate gathering system used by Nordheim to gather and transport Condensate for Sabine exists entirely within the State of Texas and is therefore not subject to FERC jurisdiction.

-4-

11. Under the Condensate Gathering Agreement, Sabine pays a monthly gathering fee along with certain costs and expenses in order for Nordheim to gather and transport the dedicated Condensate. To the extent that Sabine fails to ship a minimum volume of Condensate over a year, then it is required to make a deficiency payment to Nordheim on a yearly basis.

C. *The Gathering Agreements are Covenants that Run with the Land*

12. It is common practice in the oil and gas industry to structure obligations in gathering and pipeline agreements to run with the land, which gives the grantee the benefit of an interest in the grantor's mineral rights. *See e.g.* Judith M. Matlock, *Natural Gas Gathering, Transportation and Storage Agreements,* No. 3 RMMLF-INST Paper No. 6 (2005) (stating that dedication is not uncommon and providing sample contract language whereby a dedication commitment runs with the land). The Gathering Agreements that Sabine seeks to reject are wholly consistent with this standard legal construct. In particular, they each provide, among other things, that:

> So long as this Agreement is in effect, the Agreement shall (i) be a covenant running with the Interests now owned or hereafter acquired by [Sabine] and/or its Affiliates within the Dedicated Area and (ii) be binding on [Sabine] and enforceable by [Nordheim] and its successors and assigns against [Sabine], its Affiliates and their respective successors and assigns.

(Gas Gathering Agreement § 1.6; Condensate Gathering Agreement § 1.6).

13. A memorandum of each gathering agreement was filed of record in the real property records of DeWitt County, Texas (where the Interest are located) on January 30, 2014 (attached as **Exhibit A**). The Memorandum of Gas Gathering Agreement is recorded at Volume 497, pp. 887-896. The Memorandum of Condensate Agreement is recorded at Volume 297, pp. 897-906. Both memoranda provide, among other things, that:

> Covenant Running with the Land. The Agreement and Dedication shall (i) be a covenant running with the Interests now owned or hereafter acquired by [Sabine] and/or its Affiliates within the Dedicated Area and (ii) be binding on [Sabine] and

enforceable by [Nordheim] and its successors and assigns against [Sabine], its Affiliates and their respective successors and assigns. As such, as to any transfer thereof (which shall be subject to the provisions set forth in Article 13 of Exhibit "A" to the Agreement), the Agreement shall remain binding on the applicable transferee(s) and enforceable by the non-transferring Party or its permitted successors and assigns.

(Memorandum of Gas Gathering Agreement ¶ 4; Memorandum of Condensate Gathering Agreement ¶ 4).

### III. OBJECTION AND BASIS THEREFOR

14. Nordheim objects to the Debtors' motion to reject the Gathering Agreements, and request that the relief sought be denied. Because the Gathering Agreements contain covenants that run with Sabine's Interests, the Gathering Agreements will continue to be enforceable against Sabine and its successors and assigns. Consequently, the estate will not benefit from rejection of the Gathering Agreements, and may even suffer a detriment by incurring duplicative obligations for the gathering and transportation of its gas and Condensate.

### I.    Sabine Has Failed to Meet the Business Judgment Standard for Rejection

#### A.    *Standard for Rejection of an Executory Contract*

15. Pursuant to section 365(a) of the Bankruptcy Code, a debtor in possession may reject an executory contract. 11 U.S.C. § 365(a). A debtor's decision to reject an executory contract must comport with the "business judgment" standard, whereby a bankruptcy court reviewing a debtor's decision "should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. N.Y. 1993) (citing *In re Minges*, 602 F.2d 38 (2d Cir. 1979)). In making its own business determination, a bankruptcy court should generally defer to a debtor's decision that rejection of a contract would be advantageous. *In re Balco Equities Ltd., Inc.*, 323

-6-

B.R. 85, 98 (Bankr. S.D.N.Y. 2005). However, a bankruptcy court is not required to "blindly accept" a debtor's decision, but only to show proper deference to the debtor's management. *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426-27 (Bankr. N.D. Tex. 2009). "In reviewing a trustee's or debtor-in-possession's decision to assume an executory contract, then, a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate." *In re Orion Pictures Corp.*, 4 F.3d at 1099. "'The business judgment rule requires the Court to determine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Helm*, 335 B.R. 528, 538-539 (Bankr. S.D.N.Y. 2006)(citation omitted).

16. Here, Sabine cannot meet the business judgment standard under any circumstances. Rejection of the Gathering Agreements would not benefit Sabine's estate because, as explained below, the key terms of the Gathering Agreements—the dedication of hydrocarbons and payment of transportation fees—are covenants that run with the land and create real property interests for Nordheim in Sabine's mineral Interests. Rejection of the Gathering Agreements will not avoid valid covenants that run with the land; the real property interest of Nordheim will survive rejection in bankruptcy and remain valid and enforceable. *See In re Banning Lewis Ranch Co., LLC*, 532 B.R. 335, 346 (Bankr. D. Colo. 2015) (rejecting agreements that run with the land will not alter the effect of covenants against non-debtor parties or the debtor's successors-in-interest and would therefore serve no purpose at all). Thus, even if the Gathering Agreements are rejected, Sabine and the Interests will still be bound by the covenants to dedicate hydrocarbons and pay transportation costs. If Sabine fails to honor such covenants, Nordheim may be entitled to an administrative claim, specific performance,

#5013750

injunctive relief, or other remedies. Also, as a result of the continuing existence of the dedication, Sabine will have no gas or Condensate available to ship on any alternative pipeline. Or, if Sabine does choose to ship on an alternative pipeline (and in doing so violates Nordheim's real property rights) Sabine will still be liable to Nordheim for the agreed to transportation costs, and Sabine's alternative shipper may be subject to claims for infringing on Nordheim's property rights. It is therefore an unreasonable exercise of Sabine's business judgment to reject the Gathering Agreements.

### B. *The Key Rights under the Gathering Agreements are Covenants that Run with the Land*

17. In order to determine the nature of an interest in property, bankruptcy courts must look to state law. *See Butner v. United States*, 440 U.S. 48 (1979) ("[p]roperty interests are created and defined by state law…."). Both Gathering Agreements relate to oil and gas interests solely within the State of Texas. Consequently, Texas law governs the question of whether the Gathering Agreements are covenants that run with the land. *In re Grant Associates,* 154 B.R. 836, 841 (S.D.N.Y. 1993) (a question of real estate law is determined by the law of the state in which the realty is located); (Gathering Agreements § 7.1) (agreements governed by Texas law).

18. Under Texas law, a covenant runs with the land when it (i) touches and concerns the land; (ii) relates to a thing in existence or specifically binds the parties and their assigns; (iii) is intended by the original parties to run with the land; and (iv) when the successor to the burden has notice. *In re Energytec Inc.*, 739 F.3d 215, 221 (5th Cir. 2013) (citing *Inwood North Homeowners' Ass'n v. Harris*, 736 S.W.2d. 632, 635 (Tex. 1987)).

#### *(i) The Key Rights under the Gathering Agreements "Touch and Concern" the Land*

19. In general, under Texas law, "a covenant touches and concerns when it affects the nature, quality or value of the thing demised, independently of collateral circumstances, or it

-8-

#5013750

affects the mode of enjoying it." *Refinery Holding Co., L.P. v. TRMI Holdings, Inc. (In re El Paso Refinery, L.P.)*, 302 F.3d 343, 356 (5th Cir. Tex. 2002) (internal citations omitted).

20. The Fifth Circuit, applying Texas state law, considered whether certain aspects of a pipeline agreement "touched and concerned" the land in *In re Energytec, Inc.*, 739 F.3d 215 (5th Cir. 2013). That case involved a pipeline that was conveyed by its owner to Producers Pipeline Corporation in 1999. As partial consideration for the transaction, Producers Pipeline Corporation was required to pay Newco (an affiliate of the original owner) an ongoing "transportation fee" based on the amount of gas flowing through the pipeline. *Id.* at 217. Newco also retained a consent right related to future assignment of the pipeline. The agreement explicitly provided that Newco's interest in the transportation fee was to "run with the land." *Id.* In 2005, Producers Pipeline Corporation sold the pipeline system to Energytec, Inc., who filed for chapter 11 bankruptcy protection in May 2009.

21. As part of its bankruptcy case, Energytec sought to sell substantially all of its assets, including the pipeline, under section 363 of the Bankruptcy Code. Energytec requested that the pipeline be sold free and clear of all liens, claims, and encumbrances, including Newco's transportation fee and consent right. Newco objected, claiming that its interest in the transportation fee and consent right ran with the land, and that the pipeline could not be sold free and clear of such rights.

22. The parties agreed that the transportation fee and consent right bound the parties and their assigns, was intended to run with the land, and was noticed to all parties, leaving only the "touch and concern" element in dispute. Applying Texas law, the Fifth Circuit noted two tests to determine whether a covenant touches and concerns real property. The first test considers whether the covenant "affected the nature, quality or value of the thing demised,

independently of collateral circumstances, or if it affected the mode of enjoying it." *Energytec*, 739 F.3d at 223 (citing *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982)). The second test considers the covenant's impact on the property's value:

> If the promisor's legal relations in respect to the land in question are lessened—his legal interest as owner rendered less valuable by the promise—the burden of the covenant touches or concerns that land; if the promisee's legal relations in respect to that land are increased—his legal interest as owner rendered more valuable by the promise—the benefit of the covenant touches or concerns the land.

*Id.* (citing *Westland*, 637 S.W.2d at 911 (finding that a promise to convey interests in oil and gas leases burdened the land, potentially rendering it less valuable, and constituting a covenant running with the land)).

23. Applying both tests, the Fifth Circuit ultimately found that both the transportation fee and the consent right were covenants that run with the land. In reaching its decision, the court rejected Energytec Inc.'s argument that the transportation fee was "unrelated to the use of land because it is based solely on the volume of gas moving through the pipeline and had no direct impact on the land." *Id.* at 224. Instead, the court found that:

> The real property at issue here is a gas pipeline system and the rights-of-way required for its placement. Newco's interest in transportation fees is for the use of real property, i.e., the traveling of natural gas from a starting point along the length of the pipeline to an endpoint. The pipeline is a subsurface road for natural gas, and a fee for the use of that road was retained by [Newco's predecessor-in-interest] and assigned to Newco. Another restriction on use is that the pipeline cannot be assigned without Newco's consent. These rights impact the owner's interest in the pipeline. Furthermore, as burdens on the property, they also impact the pipeline's value in the eyes of prospective buyers. Indeed, the impact on the sale in bankruptcy has been clear, though the financial impact has not been quantified.

*Id.* at 224-25.

24. Like Energytec Inc.'s real property pipeline interests, in this case Sabine's Interests have been burdened with the terms of the Gathering Agreements. To the extent that

-10-

Sabine seeks to use its Interests to produce gas and Condensate, it has dedicated such hydrocarbons to the Nordheim pipeline systems, and it has agreed to pay a transportation fee to Nordheim. These rights of Nordheim impact Sabine's property rights in the Interests, which is evident by Sabine's present attempt to reject the Gathering Agreements. Furthermore, these rights impact the value of Interests. Depending on the price of gas and Condensate, and the market rates for transportation, the dedication agreements and transportation fees in the Gathering Agreements render the Interests either more or less valuable. As a result, the burden or benefit of the covenant touches or concerns the Interests.

### (ii) *The Gathering Agreements Relate to a Thing in Existence or Specifically and Expressly Bind the Parties and their Assigns*

25.     Each Gathering Agreement relates directly to things in existence, which are the Interests of Sabine. The Gathering Agreements govern how the Interests can be developed. Additionally, each Gathering Agreement expressly provides that it is binding on Sabine and enforceable by Nordheim "and its successors and assigns" against Sabine. Further both Gathering Agreements state that as to any transfer of the Agreement, "the Agreement shall remain binding on the applicable transferee(s) and enforceable by the non-transferring Party or its permitted successors and assigns." (Gathering Agreements § 1.6).

### (iii) *The Gathering Agreements were Intended to Run with the Land*

26.     As detailed above, both the Gas Gathering Agreement and the Condensate Gathering Agreement, as well as the filed memorandum of each, provide that they "shall be a covenant running with the Interests now owned of hereafter acquired by [Sabine]…." (Gathering Agreements § 1.6). The language used in an agreement is the primary evidence of intent. *Perry Homes v. Cull*, 258 S.W.3d 580, 606 (Tex. 2008).

### (iv) *All Successors Have Notice of the Gathering Agreements*

-11-

27. A memorandum of each Gathering Agreement was properly recorded in the real property records of DeWitt County, Texas, the county in which the gathering systems and Interests are located. Properly recording an instrument in the proper county is notice to all parties of the existence of the instrument. Tex. Prop. Code § 13.002. Consequently, any successor to the benefit or burden of the Gathering Agreements will be deemed to have notice of of the Gathering Agreements.

### *(v) Privity*

28. In addition to the four elements of a covenant that runs with the land, some Texas courts have noted that "There must also be privity of estate between the parties when the covenant was made." *Ehler v. B.T. Suppenas Ltd.,* 74 S.W.3d 515, 521 (Tex. App.—Amarillo 2002) (citations omitted). Here, there is direct privity between Sabine[2] as the grantor of the covenants under Gathering Agreements, and Nordheim, as the grantee.

### C. Covenants that Run with the Land Survive Rejection

29. Based on the foregoing, Sabine's agreement to dedicate gas and Condensate to Nordheim's gathering systems, and to pay a transportation fee for the gathering of such gas and Condensate, while executory in nature, are covenants that run with the land. It is well established that rejection of an executory agreement is not a termination, revocation, or repudiation of the contract. *In re Lavigne*, 114 F.3d 379, 386-7 (2d Cir. 1997). Furthermore, when an executory contract contains covenants that run with the land, its rejection does not affect such covenants, which are property interests that have become an integral part of the debtor's title. *See Energytec*, 739 F.3d 215; *In re Banning Lewis Ranch Co., LLC*, 532 B.R. 335, 345-46

---

[2] Sabine Oil & Gas LLC was the original counterparty to the Gathering Agreements. Based on information provided by the Debtors, it was "combined with and into" Sabine Oil & Gas Corporation on December 16, 2014. *See* Motion at 3. Based on this combination Sabine Oil & Gas Corporation is the successor-in-interest to Sabine Oil & Gas LLC. This succession satisfies the requirements of vertical privity. *See Energytec*, 739 F.3d at 223.

#5013750

(Bankr. D. Colo. 2015) (despite rejection, because the agreements in question were of the type that run with the land, they remain valid and enforceable and binding on the debtor's successors-in-interest); *In re Bergt*, 241 B.R. 17, 21 (Bankr. D. Alaska 1999) (rights created by state law in a specific asset are not avoidable by rejection); *Gouveia v. Tazbir*, 37 F.3d 295, 298 (7th Cir. 1994) (restrictive covenants are not subject to rejection under section 365); *In re Raymond*, 129 B.R. 354, 358-59 (Bankr. S.D.N.Y. 1991) (an obligation to pay common charges under a homeowner's association agreement is a covenant that runs with the land and, despite rejection, cannot be severed from ownership and remains binding on present owner and grantees of the owner). Consequently, even if the Court were to grant rejection of the Gathering Agreements, Sabine, its estate, its successors, and the Interests would remain obligated for the dedication and the transportation fees and would therefore gain no benefit by rejection.

## II. If Rejection is Allowed, the Nature of Nordheim's Claims and/or Interests Should Be Determined at a Later Time

30. The proposed order filed with Sabine's rejection motion provides, among other things, that:

- "Rejection of the Nordheim Agreements … shall relieve the Debtors of any and all obligations under the Nordheim Agreements … and no such obligations shall continue beyond such Rejection Dates"; and

- "Nordheim shall not be entitled to any claim arising from the Nordheim Agreements other than an unsecured claim for rejection damages as of the Petition Date, and shall only have an unsecured claim for rejection damages if it files a proof of claim on or before the deadline for filing proofs of claim established in these chapter 11 cases."

(Proposed Order at ¶¶ 5 and 7). Nordheim objects to this language and to the premature determination of any claims against, or interests in the property of, Sabine, its estate, its successors and any non-debtor which might infringe on Nordheim's property rights.

-13-

#5013750

31. As described above, Nordheim believes that rejection of the Gathering Agreements is an unreasonable exercise of Sabine's business judgment. Nonetheless, if the Court approves Sabine's rejection of the Gathering Agreements, then any approval should be limited to authorizing rejection under section 365(a) to the extent that the Gathering Agreements are executory. To determine the extent, validity, or priority of Nordheim's interest in the mineral estate of Sabine, or to determine the rights, obligations, and remedies of the parties under the Gathering Agreements requires an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(2) or 7001(9). Absent the procedural due process of an adversary proceeding, the question of continuing obligations or liability of Sabine, its estate, its successors, the Interests, or any non-debtors to Nordheim under the Gathering Agreements should be reserved.

32. Likewise, any claim arising from the Gathering Agreements should be subject to the claims administration process provided for under the Bankruptcy Code and Rules and should not be determined at this stage. Nordheim may have claims against Sabine in addition to claims for rejection, and the proposed order is drafted so broadly as to preclude any such claims. For example, to the extent that Sabine violates covenants that run with the land, Nordheim may have an administrative claim, a claim for injunctive relief, or claims against non-debtors who infringe on Nordheim's property rights. There is no basis in the Motion or in procedure to preclude such claims at this time. Finally, under section 502(g)(1), a party may file a proof of claim under section 501 for damages arising from the rejection of an executory contract under section 365, and such claim shall be determined and allowed or disallowed under section 502(a), (b), (c), (d), or (e). The Bankruptcy Rules related to proofs of claim filed under section 501 allow a proof of claim to assert a secured claim against the property of a debtor and Nordheim reserves the right to assert such a claim. Sabine has provided no basis in law or fact for circumventing the claim

allowance process and limiting any claim of Nordheim solely to "an unsecured claim for rejection damages" at this point in time. Consequently, if rejection is allowed, the specified language should not be included in the order granting rejection and the order should specifically reserve all the rights and claims of Nordheim resulting from rejection and any future infringement of Nordheim's property rights.

### III. Sabine Should Be Required to Make Timely Post-Petition Payments If It Wishes to Defer Rejection to December 31, 2015

33. Sabine requests the right to reject the Gathering Agreements effective as of December 31, 2015, requiring Nordheim to continue to perform for three months following the filing of the motion to reject. However, Sabine has failed to make timely payment under the Gathering Agreements on a post-petition basis. Specifically, in the ordinary course of business, Nordheim issued the following invoices to Sabine for post-petition services:

(a) Invoice #100122, issued for gas and Condensate (a portion of which was gathered post-petition) on August 10, 2015, in the amount of $336,043.80. Amounts owing under Invoice #100122 were due as of August 31, 2015.

(b) Invoice #100202, issued for gas and Condensate on September 10, 2015, in the amount of $290,527.33. Amounts owing under Invoice #100202 were due as of September 30, 2015.

34. Payment for Invoice #100122 was only received on October 6, 2015, more than a month late. No payment has been received for Invoice #100202.

35. Nordheim should not be required to continue to perform under the Gathering Agreements absent payment of the amount outstanding under Invoice 100202. Further, to the extent that Sabine fails to make timely payment on a going forward basis, Nordheim requests that it be allowed to exercise its rights against Sabine under the Gathering Agreements without further order of this Court, including but not limited to "shutting in" Sabine's gas and Condensate as a condition to deferring the rejection date.

-15-

**NOTICE**

Notice of the Application is being provided to: (a) the Debtors, 1415 Louisiana, Suite 1600, Houston, Texas 77002, Attn: Michael Magilton; (b) counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Jonathan S. Henes, P.C., Christopher Marcus, P.C., and Cristine Pirro and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Ryan Blaine Bennett and Brad Weiland; (c) administrative agent under the Debtors' first lien credit facility, Wells Fargo Bank, National Association, 333 Clay Road, Suite 2400, Houston, Texas 77024, Attn: Stephanie Harrell and Wells Fargo Bank, National Association, 1000 Louisiana Street, 8th Floor, Houston, Texas 77002, Attn: Brian M. Malone; (d) counsel to administrative agent under the Debtors' first lien facility, Willkie Farr & Gallagher LLP, 600 Travis Street, Suite 2310, Houston, Texas 77002, Attn: Kristi Treece, Michael Niebruegge, and Ryan Cicero and Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Margot B. Schonholtz, Ana M. Alfonso, and Penelope J. Jensen; (e) administrative agent under the Debtors' second lien credit facility, Wilmington Trust, National Association, 1100 North Market Street, Wilmington, Delaware 19890, Attn: Joseph Feil; (f) counsel to the agent under the Debtors' second lien credit facility, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Alan W. Kornberg, Brian S. Hermann, Moses Silverman, Kellie A. Cairns, and Brian Kim and Haynes and Boone LLP, 2323 Victory Avenue, Suite 700, Dallas, Texas 75219, Attn: Robert D. Albergotti and Ian T. Peck; (g) indenture trustee under the Debtors' 9.75% senior notes due 2017, Bank of New York Mellon Trust Company, National Association, 101 Barclay Street, Floor 4 East, New York, New York 10286, Attn: Bankruptcy Department; (h) counsel to the indenture trustee under the 2017 senior notes, Akin Gump, One Bryant Park, New York, New

York 10036, Attn: Phillip C. Dublin, Daniel H. Golden, Abid Qureshi, and Sara L. Brauner; (i) the indenture trustee under the Debtors' 7.25% senior notes due 2019, Wilmington Savings Fund, FSB, 500 Delaware Avenue, Wilmington, Delaware 19801, Attn: Bankruptcy Department; (j) the indenture trustee under the Debtors' 7.5% senior notes due 2020, Delaware Trust Company, 2711 Centerville Road, Wilmington, Delaware 19808, Attn: Bankruptcy Department; (k) counsel to certain holders of the 2019 and 2020 senior notes, Brown Rudnick, Seven Times Square, New York, New York 10036, Attn: Bob Stark and Sigmund Wissner-Gross; (l) counsel to the Official Committee of Unsecured Creditors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn: Mark R. Somerstein, Keith H. Wofford, and D. Ross Martin; (m) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Paul K. Schwartzberg; (n) HPIP (as defined in the Motion); and (o) Nordheim (as defined in the Motion).

## IV.  PRAYER

WHEREFORE, Nordheim requests that the Court deny the relief sought by Sabine in its Omnibus Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts, and that the Court grant Nordheim such other relief as the Court deems just.

                        Respectfully submitted,

                        **BRACEWELL & GIULIANI LLP**

                        By: */s/ William A. (Trey) Wood III*
                            William A. (Trey) Wood III (*pro hac vice*)
                            Jason G. Cohen (*pro hac vice*)
                            Bracewell & Giuliani LLP
                            711 Louisiana Street, Suite 2300
                            Houston, Texas 77002
                            Telephone: (713) 223-2300
                            Facsimile: (713) 221-1212
                            Trey.Wood@bgllp.com

#5013750

        Jason.Cohen@bgllp.com

        -and-

        Robert G. Burns
        Bracewell & Giuliani LLP
        1251 Avenue of Americas, 49th Floor
        New York, New York 10020-1104
        Telephone: (212) 508-6100
        Facsimile: (800) 404-3970
        Robert.Burns@bgllp.com

        **COUNSEL FOR NORDHEIM EAGLE FORD GATHERING, LLC**

#5013750