Paul M. Basta, P.C.
Jonathan S. Henes, P.C.
Christopher Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) Case No. 15-11835 (SCC) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS
TO DEBTORS' OMNIBUS MOTION FOR ENTRY OF AN ORDER
AUTHORIZING REJECTION OF CERTAIN EXECUTORY CONTRACTS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby submit this reply (the "Reply") in support of the *Debtors' Motion for Entry of an Order*

*Authorizing Rejection of Certain Executory Contracts* [Docket No. 371] (the "Motion")[2] and in

opposition to the objections thereto (the "Objections"). For the reasons set forth in the Motion,

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corporation (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440). The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is: 1415 Louisiana, Suite 1600, Houston, Texas 77002.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

in the declaration to be filed in advance of the Hearing, and as further set forth in detail herein, the Objections should be overruled.

### Preliminary Statement

1.      On September 30, 2015, the Debtors filed the Motion to reject the Nordheim Agreements and the HPIP Agreements (together, the "Agreements") because the Debtors determined, in the sound exercise of their business judgment, that the agreements place significant burdens on the Debtors' estates, that the burdens far outweigh any benefits provided thereunder, and that the rejection thereof could save the Debtors as much as $115 million. HPIP and Nordheim (together, the "Objectors") have objected to the Motion and assert that certain acreage dedications (each, an "Acreage Dedication") in the Agreements cannot be eliminated via rejection because they are covenants that run with the land under Texas law.

2.      As an initial matter, HPIP did not complete—but rather permanently halted—the construction of the facilities necessary to perform the services required of HPIP under its contracts.  Instead, the Debtors have been forced to bear the costs of gathering and manually transporting their oil and water without a facility in place, and have had no alternative but to flare all of their gas produced from the HPIP Dedicated Area.  Indeed, it is this very material breach that resulted in the prepetition *termination* of the HPIP Agreements, making the motion to reject necessary only in the event that the HPIP agreements were not terminated prepetition.

3.      As to the substance of the Objections, the Debtors did not grant *any* property interest to HPIP whatsoever; even if HPIP had performed under its agreements and built the required facilities, such facilities were to be built on non-estate property.  Despite these facts, and despite the fact that under applicable Texas law the Debtors did not convey any real property interest to HPIP (a flaw fatal to HPIP's objection), HPIP relies on a single, out-of-context

sentence in its agreements to assert an illusory property interest that would prohibit the Debtors from fully rejecting the HPIP Agreements.[3]

4.      Nordheim, like HPIP, fails to address the incongruity between one or two ill-defined "running with the land" phrases in the Agreements and the clear intent of the parties embodied in several phrases in the Nordheim Agreements that unambiguously state that Sabine is **not** transferring any title in the mineral estate to Nordheim.  Moreover, it is important to recall what "land" is at issue in the Nordheim Agreements.  The mineral estate at issue is owned by Sabine South Texas (which is not party to the Nordheim Agreements) and not by Sabine Oil & Gas Corporation ("Sabine").  Sabine could not have, and did not, convey an interest in a mineral estate that it does not own.  Nordheim, like HPIP, also fails to meet its burden of demonstrating that the Nordheim Agreements satisfy the elements required for an interest to "run with the land."

5.      The Agreements (to the extent not terminated prepetition in the case of HPIP) are gas gathering agreements with ongoing obligations on both sides for the exclusive midstream provision of gas delivery and processing service.  They contain hallmarks that are anathemic to grants of interests in real property (including, but not limited to, termination provisions, end dates, volume commitments, and options to purchase and sell).  The Agreements are similar to any other services contract of a debtor that is subject to rejection.  Services agreements such as these that place burdensome obligations on a debtor in bankruptcy are precisely the type of agreements that debtors are meant to be able to reject in the exercise of their business judgment when the market no longer supports the rates or values committed to in the contracts.

---

[3]    Notably, HPIP admits in its objection that its alleged state law property interests have never been recorded.

3

## Background

### The HPIP Agreements

6.      Sabine is an independent energy company engaged in the acquisition, production, exploration, and development of onshore oil and natural gas properties in the United States. Sabine owns certain oil and gas leases in the Eagle Ford region in Gonzales and Wilson Counties, Texas.  As part of its plans to begin developing oil and gas from those leases, Sabine entered into negotiations with HPIP Gonzalez, LLC.  On May 3, 2013, Sabine entered into a Production Gathering, Treating and Processing Agreement (the "HPIP Gathering Agreement") with HPIP Gonzalez, LLC ("HPIP") containing the following material terms:

- HPIP agrees to construct, own, operate, and maintain a gas gathering facility (the "HPIP Gathering Facility"), along with pipelines to connect the HPIP Gathering Facility to the wellheads of Sabine's wells.  *See* HPIP Gathering Agreement § 2.1, 3.1.

- HPIP agrees to make all reasonable efforts to complete "a material portion" of construction of the HPIP Gathering Facility by December 31, 2013 and to commence gathering services by May 31, 2014.  *See id.* § 3.1.7.

- HPIP agrees to process all of the gas produced and delivered to it by Sabine from Sabine's wells within a certain geographical area (the "HPIP Dedicated Area"), and to redeliver such gas to Sabine's metered points of redelivery, where Sabine resumes control of the gas either directly or by having the gas transferred the designated pipeline of a third party.  *See id.* § 3.1.4.

- Sabine dedicates and agrees to deliver all of the gas that it produces from the wells in the HPIP Dedicated Area to HPIP for processing.  *See id.* § 1.2.

- Sabine agrees to pay several fees for HPIP's processing services, which are based on the volume of gas delivered to HPIP for production or other factors, and which fees include (1) a gathering fee, (2) a dehydration fee, (3) a processing fee, (4) a compression fee, (5) a carbon dioxide treating fee, (6) a hydrogen sulfide treating fee, (7) a liquids gathering fee, (8) an electrical generation fee, (9) an oil H2S treating fee; and (10) a nitrogen treating fee.  *See id.* § 5.

- The agreement also provides that, during its first four years, if Sabine terminates its drilling program within the HPIP Dedicated Area or stops new drilling for more than a 12 month period, HPIP will have the right to sell the HPIP Facilities to the

4

purchaser at a given price (the "Put Provision"), and that such transaction shall be consummated by quitclaim assignment. *See id.* § 8.2.1, 8.2.4.

- The HPIP Gathering Agreement further provides that it shall be a default thereunder if either party to the agreement "fails or is unable to perform any of the agreements or undertaking on its part contained" therein, the other party may terminate the agreement. *See id.* Terms & Conditions § 18.

The HPIP Gathering Agreement also states that "[Sabine] expressly does not by the terms of this Agreement, sell, transfer or assign unto [HPIP] any title or interest whatsoever in [its oil and gas leases]," and that "[t]itle to all [of Sabine's produced oil and gas] shall at all times remain with [Sabine]." *See id.* § 9.2.3, Terms & Conditions § 4.

7.     In May 2014, Sabine and HPIP entered into a Water and Acid Gas Handling Agreement (the "HPIP Handling Agreement," and, together with the HPIP Gathering Agreement, the "HPIP Agreements") providing for Sabine to deliver certain fluids to HPIP for processing and disposal and for HPIP to construct a fluid disposal facility (the "HPIP Handling Facility" and, together with the HPIP Gathering Facility, the "HPIP Facilities") to achieve the same. *See* HPIP Handling Agreement § 1.2, 3.1. The HPIP Handling Agreement also provides for Sabine to pay fees for capital and operating expenses of the construction and operation of the HPIP Handling Facility. *See id.* § 5. The HPIP Handling Agreement also provided that if HPIP suspended or modified operation of the HPIP Handling Facility, Sabine could terminate its commitments under the HPIP Handling Agreement. *See id.* § 1.2.

8.     In September 2014, HPIP disclosed to Sabine that the HPIP Facilities would not function as intended, and permanently halted construction in November 2014. In December 2014, HPIP announced that it would proceed unilaterally with a redesign of the HPIP Facilities that would make it impossible for Sabine to recover and sell its natural gas as contemplated under the HPIP Agreements. Upon information and belief, HPIP has not moved forward with the redesign.

5

### *The Nordheim Agreements*

9.      In 2013, Sabine South Texas LLC (a subsidiary of Sabine) acquired certain oil and gas leases in the Eagle Ford region in DeWitt County, Texas.  As part of the plan to begin developing those leases, Sabine entered into negotiations with Nordheim Eagle Ford Gathering, LLC ("Nordheim").  On January 23, 2014, Sabine entered into two agreements with Nordheim: (1) a Gas Gathering Agreement (the "Nordheim Gas Gathering Agreement") and a Condensate Gathering Agreement (the "Nordheim Condensate Gathering Agreement" and, together with the Nordheim Gas Gathering Agreement, the "Nordheim Agreements").  The Nordheim Agreements contain substantially the same terms, with the only difference being that the Nordheim Gas Gathering Agreement is for the treatment and processing of natural gas, while the Nordheim Condensate Gathering Agreement is for the treatment of natural gas liquids.  The Nordheim Agreements provide for the following material terms:

- Nordheim agrees to construct and operate a gas gathering facility (the "Nordheim Gathering System"), along with pipelines to connect the Nordheim Gathering System to the wellheads of Sabine's wells.  *See* Nordheim Agreements § 2.1.

- Nordheim agrees to "receive," "treat," "dehydrate," and redeliver to Sabine or a designated third party all of the "Dedicated Gas delivered" to it by Sabine, and to similarly receive and redeliver all condensate delivered to it by Sabine that satisfies certain purity requirements.  *See id.* § 2.3.

- Sabine dedicates and agrees to deliver "all Gas/Condensate produced" from the wells in the Nordheim Dedicated Area to Nordheim for processing.  *See id.* § 1.1.

- Sabine agrees to pay certain gathering fees for Nordheim's processing services.  *See id.* § 5.1.

- Sabine agrees, for each year of the contract, to deliver certain minimum volumes of gas and condensate (the "Minimum Volume Commitment") or pay an additional fee (each such fee a "Deficiency Payment").  *See id.* § 1.9.

10.     In September 2014, Nordheim completed construction of the Nordheim Gathering system and begin to provide gathering services to Sabine.

***The Objections***

11.    On September 30, 2015, the Debtors filed the Motion seeking rejection of the

Agreements.    On October 7, 2015, each of Nordheim and HPIP filed the Objections to the

Motion (respectively, the "Nordheim Objection" and the "HPIP Objection").    Notably, HPIP

does *not* object to the Debtors' rejection of the HPIP Agreement.    Instead, HPIP argues that

although the Debtors may reject the HPIP Agreement, the Debtors are not permitted to avoid

certain of the burdens contained therein (specifically, HPIP's asserted ownership interest in the

Debtors' Acreage Dedication).    HPIP Objection ¶ 8.    Nordheim argues that the Debtors are not

permitted to avoid the Acreage Dedication and transport fees, and argues that the Debtors do not

meet the business judgment standard in rejecting the contract because they are unable to avoid

their obligations thereunder.    Nordheim Objection ¶ 16.

<u>**Argument**</u>

**I.    Rejection of the Nordheim Agreements Is Well Within the Debtors' Business
Judgment.[4]**

12.    Courts in this district and elsewhere have consistently held that the standard of

review for determining whether the rejection of an executory contract is appropriate is the

"business judgment" standard.    *See In re Enron Corp.*, Case No. 01-16034 (AJG), 2006 WL

898033, at *4 (Bankr. S.D.N.Y. Mar. 24, 2006) ("In determining whether to approve a [debtor's]

decision to reject such lease or contract, a court applies the 'business judgment' test which is met

if the rejection is beneficial to the estate."); *In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 51

(Bankr. S.D.N.Y. 2004) (same); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984)

(recognizing that the "business judgment" standard is used to approve rejection of executory

---

[4]    Rejection of the HPIP Agreements also falls squarely within the Debtors' business judgment, as detailed in the
Motion and as evidenced by HPIP's failure to challenge the Debtors' business judgment in rejecting the HPIP
Agreements.

7

contracts); *In re Klein Sleep Prods., Inc.*, 78 B.3d 18, 25 (2d Cir. 1996) (same).  The business

judgment standard sets a low bar for court approval of rejection by requiring that a court approve

a debtor's business decision unless that decision is the product of bad faith, whim, or caprice.

*See Westbury Real Estate Ventures v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555,

558 n.1 (Bankr. S.D.N.Y. 1996), *appeal dismissed*, 210 B.R. 506 (S.D.N.Y. 1997); *In re Balco

Equities Ltd., Inc.*, 323 B.R 85, 98 (Bankr. S.D.N.Y. 2005) (explaining that "a court should defer

to a debtor's decision that rejection of a contract would be advantageous unless the decision is so

unreasonable that it could not be based on sound business judgment, but only on bad faith or

whim") (quotation omitted); *see also In re Optim Energy, LLC*, Case No. 14-10262 (BLS) (D.

Del. July 23, 2015), H'rg Tr., at 89:17-20 (explaining that section 365 of the Bankruptcy Code

and an "immense body of case law" related thereto provide for "an exceedingly low or liberal

standard for rejection"); *In re Penn Traffic Co.*, 524 F.3d 373, 377 (2d Cir. 2008) (referring to

the "deferential standard applied to debtors' business judgments" and the "low threshold of the

business judgment test").  Rejection of an executory contract or an unexpired lease is appropriate

where such rejection would benefit the estate.  *See In re Stable Mews Assocs., Inc.*, 41 B.R. 594,

596 (Bankr. S.D.N.Y. 1984).

13.    Nordheim argues that the Debtors cannot meet the "exceedingly low" business

judgment standard here because the Debtors will be unable, through rejection, to free themselves

from the Acreage Dedication provisions and the transport fees in the Nordheim Agreements,

which Nordheim argues "run with the land" under Texas law.  Nordheim Objection ¶ 16.  This

argument misses the point of the Motion.  Under the Nordheim Agreements, the Debtors are

obligated to deliver a minimum volume of gas and condensate each year or make a Deficiency

Payment.    These Minimum Volume Commitments and Deficiency Payment obligations

constitute the most burdensome elements of the Nordheim Agreements, and clearly do not run with the land. Indeed, Nordheim does not argue otherwise. Because of the significant burden that these obligations place on the Debtors' estates (the accrued Deficiency Payment alone is $35 million), the Debtors' decision to reject the Nordheim Agreements satisfies the business judgment standard simply by virtue of the conversion of the Deficiency Payment Obligations into unsecured claims for rejection damages.

14.     The Debtors are faced with burdensome obligations that would allow Nordheim (and HPIP, though HPIP does not oppose rejection) to hamper the Debtors' reorganization efforts by preventing the efficient use of property of the estate. Further, contractual obligations to perform in the face of significantly altered economic circumstances are precisely the types of burdens that Debtors are meant to be able to reject in bankruptcy. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("the purpose behind allowing . . . rejection of executory contracts is to permit the trustee or debtor-in-possession [to] renounce . . . burdensome" obligations) (internal citations omitted). Thus, the Debtors' rejection of the Agreements should be approved.

## II.     The Agreements Do Not Contain Covenants Running With the Land.

15.     As the centerpiece of each of the Objections, the Objectors argue that certain provisions of the Agreements are covenants "running with the land" under Texas law[5] and, as such, are not subject to section 365 of the Bankruptcy Code. *See* Nordheim Objection ¶ 12, HPIP Objection ¶ 3.[6] Specifically, they claim that the Acreage Dedications contained in the

---

[5]   Each of the Agreements states that it is governed by Texas law. *See* Nordheim Agreements § 7.1; HPIP Gathering Agreement § 9.5; HPIP Handling Agreement § 8.5.

[6]   Nordheim also argues that the fees Sabine is required to pay for Nordheim's gathering services run with the land. *See* Nordheim Objection ¶ 24.

Agreements, in which Sabine "dedicates and agrees to deliver" all of the oil and gas that it produces from a certain area, are covenants "running with the land"—the land being the mineral interests from which Sabine produces such oil and gas—because somewhere in each contract there is "running with" language.[7]  *Id.*

16.    Under Texas law, however, a covenant running with the land is not created simply by being named as such in a contract.  *See, e.g., Musgrave v. Brookhaven Lake Property Owners Ass'n*, 990 S.W.2d 386, 395 (Tex. Ct. App. 1999) ("[T]erminology . . . is not dispositive [as to] an obligation intended to run with the land…."); *In re Jenkins*, 74 B.R. 440, 445 (N.D. Ga. 1987) ("[L]anguage in an instrument of conveyance or contract cannot create a covenant running with the land merely by stating that the interest conveyed is such…."); *see also Unit Petroleum Co. v. David Pond Well Service, Inc.*, 439 S.W.3d 389, 396 (Tex. Ct. App. 2014) (stating that under Texas law an "oil and gas lease" is not a lease despite its name).  Rather, in order for a covenant to run with the land under Texas law, it must satisfy five elements, the absence of any one of which is fatal:  (1) there must be privity of estate;[8] (2) the covenant must touch and concern the land; (3) the covenant must relate to a thing in existence or specifically bind the parties and their assigns; (4) the covenant must be intended by the original parties to run with the land; and (5) the successor to the burden must have notice.  *See Inwood North Homeowners' Ass'n, Inc. v. Harris*,

---

[7]    The HPIP Agreements state that "[t]his shall be a covenant attaching to and running with the lands…" without specifically referencing what "this" is.  *See* HPIP Agreements, § 1.2.  The Nordheim Agreements are similarly vague and ambiguous, each stating that "[s]o long as this Agreement is in effect, this Agreement shall [be] a covenant running with the Interests now or hereafter acquired by [Sabine]…."  *See* Nordheim Agreements, § 1.6.

[8]    Contrary to Nordheim's assertion that only "some" Texas courts require privity of estate, privity of estate is absolutely required under Texas law to establish a covenant running with the land, and no Texas court addressing the issue has held otherwise.  *See, e.g., Westland Oil Development Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 910–11 (Tex. 1982); *Wayne Harwell Properties v. Pan American Logistics Center*, Inc., 945 S.W.2d 216, 218 (Tex. Ct. App. 1997); *Panhandle & S.F. Ry. Co. v. Wiggins*, 161 S.W.2d 501, 505 (Tex. Ct. App. 1942); *Clear Lake Apartments, Inc. v. Clear Lake Utilities Co.*, 537 S.W.2d 48, 51 (Tex. Ct. App. 1976), aff'd as modified 549 S.W.2d 385 (Tex. 1977); *MPH Production Co., Inc. v. Smith*, 2012 WL 1813467, *2 (Tex. Ct. App. 2012).

736 S.W.2d 632, 635 (Tex. Sup. Ct. 1987). "In every case where parties seek to enforce a restrictive covenant, the burden of proof is upon them to establish that the covenant was imposed." *Davis v. Skipper*, S.W.2d 318, 321-22 (Tex. Sup. Ct. 1935); *see also Reagan Nat. Advertising of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 495 (Tex. App. Ct. 2002) (quoting *Davis*). HPIP and Nordheim fail to meet this burden, because neither can establish: (1) privity of estate; (2) that the covenant "touches and concerns" the land with which it is alleged to run; or (3) that the parties intended the covenant to run with the land.

**A.    There Is No Privity of Estate Between Sabine and Either Nordheim or HPIP Because There Is No Conveyance of an Interest in Property.**

17.    Under Texas law, "for a covenant to run with the land, the covenant must be made between parties who are in privity of estate at the time the covenant was made, and must be contained in a grant of land or in a grant of some property interest in land." *Wasson Interests, Ltd. v. Adams*, 405 S.W.3d 971, 973 (Tex. Ct. App. 2013); *see also Jim Walter Homes, Inc. v. Youngtown, Inc.*, 786 S.W.2d 10, 11 (Tex. Ct. App. 1980) (finding no privity of estate where allegedly burdened party was not owner of land and explaining that "restrictive covenants which run with the land are created only by parties in privity of estate…."); *In re Energytec, Inc.*, 739 F.3d 215, 221 (5th Cir. 2013) (quoting *Ehler v. B.T. Suppenas Ltd.*, 74 S.W.3d 515, 521 (Tex. Ct. App. 2002)) ("[T]here must be privity of estate between the parties when the covenant was made…."); *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 910 (Tex. Sup. Ct. 1982) (same). "Privity of estate between covenanting parties means a mutual or successive relationship exists to the same rights in property." *Wasson*, 405 S.W.3d at 973; *see also Wayne Harwell Props. v. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex. Ct. App. 1997) ("Texas has accepted the view that this requirement is satisfied by either simultaneous or successive interests in the same land.").

11

18.    In other words, in order to satisfy the requirement that a covenant running with the land be made by parties in privity of estate, one party must have granted, sold, or otherwise conveyed an interest in the property to which the covenant is said to attach.  Under Texas law, a valid conveyance requires both (1) clear language evidencing an actual *grant* of such interest and (2) the *intent* of the grantor to convey an interest in property.  *See Masgas v. Anderson*, 310 S.W.3d 567, 571 (Tex. App. 2010) ("If, from the whole instrument, a grantor and grantee can be ascertained, if there are operative words or words of grant showing an intention of the grantor to convey title to a real property interest to the grantee, and if the instrument is signed and acknowledged by the grantor, it is a deed that is legally effective as a conveyance.").

### i.    The Agreements Do Not Grant An Interest In Property.

19.    A conveyance of a mineral estate or interest therein under Texas law requires the *grant* of such interest.  *See Masgas*, 310 S.W.3d at 571 (holding that there was no conveyance of disputed working interests in oil and gas leases where the relevant agreement "does not contain operative words or words of grant"); *French v. Chevron USA, Inc.*, 871 S.W.2d 276 (Tex. Ct. App. 1994) (holding a mineral estate interest to be conveyed by a deed stating that the grantor did "grant, bargain, sell, convey, set over, assign and deliver" its "interest in and to" the mineral estate); *Prairie Producing Co. v. Schlachter*, 786 S.W.2d 409, 418 (Tex. Ct. App. 1990) (finding rights in a mineral interest to have been "expressly granted and reserved" where "the granting clause of the deed . . . convey[s] 'an undivided one-half interest in and to'" the mineral estate); *Watkins v. Slaughter*, 189 S.W.2d 699, 700 (Tex. Sup. Ct. 1945) ("here the grantor was careful to express his intention and meaning [to grant] a 15/16 interest in and to" the mineral estate).  A landowner may create an interest "by *grant, reservation, or exception*."  *Bagby v. Bredthauer*, 627 S.W.2d 190, 194 (Tex. Ct. App. 1981).

12

<u>The HPIP Agreements</u>

20.    The dedication provision of the HPIP Gathering Agreement that HPIP claims

gives rise to a covenant running with the land states that:

> [Sabine] hereby dedicates and commits to the performance of this Agreement the
> Leases and all of [Sabine's] owned or controlled Production produced and saved
> from [Sabine's] operated Wells located on the Leases, and to ensure the faithful
> performance of the provisions of this Agreement, [Sabine] covenants to deliver
> the same to Gatherer…. This shall be a covenant attaching to and running with the
> lands….

HPIP Gathering Agreement § 1.2.[9]  This language does not amount to a conveyance of real

property because there is no language of conveyance, such as a "grant" of an "interest in" any

leasehold, fee, or other property interest.  *See Masgas*, 310 S.W.3d at 571 (holding that a joint

operating agreement for oil and gas leases was not effective as a conveyance because there were

no "granting words.").  Rather, the provision states only that Sabine "***dedicates and commits***" its

leases and production "***to the performance of this Agreement***."  *Id.*  A plain reading of the

words "dedicate" ("to set apart to a definite use")[10] and commit ("to pledge . . . to some

particular course or use")[11] makes clear that Sabine has not granted or conveyed any property by

this language.  Moreover, Sabine has not dedicated or committed its production to HPIP, but to

the agreement itself.  This language amounts to nothing more than a contractual promise that

Sabine will deliver the oil and gas produced from the HPIP Dedicated Area to HPIP for ***purposes***

***of the agreement and so long as it is in effect***, making HPIP the exclusive gatherer for such oil

---

[9]    The HPIP Handling Agreement similarly states that "[Sabine] hereby dedicates and commits to the performance
of this Agreement all the Fluids produced by the actions and activities contemplated by the Gathering
Agreement…Should [HPIP] suspend or modify operation of the Central Facilities, [Sabine] may, at its option,
terminate the commitment provided for hereinabove.  This shall be a covenant attaching to and running with the
lands and leasehold interests covered hereby…." *See* HPIP Handling Agreement § 1.2.

[10]    "Dedicate." Merriam-Webster's Collegiate Dictionary 324 (11th ed. 2003).

[11]    "Commit." Merriam-Webster's Collegiate Dictionary 324 (11th ed. 2003).

and gas production, and not the recipient of a property grant.[12]   There is likewise no other operative language in the Acreage Dedications or anywhere in the HPIP Agreements indicating a grant, sale, transfer, or other conveyance of property.   To the contrary, the HPIP Agreements state that "[Sabine] expressly does not, by the terms of this Agreement, sell, transfer, or assign unto [HPIP] any title or interest whatsoever in the Leases." *See* HPIP Agreements, § 9.2.2.

The Nordheim Agreements

21.    Similarly, the dedications contained in the Nordheim Agreements state that Sabine:

> Dedicates for gathering under this Agreement,[13] and shall deliver or cause to be delivered . . . all [gas/condensate] produced and saved on or after the Effective Date from wells now or hereafter located within the Dedicated Area or on lands pooled or unitized therewith, to the extent such [gas/condensate] is attributable to the Interests within the Dedicated Area now owned, leased or hereafter acquired by [Sabine and its] successors or assigns.

*See* Nordheim Agreements at § 1.2.[14]   As with the HPIP Agreements, these dedications constitute contractual promises that Sabine shall deliver oil and gas production to Nordheim as the exclusive gatherer but do not contain the appropriate "grant" language that would effectuate a conveyance in the mineral estate to Nordheim.[15]   This is unsurprising, as Sabine does not own the mineral estate referred to in the Nordheim Agreements and thus could not convey an interest

---

[12]   This language also does not identify any **grantee** to whom Sabine's leases and production have been granted. *See Masgas*, 310 S.W.3d at 571 ("If, from the whole instrument, a grantor and grantee can be ascertained . . . it is a deed that is legally effective as a conveyance.").

[13]   As with HPIP's Acreage Dedication, this language fails to satisfy the requirement that a conveyance identify a **grantee**. *See Masgas* at 571.

[14]   Notably, this language does not state that the gathering fees contained in the Nordheim Gathering Agreements run with the land, but Nordheim still claims that the Debtors' obligation to pay such fees cannot be relieved through rejection.  HPIP, on the other hand, does not even attempt to argue that such fees for gathering and processing services run with the land.

[15]   Nordheim argues—in a single sentence—that privity of **estate** exists because privity of **contract** between exists Sabine and Nordheim with respect to the Gathering Agreements.

in something which it does not own—Sabine South Texas owns the mineral estate, and Sabine South Texas is not a party to the Nordheim Agreements.

22.    Further, the Nordheim agreements make clear that title to all oil and gas within the Nordheim Dedicated Area "shall remain with and in [Sabine] or its customers at all times." *See* Nordheim Agreements, Terms & Conditions § 3.7.    Specifically, the Nordheim Agreements state that Nordheim "dedicates" its oil and gas interests "for gathering"—it does not transfer or convey them and, as Nordheim admits in its Objection, Nordheim is obligated to return any gathered and processed gas back to Sabine.    There is no conveyance of any property to Nordheim.

### ii.    The Agreements Expressly Disclaim Any Intent to Convey Property.

23.    "The primary objective in construing mineral and other grants is to determine the intent of the parties from all the language in the instrument." *Concord Oil Co. v. Pennzoil Exploration & Prod. Co.*, 966 S.W.2d 451, 454 (Tex. 1998). "If there are operative words or words of grant showing an intention of the grantor to convey title to a real property interest to the grantee [it is] legally effective as a conveyance."  *Harlan v. Vetter*, 732 S.W.2d 390, 392 (Tex. App. 1987).  Further, oil and gas contracts that disclaim the intent to transfer title or interest in oil and gas properties have been held not to be conveyances.  *See Masgas*, 310 S.W.3d at 571 (holding a joint operating agreement not to include a conveyance of a mineral lease interest where the agreement stated "this shall not be deemed an assignment or cross-assignment of interests covered hereby").

### The HPIP Agreements

24.    The HPIP Agreements contain provisions stating that "[Sabine] expressly does not, by the terms of this Agreement, sell, transfer, or assign unto [HPIP] any title or interest whatsoever in the Leases" and that Sabine "is not obligated to assign and transfer to [HPIP] the

right[s] under its leasehold interest [including] rights of ingress and egress." *See* HPIP Handling Agreement § 8.3; Appx. to HPIP Gathering Agreement § 7. Such disclaimers reveal that the parties' intent in executing the HPIP Agreements was to avoid, rather than consummate, a conveyance of an interest in Sabine's oil and gas properties.

The Nordheim Agreements

25.    The Nordheim Agreements also constitute contractual promises that Sabine shall deliver oil and gas production to Nordheim as the exclusive gatherer, and provide that the Interests dedicated "to the agreement" shall be those "owned, leased or hereafter acquired" by Sabine. *See* Nordheim Agreements § 1.1(a). There is no grant or sale language with respect to Sabine's oil and gas properties contained in the Nordheim Agreements that could serve as evidence of intent to convey.

26.    Indeed, had Sabine and Nordheim wished to consummate a conveyance or sale transaction, they would have used the clear, unambiguous language they used for the sale of a separate parcel of land to Nordheim for purposes of constructing its gathering facilities. Each of the Nordheim Agreements contains a provision contemplating the sale of certain unrelated surface land (which Sabine, rather than Sabine South Texas, actually owned) to Nordheim for purposes of constructing the Nordheim Gathering Facilities, which states that Sabine "shall sell, convey and assign to [Nordheim], via a mutually acceptable assignment and bill of sale with special warranty of title . . . a mutually agreed tract of land sufficiently sized for [Nordheim's] construction and operation of the Gathering system [for] ($410,500.00) as consideration[.]" *See* Nordheim Agreements § 2.4.[16] Indeed, the fact that the Nordheim Agreements provided for an

---

[16]    Subsequently, Sabine and Nordheim executed a surface deed, specifying that Sabine "has GRANTED, BARGAINED, SOLD, and CONVEYED" the tract of land to Nordheim. *See* Special Warranty Deed (emphasis in original).

16

unambiguous conveyance in an unrelated context evidences that, had the parties wanted to include a clear grant in the Acreage Dedication, they could have and would have.  The provision for the sale of land for the construction of the Nordheim Gathering System did not contain the "running with the land" language in the Nordheim Agreements.  *Id.*  Such an unambiguous conveyance reveals that these parties are able to properly and unambiguously convey an interest in real property when such conveyance is their true intent.

### iii.    No Interest in Any "Estate" Is Conveyed By the Agreements.

27.    Texas courts determining whether a mineral estate or any right therein has been conveyed consistently require the grant of an ***interest in the mineral estate***.  *See French*, 871 S.W.2d at 276.  Under Texas law, once minerals are produced they cease to be real property and instead become personalty.  *See, e.g., Sabine Production Co. v. Frost Nat. Bank of San Antonio*, 596 S.W.2d 271, 276 (Tex. Ct. App. 1980) ("Once minerals have been severed from the reservoir or strata wherein they were originally contained, such minerals … become personalty."); *Colorado Interstate Gas Co. v. Hunt Energy Corp.*, 47 S.W.3d 1, 10 (Tex. Ct. App. 2000) ("Once oil or gas has been severed from the ground, it becomes personalty."); *Riley v. Riley*, 972 S.W.2d 149, 155 (Tex. Ct. App. 1998) (*citing Phillips Petroleum Co. v. Adams*, 513 F.3d 355, 363 (5th Cir. 1975) ("Texas law provides that oil and gas are realty when in place and personalty when severed from the land by production.").

### The HPIP Agreements

28.    In addition to containing no language of any grant or evidence of any intent to grant or convey any property whatsoever, the interest in which HPIP claims the Acreage Dedication runs is not a mineral estate.  HPIP Objection ¶ 23.[17]  HPIP cites no authority to

---

[17]    Rather, the Acreage Dedication in the HPIP Gathering Agreement is a dedication of the "Production" from the HPIP Dedicated Area. *See* HPIP Gathering Agreement, Terms & Conditions § 25.

support its contention that an acreage dedication constitutes a real property interest in the mineral estate under Texas law.  Sabine's research has uncovered no such authority either.  As discussed further above, there is no basis whatsoever to conclude that an acreage dedication of Sabine's oil and gas production (to HPIP or Nordheim) constitutes a real property interest.

The Nordheim Agreements

29.    Nordheim alleges that the "land" at issue—*i.e.*, the real property that must have been conveyed—is the "Interests," which are defined as "any right, title, or interest in lands and the right to produce oil and/or Gas therefrom, whether arising from fee ownership, leasehold ownership, or arising from any pooling, unitization, or communization of any of the foregoing rights."  *See* Nordheim Agreements, Appx. § 1.27.  Thus, the "land" at issue is Sabine South Texas's fee simple determinable ownership interest in the mineral estate.  The Nordheim Agreements, therefore, cannot convey to Nordheim any interest whatsoever in any mineral estate because the mineral estate is owned by Sabine South Texas, and Sabine South Texas is not a party to the Nordheim Agreements.

**iv.    The Nordheim Agreements Lack Any Element of "Vertical" Privity.**

30.    HPIP and Nordheim each devote significant space in their respective Objections to the distinction between vertical and horizontal privity, ignoring the requirement for a conveyance entirely and arguing that only vertical privity is required for a covenant to run with the land.  While the lack of a conveyance alone is sufficient to defeat the Objectors' running with the land arguments, Nordheim's argument also fails on the "vertical" element of privity.  Vertical privity under Texas law requires "the succession of ownership of the burdened property."  *In re Energytec*, 739 F.3d at 222.  The Debtors' oil and gas leases located in the Nordheim Dedicated Area are owned by Sabine South Texas LLC, not by Sabine.  Sabine South Texas LLC is not a

party to the Nordheim Agreements and has not conveyed these interests to Sabine.  Accordingly, there is no succession of ownership—from Sabine South Texas LLC to Sabine—of the burdened property, and, therefore, the requirement of vertical privity is not satisfied.

31.    In the Nordheim Objection, Nordheim cites an industry paper from 2005 (almost a decade before the execution of the HPIP Agreements) to note that dedication acreage provisions are common practice in the oil and gas industry, and claims that the paper stands for the proposition that such provisions "giv[e] the grantee the benefit of an interest in the grantor's mineral rights."  Nordheim Objection ¶ 12.  On the contrary, the industry paper in question makes no mention of any grant of a property interest, but only states that "it is not uncommon for the gatherer to require a dedication of the producer's right, title and interest in production." Judith M. Matlock, *Natural Gas Gathering, Transportation and Storage Agreements*, No. 3 RMMLF-INST Paper No. 6 (2005).  A more recent industry paper from the same trade journal describing acreage dedications similarly states that such dedications provide the gatherer with the exclusive right to process the production from the dedicated area.  *See* Michael L. Pate, *Treating and Processing Agreements*, No. 1 RMMLF-INST Paper No. 10 (2011) ("In an acreage dedication, a producer commits to process all of its production from a certain geographic area or collection of wells at the processor's facility.").  Neither of these papers states what Nordheim has claimed or makes any mention of any grant of a property interest in the context of an acreage dedication.

32.    Both Texas case law and practice-oriented descriptions of gas gathering agreements provide a wide-angle view of the purpose of gas gathering agreements and the provisions contained therein.  This perspective only supports what Texas law already provides

directly—that the Acreage Dedications in the Agreements do not convey any property interest and are not covenants that run with any land.

### B.  The Acreage Dedications Do Not Touch and Concern the Land.

33.    The second element required to establish that a covenant runs with the land under Texas law is that such covenant must "touch and concern" the burdened land.  *See Inwood*, 736 S.W.2d at 635; *Wayne Harwell Props.*, 945 S.W.2d at 218.  In *Westland Oil*, the Texas Supreme Court confirmed that the "tests involved in making this determination are far from absolute," but cited two "tests" that had been used throughout the years:

> [A] covenant will run with the land if it affected the nature, quality or value of the thing demised, independently of collateral circumstances, or if it affected the mode of enjoying it; and

> If the promisor's legal relations in respect of the land in question are lessened—his legal interest as owner rendered less valuable by the promise—the burden of the covenant touches or concerns the land; if the promisee's legal relations in respect to the land are increased—his legal interest as owner rendered more valuable by the promise—the benefit of the covenant touches or concerns the land.

*Westland Oil*, 637 S.W.2d at 911.

34.    In *El Paso Refinery*, the Fifth Circuit rejected the argument that a covenant affecting the value of land necessarily touched and concerned the land, noting that "even when a covenant impacts the value of land, it must still affect the owner's interest in the property or its use in order to be a real covenant."  *In the Matter of El Paso Refinery, LP*, 302 F.3d 343, 357 (5th Cir. 2002); *see also In re Energytec, Inc.*, 739 F.3d 215, 224 (5th Cir. 2013).  Because, as demonstrated above, the Acreage Dedications concern personal, rather than real, property, the Agreements have "no direct impact on the land itself."  *See El Paso Refinery*, 302 F.3d 343 (5th Cir. 2002) (holding that an allocation of personal payment liability for environmental costs associated with a parcel of land does not touch and concern the land under Texas law).

**C.      HPIP and Nordheim Cannot Demonstrate that the Parties Intended to Create Covenants Running with the Land.**

35.      In addition to lack of intent to convey a property interest, there is also a lack of intent by the parties to the Agreements to further create a covenant that runs with the land.  "In attempting to ascertain the intention of the parties [to an alleged restrictive covenant, a court] must look to the entire instrument in the light of the stated covenant." *Billington v. Riffe*, 492 S.W.2d 343, 346 (Tex. Ct. App. 1973).  In the Nordheim Objection, Nordheim gives short shrift to the intent of the parties to create a covenant running with the land, despite bearing the burden of proof on this (and all other) elements.  *See* Nordheim Objection ¶ 21 (citing to only one phrase of the Nordheim Agreements and stating simply that "the language used in an agreement is the primary evidence of intent").  HPIP provides a slightly more descriptive analysis but relies only on the Acreage Dedications to claim that "there can be no mistake that both Sabine and HPIP intended the Acreage Dedications to constitute covenants running with the land."   HPIP Objection ¶ 18.

36.      In light of the nature and term of the entirety of the Agreements, however, the Nordheim and HPIP cannot demonstrate that the parties clearly intended to create an interest running with Sabine's land interests.  As further discussed above, there is nothing that identifies either Nordheim or HPIP as a grantee of any property interest, and there is no language of conveyance—such as a "grant," "sale," or "assignment"—of an "interest in" any leasehold, fee, or other property estate.

**III.     HPIP's and Nordheim's Reliance on *Energytec* for the Proposition that the Acreage Dedications Run with the Land Is Misplaced.**

37.      The Objectors rely almost exclusively on *In re Energytec* for the proposition that the Acreage Dedications run with the land.  *In re Energytec, Inc.*, 739 F.3d 215 (5th Cir. 2013).  In *Energytec*, the Fifth Circuit considered the issue of whether an agreement to pay

transportation fees ran with an oil and gas pipeline.  *Id*. at 217.  In that case, Mescalaro had sold

a gas pipeline system to Producers Pipeline Company.  *Id.*  As part of the sale, Producers had

agreed to pay a transportation fee to Mescalaro based on the amount of gas flowing through the

pipeline.  *Id.*  The parties agreed that the agreement to pay this fee would be a covenant running

with the pipeline itself.  *Id.*  Producers subsequently conveyed the pipeline to Energytec, and

Mescalaro conveyed its interest in the transportation fees to Newco.  *See id.* at 222.  In

bankruptcy, Energytec attempted to sell the pipeline to a third party free and clear of the

obligation to pay the transportation fees to Newco.  *Id.* at 217.  Addressing the issue of privity,

the *Energytec* court reviewed analyzed its facts in the context of *Wayne Harwell*, explaining the

latter case as follows:

> The court held there was no privity of estate between the developer Harwell and
> the land owner, meaning no conveyance of a real property interest created the
> rights . . . the beneficiary of these rights was simply a developer who contracted to
> work with the landowner….  The alleged remarkable similarity of facts between
> the present case and *Wayne Harwell* requires equating Mescalaro to the
> landowner and Newco to the developer.  ***In the facts of* [Wayne Harwell*] no*
> ***property was conveyed at the time of creating the developer's rights.  Quite***
> ***differently, here the transportation fee and other benefits for Newco were***
> ***created at the time of a conveyance of real property***….  Had Mescalaro retained
> the transportation fee for itself when it conveyed the pipeline and other real
> property interest to Producers, there would be no question about privity.
> Mescalaro and Producers were in horizontal privity, and a later assignment by
> Mescalaro to Newco satisfies vertical privity.

*Energytec*, at 223 (emphasis added).

38.    Here, the facts are similar to *Wayne Harwell* because there was no conveyance of

any property interest at the time the Agreements were executed from Sabine to HPIP or

Nordheim, from HPIP or Nordheim to Sabine, or from Sabine, HPIP, or Nordheim to any third

party.   Indeed, the main benefit provided to the Debtors under that Agreement is that, in

Nordheim's words, each of Nordheim and HPIP "treats the gas, dehydrates the gas, and then

***delivers the gas back to Sabine*.**"  Nordheim Objection ¶ 5.

39.    Further, and as Nordheim itself explains, the interests conveyed in *Energytec* were "real property pipeline interests," not mineral estates.  *See* Nordheim Objection ¶ 24.  In addressing the "touch and concern" element of the *Inwood* test, the *Energytec* court explained that the transportation pipelines were essential "subsurface roads" through which gas moved from "a starting point along the length of the pipeline to an endpoint."  *Energytec* at 224.  Here, HPIP and Nordheim are attempting to equate the pipelines in *Energytec* to the mineral estates owned by Sabine that were expressly not conveyed in any agreement.  But the mineral estates are not "subsurface roads" through which the oil and gas travels; the only such pipelines involved in this case are those that the Objectors built (or, in the case of HPIP, failed to build) on separate parcels.

40.    Even when reviewed against the case that Nordheim and HPIP rely on most heavily in their Objections, the assertion that the obligations contained in the Agreements run with the land does not pass muster.

## IV.    The Only Appropriate Remedy for the Breach Caused By the Debtors' Rejection of the HPIP Agreements and the Nordheim Agreements Is A Claim for Rejection Damages.

41.    Both HPIP and Nordheim object to the terms of the proposed Order on the grounds that their remedies under the Agreements should not be limited to unsecured claims for rejection damages.  Section 365(g) of the Bankruptcy Code, however, clearly states that rejection of an executory contract constitutes a prepetition breach of such contract.  11 U.S.C. § 365(g).  The appropriate remedy for a prepetition breach of contract is an unsecured claim for rejection damages.  Accordingly, these objections should be overruled.

## Conclusion

42.    Rejection of the Agreements is well within the Debtors' business judgment given the cost savings the Debtors would achieve as a result.  In addition, because the contractual

provisions that HPIP and Nordheim claim cannot be rejected are not covenants running with the land, the Court should overrule the Objections and grant the Motion.

Dated:  October 14, 2015
New York, New York

/s/ Jonathan S. Henes, P.C.

Paul M. Basta, P.C.
Jonathan S. Henes, P.C.
Christopher Marcus, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*