Hearing Date and Time: to be determined
Objection Date and Time: to be determined

Mark R. Somerstein
Keith H. Wofford
D. Ross Martin
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: *mark.somerstein@ropesgray.com*
*keith.wofford@ropesgray.com*
*ross.martin@ropesgray.com*

*Counsel to the Official Committee of*
*Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) | Case No. 15-11835 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**SECOND MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS FOR (I) LEAVE, STANDING, AND AUTHORITY TO**
**COMMENCE AND PROSECUTE CERTAIN CLAIMS AND CAUSES**
**OF ACTION ON BEHALF OF THE DEBTORS' ESTATES AND**
**(II) NON-EXCLUSIVE SETTLEMENT AUTHORITY**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corporation (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT AND RELIEF REQUESTED ................................................... 1

FACTUAL BACKGROUND .............................................................................................. 6

I.     Unsecured Creditors Bear the Costs of a Merger That Was Doomed to Fail .................... 6

       A.     The Pre-Combination Entities ................................................................................. 6

       B.     Legacy Forest and Legacy Sabine Enter into Merger Agreement ....................... 10

              1.     The May 2014 Combination Financing Commitment Prior to Oil
                     Market Decline ........................................................................................ 11

              2.     The Additional Commitment Parties ....................................................... 13

       C.     Projections Are Missed by Mid-Summer 2014, Creating a Likely Covenant
              Breach After Closing ............................................................................................ 14

       D.     The Banks, First Reserve and Legacy Sabine Negotiate Alternate Financing
              Amid Declining Oil Prices  (September 12 – November 26) .............................. 17

              1.     The Banks' Early November Proposal ..................................................... 20

              2.     November Negotiations Over a Secured Bridge Facility Falter .............. 22

       E.     A Deal for Alternative Merger Financing Appears Impossible ........................... 25

       F.     Legacy Sabine Implores Legacy Forest to Abandon the Transaction, but
              Forest Insists on Closing the Merger ................................................................... 28

       G.     Wells Fargo Proposes the First Alternative Transaction Structure ..................... 33

       H.     Legacy Forest Opens the Door to Alternative Structures .................................... 36

       I.     Legacy Forest Supplies a Structure That First Reserve, Legacy Sabine and
              the Banks Immediately Adopt to Implement Their Goal ..................................... 39

       J.     Legacy Forest's Executives Stood to Benefit Personally From The
              Combination .......................................................................................................... 40

       K.     Reasons First Reserve and the Banks Wanted an Alternative Structure ............. 41

              1.     The Combined Company Would Face Financial Turmoil ....................... 41

              2.     First Reserve Used Its Control over Legacy Sabine to Obtain a Delay
                     of the Imminent Failure to Provide Distance to the Write-Down of Its
                     Investment ............................................................................................... 42

                     a)     First Reserve Controlled the Legacy Sabine Board ..................... 42

                     b)     First Reserve's Actions in Controlling Legacy Sabine Were
                            Motivated by its Desire to Distance Itself from the Imminent
                            Failure of the Transaction ........................................................... 44

c)     First Reserve Acknowledged the Combined Company Would be Insolvent, But Proceeded with the Transaction to Provide Distance to the Write-Down of the Investment ........................... 46

d)     First Reserve Was Also Motivated to Preserve Its Relationships with the Banks for Other Portfolio Companies............................ 48

3.     The Borrowing Base for the New RBL Facility Was Not Supported....... 49

4.     All Parties Knew that the Borrowing Base Would Be Redetermined Downward at the Next Redetermination Date ........................... 52

5.     The Debt Financing "Was Largely a Workout" ....................... 54

L.     Legacy Forest's Board of Directors Disregarded the Consequences of the Combination to Creditors........................................................ 58

M.     The Legacy Forest and SOGC Board Effectuate the Merger and Financing ....... 61

1.     The Decisionmakers:  Legacy Forest / SOGC's Board of Directors at the Time of the Combination ................................. 61

2.     Actions Taken by the Respective Boards ................................. 62

N.     SOGC Begins a Restructuring Process Almost Immediately After the Combination Closed........................................................... 66

II.     Demand ........................................................................ 67

BASIS FOR RELIEF ................................................................. 67

I.     The Legal Standard for Derivative Standing ................................. 67

II.     The Intentional Fraudulent Conveyance Claims Are Colorable...................... 70

A.     Statutory Bases for Causes of Action and Remedies........................... 72

1.     Intent to Hinder or Delay Creditors ........................................ 73

2.     The Badges of Fraud........................................................ 74

3.     Remedies Under Bankruptcy Code Sections 550 and 551 ...................... 75

B.     In Approving the Financing and Consummating the Merger of Legacy Sabine into Legacy Forest, Legacy Forest Intended to Hinder, Delay and Defraud the Creditors of Legacy Forest and Legacy Sabine ..................................... 77

1.     The Relevant Decision-Maker ................................................ 77

2.     First Reserve Seeks To Delay the Imminent Failure of the Legacy Sabine Investment Through a Transaction the Sabine-Slate Directors Knew Was Doomed to Fail........................................................ 79

3.     The Combination Closes With Full Knowledge by All Parties of an Imminent  and Unavoidable Liquidity Crisis by an Insolvent and Overleveraged Combined Company........................................ 81

4.     Hindering, Delaying and Defrauding Legacy Forest and Legacy Sabine Creditors Generally ....................................... 83

- ii -

a)      Intended Impact on Legacy Forest Unsecured Notes ................... 83

b)      Intended Impact on Legacy Sabine Unsecured Notes .................. 84

c)      Intent to Hinder, Delay and Defraud............................................... 85

5.      The Legacy Forest Board, Consisting of the Sabine-Slate Directors, Intended to Hinder, Delay and Defraud Legacy Forest Creditors by Attempting To Evade the Change of Control Premium............................ 87

6.      Nearly All Badges of Fraud Are Present Here........................................... 90

III.    The Breach of Fiduciary Duty Claims and Related Aiding and Abetting Claims Are Colorable............................................................................................................. 91

A.      Fiduciary Duties and Remedies ............................................................... 91

1.      Legacy Forest and New York Law of Fiduciary Duties.......................... 91

a)      Fiduciary Duty of Directors and Officers, Generally ................... 91

b)      Fiduciary Duties to Creditors under New York Law..................... 92

2.      Legacy Sabine and Delaware Law of Fiduciary Duties............................ 94

a)      Fiduciary Duties of Delaware LLCs, Generally, and the LLC Agreements of Legacy Sabine and the Legacy Sabine Subsidiaries.................................................................................... 94

b)      Fiduciary Duties to Creditors under Delaware Law ..................... 95

B.      Claims for Breaches of Fiduciary Duty Are Colorable ......................... 95

1.      Actions Against Pre-Combination Forest Directors and Officers ........... 97

2.      The Last Clear Chance to Avoid Disaster for Legacy Forest—A Replacement Slate of Directors for Legacy Forest Held a Board Meeting and Approved the Financing, Instead of Terminating the Combination ......................................................................................... 102

3.      First Reserve Was a Controlling Shareholder........................................ 106

4.      Legacy Sabine Subsidiaries and Legacy Sabine ..................................... 107

C.      Claims Against the New RBL Lenders for Aiding and Abetting Breaches of Fiduciary Duty Are Colorable ............................................................ 111

1.      Aiding and Abetting Breaches of Fiduciary Duties of the Sabine-Slate Directors on the Legacy Forest Board .................................................... 111

2.      Aiding and Abetting Breaches of Fiduciary Duties of Sambrooks as to the Legacy Sabine Subsidiaries ............................................................ 112

3.      Aiding and Abetting Breaches of Fiduciary Duties of the Original Legacy Forest Board ............................................................................. 113

D.    There Are Colorable Claims Against the Various Directors and Officers of Legacy Sabine and Legacy Forest, Managers of the Legacy Sabine Subsidiaries, and First Reserve Defendants, for Aiding and Abetting Breaches of Fiduciary Duty .................................................................................................. 114

IV.    The Equitable Subordination Claims Are Colorable ....................................... 115

A.    Legal Basis for Equitable Subordination Claims and Remedies ....................... 116

1.    Inequitable Conduct ...................................................................... 116

2.    Injury to Unsecured Creditors or an Unfair Advantage to the Banks ..... 117

3.    "Not Inconsistent with" Bankruptcy Law ........................................ 117

B.    The Inequitable Conduct of the New RBL Lenders Must Be Closely Scrutinized in Light of the Financial Leverage They Asserted Over the Debtors ........................................................................................... 118

C.    The Conduct of the New RBL Lenders Was Not Merely "Somehow Unfair," but Exceeded all Standards for Equitable Subordination of Their Claims as Both Insiders and Non-Insiders ......................................................... 121

1.    The New RBL Lenders and New RBL Agent Engaged in Substantial Inequitable Conduct ................................................................ 123

2.    The Conduct of the Banks Caused Substantial Injury to Unsecured Creditors to the Unfair Benefit of the Banks ........................... 125

3.    Equitable Subordination Is Not Inconsistent with Bankruptcy Law ...... 125

D.    Claims under the Second Lien Loan Agreement Should Be Equitably Subordinated at SOGC .................................................................... 126

V.    The Debt Recharacterization Claims Are Colorable ....................................... 127

A.    Statutory Basis for Debt Recharacterization Claims ......................................... 127

B.    Factual Support for Debt Recharacterization ................................................... 129

1.    Incremental Second Lien Loan Claims ................................................ 129

a)    It Was Expected that Repayment Would Only Occur if the Combined Company's Performance Turned Around ................. 129

b)    The Combined Company Did Not Have Adequate Capital, and the Parties Knew That .......................................................... 130

c)    There Was No Financing Available from Other Sources and the Incremental Second Lien Loan Was a Settlement of a Prior, Underwater Commitment, Not a New-Money Arm's-Length Negotiation .............................................................................. 131

d)    "Identity" of Shareholders and Lenders, and Lack of Security for the Advances ........................................................................ 132

VI.    The Debtors Have Unjustifiably Failed to Bring the Proposed Claims ........................... 133

VII.   Non-Exclusive Settlement Authority Is Appropriate...................................................... 140

VIII.  The Court Should Appoint a Mediator to Assist in Resolution of All of the Proposed
       Claims ................................................................................................................................ 140

CONCLUSION.............................................................................................................................. 141

## PRELIMINARY STATEMENT AND RELIEF REQUESTED[2]

1.      The Official Committee of Unsecured Creditors (the "Committee") has conducted an investigation of the events surrounding the business combination that led to the formation of the Debtors in these chapter 11 cases.  Sabine Oil & Gas LLC ("Legacy Sabine"), a portfolio company of the private equity firm First Reserve Corporation ("First Reserve"), combined with and then merged into a publicly traded oil and gas exploration and production company, Forest Oil Corporation ("Legacy Forest").

2.      The transaction was originally conceived in May 2014, when oil prices were high. Even then both sides knew these companies, which were struggling, would be highly leveraged when combined.  To finance the deal, the primary banks for Legacy Sabine made a fully committed financing for the Combined Company for $1.85 billion.  $850 million of this bank commitment was for an unsecured Bridge Loan.  This commitment was led by two of First Reserve's closest relationship banks, Wells Fargo and Barclays (for which First Reserve was a "Platinum relationship").

3.      The deal to acquire Legacy Forest then suffered a series of delays and setbacks, all of which were bad news for First Reserve (which controlled the acquirer Legacy Sabine) and the banks that committed to finance the deal.  A structural issue made the transaction susceptible to rejection by a third of Legacy Forest shareholders, which caused an initial redesign of the structure.  Accounting control issues at Legacy Forest delayed completion of audited financials until late summer.  In August, Legacy Forest reported results 20% below plan.  Then, in the late summer and early fall of 2014, commodity prices began to fall.  The weight of these issues was squarely upon First Reserve and the banks, because Legacy Forest had negotiated for a deal with

---

[2] Capitalized terms used and not otherwise defined in the Preliminary Statement shall have the meaning(s) ascribed to such terms elsewhere in the motion.

- 1 -

no viable "outs" for Legacy Sabine, and the banks similarly had no viable "outs" on the financing commitments they had signed.

4.      As a result, in early November, First Reserve stated that closing the transaction as negotiated would have led to "mutual assured destruction" for both First Reserve and the banks.

5.      The term "mutual assured destruction" was not just email hyperbole.  The Committee's investigation has confirmed that by November 2014, the committed banks found themselves in a position where their unsecured bridge commitment was out-of-the money by hundreds of millions of dollars.  Further, the concern about this loan commitment and the associated losses went to the highest levels of the banks.  Even on Thanksgiving Day 2014, senior bankers from Barclays were making inquiries to the "line" managing directors responsible for the commitment, seeking clarity on the status and the plan to mitigate the potential losses on the unsecured Bridge Loan.

6.      The stakes were even higher for First Reserve.  The Committee's discovery has revealed that, rather than being disinterested fiduciaries propelled purely by the interests of Legacy Sabine, the First Reserve directors had three major institutional interests that motivated their decisions.

7.      First, First Reserve carried its Legacy Sabine equity investment on its books in November and December at ██████████, marked down only marginally from its initial ████████ ██████ investment.

8.      Second, First Reserve had ongoing relationships with the banks, most notably lead banks Wells Fargo and Barclays.  The discovery shows that First Reserve was driven by this larger bank relationship to avoid enforcing the binding commitments of the banks so as to shield the banks from losses.  First Reserve's concern for preserving these bank relationships of its

franchise equaled, if not exceeded, its concern for unsecured creditors.  First Reserve itself stated

succinctly that "flaming [the banks] [w]ould be really bad for future biz."

9.    Third, the size of the potential losses on the Legacy Sabine investment threatened

to bleed over into the rest of the First Reserve platform.  The Legacy Sabine investment was an

early investment of First Reserve Fund XI, and comprised ███% of that entire fund; however, that

fund had barely broken even for investors.  The ████████ "mark" amount would have been a

major part of the investment returns of Fund XI shown to investors.  First Reserve completed a

fundraising for its newest private equity fund at the end of September 2014, in the midst of all

the concerns about the Sabine/Forest transaction.  It is a reasonable inference that had First

Reserve marked its Legacy Sabine position to zero (or down substantially) at or shortly after the

closing of the Forest acquisition, this would have damaged its relationships with limited partners

who had closed on the new First Reserve fund in the fall of 2014.

10.    These institutional motivations, as well as the further deterioration of hydrocarbon

prices through November of 2014, led various parties to take actions that harmed the unsecured

creditors of both Legacy Forest and Legacy Sabine. Negotiations between First Reserve and the

banks occurred throughout November 2014 regarding the fate of Legacy Sabine and Legacy

Forest.  They were not successful.

11.    On December 2, 2014, First Reserve, Legacy Sabine and its board of directors

looked at the situation and proposed to Legacy Forest that it was in the interest of both to

mutually terminate the transaction.  Legacy Forest should have accepted this proposal to

terminate, but it did not.  In the face of this, First Reserve, Barclays and Wells Fargo then

concluded, on or about December 4, 2014, that doing a different transaction could solve the very

serious problems that each had.  If the Combination of Legacy Sabine and Legacy Forest closed

and the banks did not have to fund a Bridge Loan to pay out Legacy Forest Unsecured Notes,

then First Reserve could delay (but not avoid) writing down its investment, the banks would

avoid the bridge commitment, and the economic loss would fall on parties who were not at the

table—the unsecured creditors.  First Reserve (for itself and in control of Legacy Sabine's

financing arrangements) and the banks immediately conducted extensive financial modeling of

this scenario, even as they may not have been able to devise a mechanism to implement it.

Notably, during a critical three-day period from December 4-6, First Reserve and Barclays

personnel deliberately communicated entirely by phone, unwilling to send substantive emails.

They then constructed a term sheet reflecting this intent, and had ideas about a potential legal

structure to accomplish their goal.  This was now their preferred path.

12.     At about this same time, Legacy Forest presented the mechanism ultimately

adopted by which First Reserve would retain the majority economic interest in the Combined

Company, but purport to have less than a majority of voting interests.  At the time, the relevant

Legacy Forest fiduciaries, as well as the banks and First Reserve, were aware that the transaction

would bury Legacy Forest unsecured creditors (who would have had access to unencumbered

assets had the merger been called off) behind Legacy Sabine secured debt and incremental

secured debt added to facilitate the deal.  But within 12 hours of being presented with the idea,

First Reserve and Legacy Sabine were fully supportive.  First Reserve (controlling Legacy

Sabine and its financing arrangements) now had a way that it thought could accomplish what it

intended since the furtive discussions from a week earlier hatched the idea of a "no-bridge"

scenario.  The preferred path was now the intended path.

13.     And so a trade was shaped as follows: the banks would amend the terms of the

new secured lending facility and make a loan with a temporarily inflated borrowing base, even

- 4 -

though the Combined Company was very likely to fail over the relatively near term.  The initial

borrowing base remained at the $1.0 billion committed amount from May 2014, even though oil

and gas prices had respectively dropped by 44% and 24%, rendering the borrowing base

unsupported.  To provide distance to the inevitable liquidity crisis, the banks then agreed not to

reset the borrowing base until April 2014 (instead of 30 days post-closing per the July

commitment).  This artificial inflation of the borrowing base would ultimately lead to default, but

that would likely occur in late 2015.  In addition, the parties directed Legacy Forest to continue

with its Arkoma Assets sale, and the banks agreed not to reduce the already unsupported

borrowing base as a result of the asset sale.  Then, instead of using $205 million of cash on hand

(including the sale proceeds) to pay Legacy Forest creditors when the funds came in prior to the

merger closing, First Reserve, Legacy Sabine and the banks agreed that the money was to be

held through the closing and then used to effectively pay down Legacy Sabine debt two days

after closing, but without reducing the borrowing base.

14.    The proper course was still to terminate the transaction, as Legacy Sabine itself

proposed.  Instead, the First Reserve dominated boards of Legacy Forest and Legacy Sabine and

interested board members went forward with the Combination and approved the alternative

financing, harming unsecured creditors.

15.    Even Wells Fargo justified this troubled-from-the-start loan as a "workout."  The

loan under the New RBL Facility could be made only because of significant additional recourse

from Legacy Forest (which was not previously an obligor to Legacy Sabine's banks), and liens

on Legacy Forest's substantial unencumbered assets.  First Reserve's Legacy Sabine investment

would not go into default immediately, and an artificial reprieve, delaying both unsecured

creditors and delaying the inevitable, was created.

16.     In short, the Legacy Sabine and Legacy Forest Combination presents a simple story.  Two struggling companies decided to combine, when prices were high.  Prices declined, and they should have called off their planned transaction.  Instead, the parties with a long-standing relationship—an equity holder that faced recognizing losses (First Reserve) and banks facing immediate losses on their loan commitments (Wells Fargo, Barclays and other banks)—undertook a transaction that preserved and enhanced their own interests at the expense of unsecured creditors.

## FACTUAL BACKGROUND

17.     The factual background underlying each of the Proposed Claims is set forth in the proposed complaint attached hereto as <u>Exhibit A</u> (the "<u>Proposed Complaint</u>") and is incorporated herein by reference.  In addition, the facts set forth in the *Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Non-Exclusive Settlement Authority* [Docket No. 518] (the "<u>First STN Motion</u>" and Exhibit A thereto, the "<u>Proposed CFC Complaint</u>") are incorporated herein by reference.[3]  Also attached hereto as <u>Exhibit B</u> for the convenience of the Court is a chart listing the various directors, officers, and other key personnel, together with their role and affiliation.

## I.     <u>Unsecured Creditors Bear the Costs of a Merger That Was Doomed to Fail</u>

### A.     *<u>The Pre-Combination Entities</u>*

18.     Prior to the Combination, Legacy Forest was a New York Stock Exchange-listed corporation, with its headquarters in Denver, Colorado, and held substantially all of its assets in that public corporation.  At the time of the Combination, Legacy Forest had approximately $905

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First STN Motion and the Proposed Complaint, attached hereto as Exhibit A.

million of funded debt, consisting of:  (i) a reserve-based lending facility (the "Legacy Forest

RBL Facility") with $105 million outstanding, secured by a first priority lien on, among other

things, certain proved oil and gas reserves; and (ii) approximately $800 million in unsecured

notes, consisting of:  $578 million in 7.25% senior unsecured notes due 2019 (the "Legacy

Forest 2019 Notes") and $222 million in 7.5% senior unsecured notes due 2020 (the "Legacy

Forest 2020 Notes" and, together with the Legacy Forest 2019 Notes, the "Legacy Forest

Unsecured Notes").[4]

19.    Prior to the Combination, Legacy Sabine was a Houston-based portfolio company

of the private equity firm First Reserve Corporation ("First Reserve").  Legacy Sabine had a

holding company structure in which the "parent" Delaware limited liability company did not

hold the primary assets of the Legacy Sabine enterprise.  Instead, a number of subsidiaries (the

"Legacy Sabine Subsidiaries" and together with Legacy Sabine, the "Legacy Sabine Entities")

held the bulk of the enterprise's assets.  Legacy Sabine also had extensive debt obligations at the

time of the Combination, including: (i) a revolving credit agreement, which had approximately

$620 million outstanding (the "Legacy Sabine RBL Facility") at the time of the Combination; (ii)

$650 million outstanding under a second lien loan (the "Legacy Sabine Second Lien Loan")

(increased to $700 million at the time of the Combination); and (iii) $350 million outstanding in

9.75% senior unsecured notes due 2017 (the "Legacy Sabine Unsecured Notes" and the trustee in

respect of such notes, the "Legacy Sabine Notes Trustee").[5]  Because the operating assets of the

Legacy Sabine enterprise were held by the Legacy Sabine Subsidiaries, each of those

---

[4] Prior to the Combination, U.S. Bank National Association was the indenture trustee for both the Legacy Forest 2019 Notes and the Legacy Forest 2020 Notes.  Wilmington Savings Fund Society, FSB is now the indenture trustee for the Legacy Forest 2019 Notes, and Delaware Trust is now the indenture trustee for the Legacy Forest 2020 Notes (together, the "Legacy Forest Notes Trustees").

[5] The Legacy Sabine Notes Trustee is The Bank of New York Mellon Trust Company, N.A.

subsidiaries guaranteed each of the Legacy Sabine RBL Facility, the Legacy Sabine Second Lien Loan, and the Legacy Sabine Unsecured Notes. A chart depicting Legacy Sabine's and Legacy Forest's pre-Combination capital structure is attached as Exhibit A to the Proposed CFC Complaint.

20.    From February through May 2014, the period during which Legacy Sabine and Legacy Forest were in ongoing discussions regarding a potential merger, Legacy Forest was already in financial distress. As early as December 2013, Legacy Forest's financial condition had deteriorated to the point that it was looking for a "way out" and had apparently started scouring the market for any "company with liquid assets." (SAB157597.) First Reserve and Legacy Sabine were well aware of Forest's declining financial situation in December 2013.

21.    Legacy Sabine, controlled by First Reserve, was the larger, more valuable of the two companies. Thus, the merger structure subsequently agreed by the parties contemplated that the equity ratio in the merger would reflect 73.5% Legacy Sabine value and 26.5% Legacy Forest value.

22.    After discovering that Legacy Sabine had "been looking for a 'go public' merger," Legacy Forest CEO Patrick McDonald approached Legacy Sabine board member John Yearwood and the two agreed to meet to discuss a potential merger between the two companies. (SAB00070848.) After meeting with McDonald, Yearwood relayed the substance of the conversation to Legacy Sabine CEO David Sambrooks, who subsequently told members of Legacy Sabine board that Legacy Forest was "in urgent need for a way out and [had] offered up a 'no barriers' path for SABO to reverse merge with them." (DCR00001253.) From the earliest stages of the negotiations, Sambrooks was well aware of the risks associated with Legacy Forest: "debt level, poor [Eagle Ford] well economics, significant CAPEX overspend in 2014, limited

- 8 -

growth potential past 2014, significant risk of multiple contraction." ((DCR00001253; *see also*

Lightner Tr. 31:6–22; 120:5–121:3.)) (noting Legacy Forest concerns in 2014 regarding Eagle

Ford production, debt levels, and overspending that limited growth potential).)

23.    In the same vein, on January 10, 2014, Duane Radtke (another Legacy Sabine

director) wrote to Sambrooks and others on the Legacy Sabine board, commenting that he

viewed the departure of Legacy Forest's president, Cyrus D. Marter, as evidence of an

"additional slow deterioration of the entire company." (SAB00158414.)  On January 15, 2014,

Radtke took the view at this time that Legacy Forest was "in a slow death spiral" and would be

"dead in the water" if it did not do something soon.  (JY00000084.)

24.    During these early negotiations, the potential debt level of a combined Legacy

Forest and Legacy Sabine was already high on each company's radar.  On January 14, 2014,

McDonald made clear to Sambrooks that if Legacy Forest and Legacy Sabine were to merge, the

"combined debt would be viewed as an issue." (SAB00403651.)  McDonald told Legacy

Forest's financial advisor, JPMorgan Securities LLC ("JPMorgan"), that Legacy Sabine "had too

much debt" for purposes of considering a merger, but asked JPMorgan to run models analyzing a

potential combination of the companies anyway.  (SAB00070848.)  McDonald similarly

informed Jim Lightner, Chairman of the Legacy Forest board, that Legacy Sabine "had too much

debt" to be ideal for a merger.  (LIGHTNER0000004.)

25.    On February 16, 2014, Dod Fraser, a member of Legacy Forest's board, argued

that increasing leverage for Legacy Forest's shareholders was an unacceptable prospect:

> A key issue that is not addressed [in the plans for the Combination]
> is leverage.  For us to trade our shareholders from one leveraged
> equity position to another even more leveraged position will not
> work . . . unless we are comfortable with the prospects to handle
> the leverage and fund the necessary capital expenditure.  Seems to
> me that before committing we need a clear view on this which will

> require[] pro formas for a few year[s] that show the necessary growth in EBITDA to match the debt, perhaps aided by divestitures and equity issuance.

(SAB00414081.)  By April, the prospect of continuing with the merger had become increasingly dubious.  On April 19, 2014, Brooks Shughart, a member of the Legacy Sabine board and a director at First Reserve, wrote to Josh Weiner (a Managing Director at First Reserve) that it was "looking like the Forest deal [was] on life support," and that he thought it necessary to "put lawyers on ice for next day or so until [Legacy Sabine could] figure it out to potentially save a couple of dollars."  Shughart lamented that it was "[r]eally just hard to get comfortable on the combined company being a better option than stand-alone [Sabine], much less the incremental leverage and execution risk."  (FRASB00016006.)

26.     In late April 2014, Radtke did not "understand the logic of putting $900 million of [Legacy Sabine's] assets into a company that [Legacy Sabine didn't] think [could] perform operationally and [had] lost most of [its] senior management." (SAB00158550.)  He noted: "If I were Pat [McDonald] I would not appreciate the 'bait and switch' approach.  They want an exit.  Now my head hurts."  (SAB00158550.)

27.     Legacy Forest, meanwhile, was managing its own capital structure issues.  As described in the Proposed CFC Complaint, McDonald had been strategizing in April 2014 about ways to obtain covenant waivers and secure an audit opinion that could get Legacy Forest through the end of the year.  Legacy Forest's stock price had recently dropped by 38%.  (Proposed CFC Complaint ¶¶ 43-44.)

**B.**      ***Legacy Forest and Legacy Sabine Enter into Merger Agreement***

28.     Nevertheless, on May 5, 2014, Legacy Forest entered into an Agreement and Plan of Merger with Legacy Sabine and certain related entities (the "Original Combination Agreement" and, the combination contemplated by such agreement, the "Original Combination").  Because

- 10 -

the corporate steps of the Original Combination included a "downstream" merger of Legacy

Forest into a subsidiary, the New York Business Corporation Law required approval of such

merger by two-thirds of the outstanding Legacy Forest shareholders entitled to vote.  The outside

date for closing was set at November 1, 2014.  (Original Combination Agreement § 8.1(b)(ii).)

29.    The next day, Legacy Forest and Legacy Sabine announced that the Original

Combination would trigger change-of-control provisions contained in the indentures governing

the Legacy Forest Unsecured Notes, and that upon closing, the post-merger company (the

"Combined Company" or "SOGC") would therefore make an offer to holders of the Legacy

Forest Unsecured Notes to redeem their notes at 101% of their outstanding principal amount,

plus accrued interest.

### 1. *The May 2014 Combination Financing Commitment Prior to Oil Market Decline*

30.    Also on May 5, 2014, Legacy Sabine obtained a commitment (the "Commitment"

or "Commitment Letter") from Barclays Bank PLC ("Barclays") and Wells Fargo Bank,

National Association ("Wells Fargo"), with Barclays and Wells Fargo each funding 50% of the

revolving credit facility and the Bridge Loan provided for in the Commitment Letter.

Specifically, the Commitment Letter set forth a reserve-based lending facility (the "New RBL

Facility") with an initial borrowing base of $1.0 billion, the proceeds of which would be used, in

part, to refinance the Legacy Sabine RBL Facility and the Legacy Forest RBL Facility.

31.    Shortly before the May 6 signing of the deal, on April 26, 2014, Wells Fargo had

determined that the maximum conforming borrowing base for SOGC would be $1.056 billion,

based on Wells Fargo's own engineering analysis.  (WF-SABINE_VOL-00016606.)  The

outside date for these commitments was the same as the November 1, 2014 end date of the

Original Combination Agreement.  (Commitment Letter, § 2.)  Wells Fargo recognized that the

terms of its financing for the Commitment Letter entailed a "long tail risk," meaning that the commitment would be left open for a long period.  (WF-SABINE_VOL-00016602 at 16621.) The Commitment Letter mitigated that risk somewhat by providing that the borrowing base for the New RBL Facility would be subject to redetermination 30 days after the closing if the financing closed after September 30, 2014.  (Commitment Letter, Ex. B.)

32.    The Commitment Letter also called for an unsecured bridge facility (the "Bridge Loan") in the aggregate principal amount of up to $850 million, to be used to redeem the Legacy Forest Unsecured Notes that would be subject to a change of control offer.  Under the terms of the Commitment, the Bridge Loan matured one year after it was issued.  However, the Bridge Loan automatically converted upon maturity into a senior unsecured term loan with an eight-year maturity of 2022.  (Commitment Letter, Ex. C, 4.)  Accordingly, the Bridge Loan as committed was actually an eight-year term loan if it could not be refinanced through the bond market.[6]

33.    Even with oil prices at $100 per barrel, the financing commitment caused Sambrooks to admit to investors that the Combined Company "is going to be fairly highly levered coming out of the box."  (SAB00480950.)  Yet at the outset, Barclays never expected to fund the Bridge Loan.  They "expect[ed] the Company to launch a consent process to get the bondholders to amend the indenture to waive the Change of Control."  (BARC_SOGC 00009414.)  In fact, Barclays's commitment to fund the Bridge Loan was motivated by its

---

[6] On July 9, 2014, and in response to certain investor strategies to take "short" positions in Legacy Forest debt and at the same time block the merger, Legacy Forest, Legacy Sabine and related entities entered into an Amended and Restated Agreement and Plan of Merger (the "July Combination Agreement").  Under the July Combination Agreement, Legacy Sabine would become a subsidiary of Legacy Forest and then would merge into Legacy Forest through a series of steps, as described in the Proposed CFC Complaint and depicted in Exhibit C thereto.  Legacy Forest and Legacy Sabine acknowledged that this structure still would have triggered the change-of-control provisions in the indentures governing the Legacy Forest Unsecured Notes.  Thus, the Combined Company would still have to make a 101% tender offer to holders of the Legacy Forest Unsecured Notes.  In connection with the modified July Combination Agreement, on July 9, 2014, Wells Fargo, Barclays and the Additional Commitment Parties entered into an Amended and Restated Commitment Letter (the "July Commitment Letter") with financing terms substantially similar to the Commitment Letter provided by Wells Fargo and Barclays, but extending the commitment to December 31, 2014.

ongoing business relationship with First Reserve.  Barclays viewed its relationship with First

Reserve as "a Platinum relationship," and believed that its "role in [the] transaction" would

"position[] Barclays well for current M&A assignments and future engagements with First

Reserve as well as [Sabine]."  (BARC_SOGC 00009414.)

34.     Similarly, Wells Fargo did not want to have exposure on the Bridge Loan.  Wells

Fargo's "target hold" for the Bridge Loan was *$0*, and its target hold for the New RBL Facility

was $150 million of the $250 million it had committed to fund.  (Scotto Tr. 28:10-29:13.)  If the

Bridge Loan had been funded according to the terms of the July Commitment Letter, Wells

Fargo would have held 25% of the $850 million Bridge Loan, or $212.5 million of a Bridge

Loan on which it intended to have zero exposure.  (Scotto Tr. 36:17-21)   Similarly, Barclays

had an approved hold of only $150 million for its $250 million New RBL exposure, and had a $0

approved hold amount for its $212.5 million Bridge Loan exposure.  (BARC_SOGC 00010860.)

The banks contemplated that high yield securities would be issued by the newly Combined

Company at or following closing, to obviate or take out the Bridge Loan.  (Scotto Tr. 28:10-

29:13.)  Thus the banks took the risk that they would remain lenders on the Bridge Loan, but

thought that the risk would not come to fruition. As described herein, when the bond market

turned, the banks were determined to figure out how to modify or to get out of their Bridge Loan

commitments altogether.

### 2.     *The Additional Commitment Parties*

35.     On May 19, 2014, Capital One Securities, Inc., Capital One, National Association,

Citigroup Global Markets Inc., Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith

Incorporated, Natixis, New York Branch, UBS Securities LLC, UBS AG, Stamford Branch

(collectively, the "Additional Commitment Parties"), Legacy Sabine, Barclays, Wells Fargo, WF

Investment Holdings, LLC and Wells Fargo Securities LLC entered into a Joinder Agreement to

the Commitment Letter  (the "<u>Commitment Joinder</u>").  Pursuant to the Commitment Joinder,

Wells Fargo and Barclays reduced their respective initial 50% commitments, to funding 25% of

each of the New RBL Facility and the Bridge Loan; each Additional Commitment Party

committed to funding 10% of each of such loans.

### C.    *<u>Projections Are Missed by Mid-Summer 2014, Creating a Likely Covenant Breach After Closing</u>*

36.      By June 12, 2014, Legacy Sabine's financial projections showed that the

Combined Company would be in trouble.  On June 12, Ashraf Elias, the Director of Treasury for

Legacy Sabine (who now holds the same role at SOGC), sent Shane Bayless, Legacy Sabine's

CFO, projections showing that the Combined Company would have 0% production growth and

have a debt-to-EBITDA ratio of 4.97x, just 0.03x shy of its 5.0x cap under the Commitment

Letter.  (SAB00077602; SAB00077603.)  Bayless forwarded these projections to Sambrooks

saying, "[w]e need to discuss . . .  this is ugly," and noting that "[he] did not want to distribute

this version" of the projections to the banks.  (SAB00077599.)  Sambrooks replied that he agreed

and could not "see putting this forecast out."  (*Id.*)

37.      Later in June, Elias ran similar projections, this time including a projected sale

of Legacy Forest's assets in the Arkoma basin (the "<u>Arkoma Assets</u>") for $170 million.

(SAB00077428.)  This time, the Combined Company projections —assuming $80 oil, $4 gas and

using 6 drilling rigs— showed a *negative production growth* of -5%, and a net debt-to-EBITDA

ratio of 4.92x.  (SAB00077431.)  In addition, the scenario resulted in a cash flow shortfall for the

company in 2015 of $120 million.  (*Id.*)  To reduce the debt-to-EBITDA ratio, the company

would have to increase capex, thus increasing the cash shortfall.  (*Id.*)  It was clear to Legacy

Sabine even in June 2014 that it was "going to start [its] public company life from [its] own 1

yard line."  (SAB00422576.)

38.     In July 2014, Legacy Forest was continuing to miss its forecasts by a substantial margin.  After Legacy Forest provided Legacy Sabine with new projections that had been revised downward, Bayless commented that Legacy Forest's "[w]alk of shame continue[d]," and Legacy Sabine Senior Vice President Cheryl Levesque noted that the "repeated forecast misses" indicated "serious flaws in [Legacy Forest's] forecasting process."  (SAB00422579.)  Sambrooks affirmed that Legacy Forest's forecasts were "nonsensical" to him, and advised the team at Legacy Sabine that they should "engage on this [in] real time" to get a "real evaluation of the forecast."  (*Id.*)

39.     Legacy Forest continued its downward spiral into August 2014, and, according to Radtke (of Legacy Sabine), the merger started to look like "a much bigger battle" (DCR00001870.)  Sambrooks noted that Legacy Forest's "quarterly miss, reduced guidance and [inability] to file [its] financials" were, taken together, "a bad group of news to come out with." (*Id.*)  By August 11, 2014, Sambrooks's estimation of Legacy Forest's performance was so low that he thought Legacy Forest CFO Victor Wind "look[ed] like damaged goods. . . ." (DCR00001870.)

40.     Legacy Forest's forecasts at this time showed a debt-to-EBTIDA ratio of 6.05x for the first quarter of 2015; this projected ratio would only increase over the rest of 2014. (SAB00078770.)  Around this time, Legacy Sabine and First Reserve learned that Legacy Forest was going to miss its projections for 2014 EBITDA by 20–25%. (FRSABO0002980.)   Legacy Sabine was also going to miss its projections, although by a smaller margin of 3% to 6%.  (*Id.*) Bayless reported to Weiner at First Reserve that Legacy Sabine was projecting that the Combined Company would be in breach of its 5.0x debt-to-EBITDA ratio covenant by year-end 2014.  (*Id.*)

41.    On August 28, 2014, Legacy Sabine and Legacy Forest were continuing to work on a "joint forecast" for the banks.  (*Id.*)  Legacy Sabine's financial model projected for the Combined Company a debt-to-EBITDA ratio of 5.11x for 4Q14 (when the ratio covenant would be 5.0x), 4.71x for 3Q15 (when the ratio covenant would be 4.75x), and 4.51x for 1Q16 (when the ratio covenant would be 4.5x).  (*Id.*)  Sambrooks could not find a model that projected a ratio level of less than 5.0x for 4Q14.  (*Id.*)  Sambrooks told First Reserve that although the Legacy Sabine projections were "quite conservative," he did not "have a high degree of confidence" in Legacy Forest's forecast for the remainder of 2014.  (*Id.*)  Weiner at First Reserve asked whether the underperformance on the pro forma was a result of Legacy Forest's or Legacy Sabine's projections.  (FRSABO00010984.)  Sambrooks responded, "we are under but probably not wildly off. . . . [Forest] is the bloodbath."  (*Id.*)

42.    Weiner agreed that Legacy Forest had "zero credibility" for future projections, correctly noting that "[w]e really don't want to have to ask the banks for covenant relief right now. . .  they will use it as an opportunity to totally recut the economics on the debt commitment."  (*Id.*)  The evidence makes clear that at this time First Reserve was firmly in control of the negotiations concerning the lending facilities.[7]  Notwithstanding the reluctance and concern over the Bridge Loan commitment, First Reserve and Legacy Sabine management agreed that they should seek covenant relief upfront on the New RBL Facility.  At this time, in August 2014, oil prices were generally between $95 and $98 per barrel.

---

[7] The leadership of the combined entity, which was always subject to First Reserve's control, was also in flux at this time.  On or before August 4, 2014, Sambrooks told Bayless that he would not continue as CFO after the Combination.  According to Sambrooks, Bayless criticized senior Legacy Sabine employees, expressed dislike of the Forest deal, and exhibited a lack of engagement in the organizational structure.  (SAB00079017.)  During the search for a new CFO, Legacy Sabine made an offer to Cedric Burgher, the CFO of Quantum Energy Partners. However, when Sambrooks shared with him financial projections that showed a breach of the New RBL Facility shortly after closing, he declined to take the job.  Sambrooks Tr. 73:16-74:11; (SAB00410692.)  SOGC eventually hired Michael Magilton, a former First Reserve associate, as CFO.

D.    **_The Banks, First Reserve and Legacy Sabine Negotiate Alternate Financing Amid Declining Oil Prices  (September 12 – November 26)_**

43.    On September 12, 2014, Legacy Sabine provided Legacy Forest with financial models projecting a breach of the debt-to-EBITDA covenant of the post-Combination company in the first quarter of 2015.  (SAB00407659.)  Legacy Sabine informed Legacy Forest that it intended to ask the New RBL Lenders to modify the covenant for the contemplated New RBL Facility.  (*Id.*)

44.    On September 12, 2014, Sambrooks provided updated forecasts to the banks. Sambrooks notified the banks that the "current forecast will have the combined company in breach of our debt/EBITDA covenants on our revolver," and that there was a "need to modify the covenants on our revolver . . . ."  (WF-SABINE_VOL-00013024.)  The following day, Sambrooks provided the banks with a comparison of the then-current forecast to the model used in April 2014 on the original commitment.  The model created in April 2014 assumed oil prices of $90 and gas prices of $4.  (SAB0047581.)  The model included in the September 12 communication to the banks assumed gas prices at $3.95 and oil prices at $91.98 for 2015.  (WF-SABINE_VOL-00013025.)

45.    Neither First Reserve nor Legacy Sabine asked for the terms of the Bridge Loan to be altered in September 2014.  The only item for which Sambrooks sought relief was the New RBL Facility debt-to-EBITDA covenant.  (Scotto Tr. 42:18-20.)  After Sambrooks asked for covenant relief on September 15, Barclays informed First Reserve and Legacy Sabine "what it would take in the form of a revised RBL and bridge to get them the covenant relief and liquidity they wanted going forward."  (BARC_SOGC 00010323.)  Internally, the banks' position almost immediately was that the company had no choice but to modify the Bridge Loan commitment: "the company cannot proceed without amendments/waivers [on the RBL] so they have to

- 17 -

negotiate [the Bridge Loan terms]." (BARC_SOGC 00021005.) On September 25, Weiner told

Sambrooks that he had not heard anything from the Bridge Lenders, when they had previously

been calling him every other day for weeks. (SAB00160732.)

46.    On October 6, Barclays internally sought authority to offer First Reserve and

Legacy Sabine additional "headroom" on the New RBL Facility leverage covenant, and noted

that it would also "seek to amend the terms of the bridge." (BARC_SOGC 00001236.) Wells

Fargo internally sought to modify the New RBL Facility covenant as of October 8. (WF-

SABINE_VOL-00008927.) Wells Fargo admitted that the banks re-traded on the Bridge Loan

commitment on the theory that "there was a higher risk to the lenders" with funding the bridge

than they had originally anticipated. (Scotto Tr. 53:3-6.) It did not matter to the banks that the

lenders had "assume[d] the risk that the borrowers' financial condition will worsen." (*Id.* at.

53:14-25) They saw a chance to re-negotiate their obligations. At this time, in its October 6,

2014 merger proxy filing, Legacy Forest noted that the Combined Company risked breaching its

covenants on the New RBL Facility in the first quarter of 2015, and that "[f]ailure to take

appropriate mitigating actions . . . may have severely negative effects on [the company's]

financing condition including, potentially, bankruptcy." (BARC_SOGC 00001236.)

47.    Legacy Sabine's projections for the Combined Company continued to deteriorate

in early October. On October 11, 2014, Elias provided Sambrooks and others with an updated

model that projected a cash flow shortfall of $346 million, a required borrowing base on the New

RBL Facility of over $1.4 billion, and total capex of over $570 million. (SAB00058156.) The

projections were based on oil prices of $97/bbl in the third quarter of 2014, $100/bbl in the

fourth quarter, and approximately $89/bbl in the first and second quarters of 2015.

(SAB00058157.)

48.     The individual companies were faring badly as well.  In the third quarter of 2014, Legacy Sabine's reported EBITDA was 18% below projections and oil sales were 21% below projections.  Legacy Sabine's financial models indicated that, as a standalone enterprise, it would default on a key financial covenant under the Legacy Sabine RBL Facility in early 2015. (Proposed CFC Complaint ¶ 65.)  Legacy Forest was projecting a breach of the debt-to-EBITDA covenant in its own existing RBL by the end of 2014 which, absent covenant relief, would require an amendment to the company's 10-K to disclose a going concern qualification. (SAB00046605; Wind Tr. 188:24-190:17.)  Rather than seek an amendment, however, Legacy Forest's board decided to rely on closing the Combination as a cure for the prospective default, and chose to accept a going concern qualification by its auditors. (SAB00046605; Wind Tr. 71:10-74:23.)

49.     On October 27, 2014, Weiner stated that he "got a preview from Barclays on what they think the pro forma cap structure looks like and what their likely ask is going to be and it's not pretty.  Their view is at this leverage level 'there is equity risk' through the level of their commitment and that the business really needs 'hundreds of millions of dollars of equity' that isn't an option . . . ."  (SAB00410692.)  Upon information and belief, additional equity was not an option because (i) sufficient funds were no longer available in the applicable First Reserve fund, (ii) the applicable First Reserve fund already had too high of a concentration in the Legacy Sabine investment, and/or (iii) the relevant First Reserve principals saw such an incremental investment as not prudent.

50.     The banks asked to meet with Sambrooks on October 29 to discuss the projections. (SAB00475804.)   Upon learning of this request for a meeting, Weiner stated,

> "They [Barclays] need to be including FR [First Reserve] in any cap structure / financing related  discussions . . .  I assume they

- 19 -

> will but if not it will be an unpleasant conversation.  The fact he's
> emailing you but nobody has responded to the email I sent the
> broader group is not filling me with confidence[.]"

(SAB00475804.)  On November 3, Sambrooks asked Weiner if he had heard from the banks.

Weiner responded that the ball was in Barclay's and Wells Fargo's court.  (SAB00410692.)  He

explained, "[t]hey have our ask on covenants/liquidity (and were okay with covenants but not in

love with $1.25Bn of guaranteed liquidity and were mulling that) but are also working through

some technical intercreditor issues that might mean the new 2nd lien they want to issue is actually

3rd lien – which will cause them to revisit pricing/doability."  (SAB00410692.)

51.     Entering into November 2014, First Reserve and Legacy Sabine were aware that

the new Combined Company would face liquidity issues that could prevent it from paying its

debts as they became due.  For example, when determining whether to seek the $50 million

necessary for Combination transaction costs from the more expensive Bridge Loan financing

versus from the cheaper New RBL Facility, Sambrooks advocated using the bridge as the

funding source.  Sambrooks said it "seems like with liquidity being critical we would go with

850 in bonds/bridge[,]" and that using the Bridge Loan to finance those costs "should help on

liquidity which could be a big question."  (SAB00475816.)

### 1.     The Banks' Early November Proposal

52.     In response to the request for covenant relief, the banks largely went radio silent

for nearly two months, making no counterproposal.  First Reserve remained desperate for a deal.

By November 5, Weiner remarked that "[n]ot getting to a deal [would be] almost ***mutually***

***assured destruction***" for both First Reserve and the banks.  (FRSABO00018950.)  (emphasis

added)

53.     Since requesting covenant relief, the pro forma Combined Company's financial

condition had worsened.  For example, Legacy Forest had acknowledged in public filings that it

had become insolvent on a balance-sheet basis as of September 30, 2014.[8]  (SAB00005267.)

Additionally, oil prices continued to decline, resulting in corresponding declines in EBITDA at

both legacy entities.

54.    On November 7, 2014—nearly two months after the request for covenant relief—

Barclays and Wells Fargo proposed to First Reserve that they would address liquidity needs by

an increase of the New RBL Facility initial borrowing base to $1.1 billion, with the potential for

a $150 million committed increase in the borrowing base at future redetermination dates if such

increases were supported by the Combined Company's reserves.  (WF-SABINE_VOL-

00016466.)  The banks further proposed changing the debt-to-EBITDA covenant in the New

RBL Facility from a formula based on total leverage (i.e., based on all funded debt) to a "First

Lien Secured Leverage" ratio covenant that would measure debt-to-EBITDA only against the

New RBL Facility.  (WF-SABINE_VOL-00016466.)  The change of the leverage covenant from

a 5.0x ratio based on total debt, to a 2.5x ratio based on only first lien debt, was a remarkable

change of the leverage covenant.  Instead of the old covenant formula projecting a breach

immediately after closing, the proposed revised "first lien only" covenant would not be breached

under any of Legacy Sabine's multiple rounds of projections (even projections produced shortly

prior to closing).  (*See, e.g.*, SAB00107634 (projections from Legacy Sabine with strip prices as

of Dec. 4, 2014).)

55.    This easy-to-meet covenant that counted only some of the company's leverage, of

course, came at a steep cost.  The banks proposed that the Bridge Loan be changed from

unsecured debt with the total interest rate capped at 9.75%, to a third-lien loan with the total

interest rate capped at 15.5% — *a 5.75% increase*. (WF-SABINE_VOL-00016466.)

---

[8] As described in the Proposed CFC Complaint, in mid-November, Legacy Forest committed to sell substantially all
of its assets in the Arkoma basin to Camterra Resources Partners, Ltd. for $185.1 million (the "Arkoma Sale").

### 2.    *November Negotiations Over a Secured Bridge Facility Falter*

56.    First Reserve responded to the banks' proposal on November 10, 2014, when Weiner (an employee of First Reserve, and not an officer or director of Legacy Sabine) advised the banks that "we want to give you guys the economics you're asking for," but noted that the Combined Company would need additional liquidity under the proposed structure in large part due to the additional interest expense of the proposed third-lien Bridge Loan with an interest rate of greater than 15%. (WF-SABINE_VOL-00016466.) Specifically, First Reserve requested an additional $50 million in the initial borrowing base. (WF-SABINE_VOL-00016466.)

57.    Additionally, to partially address the liquidity issues, Weiner informed the banks that "an impending asset sale [the Arkoma Sale] could bring in ~$175MM of proceeds that we could use to reduce the $850MM before we even start to try to place it (and given the dynamics with that last $350MM that has a big impact . . .)." (WF-SABINE_VOL-00016466.) Importantly, an asset sale of that size would typically result in a redetermination of the borrowing base to reflect the reduced reserve values. Sambrooks had performed rough calculations on the impact of the asset sale, and estimated that the borrowing base would be reduced significantly. (WF-SABINE_VOL-00016466.) As explained in further detail below, the impact of the sale of the Arkoma assets (the "Arkoma Sale") on the borrowing base was a critical liquidity issue, providing for short-term cash needs, but as Sambrooks noted, under typical financing arrangements the sale would have promptly ***reduced*** the borrowing base. Here, instead, the banks ultimately permitted the Arkoma Sale to close the day before the Combination, and as a result the Combined Company had access to the sale proceeds with no corresponding reduction to the initial borrowing base. (*See, e.g.*, SAB00167927; Elias Tr. 175:4-176:16.)

58.    Three weeks of negotiations ensued among the banks, First Reserve, and Legacy Sabine. Legacy Forest, however, was not involved in any of the negotiations with the banks.

- 22 -

(Wind Tr. 107:23-108:23; Lightner Tr. 50:8-51:8)  Throughout these negotiations, the liquidity

concerns for the Combined Company only became more acute.  Sambrooks opined to First

Reserve and others at Legacy Sabine that he feared they were "threading the needle on near term

liquidity," (SAB00677596), noting:

> Is it just me, or is anyone else getting a little pissed that the bank's
> take is going up as their risk is going down (getting out of current
> bridge, assuming limited finance risk under new caps, lowering
> bridge amount) . . . . Why are we okay with more fees for less
> bridge, increased bb fees and terrible advisory service?

(SAB00677596.)  Internal Barclays communications confirmed Sambrooks's assessment:

> [T]he [Barclays] deal team [has] focused entirely on getting the
> Firm and the associated underwriting and capital structure to a
> better spot (within the confines of the M&A) and have managed to
> get ourselves **to a point where we can re-cut the deal** (versus
> staying in our current deal with a huge MTM [mark-to-market loss]
> position).

(BARC_SOGC 00014620.) (emphasis added).[9]  It would, however, take several additional weeks

until the deal could be re-cut to avoid the banks' losses on the Bridge Loan.

    59.    By late November, the negotiations faltered.  The negotiations had included

discussions of upsizing the Second Lien Loan (which, upon information and belief, was later

determined to be prohibited by the applicable intercreditor agreement).  The banks had sought to

reduce the then-proposed secured Bridge Loan from $850 million to $780 million,

notwithstanding the resulting liquidity crises that would ensue.  (SAB00409693.)  The banks also

required that 100% of the proceeds of the Arkoma Sale be used to pay down the New RBL

Facility, which exacerbated the liquidity crunch and, as First Reserve acknowledged, would lead

---

[9] At this crucial point in late November, key personnel at Barclays instructed others to "talk live" rather than email
on the Combination financing concerns (BARC_SOGC 00010323), and that "telephone is preferable to email to the
extent that is possible."  (BARC_SOGC 00019288.)

the Combined Company "into a wall next year."[10]  By the end of November, Barclays informed First Reserve that a consensual deal was not possible.  Weiner of First Reserve reported to Sambrooks that he "[g]ot a very frustrated call from Barclays . . . basically they said going back to $850MM in a consensual deal is not possible at this point – so $780MM [on the Bridge Loan] at old caps is probably where this goes . . . So would look at liquidity profile under that construct."  (SAB00409693.)

60.    Internal discussions at First Reserve turned back to the committed financing.  In the early morning hours of November 26, an analyst was asked to run a model based on a $850MM bridge at 9.75% caps (the as-committed Bridge Loan).  He sent the model to his team at First Reserve with the caveat that the model assumed that the Combined Company would receive borrowing base increases based on 50% of capital expenditures spent over the prior two quarters.  Shughart responded just after 4 a.m. that, "[*t*]*his case actually doesn't look horrible if you thought the banks wouldn't kill you on the [New RBL Facility borrowing base] because you stuffed them on the bridge*."  (FRSABO00018178.)  Weiner responded, "*[a]nd that is what we tell them to keep them from killing us now.*"  (*Id*.) (emphasis added).

61.    The banks, too, were focused on the as-committed Bridge Loan.  On the morning of November 27, the Financial Times published an article specifically calling out that Wells Fargo and Barclays were "facing potentially heavy losses" on the Bridge Loan.  (BARC_SOGC 00001480.)  The article noted that "[i]nvestors, however, balked at buying the loan when it was

---

[10] In an internal November 25, 2015 email, Shughart admitted, "maybe I didn't notice this in previous drafts, but reducing the bridge by 100% of Arkoma proceeds kills our liquidity."  (FRSABO00003116.)  This was undoubtedly uncomfortable for Weiner, who had been negotiating during most of November a deal based on just such a use of asset sale proceeds.  Weiner responded that he had spoken to Sambrooks and that they "thought the tradeoff in terms of flexibility to repay revolver with asset sale proceeds . . . was better than locking in more expensive non-call debt . . . ." (*Id*.)  Shughart demand a change in course: "I think he's wrong.  They haven't hit their projections yet this year and I don't think we should be locked into ultra-tight liquidity.  *The right answer may be using 100% but given we are losing $100mm of borrowing base we may run into a wall next year and flexibility is very important*."  (*Id*.)

first offered in June and slumping oil prices combined with volatile credit markets in the months

since have scuppered further attempts to sell, or syndicate, the loan according to market

participants." (*Id.*)  Matthew de Mendonca of Barclays (the Barclays team lead on the financing)

forwarded the article to his team on November 26, but instructed them that the forwarded email

was "[n]ot for further comment." (*Id.*)

### E.    *A Deal for Alternative Merger Financing Appears Impossible*

62.    On November 26, Legacy Sabine had provided three five-year models to the

banks.  (SAB00107722.)  These models were run at the current strip pricing as of that date,

which reflected a $9 decrease in oil prices since the last model sent to the banks, which used

October 13 strip prices.  (SAB00107722.)  Legacy Sabine noted that:

> [T]he liquidity displayed in [these] model[s] is highly dependent
> on our borrowing base assumptions.  The assumption we have used
> . . . is that our [borrowing base] increase is 50% of our capex spend
> since the last redetermination.  *If this assumption is not accurate,
> or if there is to be an expected step down in [borrowing base] from
> a change in price deck, of course our liquidity estimates are
> optimistic.*

(*Id.* (emphasis added).)  The price deck, of course, continued to decline.  Between November 25,

2014 and December 1, 2014, oil prices fell approximately 7%.

63.    On Friday, November 28, Sambrooks reached out to McDonald and advised that

it would not be possible to refinance the debt associated with the Legacy Forest Unsecured Notes

through the unsecured bond market given the market conditions and the Combined Company's

projected leverage level.  (Proposed CFC Complaint ¶ 73)  Sambrooks asserted that a deal

whereby the Bridge Loan was reduced to $780 million and the $1 billion borrowing base was

reduced by $100 million to account for the sale of Arkoma would leave the Combined Company

with insufficient liquidity.  Sambrooks reported that "no one is very happy" and the "Sabine/First

Reserve and Barclays/Wells relationship is approaching contentious."  (SAB00107610.)  On

November 30, 2014, First Reserve/Legacy Sabine responded to the banks that the Combined Company would need the full amount of the $850 million Bridge Loan that had been originally committed. (BARC_SOGC00015813.)

64.    Between November 30 and early December, First Reserve/Legacy Sabine and the banks continued to discuss potential amendments to the terms of the New RBL Facility and Bridge Loan. The discussions focused on providing some relief on the New RBL Facility in exchange for altering the banks' Bridge Loan commitment by, among other things, increasing the interest rate, decreasing the dollar amount of the Commitment, and converting the loan from unsecured to secured debt. At no time, however, were the banks released from their original Commitment to finance the Combined Company. The banks were required to fund the Commitment as contractually agreed to on July 9, 2014, including the $1 billion New RBL Facility and the Bridge Loan.

65.    By this time, the banks started to quantify their imminent losses on the Bridge Loan. Barclays stated in an internal email on November 27: "We are in the process of trying to renegotiate bridge terms. As a reminder, we have committed $212mm of an unsecured bridge. At the current, in-negotiated terms, *we estimate that the bridge might be marked at 75*, before 3.5 points of fees. I am reasonably confident that we will get at least some relief to bring this closer to par." (BARC_SOGC 00010299 (emphasis added).) Three days later, on November 30, de Mendonca reiterated that while the Bridge Loan would not need to be funded until 30 to 90 days after the Combination closing, the "deal team" at Barclays had already predicted that, as of the Closing Date, the Bridge Loan commitment pricing "implies a potential mark of ~75 cents on the dollar which equates to a potential loss of $53mm; applying the ~15mm of total transaction fees = potential loss of $38mm (calculated off the terms of the existing underwrite)."

(BARC_SOGC 00010860.)  At a mark of 75 cents, the aggregate loss to the underwriting banks from funding the Bridge Loan would have been over $212 million.

66.    On a December 4, 2014 call, the banks asked how the Combined Company would function in a scenario where there was no increase in their borrowing base in 2015.  Relying on the models he had run for such a scenario, Elias opined that Legacy Sabine's only solution was a "wait and see" approach: to "stay on target" for the first quarter of 2015, see if oil prices came back up, and adjust their capital spending downward as required.  (SAB00355030.)  Legacy Sabine's own models as of December 4, 2014 showed, however, that the Combined Company would breach the debt-to-EBITDA ratio covenant in the second quarter of 2015.  (BARC_SOGC00003973.)  Because of this, Legacy Sabine wanted assurances that the Combined Company's borrowing base would be increased at the redetermination date.  (SAB00355030.)

67.    Just one day later, on December 5, 2014, Sambrooks stated to First Reserve that financing for the Combined Company was proving impossible under current assumptions.  (FRSABO00006538.)  The Combined Company was not viable when the projections were run as "capital turn down cases" (*i.e.*, cases in which capital spend was reduced to approximately $280 million based on the company's need to preserve liquidity).  As Sambrooks himself noted, a model in which the borrowing base was assumed to increase in 2015 "[did] not pass the smell test given that production is flat to declining.  Our borrowing bases are now largely tied to PDP . . . and current rate is a good measurement on the likelihood of bb increase.  So, ***a flat to declining bb is most likely in these capital turn down cases***."  (*Id.* (emphasis added).)  When projections were run assuming that that borrowing base remained flat, Sambrooks acknowledged that the Combination was not prudent for either company, stating:

"[O]ur total debt metric in the [second quarter of 2016] is 8.1x.
***Boom***.  When our hedges come off in 2016 we experience a very
large revenue drop at current strip pricing. . . . ***I have looked at the
first pass on the two standalone cases . . . [B]oth look
significantly better tha[n] the combo case***."

(*Id.* (emphasis added).)  The negotiations over the alternative RBL financing terms stalled by

December 2014 because, according to Wells Fargo, "[they] could not find a solution that

addressed the company's continuing deterioration of leverage and liquidity."  (Scotto Tr., 47:6-

8.)

> ## F.    *Legacy Sabine Implores Legacy Forest to Abandon the Transaction, but Forest Insists on Closing the Merger*

68.    As described in the First STN Motion, Legacy Sabine, at the direction of First

Reserve, tried adamantly to convince Legacy Forest to terminate the merger transaction.   On

Sunday, November 30, 2014, Sambrooks personally called McDonald to request that the parties

mutually agree to abandon the Combination, arguing that the two companies were better off as

standalone entities.  Sambrooks warned that "the financing for the combined companies [was]

too expensive ***and [would] create an insolvency situation at closing***."  (SAB00073878

(emphasis added).)  While Legacy Forest was not involved in the failing discussions with the

banks, Legacy Forest certainly understood the dynamic.  The day after Sambrooks requested

Legacy Forest to agree to terminate the merger agreement, Wind emailed McDonald, stating,

"[W]e need to figure out if [Legacy] Sabine already agreed to let the banks retrade the existing

bridge for relief on the facility, among other things."  (*Id.*)

69.    That evening, McDonald emailed Laurence Whittemore at JPMorgan, Legacy

Forest's financial advisor, to assess the only remaining options.  McDonald listed options that

Sambrooks of Legacy Sabine had presented:  (1) "[d]on't merge," (2) "[w]ork around the

Change in Control provision of Forest bonds," (3) "[d]elay deal for time sufficient for market

- 28 -

and financing to be more favorable," or (4) "[e]xchange only partial interests so as not to trigger

Change in Control."  (*Id.*)

70.    Legacy Forest, however, was adamant to go forward with a transaction.  In their

apparent haste to proceed with a transaction—any transaction—Legacy Forest and its board

appears never to have considered the insolvency of the Combined Company.  Indeed, Sambrooks

was not the only person to raise the solvency concern with Legacy Forest.  Legacy Forest's own

counsel, Mark Gordon of Wachtell, Lipton, Rosen & Katz LLP ("<u>Wachtell</u>") asked McDonald to

"[e]xamine whether or not we would be 'closing into an insolvent situation.'"  (*Id.*)  He also

asked Wind to examine the "'go it alone case' and make an assessment as to the viability versus

continuing with the merger."  (*Id.*)  Notwithstanding these warnings, the Legacy Forest board did

not request or obtain any solvency analysis or valuations.  JPMorgan, the investment banker for

Legacy Forest, did not conduct any solvency analysis of the Combined Company, and believed

that such analysis was outside the scope of what JPMorgan was retained to do.  (Whittemore Tr.

9:20-11:6.)  In his deposition, Whittemore of JPMorgan could not recall any effort by the Legacy

Forest board to assess whether Sambrooks was correct in stating that the Combination would

create an insolvent Combined Company.  (*Id*. at 122:21-123:3.)

71.    Following a December 1 board meeting at which the Legacy Forest board

concluded that the merger should proceed notwithstanding Sambrooks's concerns and warnings,

(SAB00046616), McDonald and Wind called Sambrooks and told him that Legacy Forest

intended to close the Combination on December 16, 2014.  McDonald stated:

> "I [told Sambrooks that Legacy Forest] did not completely
> understand their concern over financing because [Legacy Forest]
> believe[s] that [Legacy] Sabine has in place a Bridge Loan
> Commitment which is valid and in place and should be used as
> intended to close the [Combination] and subsequently be used to
> refund the Forest bonds after closing."

(SAB00066766.)  Sambrooks expressed his concern that the Bridge Loan was tied to the

contemplated New RBL Facility with a $1 billion borrowing base, which would provide

inadequate liquidity given that Legacy Sabine had approximately $620 million drawn on the

Legacy Sabine RBL Facility that would be refinanced with the new facility.  (*Id*.)  Once again,

Sambrooks tried to persuade McDonald to call off the Combination.  McDonald did not agree,

and advised the Legacy Forest board that he did not "understand the logic expressed by

Sambrooks in regard to abandoning the Bridge Loan commitment and $1 billion credit facility in

exchange for a clearly real time deleterious financing package all in the fear of a possible and

unknown liquidity issue in some future period."  (*Id*.)  The Legacy Forest board directed

McDonald to call Sambrooks and tell him that: (1) the Legacy Forest board intended to close the

Combination because it was in the best interest of the company and its shareholders; (2)

Sambrooks's justifications for abandoning the deal were not convincing; and (3) Legacy Sabine

was "contractually obligated to [] use its reasonable best efforts to complete the transaction."

(SAB00043378.)

> 72.    The very next day, on December 2, 2014, Sambrooks sent an urgent letter to the

Legacy Forest board, stating:

> [I]t has become clear that a Combination of our two companies is
> no longer in the best interests of the shareholders of either
> company. [The] transaction poses significant harm and undue risk
> to Forest's shareholders as well as Sabine's. . . .  Accordingly, we
> propose that the Forest and Sabine boards mutually agree to
> terminate the [Combination] Agreement . . . .
>
> An important factor in Sabine's decision to combine with Forest
> was to gain ready access to the equity capital markets and liquidity
> for its shareholders by merging into a publicly traded company. . . .
> [W]e are informed that the combined Forest-Sabine would face
> immediate delisting by the NYSE . . . .

> If a combined Sabine-Forest were to become insolvent, Forest
> officers and employees receiving severance packages could also be
> subject to preference and fraudulent conveyance liability under the
> Bankruptcy Code. . . .
>
> Forest would be far better positioned if it were to maintain its
> status as a standalone company . . . .  Forest's liquidity position
> and ability to satisfy its financial covenants will be further
> enhanced by the imminent closing of the Arkoma transaction
> which is more impactful to standalone Forest than the combined
> company.

(SAB00401617.)

73.     That same day, Sambrooks followed up with McDonald by email, noting that

Legacy Sabine and First Reserve were in "intense discussions with our banks," and that the

banks had requested a model to be run which **assumed that the Combined Company's**

**borrowing base would not be increased at the redetermination date.**  (SAB00107634 (emphasis

added).)  The updated model "clearly" reflected "potential liquidity issues" for the Combined

Company if the borrowing base was not increased.  (*Id.*)

74.     The Legacy Forest board again met on December 5, 2014 to discuss Legacy

Sabine's request to terminate the Combination.  JPMorgan continued to press for the closing of

the as-committed Financing.  The minutes from that meeting reflect that JPMorgan "noted [that]

the lenders under the bridge were also the lenders under the other facilities, and, accordingly,

these lenders were likely to waive any breach of the Debt to EBITDA ratio covenant of the other

facilities to avoid a default of the bridge loan."  (SAB00643438.)  The Legacy Forest board

directed McDonald to inform Sambrooks that the board still believed it was in Legacy Forest's

best interest to complete the Combination. (*Id.*)

75.     The Legacy Sabine campaign to terminate the merger continued.  On December 7,

2014, Sambrooks sent McDonald updated financial models based on the terms of the secured

Bridge Loan that were last discussed with the banks.  Sambrooks warned that "this [was] likely

not an executable finance scheme" and that under those models, "the combined company's debt

metric soars to unmanageable levels." Sambrooks continued: "This result will prevent any

realistic hope of achieving the required refinancing the combined company will have to execute

in 2016." (SAB00211669.)

76.    Also on December 7, 2014, Sambrooks wrote another letter to McDonald warning

that:

> **The transaction threatens grave, and potentially irreparable injury to Forest** shareholders, putting them in a significantly worse position than remaining independent. Accordingly, Sabine reiterates its offer to terminate the [Combination] Agreement upon mutual consent. . . . However, in light of the grave consequences for the combined company's shareholders that will result from consummation of the current transaction, we are open and ready to explore alternative structures that address of the problems the combined company will face (including onerous financing terms, worsening liquidity issues and a likely delisting from the NYSE) . . . .  Our offer is to immediately work on an alternative structure that would contemplate a joint operating agreement instead of completing a merger.

(SAB00415467 (emphasis added).)

77.    The Legacy Forest board met the evening of December 7, 2014 to discuss

Sambrooks's letter.  (*See* SAB00043384.)  The Legacy Forest board decided that McDonald

should respond to Sambrooks "to suggest to Sabine a willingness to explore alternative

approaches . . . in order to obtain from Sabine confirmation that Sabine would close the

transaction on the original terms if no mutually-acceptable alternative could be identified."  (*Id.*)

McDonald thereafter responded in a letter to Sambrooks on December 7, 2014, reiterating that:

> Forest continues to believe that completing the Combination is in the best interests of Forest and its shareholders.  [However,] Forest is willing to work with the Sabine Parties over the next few days to see if an alternative solution can be identified, provided you confirm to us by 11:00 p.m. MST tonight that, unless there is a mutual agreement otherwise, Sabine will close the Combination

- 32 -

transaction pursuant to the Combination Agreement on December 16, 2014[.]

(SAB00401619.)

### G.   *Wells Fargo Proposes the First Alternative Transaction Structure*

78.    While Sambrooks was imploring Legacy Forest to terminate the merger agreement—discussions the banks were purportedly not aware of (Scotto Tr. 66:14-16)—Wells Fargo asked Weiner on December 4 whether First Reserve had considered assigning some of its equity interests to a third-party, which would avoid a change of control and, as a result, avoid the need for the Bridge Loan to fund the payment of the Legacy Forest Unsecured Notes.  First Reserve rejected this proposal.  (Scotto Tr. 187:2-189:1.)

79.    Although First Reserve rejected the concept of divesting its equity to avoid the change of control, Wells Fargo's proposal caused First Reserve to start considering alternative structures.  While First Reserve was searching for a mechanism to evade the change of control, Wells Fargo, Barclays and First Reserve engaged in back-channel communications during the early days of December 2014, immediately preceding the ultimate proposal of the revised transaction structure that no longer contemplated the Bridge Loan.

80.    The nature of their communications is consistent with that of parties attempting to conceal facts.  In the first week of December 2014, Wells Fargo, Barclays and First Reserve began a deliberate effort to take certain of their communications regarding the Combination structure offline.[11]  Formerly detailed emails gave way to cryptic, terse exchanges that coordinated telephone calls on non-specified topics relating to Legacy Forest and Legacy Sabine. The lack of specificity in the emails is glaring.

---

[11] *See, e.g.*, (BARC_SOGC 00014586.) (Dec. 4, 2014 email from Matthew de Mendonca, Leveraged Finance Director, Barclays ("de Mendonca (B)") to Daniel Bumgardner, Managing Director, Wells Fargo ("Bumgardner (W)") ("**Can you call me offline . . . ?**")).

81.    For instance, on December 2, 2014, Barclays organized an internal call about

project "Fairway," the code word for the Legacy Forest / Legacy Sabine matter.  (BARC_SOGC

00007887.)  The next day, Barclays emailed First Reserve to coordinate a call, conspicuously

omitting any detail as to the reason or topic of the discussion.[12]  Consistent with this evasive

conduct, on December 4, 2014, First Reserve reached out to Barclays, prompting several emails

between Barclays and Wells Fargo seeking to arrange "offline" discussions.[13]  This pattern

continued through December 5, 2014, with numerous emails among Wells Fargo, Barclays and

First Reserve to coordinate calls, never once mentioning in writing the subject matter to which

the calls pertained.[14]

82.    These communications suggest behavior, intent and knowledge that supports

colorable claims of wrongful conduct by the banks and First Reserve.  There was a flurry of

activity and intentional effort to keep communications verbal, rather than in writing, by and

among Wells Fargo, Barclays and First Reserve during the first week of December 2014.  The

subject matter of these parties' discussions during this period was highly material, at least to

---

[12] *See* (BARC_SOGC 00017645.) (emails between Evan Rothenberg, Managing Director, Barclays – Financial Sponsor Group ("Rothenberg (B)") and Joshua Weiner, Managing Director, First Reserve ("Weiner (FR)"), copying Bumgardner (W) (Rothenberg (B): **"You around?"**  Weiner (FR): **"Will try your cell around 8:15 . . . ."** Rothenberg (B): **"Dan wanted to join as well."** Weiner (FR): **"Pls send dial in."**)).

[13] *See* (BARC_SOGC 00005493.) (email from de Mendonca (B) to Rothenberg (B) (stating **"On with JF"** [Jean-Francois Astier, Managing Director – Head of Global leveraged Finance, Barclays] ("Astier (B)")" **in response to message that "Josh Weiner from First Reserve Called"**)); (BARC_SOGC 00017642.) (email from Rothenberg (B) to Bumgardner (W) (**"Where can I reach you?"**)); (BARC_SOGC 00014586.) (email from de Mendonca (B) to Bumgardner (W) (**"Can you call me offline . . . ?"**)); (BARC_SOGC 00014589.) (email from Bumgardner (W) to de Mendonca (B) (**"about to take a call from [Rothenberg (B)]"**)); (BARC_SOGC 00017639.) (email from Bumgardner (W) to Rothenberg (B) (**cell phone number sent**)).

[14] *See, e.g.*, (BARC_SOGC 00017651.) (Dec. 5 emails among Rothenberg (B), Weiner (FR) and Bumgardner (W) (Rothenberg (B): **"have a few mins this morning?"** Weiner: **"am around if you want to call . . . ."** Rothenberg (B): **"aim for 11:30."** Bumgardner (W): **"trying to circle folks up here"**); (BARC_SOGC 00015778.) (Dec. 5 emails among de Mendonca (B) to Bumgardner (W), Paul Cugno, Managing Director – Leveraged Finance, Barclays ("Cugno (B)"), Robert Anderson, Investment Banking, Barclays ("Anderson (B)"), David Suh, Director – Legal, Barclays ("Suh (B)"), Kevin Scotto ("Scotto (W)") and Scott Yarbrough, Wells Fargo ("Yarbrough (W)") (de Mendonca (B): **"regroup @ 12:30?"** Bumgardner (W): **"Yes, please send dial – in."** de Mendonca (B): **"We are ready to regroup.  3:15pm work?"** Scotto (W): **"internal meeting shortly. 4:15?"** de Mendonca (B): **"Yes. we really need to make some progress"**).

Barclays, which felt the need to brief some of the most senior executives in a massive global

investment bank—including Joe Gold, CEO of the Americas, Joe McGrath, Co-Head of Banking,

and David Sawyer, Global Head of Workout & Restructuring—on the developments associated

with this particular credit and the changes being made to avoid liability for the Bridge Loan

commitment.

83.    While the documentary history that has been delivered to the Committee appears

to be intentionally thin, on Saturday, December 6, Wells Fargo drafted an email to Weiner at

First Reserve, with the draft version stating:

> Please see attached a draft of the ***strawman proposal*** to serve as
> the basis for our ongoing discussions. . . . ***Per your request to the
> Wells Fargo and Barclays teams, we are additionally working
> towards providing our thoughts related to the alternative
> transaction structure you outlined for us***.

(BARC_SOGC 00021027 (emphasis added).)  When the email was ultimately sent to Weiner

late on the evening of Sunday, December 7, the reference to the "strawman proposal" was

removed, stating:

> Josh, [p]er your request to the Wells Fargo and Barclays teams,
> please see attached a draft of terms we would propose should you
> and Forest choose ***to pursue the alternative equity structure you
> outlined to us***.

(BARC_SOGC 00013124 (emphasis added).)  The attached term sheet, which Weiner requested,

was for an alternative transaction structure that included an additional $50 million for the Second

Lien Loan, ***but no Bridge Loan***.  (BARC_SOGC 00013125 (emphasis added).)  At the Rule

30(b)(6) deposition of Wells Fargo, however, Scotto had no recollection of these discussions

with Weiner, the emails, what the strawman proposal was, or what the "alternative equity

structure" Weiner outlined was.  (Scotto Tr. 191:14-192:13.)

84.    Instead, and contrary to the email evidence, Scotto testified that Wells Fargo had no discussions with Weiner or others at First Reserve at any point between December 4 (the date Wells Fargo asked whether First Reserve had considered divesting some of its equity) and December 11, the date that, according to Scotto's testimony, Wells Fargo was first informed that a term sheet for an alternative structure would be forthcoming from Legacy Sabine's counsel). (Scotto Tr. at 190:1-9.)  Remarkably, these emails and term sheet for an alternative transaction structure were not produced by Wells Fargo, even though the email was authored by and sent to various recipients at Wells Fargo.  Instead, the only reason the Committee received these emails was because recipients at Barclays were copied on the emails and produced them.

85.    That same day, December 7, 2014, an alternative proposal that no longer contemplated a Bridge Loan structure for the Combination also surfaced in an internal Barclays email that included an "updated Fairway analysis with three cases: 1) refi with 3rd lien; 2) existing deal; and 3) **no bridge**."  (BARC_SOGC 00004912 (emphasis added).)  The best the Committee can surmise is that First Reserve, Wells Fargo, and Barclays were working together to identify alternative equity structures to evade the change of control premium, but had not yet figured out the precise mechanism by which the change of control would be evaded.

### H.    *Legacy Forest Opens the Door to Alternative Structures*

86.    While First Reserve was apparently developing an alternative equity structure, Legacy Sabine and its board continued to advocate for voluntary termination of the Combination as best for both companies.  First Reserve, however, was concerned that if Legacy Sabine were to terminate the Merger Agreement unilaterally, Legacy Forest would sue them for failing to perform thereunder, and the damages from that lawsuit would be "a very bad outcome for [Legacy] Sabine." (Shughart Tr. 235:15-21.)  First Reserve entities were party to the Combination Agreement, not just Legacy Sabine.  First Reserve, Legacy Sabine, and the banks

had, of course, already turned their attention to alternative structures for the Combination to avoid this possibility and the banks' losses on the as-committed Bridge Loan.

87.    On the morning of December 8, 2014, Gordon (Wachtell) had a call with Legacy Sabine's litigation counsel (Quinn Emanuel) regarding the prospect that Legacy Sabine would walk away from the transaction.  (*See* SAB00691069.)  Gordon updated McDonald and others at Legacy Forest after the call, noting that Legacy Sabine was afraid that Legacy Forest would sue them or refuse to discuss alternatives in good faith.  (*Id*.)  Gordon mentioned informal negotiations with Quinn Emanuel, Legacy Sabine's counsel, regarding the potential litigation.  (*Id*.)  Unsurprisingly, Sambrooks testified that as of December 8, he was aware that Legacy Forest would sue Legacy Sabine if it "unilaterally walked" from the merger.  (Sambrooks Tr. 268:5-25.)

88.    Later on December 8, McDonald asked Sambrooks to schedule a call with Lightner, Fraser, and McDonald from Legacy Forest and Sambrooks and Yearwood from Legacy Sabine.  Sambrooks asked that Radtke join from the Legacy Sabine side, as well.  (FRASER00007168.)  As a result, the call included three Legacy Forest directors and three Legacy Sabine directors.  (*Id*.)  During the call, Fraser asked Legacy Sabine to confirm that "if no alternative could be developed, Sabine would work to close, not work to find a way to not close."  (FRASER00007806.)  Sambrooks responded that Legacy Sabine was "in the same position," but it became clear, at least to Fraser, that the "same position" referred to the parties' mutual goal of finding an alternative transaction, and not to the plan to close on the merger structure as agreed in July 2014.  (*Id*.)

89.    Although not raised during this "3-on-3" discussion several days earlier, Fraser had thought of an alternative mechanism by which Legacy Forest would attempt to evade the

change of control by splitting the economic and voting rights First Reserve was to receive. (Fraser Tr. 92:3-94:14.)  Despite having already developed an alternative transaction structure and vetting it with counsel, Fraser held back on disclosing the structure until Legacy Sabine made certain statements regarding efforts to close.  (*Id*. at 126:15-130:16.)

90.    Following this 3-on-3 call, on December 8, Sambrooks wrote the Legacy Forest board another letter.  (SAB00691071.)  To advance the possibility of arriving at an alternative structure, Sambrooks proposed that the parties "work together in good faith to explore mutually acceptable alternatives to the proposed transaction under the Combination Agreement," and, in the alternative, stated that Legacy Sabine would "continue to use its reasonable best efforts to close the transaction in accordance with the Combination Agreement."  (*Id*.)

91.    The Legacy Forest board then met to discuss obtaining the assurances from Legacy Sabine.  (SAB00043387.)  Board members "Lightner, McDonald, and Fraser expressed their unanimous opinion that they believed Sabine intended to close the combination transaction" should an alternative structure not be found.  (*Id*.)  The Legacy Forest board then agreed that they should "[p]resent [an] alternative structure to Sabine" and "[p]ostpone filing suit until after Sabine [had] respond[ed] to the alternate structure presentation."  (*Id*.)

92.    Thereafter, McDonald asked Sambrooks for a call on December 9, 2014 to exchange ideas "in regard to structure."  (SAB00691161.)  McDonald asked that the group include Legacy Forest's legal and financial advisors, Gordon from Wachtell and Laurence Whittemore from JPMorgan, respectively.  (*Id*.)  Sambrooks chose to include Shughart, Legacy Sabine General Counsel Tim Yang, Ash Elias, Legacy Sabine Chief Operating Officer Todd Levesque, two junior analysts, Legacy Sabine counsel Vinson & Elkins LLP, Simpson Thacher & Bartlett LLP, and Gibson Dunn & Crutcher LLP. (*Id*.)  Sambrooks noted, in apparent

contradiction to First Reserve's prior discussions with the banks: "We are not bringing our banks into the conversation at this stage." (*Id.*)

93.    Early on the morning of December 9, Lightner, the Chairman of Legacy Forest's board, emailed Sambrooks, stating, "Based on our conversation with you, we take [you] at your word that you are not looking to avoid the deal and we both will be working in good faith to closing one way or another on the 16th so let's proceed with discussions tomorrow." (SAB00060247.)

>    ## I.    *Legacy Forest Supplies a Structure That First Reserve, Legacy Sabine and the Banks Immediately Adopt to Implement Their Goal*

94.    On December 9, 2014, First Reserve, Legacy Sabine and Legacy Forest, together with their legal advisors, held a call during which Legacy Forest's counsel presented the revised deal structure that was ultimately implemented as the Combination structure. Legacy Forest presented this revised structure as a way to avoid tripping the change-in-control covenant for the Forest Unsecured Notes, thus eliminating the need for the Bridge Loan. (SAB00355077.) The parties discussed that, if they implemented this re-worked deal, they would have to "[a]ccept the probability of lawsuits from Bondholders" and confirm the "[l]ien capacity on Forest's bonds & covenants." (SAB00355077.)

95.    The "Proposed Alternative Structure" discussed among the parties on December 9, 2014 ultimately led to a structure whereby Sabine Investor Holdings LLC ("Sabine Investor Holdings"), a related investment entity of First Reserve, was given 73.5% of the economic interest and 40% of the so-called common voting power in the post-Combination company, plus numerous other control rights. (SAB00409187.) Legacy Forest shareholders were given 26.5% of the economic interest and 60% of the so-called common voting power. The common voting power was subject to numerous control rights of First Reserve. In addition, First Reserve would

be entitled to nominate 6 of the 8 directors of the board of the Combined Company. (SAB00409187.)

96.    Within approximately 12 hours of learning of this mechanism from Legacy Forest, Legacy Sabine had drafted a full term sheet and sent it to Legacy Forest, adopting the mechanism. Sambrooks urged McDonald to provide comments to the term sheet as early as possible so Legacy Sabine could "bring our banks over the wall." (SAB00169178.) Of course, based on prior discussions with Weiner, the banks already knew that an alternative "no-Bridge Loan" structure was in the works.

### J.    *Legacy Forest's Executives Stood to Benefit Personally From The Combination*

97.    Legacy Forest's complete abdication of their duties to creditors can only be explained by the personal benefit that its top executives stood to collect upon the closing. Legacy Forest's CEO (McDonald) and CFO (Wind) both expected to receive $4 million and $2 million, respectively, in severance payments upon the Combination's closing. (*See* McDonald Tr. 35:6-9; Wind Tr. 31:15-32:2) Accordingly, the two Legacy Forest executives closest to the Combination had strong personal financial incentives to push the Combination forward at all costs.

98.    But, due to the imminent liquidity issues, First Reserve and Legacy Sabine sought to reduce all transaction costs, including the severance payments to the Legacy Forest executives by 67% in advance of the Combination. (SAB00409259.) The Legacy Forest executives did not respond kindly. On December 10, Wind emailed McDonald, upset that Legacy Sabine planned to reduce the severance and bonus of Legacy Forest employees: "F them . . . no stock, no retention, turned down jobs, no bonus for EY worst experience of my life, won't get another job, and . . . we both have SEC Enforcement lingering over our heads now that they have a new budget to pursue their broken windshield policy." (SAB00169188.) McDonald responded, "I

am super pissed off.  I told Jim [Lightner] and Dod [Fraser] to stop the director communication."
(SAB00169188.)

99.    Legacy Forest's board refused Legacy Sabine's request to reduce the severance amounts for Legacy Forest's executives. (SAB00455790.)

## K.    *Reasons First Reserve and the Banks Wanted an Alternative Structure*

### 1.    *The Combined Company Would Face Financial Turmoil*

100.    The Combination and Debt Financing resulted in dramatic increases in the obligations of both Legacy Forest (renamed SOGC) and each of the Legacy Sabine Subsidiaries. Legacy Forest, which had $905 million in funded debt liabilities pre-Combination, emerged from the Combination and Debt Financing with approximately $2.6 billion in funded debt liabilities. The Legacy Sabine Subsidiaries, which had approximately $1.62 billion in funded debt liabilities pre-Combination, emerged from the Combination and Debt Financing with no less than $2.6 billion in funded debt liabilities.  Both Legacy Forest and Legacy Sabine were insolvent at the time of the Combination.  Both companies were aware that the Combined Company would not be able to satisfy the substantial unsecured obligations layered beneath over $1.6 billion dollars of first and second lien debt under the revised structure.[15]

101.    Legacy Sabine ran projections on December 15, 2014, the night before the closing, which were based on a five-rig program and the final financing implemented on December 16. (SAB00407882.)  At this point, however, the company was running an 8-rig model and was not even sure if it would reduce its activity to five, six or seven rigs, as compared to the 14 rigs Legacy Forest and Legacy Sabine had run at the start of the year. (SAB00228043, SAB00407882.)  In sum, the company had no firm business plan in place.  The number of rigs

---

[15] A complete description of the Debtors' funded debt liabilities and the collateral granted as security therefor is included in the Proposed Complaint.

for drilling new wells requires a delicate balancing act.  Drilling new wells increases the value of

reserves and, accordingly, the borrowing base on redetermination.  But drilling new wells

requires extensive capex, which requires liquidity.  Due to the liquidity constraints, the company

was unclear on how many rigs it could afford to run.  (Elias Tr. 57:6-16.)  Even under the

supposed minimal 5-rig model, and even assuming that only $502 million would be outstanding

under the New RBL Facility at the start of the year, the Combined Company faced a $323

million cash flow shortfall in 2015.  (SAB00407884.)

102.    It was so clear that the Combined Company would have financial difficulties that

Radtke could not understand how it could have taken McDonald by surprise: "I guess Pat

[McDonald] did not believe (or want to believe) the fact that post merger Sabine was going to be

in a financially very difficult position.  He was consistently told this so he should not be

surprised."  (SAB00162605.)

### 2. *First Reserve Used Its Control over Legacy Sabine to Obtain a Delay of the Imminent Failure to Provide Distance to the Write-Down of Its Investment*

103.    First Reserve—Legacy Sabine's sponsor and the new, controlling shareholder of

SOGC—worked overtime to protect itself at the expense of Legacy Sabine and Legacy Forest's

unsecured creditors.  (SAB00410692)   As detailed below, First Reserve did not want to take an

immediate write-down of its Legacy Sabine investment.   Radtke "[w]oke up in [the] middle of

[the] night" to email Sambrooks that execution risk equals result risk and that he was "right Alex

[Krueger, co-CEO and President of First Reserve] wants to do the deal **but still bury the initial**

**book write down** on [First Reserve's] books."  (DCR00001437 (emphasis added).)

### a) First Reserve Controlled the Legacy Sabine Board

104.    First Reserve exercised control over the Legacy Sabine board, and thus controlled

the negotiations related to the financing of the Combination.  Though there were only three First

- 42 -

Reserve directors on the six-person Legacy Sabine board, First Reserve had the ability to replace

the other board members and exercised effective control of the entire Legacy Sabine board.

(Shughart Tr. 29:17-31:24.)  In addition, First Reserve directors had ultimate decision-making

authority with respect to certain Legacy Sabine decisions related to the Combination.  For

instance, in Weiner's own words: "I don't care what mgmt says – anything cap markets relates

[*sic*] needs to be approved by me and is their job to make sure i am in the loop[.]"

(FRSABO00006764.)  In other words, Weiner exercised full control over capital markets

decisions related to the Combination, regardless of the positions taken by Legacy Sabine's

management.

105.    The other Legacy Sabine directors were all too aware of First Reserve's degree of

control.  For example, when the Combination was still being discussed in April 2014, Radtke and

Sambrooks (both Legacy Sabine board members) indicated that they expected First Reserve to

instruct the other Legacy Sabine board members how to proceed with the deal.  Radtke wrote to

Sambrooks: "It will be interesting if [First Reserve] asked what Sabine still wants to do or just

tell us they have decided.  I hope I am pleasantly surprised."  (DCR00001394.)  In a separate

email, Sambrooks similarly noted that First Reserve was in full control, noting: "[First Reserve]

just needs to make a yes or no decision on the combo, assuming [Legacy Forest] doesn't tell

them to piss off first."  (SAB00158550.)  In May 2014, Sambrooks noted to Radtke, regarding

Weiner: "Josh has some great qualities, but flexibility and understanding that his issues and

process are not the entirety of the consideration are not his strong suit."  (DCR00001489.)

106.    First Reserve exercised its control over Legacy Sabine throughout the

negotiations, including during the critical time period shortly before the Combination closed.  On

December 7, 2014, Radtke complained to Sambrooks that First Reserve would hold up the deal,

writing: "[First Reserve] will be running models in the back room that could substantially

undermine the speed that will be needed to make this work. I understand their needs internally to

make a decision but we will all need to be flexible to make this interesting to [Legacy Forest]."

(DCR00001825.)

>   **b)**   **First Reserve's Actions in Controlling Legacy Sabine Were
>   Motivated by its Desire to Distance Itself from the Imminent
>   Failure of the Transaction**

107.    The motivations of First Reserve and the board it controlled are found in the

broader context of the private equity firm's performance at that time.  First Reserve had

underperformed significantly in the period leading up to the Combination.  Following a highly

successful $2 billion Fund X (raised in 2004) with a 31% internal rate of return ("IRR"), First

Reserve was able to raise two very large funds.  Fund XI (which holds First Reserve's

investment in Legacy Sabine and the combined Debtors here *see* FRSABO00009693.) was $7.8

billion in size, and Fund XII was $9 billion in size.  However, as of early 2014, at the same time

First Reserve was contemplating the Combination of Legacy Sabine and Legacy Forest, these

two funds had not performed nearly as well as Fund X.  By early 2014, Fund XI had only a 2%

IRR, and Fund XII (raised in 2009) had only a 4% IRR.[16]

108.    Then in early 2014, even with oil prices still high, First Reserve worked to raise

its next fund, Fund XIII.  Against this backdrop of underperformance, the fundraising for First

Reserve Fund XIII fell significantly short of target in the summer and early fall of 2014.  First

Reserve closed this new fund (Fund XIII) on September 29, 2014 with $3.4 billion of

commitments, barely half of its original target of $6 billion.[17]

---

[16] *First Reserve Quietly Closes Fund XIII Well Below Target*, The PE Hub Network,
https://www.pehub.com/2014/10/first-reserve-quietly-closes-fund-xiii-well-below-target/
[17] *Id.*

109.    Following this fundraising, the drop in oil and natural gas prices leading up to the closing of the Combination was especially problematic for First Reserve.  First Reserve Fund XI had invested ████████ or ██% of Fund XI's total invested capital, in Legacy Sabine.  (FRSABO00019066; Shughart Tr. 27:8-29:16)  At the time that the Combination with Legacy Forest was proceeding from signing to closing, First Reserve continued to list the Legacy Sabine investment at $████████ of value on its books.  (FRSABO00019066; Shughart Tr. 27:8-29:11) On information and belief, this was the value of Legacy Sabine embedded in the fund performance shown to potential investors in First Reserve Fund XIII.

110.    Legacy Sabine began to be very concerned about post-Combination finances by late August, just as the fundraising for Fund XIII was culminating.  If First Reserve had had to write down its investment in Legacy Sabine shortly after it closed Fund XIII, investors in that fund likely would have been extremely concerned about the disclosures made to them regarding prior First Reserve fund performance.  First Reserve's own projections showed the Combined Company failing in the very short term, based on the originally-contemplated financing. (FRSABO00011304.)  Had the Combined Company failed (or had a major amendment been made to the financing), First Reserve would have been forced to adjust the "mark" it took on the Legacy Sabine investment.  That is, First Reserve would have had to adjust the returns on Fund XI because it would have reflected the complete loss of the Legacy Sabine equity investment, comprising ██% of First Reserve Fund XI.  (Shughart Tr. 29:10-16.)

111.    On information and belief, at the critical time period leading up to the consummation of the Combination and the Financing, First Reserve was primarily motivated to avoid all scenarios in which there would be a closing of the Combination followed by a rapid, major negotiation with the banks regarding a covenant default or other major reset of the

- 45 -

Financing.  Even delaying the ultimate restructuring with the banks by several months would be

extremely helpful to First Reserve, as it wanted to distance the failure of Legacy Sabine from the

closing of Fund XIII (with the implicit representations that were made to investors that First

Reserve had nearly $1 billion of equity value in Legacy Sabine).

> ### c)    First Reserve Acknowledged the Combined Company Would be Insolvent, But Proceeded with the Transaction to Provide Distance to the Write-Down of the Investment

112.    First Reserve's motivations are corroborated by even the limited documents the

Committee has been able to obtain from First Reserve.  Indeed, by December 5, the deal team at

First Reserve (which included Legacy Sabine board members France, Krueger, and Shughart)

recommended internally at First Reserve to not close the merger, despite the significant litigation

threat from Legacy Forest.  (FRSABO00011304.)  The recommendation of the deal team at First

Reserve not to close the transaction was based on projected equity values for the various options

then under consideration.  (*Id.*)  Specifically, as of December 5, First Reserve projected that

closing under the committed structure would result in equity value in 2015 for the Combined

Company between negative $51 million and negative $711 million, and that the negative equity

value was even worse for the secured Bridge Loan construct under negotiation at that time.  (*Id.*)

First Reserve's only projection of positive equity value in 2015 for its investment was if First

Reserve refused to close the transaction altogether.   (*Id.*)

113.    At the same time First Reserve was recommending internally to not close the

transaction (*Id.*), First Reserve was working frantically on a second path to close the transaction

(because the Combination Agreement was a firm commitment) that would avoid an immediate

post-closing default under the New RBL Facility.  To induce the banks to amend the New RBL

Facility, First Reserve's primary negotiating leverage was the banks' underwater commitment to

fund the Bridge Loan.  As discussed above, by December 6, Weiner of First Reserve was

requesting from the banks proposals for transaction structures without the Bridge Loan.[18]  There

was extensive and rapid work underway to create financial models for this scenario, even though

First Reserve and the banks had not yet figured out how they were going to evade the change of

control provision of the Forest Notes.  These financial models demonstrated the intention of First

Reserve to do a financing that avoided massive losses to the banks at the expense of unsecured

creditors of the legacy entities; First Reserve just needed to find a way to implement that intent.

The Committee now knows that Legacy Sabine developed one such structure.  But when Legacy

Forest developed a different mechanism by which the change of control could be evaded, First

Reserve and Legacy Sabine jumped at the chance.

114.    By December 11, the deal team was recommending internally at First Reserve

that the Legacy Forest-proposed revised transaction structure be approved, notwithstanding that

First Reserve was projecting that the equity value of the combined company under the revised

structure would be between negative $11 million and negative $671 million for 2015 (as

compared to the positive equity value previously projected for Legacy Sabine if the merger did

not close).  (FRSABO00019794.)[19]

115.    In determining to proceed with the alternative transaction structure, the deal team

at First Reserve acknowledged (at least internally) that the Combined Company still would face a

liquidity crisis, just not as soon as under the original committed financing structure.

(FRSABO00019700.)  The day before the Combination closed, First Reserve projected under the

---

[18] BARC_SOGC 00021027) (Dec. 6 email from Rob Ferguson, Leveraged Finance, Wells Fargo Securities
("Ferguson (W)") to the Barclays and Wells Fargo teams soliciting feedback on, and editing, a draft email to
Weiner, which read: **"Please see attached a draft of the strawman proposal to serve as the basis for our
ongoing discussions. . . .** _**Per your request to the Wells Fargo and Barclays teams, we are additionally working
towards providing our thoughts related to the alternative transaction structure you outlined for us**_**"**) (emphasis
added)).

[19] Remarkably, in the final version of the memorandum recommending that First Reserve approve the revised
structure to evade the change of control provision of the Forest Notes, the deal team at First Reserve removed the
2015 negative equity value calculations.  (FRSABO00019700)

alternative transaction structure that the Combined Company would have a liquidity crisis by no

later than 2016, even before taking into account required downward adjustments to projected

borrowing base availability due to declines in commodity prices based on warnings from Wells

Fargo.  (*Id.*)  Specifically, First Reserve projected a $21 million liquidity shortfall in 2016 in

excess of the borrowing base, and a $135 million shortfall in 2017, which amounts were based

"on assumed borrowing base which [Wells Fargo] indicated will not grow as fast as we were

previously modeling (and may decline near-term) given the recent commodity downturn").  (*Id.*)

In recommending the alternative transaction structure (instead of walking away as previously

recommended), the deal team at First Reserve did not project a thriving business, but instead

remarked that closing the revised structure provided "[b]est opportunity to realize equity value"

and merely provided a "[h]igher probability of survival."  (*Id.*)

**d)**      **First Reserve Was Also Motivated to Preserve Its
Relationships with the Banks for Other Portfolio Companies**

116.      In addition to its motivation to provide distance between the closing of its Fund

XIII and the imminent failure of the Combined Company, First Reserve had larger relationship

issues with the banks it needed to control, as these same banks were lenders to other portfolio

companies.  For example, while negotiating potential amendments to the Bridge Loan in late

November, the First Reserve deal team sent a draft "Open Hours Update" presentation to Alex

Krueger (co-CEO and President of First Reserve) for his review before sending it to the First

Reserve Investment Committee.  (FRSABO000020387.)  At that time, the First Reserve deal

team was recommending to the Investment Committee that First Reserve should accept the banks'

new financing facility (which included converting the bridge to secured debt) instead of forcing

the banks to close on the as-committed financing, reasoning that under the as-committed

- 48 -

financing "the banks will be forced to take the loss on the economics." (*Id.*)  First Reserve

concluded that there were "[l]arger bank relationship issues beyond Sabine."  (*Id.*)

117.    Weiner was particularly vocal about the need to maintain First Reserve's

relationships with the banks.  For instance, he observed to France in November 2014 that it was

better to handle the transaction "as a deal with the banks vs. flame them," because the "[i]dea of

flaming them" made Weiner "really nervous."  (FRSABO00009682.)  According to Weiner,

"flaming" the banks "[w]ould be really bad for future biz."  (*Id.*)

118.    First Reserve pushed through the merger, with full knowledge that it was a

disastrous deal for both Legacy Sabine and Legacy Forest and their respective creditors.  On

December 15, 2014, William Macaulay, the Chairman and Co-CEO of First Reserve,

acknowledged in an internal email:  "I would observe that everyone is aware that it was not a

good decision to do this deal and all of the circumstances around it."  (FRSABO00012342.)

### 3.    The Borrowing Base for the New RBL Facility Was Not Supported

119.    A central term of the Financing as closed was that the initial borrowing base

would remain $1 billion (despite the free-fall of commodity prices) and, unlike the original

commitment, there would be no redetermination 30 days post-closing.  The initial borrowing

base and the removal of the 30-days post-closing redetermination, were both made with the

intent to keep the borrowing base artificially high.  Instead of funding the unsecured Bridge Loan,

as the banks had committed to do in July 2014, the banks intentionally loaned funds that were

not supported by an accurate borrowing base because that alternative —having risky,

unconventional "secured" debt—was still more appealing than extending the unsecured,

committed Bridge Loan.  Wells Fargo acknowledged in its December 16, 2014 Full Credit

Report that the $1.0 billion borrowing base was above the "[m]aximum [c]onforming"

borrowing base under Wells' Fargo's model for Legacy Sabine in November 2014.  However,

- 49 -

even its analysis of the "appropriate" borrowing base was based on an August 2014 price deck

for oil prices, intentionally ignoring that oil prices had declined over 40% between August 2014

and the December 16 Closing Date.  Despite using inflated prices, Wells Fargo still found that

the maximum conforming borrowing base for SOGC was less than $1.0 billion.  (WF-

SABINE_VOL-00019079.)

120.    In addition, the banks made no adjustment to the borrowing base for the sale of

Legacy Forest's Arkoma Assets on the day before the closing, which was a sale planned for by

Legacy Sabine and First Reserve.  Under Wells Fargo's borrowing base policy, "[the Arkoma

Assets] have producing assets, [and] thus realized proceeds would be offset by the negative

impact on our borrowing base." (WF-SABINE_VOL-00022080.)  But as a trade for getting out

of the Bridge Loan, the banks did not seek to reduce the borrowing base to account for either the

Arkoma sale or the significant changes in prices between the Commitment Letter date and when

the transaction closed on December 16.

121.    Tellingly, the proceeds from the Arkoma sale (the "Arkoma Proceeds") were used

to reduce the amount outstanding under the New RBL Facility by pre-agreement with the banks.

Legacy Forest had planned, as of December 12, to use the proceeds of the Arkoma Sale to pay

down its own debt.  (SAB00336689.)  Instead, at Sambrooks's instruction, Elias directed Legacy

Forest to keep the proceeds in cash for SOGC's use after closing.  (SAB00166644;

SAB00169267; Elias Tr. 175:4-176:16.)  On December 16, the day the transaction closed, Wells

Fargo asked Elias, "what is your expected timeline for using the Arkoma proceeds to repay

outstandings [under the New RBL Facility]?" (SAB00209228.)  Two days later, Elias wrote

Wells Fargo that "[t]he amount I have to pay now is $205,834,604.  So it is more than the

Arkoma proceeds anyways and we borrowed ABR, so we should be good to go."
(SAB00209228.)

122.     The borrowing base was intentionally inflated because all parties knew SOGC
would be walking a liquidity tightrope as soon as the Combination closed.  Barton Schouest at
Wells Fargo remarked on November 30 that "the 850 number [for the Bridge Loan] was
developed because the company deemed it's liquidity to be insufficient at closing with the
reduced level [of $780 million] originally discussed as a result of the Arkoma sale.  With the
smaller facility, the company would not be able to satisfy the liquidity covenant required at
closing."  (WF-SABINE_VOL 00008406A.)  The removal of the Bridge Loan and the associated
fees and interest expenses did not alleviate the liquidity crisis.

123.     Other banks recognized that the borrowing base for the New RBL Facility was
unsupported.  Of the 12 banks to which Wells Fargo had syndicated the earlier committed RBL
on the terms contained in the July Commitment Letter, upon information and belief, *none* was
willing to remain in the syndication after the merger agreement was revised in December 2014
and the committed financing (including the Bridge Loan) was abandoned.  In fact, on the day
before the Combination was set to close, a contact at BB&T Capital Markets, Energy Group (one
of the potential syndicate banks) noted changes to the credit agreement concerning bankruptcy
and asked "Has the company engaged or planning to engage any advisors concerning
restructuring or bankruptcy?"  (WF-SABINE_VOL00022080.)

124.     As of December 17, 2015, the Combination had closed and Wells Fargo failed to
syndicate any of the New RBL Facility beyond the initial seven underwriting banks, all of whom
were legally bound to fund the Bridge Loan under the July Commitment Letter.  Prospective
lenders that were not already legally bound declined because, among other reasons, (i) the

Combined Company's leverage was simply too high, (ii) the borrowing base was too high and should have been reduced to reflect the Arkoma Sale (but was not), (iii) the removal of the 30-day borrowing base redetermination after the Combination closed was unsatisfactory because that redetermination of the appropriate debt level for SOGC "was very important . . . to keep the client on a short leash," and (iv) the borrowing base was "out of the box" for the lenders.  (WF-SABINE_VOL- 00014310.)  One prospective lender noted that "[w]hen we did the Fall BB for Sabine the $750MM number was stretchy for them."  (WF-SABINE_VOL-F 00014310.)

125.    JPMorgan, one of the potential syndicate banks, told Wells Fargo on December 19 that it was unlikely JPMorgan would accept any of the New RBL Facility debt.  JPMorgan asked:

> Has anyone approved out of the 12 non bridge lenders?  More than a handful have called me saying they've declined or plan to and I haven't heard any say they thought they'd get there. . . .  We're struggling given the aggregate leverage, higher borrowing base and covenant structure.  We're trying to be supportive of the sponsor and company but it's an uphill battle given what this will be rated internally.

(WF-SABINE_VOL- 00014405.)  Most of the banks that had contacted JPMorgan "were around 800 on bbase . . . but [did not] like the increased leverage in the next two years with no covenant protecting that issue."  (WF-SABINE 00014405.)  Put simply, banks that were not on the hook for the Bridge Loan viewed the New RBL Facility as a risky, inappropriate deal with an unsupported borrowing base.

### 4.    All Parties Knew that the Borrowing Base Would Be Redetermined Downward at the Next Redetermination Date

126.    On December 2, David Sambrooks warned Legacy Forest that the Combined Company's borrowing base redetermination would be a problem.  Sambrooks also told the board that "substantial additional liquidity drains would strain the combined company's ability to fund

its operations and essential capital expenditures and make the combined company more reliant

on the size of its revolving borrowing base facility, which is subject to redetermination as soon

as within 30 business days after the closing of the combination under the terms of its existing

financing." (SAB00415412.) On December 4, Wells Fargo's senior bankers unexpectedly

showed up at Legacy Sabine's offices and advised them that future borrowing base increases for

the Combined Company would be unlikely. (FRSABO00020286.)

127.    Also on December 4, Sambrooks warned McDonald that the projections for

SOGC that Legacy Sabine / First Reserve had provided to the banks on that day assumed "a

simple calculation of increasing borrowing base by 50% of the capital expenditure since last

redetermination. *Ou[r] banks have not in any way confirmed these assumptions and have to

date expressed significant concern/caution on these assumptions*." (SAB00107634 (emphasis

added).)

128.    On December 7, 2015, Sambrooks told McDonald that the New RBL Facility

borrowing base would *only decline* after the Combination:

> "[T]he borrowing base assumptions in these models [provided to
> McDonald on that date] that predict borrowing base remaining flat
> or growing while production declines are clearly unlikely. The
> likely forecast is a lower starting borrowing base, that will decline
> from there. Thus the forecast of liquidity should be viewed as
> unlikely."

(SAB00107750.) Sambrooks's prediction is almost exactly what happened. Wells Fargo did, in

fact, determine prior to funding the New RBL Facility that the borrowing base exceeded the

maximum conforming amount under Wells Fargo's standards. (WF-SABINE_VOL-00006962.)

Legacy Sabine, Legacy Forest, First Reserve and the banks all knew that that SOGC would face

a declining borrowing base and a massive liquidity crunch no later than April 1, 2015, just three

months after the Combination closed.

### 5.    The Debt Financing "Was Largely a Workout"

129.    In exchange for these off-market concessions on the New RBL Facility, both

Wells Fargo and Barclays reduced their total exposure to SOGC from $462.5 million ($250

million of the $1 billon RBL, and $212.5 million of Bridge Loan Financing), to just $262.5

million ($250 million on the RBL, and $12.5 million in second lien secured debt (WF-

SABINE_VOL-00019079.)  The other five underwriting bridge lenders similarly reduced their

relative exposure to SOGC (each was liable for 10% rather than 25% of the total funding), at the

expense of Legacy Forest's existing unsecured creditors.  (WF-SABINE_VOL-00019079.)

Shortly before the Combination closed, Gary Wolfe, the Co-Head of the Leveraged Finance

Group at Wells Fargo Securities, noted that the revised deal was beneficial for the bank because,

"[w]hile total WF exposure is reduced modestly, our junior capital exposure has been secured

with a 2nd lien and reduced significantly under this alternative structure."  (WF-SABINE_VOL-

00018661.)

130.    Wells Fargo viewed the New RBL Facility, as renegotiated with the unsupported

borrowing base and various non-market covenant and re-determination allowances, as "largely a

workout . . . . "  (WF-SABINE_VOL-00018663.)  In fact, relying on the information provided to

them by Legacy Sabine and First Reserve, the banks understood that SOGC would be insolvent

upon the closing of the Combination.  As of December 16, 2014, and using a price deck with

stale August 2014 oil prices, Wells Fargo determined in its full credit report that the total value

of the Combined Company's oil and gas properties (or PV9 value), was only *$1.449 billion*.

(WF-SABINE_VOL-00019079.)  The Combination levered SOGC with over $2.6 billion of debt.

Wells Fargo noted that SOGC was deemed an "FDIC High Risk Borrower."  As of the Closing

Date, Wells Fargo downgraded the Combined Company's "borrower rating" from a "BQR 5" at

the time of the Commitment to a "BQR 6" at closing.  (WF-SABINE_VOL-00019079.)  This

reflected a significant negative change in the quality of the credit, using Wells Fargo's own

internal ratings.

131.    Post-closing, federal bank examiners made direct inquiries to Wells Fargo

regarding the Sabine credit, and internal Wells Fargo discussions sparked by the inquiry provide

an unvarnished view of what Wells Fargo was thinking at the time.  When contacted by a federal

bank examiner on February 6, 2015, Peter Roos, an Executive Vice President and Senior Credit

Officer at Wells Fargo forwarded the email to Richard Gould (also of Wells Fargo), informing

him as follows:

> They [the National Bank Examiner] are going to come at you with
> booking a leveraged 5 in December and then moving to a 6.
> Obviously, a hot button.  What he doesn't understand (and where
> you can help) is *why this was done and was largely a workout in
> some respects*.  I come to you as I think this one has to come from
> you.  UGH!

(WF-SABINE_VOL-00018663 (emphasis added).)  The bank examiners immediately noted that

the banks made an obviously inadequately-secured loan with an inflated borrowing base:

> The BB showed a mid-year [2014] collateral value of $1.449Bn
> valuation (and a $970MM BB) . . . . However, this was under the
> Aug 2014 price deck when market oil was $95-100 and the price
> deck was $82.50 . . . . Since this time, market oil has dropped some
> 45-50% to $45-50 and the price deck to $50 (39% lower).  *As
> such, the $1.449 Bn Borrowing Base valuation would appear to
> have dropped a corresponding amount to ~$869MM (with a
> ~$582MM BB)*.  *It would appear that WF would have had this
> information prior to the December 2014 closing of the loan*.

(WF-SABINE_VOL-00018704.) (emphasis added)  Wells Fargo's planned response was as

follows:

> While we had a new price deck prior to the December 16th close,
> our commitment was made on May 5, 2014 and the $1.0B BB was
> based on Spring 2014 engineering evaluations and the price decks
> at that time.  The updated $1,449MM and $970MM BB were
> conducted for internal purposes only, given the price environment
> change since our initial commitment and evaluation.  While we

- 55 -

> could not reduce the BB until the next scheduled redetermination,
> we documented a CQR downgrade knowing that our collateral
> coverage had weakened.  On January 22, 2015, our reserve
> engineer provided us with the new BB value using our recently
> approved price deck, again for internal assessments.  Using our
> current price deck which is more in line with the current strip
> price, our reserve engineer calculated a maximum BB of $815MM
> (Total Proved PV9 $1.231B) . . . .

(WF-SABINE_VOL-00018704.)

132.    It is telling that Wells Fargo's planned response—that it committed to a $1 billion

RBL facility in May and July 2014 and "could not reduce the BB until the next scheduled

redetermination" —was false. (WF-SABINE_VOL-00018704.)  In fact, the banks had the right

under the original Commitment to re-determine an accurate and appropriate borrowing base 30

days after the transaction closed, in January 2015, which right they waived in exchange for

getting out of the Bridge Loan.  Of course, in renegotiating the New RBL Facility, the banks had

every opportunity to adjust the borrowing base to a supported amount based on then-current

market conditions.

133.    Wells Fargo's own Credit & Risk Management group looked to the credit officers

responsible for approving the financing for an explanation of why it was funded, asking whether

Legacy Sabine "really became leveraged more as a 'fallen angel'" and whether "the delay in

measuring the borrowing base [was] one of the reasons we marked it leveraged [after the

transaction closed]?"  (WF-SABINE_VOL-00010117.)  Karin Patterson, one of the credit

officers at Wells Fargo responsible for approving the re-negotiated New RBL Facility stated,

"[i]n May 2014, [our] interpretation was that if our facility had sufficient collateral coverage, we

did not have a Leveraged Loan.  At closing, we considered the October, 2014 Leveraged

Lending policy revision, and subsequent interpretations which defined aggregate debt as total

secured/unsecured debt, including unfunded commitments.  While we did not have guidance on

how to value oil & gas collateral for this purpose, we felt the value would not be adequate to

sufficiently cover aggregate debt as now defined." (WF-SABINE_VOL-00010117 (emphasis in original).) Wells Fargo knew in October 2014 that the Combined Company would have more liabilities than it had assets upon the closing of the Combination. But a risky "secured" loan was better than unsecured debt, and the banks made a knowing trade-off to fund the secured loan instead of the unsecured Bridge Loan.

134.    Further evidencing their "workout" mentality, the banks loaned an additional $50 million of second lien "secured" debt (bringing the Second Lien Loan from $650 million to $700 million) despite knowing that a collateral shortfall existed at that time for the Second Lien Loan. At the Combination closing, the Second Lien Loan of $700 million (which sat ahead of the $1.15 billion of Legacy Sabine and Legacy Forest unsecured notes), was substantially undersecured. On the eve of the Combination, Barclays noted its aim to sell the interest in the Second Lien Loan as soon as possible, "*[b]ut to be clear, it is a below par instrument*." (BARC_SOGC 00004016.) (emphasis added). On December 7, 2014, Barclays discussed in internal emails that it should be willing to fund the $50 million incremental Second Lien Loan because "our absolute exposure would be relatively small and this is an improved 2nd lien position. If the company performs, there may ultimately be the potential to monetize the exposure to one of the existing 2nd lien holders at some discount . . . ." (BARC_SOGC 00021027.) Barclays questioned, however, whether the debt was "fungible" given "the fact that the existing [second lien debt] is trading in the low to mid 80s . . . ." (BARC_SOGC 00021027.) That might not "factor[] into the tax treatment/calculus if we're willing to purchase the loan at an above market price." (BARC_SOGC 00021027.) By January 8, 2015, Wells Fargo had already committed to selling its piece of the Second Lien Loan for 70.5 cents on the dollar (WF-SABINE_VOL-00000999),

further confirming that Wells Fargo understood the just-issued incremental Second Lien

"secured" debt to be substantially undersecured.

135.    Just three weeks after the closing, Wells Fargo made an official "asset quality

rating change" for SOGC, downgrading the asset quality rating ("AQR") to a "Special Mention

(6)" because it was clear that SOGC could not "demonstrate the ability to pay 100% [of its]

senior debt or 50% [of its] total debt within 5-7 years."  (WF-SABINE_VOL-00006944.) Wells

Fargo thus acknowledged that the Legacy Forest noteholders, which, by priority, were part of the

one-half of SOGC's lenders that could not be paid, were intentionally hindered by the merger

and abandonment of the Bridge Loan.  Wells Fargo again acknowledged that the $1 billion

borrowing base established pursuant to the RBL re-negotiations was "non-conforming."  (WF-

SABINE_VOL-00006944.)

> ### L.    *Legacy Forest's Board of Directors Disregarded the Consequences of the Combination to Creditors*

136.    As discussed herein, Legacy Forest's board of directors made no effort to

ascertain whether Legacy Forest was entering into a transaction that would create an insolvent

company.  Indeed, upon information and belief, Legacy Forest's directors and officers paid

minimal attention to the financial details of this multibillion-dollar transaction and the effect it

would have on Legacy Forest's creditors.  The Combination resulted in the New RBL Facility

($750 million as of closing) and the $650 million of Legacy Sabine Second Lien Loan being

placed ahead of the Legacy Forest Unsecured Notes, and yet, at no time leading up to the Debt

Financing was the Forest board provided with, nor did the Forest board request, any analysis or

models concerning (i) the impact of such debt being placed ahead of the Legacy Forest

Unsecured Notes, or (ii) the recoveries to the holders of the Legacy Forest Unsecured Notes in a

bankruptcy of the stand-alone Legacy Forest as compared to a bankruptcy of the combined company.  (Wind Tr. 172:13-175:3.)

137.    It has been less than one year since this significant transaction closed, and yet McDonald, Legacy Forest's CEO and chief negotiator, testified that he could not recall any specifics regarding the Combination's proposed financing arrangements at any stage of the negotiations.  (McDonald Tr. 46:17-47:18.)  Remarkably, McDonald testified that he was unsure whether the Bridge Loan was ever funded or not.  (McDonald Tr. 133:8-21.)  Wind, Legacy Forest's CFO, and Lightner, the Chairman of the Legacy Forest board, both similarly testified that they did not know whether the Combination closed with a bridge facility in place. (Wind Tr. 151:21-152:11; Lightner Tr. 85:24–86:9.)  In other words, the senior most officers and Legacy Forest's CEO and board member did not even know that the $800 million of Legacy Forest unsecured notes were to remain unpaid.

138.    Between May and early December 2014, when Legacy Sabine attempted to persuade Legacy Forest to mutually terminate the Combination, Legacy Sabine's opinion of the anticipated merger changed from enthusiasm to believing that a merger of the two companies "pose[d] significant harm and undue risk," could result in insolvency, and was "no longer in the best interests" of either company.  (SAB00418076.)  McDonald's perception of the benefits and challenges of the Combination, however, *did not change at all* between the signing of the initial agreement in May 2014 and the Combination's closing in December 2014.  (McDonald Tr. 153:23-154:10.)  Indeed, McDonald testified that he never fully understood Legacy Sabine's aforementioned concerns, and that he simply did not have enough information to understand what the Legacy Sabine models and forecasts said about the financial condition of the Combined Company.  (McDonald Tr. 263:16-265:16.)  Similarly, Lightner testified that the board did not

totally understand the concerns underlying Legacy Sabine's request to terminate the Combination, but rather considered the request a likely attempt by Legacy Sabine to renegotiate the Combination's terms.  (Lightner 92:22–93:8.)

139.    McDonald testified that *Legacy Forest did not perform or ask any third party to perform any solvency analysis* of Legacy Forest in the crucial weeks leading up to the Combination's closing during which the alternate structure was adopted, even though oil and gas prices had collapsed since May 2014.  (McDonald Tr. 259:15-260:3.)  When asked whether Legacy Forest had conducted any solvency analysis of the Combined Company, Lightner testified that Legacy Forest did not.  (Lightner Tr. 206:9–207:22.) When asked the same question, Legacy Forest CFO Victor Wind testified that Legacy Forest had looked at Legacy Sabine's models and formed its own opinion, but was unable to identify any independent analysis or modeling conducted by Legacy Forest. (Wind Tr. 111:10-111:21.)  It appears, however, that Wind was aware that a solvency analysis needed to be done, even if Legacy Forest declined to do one.  Indeed, McDonald told Wind on December 1, 2014 that Legacy Forest's outside counsel had requested that Legacy Forest examine whether or not the Combined Company would be insolvent, and requested that Wind examine Legacy Forest's "go it alone" versus merger options, which Wind agreed to do.  (SAB00415387.)  The above-described request by Legacy Forest's counsel that Legacy Forest should examine the potential for insolvency at the Combined Company may have been futile regardless.  Wind testified at deposition that he had only recently learned that one measure of insolvency is whether a company's liabilities exceed the fair value of its assets. (Wind Tr. 113:3-15.)  When asked whether it was his understanding that the Combined Company would be insolvent on a balance sheet basis at closing, Lightner testified that he was "sure there was probably a period where there was negative equity value," and that he did not

recall for how long the Combined Company's equity values were expected to be negative

thereafter.  (Lightner Tr. 92:8–20.) Lightner testified that in making its decisions, the Legacy

Forest board held the "firm belief that if the shareholders did well, everybody would do well,"

and that the board believed that "changing the structure made sense for the Forest stakeholder

group [as a] whole," including the holders of Legacy Forest's debt.  (Lightner Tr. 29:3–13; 68:8–

11; 101:5–15.)   But Legacy Forest director Dod Fraser testified that one of the anticipated

benefits of the alternate structure ultimately agreed upon was that it denied the Legacy Forest

noteholders the ability to exercise their put rights.  (Fraser Tr. 132:4-132:21, 280:18-284:25.)

140.    When pressed as to why Legacy Forest would have amended the merger structure

to accomplish the Combination despite the consequences to Legacy Forest's creditors,

McDonald testified that Legacy Forest considered alternate transactional structures "in the spirit

of cooperation." (McDonald Tr. 110:6-15.)  Legacy Forest's CFO viewed the Combined

Company's need to obtain covenant relief from the banks with respect to the debt-to-EBITDA

ratio covenant as not particularly troubling, because he had obtained such relief for Legacy

Forest twice in the past with nearly 100% lender consent. (Wind Tr. 210:20-211:12.)  Similarly,

JPMorgan's view of the alternatives suggested that there was no real need to alter the structure.

JPMorgan's consensus opinion, which it provided to Legacy Forest, was that the New RBL

Lenders were likely to waive the debt-to-EBITDA covenant breach in the first quarter of 2015

because they were also the lenders on the Bridge Loan.  (SAB00043381.)

**M.**    **_The Legacy Forest and SOGC Board Effectuate the Merger and Financing_**

**1.**    **_The Decisionmakers:  Legacy Forest / SOGC's Board of Directors at the Time of the Combination_**

141.    Immediately prior to the Combination, the Legacy Sabine board of directors was

comprised of Duane C. Radtke (Chairman of the Board), David J. Sambrooks, Michael G.

France, Alex T. Krueger, Brooks M. Shughart and John Yearwood. (SAB00042448.) Sambrooks also served as chief executive officer of Legacy Sabine. (SAB00499391.) He also was the authorized representative of each of the Legacy Sabine Subsidiaries (except two),[20] with full power under each of the respective limited liability company agreements to fully manage the affairs of each of those entities. (*Id.*)

142.    Up until 6 a.m. Mountain Standard Time on December 16, 2014, the Legacy Forest board of directors was comprised of: Loren K. Carroll, Richard J. Carty, Dod A. Fraser, James H. Lee, James D. Lightner (Chairman of the Board), Patrick R. McDonald, and Raymond I. Wilcox. (SAB00643228.) McDonald served as chief executive officer of Legacy Forest. Victor Wind served as chief financial officer of Legacy Forest. (*Id.*)

143.    At all relevant times, Michael France served as a Managing Director of First Reserve, Alex Krueger was the Co-CEO & President of First Reserve, and Brooks Shughart was a Director of First Reserve. (SAB00163865.) Each also served as a Director on the Legacy Sabine board. (*Id.*) John Yearwood, another member of the Legacy Sabine board, had a separate consulting and/or advisory agreement with First Reserve. (*Id.*)

### 2.    *Actions Taken by the Respective Boards*

144.    At approximately 3:07 p.m. (MST) on December 15, 2014, a telephonic meeting of the Legacy Forest board was held at which James D. Lightner (Chairman), Patrick R. McDonald, Dod A. Fraser, Raymond I. Wilcox, Loren K. Carroll, Richard J. Carty and James H. Lee were present. (SAB00043393 Also present from Legacy Forest were Victor A. Wind, General Counsel Richard W. Schelin and Deputy General Counsel Joseph G. Walker. (*Id.*) From Wachtell, Legacy Forest's outside counsel, Ronald Chen, Gordon, Deborah Paul and Eric

---

[20] Except Redrock Drilling LLC and Sabine Oil & Gas Financing Corporation. Sambrooks acted on behalf of both in the Financing.

Rosof were present.  (*Id.*)  From JPMorgan, Legacy Forest's financial advisor, Laurence

Whittemore, Lee Nix and Peter Kelly were present.  (*Id.*)  Lightner presided over the board

meeting and Schelin served as secretary.  (*Id.*)

145.    During the meeting, Gordon provided an update to the Legacy Forest board

regarding the status of the closing of the Combination.  (*Id.*)  The Compensation Committee then

met to discuss performance bonuses and severance issues.  (*Id.*)  The full Legacy Forest board

then approved performance bonuses, including CEO compensation, as recommended by the

Compensation Committee. (*Id.*)  Also on December 15, 2014, the Legacy Forest board executed

a Unanimous Written Consent of the board of Directors in Lieu of a Meeting.  (SAB00045828.)

The consent provided for acceptance of resignation of various directors, and removal and

appointment of officers.

146.    At 6:00 a.m. (MST) on December 16, 2014, a telephonic meeting of the Legacy

Forest board was held at which James D. Lightner (Chairman), Patrick R. McDonald, Dod A.

Fraser, Raymond I. Wilcox, Loren K. Carroll, Richard J. Carty and James H. Lee were present.

(SAB00043473.)  Also present from Legacy Forest were Victor A. Wind, Richard W. Schelin

and Joe Walker.  (*Id.*)  From Wachtell, Gordon, Ronald Chen and Lisa Schwartz were present.

(*Id.*)  From JPMorgan, Lee Nix and Peter Kelly were present.  (*Id.*)  Lightner presided over the

board meeting and Schelin served as secretary. (*Id.*)

147.    The meeting lasted less than one hour, during which time Gordon presented "the

status of the amendments to the combination transaction with [Legacy Sabine] and the timing for

closing." (*Id.*)  The original Legacy Forest board approved going forward with the share

issuance to First Reserve in exchange for the equity interests in two intermediate holding

companies that in turn owned Legacy Sabine.  At this stage, Legacy Sabine remained separate

from Legacy Forest—it had not yet merged into Legacy Forest.  Legacy Sabine was now a

wholly owned subsidiary of Legacy Forest, and First Reserve received its voting common and

"non-voting" preferred shares of Legacy Forest, giving it 73.5% of the economics of the two

companies.

148.    Also at that morning board meeting, the original Legacy Forest board members

resigned, except for two (McDonald and Fraser).  (WLRK0012485.)  Those two then appointed,

by written directive, six persons designated by First Reserve and Legacy Sabine, now comprising

an eight-member board.  (*Id.*)  This of course reflected the fact that First Reserve was to have the

vast majority of the economics of the combined companies.  Effective upon the share issuance to

First Reserve (the "Effective Time"), the directors of Legacy Forest had changed to the eight-

person First-Reserve-dominated slate, of Shughart, Krueger, Sambrooks, Yearwood, Radtke,

McDonald, Fraser and Chewning (collectively, the "Sabine-Slate Directors").  (*Id.*).

149.    At approximately 11:08 a.m. (CST), Sambrooks, the CEO of Legacy Sabine and a

Legacy Sabine board member, wrote to the Sabine-Slate Directors:

> Welcome directors of (soon to be) Sabine Oil & Gas Corporation.
> We will close our transaction in short order – signature pages have
> been exchanged and we are waiting on share distribution to
> memorialize closing. . . Immediately after closing we need to have
> a quick telephonic board meeting to obtain formal approval of the
> combined company revolver and increase in second lien
> commitments. Of course we need this right away to close out the
> [Legacy Sabine] and [Legacy Forest] reserve base lending credit
> agreements and have in place the new SABO RBL revolver for
> liquidity.

(SAB00358891.)  Sambrooks also attached to this email the verbal consents that would be

sought at the follow-up meeting and a press release which was to be published when the

transaction closed.  (*Id.*; SAB00358893.)

150.    Upon information and belief, the "Effective Time" under the Combination

Agreement is approximately 12:20 p.m. (CST), at which time a press release was issued.  The

Legacy Forest board, consisting of the Sabine-Slate Directors, was in place.

151.    Approximately one hour later, at 2:30 p.m. (CST) the new board of directors met

telephonically.  (SAB00042451.)  David Sambrooks (Chairman), Duane Radtke (Lead Director),

Brooks Shughart, John Yearwood, Alex Krueger, Patrick McDonald, and Dod Fraser attended

the meeting.  (*Id.*)  One director, Thomas Chewning, did not attend.  (*Id.*)  Also present was

Timothy Yang (Combined Company General Counsel and Chief Compliance Officer), and

representatives from Vinson & Elkins LLP and Simpson Thacher & Bartlett LLP, both counsel

to Legacy Sabine (which had not yet merged with Legacy Forest).  (*Id.*)  Yang served as

secretary of the meeting.  (*Id.*)  During the meeting, Sambrooks reviewed proposed resolutions

with respect to the Combined Company financing, including a new RBL Credit Agreement, an

increase in the second lien commitments, and other revised financing documents.  (*Id.*)  The

Legacy Forest board then resolved "that any specific resolutions that may be required to have

been adopted by the board or the Members in connection with the actions and transactions

contemplated by the foregoing resolutions be, and they hereby are, adopted. . ." (*Id.*)

152.    Upon information and belief, the resolutions adopted at this board meeting

provided, among other things:

> a.  That the Combined Company is authorized and directed to (a) execute and
>     deliver, and to perform its obligations under, the Financing Documents to
>     which it is a party and (b) take all Related Actions;
>
> b.  that the Combined Company approves the terms and conditions of the 2nd
>     Term Amendment and all documents related thereto;
>
> c.  that each Financing Document and all of the transactions contemplated
>     thereby be, and each of them hereby is, authorized, ratified and approved
>     in all respects on the terms determined by the Authorized Officers and on

such other terms and conditions included in the final forms of the agreements to be negotiated, executed and delivered in connection therewith;

d.   that the Combined Company is, authorized and empowered to borrow and repay amounts as contemplated by the RBL Credit Agreement, the 2nd Term Amendment (upon the consummation of the Merger);

e.   that the Combined Company is, authorized and empowered to grant a security interest in, and to pledge, mortgage or grant deeds of trust with respect to, its right, title and interest in and to its properties and assets;

f.   that any of the Authorized Officers be, and each of them hereby is, authorized and empowered to negotiate the form, terms and provisions of, and to execute and deliver for and in the name and on behalf of the Combined Company any and all security documents;

g.   that, for any limited liability companies with the Combined Company as member that are Guarantors, the Combined Company is, authorized and empowered to execute and deliver such consents, resolutions and authorizations approving the execution and delivery of the Financing Documents, and to execute and deliver any Financing Documents, as the Combined Company may deem necessary or advisable to carry out the terms, intents and purposes of RBL Credit Agreement, the 2nd Term Amendment and other Financing Documents, or as required by the Administrative Agent in order to effect the transactions contemplated by RBL Credit Agreement and the 2nd Term Amendment; and

h.   that all acts and things heretofore done by any Authorized Officer or by any employees or agents of the Combined Company and any Subsidiary, on or before the date hereof in connection with the transactions contemplated by the foregoing resolutions be, and they hereby are, ratified, approved and confirmed in all respects.

153.    The meeting of the Legacy Forest board (consisting of the Sabine-Slate Directors) adjourned at 2:45 CST.  Only after that, at 2:48 p.m. CST, did the merger of Legacy Sabine into Legacy Forest become effective.

### N.    *SOGC Begins a Restructuring Process Almost Immediately After the Combination Closed*

154.    On Monday, February 2, 2015, a matter of weeks after the Combination and Financing closed, Sambrooks emailed Krueger and Shughart, both SOGC board members and

employees at First Reserve, to arrange a conference call that evening to discuss engaging Kirkland & Ellis LLP ("Kirkland"). (SAB00162136.) Sambrooks wrote Krueger later than evening to convey that Sambrooks and Shughart had "caught up" on the issue, and Sambrooks understood that Krueger has already spoken with Shughart about retaining Kirkland. (*Id.*) Krueger (co-CEO and President of First Reserve) wrote back that night, "[Y]es I'm on board." (*Id.*) Sambrooks then scheduled a call for the SOGC board for the next day on the same issue. (*Id.*) Kirkland's engagement letter was retroactively dated to be effective on January 30, 2015. (*See* Dkt. No. 218)

## II.     Demand

155.    The Committee has submitted a demand letter, dated December 8, 2015, to the Debtors pursuant to the *Stipulated Order Regarding Coordinated Discovery Protocol* [Docket No. 359] (the "Discovery Protocol"). The Debtors had already refused to bring any of the causes of action described in this Motion, stating so in the cover letter delivering their report on December 1, 2015, and in a pleading filed with the Court (and in statements in open court) on that same day.

## BASIS FOR RELIEF

## I.     The Legal Standard for Derivative Standing

156.    Title 11 of the United States Code (the "Bankruptcy Code") provides for the establishment of a creditors' committee for the express purpose of protecting the rights of its constituents and similarly situated creditors. The Bankruptcy Code authorizes a creditors' committee to "perform such other services as are in the interests of those represented." 11 U.S.C. § 1103(c)(5). To that end, Bankruptcy Code section 1109(b) provides, in pertinent part that:

> a party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an

> equity security holder, or any indenture trustee, may raise and may
> appear and be heard on any issue in a case under this chapter.

*Id.* § 1109(b).   The right to appear and to be heard includes the right to bring suit when the

debtors refuse to do so.  *See Official Comm. of Unsecured Creditors of Joyanna Holitogs, Inc. v.*

*I. Hyman Corp. (In re Joyanna Holitogs, Inc.)*, 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982).

157.    There is "an implied . . . right for creditors' committees to initiate adversary

proceedings in the name of the debtor in possession[.]"  *In re STN Enters.*, 779 F.2d 901 (2d Cir.

1985) ("*STN*").  A creditors' committee typically must satisfy a two-part test to demonstrate

entitlement to commence such a proceeding:  First, a committee must present colorable claims

for relief "that on appropriate proof would support a recovery," and second, a committee must

demonstrate that the "debtor unjustifiably failed to bring suit."  *Id.* at 905.  In determining

whether the debtor unjustifiably failed to bring suit, the court examines "whether an action

asserting such claims(s) is likely to benefit the reorganization estate."  *Id.*

158.    The threshold for showing that claims are colorable "is a relatively easy one" to

satisfy.  *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330

B.R. 364, 375 (Bankr. S.D.N.Y. 2005).  The issue of standing is not designed to have a final trial

on the merits of causes of action, or to truncate the ability of creditors to get the benefits of full

discovery if a viable lawsuit can be initiated.  Authorization to bring claims derivatively "should

be denied only if the claims are 'facially defective.'"  *Id.; see also Official Comm. of Unsecured*

*Creditors of America's Hobby Ctr., Inc. v. Hudson United Bank (In re America's Hobby Ctr.,*

*Inc.)*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (same).  The required inquiry is "much the

same as that undertaken when a defendant moves to dismiss a complaint for failure to state a

claim."  *Id.* (internal citation and quotation marks omitted).  In determining whether a claim is

colorable, a court is not required to conduct a mini-trial.  Instead, a court should weigh the

- 68 -

"probability of success and financial recovery," as well as the anticipated costs of litigation, as part of a cost/benefit analysis to determine whether the prosecution of claims is likely to benefit the debtor's estate. *Id.* at 282.

159.     Here, the Committee need only demonstrate the existence of a plausible claim and demonstrate that its contentions are not frivolous—a bar clearly met by this Motion and the Proposed Complaint. *See STN*, 779 F.2d at 905.  The best analogy for the current situation is what the bankruptcy court faced in *Adelphia*.  Where a committee has compiled significant evidence to survive a motion to dismiss, and additional discovery in such actions (when formally commenced) can even further bolster the claims, standing should be granted.  The *Adelphia* court concluded that the *STN* stage of proceedings does not exist to protect defendants, 330 B.R. at 386, and while some factual matters can be put forward at this stage, the full factual development occurs in the actual lawsuit, *id.* at 377.

160.     The Proposed Claims are both meritorious and highly valuable, and actions prosecuting them would unquestionably benefit the Debtors' estates.  The Committee has conducted as thorough an investigation as possible given limits imposed by the voluntary nature of document production, the short time during which discovery has taken place, and the Debtors' conflicting efforts, which have impeded the Committee investigation.  These conflicting efforts are discussed below.

161.     The Committee has reviewed 145,000 documents from 11 producing parties on an exceedingly compressed timeline.  In many cases the Committee received documents only days before depositions because the Debtors received all documents first and then screened what the Committee received, ostensibly for privilege.  Indeed, the Committee only began receiving a material volume of documents from certain third parties on November 8 (other than a copy of the

loan closing documents) and reviewed such documents before the respective November 17 and December 15 challenge deadlines.  The Committee then conducted 13 depositions over the course of 12 business days, sandwiched around the Thanksgiving holiday and ending only four days before the Challenge Period deadline.

162.    During this short period, however, it became clear to the Committee that the Debtors have acted and continue to act in a dual role of "investigator" and "protector" of the targets of the investigation.  For example, the Debtors went so far as to actually try to "rehabilitate" the testimony of bank and other witnesses after questioning by the Committee at depositions, with leading questions attempting to refute liability or key facts.  Witnesses who were "interviewed" by the Debtors in advance of depositions (without any notice to the Committee) were highly evasive under Committee questioning about what occurred in those Debtor "interviews."  The Committee's investigation has uncovered the fact that counsel to a principal target of the investigation (First Reserve) was actually *counsel to the company*, and taking direction from a First Reserve controlled board, at the most critical times during the transaction.

163.    In view of the Debtors' conduct during this irregular investigation, it is no surprise to the Committee that the Debtors have refused to prosecute *any* of the claims or causes of action described in this Motion, as discussed in further detail below.

## II.    The Intentional Fraudulent Conveyance Claims Are Colorable

164.    Viable—not merely colorable—causes of action exist to avoid various obligations incurred in favor of, and liens granted to, the Secured Parties.  Specifically, the Proposed Complaint seeks to avoid as intentional fraudulent conveyances:

- the New RBL Facility obligations at Legacy Forest;

- the liens granted by Legacy Forest to secure the New RBL Facility obligations;

- the New RBL Facility obligations at each of the Legacy Sabine Subsidiaries;

- the liens granted by the Legacy Sabine Subsidiaries to secure the New RBL Facility obligations;

- the Legacy Sabine Second Lien Loan obligations at Legacy Forest;

- the liens granted by Legacy Forest to secure the Legacy Sabine Second Lien Loan obligations;

- the $50 million in incremental obligations incurred under the Legacy Sabine Second Lien Loan by the Legacy Sabine Subsidiaries at the closing of the Combination;

- the liens granted by the Legacy Sabine Subsidiaries to the extent that such liens secure the $50 million in avoidable obligations under the Legacy Sabine Second Lien Loan;

- the approximately $620 million in payments made in respect of the Legacy Sabine RBL Facility at the closing of the Combination; and

- all post-Combination payments of principal, interest and fees in respect of the New RBL Facility and the Legacy Sabine Second Lien Loan, including the $185 million of proceeds of the sale of the Arkoma assets of Legacy Forest that were used two days after the Combination to pay down the balance of the New RBL Facility.

Additionally, the Proposed Complaint seeks to preserve the avoided liens under Bankruptcy Code section 551 for the benefit of the estate.

165.    The Committee recognizes that the Secured Parties may seek to establish, at trial, the amount of value they gave in good faith as an affirmative defense under Bankruptcy Code section 548(c) and potentially applicable state law.[21]  In light of the evidence already identified concerning the conduct of the Secured Parties, particularly the New RBL Parties, this affirmative defense will be difficult for the Secured Parties to prove (in whole or in part).  In any event, the question of whether the Secured Parties gave value in good faith should not preclude the

---

[21] Notably, New York law does not provide an affirmative defense for intentional fraudulent conveyances to the extent of value given in good faith. *See Drenis v. Haligiannis*, 452 F. Supp. 2d. 418, 426-27 (S.D.N.Y. 2006) (citing N.Y. DEBT. & CRED. LAW § 276 (providing that every conveyance with actual intent to defraud present or future creditors is fraudulent, irrespective of transferee's good faith (or lack thereof) or exchange of fair consideration)).

Committee from obtaining derivative standing because (i) it is an affirmative defense, and (ii) as

with the amount of value, it is a factual matter  *See, e.g.*, *In re MarketXT Holdings Corp.*, 426

B.R. 467, 476 (Bankr. S.D.N.Y. 2010); *Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin.*

*Techs., Ltd.*), 337 B.R. 791, 805 (Bankr. S.D.N.Y. 2005).

### A.    *Statutory Bases for Causes of Action and Remedies*

166.    There are two statutory bases in the Bankruptcy Code for the Committee, acting

on behalf of the Debtors' estates, to avoid the various obligations incurred by, and liens granted

by, the Debtors with the intent to hinder, delay, or defraud their creditors.  *First*, Bankruptcy

Code section 548(a)(1)(A) provides that a bankruptcy trustee may avoid a transfer of an interest

of the debtor in property, or an obligation incurred by the debtor, that was made or incurred with

"actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . .

indebted."  *Second*, under Bankruptcy Code section 544(b) the bankruptcy trustee may avoid a

transfer of property or obligation that is voidable under state fraudulent transfer law by an

unsecured creditor with an allowable claim against the debtor.  Although Bankruptcy Code

section 544 requires a showing that an actual creditor exists who could bring the cause of action,

once that is shown, the obligation is avoided in its entirety for the benefit of the debtor's estate.

*In re Interstate Cigar Co., Inc.*, 278 B.R. 8, 18 (Bankr. E.D.N.Y. 2002); *In re All Am. Petroleum*

*Corp.*, 259 B.R. 6, 17 (Bankr. E.D.N.Y. 2001).

167.    Potentially applicable state intentional fraudulent transfer laws (New York, Texas,

and Colorado) are substantially similar to Bankruptcy Code section 548(a)(1)(A).   N.Y. DEBT. &

CRED. LAW § 276 ("Every conveyance made and every obligation incurred with actual intent . . .

to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and

future creditors."); TEX. BUS. & COMM. CODE § 24.005(a)(1) (providing for avoidance of

transfers made, or obligations incurred, "with actual intent to hinder, delay, or defraud any

- 72 -

creditor of the debtor"); COLO. REV. STAT. § 38-3-105(1)(a) (same);  *see also Drenis*, 452 F.

Supp. 2d.at 426 (noting that "the UFCA and UFTA are substantially similar" with respect to

intentional fraudulent conveyances).

### 1.  *Intent to Hinder or Delay Creditors*

168.    In asserting claims for intentional fraudulent conveyance, a plaintiff need only

establish that the transfer or incurrence of an obligation was made with the intent to hinder ***or***

delay creditors.  *In re Rowe*, 234 F. Supp. 114, 116 (E.D.N.Y. 1964) ("The statute reads in the

disjunctive so that only one of these three motivating factors is required."); *Flushing Sav. Bank v.*

*Parr*, 81 A.D.2d 655, 656 (N.Y. App. Div. 1981) ("A conveyance is illegal if made with an

intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to

hinder and delay them.") (citing *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932)); *Rozen v. Russ &*

*Russ, P.C.*, 2012 N.Y. Misc. LEXIS 633, *8–9 (N.Y. Sup. Ct. Jan. 30, 2012) ("[A] creditor need

only establish an actual intent to hinder and delay.  An actual intent to defraud is unnecessary.").

"The words 'hinder' and 'delay' have separate significance: they embrace . . . deliberate effort to

stave off creditors by putting property beyond their reach even when the purpose of that is not to

cheat them of ultimate payment but only to wrest from them time to restore the debtor's

affairs."  *Klein v. Rossi*, 251 F. Supp. 1, 2 (E.D.N.Y. 1966).  As the Supreme Court has held, the

necessary intent to delay or hinder creditors exists even where a debtor "holds the genuine belief

that, if suits can be staved off for a season, he will weather a financial storm, and pay his debts in

full."  *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932) ("The belief even though well founded, does

not clothe [the debtor] with a privilege to build up obstructions that will hold his creditors at

bay."); *see also In re MarketXT Holdings Corp.*, 376 B.R. 390, 403 (Bankr. S.D.N.Y. 2007)

("An intent merely to delay, but not ultimately prevent, a creditor from being repaid is generally

sufficient to trigger the requisite culpability required by the statute.) (citation omitted).

- 73 -

169.    For example, the New York State Court of Appeals has held that a transfer is

fraudulent where it evinces "actual intent on the part of the debtor to *evade* the creditor," *Hearn*

*45 St. Corp. v. Jano et al.*, 283 N.Y. 139, 142-43 (N.Y. 1940) (emphasis added), or "was 'made

by the debtor with the actual intent thereby to *impede or altogether defeat* the efforts of the

creditor'" to recover on his claim, *Pattison v. Pattison*, 301 N.Y. 65, 74 (N.Y. 1950) (citing

*Hearn*, 283 N.Y. at 142) (emphasis added).  Thus, evidence of an effort merely to make a

creditor's collection efforts more difficult—even where the effort was not intended to deprive the

creditor of its claim outright—is sufficient to support a cause of action for intentional fraudulent

conveyance.

### 2.    The Badges of Fraud

170.    The intent to hinder, delay, or defraud creditors is not ordinarily proven by direct

evidence, but rather by inference from a debtor's conduct and the circumstances surrounding a

transaction.  In determining whether a debtor acted with actual fraudulent intent in making

transfers or incurring obligations, courts within the Second Circuit have recognized various

"badges of fraud" to determine intent, specifically:

(i)    the financial condition of the transferor at the time of the transfer;

(ii)    concealment of facts and false pretenses by the transferor;

(iii)    an unconscionable discrepancy between the value of the property
transferred and the consideration received;

(iv)    a close relationship between the parties to the alleged fraudulent
transaction;

(v)    the reservation of rights in or control over the transferred property after
the alleged conveyance;

(vi)    the existence or cumulative effect of a pattern or series of transactions or
course of conduct after the incurring debt, onset of financial difficulties,
or pendency or threat of suits by creditors; and

(vii)    the general chronology of the events and transactions under inquiry.

- 74 -

*In re MarketXT Holdings Corp.,* 376 B.R. 390, 405-06 (Bankr. S.D.N.Y. 2007) (citing *In re*

*Kaiser*, 722 F.2d 1574, 1582-82 (2d Cir. 1983)); *Bub v. Rockstone Capital, LLC*, 516 B.R. 685,

694 (E.D.N.Y. 2014)  Potentially applicable state law in New York,[22] Texas,[23] and Colorado[24]

provide similar badges of fraud.

### 3.    Remedies Under Bankruptcy Code Sections 550 and 551

171.    With respect to any transfer that is avoided as an intentional fraudulent

conveyance pursuant to Bankruptcy Code sections 544 or 548, Bankruptcy Code section 550

authorizes an estate representative to "recover, for the benefit of the estate, the property

transferred, or, if the court so orders, the value of such property" from (i) the initial transferee of

such transfer or the entity for whose benefit such transfer was made, or (ii) any immediate or

mediate transferee of such initial transferee.  11 U.S.C. § 550(a).

172.    Of special relevance here is that a judgment for the value of the property at the

time of the avoidable transfer (*i.e.*, the time the liens were granted in favor of the New RBL

---

[22] *A&M Global Mgmt. Corp. v. Northtown Urology Assocs.*, 115 A.D.3d 1283, 1288–89 (N.Y. App. Div. 4th Dept. 2014):

> Badges of fraud [under New York law] include: (1) a close relationship between the parties to the transfer; (2) the inadequacy of consideration; (3) the transferor's knowledge of the creditor's claims and the transferor's inability to pay them; (4) the retention of control of the property by the transferor after the conveyance; (5) the fact that the transferred property was the only asset sufficient to pay the transferor's obligations; (6) the fact that the same attorney represented the transferee and transferor; and (7) a pattern or course of conduct by the transferor after it incurred its obligation to the creditor.

[23] Tex. Bus. & Comm. Code § 24.005(b) (providing by statute badges of fraud: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.).

[24] Colo. Rev. Stat. § 38-3-105(2) (same).

Agent) is appropriate when the value of the property has declined and the assets could have been sold. *See, e.g.*, *Rodriguez v. Drive Fin. Servs., L.P.* (*In re Trout*), 609 F.3d 1106, 1112-13 (10th Cir. 2010). The remedy for a fraudulent transfer of a wasting asset—like oil and gas reserves— is the value of the property at the time, not just mere avoidance. *Drewes v. FM Da-Sota Elevator Co.* (*In re Da-Sota Elevator Co.*), 939 F.2d 654, 655 n.2 (8th Cir. 1991). Indeed, a Texas bankruptcy court has applied this principle to working interests in oil and gas leases. *Pritchard v. Brown* (*In re Brown*), 118 B.R. 57 (Bankr. N.D. Tex. 1990). Some courts have awarded the value of the property as a remedy based only on declining value of the property transferred, even if the property might not have been sold. *Reiber v. Baker* (*In re Baker*), 17 B.R. 392, 394-95 (Bankr. W.D.N.Y. 1982). In this regard, the *Baker* court noted that "[t]he purpose and thrust of [Bankruptcy Code] section [550] is to restore the debtor's financial condition to the state it would have been had the transfer not occurred. This purpose would not be accomplished by the return of the [property] or its present value." *Id.* at 395.

173. Bankruptcy Code section 551 is also of critical importance in the instant dispute because avoidance of liens will be sought with respect to secured lenders. Bankruptcy Code section 551 provides that any transfer or lien avoided in connection with fraudulent conveyances is "preserved for the benefit of the estate." As such, Bankruptcy Code section 551 is meant "to allow a trustee in bankruptcy, upon avoidance of certain preferential or fraudulent transfers, to increase the assets of the bankruptcy estate." *Staats v. Barry* (*In re Barry*), 31 B.R. 683, 686 (Bankr. S.D. Ohio 1983). By operation of this provision, the bankruptcy estate steps into the position of the creditor whose lien or claim has been avoided. Put simply, any value recovered and lien avoided will be preserved for the benefit of the Debtors' unsecured creditors.

**B.**    ***In Approving the Financing and Consummating the Merger of Legacy Sabine into Legacy Forest, Legacy Forest Intended to Hinder, Delay and Defraud the Creditors of Legacy Forest and Legacy Sabine***

**1.**    ***The Relevant Decision-Maker***

174.    The intent of a company is determined by the intent of the authorized corporate decision-maker for purposes of fraudulent conveyance law.  As relevant in this case, if a financing requires board approval, then the intent of the board of directors in approving the financing is the relevant intent for fraudulent conveyance purposes.  *See, e.g.*, *Weisfelner v. Fund 1* (*In re Lyondell Chem. Corp.*), 503 B.R. 348, 389 (Bankr. S.D.N.Y. 2014) (holding in corporate context that intent to hinder, delay or defraud must be pled "on the part of a critical mass of the directors who made the decisions in question").  Importantly, in assessing the intent of a board of directors, the intent to "hinder, delay, or defraud" creditors "need not target any particular entity or individual as long as the intent is generally directed toward present or future creditors of the debtor."  *In re Bayou Grp., LLC*, 439 B.R. 284, 304 (S.D.N.Y. 2010).

175.    In this case, the relevant decision-maker is the Legacy Forest board, who authorized the incurrence of debt and the grant of liens.  However, the Legacy Forest board of directors that approved the New RBL Facility was <u>not</u> the pre-Combination board of directors.  Quite to the contrary—the last act of the original, full Legacy Forest board was a meeting early on the morning of December 16, 2014 when the original Legacy Forest board voted to approve Amendment No.1 (the new merger structure), and all but two directors resigned (McDonald and Fraser).  (SAB00043473.)  McDonald and Fraser then, as the only remaining directors and in accordance with the bylaws, then appointed new directors by unanimous written consent, specifically to install the Sabine-Slate Directors.  (WLRK0012485.)  That appointment of the Sabine-Slate Directors became effective at the "Effective Time," which was <u>not</u> defined as the closing of the entire Combination and Financing.  (July Combination Agreement § 1.1(a)(i).)

Rather, the "Effective Time" occurred when the parties completed only the very first step of the Combination—First Reserve's contribution of the Legacy Sabine equity to Legacy Forest, in exchange for Legacy Forest's issuance of new shares to First Reserve. *Id.*; *see also* Amendment No.1 (not changing the term "Effective Time"). The "Effective Time" occurred at approximately noon Central time on December 16, 2014.

176.    At that point, the new Sabine-Slate Directors were in office at Legacy Forest, and Legacy Sabine was an indirect, wholly owned subsidiary of Legacy Forest. Then, this new board of Legacy Forest (consisting of the new Sabine-Slate Directors) held a 15-minute long board meeting, at 2:30 p.m. Central time, to approve the new financing, the amendment of the Second Lien Loan Agreement to provide for $50 million of additional obligations, and the granting of liens to secure the obligations under both the New RBL Facility and the Second Lien Loan Agreement, including the liens on the Legacy Forest assets to secure the Second Lien Loan obligations. (SAB00042451.) Present at the meeting were only seven of the eight Sabine-Slate Directors; Chewning did not attend. (*Id.*) The seven directors who did attend included five directors who were at that very time also members of the Legacy Sabine board: Sambrooks, Shughart, Krueger, Radtke and Yearwood. (*Id.*)

177.    Alternatively, First Reserve directly controlled the decision to approve the New RBL Facility and associated liens, as well as the assumption by Legacy Forest of the Second Lien Loan obligations and the granting of liens on Legacy Forest Assets to secure the Second Lien Loan. This is not just because of some confluence of factors or indirect control. First Reserve personnel affirmatively took the position, in writing, that they controlled all decisions regarding the Financing.[25]

---

[25] As Mr. Weiner of First Reserve stated, "I don't care what mgmt says – anything cap markets relates [*sic*] needs to be approved by me and is their job to make sure i am in the loop[.]" (FRSABO00006764); *see also* Sambrooks Dep.

>    **2.     *First Reserve Seeks To Delay the Imminent Failure of the Legacy
>             Sabine Investment Through a Transaction the Sabine-Slate Directors
>             Knew Was Doomed to Fail***

178.    The motivations of First Reserve and the board members it installed at Legacy

Forest in pushing through a transaction that it knew was doomed to fail—instead of refusing to

close the deal or forcing the banks to fund the committed bridge facility—are found in the

broader context of the private equity firm's performance at that time.  As set forth above, First

Reserve had underperformed significantly in the period leading up to the Combination and was

coming off the heals of a troubled fundraising campaign for its new fund (Fund XIII), which

closed at the end of September 2014 with $3.4 billion of commitments, barely half of its original

target of $6 billion.  This fundraising followed a highly successful $2 billion Fund X (raised in

2004), which had a 31% IRR.  First Reserve also subsequently raised two very large funds, Fund

XI (which holds First Reserve's investment in Legacy Sabine and the combined Debtors here)

was $7.8 billion in size, and Fund XII was $9 billion in size.  As of early 2014, when First

Reserve was contemplating the Combination of Legacy Sabine and Legacy Forest, these two

funds had not performed nearly as well as Fund X, with only 2% and 4% IRR, respectively.

179.    Legacy Sabine began to be very concerned about post-Combination finances by

late August, just as the fundraising for Fund XIII was culminating.  If First Reserve had had to

write down its investment in Legacy Sabine shortly after it closed Fund XIII, investors in that

fund likely would have been extremely concerned about the disclosures made to them regarding

prior First Reserve fund performance.  First Reserve's own projections showed the Combined

Company failing in the very short term, based on the originally-contemplated financing.

---

Tr. 92:2-94:11 (discussing the role of Ken Moore, who was senior to Mr. Weiner at First Reserve and was
"responsible for the financing function at First Reserve" to "supply advice in financing to portfolio companies").

(FRSABO00011304)  Had the Combined Company failed (or had a major amendment been

made to the financing), First Reserve would have been forced to have to adjust the "mark" it took

on the Legacy Sabine investment.  That is, First Reserve would have had to adjust the returns on

Fund XI because it would have reflected the complete loss of the Legacy Sabine equity

investment, comprising █% of First Reserve Fund XI.  (Shughart Tr. 29:10-16.)

180.     On information and belief, at the critical time period leading up to the

consummation of the Combination and the Financing, First Reserve was primarily motivated to

avoid all scenarios in which there would be a closing of the Combination followed by a rapid,

major negotiation with the banks regarding a covenant default or other major reset of the

Financing.  Even delaying the ultimate restructuring with the banks by several months would be

extremely helpful to First Reserve, as it wanted to distance the failure of Legacy Sabine from the

closing of Fund XIII (with the implicit representations that were made to investors that First

Reserve had nearly $1 billion of equity value in Legacy Sabine).

181.     As detailed above, these events are corroborated by even the limited documents

the Committee has been able to obtain from First Reserve.  For example, in determining to

proceed with the alternative transaction structure, the deal team at First Reserve acknowledged

(at least internally) that the Combined Company would face a liquidity crisis, just not as soon as

under the original committed financing structure.  (FRSABO00019700)  The day before the

Combination closed, First Reserve projected under the alternative transaction structure that the

Combined Company would have a liquidity crisis by no later than 2016, even before taking into

account required downward adjustments to projected borrowing base availability due to declines

in commodity prices based on warnings from Wells Fargo.  (*Id.*)  Specifically, First Reserve

projected a $21 million liquidity shortfall in 2016 in excess of the borrowing base, and a $135

million shortfall in 2017, which amounts were based "on assumed borrowing base which [Wells

Fargo] indicated will not grow as fast as we were previously modeling (and may decline near-

term) given the recent commodity downturn").  (*Id.*)  In recommending the alternative

transaction structure (instead of walking away as previously recommended), the deal team at

First Reserve did not project a thriving business, but instead remarked that closing the revised

structure provided "[b]est opportunity to realize equity value" and merely provided a "[h]igher

probability of survival."  (*Id.*)

> **3.      The Combination Closes With Full Knowledge by All Parties of an
> Imminent  and Unavoidable Liquidity Crisis by an Insolvent and
> Overleveraged Combined Company**

182.      A redetermination of the borrowing base downward from $1.0 billion upon the

initial redetermination in April 2015 and the resulting liquidity crisis was a *fait accompli*.  The

$1.0 billion borrowing base as first committed in July 2014 was based on commodity prices prior

to the market free-fall in the latter part of 2014.  Between the May 2014 commitment and the

closing of the Combination, oil prices declined by 44% and natural gas prices declined by 24%.

Yet, the borrowing base did not change under the alternative financing structure.  Any proposal

by the banks of a supportable borrowing base in an amended transaction structure (as would have

occurred in an arms'-length negotiation of a completely new financing transaction) would have

forced the closing of the original commitment, including the funding of an $850 million

(underwater) unsecured bridge facility.  Indeed, when outside bank regulators first looked at this

loan in early 2015, they immediately questioned how Wells Fargo could have entered into a loan

that was so far underwater on the day that it was originated.

183.      But it was not only the banks that used outdated pricing assumptions in justifying

the transaction for their benefit.  Even though Legacy Sabine was updating its pro forma

projections for the Combined Company on a nearly daily basis as the closing approached, the

projections retained assumptions regarding the price of oil *as of December 4, 2014*.  However, during the same period, the price of oil was in free-fall.  During that 12-day gap until the closing, oil prices fell from $67/bbl to $56/bbl, a decline of over 16%.  The Sabine-Slate Directors based their decision to close the Financing on this erroneous top-line assumption regarding revenue, which was patently unreasonable given the decline.

184.     The Sabine-Slate Directors' use of outdated projections was just one symptom of a transaction that was doomed to fail.  First Reserve was explicitly warned by Wells Fargo prior to closing that the borrowing base would likely decline in the near-term.  Indeed, the Sabine-Slate Directors (and any rational observer) must have known that the borrowing base would be immediately re-determined downward given the 44% decline in oil prices and the 24% decline in natural gas prices since the May 2014 commitment for a $1.0 billion initial borrowing base was first committed (which was based on prices near 5-year market highs).  This downward re-determination was an unavoidable liquidity wall that all parties knew was coming and that would preclude any chance of repaying the Legacy Forest Unsecured Notes and Legacy Sabine Unsecured Notes in full and, instead, would result in a cross-collateralization that dramatically— and intentionally— reduced the recovery prospects of the legacy entities' respective creditors. The redetermination would have occurred in April 2015, and then the Combined Company would have had to pay back overadvances in six equal installments over six months.  Thus, a default would have occurred sometime between May and November 2016.  That was, however, a liquidity wall that would be three to nine months later than the covenant default that would have occurred under the original financing structure in the first quarter of 2015.

### 4. *Hindering, Delaying and Defrauding Legacy Forest and Legacy Sabine Creditors Generally*

185.    The approval of the Financing was intended to hinder and delay unsecured creditors generally, all for the benefit of the banks (through effective cross-collateralization) and First Reserve (through a delay of an inevitable bankruptcy filing and resulting mark-down of its investment).  When the Sabine-Slate Directors on the Legacy Forest board approved the Financing for a combination doomed to fail, they intentionally and drastically reduced the potential recoveries of Legacy Forest Unsecured Notes and Legacy Sabine Unsecured Notes.  As only one of several indicia of the intent to impair recoveries of unsecured creditors, Legacy Sabine's owner and the controlling shareholder of SOGC intended to pursue a plan of "liability management," which is the private equity term of art for acquiring the company's bonds at a discounted price while the company is distressed.  SOGC viewed the bonds' low trading prices, which SOGC itself intentionally caused through its incurrence of unsupportable obligations, as an opportunity to "make lemonade" by repurchasing notes at depressed values.  (SAB00161076).

### a)    Intended Impact on Legacy Forest Unsecured Notes

186.    As a result of the Combination, Legacy Forest went from having a capital structure with $105 million of secured debt and $800 million of unsecured bond debt, to having $750 million of first lien secured debt (as of the closing), $700 million of second lien secured debt, and $1.15 billion in unsecured bond debt, with no material change in assets, since substantially all of the assets of Legacy Sabine remained owned by the insolvent Legacy Sabine Subsidiaries.  This had a significant impact on the holders of the $800 million of unsecured Legacy Forest Unsecured Notes.  On the first day after announcement of the change, the Legacy Forest Unsecured Notes dropped to as low as 40 cents on the dollar.

187.    In addition to the incurrence of obligations and granting of liens, the sale of the
Arkoma Assets on the day before closing, coupled with the use of the sale proceeds after closing,
demonstrated an intent to hinder, delay and defraud creditors of Legacy Forest.  On December 15,
2014, when it received the Arkoma Proceeds, Legacy Forest took specific and deliberate
direction regarding the use of such proceeds.  Specifically, Elias and Sambrooks directed Wind
and McDonald not to use the proceeds of the Arkoma Sale to pay down the Legacy Forest RBL
Facility or the unsecured debt of Legacy Forest.  Instead, the Arkoma Proceeds were to be used
on December 18, 2014 (two days after the Financing) to pay down amounts outstanding under
the New RBL Facility.

188.    This paydown was intended to allow $185 million of additional secured debt to
remain in place senior to the unsecured creditors of Legacy Forest, thereby reducing the amount
that Legacy Forest unsecured creditors could expect to be paid.  By closing the sale of Arkoma
Assets just prior to the Combination and Financing, the parties involved ensured that the sale did
not constitute an "asset sale" under the New RBL Facility.  Therefore, the use of Arkoma
Proceeds to pay down the New RBL Facility did not immediately reduce borrowing base
availability, as it otherwise would have done.  In short, consummating the sale of the Arkoma
Assets prior to the Combination and Financing, but using the proceeds only after the New RBL
Facility was in place, caused the New RBL Facility borrowing base to be inflated deliberately
and artificially.  As a result, the lenders under the New RBL Facility received the Arkoma
Proceeds and were the beneficiaries of the Arkoma Assets sale.

### b)    Intended Impact on Legacy Sabine Unsecured Notes

189.    As a result of the Combination, Legacy Sabine went from having a capital
structure with $1.27 billion of secured debt and $350 million of unsecured bond debt, to having
$750 million of first lien secured debt (as of the closing), $700 million of second lien secured

debt, and $1.15 billion in unsecured bond debt.  This has had a significant impact on the holders

of the $350 million of unsecured Legacy Sabine Unsecured Notes.

190.    The approval of the Financing was intended to hinder, delay and defraud Legacy

Sabine's unsecured creditors.  Prior to the Combination, the $350 million of Legacy Sabine

Unsecured Notes, which were guaranteed by the Legacy Sabine Subsidiaries, were junior only to

the Legacy Sabine RBL and the Legacy Sabine Second Lien Loan.  As a result of the

Combination, each of the Legacy Sabine Subsidiaries issued $980 million of additional upstream

guarantees on debt for which none of the Legacy Sabine Subsidiaries were previously liable and

for which they received no direct value.  Indeed, given that the assets of Legacy Forest remained

at the parent-level SOGC, the Combination drastically—and intentionally—diluted potential

recoveries for the Legacy Sabine Unsecured Notes.

### c)      Intent to Hinder, Delay and Defraud

191.    The Sabine-Slate Directors of Legacy Forest approved the Financing to

effectively cross-collateralize the pre-Combination obligations of Legacy Forest and the Legacy

Sabine Subsidiaries—to the detriment of unsecured creditors of the respective entities—with the

full knowledge that the combined company was to be insolvent, overleveraged, and doomed to

fail.  Notwithstanding the imminent liquidity crisis that SOGC would (and did) face as a result of

the forewarned borrowing base redetermination, the Sabine-Slate Directors approved the merger

and Financing to the determinant of unsecured creditors in order to temporarily delay the

inevitable collapse of the Combined Company—which was realized less than two months after

the Combination closed when SOGC retained restructuring counsel and advisors in early

February 2015.  The cost of that delay was borne by the unsecured creditors of both Legacy

Forest and Legacy Sabine.

192.    First Reserve, and the board it dominated in making the decision to undertake the

financing, specifically knew that no true third-party lender would provide the Financing.  For

example, when Sambrooks, raised the possibility of trying to find new outside lenders, Brooks

Shughart of First Reserve told him that no other lender would be willing to come forward.  This

is precisely how the banks described the transaction after-the-fact: <u>not as a new loan</u>, but rather

as a "workout."  (WF 00018663).

193.    Of course, a secured creditor taking additional collateral in a workout is not

ordinarily a fraudulent conveyance; it is in the nature of preference.  However, that is not what

occurred here.  Wells Fargo, Barclays and the other lenders under the New RBL Facility did not

have claims against Legacy Forest before the Combination.  Moreover, it is the banks' position

that the New RBL Facility was an entirely new loan as to the Legacy Sabine Subsidiaries.  Thus,

the banks cannot be said to have taken additional collateral from an existing borrower.

194.    The incurrence by Legacy Forest of Legacy Sabine's obligations under the

Second Lien Loan Agreement was also made with the intent to hinder, delay and defraud the

Legacy Forest creditors.  The same intent of the Sabine-Slate Directors in approving the

incurrence of obligations under, and granting of liens securing, the New RBL Facility, in a

transaction that the Sabine-Slate Directors knew was doomed to fail, applies equally to the

incurrence by Legacy Forest of the obligations under, and the granting of liens to secure, the

Second Lien Loan Agreement.  The law is clear that in connection with a merger transaction, the

surviving entity (here, Legacy Forest) incurs the obligations of the merged entity (*i.e.*, Legacy

Sabine's Second Lien Loan obligations).  *See, e.g.*, *Scharffenberger v. Phila. Health Care Trust*

*(In re Allegheny Health, Educ. & Research Found.)*, 253 B.R. 157, 167 (Bankr. W.D. Pa. 2000)

("*Allegheny*") ("There cannot be any doubt" that the surviving corporation in a merger that

"absorb[s] preexisting liabilities of the [other merger party]" "thereby incur[s] obligations" as a matter of law.).

195.    All of the facts and circumstances of the transaction evidence a transparent intent to decrease the recoveries of the holders of the Legacy Forest Unsecured Notes and Legacy Sabine Unsecured Notes for the benefit of the Secured Parties and First Reserve.

> **5.    *The Legacy Forest Board, Consisting of the Sabine-Slate Directors, Intended to Hinder, Delay and Defraud Legacy Forest Creditors by Attempting To Evade the Change of Control Premium***

196.    In addition to intending to hinder, delay and defraud creditors of both Legacy Sabine and Legacy Forest generally, the Legacy Forest Board also sought to hinder and delay recovery by the Legacy Forest noteholders by attempting to evade the change of control provision of the Legacy Forest Unsecured Notes.  It is beyond question that the Legacy Forest board, then consisting of the Sabine-Slate Directors and dominated by First Reserve (especially as to financing matters, which could not be approved without a specific First Reserve officer, Weiner), did not want to pay the Legacy Forest bondholders in connection with the Combination. At least as early as December 2, Legacy Sabine asked to terminate the entire merger transaction, precisely because it did not want to force its own committed banks to fund the committed Bridge Loan and because the Combined Company would be overleveraged and doomed to fail.  Just two days later, First Reserve, Wells Fargo and Barclays began frantic efforts to produce financial models for the combined company that left the Legacy Forest Unsecured Notes in place.  At this time, First Reserve proposed some "alternative equity structure" for the transaction in order to avoid paying the Legacy Forest Unsecured Notes.

197.    All of this evidences a plain intent to hinder and delay the payment of the Legacy Forest Unsecured Notes, which had been contemplated in all public securities filings of Legacy Forest.  At the time of the December 16 afternoon board meeting, the same First Reserve

personnel who had been involved in these prior discussions with the banks (Shughart and

Krueger) voted to approve the Financing.  Sambrooks had evidenced an intent to avoid the

change of control payment since at least a call with McDonald on November 30.

198.   The Debtors contend that the holders of the Legacy Forest Unsecured Notes had

no rights under the Merger Agreement to be immediately paid, and therefore cannot have been

hindered or delayed.  This fundamentally misconstrues the nature of intentional fraudulent

conveyance law.  Any creditor—whether it has a contingent, disputed, or (most relevant here)

unmatured claim—can avoid an obligation or transfer as an intentional fraudulent conveyance.

Moreover, it is the intent of the transferor that matters: was an obligation incurred or a

conveyance made with the intent to hinder or delay the otherwise expected payment to, or

recourse of, the creditor?[26]

199.   Through early December 2014, Legacy Forest led the markets to believe it

planned to pay off its unsecured bonds at closing.  The holders of the Legacy Forest Unsecured

Notes had been told in public securities filings for seven months that they would be paid as a

result of the merger.  Moreover, Legacy Forest personnel had specifically contacted bondholders,

in the period from July to November, asking them to purchase Legacy Forest publicly traded

stock, in order to maximize the probability of approval of the merger, precisely so that the bonds

would be paid immediately after the Combination.

200.   This is the proper factual backdrop against which to measure the intent of the

Sabine-Slate Directors on the Legacy Forest Board in approving the incurrence of the New RBL

---

[26] The Debtors cannot use a legally deficient attempt to manipulate the Legacy Forest Noteholders' rights under the
indenture as a basis to circumvent intentional fraudulent conveyance liability.  For example, the recent and highly
informative decision by Vice Chancellor Laster, *Wilmington Savings Fund Society FSB v. Foresight Energy LLC*,
C.A. 11059-VCL (Del. Ch. Dec. 4, 2015), found that, even where the parties have "carefully attempted to evade
[triggering] the Change of Control" provision in an indenture through altered ownership structures, it is enough to
constitute a "change in control" where one party clearly "runs the show," because "the essence of proper contract
interpretation under New York law is to enforce a contract in accordance with the true expectations of the parties in
light of the circumstances existing at the time of the formation of the contract.'" (internal citations omitted).

Facility and the grant of liens to support it.  These incurrences of obligations and granting of

liens were done as part of a package specifically designed and intended to deprive the Legacy

Forest Unsecured Notes of payment that they otherwise would have received following the

Combination.  Intent to hinder or delay does not require nefarious intent, and results in a

fraudulent conveyance even when the debtor intends to pay creditors in full at some later point in

time.  *See, e.g.*, *Klein v. Rossi*, 251 F. Supp. 1, 2 (E.D.N.Y. 1966).  There is no question that the

intent of the Legacy Forest board, at the time it approved the Financing, was to hinder and delay

the ability of the Legacy Forest Unsecured Notes to be paid as a result of the Combination.

201.    There is still further evidence of intent to hinder and delay from the day of the

closing, December 16, 2014.  Following the public announcement of the changes to the

Combination structure, the trading price of the Legacy Forest Unsecured Notes dropped from

near par to approximately 40-45 cents on the dollar in a single day.  The immediate reaction from

First Reserve personnel that sat on the Sabine-Slate of directors included that ***this presented an***

***opportunity*** for SOGC—that they could "make lemonade" by now engaging in "liability

management."  (SAB00161076) (emphasis added).  The term "liability management" refers to

the ability to put junior debt in a position, usually junior to newly incurred secured debt,

specifically to create incentives to be able to pay (or repurchase) the junior debt at less than par.

202.    There was also intent by all parties, including the Sabine-Slate Directors, to

defraud creditors.  There was no prior warning or disclosure of the change to the Combination

structure.  The public announcement of the change in structure came only after the key first step

of the Combination had occurred—the altered step that the companies thought prevented a

change of control triggering payment on the Legacy Forest Unsecured Notes.  *See Wilmington*

*Savings Fund Society, FSB v. Foresight Energy LLC*, C.A. 11059-VLC (Del. Ch. Dec. 4, 2015)

(interpreting a change in control clause to include a change in beneficial ownership of an entity's securities). As described above, there had been repeated statements in securities filings that the Legacy Forest Unsecured Notes would be called at 101% following the Combination. There were repeated statements that Legacy Sabine had committed financing arranged to pay the Legacy Forest Unsecured Notes. Legacy Sabine and its banks had commented on the Legacy Forest proxy statements that made these statements and disclosures. The proxy statement itself had been updated multiple times. Yet at this crucial juncture, there was no advance amendment or updating of the disclosure in advance of the closing of the Combination and the Financing.

### 6.    *Nearly All Badges of Fraud Are Present Here*

203.    As discussed above, intent to hinder, delay or defraud creditors is typically proven by circumstantial evidence and direct evidence is not required. Here, however, there is a significant amount of direct evidence, as described above. Also present here is the typical circumstantial evidence that the fraudulent conveyance statutes expressly consider relevant to intent. The so-called "badges of fraud" are not a litmus test or a specific list of elements that must be satisfied or counted. But in all events, and contrary to the Debtors' conclusions, the badges of fraud are almost all present in this case in respect of the New RBL Facility, Legacy Forest's incurrence of obligations under and liens granted for the Second Lien Loan, and the change in the Combination structure, among others. For example:

- the Debtors were insolvent and there was no reasonably equivalent value for the incurrence of obligations or the granting of liens to secure otherwise avoidable obligations;

- the obligations incurred were massive, and the liens transferred were a very large part of the assets of the Debtors;

- there was concealment: the Debtors waited until after the critical first step of the transaction closed to make a public announcement that they reversed course regarding paying the unsecured notes because of a change of control;

- the Debtors retained possession of the property (the transfer was of liens);

- 90 -

- the Debtors knew they would face a lawsuit, had engaged counsel, had in fact been sued by shareholders regarding the Combination, and had even made provision for substantial legal fees to defend against bondholder lawsuits;

- there was even conduct analogous to the Debtors "absconding": immediately after the closing, the CFO of Legacy Forest was not heard from again by McDonald, his boss and CFO throughout the period.  Wind took a hard drive with him from Legacy Forest, which contained all of his work emails.  Those emails were only recovered by the Debtors post-petition; and

- the transaction falls squarely within the traditional badge of fraud for a transaction that occurred "shortly before or after substantial debt was incurred."

204.    Thus, directly contrary to the Debtors' narrow view of the badges of fraud, in fact nearly every one is present here.

## III.    The Breach of Fiduciary Duty Claims and Related Aiding and Abetting Claims Are Colorable

### A.    *Fiduciary Duties and Remedies*

#### 1.    *Legacy Forest and New York Law of Fiduciary Duties*

##### a)    Fiduciary Duty of Directors and Officers, Generally

205.    Legacy Forest was a New York corporation.  Directors of New York corporations generally owe fiduciary duties of care and loyalty to shareholders of the company "who stand to gain from the firm's success and also bear the risk of its potential financial failure."  *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 201 (S.D.N.Y. 2009), *aff'd sub nom. RSL Commc'ns PLC, ex rel. Jervis v. Fisher*, 412 F. App'x 337 (2d Cir. 2011).  Directors of New York corporations owe the duties of care and loyalty.  The duty of care requires a director to "perform his duties as a director . . . in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances."  N.Y. BUS. CORP. LAW § 717(a).

206.    Directors of New York corporations are entitled to the protection of the business

judgment rule, which "creates a presumption that a corporation's directors act in good faith and

in the best interests of the corporation," but does not "protect a decision that was the product of

fraud, self-dealing or bad faith." *Patrick v. Allen*, 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005).

"At the same time, to earn the protection of the business judgment rule, directors must do more

than merely avoid fraud, bad faith, and self-dealing.  The business judgment rule protects

directors who act with 'due care' and 'conscientious fairness.'  In other words, a director who

exercises reasonable diligence in gathering and considering material information, who makes an

informed decision after a reasonable investigation, will be protected from liability, even if the

decision turns out to be 'unwise or inexpedient.'"  *In re 1st Rochdale Co-op Grp., Ltd.*, No. 07

CIV. 7852DC, 2008 WL 170410, at *1 (S.D.N.Y. Jan. 17, 2008) (internal citations omitted).

207.    "The duty of loyalty requires a director to subordinate his own personal interests

to the interest of the corporation."  *Patrick v. Allen*, 355 F. Supp. 2d 704, 712-13 (S.D.N.Y.

2005).  The business judgment rule does not apply where a director or officer has an interest in a

decision.  *In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995).  "A director is considered

interested in a transaction if the director stands to receive a direct financial benefit from the

transaction which is different from the benefit to shareholders generally."  *Patrick v. Allen*, 355 F.

Supp. 2d 704, 711 (S.D.N.Y. 2005) (internal quotation marks omitted); *Marx v. Akers*, 666

N.E.2d 1034, 1042 (N.Y. Ct. App. 1996).

### b)    Fiduciary Duties to Creditors under New York Law

208.    Directors and officers do not owe fiduciary duties to creditors of a solvent

corporation.  *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 308 (S.D.N.Y. 2006).

Once a corporation becomes insolvent, the duties of company fiduciaries extend to the creditors

of the corporation, and directors and officers owe a fiduciary duty to preserve the assets of the

corporation. *Id*.

209.    New York law takes a different view of the fiduciary duties to creditors than

Delaware law.[27]  Under New York law, "the officers and directors of an insolvent corporation

are said to hold the remaining corporate assets in trust for the benefit of its general creditors."

*Credit Agricole Indosuez v. Rossiyskiy Kredit Bank,* 94 N.Y.2d 541, 549 (N.Y. 2000).  Outside

of insolvency proceedings, these fiduciary duties may be enforced by creditors in direct, rather

than derivative, claims.  *Hughes*, 452 F. Supp. 2d at 308.  They are estate claims once a

bankruptcy begins. *Credit Agricole*, 94 N.Y.2d at 549.

210.    An exculpation provision in a New York corporate charter protects only duties to

shareholders and the corporation.  It does not affect duties to creditors.  "[C]orporate officers and

directors owe a fiduciary duty to preserve corporate assets for the benefit of creditors once the

company is actually insolvent.  *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, No. 13-

CV-5586 VEC, 2014 WL 6466994 at *18 (S.D.N.Y. Nov. 18, 2014) (internal citations omitted);

*see also RSL*, 649 F. Supp. 2d at 207. Furthermore, "claims based on the breach of fiduciary duty

to creditors when a company is in the zone of insolvency are derivative of claims of breach of

fiduciary duty to the company itself.  Once a corporation becomes insolvent, the fiduciary duties

of corporate officers and directors also extend to creditors."  *In re I Successor Corp.*, 321 B.R.

640, 659 (Bankr. S.D.N.Y. 2005) (quotation marks omitted).  As Legacy Forest was clearly

insolvent at the time of the Combination, its creditors were owed fiduciary duties in connection

with the Combination.

---

[27] This is a point on which the Debtors are incorrect, when they say it is the same as Delaware law. The analysis on
which the Debtors base their refusal to sue is therefore incorrect. (Debtors' Report at 137.)

### 2.    *Legacy Sabine and Delaware Law of Fiduciary Duties*

#### a)    **Fiduciary Duties of Delaware LLCs, Generally, and the LLC Agreements of Legacy Sabine and the Legacy Sabine Subsidiaries**

211.    Directors of a Delaware LLC, like Legacy Sabine and the Legacy Sabine Subsidiaries,[28] owe the default duties of care and loyalty to the company.  *See Feeley v. NHAOCG, LLC,* 62 A.3d 649, 660 n.1 (Del. Ch. 2012) (collecting cases); 18 DEL. C. § 18-1104. As articulated by Delaware courts, the duty of care requires that a fiduciary "use that amount of care which ordinarily careful and prudent men would use in similar circumstances and consider all material information reasonably available in making business decisions."  *In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 749 (Del. Ch. 2005) (citations and internal quotation marks omitted).  The duty of loyalty requires a director to put the best interests of the company and its shareholders ahead of any interest held by that director and not possessed by the shareholders generally.  *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993).

212.    Delaware law does allow LLCs to limit or eliminate the fiduciary duties of its directors and officers by including provisions to that effect in the LLC agreement.  Specifically, Section 1101(c) of the Delaware LLC Act provides, in pertinent part, as follows:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement. . . .

6 DEL. C. § 18-1101(c); *see also Feeley*, 62 A.3d at 663 ("Section 1101(c) of the LLC Act . . . empowers the drafters of a limited liability company to expand, restrict, or eliminate a member

---

[28] Although most of the Legacy Sabine Subsidiaries are Delaware LLCs, Giant Gas Gathering LLC is an Oklahoma LLC and Redrock Drilling LLC was a Nevada LLC prior to its dissolution.  For the purposes of this Motion, these claims are solely analyzed under Delaware law.

or manager's duties, including fiduciary duties."). The Delaware LLC Act also allows an LLC to

"leave the default duties in place, but limit or eliminate monetary liability for breach of duty."

*Feeley*, 62 A.3d at 663-64; 6 Del. C. § 18-1101(e). Whether an LLC agreement limits or

eliminates duties is a matter of contract interpretation. *Gatz Properties, LLC v. Auriga Capital

Corp.*, 59 A.3d 1206, 1212-13 (Del. 2012) (dispute over existence and extent of fiduciary duties

owed under an LLC agreement are issues of contract interpretation).

**b)**     **Fiduciary Duties to Creditors under Delaware Law**

213.    When a Delaware corporation is solvent, its directors must discharge their

fiduciary duties to the company, but when the corporation is insolvent the duties shift and

creditors gain derivative standing to enforce such duties. *N. Am. Catholic Educ. Programming

Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). At state law creditors of an LLC

cannot sue to enforce duties. *See CML V, LLC v. Bax*, 6 A.3d 238, 241-54 (Del. Ch. 2010).

However, in a chapter 11 case, a grant of standing to an official creditors committee does not

depend on state law. The claim for breach of fiduciary duty regarding an LLC is a claim of the

chapter 11 estate. Federal law (not state law) authorizes potential alternative "estate

representatives" who can prosecute claims. *See Official Committee of Unsecured Creditors of

Cybergenics Corp. v. Chinery* (*In re Cybergenics*), 330 F.3d 548, 573 (3d Cir. 2003) (en banc).

**B.**     ***Claims for Breaches of Fiduciary Duty Are Colorable***

214.    The Committee investigation has uncovered three categories of claims for breach

of fiduciary duty. They are detailed below, but are briefly summarized here. *First*, the original

directors and officers of Legacy Forest failed to terminate the transaction, with great detriment to

Legacy Forest creditors, when Legacy Sabine offered to terminate with no liability to either side.

There was both a breach of the duty of loyalty and, remarkably, a complete breach of the duty of

- 95 -

care, as those Legacy Forest directors considered the wrong interests, and took no advice on the

financial state of Legacy Forest or the combined company.

215.    *Second*, the Debt Financing was actually approved by a different slate of Legacy

Forest directors, and approving it was a breach of fiduciary duty.  The transaction structure

created a distinct period in which First Reserve had effectively appointed a new slate of directors

for Legacy Forest when the merger of Legacy Sabine into Legacy Forest had not yet occurred.

That is, most of the same Legacy Sabine-side directors had an opportunity, just before the

merger occurred, to halt the transaction that damaged Legacy Forest creditors so gravely.  A

board meeting of those directors occurred, and it approved the Financing, rather than taking the

path that would have protected creditors.  Those directors were in a conflicted position because

of their ties to First Reserve, and approved a transaction that greatly benefitted First Reserve.[29]

This Sabine Slate of directors also breached its duty of care, as it did not even consider the

interests of Legacy Forest standing alone—which was the state of affairs when the board met.  In

addition, First Reserve was a controlling shareholder at this critical juncture.

216.    *Third*, fiduciaries on the Legacy Sabine-side breached fiduciary duties.

Preliminarily, the Debtors are incorrect that the relevant LLC agreements eliminate fiduciary

duties; for example, the Debtors entirely ignore the provisions of the Legacy Sabine Subsidiares'

LLC agreements.  In all events, the Legacy Sabine directors and the Legacy Sabine Subsidiaries

fiduciary (Sambrooks) each declined to refuse to close the transaction.  Sambrooks, as the only

responsible person for the Legacy Sabine Subsidiaries, then approved guarantees in the

Financing (including guarantees of the Legacy Forest Unsecured Notes) that benefitted First

Reserve, and perhaps the Combined Company, to the detriment of the Legacy Sabine

---

[29] At least one director was also conflicted for separate reasons, discussed below.

Subsidiaries' creditors.  Again, First Reserve was a controlling equity holder with respect to all

these matters.

### 1.    *Actions Against Pre-Combination Forest Directors and Officers*

217.    The pre-Combination Legacy Forest directors and officers (the "Legacy Forest

D&Os") took at least two specific actions that violated their fiduciary duties to the creditors of

Legacy Forest.  First, they did not accept Legacy Sabine's offer to terminate the Combination,

with no liability for either side.  Termination would have left Legacy Forest's creditors in a far

superior position.  Indeed, this would have prevented Legacy Forest from incurring any

additional debt.  It would have enabled Legacy Forest to complete the Arkoma Assets sale,

payoff all secured debt, and have remaining cash to continue to operate until the remaining assets

were sold, or some other resolution was reached with the Legacy Forest Unsecured Bonds (such

as those bonds restructuring into equity).

218.    Alternatively, Legacy Forest could have forced the transaction to close on its

original terms, providing substantial benefits because the Bridge Loan would have extended the

maturity of its unsecured debt for five years and the Lenders would almost certainly have

negotiated any issues with the New RBL Facility.[30]  In other words, the Pre-Combination Forest

D&Os pursued neither (i) the best path of abandoning the transaction entirely, which would have

preserved significant recoveries for existing creditors, nor (ii) a second-best path of compelling

the closing of a transaction, which would have paid off the existing bondholders and have had

significant benefits for remaining creditors because of the high likelihood of achieving a

negotiated resolution with the banks that would have allowed those other creditors to be paid as

well.  The Legacy Forest D&Os knowingly chose a third path, which was detrimental to both the

---

[30] The Bridge Loan converted, on a mandatory basis if not refinanced with long-term unsecured notes, into an unsecured loan term facility with a maturity of 2024.  As described above, the Legacy Forest Unsecured Notes had maturities of 2019 and 2020.

Legacy Forest creditors. They permitted a transaction to close that was certain to place massive additional secured (and unsecured) obligations on the Combined Company.

219.    The Legacy Forest D&Os further compounded this breach of fiduciary duty by allowing the sale of the Arkoma Assets to close in advance of the Combination, and failing to use the proceeds of such sale to pay down existing debt.  Instead, acting at the direction of Legacy Sabine even before the Closing Date, the Legacy Forest D&Os held the Arkoma Proceeds to pay down the New RBL Facility after the closing. (SAB00166644; SAB00336684.) This mechanic (using the Arkoma Proceeds for paydown post-Combination, not pre-Combination) directly caused an increase in the secured debt on the Combined Company and the Legacy Sabine Unsecured Notes because the amount of the post-Combination paydown could be re-borrowed.

220.    These actions occurred at a time when Legacy Forest was insolvent and, as such, were breaches of both the duty of care and the duty of loyalty by the Legacy Forest D&Os.  A key Legacy Forest director, Dod Fraser, stated during his deposition that Legacy Forest was skeptical of Legacy Sabine's assertion that the Combined Company would be insolvent.  (Fraser Tr. 132:22-134:20.)  Apparently the Legacy Forest board, "including [its] legal and financial advisors," thought that the Sambrooks projection of the Combined Company's insolvency "was incorrect."  (Fraser Tr. 133:18-134:20.)  By proceeding with the Combination without taking proper care to investigate Sambrooks's concerns, the Legacy Forest board entirely failed even in the most basic duty of care.

221.    Importantly, Legacy Forest board's only financial advisor, JPMorgan, did not provide *any* advice regarding solvency, of any entity.  (Whittemore Tr. 9:20-11:10; 28:13-28:15; 45:4-45:10; 52:23-53:19.)  Indeed, the JPMorgan engagement letter expressly excluded any

opinions and advice regarding solvency of Legacy Forest, its assets or any purchaser thereof (SAB00051929; SAB00050251); in fact JPMorgan did no valuation work during the period, and presented no formal valuation opinion. (Whittemore Tr. 14:23-18:7; 36:5-37:3.)

222.    Only one of the depositions in the investigation was of a witness to the Legacy Forest board meetings that considered this issue. The Debtors did not interview anyone from JPMorgan, at least no one cited in the Debtors' Report. Mr. Whittemore led JPMorgan's engagement as financial advisor to Legacy Forest. (Whittemore Tr. 9:4-9:8.) As a third-party observer (not a director or officer subject to suit), his deposition testimony is of additional weight. Mr. Whittemore testified that the Legacy Forest board did not consider the possibility of insolvency, and hired no professional advisor to consider it. (Whittemore Tr. 10:14-11:10.)

223.    Furthermore, the Legacy Forest board could not have reasonably relied on any valuation conclusions of management regarding the solvency and valuation of the *pro forma* combined company. The Legacy Forest board knew, from events in May 2014, that its management team had already made fundamental errors in analyzing the value of Legacy Sabine. (SAB00046580.) Specifically, in May 2014 management had over-calculated the EBITDA of Legacy Sabine by $30 million, thus potentially overvaluing Legacy Sabine. (*Id.*) JPMorgan had to do additional formal work at that time just to reaffirm its fairness opinion for the Combination. (*Id.*) The value of Legacy Sabine would of course be a major component of the value and solvency of the Combined Company. The Legacy Forest board could not reasonably rely on management calculations of solvency or value without again having them confirmed by an outside advisor. Indeed, with one potentially significant mistake having already been made on this exact subject, the board could not reasonably rely on any opinion management had on this topic without outside advice. *See* N.Y. BUS. CORP. LAW § 717(a) (directors may rely on

outside advice in the execution of their duties, but "[a director] shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause such reliance to be unwarranted.").

224.    It is certainly true that violations of the duty of care are rare.  *In re Walt Disney Co. Derivative Litigation*, 825 A.2d 275, 278 (Del.Ch. 2003) (noting that "[i]t is rare when a court imposes liability on directors of a corporation for breach of the duty of care").  However, without any analysis of the solvency of the Combined Company on which the Legacy Forest board could reasonably rely, there is a straightforward violation of the duty of care, particularly because Sambrooks put them on notice.  *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 274-76 (2d Cir. 1986) (noting that the "proper exercise of due care by a director in informing himself of material information and in overseeing the outside advice on which he might appropriately rely is, of necessity, a pre-condition to performing his ultimate duty of acting in good faith to protect the best interests of the corporation").  Notably, in his deposition, a very financially savvy member of the Legacy Forest board (Fraser) volunteered that the "advisors" agreed with the conclusion that the combined company would be solvent.  This demonstrates that he knows now, and knew then, that the Legacy Forest board needed reliable advice from outside advisors in order to proceed with the Combination.  However, the outside financial advisor did not provide such advice, directly contradicting Fraser on this point.  (Whittemore Tr. 9:20-11:10; 52:23-53:19.)  The Legacy Forest board did not have—and declined to obtain—any such advice. Accordingly, the Legacy Forest board breached its fiduciary duty to creditors in this most fundamental way.

225.    The Legacy Forest board also breached its duty of loyalty.  It completely disregarded the interests of creditors, and considered the interests of shareholders instead. Fraser

so testified at deposition, and of course the Debtors place Fraser at the epicenter of Legacy

Forest's decision-making regarding the amendments to the Combination structure. (Debtors'

Report at 69.) McDonald testified that he and the board took into account the interests of "the

company" and "all stakeholders." However, that is the incorrect approach under New York law.

226. New York's law of fiduciary duty to creditors emanates from the substantive

"trust fund doctrine," in which board members of an insolvent company owe substantive

fiduciary duties specifically to creditors. It is not the same as Delaware's "duty to the

corporation" where creditors can merely obtain standing when the corporation becomes insolvent.

When the Legacy Forest board made decisions that took into account a different constituency—

shareholders—they breached their duty of loyalty to the creditors.

227. A second, although less desirable, manner in which the Legacy Forest board could

have fulfilled its "trust fund" duty to existing creditors was to seek to compel the transaction to

close on its original terms, obtaining a full recovery for the existing Legacy Forest Unsecured

Notes, and potentially for the other unsecured creditors. What the Legacy Forest board did

instead was the worst possible solution: picking a supposed "middle ground" that avoided

litigation at the cost of massive new secured debt on Legacy Forest. This left the unsecured

creditors with a recovery far worse than they would have received if the Legacy Forest D&Os

had terminated the Combination voluntarily. Instead, the Legacy Forest board chose to close the

Combination knowing about the onerous secured financing, all at a heavy cost to creditors (to

whom it owed duties). The primary anticipated beneficiaries were McDonald (who expected to

receive nearly $5 million in bonus and incentive payments), Legacy Sabine's banks, and First

Reserve.

### 2. The Last Clear Chance to Avoid Disaster for Legacy Forest—A Replacement Slate of Directors for Legacy Forest Held a Board Meeting and Approved the Financing, Instead of Terminating the Combination

228.     Even after the original Legacy Forest board failed in its fiduciary duties, there was still another opportunity for the insolvent Legacy Forest to avoid harm to its creditors.  This opportunity arose from the specific manner in which the Combination was structured.  It was not a simple merger.  Rather, it occurred in distinct steps, separated in time, and with different boards of directors considering various parts of the transaction to which the ultimately combined entity was bound (the details, which are critical, are set forth again below).  Often, a complex corporate transaction (including all of its constituent components) will essentially "close" at a single point in time, with the transaction being deemed to occur in a particular sequence of steps, the order of which is important but between which there are no actual meaningful gaps in time.  This was not such a transaction.

229.     Here, by contrast, there were significant gaps in time between the steps of the transaction.  Those gaps created periods in which the transaction could have been terminated.  Critically, the Financing was not approved by the original Legacy Forest board.  Rather, it was approved by a replacement slate of directors, selected by First Reserve and Legacy Sabine pursuant to the Merger Agreement, and which continued as the board of SOGC after Legacy Sabine merged into Legacy Forest.

230.     Pursuant to the Merger Agreement, the Sabine-Slate Directors did not take office at the end of the day when all Combination and Financing steps had occurred, as part of some "simultaneous closing."  They did not even take office following the step of merging Legacy Sabine into Legacy Forest.  Instead, they took office, expressly pursuant to the Merger Agreement and the appointment document, *immediately after the very first step of the transaction* (*i.e.*, the contribution by First Reserve of its equity in Legacy Sabine, making

Legacy Sabine a wholly owned subsidiary of Legacy Forest, and the issuance of new shares by

Legacy Forest to First Reserve).  (SAB00000295; SAB00643228.)  This was not mere formality.

The press release announcing the Combination actually was released to wire services after this

first step—and before the merger of Legacy Sabine into Legacy Forest.

231.    As a result, for a critical and significant period of time on the Closing Date, from

approximately 12:30 p.m. Eastern until 3:48 p.m. Eastern, two things were true: (i) Legacy

Forest remained a separate legal entity from Legacy Sabine (they had not yet merged); and

(ii) the new Sabine Slate of the Legacy Forest board had a majority of overlapping membership

with the First Reserve-controlled Legacy Sabine board in office at that time.  And in that precise

window of time, *the Sabine Slate of Legacy Forest directors held a board meeting and voted to

approve the Financing*.  The Financing was never approved by the board of the Combined

Company after the merger.[31]

232.    The Sabine-Slate Directors' approval of the Financing, instead of accepting

Legacy Sabine's prior proposal to terminate the transaction, was a breach of the duty of loyalty.

Going forward with the Combination was highly detrimental to Legacy Forest.  Indeed, Legacy

Sabine had repeatedly said so in the period leading up to the closing, when it had tried in writing

and orally to get Legacy Forest to mutually terminate.  But then when the New RBL Facility

terms became available, because of the lack of need for the bridge commitment, Legacy Sabine

changed its tune because the altered Financing was potentially beneficial to First Reserve.

---

[31] This is not an isolated instance in the structure of the Combination and the Financing.  For example, the changes to the Second Lien Loan were approved not by the Combined Company board, or even the Sabine-Slate Directors on the Legacy Forest board, but rather by a vote of the Legacy Sabine board occurring before any of the other events in the Combination.  At the other end of the spectrum, the Combined Company board acted by unanimous written consent within hours after the live board meeting approving the Financing, to approve a host of matters including amending and restating bylaws, various securities law matters, designation of directors and officers to various roles and committees, and major employee benefits matters.  Chewning, who had been absent from the December 16, 2014 live board meeting regarding the Financing, did sign the unanimous written consent concerning these other matters.  Thus it is clear that the Debtors could have had Chewning be involved in the approval of the Financing.

233.    The approval of the Financing was an interested transaction for several reasons.

For the four Sabine-Slate Directors that had a connection to First Reserve, it was an interested

transaction because it resolved a major relationship issue between First Reserve and the banks

(the "mutual assured destruction" and the "larger issues") that was created by the underwater

Bridge Loan commitment and having an RBL that would have gone into immediate covenant

default (requiring bank concessions).  The New RBL Facility was perhaps even more critical to

First Reserve than getting the banks released from the Bridge Loan commitment, with its

changes to the key financial covenant and a three-month delay in the first borrowing base

redetermination (from 30 days after closing to four months after closing, in April 2015).  At the

time of the closing, First Reserve retained its equity investment in Sabine on its books in the

amount of ████████, very nearly the original investment amount, notwithstanding a massive

drop in the price of oil.  (FRSABO00019066; Shughart Tr. 27:8-29:12.)  First Reserve had

significant reasons of its own to avoid revaluing the equity investment in Sabine.  That amount

represented ███% of the entire First Reserve fund that held the Sabine investment.  (Shughart Tr.

27:8-29:12.)  It is clear that both Legacy Sabine and the combined company were in fact

insolvent, and thus if any event occurred that might require First Reserve to revalue its

investment, it would trigger a massive loss in that fund.

234.    Because (i) interested directors were present at the Legacy Forest board meeting

that approved the Financing (and did not terminate the transaction), and (ii) the meeting did not

comply with the New York corporation law safe-harbors, the burden of proof in the action for

breach of fiduciary duty will be on the directors.  Specifically, the Sabine-Slate Directors of the

Legacy Forest board consisted of eight directors.  However, only seven of those directors

attended the telephonic board meeting.  Absent from the meeting was Chewning, who the Debtors assert is an independent director.[32]

235.    New York Business Corporations Law section 713 sets up a safe harbor regarding transactions in which directors have a direct financial interest.  Courts have also used this safe harbor to establish the burden of proof in actions for breach of fiduciary duty.  New York made this safe harbor stricter in the 1971 amendment that enacted the current version of the statute, and New York law remains stricter than Delaware law.  In New York, if interested directors are present in the meeting and vote, then there must be either (i) sufficient disinterested directors voting in favor to have carried the vote, by themselves, with a quorum of the board, or (ii) a unanimous vote of all disinterested directors in favor of the matter.  N.Y. BUS. CORP. LAW § 713(a).  The latter test requires all disinterested members, not just the unanimous vote of the disinterested members present at the meeting.  *Cohen v. Ayers*, 449 F. Supp. 298, 311 n.8 (N.D. Ill. 1978) (defining unanimity as all disinterested directors then in office), *aff'd on other grounds*, 596 F.2d 733 (7th Cir. 1979); *see also* Claire M. Dickerson, *Interested Directors of New York Corporations and the Burden of Proof*, 1988 COLUM. BUS. L. REV. 91, 115-18 (1988) (concluding after an analysis of the legislative history of Section 713 that the district court in *Cohen* "must be correct" in its interpretation of the term "unanimous").

236.    With seven out of eight members present at the Sabine-Slate Directors' board meeting on December 16, 2014, there was a quorum.  Four votes would be needed to pass resolutions and make decisions.  However, there were not four disinterested directors present, and therefore the first potential safe harbor was not satisfied.  At best, there was one such

---

[32] The Committee reserves all rights as to whether Chewning is in fact independent, especially with respect to his participation in the Debtors' investigation, in light of post-Combination events.

director present, Fraser.[33]  Chewning's absence from the meeting precludes the second safe

harbor from applying.  The consequence of this is simple: all of these directors will carry the

burden of proof to show (which they cannot) that approving the Financing, and not terminating

the transaction, was somehow "entirely fair" to Legacy Forest's creditors.  There can be no doubt,

with all of these facts, and the burden of proof on the defendants, that the action is colorable.

### 3.      First Reserve Was a Controlling Shareholder

237.     At the time of the critical meeting of the Legacy Forest board, consisting of the

Sabine-Slate Directors, First Reserve was a controlling shareholder of Legacy Forest.  It had a

combination of the largest block of voting common stock and preferred stock with very

significant veto rights.  (SAB00643228; *see also, e.g.,* Restated Certificate of Incorporation of

Forest Oil Corporation, § II.D.6.)  First Reserve had just caused Legacy Sabine to appoint

directly (without election) six of the eight members of the Legacy Forest board who participated

in that meeting.  Through Legacy Sabine, First Reserve had rights under the Combination

Agreement to tightly control nearly all of Legacy Forest's activities up through the end of the

closing.  And, of course, First Reserve was the party who actually negotiated the Financing

(which had no input from Legacy Forest), and indeed asserted direct control over Financing

terms, outside the board even of Legacy Sabine.  (FRSABO00006764) ("I don't care what mgmt

says – anything cap markets relates [*sic*] needs to be approved by me and is their job to make

sure i am in the loop[.]").)  Controlling shareholders have fiduciary duties under New York

law.  *See Barbour v. Knecht*, 296 A.D.2d 218, 227 (N.Y. 1st Dep't 2002) (citing *Alpert v. 28

Williams Street Corp.*, 63 N.Y.2d 557, 568 (N.Y. 1984)); *Kavanagh v. Kavanagh Knitting Co.*,

226 N.Y. 185, 195-96 (N.Y. 1919).

---

[33] The Committee reserves all rights as to whether Fraser was in fact disinterested, including given his substantial prior connections to two Sabine board members (Fraser Tr. 27:3-29:21), and his role in and potential liability for devising (at least in parallel) the alternative Combination structure.

#### 4.    *Legacy Sabine Subsidiaries and Legacy Sabine*

238.    *There Is No Contractual Elimination of Fiduciary Duties*.  Legacy Sabine and the Legacy Sabine Subsidiaries were limited liability companies.  The Delaware Court of Chancery has repeatedly held that directors and managers of limited liability companies owed default fiduciary duties.  *See, e.g.*, *Feeley v. NHAOCG, LLC,* 62 A.3d 649, 660-63 (Del. Ch. 2012).  To eliminate any doubt, Delaware amended its Limited Liability Company Act in 2013 to clarify that the default rule is that directors and other responsible persons of LLCs have fiduciary duties.  *See* 6 DEL. C. § 18-1104.  However, unlike with a corporation, the limited liability company agreement may entirely eliminate non-contractual duties, leaving only the implied covenant of good faith and fair dealing.  6 DEL. C. § 18-1101(c).

239.    Only one of the Legacy Sabine Subsidiaries—Giant Gas Gathering LLC[34]— eliminated fiduciary duties in its LLC agreement.  The LLC agreements for the other Legacy Sabine Subsidiaries, including the LLC agreements for the subsidiaries that own the substantial majority of Legacy Sabine's oil and gas properties, do not contain provisions that eliminated their directors' and officers' fiduciary duties.  The Debtors try to effectively equate Legacy Sabine and its subsidiaries.  For most of these subsidiaries, Sambrooks is specifically listed as the person charged with managerial control. (*See, e.g.,* SAB00499391; First Amended and Restated Limited Liability Company Agreement of Sabine East Texas Basin LLC stating that the "rights and powers to manage and control the business affairs of the Company . . . are delegated to David J. Sambrooks").)  Sambrooks acknowledged this in his deposition.  (Sambrooks Tr. 331:14-19:  "Q: Who was the person who was responsible for the management of the legacy Sabine subsidiaries at that time? . . .  A: I, I expect it was myself.").  He was in a fundamentally conflicted position.

---

[34] Giant Gas Gathering LLC is an Oklahoma LLC, for which fiduciary duties can be eliminated by contract.

240.    With respect to the parent Legacy Sabine's LLC agreement, the Debtors have

incorrectly asserted that it fully eliminates fiduciary duties.  The extent to which fiduciary duties

are limited in an LLC agreement is a matter of contract interpretation.  *See Feeley,* 62 A.3d 663-

64; 6 DEL. C. § 18–1101(e).  Section 9.7 of the Legacy Sabine LLC Agreement states only that

the agreement itself "does not, create or impose any fiduciary duty on any Covered Person" and

that "[t]he Members hereby waive any and all fiduciary duties owed by the Members."  Notably,

this provision "waives" fiduciary duties only among the Members.  It does not speak to waiver of

duties to the company, or fiduciary duties of other "Covered Persons."  The Legacy Sabine LLC

Agreement is an amendment and restatement of prior agreements (SAB00499391), which at one

time reflected this limited liability company being a joint venture between Legacy Sabine and

Nabors Industries, a third-party publicly-traded energy company.  (SAB00499391.)[35]  The intent

of the agreement appears to derive from a waiver of fiduciary duties *inter se* among those two

joint venture members, but not a waiver of duties of the managers and others who operated the

joint venture for them, or duties of members to the company.  The fact that the agreement states

that it "does not create" fiduciary duties is not an elimination of duties; because those duties

emanate from the LLC statute itself, any language in an LLC agreement purporting to eliminate

such duties must be "plain and unambiguous."  *In re Signature Apparel Grp. LLC*, No. 09-15378

(RG), 2015 WL 1009452, at *10 (Bankr. S.D.N.Y. Mar. 4, 2015) (applying Delaware law).  The

Debtors' conclusion that the Legacy Sabine LLC Agreement eliminates those duties is not

credible.

241.    <u>*The Breaches of Fiduciary Duty to the Sabine Subsidiaries*</u>.  There are clear

breaches by Sambrooks of his duty of care and duty of loyalty to the Legacy Sabine Subsidiaries.

---

[35] *See also Nabors, First Reserve Commit $1B to New E&P,* Natural Gas Intelligence (Sept. 25, 2006),
http://www.naturalgasintel.com/articles/15325-nabors-first-reserve-commit-1b-to-new-e-p.

Specifically, those subsidiaries incurred $980 million of new guarantees for no cognizable

benefit.  Sambrooks testified clearly about this at his deposition:

> Q: Who was the person who was responsible for the management of
> the legacy Sabine subsidiaries at that time? . . .
>
> A: I, I expect it was myself.
>
> Q: Did the subsidiaries have separate advisors?
>
> A: No.
>
> Q.  Did you ask any questions . . . about how the transaction should
> be viewed from the perspective of the Sabine subsidiaries? . . .
>
> A:  I don't recall.

(Sambrooks Tr. 331:14-332:5.)  There is no question that Sambrooks's approach constitutes a

violation of the duty of care because he did not consider the position of the Legacy Sabine

Subsidiaries at all.  (Sambrooks Tr. 331:14-332:5.)  Sambrooks clearly violated his duty of

loyalty because he was considering the interests of other entities, not just those of the Legacy

Sabine Subsidiaries. (Sambrooks 326:24-327:24.)  He considered only the parent company.

Further, he is also an interested person as to First Reserve. They have kept him as CEO, and this

role has been his only role as a CEO.

242.    Sambrooks was on record stating that the transaction and Financing were a bad

idea for Legacy Sabine (and presumably its subsidiaries).  (SAB00401621.)  He then approved

the altered Financing for the subsidiaries, even though it did not materially improve the liquidity

runway as compared to no transaction at all.  The only "improvement" in liquidity was at the cost

of layering substantial additional secured debt on the subsidiaries (including $50 million of

incremental Second Lien Loan, none of which went to subsidiaries).

243.    *The Breaches of Fiduciary Duty to Legacy Sabine.* Numerous members of the

Legacy Sabine board were conflicted with respect to the decision to undertake the Financing.

Three members were senior personnel at First Reserve, which had strong adverse interests in

having the transaction approved and go forward, to avoid taking a massive loss of ██% of their

fund.  Sambrooks is of course the CEO, hired by First Reserve.  But even more, the evidence is

clear and unrebutted that as to the Financing, Sambrooks was required to act at the direction of

still another First Reserve employee.  (FRSABO00006764 (Josh Weiner writes, "anything cap

markets relate[d] needs to be approved by me and [it] is [Barclays'] job to make sure i am in the

loop…"); Weiner Tr. 116:6-16 ("[B]oth management and First Reserve should be kept apprised

of financing-related requests and processes together at the same time.").)

244.    As such, Sambrooks was controlled by First Reserve, and thus conflicted as to

decisions that affected First Reserve.  Radtke, although listed as the "non-executive chairman" to

lend a gloss of independence, also served at all relevant times as a director of another First

Reserve portfolio company with Shughart and Yearwood had a separate consulting contract with

First Reserve.  (SAB00163865)

245.    Thus the decision to go forward with the Financing, which benefitted First

Reserve but put more debt onto the Legacy Sabine entities, was a clear breach of the duty of

loyalty.

246.    *Controlling Equityholder*.  Sambrooks was appointed as the only manager of the

Legacy Sabine Subsidiaries.  However, the Legacy Sabine Subsidiaries were indirect, wholly-

owned subsidiaries of entities managed and controlled by First Reserve Corporation.   In addition,

First Reserve personnel asserted that they had complete control over decisions regarding the

Financing, even where such persons were not directors or officers of Legacy Sabine or its

subsidiaries.  (SAB00475805 (Weiner states the banks need to include First Reserve in any cap

structure / financing related discussions); FRSABO00006764 (Weiner proclaims, "I don't care

what mgmt says – anything cap markets relates [*sic*] needs to be approved by me and is their job

to make sure i am in the loop[.]").)  As controlling equity holders, First Reserve and certain of its

affiliates therefore had fiduciary duties to the creditors of the Legacy Sabine Subsidiaries.  Those

affiliates are: (i) First Reserve Fund XI, L.P., which owned a majority of the equity of the parent

entities of the Legacy Sabine Subsidiaries; (ii) First Reserve GP XI, L.P., which on information

and belief is the general partner (and therefore controlling entity) of First Reserve Fund XI, L.P.,

and (iii) First Reserve GP XI, Inc., which on information and belief is the general partner (and

therefore controlling entity) of First Reserve GP XI, L.P.

### C. *Claims Against the New RBL Lenders for Aiding and Abetting Breaches of Fiduciary Duty Are Colorable*

247.    New York law requires three elements to state a claim for aiding and abetting

breach of fiduciary duty: (1) a breach of fiduciary obligations, of which the aider and abettor had

actual knowledge; (2) the defendant knowingly induced or participated in the breach, and (3) the

plaintiff suffered damages as a result of the breach.  *In re Sharp Int'l Corp.*, 403 F.3d 43, 49-50

(2d Cir. 2005); *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (N.Y. App. Div. 2003).  To establish

knowing inducement or participation, a plaintiff must establish both actual knowledge and

substantial assistance.  *Kaufman*, 307 A.D.2d at 124-26.  Substantial assistance occurs when a

defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby

enabling the breach to occur.  *Kolbeck v. LIT America, Inc.*, 939 F.Supp. 240, 247 (S.D.N.Y.

1996).

### 1. *Aiding and Abetting Breaches of Fiduciary Duties of the Sabine-Slate Directors on the Legacy Forest Board*

248.    The New RBL Lenders not only had actual knowledge – but in fact prompted –

each of the breaches of fiduciary duties outlined above and actively participated in the scheme by

which unsecured creditors were harmed for the benefit of the banks and First Reserve.  The

Sabine-Slate Directors on the Legacy Forest board breached their fiduciary duties in approving

the Financing.  The New RBL Lenders had actual knowledge of the insolvency of the combined

company, which resulted in a shift of fiduciary duties of the Sabine-Slate Directors to creditors.

For example, Wells Fargo recognized that "the value would not be adequate to sufficiently cover

aggregate debt as now defined."  (WF 00010117) (emphasis in original).  When assessing the

loan, the bank examiners concluded that due to the decline in commodity prices, the "Borrowing

Base valuation would appear to have dropped a corresponding  amount to ~$869MM (with a

~$582MM BB)" and that "[i]t would appear that WF would have had this information prior to

the December 2014 closing of the loan."  (WF 00018704).  Indeed, given the market free-fall of

commodity prices, the seven underwriters were not able to syndicate any of the debt due to the

leverage concerns of prospective lenders.

249.    Despite knowledge of insolvency, the banks participated in the development of,

and closed on the terms of, the alternative transaction structure that was predicated on shifting

the losses on the contractually-committed bridge facility to the unsecured creditors of Legacy

Forest and Legacy Sabine, in a transaction that all parties knew was doomed to fail.  Instead of

suffering hundreds of millions of dollars of losses on an unsecured bridge facility, the banks

gained access to new collateral of Legacy Forest for the New RBL Facility.  This allowed the

board of Sabine-Slate Directors to not terminate or refuse to close the Combination and

Financing, procuring First Reserve slight distance from imminent failure.  The New RBL

Lenders not only participated in the breach of fiduciary duties by the Sabine-Slate Directors, but

in fact induced the breach for their direct benefit.

### 2.    Aiding and Abetting Breaches of Fiduciary Duties of Sambrooks as to the Legacy Sabine Subsidiaries

250.    Sambrooks, as the responsible manager for the Legacy Sabine Subsidiaries,

approved the additional $980 million of upstream guarantees by the Legacy Sabine Subsidiaries,

for which they received no value in return.  Indeed, as noted above, Sambrooks never even

considered the position of the Legacy Sabine Subsidiaries.  The banks, of course, were

undoubtedly aware that the Legacy Sabine Subsidiaries were not receiving any value in the

transaction in exchange for the upstream guarantees, as all of the assets of Legacy Forest

remained at the parent company SOGC.  Notwithstanding the absence of value to the Legacy

Sabine Subsidiaries, the banks assisted in the development of and closed under the terms of the

alternative transaction structure with full knowledge of the harm to the Legacy Sabine

Subsidiaries and their creditors, and the corresponding breach of fiduciary duty of Sambrooks.

### 3. *Aiding and Abetting Breaches of Fiduciary Duties of the Original Legacy Forest Board*

251.    As outlined above, the members of the Legacy Forest board breached their

fiduciary duties in not terminating the transaction.  Instead, the Legacy Forest board pursued a

transaction that directly harmed Legacy Forest unsecured creditors by placing $1.345 billion of

new secured debt ahead of its unsecured creditors, instead of paying the Legacy Forest

Unsecured Notes.  Of course, the New RBL Lenders not only knew of the scheme to take

massive additional collateral from an entity not obligated on the Legacy Sabine debt, and to

avoid the contractual Bridge Loan commitment, but also actively participated in its development

in order to avoid hundreds of millions of dollars in immediate losses on the Bridge Loan

commitments.  The New RBL Lenders pursued their self-interests in seeking to avoid their

funding obligations for the committed bridge facility by first proposing a replacement financing

package that was not feasible for the borrower, proposing the first structure to evade the change

of control premium of the Legacy Forest Unsecured Notes, and then adopting the financing

package by which the premium was evaded.  This created incentives for the alternative

transaction to close, when the transaction should have been abandoned.  There can be no

reasonable dispute that the banks knew of, induced, and participated in this breach of fiduciary duties by the original board members of Legacy Forest.

### D. *There Are Colorable Claims Against the Various Directors and Officers of Legacy Sabine and Legacy Forest, Managers of the Legacy Sabine Subsidiaries, and First Reserve Defendants, for Aiding and Abetting Breaches of Fiduciary Duty*

252.    The Proposed Complaint includes causes of action against all directors, and certain officers (McDonald, Wind and Sambrooks), for aiding and abetting the breaches of fiduciary duty.  The underlying breaches of duty are described above.  Thus there need only be colorable bases to support knowledge and participation.

253.    The evidentiary record leaves no doubt regarding knowledge and participation of the original Legacy Forest board members and Wind.  There were numerous board meetings of Legacy Forest (which Wind also attended) from and after December 1, 2014, as well as emails and phone calls, at which McDonald and others updated all Legacy Forest board members and Wind about Sambrooks's assertions regarding the Combined Company financial problems, the invitation to terminate the transaction, and the proposed alternative structure.  There is also no doubt about active participation in the events.  Mr. Fraser allegedly developed the alternative structure that Legacy Sabine, First Reserve and the banks adopted.  The Legacy Forest board was briefed on that structure, and changed their insistence on the original transaction closing to accepting consideration of Fraser's and other alternative structures.  Three Legacy-Forest-side directors (Sambrooks, Lightner and Fraser) participated in the December 8 "3-on-3" phone call with Legacy Sabine.  Wind and Sambrooks allowed the Arkoma Proceeds to be diverted from paying Legacy Forest debt, and moved funds to different accounts than they otherwise would.  Ultimately, Sambrooks and Fraser appointed the Sabine-Slate Directors allowing the transaction to go forward.

254.    The Legacy Sabine directors, and Sambrooks as the responsible person for the Legacy Sabine Subsidiaries, also had full knowledge of and participated in the breach by the Legacy Sabine officers and directors.  It is true that these Legacy Sabine personnel at first sought the correct result: to terminate the Combination.  However, several of them (the directors who were also First Reserve employees) were actively seeking ways to consummate the transactions to the detriment of unsecured creditors, at the same time as Legacy Sabine was seeking termination.  Sambrooks (at the direction of the Legacy Sabine board) did in fact propose the alternative mechanic of using an operating agreement.  When Legacy Forest personnel and professionals proposed the mechanism ultimately used, the Legacy Sabine directors and Sambrooks enthusiastically worked to consummate that transaction.

255.    The First Reserve defendants also aided and abetted the fiduciary breach by all four sets of fiduciaries (the original Legacy Forest board, the Legacy Forest Board consisting of the Sabine-Slate Directors, the Legacy Sabine board, and the fiduciary for the Legacy Sabine Subsidiaries).  First Reserve was the party actively negotiating with the banks throughout the history of the transaction.  Various emails from other Legacy Sabine directors state that, at critical junctures, they simply worked at the direction of First Reserve.  Weiner actively stated that he controlled the financing aspects of the transaction, and thus had full knowledge and was a central participant in every action approved (or not taken, in the case of failing to terminate the Combination) by the fiduciaries.

## IV.    The Equitable Subordination Claims Are Colorable

256.    This Court may also equitably subordinate claims of the Secured Parties— particularly the New RBL Lenders—because of harm caused unsecured creditors in a transaction that the Secured Parties knew was doomed to fail, but was pursued to avoid hundreds of millions of dollars of losses by the New RBL Lenders on their contractually committed bridge

commitment. Specifically, the estate has colorable and sustainable claims for this Court to equitably subordinate the claims set forth below to all unsecured creditors of the applicable debtor, in each case to remedy the damage caused to unsecured creditors by the New RBL Lenders' and Second Lien Parties' inequitable conduct, including, without limitation, the reduction in recoveries of unsecured creditors attributable to the decline in value of the assets of the respective Debtor entities resulting from the Combination, which would not have inured to the harm of unsecured creditors in the absence of the Combination:

- the claims of the New RBL Agent and New RBL Lenders at SOGC;
- the guaranty claims of the New RBL Agent and New RBL Lenders at the Legacy Sabine Subsidiaries;
- the $50 million in incremental obligations, funded by the New RBL Lenders and incurred under the Second Lien Loan by SOGC and the Legacy Sabine Subsidiaries, at the closing of the Combination; and
- the entirety of the claims of the Second Lien Parties at SOGC.

### A.    *Legal Basis for Equitable Subordination Claims and Remedies*

257.    Under Bankruptcy Code section 510(c), a court has the power to equitably subordinate an allowed claim where (i) the claimant engaged in inequitable conduct, (ii) the misconduct injured other creditors or conferred an unfair advantage, and (iii) the equitable subordination is not inconsistent with bankruptcy law. *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977); *see generally LightSquared LP v. SP Special Opportunities LLC* (*In re LightSqaured Inc.*), 511 B.R. 253, 346-52 (Bankr . S.D.N.Y. 2014) . Equitable subordination requires a fact-intensive analysis. *Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 69 (Bankr. S.D.N.Y. 2007).

### 1.    *Inequitable Conduct*

258.    The first prong of the *Mobile Steel* test can be satisfied by a wide range of inequitable conduct. Such inequitable conduct includes (i) fraud, illegality, breach of fiduciary

duties, or undercapitalization, *Enron Corp. v. Springfield Assocs., LLC (In re Enron Corp.)*, 379

B.R. 425, 433 (S.D.N.Y. 2007), or (ii) "unjust enrichment, not enrichment by bon chance,

astuteness or business acumen, but enrichment through another's loss brought about by one's

own unconscionable, unjust, unfair, close or double dealing or foul conduct," *In re Tampa Chain

Co.*, 53 B.R. 772, 779 (Bankr. S.D.N.Y. 1985).    A creditor's conduct may be lawful, yet still

inequitable.  *See In re Adelphia Commc'ns Corp.*, 365 B.R. at 68; *Official Comm. of Unsecured

Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 461 (Bankr.

S.D.N.Y. 2006).  Any inequitable conduct by a creditor that is "directed against the bankrupt or

its creditors may be sufficient to warrant subordination" of such creditor's claim.  *N.J. Steel Corp.

v. Bank of N.Y.*, No. 95 CIV 3071 (KMW), 1997 WL 716911, at *5 (S.D.N.Y. Nov. 17, 1997)

(citing *In re Mobile Steel*, 563 F.2d at 700).

### 2.    *Injury to Unsecured Creditors or an Unfair Advantage to the Banks*

259.    To satisfy the second prong of the *Mobile Steel* test, the alleged inequitable

conduct must have caused injury to the other creditors or resulted in an unfair advantage to the

claimant.  *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R.

832, 840 (Bankr. S.D.N.Y. 1994).  However, if the inequitable conduct harmed the entire

creditor body, proponents need not "identify the injured creditors or quantify their injury, but

need only show that the creditors were harmed in some general, concrete manner."  *Id.*  "[I]t is

sufficient to allege that the general creditors are less likely to collect their debts."  *Id.*

### 3.    *"Not Inconsistent with" Bankruptcy Law*

260.    The third prong of the *Mobile Steel* test serves primarily as "a reminder to the

bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim

of an innocent party who asserts the claim in good faith merely because the court perceives that

the result is inequitable."  *In re Enron Corp.*, 379 B.R. 425, 434 (S.D.N.Y. 2007).  This prong

"incorporate[s] the distinction between claims and interests such that creditors' claims may not

be equitably subordinated to equity interests." *Schubert v. Lucent Techs. Inc. (In re Winstar

Commc'ns, Inc.)*, 554 F.3d 382, 414 (3d Cir. 2009).

261.    A cause of action for equitable subordination can be asserted as an independent

claim. *See, e.g.*, *Verestar,* 343 B.R. at 461-62 (holding that a creditors' committee stated a claim

against the parent corporation for equitable subordination as a separate cause of action); *Kittay v.

Atl. Bank of N.Y. (In re Global Serv. Grp., LLC)*, 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004)

(identifying equitable subordination as a separate cause of action). In addition, equitable

subordination can be asserted as a remedy. *See, e.g.*, *LightSquared LP*, 511 B.R. at 360-61

(equitably subordinating claim based on defendant's breach of the implied covenant of good

faith and fair dealing); *Bank of New Richmond v. Prod. Credit Ass'n of River Falls, Wisconsin

(In re Osborne)*, 42 B.R. 988, 1000 (W.D. Wis. 1984) (secured creditor's claim was equitably

subordinated to creditor who extended credit in reliance of secured creditor's misrepresentations).

**B.      *The Inequitable Conduct of the New RBL Lenders Must Be Closely Scrutinized
          in Light of the Financial Leverage They Asserted Over the Debtors***

262.    While creditors who are neither insiders nor fiduciaries of the debtor are subject

to equitable subordination, *Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 29

B.R. 139, 169 (Bankr. E.D.N.Y. 1983), where the creditor is an insider, inequitable conduct is

"closely scrutinized." For an insider creditor, the threshold for inequitable conduct is simply

conduct that is "somehow unfair." *New Jersey Steel Corp.*, 1997 WL 716911, at *5. In addition,

"the insider or fiduciary creditor must have actually used its power to control the debtor or its

position of trust with the debtor to its own advantage or to the other creditors' detriment." *In re

Exide Techs., Inc.*, 299 B.R. 732, 744 (Bankr. D. Del. 2003) (quoting *In re Mid-American Waste*,

284 B.R. 53, 70 (Bankr. D. Del. 2002)). Insiders include both (i) "statutory insiders," which are

the persons described in the non-exhaustive list of "insiders" set forth in section 101(31)(B) of

the Bankruptcy Code, such as a "person in control of the debtor," and (ii) "non-statutory insiders."

*In re Winstar Commc'ns, Inc.*, 554 F.3d at 395-96.

263.    Courts apply a multi-factor test in determining whether a creditor acted as a non-

statutory insider for purposes of the Bankruptcy Code.  These factors include whether a creditor

(i) attempted to influence decisions made by the debtor; (ii) selected new management for the

debtor; (iii) had special access to the debtor's premises and personnel; (iv) was the debtor's sole

source of financial support; and (v) generally acted as a joint venture or prospective partner with

the debtor rather than an arms-length creditor.  *N.J. Steel Corp.*, 1997 WL 716911, at *4-5.

Courts have also examined whether the creditor had more ability to assert control than the other

creditors, whether the creditor made management decisions for the debtor, directed work

performance, and directed payment of the debtor's expenses.  *In re Winstar Commc'ns*, 348 B.R.

234, 279 (Bankr. D. Del. 2005) (citing *ABC Elec. Serv. Inc. v. Rondout Elec., Inc. (In re ABC

Elec. Serv. Inc.)*, 190 B.R. 672 (Bankr. M.D. Fla. 1995)).

264.    As is appropriate in this case for the New RBL Lenders, in *Exide*, the bankruptcy

court upheld allegations that the debtor's pre-petition lenders were statutory insiders, constituting

a "person in control of the debtor" under section 101(31)(B) of the Bankruptcy Code, because

the lenders "exerted financial leverage" over the debtor, through the debtor's indebtedness to the

lenders, "in a manner that effectively permitted the Lenders to control [the debtor]."  299 B.R. at

742-43.  In finding the pre-petition lenders to be statutory insiders, the court observed that the

lenders, *inter alia*, (x) underwrote and provided the necessary financing for a transaction when

the debtor was already insolvent and while possessing material, non-public information that

other creditors did not have; (y) required the debtor to pledge substantial assets; and (z) used

their financial leverage to cause the board of directors of the debtor to make certain key decisions.

*Id.* at 743.

265.    For a non-statutory insider, actual control is not required; rather, the key inquiry is whether there is a close relationship between the debtor and creditor and "anything other than closeness to suggest that any transactions were not conducted at arm's length." *In re Winstar Commc'ns*, 554 F.3d at 395-96 (holding that the parties' "one-sided transactions refute any suggestion of arm's length dealings").

266.    The facts here strongly suggest that the New RBL Lenders did not deal with the Debtors at arm's length.  As explained further below, the New RBL Lenders, among other things, financed the Combination knowing that the Debtors were insolvent, conspired with the Debtors to engineer an unsupported borrowing base for the New RBL Facility, and proposed converting the Bridge Loan into a 3rd and 4th lien secured facility that was not viable under the Debtors' projections as leverage to escape the banks' Bridge Loan commitments altogether and gain a senior position relative to the Debtors' unsecured creditors.  Moreover, First Reserve, which itself claimed full and complete control over the Debtors' capital markets decisions, had an important institutional relationship with the banks that precluded true arm's-length negotiations (i.e., any attempt to hold the banks to a contractual Bridge Loan commitment was considered "flaming" the banks and made First Reserve "really nervous" based on, among other things, future transactions First Reserve may seek with the same financial institutions in matters unrelated to the Debtors).

267.    The investigation to date has uncovered a period of days in early December in which the New RBL Facility Lenders engaged in furtive communications with First Reserve, intentionally communicating by telephone rather than email to obscure the content of their

communications. It is not clear based on the information gathered to date what pressure was or was not exerted during those calls. It is clear, however, that during that time period, Wells Fargo attempted to convince First Reserve to dispense with part of its equity interest in the Combined Company to eliminate the banks' obligation to fund the Bridge Loan, and First Reserve was led to believe that it was "unclear if the banks would show up at closing" if First Reserve required them to fund the Commitment. (FRSABO00020134, (emphasis added).

C.     ***The Conduct of the New RBL Lenders Was Not Merely "Somehow Unfair," but Exceeded all Standards for Equitable Subordination of Their Claims as Both Insiders and Non-Insiders***

268.    In light of the financial leverage asserted by the New RBL Lenders over the Debtors, equitable subordination of the claims of the New RBL Lenders may be based simply on their conduct, which undoubtedly meets the "somehow unfair" threshold requirement. *N.J. Steel Corp.*, 1997 WL 716911, at *5. However, even if the Court were to conclude that the New RBL Lenders were not non-statutory insiders, their claims remain subject to equitable subordination under the standards applicable to non-insiders.

269.    For non-insider creditors, the Bankruptcy Court for the Southern District of New York has declined to apply a different or heightened standard for determining inequitable conduct, noting that "there are just fewer traditional grounds available." *80 Nassau Assocs.*, 169 B.R. at 839. Generally, proponents must show that the non-insider "creditor has dominated or controlled the debtor to gain an unfair advantage" or "substantial breach of contract and advantage-taking by the creditor." *Id.* at 840 (quoting *In re 604 Columbus Ave. Realty Tr.*, 968 F.2d 1332, 1362 (1st Cir. 1992)). Absent a contractual breach, "the proponent must demonstrate fraud, misrepresentation, estoppel, or similar conduct that justifies the intervention of equity." *Id.* One bankruptcy court has found inequitable conduct by a non-insider creditor where (i) the lender approved the loan facilities requested by the debtor despite a collateral shortfall, (ii) the

lender proceeded to close the loan, even though the debtor did not own assets that comprised a

significant portion of the collateral it sought, and (iii) when the lender's overly optimistic

prognostications failed to materialize due to foreseeable problems, it "set out on a course to

improve its own position to the serious detriment of the unsecured creditors." *Murphy v. Meritor

Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 412 (Bankr. D. Mass. 1991) (equitably

subordinating the secured lender's claims to the claims of the unsecured creditors).  The court

further noted that the lender "suffered from overweening optimism about the debtor's financial

abilities . . . [which] permitted them to disregard the cyclical nature of the Debtor's business and

the industry." *Murphy*, 126 B.R. at 412.

270.    Another bankruptcy court found inequitable conduct where a non-insider bank

lender turned a blind eye to the borrower's financial statements, overlooked evidence of

insufficient collateral coverage and relied on unrealistic financial projections in issuing a loan

that the lender never intended to hold and that grossly over-levered the borrower.  *See Credit

Suisse v. Official Comm. of Unsecured Creditors (In re Yellowstone Mt. Club, LLC)*, 2009 WL

3094930, at *9 (Bankr. D. Mont. May 12, 2009).  The court found that the bank evinced a

"complete disregard for the Debtors or any other person or entity who was subordinated to [the

bank's] first lien position" and "lined its pockets on the backs of the unsecured creditors," such

that equitable subordination was warranted.  *See id.* at *9-10.

271.    The New RBL Agent and New RBL Lenders knew that the Debtors were

insolvent and that the banks would face substantial losses if they honored their unsecured Bridge

Loan commitment.  For example, in late November, Barclays predicted that the lenders would

face an approximate loss of $212 million based on a mark of the Bridge Loan at 75 cents on the

dollar upon closing.  (BARC_SOGC 00010860).  To avoid this bargained-for outcome, the banks

took advantage of the Debtors' need for covenant relief and liquidity in order to offload the banks' risk onto the Debtors' existing unsecured creditors, thereby leaving such creditors subordinated to a significantly increased secured debt load. The Court should not permit these lenders to recover on their claims prior to the unsecured creditors that were directly harmed as a result of this unfair and unjust conduct.

### 1. The New RBL Lenders and New RBL Agent Engaged in Substantial Inequitable Conduct

272. The evidence of the banks' inequitable conduct is extensive. The banks knew that the Debtors would be insolvent upon closing the Combination, and that the banks would face heavy losses on the Bridge Loan were the banks to fund it under the as-committed terms. The banks therefore did everything in their power to escape their out-of-the-money commitment. When the Debtors requested amendments and waivers on the New RBL Facility, the banks exploited their new-found leverage to re-trade the Bridge Loan at the expense of unsecured creditors. The banks initially proposed an alternative structure that, in an obvious attempt to capture collateral, would have converted the unsecured Bridge Loan into a 3rd and 4th lien secured facility with terms that the banks knew were unsupportable given then-current market conditions. When this proposal unsurprisingly faltered, the banks proposed that the deal be amended to remove the need for a bridge facility. The banks then actively participated in a manipulative scheme to supplant the Bridge Loan with a new merger and financing structure that kept the Legacy Forest unsecured bonds in place, provided an unsupported borrowing base for the New RBL Facility, and funded an incremental $50 million of so-called Second Lien Loans— all for the purposes of providing short-term liquidity for a Combination that was doomed to fail, ensuring that the new financing was senior to all of the Debtors' unsecured claims and collecting transaction fees on the new financing.

273.    The banks also knew that the transaction was doomed to fail, as evidenced through their artificial inflation of the borrowing base, which was not reduced from the original $1.0 billion initial borrowing base despite the fact that oil and gas prices had dropped by 44% and 24%, respectively.  To maintain an artificial borrowing base, the banks deliberately used outdated oil price data to calculate the value of the New RBL Facility collateral.  The banks made no adjustment to the New RBL Facility borrowing base to account for the sale of Legacy Forest's Arkoma Assets the day before the Combination, and instead required that the proceeds be used post-Combination to pay down the New RBL Facility.  Additionally, the banks eliminated their right to re-determine an accurate and appropriate borrowing base 30 days after the Combination closing, thereby prolonging the artificial inflation of the borrowing base.  The bank's unsupported calculation of the borrowing base was so egregious that federal bank examiners immediately noticed and reported it.

274.    The banks knew that the post-Combination entity would be insolvent and unable to satisfy the claims of unsecured creditors.  For example, Wells Fargo understood that "the value [of the Debtors' assets] would not be adequate to sufficiently cover aggregate debt as now defined," but nonetheless proceeded with the financing because the overall effect was to reduce their aggregate exposure to the Debtors.  In particular, the banks' "junior capital exposure" was "reduced significantly" by replacing their unsecured Bridge Loan obligations with ostensibly secured obligations under the New RBL Facility and the Second Lien Loan.  Moreover, Wells Fargo downgraded the Debtors' "borrower rating" immediately upon the closing of the Combination and then downgraded the Debtors' "asset quality rating" just three weeks later. Unsurprisingly, the banks viewed both the New RBL Facility, as renegotiated with an

unsupported borrowing base and various non-market covenant and re-determination allowances,

and the incremental Second Lien Loan, as "largely a workout."

275.    Additionally, to provide necessary short-term liquidity to a business doomed to

fail, the New RBL Lenders provided an incremental $50 million under the Second Lien Loan

Agreement.  If there was any doubt as to the knowledge of the banks, the lead arrangers,

Barclays and Wells Fargo, immediately sold their Second Lien Loan positions at steep discounts

promptly after the Combination.

### 2.      The Conduct of the Banks Caused Substantial Injury to Unsecured Creditors to the Unfair Benefit of the Banks

276.    The banks' exercise of financial leverage over the Debtors provided them a direct

unfair advantage to the detriment of unsecured creditors.  The banks participated in crafting a

structure to keep the Legacy Forest unsecured bonds outstanding in lieu of either terminating the

Combination or requiring the banks to honor their Bridge Loan commitments.  As a result,

Legacy Forest bondholders, who at a minimum would have received nearly all Legacy Forest

assets, instead received an unsecured claim that is junior to up to a billion dollars in first lien

secured debt claims, and could have to share with New RBL Facility deficiency claims.  Legacy

Sabine bondholders now have unsecured claims that are more deeply underwater than would

have been the case had the Debtors not consummated the Combination.  The principal parties

that benefitted were the banks, who instead of funding an out-of-the-money unsecured Bridge

Loan, obtained access to collateral not previously encumbered under the Legacy Forest RBL.

### 3.      Equitable Subordination Is Not Inconsistent with Bankruptcy Law

277.    Equitable subordination of the claims of the New RBL Parties is consistent with

bankruptcy law, and the equities of this case.  The New RBL Lenders should not be permitted to

enrich themselves unjustly—at the expense of unsecured creditors—through the unfair advantage

that these banks obtained from their financial leverage over the Debtors at the time of the

Combination. For the foregoing reasons, equitable subordination of the claims of the New RBL

Agent and New RBL Lenders, and claims in respect of the incremental $50 million under the

Second Lien Loan, is warranted at SOGC and each of the Legacy Sabine Subsidiaries to remedy

the harm caused to unsecured creditors by the New RBL Lenders' inequitable conduct.

### D.    *Claims under the Second Lien Loan Agreement Should Be Equitably Subordinated at SOGC*

278.    While most of the Second Lien Lenders (aside from the incremental Second Lien

Loans made by the New RBL Lenders) do not appear to have been directly involved in the

structuring of the Combination or the efforts to enrich the Secured Parties at the expense of pre-

existing unsecured creditors, the Second Lien Lenders obtained a windfall in the Combination by

Legacy Forest becoming obligated on the loan and in obtaining access to assets of Legacy Forest.

The absence of the Second Lien Lenders' direct involvement in the negotiation of the transaction

does not preclude equitable subordination of their claims at SOGC.

279.    Inequitable conduct sufficient for equitable subordination has been found based

solely on the undercapitalization of the debtor or the unjust enrichment of the creditor. *In re

Enron Corp.*, 379 B.R. 425, 433 (S.D.N.Y. 2007). As demonstrated above, post-Combination

SOGC was undoubtedly undercapitalized through an artificially inflated and unsupported

borrowing base, which upon the expected downward redetermination in April 2015 would create

a liquidity crisis. Additionally, the Second Lien Lenders were unjustly enriched—at the expense

of Legacy Forest unsecured creditors—by gaining access to the assets of Legacy Forest as

collateral. While fraudulent conveyance law provides a remedy for the substantial harm imposed

on unsecured creditors of Legacy Forest as a result of SOGC becoming obligated on the Second

Lien Loan, equitable subordination provides the Court with an additional remedy to correct this

harm to Legacy Forest unsecured creditors.

**V.**     **The Debt Recharacterization Claims Are Colorable**

      **A.**     ***Statutory Basis for Debt Recharacterization Claims***

280.    "[B]ankruptcy courts have the power to recharacterize ostensible debt as

equity . . . ."  *In re Adelphia*, 365 B.R. at 74 (*citing In re Official Comm. of Unsecured Creditors*

*for Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 231 (4th Cir. 2006)); *see also In re Fitness*

*Holdings Int'l, Inc.*, 714 F.3d 1141, 1148 (9th Cir. 2013) (noting all circuits now agree that

bankruptcy courts have the power to recharacterize debt).  This power stems from bankruptcy

courts' equitable authority under Bankruptcy Code section 105(a) to "issue any order, process or

judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

11 U.S.C. § 105(a); *see* also *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.*

(*In re BH S&B Holdings LLC*), 420 B.R. 112, 157 n.17 (Bankr. S.D.N.Y. 2009) (noting that

"courts in this jurisdiction and elsewhere have held that courts do have equitable power to

recharacterize debt as equity where circumstances warrant it as part of the general authority

under § 105(a) to test the validity of debts") (internal quotation marks and citations omitted).

281.    Recharacterization of debt as equity "is appropriate where the circumstances show

that a debt transaction was actually an equity contribution *ab initio*."  *In re BH S&B Holdings*,

420 B.R. at 157 (quotation marks omitted) (citing *Bayer Corp. v. MascoTech, Inc. (In re*

*Autostyle Plastics, Inc.*), 269 F.3d 726, 747–48 (6th Cir. 2001).  Recharacterization differs from

equitable subordination, in that recharacterization "turn[s] on whether a debt actually exists—not

on whether the claim should be equitably subordinated or disallowed."  *In re Adelphia*, 365 B.R.

at 73.  Recharacterization analysis thus focuses on the substance of the transaction rather than on

the form.  *See Id; see also In re Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir. 1991) ("The

ability to recharacterize a purported loan emanates from the bankruptcy court's power to ignore the form of a transaction and give effect to its substance.").

282.    In determining whether an investment that purports to be debt should be recharacterized as equity, courts in this district balance the factors laid out by the Sixth Circuit Court of Appeals in *In re Autostyle Plastics, Inc.*,[36] which are:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

269 F.3d at 749–50; *see also In re BH S&B Holdings*, 420 B.R. at 157 (considering *Autostyle* factors); *In re Gen. Motors Corp.*, 407 B.R. 463, 498 (Bankr. S.D.N.Y. 2009) (same); *In re Adelphia*, 365 B.R. at 74 (same); *accord Dornier Aviation*, 453 F.3d at 231.

283.    "No one factor is controlling or decisive," and courts must consider the "particular circumstances of each case."  *In re Autostyle,* 269 F.3d at 750.  A recharacterization plaintiff must "plead facts [that] trigger the applicability of the *Autostyle* factors or their equivalent, or a meaningful subset of them."  *In re Adelphia*, 365 B.R. at 75 n. 216; *see In re BH S&B Holdings*, 420 B.R. at 157.

---

[36] The *Autostyle* factors have also been referred to as the *Roth Steel* factors.  *See Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625, 630 (6th Cir. 1986) (applying substantially similar considerations in tax law context).

B.    **_Factual Support for Debt Recharacterization_**

1.    **_Incremental Second Lien Loan Claims_**

284.    The *Autostyle* factors weigh heavily in favor of recharacterizing the $50 million

incremental Second Lien Loan claims as equity.  There is no doubt that successful

recharacterization arguments are rare.  But what are equally rare are the core facts that the

Committee unearthed in even the limited discovery it has obtained to date:

- the banks who made the incremental Second Lien Loan were actually the lenders who had committed to make the unsecured Bridge Loan (in exact proportion to their commitments);

- the $50 million incremental "second lien" was expressly seen as a settlement allowing those lenders out of their massively underwater and underlined unsecured Bridge Loan commitment;

- the lenders and First Reserve (who controlled the financing issues) agreed that the money really should be an equity infusion (but that equity "wasn't an option"); and

- the same banks had proposed to fund the Bridge Loan commitment with "4th lien" debt that had "equity risk" supposedly justifying an exorbitant "interest rate."

These facts, and others, all make out a strong (and certainly colorable) claim for

recharacterization.

a)    **It Was Expected that Repayment Would Only Occur if the Combined Company's Performance Turned Around**

285.    "If the expectation of repayment depends solely on the success of the borrower's

business, the transaction has the appearance of a capital contribution."  *In re Autostyle,* 269 F.3d

at 751; *see In re BH S&B Holdings*, 420 B.R. at 158.  There is the strongest possible evidence of

this here—in the words of Barclays, one of the two lead banks: "*[i]f the company performs,* there

may ultimately be the potential to monetize the exposure to one of the existing 2nd lien holders at

some discount . . . ."  (BARC_SOGC 00021027 (emphasis added).)

286.     An equally strong indicator that there was no expected repayment except from a

recovery in the Combined Company's business is that both lead banks worked immediately to

sell their Second Lien Loan positions at a deep discount.  Barclays knew that the incremental

Second Lien Loans were, at their inception, "a below par instrument."  (BARC_SOGC

00004016.)  The other lead bank, Wells Fargo, committed to sell its piece of the Second Lien

Loan for 70.5 cents on the dollar almost immediately after the funding of the Second Lien Loan.

(WF-SABINE_VOL-00000999.)  Barclays was also trying immediately to sell its Second Lien

Loan position.  That is, these banks did not expect to be repaid in the normal course on the

Second Lien Loans.  The steep discounted value at the time the loan was made indicates that the

return was not expected to be at a fixed interest rate, but rather whatever was ultimately

recovered on the "principal" of the Second Lien Loan.

### b)     The Combined Company Did Not Have Adequate Capital, and the Parties Knew That

287.     "Thin or inadequate capitalization is strong evidence that the advances are capital

contributions rather than loans."  *In re Autostyle,* 269 F.3d at 751.  Capitalization is to be

examined "at the time the transfer was made."  *Id.* (citing *Roth Steel*, 800 F.2d at 630).  The

evidence shows that the Debtors were grossly undercapitalized—and the banks knew this—when

the banks funded the $50 million incremental Second Lien Loan.  Evidence of the

undercapitalization is set forth in detail in the First STN Motion.  The facts regarding the banks'

knowledge of the undercapitalization are extensive, as noted throughout.

288.     As early as October 27, 2014, Barclays's knew that "at this leverage level 'there is

equity risk' through the level of their commitment and that the business really needs 'hundreds

of millions of dollars of equity' that isn't an option . . . ."  (SAB00410692 (First Reserve's

Weiner reporting on discussions with Barclays).)  Shortly thereafter, a new bank proposal to

change their underwater unsecured $850 million Bridge Loan commitment consisted of

"$500MM of 3rd lien term loan[s] at 13-13.5% [interest] *and then [a] stub of 'equity risk'*

*unsecured or 4th lien debt with a 'high teens' [interest rate].*"  (FRSABO00009682 (emphasis

added).)[37]  In sum, investing at the bottom of the Debtors' capital structure was so inherently

risky that such investment was, in effect, equity.

289.    The incremental Second Lien Loan was approved by the Legacy Sabine board just

prior to the Combination.  Sambrooks had, just two weeks prior, characterized the situation as

one in which "[e]quity from First Reserve [was] not possible" and "[e]quity from public markets

[was] not feasible."  (SAB00073878, (email from McDonald recounting conversation with

Sambrooks).)  All of the relevant parties thus understood that the Debtors desperately required an

equity infusion and were undercapitalized.

> c)    **There Was No Financing Available from Other Sources and
> the Incremental Second Lien Loan Was a Settlement of a
> Prior, Underwater Commitment, Not a New-Money Arm's-
> Length Negotiation**

290.    It is unquestioned that the Debtors could not obtain financing from any other

sources.  First Reserve specifically told Sambrooks not to waste time looking for any source

other than the existing bridge lenders who already had their commitment.  (SAB00410692,

(email from Weiner to Sambrooks: "On other banks - I think it's not a good use of time - nobody

is going to want to step into this who isn't already handcuffed to us.").)  Indeed, the negotiation

for the incremental Second Lien Loan was not an arms'-length negotiation *for a stand-alone,*

*new-money credit*.  It was a settlement and resolution of an existing $850 million unsecured

commitment that was at least 50% underwater.  That is, the banks that committed to the Bridge

---

[37] According to a subsequent email from Patrick McDonald (Legacy Forest CEO), this "high teens" interest rate was
18%.  (SAB00073878.)

Loan were already committed to fund capital that, at the enterprise value of the company, was in fact equity.  The $50 million incremental Second Lien Loan was the settlement of that same funding.

### d)   "Identity" of Shareholders and Lenders, and Lack of Security for the Advances

291.   An "identity of interest" between shareholders and the lenders and "[t]he absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans."  *In re Autostyle,* 269 F.3d at 751–52 (citing *Roth Steel*, 800 F.2d at 630–31).  Both are present here.

292.   There could be no closer alignment and intertwining of interest between First Reserve and the New RBL Lenders.  The unsecured Bridge Loan commitment placed them in a position of "mutually assured destruction" if the transaction were to close as originally planned.  (FRSABO00018950.)  So instead, they proceeded to avoid the original unsecured (and underwater) Bridge Loan terms.  First they discussed a "3rd lien [and] 4th lien" structure.  (FRSABO00009682.)  However, saying that something has a junior lien does not actually provide "security" if there is no value in the collateral.  Merely labeling as "4th lien" a funding for a business that "really needs 'hundreds of millions of dollars of equity,'" does not change the economic reality.  (SAB00410692.)  And then resolving the situation with a $50 million incremental second lien advance does not change it either.

293.   The fact that the $50 million incremental funding was documented as part of the Second Lien Loan also does not change anything.  Another remarkable fact that discovery brought to light is that Barclays questioned whether the incremental $50 million Second Lien Loan would even be fungible with the existing Second Lien Loan at all.  (BARC_SOGC 00021027  (email from Barclays questioning whether the incremental debt was "fungible" given

"the fact that the existing [second lien debt] is trading in the low to mid 80s . . . [but] we're willing to purchase the loan at an above market price.")) This was not just a part of the Second Lien Loan facility. The Debtors consistently portray this as incremental financing "from the second lien lenders." In fact it was the furthest possible thing from that. It was the funding of underwater new money, in settlement of an even larger underwater commitment, for a company that all agreed needed equity, not debt. Indeed, one of the key lenders was specifically concerned that this debt would not be considered equal to the existing second lien debt.

## VI.    The Debtors Have Unjustifiably Failed to Bring the Proposed Claims

294.    In the final analysis, the Committee has identified colorable and valuable claims. But now at the end of the Debtors supposed investigation, the problematic dynamic of this case is on full display. Instead of an investigation to identify claims, the Debtors have spent their time trying to exonerate potential targets. The Debtors and the targets have attempted to obstruct the Committee's investigation and decision making. The Court must consider at least some examples of this behavior in considering whether standing is appropriate. As this Court has already stated, the question of standing is of fundamental importance to these chapter 11 cases. (Tr. of December 1, 2015 Hearing at 34:16–23)

295.    This is precisely the case in which Committee standing is necessary and desirable. A unanimous *en banc* panel of the Third Circuit has given the most cogent explanation of the central danger in chapter 11 cases of this nature:

> Before bankruptcy, a debtor's management and its most powerful creditors typically try to "work out" the debtor's financial distress. In this process, managers frequently experience pressure to take extreme measures to protect the company. They may make extraordinary concessions to providers of critical services, such as granting new liens on unencumbered property, agreeing to an excessive rate of interest, committing to lavish retention bonuses, or doing virtually anything else to avoiding filing for bankruptcy. . . . Whether or not these radical actions are ultimately

successful, they often reduce the assets available to the debtor's creditors.

The Bankruptcy Code's avoidance powers are intended, inter alia, to deter this kind of managerial overreaching and to encourage creditors to allow a debtor a measure of breathing room. . . . Fraudulent avoidance actions, such as those provided for in § 544(b), are intended to afford unsecured creditors peace of mind, for those creditors are usually the principal victims of managerial misfeasance.

Although fraudulent transfers are of concern in many chapters of the Bankruptcy Code, including in Chapter 7 liquidations, they present a particularly vexing problem in reorganizations conducted under Chapter 11. The premise of a reorganization is to ensure that the debtor emerges from bankruptcy as a viable concern. . . .  In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, i.e., the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee. Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate.

This situation immediately gives rise to the proverbial problem of the fox guarding the henhouse . . . One suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it.  For that reason, courts and commentators have acknowledged that the debtor-in-possession "often acts under the influence of conflicts of interest."  These conflicts of interest can arise even in situations where there is no concern that a debtor's management is trying to save its own skin. For example, a debtor may be unwilling to pursue claims against individuals or businesses, such as critical suppliers, with whom it has an ongoing relationship that it fears damaging. Finally, even if a bankrupt debtor is willing to bring an avoidance action, it might be too financially weakened to advocate vigorously for itself. In any of these situations, the real losers are the unsecured creditors whose interests avoidance actions are designed to protect.

The possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions.

*Official Comm. of Unsecured Creditors of Cybergenics, Inc. v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 572-74 (3d Cir. 2003) (*en banc*) (internal citations omitted).  This is precisely what has occurred in this case.  Several examples will suffice for the moment.

296.    The Debtors have tried to actively impede the Committee investigation by, *inter alia*, contesting the Committee's ability to take certain depositions.  The Debtors advocated for the Committee to take fewer depositions, ***even though the Debtors found it necessary to interview the exact same witnesses***.  For example, the Debtors objected to the Committee taking the deposition of Wind, the former CFO of Legacy Forest.  (*See* Committee Letter Submission, Dkt. No. 529.)  Yet the Debtors did not disclose to the Committee or to this Court that they had already interviewed Wind.  (*See, e.g.*, Debtors' Report at 64 n.66 (citing a November 15, 2015 interview with V. Wind).)  Thus, they fought the Committee's ability to get the same information.  Similarly, the Debtors repeatedly asked the Committee to reduce the number of its depositions of current and former directors; yet they interviewed each and every director for which they informally opposed depositions.[38]  In short, the Debtors worked to curtail the witnesses whose sworn, recorded testimony the Committee could obtain, while the Debtors wanted to rely on unrecorded interviews available only to them.

297.    Why the Debtors wanted to do this is now clear from the Debtors' report.  In reaching their conclusion that there are no colorable claims, the Debtors have relied extensively on the content of their interviews, to which neither a court reporter nor the Committee was invited. (*See, e.g.*, Debtors' Report at 126 n.520; 149; 162; 163 n.603, n.604.)  Worse, the actual deposition testimony has revealed that the contents of those interviews are completely

---

[38] The Debtors' Report indicates that they interviewed Legacy Sabine directors Michael France, Duane Radtke, David Sambrooks, Brooks Shughart, Alex Krueger, and John Yearwood; Legacy Forest directors James Lightner, Loren Carroll, Richard Carty, Dod Fraser, James Lee, Raymond Wilcox, and Pat McDonald; and Sabine Oil & Gas officers Lindsay Bourg; Ashraf Elias; Larry Hartman; Cheryl Levesque; Todd Levesque; Yamoria Miller; June Sarner; and Victor Wind.  (Debtor's Report at 3.)

unverifiable.  Essentially every witness said they could not recall events at their interview with

the Debtors; the interviews of the two CEOs are emblematic of the problem.  The Legacy Forest

CEO, McDonald, was among the worst at recalling the content of his interview.  At deposition,

which happened after his "interview," he could not recall whether certain key board of directors

meetings even occurred.  (McDonald Tr. 61:11-22; 73:8-14; 81:25-82:18; 85:5-7; 125:17-21.)

He could not recall seeing the board minutes during Debtor interviews.  (*See* McDonald Tr.

29:23-30:6; 73:15-20; 82:19-21; 85:5-13.)  He could not recall a single specific question that

Debtors' counsel asked him during his interviews, nor a single specific document he was shown.

(McDonald Tr. 129:23-130: 6.)  Even worse than McDonald was David Sambrooks, the CEO of

Legacy Sabine and current CEO of the Debtors.  The Debtors relied on at least four interviews of

him in their Report.  (*See, e.g.* Debtors' Report at 173 n.622; n.623; 70 n.297; 103 n.452)  He

could not remember that a single interview even occurred.  (*See* Sambrooks Tr. 12:11-19; 13:3-

14:11; 15:8-13.)  He could not recall ***even the occurrence of an interview*** that supposedly

occurred in November with the Debtors' principal investigators from Kirkland regarding events

relating to the Combination and Financing.  (Sambrooks Tr. 14:2-11.)  And yet Sambrooks had a

crisp recollection of meeting in November with one of those very same Kirkland lawyers on the

topic of the employee "incentive" program that will pay him million of dollars.  (Sambrooks Tr:

14:12-17.)

298.    Perhaps the most troubling aspect of the investigation relates to its scope. The

Court will recall that the Committee complained at the very outset of the case that the Debtors

were purporting to investigate a complex corporate transaction but had not sought any

documents from the outside advisors.  (Committee's Rule 2004 Mot. at 17, ¶ 37.)  The Debtors

then decided to collect documents from Vinson & Elkins (counsel to Legacy Sabine) and

Wachtell (counsel to Legacy Forest), and informed the Committee and the Court of this decision

(as part of the Debtors' last-minute attempt to avoid a Rule 2004 examination at all).  (Debtors'

Supplemental Opposition to Rule 2004 Mot. at 6, ¶ 11.)

299.    What has now come to light is that there was another critical, centrally-involved

law firm for Legacy Sabine.  Vinson & Elkins did not advise Legacy Sabine with respect to

potential litigation risks arising from the changes to the Combination structure and the Financing.

***That advice was given to Legacy Sabine by the firm of Quinn Emanuel Urquart & Sullivan***

***LLP*** ("Quinn").  (*See, e.g.*, Sambrooks Tr. 109:14-110:10; Shughart Tr. 251:10-252:6; 260:22-

261:5.)  Quinn gave advice to Legacy Sabine over whether it should refuse to close the

transaction, an issue on which Legacy Sabine changed its view at the critical juncture in

December 2014.  (*See, e.g.*, SAB00691069.)  No document collection has been done from Quinn,

so far as the Committee is aware.  The Debtors have asserted the privilege over all

communications with Quinn during the critical period.  Yet Quinn represents one of the central

targets of the investigation—First Reserve.  Quinn defended at deposition in this case two First

Reserve personnel, one of whom is a director of the Debtors. (Weiner Tr. 3:16-23; Shughart Tr.

2:10-14)  Notably, those First Reserve personnel (Weiner and Shughart) asserted that during the

transaction period, they exercised control over some of Legacy Sabine's key negotiations

regarding the Financing.  (*See* FRSABO00006764; Weiner Tr. 116:6-117:12; 122:16-20.)  In

other words, a key target of the investigation is actually represented by the law firm that was

perhaps the key outside counsel to Legacy Sabine and its fiduciaries in making decisions to close

the Combination and Financing.  This alone creates an obvious conflict disabling the Debtors

from investigating any matter related to First Reserve.

300.    The Debtors conduct surrounding the depositions also interfered with the

Committee investigation.  Wind's deposition is a key example of this.  As noted above, the

Debtors interviewed Wind in mid-November.  (Debtors' Report at 64 n. 266.)  They then

opposed the Committee taking his deposition.  (Committee Letter Submission, Dkt. No. 529.)

When the Court granted the Committee a subpoena for Wind, the ***Debtors then interviewed him***

***again in advance of the deposition that the Debtors had opposed***.  (Debtors' Report at 59,

n.245.)  The Committee considers this to be highly improper.   There can be no way to know

with confidence the effect on Wind's testimony that this further pre-deposition questioning by

the Debtors had.  The Debtors conducted their additional interview of Wind on November 30,

the day before they issued their report.  Wind's November 30 interview could not have

materially contributed to the Debtors' Report, as it would have been substantially finished by

then in advance of its release the next day.  Given this timing, it is difficult to imagine that the

additional Wind interview was anything other than a reaction to the Committee obtaining a

deposition.

301.    A second set of examples occurred in the depositions themselves.  In depositions

***of bank witnesses***—supposed targets of the Debtors' investigation—the Debtors lodged an in-

advance blanket objection to any question asked by the Committee to which bank counsel also

objected.  (*See, e.g.*, Scotto Tr. 119:18-25.)  Furthermore, in virtually every deposition, the

Debtors "reserved time" in order to ask rehabilitation questions of witnesses, including their own

directors and officers.  (*See, e.g.*, Weiner Tr. 107:22-24.)  The questioning usually took the form

of highly leading questions of their own witnesses.  Still further, the Debtors objected to the

Committee and other creditor-questioners who had remaining time deciding to reallocate it

amongst themselves, insisting on taking creditor time for the Debtors' rehabilitation and leading

questions.  (*See, e.g.*, Weiner Tr. 110:2-24.)  Notwithstanding these attempts to strictly control

creditor time, in the highly crucial deposition of Sambrooks, the Debtors ran out of time for their

own questioning.  They then asked Sambrooks's estate-paid-for counsel if the Debtors could

have extra time.  Counsel agreed.  (Sambrooks Tr. 282:3-15.)  The Committee requested equal

extra time, and Sambrooks's estate-paid counsel refused to accommodate that request.

(Sambrooks Tr. 282:16- 285:11.)  In short, the Debtors' conduct in these depositions protected

targets to the detriment of uncovering evidence to support potential claims.

302.    The Debtors and targets have also abused the protective order to attempt to

impede the Committee's investigation and its decision making.  For example, notwithstanding

the fact that they produced documents only *after* the protective order was entered, First Reserve

initially designated every single document as highly confidential.  It took the position that the

entirety of depositions of its personnel was highly confidential, maintaining that throughout

depositions.  (*See, e.g.*, Weiner Tr. 12:20-13:21)  This precluded Committee counsel from

sharing significant information regarding First Reserve with its client, the Committee itself.  It

also affected the Committee's ability to consider other information, because any document (such

as draft pleadings) sent even to the Committee required extensive redactions.  The principal bank

targets (Wells Fargo and Barclays) similarly abused the protective order to delay Committee

consideration of key information.  The Debtors also took direct advantage of this.  When the

Debtors delivered their Report to Committee counsel on December 1, they placed a "Highly

Confidential" designation on the cover page, with no indication of what portions of the 250-page

document were so designated.  This prevented Committee counsel from delivering a copy of the

Report to the Committee itself.  The Committee immediately requested a redacted version (since

the Debtors knew what evidence they had cited), but the Debtors only delivered one several days later.

303.     The Committee has continuously insisted that only the smallest set of documents and deposition testimony (if any at all) merit a "highly confidential" designation.  It has continuously attempted to engage in meet and confer sessions to request withdrawal of these over-broad designations.  Only five days before the Challenge Deadline did Barclays agree to allow Committee members to see a limited set of (wrongfully) designated "Highly Confidential" documents and the similarly designated transcripts of its witness's deposition.  After Wells Fargo and First Reserve delayed for a week, within minutes of each other on the Saturday night, just three days before the end of the Challenge Period, Wells Fargo and First Reserve agreed that the Committee members could see deposition transcripts and (in the case of First Reserve, but not Wells Fargo) a limited set of their documents that had been marked "highly confidential."

## VII.    <u>Non-Exclusive Settlement Authority Is Appropriate</u>

304.     The Committee is entitled not only to prosecute the Proposed Claims, but must also be able to engage in settlement negotiations with parties in interest in relation to the Proposed Claims.  Of course, any such settlements would be subject to approval of this Court.  It is indisputable that any decision to settle any of the Proposed Claims, and at what level, will have a disproportionate economic impact on the Debtors' unsecured creditors, whose interests the Committee represents in these cases.

## VIII.   <u>The Court Should Appoint a Mediator to Assist in Resolution of All of the Proposed Claims</u>

305.     This Court may order assignment of a matter to mediation upon its own motion, or upon a motion by any party in interest or the U.S. Trustee.  Local Bankruptcy Rule 9019-1; *United States Bankruptcy Court Southern District of New York Procedures Governing Mediation*

- 140 -

*of Matters and the Use of Early Neutral Evaluation and Mediation / Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings.*

306.    Due to the size and complexity of these chapter 11 cases and the issues set forth in the Proposed Complaint and the complaints proposed in the First STN Motion (collectively, the "Proposed Committee Complaints") as well as the parties involved, the Committee believes that litigation surrounding the claims raised by the Proposed Committee Complaints will necessarily be costly and time consuming.  Thus, the Committee requests that the Court appoint a mediator to assist in the resolution of the issues raised in the Proposed Committee Complaints.  The Committee believes that given the nature of the claims presented by the Proposed Committee Complaints, a sitting bankruptcy court judge is appropriate for the mediator role.

## CONCLUSION

307.    For the foregoing reasons, the Committee respectfully requests that the Court enter an order (i) granting the Committee derivative standing to commence and prosecute the Proposed Claims on behalf of the Debtors' estates; and (ii) granting the Committee non-exclusive authority to settle such claims on behalf of the Debtors' estates.

- 141 -

Dated:  December 15, 2015

ROPES & GRAY LLP

*/s/ D. Ross Martin*_____
Mark R. Somerstein
Keith H. Wofford
Ross Martin
1211 Avenue of the Americas
New York, New York 10036-8704
Tel: (212) 596-9000
Fax: (212) 596-9090
mark.somerstein@ropesgray.com
keith.wofford@ropesgray.com
ross.martin@ropesgray.com

*Counsel for the Official Committee of
Unsecured Creditors*

## **Exhibit A**

Proposed Complaint

Mark R. Somerstein
Keith H. Wofford
D. Ross Martin
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | Case No. 15-11835 (SCC) |
| *Debtors.* | Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the Debtors' estates, | |
| *Plaintiff,* | Adversary Proceeding No. 15-_____ |
| v. | |
| WELLS FARGO BANK, N.A.; WELLS FARGO SECURITIES LLC; WF INVESTMENT HOLDINGS, LLC; BRIAN M. MALONE, as trustee; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BANK OF AMERICA N.A.; CAPITAL ONE, N.A.; CITIBANK N.A.; NATIXIS, NEW YORK BRANCH; UBS AG, STAMFORD BRANCH; WILMINGTON TRUST, N.A.; KATE K. MOSELEY, as trustee; ALAN TAPLEY, as trustee; DON B. PINZON, as trustee; JOHN DOE ENTITIES Nos. 1-100; FIRST RESERVE CORPORATION; SABINE INVESTOR HOLDINGS LLC; FIRST RESERVE FUND XI, L.P.; FIRST RESERVE GP XI, L.P.; FIRST RESERVE GP XI, INC.; LOREN CARROLL; RICHARD J. CARTY; DOD A. FRASER; JAMES H. LEE; JAMES D. LIGHTNER; PATRICK MCDONALD; RAYMOND WILCOX; VICTOR WIND; MICHAEL FRANCE; KEVIN GOODMAN; ALEX KRUEGER; DUANE RADTKE; DAVID SAMBROOKS; BROOKS SHUGHART; JOSHUA WEINER; and JOHN YEARWOOD. | **[PROPOSED] COMPLAINT FOR (I) INTENTIONAL FRAUDULENT CONVEYANCE; (II) BREACH OF FIDUCIARY DUTY; (III) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; (IV) EQUITABLE SUBORDINATION; (V) DEBT RE-CHARACTERIZATION; AND RELATED RELIEF** |
| *Defendants.* | |

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corporation (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).

1

Plaintiff, the Official Committee of Unsecured Creditors (the "Committee") of Sabine Oil & Gas Corporation, a New York corporation ("SOGC") and its affiliated debtors (collectively, the "Debtors"), by and through its undersigned counsel, on behalf of and as the representative of the Debtors' estates, and based upon knowledge, information, belief, and its investigation to date, alleges as follows:

## NATURE OF ACTION[2]

1.      This adversary proceeding asserts claims on behalf of the applicable Debtors' estates, arising from the disastrous merger of Forest Oil Corporation ("Legacy Forest"), a New York Corporation, and Sabine Oil & Gas LLC ("Legacy Sabine"), a Delaware limited liability company, that occurred in December 2014 (the "Combination").  In addition, this adversary proceeding asserts claims in connection with obligations incurred, liens transferred and payments made in connection with or related to the Combination (generally the "Debt Financing").

2.      Specifically, by this Complaint, the Committee seeks to pursue:  (a) claims for intentional fraudulent conveyance against the Secured Parties (as defined below), to avoid the obligations incurred, liens transferred and payments made by the Debtors in connection with or related to the Combination; (b) claims for breach of fiduciary duty against two groups of Legacy Forest directors and officers, in particular: (i) the Legacy Forest directors and officers in place until the morning of the closing of the Combination and (ii) a second group of Legacy Forest directors and officers that approved the financing arrangements in connection with the Combination; (c) claims for breach of fiduciary duty against the directors and officers of Legacy Sabine and certain of its subsidiaries (the "Legacy Sabine Subsidiaries") with respect to the

---

[2] Capitalized terms used and not otherwise defined in this section shall have the meaning(s) ascribed to such terms in the *Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Non-Exclusive Settlement Authority*, filed contemporaneously herewith.

Combination and the Debt Financing; (d) claims against the Debtors' current and former secured

lenders for aiding and abetting breaches of fiduciary duty of the various officers and directors of

Legacy Forest, Legacy Sabine, and the Legacy Sabine Subsidiaries; (e) claims against First

Reserve (as defined below) and certain of its related entities that ultimately owned and/or

managed various of the Debtors, for breach of their fiduciary duty to the Legacy Sabine

Subsidiaries; (f) equitable subordination of the claims of certain of the Debtors' current and

former secured lenders due to such parties' inequitable conduct in connection with or related to

the Combination; and (g) recharacterize as equity certain portions of the Second Lien Loan (as

defined below).

3.      The claims asserted herein represent significant potential recoveries for the

benefit of the Debtors' estates.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334.

5.      This adversary proceeding is a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2)(A), (C), (H) and (K).

6.      Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C.

§§ 1408 and 1409.

7.      Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure and Rule

7008-1 of the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for

the Southern District of New York, Plaintiff consents to entry of final orders and judgments by

the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties,

cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PARTIES

8.      On July 15, 2015 (the "Petition Date"), the Debtors filed voluntary petitions (the "Chapter 11 Cases") in this Court for bankruptcy protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9.      The Committee is the official committee of unsecured creditors appointed in these cases on July 28, 2015 pursuant to section 1102(a) of the Bankruptcy Code by the United States Trustee for the Southern District of New York.  The Committee is vested with, among other things, the powers described in section 1103 of the Bankruptcy Code, including the power to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors, and any other matter relevant to the case.

10.     The Committee brings this action on behalf of the estates of each of the Debtors, including, without limitation:  SOGC; Giant Gas Gathering LLC, an Oklahoma limited liability company; Sabine Bear Paw Basin LLC, a Delaware limited liability company; Sabine East Texas Basin LLC, a Delaware limited liability company; Sabine Mid-Continent Gathering LLC, a Delaware limited liability company; Sabine Mid-Continent LLC, a Delaware limited liability company; Sabine Oil & Gas Finance Corporation, a Delaware corporation; Sabine South Texas Gathering LLC, a Delaware limited liability company; Sabine South Texas LLC, a Delaware limited liability company; and Sabine Williston Basin LLC, a Delaware limited liability company.  The Committee has been authorized to prosecute the claims set forth herein on behalf of the foregoing estates pursuant to [the STN Order].

11.     At all relevant times there was and is at least one creditor who held and holds matured or unmatured unsecured claims against the various debtors that were and are allowable under section 502 of the Bankruptcy Code.  With respect to the estate of SOGC, such creditors include the indenture trustees for the Legacy Forest Unsecured Notes (as defined below).  With

4

respect to the estates of the Legacy Sabine Subsidiaries, such creditors include the indenture trustee for the Legacy Sabine Unsecured Notes (as defined below).

12.     Defendant Wells Fargo Bank, National Association ("Wells Fargo Bank" or the "New RBL Agent") is an entity that (i) is the administrative agent under that certain Second Amended and Restated Credit Agreement, dated as of December 16, 2014 (as amended, supplemented, or restated, the "New RBL Facility Agreement"), for a reserve-based lending facility (the "New RBL Facility"), by and among SOGC (f/k/a Forest Oil Corporation) as borrower, the New RBL Agent, and the lenders party thereto (the "New RBL Lenders," and together with the New RBL Agent, the "New RBL Parties"), and (ii) is a New RBL Lender and holds an interest in the loan made under the New RBL Facility Agreement.

13.     Defendant Wells Fargo Securities LLC ("Wells Fargo Securities") is an entity that served as a financial advisor to Legacy Sabine for the Combination and helped arranged the debt financing in connection with the Combination.

14.     Defendant WF Investment Holdings, LLC ("WFIH," and together with Wells Fargo Bank and Wells Fargo Securities, "Wells Fargo") is an entity that was a lender party under the Second Lien Loan Agreement (as defined below).

15.     Defendant Barclays Bank PLC ("Barclays Bank") is an entity that is a New RBL Lender and holds an interest in the loan made under the New RBL Facility Agreement.

16.     Defendant Barclays Capital Inc. ("Barclays Capital" and together with Barclays Bank, "Barclays") is an entity that served as a financial advisor to Legacy Sabine for the Combination and helped arranged the debt financing in connection with the Combination.

17.     Defendant Bank of America N.A. is an entity that (i) is a New RBL Lender and holds an interest in the loan made under the New RBL Facility Agreement, and (ii) was the

5

administrative agent on the Second Lien Loan (defined below) at the time of the Combination and Debt Financing.

18.     Defendant Capital One, N.A. is an entity that is a New RBL Lender and holds an interest in the loan made under the New RBL Facility Agreement.

19.     Defendant Citibank N.A. is an entity that is a New RBL Lender and holds an interest in the loan made under the New RBL Facility Agreement.

20.     Defendant Natixis, New York Branch is an entity that is a New RBL Lender and holds an interest in the loan made under the New RBL Facility Agreement.

21.     Defendant UBS AG, Stamford Branch (i) is an entity that is a New RBL Lender and holds an interest in the loan made under the New RBL Facility Agreement, and (ii) was a Legacy Sabine RBL Lender and held an interest in the loan made under the Legacy Sabine RBL Credit Agreement.

22.     Defendant Brian M. Malone is the first lien mortgage trustee with respect to the New RBL Facility Agreement.

23.     Defendant Wilmington Trust, N.A. (the "Second Lien Agent") is the administrative agent under that certain Second Lien Loan Agreement dated as of December 14, 2012 (as amended, supplemented, or restated, the "Second Lien Loan Agreement") for a loan ("Second Lien Loan"), by and among SOGC (f/k/a Sabine Oil & Gas LLC) as borrower, the Second Lien Agent (as successor to Bank of America, N.A.), and the lenders party thereto (including, without limitation, WFIH) (the "Second Lien Lenders").  Defendants John Doe Entities Nos. 1-100 are the current and former Second Lien Lenders at the times relevant to this Complaint, their successors, assigns, and participants (the Second Lien Lenders together with the Second Lien Agent, the "Second Lien Parties," and collectively with the New RBL Parties, the

6

"Secured Parties").  The true names, identities, and capacities of the Second Lien Lenders sued

herein as Defendants John Doe Entities Nos. 1-100 are unknown to the Committee (including

those which are unknown affiliates of entities otherwise known to the Committee).  As and when

the names, identities, and capacities of these fictitiously named Defendants become known, the

Committee will amend this Complaint to set forth these Defendants' true names, identities, and

capacities and otherwise proceed against them as if they had been named parties upon the

commencement of this adversary proceeding in accordance with Rules 15 and 25 of the Federal

Rules of Civil Procedure, made applicable to this proceeding by Rules 7015 and 7025 of the

Federal Rules of Bankruptcy Procedure.

24.    Defendant Alan Tapley is a second lien mortgage trustee with respect to certain

Second Lien Mortgages (as such terms are defined below).

25.    Defendant Kate K. Moseley is a second lien mortgage trustee with respect to

certain Second Lien Mortgages.

26.    Defendant First Reserve Corporation ("First Reserve") is an entity that was the

majority equity holder, through Sabine Investor Holdings LLC ("Sabine Investor Holdings"), FR

XI Onshore AIV, LLC ("AIV Holdings"), FR NFR PI, Inc., FR NFR Holdings, Inc., Sabine Oil

& Gas Holdings LLC ("Sabine Holdings"), and Sabine Oil & Gas Holdings II LLC ("SOGH II")

of Legacy Sabine and is an entity that holds a majority economic interest in SOGC.

27.    Defendant Sabine Investor Holdings is an entity that is controlled or managed by

First Reserve or its affiliates, held a majority economic interest in Legacy Sabine, and holds a

majority economic interest in SOGC.

28.    Defendant First Reserve Fund XI, L.P. ("First Reserve Fund XI") is an entity that

is controlled or managed by First Reserve or its affiliates, held a majority economic interest in

Legacy Sabine, and holds a majority economic interest in SOGC.

29.    Defendant First Reserve GP XI, L.P. ("First Reserve Fund GP XI") is an entity that is the general partner of First Reserve Fund XI, and therefore controlled a majority economic interest in Legacy Sabine, and controls a majority economic interest in SOGC.

30.    Defendant First Reserve GP XI, Inc. (together with First Reserve, First Reserve Fund XI, and First Reserve Fund GP XI, the "First Reserve Defendants") is an entity that is the general partner of First Reserve Fund GP XI, and therefore controlled a majority economic interest in Legacy Sabine, and controls a majority economic interest in SOGC.

31.    Defendant Don B. Pinzon is a second lien mortgage trustee with respect to certain Second Lien Mortgages.

32.    Defendant Loren Carroll is a former director of Legacy Forest.

33.    Defendant Richard J. Carty is a former director of Legacy Forest.

34.    Defendant Dod A. Fraser is a former director of Legacy Forest and a former director of SOGC.

35.    Defendant James H. Lee is a former director of Legacy Forest.

36.    Defendant James D. Lightner is a former director of Legacy Forest.

37.    Defendant Patrick McDonald is a former officer and director of Legacy Forest and a current director of SOGC.

38.    Defendant Raymond Wilcox is a former director of Legacy Forest.

39.    Defendant Victor Wind is a former officer of Legacy Forest (together with Defendants Carroll, Carty, Fraser, Lee, Lightner, McDonald, and Wilcox, the "Legacy Forest Directors and Officers").

40.    Defendant Michael France is a former director of Legacy Sabine and is a

8

Managing Director of First Reserve.

41.    Defendant Kevin Goodman is a former director of Legacy Sabine.

42.    Defendant Alex Krueger is a former director of Legacy Sabine, a Director of SOGC and the current Co-CEO & President of First Reserve.

43.    Defendant Duane Radtke is a former director of Legacy Sabine and a current director of SOGC.

44.    Defendant David Sambrooks is a former director and CEO of Legacy Sabine and a current director, CEO and President of SOGC.

45.    Defendant Brooks Shughart is a former director of Legacy Sabine, a current officer of SOGC and a current director of First Reserve.

46.    John Yearwood is a former director of Legacy Sabine and a current director of SOGC (together with Defendants France, Goodman, Krueger, Radtke, Sambrooks, Shughart, the "Legacy Sabine Directors and Officers").

47.    Defendant Joshua Weiner is an employee of First Reserve.

## FACTUAL BACKGROUND

48.    The Combination and Debt Financing arose out of discussions that began no later than December 2013 regarding a potential transaction between Legacy Sabine and Legacy Forest. The Committee has alleged the background of the companies and certain facts and circumstances in the Committee's Proposed Complaint For Constructive Fraudulent Conveyance And Related Relief (Doc. 518-1.  Those allegations are incorporated herein by reference.[3]

---

[3] Upon the Court's granting the Committee standing to pursue the claims set forth herein, and in the Committee's earlier *STN* motion (Doc. 518), the Committee would file a Consolidated Amended Complaint combining all jurisdictional and factual allegations, and all substantive counts, into a single pleading.

I.    **Financial Impact of the Revised Combination and Debt Financing for Legacy Sabine and Legacy Forest Creditors**

49.    The Combination resulted in dramatic increases in the obligations of both Legacy Forest (renamed SOGC) and each of the Legacy Sabine Subsidiaries.  Legacy Forest, which had $905 million in funded debt liabilities pre-Combination, emerged from the Combination with approximately $2.6 billion in funded debt liabilities.  The Legacy Sabine Subsidiaries, which had approximately $1.62 billion in funded debt liabilities pre-Combination, emerged from the Combination with no less than $2.6 billion in funded debt liabilities.  Both Legacy Forest and Legacy Sabine were insolvent at the time of the Combination.  Both companies were aware that the Combined Company would not be able to satisfy the substantial unsecured obligations jammed beneath over $1.6 billion dollars of first and second lien debt under the revised Combination structure.  The existing, post-Combination funded liabilities of the each of the Debtors are summarized below.

A.    *The New RBL Facility*

50.    On the Closing Date, SOGC entered into the Second Amended and Restated Credit Agreement (the "New RBL Facility Agreement"), with Wells Fargo, as administrative agent (the "New RBL Agent"), and the lenders party thereto (the "New RBL Lenders").

51.    In connection with the New RBL Facility Agreement, SOGC and each of the Legacy Sabine Subsidiaries entered into the Second Amended and Restated Guaranty and Pledge Agreement (the "RBL Guaranty and Pledge Agreement"), pursuant to which, among other things, the Legacy Sabine Subsidiaries unconditionally guaranteed the payment of the obligations of SOGC under the New RBL Facility Agreement.

52.    As of the Closing Date, there was approximately $750.3 million outstanding under the New RBL Facility, which was used to, among other things, repay the Legacy Sabine

RBL and the Legacy Forest RBL.

53.     As of the Petition Date, $929,628,373.00 was outstanding (including accrued but

unpaid interest) under the New RBL Facility, according to Schedule D filed by SOGC [Docket

No. 413].

### B.     *The Second Lien Loan Agreement*

54.     On December 14, 2012, Legacy Sabine entered into the Second Lien Loan

Agreement (the "Second Lien Loan Agreement") with Wilmington Trust, N.A., as administrative

agent (the "Second Lien Agent"), the lenders party thereto (the "Second Lien Lenders" and,

together with the Second Lien Agent, the New RBL Agent, and the New RBL Lenders, the

"Secured Parties").  The Second Lien Loan Agreement provided for a six-year term loan facility.

55.     Each of the Legacy Sabine Subsidiaries entered into the Second Lien Guaranty

and Pledge Agreement (the "Second Lien Guaranty and Pledge Agreement"), pursuant to which

the Legacy Sabine Subsidiaries unconditionally guaranteed the payment of the obligations of

Legacy Sabine under the Second Lien Loan Agreement.

56.     As of the Closing Date, an additional $50 million was advanced under the Second

Lien Loan Agreement, increasing the principal amount thereunder from $650 million to $700

million.  These funds were advanced by the same seven banks that were responsible for funding

the Bridge Loan and the New RBL Facility.

57.     As of the Petition Date, $730,193,302.00 was outstanding (including accrued but

unpaid interest) under the Second Lien Loan Agreement, according to Schedule D filed by

SOGC [Docket No. 413].

### C.     *Unsecured Debt*

58.     As part of the Combination, Legacy Forest became obligated on the $350 million

in principal amount of Legacy Sabine Unsecured Notes, thus increasing the principal amount of

its unsecured funded debt liabilities from $800 million to $1.15 billion. On the Closing Date,

each of the Legacy Sabine Subsidiaries issued upstream guarantees in respect of the $800 million

in principal amount Legacy Forest Unsecured Notes, thus increasing the principal amount of

each of the Legacy Sabine Subsidiaries unsecured funded debt liabilities from $350 million to

$1.15 billion.

### D. Collateral for the New RBL Facility Agreement and Second Lien Loan Agreement

59.      As set forth in more detail in **Exhibit C** to the First STN Motion (the "Proposed

CFC Complaint"), the Debtors' obligations under the New RBL Facility Agreement and the

Second Lien Loan Agreement are not secured by all of the Debtors' assets. Instead, as is

common in financings of oil-and-gas exploration-and-production companies such as the Debtors,

the New RBL Facility Agreement and Second Lien Loan Agreement provided that the Debtors

were required to provide collateral consisting of mortgages on mineral-rights leases (*i.e.*, leases

to drill for and produce oil and gas) that included at least 80% of the so-called "PV-9 value" of

the Debtors' "proved" oil and gas reserves. "Proved reserves" refer to reserves that can be

estimated with reasonable certainty to be economically producible, according to geoscientific

data. "PV-9" refers to the discounted net present value of such "proved reserves" (net of

estimated production costs), using a 9% discount rate, and is the common measurement for the

"borrowing base" in secured financings of oil-and-gas exploration-and-production companies.

60.      The Debtors' obligations were also secured under the RBL Guaranty and Pledge

Agreement and the Second Lien Guaranty and Pledge Agreement by a pledge of the capital stock

of the Legacy Sabine Subsidiaries.[4]

---

[4] The Debtors granted additional mortgages in favor of the secured parties pursuant to forbearance agreements in May 2015. Such grants are being challenged as preferences pursuant to the complaint filed by the Committee on November 17, 2015.

61.     *The New RBL Collateral*.  To secure the obligations under the New RBL Facility

Agreement, the Debtors executed two types of security agreements in favor the New RBL Agent:

(i) certain (but not all) of the Debtors executed mortgages on certain oil and gas leases in favor of

Brian M. Malone, as trustee (the "New RBL Mortgage Trustee"), for the benefit of the New RBL

Agent (collectively, the "New RBL Mortgages"); and (ii) each of the Debtors executed the RBL

Guaranty and Pledge Agreement.  Under the New RBL Mortgages, certain of the Debtors

granted to the New RBL Mortgage Trustee a lien and security interest on all "Deed of Trust

Property," including the "Hydrocarbon Property" (as such terms are defined in the New RBL

Mortgages) (the "New RBL Deed of Trust Property").  The Deed of Trust Property consists of

the Hydrocarbon Property, which is defined as the Debtors' interests in the oil and gas leases

and/or oil, gas and other mineral leases and other interests and estates and the lands and premises

covered or affected thereby, which are identified and described on an exhibit to the respective

New RBL Mortgages, the hydrocarbons produced from the Hydrocarbon Property, all proceeds

thereof, and various other property, rights, and interests relating to the Hydrocarbon Property, all

as more fully set forth in the New RBL Mortgages.  Under the RBL Guaranty and Pledge

Agreement, the Debtors granted to the New RBL Agent a security interest in the capital stock of

and membership interests in SOGC's direct and/or indirect subsidiaries identified on the

schedule thereto (the "New RBL Pledge Collateral").

62.     The New RBL Facility Agreement also contemplated the execution of a so-called

"intercompany note" that purported to evidence any intercompany indebtedness between and

among any of the Debtors.  A security interest in the intercompany note was not granted under

the terms of the New RBL Mortgages or the RBL Guaranty and Pledge Agreement.  Accordingly,

for a security interest in the intercompany note to have been granted to the New RBL Agent, the

note would need to have been physically delivered into the possession of the New RBL Agent with the intent to create a security agreement by possession. Upon information and belief, any intercompany note executed on the Closing Date was not delivered to, nor was otherwise in the possession of, the New RBL Agent prior to the 90 days preceding the Petition Date. Upon information and belief, upon discovering that it did not have the intercompany note in its possession shortly prior to the Petition Date, the New RBL Agent required the Debtors to execute an intercompany note in the form contemplated by the New RBL Facility Agreement, which the Debtors executed on or about May 4, 2015 (the "2015 Intercompany Note").

63.    As of the Petition Date, the New RBL Mortgages and the RBL Guaranty and Pledge Agreement were the only security agreements pursuant to which the Debtors granted security interests to the New RBL Agent to secure the obligations under the New RBL Facility Agreement. In addition, as of the Petition Date, the New RBL Deed of Trust Property, the New RBL Pledge Collateral, and the 2015 Intercompany Note (collectively, the "New RBL Collateral") was the only collateral in which the Debtors granted security interests to or for the benefit of the New RBL Parties.

64.    *The Second Lien Collateral*. To secure the obligations under the Second Lien Loan Agreement, the Debtors executed two types of security agreements in favor the Second Lien Agent, namely: (i) certain (but not all) of the Debtors executed mortgages and certain supplements thereto on certain oil and gas leases in favor of the trustee named therein (each, a "Second Lien Mortgage Trustee"), for the benefit of the Second Lien Agent (collectively, the "Second Lien Mortgages" and, together with the New RBL Mortgages, the "Mortgages"); and (ii) each of the Debtors executed the Second Lien Guaranty and Pledge Agreement. Under the Second Lien Mortgages, certain of the Debtors granted to the Second Lien Mortgage Trustee a

lien and security interest on all "Deed of Trust Property," including the "Hydrocarbon Property" (as such terms are defined in the Second Lien Mortgages) (the "Second Lien Deed of Trust Property"). Under the Second Lien Guaranty and Pledge Agreement, the Debtors granted to the Second Lien Agent a security interest in the capital stock of and membership interests in SOGC's direct and/or indirect subsidiaries identified on the schedule thereto (the "Second Lien Pledge Collateral").

65.    As of the Petition Date, the Second Lien Mortgages and the Second Lien Guaranty and Pledge Agreement were the only security agreements pursuant to which the Debtors granted security interests to the Second Lien Agent to secure the obligations under the Second Lien Loan Agreement. In addition, as of the Petition Date, the Second Lien Deed of Trust Property and the Second Lien Pledge Collateral (collectively, the "Second Lien Collateral" and, together with the New RBL Collateral, the "Prepetition Collateral") was the only collateral in which the Debtors granted security interests to or for the benefit of the Second Lien Parties.

**II.    Unsecured Creditors Bear the Costs of a Merger That Was Doomed to Fail**

   **A.    *The Pre-Combination Entities***

66.    Prior to the Combination, Legacy Forest was a New York Stock Exchange-listed corporation, with its headquarters in Denver, Colorado, and held substantially all of its assets in that public corporation. At the time of the Combination, Legacy Forest had approximately $905 million of funded debt, consisting of: (i) a reserve-based lending facility (the "Legacy Forest RBL Facility") with $105 million outstanding, secured by a first priority lien on, among other things, certain proved oil and gas reserves; and (ii) approximately $800 million in unsecured notes, consisting of: $578 million in 7.25% senior unsecured notes due 2019 (the "Legacy Forest 2019 Notes") and $222 million in 7.5% senior unsecured notes due 2020 (the "Legacy Forest 2020 Notes" and, together with the Legacy Forest 2019 Notes, the "Legacy Forest

Unsecured Notes"). Prior to the Combination, U.S. Bank National Association was the indenture trustee for both the Legacy Forest 2019 Notes and the Legacy Forest 2020 Notes. Wilmington Savings Fund Society, FSB is now the indenture trustee for the Legacy Forest 2019 Notes, and Delaware Trust is now the indenture trustee for the Legacy Forest 2020 Notes (together, the "Legacy Forest Notes Trustees").

67.     Prior to the Combination, Legacy Sabine was a Houston-based portfolio company of the private equity firm First Reserve Corporation ("First Reserve"). Legacy Sabine had a holding company structure in which the "parent" Delaware limited liability company did not hold the primary assets of the Legacy Sabine enterprise. Instead, a number of subsidiaries (the "Legacy Sabine Subsidiaries" and together with Legacy Sabine, the "Legacy Sabine Entities") held the bulk of the enterprise's assets. Legacy Sabine also had extensive debt obligations at the time of the Combination, including: (i) a revolving credit agreement, which had approximately $620 million outstanding (the "Legacy Sabine RBL Facility") at the time of the Combination; (ii) $650 million outstanding under a second lien loan (the "Legacy Sabine Second Lien Loan") (increased to $700 million at the time of the Combination); and (iii) $350 million outstanding in 9.75% senior unsecured notes due 2017 (the "Legacy Sabine Unsecured Notes" and the trustee in respect of such notes, The Bank of New York Mellon Trust Company, N.A., the "Legacy Sabine Notes Trustee"). Because the operating assets of the Legacy Sabine enterprise were held by the Legacy Sabine Subsidiaries, each of those subsidiaries guaranteed each of the Legacy Sabine RBL Facility, the Legacy Sabine Second Lien Loan, and the Legacy Sabine Unsecured Notes. A chart depicting Legacy Sabine's and Legacy Forest's pre-Combination capital structure is attached as Exhibit A to the Proposed CFC Complaint.

68.     From February through May 2014, the period during which Legacy Sabine and Legacy Forest were in ongoing discussions regarding a potential merger, Legacy Forest was already in financial distress.  As early as December 2013, Legacy Forest's financial condition had deteriorated to the point that it was looking for a "way out" and had apparently started scouring the market for any "company with liquid assets."   First Reserve and Legacy Sabine were well aware of Forest's declining financial situation in December 2013.

69.     Legacy Sabine, controlled by First Reserve, was the larger, more valuable of the two companies.  Thus, the merger structure subsequently agreed by the parties contemplated that the equity ratio in the merger would reflect 73.5% Legacy Sabine value and 26.5% Legacy Forest value.

70.     After discovering that Legacy Sabine had "been looking for a 'go public' merger," Legacy Forest CEO Patrick McDonald approached Legacy Sabine board member John Yearwood and the two agreed to meet to discuss a potential merger between the two companies. After meeting with McDonald, Yearwood relayed the substance of the conversation to Legacy Sabine CEO David Sambrooks, who subsequently told members of Legacy Sabine board that Legacy Forest was "in urgent need for a way out and [had] offered up a 'no barriers' path for SABO to reverse merge with them."   From the earliest stages of the negotiations, Sambrooks was well aware of the risks associated with Legacy Forest:  "debt level, poor [Eagle Ford] well economics, significant CAPEX overspend in 2014, limited growth potential past 2014, significant risk of multiple contraction."

71.     In the same vein, on January 10, 2014, Duane Radtke (another Legacy Sabine director) wrote to Sambrooks and others on the Legacy Sabine board, commenting that he viewed the departure of Legacy Forest's president, Cyrus D. Marter, as evidence of an

17

"additional slow deterioration of the entire company."  On January 15, 2014, Radtke took the

view at this time that Legacy Forest was "in a slow death spiral" and would be "dead in the water"

if it did not do something soon.

72.    During these early negotiations, the potential debt level of a combined Legacy

Forest and Legacy Sabine was already high on each company's radar.  On January 14, 2014,

McDonald made clear to Sambrooks that if Legacy Forest and Legacy Sabine were to merge, the

"combined debt would be viewed as an issue."  McDonald told Legacy Forest's financial advisor,

JPMorgan Securities LLC ("JPMorgan"), that Legacy Sabine "had too much debt" for purposes

of considering a merger, but asked JPMorgan to run models analyzing a potential combination of

the companies anyway.  McDonald similarly informed Jim Lightner, a Legacy Forest board

member, that Legacy Sabine "had too much debt" to be ideal for a merger.

73.    On February 16, 2014, Dod Fraser, a member of Legacy Forest's board, argued

that increasing leverage for Legacy Forest's shareholders was an unacceptable prospect:

> A key issue that is not addressed [in the plans for the Combination]
> is leverage.  For us to trade our shareholders from one leveraged
> equity position to another even more leveraged position will not
> work . . . unless we are comfortable with the prospects to handle
> the leverage and fund the necessary capital expenditure.  Seems to
> me that before committing we need a clear view on this which will
> require[] pro formas for a few year[s] that show the necessary
> growth in EBITDA to match the debt, perhaps aided by
> divestitures and equity issuance.

By April, the prospect of continuing with the merger had become increasingly dubious.  On

April 19, 2014, Brooks Shughart, a member of the Legacy Sabine board and a director at First

Reserve, wrote to Josh Weiner at First Reserve that it was "looking like the Forest deal [was] on

life support," and that he thought it necessary to "put lawyers on ice for next day or so until

[Legacy Sabine could] figure it out to potentially save a couple of dollars."  Shughart lamented

18

that it was "[r]eally just hard to get comfortable on the combined company being a better option

than stand-alone [Sabine], much less the incremental leverage and execution risk."

74.     In late April 2014, Legacy Sabine board chairman Radtke did not "understand the

logic of putting $900 million of [Legacy Sabine's] assets into a company that [Legacy Sabine

didn't] think [could] perform operationally and [had] lost most of [its] senior management."  He

noted: "If I were Pat [McDonald] I would not appreciate the 'bait and switch' approach.  They

want an exit.  Now my head hurts."

75.     Legacy Forest, meanwhile, was managing its own capital structure issues.  As

described in the Proposed CFC Complaint, McDonald had been strategizing in April 2014 about

ways to obtain covenant waivers and secure an audit opinion that could get Legacy Forest

through the end of the year.  Legacy Forest's stock price had recently dropped by 38%.

### B.     *Legacy Forest and Legacy Sabine Enter into Merger Agreement*

76.     Nevertheless, on May 5, 2014, Legacy Forest entered into an Agreement and Plan

of Merger with Legacy Sabine and certain related entities (the "Original Combination Agreement"

and, the combination contemplated by such agreement, the "Original Combination").  Because

the corporate steps of the Original Combination included a "downstream" merger of Legacy

Forest into a subsidiary, the New York Business Corporation Law required approval of such

merger by two-thirds of the outstanding Legacy Forest shareholders entitled to vote.  The outside

date for closing was set at November 1, 2014.

77.     The next day, Legacy Forest and Legacy Sabine announced that the Original

Combination would trigger change-of-control provisions contained in the indentures governing

the Legacy Forest Unsecured Notes, and that upon closing, the post-merger company (the

"Combined Company" or "SOGC") would therefore make an offer to holders of the Legacy

Forest Unsecured Notes to redeem their notes at 101% of their outstanding principal amount, plus accrued interest.

### 1.    The May 2014 Combination Financing Commitment Prior to Oil Market Decline

78.    Also on May 5, 2014, Legacy Sabine obtained a commitment (the "Commitment" or "Commitment Letter") from Barclays and Wells Fargo, with Barclays and Wells Fargo each funding 50% of the revolving credit facility and the Bridge Loan provided for in the Commitment Letter.  Specifically, the Commitment Letter set forth a reserve-based lending facility (the "New RBL Facility") with an initial borrowing base of $1.0 billion, the proceeds of which would be used, in part, to refinance the Legacy Sabine RBL Facility and the Legacy Forest RBL Facility.

79.    Shortly before the May 6 signing of the deal, on April 26, 2014, Wells Fargo had determined that the maximum conforming borrowing base for SOGC would be $1.056 billion, based on Wells Fargo's own engineering analysis.  The outside date for these commitments was the same as the November 1, 2014 end date of the Original Combination Agreement.  Wells Fargo recognized that the terms of its financing for the Commitment Letter entailed a "long tail risk," meaning that the commitment would be left open for a long period.  The Commitment Letter mitigated that risk somewhat by providing that the borrowing base for the New RBL Facility would be subject to redetermination 30 days after the closing if the financing closed after September 30, 2014.

80.    The Commitment Letter also called for an unsecured bridge facility (the "Bridge Loan") in the aggregate principal amount of up to $850 million, to be used to redeem the Legacy Forest Unsecured Notes that would be subject to a change of control offer.  Under the terms of the Commitment, the Bridge Loan matured one year after it was issued.  However, the Bridge

Loan automatically converted upon maturity into a senior unsecured term loan with an eight-year

maturity of 2022.  Accordingly, the Bridge Loan as committed was actually an eight-year term

loan if it could not be refinanced through the bond market.

81.    On July 9, 2014, and in response to certain investor strategies to take "short"

positions in Legacy Forest debt and at the same time block the merger, Legacy Forest, Legacy

Sabine and related entities entered into an Amended and Restated Agreement and Plan of Merger

(the "July Combination Agreement").  Under the July Combination Agreement, Legacy Sabine

would become a subsidiary of Legacy Forest and then would merge into Legacy Forest through a

series of steps, as described in the Proposed CFC Complaint and depicted in Exhibit C thereto.

Legacy Forest and Legacy Sabine acknowledged that this structure still would have triggered the

change-of-control provisions in the indentures governing the Legacy Forest Unsecured Notes.

Thus, the Combined Company would still have to make a 101% tender offer to holders of the

Legacy Forest Unsecured Notes.  In connection with the modified July Combination Agreement,

on July 9, 2014, Wells Fargo, Barclays and the Additional Commitment Parties entered into an

Amended and Restated Commitment Letter (the "July Commitment Letter") with financing

terms substantially similar to the Commitment Letter provided by Wells Fargo and Barclays, but

extending the commitment to December 31, 2014.

82.    Even with oil prices at $100 per barrel, the financing commitment caused

Sambrooks to admit to investors that the Combined Company "is going to be fairly highly

levered coming out of the box."  Yet at the outset, Barclays never expected to fund the Bridge

Loan.  They "expect[ed] the Company to launch a consent process to get the bondholders to

amend the indenture to waive the Change of Control."  In fact, Barclays's commitment to fund

the Bridge Loan was motivated by its ongoing business relationship with First Reserve.  Barclays

viewed its relationship with First Reserve as "a Platinum relationship," and believed that its "role

in [the] transaction" would "position[] Barclays well for current M&A assignments and future

engagements with First Reserve as well as [Sabine]."

83.    Similarly, Wells Fargo did not want to have exposure on the Bridge Loan.  Wells

Fargo's "target hold" for the Bridge Loan was *$0*, and its target hold for the New RBL Facility

was $150 million of the $250 million it had committed to fund.  If the Bridge Loan had been

funded according to the terms of the July Commitment Letter, Wells Fargo would have held 25%

of the $850 million Bridge Loan, or $212.5 million of a Bridge Loan on which it intended to

have zero exposure.  Similarly, Barclays had an approved hold of only $150 million for its $250

million New RBL exposure, and had a $0 approved hold amount for its $212.5 million Bridge

Loan exposure.  The banks contemplated that high yield securities would be issued by the newly

Combined Company at or following closing, to obviate or take out the Bridge Loan.  Thus the

banks took the risk that they would remain lenders on the Bridge Loan, but thought that the risk

would not come to fruition. As described herein, when the bond market turned, the banks were

determined to figure out how to modify or to get out of their Bridge Loan commitments

altogether.

### 2.    *The Additional Commitment Parties*

84.    On May 19, 2014, Capital One Securities, Inc., Capital One, National Association,

Citigroup Global Markets Inc., Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith

Incorporated, Natixis, New York Branch, UBS Securities LLC, UBS AG, Stamford Branch

(collectively, the "Additional Commitment Parties"), Legacy Sabine, Barclays, Wells Fargo, WF

Investment Holdings, LLC and Wells Fargo Securities LLC entered into a Joinder Agreement to

the Commitment Letter  (the "Commitment Joinder").  Pursuant to the Commitment Joinder,

Wells Fargo and Barclays reduced their respective initial 50% commitments, to funding 25% of

each of the New RBL Facility and the Bridge Loan; each Additional Commitment Party

committed to funding 10% of each of such loans.

### C.    *Projections Are Missed by Mid-Summer 2014, Creating a Likely Covenant Breach After Closing*

85.    By June 12, 2014, Legacy Sabine's financial projections showed that the

Combined Company would be in trouble.  On June 12, Ashraf Elias, the Director of Treasury for

Legacy Sabine (who now holds the same role at SOGC), sent Shane Bayless, Legacy Sabine's

CFO, projections showing that the Combined Company would have 0% production growth and

have a debt-to-EBITDA ratio of 4.97x, just 0.03x shy of its 5.0x cap under the Commitment

Letter.  Bayless forwarded these projections to Sambrooks saying, "[w]e need to discuss . . .  this

is ugly," and noting that "[he] did not want to distribute this version" of the projections to the

banks.  Sambrooks replied that he agreed and could not "see putting this forecast out."

86.    Later in June, Elias ran similar projections, this time including a projected sale of

Legacy Forest's assets in the Arkoma basin (the "Arkoma Assets") for $170 million.  This time,

the Combined Company projections —assuming $80 oil, $4 gas and using 6 drilling rigs—

showed a *negative production growth* of -5%, and a net debt-to-EBITDA ratio of 4.92x.  In

addition, the scenario resulted in a cash flow shortfall for the company in 2015 of $120 million.

To reduce the debt-to-EBITDA ratio, the company would have to increase capex, thus increasing

the cash shortfall.  It was clear to Legacy Sabine even in June 2014 that it was "going to start [its]

public company life from [its] own 1 yard line."

87.    In July 2014, Legacy Forest was continuing to miss its forecasts by a substantial

margin.  After Legacy Forest provided Legacy Sabine with new projections that had been revised

downward, Bayless commented that Legacy Forest's "[w]alk of shame continue[d]," and Cheryl

Levesque noted that the "repeated forecast misses" indicated "serious flaws in [Legacy Forest's]

forecasting process." Sambrooks affirmed that Legacy Forest's forecasts were "nonsensical" to him, and advised the team at Legacy Sabine that they should "engage on this [in] real time" to get a "real evaluation of the forecast."

88.    Legacy Forest continued its downward spiral into August 2014, and, according to Radtke (of Legacy Sabine), the merger started to look like "a much bigger battle." Sambrooks noted that Legacy Forest's "quarterly miss, reduced guidance and [inability] to file [its] financials" were, taken together, "a bad group of news to come out with." By August 11, 2014, Sambrooks's estimation of Legacy Forest's performance was so low that he thought Legacy Forest CFO Victor Wind "look[ed] like damaged goods. . . ."

89.    Legacy Forest's forecasts at this time showed a debt-to-EBTIDA ratio of 6.05x for the first quarter of 2015; this projected ratio would only increase over the rest of 2014. Around this time, Legacy Sabine and First Reserve learned that Legacy Forest was going to miss its projections for 2014 EBITDA by 20–25%. Legacy Sabine was also going to miss its projections, although by a smaller margin of 3% to 6%. Shane Bayless reported to Josh Weiner at First Reserve that Legacy Sabine was projecting that the Combined Company would be in breach of its 5.0x debt-to-EBITDA ratio covenant by year-end 2014.

90.    On August 28, 2014, Legacy Sabine and Legacy Forest were continuing to work on a "joint forecast" for the banks. Legacy Sabine's financial model projected for the Combined Company a debt-to-EBITDA ratio of 5.11x for 4Q14 (when the ratio covenant would be 5.0x), 4.71x for 3Q15 (when the ratio covenant would be 4.75x), and 4.51x for 1Q16 (when the ratio covenant would be 4.5x). Sambrooks could not find a model that projected a ratio level of less than 5.0x for 4Q14. Sambrooks told First Reserve that although the Legacy Sabine projections were "quite conservative," he did not "have a high degree of confidence" in Legacy Forest's

forecast for the remainder of 2014.  Josh Weiner at First Reserve asked whether the

underperformance on the pro forma was a result of Legacy Forest's or Legacy Sabine's

projections.  Sambrooks responded, "we are under but probably not wildly off. . . . [Forest] is the

bloodbath."

91.    Weiner agreed that Legacy Forest had "zero credibility" for future projections,

correctly noting that "[w]e really don't want to have to ask the banks for covenant relief right

now. . . they will use it as an opportunity to totally recut the economics on the debt commitment."

The evidence makes clear that at this time First Reserve was firmly in control of the negotiations

concerning the lending facilities.

92.    The leadership of the combined entity, which was always subject to First

Reserve's control, was also in flux at this time.  On or before August 4, 2014, Sambrooks told

Bayless that he would not continue as CFO after the Combination.  According to Sambrooks,

Bayless criticized senior Legacy Sabine employees, expressed dislike of the Forest deal, and

exhibited a lack of engagement in the organizational structure.  During the search for a new CFO,

Legacy Sabine made an offer to Cedric Burgher, the CFO of Quantum Energy Partners.

However, when Sambrooks shared with him financial projections that showed a breach of the

New RBL Facility shortly after closing, he declined to take the job.  SOGC eventually hired

Michael Magilton, a former First Reserve associate, as CFO.

93.    Notwithstanding the reluctance and concern over the Bridge Loan commitment,

First Reserve and Legacy Sabine management agreed that they should seek covenant relief

upfront on the New RBL Facility.  At this time, in August 2014, oil prices were generally

between $95 and $98 per barrel.

D.    **_The Banks, First Reserve and Legacy Sabine Negotiate Alternate Financing_**
**_Amid Declining Oil Prices  (September 12 – November 26)_**

94.    On September 12, 2014, Legacy Sabine provided Legacy Forest with financial

models projecting a breach of the debt-to-EBITDA covenant of the post-Combination Company

in the first quarter of 2015.  Legacy Sabine informed Legacy Forest that it intended to ask the

New RBL Lenders to modify the covenant for the contemplated New RBL Facility.

95.    On September 12, 2014, Sambrooks provided updated forecasts to the banks.

Sambrooks notified the banks that the "current forecast will have the combined company in

breach of our debt/EBITDA covenants on our revolver," and that there was a "need to modify

the covenants on our revolver . . . ."  The following day, Sambrooks provided the banks with a

comparison of the then-current forecast to the model used in April 2014 on the original

commitment.  The model created in April 2014 assumed oil prices of $90 and gas prices of $4.

The model included in the September 12 communication to the banks assumed gas prices at

$3.95 and oil prices at $91.98 for 2015.

96.    Neither First Reserve nor Legacy Sabine asked for the terms of the Bridge Loan

to be altered in September 2014.  The only item for which Sambrooks sought relief was the New

RBL Facility debt-to-EBITDA covenant.  After Sambrooks asked for covenant relief on

September 15, Barclays informed First Reserve and Legacy Sabine "what it would take in the

form of a revised RBL and bridge to get them the covenant relief and liquidity they wanted going

forward."  Internally, the banks' position almost immediately was that the company had no

choice but to modify the Bridge Loan commitment:  "the company cannot proceed without

amendments/waivers [on the RBL] so they have to negotiate [the Bridge Loan terms]."  On

September 25, Weiner told Sambrooks that he had not heard anything from the Bridge Lenders,

when they had previously been calling him every other day for weeks.  On October 6, Barclays

26

internally sought authority to offer First Reserve and Legacy Sabine additional "headroom" on the New RBL Facility leverage covenant, and noted that it would also "seek to amend the terms of the bridge." Wells Fargo internally sought to modify the New RBL Facility covenant as of October 8. Wells Fargo admitted that the banks re-traded on the Bridge Loan commitment on the theory that "there was a higher risk to the lenders" with funding the bridge than they had originally anticipated. It did not matter to the banks that the lenders had "assume[d] the risk that the borrowers' financial condition will worsen." They saw a chance to re-negotiate their obligations. At this time, in its October 6, 2014 merger proxy filing, Legacy Forest noted that the Combined Company risked breaching its covenants on the New RBL Facility in the first quarter of 2015, and that "[f]ailure to take appropriate mitigating actions . . . may have severely negative effects on [the company's] financing condition including, potentially, bankruptcy."

97.    Legacy Sabine's projections for the Combined Company continued to deteriorate in early October. On October 11, 2014, Elias provided Sambrooks and others with an updated model that projected a cash flow shortfall of $346 million, a required borrowing base on the New RBL Facility of over $1.4 billion, and total capex of over $570 million. The projections were based on oil prices of $97/bbl in the third quarter of 2014, $100/bbl in the fourth quarter, and approximately $89/bbl in the first and second quarters of 2015.

98.    The individual companies were faring badly as well. In the third quarter of 2014, Legacy Sabine's reported EBITDA was 18% below projections and oil sales were 21% below projections. Legacy Sabine's financial models indicated that, as a standalone enterprise, it would default on a key financial covenant under the Legacy Sabine RBL Facility in early 2015. Legacy Forest was projecting a breach of the debt-to-EBITDA covenant in its own existing RBL by the end of 2014 which, absent covenant relief, would require an amendment to the company's 10-K

to disclose a going concern qualification.  Rather than seek an amendment, however, Legacy

Forest's board decided to rely on closing the Combination as a cure for the prospective default,

and chose to accept a going concern qualification by its auditors.

99.    On October 27, 2014, Weiner stated that he "got a preview from Barclays on what

they think the pro forma cap structure looks like and what their likely ask is going to be and it's

not pretty.  Their view is at this leverage level 'there is equity risk' through the level of their

commitment and that the business really needs 'hundreds of millions of dollars of equity' that

isn't an option . . . ."  Upon information and belief, additional equity was not an option because (i)

sufficient funds were no longer available in the applicable First Reserve fund, (ii) the applicable

First Reserve fund already had too high of a concentration in the Legacy Sabine investment,

and/or (iii) the relevant First Reserve principals saw such an incremental investment as not

prudent.

100.    The banks asked to meet with Sambrooks on October 29 to discuss the projections.

Upon learning of this request for a meeting, Weiner stated,

> "They [Barclays] need to be including FR [First Reserve] in any
> cap structure / financing related  discussions . . .  I assume they
> will but if not it will be an unpleasant conversation.  The fact he's
> emailing  you  but  nobody  has  responded  to  the  email  I  sent  the
> broader group is not filling me with confidence[.]"

On November 3, Sambrooks asked Weiner if he had heard from the banks.  Weiner responded

that the ball was in Barclay's and Wells Fargo's court.  He explained, "[t]hey have our ask on

covenants/liquidity (and were okay with covenants but not in love with $1.25Bn of guaranteed

liquidity and were mulling that) but are also working through some technical intercreditor issues

that might mean the new 2nd lien they want to issue is actually 3rd lien – which will cause them to

revisit pricing/doability."

28

101.    Entering into November 2014, First Reserve and Legacy Sabine were aware that the new Combined Company would face liquidity issues that could prevent it from paying its debts as they became due.  For example, when determining whether to seek the $50 million necessary for Combination transaction costs from the more expensive Bridge Loan financing versus from the cheaper New RBL Facility, Sambrooks advocated using the bridge as the funding source.  Sambrooks said it "seems like with liquidity being critical we would go with 850 in bonds/bridge[,]" and that using the Bridge Loan to finance those costs "should help on liquidity which could be a big question."

### 1.    The Banks' Early November Proposal

102.    In response to the request for covenant relief, the banks largely went radio silent for nearly two months, making no counterproposal.  First Reserve remained desperate for a deal.  By November 5, Weiner remarked that "[n]ot getting to a deal [would be] almost ***mutually assured destruction***" for both First Reserve and the banks.

103.    Since requesting covenant relief, the pro forma Combined Company's financial condition had worsened.  For example, Legacy Forest had acknowledged in public filings that it had become insolvent on a balance-sheet basis as of September 30, 2014.  As described in the Proposed CFC Complaint, in mid-November, Legacy Forest committed to sell substantially all of its assets in the Arkoma basin to Camterra Resources Partners, Ltd. for $185.1 million (the "Arkoma Sale").  Additionally, oil prices continued to decline, resulting in corresponding declines in EBITDA at both legacy entities.

104.    On November 7, 2014—nearly two months after the request for covenant relief— Barclays and Wells Fargo proposed to First Reserve that they would address liquidity needs by an increase of the New RBL Facility initial borrowing base to $1.1 billion, with the potential for a $150 million committed increase in the borrowing base at future redetermination dates if such

increases were supported by the Combined Company's reserves.  The banks further proposed changing the debt-to-EBITDA covenant in the New RBL Facility from a formula based on total leverage (i.e., based on all funded debt) to a "First Lien Secured Leverage" ratio covenant that would measure debt-to-EBITDA only against the New RBL Facility.  The change of the leverage covenant from a 5.0x ratio based on total debt, to a 2.5x ratio based on only first lien debt, was a remarkable change of the leverage covenant.  Instead of the old covenant formula projecting a breach immediately after closing, the proposed revised "first lien only" covenant would not be breached under any of Legacy Sabine's multiple rounds of projections (even projections produced shortly prior to closing).

105.    This easy-to-meet covenant that counted only some of the company's leverage, of course, came at a steep cost.  The banks proposed that the Bridge Loan be changed from unsecured debt with the total interest rate capped at 9.75%, to a third-lien loan with the total interest rate capped at 15.5% — *a 5.75% increase*.

## 2.    *November Negotiations Over a Secured Bridge Facility Falter*

106.    First Reserve responded to the banks' proposal on November 10, 2014, when Weiner (an employee of First Reserve, and not an officer or director of Legacy Sabine) advised the banks that "we want to give you guys the economics you're asking for," but noted that the Combined Company would need additional liquidity under the proposed structure in large part due to the additional interest expense of the proposed third-lien Bridge Loan with an interest rate of greater than 15%.  Specifically, First Reserve requested an additional $50 million in the initial borrowing base.

107.    Additionally, to partially address the liquidity issues, Weiner informed the banks that "an impending asset sale [the Arkoma Sale] could bring in ~$175MM of proceeds that we could use to reduce the $850MM before we even start to try to place it (and given the dynamics

with that last $350MM that has a big impact . . .)."  Importantly, an asset sale of that size would

typically result in a redetermination of the borrowing base to reflect the reduced reserve values.

Sambrooks had performed rough calculations on the impact of the asset sale, and estimated that

the borrowing base would be reduced significantly.  As explained in further detail below, the

impact of the Arkoma Sale on the borrowing base was a critical liquidity issue, providing for

short-term cash needs, but as Sambrooks noted, under typical financing arrangements the sale

would have promptly *reduced* the borrowing base.  Here, instead, the banks ultimately permitted

the Arkoma Sale to close the day before the Combination, and as a result the Combined

Company had access to the sale proceeds with no corresponding reduction to the initial

borrowing base.

108.    Three weeks of negotiations ensued among the banks, First Reserve, and Legacy

Sabine.  Legacy Forest, however, was not involved in any of the negotiations with the

banks.  Throughout these negotiations, the liquidity concerns for the Combined Company only

became more acute.  Sambrooks opined to First Reserve and others at Legacy Sabine that he

feared they were "threading the needle on near term liquidity," noting:

> Is it just me, or is anyone else getting a little pissed that the bank's
> take is going up as their risk is going down (getting out of current
> bridge, assuming limited finance risk under new caps, lowering
> bridge amount) . . . . Why are we okay with more fees for less
> bridge, increased bb fees and terrible advisory service?

Internal Barclays communications confirmed Sambrooks's assessment:

> [T]he [Barclays] deal team [has] focused entirely on getting the
> Firm and the associated underwriting and capital structure to a
> better spot (within the confines of the M&A) and have managed to
> get ourselves *to a point where we can re-cut the deal* (versus
> staying in our current deal with a huge MTM [mark-to-market loss]
> position).

At this crucial point in late November, key personnel at Barclays instructed others to "talk live"

rather than email on the Combination financing concerns, and that "telephone is preferable to email to the extent that is possible." It would, however, take several additional weeks until the deal could be re-cut to avoid the banks' losses on the Bridge Loan.

109.    By late November, the negotiations faltered. The negotiations had included discussions of upsizing the Second Lien Loan (which, upon information and belief, was later determined to be prohibited by the applicable intercreditor agreement). The banks had sought to reduce the then-proposed secured Bridge Loan from $850 million to $780 million, notwithstanding the resulting liquidity crises that would ensue. The banks also required that 100% of the proceeds of the Arkoma Sale be used to pay down the New RBL Facility, which exacerbated the liquidity crunch and, as First Reserve acknowledged, would lead the Combined Company "into a wall next year."

110.    In an internal November 25, 2015 email, Shughart admitted, "maybe I didn't notice this in previous drafts, but reducing the bridge by 100% of Arkoma proceeds kills our liquidity." This was undoubtedly uncomfortable for Weiner, who had been negotiating during most of November a deal based on just such a use of asset sale proceeds. Weiner responded that he had spoken to Sambrooks and that they "thought the tradeoff in terms of flexibility to repay revolver with asset sale proceeds . . . was better than locking in more expensive non-call debt . . . ." Shughart demand a change in course: "I think he's wrong. They haven't hit their projections yet this year and I don't think we should be locked into ultra-tight liquidity. ***The right answer may be using 100% but given we are losing $100mm of borrowing base we may run into a wall next year and flexibility is very important***."

111.    By the end of November, Barclays informed First Reserve that a consensual deal was not possible. Josh Weiner of First Reserve reported to Sambrooks that he "[g]ot a very

frustrated call from Barclays . . . basically they said going back to $850MM in a consensual deal

is not possible at this point – so $780MM [on the Bridge Loan] at old caps is probably where this

goes . . . So would look at liquidity profile under that construct."

112.    Internal discussions at First Reserve turned back to the committed financing.  In

the early morning hours of November 26, an analyst was asked to run a model based on a

$850MM bridge at 9.75% caps (the as-committed Bridge Loan).  He sent the model to his team

at First Reserve with the caveat that the model assumed that the Combined Company would

receive borrowing base increases based on 50% of capital expenditures spent over the prior two

quarters.  Shughart responded just after 4 a.m. that, "[*t]his case actually doesn't look horrible if

you thought the banks wouldn't kill you on the [New RBL Facility borrowing base] because

you stuffed them on the bridge*."  Weiner responded, "*[a]nd that is what we tell them to keep

them from killing us now.*"

113.    The banks, too, were focused on the as-committed Bridge Loan.  On the morning

of November 27, the Financial Times published an article specifically calling out that Wells

Fargo and Barclays were "facing potentially heavy losses" on the Bridge Loan.  The article noted

that "[i]nvestors, however, balked at buying the loan when it was first offered in June and

slumping oil prices combined with volatile credit markets in the months since have scuppered

further attempts to sell, or syndicate, the loan according to market participants."  Matthew de

Mendonca of Barclays (the Barclays team lead on the financing) forwarded the article to his

team on November 26, but instructed them that the forwarded email was "[n]ot for further

comment."

        E.    ***A Deal for Alternative Merger Financing Appears Impossible***

114.    On November 26, Legacy Sabine had provided three five-year models to the

banks.  These models were run at the current strip pricing as of that date, which reflected a $9

33

decrease in oil prices since the last model sent to the banks, which used October 13 strip prices.

Legacy Sabine noted that:

> [T]he liquidity displayed in [these] model[s] is highly dependent
> on our borrowing base assumptions. The assumption we have used
> . . . is that our [borrowing base] increase is 50% of our capex spend
> since the last redetermination. *If this assumption is not accurate,
> or if there is to be an expected step down in [borrowing base] from
> a change in price deck, of course our liquidity estimates are
> optimistic.*

The price deck, of course, continued to decline. Between November 25, 2014 and December 1,

2014, oil prices fell approximately 7%.

115. On Friday, November 28, Sambrooks reached out to McDonald and advised that

it would not be possible to refinance the debt associated with the Legacy Forest Unsecured Notes

through the unsecured bond market given the market conditions and the Combined Company's

projected leverage level. Sambrooks asserted that a deal whereby the Bridge Loan was reduced

to $780 million and the $1 billion borrowing base was reduced by $100 million to account for

the sale of Arkoma would leave the Combined Company with insufficient liquidity. Sambrooks

reported that "no one is very happy" and the "Sabine/First Reserve and Barclays/Wells

relationship is approaching contentious." On November 30, 2014, First Reserve/Legacy Sabine

responded to the banks that the Combined Company would need the full amount of the $850

million Bridge Loan that had been originally committed.

116. Between November 30 and early December, First Reserve/Legacy Sabine and the

banks continued to discuss potential amendments to the terms of the New RBL Facility and

Bridge Loan. The discussions focused on providing some relief on the New RBL Facility in

exchange for altering the banks' Bridge Loan commitment by, among other things, increasing

the interest rate, decreasing the dollar amount of the Commitment, and converting the loan from

unsecured to secured debt. At no time, however, were the banks released from their original

34

Commitment to finance the Combined Company.  The banks were required to fund the

Commitment as contractually agreed to on July 9, 2014, including the $1 billion New RBL

Facility and the Bridge Loan.

117.    By this time, the banks started to quantify their imminent losses on the Bridge

Loan.  Barclays stated in an internal email on November 27:  "We are in the process of trying to

renegotiate bridge terms.  As a reminder, we have committed $212mm of an unsecured bridge.

At the current, in-negotiated terms, *we estimate that the bridge might be marked at 75*, before

3.5 points of fees.  I am reasonably confident that we will get at least some relief to bring this

closer to par."  Three days later, on November 30, de Mendonca reiterated that while the Bridge

Loan would not need to be funded until 30 to 90 days after the Combination closing, the "deal

team" at Barclays had already predicted that, as of the Closing Date, the Bridge Loan

commitment pricing "implies a potential mark of ~75 cents on the dollar which equates to a

potential loss of $53mm; applying the ~15mm of total transaction fees = potential loss of $38mm

(calculated off the terms of the existing underwrite)."   At a mark of 75 cents, the aggregate loss

to the underwriting banks from funding the Bridge Loan would have been over $212 million.

118.    On a December 4, 2014 call, the banks asked how the Combined Company would

function in a scenario where there was no increase in their borrowing base in 2015.  Relying on

the models he had run for such a scenario, Elias opined that Legacy Sabine's only solution was a

"wait and see" approach: to "stay on target" for the first quarter of 2015, see if oil prices came

back up, and adjust their capital spending downward as required.  Legacy Sabine's own models

as of December 4, 2014 showed, however, that the Combined Company would breach the debt-

to-EBITDA ratio covenant in the second quarter of 2015.  Because of this, Legacy Sabine

wanted assurances that the Combined Company's borrowing base would be increased at the

redetermination date.

119.    Just one day later, on December 5, 2014, Sambrooks stated to First Reserve that

financing for the Combined Company was proving impossible under current assumptions.  The

Combined Company was not viable when the projections were run as "capital turn down cases"

(*i.e.*, cases in which capital spend was reduced to approximately $280 million based on the

company's need to preserve liquidity).  As Sambrooks himself noted, a model in which the

borrowing base was assumed to increase in 2015 "[did] not pass the smell test given that

production is flat to declining.  Our borrowing bases are now largely tied to PDP . . . and current

rate is a good measurement on the likelihood of bb increase.  So, *a flat to declining bb is most*

*likely in these capital turn down cases.*"  When projections were run assuming that that

borrowing base remained flat, Sambrooks acknowledged that the Combination was not prudent

for either company, stating:

> "[O]ur total debt metric in the [second quarter of 2016] is 8.1x.
> *Boom*.  When our hedges come off in 2016 we experience a very
> large revenue drop at current strip pricing. . . . *I have looked at the*
> *first pass on the two standalone cases . . . [B]oth look*
> *significantly better tha[n] the combo case.*"

The negotiations over the alternative RBL financing terms stalled by December 2014 because,

according to Wells Fargo, "[they] could not find a solution that addressed the company's

continuing deterioration of leverage and liquidity."

### F.      *Legacy Sabine Implores Legacy Forest to Abandon the Transaction, but Forest Insists on Closing the Merger*

120.    As described in the First STN Motion, Legacy Sabine, at the direction of First

Reserve, tried adamantly to convince Legacy Forest to terminate the merger transaction.   On

Sunday, November 30, 2014, Sambrooks personally called McDonald to request that the parties

mutually agree to abandon the Combination, arguing that the two companies were better off as standalone entities.  Sambrooks warned that "the financing for the combined companies [was] too expensive *and [would] create an insolvency situation at closing*."  While Legacy Forest was not involved in the failing discussions with the banks, Legacy Forest certainly understood the dynamic.  The day after Sambrooks requested Legacy Forest to agree to terminate the merger agreement, Wind emailed McDonald, stating, "[W]e need to figure out if [Legacy] Sabine already agreed to let the banks retrade the existing bridge for relief on the facility, among other things."

121.    That evening, McDonald emailed Laurence Whittemore at JPMorgan, Legacy Forest's financial advisor, to assess the only remaining options.  McDonald listed options that Sambrooks of Legacy Sabine had presented:  (1) "[d]on't merge," (2) "[w]ork around the Change in Control provision of Forest bonds," (3) "[d]elay deal for time sufficient for market and financing to be more favorable," or (4) "[e]xchange only partial interests so as not to trigger Change in Control."

122.    Legacy Forest, however, was adamant to go forward with a transaction.  In their apparent haste to proceed with a transaction—any transaction—Legacy Forest and its board appears never to have considered the insolvency of the Combined Company.  Indeed, Sambrooks was not the only person to raise the solvency concern with Legacy Forest.  Legacy Forest's own counsel, Mark Gordon of Wachtell, Lipton, Rosen & Katz LLP ("Wachtell") asked McDonald to "[e]xamine whether or not we would be 'closing into an insolvent situation.'"  He also asked Wind to examine the "'go it alone case' and make an assessment as to the viability versus continuing with the merger."  Notwithstanding these warnings, the Legacy Forest board did not request or obtain any solvency analysis or valuations.  JPMorgan, the investment banker for

Legacy Forest, did not conduct any solvency analysis of the Combined Company, and believed

that such analysis was outside the scope of what JPMorgan was retained to do.  In his deposition,

Whittemore of JPMorgan could not recall any effort by the Legacy Forest board to assess

whether Sambrooks was correct in stating that the Combination would create an insolvent

Combined Company.

123.    Following a December 1 board meeting at which the Legacy Forest board

concluded that the merger should proceed notwithstanding Sambrooks's concerns and warnings,

McDonald and Wind called Sambrooks and told him that Legacy Forest intended to close the

Combination on December 16, 2014.  McDonald stated:

> "I [told Sambrooks that Legacy Forest] did not completely
> understand their concern over financing because [Legacy Forest]
> believe[s] that [Legacy] Sabine has in place a Bridge Loan
> Commitment which is valid and in place and should be used as
> intended to close the [Combination] and subsequently be used to
> refund the Forest bonds after closing."

Sambrooks expressed his concern that the Bridge Loan was tied to the contemplated New RBL

Facility with a $1 billion borrowing base, which would provide inadequate liquidity given that

Legacy Sabine had approximately $620 million drawn on the Legacy Sabine RBL Facility that

would be refinanced with the new facility.  Once again, Sambrooks tried to persuade McDonald

to call off the Combination.  McDonald did not agree, and advised the Legacy Forest board that

he did not "understand the logic expressed by Sambrooks in regard to abandoning the Bridge

Loan commitment and $1 billion credit facility in exchange for a clearly real time deleterious

financing package all in the fear of a possible and unknown liquidity issue in some future

period."  The Legacy Forest board directed McDonald to call Sambrooks and tell him that: (1)

the Legacy Forest board intended to close the Combination because it was in the best interest of

the company and its shareholders; (2) Sambrooks's justifications for abandoning the deal were

not convincing; and (3) Legacy Sabine was "contractually obligated to [] use its reasonable best efforts to complete the transaction."

124.    The very next day, on December 2, 2014, Sambrooks sent an urgent letter to the Legacy Forest board, stating:

> [I]t has become clear that a Combination of our two companies is no longer in the best interests of the shareholders of either company. [The] transaction poses significant harm and undue risk to Forest's shareholders as well as Sabine's. . . . Accordingly, we propose that the Forest and Sabine boards mutually agree to terminate the [Combination] Agreement . . . .
>
> An important factor in Sabine's decision to combine with Forest was to gain ready access to the equity capital markets and liquidity for its shareholders by merging into a publicly traded company. . . . [W]e are informed that the combined Forest-Sabine would face immediate delisting by the NYSE . . . .
>
> If a combined Sabine-Forest were to become insolvent, Forest officers and employees receiving severance packages could also be subject to preference and fraudulent conveyance liability under the Bankruptcy Code. . . .
>
> Forest would be far better positioned if it were to maintain its status as a standalone company . . . .  Forest's liquidity position and ability to satisfy its financial covenants will be further enhanced by the imminent closing of the Arkoma transaction which is more impactful to standalone Forest than the combined company.

125.    That same day, Sambrooks followed up with McDonald by email, noting that Legacy Sabine and First Reserve were in "intense discussions with our banks," and that the banks had requested a model to be run which *assumed that the Combined Company's borrowing base would not be increased at the redetermination date.*  The updated model "clearly" reflected "potential liquidity issues" for the Combined Company if the borrowing base was not increased.

126.    The Legacy Forest board again met on December 5, 2014 to discuss Legacy

Sabine's request to terminate the Combination.  JPMorgan continued to press for the closing of

the as-committed Financing.  The minutes from that meeting reflect that JPMorgan "noted [that]

the lenders under the bridge were also the lenders under the other facilities, and, accordingly,

these lenders were likely to waive any breach of the Debt to EBITDA ratio covenant of the other

facilities to avoid a default of the bridge loan."  The Legacy Forest board directed McDonald to

inform Sambrooks that the board still believed it was in Legacy Forest's best interest to complete

the Combination.

127.    The Legacy Sabine campaign to terminate the merger continued.  On December 7,

2014, Sambrooks sent McDonald updated financial models based on the terms of the secured

Bridge Loan that were last discussed with the banks.  Sambrooks warned that "this [was] likely

not an executable finance scheme" and that under those models, "the combined company's debt

metric soars to unmanageable levels."  Sambrooks continued: "This result will prevent any

realistic hope of achieving the required refinancing the combined company will have to execute

in 2016."

128.    Also on December 7, 2014, Sambrooks wrote another letter to McDonald warning

that:

> **The transaction threatens grave, and potentially irreparable
> injury to Forest** shareholders, putting them in a significantly
> worse position than remaining independent. Accordingly, Sabine
> reiterates its offer to terminate the [Combination] Agreement upon
> mutual consent. . . . However, in light of the grave consequences
> for the combined company's shareholders that will result from
> consummation of the current transaction, we are open and ready to
> explore alternative structures that address of the problems the
> combined company will face (including onerous financing terms,
> worsening liquidity issues and a likely delisting from the
> NYSE) . . . .  Our offer is to immediately work on an alternative
> structure that would contemplate a joint operating agreement

40

instead of completing a merger.

129.    The Legacy Forest board met the evening of December 7, 2014 to discuss Sambrooks's letter.  The Legacy Forest board decided that McDonald should respond to Sambrooks "to suggest to Sabine a willingness to explore alternative approaches . . . in order to obtain from Sabine confirmation that Sabine would close the transaction on the original terms if no mutually-acceptable alternative could be identified."  McDonald thereafter responded in a letter to Sambrooks on December 7, 2014, reiterating that:

> Forest continues to believe that completing the Combination is in the best interests of Forest and its shareholders.  [However,] Forest is willing to work with the Sabine Parties over the next few days to see if an alternative solution can be identified, provided you confirm to us by 11:00 p.m. MST tonight that, unless there is a mutual agreement otherwise, Sabine will close the Combination transaction pursuant to the Combination Agreement on December 16, 2014[.]

### G.    *Wells Fargo Proposes the First Alternative Transaction Structure*

130.    While Sambrooks was imploring Legacy Forest to terminate the merger agreement—discussions the banks were purportedly not aware of—Wells Fargo asked Weiner on December 4 whether First Reserve had considered assigning some of its equity interests to a third-party, which would avoid a change of control and, as a result, avoid the need for the Bridge Loan to fund the payment of the Legacy Forest Unsecured Notes.  First Reserve rejected this proposal.

131.    Although First Reserve rejected the concept of divesting its equity to avoid the change of control, Wells Fargo's proposal caused First Reserve to start considering alternative structures.  While First Reserve was searching for a mechanism to evade the change of control, Wells Fargo, Barclays and First Reserve engaged in back-channel communications during the

41

early days of December 2014, immediately preceding the ultimate proposal of the revised

transaction structure that no longer contemplated the Bridge Loan.

132.    The nature of their communications is consistent with that of parties attempting to

conceal facts.  In the first week of December 2014, Wells Fargo, Barclays and First Reserve

began a deliberate effort to take certain of their communications regarding the Combination

structure offline.  Formerly detailed emails gave way to cryptic, terse exchanges that coordinated

telephone calls on non-specified topics relating to Legacy Forest and Legacy Sabine.  The lack of

specificity in the emails is glaring.

133.    For instance, on December 2, 2014, Barclays organized an internal call about

project "Fairway," the code word for the Legacy Forest / Legacy Sabine matter.  The next day,

Barclays emailed First Reserve to coordinate a call, conspicuously omitting any detail as to the

reason or topic of the discussion.  Consistent with this evasive conduct, on December 4, 2014,

First Reserve reached out to Barclays, prompting several emails between Barclays and Wells

Fargo seeking to arrange "offline" discussions.  This pattern continued through December 5,

2014, with numerous emails among Wells Fargo, Barclays and First Reserve to coordinate calls,

never once mentioning in writing the subject matter to which the calls pertained.

134.    These communications suggest behavior, intent and knowledge that support

colorable claims of wrongful conduct by the banks and First Reserve.  There was a flurry of

activity and intentional effort to keep communications verbal, rather than in writing, by and

among Wells Fargo, Barclays and First Reserve during the first week of December 2014.  The

subject matter of these parties' discussions during this period was highly material, at least to

Barclays, which felt the need to brief some of the most senior executives in a massive global

investment bank—including Joe Gold, CEO of the Americas, Joe McGrath, Co-Head of Banking,

and David Sawyer, Global Head of Workout & Restructuring—on the developments associated

with this particular credit and the changes being made to avoid liability for the Bridge Loan

commitment.

135.    While the documentary history that has been delivered to the Committee appears

to be intentionally thin, on Saturday, December 6, Wells Fargo drafted an email to Weiner at

First Reserve, with the draft version stating:

> Please see attached a draft of the ***strawman proposal*** to serve as
> the basis for our ongoing discussions. . . . ***Per your request to the
> Wells Fargo and Barclays teams, we are additionally working
> towards providing our thoughts related to the alternative
> transaction structure you outlined for us***.

When the email was ultimately sent to Weiner late on the evening of Sunday, December 7, the

reference to the "strawman proposal" was removed, stating:

> Josh, [p]er your request to the Wells Fargo and Barclays teams,
> please see attached a draft of terms we would propose should you
> and Forest choose ***to pursue the alternative equity structure you
> outlined to us***.

The attached term sheet, which Weiner requested, was for an alternative transaction structure

that included an additional $50 million for the Second Lien Loan, ***but no Bridge Loan***.  At the

Rule 30(b)(6) deposition of Wells Fargo, however, Scotto had no recollection of these

discussions with Weiner, the emails, what the strawman proposal was, or what the "alternative

equity structure" Weiner outlined was.

136.    Instead, and contrary to the email evidence, Scotto testified that Wells Fargo had

no discussions with Weiner or others at First Reserve at any point between December 4 (the date

Wells Fargo asked whether First Reserve had considered divesting some of its equity) and

December 11, the date that, according to Scotto's testimony, Wells Fargo was first informed that

a term sheet for an alternative structure would be forthcoming from Legacy Sabine's counsel).

Remarkably, these emails and term sheet for an alternative transaction structure were <u>not</u>

produced by Wells Fargo, even though the email was authored by and sent to various recipients

at Wells Fargo.  Instead, the only reason the Committee received these emails was because

recipients at Barclays were copied on the emails and produced them.

137.    That same day, December 7, 2014, an alternative proposal that no longer

contemplated a Bridge Loan structure for the Combination also surfaced in an internal Barclays

email that included an "updated Fairway analysis with three cases: 1) refi with 3rd lien; 2)

existing deal; and 3) *no bridge*."  The best the Committee can surmise is that First Reserve,

Wells Fargo, and Barclays were working together to identify alternative equity structures to

evade the change of control premium, but had not yet figured out the precise mechanism by

which the change of control would be evaded.

### H.    *Legacy Forest Opens the Door to Alternative Structures*

138.    While First Reserve was apparently developing an alternative equity structure,

Legacy Sabine and its board continued to advocate for voluntary termination of the Combination

as best for both companies.  First Reserve, however, was concerned that if Legacy Sabine were

to terminate the merger agreement unilaterally, Legacy Forest would sue them for failing to

perform thereunder, and the damages from that lawsuit would be "a very bad outcome for

[Legacy] Sabine."  First Reserve entities were party to the Combination Agreement, not just

Legacy Sabine.  First Reserve, Legacy Sabine, and the banks had, of course, already turned their

attention to alternative structures for the Combination to avoid this possibility and the banks'

losses on the as-committed Bridge Loan.

139.    On the morning of December 8, 2014, Gordon (Wachtell) had a call with Legacy

Sabine's litigation counsel (Quinn Emanuel) regarding the prospect that Legacy Sabine would

walk away from the transaction.  Gordon updated McDonald and others at Legacy Forest after

44

the call, noting that Legacy Sabine was afraid that Legacy Forest would sue them or refuse to

discuss alternatives in good faith.  Gordon mentioned informal negotiations with Quinn

Emanual, Legacy Sabine's counsel, regarding the potential litigation.  Unsurprisingly,

Sambrooks testified that as of December 8, he was aware that Legacy Forest would sue Legacy

Sabine if it "unilaterally walked" from the merger.

140.    Later on December 8, McDonald asked Sambrooks to schedule a call with

Lightner, Fraser, and McDonald from Legacy Forest and Sambrooks and Yearwood from Legacy

Sabine.  Sambrooks asked that Radtke join from the Legacy Sabine side, as well.  As a result, the

call included three Legacy Forest directors and three Legacy Sabine directors.  During the call,

Fraser asked Legacy Sabine to confirm that "if no alternative could be developed, Sabine would

work to close, not work to find a way to not close."  Sambrooks responded that Legacy Sabine

was "in the same position," but it became clear, at least to Fraser, that the "same position"

referred to the parties' mutual goal of finding an alternative transaction, and not to the plan to

close on the merger structure as agreed in July 2014.

141.    Although not raised during this "3-on-3" discussion several days earlier, Fraser

had thought of an alternative mechanism by which Legacy Forest would attempt to evade the

change of control by splitting the economic and voting rights First Reserve was to receive.

Despite having already developed an alternative transaction structure and vetting it with counsel,

Fraser held back on disclosing the structure until Legacy Sabine made certain statements

regarding efforts to close.

142.    Following this 3-on-3 call, on December 8, Sambrooks wrote the Legacy Forest

board another letter.  To advance the possibility of arriving at an alternative structure, Sambrooks

proposed that the parties "work together in good faith to explore mutually acceptable alternatives

to the proposed transaction under the Combination Agreement," and, in the alternative, stated

that Legacy Sabine would "continue to use its reasonable best efforts to close the transaction in

accordance with the Combination Agreement."

143.    The Legacy Forest board then met to discuss obtaining the assurances from

Legacy Sabine.  Board members "Lightner, McDonald, and Fraser expressed their unanimous

opinion that they believed Sabine intended to close the combination transaction" should an

alternative structure not be found.  The Legacy Forest board then agreed that they should

"[p]resent [an] alternative structure to Sabine" and "[p]ostpone filing suit until after Sabine [had]

respond[ed] to the alternate structure presentation."

144.    Thereafter, McDonald asked Sambrooks for a call on December 9, 2014 to

exchange ideas "in regard to structure."  McDonald asked that the group include Legacy Forest's

legal and financial advisors, Mark Gordon from Wachtell and Laurence Whittemore from

JPMorgan, respectively.  Sambrooks chose to include Shughart, Tim Yang, Ash Elias, Todd

Levesque, two junior analysts, Vinson and Elkins, Simpson Thacher, and Gibson Dunn.

Sambrooks noted, in apparent contradiction to First Reserve's prior discussions with the banks:

"We are not bringing our banks into the conversation at this stage."

145.    Early on the morning of December 9, Jim Lightner, the Chairman of Legacy

Forest's board, emailed Sambrooks, stating, "Based on our conversation with you, we take [you]

at your word that you are not looking to avoid the deal and we both will be working in good faith

to closing one way or another on the 16th so let's proceed with discussions tomorrow."

**I.**     **_Legacy Forest Supplies a Structure That First Reserve, Legacy Sabine and the Banks Immediately Adopt to Implement Their Goal_**

146.    On December 9, 2014, First Reserve, Legacy Sabine and Legacy Forest, together

with their legal advisors, held a call during which Legacy Forest's counsel presented the revised

deal structure that was ultimately implemented as the Combination structure.  Legacy Forest

presented this revised structure as a way to avoid tripping the change-in-control covenant for the

Forest Unsecured Notes, thus eliminating the need for the Bridge Loan.  The parties discussed

that, if they implemented this re-worked deal, they would have to "[a]ccept the probability of

lawsuits from Bondholders" and confirm the "[l]ien capacity on Forest's bonds & covenants."

147.    The "Proposed Alternative Structure" discussed among the parties on December 9,

2014 ultimately led to a structure whereby Sabine Investor Holdings LLC ("Sabine Investor

Holdings"), a related investment entity of First Reserve, was given 73.5% of the economic

interest and 40% of the so-called common voting power in the post-Combination Company, plus

numerous other control rights.  Legacy Forest shareholders were given 26.5% of the economic

interest and 60% of the so-called common voting power.  The common voting power was subject

to numerous control rights of First Reserve.  In addition, First Reserve would be entitled to

nominate 6 of the 8 directors of the board of the Combined Company.

148.    Within approximately 12 hours of learning of this mechanism from Legacy Forest,

Legacy Sabine had drafted a full term sheet and sent it to Legacy Forest, adopting the

mechanism.  Sambrooks urged McDonald to provide comments to the term sheet as early as

possible so Legacy Sabine could "bring our banks over the wall."  Of course, based on prior

discussions with Weiner, the banks already knew that an alternative "no-Bridge Loan" structure

was in the works.

### J.    *Legacy Forest's Executives Stood to Benefit Personally From The Combination*

149.    Legacy Forest's complete abdication of their duties to creditors can only be

explained by the personal benefit that its top executives stood to collect upon the closing.

Legacy Forest's CEO (McDonald) and CFO (Wind) both expected to receive $4 million and $2

million, respectively, in severance payments upon the Combination's closing.  Accordingly, the

47

two Legacy Forest executives closest to the Combination had strong personal financial incentives to push the Combination forward at all costs.

150.    But, due to the imminent liquidity issues, First Reserve and Legacy Sabine sought to reduce all transaction costs, including the severance payments to the Legacy Forest executives by 67% in advance of the Combination.  The Legacy Forest executives did not respond kindly. On December 10, Wind emailed McDonald, upset that Legacy Sabine planned to reduce the severance and bonus of Legacy Forest employees:  "F them . . . no stock, no retention, turned down jobs, no bonus for EY worst experience of my life, won't get another job, and . . . we both have SEC Enforcement lingering over our heads now that they have a new budget to pursue their broken windshield policy."  McDonald responded, "I am super pissed off.  I told Jim [Lightner] and Dod [Fraser] to stop the director communication."

151.    Legacy Forest's board refused Legacy Sabine's request to reduce the severance amounts for Legacy Forest's executives.

### K.    *Reasons First Reserve and the Banks Wanted an Alternative Structure*

#### 1.    *The Combined Company Would Face Financial Turmoil*

152.    The Combination and Debt Financing resulted in dramatic increases in the obligations of both Legacy Forest (renamed SOGC) and each of the Legacy Sabine Subsidiaries. Legacy Forest, which had $905 million in funded debt liabilities pre-Combination, emerged from the Combination and Debt Financing with approximately $2.6 billion in funded debt liabilities. The Legacy Sabine Subsidiaries, which had approximately $1.62 billion in funded debt liabilities pre-Combination, emerged from the Combination and Debt Financing with no less than $2.6 billion in funded debt liabilities.  Both Legacy Forest and Legacy Sabine were insolvent at the time of the Combination.  Both companies were aware that the Combined Company would not

be able to satisfy the substantial unsecured obligations layered beneath over $1.6 billion dollars of first and second lien debt under the revised structure.

153.    Legacy Sabine ran projections on December 15, 2014, the night before the closing, which were based on a five-rig program and the final financing implemented on December 16. At this point, however, the company was running an 8-rig model and was not even sure if it would reduce its activity to five, six or seven rigs, as compared to the 14 rigs Legacy Forest and Legacy Sabine had run at the start of the year.  In sum, the company had no firm business plan in place.  The number of rigs for drilling new wells requires a delicate balancing act.  Drilling new wells increases the value of reserves and, accordingly, the borrowing base on redetermination. But drilling new wells requires extensive capex, which requires liquidity.  Due to the liquidity constraints, the company was unclear on how many rigs it could afford to run.  Even under the supposed minimal 5-rig model, and even assuming that only $502 million would be outstanding under the New RBL Facility at the start of the year, the Combined Company faced a $323 million cash flow shortfall in 2015.

154.    It was so clear that the Combined Company would have financial difficulties that Radtke could not understand how it could have taken McDonald by surprise: "I guess Pat [McDonald] did not believe (or want to believe) the fact that post merger Sabine was going to be in a financially very difficult position.  He was consistently told this so he should not be surprised."

### 2.    *First Reserve Used Its Control over Legacy Sabine to Obtain a Delay of the Imminent Failure to Provide Distance to the Write-Down of Its Investment*

155.    First Reserve—Legacy Sabine's sponsor and the new, controlling shareholder of SOGC—worked overtime to protect itself at the expense of Legacy Sabine and Legacy Forest's unsecured creditors.  As detailed below, First Reserve did not want to take an immediate write-

down of its Legacy Sabine investment.    Radtke "[w]oke up in [the] middle of [the] night" to email Sambrooks that execution risk equals result risk and that he was "right Alex [Krueger, co-CEO and President of First Reserve] wants to do the deal **but still bury the initial book write down** on [First Reserve's] books."

a)       **First Reserve Controlled the Legacy Sabine Board**

156.    First Reserve exercised control over the Legacy Sabine board, and thus controlled the negotiations related to the financing of the Combination.    Though there were only three First Reserve directors on the six-person Legacy Sabine board, First Reserve had the ability to replace the other board members and exercised effective control of the entire Legacy Sabine board.    In addition, First Reserve directors had ultimate decision-making authority with respect to certain Legacy Sabine decisions related to the Combination.    For instance, in Joshua Weiner's own words: "I don't care what mgmt says – anything cap markets relates [*sic*] needs to be approved by me and is their job to make sure i am in the loop[.]"    In other words, Weiner exercised full control over capital markets decisions related to the Combination, regardless of the positions taken by Legacy Sabine's management.

157.    The other Legacy Sabine directors were all too aware of First Reserve's degree of control.    For example, when the Combination was still being discussed in April 2014, Radtke and Sambrooks (both Legacy Sabine board members) indicated that they expected First Reserve to instruct the other Legacy Sabine board members how to proceed with the deal.    Radtke wrote to Sambrooks: "It will be interesting if [First Reserve] asked what Sabine still wants to do or just tell us they have decided.    I hope I am pleasantly surprised."    In a separate email, Sambrooks similarly noted that First Reserve was in full control, noting: "[First Reserve] just needs to make a yes or no decision on the combo, assuming [Legacy Forest] doesn't tell them to piss off first."    In May 2014, Sambrooks noted to Radtke, regarding Weiner: "Josh has some great qualities, but

flexibility and understanding that his issues and process are not the entirety of the consideration are not his strong suit."

158.    First Reserve exercised its control over Legacy Sabine throughout the negotiations, including during the critical time period shortly before the Combination closed.  On December 7, 2014, Radtke complained to Sambrooks that First Reserve would hold up the deal, writing: "[First Reserve] will be running models in the back room that could substantially undermine the speed that will be needed to make this work. I understand their needs internally to make a decision but we will all need to be flexible to make this interesting to [Legacy Forest]."

> **b)    First Reserve's Actions in Controlling Legacy Sabine Were Motivated by its Desire to Distance Itself from the Imminent Failure of the Transaction**

159.    The motivations of First Reserve and the board it controlled are found in the broader context of the private equity firm's performance at that time.  First Reserve had underperformed significantly in the period leading up to the Combination.  Following a highly successful $2 billion Fund X (raised in 2004) with a 31% internal rate of return ("IRR"), First Reserve was able to raise two very large funds.  Fund XI (which holds First Reserve's investment in Legacy Sabine and the combined Debtors here) was $7.8 billion in size, and Fund XII was $9 billion in size.  However, as of early 2014, at the same time First Reserve was contemplating the Combination of Legacy Sabine and Legacy Forest, these two funds had not performed nearly as well as Fund X.  By early 2014, Fund XI had only a 2% IRR, and Fund XII (raised in 2009) had only a 4% IRR.

160.    Then in early 2014, even with oil prices still high, First Reserve worked to raise its next fund, Fund XIII.  Against this backdrop of underperformance, the fundraising for First Reserve Fund XIII fell significantly short of target in the summer and early fall of 2014.  First

Reserve closed this new fund (Fund XIII) on September 29, 2014 with $3.4 billion of commitments, barely half of its original target of $6 billion.

161.    Following this fundraising, the drop in oil and natural gas prices leading up to the closing of the Combination was especially problematic for First Reserve.  First Reserve Fund XI had invested █████████ or █% of Fund XI's total invested capital, in Legacy Sabine.  At the time that the Combination with Legacy Forest was proceeding from signing to closing, First Reserve continued to list the Legacy Sabine investment at █████████ of value on its books.  On information and belief, this was the value of Legacy Sabine embedded in the fund performance shown to potential investors in First Reserve Fund XIII.

162.    Legacy Sabine began to be very concerned about post-Combination finances by late August, just as the fundraising for Fund XIII was culminating.  If First Reserve had had to write down its investment in Legacy Sabine shortly after it closed Fund XIII, investors in that fund likely would have been extremely concerned about the disclosures made to them regarding prior First Reserve fund performance.  First Reserve's own projections showed the Combined Company failing in the very short term, based on the originally-contemplated financing.  Had the Combined Company failed (or had a major amendment been made to the financing), First Reserve would have been forced to adjust the "mark" it took on the Legacy Sabine investment.  That is, First Reserve would have had to adjust the returns on Fund XI because it would have reflected the complete loss of the Legacy Sabine equity investment, comprising █% of First Reserve Fund XI.

163.    On information and belief, at the critical time period leading up to the consummation of the Combination and the Financing, First Reserve was primarily motivated to avoid all scenarios in which there would be a closing of the Combination followed by a rapid,

major negotiation with the banks regarding a covenant default or other major reset of the

Financing.  Even delaying the ultimate restructuring with the banks by several months would be

extremely helpful to First Reserve, as it wanted to distance the failure of Legacy Sabine from the

closing of Fund XIII (with the implicit representations that were made to investors that First

Reserve had nearly $█████ of equity value in Legacy Sabine).

> ### c)    First Reserve Acknowledged the Combined Company Would be Insolvent, But Proceeded with the Transaction to Provide Distance to the Write-Down of the Investment

164.    First Reserve's motivations are corroborated by even the limited documents the

Committee has been able to obtain from First Reserve.  Indeed, by December 5, the deal team at

First Reserve (which included Legacy Sabine board members France, Krueger, and Shughart)

recommended internally at First Reserve to not close the merger, despite the significant litigation

threat from Legacy Forest.  The recommendation of the deal team at First Reserve not to close

the transaction was based on projected equity values for the various options then under

consideration.  Specifically, as of December 5, First Reserve projected that closing under the

committed structure would result in equity value in 2015 for the Combined Company between

negative $51 million and negative $711 million, and that the negative equity value was even

worse for the secured Bridge Loan construct under negotiation at that time.  First Reserve's only

projection of positive equity value in 2015 for its investment was if First Reserve refused to close

the transaction altogether.

165.    At the same time First Reserve was recommending internally to not close the

transaction, First Reserve was working frantically on a second path to close the transaction

(because the Combination Agreement was a firm commitment) that would avoid an immediate

post-closing default under the New RBL Facility.  To induce the banks to amend the New RBL

Facility, First Reserve's primary negotiating leverage was the banks' underwater commitment to

fund the Bridge Loan.  As discussed above, by December 6, Weiner of First Reserve was

requesting from the banks proposals for transaction structures without the Bridge Loan.  There

was extensive and rapid work underway to create financial models for this scenario, even though

First Reserve and the banks had not yet figured out how they were going to evade the change of

control provision of the Forest Notes.  These financial models demonstrated the intention of First

Reserve to do a financing that avoided massive losses to the banks at the expense of unsecured

creditors of the legacy entities; First Reserve just needed to find a way to implement that intent.

The Committee now knows that Legacy Sabine developed one such structure.  But when Legacy

Forest developed a different mechanism by which the change of control could be evaded, First

Reserve and Legacy Sabine jumped at the chance.

166.    By December 11, the deal team was recommending internally at First Reserve

that the Legacy Forest-proposed revised transaction structure be approved, notwithstanding that

First Reserve was projecting that the equity value of the combined company under the revised

structure would be between negative $11 million and negative $671 million for 2015 (as

compared to the positive equity value previously projected for Legacy Sabine if the merger did

not close).  Remarkably, in the final version of the memorandum recommending that First

Reserve approve the revised structure to evade the change of control provision of the Forest

Notes, the deal team at First Reserve removed the 2015 negative equity value calculations.

167.    In determining to proceed with the alternative transaction structure, the deal team

at First Reserve acknowledged (at least internally) that the Combined Company still would face a

liquidity crisis, just not as soon as under the original committed financing structure.  The day

before the Combination closed, First Reserve projected under the alternative transaction structure

that the Combined Company would have a liquidity crisis by no later than 2016, even before

taking into account required downward adjustments to projected borrowing base availability due to declines in commodity prices based on warnings from Wells Fargo. Specifically, First Reserve projected a $21 million liquidity shortfall in 2016 in excess of the borrowing base, and a $135 million shortfall in 2017, which amounts were based "on assumed borrowing base which [Wells Fargo] indicated will not grow as fast as we were previously modeling (and may decline near-term) given the recent commodity downturn"). In recommending the alternative transaction structure (instead of walking away as previously recommended), the deal team at First Reserve did not project a thriving business, but instead remarked that closing the revised structure provided "[b]est opportunity to realize equity value" and merely provided a "[h]igher probability of survival."

### d)    First Reserve Was Also Motivated to Preserve Its Relationships with the Banks for Other Portfolio Companies

168.    In addition to its motivation to provide distance between the closing of its Fund XIII and the imminent failure of the Combined Company, First Reserve had larger relationship issues with the banks it needed to control, as these same banks were lenders to other portfolio companies. For example, while negotiating potential amendments to the Bridge Loan in late November, the First Reserve deal team sent a draft "Open Hours Update" presentation to Alex Krueger (co-CEO and President of First Reserve) for his review before sending it to the First Reserve Investment Committee. At that time, the First Reserve deal team was recommending to the Investment Committee that First Reserve should accept the banks' new financing facility (which included converting the bridge to secured debt) instead of forcing the banks to close on the as-committed financing, reasoning that under the as-committed financing "the banks will be forced to take the loss on the economics." First Reserve concluded that there were "[l]arger bank relationship issues beyond Sabine."

169.    Weiner was particularly vocal about the need to maintain First Reserve's relationships with the banks.  For instance, he observed to France in November 2014 that it was better to handle the transaction "as a deal with the banks vs. flame them," because the "[i]dea of flaming them" made Weiner "really nervous."  According to Weiner, "flaming" the banks "[w]ould be really bad for future biz."

170.    First Reserve pushed through the merger, with full knowledge that it was a disastrous deal for both Legacy Sabine and Legacy Forest and their respective creditors.  On December 15, 2014, William Macaulay, the Chairman and Co-CEO of First Reserve, acknowledged in an internal email:  "I would observe that everyone is aware that it was not a good decision to do this deal and all of the circumstances around it."

171.    Despite these numerous conflicts and red flags, the Legacy Sabine Directors approved the Combination, a decision that ultimately benefitted First Reserve but put more debt onto Legacy Sabine and the Legacy Sabine Subsidiaries

### 3.    The Borrowing Base for the New RBL Facility Was Not Supported

172.    A central term of the Financing as closed was that the initial borrowing base would remain $1 billion (despite the free-fall of commodity prices) and, unlike the original commitment, there would be no redetermination 30 days post-closing.  The initial borrowing base and the removal of the 30-days post-closing redetermination, were both made with the intent to keep the borrowing base artificially high.  Instead of funding the unsecured Bridge Loan, as the banks had committed to do in July 2014, the banks intentionally loaned funds that were not supported by an accurate borrowing base because that alternative —having risky, unconventional "secured" debt—was still more appealing than extending the unsecured, committed Bridge Loan.  Wells Fargo acknowledged in its December 16, 2014 Full Credit Report that the $1.0 billion borrowing base was above the "[m]aximum [c]onforming"

borrowing base under Wells' Fargo's model for Legacy Sabine in November 2014.  However, even its analysis of the "appropriate" borrowing base was based on an August 2014 price deck for oil prices, intentionally ignoring that oil prices had declined over 40% between August 2014 and the December 16 Closing Date.  Despite using inflated prices, Wells Fargo still found that the maximum conforming borrowing base for SOGC was less than $1.0 billion.

173.    In addition, the banks made no adjustment to the borrowing base for the sale of Legacy Forest's Arkoma Assets on the day before the closing, which was a sale planned for by Legacy Sabine and First Reserve.  Under Wells Fargo's borrowing base policy, "[the Arkoma Assets] have producing assets, [and] thus realized proceeds would be offset by the negative impact on our borrowing base."  But as a trade for getting out of the Bridge Loan, the banks did not seek to reduce the borrowing base to account for either the Arkoma sale or the significant changes in prices between the Commitment Letter date and when the transaction closed on December 16.

174.    Tellingly, the Arkoma Proceeds were used to reduce the amount outstanding under the New RBL Facility by pre-agreement with the banks.  Legacy Forest had planned, as of December 12, to use the proceeds of the Arkoma Sale to pay down its own debt.  Instead, at Sambrooks's instruction, Elias directed Legacy Forest to keep the proceeds in cash for SOGC's use after closing.  On December 16, the day the transaction closed, Wells Fargo asked Elias, "what is your expected timeline for using the Arkoma proceeds to repay outstandings [under the New RBL Facility]?"  Two days later, Elias wrote Wells Fargo that "[t]he amount I have to pay now is $205,834,604.  So it is more than the Arkoma proceeds anyways and we borrowed ABR, so we should be good to go."

175.    The borrowing base was intentionally inflated because all parties knew SOGC would be walking a liquidity tightrope as soon as the Combination closed.  Barton Schouest at Wells Fargo remarked on November 30 that "the 850 number [for the Bridge Loan] was developed because the company deemed it's liquidity to be insufficient at closing with the reduced level [of $780 million] originally discussed as a result of the Arkoma sale.  With the smaller facility, the company would not be able to satisfy the liquidity covenant required at closing."  The removal of the Bridge Loan and the associated fees and interest expenses did not alleviate the liquidity crisis.

176.    Other banks recognized that the borrowing base for the New RBL Facility was unsupported.  Of the 12 banks to which Wells Fargo had syndicated the earlier committed RBL on the terms contained in the July Commitment Letter, upon information and belief, *none* was willing to remain in the syndication after the merger agreement was revised in December 2014 and the committed financing (including the Bridge Loan) was abandoned.  In fact, on the day before the Combination was set to close, a contact at BB&T Capital Markets, Energy Group (one of the potential syndicate banks) noted changes to the credit agreement concerning bankruptcy and asked "Has the company engaged or planning to engage any advisors concerning restructuring or bankruptcy?"

177.    As of December 17, 2015, the Combination had closed and Wells Fargo failed to syndicate any of the New RBL Facility beyond the initial seven underwriting banks, all of whom were legally bound to fund the Bridge Loan under the July Commitment Letter.  Prospective lenders that were not already legally bound declined because, among other reasons, (i) the Combined Company's leverage was simply too high, (ii) the borrowing base was too high and should have been reduced to reflect the Arkoma Sale (but was not), (iii) the removal of the 30-

58

day borrowing base redetermination after the Combination closed was unsatisfactory because

that redetermination of the appropriate debt level for SOGC "was very important . . . to keep the

client on a short leash," and (iv) the borrowing base was "out of the box" for the lenders.  One

prospective lender noted that "[w]hen we did the Fall BB for Sabine the $750MM number was

stretchy for them."

178.    JPMorgan, one of the potential syndicate banks, told Wells Fargo on December

19 that it was unlikely JPMorgan would accept any of the New RBL Facility debt.  JPMorgan

asked:

> Has anyone approved out of the 12 non bridge lenders?  More than
> a handful have called me saying they've declined or plan to and I
> haven't heard any say they thought they'd get there. . . .  We're
> struggling given the aggregate leverage, higher borrowing base and
> covenant structure.  We're trying to be supportive of the sponsor
> and company but it's an uphill battle given what this will be rated
> internally.

Most of the banks that had contacted JPMorgan "were around 800 on base . . . but [did not] like

the increased leverage in the next two years with no covenant protecting that issue."  Put simply,

banks that were not on the hook for the Bridge Loan viewed the New RBL Facility as a risky,

inappropriate deal with an unsupported borrowing base.

### 4.    All Parties Knew that the Borrowing Base Would Be Redetermined Downward at the Next Redetermination Date

179.    On December 2, David Sambrooks warned Legacy Forest that the Combined

Company's borrowing base redetermination would be a problem.  Sambrooks also told the board

that "substantial additional liquidity drains would strain the combined company's ability to fund

its operations and essential capital expenditures and make the combined company more reliant

on the size of its revolving borrowing base facility, which is subject to redetermination as soon

as within 30 business days after the closing of the combination under the terms of its existing

financing." On December 4, Wells Fargo's senior bankers unexpectedly showed up at Legacy Sabine's offices and advised them that future borrowing base increases for the Combined Company would be unlikely.

180.    Also on December 4, Sambrooks warned McDonald that the projections for SOGC that Legacy Sabine / First Reserve had provided to the banks on that day assumed "a simple calculation of increasing borrowing base by 50% of the capital expenditure since last redetermination. ***Ou[r] banks have not in any way confirmed these assumptions and have to date expressed significant concern/caution on these assumptions***."

181.    On December 7, 2015, Sambrooks told McDonald that the New RBL Facility borrowing base would *only decline* after the Combination:

> "[T]he borrowing base assumptions in these models [provided to McDonald on that date] that predict borrowing base remaining flat or growing while production declines are clearly unlikely. The likely forecast is a lower starting borrowing base, that will decline from there. Thus the forecast of liquidity should be viewed as unlikely."

Sambrooks's prediction is almost exactly what happened. Wells Fargo did, in fact, determine prior to funding the New RBL Facility that the borrowing base exceeded the maximum conforming amount under Wells Fargo's standards. Legacy Sabine, Legacy Forest, First Reserve and the banks all knew that that SOGC would face a declining borrowing base and a massive liquidity crunch no later than April 1, 2015, just three months after the Combination closed.

### 5.    *The Debt Financing "Was Largely a Workout"*

182.    In exchange for these off-market concessions on the New RBL Facility, both Wells Fargo and Barclays reduced their total exposure to SOGC from $462.5 million ($250 million of the $1 billon RBL, and $212.5 million of Bridge Loan Financing), to just $262.5

million ($250 million on the RBL, and $12.5 million in second lien secured debt. The other five underwriting bridge lenders similarly reduced their relative exposure to SOGC (each was liable for 10% rather than 25% of the total funding), at the expense of Legacy Forest's existing unsecured creditors. Shortly before the Combination closed, Gary Wolfe, the Co-Head of the Leveraged Finance Group at Wells Fargo Securities, noted that the revised deal was beneficial for the bank because, "[w]hile total WF exposure is reduced modestly, our junior capital exposure has been secured with a 2nd lien and reduced significantly under this alternative structure."

183.    Wells Fargo viewed the New RBL Facility, as renegotiated with the unsupported borrowing base and various non-market covenant and re-determination allowances, as "largely a workout . . . ." In fact, relying on the information provided to them by Legacy Sabine and First Reserve, the banks understood that SOGC would be insolvent upon the closing of the Combination. As of December 16, 2014, and using a price deck with stale August 2014 oil prices, Wells Fargo determined in its full credit report that the total value of the Combined Company's oil and gas properties (or PV9 value), was only *$1.449 billion*. The Combination levered SOGC with over $2.6 billion of debt.    Wells Fargo noted that SOGC was deemed an "FDIC High Risk Borrower." As of the Closing Date, Wells Fargo downgraded the Combined Company's "borrower rating" from a "BQR 5" at the time of the Commitment to a "BQR 6" at closing. This reflected a significant negative change in the quality of the credit, using Wells Fargo's own internal ratings.

184.    Post-closing, federal bank examiners made direct inquiries to Wells Fargo regarding the Sabine credit, and internal Wells Fargo discussions sparked by the inquiry provide an unvarnished view of what Wells Fargo was thinking at the time. When contacted by a federal

bank examiner on February 6, 2015, Peter Roos, an Executive Vice President and Senior Credit

Officer at Wells Fargo forwarded the email to Richard Gould, informing him as follows:

> They [the National Bank Examiner] are going to come at you with
> booking a leveraged 5 in December and then moving to a 6.
> Obviously, a hot button.  What he doesn't understand (and where
> you can help) is *why this was done and was largely a workout in
> some respects*.  I come to you as I think this one has to come from
> you.  UGH!

The bank examiners immediately noted that the banks made an obviously inadequately-secured

loan with an inflated borrowing base:

> The BB showed a mid-year [2014] collateral value of $1.449Bn
> valuation (and a $970MM BB) . . . . However, this was under the
> Aug 2014 price deck when market oil was $95-100 and the price
> deck was $82.50 . . . . Since this time, market oil has dropped some
> 45-50% to $45-50 and the price deck to $50 (39% lower).  *As
> such, the $1.449 Bn Borrowing Base valuation would appear to
> have dropped a corresponding amount to ~$869MM (with a
> ~$582MM BB).  It would appear that WF would have had this
> information prior to the December 2014 closing of the loan*.

Wells Fargo's planned response was as follows:

> While we had a new price deck prior to the December 16th close,
> our commitment was made on May 5, 2014 and the $1.0B BB was
> based on Spring 2014 engineering evaluations and the price decks
> at that time.  The updated $1,449MM and $970MM BB were
> conducted for internal purposes only, given the price environment
> change since our initial commitment and evaluation.  While we
> could not reduce the BB until the next scheduled redetermination,
> we documented a CQR downgrade knowing that our collateral
> coverage had weakened.  On January 22, 2015, our reserve
> engineer provided us with the new BB value using our recently
> approved price deck, again for internal assessments.  Using our
> current price deck which is more in line with the current strip
> price, our reserve engineer calculated a maximum BB of $815MM
> (Total Proved PV9 $1.231B) . . . .

185.    It is telling that Wells Fargo's planned response—that it committed to a $1 billion

RBL facility in May and July 2014 and "could not reduce the BB until the next scheduled

redetermination" —was false.  In fact, the banks had the right under the original Commitment to

re-determine an accurate and appropriate borrowing base 30 days after the transaction closed, in January 2015, which right they waived in exchange for getting out of the Bridge Loan.  Of course, in renegotiating the New RBL Facility, the banks had every opportunity to adjust the borrowing base to a supported amount based on then-current market conditions.

186.    Wells Fargo's own Credit & Risk Management group looked to the credit officers responsible for approving the financing for an explanation of why it was funded, asking whether Legacy Sabine "really became leveraged more as a 'fallen angel'" and whether "the delay in measuring the borrowing base [was] one of the reasons we marked it leveraged [after the transaction closed]?"  Karin Patterson, one of the credit officers responsible for approving the re-negotiated New RBL Facility stated, "[i]n May 2014, [our] interpretation was that if our facility had sufficient collateral coverage, we did not have a Leveraged Loan.  At closing, we considered the October, 2014 Leveraged Lending policy revision, and subsequent interpretations which defined aggregate debt as total secured/unsecured debt, including unfunded commitments. While we did not have guidance on how to value oil & gas collateral for this purpose, we felt the value would not be adequate to sufficiently cover aggregate debt as now defined."  Wells Fargo knew in October 2014 that the Combined Company would have more liabilities than it had assets upon the closing of the Combination.  But a risky "secured" loan was better than unsecured debt, and the banks made a knowing trade-off to fund the secured loan instead of the unsecured Bridge Loan.

187.    Further evidencing their "workout" mentality, the banks loaned an additional $50 million of second lien "secured" debt (bringing the Second Lien Loan from $650 million to $700 million) despite knowing that a collateral shortfall existed at that time for the Second Lien Loan. At the Combination closing, the Second Lien Loan of $700 million (which sat ahead of the $1.15

billion of Legacy Sabine and Legacy Forest unsecured notes), was substantially undersecured. On the eve of the Combination, Barclays noted its aim to sell the interest in the Second Lien Loan as soon as possible, "*[b]ut to be clear, it is a below par instrument*."  On December 7, 2014, Barclays discussed in internal emails that it should be willing to fund the $50 million incremental Second Lien Loan because "our absolute exposure would be relatively small and this is an improved 2nd lien position.  If the company performs, there may ultimately be the potential to monetize the exposure to one of the existing 2nd lien holders at some discount . . . ."  Barclays questioned, however, whether the debt was "fungible" given "the fact that the existing [second lien debt] is trading in the low to mid 80s . . . ."  That might not "factor[] into the tax treatment/calculus if we're willing to purchase the loan at an above market price."  By January 8, 2015, Wells Fargo had already committed to selling its piece of the Second Lien Loan for 70.5 cents on the dollar, further confirming that Wells Fargo understood the just-issued incremental Second Lien "secured" debt to be substantially undersecured.

188.    Just three weeks after the closing, Wells Fargo made an official "asset quality rating change" for SOGC, downgrading the asset quality rating ("AQR") to a "Special Mention (6)" because it was clear that SOGC could not "demonstrate the ability to pay 100% [of its] senior debt or 50% [of its] total debt within 5-7 years."  Wells Fargo thus acknowledged that the Legacy Forest noteholders, which, by priority, were part of the one-half of SOGC's lenders that could not be paid, were intentionally hindered by the merger and abandonment of the Bridge Loan.  Wells Fargo again acknowledged that the $1 billion borrowing base established pursuant to the RBL re-negotiations was "non-conforming."

**L.**    ***Legacy Forest's Board of Directors Disregarded the Consequences of the Combination to Creditors***

189.    As discussed herein, Legacy Forest's board of directors made no effort to ascertain whether Legacy Forest was entering into a transaction that would create an insolvent company.  Indeed, upon information and belief, Legacy Forest's directors and officers paid minimal attention to the financial details of this multibillion-dollar transaction and the effect it would have on Legacy Forest's creditors.  The Combination resulted in the New RBL Facility ($750 million as of closing) and the $650 million of Legacy Sabine Second Lien Loan being placed ahead of the Legacy Forest Unsecured Notes, and yet, at no time leading up to the Debt Financing was the Forest board provided with, nor did the Forest board request, any analysis or models concerning (i) the impact of such debt being placed ahead of the Legacy Forest Unsecured Notes, or (ii) the recoveries to the holders of the Legacy Forest Unsecured Notes in a bankruptcy of the stand-alone Legacy Forest as compared to a bankruptcy of the combined company.

190.    It has been less than one year since this significant transaction closed, and yet McDonald, Legacy Forest's CEO and chief negotiator, testified that he could not recall any specifics regarding the Combination's proposed financing arrangements at any stage of the negotiations.  Remarkably, McDonald testified that he was unsure whether the Bridge Loan was ever funded or not.  Victor Wind, Legacy Forest's CFO, and Jim Lightner, the Chairman of the Legacy Forest board, both similarly testified that they did not know whether the Combination closed with a bridge facility in place.  In other words, the senior most officers and Legacy Forest's CEO and board member did not even know that the $800 million of Legacy Forest unsecured notes were to remain unpaid.

191.    Between May and early December 2014, when Legacy Sabine attempted to persuade Legacy Forest to mutually terminate the Combination, Legacy Sabine's opinion of the anticipated merger changed from enthusiasm to believing that a merger of the two companies "pose[d] significant harm and undue risk," could result in insolvency, and was "no longer in the best interests" of either company.  McDonald's perception of the benefits and challenges of the Combination, however, *did not change at all* between the signing of the initial agreement in May 2014 and the Combination's closing in December 2014.  Indeed, McDonald testified that he never fully understood Legacy Sabine's aforementioned concerns, and that he simply did not have enough information to understand what the Legacy Sabine models and forecasts said about the financial condition of the Combined Company.  Similarly, Lightner testified that the board did not totally understand the concerns underlying Legacy Sabine's request to terminate the Combination, but rather considered the request a likely attempt by Legacy Sabine to renegotiate the Combination's terms.

192.    McDonald testified that *Legacy Forest did not perform or ask any third party to perform any solvency analysis* of Legacy Forest in the crucial weeks leading up to the Combination's closing during which the alternate structure was adopted, even though oil and gas prices had collapsed since May 2014.  When asked whether Legacy Forest had conducted any solvency analysis of the Combined Company, Lightner testified that Legacy Forest did not.  When asked the same question, Legacy Forest CFO Victor Wind testified that Legacy Forest had looked at Legacy Sabine's models and formed its own opinion, but was unable to identify any independent analysis or modeling conducted by Legacy Forest.  It appears, however, that Wind was aware that a solvency analysis needed to be done, even if Legacy Forest declined to do one.  Indeed, McDonald told Wind on December 1, 2014 that Legacy Forest's outside counsel had

66

requested that Legacy Forest examine whether or not the Combined Company would be
insolvent, and requested that Wind examine Legacy Forest's "go it alone" versus merger options,
which Wind agreed to do.  The above-described request by Legacy Forest's counsel that Legacy
Forest should examine the potential for insolvency at the Combined Company may have been
futile regardless.  Wind testified at deposition that he had only recently learned that one measure
of insolvency is whether a company's liabilities exceed the fair value of its assets.  When asked
whether it was his understanding that the Combined Company would be insolvent on a balance
sheet basis at closing, Lightner testified that he was "sure there was probably a period where
there was negative equity value," and that he did not recall for how long the Combined
Company's equity values were expected to be negative thereafter.  Lightner testified that in
making its decisions, the Legacy Forest board held the "firm belief that if the shareholders did
well, everybody would do well," and that the board believed that "changing the structure made
sense for the Forest stakeholder group [as a] whole," including the holders of Legacy Forest's
debt.  But Legacy Forest director Dod Fraser testified that one of the anticipated benefits of the
alternate structure ultimately agreed upon was that it denied the Legacy Forest noteholders the
ability to exercise their put rights.

193.    When pressed as to why Legacy Forest would have amended the merger structure
to accomplish the Combination despite the consequences to Legacy Forest's creditors,
McDonald testified that Legacy Forest considered alternate transactional structures "in the spirit
of cooperation."  Legacy Forest's CFO viewed the Combined Company's need to obtain
covenant relief from the banks with respect to the debt-to-EBITDA ratio covenant as not
particularly troubling, because he had obtained such relief for Legacy Forest twice in the past
with nearly 100% lender consent.  Similarly, JPMorgan's view of the alternatives suggested that

there was no real need to alter the structure.  JPMorgan's consensus opinion, which it provided to Legacy Forest, was that the New RBL Lenders were likely to waive the debt-to-EBITDA covenant breach in the first quarter of 2015 because they were also the lenders on the Bridge Loan.

### M.    *The Legacy Forest and SOGC Board Effectuate the Merger and Financing*

#### 1.    *The Decisionmakers:  Legacy Forest / SOGC's Board of Directors at the Time of the Combination*

194.    Immediately prior to the Combination, the Legacy Sabine board of directors was comprised of Duane C. Radtke (Chairman of the Board), David J. Sambrooks, Michael G. France, Alex T. Krueger, Brooks M. Shughart and John Yearwood.  Sambrooks also served as chief executive officer of Legacy Sabine.  He also was the authorized representative of each of the Legacy Sabine Subsidiaries (except for Redrock Drilling LLC and Sabine Oil & Gas Financing Corporation, both of which Sambrooks acted on behalf of in the Financing), with full power under each of the respective limited liability company agreements to fully manage the affairs of each of those entities.

195.    Up until 6 a.m. Mountain Standard Time on December 16, 2014, the Legacy Forest board of directors was comprised of: Loren K. Carroll, Richard J. Carty, Dod A. Fraser, James H. Lee, James D. Lightner (Chairman of the Board), Patrick R. McDonald, and Raymond I. Wilcox.  McDonald served as chief executive officer of Legacy Forest.  Victor Wind served as chief financial officer of Legacy Forest.

196.    At all relevant times, Michael France served as a Managing Director of First Reserve, Alex Krueger was the Co-CEO & President of First Reserve, and Brooks Shughart was a Director of First Reserve.  Each also served as a Director on the Legacy Sabine board.  John

Yearwood, another member of the Legacy Sabine board, had a separate consulting and/or advisory agreement with First Reserve.

### 2.    *Actions Taken by the Respective Boards*

197.    At approximately 3:07 p.m. (MST) on December 15, 2014, a telephonic meeting of the Legacy Forest board was held at which James D. Lightner (Chairman), Patrick R. McDonald, Dod A. Fraser, Raymond I. Wilcox, Loren K. Carroll, Richard J. Carty and James H. Lee were present.  Also present from Legacy Forest were Victor A. Wind, Richard W. Schelin and Joseph G. Walker.  From Wachtell, Legacy Forest's counsel, Ronald Chen, Mark Gordon, Deborah Paul and Eric Rosof were present.  From JPMorgan, Legacy Forest's financial advisor, Laurence Whittemore, Lee Nix and Peter Kelly were present.  Lightner presided over the board meeting and Schelin served as secretary.

198.    During the meeting, Gordon provided an update to the Legacy Forest board regarding the status of the closing of the Combination.  The Compensation Committee then met to discuss performance bonuses and severance issues.  The full Legacy Forest board then approved performance bonuses, including CEO compensation, as recommended by the Compensation Committee. Also on December 15, 2014, the Legacy Forest board executed a Unanimous Written Consent of the board of Directors in Lieu of a Meeting.  The consent provided for acceptance of resignation of various directors, and removal and appointment of officers.

199.    At 6:00 a.m. (MST) on December 16, 2014, a telephonic meeting of the Legacy Forest board was held at which James D. Lightner (Chairman), Patrick R. McDonald, Dod A. Fraser, Raymond I. Wilcox, Loren K. Carroll, Richard J. Carty and James H. Lee were present. Also present from Legacy Forest were Victor A. Wind, Richard W. Schelin and Joe Walker. From Wachtell, Mark Gordon, Ronald Chen and Lisa Schwartz were present.  From JPMorgan,

Lee Nix and Peter Kelly were present.  Lightner presided over the board meeting and Schelin

served as secretary.

200.    The meeting lasted less than one hour, during which time Gordon presented "the

status of the amendments to the combination transaction with [Legacy Sabine] and the timing for

closing."  The original Legacy Forest board approved going forward with the share issuance to

First Reserve in exchange for the equity interests in two intermediate holding companies that in

turn owned Legacy Sabine.  At this stage, Legacy Sabine remained separate from Legacy

Forest—it had not yet merged into Legacy Forest.  Legacy Sabine was now a wholly owned

subsidiary of Legacy Forest, and First Reserve received its voting common and "non-voting"

preferred shares of Legacy Forest, giving it 73.5% of the economics of the two companies.

201.    Also at that morning board meeting, the original Legacy Forest board members

resigned, except for two (McDonald and Fraser).  Those two then appointed, by written directive,

six persons designated by First Reserve and Legacy Sabine, now comprising an eight-member

board.  This of course reflected the fact that First Reserve was to have the vast majority of the

economics of the combined companies.  Effective upon the share issuance to First Reserve (the

"Effective Time"), the directors of Legacy Forest had changed to the eight-person First-Reserve-

dominated slate, of Shughart, Kreuger, Sambrooks, Yearwood, Radtke, McDonald, Fraser and

Chewning (collectively, the "Sabine-Slate Directors")..

202.    At approximately 11:08 a.m. (CST), David Sambrooks, the CEO of Legacy

Sabine and a Legacy Sabine board member, wrote to the Sabine-Slate Directors:

> Welcome directors of (soon to be) Sabine Oil & Gas Corporation.
> We will close our transaction in short order – signature pages have
> been exchanged and we are waiting on share distribution to
> memorialize closing. . . Immediately after closing we need to have
> a quick telephonic board meeting to obtain formal approval of the
> combined company revolver and increase in second lien

> commitments. Of course we need this right away to close out the
> [Legacy Sabine] and [Legacy Forest] reserve base lending credit
> agreements and have in place the new SABO RBL revolver for
> liquidity.

Sambrooks also attached to this email the verbal consents that would be sought at the follow-up meeting and a press release which was to be published when the transaction closed.

203.    Upon information and belief, the "Effective Time" under the Combination Agreement is approximately 12:20 p.m. (CST), at which time a press release was issued.  The Legacy Forest board, consisting of the Sabine-Slate Directors, was in place.

204.    Approximately one hour later, at 2:30 p.m. (CST) the new board of directors met telephonically.  David Sambrooks (Chairman), Duane Radtke (Lead Director), Brooks Shughart, John Yearwood, Alex Krueger, Patrick McDonald, and Dod Fraser attended the meeting.  One director, Thomas Chewning, did not attend.  Also present was Timothy Yang from the Combined Company, and representatives from Vinson & Elkins LLP and Simpson Thacher & Bartlett LLP, both counsel to Legacy Sabine (which had not yet merged with Legacy Forest).  Timothy Yang served as secretary of the meeting.  During the meeting, Sambrooks reviewed proposed resolutions with respect to the Combined Company financing, including a new RBL Credit Agreement, an increase in the second lien commitments, and other revised financing documents. The Legacy Forest board then resolved "that any specific resolutions that may be required to have been adopted by the board or the Members in connection with the actions and transactions contemplated by the foregoing resolutions be, and they hereby are, adopted. . ."

205.    Upon information and belief, the resolutions adopted at this board meeting provided, among other things:

> a.    That the Combined Company is authorized and directed to (a) execute and
> deliver, and to perform its obligations under, the Financing Documents to
> which it is a party and (b) take all Related Actions;

71

b.  that the Combined Company approves the terms and conditions of the 2nd Term Amendment and all documents related thereto;

c.  that each Financing Document and all of the transactions contemplated thereby be, and each of them hereby is, authorized, ratified and approved in all respects on the terms determined by the Authorized Officers and on such other terms and conditions included in the final forms of the agreements to be negotiated, executed and delivered in connection therewith;

d.  that the Combined Company is, authorized and empowered to borrow and repay amounts as contemplated by the RBL Credit Agreement, the 2nd Term Amendment (upon the consummation of the Merger);

e.  that the Combined Company is, authorized and empowered to grant a security interest in, and to pledge, mortgage or grant deeds of trust with respect to, its right, title and interest in and to its properties and assets;

f.  that any of the Authorized Officers be, and each of them hereby is, authorized and empowered to negotiate the form, terms and provisions of, and to execute and deliver for and in the name and on behalf of the Combined Company any and all security documents;

g.  that, for any limited liability companies with the Combined Company as member that are Guarantors, the Combined Company is, authorized and empowered to execute and deliver such consents, resolutions and authorizations approving the execution and delivery of the Financing Documents, and to execute and deliver any Financing Documents, as the Combined Company may deem necessary or advisable to carry out the terms, intents and purposes of RBL Credit Agreement, the 2nd Term Amendment and other Financing Documents, or as required by the Administrative Agent in order to effect the transactions contemplated by RBL Credit Agreement and the 2nd Term Amendment; and

h.  that all acts and things heretofore done by any Authorized Officer or by any employees or agents of the Combined Company and any Subsidiary, on or before the date hereof in connection with the transactions contemplated by the foregoing resolutions be, and they hereby are, ratified, approved and confirmed in all respects.

206.    The meeting of the Legacy Forest board (consisting of the Sabine-Slate of directors) adjourned at 2:45 CST.  Only after that, at 2:48 p.m. CST, did the merger of Legacy Sabine into Legacy Forest become effective.

N.    *SOGC Begins a Restructuring Process Almost Immediately After the Combination Closed*

207.    On Monday, February 2, 2015, a matter of weeks after the Combination and Financing closed, Sambrooks emailed Krueger and Shughart, both SOGC board members and employees at First Reserve, to arrange a conference call that evening to discuss engaging Kirkland & Ellis LLP ("Kirkland").  Sambrooks wrote Krueger later than evening to convey that Sambrooks and Shughart had "caught up" on the issue, and Sambrooks understood that Krueger has already spoken with Shughart about retaining Kirkland.  Krueger (co-CEO and President of First Reserve) wrote back that night, "[Y]es I'm on board."  Sambrooks then scheduled a call for the SOGC board for the next day on the same issue.  Kirkland's engagement letter was retroactively dated to be effective on January 30, 2015.

## COUNT I
## INTENTIONAL FRAUDULENT CONVEYANCE
### Bankruptcy Code Sections 544 and 548 and
### Applicable New York, Texas, and Colorado State Law
### (Defendants Secured Parties)

208.    The Committee restates and re-alleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

209.    As a result of the Combination, which occurred within two years of the Petition Date, Legacy Forest and Legacy Sabine each incurred various obligations to the Secured Parties.

210.    On December 16, 2014, Legacy Forest incurred not less than $1.32 billion of obligations that were previously only obligations of Legacy Sabine, including (i) over $620 million in respect of the New RBL Facility; and (ii) over $700 million in respect of the Second Lien Loan.  On or thereafter, Legacy Forest transferred liens to secure those avoidable debts. Since the Combination, SOGC has made over $200 million in payments to the New RBL Agent and Second Lien Agent for the benefit of the New RBL Lenders and Second Lien Lenders,

including the transfer of approximately $180 million of proceeds from the Arkoma Sale to pay down the New RBL Facility just two days after it was funded.

211.    In addition, Legacy Sabine and the Legacy Sabine Subsidiaries, which held all of the assets of Legacy Sabine, incurred (i) $105 million in incremental secured obligations in respect of the New RBL Facility; (ii) a $356 million obligation under the New RBL Facility as a result of the $356 million draw on February 25, 2015; and (iii) $50 million in incremental obligations incurred under the Second Lien Loan in excess of the Legacy Sabine Second Lien Loan.  On or thereafter, Legacy Sabine and the Legacy Sabine Subsidiaries transferred liens in connection with the Legacy Sabine's obligations and the Legacy Sabine Subsidiaries' incremental guarantees of obligations under the New RBL Facility and the Second Lien Loan.

212.    These transfers made and obligations incurred by Legacy Forest and Legacy Sabine in effectuating the Combination were made with the intent to hinder, delay and defraud existing and future unsecured creditors of Legacy Sabine and Legacy Forest.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**Applicable New York State Law**
**(Defendants Legacy Forest Directors and Officers)**

213.    The Committee restates and re-alleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

214.    At the time of the Combination, Legacy Forest was insolvent, triggering a duty to preserve corporate assets for the benefit of the company's creditors.  The Legacy Forest Directors and Officers participated in the effectuation of the Combination and the Debt Financing, including the incurrence of obligations and the pledges of unencumbered assets made by Legacy Forest, in direct contravention of their fiduciary duties to Legacy Forest and its creditors.

215.    In addition, withholding the use of the proceeds of the sale of the Arkoma Assets

so they could be used by the post-Combination Company, rather than applying such proceeds for

the benefit of Legacy Forest and its creditors, was a breach of fiduciary duty.

216.    Each of these breaches of fiduciary duty resulted in damages to Legacy Forest and

the unsecured creditors of Legacy Forest.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**Applicable Delaware State Law**
**(Defendants Sambrooks and First Reserve Defendants**
**with respect to the Legacy Sabine Subsidiaries)**

217.    The Committee restates and re-alleges the foregoing paragraphs, which are

incorporated by reference as if set forth fully herein.

218.    As a result of the Debt Financing, the Legacy Sabine Subsidiaries incurred over

$900 million of new guarantees and received no cognizable benefit.  The Legacy Sabine

Subsidiaries did not have separate advisors from Legacy Sabine, who were the primary

beneficiaries of the incurrence of these additional obligations, nor were the positions of the

Legacy Sabine Subsidiaries even considered by the Legacy Sabine Directors and Officers

responsible for such decisions.  All of these actions were in clear violation of the fiduciary duties

owed to the Legacy Sabine Subsidiaries.

219.    The First Reserve Defendants and Sambrooks owed duties to the Legacy Sabine

Subsidiaries as controlling equity holders, and/or as general partners who are themselves liable

for the debts of such controlling equity holders.

220.    Each of these breaches of fiduciary duty resulted in damages to the Legacy Sabine

Subsidiaries.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**Applicable Delaware State Law**
**(Defendants Legacy Sabine Directors and Officers)**

221.    The Committee restates and re-alleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

222.    The Legacy Sabine Directors and Officers who approved the Debt Financing were conflicted.  Several of them were concurrently serving as directors or officers of First Reserve at the time of the negotiation and effectuation of the Combination or had been appointed to their roles by First Reserve.  As described above, First Reserve had interests in the Combination and Debt Financing separate and apart from any potential benefits to Legacy Sabine, and the Legacy Sabine Directors and Officers were acting at the direction of First Reserve in connection with the Combination.  Thus, in approving the Debt Financing, First Reserve's relationships with the Secured Parties took precedence over the benefits to Legacy Sabine, in breach of the fiduciary duties owed by the Legacy Sabine Directors and Officers.

223.    Each of these breaches of fiduciary duty resulted in damages to Legacy Sabine.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**Applicable New York Law**
**(Defendants Sabine-Slate Directors and First Reserve Defendants)**

224.    The Committee restates and re-alleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

225.    The Sabine-Slate Directors were the decision makers who approved the Debt Financing.  As the Sabine-Slate Directors were directors of what was then still Legacy Forest, before the merger of Legacy Sabine into Legacy Forest occurred, they owed the same duties to creditors owed by the predecessor Legacy Forest Directors and Officers.  Their approval of the

Debt Financing was in clear breach of their duty to preserve assets for the benefit of those creditors.

226.    Similarly, once the First Reserve Defendants became the controlling equity holders of Legacy Forest following the contribution and share exchange, the First Reserve Defendants owed duties to Legacy Forest and its creditors as controlling equity holders.  The First Reserve Defendants' knowing participation in approving the Debt Financing, instead of preserving the assets for the benefit of Legacy Forest's creditors, was a breach of those duties.

227.    Each of these breaches of fiduciary duty resulted in damages to the parties to whom the duties were owed.

## COUNT VI
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### Applicable New York and Delaware State Law
### (All Defendants)

228.    The Committee restates and re-alleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

229.    The breaches of fiduciary duties described in Counts II, III, IV, and V above were each aided and abetted by one or more Defendants.

230.    In negotiating, agreeing to, and implementing the Combination, the Legacy Forest Directors and Officers, Legacy Sabine Directors and Officers, and the First Reserve Defendants all knowingly participated in and induced the breaches of duties by their counterparts in connection with the Combination.

231.    The Secured Parties, Wells Fargo Securities, and Barclays Capital were all knowing participants in the Debt Financing that was a central part of the Combination and induced the pledging of unencumbered assets and guarantees of debt, thereby aiding and abetting the breaches of duty described in Counts II, III, IV, and V above.

## COUNT VII
## EQUITABLE SUBORDINATION
### Bankruptcy Code Section 510
### (Defendants New RBL Agent, New RBL Lenders,
### Second Lien Agent, and the Second Lien Lenders)

232.    The Committee restates and re-alleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

233.    A cause of action for equitable subordination can be asserted as an independent claim.[5]  *See, e.g.*, *Verestar,* 343 B.R. at 461-62 (holding that a creditors' committee stated a claim against the parent corporation for equitable subordination as a separate cause of action); *Kittay v. Atl. Bank of N.Y. (In re Global Serv. Grp., LLC)*, 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004) (identifying equitable subordination as a separate cause of action).

234.    The actions of the New RBL Agent, New RBL Lenders, Second Lien Agent, and the Second Lien Lenders in knowingly receiving fraudulent transfers and aiding and abetting breaches of fiduciary duties in connection with the Combination constituted inequitable conduct and directly injured the unsecured creditors of SOGC.

235.    The New RBL Parties were insiders of the Debtors during the negotiation and effectuation of the Combination and Debt Financing, either as "person[s] in control of the debtor" pursuant to 11 U.S.C. § 101(31)(B), or in the alternative, as non-statutory insiders.  The New RBL Parties exerted financial leverage over the Debtors (via First Reserve) and did not deal with the Debtors at arm's length, in each case in a manner that effectively permitted the New RBL Parties to control the Debtors and escape their out-of-the-money Bridge Loan commitment.

---

[5]To the extent any debt held by a Secured Party is not equitably subordinated under this count, the Committee seeks equitable subordination of such debt as a remedy under the other counts against that Secured Party.  *See, e.g.*, *LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 360-61 (Bankr. S.D.N.Y. 2014) (equitably subordinating claim based on defendant's breach of the implied covenant of good faith and fair dealing); *In re Osborne*, 42 B.R. 988, 1000 (W.D. Wis. 1984) (secured creditor's claim was equitably subordinated to creditor who extended credit in reliance of secured creditor's misrepresentations).

236.    The New RBL Parties knew that the Debtors would be insolvent upon closing the Combination and unable to satisfy unsecured creditor claims, and further knew that the New RBL Parties would sustain heavy losses were they to fund the unsecured Bridge Loan.

237.    The New RBL Parties engaged in a manipulative scheme to supplant the Bridge Loan with a new merger and financing structure that kept the Legacy Forest unsecured bonds in place, provided an unsupported borrowing base for the New RBL Facility, and funded an incremental $50 million of so-called Second Lien Loans—all for the purposes of providing short-term liquidity for a Combination which was doomed to fail, ensuring that the new financing was senior to all of the Debtors' unsecured claims and collecting transaction fees on the new financing.  Further, the New RBL Parties immediately sold their Second Lien Loan positions at steep discounts promptly after the Combination.

238.    The inequitable conduct of the New RBL Parties caused substantial harm to unsecured creditors, to the unfair benefit of the New RBL Parties.

239.    As a result of the New RBL Parties' inequitable conduct, Legacy Forest's unsecured creditors, who at a minimum would have received nearly all Legacy Forest assets, instead received an unsecured claim that is junior to over a billion in secured debt claims. Legacy Forest's unsecured creditors now have unsecured claims worth far less than had the Debtors not consummated the Combination.  The New RBL Parties obtained recourse to Legacy Forest and therefore access to collateral not previously encumbered to support the Legacy Sabine RBL.

240.    As a result of the New RBL Parties' inequitable conduct, Legacy Sabine's unsecured creditors, who at a minimum would have received a substantial amount of Legacy Sabine's assets, instead received an unsecured claim that is junior to over a billion in secured

debt claims, including incremental secured claims made possible only because of Legacy Forest

assets.  Legacy Sabine's unsecured creditors now have unsecured claims worth less than had the

Debtors not consummated the Combination.

241.    As a result of the New RBL Parties' inequitable conduct, the Legacy Sabine

Subsidiaries' unsecured creditors, who at a minimum would have received a substantial amount

of the assets of the Legacy Sabine Subsidiaries, instead received an unsecured claim that is junior

to over a billion in secured debt claims, including incremental secured claims made possible only

because of Legacy Forest assets.  The Legacy Sabine Subsidiaries' unsecured creditors now have

unsecured claims worth less than had the Debtors not consummated the Combination.

242.    The Second Lien Parties obtained a windfall in the Combination by Legacy Forest

becoming obligated on the Second Lien Loan and in obtaining access to assets of Legacy Forest.

Further, the Debtors were undercapitalized through an artificially inflated and unsupported

borrowing base.  The confluence of these facts resulted in the Second Lien Parties being unjustly

enriched such that equitable subordination of the claims under the Second Lien Loan Agreement

is warranted.

## COUNT VIII
## DEBT RECHARACTERIZATION
### Bankruptcy Code Section 105
### (Defendants New RBL Agent, New RBL Lenders,
### Second Lien Agent, and the Second Lien Lenders)

243.    The Committee restates and re-alleges the foregoing paragraphs, which are

incorporated by reference as if set forth fully herein.

244.    The New RBL Parties (or their affiliates) that funded the incremental $50 million

Second Lien Loan expected that the repayment of such loan would depend solely on the success

of the Debtors' business; these lenders did not expect to be repaid in the normal course.

80

245.    The Debtors were grossly undercapitalized prior to and upon the funding of the incremental $50 million Second Lien Loan.

246.    The Debtors could not obtain incremental financing from any sources other than the New RBL Parties (or their affiliates) who had already committed to finance the Debtors with a Bridge Loan.  The incremental $50 million Second Lien Loan was not a stand-alone, new-money credit, but rather a settlement of a commitment that the New RBL Parties (or their affiliates) and the Debtors (via First Reserve) considered to have equity-like risk and return.

247.    There was an identity of interest between the Debtors' controlling shareholder (First Reserve) and the incremental Second Lien Lenders, because, *inter alia*, First Reserve and the New RBL Parties worked together to avoid the New RBL Parties' unsecured Bridge Loan commitment, and each of these parties would have been adversely affected if the New RBL Parties' unsecured Bridge Loan commitment had closed as originally planned.

248.    The incremental $50 million Second Lien Loan effectively lacked security because it was not secured by collateral of any value and was deeply out of the money.

249.    The incremental $50 million of the Second Lien Loan was in substance a disguised equity investment.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, the Committee requests that judgment be entered against the Defendants as follows:

250.    Judgment against the New RBL Agent, New RBL Lenders, Second Lien Agent, and the Second Lien Lenders avoiding the following transfers as intentional fraudulent conveyances:

   i.  New RBL Facility obligations at Legacy Forest;

ii.     liens securing the New RBL Facility obligations at Legacy Forest;

iii.    New RBL Facility obligations (at least in part) at each of the Legacy

Sabine Subsidiaries;

iv.    liens securing the New RBL Facility obligations at each Legacy Sabine

Subsidiary;

v.     Second Lien Credit Agreement obligations at Legacy Forest;

vi.    the liens securing the Second Lien Credit Agreement obligations at

Legacy Forest;

vii.    Second Lien Credit Agreement obligations (at least in part) at the Legacy

Sabine Subsidiaries;

viii.    liens securing the obligations avoidable as set forth in clause (vii); and

ix.    payments of principal, interest and fees in respect of the New RBL

Facility and the Second Lien Credit Agreement.

251.    Judgment against the Legacy Forest Directors and Officers, the Legacy Sabine Directors and Officers, and the First Reserve Defendants for breaches of fiduciary duties.

252.    Judgment against the Legacy Forest Directors and Officers, Legacy Sabine Directors and Officers, First Reserve Parties, New RBL Agent, New RBL Lenders, Second Lien Agent, and the Second Lien Lenders for aiding and abetting the breaches of fiduciary duty by the Legacy Forest Directors and Officers, the Legacy Sabine Directors and Officers, and First Reserve.

253.    Equitable subordination and/or equitable disallowance of the claims of the New RBL Agent, New RBL Lenders, Second Lien Agent, and the Second Lien Lenders, either as a standalone cause of action, or as a remedy for the inequitable conduct of those parties in

82

connection Counts I and III.

254.    Recharacterization as equity of the incremental $50 million of the Second Lien

Loan.

255.    Awarding the Debtors' estates attorney's fees.

256.    Awarding the Committee, on behalf of the Debtors' estates, pre-judgment interest

at the maximum legal rate running from the date of the Combination and Debt Financing to the

date of recovery, and the costs of this action.

257.    Providing for such other relief as justice and equity may require.

Dated:  December ___, 2015

                                        ROPES & GRAY LLP

                                        _____
                                        Mark R. Somerstein
                                        Keith H. Wofford
                                        D. Ross Martin
                                        1211 Avenue of the Americas
                                        New York, New York 10036-8704
                                        Tel: (212) 596-9000
                                        Fax: (212) 596-9090
                                        mark.somerstein@ropesgray.com
                                        keith.wofford@ropesgray.com
                                        ross.martin@ropesgray.com

                                        *Counsel for the Official Committee of
                                        Unsecured Creditors*

## **Exhibit B**

Relevant Persons

| **LEGACY FOREST** | |
|---|---|
| Carroll, Loren K. | Director |
| Carty, Richard J. | Director, Audit Committee |
| Fraser, Dod A. | Director |
| Lee, James H. | Director, Audit and Compensation Committee |
| Lightner, James D. | Director, Chairman of the Board |
| Marter, Cyrus D. | President; GC; and Secretary (resigned Jan. 24, 2014) |
| McDonald, Patrick | Director; CEO |
| Wilcox, Raymond | Director, Chair of Compensation Committee |
| Wind, Victor | CFO |

| **LEGACY SABINE** | |
|---|---|
| Bayless, Shane | EVP; CFO |
| Elias, Ashraf | Controller; Director of Treasury and Budgeting |
| France, Michael | Director (also First Reserve) |
| Krueger, Alex | Director (also First Reserve) |
| Radtke, Duane | Director |
| Sambrooks, David | Director; CEO; Legacy Sabine Subsidiaries fiduciary |
| Shughart, Brooks | Director (also First Reserve) |
| Yang, Tim | SVP; GC; Corporate Secretary |
| Yearwood, John | Director, Chair of Compensation Committee |

| **FIRST RESERVE** | |
|---|---|
| France, Michael | Managing Director (also Legacy Sabine) |
| Krueger, Alex | Co-CEO; President (also Legacy Sabine) |
| Shughart, Brooks | Director (also Legacy Sabine) |
| Weiner, Joshua | Managing Director (capital markets) |

| SOGC (POST-COMBINATION) | |
|---|---|
| Chewning, Thomas | Director, Investigations Committee |
| Krueger, Alex | Director (also First Reserve) |
| McDonald, Patrick | Director |
| Radtke, Duane | Director |
| Sambrooks, David | Director; CEO; Legacy Sabine Subsidiaries fiduciary |
| Shughart, Brooks | Director (also First Reserve) |
| Yearwood, John | Director |

| BARCLAYS | |
|---|---|
| De Mendonca, Matthew | Director, Leveraged Finance Group |
| Gold, Joe | CEO of the Americas |
| McGrath, Joe | Co-Head of Banking |
| Sawyer, David | Global Head of Workout & Restructuring |

| WELLS FARGO | |
|---|---|
| Ferguson, Robert | VP, Leveraged Finance |
| Gould, Richard | Energy Credit and Risk Management |
| Patterson, Karin | Credit Officer |
| Scotto, Kevin | Director, Leveraged Finance Group |
| Wolfe, Gary | Co-Head of the Leveraged Finance Group |

| J.P. MORGAN SECURITIES LLC | |
|---|---|
| Whittemore, Laurence | Managing Director, Global Mergers & Acquisitions |