Paul M. Basta, P.C.
Jonathan S. Henes, P.C.
Christopher Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) Case No. 15-11835 (SCC) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| SABINE OIL & GAS CORPORATION, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Adversary Proceeding No. 16-___ |
| v. | ) |
| | ) |
| NORDHEIM EAGLE FORD GATHERING, LLC | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT FOR DECLARATORY JUDGMENT

In support of their Complaint for Declaratory Judgment, Sabine Oil & Gas Corporation

("Sabine") and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "Debtors"), state as follows:

---

[1]     The debtors in these chapter 11 cases (the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corporation (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is:  1415 Louisiana, Suite 1600, Houston, Texas 77002.

**Introduction and Nature of Action**

1.      On July 15, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 16, 2015, the Court entered an order [ECF No. 48] authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

2.      On September 30, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts* [Docket No. 371] (the "Motion").[2] On October 8, 2015, Nordheim Eagle Ford Gathering, LLC ("Nordheim") filed its objection to the Motion [Docket No. 387] (the "Objection"). On October 14, 2015, the Debtors filed their *Debtors' Omnibus Reply to Objections to Debtors' Omnibus Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts* [Docket No. 410] (the "Reply") in response to the Objection.

3.      On January 8, 2016, following several adjournments of the scheduled hearing on the Motion, Nordheim filed *Nordheim's Surreply Regarding Rejection of Certain Executory Contracts* [Docket No. 676] (the "Surreply"). On January 22, 2016, the Debtors filed the *Debtors' Response to Nordheim's Surreply Regarding Rejection of Certain Executory Contracts* [Docket No. 742].

4.      On March 8, 2016, the Court found "the Debtors' decision to reject each of the Nordheim Agreements . . . to be a reasonable exercise of business judgment." *See In re Sabine*

---

[2]      Because the contracts underlying the Motion have already been filed with the Court, the Debtors have omitted to include the contracts herein. The contracts will be provided upon Court request.

*Oil & Gas Corp.*, --B.R.--, 2016 WL 890299, at \*9 (Bankr. S.D.N.Y. Mar. 8, 2016).  A copy of

the opinion setting forth that decision is annexed hereto as **Exhibit A.**

5.    Although the Court approved the Debtors' decision to reject the agreements

underlying the Motion, the Court did not make a final determination as to whether the covenants

at issue run with the land. *Id.*  Accordingly, the Debtors bring this adversary complaint seeking a

finding that the Nordheim Agreements (as defined herein) do not contain covenants that run with

the land.

### Jurisdiction and Venue

6.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

7.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

8.    This adversary proceeding is commenced pursuant to Bankruptcy Rule 7001(2),

which allows for an adversary proceeding "to determine the validity, priority, or extent of a lien

or other interest in property," and section 105(a) of the Bankruptcy Code.  Declaratory relief is

appropriate pursuant to Bankruptcy Rule 7001 and 28 U.S.C. § 2201.

9.    As set forth below, an actual legal controversy exists between the Debtors and

Nordheim Eagle Ford Gathering, LLC (the "Defendant").

### Parties

10.    Plaintiff Debtor Sabine Oil & Gas Corporation ("Sabine") is a Delaware

corporation with its principal place of business in Harris County, Texas.

11.    Plaintiff Debtor Giant Gas Gathering LLC is an Oklahoma limited liability

company with its principal place of business in Harris County, Texas.

12.    Plaintiff Debtor Sabine Bear Paw Basin LLC is a Delaware limited liability

company with its principal place of business in Harris County, Texas.

13.     Plaintiff Debtor Sabine East Texas Basin LLC is a Delaware limited liability company with its principal place of business in Harris County, Texas.

14.     Plaintiff Debtor Sabine Mid-Continent Gathering LLC is a Delaware limited liability company with its principal place of business in Harris County, Texas.

15.     Plaintiff Debtor Sabine Mid-Continent LLC is a Delaware limited liability company with its principal place of business in Harris County, Texas.

16.     Plaintiff Debtor Sabine Oil & Gas Finance Corporation is a Delaware corporation with its principal place of business in Harris County, Texas.

17.     Plaintiff Debtor Sabine South Texas Gathering LLC is a Delaware limited liability company with its principal place of business in Harris County, Texas.

18.     Plaintiff Debtor Sabine South Texas LLC is a Delaware limited liability company with its principal place of business in Harris County, Texas.

19.     Plaintiff Debtor Sabine Williston Basin LLC is a Delaware limited liability company with its principal place of business in Harris County, Texas.

20.     Defendant Nordheim Eagle Ford Gathering, LLC is a Delaware limited liability company with its principal place of business in Harris County, Texas.

## General Allegations

### A.    The Nordheim Agreements

21.     Sabine[3] is party to two executory contracts with Nordheim.  The first executory contract is the *Gas Gathering Agreement* dated as of January 23, 2014 (the "Nordheim Gas Gathering Agreement"), which provides for Nordheim to gather, treat, dehydrate, and deliver all of the gas produced by Sabine from a certain area (the "Nordheim Dedicated Area").  The

---

[3]      The original party to the Nordheim Agreements was Sabine Oil & Gas LLC, which was merged into Forest Oil Corporation on December 16, 2014, and renamed Sabine Oil & Gas Corporation on December 19, 2014.

second executory contract is the *Condensate Gathering Agreement* dated as of January 23, 2014

(the "Nordheim Condensate Gathering Agreement" and, together with the Nordheim Gas

Gathering Agreement, the "Nordheim Agreements"), which provides for Nordheim to gather and

deliver all of the condensate produced by Sabine from the Nordheim Dedicated Area.   The

Nordheim Agreements obligate Sabine to deliver certain minimum amounts of gas and

condensate to Nordheim on an annual basis, pay annual gathering fees to Nordheim for the

services provided thereunder, and, to the extent that Sabine does not deliver certain minimum

amounts of gas or condensate each year, make deficiency payments to Nordheim on an annual

basis.

### B.     The Rejection Motion and Objections Thereto

22.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession,

"subject to the court's approval, may assume or reject any . . . executory contract or unexpired

lease of the debtor." 11 U.S.C. § 365(a).   The Debtors filed the Motion to reject the Nordheim

Agreements pursuant to section 365(a) of the Bankruptcy Code, noting that ample business

justification exists for the rejection of the Nordheim Agreements and explaining that the

Debtors' ongoing obligations thereunder constitute unnecessary drains on the Debtors' resources

compared to any minimal benefits associated with such contracts.

23.     Specifically, the Debtors have determined, in the exercise of their business

judgment, that it is no longer necessary or desireable to maintain the Nordheim Agreements

because the Debtors will likely be unable to deliver the minimum amounts of gas and condensate

required thereunder for certain periods, and absent rejection would be required to make certain

deficiency payments as a result.   The Debtors estimate that rejection of the Nordheim

Agreements will save the Debtors approximately $35 million in deficiency payments over the

life of the Nordheim Agreements.

24.     Nordheim argued in its Objection that rejection could not be in the best interests of the Debtors' estates because rejection could not relieve Sabine of the various covenants that it alleged "run with the land" under Texas law.[4]  *See* Nordheim Objection ¶¶ 12.   Specifically, Nordheim claimed that the provisions in each contract stating that the "Agreement shall be a covenant running with the Interests . . . within the Dedicated Area…." (the "Covenants") made the dedication of hydrocarbons and the payment of transportation fees covenants that run with the land. *See* Nordheim Objection ¶¶ 16; Nordheim Gas Gathering Agreement § 1.6; Nordheim Condensate Gathering Agreement § 1.6.

### C.      The Nordheim Agreements Do Not Contain Covenants Running With the Land

25.     Under Texas law, a covenant running with the land is not created simply by being named as such in a contract. *See, e.g., Musgrave v. Brookhaven Lake Property Owners Ass'n*, 990 S.W.2d 386, 395 (Tex. Ct. App. 1999) ("[T]erminology . . . is not dispositive [as to] an obligation intended to run with the land…."); *In re Jenkins*, 74 B.R. 440, 445 (N.D. Ga. 1987) ("[L]anguage in an instrument of conveyance or contract cannot create a covenant running with the land merely by stating that the interest conveyed is such….").   Rather, to prove that the Covenants run with the land under Texas law, Nordheim must satisfy five elements, the absence of any one of which is fatal: (1) there must be privity of estate; (2) the Covenants must touch and concern the land; (3) the Covenants must relate to a thing in existence or specifically bind the parties and their assigns; (4) the Covenants must be intended by the original parties to run with the land; and (5) the successor to the burden must have notice. *See In re Sabine*, 2016 WL 890299, at *12; *Inwood North Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. Sup. Ct. 1987).   "In every case where parties seek to enforce a restrictive covenant, the burden of

---

[4]         Both of the Nordheim Agreements states that it is governed by Texas law. *See* Nordheim Agreements § 7.1.

proof is upon them to establish that the covenant was imposed." *Davis v. Skipper*, S.W.2d 318, 321-22 (Tex. Sup. Ct. 1935); *see also Reagan Nat. Advertising of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 495 (Tex. App. Ct. 2002) (quoting *Davis*).   Nordheim fails to meet this burden because it cannot establish: (1) privity of estate; (2) that the Covenants "touch and concern" the land with which they are alleged to run; or (3) that the parties intended the Covenants to run with the land.

### D.    Nordheim Cannot Meet its Burden to Establish Privity of Estate

26.    Under Texas law, "for a covenant to run with the land, the covenant must be made between parties who are in privity of estate at the time the covenant was made, and must be contained in a grant of land or in a grant of some property interest in land." *Wasson Interests, Ltd. v. Adams*, 405 S.W.3d 971, 973 (Tex. Ct. App. 2013); *see also Jim Walter Homes, Inc. v. Youngtown, Inc.*, 786 S.W.2d 10, 11 (Tex. Ct. App. 1980) (finding no privity of estate where allegedly burdened party was not owner of land and explaining that "restrictive covenants which run with the land are created only by parties in privity of estate…."); *In re Energytec, Inc.*, 739 F.3d 215, 221 (5th Cir. 2013) (quoting *Ehler v. B.T. Suppenas Ltd.*, 74 S.W.3d 515, 521 (Tex. Ct. App. 2002)) ("[T]here must be privity of estate between the parties when the covenant was made…."); *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 910 (Tex. Sup. Ct. 1982) (same). "Privity of estate between covenanting parties means a mutual or successive relationship exists to the same rights in property." *Wasson*, 405 S.W.3d at 973; *see also Wayne Harwell Props. v. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex. Ct. App. 1997) ("Texas has accepted the view that this requirement is satisfied by either simultaneous or successive interests in the same land.").

27.    In other words, in order to satisfy the requirement that a covenant running with the land be made by parties in privity of estate, one party must have granted, sold, or otherwise

7

conveyed an interest in the property to which the covenant is said to attach. Under Texas law, a valid conveyance of property requires both (1) clear language evidencing an actual **grant** of such interest and (2) the **intent** of the grantor to convey an interest in property. *See Masgas v. Anderson*, 310 S.W.3d 567, 571 (Tex. App. 2010) ("If, from the whole instrument, a grantor and grantee can be ascertained, if there are operative words or words of grant showing an intention of the grantor to convey title to a real property interest to the grantee, and if the instrument is signed and acknowledged by the grantor, it is a deed that is legally effective as a conveyance.").

28.     As an initial matter, there is no clear language in the Nordheim Agreements granting an interest in property because they do not contain language of conveyance, such as a "grant" of an "interest in" any leasehold, fee, or other property interest. *See Masgas*, 310 S.W.3d at 571 (holding that a joint operating agreement for oil and gas leases was not effective as a conveyance because there were no "granting words."). Rather than reserve any interest in their property, the Debtors contracted with Nordheim to perform certain services related to the hydrocarbon products produced by Sabine from its property. *See* Nordheim Agreements § 1.2. This transferred right to transport and/or gather gas is not a real property interest under Texas law. *See In re Sabine*, 2016 WL 890299, at *14. Rather, "the covenants at issue are properly viewed as identifying and delineating the contractual rights and obligations with respect to the services to be provided, and not as reserving an interest in the subject real property." *In re Sabine*, 2016 WL 890299, at *13. As such, "the Agreements do not grant Nordheim…a real property interest in the Debtors' mineral estate…." *Id.*

29.     Nor do the Nordheim Agreements reflect any intent to convey an interest in property. Sabine could not have transferred an interest in property even if it desired to do so

given the fact that it does not own the mineral estate referred to in the Nordheim Agreements.[5]

Moreover, had Sabine and Nordheim wished to consummate a conveyance or sale transaction, they would have used the clear, unambiguous language they used for the sale of a separate parcel of land to Nordheim for purposes of constructing its gathering facilities. *See* Nordheim Agreements § 2.4.

### E.   Nordheim Cannot Meet its Burden to Establish that the Covenants "Touch and Concern" the Land.

30.   The second element required to establish that a covenant runs with the land under Texas law is that such covenant must "touch and concern" the burdened land. *See Inwood,* 736 S.W.2d at 635; *Wayne Harwell Props.*, 945 S.W.2d at 218.   Although the "tests involved in making this determination are far from absolute," courts utilize two tests to determine whether a covenant "touches and concerns" the land. *Westland Oil*, 637 S.W.2d at 911.   The first considers whether the covenant "affected the nature, quality or value of the thing demised, independently of collateral circumstances, or if it affected the mode of enjoying it," and the second evaluates whether "the promisor's legal relations in respect of the land in question are lessened… and the promisee's legal relations in respect to the land are increased…." *Id.*; *see also In re Sabine*, 2016 WL 890299, at *14.   In *El Paso Refinery*, the Fifth Circuit rejected the argument that a covenant affecting the value of land necessarily touched and concerned the land, noting that "even when a covenant impacts the value of land, it must still affect the owner's interest in the property or its use in order to be a real covenant." *In the Matter of El Paso Refinery, LP*, 302 F.3d 343, 357 (5th Cir. 2002); *see also In re Energytec, Inc.*, 739 F.3d at 224; *In re Sabine*, 2016 WL 890299, at *14.

---

[5]      Sabine South Texas LLC owns the mineral estate, and Sabine South Texas LLC is not a party to the Nordheim Agreements.

31.    "The covenants at issue here do not satisfy either test: they do not impact the value of the land independent of collateral circumstances and do not affect any interest in the real property of, or its use by, the owner." *In re Sabine*, 2016 WL 890299, at \*14.  The Covenants do not burden the Debtors' property interests; rather, they identify what property and products are the subject of the Nordheim Agreements.  "Under Texas law, such covenants do not have a direct impact upon the real property from which those products were produced and thus do not 'touch and concern' the land." *In re Sabine*, 2016 WL 890299, at \*15.  In addition, "the provisions in the contracts that trigger the covenants relate to the Products, not to the land itself…. The land itself remains unburdened." *Id.*

32.    Furthermore, the Covenants concern personal, rather than real, property.  Under Texas law, once minerals are produced they cease to be real property and instead become personalty. *See In re Sabine*, 2016 WL 890299, at \*15; *Sabine Prod. Co. v. Frost Nat. Bank of San Antonio*, 596 S.W.2d 271, 276 (Tex. Ct. App. 1980) ("Once minerals have been severed from the reservoir or strata wherein they were originally contained, such minerals … become personalty."); *Colorado Interstate Gas Co. v. Hunt Ener. Corp.*, 47 S.W.3d 1, 10 (Tex. Ct. App. 2000) ("Once oil or gas has been severed from the ground, it becomes personalty."); *Riley v. Riley*, 972 S.W.2d 149, 155 (Tex. Ct. App. 1998) (*citing Phillips Petroleum Co. v. Adams*, 513 F.3d 355, 363 (5th Cir. 1975) ("Texas law provides that oil and gas are realty when in place and personalty when severed from the land by production."). As such, the Nordheim Agreements have "no direct impact on the land itself." *See El Paso Refinery,* 302 F.3d 343 (5th Cir. 2002) (holding that an allocation of personal payment liability for environmental costs associated with a parcel of land does not touch and concern the land under Texas law).

**F.**     **Nordheim Cannot Establish that the Nordheim Agreements Create an Equitable Servitude**

33.     Nordheim fails to establish that the Covenants are equitable servitudes not subject to rejection pursuant to the Bankruptcy Code. *See In re Sabine*, 2016 WL 890299, at *18. "Because the Court has concluded that the covenants at issue do not 'concern the land or its use,' the Court also must conclude that the covenants at issue are likewise not enforceable as equitable servitudes." *Id.*

## Count I: Claim for Declaratory Judgment

34.     The Debtors repeat and reallege the allegations set forth in Paragraphs 1 through 33 *supra*, as well as those set forth in the Motion, Reply, and Reply to Surreply, as if fully set forth herein.

35.     As alleged hereinabove, the Covenants do not run with the land and nothing prevents the Debtors from entering into any agreements with respect to third parties regarding the Nordheim Dedicated Area.

36.     By reason of the foregoing, an actual, justiciable controversy exists between the Debtors and the Defendant as to whether the Covenants run with the land and as to whether the Court may authorize the rejection of the Nordheim Agreements in their entirety under section 365(a) of the Bankruptcy Code.

## Prayer for Relief

WHEREFORE, the Debtors respectfully request that judgment be entered as follows:

1.     On Count I, declaring that the Covenants do not run with the land.

2.     For such other and further relief as the Court deems just and proper.

Dated: March 18, 2016        */s/ Ryan Blaine Bennett*
New York, New York     Paul M. Basta, P.C.
Jonathan S. Henes, P.C.
Christopher Marcus, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Opinion**

FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) | Case No. 15-11835 (SCC) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

_____

## BENCH DECISION ON DEBTORS' OMNIBUS MOTION
## TO AUTHORIZE REJECTION OF CERTAIN EXECUTORY CONTRACTS[2]

APPEARANCES:

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, NY 10022
By:     Paul M. Basta, P.C.
          Jonathan S. Henes, P.C.
          Christopher Marcus, P.C.

300 North LaSalle
Chicago, IL 60654
By:     James H.M. Sprayregen, P.C.
          Ryan Blaine Bennett, Esq. (argued)
          Brad Weiland, Esq.
*Counsel to the Debtors*

BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Floor
New York, NY 10020

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is: 1415 Louisiana St., Suite 1600, Houston, Texas 77002.

[2]     This decision was dictated on the record of the hearing held on March 8, 2016.  It has been modified to include full citations and defined terms, and reflects minor additional non-substantive modifications.

By:    Robert G. Burns, Esq. (argued)

711 Louisiana St., Suite 2300
Houston, TX 77002
By:    William A. (Trey) Wood III, Esq.
       Jason G. Cohen, Esq.
*Counsel to Nordheim Eagle Ford Gathering, LLC*

LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
By:    Keith Simon, Esq. (argued)
       Annemarie V. Reilly, Esq.
*Counsel to HPIP Gonzales Holdings, LLC*

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
By:    Mark R. Somerstein, Esq. (argued)
       Keith H. Wofford, Esq.
       D. Ross Martin, Esq.
       C. Thomas Brown, Esq.
*Counsel to the Official Committee of Unsecured Creditors*

LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
By:    Margot B. Schonholtz, Esq. (argued)
       Robert H. Trust, Esq.
*Counsel to Wells Fargo, National Associate,*
*as Administrative Agent under First Lien Credit Agreement*

HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Before the Court is the Debtors' Motion (the "Motion") for an Order Authorizing

Rejection of Certain Executory Contracts [ECF No. 371].  By the Motion, the Debtors seek to

reject certain contracts between Sabine Oil & Gas Corporation ("Sabine") and Nordheim Eagle

Ford Gathering, LLC ("Nordheim"), and between Sabine and HPIP Gonzales Holdings, LLC

("HPIP") pursuant to section 365(a) of the Bankruptcy Code.

On October 8, 2015, Nordheim and HPIP[3] each filed an objection to the Motion [ECF

Nos. 386 and 387].  On October 14, 2015, the Debtors filed their omnibus reply to the objections

[ECF No. 410].  On January 8, 2016, Nordheim filed a surreply to the Motion [ECF No. 676],

and on January 22, 2016, the Debtors filed a response to that surreply [ECF No. 742].  The Court

heard oral argument on the Motion on February 2, 2016.

**Background**

The Debtors — an independent energy company engaged in the acquisition, production,

exploration, and development of onshore oil and natural gas properties in the United States —

filed petitions for relief under chapter 11 of the Bankruptcy Code with this Court on July 15,

2015.  The Debtors are operating their businesses and managing their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court entered an

order authorizing the joint administration and procedural consolidation of the Debtors' chapter

11 cases pursuant to Bankruptcy Rule 1015(b) on July 16, 2015.  There has not been a request

---

[3]     Nordheim and HPIP are so-called "midstream gatherers."  Situated operationally between
upstream companies such as Sabine and downstream refining companies, midstream gatherers
gather, treat, transport, and/or process mineral products produced from a well before such
products enter the commercial market.  *See, generally*, Kurt L. Krieger*, Gathering and
Transporting Marcellus and Utica Shale Natural Gas to the Market and the Regulation of
Midstream Pipeline Companies*, 19 Tex. Wesleyan L. Rev. 49 (2012).

1

for the appointment of a trustee or examiner in these chapter 11 cases. On July 28, 2015, the

Office of the U.S. Trustee for the Southern District of New York formed the official committee

of unsecured creditors pursuant to section 1102 of the Bankruptcy Code. Familiarity with the

background of the Debtors' businesses and chapter 11 cases, and with the December 16, 2014

combination of Sabine Oil & Gas LLC and Forest Oil Corporation (the "Combination"), is

assumed.[4]

### A. The Nordheim Agreements

As a result of the Combination, Sabine became party to two contracts with Nordheim,

each dated January 23, 2014: the first, a Gas Gathering Agreement, and the second, a Condensate

Gathering Agreement (together, the "Nordheim Agreements"). By the Gas Gathering

Agreement, Sabine agreed to "dedicate" to the "performance" of that agreement all of the gas

produced by Sabine from a designated area and deliver such gas to Nordheim, and Nordheim

agreed to gather, treat, dehydrate, and re-deliver that gas to Sabine. Nordheim further agreed to

construct, at its sole cost and expense, a gathering system of pipelines and treatment facilities to

provide certain agreed-upon services. The Gas Gathering Agreement contemplates a separate

and subsequent conveyance from Sabine to Nordheim of a mutually agreed tract of land in

connection with Nordheim's construction and operation of the gathering system. Sabine also

agreed to deliver a certain minimum amount of gas to Nordheim on an annual basis. To the

extent it does not deliver such minimum amounts, Sabine is required to make a deficiency

payment to Nordheim; Sabine also is obligated to pay monthly gathering fees to Nordheim. The

Gas Gathering Agreement has a 10-year term, with automatic yearly renewal subject to

termination, and is governed by Texas law.

---

[4] *See, generally, Declaration of Michael Magilton (A) in Support of First Day Motions and (B) Pursuant to Local Bankruptcy Rule 1007-2* [ECF No. 3].

The Condensate Gathering Agreement between Sabine and Nordheim contains substantially the same terms as the Gas Gathering Agreement, but it relates to liquid hydrocarbons and other liquids rather than gas. The Court will refer to the liquid hydrocarbons, gas, and other products that are the subject of the dedications in the Nordheim Agreements as the "Nordheim Products."

Each Nordheim Agreement specifically provides that the agreement itself is a "covenant running with the [land]" within the designated area, and is enforceable by Nordheim against Sabine, its affiliates, and their successors and assigns.[5]

## B. The HPIP Agreements

Sabine also became party to two contracts with HPIP as a result of the Combination: one, a Production Gathering, Treating and Processing Agreement, dated May 3, 2013, and the other a Water and Acid Gas Handling Agreement, dated May 2014, with no specific date (together, the "HPIP Agreements"). The former, the HPIP Gathering Agreement, obligates Sabine to "dedicate" to the "performance" of the agreement certain leases owned by Sabine and the oil, gas, and water produced from the wells located on the land subject to those leases, and to deliver that oil, gas, and water to HPIP. Pursuant to the agreement, HPIP agreed to construct, operate, and maintain gathering facilities to provide certain services with respect to the products delivered by Sabine. The HPIP Gathering Agreement is also governed by Texas law.

The latter, the HPIP Handling Agreement, contains substantially similar terms to those set forth in the HPIP Gathering Agreement, but provides for HPIP to construct, operate, and maintain disposal facilities for and perform disposal services with respect to all of the water and acid gas produced by Sabine from the same land subject to the leases. The Court will refer to the

---

[5]    Nordheim Gas Gathering Agreement ¶ 1.6; Nordheim Condensate Gathering Agreement ¶ 1.6.

3

oil, gas, acid, and water that are the subject of the dedications in the HPIP Agreements as the

"HPIP Products."

Each HPIP Agreement provides that Sabine's undertaking to deliver the HPIP Products to

HPIP is a covenant "running with the lands and leasehold interests" identified in the agreement,[6]

and further provides that the agreement "shall be binding upon and inure to the benefit of the

Parties hereto, their successors, assigns, heirs, administrators and/or executors."[7]

**Discussion**

### A. The Debtors Have Satisfied the Standard for Rejection of the Agreements

The Debtors seek to reject the Nordheim Agreements and the HPIP Agreements (referred

to collectively as the "Agreements") pursuant to section 365(a) of the Bankruptcy Code.  Under

that provision, a debtor in possession, "subject to the court's approval, may assume or reject any

executory contract…of the debtor."[8]  Subject to the requirement of notice and a hearing, and the

bankruptcy court's approval, section 365(a) allows the debtor in possession to evaluate its

executory contracts (and unexpired leases) and "decide which ones would be beneficial to adhere

to and which ones it would be beneficial to reject."[9]  "The purpose behind allowing the

assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to

use valuable property of the estate and to renounce title to and abandon burdensome property."[10]

As the Second Circuit held in *Orion Pictures Corp. v. Showtime Networks*, the "process

of deciding a motion to assume [or reject] is one of the bankruptcy court placing itself in the

position of…the debtor in possession and determining whether assuming [or rejecting] the

---

[6]     HPIP Gathering Agreement ¶ 1.2; HPIP Handling Agreement ¶ 1.2.

[7]     HPIP Gathering Agreement ¶ 9.2.1; HPIP Handling Agreement ¶ 8.2.1.

[8]     11 U.S.C. § 365(a).

[9]     *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F. 3d 1095, 1098 (2d Cir. 1993).

[10]    *Id.*

4

contract would be a good business decision or a bad one."[11]  This analysis is generally referred to

as a "business judgment" test, although it varies somewhat from the traditional business

judgment rule employed in state corporate law,[12] and requires the court to look at whether the

debtor's decision to assume or reject is beneficial to the estate.[13]  The bankruptcy court generally

defers to a debtor's determination as to whether rejection of an executory contract is

advantageous,[14] unless the decision to reject is the product of bad faith, whim, or caprice.[15]

Unless a separate provision of the Bankruptcy Code provides a non-debtor party with specific

protection, the interests of the debtor and its estate are paramount; adverse effects on the non-

debtor contract party arising from the decision to assume or reject are irrelevant.[16]  At root, the

question for the court on a motion to reject is "whether a reasonable business person would make

a similar decision under similar circumstances."[17]

     The Debtors argue that rejection of the Nordheim Agreements and the HPIP Agreements

is a reasonable exercise of their business judgment and is in the best interests of their estates

because those Agreements are unnecessarily burdensome.  Specifically, the Debtors submit that

it is not financially viable for them to deliver the minimum amounts of gas and condensate set

forth in the Agreements, and, absent rejection, they would therefore be required to make the

contractual deficiency payments, which would impose a considerable and unnecessary drain on

---

[11]    *Id.* at 1099; *see also In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008); *In re The Great Atlantic & Pacific Tea Co.*, 544 B.R. 43 (Bankr. S.D.N.Y. 2016) (RDD).

[12]    *In re The Great Atlantic & Pacific Tea Co.*, 544 B.R. at 48.

[13]    *In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 898033, at *4 (Bankr. S.D.N.Y. Mar. 24, 2006).

[14]    *In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005).

[15]    *Westbury Real Estate Ventures v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996).

[16]    *In re Penn Traffic Co.*, 524 F.3d at 383; *In re The Great Atlantic & Pacific Tea Co.*, 472 B.R. at 672-73; *In re Old Carco LLC*, 406 B.R. 180, 192-93 (Bankr. S.D.N.Y. 2009).

[17]    *In re Helm*, 335 B.R. 528, 538-39 (Bankr. S.D.N.Y. 2006).

the estates' resources.  If rejection is authorized, the Debtors state that they plan to enter into new
gathering agreements with other gatherers on terms more favorable to the Debtors.

Both Nordheim and HPIP object to the Debtors' proposed rejection, but for slightly
different reasons.  In its papers, Nordheim argues that the Debtors' decision to reject the
Nordheim Agreements does not satisfy the business judgment standard because Sabine's
covenants to dedicate the Nordheim Products and to pay a "transportation fee" are covenants that
run with the land and therefore would survive rejection.[18]  As argued by Nordheim, if the
Debtors reject the Nordheim Agreements, Sabine would remain bound by those covenants, and
rejection of the remainder of the agreements would provide little or no benefit to the Debtors'
estates.

At oral argument, however, Nordheim put forward an additional and distinct argument
for the first time: that while the Court can authorize the Debtors' rejection of the Nordheim
Agreements, it cannot in doing so make a determination as to the legal status under Texas
property law of those covenants in the Nordheim Agreements that Nordheim argues "run with
the land."  In support of its argument, Nordheim relies on the Second Circuit's decision in *Orion*
as a legal limitation on the Court's authority in the context of the Motion.  In that case, the
Second Circuit found that a bankruptcy court had committed reversible error by deciding a
disputed factual issue in the context of a motion to assume an executory contract.

Like Nordheim, HPIP argues that Sabine's dedication of certain of its leases and the
HPIP Products are covenants that run with the land and are not subject to rejection.[19]  Unlike

---

[18]    Nordheim Objection, ¶ 16 (citing *In re Banning Lewis Ranch Co., LLC*, 532 B.R. 335, 346
(Bankr. D. Colo. 2015) for proposition that debtor's rejection of an agreement does not affect
covenants to non-debtor parties that run with the land).

[19]    HPIP Objection, ¶ 9 (citing *Gouveia v. Tazbir*, 37 F.3d 295, 298 (7th Cir. 1994) holding that
covenants running with the land are property interests and cannot be extinguished through
bankruptcy).

6

Nordheim, however, HPIP does not object to the rejection of the HPIP Agreements, but opposes

only the Debtors' attempt to reject those certain covenants contained in the HPIP Agreements

that HPIP argues "run with the land."[20]  Contrary to Nordheim's *Orion* argument, HPIP submits

that the Court should make an affirmative determination in the context of this Motion that the

covenants do in fact run with the land and therefore cannot be rejected.

Significantly, neither Nordheim nor HPIP has put forward any arguments or evidence

that the Debtors' decision to reject their Agreements is the product of "bad faith, whim or

caprice."

As discussed more fully below, after review of Nordheim's *Orion* argument and Judge

Drain's recent decision in *In re The Great Atlantic & Pacific Tea Company, Inc.* interpreting

*Orion*, the Court concludes that it cannot decide substantive legal issues, including whether the

covenants at issue run with the land, in the context of a motion to reject, unless such motion is

scheduled simultaneously with an adversary proceeding or contested matter to determine the

merits of the substantive legal disputes related to the motion.[21]  Although Federal Rules of

Bankruptcy Procedure 6006 and 9014 provide that a proceeding to reject an executory contract is

a contested matter, the Second Circuit's decision in *Orion* makes clear that such a proceeding

"should be considered a summary proceeding, intended to efficiently review the trustee's or

debtor's decision to adhere to or reject a particular contract in the course of the swift

administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a

lengthy trial with disputed issues."[22]  In the instant case, because there is not procedural clarity or

consensus as to whether issue was properly joined on the substantive legal issues presented by

the Motion – *i.e.*, whether certain of the contractual terms are covenants that "run with the land"

---

[20]      HPIP Objection, p. 2.
[21]      *Orion*, 4 F.3d. at 1099.
[22]      *Id.* at 1098-99.

7

under Texas law – the Court must proceed in accordance with *Orion* and rule on the Motion

without deciding in a binding way the underlying legal dispute with respect to whether the

covenants at issue run with the land.  The Court does so reluctantly inasmuch as there is no doubt

that bifurcating the motion to reject and further proceedings to finally resolve the underlying

property law dispute is an inefficient use of judicial and private resources; it would have been far

preferable for the Court to hear the two together.

At oral argument, counsel for HPIP acknowledged that HPIP does not object to the

Debtors' rejection of the HPIP Agreements, stating that "there's no question they should reject"[23]

and that "assumption wouldn't make any sense."[24]  Accordingly, there is no dispute with respect

to the reasonableness of the Debtors' decision to reject the HPIP Agreements.  Nordheim,

however, challenges the reasonableness of the Debtors' decision to reject the Nordheim

Agreements, but has put forward no evidence or argument that the Debtors' decision was the

product of bad faith, whim, or caprice, or was otherwise an unreasonable exercise of the Debtors'

business judgment.

If it is ultimately determined that the covenants at issue in the Agreements do not run

with the land, as the Debtors argue and the Court believes to be the case, the Debtors will be free

to negotiate new gas gathering agreements with any party, likely obtaining better terms than the

existing agreements provide.  If, however, the covenants are ultimately determined to run with

the land, the Debtors will likely need to pursue alternative arrangements with Nordheim and

HPIP consistent with the covenants by which the Debtors would remain bound.  In either

scenario, the Debtors' conclusion that they are better off rejecting the Nordheim and HPIP

Agreements is a reasonable exercise of their business judgment.  Therefore, even though, as

---

[23]    Tr. of 2/2/16 Hearing 94:16-17 [ECF No. 816].
[24]    Tr. of 2/2/16 Hearing 97:20-23.

explained below, the Court's conclusion that the covenants at issue do not run with the land is non-binding, the Court finds the Debtors' decision to reject each of the Nordheim Agreements and the HPIP Agreements to be a reasonable exercise of business judgment.

In the absence of any allegation challenging the Debtors' decision-making process, the Court finds that the Debtors have properly and adequately considered the business and legal risks associated with rejection of the Nordheim Agreements and the HPIP Agreements.  Taking into account HPIP's consent to the rejection of the HPIP Agreements, and having identified no basis to find otherwise with respect to either the Nordheim Agreements or the HPIP Agreements, the Court defers to the business judgment of the Debtors to reject the Agreements.  Rejection of the Agreements relieves the Debtors of those terms that are subject to rejection (whether that be all or some of the terms of the Agreements as will be decided in a subsequent proceeding or agreed to by the parties), and will likely allow for the more efficient use of the Debtors' assets.

The Court's non-binding analysis as to whether the covenants at issue "run with the land" under Texas law follows.[25]

**B.  The Covenants At Issue Do Not "Run with the Land" under Texas Law**

The covenants at issue are (i) the Debtors' dedication to HPIP of the HPIP Products and certain leases to the performance of the HPIP Agreements; (ii) the Debtors' dedication to Nordheim of the Nordheim Products to the performance of the Nordheim Agreements; and (iii) the Debtors' covenant to pay Nordheim a gathering fee.  Generally, a covenant may run with the land as a real covenant or as an equitable servitude.  Here, the Court preliminarily finds that none of the covenants runs with the land either as a real covenant or as an equitable servitude.

---

[25]   It is clear that under *Orion* the Court may consider disputed legal issues in a non-binding way in the context of a motion to reject.  *In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. at 52.

1.    **Historical Development of Covenants "Running with the Land"**[26]

As many practitioners have noted, "[i]n U.S. property law, no rules are more arcane and anachronistic than those governing real covenants,"[27] a statement with which every first-year law student undoubtedly agrees.  Nevertheless, the use of property covenants is pervasive in the United States, and the law relating to covenants, while archaic, must still be faithfully applied. To inform its analysis of Texas law and its application to the facts here, the Court provides some background on the origins and development of covenants "running with the land" in the United States.

The original concept of covenants "running with the land" was introduced in early English law at a time when neither the rights nor the duties created by contract could be assigned.  Beginning in the landlord and tenant context, the idea that the benefit and burden of a covenant could run with the ownership interest was applied in other situations, including covenants included in a conveyance of land.  These covenants respecting the use of land that ran with the estate came to be known as "real covenants" and were enforceable in the English courts of law.

In the early cases, the courts tended to restrict the expansion of the use of real covenants by adding requirements to be met in order for a successor to recover for breach of a covenant in the original contract.  For example, in one of the earliest cases dealing with the running of a burden, *Spencer's Case*,[28] the English court in the year 1583 created two requirements: (1) for a covenant relating to something not in existence to run, it must expressly bind assigns and (2) a covenant must "touch and concern" the land in order for it to run.

---

[26]    *See generally* 9 Richard R. Powell, *Powell on Real Property*, § 60.01 (2015).
[27]    53 Rocky Mt. Min. L. Inst. § 19.01 (2007).
[28]    77 E.R. 72 (1583).

By 1834, the English courts of law had greatly narrowed the scope of legal relief available for breaches of covenants by holding that the running of the burdens on owners in fee violated public policy against encumbering land and restricting alienation.  Thereafter, English courts of equity began developing rules for the enforcement of covenants against successive interestholders.  Although over time English courts stopped finding that affirmative covenants run with the land, American jurisdictions have generally rejected that approach, instead adopting a policy that the requirements for running with the land should be more strictly applied to affirmative covenants than to negative ones.  The covenants that meet the test established by the courts of equity have come to be known as "equitable servitudes."

Over time, the use of covenants, both real and equitable, has become common.  Yet, many characterize the law of covenants as an "unspeakable quagmire,"[29] in part because of the continued distinction between real covenants and equitable servitudes even after the union of law and equity, as well as the development in judicial decisions of additional requirements and wrinkles across different jurisdictions.  Although the American Law Institute has pursued clarification by adopting the *Restatement (Third) of Property: Servitudes* in 1998, acceptance of some of the newer propositions has not been universal.

It is in this historical context that the Court has considered the arguments as to the status under Texas property law of the covenants at issue in this case, and has preliminarily concluded that the covenants do not run with the land either as real covenants or as equitable servitudes.

## 2.  Real Covenants

---

[29]     *See* 9 Richard R. Powell, *Powell on Real Property*, § 60.01 (2015) (citing Edward Rabin, Roberta Kwall, Jeffrey Kwall, and Craig Arnold, *Fundamentals of Modern Real Property Law 489* (6th ed. 2011).

The parties agree that whether the covenants run with the land is a question of Texas law, which is the law governing the Agreements.  Unfortunately, there appears to be no applicable binding decision of the Texas Supreme Court on all aspects of the question.  What follows is the Court's analysis of the issue based on existing caselaw.

Under Texas law, language in a contract containing a covenant is the primary evidence of the parties' intent, but terminology is not dispositive.[30]  Rather, a covenant runs with the land when (1) it touches and concerns the land; (2) it relates to a thing in existence or specifically binds the parties and their assigns; (3) it is intended by the original parties to run with the land; and (4) the successor to the burden has notice.[31]  Many courts have also required that the parties have horizontal privity of estate.  Neither Nordheim nor HPIP has identified any governing authority that has rejected the horizontal privity requirement, and so the Court has considered the issue of horizontal privity of estate in its analysis.[32]

 In their omnibus reply to the objections, the Debtors dispute the existence of three of these elements: (1) that there is horizontal privity of estate between, respectively, Sabine and Nordheim, and Sabine and HPIP; (2) that the relevant covenants "touch and concern" the land; and (3) that the parties intended those covenants to run with the land.

Horizontal privity of estate generally means that there was "simultaneous existing interests or mutual privity" between the original covenanting parties as either landlord and tenant or grantor and grantee.[33]  According to the traditional concept, the original covenanting parties seeking to create a covenant "running with the land" would need to have some additional transactional element to their relationship, and not merely be two parties seeking to covenant

---

[30]     *Musgrave v. Brookhaven Lake Property Owners Ass'n*, 990 S.W.2d 386, 395 (Tex. App. 1999).
[31]     *Inwood North Homeowners' Ass'n. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987).
[32]     *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 910-11 (Tex. 1982).
[33]     *Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 222 (5th Cir. 2013).

12

with one another.[34]  The traditional paradigm involves a property owner reserving by covenant, either for itself or another beneficiary, a certain interest out of the conveyance of the property burdened by the covenant.  That was the factual context before the Fifth Circuit in its decision in *Newco Energy v. Energytec, Inc.*[35] on which both Nordheim and HPIP rely almost exclusively in support of their argument that the covenants at issue run with the land.  In *Energytec*, the owner of a pipeline system assigned its property rights to one party, while reserving by covenant for another party the right to receive a fee for product transported on that property (*i.e.*, through the pipeline) and a right to consent to any assignment of that property – a clear instance of the promisor seeking to ensure that the conveyance of its property interests did not eradicate an interest in the property of a third party.

The facts here do not fit within that traditional model.  In this case, the Debtors did not in the context of a relevant conveyance reserve any interest for Nordheim or HPIP; rather, they simply engaged Nordheim and HPIP to perform certain services related to the hydrocarbon products produced by Sabine from its property.  The covenants at issue are properly viewed as identifying and delineating the contractual rights and obligations with respect to the services to be provided, and not as reserving an interest in the subject real property.

Moreover, the Agreements do not grant Nordheim or HPIP a real property interest in the Debtors' mineral estate, which is comprised of five real property rights, or "sticks," under Texas law: "(1) the right to develop (the right of ingress and egress),  (2) the right to lease (the executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals, [and] (5) the right to receive royalty payments."[36]  A right to transport or gather produced gas is

---

[34]     53 Rocky Mt. Min. L. Inst. § 19.03 (2007).
[35]     739 F.3d at 221.
[36]     *Lesley v. Veterans Land Bd.*, 352 S.W.3d 479, 481 n.1 (Tex. 2011) (quoting *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986)).

clearly not one of these "sticks."[37]  Therefore, under Texas law, the Debtors have not transferred

any portion of their real property interests to Nordheim or HPIP through the Agreements.

The covenants at issue also do not appear to satisfy the "touch and concern" prong.

Courts utilize two tests for determining whether that prong is satisfied under Texas law, although

these tests are not "absolute."[38]  The first test considers whether the covenant "affected the

nature, quality or value of the thing demised, independently of collateral circumstances, or if it

affected the mode of enjoying it."[39]  The second test evaluates whether "the promisor's legal

relations in respect of the land in question are lessened—his legal interest as owner rendered less

valuable by the promise…[and] if the promisee's legal relations in respect to the land are

increased—his legal interest as owner rendered more valuable by the promise."[40]  The Fifth

Circuit, in interpreting Texas law, has stated that "[a]lthough the caselaw is somewhat unclear, it

is at least arguable that the benefit requirement has been abandoned by the Texas courts"—

meaning that a covenant need only burden the promisor's legal interest in the land to "touch and

concern" that land.[41]  But, the Fifth Circuit has also explained that it is not enough that a

covenant affect the value of the land; "it must still affect the owner's interest in the property or its

use in order to be a real covenant."[42]  The covenants at issue here do not satisfy either test: they

do not impact the value of the land "independent of collateral circumstances" and do not affect

any interest in the real property of, or its use by, the owner.  Rather, those covenants constitute

---

[37]     *Id.* at 481.
[38]     *Westland Oil,* 637 S.W.2d at 911.
[39]     *El Paso Refinery, LP v. TRMI Holdings, Inc. (In re El Paso Refinery, LP)*, 302 F.3d 343, 356 (5th
Cir. 2002).
[40]     *Westland Oil,* 637 S.W.2d at 911.
[41]     *El Paso*, 302 F.3d at 356.  Not only is the caselaw "somewhat unclear," but each of the two tests
identified in the caselaw is somewhat analytically circular.
[42]     *Id.* at 357.

an undertaking personal to the producer (Sabine) and the midstream service providers (Nordheim and HPIP).

Under Texas law, once minerals are extracted from the ground, such minerals cease to be real property and instead become personal property.[43]  The covenants at issue concern only Sabine's interests in the produced "Products."  The dedication covenants provide Nordheim and HPIP, as Sabine's service-providers, with the products needed to perform the contracted-for services.  This is true even for the Debtors' dedication of certain leases in the HPIP Agreements inasmuch as that dedication is in furtherance of the overarching purpose of the contract, which is to provide product services to the Debtors.  Similarly, the gathering fee compensates Nordheim for gathering those Products as part of its provision of those services.  Contrary to HPIP's argument, the "dedication" does not constitute a burdening of the Debtors' property interests, but rather an identification of what property and products are the subject of the Agreement and will be made available to the gatherer in furtherance of the purposes of the Agreements.  Under Texas law, such covenants do not have a direct impact upon the real property from which those products were produced and thus do not "touch and concern" the land.  They concern only the Products produced from real property and affect only Sabine's personal property rights.[44]

---

[43]     *See, e.g., Sabine Prod. Co. v. Frost Nat. Bank of San Antonio*, 596 S.W.2d 271, 276 (Tex. Civ. App. 1980); *Colorado Interstate Gas Co. v. Hunt Energy Corp.*, 47 S.W.3d 1, 10 (Tex. App. 2000), *pet. denied*; *Riley v. Riley*, 972 S.W.2d 149, 155 (Tex. App. 1998); *Phillips Petroleum Co. v. Adams*, 513 F.3d 355, 363 (5th Cir. 1975).

[44]     An argument might be made that the fact that only "produced" Products are dedicated to the performance of the Agreements does not limit such a dedication to Products extracted from the ground (*i.e.*, personal property) but also includes Products that are still in the ground (*i.e.*, real property) because, under Texas law, a conveyance of oil and gas "produced and saved" is classified as a royalty interest, which is characterized by Texas courts as a real property interest.  Such an argument, however, depends on the separate and different conclusion that a conveyance of oil and gas "produced and saved" is a conveyance of oil and gas not extracted from the ground, *i.e.*, the reserves.  That conclusion does not logically follow, and therefore any such argument would fail.  Moreover, as discussed *infra*, the Debtors' reserves are subject to the liens of their reserve-based lenders.

Another consideration that the Fifth Circuit has examined in determining whether a covenant burdens the land is whether the action triggering the covenant is one that affects the land.[45]  In *Westland Oil*, for example, the Texas Supreme Court held that a covenant obligating a third-party to assign part of its interest in certain oil and gas leases "touched and concerned the land" in part because the covenant was triggered by the drilling of a test well on the land.[46]  Here, the triggers for the covenants at issue relate to the Products, not to the land itself.

The dedication covenants are triggered contractually by Sabine's production and saving of the Nordheim and HPIP Products, while the Nordheim gathering fee covenant is triggered by Nordheim's receipt of the Nordheim Products.  None of those triggers affects the land from which those products have been produced.  Rather, only *the products themselves*, and, importantly, Sabine's rights with respect to those products, are affected by those covenants.[47]  The land itself remains unburdened.[48]

On this basis, once again, *Energytec* is distinguishable.[49]  First, the right to consent to an assignment in *Energytec* was a clear burden on the land because it restricted the landowner's rights of alienation of its property.  Such a burden does not exist here.  Second, unlike the Nordheim gathering fee, the transportation fee in *Energytec* was secured by a lien on the entire

---

[45]    *El Paso*, 302 F.3d at 356 (distinguishing *Westland Oil*).

[46]    *Westland Oil*, 302 F.3d at 357.

[47]    A question as to the extent of the Debtors' rights under the Agreements or otherwise to transport Products by means other than the gathering systems of Nordheim and HPIP arose at oral argument – to wit, the Debtors acknowledged that they are in fact using trucks instead of the HPIP gathering system to transport certain HPIP Products, a fact of which HPIP's counsel stated he was unaware.  *See* Tr. of 2/2/16 Hearing 105:18-23.  The transportation of the HPIP Products other than through HPIP's gathering system, if permissible under the HPIP Agreements, supports the conclusion that the dedication covenants in the HPIP Agreements do not "touch and concern" the land.  As of the date hereof, HPIP has not, to the Court's knowledge, sought injunctive relief against the Debtors relating to such activities.

[48]    *See El Paso*, 302 F.3d at 356 *(citing Mobil Oil Corp. v. Brennan*, 385 F.2d 951, 953 (5th Cir. 1967) (describing covenant preventing mineral estate owner from interfering with surface grazing and from placing pipelines above certain depth)).

[49]    739 F.3d at 221.

gas pipeline system, which was owned by the promisor. As the Debtors point out, not only is the

Nordheim gathering fee not secured, but the property subject to the Nordheim Agreements is

subject to preexisting liens held by the Debtors' secured lenders. Those lienholders did not

approve a conveyance of any interest in the land subject to the liens, and they were not informed

of any interest being created in those properties.[50] Moreover, while Nordheim and HPIP point to

local recordings filed in connection with their respective Agreements, there was no security

provided to them with respect to their alleged interests in the property. Contrary to Nordheim's

argument that any lien priority dispute is an issue between the Debtors and their lienholders,[51]

those facts strongly militate against a finding that the covenants at issue burden the property and

thus touch and concern the land.

*Energytec* is also distinguishable by the fact that the obligation to pay the transport fee in

that case was triggered simply by the flow of gas through the pipeline. Here, in contrast, the

Nordheim gathering fee is triggered by Nordheim's receipt of gas from Sabine into Nordheim's

own facilities. Nordheim's gathering fee is thus not as directly tied to the promisor's land as was

the case in *Energytec*. The Nordheim gathering fee covenant therefore has no direct connection

to or impact on the land or on Sabine's property rights.[52] Neither the property owner's interest in

the land (as distinct from the products produced from those lands) nor its use of those lands is

affected by such covenants, which, as the Fifth Circuit stated in *El Paso*, do not "compel []or

preclude [the owner]…from doing anything on the land itself."[53]

Having found preliminarily that the covenants at issue do not (i) readily fit into the

traditional paradigm for horizontal privity of estate or (ii) "touch and concern" the Debtors' land,

---

[50]    Tr. of 2/2/16 Hearing 114:6-9.
[51]    Tr. of 2/2/16 Hearing 119:18-25.
[52]    *El Paso*, 302 F.3d at 346.
[53]    *Id.* at 346, 356-57.

the Court need not further extend its real covenant analysis at this time; accordingly, the Court

has not considered the issue of the parties' intent.

### 3. Equitable Servitudes

Nordheim, in its surreply, alternatively argues that even if the covenants at issue are

personal covenants, they constitute equitable servitudes which cannot be rejected pursuant to the

Bankruptcy Code. This argument lacks merit. An equitable servitude is enforceable when the

contracting parties are in privity of estate at the time of the conveyance and a subsequent party

purchases the land with notice of the restriction.[54] However, in the case of an equitable

servitude, the restriction sought to be enforced must still "concern the land or its use or

enjoyment."[55] Because the Court has concluded that the covenants at issue do not "concern the

land or its use," the Court also must conclude that the covenants at issue are likewise not

enforceable as equitable servitudes.

### Conclusion

For all of the foregoing reasons, the Court finds that the decision to reject the Nordheim

Agreements and HPIP Agreements is a reasonable exercise of the Debtors' business judgment.

Accordingly, the Court authorizes the rejection of those agreements as of the dates requested in

the Motion.

As required by *Orion*, in granting the Motion, the Court does not make any final

determination as to whether the covenants at issue run with the land or as to any substantive legal

issue other than granting authority to reject the contracts under section 365(a). The Court does

not at this time grant the Debtors' request to limit the nature of the claims that Nordheim or HPIP

may file against the Debtors' estates, nor does it grant Nordheim's request for what is effectively

---

[54]    *Id.* at 358.
[55]    *Id.*

18

15-11835-scc   Doc 872   Filed 03/08/16   Entered 03/08/16 16:28:39   Main Document
Pg 21 of 21

relief from the automatic stay to pursue remedies against Sabine and its property.  Nordheim and

HPIP may file claims (and, in HPIP's case, amend its previously filed claim) against the

Debtors' estates consistent with what each of them believes its legal rights to be, and those

claims may be resolved promptly through the Debtors' claims administration process.  The

parties are directed to submit an order consistent with this decision.

Dated: March 8, 2016
      New York, New York

_____/S/ Shelley C. Chapman_____
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE
