**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) | Case No. 15-11835 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**BENCH DECISION ON MOTIONS FOR LEAVE, STANDING, AND**
**AUTHORITY TO COMMENCE AND PROSECUTE CERTAIN CLAIMS AND**
**CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES[2]**

A P P E A R A N C E S :

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
By:    Mark R. Somerstein, Esq.
        Keith H. Wofford, Esq.
        D. Ross Martin, Esq.
        C. Thomas Brown, Esq.
*Counsel to the Official Committee of Unsecured Creditors*

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
By:    Jonathan S. Henes, P.C.
        Christopher J. Marcus, P.C.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is: 1415 Louisiana St., Suite 1600, Houston, Texas 77002.

[2]    This decision was dictated on the record of the hearing held on March 24, 2016.  It has been modified to include full citations and defined terms, and it reflects minor additional non-substantive modifications.

300 North LaSalle
Chicago, Illinois 60654
By:    Gabor Balassa, P.C.
       A. Katrine Jakola, Esq.
       Whitney L. Becker, Esq.
*Counsel to the Debtors*

BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
By:    Robert J. Stark, Esq.
       Daniel J. Saval, Esq.
*Counsel to the Forest Notes Indenture Trustees*

LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
By:    Margot B. Schonholtz, Esq.
       Robert H. Trust, Esq.
*Counsel to Wells Fargo, National Association, as First Lien Agent*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
By:    Moses Silverman, Esq.
       Brian S. Hermann, Esq.
       Kyle J. Kimpler, Esq.
*Counsel to Wilmington Trust, N.A. as Second Lien Agent*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Andrew J. Rossman, Esq.
       Susheel Kirpalani, Esq.
       Julia M. Beskin, Esq.
*Counsel to FRC Founders Corporation, Sabine Investor Holdings LLC, First Reserve Fund XI,
L.P., First Reserve GP XI, L.P., First Reserve GP XI, Inc., Alex Krueger, Brooks Shughart,
Michael France, and Joshua Weiner*

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
By:    Joseph J. Frank, Esq.
       Fredric Sosnick, Esq.
*Counsel to Barclays Bank PLC and Barclays Capital Inc.*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
By:    Kenneth R. David, Esq.
         Daniel A. Fliman, Esq.
*Counsel to Richard J. Carty, Loren Carroll, Dod Fraser, James Lee, James Lightner, Patrick R.*
*McDonald, Raymond Wilcox, and Victor Wind*

AKIN, GUMP, STRAUSS, HAUER & FELD LLP
One Bryant Park
New York, New York 10036
By:    Daniel H. Golden, Esq.
         Philip C. Dublin, Esq.
         Sara L. Brauner, Esq.

EMMET, MARVIN & MARTIN, LLP
120 Broadway, 32nd Floor
New York, New York 10271
By:    Edward P. Zujkowski, Esq.
         Thomas A. Pitta, Esq.
*Co-counsel to The Bank of New York Mellon Trust Company, N.A. as Trustee under the 2017*
*Notes Indenture*

CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
101 Park Avenue
New York, New York 10178
By:    Steven J. Reisman, Esq.
         Theresa A. Foudy, Esq.
*Counsel to Sabine Directors Duane Radtke, David Sambrooks, and John Yearwood*

## Table of Contents

I.    Applicable Standard ........................................................................................ 4

II.   Scope of Decision and Ruling ....................................................................... 12

III.  Background ..................................................................................................... 13

IV.   The STN Hearing ........................................................................................... 30

V.    Discussion ....................................................................................................... 41

  A. *Constructive Fraudulent Transfer Claims* ................................................ 41

    1. *Constructive Fraudulent Transfer Claims to Be Asserted on behalf of Legacy Forest* ............................................................................................ 42

    2. *Constructive Fraudulent Transfer Claims to Be Asserted on behalf of the Legacy Sabine Subsidiaries* ................................................................... 51

  B. *The Bad Acts Claims* ............................................................................... 59

    1. *The Committee's Alleged Theory of the Bad Acts Claims is Implausible and is Contradicted by the Record* .............................................................. 60

    2. *The Intentional Fraudulent Transfer Claims are Not Colorable* ............... 66

    3. *The Breach of Fiduciary Duty Claims are Not Colorable* ....................... 70

    4. *The Aiding and Abetting Breach of Fiduciary Duty Claims are Not Colorable* ........... 83

    5. *The Equitable Subordination Claims are Not Colorable* ........................... 84

    6. *The Recharacterization Claims are Not Colorable* ................................... 88

  C. *Conclusions with Respect to Colorability* ................................................ 91

  D. *Consideration of the STN Best Interests Test* ........................................... 91

    1. *Value of the Constructive Fraudulent Transfer Claims to be Asserted on Behalf of the Legacy Sabine Subsidiaries' Estates* .................................. 92

    2. *Avoidance of Liens* ................................................................................. 93

    3. *Recovery of New RBL Paydown, Merger and Financing Fees, and Prejudgment Interest* ................................................................................. 95

    4. *Diminution in Value of Liens Improperly Granted to the New RBL Lenders* .............. 97

    5. *Cost-Benefit Analysis* .............................................................................. 100

  E. *Methodology for Calculating Value of Adequate Protection Claims* ............ 101

VI.   Conclusion ..................................................................................................... 108

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the (i) Motion of the Official Committee of Unsecured Creditors for

(I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of

Action on Behalf of the Debtors' Estates and (II) Non-Exclusive Settlement Authority, dated

November 17, 2015 [ECF No. 518] (the "First Committee STN Motion"); (ii) Motion of the

Forest Notes Indenture Trustees for Entry of an Order Pursuant to § 1109(b) Granting Leave,

Standing and Authority to Prosecute and, if Appropriate, Settle Certain Claims on Behalf of the

Estate of Sabine Oil & Gas Corporation, dated November 17, 2015 [ECF No. 521] (the "Forest

Notes Indenture Trustees' STN Motion"); and (iii) Second Motion of the Official Committee of

Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain

Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Non-Exclusive

Settlement Authority, dated December 15, 2015 [ECF No. 609] (the "Second Committee STN

Motion," and, collectively with the First Committee STN Motion and the Forest Notes Indenture

Trustees' STN Motion, the "STN Motions").  The Official Committee of Unsecured Creditors

(the "Committee") and the indenture trustees for the Legacy Forest Notes (as defined herein) (the

"Forest Notes Indenture Trustees") shall be referred to herein collectively as the "Movants."

Throughout these cases, the parties have grouped the claims that are the subject of the

STN Motions into three categories.  First, the First Committee STN Motion and the Forest Notes

Indenture Trustees' STN Motion each seeks standing to pursue constructive fraudulent

conveyance claims against the Debtors' current and former secured lenders arising from the

December 2014 merger between Forest Oil Corporation ("Legacy Forest") and Sabine Oil & Gas

LLC ("Legacy Sabine Parent") and related financing transactions (collectively, and with the

1

merger, the "Combination").[3]  Specifically, these claims (the "Constructive Fraudulent Transfer Claims") seek, on behalf of (i) the Legacy Forest estate and (ii) the estates of the subsidiaries of Legacy Sabine Parent (the "Legacy Sabine Subsidiaries"), to avoid obligations incurred, liens transferred, and payments made in connection with or related to the Combination.

Second, the Second Committee STN Motion seeks standing to pursue claims for (i) intentional fraudulent transfers related to the Combination; (ii) breaches of fiduciary duty against (a) the pre-Combination Legacy Forest directors and officers (the "Legacy Forest Directors and Officers"); (b) the Legacy Sabine Parent board of directors; (c) Mr. David J. Sambrooks, as fiduciary for the Legacy Sabine Subsidiaries; and (d) the members of the board of directors of the Combined Company who replaced the Legacy Forest board of directors at or around 1:20 p.m. EST on December 16, 2014 and met for the first time at 3:30 p.m. EST on December 16, 2014 (the "3:30 Board"); (iii) aiding and abetting breaches of fiduciary duty against the New RBL Lenders,[4] the Second Lien Lenders,[5] the Legacy Forest Directors and Officers, and the First Reserve Defendants (as defined below); (iv) equitable subordination of the claims of the New RBL Lenders and the Second Lien Lenders; and (v) recharacterization as

---

[3]        A note on terminology: as further described below, through the Combination, Legacy Sabine Parent merged into Legacy Forest, leaving Legacy Forest as the surviving entity and the current parent company of the Debtors.  In the days following the Combination, Legacy Forest was renamed Sabine Oil & Gas Corp.  As a result, the pleadings and documents contemporaneous with the Combination sometimes refer to Legacy Forest following Legacy Sabine Parent's merger into it as the "Combined Company" or Sabine Oil & Gas Corp.  For purposes of this decision, references to "Legacy Forest" or the "Combined Company" each refer to the Debtors' parent entity, which prior to the Combination was known as Forest Oil Corp. and is now known as Sabine Oil & Gas Corp.

[4]        The term "New RBL" shall refer to the reserve-based revolving credit facility evidenced by an amended and restated First Lien Credit Agreement, dated December 16, 2014, among Sabine Oil & Gas Corporation and the lenders party thereto (the "New RBL Credit Agreement").  The term "New RBL Lenders" shall refer to those lenders under the New RBL Credit Agreement: Capital One N.A., Citibank, N.A., Bank of America N.A., Natixis New York Branch, and UBS AG Stamford Branch, Wells Fargo Bank, N.A. ("Wells Fargo"), and Barclays Bank PLC ("Barclays").  Wells Fargo executed the New RBL Credit Agreement on behalf of itself individually and as administrative agent (the "New RBL Agent").

[5]        The term "Second Lien Lenders" shall refer to those lenders under the Second Lien Credit Agreement, dated December 14, 2012 (as amended, the "Second Lien Credit Agreement"), among Sabine Oil & Gas LLC (n/k/a Sabine Oil & Gas Corporation) and the lenders party thereto.  The term "Second Lien Agent" shall refer to Wilmington Trust, N.A., as successor administrative agent under the Second Lien Credit Agreement.

equity of the $50 million borrowed from the Second Lien Lenders by the Combined Company in connection with the Combination (collectively, the "Bad Acts Claims").

Finally, the First Committee STN Motion seeks standing to pursue certain claims unrelated to the Combination, including, among others, claims challenging certain liens as beyond the scope of the grant or as avoidable preferences (the "Bucket II Claims").[6]  The Bank of New York Mellon Trust Company, N.A. (the "Legacy Sabine Notes Trustee"), as indenture trustee for the $350 million outstanding in 9.75% senior unsecured notes due 2017 (the "Legacy Sabine Notes"), has joined each of the STN Motions.[7]  The Forest Notes Indenture Trustees joined the Second Committee STN Motion[8] and later amended the Forest Notes Indenture Trustees' STN Motion to allow the Committee to seek a "lead" position with respect to the Constructive Fraudulent Transfer Claims.[9]  Accordingly, the Legacy Sabine Notes Trustee and the Forest Notes Indenture Trustees join the Committee as Movants in this proceeding.

Objections to one or all of the STN Motions were filed by the following parties, which the Court will refer to collectively as the "Objectors": (i) Wells Fargo, in its capacity as New RBL Agent;[10] (ii) Barclays Bank PLC and Barclays Capital Inc.;[11] (iii) the Second Lien Agent;[12] (iv) the Debtors;[13] (v) the Ad Hoc Committee of Former Forest Employees;[14] (vi) FRC Founders Corporation, Sabine Investor Holdings LLC, First Reserve Fund XI, L.P., First Reserve GP XI, L.P., First Reserve GP XI, Inc., Michael G. France, Alex T. Krueger, Brooks M. Shughart, and

---

[6]      Count IV of the Forest Notes Indenture Trustees' proposed complaint, regarding an allegedly fraudulent transfer by Legacy Forest of cash drawn from the New RBL in February 2015 to the Legacy Sabine Subsidiaries, would also fall into this category.

[7]      *See* [ECF No. 520]; [ECF No. 611].

[8]      *See* [ECF No. 612].

[9]      *See* [ECF No. 712].

[10]     *See* [ECF Nos. 717, 720].  In support of its objections, Wells Fargo filed the Declaration of Robert Trust [ECF No. 725] (the "Trust Decl.").

[11]     *See* [ECF No. 716].

[12]     *See* [ECF No. 719].

[13]     *See* [ECF No. 722].

[14]     *See* [ECF No. 767].

Joshua Weiner (collectively, the "First Reserve Defendants");[15] (vii) Sabine directors Duane

Radtke, David J. Sambrooks, and John Yearwood;[16] and (viii) Legacy Forest Directors and

Officers Victor A. Wind, Loren K. Carroll, Richard J. Carty, Dod A. Fraser, James H. Lee,

James D. Lightner, Patrick R. McDonald, and Raymond I. Wilcox.[17]  On February 1, 2016, the

Committee filed an omnibus reply to the objections to the STN Motions,[18] which reply was

joined by the Legacy Sabine Notes Trustee.[19]

## I.    Applicable Standard

The Committee seeks to obtain derivative standing to prosecute the STN Motions

pursuant to the holding in *Unsecured Creditors Comm. of Debtor STN Enters. Inc. v. Noyes (In

re STN Enterprises)*, 779 F.2d 901 (2d Cir. 1985) ("*STN*").  In *STN*, the United States Court of

Appeals for the Second Circuit recognized "an implied . . . right for creditors' committees to

initiate adversary proceedings in the name of the debtor in possession[.]"  779 F.2d at 904.  In

doing so, the Second Circuit agreed with the majority of bankruptcy courts that have "allowed

creditors' committees to initiate proceedings . . . when the . . . debtor in possession unjustifiably

fail[s] to bring suit or abuse[s] its discretion in not suing . . . ."[20]  *Id.*  To obtain derivative

standing under *STN*, a creditors' committee typically must satisfy a two-part test.  First, a

committee presents colorable claims for relief "that on appropriate proof would support a

---

[15]      *See* [ECF No. 714].
[16]      *See* [ECF No. 715].
[17]      *See* [ECF No. 721].
[18]      *See* [ECF No. 771].
[19]      *See* [ECF No. 772].
[20]      In *STN*, the Second Circuit found that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code "imply a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court."  *STN*, 779 F.2d at 904 (citations omitted) (noting that most bankruptcy courts to have considered the issue have come to the same conclusion); *see also* 5 COLLIER ON BANKRUPTCY ¶ 547.11 [6] (Matthew Bender 15th ed. rev.) (noting that "most lower courts today recognize the concept of derivative standing and . . . will allow a creditors' committee . . . to initiate and prosecute a preference or other avoidance action on behalf of the estate . . . [with] prior approval from the bankruptcy court").

recovery," and second, a committee demonstrates that the "debtor unjustifiably failed to bring suit." *Id.* at 905.

The inquiry as to whether a claim is "colorable" under *STN* is similar to that undertaken by the court on a motion to dismiss. *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005); *Official Comm. of Unsecured Creditors of Am.'s Hobby Ctr., Inc. v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998); *Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Serv. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999) (citation omitted) (holding that, in determining whether there is a colorable claim, the court must engage in an inquiry that is "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim"). Therefore, the movant must "state a claim [for] relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), determination of which will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted).

While courts have commented that, under *STN*, the "required showing is a relatively easy one to make," *Adelphia*, 330 B.R. at 375, in determining whether to confer standing, the court may nevertheless "engag[e] in some review of disputed facts" to determine if there is "some factual support for the Committee's allegations" and to determine that "the proposed litigation would be a sensible application of estate resources." *Id.* at 369. In making its determination, a court is not required to conduct a mini-trial or an evidentiary hearing,[21] and the court should

---

[21]    In *Adelphia*, what the court described as "apparently undisputed facts" were set forth in evidence through e-mails, other documents, and deposition testimony which provided "at the least, reasonable basis to conclude that the Committees would succeed in proving material portions of the factual matters they allege." *Adelphia*, 330 B.R. at 372.

make no factual findings on disputed issues of fact. *Id.* In *Adelphia*, after stating that the court

"engaged in some review of disputed facts . . . only to satisfy itself that there is some factual

support for the Committees' allegations without determining whether those allegations are true –

and to satisfy itself that the proposed litigation would be a sensible application of estate

resources," Judge Gerber noted that he did so "perhaps in an excess of caution, as the language

in *STN* suggests that factual review is not required." *Id.*

The issue of standing is not designed to truncate the ability of creditors to get the benefit

of full discovery if a lawsuit is viable, and authorization to bring claims derivatively "should be

denied only if the claims are 'facially defective.'" *Adelphia*, 330 B.R. at 376 (quoting *America's

Hobby Ctr.*, 223 B.R. at 288). A determination that claims are colorable permits the issues to be

decided in plenary litigation, where the parties will need to prove their allegations and where the

court can consider factual and legal claims and defenses on the merits. *Id.* at 381.

Notwithstanding, courts have observed that, consistent with the common meaning of "colorable,"

the claims to be asserted should be "plausible" or "not without some merit." *Id.* at 376 (citations

omitted). Courts have denied *STN* standard to pursue "apparently meritless claim[s]" or claims

so flawed and "not subject to cure" that estate funds "ought not be squandered through continued

litigation" of such claims. *America's Hobby Ctr.*, 223 B.R. at 288.

If a committee presents a colorable claim or claims for relief that on appropriate proof

would support a recovery, the bankruptcy court's threshold inquiry has not concluded. *STN*, 779

F.2d at 905. The second of the two prongs for determining whether a creditors' committee can

bring claims on behalf of a debtor's estate is that the debtor itself must have unjustifiably refused

to bring such claims. *Id.* at 904. This inquiry does not require an improper motive for such

failure, *see Adelphia*, 330 B.R at 374 n.19; and the creditor need not plead facts alleging the

debtor's reason or motive for inaction. *See Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Group)*, 66 F.3d 1436, 1439 (6th Cir. 1995). Rather, the burden may be met through notice pleading by alleging the existence of an unpursued colorable claim that would benefit the estate. Thereafter, the burden shifts to the debtor, who is then obligated to show that its failure to act is justified. *See id.* at 1446. "Where the debtor actively opposes a creditor's request for leave to sue, the court must look at whether, beyond the fact that the debtor had no meaningful choice but to forego litigation, there is a substantial reason why interposition of the proposed suit would be harmful to the estate." *America's Hobby Ctr.*, 223 B.R. at 283 (citation omitted).

"In order to decide whether the debtor unjustifiably failed to bring suit so as to give the creditors' committee standing to bring an action, the court must also examine, on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such claim(s) is likely to benefit the reorganization estate." *STN*, 779 F.2d at 905. The court should weigh the "probability of success and financial recovery," as well as the anticipated costs of litigation, as part of a cost/benefit analysis to determine whether the prosecution of claims is likely to benefit the debtor's estate. *America's Hobby Ctr.*, 223 B.R. at 282. The court must assure itself (i) "that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that initiation and continuation of litigation will likely produce," *Adelphia*, 330 B.R. at 374 (quoting *STN*, 779 F.2d at 905-06)); (ii) that the claims, if proven, will provide a basis for recovery; and (iii) that the proposed litigation will not be a "hopeless fling." *Adelphia*, 330 B.R. at 386.

The role of the court as gatekeeper is to protect the estate and to ensure that the proposed litigation "reasonably can be expected to be a sensible expenditure of estate resources . . . [that] will not impair reorganization." *Id.* Courts have denied standing where the proposed litigation

would "delay resolution of [the] reorganization proceeding by impeding approval of the pending plan of reorganization." *Official Comm. Of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 375 (Bankr. S.D.N.Y. 2002) (denying standing to committee after finding that committee failed to demonstrate that prosecution of the actions would be "necessary and beneficial" to the resolution of the bankruptcy proceedings). "Requiring bankruptcy court approval conditioned upon the litigation's effect on the estate helps prevent committees and individual creditors from pursuing adversary proceedings that may provide them with private benefits but result in a net loss to the entire estate." *In re Applied Theory Corp.*, 493 F.3d 82, 86 (2d Cir. 2007) (citation omitted).  In evaluating requests for standing and whether proposed litigation is in the best interests of the estate, courts also consider other "common sense factors" such as (i) whether the deputization of the committee would permit the debtor to concentrate its resources on rehabilitating its business, (ii) whether the committee's interests do not conflict with those of the estate, and (iii) whether the assignment would prejudice the equity of distribution amongst the debtor's creditors.  *Adelphia*, 330 B.R. at 375.

The parties cite heavily to *Adelphia*, in which the court considered motions by the official committee of unsecured creditors and the official committee of equity security holders to prosecute claims on behalf of the debtors' estates.  *Adelphia*, 330 B.R. 364.  While the fact that the *Adelphia* debtors joined the creditors' committee's claims as co-plaintiffs positioned the court's analysis more squarely under *Glinka v. Murad (In re Housecraft Industries USA, Inc.)*, 310 F.2d 64 (2d Cir. 2002), in which the Second Circuit articulated the standard under which a bankruptcy court can confer standing upon a committee to sue as a *co-plaintiff* with the debtor on behalf of the estate, than solely under *STN*, the court provided extensive discussion of the *STN*

8

standard, as described herein, which remains instructive. *Adelphia*, 330 B.R. at 373-386. It bears noting, however, that the facts in *Adelphia* are otherwise distinguishable from the instant facts. In contrast to the instant case, neither of the committees' standing motions in *Adelphia* was opposed by any party other than the defendants in the proposed litigation – in fact, the debtors stipulated to prosecuting the alleged claims as co-plaintiffs with the creditors' committee, leading the court to stress that "[t]hose with an interest in maximizing the value of the estate – as contrasted to those with an interest in defeating the claims to be asserted here – do not seem to be troubled by the Committees' proposed use of estate resources for the litigation the Committees wish to prosecute." *Id*. at 368. In addition to the fact that no non-defendant stakeholders were opposed to the assertion of the proposed claims, the court found that granting the committees standing to pursue the proposed actions, which (i) had the potential for "enormous" potential recoveries at a "relatively modest" cost of prosecution and (ii) set forth claims that will "easily withstand 12(b)(6) motions, and (to the extent the Court needs to consider this) have factual support," was not only consistent with maximizing the value of the estate but "necessary to achieve that goal." *Id*. at 384, 386.

Here, the Committee argues that the proposed claims set forth in the complaints annexed to the STN Motions "are both meritorious and highly valuable, and actions prosecuting them would unquestionably benefit the Debtors' estates."[22] The Committee argues that the "best analogy for the current situation is what the bankruptcy court faced in *Adelphia*," asserting that, during the "short time during which discovery has taken place," the Committee has compiled enough evidence to survive a motion to dismiss each of the proposed claims.[23] Therefore, the Movants submit, the Committee should be granted standing to file its proposed complaints and

---

[22]    First Committee STN Motion ¶ 93.
[23]    Second Committee STN Motion ¶ 160.

pursue the full factual development that will occur in the actual lawsuit – to be provided with its opportunity to go beyond putting "some meat . . . on the bones" and put forth "demonstrable proof" at trial, proof sufficient to satisfy the ultimate burden of proof on the issue.[24]    The Committee further argues that "[t]here has been no negotiation [with respect to the Debtors' reorganization] because the Debtors concluded and publicly announced that the claims had zero merit," but asserts that granting standing to the Committee will help shift leverage in that regard, as it "will foster an actual negotiation" – "the proper role of *STN*."[25]    Focusing on their ongoing assertion that the Debtors' objective is to obtain plan releases for directors, officers, lenders, and First Reserve, the Movants submit that "granting *STN* authority . . . would present a sizeable objection or obstacle to this attempt [to obtain plan releases]."[26]

In sharp contrast to the Movants' positions on colorability and on the purpose of *STN* standing in general, the Objectors contend that none of the Committee's putative claims is colorable and that each of the proposed claims would warrant dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.    As Debtors' counsel argued during closing arguments, the Committee has failed to satisfy its burden on colorability with respect to any of the claims – the undisputed facts demonstrate that no plausible inferences can be drawn in the Committee's favor, and, in fact, the evidence presented during the ten days of trial on the STN Motions "doesn't support but, in fact, undermines the Committee's proposed claims."[27]    Moreover, even if certain of the proposed claims could be considered colorable, the Objectors submit that the Committee nevertheless should be denied standing because the pursuit of such claims is not justified where,

---

[24]    3/11/16 Hr'g Tr. 18:23-25 (Golden).

[25]    Committee's 3/15/16 "STN Best Interests" Closing Demonstrative at 57.

[26]    3/11/16 Hr'g Tr. 21:15-22:13 (Golden) (asking the Court to "keep this in mind as you make the ultimate determination regarding *STN* authority").

[27]    3/16/16 Hr'g Tr. 11:23-12:2  (Balassa) (arguing that, "[h]aving shaped the scope of this proceeding by presenting the Court with voluminous evidence, the committee should not be heard to argue that the Court should proceed with blinders on now and ignore the evidence that's been put before it").

10

as here, the costs heavily outweigh the benefits to the Debtors' estates.  They assert that the typical benefits found in other cases are not present here; namely, that the Committee is unlikely to prevail on the claims and, even assuming the claims are successful, the potential recoveries, if any, will result in an insignificant recovery to unsecured creditors given the existence of adequate protection claims.  On the other hand, the costs to the Debtors' estates are tremendous: expensive and protracted litigation – on meritless claims – that will deplete the Debtors' remaining liquidity and undermine and delay the Debtors' reorganization efforts.  The Debtors argue that the standard under *STN* does not simply consider whether the estate can afford the proposed litigation but whether it is a "sensible" use of estate resources.[28]  Here, they submit, the proposed litigation would impede the Debtors' reorganization and erode value for all stakeholders.

Accordingly, applying the standard set forth in *STN* and its progeny, the Court finds that in order to grant standing to the Committee to pursue the proposed claims, it must conclude that the Committee has met its burden to demonstrate that each of the claims is colorable, that is, plausible and not facially defective, and which, upon appropriate proof, would support a recovery.  While the Court believes that the facts that are determinative here are largely not in dispute, a point made by both the Movants and the Objectors during the Hearing (as defined below), the Court recognizes that it may engage in some review of disputed facts in order to satisfy itself as to whether there exists factual support for the allegations put forth by the Committee.  Assuming the Court finds one or more colorable claims has been asserted, its analysis will then shift to the second prong of the *STN* analysis to determine whether the Debtors unjustifiably refused to bring suit.  Conscious of its role as gatekeeper, the Court must weigh the

---

[28]    3/16/16 Hr'g Tr. 98:12-99:4 (Jakola) ("That's the question.  Not necessarily whether . . . they can afford it. Is it a sensible expenditure of the estate resources?").

probability of success, the potential financial recovery, and the costs to the estates of the proposed litigation in examining whether the proposed litigation is likely to benefit the estates and will not impair the Debtors' reorganization.  The Court's analysis follows.

## II.    Scope of Decision and Ruling

By agreement of the parties, the trial testimony and legal argument to this point have been focused primarily on the first prong of the *STN* test—whether the claims the Committee seeks standing to prosecute are in fact colorable claims.  Accordingly, this decision shall reflect the Court's ruling on the colorability of the Constructive Fraudulent Transfer Claims and the Bad Acts Claims.[29]

With respect to colorability, the Court finds as follows:

- The Constructive Fraudulent Transfer Claims that could be asserted on behalf of the Legacy Forest estate are not colorable;[30]
- The Constructive Fraudulent Transfer Claims that could be asserted on behalf of the estates of the Legacy Sabine Subsidiaries are colorable; and
- The Bad Acts Claims are not colorable.

The Court's detailed analysis of the colorability of each category of claims follows.  In addition, with respect to the second prong of the *STN* test,[31] the Court will provide an explanation as to why it is not in the best interests of the estates to pursue the Constructive Fraudulent Transfer

---

[29]    Because the Debtors argue that they are pursuing settlement of the Bucket II Claims in the context of a plan of reorganization, the Court declines to rule on the colorability of the Bucket II Claims at this time.  *See* Debtors' Objection at pp. 141-51.

[30]    For the avoidance of doubt, this ruling does not address the Debtors' pending adversary proceeding against the Second Lien Lenders, [Adv. Pro. No. 15-01126], which seeks to avoid certain liens granted to the Second Lien Lenders in connection with the Combination.  It does not appear that the Movants seek standing to avoid such liens; instead they seek standing to bring claims avoiding (i) the entirety of the Second Lien Lenders' claims and liens at Legacy Forest and (ii) the incremental $50 million of Second Lien Loan obligations guaranteed by the Legacy Sabine Subsidiaries in connection with the Combination and any liens granted to secure a guarantee of the incremental $50 million.  To the extent there is overlap between the claims against the Second Lien Lenders that the Movants seek standing to pursue and the claims against the Second Lien Lenders asserted by the Debtors in their adversary proceeding, the Movants are denied standing to assert such overlapping claims because the Debtors are pursuing such claims.

[31]    Although a fair amount of evidence was presented during the Hearing that is relevant to and informs the Court's decision on the second prong of the *STN* test, the Movants have yet to formally close their case with respect to the issue of whether the Debtors have unjustifiably failed to bring suit on any or all of the claims, the so-called "best interests" test.

Claims that could be asserted on behalf of the estates of the Legacy Sabine Subsidiaries.  Finally, the Court will set forth its determination as to the proper methodology for calculating the New RBL Lenders' adequate protection claim, an issue that was sharply contested by the parties because of its bearing on the second prong of the *STN* test.[32]

## III.   **Background**[33]

Remarkably, despite the widely disparate legal positions of the Movants and the Objectors during fifteen days of trial, there is very little disagreement on the relevant facts.  Each of the Constructive Fraudulent Transfer Claims and Bad Acts Claims is alleged to arise out of the Combination.

Prior to the Combination, Legacy Forest was a New York Stock Exchange-listed corporation, with its headquarters in Denver, Colorado; it held substantially all of its assets in that public corporation.  At the time of the Combination, Legacy Forest had approximately $905 million of funded debt, consisting of (i) a reserve-based lending facility (the "Legacy Forest RBL") with $105 million outstanding, secured by a first priority lien on, among other things, certain proved oil and gas reserves and (ii) approximately $800 million in unsecured notes: $578 million in 7.25% senior unsecured notes due 2019 (the "Legacy Forest 2019 Notes") and $222 million in 7.5% senior unsecured notes due 2020 (the "Legacy Forest 2020 Notes" and, together with the Legacy Forest 2019 Notes, the "Legacy Forest Notes").[34]

---

[32]    The Final Cash Collateral Order in these cases [ECF No. 339] provides for an adequate protection claim equal to "Collateral Diminution."  *See* Final Cash Collateral Order ¶ 3.  Such claim is secured by all of the Debtors' unencumbered assets, save for unencumbered assets brought into the estates as the result of successful litigation against the New RBL Lenders.  *See* Final Cash Collateral Order ¶ 3.

[33]    Unless otherwise indicated, statements in this section are adapted from the section entitled "History of the Combination and the Debt Financing Relevant to the Proposed Causes of Action" contained in the First Committee STN Motion.

[34]    Prior to the Combination, U.S. Bank National Association was the indenture trustee for both the Legacy Forest 2019 Notes and the Legacy Forest 2020 Notes.  Wilmington Savings Fund Society, FSB is now the indenture trustee for the Legacy Forest 2019 Notes, and Delaware Trust is now the indenture trustee for the Legacy Forest 2020 Notes.

Prior to the Combination, Legacy Sabine Parent was a portfolio company of the private equity firm First Reserve Corporation ("First Reserve"), with its headquarters in Houston, Texas. Legacy Sabine Parent was a holding company; the Legacy Sabine Subsidiaries held the bulk of the enterprise's assets.  Legacy Sabine Parent also had extensive debt obligations at the time of the Combination, including (i) a revolving credit agreement which had approximately $620 million outstanding (the "Legacy Sabine RBL"), (ii) $650 million in obligations outstanding under the Second Lien Credit Agreement (which obligations increased to $700 million at the time of the Combination) (the "Second Lien Loan"), and (iii) $350 million outstanding in Legacy Sabine Notes.  Because the operating assets of the enterprise were held by the Legacy Sabine Subsidiaries, each of those subsidiaries guaranteed each of the Legacy Sabine RBL, the Second Lien Loan, and the Legacy Sabine Notes.  In addition, the guarantees of the Legacy Sabine RBL and the Second Lien Loan were secured by liens on the assets of the Legacy Sabine Subsidiaries.

The genesis of the Combination can be traced to a December 2013 meeting between Patrick McDonald, the Chief Executive Officer of Legacy Forest, and John Yearwood, a director of Legacy Sabine Parent, followed by a meeting between Mr. McDonald and David Sambrooks, then the Chief Executive Officer of Legacy Sabine Parent.  Talks between Legacy Forest and Legacy Sabine Parent progressed through the spring of 2014, culminating in the announcement of the Combination on May 5, 2014.

### A.    *The Structure of the Combination as of May 5, 2014*

On May 5, 2014, Legacy Forest entered into an Agreement and Plan of Merger with Legacy Sabine Parent and certain related entities (the "May Agreement and Plan of Merger"). The May Agreement and Plan of Merger provided for the combination of Legacy Forest and Legacy Sabine Parent through multiple steps, pursuant to which Legacy Forest would survive as

14

a subsidiary of a newly formed holding company.  Under this structure, Legacy Sabine Parent shareholders would own approximately 73.5% percent of the post-Combination company, while Legacy Forest shareholders would own approximately 26.5%.  Because the corporate steps included a "downstream" merger of Legacy Forest into a subsidiary, New York Business Corporation Law required approval by two-thirds of the outstanding Legacy Forest shareholders entitled to vote.  Legacy Forest and Legacy Sabine Parent announced that execution of the May Agreement and Plan of Merger would trigger the change-of-control provisions of the indentures governing the Legacy Forest Notes, and that, upon closing, the combined company would be required to make an offer to holders of the Legacy Forest Notes to redeem their notes at 101% of the outstanding principal amount, plus accrued interest.

Also on May 5, 2014, and in connection with the May Agreement and Plan of Merger, the post-Combination company obtained a commitment (the "May Commitment Letter") from Barclays and Wells Fargo for two loans, with each of Barclays and Wells Fargo committing to funding fifty percent of each loan.  The first was the New RBL, with an initial borrowing base of $1 billion, the proceeds of which would be used, in part, to refinance the Legacy Sabine RBL and the Legacy Forest RBL.  The second was an unsecured bridge facility in the aggregate principal amount of up to $850 million (the "Bridge Loan"), which was to be used to provide sufficient funds to repurchase the Legacy Forest Notes under the change-of-control offer triggered by the structure of the May Agreement and Plan of Merger.  The May Commitment Letter expired by its terms on November 1, 2014.[35]

At Legacy Sabine Parent's request, the May Commitment Letter was amended on May 19, 2014 to permit five additional financial institutions – Capital One N.A., Citibank, N.A., Bank of America N.A., Natixis New York Branch, and UBS AG Stamford Branch – to each commit to

---

[35]    Objection of New RBL Agent [ECF No. 717] ("New RBL Agent Fraudulent Transfer Objection") ¶ 14.

and underwrite 10% of the aggregate commitments for the New RBL and the Bridge Loan. As a result, the respective commitments of Wells Fargo and Barclays on each of the New RBL and the Bridge Loan were reduced from 50% to 25%.

### B.    The Structure of the Combination is Revised in July 2014

In early June 2014, Legacy Forest and Legacy Sabine Parent learned that certain investors had embarked on a "shorting" strategy that could jeopardize the proposed Combination. Specifically, certain investment firms acquired "short" positions with respect to the Legacy Forest Notes. The investment firms had also begun buying Legacy Forest stock in order to vote against the Combination. If the investment firms could defeat the Combination, Legacy Forest would not be required to redeem the Legacy Forest Notes at 101%, benefiting the firms' "short" positions.

In order to defeat the "shorts'" strategy, Legacy Forest and Legacy Sabine Parent restructured the May Agreement and Plan of Merger during the summer of 2014 to remove the initial Legacy Forest merger from the transaction steps so as to avoid the two-thirds shareholder approval threshold required under the May Agreement and Plan of Merger structure. The revised structure would require only majority approval of the Legacy Forest shareholders, which decreased the likelihood that the "shorts" seeking to block the Combination would succeed. On July 9, 2014, Legacy Forest, Legacy Sabine Parent, and related entities entered into an Amended and Restated Agreement and Plan of Merger (the "July Agreement and Plan of Merger"). Under the July Agreement and Plan of Merger, Legacy Sabine Parent would become a subsidiary of Legacy Forest and then would merge into Legacy Forest through a series of steps – meaning Legacy Forest would be the surviving company. The July structure still triggered the change-of-

16

control provisions in the indentures governing the Legacy Forest Notes, requiring the combined company to make a 101% redemption offer to holders of the Legacy Forest Notes.

In connection with the new structure, Wells Fargo, Barclays, and the remaining New RBL Lenders entered into an Amended and Restated Commitment Letter (the "July Commitment Letter") with financing terms similar to the May Commitment Letter, except that the commitment was extended to December 31, 2014 and the commitment fee was raised by 25 basis points.[36]  Of particular relevance, the July Commitment Letter provided that (i) the New RBL would include a debt-to-EBITDA[37] ratio covenant for fourth quarter 2014 of 5.0x, decreasing to 4.75x for third quarter 2015 and 4.50x for first quarter 2016 (the "New RBL Debt-EBITDA Covenant"), *i.e.*, if the prospective combined company's total debt was more than five times the amount of the prospective combined company's EBITDA at the end of 2014, the prospective combined company would be in default on the New RBL and the New RBL Lenders would have the ability to accelerate all indebtedness outstanding;[38] and (ii) the total interest rate on the Bridge Loan was capped at 9.75%.[39]

C.    ***Worsening Market and Financial Conditions Threaten the Combined Company's Ability to Comply with the RBL Debt-EBITDA Covenant***

Following the announcement of the July 2014 combination structure, each of Legacy Forest and Legacy Sabine Parent faced declining operating performance exacerbated by falling hydrocarbon prices.  The declining operating performance threatened the prospective combined company's projected ability at closing to comply with the New RBL Debt-EBITDA Covenant. Specifically, Legacy Sabine Parent's financial model projected for the combined company a debt-to-EBITDA ratio of 5.11x for 4Q14 (when the ratio covenant would be 5.0x); 4.71x for

---

[36]    New RBL Agent Fraudulent Transfer Objection ¶ 17.

[37]    "EBITDA" refers to earnings before interest, taxes, depreciation, and amortization.

[38]    *See* Second Committee STN Motion ¶¶ 40-41.

[39]    *See* Second Committee STN Motion ¶ 55.

3Q15 (when the ratio covenant would be 4.75x); and 4.51x for 1Q16 (when the ratio covenant would be 4.5x). Mr. Sambrooks and Legacy Sabine Parent were unable to develop a model that projected a ratio level of less than 5.0x for 4Q14,[40] prompting Mr. Sambrooks on September 12, 2014 to write to the New RBL Lenders to request relief on the New RBL Debt-EBITDA Covenant. Thereafter, negotiations on the financing terms in the July Commitment Letter ensued.

### D.    Initial Renegotiation with the New RBL Lenders

The New RBL Lenders, who were also committed to funding the Bridge Loan, determined internally that they would offer the combined company relief on the New RBL Debt-EBITDA Covenant in exchange for modifying the terms of the Bridge Loan. Although the May and July combination structures had contemplated that the Bridge Loan would be replaced by a high-yield bond offering and would thus never fund, deterioration in the operating performance of Legacy Sabine Parent and Legacy Forest, combined with deteriorating conditions in the capital markets generally, made selling a high-yield bond offering challenging and thus increased the chances that the New RBL Lenders would in fact have to fund the Bridge Loan.[41] Accordingly, in exchange for offering relief on the New RBL Debt-EBITDA Covenant, the New RBL Lenders sought better terms on the Bridge Loan.[42]

As of early November 2014, the New RBL Lenders had not formally responded to Mr. Sambrooks' September 12, 2014 request. On November 5, 2014, Joshua Weiner, a First Reserve Managing Director who, along with Mr. Sambrooks, was leading negotiations on behalf of the

---

[40]    *See* Second Committee STN Motion ¶ 41.

[41]    As Mr. Joshua Weiner testified, and as is typical for such facilities, the parties did not expect the Bridge Loan to close and fund. Rather, the parties intended for the Combined Company to sell a high-yield debt offering that would fund redemption of the Legacy Forest Notes and obviate the need for the Bridge Loan. As market conditions deteriorated in 2014, it became clear that a high-yield offering was not salable and the parties contemplated, contrary to the original plan, having to close on the Bridge Loan. *See* 2/10/16 Hr'g Tr. 167:5-10 (Weiner).

[42]    *See* Second Committee STN Motion ¶¶ 42-50.

post-Combination prospective combined company, remarked that "[n]ot getting to a deal [would

be] almost mutually assured destruction."[43]

Finally, on November 7, 2014, the New RBL Lenders informed Messrs. Weiner and

Sambrooks of their initial proposal.  The New RBL Lenders proposed (i) an increase of the New

RBL initial borrowing base to $1.1 billion, with the potential for a $150 million committed

increase in the borrowing base at future redetermination dates if such increases were supported

by the combined company's reserves; (ii) changing the New RBL Debt-EBITDA Covenant from

a formula based on total leverage (*i.e.*, based on all funded debt) to a "First Lien Secured

Leverage" ratio covenant that would measure debt-to-EBITDA only against the New RBL,

thereby changing the New RBL Debt-EBITDA Covenant from a 5.0x ratio based on total debt,

to a 2.5x ratio based on only first lien debt – a remarkable change resulting in the RBL Debt-

EBITDA Covenant not being breached under any of Legacy Sabine Parent's multiple rounds of

projections (even projections produced shortly prior to closing); and (iii) changing the Bridge

Loan from unsecured debt with the total interest rate capped at 9.75% to a third-lien loan with

the total interest rate capped at 15.5%.[44]

However, the New RBL Lenders' proposal was not acceptable to the combined company

in part because of concerns that the increased interest rate on the Bridge Loan would exacerbate

the combined company's liquidity issues.[45]   Accordingly, negotiations with the New RBL

Lenders continued through at least December 11, 2014.  On the one hand, representatives of the

prospective combined company, led by Mr. Weiner and Mr. Sambrooks, sought relief on the

New RBL Debt-EBITDA Covenant while preserving liquidity for the combined company and,

---

[43]        *See* Second Committee STN Motion ¶ 52.
[44]        *See* Second Committee STN Motion ¶¶ 54-55.
[45]        *See* Second Committee STN Motion ¶ 58.

19

on the other hand, the New RBL Lenders sought to obtain more favorable terms on the Bridge Loan.[46]

### E.    Negotiations with the New RBL Lenders Appear to Break Down, Prompting Mr. Sambrooks to Seek a Termination of the Proposed Combination

At the end of November 2014, negotiations between the prospective combined company and the New RBL Lenders faltered, prompting both Mr. Sambrooks and the New RBL Lenders to consider the prospects for the prospective combined company if it were to close on the financing contemplated by the July Commitment Letter, *i.e.*, no relief on the New RBL Debt-EBITDA Covenant and an $850 million Bridge Loan at an interest rate capped at 9.75%.[47]

Troubled by the specter of this scenario, Mr. Sambrooks called Mr. McDonald on November 30, 2014 and warned that "the financing for the combined companies [was] too expensive and [would] create an insolvency situation at closing" due to the projected breach of the New RBL Debt-EBITDA Covenant at the end of 2014.[48]    Accordingly, Mr. Sambrooks presented four options to Mr. McDonald: (1) "[d]on't merge," (2) "[w]ork around the Change in Control provision of Forest bonds," (3) "[d]elay deal for time sufficient for market and financing to be more favorable," or (4) "[e]xchange only partial interests so as not to trigger Change in Control."[49]    Of these options, Mr. Sambrooks told Mr. McDonald that he would prefer terminating the Combination.

Mr. McDonald addressed Mr. Sambrooks' concerns at a December 1, 2014 Legacy Forest board meeting.    At the conclusion of that board meeting, the Legacy Forest board

---

[46]    *See* Second Committee STN Motion ¶¶ 58-67; UCC Ex. 1154 (e-mail from Mr. Weiner, dated December 11, 2014 to Barclays and Wells Fargo discussing modifications to Bridge Loan); *see also* 2/10/16 Hr'g Tr. 229:15-231:18 (Weiner) (discussion of UCC Ex. 1154).

[47]    *See* Second Committee STN Motion ¶¶ 59-61.

[48]    *See* Second Committee STN Motion ¶ 68.

[49]    *See* Second Committee STN Motion ¶ 69.

instructed Mr. McDonald to inform Mr. Sambrooks of Legacy Forest's intention to close the Combination and to remind Mr. Sambrooks of Legacy Sabine Parent's obligation, pursuant to the July Agreement and Plan of Merger, to close the Combination.  The next day, on December 2, 2014, Mr. Sambrooks wrote a letter to the Legacy Forest board, again urging that Legacy Forest consent to a termination of the Combination.  On December 5, 2014, the Legacy Forest board again met to consider Mr. Sambrooks' letter and determined that pursuing the Combination remained in Legacy Forest's best interests.  On December 7, 2014, Mr. Sambrooks sent to Mr. McDonald updated financial models based on the terms of the secured Bridge Loan last discussed with the lenders and warned him of unmanageable debt levels at the combined company under such a scenario.  Also on December 7, 2014, Mr. Sambrooks wrote another letter to Mr. McDonald, again urging termination of the Combination but this time urging Mr. McDonald and Legacy Forest to consider alternative structures, including a joint venture structure.  That evening, the Legacy Forest board met again, after which Mr. McDonald wrote to Mr. Sambrooks reiterating Legacy Forest's intention to close the Combination, but also agreeing to consider alternative solutions.[50]

## F.    *An Alternative Combination Structure Emerges*

Well into early December 2014, the dynamics of the negotiations between the prospective combined company and the New RBL Lenders remained the same: the prospective combined company continued to seek relief on the New RBL Debt-EBITDA Covenant while preserving liquidity and the New RBL Lenders continued to seek better terms or reduction in exposure on the Bridge Loan in exchange for such relief.  All parties recognized that leaving the Legacy Forest Notes in place, rather than replacing them with more expensive Bridge Loan financing, would both (i) directly increase the prospective combined company's liquidity and

---

[50]    *See* Second Committee STN Motion ¶¶ 68-77.

capacity to service debt by freeing up cash that would otherwise be committed to interest payments on the Bridge Loan and (ii) simultaneously reduce the New RBL Lenders' exposure, thereby making the New RBL Lenders more likely to grant covenant relief. Accordingly, the parties began to explore combination structures that would not trigger the change-of-control provisions of the Legacy Forest Notes, thus obviating the need to obtain the Bridge Loan to fund a repurchase of such Legacy Forest Notes. For example, on November 30, 2014, during his call with Mr. McDonald, Mr. Sambrooks listed as an option "[w]ork around the Change in Control provision of Forest bonds," and "[e]xchange only partial interests so as not to trigger Change in Control."[51]

Similarly, on December 4, 2014, Mr. Scotto of Wells Fargo asked Mr. Weiner whether First Reserve had considered assigning some of its equity interests to a third-party, which would avoid a change-of-control and, consequently, avoid the need for the Bridge Loan to fund the payment of the Legacy Forest Notes. First Reserve rejected this proposal.[52] During the week that followed, a number of structures were considered and negotiated, including structures without a Bridge Loan, but Mr. Scotto testified that Wells Fargo was not informed of the final structure of the Combination until December 11.[53]

Ultimately, the final structure of the Combination originated in a December 3, 2014 conversation between Legacy Forest board member Dod Fraser and Legacy Forest's legal counsel, Mark Gordon of Wachtell, Lipton, Rosen & Katz ("Wachtell"). Over the course of their conversation, Mr. Fraser and Mr. Gordon developed a combination structure that they believed would avoid the change-of-control provisions of the Legacy Forest Notes by giving Legacy Forest shareholders 60% of the common voting power of the prospective combined company,

---

[51]    *See* Second Committee STN Motion ¶¶ 68-69.
[52]    *See* Second Committee STN Motion ¶ 78.
[53]    *See* Scotto Dep. Tr. 88:8-11.

22

subject to control rights held by First Reserve.[54]  Mr. Fraser testified that he did not receive any

input from the New RBL Lenders in developing this structure.    Notwithstanding this

development, Mr. Fraser did not share this new structure with the Legacy Sabine Parent board

until a December 9, 2014 conference call discussing alternative structures.    Mr. Sambrooks

deliberately chose to exclude the New RBL Lenders from this call.[55]

During that December 9 conference call, the boards of Legacy Forest and Legacy Sabine

Parent agreed to pursue Mr. Fraser's alternative structure.    On December 10, 2014, Mr.

Sambrooks sent a term sheet to Mr. McDonald reflecting Mr. Fraser's alternative structure and

urged Mr. McDonald to provide comments as soon as possible so that he could "bring our banks

over the wall."[56]  Mr. Sambrooks testified that he decided not to tell the New RBL Lenders about

the potential alternative merger structure in order to ensure that they continued to work toward

completion of a financing package under the July Commitment Letter in case agreement on an

alternative structure could not be reached with Legacy Forest.[57]

The next day, the boards of Legacy Forest and Legacy Sabine Parent agreed to modify

the final structure for the Combination in accordance with Mr. Fraser's proposal.  On December

11, 2014, Legacy Sabine Parent sent the New RBL Lenders a term sheet reflecting Mr. Fraser's

proposed structure but did not commit to the prospective combined company closing under the

revised structure.  Instead, Legacy Sabine Parent asked the New RBL Lenders to both (i) provide

financing terms based on the revised structure and (ii) continue negotiating modifications to the

financing reflected in the July Commitment Letter, based on a structure that would include the

Bridge Loan.  The New RBL Lenders did as requested and negotiated on dual tracks.  By the

---

[54]        *See* Second Committee STN Motion ¶ 95.
[55]        *See* Second Committee STN Motion ¶ 92.
[56]        *See* Second Committee STN Motion ¶ 96.
[57]        *See* 2/9/16 Hr'g Tr. 254:12-255:1 (Sambrooks).

night of December 15, 2014, the New RBL Lenders had received internal credit approval to finance the structure based on Mr. Fraser's proposal but did not yet know if the legacy companies would choose to close based on Mr. Fraser's structure (without the Bridge Loan) or based on the July 2014 structure (with the Bridge Loan).[58]

### G.    The Final Combination Structure and Execution of the Combination

On December 16, 2014, the two legacy companies elected to close under Mr. Fraser's proposed structure, thereby avoiding the change-of-control provisions of the Legacy Forest Notes and obviating the need to obtain the Bridge Loan to redeem the Legacy Forest Notes. Under this structure, the New RBL Lenders agreed to grant relief on the New RBL Debt-EBITDA Covenant and to delay a likely downward redetermination of the borrowing base from thirty days post-closing (*i.e.*, January 15, 2015) to April 1, 2015, ensuring that the prospective combined company would enjoy the liquidity benefits of an increased borrowing base for an additional two and a half months. In accordance with these revised (and subsequently finalized) terms, the Combination proceeded in three steps: a share exchange, a merger, and a debt financing, as described below.

### Step 1: The Share Exchange

First, as authorized by their respective boards, Legacy Forest issued shares to Legacy Sabine Parent shareholders in exchange for the shares of Legacy Sabine Parent (the "Share Exchange"). The Share Exchange occurred at or around 12:40 p.m. EST on December 16, 2014. At the conclusion of the Share Exchange, Legacy Sabine Parent and, in turn, the Legacy Sabine Subsidiaries, were indirect subsidiaries of Legacy Forest.

---

[58]    Scotto Dep. Tr. 106:7-18 (Q: "Am I correct that as of the night of December 15, 2014, Wells Fargo did not know whether the transaction would close under Option 1 or Option 2?" A: "No. You are correct that Wells did not know.").

**Step 2: The Merger**

The second step of the Combination was the merger of Legacy Sabine Parent into Legacy Forest (the "Merger").  The Merger, along with the Share Exchange, was contemplated by the documents that the Legacy Forest and Legacy Sabine Parent directors had executed on the morning of December 16, 2014.  Following the Share Exchange, all but two of the Legacy Forest directors resigned and were replaced by the 3:30 Board.  Notwithstanding the replacement of the Legacy Forest board with the 3:30 Board, no further board action was required to effectuate the Merger; the Merger would become effective upon each of the New York[59] and Delaware secretaries of state filing the relevant merger certificates.  Nonetheless, when the 3:30 Board assumed its position, neither secretary of state had filed the relevant merger certificates and the Merger was not yet technically effective.  Although the New York secretary of state filed the relevant merger certificates as of 2:09 p.m. EST, and the companies issued a press release announcing the closing of the Merger, the Delaware secretary of state did not file the relevant merger certificates until 3:48 p.m. EST.  The 3:30 Board met from 3:30 p.m. EST through 3:45 p.m. EST, primarily to authorize and direct Legacy Forest to enter into the third step of the Combination, the Debt Financing (as defined below).  Accordingly, although, as Mr. Sambrooks testified, the 3:30 Board believed that the Merger had closed prior to its 3:30 meeting, the Merger may not have been technically effective until after the conclusion of the 3:30 Board's meeting.  Upon the technical effectiveness of the Merger, pursuant to New York corporate law, Legacy Forest, as the successor to Legacy Sabine Parent, assumed the assets and the obligations

---

[59]    At the Hearing, counsel for First Reserve argued that under applicable New York law, the Merger was effective when the New York secretary of state filed its merger certificate and that the subsequent filing by the Delaware secretary of state is not necessarily determinative, as a technical matter, of the time the Merger became effective.  *See* 3/16/16 Hr'g Tr. 268:11-269:3 (Rossman) ("So you've got a funny business here, right, because under their theory you're married in one state, you're not married in the other.  So what do you do?  Now Forest is a New York corporation. . . . I'm prepared to take the position that they're merged under New York law . . . .").

of Legacy Sabine Parent, *i.e.*, the $620 million Legacy Sabine RBL, the $650 million Second Lien Loan, and the $350 million of Legacy Sabine Notes. In addition, Legacy Forest succeeded to Legacy Sabine Parent's status as the sole member of the Legacy Sabine Subsidiaries.

### Step 3: The Debt Financing

The third step of the Combination was the refinancing of the debt of Legacy Forest, which had by this point subsumed Legacy Sabine Parent. In accordance with the resolutions passed by the 3:30 Board, Legacy Forest, now the Combined Company, took the following steps (the "Debt Financing"):

- Incurred the $750 million New RBL;
- Used proceeds of the New RBL to pay off the Legacy Forest RBL and the Legacy Sabine RBL;
- Amended the Second Lien Loan to provide the Combined Company with an additional $50 million of availability and subsequent borrowing of such $50 million;
- Caused the Legacy Sabine Subsidiaries to issue guarantees to secure (i) the New RBL; (ii) the additional $50 million of borrowings on the Second Lien Loan; and (iii) the Legacy Forest Notes; and
- Granted liens to secure (i) the New RBL and the additional $50 million of borrowings on the Second Lien Loan and (ii) the guarantees thereof.[60]

Following the completion of the Debt Financing, the Combination was complete.

On December 18, 2014, the Combined Company paid down approximately $206 million[61] of the amount outstanding under the New RBL. In late February 2015, the Combined Company drew down the $356 million of balance available on the New RBL.

---

[60]    Liens on Legacy Sabine Parent and Legacy Sabine Subsidiary assets that had previously secured the Legacy Sabine RBL were transferred from the administrative agent for the Legacy Sabine RBL to the New RBL Agent.  Liens on Legacy Sabine Parent and Legacy Sabine Subsidiary assets that had secured the Second Lien Loan pre-Combination continued to secure the Second Lien Loan post-Combination.  *See* New RBL Credit Agreement § 12.20.

[61]    The parties disagree on the amount of proceeds from the sale of Legacy Forest's Arkoma assets that was included in the $206 million.

H.    *The Debtors' Investigation of the Constructive*
      *Fraudulent Transfer Claims and Bad Act Claims*

On May 15, 2015, the Combined Company's board of directors approved the formation

of a special committee (the "Independent Directors' Committee") to conduct an investigation of

any potential claims and causes of action related to the Combination that the Debtors may

possess against creditors and others.  The Independent Directors' Committee is comprised of two

independent directors, Thomas Chewning and Jonathan Foster, neither of whom was involved in

the Combination or had involvement with Legacy Sabine Parent or Legacy Forest at the time of

the Combination.  On June 10, 2015, the Combined Company's board of directors approved an

expansion of the Independent Directors' Committee's authority to decide which claims related to

the Combination, if any, the Combined Company should assert.[62]  Mr. Chewning and Mr. Foster

were assisted in their assessment of potential claims by the Independent Directors' Committee's

legal and financial advisors.  Initially, these advisors included litigation attorneys from Kirkland

& Ellis LLP ("Kirkland") and financial advisors from Zolfo Cooper.[63]  The Independent

Directors' Committee later retained Professor Jack F. Williams, formerly of Mesirow Financial

Consulting LLC and now of Baker Tilly, to provide additional expertise and perspective on the

Debtors' potential constructive fraudulent transfer claims.[64]

Professor Williams produced an extensive report, dated October 26, 2015, analyzing

potential constructive fraudulent transfer claims (the "Williams Report").[65]  In preparing his

report, Professor Williams assumed that a constructive fraudulent transfer would exist where the

transferring entity (i) was insolvent and (ii) received less than reasonably equivalent value in the

---

[62]     Debtors' Objection ¶ 28.
[63]     Debtors' Objection ¶ 29.
[64]     Debtors' Objection ¶ 30.
[65]     The Williams Report and the December 1 Report (as defined below) were both filed on the docket of these cases on December 22, 2015.  *See* Notice of Filing of Analysis of Potential Estate Causes of Action [ECF No. 650].

exchange.[66]  Professor Williams found that each of Legacy Forest, Legacy Sabine Parent, and the

Legacy Sabine Subsidiaries was insolvent on the day of the Combination.[67]  He then analyzed

the issue of reasonably equivalent value "from the perspective of creditors" of each of Legacy

Forest, Legacy Sabine Parent, and the Legacy Sabine Subsidiaries, *i.e.*, whether discrete groups

of *creditors* received reasonably equivalent value in the Combination.[68]  Finally, in assessing

reasonably equivalent value, Professor Williams declined to analyze any single step of the

Combination in isolation and instead viewed the Combination as a whole.[69]  Using this

framework, he reached the following conclusions with respect to potential constructive

fraudulent transfer claims, which conclusions were adopted by the Independent Directors'

Committee:

- Legacy Forest unsecured creditors' recoveries were harmed by the Combination as a whole and thus they did not receive reasonably equivalent value;[70]
- Legacy Sabine Parent and Legacy Sabine Subsidiary unsecured creditors' recoveries were benefitted by the Combination as a whole and thus they received reasonably equivalent value;[71] and
- Legacy Forest unsecured creditors had no remedy "because it is not economically feasible presently to identify and trace [Legacy Forest] property, debt, and expenses that existed immediately before the [Combination] that remains property of the estate and because of the commingling of cash and cash equivalents and cross-debt obligations."[72]

Thereafter, on November 2, November 11, and November 14, 2015, the Independent

Directors' Committee received demand letters from the Committee and the Forest Notes

Indenture Trustees with respect to the Constructive Fraudulent Transfer Claims and the Bad Acts

Claims.  On December 1, 2015, the Independent Directors' Committee adopted a report prepared

---

[66]    *See* Williams Report p. 62.
[67]    *See* Williams Report p. 106.
[68]    *See* Williams Report p. 113; p. 119.
[69]    *See* Williams Report p. 121.
[70]    *See* Williams Report p. 147.
[71]    *See* Williams Report pp. 148-149.
[72]    *See* Williams Report p. 153.

by Kirkland analyzing the Bad Acts Claims (the "December 1 Report"). The Independent Directors' Committee adopted the report's conclusion that there were no additional colorable claims that would benefit the estates. The Independent Directors' Committee considered the claims raised in the demand letters received, and it continued to conclude that no additional claims were colorable and beneficial to the estates.[73]

### I.      The Committee's Investigation of the Constructive Fraudulent Transfer Claims and Bad Act Claims

On July 15, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Shortly after its appointment, the Committee began its own investigation of the Constructive Fraudulent Transfer Claims and the Bad Acts Claims in parallel with the ongoing work of the Debtors' Independent Directors' Committee. Following initial discovery, and at the urging of the Court, the Committee and the Debtors entered into a coordinated discovery protocol stipulation that was so-ordered by the Court in September 2015 [ECF No. 357] (the "Discovery Protocol").[74] Pursuant to the Discovery Protocol, the Committee received extensive access to documents and witnesses for deposition, albeit on a negotiated and voluntary, rather than unlimited, basis. So as to avoid duplication of efforts and costs, the Discovery Protocol stated that the Committee and the Debtors/Independent Directors' Committee would work together to make document requests, conduct depositions, and otherwise investigate all potential claims, including the Constructive Fraudulent Transfer Claims and the Bad Acts Claims. In pursuing its investigation, the Committee had access to and reviewed over a million pages of documents, deposed seventeen witnesses, and billed over 9700 hours of time between August and December 2015.[75]

---

[73]      *See* Debtors' Objection ¶ 36.
[74]      The Discovery Protocol also covers the Bucket II Claims.
[75]      3/16/16 Hr'g Tr. 16:15-17:14 (Balassa).

IV.    **The STN Hearing**

The hearing on the STN Motions (the "Hearing") took place over the course of fifteen days, commencing on February 8, 2016 and with closing arguments concluding on March 17, 2016.  It included nine days of live witness testimony from seven witnesses, over 400 exhibits submitted to the Court, five days of closing arguments, and closing argument demonstratives comprised of hundreds of slides.

The Court heard live testimony from the following seven witnesses: (i) Mr. Jonathan Foster, a member of the Independent Directors' Committee of the Combined Company's board of directors; (ii) Mr. David J. Sambrooks, the Chief Executive Officer of the Combined Company, the former Chief Executive Officer of Legacy Sabine, and a member of the Combined Company's board of directors; (iii) Mr. Thomas Chewning, a member of the Independent Directors' Committee of the Combined Company's board of directors; (iv) Mr. Joshua Weiner, a Managing Director at First Reserve; (v) Mr. Steven M. Zelin, a Managing Director at PJT Partners LP, financial advisor to the Committee; (vi) Mr. Jonathan Mitchell, Chief Restructuring Officer of the Debtors; and (vii) Professor Jack F. Williams, formerly of Mesirow Financial Consulting LLC and now of Baker Tilly, retained by the Independent Directors' Committee to provide additional expertise and perspective on the Debtors' potential constructive fraudulent transfer claims.

The Court also viewed videotaped deposition testimony of the following five witnesses: (i) Mr. Dod A. Fraser, a member of the board of directors of Legacy Forest; (ii) Mr. Patrick R. McDonald, the Chief Executive Officer of Legacy Forest; (iii) Mr. Victor Wind, the former Chief Financial Officer of Legacy Forest; (iv) Mr. Kevin Scotto, an employee of Wells Fargo;

and (v) Mr. Laurence Whittemore, an employee of JPMorgan Securities LLC, financial advisor to Legacy Forest.

The parties also submitted deposition designations and counter-designations of the deposition testimony of the following additional witnesses: (i) Mr. Loren K. Carroll, a member of the board of directors of Legacy Forest; (ii) Mr. Richard J. Carty, a member of the board of directors of Legacy Forest; (iii) Mr. James H. Lee, a member of the board of directors of Legacy Forest; (iv) Mr. James D. Lightner, Chairman of the board of directors of Legacy Forest; (v) Mr. Raymond I. Wilcox, a member of the board of directors of Legacy Forest; (vi) Mr. Duane C. Radtke, Chairman of the Board of Legacy Sabine Parent; (vii) Mr. John Yearwood, a member of the board of directors of Legacy Sabine Parent; (viii) Mr. Michael G. France, a member of the board of directors of Legacy Sabine Parent and a Managing Director of First Reserve; (ix) Mr. Alex T. Krueger, a member of the board of directors of Legacy Sabine Parent and Co-Chief Executive Officer and President of First Reserve; and (x) Mr. Brooks M. Shughart, a member of the board of directors of Legacy Sabine Parent and a Director of First Reserve.

Witness testimony was particularly focused on the following issues: (i) the negotiation and decision-making process of the boards of directors and management teams of Legacy Sabine Parent and Legacy Forest with respect to the terms of the Combination between May 2014 and December 2014; (ii) the Debtors' investigation of potential claims and causes of action that the Debtors or certain of their stakeholders may possess related to the Combination; and (iii) the Independent Directors' Committee's conclusions as to the colorability of those potential claims and causes of action.

### A.  Mr. Jonathan Foster

Mr. Foster, one of the two members of the Independent Directors' Committee, gave extensive testimony regarding the process and analysis of potential claims and causes of action undertaken by the Independent Directors' Committee.  Mr. Foster joined the board of directors of the Combined Company on May 15, 2015 and was appointed to the Independent Directors' Committee, along with Mr. Thomas Chewning, on the same day.  Mr. Foster described the scope of the authorization given to the Independent Directors' Committee to determine what claims, if any, the Company should pursue.  He testified about the Independent Directors' Committee's authorizing Kirkland to prepare a complaint asserting a constructive fraudulent transfer claim seeking to avoid the liens associated with the Second Lien Loan's deficiency at the time of the Combination, and the Independent Directors' Committee's direction to Kirkland to continue its investigation into other potential causes of action.

While Mr. Foster was questioned extensively on the timing and the scope of third-party discovery conducted by the Independent Directors' Committee with respect to potential causes of action, which discovery did not begin until the Independent Directors' Committee had reviewed all of the Debtors' documents, Mr. Foster offered a credible explanation for the Independent Directors' Committee's approach to third-party document discovery and review.  He testified that the Independent Directors' Committee understood that fraudulent transfer claims were "at the top of the list" of potential claims that creditors would likely want to pursue and that such claims are primarily economic-based and were more of an "analytical exercise" than other potential claims being considered by the Independent Directors' Committee.[76]  Accordingly, the Independent Directors' Committee began its claims analysis there.

---

[76]     2/9/16 Hr'g Tr. 91:10-92:2 (Foster) (Q: "Why was the committee starting with constructive fraudulent transfer?" A: ". . . we understood that this was on the top of the list for the creditors, and the constructive fraudulent

In addition to testifying in detail regarding the Independent Directors' Committee's process with respect to its analysis of potential claims, Mr. Foster also explained the Independent Directors' Committee analysis and assessment of each of the potential claims identified by the Committee and his understanding of the possible remedies available. Mr. Foster's testimony revealed a competent grasp of the multiple and complicated potential claims at issue.

### B. Mr. David J. Sambrooks

Mr. Sambrooks is the former Chief Executive Officer and a director on the board of Legacy Sabine Parent, was a member of the 3:30 Board, and is the current Chief Executive Officer of the Combined Company. At the Hearing, he testified thoughtfully and credibly to the process and considerations of the Legacy Sabine board and management team with respect to the Combination and the issues leading up to it in December 2014. Mr. Sambrooks explained that although he initially thought a merger of Legacy Sabine Parent and Legacy Forest was a good fit, as of December 1, 2014, he had reached the conclusion that Legacy Sabine Parent should not enter into the Combination. Mr. Sambrooks described the reasons he requested covenant relief from Legacy Sabine's lenders prior to the Combination, and why he thought it was important to seek to renegotiate the financing arrangements with the lenders.

Mr. Sambrooks testified that the revised structure under which the transaction closed was first discussed on a phone call between Legacy Forest and Legacy Sabine Parent management and board members with no lenders participating, and that the proposal originated with Legacy Forest. The new proposal – which eliminated the need for the Bridge Loan – addressed his concerns with the proposed transaction and so he supported the Combination under those terms.

---

transfer topic is an analytical one as opposed to intentional fraudulent transfer being more of a qualitative one. And so we were able to more easily start with whether we thought there was a constructive fraudulent transfer. . . . Again, being more of an analytical exercise, we understood that it would be easier . . . and quicker to look first at constructive fraudulent transfer . . . .").

Nevertheless, Mr. Sambrooks testified that Legacy Sabine Parent requested that its lenders work on parallel tracks – toward being in a position to consummate the original financing structure and the revised structure. Ultimately, the final decision as to the financing terms was made by the boards of Legacy Sabine Parent and Legacy Forest. Mr. Sambrooks also explained that First Reserve's role was to assist the Legacy Sabine Parent management and board, but that First Reserve had no authority to control or bind the company.

Mr. Sambrooks testified that he attended the meeting of the 3:30 Board and that, as of that meeting, he viewed the Merger as completed; he was unaware that there was any opportunity to stop it without facing litigation. He further testified that he viewed the Debt Financing as a necessary and integrated step of the Combination to ensure the Combined Company would have liquidity to operate. He emphasized that he believed closing the Combination was the best alternative available to Legacy Sabine Parent at the time.

Mr. Sambrooks also testified that, from his perspective, Legacy Sabine Parent and the Legacy Sabine Subsidiaries operated as a single common enterprise prior and subsequent to the Combination.

### C. Mr. Thomas Chewning

Mr. Chewning, a member of the board of the Combined Company as well as the second member of the Independent Directors' Committee along with Mr. Foster, also testified as to the process and analysis of potential claims and causes of action undertaken by the Independent Directors' Committee. Mr. Chewning described his vast experience in corporate finance, corporate governance, and the oil and gas industry. He explained the process of selecting Mr. Foster to join him as a member of the Independent Directors' Committee and specifically

testified that he chose Mr. Foster from the list of candidates provided to him based on Mr. Foster's background.

Mr. Chewning understood the Independent Directors' Committee members to have an "open mandate" to investigate the elements of the Combination for potential causes of action,[77] that it was their responsibility to have an "open mind" with respect to the Committee's theories and what causes of action might be pursued,[78] and that their duties to investigate were ongoing even after the Debtors filed their complaint against the Second Lien Agent and Second Lien Lenders.  Mr. Chewning also testified that while the Legacy Sabine Subsidiaries are legally separate from Legacy Sabine Parent, he always viewed them as a single enterprise based on how they operate.

Mr. Chewning explained how he was personally and actively involved in all aspects of the Independent Directors' Committee's investigation process, and he provided a credible explanation for why the Independent Directors' Committee commenced its investigation with fraudulent conveyances and why it reached the conclusions that it did.  Mr. Chewning's testimony provided strong support for the good faith of the Independent Directors' Committee in analyzing and assessing potential causes of action.

### D.  Mr. Joshua Weiner

Mr. Weiner is a Managing Director of First Reserve.  He focuses on capital markets transactions, including managing relationships with third-party capital providers.  Mr. Weiner testified that he has been involved in prior financing transactions since the creation of NFR (the

---

[77]    2/10/16 Hr'g Tr. 52:6-10 (Chewning) ("Our committee never felt there was any bar to looking at claims against any party.  If it had been that way during negotiations, interim, whatever, we never felt that we didn't have an open mandate to look at any and all things pertinent to the formation and the financing.").

[78]    2/10/16 Hr'g Tr. 68:12-17 (Chewning) ("We were responsible to the creditors of the company, we were responsible to the whole enterprise.  So it was important to get it right, it was important to be thorough, it was important to be engaged, it was important to have an open mind, and to let the chips more or less fall where they may.").

predecessor name of Legacy Sabine Parent) and was "heavily involved" in the negotiation of the financing structure for the Combination, working closely with Mr. Sambrooks.[79]   Mr. Weiner described the contentious negotiations between Legacy Sabine Parent and the New RBL Lenders in December 2014 with respect to the terms of the New RBL and the Combined Company's request for covenant relief.   As he explained, given the absence of any "out" from the Combination, the Combined Company was facing a likely covenant breach upon closing under the terms of the July Commitment Letter.[80]

Mr. Weiner further testified that, at all times, he undertook negotiations in the interests of the Combined Company, not in the interests of First Reserve or any other insider of Legacy Sabine Parent.  Mr. Weiner also credibly testified that his role was to assist in the negotiation of the financing, and he did not try to and did not control Legacy Sabine Parent's board or management team.  He explained that, during the negotiations, he sought to be actively involved to prevent the lenders from attempting to manipulate management for the lenders' own benefit and to ensure that the Combined Company maintained a good working relationship with its lenders as providers of liquidity going forward.   He credibly testified that First Reserve's business relationship with the New RBL Lenders was a secondary concern to the ability of the Combined Company to continue to access capital, and that he was doing what he believed was best for Legacy Sabine Parent to obtain the best financing package possible.  Mr. Weiner was a forthright and credible witness.

### E.  Mr. Steven M. Zelin

Mr. Zelin is a Managing Director of PJT Partners LP, the financial advisor to the Committee.  Mr. Zelin, who has decades of experience in major chapter 11 bankruptcies and out

---

[79]    2/10/16 Hr'g Tr. 106:5-15; 117:1-3 (Weiner).
[80]    2/10/16 Hr'g Tr. 131:22-24; 141:3-5; 169:4-24 (Weiner).

of court restructurings, was called to testify regarding his conclusions with respect to potential recoveries available from pursuit of the Committee's proposed claims, as reflected more fully in his expert report (the "Zelin Report").    Mr. Zelin testified that he was given a series of assumptions from counsel to the Committee with respect to a number of "inputs,"[81] including assuming a one hundred percent chance of success on all of the Committee's proposed claims, and that his methodology involved "unwinding" the Combination and evaluating each of the Legacy Forest and Legacy Sabine estates on a pre-Combination and post-Combination basis in order to conduct his analysis.[82]

As discussed in greater detail hereinafter, Mr. Zelin's testimony was consistent with the conclusions set forth in the Zelin Report.    Mr. Zelin testified that, under the assumptions he applied, the Constructive Fraudulent Transfer Claims would result in a recovery of $729 million to the unsecured creditors of Legacy Forest and $265 million to the unsecured creditors of the Legacy Sabine Subsidiaries.    Mr. Zelin testified that he reached these conclusions by assuming a one hundred percent likelihood of success on the Constructive Fraudulent Transfer Claims and allocating the recoveries between the *pro forma* Legacy Forest and Legacy Sabine Subsidiaries using additional assumptions.    He also provided his estimate of the plaintiffs' cost of litigating the entirety of the Constructive Fraudulent Transfer Claims in the amount of $20-30 million.

---

[81]    2/22/16 Hr'g Tr. 277:21-278:3 (Zelin) (" . . . with respect to the . . . numbers to be used and where I derived the numbers the logic of the calculation was the legal analysis provided by Ropes & Gray, but there's [sic] a lot of underlying mathematical assumptions and it's the estimates and judgments that I had to make in the numbers that gave rise to and modeled the legal analysis provided to me by Ropes & Gray.").

[82]    2/22/16 Hr'g Tr. 32:20-33:2 (Zelin) ("The approach that was outlined to me was one that attempted to look at the two estates, Legacy Sabine, Legacy Forest – the Legacy Sabine subsidiaries and Legacy Forest and attempt to calculate a separate recovery analysis at each of those two estates as if the combination did not occur, in essence, attempting to unwind the transaction in a manner consistent with the law and the approach as described to me.").

Mr. Zelin further testified to the methodology he utilized to calculate potential recoveries on the Bad Acts Claims in the amount of $1.17 to $1.19 billion;[83] he only viewed the Bad Acts Claims as a group and did not allocate potential damages and recoveries on a claim-by-claim basis. Mr. Zelin also described his methodology for calculating the value of the New RBL Lenders' adequate protection claim in an amount between $0 and $50 million. In preparing his report, Mr. Zelin did not conduct a valuation of his own; rather, he relied on the valuation work done by Mr. Christopher Kearns of Berkeley Research Group ("BRG") and on the asset values utilized by Professor Williams in the Williams Report.

While it is clear that Mr. Zelin faithfully applied the assumptions underlying his analysis and calculations, it was also readily apparent that he had been asked to use certain methodologies and assumptions that he had never used in other cases, nor had he ever seen them used by others. Criticisms of Mr. Zelin's conclusions and report go not to his credibility and expertise but rather to the assumptions that he was asked to apply and model.

### F.  Mr. Jonathan Mitchell

After serving as an advisor to the Combined Company beginning in March 2015, Mr. Mitchell became the Chief Restructuring Officer of the Debtors on July 15, 2015. At the Hearing, Mr. Mitchell testified to his prior experience as a CRO or interim CEO for a number of other companies and to his prior work in the energy sector. Mr. Mitchell described the Debtors' ongoing business activities and financial condition. He detailed his considerations in evaluating potential claims that the Debtors could assert, including (i) the Independent Directors' Committee's views as to the colorability of and potential recoveries on such claims and (ii) the

---

[83]    2/22/16 Hr'g Tr. 163:14-21 (Zelin) (Q: "Sir, your methodology for calculating bad acts damages is based on assumptions from counsel, correct?" A: "Yes, absolutely, yes." Q: "You did not do anything to test the reasonableness of those assumptions, true?" A: "Other than having conversations with counsel I didn't go anywhere else to test it with other lawyers or other third parties.").

size of the New RBL Lenders' adequate protection claim.  To determine the size of the adequate

protection claim, Mr. Mitchell utilized the value of the subject collateral as of the Petition Date

and then relied on recent valuation work performed by the Debtors' financial advisor, Lazard

Freres, to obtain a resulting adequate protection claim of approximately $480 million.  Mr.

Mitchell noted his disagreement with the methodology employed by the Committee's expert, Mr.

Zelin, for calculating the New RBL Lenders' adequate protection claim.

Mr. Mitchell also reinforced his understanding of his obligation to preserve value for the

Debtors' estates; it is his belief that the cost of litigation (which he estimates at approximately

$30-$40 million), the low likelihood of success on the proposed claims, and the Debtors' priority

of preserving liquidity in order to emerge from bankruptcy further militate against any benefit in

bringing the causes of action identified by the Committee.  Mr. Mitchell also reconfirmed his

view that a sale process would not be value-enhancing to the Debtors.

### G. Professor Jack F. Williams

Professor Williams, formerly of Mesirow Financial Consulting LLC and now of Baker

Tilly, was retained by the Independent Directors' Committee to provide analysis and expertise as

to potential constructive fraudulent transfer claims arising out of the Combination.  Professor

Williams was called to testify as an expert and fact witness as to the opinions set forth in the

Williams Report, and as an expert witness to rebut the testimony of the Committee's expert, Mr.

Zelin.

Professor Williams' testimony was consistent with the opinions reflected in the Williams

Report.  As described more fully hereinafter, Professor Williams testified to the numerous bases

for his conclusion that Legacy Sabine Parent and the Legacy Sabine Subsidiaries functioned as a

common enterprise from an economic perspective prior to the Combination, including the use of

a centralized financing and cash management system.   Professor Williams explained his conclusion that each of Legacy Forest, Legacy Sabine Parent, and the Legacy Sabine Subsidiaries was insolvent on the date of the Combination.  Professor Williams walked through his methodology for determining what he described as the transfer of value to certain creditor constituencies as a result of the Combination.  He explained that he assessed the impact of the Combination from a creditor perspective because while the constructive fraudulent transfer analysis focuses on what the Debtors received, he considers the creditors to be the component parts of the Debtors' estates for the purpose of a fraudulent transfer analysis because the law is designed to protect unsecured creditors.  He explained that he views the Combination as an integrated economic event that included the Merger and the Debt Financing.  When asked how he determined whether a creditor group received "reasonably equivalent value," Professor Williams testified that he assessed whether the value transferred and value received was "economically equivalent."[84]  Professor Williams acknowledged that he did not do a separate calculation of the value of the business synergies achieved by the Combination; he treated the liens granted to the Second Lien Lenders as part of the Combination transaction because this was a contractual obligation as of the Combination, but did not include the undrawn amount of the New RBL because the Debtors had no obligation to incur that additional debt.

Most importantly, upon questioning by Debtors' counsel, Professor Williams provided persuasive testimony rebutting the methodology and conclusions of Mr. Zelin.  Professor Williams explained his belief that Mr. Zelin's calculations relied on a "double-counting" of the New RBL obligation and the corresponding liens, and that absent such "double-counting," there

---

[84]    2/26/16 Hr'g Tr. 212:1-7 (Williams) ( ". . . but for purposes of determining equivalent value from an economic perspective, I was focused on harm, not necessarily to the extent of greater benefit, because reasonably equivalent value – or the economic equivalent, excuse me, is assessed from the perspective of harm to the creditors. That's what I was primarily looking for.").

would be no value left for unsecured creditors to recover from encumbered assets of the Debtors' estates.[85]

## V.    Discussion

### A.    Constructive Fraudulent Transfer Claims

The Court now turns to its analysis of each of the Constructive Fraudulent Transfer Claims to determine if any of these claims is colorable.  Under applicable statutory and case law, including sections 544 and 548 of the Bankruptcy Code, a constructive fraudulent transfer generally occurs when (i) the debtor receives less than reasonably equivalent value in exchange for the property transferred or obligation incurred and (ii) the transfer of property or incurrence of debt occurs when the debtor is insolvent.  *See Orr v. Kinderhill Corp.*, 991 F.2d 31, 35-36 (2d Cir. 1993).

Each of the Constructive Fraudulent Transfer Claims the Committee proposes to assert on behalf of Legacy Forest and the Legacy Sabine Subsidiaries arises from transfers made or obligations incurred in connection with the Combination.  The Movants and the Objectors agree on the basic facts of the Combination; additionally, there is no dispute that Legacy Forest and the Legacy Sabine Subsidiaries were balance sheet insolvent at the time of the Combination.  The Movants and the Objectors alike cite to Second Circuit precedent in *Orr* and *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995), which directs the Court to consider, for purposes of fraudulent transfer analysis, multiple transactions that occur pursuant to an integrated plan as a whole – the so-called "collapsing doctrine."  Nonetheless, the parties have a fundamental

---

[85]    2/26/16 Hr'g Tr. 101:1-9 (Williams) (Q: "How does Mr. Zelin allocate the $927 million total obligation between the pro forma Forest estate and the pro forma Sabine estate?" A: "He does not. . . . he burdens both the pro forma Forest estate and the pro forma Sabine estate with the entire $927 million, duplicating the obligations."); 2/26/16 Hr'g Tr. 109:25-110:8 (Williams) (Q: "So assuming Mr. Zelin's pro forma estates are created adopting his assumptions with the one difference being that there is one set of obligations instead of Mr. Zelin's duplication of the $927 million of obligations and liens, . . . how much encumbered value would be available to preserve on behalf of the estate and its unencumbered creditors?" A: "There would be none.").

threshold dispute as to exactly how the Court should analyze the various transfers and incurrences incident to the Combination for purposes of fraudulent transfer law, and specifically how and when the Court should apply the collapsing doctrine. This threshold dispute largely drives the parties' disagreement on whether the Constructive Fraudulent Transfer Claims, which the Committee values at more than $1 billion in the aggregate, assuming complete success on such claims, are colorable.

### 1. *Constructive Fraudulent Transfer Claims to Be Asserted on behalf of Legacy Forest*

#### a. The Committee's Theory[86]

The theory of the Committee's Constructive Fraudulent Transfer Claims as to Legacy Forest involves two steps and is dependent on the Court adopting a segmented view of the Combination. The Committee's theory has been referred to from time to time in this proceeding as a "freeze frame" or "snapshot" approach. First, the Committee argues that the result of the Merger was that Legacy Forest (i) incurred a total of $1.26 billion in obligations of Legacy Sabine Parent (*i.e.*, the Legacy Sabine RBL, the Second Lien Loan, and the Legacy Sabine Notes) and (ii) received only the negligible assets of Legacy Sabine Parent in return – far less than reasonably equivalent value for the incurrence of $1.26 billion in debt.[87] Therefore, says the Committee, the Merger effected a constructive fraudulent transfer as to Legacy Forest and, thus, each of the Legacy Sabine RBL, the Second Lien Loan, and the Legacy Sabine Notes are avoidable obligations of Legacy Forest. In an indication that the focus of this *STN* proceeding is more about shifting recoveries from secured creditors to unsecured creditors than protecting the Debtors' estates, the Committee, however, does not seek standing to challenge the incurrence of

---

[86]    *See* First Committee STN Motion ¶¶ 102-108.

[87]    Per the Committee's theory, only the value of assets at Legacy Sabine Parent (approximately $216 million) should be included in this step, not the value of assets held by the Legacy Sabine Subsidiaries.

the Legacy Sabine Notes, even though such notes are avoidable obligations under the Committee's theory.[88]

Next, the Committee asserts that the collapsing doctrine referred to in *Orr v. Kinderhill Corp.*, 991 F.2d 31 (2d Cir. 1993), and *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995), should apply to Legacy Forest's incurrence of portions of the New RBL, resulting in a fraudulent transfer claim here as well. Specifically, the Committee contends that the Court should collapse Legacy Forest's (i) incurrence of the New RBL and (ii) use of $620 million of the New RBL proceeds to pay off the Legacy Sabine RBL because "[t]here is no question that the paydown of the Legacy Sabine RBL was to be, and could only have been, accomplished through the [New RBL]."[89] In the Committee's view, such application collapses these two transactions into a single transaction in which Legacy Forest used $620 million of the New RBL proceeds to pay an avoidable obligation, the Legacy Sabine RBL. Thus, contends the Committee, "viewing the transaction as a whole," Legacy Forest received no value for the incurrence of the portion of the New RBL that was used to pay off the Legacy Sabine RBL, making the incurrence of the New RBL itself an avoidable transfer and the New RBL an avoidable obligation.[90]

The proposed Constructive Fraudulent Transfer Claims seek a number of remedies as recompense to the creditors of the Legacy Forest estate for the allegedly fraudulent transfers described above, including (i) avoidance of liens granted to secure the allegedly avoidable obligations, including liens on the equity interests of the Legacy Sabine Subsidiaries; (ii)

---

[88]     *See* Debtors' Objection ¶ 69; New RBL Agent Fraudulent Transfer Objection p. 34 n. 61 ("Although the Movants seem to favor this novel theory of unscrambling the Combination, they refuse to consider the implications for the Forest Notes and the Sabine Notes, hiding behind their assertion that there is no deadline for them to bring these constructive fraudulent transfer claims. Applying their theory to their own debt, among other matters, any guarantees incurred in connection with the Combination in respect of the Forest Notes or the Sabine Notes would also have to be avoided.").

[89]     First Committee STN Motion ¶ 106.

[90]     First Committee STN Motion ¶¶ 105-106.

43

recovery of the diminution in value of such avoidable liens since the Combination; (iii) recovery of the December 18, 2014 $206 million paydown of the New RBL, and prejudgment interest on the same; and (iv) recovery of fees paid in connection with the Combination, and prejudgment interest on the same.  The Committee's financial expert, Mr. Zelin, estimates that complete success on these Constructive Fraudulent Transfer Claims would result in an additional $729 million of value available to the unsecured creditors of Legacy Forest, as follows:[91]

- Avoidance of Liens Improperly Granted to Secure Avoidable Obligations – $111 million
- Recovery of New RBL Paydown – $159 million
- Merger & Financing Fees – $13 million
- Prejudgment Interest – $24 million
- Diminution in Value of Improperly Granted Liens to Secure Avoidable Obligations – $422 million
- **Total – $729 million**

During his testimony, Mr. Zelin conceded that if the Court finds that the New RBL is not an avoidable obligation at Legacy Forest, the vast majority, if not all, of the above amounts would not be recoverable.[92]

Accordingly, recovery of these amounts is dependent upon the Court adopting a segmented view of the Combination and finding that (i) Legacy Forest did not receive reasonably equivalent value in the Merger, rendering the Legacy Sabine RBL an avoidable obligation, which conclusion indeed requires adopting a "freeze-frame" analysis, and (ii) the incurrence of the New RBL and the paydown of the "avoidable" Legacy Sabine RBL are collapsed into a single transaction such that the New RBL, save for $182 million used to pay down the valid Legacy Forest RBL obligations, is itself an avoidable obligation.

---

[91]    Mr. Zelin's initial expert report included a category for recovery of adequate protection payments made to the New RBL Lenders and to the Second Lien Lenders.  As claims to recover such payments are not part of the STN Motions, Mr. Zelin agreed with Debtors' counsel that this category should be removed from his analysis, and he submitted a revised expert report at the Hearing.  *See generally* 2/22/16 Hr'g Tr. (Zelin).

[92]    *See* 2/22/16 Hr'g Tr. 331:17-333:20.

b.  **The Objectors' Theories**

Each of the Objectors contends that the Constructive Fraudulent Transfer Claims that the Committee argues can be asserted by Legacy Forest are not colorable.  The Debtors and the New RBL Lenders argue persuasively that the Committee's argument rests on a false premise, namely that Legacy Forest's incurrence of the Legacy Sabine RBL in the Merger can be analyzed separate and apart from the entire Combination for purposes of fraudulent transfer law.  The New RBL Lenders, citing to *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537 (D. Del. 2005), assert that the entirety of the Combination, *i.e.*, the Share Exchange, Merger, and Debt Financing, should be viewed as a single transaction.[93]  Similarly, the Debtors and the Second Lien Agent observe that the Committee's theory cannot be correct as a matter of law because it essentially provides a "magic wand" which transforms valid obligations into avoidable obligations upon the borrower merging into another entity and failing to provide reasonably equivalent value.[94]  In addition, as argued by Debtors' counsel during closing argument (echoing the views of Professor Williams), the math tracks the analytics inasmuch as the Legacy Sabine RBL went into the Combination fully secured and contributing its underlying collateral and cannot, as a result of the Merger, be rendered an avoidable obligation.[95]

Accordingly, as a threshold issue, the Court must determine whether the Committee's theory that the Merger and the incurrence of the New RBL should be analyzed separately from the entire Combination is tenable.  If the Merger must instead be analyzed with the Share Exchange and Debt Financing as part of a single transaction, the Committee's claims to avoid the New RBL obligation (based on the theory that Legacy Forest did not receive reasonably

---

[93]      *See* New RBL Agent Fraudulent Transfer Objection ¶ 70.
[94]      *See* Objection of Second Lien Agent ¶ 52; Debtors' Objection ¶ 68.
[95]      *See* 3/14/16 Hr'g Tr. 19-36 (Balassa); 2/26/16 Hr'g Tr. 37:11-38:19 (Williams).

equivalent value when it incurred the Legacy Sabine RBL in connection with the Merger) are not colorable.

### c. The Merger Must Be Analyzed as One Part of a Single, Integrated Transaction – The Combination

The Committee's constructive fraudulent transfer theory requires the Court to apply the collapsing doctrine to find that (a) the Merger is not collapsible into a single transaction with the Share Exchange and the Debt Financing and therefore Legacy Forest's incurrence of the Legacy Sabine RBL is a fraudulent transfer and (b) Legacy Forest's incurrence of $620 million of the New RBL and the paydown of the $620 million Legacy Sabine RBL are collapsible into a single transaction. The Committee contends that this selective application of the collapsing doctrine is appropriate because, in its view, the application of the collapsing doctrine is limited to consideration of whether a transfer was made or an obligation incurred for reasonably equivalent value. In other words, the Committee's view of the collapsing doctrine is that (i) the Court can analyze any one transfer related to the Combination, including Legacy Forest's incurrence of Legacy Sabine Parent's debt through the Merger, in isolation from other possibly related transfers and (ii) the Court may collapse value received or value given in related transactions for purposes of determining whether the transferee received reasonably equivalent value in connection with a transfer.

The Court declines to adopt the Committee's view of the collapsing doctrine. While the collapsing doctrine seems to be employed most often in the context of assessing reasonably equivalent value, counsel for the Committee, when questioned by the Court, was unable to point to any case limiting its application to that context. Further, the Committee's theory is at odds with the Second Circuit's articulation of the collapsing doctrine. In *Orr v. Kinderhill Corp.*, the Second Circuit held "[w]here a transfer is only a step in a general plan, the plan must be viewed

46

as a whole with all its composite implications."[96]    Notably this language refers to all composite implications, not just implications for assessing reasonably equivalent value.    In fact, Judge Gropper in *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013), citing to *Orr v. Kinderhill Corp.*, recently applied the collapsing doctrine to assess whether a claim to avoid a fraudulent transfer was timely brought, an application outside the context of assessing reasonably equivalent value.    *See id.* at 267 ("[i]n any event, the law is clear that for statute of limitations purposes fraudulent conveyances are examined for their substance, not their form.").    Accordingly, the Court concludes that the better view is that a proper application of the collapsing doctrine, as articulated by the Second Circuit, requires collapsing all transfers that are part of a single plan and viewing that single plan as a whole, with all its composite implications, for reasonably equivalent value and otherwise.

In determining whether to treat a transfer as part of a general plan, courts in this District and elsewhere have focused on the knowledge and intent of the parties.[97]    In the recent decision of *Adelphia Recovery Trust v. FPL Group, Inc. (In re Adelphia Commc'ns Corp.)*, 512 B.R. 447, 491 (Bankr. S.D.N.Y. 2014), Judge Gerber identified three factors to consider in such analysis:

    a.  Whether all of the parties involved had knowledge of the multiple transactions;

    b.  Whether each transaction would have occurred on its own; and

    c.  Whether each transaction was dependent or conditioned on other transactions.

Applying these factors here, it is clear that the Merger, along with the Share Exchange and the Debt Financing, must be treated as parts of a general plan, and that the Combination must be

---

[96]    *Orr*, 991 F.2d at 35.

[97]    *See e.g., In re Sunbeam Corp.,* 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) (stating that "[c]ourts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction") (citation omitted); *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537 (D. Del. 2005).

analyzed as a whole for purposes of fraudulent transfer law.  First, as the Committee itself alleges, the parties negotiated with full knowledge that the Combination would occur as a share exchange and merger of the two companies and a simultaneous refinancing; the Committee's view of the facts was confirmed by each of the testifying witnesses who were involved with the structuring and negotiation of the Combination and no contradictory evidence was introduced at the Hearing.  Indeed, the facts as alleged by the Committee clearly demonstrate that the M&A structure and consideration were negotiated contemporaneously with the financing and that negotiations on one piece of the Combination informed and influenced negotiations on the other pieces of the Combination.  For example, the parties' concerns that, amid declining hydrocarbon prices, the post-Combination company would close into a breach of the New RBL Debt-EBITDA Covenant drove both renegotiation of the May 2014 and July 2014 financing terms and a reconsideration of the post-Combination capital structure that directly led to the final Combination structure and terms implemented at closing in December 2014.[98]

The facts alleged by the Committee further demonstrate that each step of the Combination was dependent upon and contingent on each other step and could not have happened on its own.  The Debt Financing was always dependent upon and contingent on Legacy Forest and Legacy Sabine Parent becoming the "Combined Company" referenced in the resolutions of the 3:30 Board approving the Debt Financing.[99]  Similarly, contemporaneous with completion of the Share Exchange, the documents that would effect the Merger were on their way to the New York and Delaware secretaries of state.  Finally, and contrary to the Committee's unsubstantiated contention, there is nothing in the facts pleaded by the Committee

---

[98]      See e.g., Proposed Constructive Fraudulent Transfer Complaint annexed to First Committee STN Motion ("Constructive Fraudulent Transfer Complaint"), ¶¶ 123, 146 (describing negotiations in which structuring concerns and financing concerns were discussed simultaneously).

[99]      See e.g., Constructive Fraudulent Transfer Complaint ¶ 202 (describing Mr. Sambrooks' e-mail to the 3:30 Board indicating that "formal" approval of Debt Financing would occur "immediately after closing.").

(or in the record developed at the Hearing) suggesting that the Combination could somehow have been stopped or have been reversed after the Share Exchange and/or Merger.  Mr. Sambrooks, who was intimately involved in every aspect of the Combination and served on the 3:30 Board, testified that leaving Legacy Forest and Legacy Sabine Parent to function with separate capital structures was never considered; he expressed doubt over whether such an arrangement would have been feasible both as a matter of operational efficiency and as a matter of remaining in compliance with the debt covenants of each of Legacy Forest and Legacy Sabine Parent.[100]  Simply put, the Committee's characterization of the possible reversal of the Share Exchange and Merger as a "simple paper transaction" is simplistic and implausible.

Accordingly, the Court finds that the Combination must be viewed as a whole for purposes of fraudulent transfer law.  This conclusion is further buttressed by the Williams Report, which regards the Combination as an integrated event from an economic perspective.[101]  Neither the Zelin Report nor Mr. Zelin's testimony challenged Professor Williams' conclusion that, from an economic perspective, the Combination was an integrated event.[102]

### d.  The Constructive Fraudulent Transfer Claims to Be Asserted on behalf of Legacy Forest Are Not Colorable

Having concluded that the Combination must be evaluated as a whole, the Court next turns to the question of whether the Committee has stated colorable constructive fraudulent transfer claims on behalf of Legacy Forest.  It has not.  As already discussed, the Committee's

---

[100]    *See* 2/9/16 Hr'g Tr. 233:5-10 (Sambrooks) (Q: "What's your understanding, sir, of what would have happened to the combined company if in the December 16, 2014 board meeting . . . the board had not approved the combined company financing?"  A: "Well we would have no effective financing, we'd have no liquidity as a company.  We wouldn't be able to operate.").

[101]    *See* Williams Report p. 121; 2/26/16 Hr'g Tr. 12:21-13:18 (Williams).

[102]    *See* 2/22/16 Hr'g Tr. 26:16-27:3 (Zelin) (Q: "But what is your understanding of the general economic impact of the transaction on the Legacy entities?"  A: "By virtue of, reviewing both Professor Williams' analysis, you have one entity, again, that . . . had a value according to Professor Williams less than its obligations, the funded indebtedness.  You then had the Legacy Sabine subsidiaries who had obligations that were less than the value of those entities.  And combining, you took one insolvent company, combined it with another insolvent company and put each of the separate subsidiaries and the parent on the hook for a significantly larger amount of indebtedness.").

claims are premised on the notion that the Court will apply a selective collapsing analysis and (i) view the Merger in a "freeze frame," as an occurrence separate from the Combination as a whole, to find fraudulent incurrences of Legacy Sabine debt by the Legacy Forest estate, and (ii) collapse the incurrence of the New RBL and the use of the New RBL proceeds to pay off the allegedly avoidable Legacy Sabine RBL, rendering $620 million of the New RBL proceeds a fraudulent incurrence of debt.  Such a selective collapsing approach is inconsistent with the law in this Circuit and elsewhere, which directs the Court to consider as a whole *all* transaction steps that are part of an integrated plan.  Without application of the Committee's selective collapsing approach, the Constructive Fraudulent Transfer Claims to be asserted on behalf of Legacy Forest fail.

The Court concurs with the observations of the New RBL Lenders that the case most analogous to the instant case is *Hechinger*,[103] in which, as here, a new secured credit facility was used to provide financing to the post-merger entity, which used proceeds of the financing to pay a pre-merger creditor.  The New RBL Lenders maintain that "[w]hen viewed correctly, the New RBL Lenders indisputably provided value in the form of a new money, oversecured RBL Facility to the Combined [Company] at the time of the closing of the Combination."[104]

It has been suggested, however, that it defies common sense to conclude that the Movants have alleged no colorable claim to right the wrongs to Legacy Forest unsecured creditors, particularly given that Professor Williams himself identified, in the words of counsel to the Legacy Sabine Notes Trustee, an "acknowledged harm" flowing from the Combination.[105] Specifically, Professor Williams' analysis concludes that recoveries to Legacy Forest unsecured

---

[103] 327 B.R. 537 (D. Del. 2005).
[104]        Objection of the New RBL Agent [ECF No. 717] ¶ 71.
[105]        3/17/16 Hr'g Tr. 92:18 (Golden).

creditors fell from 60.9% pre-Combination to 36.7% post-Combination.[106]  But, as the Movants have repeatedly confirmed when queried by the Court, the Committee is not interested in pursuing a cause of action that could compensate the Legacy Forest unsecured creditors for this alleged harm.  In any event, the Debtors have filed an adversary proceeding in this Court seeking to, in effect, recover this amount on behalf of the Legacy Forest unsecured creditors by challenging certain liens granted to the Second Lien Lenders in the Combination; there is thus no need for the Court to address *STN* standing for the Committee on such claim.

### 2.  *Constructive Fraudulent Transfer Claims to Be Asserted on behalf of the Legacy Sabine Subsidiaries*

#### a.  **The Committee's Theory**

Unlike the Constructive Fraudulent Transfer Claims the Committee seeks to assert on behalf of the Legacy Forest estate, the Constructive Fraudulent Transfer Claims to be asserted on behalf of the Legacy Sabine Subsidiaries' estates do not require the Court to view any step of the Combination apart from the whole.  As described in the First Committee STN Motion, the Constructive Fraudulent Transfer Claims that the Committee seeks to pursue on behalf of the Legacy Sabine Subsidiaries' estates are relatively straightforward: the avoidance of the "upstream" guarantees and, as applicable, related liens granted by the Legacy Sabine Subsidiaries, in connection with (i) the New RBL in amounts greater than the Legacy Sabine RBL at the time of the Combination and (ii) the incremental $50 million obligation incurred under the Second Lien Loan in connection with the Combination.[107]  The Committee's theory for avoidance of the guarantees is also straightforward: as a result of the Combination, the Legacy Sabine Subsidiaries guaranteed an additional $980 million in debt comprised of (a) the additional $130 million of borrowings on the New RBL as compared to the Legacy Sabine RBL; (b) the

---

[106]    Williams Report p. 142.
[107]    First Committee STN Motion ¶ 109.

incremental $50 million incurred under the Second Lien Loan; and (c) the $800 million of Legacy Forest Notes, and the Legacy Sabine Subsidiaries granted liens on assets to secure the incremental borrowings on the New RBL and the Second Lien Loan.  In the Committee's view, the Legacy Sabine Subsidiaries received no value in return for the guarantees issued and liens granted to secure such guarantees.[108]    Notably, the Committee does not seek standing to challenge the Legacy Sabine Subsidiaries' guarantees of the Legacy Forest Notes, even though such guarantees would be avoidable obligations under the Committee's theory.

The Committee's expert, Mr. Zelin, did not perform a separate valuation of the Constructive Fraudulent Transfer Claims to be asserted on behalf of the Legacy Sabine Subsidiaries.  Instead, he assumed complete success on each and every Constructive Fraudulent Transfer Claim proposed to be asserted by the Committee (*i.e.*, those to be asserted on behalf of Legacy Forest and on behalf of the Legacy Sabine Subsidiaries), and he allocated the recoveries from such claims between Legacy Forest and the Legacy Sabine Subsidiaries using additional assumptions.  Applying these assumptions, Mr. Zelin estimated that complete success on the Constructive Fraudulent Transfer Claims would result in an additional $265 million of value available to unsecured creditors of the Legacy Sabine Subsidiaries, as follows:

- Avoidance of Liens Improperly Granted to Secure  Guarantees – $68 million
- Recovery of New RBL Paydown – $47 million
- Merger & Financing Fees – $20 million
- Prejudgment Interest – $9 million
- Diminution in Value of Liens Improperly Granted to Secure Guarantees – $121 million
- **Total – $265 million**

As discussed in further detail below, the assumptions supplied by Committee counsel to Mr. Zelin are deeply flawed.  They do not take into account the possibility that some of the

---

[108]    *See* First Committee STN Motion ¶¶ 109-112.

assumed recoveries allocated to Legacy Sabine Subsidiaries are based on payments actually made by Legacy Forest, not by the Legacy Sabine Subsidiaries.[109]  In addition, if the Constructive Fraudulent Transfer Claims to be asserted on behalf of Legacy Forest are not colorable and the Court declines to recognize, as a matter of law, any claim for the diminution in value of liens allegedly improperly granted, then only the first category identified by Mr. Zelin – Avoidance of Liens Improperly Granted to Secure Guarantees – reflects value hypothetically available to the estates of the Legacy Sabine Subsidiaries on account of the Constructive Fraudulent Transfer Claims.

The bottom line is that the only remedy potentially available to the Legacy Sabine Subsidiaries if their Constructive Fraudulent Transfer Claims are successful would be the avoidance of liens actually granted to secure the incremental borrowings on the New RBL and the Second Lien Loan.  The maximum value of these claims is $68 million, reflecting Mr. Zelin's assumptions as to the value of the assets pledged to secure the incremental borrowings. Further, and as described hereinafter, the Zelin Report does not disclose which liens he assumes would be avoided to yield that $68 million figure.  That omission is especially glaring in light of testimony and documentary evidence that the Legacy Sabine Subsidiaries did not grant *any* new liens to secure the incremental borrowings on the New RBL and Second Lien Loan.  Thus, while the maximum recoverable amount on the Constructive Fraudulent Transfer Claims asserted by the Legacy Sabine Subsidiaries is, per Mr. Zelin, $68 million, such amount is limited to the value of the *actual* liens granted by the Legacy Sabine Subsidiaries.  The facts alleged, and the record

---

[109]     *See* Proposed Constructive Fraudulent Transfer Complaint annexed to First Committee STN Motion ¶¶ 149-160; 2/22/16 Hr'g Tr. 190:13-18 (Zelin) (Q: "Now, turning to the next line item, which is the recovery of the RBL pay down, do you see that sir?"  A: "I do . . . yes."  Q: "That's $206 million that the combined company paid on its RBL indebtedness after the combination, correct?"  A: "That's correct.").

thus far, suggest that such value would be closer to $0 than to $68 million, without any consideration of litigation costs.

### b. The Constructive Fraudulent Transfer Claims to Be Asserted on behalf of the Legacy Sabine Subsidiaries Are Colorable

The Objectors concede that the Legacy Sabine Subsidiaries were insolvent when they granted the upstream guarantees. However, they advance three theories as to why the Legacy Sabine Subsidiaries received reasonably equivalent value for the upstream guarantees. None of the Objectors' theories is dispositive of the issue of colorability, however. First, the Debtors, supported by the Williams Report, argue that the Legacy Sabine Subsidiaries received reasonably equivalent value because Legacy Sabine unsecured creditors' recoveries increased from 30.7% prior to the Combination to 36.7% following the Combination.[110] While the Debtors are correct that fraudulent transfer law is designed to protect creditors, the Debtors' theory ignores the text of section 548 of the Bankruptcy Code, which states that a transfer is avoidable "if the *debtor* . . . received less than reasonably equivalent value in exchange for such transfer or obligation." 11 U.S.C. § 548(c) (emphasis added). Delaware and Texas state law, which could potentially be applied through section 544(b)(1) of the Bankruptcy Code,[111] similarly refer to *the debtor's* receipt of reasonably equivalent value in the transfer, not whether creditors were harmed by the transfer.[112] Thus, the relevant question is whether the Legacy Sabine Subsidiaries' estates received reasonably equivalent value for the upstream guarantees extended in connection with the Combination, not whether, as the Debtors would have it, any class of Legacy Sabine creditors was harmed as a result of the Combination.

---

[110]    *See, e.g.,* Debtors' Objection ¶¶ 122-126.

[111]    Section 544(b)(1) of the Bankruptcy Code provides that "[e]xcept as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1).

[112]    *See* Del. Code ann. tit. 6 §§ 1304-1305; TEX. BUS. & COMM. CODE §§ 24.005-24.006.

Second, the New RBL Lenders argue that the Legacy Sabine Subsidiaries received reasonably equivalent value for the upstream guarantees in the form of contingent contribution and subrogation rights. The New RBL Lenders contend that such rights constitute reasonably equivalent value as a matter of law "[b]ecause there was more collateral than obligations outstanding under the [RBL], any Debtor subsidiary guarantor had the right to recover an amount from any other co-obligor that would be greater than the amount for which it could be liable."[113] The value of these rights, and whether such value constitutes reasonably equivalent value, is a question of fact which the Court cannot address in the context of an *STN* motion.

Third, the Debtors and the New RBL Lenders argue that the Legacy Sabine Subsidiaries could not function independently and therefore the reasonably equivalent value analysis must include the benefits the Legacy Sabine Subsidiaries received as members of a single enterprise, including the benefits of increased liquidity and access to additional borrowings. The Debtors, joined by the New RBL Lenders, argue that, because the Legacy Sabine Subsidiaries are members of a single enterprise, they shared dollar for dollar in any value or benefits received by Legacy Sabine Parent before the Combination and Legacy Forest/the Combined Company following the Combination. The Debtors and the New RBL Lenders further contend that, because Legacy Forest received reasonably equivalent value in the Combination, the Court should find that such reasonably equivalent value was also received by the Legacy Sabine Subsidiaries as members of a single enterprise, without the need to perform a specific reasonably equivalent value analysis with respect to the amount of indirect benefits received by the Legacy Sabine Subsidiaries.

The record developed at the Hearing, including the undisputed facts that the Legacy Sabine Subsidiaries do not have employees or enter into contracts, among others, strongly

---

[113]    New RBL Agent Fraudulent Transfer Objection ¶ 77.

indicates that the Legacy Sabine Subsidiaries and Legacy Sabine Parent, and post-Combination, the Legacy Sabine Subsidiaries and Legacy Forest, functioned as a single enterprise.[114] Nevertheless, at this stage of the proceedings, the Court cannot make a determination as a matter of law that the Debtors are a single enterprise. But, even assuming the existence of a single enterprise, the Court cannot accept the argument of the Debtors and the New RBL Lenders that such a conclusion obviates the need to conduct a reasonably equivalent value analysis with respect to the amount of indirect benefits received by the Legacy Sabine Subsidiaries.

In support of their argument, the Debtors and New RBL Lenders rely principally on *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013), and *PSN Liquidating Trust v. Intelsat Corp. (In re PSN USA, Inc.)*, 2011 WL 4031147 (Bankr. S.D. Fla. Sept. 9, 2011). Neither case stands for the proposition asserted. In *Tronox*, Judge Gropper considered an alleged intentional fraudulent transfer in which a conglomerate spun off its oil and gas business, leaving behind its chemical business and the substantial liabilities associated with such business, through (i) a series of integrated transfers of the assets of the oil and gas entity into a new enterprise and transfers of the assets comprising the chemical business and cash into three separate Tronox entities and (ii) an IPO of such Tronox entities. Each of the Tronox entities sued to avoid the transfers and the IPO as an intentional fraudulent conveyance aimed at allowing the conglomerate to shed its legacy liabilities associated with the chemical business. One of the Tronox entities, Tronox LLC, received property that the parties in the case agreed was worth more than the property it had transferred out, prompting the defendants to argue that Tronox LLC had received reasonably equivalent value, notwithstanding that, as a whole, the

---

[114]    *See generally* 2/10/16 Hr'g Tr. 238:8-239:21 (Sambrooks) (discussing the relationship between the Legacy Sabine Subsidiaries and Legacy Sabine Parent); 2/25/16 Hr'g Tr. 103:9-135:5 (Williams) (discussing the bases for his conclusion that the Legacy Sabine Subsidiaries and Legacy Sabine Parent functioned as an economic common enterprise prior to the Combination).

three Tronox entities had transferred out, in total, more than $17 billion in assets and received only $2.6 billion in assets in return. Judge Gropper held that, because, in substance, creditors looked to the three Tronox entities on a consolidated basis as responsible for the legacy liabilities, the Tronox plaintiffs were able to satisfy their burden of proof that Tronox LLC had not received reasonably equivalent value in the transfers by demonstrating that the three Tronox entities on a consolidated basis had not received reasonably equivalent value. *See* 503 B.R. at 294-95.

In *PSN*, the debtor, which operated a television network, made market rate payments for satellite services necessary to operate such network pursuant to a contract entered into by its parent company. The liquidating trust of the debtor's estate argued that such payments constituted constructive fraudulent transfers because, pursuant to the contract at issue, the satellite services were "owned" by the parent company and thus provided no value to the debtor. The Court held that, because the debtor actually used the satellite services, it received reasonably equivalent value in exchange for its payments on the contract. *PSN*, 2011 WL 4031147 at *4. In addition, and in response to the liquidating trust's argument that only the debtor's parent benefitted from the satellite services contract because the debtor did not "own" the contract, the court held that "the relationship between the Debtor and [parent] was that of a single enterprise. Accordingly, even if the Court were to conclude that [parent] received the benefit of the satellite services, the Debtor indirectly benefitted as well. These indirect benefits to the Debtor constitute reasonably equivalent value and shield the Transfers from avoidance." *Id.* at *6. While *Tronox* and *PSN* are instances in which courts did not need to consider reasonably equivalent value on an estate-by-estate basis within a single enterprise, it is the specific facts of those cases, not the

findings that the estates operated as members of a single enterprise, which obviated the need for an estate-by-estate analysis.

*In re Jesup & Lamont, Inc.*, 507 B.R. 452, 471-72 (Bankr. S.D.N.Y. 2014), which Judge Gropper decided subsequent to *Tronox* and involved facts somewhat more analogous to the facts here, is particularly instructive. In that case, a wholly-owned subsidiary, JLSC, pledged funds to secure a loan obligation incurred by its parent company, JLI, and such pledge was challenged as a fraudulent transfer. Judge Gropper held that there was a triable issue of fact as to whether JLSC, the subsidiary, had received benefits from the loan sufficient to constitute reasonably equivalent value for the pledge of its assets to secure such loan. *See id.* at 472.

The Committee asserts in its reply brief that the question of whether indirect benefits, whether received by entities as members of a single enterprise or otherwise, can constitute reasonably equivalent value for a guarantee is a question of fact that cannot be determined at this stage of the proceedings.[115] The Court agrees. While the Legacy Sabine Subsidiaries may have received substantial indirect benefits from the Combination as members of a single enterprise, and such benefits must be considered when assessing reasonably equivalent value, the value of the indirect benefits (and any contingent contribution and subrogation rights), and whether such indirect benefits provide reasonably equivalent value for the guarantees the Legacy Sabine Subsidiaries issued in connection with the Combination, raises a question of fact.[116]

Accordingly, the Constructive Fraudulent Transfer Claims the Committee seeks to assert on behalf of the Legacy Sabine Subsidiaries clear the hurdle of colorability. It is undisputed that

---

[115]     Omnibus Reply of Committee to Objections to STN Motions ¶ 42 ("Alleging that the 'fortunes' of the Legacy Sabine Subsidiaries and the Combined Company rise and fall together, or that the companies shared a cash management system, is insufficient to demonstrate reasonably equivalent value, even at trial, let alone [at] an *STN* hearing. . . . An *STN* motion is an especially inappropriate place for determinations regarding indirect benefits.").
[116]     The Debtors made no attempt to quantify the value of those benefits. *See* 3/3/16 Hr'g Tr. 64:17-23 (Williams) (describing quantification of indirect benefits including synergies in directional, not quantitative terms).

the Legacy Sabine Subsidiaries, while insolvent, guaranteed an additional $980 million in debt in connection with the Combination.  Further development of the factual record would be required for the Court to determine whether the Legacy Sabine Subsidiaries received reasonably equivalent value in exchange for such guarantees and the liens that were granted to secure them. However, for the reasons discussed below, it does not appear that asserting such claims (which, as discussed below, would be worth $68 million in value at most) would be in the best interests of the estates.

### B.    The Bad Acts Claims

As described above, the Bad Acts Claims consist of claims for (i) intentional fraudulent transfers related to the Combination; (ii) breaches of fiduciary duty against (a) the Legacy Forest Directors and Officers, (b) the Legacy Sabine board of directors, (c) Mr. David J. Sambrooks, as fiduciary for the Legacy Sabine Subsidiaries, and (d) the 3:30 Board; (iii) aiding and abetting breaches of fiduciary duty against the New RBL Lenders, the Legacy Forest Directors and Officers, the Second Lien Lenders, and the First Reserve Defendants; (iv) equitable subordination of the claims of the New RBL Lenders and the Second Lien Lenders; and (v) recharacterization as equity of the $50 million borrowed from the Second Lien Lenders by the Combined Company in connection with the Combination.[117]  At the direction of counsel to the Committee, Mr. Zelin assumed that damages from the entirety of the Bad Acts Claims would be equal to the difference between "what recoveries to unsecured creditors would have been at the time of the Combination" and what recoveries to unsecured creditors are under the Debtors' proposed plan of reorganization.[118]  Using that flawed assumption, Mr. Zelin estimates that, if the Committee succeeds on the Bad Acts Claims, recoveries to unsecured creditors would be

---

[117]    The Committee's proposed complaint asserting the Bad Acts Claims will be referred to herein as the "Bad Acts Complaint."

[118]    Zelin Report p. 27.

approximately $1.17 to $1.19 billion, inclusive of prejudgment interest.[119]  The Zelin Report

does not allocate potential damages and recoveries on a claim-by-claim basis.[120]  Because the

Court finds that none of the Bad Acts Claims is colorable as a matter of law, however, the failure

to perform such allocation is immaterial, as are the myriad other flaws in the Committee's

damage calculation assumptions.

> 1. ***The Committee's Alleged Theory of the Bad Acts Claims
> is Implausible and is Contradicted by the Record***

Each of the Committee's proposed Bad Acts Claims arises from allegations concerning

the conduct of various parties during the negotiation and execution of the Combination.  The

Committee's assertion that such claims are colorable is animated by the Committee's narrative of

the Combination, stated succinctly in the Second Committee STN Motion as follows:

> Two struggling companies decided to combine, when prices were high.  Prices
> declined, and they should have called off their planned transaction.  Instead, the
> parties with a long-standing relationship—an equity holder that faced recognizing
> losses (First Reserve) and banks facing immediate losses on their loan
> commitments (Wells Fargo, Barclays and other banks)—undertook a transaction
> that preserved and enhanced their own interests at the expense of unsecured
> creditors.[121]

More specifically, the Committee asserts that First Reserve and the New RBL Lenders, notably

Wells Fargo and Barclays, re-engineered the Combination in December 2014 to shift losses to

unsecured creditors that the New RBL Lenders would have suffered from closing on the Bridge

Loan, thereby allowing First Reserve to delay recognizing a loss on its investment in Legacy

Sabine Parent and to preserve First Reserve's institutional relationship with the New RBL

Lenders.[122]  Then, alleges the Committee, First Reserve and the New RBL Lenders, using First

Reserve's effective control over the Legacy Sabine Parent board and the 3:30 Board and with the

---

[119]    Zelin Report p. 27.
[120]    Zelin Report p. 27.
[121]    *See* Second Committee STN Motion ¶ 16.
[122]    *See* Second Committee STN Motion ¶¶ 7-8.

help of certain of the Legacy Forest Directors and Officers and Mr. Sambrooks, were able to ensure that each of the Legacy Forest board, the Legacy Sabine Parent board, and the 3:30 Board would execute the re-engineered Combination, notwithstanding that doing so constituted a breach of each board's fiduciary duties.   Indeed, the entire focus of counsel for the Forest Notes Indenture Trustees during closing arguments was the theory that, in the days before the Combination closed, the New RBL Lenders knowingly shifted to the holders of the Legacy Forest Notes the risks that the lenders had previously assumed.[123]   The Committee's narrative, however, is not only at odds with common sense but is overwhelmingly contradicted by the voluminous record established thus far in this proceeding.   Simply put, the Committee's theory is implausible and the claims premised upon it are not colorable.

First, the parties agree that the final structure and steps of the Combination were first presented by Legacy Forest board member Dod Fraser on December 9, 2014.[124]   Mr. Fraser testified that he developed the modified structure on December 3, 2014, with input from Mr. Gordon of Wachtell.[125]   Mr. Fraser further testified that, while he was aware of the contentious relationship between the New RBL Lenders and Legacy Sabine Parent/First Reserve with respect to funding the Combination and the New RBL Lenders' desire not to fund the Bridge Loan,[126] he and Mr. Gordon devised the structure without input from Legacy Sabine Parent, First Reserve, or

---

[123]    *See* 3/11/16 Hr'g Tr. 195:6-14 (Stark) ("We have the reallocation of risk in the days before.  The Forest noteholders were not here.  And in the end the allocation of risk was re-positioned back towards the Forest noteholders and the transaction.  It wasn't the lottery ticket.  It was the transaction that they constructed, the risk allocation that they put together, they themselves.  The banks assumed the lending risk.  They assumed the risk of positioning where we sit now.  And that got shifted in the last two days before the deal closed.").

[124]    *See* Second Committee STN Motion ¶¶ 89-94.

[125]    *See* Fraser Dep. Tr. 92:14-94:14.

[126]    *See* Fraser Dep. Tr. 90:7-92:7.

the New RBL Lenders.[127]  In fact, Mr. Fraser did not share the final structure with Legacy Sabine

Parent until December 9, 2014.[128]

Further, although structures similar to the final structure and steps of the Combination

(*i.e.*, structures in which the New RBL Lenders did not fund the Bridge Loan and the Legacy

Forest Notes remained in place) were discussed prior to December 9, 2014,[129] there is nothing

indicating that First Reserve or the New RBL Lenders were the driving force behind the final

structure of the Combination.  To the contrary, the testimony elicited at the Hearing indicates

that Legacy Sabine Parent deliberately excluded the New RBL Lenders from discussions of a

Combination structure that did not include the Bridge Loan in order to ensure that the lenders

focused on revising the terms of the New RBL and Bridge Loan and being prepared to close

under the original structure.  Indeed, the record indicates that, even as of December 9, 2014, after

Mr. Fraser had introduced the final Combination structure and steps to Legacy Sabine Parent, the

New RBL Lenders were continuing negotiation on financing under the original structure

including the Bridge Loan.[130]

Second, there is no reasonable basis for the Committee's allegations that the New RBL

Lenders and First Reserve were conspiratorially working together to protect the New RBL

---

[127]    Fraser Dep. Tr. 235:22-236:8 (Q: "Prior to the December 9, 2014 telephone conference between representatives of Sabine and Forest, you had never presented the substance of your modified deal structure to anyone at Sabine; correct?"  A: "That's correct."  Q: "Prior to December 9, 2014, did you have any discussions with anyone at Barclays or Wells Fargo regarding the modified deal structure?"  A: "No.").

[128]    *See* Fraser Dep. Tr. 126:15-127:15; Second Committee STN Motion ¶¶ 86-94.

[129]    Such structures would include (i) Wells Fargo's December 4, 2014 proposal to First Reserve that First Reserve give up some of its equity to avoid the Change of Control provisions of the Legacy Forest Notes and (ii) the December 7, 2014 proposal Wells Fargo and Barclays sent to Mr. Weiner, apparently at his request.  While each proposal may have envisioned a final Combination structure that did not include the Bridge Loan, neither structure matured into the final Combination structure.  Moreover, it is not at all unusual that parties to a transaction in which debt carrying interest rates of 7.25% and 7.50%, respectively, would be replaced with debt carrying an interest rate of 9.75% would, as a matter of common sense, be exploring options for avoiding executing such transaction and thereby avoid taking on more expensive financing.

[130]    *See* 2/9/16 Hr'g Tr. 214:11-14 (Sambrooks) (Q: "At that point in time [December 9, 2014] was Sabine still trying to work out with the lenders financing in the event the original structure closed?"  A:  "Yes."); UCC Ex. 1154 (e-mail from Mr. Weiner, dated December 11, 2014, to Barclays and Wells Fargo discussing modifications to Bridge Loan); *see also* 2/10/16 Hr'g Tr. 229:15- 231:18 (Weiner) (discussion of UCC Ex. 1154).

Lenders' interests at the expense of Legacy Forest and Legacy Sabine unsecured creditors.  The

Committee attempts to substantiate its allegations by pointing to a November 5, 2014 e-mail

from First Reserve Managing Director Joshua Weiner in which Mr. Weiner remarked that "[n]ot

getting to a deal [would be] almost mutually assured destruction."[131]  The Committee infers from

this e-mail that the referenced "mutually assured destruction" is that of the New RBL Lenders

and First Reserve if the Combination closed with the inclusion of the Bridge Loan and that First

Reserve and the New RBL Lenders were working together to avoid this outcome.  Placed into its

proper context, however, Mr. Weiner's remark tells a very different story.  As the Committee

acknowledges, the "deal" to which Mr. Weiner referred was his request, on behalf of the

prospective combined company, for covenant relief on the planned New RBL.[132]  As the

Committee concedes, the request was necessitated by declining operating performance at both

Legacy Forest and Legacy Sabine Parent that resulted in projections indicating that the

Combined Company would be in breach of its New RBL Debt-to-EBITDA Covenant by year-

end 2014; to avoid that breach, Legacy Sabine Parent requested a modification of the New RBL

Debt-to-EBITDA Covenant.[133]  Thus, the "mutually assured destruction" to which Mr. Weiner

referred was that of the New RBL Lenders and the Combined Company, each of whom would be

faced with difficult scenarios if the New RBL Debt-to-EBITDA Covenant were breached.

In response to the request for covenant relief, Wells Fargo and Barclays, the lead New

RBL Lenders and the lenders committed to funding the Bridge Loan, indicated to Mr. Weiner

that they would grant the requested covenant relief but would require modifications to the Bridge

Loan in return.[134]  What followed, as meticulously detailed in the Second Committee STN

---

[131]    *See* Second Committee STN Motion ¶ 292.
[132]    *See* Second Committee STN Motion ¶ 52.
[133]    *See* Second Committee STN Motion ¶¶ 40-45.
[134]    *See* Second Committee STN Motion ¶¶ 46, 49.

Motion and as recounted by Mr. Weiner during his testimony, were weeks of negotiations to revise the terms of the New RBL to provide the Combined Company with covenant relief while providing the lenders with a higher rate of interest and/or more security on their Bridge Loan commitment.[135]   These negotiations were contentious and demonstrate that the New RBL Lenders on the one hand, and First Reserve, on the other, had assumed an adversarial posture and were not working together to protect the New RBL Lenders' interests.

Third, the Committee has provided no reasonable basis for its assertion that First Reserve, in the person of Mr. Weiner, negotiated at any point or in any way against the Combined Company's interests.   The Committee primarily relies on two e-mails from Mr. Weiner to portray First Reserve as (i) controlling Legacy Sabine Parent's capital markets decisions related to the Combination, regardless of the position of Legacy Sabine Parent's management or board and (ii) using such control to protect the New RBL Lenders and, in particular, Barclays and Wells Fargo.   The first such e-mail, sent by Mr. Weiner to a First Reserve colleague, states "I don't care what mgmt says – anything cap markets relates [*sic*] needs to be approved by me and [it] is their job to make sure i am in the loop[.]"[136]   The Committee contends that this e-mail establishes that "[Mr.] Weiner exercised full control over capital markets decisions related to the Combination, regardless of the positions taken by Legacy Sabine Parent's management."[137]   In the second e-mail, sent on November 7, 2014,[138] Mr. Weiner observes that it was better to handle the transaction "as a deal with the banks vs. flame them," because the "[i]dea of flaming them" made him "really nervous."   According to Mr. Weiner, "flaming" the banks "[w]ould be really bad for future biz."   The Committee contends

---

[135]    *See* Second Committee STN Motion ¶¶ 52-68.
[136]    Second Committee STN Motion ¶ 104; UCC Ex. 75.
[137]    Second Committee STN Motion ¶¶ 104, 237, 243, 246.
[138]    UCC Ex. 135.

this e-mail shows Mr. Weiner being "particularly vocal about the need to maintain First Reserve's relationships with the banks."[139]

Mr. Weiner's testimony at the Hearing credibly contradicts the Committee's speculative interpretation of both e-mails and, further, forcefully debunks the Committee's baseless conspiracy theory. With respect to the first e-mail, Mr. Weiner explained, while "[u]ltimately, it's the board and management that control the decision-making," his role at First Reserve is to assist portfolio companies' management teams in negotiating capital markets and financing terms, a role that requires him to be apprised of negotiations between lenders and portfolio companies. Mr. Weiner clarified that he sent the first e-mail to a colleague in response to a report that Barclays and Wells Fargo were attempting to meet with Mr. Sambrooks "because I felt like the banks were trying to convince management to do something silly – was that they need to keep me in the loop so I can stop this kind of stuff from happening."[140] With respect to the second e-mail, Mr. Weiner testified that "flaming" Wells Fargo and Barclays by forcing them to close on the Bridge Loan would have been bad for the future business of the *Combined Company* because Barclays and Wells Fargo were "Sabine's core relationships and the providers of liquidity directly to Sabine."[141] By contrast, Mr. Weiner testified that neither Wells Fargo nor Barclays was a "top five" relationship for First Reserve.[142]

Perfectly illustrating the fallacy of the Committee's narrative that the New RBL Lenders and First Reserve were working together to protect each other's interests is the fact that First Reserve and Legacy Sabine Parent, negotiating on behalf of the prospective combined company, turned down the New RBL Lenders' November 7, 2014 proposal, which called for (i) replacing

---

[139]    Second Committee STN Motion ¶ 117.
[140]    *See* 2/10/16 Hr'g Tr. 121:8-122:5 (Weiner).
[141]    2/10/16 Hr'g Tr. 200:23-201:11 (Weiner).
[142]    2/10/16 Hr'g Tr. 165:2-7 (Weiner).

the New RBL Debt-to-EBITDA Covenant with an "easy-to-meet" first lien debt-to-EBITDA covenant and (ii) increasing the total interest rate cap on the Bridge Loan from 9.75% to 15.5%.[143]  This proposal would have protected the alleged interests of both the New RBL Lenders, who of course had made the proposal, and First Reserve, in that the "easy-to-meet" covenant relief would have delayed the default that would cause First Reserve to write down its investment while at the same time allowed First Reserve to accede to the wishes of Barclays, Wells Fargo, and the New RBL Lenders.  Nonetheless, despite an alleged alignment of interests and a proposal that served such alleged alignment of interests, First Reserve and Legacy Sabine Parent declined to accept the proposal and instead continued negotiations.

The Committee's Bad Acts Complaint and the factual record completely contradict the Committee's narrative.  It is clear beyond peradventure that the parties were working diligently to make the best of a difficult situation, a situation driven largely by commodity market forces entirely beyond their control.  Against this backdrop, the Court will analyze each of the Bad Acts Claims in turn.

### 2.  The Intentional Fraudulent Transfer Claims are Not Colorable

The Committee seeks standing to assert each of the constructive fraudulent transfer claims described above as intentional fraudulent transfer claims.  Section 548(a)(1)(A) of the Bankruptcy Code provides that a bankruptcy trustee may avoid a transfer of an interest of the debtor in property, or an obligation incurred by the debtor, that was made or incurred with "actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted."  11 U.S.C. § 548(a)(1)(A).  Second, pursuant to section 544(b) of the Bankruptcy Code, the bankruptcy trustee may avoid a transfer of property or obligation that is voidable under state fraudulent transfer law by an unsecured creditor with an allowable claim against the debtor.

---

[143]    *See* Second Committee STN Motion ¶ 54-55.

11 U.S.C. § 544(b). Potentially applicable state intentional fraudulent transfer laws (those of New York, Texas, and Colorado) are substantially similar to section 548(a)(1)(A) of the Code. *See* N.Y. DEBT. & CRED. LAW § 276 ("Every conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."); TEX. BUS. & COMM. CODE § 24.005(a)(1) (providing for avoidance of transfers made, or obligations incurred, "with actual intent to hinder, delay, or defraud any creditor of the debtor"); COLO. REV. STAT. § 38-3-105(1)(a) (same); *see also Drenis v. Haligiannis*, 452 F. Supp. 2d. 418, 426 (S.D.N.Y. 2006) (noting that "the UFCA and UFTA are substantially similar" with respect to intentional fraudulent conveyances).

To find the requisite intent, the hindering or delaying must have been the "clear and intended consequences of the act, substantially certain to result from it." *In re Tronox Inc.*, 503 B.R. 239, 280 (Bankr. S.D.N.Y. 2013). The intent to hinder, delay, or defraud creditors can be proven not only by direct evidence but also by inference from a debtor's conduct and the circumstances surrounding a transaction. In determining whether a debtor acted with actual fraudulent intent in making transfers or incurring obligations, courts within the Second Circuit have recognized various "badges of fraud" to determine intent. These circumstances are "so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Id*. at 282-283.[144]

---

[144]    Such "badges of fraud" include:
  (i)    the financial condition of the transferor at the time of the transfer;
  (ii)    concealment of facts and false pretenses by the transferor;
  (iii)    an unconscionable discrepancy between the value of the property transferred and the consideration received;
  (iv)    a close relationship between the parties to the alleged fraudulent transaction;
  (v)    the reservation of rights in or control over the transferred property after the alleged conveyance;
  (vi)    the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

The Committee points to the approval of the Merger and Debt Financing by the 3:30 Board as signifying that the 3:30 Board possessed the requisite intent to hinder, delay, or defraud creditors.[145]  Specifically, the Committee contends that the 3:30 Board was focused on carrying out the agenda of First Reserve, who, consistent with the Committee's view of events, was seeking to (a) delay a restructuring of the Combined Company until after closing its latest fundraising efforts and (b) shift losses from the lenders, with whom First Reserve had a relationship, to unsecured creditors.[146]

The Committee's theory of intent fails for two reasons.  First, it relies on a flawed view of the Merger and approval of the Debt Financing as events independent of the Combination.  As detailed above, the application of the law to the undisputed record compels the conclusion that the Merger and Debt Financing were part of the integrated Combination and thus cannot be viewed separately.  Moreover, and critically, for the question of intent, the record is clear that the 3:30 Board did not view the Merger and Debt Financing as separate transactions.  As Mr. Sambrooks, a member of the 3:30 Board, testified, the 3:30 Board (i) considered the Merger as having been completed at the time the 3:30 Board met and was unaware that there was any opportunity to stop it and (ii) regarded the Debt Financing as a mere execution of the final steps of the Combination previously approved by the boards of Legacy Sabine Parent and Legacy Forest, a step which ensured that the Combined Company would have the liquidity needed to operate.[147]  The Committee fails to allege any facts in the Bad Acts Complaint which support an

---

(vii)   the general chronology of the events and transactions under inquiry.
*In re MarketXT Holdings Corp.,* 376 B.R. 390, 405-06 (Bankr. S.D.N.Y. 2007) (citing *In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983)).  Potentially applicable state law in New York, Texas, and Colorado provide similar badges of fraud.  *A&M Global Mgmt. Corp. v. Northtown Urology Assocs.*, 115 A.D.3d 1283, 1288–89 (N.Y. App. Div. 4th Dept. 2014); TEX. BUS. & COMM. CODE § 24.005(b); COLO. REV. STAT. § 38-3-105(2) (same).

[145]    *See* Second Committee STN Motion ¶¶ 174-177.
[146]    *See* Second Committee STN Motion ¶¶ 178-185.
[147]    *See* 2/9/16 Hr'g Tr. 173:1-174:21 (Sambrooks).

inference that the clear and intended consequences of the actions of the 3:30 Board were to hinder, delay, or defraud creditors.

Second, and as detailed above, the Committee's narrative that First Reserve pressed on to complete the Combination in service of its own interests is implausible and the Committee has not alleged sufficient facts that could substantiate such a theory. Thus, even if the 3:30 Board had been acting in accordance with First Reserve's intent – a baseless inference that the Committee does not support with actual facts – it is entirely without merit to allege that First Reserve's intent was to hinder, delay, or defraud creditors. Accordingly, the intentional fraudulent transfer claims that the Committee seeks to assert do not allege plausible facts which would allow the Court to reasonably infer the requisite intent to hinder, delay, or defraud creditors. Therefore, such claims are not colorable.

Moreover, the Court can infer no intent to delay, hinder, or defraud creditors from the fact that the new structure for the Combination, which did not include the Bridge Loan and therefore left the Legacy Forest Notes outstanding, was not disclosed publicly until after the Share Exchange. As the press release[148] disclosing the new structure indicated, leaving the Legacy Forest Notes outstanding with interest rates of 7.25% and 7.50%, respectively, as opposed to redeeming them with indebtedness under the Bridge Loan (which would have carried an interest rate of 9.75%), was designed to save the Combined Company a significant amount in interest payments and inure to the benefit of the enterprise and creditor body as a whole.

Further, the decision to modify the Combination structure to obviate the need to redeem the Legacy Forest Notes at a premium above par when such notes did not mature for several years cannot logically evidence an intent to hinder, delay, or defraud the Legacy Forest

---

[148]    Attachment to UCC Ex. 1173 (Combined Company Press Release, December 16, 2014, *Sabine Oil & Gas and Forest Oil Complete All-Stock Business Combination*).

noteholders.    As the Delaware Chancery Court has recently held, "efforts to structure a transaction to avoid tripping the terms of an indenture are perfectly permissible."[149]   The Legacy Forest noteholders did not hold an absolute right to collect an early redemption premium. Rather, early redemption was a conditional contractual right that was triggered only upon a "Change of Control," as defined in the Legacy Forest Notes indentures.   The Legacy Forest board took the good faith position that the revised Combination structure avoided a "Change of Control" as defined in such indentures, thereby enabling the Combined Company to preserve much needed capital while still upholding its contractual obligations to the Legacy Forest noteholders.[150]   The Legacy Forest noteholders' contention that the revised Combination structure did in fact trigger the "Change of Control" provisions of the applicable indentures is a question of law that is not before the Court and has no bearing on the intent of the Legacy Forest board.   That intent, as the record and common sense make indisputably clear, was to comply with the provisions of the indentures.

### 3.   The Breach of Fiduciary Duty Claims are Not Colorable

The Committee seeks standing to assert breach of fiduciary duty claims against each of (i) the Legacy Forest Directors and Officers for (a) neither terminating the Combination when offered the chance by Mr. Sambrooks and Legacy Sabine Parent nor forcing the Combination to close with the Bridge Loan and (b) failing to use the proceeds of the pre-Combination sale of Legacy Forest's Arkoma assets to pay the unsecured creditors of Legacy Forest;[151] (ii) the 3:30

---

[149]        *Wilmington Sav. Fund Soc'y FSB v. Foresight Energy LLC*, C.A. No. 11059-VCL, 2015 WL 7889552 at *9 (Del. Ch. Dec. 4, 2015).

[150]        *See* Fraser Dep. Tr. 94:3-14 (". . . as I might point out, the idea of having the economic interest different from the voting interest was not a new idea, that was inherent in the July restructuring, it was from that conversation I believe, that the later restructuring evolved which was to have in this case not a high vote but a low vote preferred in order that we could meet our contractual obligations to the Forest Oil bondholders, and yet preserve the benefits of the transaction for the company and its shareholders.").

[151]        *See* Second Committee STN Motion ¶¶ 219-220.

Board, for approving the Debt Financing, rather than terminating the Combination;[152] (iii) First

Reserve, as controlling equity holder, and Mr. Sambrooks for allowing the Legacy Sabine

Subsidiaries to incur additional guarantees;[153] and (iv) the Legacy Sabine board of directors, for

approving the Debt Financing that led to the Legacy Sabine Subsidiaries incurring additional

guarantees.[154]   None of these claims is colorable.

### a.   Standard Under New York Law and Delaware Law

Legacy Forest was a New York corporation, as is the Combined Company.   Legacy

Sabine Parent was, and the Legacy Sabine Subsidiaries were and are, for purposes of the Second

Committee STN Motion, Delaware limited liability companies.[155]   Therefore, the Court must

look to (i) New York law when considering the claims against the Legacy Forest Directors and

Officers and the 3:30 Board and (ii) Delaware law when considering the claims against the

Legacy Sabine Parent board, Mr. Sambrooks, and the First Reserve Defendants.   Under both

New York law and Delaware law, directors owe fiduciary duties of care and loyalty and, absent

specific allegations that the directors breached such duties, the business judgment rule of each

state's law prevents a court from second guessing such directors' business decisions.   *See*

*Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 308 (S.D.N.Y. 2006); *N. Am. Catholic*

*Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007).   The duty of care

generally requires a director to perform his duties as a director in good faith and with that degree

of care which an ordinarily prudent person in a like position would use under similar

circumstances.   The duty of loyalty requires a director to subordinate his own personal interests

to the interests of the corporation.   Under both New York and Delaware law, when an entity is

---

[152]        *See* Second Committee STN Motion ¶¶ 232-233.
[153]        *See* Second Committee STN Motion ¶¶ 241-242; ¶ 246.
[154]        *See* Second Committee STN Motion ¶¶ 243-245.
[155]        In fact, not all of the Legacy Sabine Subsidiaries are Delaware limited liability companies.  However, the Committee treats them all as such for purposes of its motion.  *See* Second Committee STN Motion ¶ 211.

insolvent, fiduciary duties, which are typically owed only to shareholders and the entity itself, also extend to creditors. *See id.*; *Hughes*, 452 F. Supp. 2d at 308.

Under Delaware law, directors of an insolvent entity discharge their fiduciary duties by maximizing the value of the insolvent entity for the benefit of all stakeholders, and they do not owe any specific duty to a particular constituency, creditor, or otherwise. *See Quadrant Structured Prods. Co. v. Vertin,* 115 A.3d 535, 546 (Del. Ch. 2015) ("[t]he directors of an insolvent firm do not owe any particular duties to creditors"); *Gheewalla*, 930 A.2d at 103 ("[t]o recognize a new right for creditors to bring direct fiduciary clams against . . . directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors").

The Debtors and the Legacy Forest Directors and Officers contend that New York law, consistent with Delaware law, requires directors of an insolvent entity to discharge their fiduciary duties by maximizing the value of the insolvent entity for the benefit of all stakeholders, and does not impose fiduciary duties owed specifically to creditors. New York courts and courts applying New York law have held, consistent with Delaware law, that claims for breach of fiduciary duties owed to creditors when a company is in the zone of insolvency are "derivative of claims of breach of fiduciary duty to the company itself," *In re I Successor Corp.*, 321 B.R. 640, 659 (Bankr. S.D.N.Y. 2005), and that such duties are discharged by "maximiz[ing] the corporation's long-term wealth creating capacity." *In re Glob. Serv. Grp., LLC*, 316 B.R. 451, 460 (Bankr. S.D.N.Y. 2004) (citations omitted).

The Committee contends, however, that under New York law, the so-called "trust-fund doctrine" imposes upon directors the additional duty "to hold the remaining corporate assets in

trust for the benefit of its general creditors." *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank,* 94 N.Y.2d 541, 549 (N.Y. 2000) (citations omitted). The Second Circuit has characterized the trust fund doctrine as "ensur[ing] that the directors do not funnel the assets of the corporation to themselves or to other shareholders, subverting the creditor's rights in bankruptcy." *Geren v. Quantum Chem. Corp.*, No. 95-7554, 1995 WL 737512, at *1 (2d Cir. Dec. 13, 1995). Further, in *Credit Agricole*, the New York Court of Appeals provided a significant limitation on the applicability of the doctrine, holding that "a simple contract creditor may not invoke the doctrine to reach transferred assets before exhausting legal remedies by obtaining judgment on the debt and having execution return unsatisfied." *Credit Agricole*, 94 N.Y.2d at 550. This formulation has been subsequently applied by both state and federal courts to bar contract creditors from asserting the trust fund doctrine. *See, e.g., Aldoro, Inc. v. Gold Force Int'l., Ltd.*, 859 N.Y.S.2d 154, 155 (N.Y. App. Div. 1st Dep't 2008); *Staudinger+Franke GMBH v. Casey*, No. 13 CV. 6124 (JGK), 2015 WL 3561409, at *13 (S.D.N.Y. June 8, 2015).

Any additional duty the "trust fund doctrine" imposes upon directors of a New York corporation is not applicable here. There is no allegation that the Legacy Forest Directors and Officers or the 3:30 Board funneled assets to themselves and, even if they had, the Committee has not identified a fiduciary duty owed to a non-contract creditor. Therefore, the Legacy Forest Directors and Officers and the 3:30 Board were subject only to the general duties of care and loyalty imposed on directors of an insolvent entity, including duties to creditors. Such duties to creditors, under both New York law and Delaware law, are discharged by maximizing the value of the enterprise for the benefit of all stakeholders.

### b. Breach of Fiduciary Duty Claims Against the Legacy Forest Directors and Officers

The Committee alleges that the Legacy Forest Directors and Officers breached both their duty of care and their duty of loyalty in approving the Combination instead of (i) terminating the Combination when offered the opportunity to do so by Mr. Sambrooks and Legacy Sabine Parent or (ii) insisting that the Combination close under the original financing structure with the Bridge Loan, the proceeds of which would have funded the redemption of the Legacy Forest Notes, and then using proceeds of the Arkoma sale to pay unsecured creditors of Legacy Forest.

Neither claim is colorable. For a director or officer to breach the duty of care, a plaintiff must show a "reckless indifference to or a deliberate disregard" of the interests of those to whom fiduciary duties are owed or "actions which are with out the bounds of reason." *In re Trinsum Group, Inc.*, 466 B.R. 596, 610 (Bankr. S.D.N.Y. 2012) (citing to *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005)). The Committee contends that the Legacy Forest Directors and Officers breached their duty of care *to creditors* by failing to obtain outside advice on the solvency of the prospective combined company (i) after reviewing Mr. Sambrooks' December 2, 2014 letter expressing concern that the prospective combined company would be in default on the New RBL immediately after closing and would face liquidity challenges and (ii) prior to the Legacy Forest Directors and Officers formally approving the final Combination structure.[156] But any allegation that the Legacy Forest Directors and Officers acted with reckless indifference is not sustainable. The Committee has not alleged sufficient facts which, if proven, would establish that the Legacy Forest Directors and Officers responded to Mr. Sambrooks' letter in a manner inconsistent with a proper discharge of their duty of care.

---

[156]    Second Committee STN Motion ¶ 224.

Specifically, prior to approving the revised Combination structure, the Legacy Forest Directors and Officers requested new financial analyses and advice from outside advisors JPMorgan and Wachtell as to (i) whether Legacy Forest would be better off proceeding with the Combination or remaining as a stand-alone entity and (ii) the financial condition of the prospective combined company.[157]  These analyses led the Legacy Forest Directors and Officers to conclude, perhaps not surprisingly given Legacy Forest's impending covenant breach and going concern qualification, that Legacy Forest as an enterprise would be better positioned as part of the Combined Company than as a standalone entity, notwithstanding Mr. Sambrooks' concerns.  Although the Committee alleges, in essence, that the fact that the Legacy Forest Directors and Officers did not obtain a solvency analysis is by itself sufficient to state a claim for breach of their duty of care, this is manifestly incorrect; a solvency analysis is just one piece of information among many that a board may consider in discharging its duty of care.  As the Legacy Forest Directors and Officers correctly point out in their objection to the STN Motions, the Committee's argument amounts to a "mere disagreement" with the decision of the Legacy Forest Directors and Officers as to what analysis was necessary, and "New York law did not and does not impose a requirement for the Legacy Forest Board to conduct any specific type of financial analysis in reaching its decision."[158]

Further, the Committee's allegations that the Legacy Forest Directors and Officers breached their duty of care in approving Legacy Forest's entry into the Combination instead of selecting a different path also fail to support a colorable claim for breach of the duty of care.  An allegation that directors "made the *wrong decision*. . . is precisely the type of second-guessing

---

[157]    Fraser Dep. Tr. at 275:5-17; 281:19-282:4; Lightner Dep. Tr. at 219:21-23; Bad Acts Complaint ¶ 126.
[158]    Objection of Legacy Forest Directors and Officers at ¶ 17.

that the business judgment rule is designed to prevent."[159]  The facts alleged by the Committee demonstrate that the Legacy Forest Directors and Officers informed themselves of material information relevant to the decision of whether the Combination would maximize the value of Legacy Forest for all stakeholders, as required by their duty of care.  Moreover, the Legacy Forest certificate of incorporation contains an exculpation for such breaches, which the Debtors and Legacy Forest Directors and Officers argue forcefully would be applicable in the case of a finding of a breach of the duty of care by the Legacy Forest Directors and Officers based on facts alleged by the Committee.[160]

Similarly, the Committee fails to state a colorable claim for a breach of the duty of loyalty by the Legacy Forest Directors and Officers.  The Committee's proposed claim is based entirely on the assumption that the trust fund doctrine applies and that the Legacy Forest Directors and Officers owed specific duties to creditors to preserve assets; therefore, the Committee argues, the Legacy Forest Directors and Officers breached a duty of loyalty owed to creditors by considering the interests of other constituencies and the company as a whole.  In

---

[159]     Objection of Legacy Forest Directors and Officers at ¶ 16 (citing *Shapiro v. Rockville Country Club, Inc.*, No. 15308-02, WL 398980, at *9 (N.Y. Sup. Ct. Feb. 23, 2004)).

[160]     Legacy Forest's Restated Certificate of Incorporation, dated October 21, 1993, limits the liability of its directors to the fullest extent permitted by the New York Business Corporation Law.  Specifically, it provides that:

> A director of the Corporation shall not be liable to the Corporation or its shareholders for damages for any breach of duty in such a capacity unless a judgment or other final adjudication adverse to the director establishes that: (a)  The director's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law; (b) The director personally gained in fact a financial profit or other advantage to which the director was not legally entitled; or (c) The director's acts violate Section 719 of the New York Business Corporation Law (the "BCL").  A director's liability for any act or omission prior to the adoption of this paragraph 8 shall not be eliminated or limited by virtue hereof and any repeal or modification of the foregoing provisions of, or the adoption of any provision of, the Restated Certificate of Incorporation inconsistent with this paragraph 8 shall not adversely affect any right, immunity or protection of a director existing hereunder with respect to any act or omission occurring prior to or at the time of such repeal or modification or the adoption of such inconsistent provision.  If, after approval by the shareholders of this paragraph 8, the BCL is amended to permit the further elimination or limitation of the personal liability of a director, then the liability of the director shall be eliminated or limited to the fullest extent permitted by the BCL as so amended.

Legacy Forest Restated Certificate of Incorporation, at 30-31.

support of its assertion, the Committee points to the testimony of Mr. McDonald, former Chief Executive Officer of Legacy Forest, that he and the board of Legacy Forest took into account the interests of "the company" and "all stakeholders."[161]

The Committee misstates the duty of loyalty, which, under New York law, "requires a director to subordinate his own personal interests to the interests of the corporation," *In re Marine Risks*, 441 B.R. 181, 200 (Bankr. E.D.N.Y. 2010), and "derives from the prohibition against self-dealing that inheres in the fiduciary relationship." *Id.* (citation omitted). The Legacy Forest Directors and Officers assert that an allegation that the board favored one class of stakeholders over another, as the Committee alleges occurred here, fails to state a claim for breach of the duty of loyalty.[162] The Court agrees. With respect to allegations of self-dealing, the proposed Bad Acts Complaint does not allege that any of the members of the board of Legacy Forest other than Mr. McDonald has a personal interest in the Combination. There can be no colorable claim for a breach of the duty of loyalty where a plaintiff fails to plead that a majority of the directors were not disinterested. *See*, *e.g.*, *Giuliano v. Gawrylewski*, 40 Misc. 3d 1210(A), 2013 WL 3497611, at *11 (N.Y. Sup. Ct. 2013), *aff'd*, 122 A.D.3d 477 (1st Dep't 2014); *Stoner v. Walsh,* 772 F.Supp. 790, 801 (S.D.N.Y. 1991). The Committee's assertions are incorrect as a matter of law and its claim that the Legacy Forest Directors and Officers breached their duty of loyalty is not colorable.

At bottom, the Legacy Forest Directors and Officers acted in a manner consistent with their duties to creditors under New York law in (i) declining to terminate the Combination or force the Combination to close with the Bridge Loan financing and (ii) determining to use the Arkoma proceeds for the benefit of the Combined Company, rather than distributing such

---

[161]    Second Committee STN Motion ¶ 225.
[162]    Objection of Legacy Forest Directors and Officers at ¶ 31.

proceeds to creditors of Legacy Forest.  Simply put, the Legacy Forest Directors and Officers had no duty to walk away from the proposed Combination and liquidate; nor did they have a duty to lead Legacy Forest into a Combination premised on an expensive bridge to nowhere.

### c.  Breach of Fiduciary Duty Claims Against the 3:30 Board and First Reserve on behalf of Legacy Forest

The Committee next contends that the 3:30 Board breached its duty of loyalty by approving the Debt Financing, rather than terminating the Combination, and that First Reserve breached its duties as a controlling shareholder in connection with the actions of the 3:30 Board.[163]  Specifically, the Committee asserts that the Debt Financing was an "interested transaction" and, therefore, its approval constitutes a breach of the duty of loyalty because (i) four of the seven 3:30 Board members present for the meeting had connections to First Reserve and (ii) First Reserve was motivated to protect its relationships with the lenders and to avoid writing down its investment in Legacy Sabine Parent.  The record as developed at the Hearing, however, confirms that the Committee's hypothesis that First Reserve was motivated to pursue its own interests and those of the New RBL Lenders at the expense of the Combined Company is facially implausible.  There is no merit to the claim that the 3:30 Board was conflicted by its connection to First Reserve, and the Committee's claim based on the 3:30 Board's alleged breach of the duty of loyalty is not colorable.

Moreover, it is arguable that, had the 3:30 Board pursued the Committee's quixotic course of action – electing not to approve the Debt Financing and then somehow terminating the Combination and embarking on a workout with holders of the Legacy Forest Notes, the lenders under the Legacy Sabine RBL, and the Second Lien Lenders – such action itself would have been a violation of the fiduciary duties of the 3:30 Board.  First, at the time the 3:30 Board met,

---

[163]     Second Committee STN Motion ¶¶ 232, 237.

the Share Exchange was completed and the Merger was in process, to be formally completed upon the filing by the Delaware secretary of state. Given that the Delaware secretary of state filed the merger certificate at 3:48 EST, under the Committee's theory, the 3:30 Board had all of eighteen minutes to stop the Merger and then, somehow (the Committee does not say how), terminate the Combination, including the already completed Share Exchange. To fulfill its duty of care with respect to such a decision, the 3:30 Board would have had to inform itself of all material considerations associated with halting the Merger, including (i) whether the Share Exchange could be terminated and (ii) the consequences of (a) Legacy Forest returning to being a standalone company in the event the 3:30 Board were somehow able to terminate the Merger and reverse the Share Exchange and (b) Legacy Forest operating with Legacy Sabine Parent and the Legacy Sabine Subsidiaries as indirect subsidiaries, in the event the Share Exchange could not be terminated, including the possibility that principal amounts due under each of the Legacy Sabine RBL and Legacy Forest RBL would have been accelerated by the Share Exchange and would be due and owing. That the 3:30 Board could have informed itself of these complex matters, made a decision to terminate the Merger, and then executed on that decision, all in eighteen minutes, is simply implausible, and so are the Committee's claims that suggest otherwise.

### d. Breach of Fiduciary Duty Claims Against Mr. Sambrooks and First Reserve on behalf of the Legacy Sabine Subsidiaries

The Legacy Sabine Subsidiaries consist of (i) seven limited liability companies organized under Delaware law; (ii) one corporation, Sabine Oil & Gas Finance Corp., organized under Delaware law; and (iii) one limited liability company, Giant Gas Gathering LLC, organized under Oklahoma law. The Second Committee STN Motion and proposed Bad Acts Complaint do not appear to make any distinction among the Legacy Sabine Subsidiaries, choosing to treat

them all as Delaware LLCs and to analyze all fiduciary duty claims solely under Delaware law.[164]

The Committee contends that Mr. Sambrooks, as appointed manager, and First Reserve, as controlling equity holder, each owed fiduciary duties to "the Legacy Sabine Subsidiaries."[165] The Committee further contends that, in evaluating the Combination, Mr. Sambrooks only considered the interests of Legacy Sabine Parent and did not consider the interests of the Legacy Sabine Subsidiaries, thereby violating both his duty of care and his duty of loyalty to the Legacy Sabine Subsidiaries.[166] The Committee contends that First Reserve violated its duty of loyalty to the *creditors* of Legacy Sabine Subsidiaries by prioritizing its interests over those of the Legacy Sabine Subsidiaries.[167] Both claims are facially defective in that the Committee has failed to allege that either Mr. Sambrooks or First Reserve owed fiduciary duties to the Legacy Sabine Subsidiaries.

First, Legacy Sabine Parent, itself a Delaware LLC, directly or through an intermediary – and not Mr. Sambrooks – was the sole managing member of the Legacy Sabine Subsidiaries that are LLCs.[168] Mr. Sambrooks was authorized to manage such subsidiaries but was at all times subject to the authority of the managing member. Under Delaware law, only directors and managing members of an LLC (and not parties to whom such managing members delegate authority, such as Mr. Sambrooks) owe fiduciary duties, if any,[169] to the LLC. *See Coventry Real Estate Advisors, LLC v. Developers Diversified Realty Corp.*, 923 N.Y.S.2d 476, 477–78 (N.Y. App. Div. 1st Dep't 2011) (applying Delaware law and holding that only managing

---

[164]    *See* Second Committee STN Motion ¶ 211 n. 28.
[165]    *See* Bad Acts Complaint, Count III.
[166]    *See* Second Committee STN Motion ¶ 241.
[167]    *See* Second Committee STN Motion ¶ 246.
[168]    *See* Limited Objection of Sabine Directors ¶ 10 (citing to Legacy Sabine Subsidiaries' LLC Agreements § 7).
[169]    The Committee concedes that Delaware law permits a limited liability company to eliminate fiduciary duties under certain circumstances.

member owed fiduciary duties to company and not member who was authorized by LLC agreement to manage day-to-day operations). Accordingly, as counsel for Mr. Sambrooks correctly asserts, Mr. Sambrooks owed no fiduciary duties to the Legacy Sabine Subsidiaries.[170]

Second, the Committee has failed to allege any legally cognizable basis on which First Reserve, as a controlling equityholder, owes fiduciary duties to the Legacy Sabine Subsidiaries. The Committee simply states, without citation to authority, that First Reserve owed fiduciary duties to the creditors of the Legacy Sabine Subsidiaries.[171] Thus, the Committee has failed to plead an essential element of its claim, rendering the claim not colorable for that reason alone. Moreover, as noted by First Reserve in its objection to the STN Motions, First Reserve was only an indirect controlling equity holder, through Legacy Sabine Parent, of the Legacy Sabine Subsidiaries.[172] To the extent a parent entity is found to owe any fiduciary duties to its wholly-owned LLC,[173] the Committee, seeking to assert claims on behalf of the wholly-owned subsidiaries, would first have to pierce the corporate veil to reach First Reserve in order to assert such a claim. The Committee has not argued in the Second Committee STN Motion or in its proposed complaint that the corporate veil should be pierced, providing yet another reason why the proposed claims against the First Reserve Defendants are not colorable.

---

[170]    *See* Limited Objection of Sabine Directors ¶¶ 70-73.

[171]    *See* Second Committee STN Motion ¶ 246; *see also* Omnibus Reply of Committee to Objections to STN Motions ¶ 75 ("As to other allegations of First Reserve as controlling equity holder, the Committee's *STN* Motion provides sufficient bases for standing to be granted.").

[172]    *See* Objection of First Reserve Defendants ¶ 78 (arguing that "[a]lthough under certain circumstances a controlling stockholder may owe fiduciary duties to minority stockholders, that is not remotely applicable where, as here, the subsidiaries are wholly-owned and no minority stockholders exist").

[173]    Under Delaware law, a *corporation* does not owe fiduciary duties to its wholly-owned subsidiaries or their creditors. *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191 (Del. Ch. 2006), *aff'd sub nom.*, *Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007).

e.  **Breach of Fiduciary Duty Claims Against the Legacy Sabine
Parent Board on behalf of Legacy Sabine Parent**

The Committee contends that the Legacy Sabine Parent board of directors breached its fiduciary duty of loyalty to Legacy Sabine Parent when it approved the Debt Financing because (i) the Legacy Sabine Parent board was acting at the direction of First Reserve and (ii) the Debt Financing "benefitted First Reserve but put more debt onto the Legacy Sabine entities."[174]  Mr. Weiner provided credible and uncontroverted testimony that establishes that the Legacy Sabine Parent board was not acting at the direction of First Reserve.  Moreover, the facts in the record offered in support of the Committee's scant allegations are insufficient to support a plausible inference that First Reserve was motivated to pursue its own interests and those of the New RBL Lenders at the expense of Legacy Sabine Parent or the Combined Company at all, let alone in a way that would have created a conflict for the Legacy Sabine Parent board.  The claim as pleaded is not sustainable.

In addition, the Committee's claim for breach of the duty of loyalty by the board of Legacy Sabine Parent not only relies on treating the Debt Financing as a separate transaction but also ignores the fact that the Legacy Sabine Parent board did not act on behalf of the "Legacy Sabine entities" that incurred additional debt as a result of the Debt Financing, *i.e.*, the Legacy Sabine Subsidiaries.  As described herein, the Legacy Sabine Parent board did not approve the Debt Financing; the 3:30 Board did.   The Legacy Sabine Parent board approved the Combination, of which the Debt Financing was but one step.  Thus, to even state a claim, the Committee would have to plead some harm to Legacy Sabine Parent, as opposed to the Legacy Sabine Subsidiaries, resulting from entry into the *Combination*, not the Debt Financing.  This, of

---

[174]       Second Committee STN Motion ¶ 246; Bad Acts Complaint ¶ 222 (Count IV).

course, is impossible because, according to the Committee's theory of the Combination, the debts of Legacy Sabine Parent were assumed by Legacy Forest for no consideration.

Finally, even assuming that a claim for a breach of fiduciary duty on behalf of Legacy Sabine Parent were colorable, the Debtors and the directors of Legacy Sabine Parent contend (likely correctly) that the Legacy Sabine Parent operating agreement waives such claims on behalf of Legacy Sabine Parent in the absence of bad faith, providing another potential basis for a finding that the claims are not colorable.[175]

### 4. The Aiding and Abetting Breach of Fiduciary Duty Claims are Not Colorable

The Committee also seeks standing to assert claims for aiding and abetting breaches of fiduciary duties against (i) the Legacy Forest Directors and Officers, the Legacy Sabine Parent board, Mr. Sambrooks, and the First Reserve Defendants for allegedly aiding and abetting breaches of fiduciary duties in connection with the Share Exchange and the Merger and (ii) the New RBL Lenders, the Second Lien Lenders, Wells Fargo, and Barclays for allegedly aiding and abetting breaches of fiduciary duties in connection with the Debt Financing.[176]  To state a claim for aiding and abetting breach of fiduciary duty under New York law, the following three elements must be pled: (1) a breach of fiduciary obligations, of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) the plaintiff suffered damages as a result of the breach.  *In re Sharp Int'l Corp.*, 403 F.3d 43, 49-50 (2d Cir. 2005); *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (N.Y. App. Div. 1st Dep't 2003).

As the Court has found no colorable claims for breaches of fiduciary duties, it is elementary that the first requirement, a breach of fiduciary obligations, is not met.  Moreover, even if the first element were met, the Committee's allegations that the ultimate decision with

---

[175]     *See* Ex. 1019 (Third Amended and Restated Operating Agreement of Sabine Oil & Gas LLC, dated as of January 7, 2013) at §§ 9.3 & 9.7.

[176]     Bad Acts Complaint ¶¶ 230-231 (Count VI).

respect to structure and execution of the Combination, including the Debt Financing, was influenced or directed by any third parties are without merit.   Although First Reserve and the various lenders did indeed participate in negotiating the Debt Financing – and the progress of such negotiations informed the negotiations and decisionmaking of the legacy boards – the Committee has not alleged facts sufficient to establish an aiding and abetting claim under the relevant standard.

With respect to the First Reserve Defendants, the Court agrees that "[i]t would be a bizarre perversion of corporate law to hold [] First Reserve . . . liable for trying to negotiate against its counterparty for the best deal possible."[177]   Moreover, with respect to the New RBL Lenders, the proposed Bad Acts Complaint is utterly devoid of any allegation that the New RBL Lenders had actual knowledge of a breach of fiduciary duty by some other party.[178]   Similarly, the Second Lien Lenders argue that the Movants "have not alleged a single fact that any Second Lien Lender had actual knowledge of any breach of fiduciary duty or that any Second Lien Lenders knowingly induced or participated in such breach;" rather, they assert, "the [Bad Acts] Complaint is based entirely on conclusory statements concerning the 'Secured Parties' (*i.e.*, lumping together the [New] RBL Lenders and the Second Lien Lenders as if they are one and the same) and cannot possibly meet the pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure."[179]   For all of the foregoing reasons, the aiding and abetting claims are not colorable.

### 5.   *The Equitable Subordination Claims are Not Colorable*

The Committee seeks standing to assert claims for equitable subordination against each of the New RBL Agent, the New RBL Lenders, the Second Lien Agent, and the Second Lien

---

[177]    Objection of First Reserve Defendants ¶ 127.
[178]    Objection of New RBL Agent to Bad Acts Claims [ECF No. 720] at 50.
[179]    Objection of Second Lien Agent ¶ 102.

Lenders (collectively, the "Equitable Subordination Defendants").[180]  Under section 510(c) of the Bankruptcy Code, a court has the power to equitably subordinate an allowed claim where (i) the claimant engaged in inequitable conduct; (ii) the misconduct injured other creditors or conferred an unfair advantage; and (iii) the equitable subordination is not inconsistent with bankruptcy law. 11 U.S.C. § 510(c); *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977); *see generally LightSquared LP v. SP Special Opportunities LLC* (*In re LightSquared Inc.*), 511 B.R. 253, 346-52 (Bankr. S.D.N.Y. 2014).    Equitable subordination is an "extraordinary remedy that is to be used sparingly."  *In re Kalisch*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd*, No. 09 Civ. 1636 (PKC), 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009).

The Committee contends that the Court may equitably subordinate the claims of the Equitable Subordination Defendants "because of harm caused unsecured creditors in a transaction that the [Equitable Subordination Defendants] knew was doomed to fail, but was pursued to avoid hundreds of millions of dollars of losses by the [RBL Lenders] on their contractually committed bridge commitment."[181]    The Committee's claims for equitable subordination against each of the Equitable Subordination Defendants fail at the first element – inequitable conduct – and are thus not colorable.

The Committee's claims that the New RBL Agent and the New RBL Lenders engaged in inequitable conduct are based on the allegation that the New RBL Agent and the New RBL Lenders "actively participated in a manipulative scheme to supplant the Bridge Loan with a new merger and financing structure . . . all for the purposes of providing short-term liquidity for a Combination that was doomed to fail, ensuring that the new financing was senior to all of the

---

[180]    Bad Acts Complaint ¶¶ 232-242 (Count VII).
[181]    Second Committee STN Motion ¶ 256.

Debtors' unsecured claims and collecting transaction fees on the new financing."[182]    That

allegation, while sensational, is contradicted and rendered implausible by the record.  First, as

described herein, there is no plausible allegation that the New RBL Agent or the New RBL

Lenders actively participated in creating the final structure of the Combination that closed on

December 16, 2014.  Indeed, Mr. Fraser testified in his deposition that he had no communication

with the New RBL Lenders in conceiving of the final structure of the Combination.  Further

supporting the New RBL Lenders' lack of involvement in designing the final structure is the fact

that even after Mr. Fraser had presented the structure to each of the Legacy Forest and Legacy

Sabine boards on December 9, 2014 and received a favorable response, the New RBL Lenders

continued to negotiate with respect to alternative financing structures that included the Bridge

Loan.

Second, the allegation that the New RBL Agent and the New RBL Lenders knew the

Combination was "doomed to fail" is contradicted and rendered implausible by the record.  To

the contrary, as a condition precedent to the closing of the New RBL, Mr. Sambrooks delivered a

solvency certificate to the New RBL Agent.[183]    Through such solvency certificate, Mr.

Sambrooks attested, among other things, to the facts that (i) the Combined Company's assets

would exceed its liabilities (at fair valuation) and (ii) the Combined Company would be able to

meet its debts as they matured.[184]    The better view – the plausible view – is not that the New

RBL Agent and the New RBL Lenders engaged in a "manipulative scheme" but rather that they

engaged in contentious, arm's-length negotiations to renegotiate the financing to which they had

committed in May 2014 to reflect the changed environment and prospects for the Combined

Company in December 2014, with both sides protecting their respective interests to the best of

---

[182]    Second Committee STN Motion ¶ 272.
[183]    Trust Decl. Ex. 1 at 230:7-14.
[184]    Trust Decl. Ex. 9.

their abilities.  There is nothing inequitable about such conduct; the Committee's claims for equitable subordination of the claims of the New RBL Lenders are not colorable.

With respect to the Second Lien Agent and the Second Lien Lenders, the Committee acknowledges that the Second Lien Lenders "do not appear to have been directly involved in the structuring of the Combination or the efforts to enrich the [Equitable Subordination Defendants] at the expense of pre-existing unsecured creditors."[185]  Nonetheless the Committee contends, citing solely to *In re Enron Corp.*, 379 B.R. 425, 433 (S.D.N.Y. 2007), that inequitable conduct is present because (i) the Combined Company was left undercapitalized following the Combination and (ii) the Second Lien Lenders were unjustly enriched by gaining access to Legacy Forest assets.[186]  As the Second Lien Agent points out in its objection, however, "allegations of unjust enrichment cannot support a claim for equitable subordination without additional allegations that the unjust enrichment resulted from the defendant's egregious or unconscionable conduct."[187]  The reference in *Enron* to undercapitalization and unjust enrichment[188] is derived from *In re Adelphia Commc'ns Corp.*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007), in which Judge Gerber described unjust enrichment as "not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct." *Id*. at 68-69.  The Committee, by its own admission, has not alleged any conduct approaching unconscionable, unjust, or unfair, let alone any double dealing or foul conduct by the Second Lien Agent or Second Lien Lenders.  Accordingly, the paltry facts alleged by the Committee are insufficient to state a colorable claim to equitably subordinate the claims of the Second Lien Lenders.

---

[185]     Second Committee STN Motion ¶ 278.
[186]     Second Committee STN Motion ¶ 279.
[187]     Objection of Second Lien Agent ¶ 98.
[188]     379 B.R. at 433 n.39.

### 6.    The Recharacterization Claims are Not Colorable

"[B]ankruptcy courts have the power to recharacterize ostensible debt as equity . . . ."
*Adelphia*, 365 B.R. at 74 (*citing In re Official Comm. of Unsecured Creditors for Dornier
Aviation (N. Am.), Inc.*, 453 F.3d 225, 231 (4th Cir. 2006)).  Recharacterization of debt as equity
"is appropriate where the circumstances show that a debt transaction was actually an equity
contribution *ab initio*."   *In re BH S&B Holdings*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009).
The Committee seeks standing to assert a claim to recharacterize as equity the $50 million in
additional Second Lien Loan obligations that the Combined Company incurred at the time of the
Combination.[189]

In determining whether an investment that purports to be debt should be recharacterized
as equity, courts in this district balance the factors laid out by the Court of Appeals for the Sixth
Circuit in *In re AutoStyle Plastics, Inc.*,[190] which are:

> (1) the names given to the instruments, if any, evidencing the
> indebtedness; (2) the presence or absence of a fixed maturity date
> and schedule of payments; (3) the presence or absence of a fixed
> rate of interest and interest payments; (4) the source of repayments;
> (5) the adequacy or inadequacy of capitalization; (6) the identity of
> interest between the creditor and the stockholder; (7) the security,
> if any, for the advances; (8) the corporation's ability to obtain
> financing from outside lending institutions; (9) the extent to which
> the advances were subordinated to the claims of outside creditors;
> (10) the extent to which the advances were used to acquire capital
> assets; and (11) the presence or absence of a sinking fund to
> provide repayments.

269 F.3d 726, 749-50 (6th Cir. 2001); *see also In re BH S&B Holdings*, 420 B.R. at 157
(considering *AutoStyle* factors); *In re Gen. Motors Corp.*, 407 B.R. 463, 498 (Bankr. S.D.N.Y.
2009) (same).  The "ultimate exercise" in evaluating any recharacterization claim "is to ascertain

---

[189]    *See* Second Committee STN Motion ¶¶ 284-293; Bad Acts Complaint ¶¶ 243-249 (Count VIII).
[190]    The *AutoStyle* factors have also been referred to as the *Roth Steel* factors.  *See Roth Steel Tube Co. v.
Commissioner*, 800 F.2d 625, 630 (6th Cir. 1986) (applying substantially similar considerations in tax law context).

the intent of the parties." *See Weisfelner* v. *Blavatnik* (*In re Lyondell Chemical Co.*), No. 09-01375 (REG), 2016 WL 74681, at *20 (Bankr. S.D.N.Y. Jan. 4, 2016). While "no one factor is controlling or decisive . . . the court may dismiss a recharacterization claim if the plaintiff fails to plead facts that trigger the applicability of the *AutoStyle* factors, or a meaningful subset of them." *BH S & B Holdings*, 420 B.R. at 157-58 (internal citations omitted).

The Committee relies primarily on *AutoStyle* factors four through eight, contending that (i) the source of repayment was dependent on the Combined Company's performance, as evidenced by Wells Fargo and Barclays' seeking to sell their pieces of the Second Lien Loan at prices below par;[191] (ii) the Combined Company was inadequately capitalized following the Combination, as evidenced by the apparent inability of the Combined Company to raise equity;[192] (iii) there was an identity of interests between the New RBL Lenders, who also financed the incremental $50 million, and First Reserve;[193] (iv) there was a lack of security for the incremental $50 million, as evidenced by an e-mail from Barclays questioning whether the debt was "fungible" given "the fact that the existing [second lien debt] is trading in the low to mid 80s" but stating that "we're willing to purchase the loan at an above market price;"[194] and (v) there was a lack of financing available from other sources, as evidenced by Mr. Weiner's e-mail to Mr. Sambrooks advising that seeking financing from lenders who had not already committed to finance the Combined Company was a "waste of time."[195]

On balance, application of the *AutoStyle* factors does not support the existence of a colorable claim for recharacterization here. First, the Committee ignores entirely the "meaningful subset" of other *AutoStyle* factors which militate against its argument and would

---

[191]     *See* Bad Acts Complaint ¶¶ 285-86.
[192]     *See* Bad Acts Complaint ¶¶ 287-89.
[193]     *See* Bad Acts Complaint ¶ 292.
[194]     *See* Bad Acts Complaint ¶ 293.
[195]     *See* Bad Acts Complaint ¶ 290.

likely establish that the intent of the parties was that the $50 million of additional Second Lien Loan obligations that the Combined Company incurred at the time of the Combination should be treated as debt because it (i) was documented as a loan; (ii) carried a fixed maturity date and schedule of payments; (iii) carried a fixed interest rate; (iv) was not subordinated to claims of outside creditors; and (v) was not used to purchase capital assets. Each of these undisputed facts supports the position of the Second Lien Agent that the obligation was intended to be debt.

Moreover, the record thus far dispels the notion that that *AutoStyle* factors four through eight would support a claim for recharacterization here. For example, the Committee does not cite to any authority for the proposition that selling a debt instrument at a price below suggests that repayment of the instrument is dependent on the performance of the business in a manner indicating that the instrument is equity and not debt. Similarly, *AutoStyle*'s "identity of interest" factor is typically deployed to establish that a stockholder making a loan to a corporation in proportion to its ownership interest indicates such loan is equity. That situation is clearly not present here, where First Reserve did not participate in the incremental Second Lien Loan, and, as indicated above, First Reserve and the New RBL Lenders were not united in their interests but in fact had an arm's-length relationship. Moreover, as the Second Lien Agent notes in its objection, the Legacy Forest Notes were trading at 40-45 cents on the dollar following the Combination, which price implies a recovery for *unsecured* creditors.[196] As a matter of common sense, it is hard to even imagine how it could be argued that *secured* debt issued at the same time was intended as equity. The Committee's recharacterization claim is frivolous.

---

[196]    *See* Objection of Second Lien Agent ¶ 82 (noting that, following the public announcement of the Combination structure, the Legacy Forest Notes were trading at approximately 40-45 cents and contending that "if the Debtor's **unsecured** debt was trading at 40-75 cents on the dollar, Movants cannot seriously claim that incremental **secured** debt constituted disguised equity."). The Committee acknowledges that the Legacy Forest Notes were trading at approximately 40-45 cents on the dollar immediately following the public announcement of the changes to the Combination structure. *See* Second Committee STN Motion ¶ 201.

### C.  Conclusions with Respect to Colorability

For all of the foregoing reasons, the Court finds:

- the Constructive Fraudulent Transfer Claims the Committee seeks to assert on behalf of Legacy Forest are not colorable;
- the Constructive Fraudulent Transfer Claims the Committee seeks to assert on behalf of the Legacy Sabine Subsidiaries' estates with respect to the avoidance of liens granted to secure the incremental guarantees are colorable;
- the Bad Acts Claims the Committee seeks to assert are not colorable; and
- because the Debtors propose to settle the Bucket II Claims in the context of a plan, the Court will abstain from ruling on the colorability of the Bucket II Claims pending a hearing on confirmation of a plan.

To the extent the Court has failed specifically to address a claim asserted by the Movants in their proposed complaints, the Court finds that such claim is not colorable.

### D.  Consideration of the STN Best Interests Test

In accordance with the Court's findings on colorability, and pursuant to the framework in which the parties have addressed the STN Motions, the Court will now address the question of whether the Debtors have unjustifiably failed to bring the claims that the Court has identified are colorable: the Constructive Fraudulent Transfer Claims on behalf of the Legacy Sabine Subsidiaries.  The Court must determine whether the Debtors' refusal to bring such claims is in the best interests of the estates, *i.e.*, whether, when considering the effect of the litigation on the estates and conducting a cost-benefit analysis, the potential benefits of the litigation outweigh the costs, monetary and otherwise, to the Debtors' reorganization.  In evaluating requests for standing, the Court's role as gatekeeper, as discussed herein, is to ensure that the proposed litigation is expected to be a "sensible" use of estate resources that "will not impair reorganization."  *See Adelphia*, 330 B.R. at 386.

### 1. *Value of the Constructive Fraudulent Transfer Claims to be Asserted on Behalf of the Legacy Sabine Subsidiaries' Estates*

Mr. Zelin submitted two reports and gave substantial live testimony on potential recovery values with respect to the various proposed STN claims. Regarding the Constructive Fraudulent Transfer Claims sought to be asserted on behalf of the Legacy Sabine Subsidiaries' estates, Mr. Zelin calculated the value components of such claims as follows:[197]

- Avoidance of Liens Improperly Granted to Secure Guarantees – $68 million
- Recovery of New RBL Paydown – $47 million
- Merger & Financing Fees – $20 million
- Prejudgment Interest – $9 million
- Diminution in Value of Liens Improperly Granted to Secure Guarantees – $121 million
- **Total – $265 million**

Notably, Mr. Zelin did not independently value the Constructive Fraudulent Transfer Claims asserted on behalf of the Legacy Sabine Subsidiaries' estates. Instead, his analysis (i) assumed that the Committee would be successful on *all* Constructive Fraudulent Transfer Claims (including those to be asserted on behalf of Legacy Forest) and (ii) allocated the proceeds to the Legacy Sabine Parent *pro forma* estate and the Legacy Forest *pro forma* estate in accordance with certain assumptions Mr. Zelin applied as to how such recoveries should be allocated between the two *pro forma* estates.

At the outset, it bears emphasis that the Constructive Fraudulent Transfer Claims sought to be asserted on behalf of the Legacy Sabine Subsidiaries' estates do not seek to avoid the New RBL or the Second Lien Loan at the Legacy Sabine Subsidiaries' estates, as the Constructive Fraudulent Transfer Claims sought to be asserted on behalf of Legacy Forest seek to do. This is because, prior to the Combination, there existed $620 million of Legacy Sabine RBL

---

[197]    *See* Zelin Report p. 23.

indebtedness and $650 million of Legacy Sabine Second Lien indebtedness, all of which was supported by guarantees of the Legacy Sabine Subsidiaries secured by liens on the assets of the Legacy Sabine Subsidiaries. The Committee does not contend that these obligations and liens were avoidable at the Legacy Sabine Subsidiaries' estates prior to the Combination. Accordingly, Mr. Zelin's analysis contemplates an allowed New RBL claim of $620 million that would have recourse to Legacy Sabine assets as well as a $678 million Second Lien Loan claim, reflecting the $650 million of Legacy Sabine Second Lien Loan debt and incurred interest that would have recourse to the same assets. The Constructive Fraudulent Transfer Claims the Committee seeks to assert on behalf of the Legacy Sabine Subsidiaries' estates merely seek to avoid the guarantees issued and liens granted to secure (i) New RBL borrowings in excess of the $620 million of borrowings outstanding on the Legacy Sabine RBL pre-Combination and (ii) Second Lien Loan borrowings in excess of the $650 million outstanding on the Legacy Sabine Second Lien Loan pre-Combination.

### 2. Avoidance of Liens

Mr. Zelin estimates that $68 million of value would be available to the Legacy Sabine Subsidiaries' unsecured creditors if the incremental guarantees issued and liens granted by the Legacy Sabine Subsidiaries were avoided.[198] Mr. Zelin arrives at this figure in three steps. First, Mr. Zelin assumes the existence of an RBL identical to the actual New RBL (the "Duplicate RBL") under the theory that each *pro forma* estate is jointly and severally liable for the New RBL. Such portions of the Duplicate RBL claims allocable to Legacy Forest, or $182 million,[199] would, according to Mr. Zelin's analysis, be disallowed at the estates of the Legacy Sabine Subsidiaries. Second, Mr. Zelin assumes that the Duplicate RBL is secured by liens on the exact

---

[198]    *See* Zelin Report p. 25.
[199]    *See* 2/22/16 Hr'g Tr. 40:24-42:3 (Zelin).

same assets at the estates of the Legacy Sabine Subsidiaries, valued at $345 million, as those which secure the New RBL itself. This assumption, as Professor Williams persuasively pointed out during his testimony at the Hearing, results in a double counting of the value of such encumbered assets.[200] Third, Mr. Zelin assumes that the percentage of secured recoveries of the New RBL attributable to encumbered assets held by the Legacy Sabine Subsidiaries (*i.e.*, $345 million of secured recoveries on a $927 million claim) is equal to the percentage of secured recoveries of the Duplicate RBL that are attributable to avoidable liens granted by the Legacy Sabine Subsidiaries to secure the Duplicate RBL, including the disallowed $182 million claim attributable to indebtedness of Legacy Forest.

According to Mr. Zelin's analysis, the calculation necessary to isolate the value of the avoided liens securing the disallowed $182 million is thus two steps. First, it is necessary to divide $345 million of assumed RBL secured recoveries by $927 million of RBL claims to arrive at the percentage of RBL secured recoveries attributable to Legacy Sabine Subsidiary assets. Second, one would multiply that percentage by the disallowed $182 million claim to arrive at the avoided secured recoveries, *i.e.*, the value of assets secured by avoided liens. The result of this calculation yields avoided liens valued at $68 million, at the very most.

Mr. Zelin's calculation and the assumptions that inform it shed little to no light on the actual question that must be answered to determine the value available to unsecured creditors which could result from successfully avoiding liens granted to secure (i) New RBL borrowings in excess of the $620 million of borrowings outstanding on the Legacy Sabine RBL pre-

---

[200]    *See* 2/26/16 Hr'g Tr. 102:19-103:4 (Williams) (Q: "And do you agree with Mr. Zelin's approach of assigning $927 million of liens to pro forma Sabine and a separate $927 million of liens to pro forma Forest for purposes of his waterfall?" A: "No, I do not agree with that. Again, we're going back before the merger, and there would be allocable debt. And the liens would encumber or be allocated in accordance with the debt." Q: "So in the post-combination company, was there ever sort of two separate sets of $927 million worth of liens?" A: "No, there never was.")

Combination and (ii) Second Lien Loan borrowings in excess of the $650 million outstanding on the Legacy Sabine Second Lien Loan pre-Combination. Answering that question requires determining what liens on pre-Combination unencumbered assets, if any, the Legacy Sabine Subsidiaries granted post-Combination to secure the New RBL and the Second Lien Loan. Professor Williams testified that no such liens were granted and the Committee has produced nothing (e.g., UCC filings) indicating otherwise.[201] Accordingly, while the Court does not rule out the possibility that there may be some value (likely less than $68 million) available to unsecured creditors from avoiding liens securing the allegedly avoidable guarantees issued by the Legacy Sabine Subsidiaries, the Court cannot on this record quantify such value. Moreover, in considering whether the Committee should be granted standing to assert the Constructive Fraudulent Transfer Claims on behalf of the Legacy Sabine Subsidiaries and whether pursuit of such claims would be in the best interests of the estates, the Court must also consider the fact that any value "realized" from avoided liens would not be incremental value brought into the estates but instead would be a reallocation of value from the New RBL Lenders to the unsecured creditors of the Legacy Sabine Subsidiaries, i.e., to the holders of the Legacy Sabine Notes.

### 3. Recovery of New RBL Paydown, Merger and Financing Fees, and Prejudgment Interest

None of the next three categories identified in Mr. Zelin's analysis – (i) Recovery of New RBL Paydown; (ii) Merger and Financing Fees; and (iii) Prejudgment Interest – would be recoverable for the benefit of the Legacy Sabine Subsidiaries' estates even if the Constructive Fraudulent Transfer Claims to be asserted on behalf of the Legacy Sabine Subsidiaries, which

---

[201]    3/3/16 Hr'g Tr. 62:4-15 (Williams) (Q: "Are you aware that post-combination the Sabine subsidiaries did not pledge a mortgage – any additional collateral to support the upsized RBL?" A: "Yes, I am. They did not." Q: "Did you develop an understanding as to where the additional collateral for the upsized secured loans came from?" A: "At the RBL level and the second?" Q: "Yes." A: "Okay. Yes. I did develop an understanding. It came from the unencumbered assets of Forest or the Forest assets that were brought to the business combination."); see also Williams Report at 55.

seek only to avoid guarantees issued and liens granted securing such guarantees, were successful.[202]  Each of (i) the December 18, 2014 paydown of a portion of the New RBL by the Combined Company (the "New RBL Paydown") and (ii) the merger and financing fees incurred by the Combined Company in connection with the Merger (the "Merger and Financing Fees") represents payments made by Legacy Forest, not by the Legacy Sabine Subsidiaries.  Mr. Zelin's allocation of such recovery amounts to the Legacy Sabine Subsidiaries is presumably based on an assumption that assets from the Legacy Sabine Subsidiaries were earmarked and transferred to Legacy Forest for the purpose of making such payments.  However, Mr. Zelin testified that his analysis did not attempt to source the funds used to make the New RBL Paydown,[203] and no evidence has been proffered to substantiate his assumption in this regard.  In fact, counsel for the Committee confirmed at closing arguments that no portion of the New RBL Paydown came from the Legacy Sabine Subsidiaries.[204]  Accordingly, the New RBL Paydown, the Merger and Financing Fees,[205] and prejudgment interest on the foregoing would not be recoverable for the benefit of Legacy Sabine Subsidiaries.

---

[202]    *See* Constructive Fraudulent Transfer Complaint ¶¶ 149-160 (claims proposed to be asserted on behalf of the Legacy Sabine Subsidiaries).

[203]    *See* 2/22/16 Hr'g Tr. 311:6-15 (Zelin) (Q: "And that [Recovery of New RBL Paydown number] is comprised of the $50 million upside [sic] second lien proceeds and the net Arcoma [sic] proceeds which the combined company paid down after closing.  You know that, right?"  A: "It's just 206 million of pay down.  I don't recall the source of the cash.").

[204]    *See* 3/11/16 Hr'g Tr. 162:24-163:7 (Martin) (The Court: "So did any -- did the funds for any portion of [the New RBL Paydown] come from the Legacy Sabine subsidiaries?" Mr. Martin: "No.  The funds came from -- that's why I showed the funds flow.  It came from two places, it appears, something we found in discovery.  It came from cash that had been at Forest . . . and it came from the new incremental $50 million second lien loan.").

[205]    At closing arguments, counsel for the Committee agreed that the Committee's ability to assert claims for the Merger and Financing Fees would be dependent upon its ability to assert claims for the avoidance of the obligations pursuant to its Constructive Fraudulent Transfer Claims on behalf of Legacy Forest.  *See* 3/11/16 Hr'g Tr. 181:10-13 (Martin) ("I do want to say, Your Honor, the fact, just for completeness, that, you know, specifically listed here is not the avoidance of the financing fees because that follows along with the avoidance of the obligations.").  As such claims are not colorable, it follows that the claims for recovery of the Merger and Financing Fees also fail.

#### *4.   Diminution in Value of Liens Improperly Granted to the New RBL Lenders*

At the direction of Committee counsel, Mr. Zelin assumed in his analysis that the Court would authorize the Committee to collect from the New RBL Lenders or the Second Lien Lenders, as the case may be, a recovery equal to the diminution of the value of assets securing avoidable liens.  Per Mr. Zelin, assets securing allegedly avoidable liens granted by the Legacy Sabine Subsidiaries have diminished in value by $121 million between December 16, 2014 (the date of the Combination) and December 31, 2015.  Mr. Zelin arrives at this calculation by first calculating that the value of all Legacy Sabine assets diminished by 64% between the date of the Combination and December 31, 2015.  Mr. Zelin assumes, sensibly, that assets secured by avoidable liens would have diminished in value by the same percentage.  Applying this assumption and Mr. Zelin's additional assumption that there are $68 million in assets encumbered by avoidable liens at the Legacy Sabine Subsidiaries (as of December 31, 2015), Mr. Zelin concludes that (i) there were $188 million of assets encumbered by avoidable liens as of the date of the Combination ($68 million divided by the 36% of remaining value) and (ii) such liens are now worth $68 million, yielding a diminution in value claim of $121 million (the extra $1 million is presumably attributable to rounding in the calculations).

The Court ascribes no value to a claim for the alleged diminution in value of avoidable liens.  In addition to being entirely derivative of Mr. Zelin's calculation of the value of avoidable liens as $68 million, a value that the Court finds questionable, application of such a remedy here is unsupportable as a matter of law.

The Committee relies almost exclusively on *In re TOUSA, Inc.*, 422 B.R. 783 (Bankr. S.D. Fla. 2009), as authority for its claim seeking to recover the diminution in value of avoidable liens.  In *TOUSA*, the debtors' parent company borrowed approximately $421 million for the

purpose of funding a litigation settlement; the lenders, in fact, required that the proceeds be used for this purpose.  Although only the parent company was obligated to pay the litigation settlement, the parent's subsidiaries guaranteed the debt.  The bankruptcy court determined that the subsidiaries received no value from the payment of the litigation settlement amount and, therefore, the conveyance of guarantees was a transfer for which the subsidiaries did not receive "reasonably equivalent value."[206]

In imposing remedies, the bankruptcy court in *TOUSA* began with the premise that "11 U.S.C. § 550 'is designed to restore the estate to the financial condition that would have existed had the transfer never occurred.'"  *Id.* at 881 (internal citation omitted).  From this premise, the bankruptcy court held that, in addition to avoiding the subsidiaries' obligations, a complete remedy required more, including restoration of fees and costs of pursuing litigation.  In addition, the Court held that the "Conveying Subsidiaries are also entitled to recover the diminution in value of the liens that has occurred since the transfer."  *Id.* at 883.  As support for its remedy, the court cited to *In re Warmus*, 229 B.R. 496, 532 (Bankr. S.D. Fla. 1999), in which the court explained that "if the court limits the Trustees to recovery of the property itself, and if the property has declined in value, the estate will have lost the opportunity to dispose of the property prior to its depreciation."  *TOUSA*, 422 B.R. at 883 (citing *Warmus*, 229 B.R. at 532).

The district court in *TOUSA* reversed the bankruptcy court's decision that the subsidiaries did not receive "reasonably equivalent value" for the issuance of the guarantees.  444 B.R. 613 (S.D. Fla. 2011).  The district court did not review the remedies, including the claim for diminution in value of the conveyed liens.  The Eleventh Circuit reversed the district court, holding that the bankruptcy court did not clearly err in finding that the subsidiaries did not receive reasonably equivalent value.  680 F.3d 1298 (11th Cir. 2012).  The Eleventh Circuit

---

[206]    *TOUSA*, 422 B.R. at 848.

explicitly declined to consider whether to vacate the remedies imposed by the bankruptcy court,

holding that the issue was not ripe because it had not been considered by the district court.  The

Eleventh Circuit remanded to the district court to consider the question of remedies, where the

parties appear to have settled before the district court could issue a decision.  Thus, the

bankruptcy court's ruling on the diminution in value remedy was never affirmed by the district

court or by the Eleventh Circuit.

The Committee has not cited to a single case subsequent to *TOUSA* in which a court has

applied the diminution in lien value remedy applied in TOUSA.  Moreover, subsequent to

*TOUSA*, the Tenth Circuit, in a case cited by the Committee, issued a persuasive decision

affirming the decision of the bankruptcy court, in which the Tenth Circuit declined to award a

trustee monetary damages equal to the diminution in value of the collateral as a remedy for a

secured lien granted to a lender as a preference.  The Tenth Circuit reasoned:

> The "property" that was transferred here was the perfected security interest. The
> Trustee makes a number of arguments and hypotheticals based on the declining
> value of the collateral, but the vehicle itself was never transferred. The bankruptcy
> estate would have had an asset which was declining in value regardless of
> whether the debtor transferred the lien during the preference period. Rather, by
> virtue of the transferred security interest, a creditor obtained a leg-up over
> unsecured creditors in the impending bankruptcy; when that lien was avoided and
> preserved for the benefit of the estate, that creditor had to take its place with the
> general unsecured creditors, and, having obtained § 547 and § 551 relief, the
> Trustee gained priority over any junior liens on the same collateral.

*Rodriguez v. Drive Fin. Servs., L.P. (In re Trout)*, 609 F.3d 1106, 1112 (10th Cir. 2010).

The pre-*TOUSA* cases cited by the Committee in support of its proposed remedy are

consistent with the reasoning of *In re Trout*, as well as *Warmus*, upon which *TOUSA* relied, in

that they each involved assets that were transferred away from, and out of, the debtor's

control.[207]   Accordingly, the case law indicates that a remedy of monetary damages equal to the

diminution in value of property securing an avoidable lien may only be appropriate when such

property was transferred beyond the debtor's control.

Here, there is no plausible allegation that the Legacy Sabine Subsidiaries were seeking to

sell the property upon which the allegedly avoidable liens were granted and that they lost that

opportunity as a result of there being liens on such property.  Indeed, testimony reveals that the

Legacy Sabine Subsidiaries would have been incapable of making such a decision on their own.

Therefore, to the extent that the Movants seek to recover the $121 million identified by Mr. Zelin

based on a *TOUSA* theory, the Court finds that such amount would not be recoverable even if the

Constructive Fraudulent Transfer Claims sought to be asserted on behalf of the Legacy Sabine

Subsidiaries were successful.

### 5.  *Cost-Benefit Analysis*

In accordance with the foregoing, the maximum potential value of the Constructive

Fraudulent Transfer Claims to be asserted on behalf of the Legacy Sabine Subsidiaries appears

more likely to be as follows, assuming complete success on the underlying claims:

- Avoidance of Liens Improperly Granted to Secure
  Guarantees – $0-68 million (likely closer to $0)
- Recovery of New RBL Paydown – $0
- Merger & Financing Fees – $0
- Prejudgment Interest – $0
- Diminution in Value of Liens Improperly Granted to
  Secure Guarantees – $0
- **Total – $0-68 million (likely closer to $0)**

The costs of the litigation must be weighed against this maximum potential benefit.  Mr.

Zelin estimated the plaintiffs' cost of litigating the entirety of the Constructive Fraudulent

Transfer Claims at $20-30 million.  Litigating only the Constructive Fraudulent Transfer Claims

---

[207]      *See In re Baker,* 17 B.R. 392 (Bankr. W.D.N.Y. 1982); *In re Brown,* 118 B.R. 57 (Bankr. N.D. Tex. 1990);
*In re Da-Sota Elevator Co.,* 939 F.2d 654, 655 n.2 (8th Cir. 1991).

asserted by the Legacy Sabine Subsidiaries would logically cost a percentage of that $20-30 million.  However, given the fact-intensive nature of (a) discovering and valuing any liens subject to avoidance and (b) valuing the indirect benefits received by the Legacy Sabine Subsidiaries as members of a single enterprise for purposes of a reasonably equivalent value analysis, it seems reasonable that litigating those claims could require at least 50% of Mr. Zelin's estimated cost, or $10-15 million.  And to that figure must be added an equal amount for the costs of defending such litigation.

Weighing these costs and benefits, and adding consideration of some modicum of litigation risk, the Court concludes that the Debtors have met their burden to demonstrate that bringing such claims would not be in the best interests of the estates and, therefore, have not unjustifiably refused to bring such claims.

### E.  Methodology for Calculating Value of Adequate Protection Claims

Another key consideration in determining whether bringing certain claims is in the best interests of the estates in these cases is the question of how much of any litigation recoveries would be subject to the New RBL Lenders' adequate protection claim.  In light of the Court's ruling on the Bad Acts Claims, it is arguably not necessary to reach the issue of the value of the adequate protection claim; the Court does so to provide alternative additional support for its conclusion that the Bad Acts Claims should not proceed.

The Final Cash Collateral Order [ECF No. 339] provides for an adequate protection claim equal to "Collateral Diminution."  *See* Final Cash Collateral Order ¶ 3.  Such claim is secured by all of the Debtors' unencumbered assets, save for unencumbered assets brought into the estates as the result of successful litigation against the New RBL Lenders.  The Order defines "Collateral Diminution" as follows:

> For purposes of this Final Order, "Collateral Diminution" shall mean an amount equal to the decrease in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, resulting from the use, sale or lease of the Prepetition Collateral (including Cash Collateral), or the imposition of the automatic stay. Cash payments from the proceeds of the Prepetition Collateral pursuant to the terms of this Final Order shall not constitute Collateral Diminution.

Final Cash Collateral Order ¶ 5.

There is broad agreement that the market value of the Debtors' assets, and thus the value of the New RBL Lenders' collateral, has declined substantially since the Petition Date. Mr. Jonathan Mitchell, the Debtors' Chief Restructuring Officer, estimates that the value of the New RBL Lenders' collateral has declined by approximately $480 million since the Petition Date.[208] Similarly, while the Zelin Report does not calculate the diminution in the New RBL Lenders' collateral since the Petition Date, it states that the value of the Debtors' assets declined by more than $1 billion between the date of the Combination and December 31, 2015.[209] Based on the Final Cash Collateral Order and his estimate of the decline in the value of the New RBL Lenders' collateral since the Petition Date, Mr. Mitchell estimates that the New RBL Lenders would have an adequate protection claim of $480 million. If Mr. Mitchell is correct, litigation recoveries from parties other than the New RBL Lenders up to $480 million (less existing unencumbered value that could be used to satisfy the adequate protection claim) would simply be absorbed by the New RBL Lenders' adequate protection claim. In other words, litigation recoveries would have to exceed $480 million (less existing unencumbered value that could be used to satisfy the adequate protection claim) before it would be in the best interests of the estates to expend any estate resources in litigating such claims.

---

[208]    2/24/16 Hr'g Tr. 37:20-38:21 (Mitchell).
[209]    *See* Zelin Report p. 25.

To address this concern, the Committee contends that the amount of the New RBL Lenders' "Collateral Diminution" and thus, adequate protection claim, is not, as Mr. Mitchell's calculation implies, equal to the diminution in the market value of the New RBL Lenders' collateral. Instead, the Committee argues that the Final Cash Collateral Order limits the New RBL Lenders' adequate protection claim to "'the decrease in value . . . from and after the Petition Date resulting from . . . the imposition of the automatic stay' (emphasis added)."[210] The Committee further contends that adequate protection claims resulting from the imposition of the automatic stay are limited to instances "when the creditor's collateral decreases in value and the lender, which wants to foreclose upon, force the sale of, or take possession of, its collateral is prevented from doing so."[211] The Committee argues that "if the lender does not desire to foreclose, sell or take immediate possession of the collateral, and wants the affirmative benefits of the reorganization process (such as releases from estate causes of action that would otherwise belong to creditors) the imposition of the automatic stay is not impeding on any rights of the secured creditor and the creditor itself is permitting the decline to occur."[212] The Committee cites no persuasive authority for this novel approach which, not surprisingly, results in a vastly reduced adequate protection claim for the New RBL Lenders.

Even more creatively, the Committee argues that, because the New RBL Lenders have supported a reorganization in these cases, rather than a sale of their collateral, the New RBL Lenders are not entitled to an adequate protection claim at all.[213] Notwithstanding that belief, the Committee points to a pleading filed by the New RBL Lenders on November 23, 2015, in which

---

[210]    Omnibus Reply of Committee to Objections to STN Motions ¶ 114.
[211]    Omnibus Reply of Committee to Objections to STN Motions ¶ 115.
[212]    Omnibus Reply of Committee to Objections to STN Motions ¶ 118 (emphasis in original).
[213]    Omnibus Reply of Committee to Objections to STN Motions ¶ 120.

the New RBL Lenders stated that they were opposed to a sale of their collateral,[214] as the
"conclusive end date" for any "Collateral Diminution" resulting from the imposition of the
automatic stay.[215]  Moreover, the Committee asserts that, because the New RBL Lenders would
have been required to follow Texas law in foreclosing on and then selling their collateral and
Texas law provides for a delayed sale process, the New RBL Lenders could not have sold their
collateral until September 1, 2015.  Thus, contends the Committee, the maximum timeframe for
which "Collateral Diminution" resulting from the automatic stay would apply is September 1,
2015 through November 23, 2015.[216]

Mr. Zelin confirmed during live testimony that, during his twenty-eight year career, he
had never seen adequate protection claims limited in time in the way suggested by the
Committee.[217]  Additionally, in recognition of the fact that a foreclosure sale would be conducted
under "sub-optimal" conditions, Mr. Zelin applied a 20-30% discount to the value of the New
RBL Lenders' collateral on the start date for purposes of calculating "Collateral Diminution."
He did not, however, apply the same discount to the end date for purposes of calculating
"Collateral Diminution," instead applying, as instructed by counsel for the Committee, a "going
concern" valuation in recognition of the fact that the New RBL Lenders supported a going
concern reorganization of the Debtors' businesses.  Applying those assumptions, Mr. Zelin
calculated the New RBL Lenders' adequate protection claim to be between $0 and $50 million
based on thirty-six scenarios applying different start and end dates for "Collateral Diminution" as
well as different pricing assumptions.  Astonishingly, in thirty of the thirty-six scenarios, Mr.

---

[214]    *See* Limited Response of Wells Fargo Bank, National Association, as First Lien Agent, to Objection of the
Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order Approving and Authorizing
the Performance Award Program [ECF No. 554].

[215]    Omnibus Reply of Committee to Objections to STN Motions ¶ 120.

[216]    Notwithstanding this contention, Mr. Zelin's analysis includes scenarios assuming an end date for adequate
protection of December 12, 2015, the date on which the New RBL Lenders supported an extension of the Debtors'
exclusive periods.  *See* Zelin Report p. 31.

[217]    *See* 2/22/16 Hr'g Tr. 306:9-13 (Zelin).

Zelin found that "Collateral Diminution" was a positive number, implying that the New RBL Lenders' collateral value had increased, notwithstanding the undisputed fact that the market value of such collateral was declining.[218]

Saddled with the untenable assumptions he was instructed to apply to his calculations, Mr. Zelin accurately presented the Committee's unique and entirely unsupportable value of the New RBL Lenders' adequate protection claim.   The Committee's calculation is not only inconsistent with the Final Cash Collateral Order and established law in this District, but also with common sense.

First, the Committee's theory that "Collateral Diminution" is limited to decreases in value caused by the imposition of the automatic stay ignores the text of the Final Cash Collateral Order.   The Committee's citation to the Cash Collateral Order with respect to its definition of "Collateral Diminution" conveniently omits the portion of the text referring to a decrease in collateral resulting from the "use, sale or lease of the Prepetition Collateral (including Cash Collateral)."   Read fairly, "Collateral Diminution" is defined in the Cash Collateral Order as a decrease in value of collateral resulting from the use, sale, or lease of the collateral *or* from the imposition of the automatic stay, not solely a decrease in value of collateral resulting from imposition of the automatic stay.   *See* Final Cash Collateral Order ¶ 5.   The Committee's theory does not even attempt to account for decreases in value resulting from the Debtors' use of the New RBL Lenders' collateral to operate the business pursuant to the consensual Final Cash Collateral Order.   To read those words out of the analysis, as the Committee would have the Court do, would effectively punish the New RBL Lenders for consenting to the use of their collateral and for allowing the Debtors to attempt to preserve the going concern value of the business for the benefit of all creditors, rather than seeking to lift the stay and foreclose at the

---

[218]        *See* Zelin Report p. 31.

outset of the case. Such a reading is contrary to both the text of the order and long-established bankruptcy policy favoring preservation of going concern value whenever possible.

Second, the Committee's assertion that the New RBL Lenders are limited to foreclosure value when measuring the value of their interest in their collateral as of the Petition Date is contrary to established law setting forth the proper methodology for valuing an adequate protection claim. In *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital)*, 501 B.R. 549 (Bankr. S.D.N.Y. 2013) ("*ResCap*"), cited by the Committee,[219] Judge Glenn considered the proper methodology for valuing a secured creditor's interest in collateral as of the petition date. The debtors in *ResCap* sought to value the secured creditor's interest on the basis of foreclosure value, notwithstanding that the debtors and the secured creditor entered into a consensual cash collateral stipulation to enable the debtors to effect a going concern sale of the collateral. Applying *United Sav. v. Timbers of Inwood*, 484 U.S. 365 (1988), and *Associates Commercial Corp. v. Rash*, 520 U.S. 365 (1997), among other cases, Judge Glenn first held that "the proper valuation methodology must account for the proposed disposition of the collateral." *ResCap*, 501 B.R. at 593. Judge Glenn then applied this holding to find that, based on the facts of the case, the proposed disposition of the collateral was a going concern sale, not a foreclosure, and, on that basis, the secured creditor's interest in the collateral for purposes of calculating an adequate protection claim should be the going concern value of the collateral as of the petition date:

> In this case, the parties were not contemplating on the Petition Date that the creditors might conduct a foreclosure sale. The Debtors never had any intention of turning over the JSN Collateral to the collateral agent. Nor did the [Secured Creditor] foreclose or attempt to foreclose on the assets. Rather, the [Secured Creditor] entered into a cash collateral stipulation to allow the sale of assets as a going concern. . . . Thus, in determining the value of the [Secured Creditor's]

---

[219]    *See* Omnibus Reply of Committee to Objections to STN Motions ¶ 121.

Collateral on the Petition Date, the Court must apply that value based on the proposed disposition of the collateral—fair market value in the hands of the Debtors.

The same reasoning applies here. In selecting a methodology for valuing the interests of the New RBL Lenders and the Second Lien Lenders in the collateral as of the Petition Date, the Court must consider the proposed disposition of the collateral. Here, the Debtors entered into a consensual cash collateral order with the New RBL Lenders and the Second Lien Lenders to preserve going concern value and allow the Debtors to pursue a reorganization or a sale. Neither the Debtors nor the lenders have ever indicated that the outcome of these cases would be a foreclosure sale by the secured lenders. As Mr. Zelin testified when questioned by Committee counsel, he is unaware of any instance during these cases in which the New RBL Lenders have "suggested that they intended to, desired to, or even raised a threat of seeking to foreclose on these assets."[220] Accordingly, as in *ResCap*, the Court finds that a going concern or fair market valuation is the appropriate methodology for valuing the interests of the New RBL Lenders and the Second Lien Lenders in the prepetition collateral as of the Petition Date.

Consistent with the conclusion that a going concern or fair market value is the appropriate valuation methodology, the Court also rejects the Committee's contention that the time for calculating "Collateral Diminution" is limited to the time between the first date the New RBL Lenders could have sold their collateral had they foreclosed and the time the New RBL Lenders indicated that they did not wish their collateral to be sold. The Final Cash Collateral Order provides that "Collateral Diminution" shall be calculated from the Petition Date. The Court thus holds that the value of the New RBL Lenders' adequate protection claim should be calculated as the fair market or going concern value of the New RBL Lenders' interest in the

---

[220]    2/22/16 Hr'g Tr. 136:24-137:4 (Zelin) (Q: "Mr. Zelin, as the investment banker to the official committee are you aware of the banks at any time during these cases ever suggesting that they intended to, desired to, or even raised a threat of seeking to foreclose on these assets?"  A:  "I am not aware.").

prepetition collateral as of the Petition Date less the fair market or going concern value of the prepetition collateral as of the effective date of a confirmed plan of reorganization or the closing date of a sale, as the case may be.

**VI.    <u>Conclusion</u>**

For all of the foregoing reasons, the STN Motions are denied in their entirety.   The parties are directed to settle an order consistent with this Decision.

Dated:  March 31, 2016
New York, New York

                                                                    /s/ Shelley C. Chapman_____
                                                                    UNITED STATES BANKRUPTCY JUDGE