**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
                                                                  :
In re:                                                            :        Chapter 11
                                                                  :
SABINE OIL & GAS CORPORATION, *et al.*,                           :        Case No. 15-11835 (SCC)
                                                                  :
                                    Debtors.                      :        (Jointly Administered)
                                                                  :
-------------------------------------------------------------------X

**MEMORANDUM DECISION CONFIRMING DEBTORS' SECOND**
**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**SABINE OIL & GAS CORPORATION AND ITS DEBTOR AFFILIATES**

A P P E A R A N C E S :

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
By:     Jonathan S. Henes, P.C.
        Christopher J. Marcus, P.C.

300 North LaSalle
Chicago, Illinois 60654
By:     Gabor Balassa, P.C.
        A.  Katrine Jakola, Esq.
        Whitney L. Becker, Esq.

*Counsel to the Debtors*

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
By:     Mark R. Somerstein, Esq.
        Gregg Galardi, Esq.
        Gregg Weiner, Esq.
        Daniel McCaughey, Esq.

*Counsel to the Official Committee of Unsecured Creditors*

BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
By:     Robert J. Stark, Esq.
        Daniel J. Saval, Esq.

*Counsel to the Forest Notes Indenture Trustees*

LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
By:     Margot B. Schonholtz, Esq.
        Robert H. Trust, Esq.

*Counsel to Wells Fargo, National Association, as First Lien Agent*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019

By:    Moses Silverman, Esq.
       Brian S. Hermann, Esq.
       Kyle J. Kimpler, Esq.

*Counsel to Wilmington Trust, N.A. as Second Lien Agent*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Andrew J. Rossman, Esq.
       Susheel Kirpalani, Esq.
       Julia M. Beskin, Esq.

*Counsel to FRC Founders Corporation, Sabine Investor Holdings LLC, First Reserve Fund XI, L.P., First Reserve GP XI, L.P., First Reserve GP XI, Inc., Alex Krueger, Brooks Shughart, Michael France, and Joshua Weiner*

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
By:    Joseph J. Frank, Esq.
       Fredric Sosnick, Esq.

*Counsel to Barclays Bank PLC and Barclays Capital Inc.*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
By:    Kenneth R. David, Esq.
       Daniel A. Fliman, Esq.

*Counsel to Richard J. Carty, Loren Carroll, Dod Fraser, James Lee, James Lightner, Patrick R. McDonald, Raymond Wilcox, and Victor Wind*

AKIN, GUMP, STRAUSS, HAUER & FELD LLP
One Bryant Park
New York, New York 10036
By:    Daniel H. Golden, Esq.
       Abid Qureshi, Esq.

EMMET, MARVIN & MARTIN, LLP
120 Broadway, 32nd Floor
New York, New York 10271
By:    Edward P. Zujkowski, Esq.
       Thomas A. Pitta, Esq.

*Co-counsel to The Bank of New York Mellon Trust Company, N.A. as Trustee under the 2017
Notes Indenture*

CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
101 Park Avenue
New York, New York 10178
By:     Steven J. Reisman, Esq.
        Theresa A. Foudy, Esq.

*Counsel to Sabine Directors Duane Radtke, David Sambrooks, and John Yearwood*

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................2

I.    Case and Company Background..................................................................2

II.   Events Leading to the Plan and Settlement................................................3

III.  The Plan .....................................................................................................7

      A.   Summary of the Plan and the Settlement Embodied in the Plan ............................9

      B.   Voting Results.........................................................................................12

      C.   Objections to the Plan .............................................................................13

IV.   Estimates of Adequate Protection Claims and Potential Bucket II Claims Recoveries ....15

      A.   Estimates of the Adequate Protection Claims.............................................16

           1.   The Debtors' Estimate of the Adequate Protection Claims.................................21

           2.   The Committee's Challenges to the Debtors' Estimate of the
                Adequate Protection Claims..........................................................27

                a.   Deduction of All Indirect Costs (Whether or Not Included in COPAS
                     Charges) from the Value of the Reserves ...............................................28

                b.   Reserve Adjustment Factors (RAFs) ........................................30

                c.   Strip Pricing ...............................................................32

                d.   Encumbrance Analysis.........................................................34

                e.   Postpetition Adequate Protection Payments and Application of
                     Swap Payments ...............................................................35

                f.   Postpetition Mineral Lien Payments.........................................36

      B.   Estimates of Potential Bucket II Claims Recoveries ...................................37

           1.   Bucket II Unencumbered Assets.................................................39

           2.   Disputed Cash ...........................................................39

           3.   Bucket II Unallocated G&A ...............................................41

           4.   Unitized Leases and After-Acquired Unitized Leases........................42

     5.   Potentially Defective Recording Leases ................................................43

     6.   County Leases ..................................................................................44

     7.   Personal Property Liens ...................................................................45

     8.   RBL Lenders' Preference Claims and Second Lien Lenders'
         Preference Claims ...........................................................................46

     9.   Swap Payments ...............................................................................47

V.    The Confirmation Hearing ........................................................................48

     A.  Confirmation Testimony ......................................................................50

     1.  Mr. David J. Sambrooks ...................................................................50

     2.  Mr. David Cecil ..............................................................................55

     3.  Mr. James Seery ..............................................................................61

     4.  Mr. Michael Magilton ......................................................................64

     5.  Mr. Jonathan (Joff) A. Mitchell ........................................................70

     6.  Mr. Christopher J. Kearns ................................................................82

     7.  Mr. Steven M. Zelin ........................................................................87

     B.  Evidentiary Matters Relating to Certain Confirmation Testimony........91

     1.  The Committee's Motion to Exclude the Declarations and Testimony of
        Mr. Brandon Aebersold ...................................................................92

     2.  The Debtors' Motion to Exclude the Testimony of Mr. Adrian Reed................99

DISCUSSION ..................................................................................................108

VI.   Applicable Law ..........................................................................................108

VII.  The Process Undertaken by the Debtors and the Independent Directors Committee......112

VIII. The Settlement Embodied in the Plan is Fair, Reasonable, and
     Well Above the Lowest Point in the Range of Reasonableness .....................................116

     A.  The Settlement of the Adequate Protection Claims ............................117

1. An "Enterprise" Valuation In Which All Indirect Costs Are Deducted from the Value of the Reserves is Not Appropriate for Purposes of Estimating Collateral Diminution and the Adequate Protection Claims..........................118

2. Using the Mid-RAFs and High-RAFs to Risk-Adjust the Value of the Reserves is Appropriate ..................................................................................127

3. The Court Must Consider the Most Recent Strip Pricing Data But May Also Consider Additional Strip Pricing Data ...........................................132

4. The Committee's Other Critiques of the Debtors' Estimate of the Adequate Protection Claims Do Not Withstand Scrutiny and Must be Rejected .............136

    a. Encumbrance Analysis...........................................................................136

    b. Postpetition Adequate Protection Payments and Application of Swap Payments ................................................................138

    c. Postpetition Mineral Lien Payments ......................................................140

5. Additional Considerations Supporting the Reasonableness of the Debtors' Estimate of the Adequate Protection Claims ...................................................141

    a. The Additional Haynesville Locations ...................................................142

    b. Mr. Mitchell's Conservative, Committee-Favorable "Weighted Bucket II Approach"................................................................143

B. The Settlement of the Bucket II Claims................................................................144

1. The Two "Critical Wins" ....................................................................................144

2. Other Bucket II Claims .......................................................................................152

    a. Disputed Cash .........................................................................................152

    b. Unitized Leases and After-Acquired Unitized Leases............................155

    c. Potentially Defective Recording Leases .................................................156

C. Other Settlements Embodied in the Plan ............................................................157

1. The RBL Release Satisfies *Metromedia* and is Justified in These Cases ......157

    a. The Court Has Subject Matter Jurisdiction to Approve the RBL Release .............................................................................................160

    b. The RBL Release Satisfies *Metromedia* and its Progeny .......................162

D.  The *Iridium* Factors Weigh Decisively in Favor of
Approval of the Settlement ..................................................................168

1.  The Uncontested *Iridium* Factors..............................................168

a.  Factor #5: The Competency and Experience of
Counsel Supporting, and the Experience and
Knowledge of the Judge Reviewing, the Settlement .............168

b.  Factor #7: The Extent to Which the Settlement is the
Product of Arm's Length Bargaining ...................................169

2.  The Contested *Iridium* Factors.................................................170

a.  Factor #1: The Balance Between the Litigation's Possibility of
Success and the Settlement's Future Benefits ........................171

b.  Factor #2: The Likelihood of Complex and Protracted Litigation,
with its Attendant Expense, Inconvenience, and Delay.........186

c.  Factor #3: The Paramount Interests of Creditors ...................188

d.  Factor #4: Whether Other Parties in Interest Support the Settlement......189

e.  Factor #6: The Nature and Breadth of Releases to be
Obtained by Officers and Directors .....................................190

IX.  The Plan Complies with Sections 1129(a) and (b) of the Bankruptcy Code and
Other Confirmation Standards ...........................................................192

A.  Section 1129(a)(1) ...................................................................192

B.  Section 1129(a)(2) ...................................................................195

C.  Section 1129(a)(3) ...................................................................196

D.  Section 1129(a)(4) ...................................................................197

E.  Section 1129(a)(5) ...................................................................198

F.  Section 1129(a)(6) ...................................................................199

G.  Section 1129(a)(7) ...................................................................199

H.  Sections 1129(a)(8)-(13)...........................................................202

I.   Section 1129(b)..................................................................................................202

J.   The Plan Does Not Effect a *De Facto* Substantive Consolidation ......................203

CONCLUSION..............................................................................................................205

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

"It's not even close."  So said Sabine's Chief Restructuring Officer when asked his opinion during the confirmation hearing as to the reasonableness of the settlement embodied in the Debtors' plan of reorganization.

Just six months ago, the Debtors in these chapter 11 cases engaged in a lengthy evidentiary hearing in this Court to determine whether or not the Official Committee of Unsecured Creditors should be granted so-called STN standing to pursue a sweeping set of claims against the Debtors' lenders as well as the Debtors' current and former officers and directors.  Nine days of live testimony, hundreds of exhibits, and five days of closing argument later, the Court denied the Committee's request for STN standing.  The proceedings took an enormous toll on the Debtors: tens of millions of dollars in litigation costs were incurred and key members of senior management had no choice but to attend every day of the hearing rather than focus on maintaining the stability of the business and the morale of their employees.

Undaunted, the Debtors filed a plan of reorganization, dated April 29, 2016, and commenced a confirmation hearing on Monday, June 13, 2016 – just thirty-six hours after arguing before the District Court on the Committee's appeal of this Court's STN decision.  In the two months between the STN decision and the commencement of the confirmation hearing, the parties once again engaged in weeks of depositions, discovery, and pre-trial skirmishes.  Five days into the hearing, the District Court issued its decision in favor of the Debtors on the STN appeal.  Ten days of live testimony, hundreds of exhibits, and ten hours of closing argument later, it is eminently clear that the plan should be confirmed.  The proceedings again took an

enormous financial toll on the Debtors and visited further human capital costs on members of senior management and the Debtors' employees.

What makes this case unique is not that it was litigious and expensive and exhausting for all involved. Rather, it is the enormous extent to which it was unnecessarily litigious and expensive. Notwithstanding the complexities of certain of the issues implicated by the Rule 9019 settlement that forms the basis of the plan – most notably, valuing oil and gas reserves in a volatile market – the settlement addresses and resolves the wide variety of challenges raised by the Committee, which seemed oblivious to the context and circumstances in which the case unfolded. During the year in which Sabine has operated under chapter 11 protection, dozens and dozens of oil and gas companies have been financially ravaged by plummeting commodity prices and have sought refuge in chapter 11. Thousands of jobs have been lost in Texas alone as rigs have been shut down and exploration activities curtailed. It is time for this oil and gas company to emerge from chapter 11 and, with a right-sized capital structure, focus anew on maximizing the value of its assets and allowing its employees to feel a measure of security.

The settlement contained in the plan is fair, reasonable, and well above the lowest point in the range of reasonableness and the plan otherwise satisfies each and every requirement for confirmation. It's not even close.

## **BACKGROUND**[1]

### I.    **Case and Company Background**

---

[1]    Having considered the voluminous evidence, testimonial and documentary, including all exhibits admitted into evidence, and having conducted an independent analysis of the law and the facts, the Court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Rule 9014 of the Bankruptcy Rules. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

Sabine Oil & Gas Corporation ("Sabine") and its debtor affiliates, as debtor and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the "Company") are an independent energy company engaged in the acquisition, production, exploration, and development of onshore oil and natural gas properties in the United States. The Debtors constitute the surviving business from the business combination (the "Combination") of Forest Oil Corporation ("Legacy Forest") and Sabine Oil & Gas LLC ("Legacy Sabine Parent") that was first announced in May 2014 and consummated in December 2014.

On July 15, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code ("the Code"). On July 28, 2015, the United States Trustee for Region 2 (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee").[2]

## II.    Events Leading to the Plan and Settlement

Two months prior to the Petition Date, Sabine's board of directors approved the formation of a special committee (the "Independent Directors Committee") to conduct and oversee an investigation of potential claims and causes of action related to the Combination that the Debtors may possess against creditors and others. The Independent Directors Committee was comprised of two independent directors, neither of whom had been involved in the Combination or had involvement with Legacy Sabine Parent or Legacy Forest at the time of the Combination. On June 10, 2015, Sabine's board of directors approved an expansion of the Independent Directors Committee's authority to decide which claims related to the Combination, if any, Sabine should assert. The Independent Directors Committee was assisted in its assessment of potential claims by legal advisors and restructuring specialists who initially

---

[2]    Dkt. No. 90. On November 10, 2015, the Committee was reconstituted by the U.S. Trustee [Dkt. No. 499].

3

included litigation attorneys from Kirkland & Ellis LLP ("Kirkland") and financial advisors from

Zolfo Cooper Management, LLC ("Zolfo Cooper").  The Independent Directors Committee later

retained Professor Jack F. Williams to provide additional expertise and perspective on the

Debtors' potential constructive fraudulent transfer claims.

The Independent Directors Committee's advisors analyzed over 100,000 documents over

the course of more than six months in an effort to identify meritorious estate causes of action.  In

connection with the investigation, Professor Williams produced an extensive report, dated

October 26, 2015, analyzing potential constructive fraudulent transfer claims (the "Williams

Report")[3] and, on December 1, 2015, the Independent Directors Committee adopted a detailed

report prepared by Kirkland (the "December 1 Report") analyzing potential claims for (i)

intentional fraudulent transfers related to the Combination; (ii) breaches of fiduciary duty against

(a) the pre-Combination Legacy Forest directors and officers (the "Legacy Forest Directors and

Officers"); (b) the Legacy Sabine Parent board of directors; (c) Mr. David J. Sambrooks, as

fiduciary for the subsidiaries of Legacy Sabine Parent (the "Legacy Sabine Subsidiaries");[4] and

(d) the members of the board of directors of Sabine who replaced the Legacy Forest board of

directors at or around 1:20 p.m. EST on December 16, 2014 and met for the first time at 3:30

p.m. EST on December 16, 2014 (the "3:30 Board"); (iii) aiding and abetting breaches of

fiduciary duty against the RBL Lenders,[5] the Second Lien Lenders,[6] the Legacy Forest Directors

---

[3]        The Williams Report and the December 1 Report (as defined herein) were both filed on the docket of these cases on December 22, 2015.  *See* Notice of Filing of Analysis of Potential Estate Causes of Action [Dkt. No. 650].

[4]        Legacy Sabine Parent and the Legacy Sabine Subsidiaries shall be referred to collectively herein as "Legacy Sabine."

[5]        The term "RBL" shall refer to the reserve-based revolving credit facility evidenced by an amended and restated First Lien Credit Agreement, dated December 16, 2014, among Sabine Oil & Gas Corporation and the lenders party thereto (the "RBL Credit Agreement").  The term "RBL Lenders" shall refer to those lenders under the RBL Credit Agreement: Capital One N.A., Citibank, N.A., Bank of America N.A., Natixis New York Branch, and UBS AG Stamford Branch, Wells Fargo Bank, N.A. ("Wells Fargo"), and Barclays Bank PLC ("Barclays").  Wells

and Officers, and the First Reserve Defendants (as defined below); (iv) equitable subordination of the claims of the RBL Lenders and the Second Lien Lenders (collectively, the "Prepetition Secured Lenders"); and (v) recharacterization as equity of the $50 million borrowed from the Second Lien Lenders by Sabine in connection with the Combination (collectively, the "Bad Acts Claims").

The Williams Report and the December 1 Report provided the foundation for the Independent Directors Committee's conclusion that, other than the claims for constructive fraudulent transfer asserted against the Second Lien Agent in the Adversary Proceeding filed by the Debtors,[7] there were no other colorable constructive fraudulent transfer claims, nor were there any other colorable claims arising from the Combination or related transactions that would benefit the estates.

On October 27, 2015, Sabine's board of directors convened a meeting to discuss whether to pursue the so-called "Bucket II Claims," a set of potential claims unrelated to the Combination, including, among others, claims challenging certain liens of the Prepetition Secured Lenders as beyond the scope of the applicable grant or as avoidable preferences.[8] After discussing at the meeting Kirkland's analysis and recommendation regarding the Bucket II Claims, the Board of Directors determined not to pursue certain of the Bucket II Claims because doing so would not be in the best interest of the Debtors or their stakeholders.

---

Fargo executed the RBL Credit Agreement on behalf of itself individually and as administrative agent (the "RBL Agent").

[6]     The term "Second Lien Lenders" shall refer to those lenders under the Second Lien Credit Agreement, dated December 14, 2012 (as amended, the "Second Lien Credit Agreement"), among Sabine Oil & Gas LLC (n/k/a Sabine Oil & Gas Corporation) and the lenders party thereto.  The term "Second Lien Agent" shall refer to Wilmington Trust, N.A., as successor administrative agent under the Second Lien Credit Agreement.

[7]     The "Adversary Proceeding" filed by the Debtors on the Petition Date (Adv. Pro. No. 15-01126 (SCC)) was pending before this Court at the time of the Confirmation Hearing (as defined below).

[8]     See Section IV.B, *infra*, for a detailed discussion of the Bucket II Claims.

On November 2, November 11, and November 14, 2015, the Independent Directors Committee received demand letters from the Committee and the Forest Notes Trustees[9] with respect to (a) the Bad Acts Claims and (b) claims seeking, on behalf of (i) the Legacy Forest estate and (ii) the estates of the subsidiaries of the Legacy Sabine Subsidiaries, to avoid obligations incurred, liens transferred, and payments made in connection with or related to the Combination (the "Constructive Fraudulent Transfer Claims").  The Independent Directors Committee considered the claims raised in the demand letters, and it continued to conclude that no additional claims were colorable and beneficial to the estates.

On November 17, 2015, the Committee filed a motion for leave, standing, and authority to commence and prosecute certain claims and causes of action on behalf of the Debtors' estates (the "First Committee STN Motion"),[10] which was followed on December 15, 2015 by a second motion seeking standing to pursue additional claims and causes of action (the "Second Committee STN Motion,"[11] and together with the First Committee STN Motion, the "STN Motions").  By the STN Motions, the Committee sought standing to pursue the Constructive Fraudulent Transfer Claims, the Bad Acts Claims, and the Bucket II Claims.

---

[9]     The "Forest Notes Trustees" are (i) Wilmington Savings Fund Society, FSP, as indenture trustee for $578 million in 7.25% senior unsecured notes due 2019 (the "Legacy Forest 2019 Notes") and (ii) Delaware Trust Company, as indenture trustee for $222 million in 7.5% senior unsecured notes due 2020 (the "Legacy Forest 2020 Notes" and, together with the Legacy Forest 2019 Notes, the "Legacy Forest Notes").

[10]    Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Non-Exclusive Settlement Authority, dated November 17, 2015 [Dkt. No. 518].  Also on November 17, 2015, the Forest Notes Trustees filed their Motion for Entry of an Order Pursuant to § 1109(b) Granting Leave, Standing and Authority to Prosecute and, if Appropriate, Settle Certain Claims on Behalf of the Estate of Sabine Oil & Gas Corporation, dated November 17, 2015 [Dkt. No. 521] (the "Forest Notes Trustees' STN Motion").  The Forest Notes Trustees joined the Second Committee STN Motion and later amended the Forest Notes Trustees' STN Motion to allow the Committee to seek a "lead" position with respect to the Constructive Fraudulent Transfer Claims.

[11]    Second Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Non-Exclusive Settlement Authority, dated December 15, 2015 [Dkt. No. 609].

After a fifteen-day trial on the STN Motions which included ten days of live witness testimony and the submission of over 400 exhibits (the "STN Hearing"), the Court denied the STN Motions.[12]  The Court found that the Bad Acts Claims and the Constructive Fraudulent Transfer Claims asserted were not colorable, with the exception of the Constructive Fraudulent Transfer Claims sought to be asserted on behalf of the Legacy Sabine Subsidiaries.  Although the Court found this subset of Constructive Fraudulent Transfer Claims to be colorable, the Court concluded that it was not in the best interests of the Debtors' estates to pursue such claims because the potential recovery was relatively low as compared to the high costs and risks to the Debtors' estates associated with that litigation.[13]  The Court also declined to rule on the colorability of the Bucket II Claims because the Debtors were pursuing a settlement of the Bucket II Claims in the context of the proposed plan of reorganization filed by the Debtors on January 26, 2016.[14]

## III.    The Plan

In January of 2016, before the commencement of the STN Hearing, the Court entered the Order Selecting Mediator and Governing Mediation Procedures [Dkt. No. 669] (the "First Mediation Order") appointing the Honorable Allan L. Gropper (Ret.) as mediator (the "First Mediator") in these chapter 11 cases.  Through the First Mediation Order, the Court authorized the First Mediator to mediate any issues concerning, among other things, the terms of any plan of reorganization relating to the claims and causes of action raised in the Adversary Proceeding, the

---

[12]        *See Bench Decision on Motions for Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates* (the "STN Ruling"), Case No. 15-11835 (SCC) (Bankr. S.D.N.Y. Mar. 31, 2016) [Dkt. No. 923], also available at *In re Sabine Oil & Gas Corp.*, 547 B.R. 503 (Bankr. S.D.N.Y. 2016), *aff'd, Opinion and Order*, 16-cv-2561 (JGK) [Dkt. No. 39] (S.D.N.Y. June 24, 2016).
[13]        STN Ruling, *aff'd, Opinion and Order*, 16-cv-2561 (JGK) [Dkt. No. 39] (S.D.N.Y. June 24, 2016).
[14]        *Id.* at n.29.  On January 26, 2016, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Sabine Oil & Gas and Its Debtor Affiliates* [Dkt. No. 748] (the "Standalone Plan") and a corresponding disclosure statement [Dkt. No. 749].  The Standalone Plan did not have the support of any of the Debtors' key stakeholders.

proposed complaints annexed to the STN Motions, the Williams Report, and the December 1

Report, as well as any issues related to the confirmation of a plan of reorganization (the "First

Mediation").  In accordance with the terms of the First Mediation Order, the First Mediation

Parties[15] submitted mediation statements and participated in several mediation sessions.  The

First Mediation culminated in an agreement among the Debtors and the RBL Lenders, the RBL

Agent, the Second Lien Lenders, and the Second Lien Agent (collectively, the "Supporting

Parties") (who were also First Mediation Parties) on the terms of the restructuring transaction

contemplated in the Plan (as defined below).

Accordingly, on March 31, 2016, the Debtors filed an amended version of the Standalone

Plan [Dkt. No. 926] (the "March 2016 Plan") and an amended version of the disclosure statement

[Dkt. No. 927] reflecting the agreement among the Supporting Parties and the Debtors.  On April

27, 2016, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Sabine Oil & Gas*

*Corporation and its Debtor Affiliates* [Dkt. No. 1041] (the "April 2016 Plan") and related

disclosure statement [Dkt. No. 1042] (the "Disclosure Statement") (i) reflecting further

discussions among the Supporting Parties and the Debtors and (ii) incorporating the STN Ruling.

On April 29, 2016, the Court entered the *Order Approving (A) The Adequacy Of The*

*Disclosure Statement, (B) Solicitation And Notice Procedures With Respect To Confirmation Of*

*The Second Amended Joint Chapter 11 Plan Of Reorganization Of Sabine Oil & Gas*

*Corporation And Its Debtor Affiliates, (C) The Form Of Ballots And Notices In Connection*

*Therewith, And (D) The Scheduling Of Certain Dates With Respect Thereto* [Dkt. No. 1050, as

---

[15]    The "First Mediation Parties" included the Debtors, the Committee, the RBL Agent, certain of the RBL Lenders, the Second Lien Agent, an *ad hoc* group of holders of the Legacy Forest Notes, an *ad hoc* group of holders of the $350 million outstanding in 9.75% senior unsecured notes due 2017 (the "Legacy Sabine Notes"), The Bank of New York Mellon Trust Company, N.A., as indenture trustee for the Legacy Sabine Notes (the "Legacy Sabine Notes Trustee"), the Forest Notes Trustees, Barclays, certain current and former directors of Sabine, FRC Founders Corporation, and certain former officers and directors of Legacy Forest.

amended by Dkt. No. 1062] (the "Disclosure Statement Order") approving the Disclosure Statement.  On May 2, 2016, the Debtors filed final solicitation versions of the April 2016 Plan (the "Plan") and the Disclosure Statement [Docket No. 1061].  Shortly thereafter, the Debtors began solicitation of votes on the Plan.

In early May 2016, the Court ordered the parties to take part in a second round of mediation (the "Second Mediation")[16] and appointed the Honorable Robert D. Drain (the "Second Mediator") as the mediator for the Second Mediation.  The parties participating in the Second Mediation[17] were unable to reach a global settlement; on June 7, 2016, the Second Mediator filed his post-mediation memorandum stating his conclusion that "there is no prospect of a mediated settlement at this time."[18]

A.    **Summary of the Plan and the Settlement Embodied in the Plan**[19]

The centerpiece of the Plan is a settlement (the "Settlement") of certain claims and causes of action that were asserted or could have been asserted by or against the Debtors including, but not limited to the Bucket II Claims and the Adequate Protection Claims (as defined below).[20] The Debtors submit that they have conducted "a lengthy and thorough analysis of the potential value of their unencumbered assets" and have concluded that, even in "the best possible scenario for the unsecured creditors" (*i.e.*, a scenario that (i) ignores risk of loss and assumes a total victory on each and every Bucket II Claim and (ii) ignores the substantial costs and delays

---

[16]    *See Second Order Selecting Mediator and Governing Mediation Procedures* [Dkt. No. 1113].  The First Mediation was officially terminated on May 2, 2016.  [Dkt. No. 1057].

[17]    The parties that participated in the Second Mediation included the Debtors; the Committee; the RBL Agent; the Second Lien Agent; Wilmington Savings Fund Society, FSB, as Indenture Trustee for the 2019 Notes; Delaware Trust Company, as Indenture Trustee for the 2020 Notes; and the Bank of New York Mellon Trust Company, N.A. as Indenture Trustee for the 2017 Notes.

[18]    Dkt. No. 1236.

[19]    The summary of the Plan terms herein is designed to provide only a high-level summary; the full terms of the Plan are set forth in the Plan itself and are also described in the Disclosure Statement. *See* Dkt. No. 1061.

[20]    The Settlement also includes releases of the Fraudulent Conveyance Claims and the Bad Acts Claims addressed by the Court's STN Ruling.

associated with pursuit of the claims),[21] (a) the collateral diminution suffered by the RBL Lenders entitles them to all of the value of the Debtors' unencumbered assets on account of their adequate protection claims and (b) the adequate protection claims of the Prepetition Secured Lenders "swamp any recovery" on the Bucket II Claims.[22]

Notwithstanding the entitlements of the Prepetition Secured Lenders, however, pursuant to the Settlement, unsecured creditors holding allowed claims will receive a recovery under the Plan. The Plan provides that (i) holders of Allowed RBL Secured Claims (as defined in the Plan) will receive ninety-three percent (93%) of the New Common Stock in the Reorganized Debtors[23] (the "RBL Equity Pool");[24] (ii) holders of Allowed Second Lien Adequate Protection Claims will receive (a) five percent (5%) of the New Common Stock and (b) one hundred percent (100%) of the Tranche 1 Warrants[25] to be issued and outstanding as of the effective date (the "Second Lien Equity Pool); (iii) holders of Allowed Second Lien Deficiency Claims (Class 4b), Allowed 2017 Senior Notes Claims (Class 5a), Allowed 2019 Senior Notes Claims (Class 5b), Allowed 2020 Senior Notes Claims (Class 5c), and Allowed General Unsecured Claims (Class

---

[21]    Per the Debtors, this amount does not include, among other things, costs incident to any substantial delay in emerging from chapter 11 and continued uncertainty, as well as opportunity costs and human costs, which cannot be quantified but which the Debtors believe would be substantial if the Bucket II Claims were pursued. The Debtors submit that these additional costs would further reduce any potential value available to unsecured creditors from the unencumbered assets. *See* Debtors' Conf. Br. [Dkt. No. 1219] ¶ 19.

[22]    *Id.* at ¶ 20.

[23]    The "Reorganized Debtors" shall refer to the Debtors on or after the Effective Date of the Plan.

[24]    Because Class 3 (Allowed RBL Secured Claims) voted to accept the Plan, holders of Allowed RBL Deficiency Claims are conclusively deemed to have waived recoveries (but not the right to vote) under the Plan on account of the RBL Deficiency Claims or any portion thereof.

[25]    "Tranche 1 Warrants" are defined in the Plan as
        . . . the ten-year warrants issued pursuant to the Plan and the Tranche 1 Warrant Agreement, which shall be exercisable on a cashless basis at a total enterprise value, calculated as of the Effective Date, of $1.0 billion less the principal amount outstanding under the Exit Revolver Credit Facility and the New Second Lien Credit Facility on the Effective Date (in each case excluding any amounts deemed borrowed and repaid on the Effective Date) plus any Cash retained by the Reorganized Debtors on the Effective Date, for fifteen percent (15%) of all shares of New Common Stock (subject to dilution by shares issued in connection with the Management Incentive Plan).

Plan, Article I.A.166.

6) will share pro rata in (x) the remaining two percent (2%) of the New Common Stock and (y) one hundred percent (100%) of the Tranche 2 Warrants[26] to be issued and outstanding as of the effective date of the Plan (the "Unsecured Equity Pool").   The parties disagree on the approximate value of the Unsecured Equity Pool to be distributed to Classes 4b, 5a, 5b, 5c, and 6 and, more specifically, on the value of both the Tranche 1 Warrants and the Tranche 2 Warrants.

Additionally, the Plan provides that the Reorganized Debtors on the effective date of the Plan (the "Effective Date") will enter into (i) an exit revolver credit facility, which will consist of a new reserve-based revolving credit facility with $200 million of initial commitments that is being provided to the Debtors by each of the RBL Lenders on account of its pro rata share of the Allowed RBL Secured Claims (the "Exit Facility") and (ii) a new second lien credit facility with a principal amount of $150 million.

The Plan also provides for the following releases: (i) releases by the Debtors of the secured lenders, the Committee, and certain other released parties set forth in Article VIII.F of the Plan (the "Debtor Release"); (ii) a third-party release by holders of claims or interests (who did not elect on their ballot to opt out of such release) of the Debtors, the Reorganized Debtors, the Committee, and other released parties as set forth in Article VIII.G of the Plan; and (iii) a mandatory release by holders of claims or interests (for which parties may not opt out) of the

---

[26]      Tranche 2 Warrants are defined in the Plan as
. . . the ten-year warrants issued pursuant to the Plan and the Tranche 2 Warrant Agreement, which shall be exercisable on a cashless basis at a total enterprise value, calculated as of the Effective Date, of $1.25 billion less the principal amount outstanding under the Exit Revolver Credit Facility and the New Second Lien Credit Facility on the Effective Date (in each case excluding any amounts deemed borrowed and repaid on the Effective Date) plus any Cash retained by the Reorganized Debtors on the Effective Date, for ten percent (10%) of all shares of New Common Stock (subject to dilution by shares issued in connection with the Management Incentive Plan).
Plan, Article I.A.168. The Tranche 1 Warrants and the Tranche 2 Warrants will be referred to collectively herein as the "Warrants."

"RBL Released Parties," who are defined in the Plan to include each of the RBL Agent, the RBL

Lenders, and their respective affiliates, equity holders, and professionals as set forth in Article

VIII.B of the Plan (the "RBL Release").[27]

### B.    Voting Results

The deadline for all holders of Claims or Interests (each as defined in the Plan) entitled to

vote on the Plan to submit their Ballots was June 3, 2016 at 5:00 p.m. (Eastern Time).

Consistent with Local Bankruptcy Rule 3018-1(a), on June 6, 2016, the Debtors filed the voting

certifications and reports of the Court-appointed Notice and Claims Agent, Prime Clerk LLC

(the "Voting Certification").[28] All classes of claims entitled to vote on the Plan voted to accept

the Plan, with the exception of the three classes of noteholders, who voted to reject: Class 5a

(2017 Senior Notes Claims); Class 5b (2019 Senior Notes Claims); and Class 5c (2020 Senior

---

[27]        Specifically, the Plan defines an "RBL Released Party" to mean
          . . . collectively, (a) the RBL Agent (in its capacity as agent under the Old Sabine RBL and the
          RBL Credit Facility Documents); (b) the RBL Lenders in their capacities as "Lenders" "Issuing
          Banks" or "Secured Swap Parties" under the RBL Credit Facility Documents, the Old Sabine
          RBL and the Old Forest RBL; and (c) such Entity and its affiliates, and such Entity and its
          affiliates' current and former equity Holders (regardless of whether such Interests are held
          directly or indirectly), predecessors, successors, and assigns, subsidiaries, and their current and
          former officers, directors, managers, principals, members, employees, agents, advisory board
          members, financial advisors, partners, attorneys, accountants, investment bankers, consultants,
          representatives, and other professionals, each in their capacity as such.
Plan, Article I.A.127.
[28]        Dkt. No. 1231. As set forth in greater detail in the Voting Certification, the following classes of claims
entitled to vote on the Plan voted to accept the Plan: (i) Class 3: RBL Secured Claims; (ii) Class 4b: Second Lien
Deficiency Claims; (iii) Class 6a: General Unsecured Claims (Giant Gas Gathering LLC); (iv) Class 6b: General
Unsecured Claims (Sabine Bear Paw Basin LLC); (v) Class 6c: General Unsecured Claims (Sabine East Texas
Basin LLC); (v) Class 6d: General Unsecured Claims (Sabine Mid-Continent Gathering LLC); (vi) Class 6e:
General Unsecured Claims (Sabine Mid-Continent LLC); (vii) Class 6f: General Unsecured Claims (Sabine Oil &
Gas Corporation); (viii) Class 6g: General Unsecured Claims (Sabine Oil & Gas Finance Corporation); (ix) Class
6h: General Unsecured Claims (Sabine South Texas Gathering LLC); (x) Class 6i: General Unsecured Claims
(Sabine South Texas LLC); (xi) Class 6j: General Unsecured Claims (Sabine Williston Basin LLC); (xii) Class 7b:
Convenience Claims (Sabine East Texas Basin LLC); and (xiii) Class 7e: Convenience Claims (Sabine Oil & Gas
Corporation). As a result of (and as part of) the Settlement, the RBL Lenders and the Second Lien Lenders support
the Plan.

Notes Claims).[29]   In total, over 470 creditors voted to accept the Plan, while only 216 creditors

voted to reject the Plan.

### C.    Objections to the Plan

In addition to the objections related to the assumption of executory contracts or unexpired

leases,[30]   the Debtors received nine[31] other objections to Confirmation (including the objections

of the Committee (the "Committee Objection")[32] and the Forest Notes Trustees (the "Forest

Objection")).[33]

In support of its objection, the Committee submitted (i) three Declarations and Expert

Reports of Christopher J. Kearns;[34] (ii) three Declarations and Expert Reports of Steven M.

Zelin;[35] (iii) a Declaration and Expert Report of Adrian A. Reed;[36] and (iv) a Declaration of

Anders T.C. Gibson.[37]

---

[29]      The Legacy Forest Notes and the Legacy Sabine Notes appear to be held in large part by a small number of institutional investors, including Aurelius Capital Partners, LP.  *See* Second Amended Verified Statement of the Official Committee of Unsecured Creditors of Sabine Oil & Gas Corporation, et al., Pursuant to Bankruptcy Rule 2019, dated May 25, 2016 [Dkt. No. 1159].

[30]      At the Confirmation Hearing, the Debtors informed the Court that the unresolved cure objections are those filed by BP America Production Company [Dkt. 1208], Energy Transfer Parties [Dkt. No. 1213], Tristate ETX, LLC [Dkt. No. 1206], and a group of Forest Oil Corporation Retirees [Dkt. No. 1161].  Each of these objections, to the extent not resolved, will be heard by the Court on a date to be determined.

[31]      *See* Dkt. Nos. 1067, 1151, 1161, 1162, 1163, 1167, 1168, 1169, and 1170.  Other than the Committee Objection (which was joined by the Sabine Notes Trustee) and the Forest Objection, all such objections have been resolved.

[32]      *See* Dkt. No. 1168.

[33]      *See* Dkt. No. 1164.

[34]      *See* Declaration and Expert Report of Christopher J. Kearns in Support of the Objection of the Official Committee of Unsecured Creditors to Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization ("Kearns Initial Report"); Amended Declaration and Expert Report of Christopher J. Kearns in Support of the Objection of the Official Committee of Unsecured Creditors to Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization ("Kearns Amended Report") (Ex. 755); Supplement to Amended Declaration and Expert Report of Christopher J. Kearns in Support of the Objection of the Official Committee of Unsecured Creditors to Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization ("Kearns Supplemental Report") (Ex. 756).

[35]      *See* Declaration and Expert Report of Steven M. Zelin in Support of the Objection of the Official Committee of Unsecured Creditors to Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization ("Zelin Initial Report") (Ex. 753); Declaration and Supplemental Expert Report of Steven M. Zelin in Support of the Objection of the Official Committee of Unsecured Creditors to Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization ("Zelin Supplemental Report") (Ex. 754); Declaration and Supplemental Expert Report of Steven M. Zelin in Support of the Objection of the Official Committee of

In support of confirmation of the Plan and in response to the objections, the Debtors filed

(i) the Debtors' (I) Memorandum of Law in Support of Confirmation of Debtors' Second

Amended Joint Chapter 11 Plan of Reorganization of Sabine Oil & Gas Corporation and Its

Debtor Affiliates and (II) Omnibus Reply to Objections Thereto;[38] (ii) two Declarations of David

Sambrooks;[39] (iii) two Declarations of Brandon Aebersold;[40] (iv) the Declaration of Michael

Magilton;[41] (v) three Declarations and Expert Reports of Jonathan (Joff) A. Mitchell;[42] (vi) four

Declarations and Expert Reports of David Cecil;[43] and (vii) the Voting Certification.[44]

---

Unsecured Creditors to Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization
("Zelin Second Supplemental Report") [Dkt. No. 1322-1] (Ex. 758).

[36]      *See* Declaration and Expert Report of Adrian A. Reed in Support of the Objection of the Official
Committee of Unsecured Creditors to Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of
Reorganization ("Reed Decl.") (Ex. No. 757).

[37]      *See* Declaration of Anders T.C. Gibson in Support of Committee's Objection to the Plan of Confirmation
("Gibson Decl.") [Dkt. No. 1331].

[38]      *See* Dkt. No. 1219 ("Debtors' Conf. Br.").

[39]      *See* Declaration of David Sambrooks in Support of Confirmation of the Debtors' Second Amended Joint
Chapter 11 Plan of Reorganization ("Sambrooks Decl.") [Dkt. No. 1262]; Declaration and Rebuttal Report of David
Sambrooks in Response to Expert Report of Adrian A. Reed Relating to Debtors' Second Amended Joint Chapter 11
Plan of Reorganization ("Sambrooks Rebuttal Report") [Dkt. No. 1225] (Ex. No. 1247).

[40]      *See* Declaration of Brandon Aebersold in Support of the Debtors' Second Amended Joint Chapter 11 Plan
of Reorganization ("Aebersold Decl.") (Ex. 1245); Declaration and Supplement to the Declaration of Brandon
Aebersold in Support of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization ("Aebersold
Supplemental Decl.") (Ex.1398).

[41]      *See* Declaration of Michael Magilton in Support of the Debtors' Second Amended Joint Chapter 11 Plan of
Reorganization ("Magilton Decl.") [Dkt. No. 1277].

[42]      *See* Declaration and Expert Report of Jonathan A. Mitchell in Support of the Debtors' Second Amended
Joint Chapter 11 Plan of Reorganization ("Mitchell Initial Report") [Dkt. No. 1221] (Ex. 1248); Declaration and
Rebuttal Report of Jonathan A. Mitchell in Support of the Debtors' Second Amended Joint Chapter 11 Plan of
Reorganization ("Mitchell Rebuttal Report") [Dkt. No. 1224] (Ex. 1249); Declaration and Supplemental Report of
Jonathan A. Mitchell in Support of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization
("Mitchell Supplemental Report") [Dkt. No. 1323] (Ex. 1400).

[43]      *See* Declaration and Expert Report of David Cecil in Support of the Debtors' Second Amended Joint
Chapter 11 Plan of Reorganization ("Cecil Initial Report") [Dkt. No. 1220] (Ex. 1246); Declaration and Rebuttal
Report of David Cecil in Response to Expert Reports of the Official Committee of Unsecured Creditors Relating to
Debtors' Second Amended Joint Chapter 11 Plan of Reorganization ("Cecil Rebuttal Report") [Dkt. No. 1223] (Ex.
1250); Declaration and Supplement to the Expert Report of David Cecil in Support of the Debtors' Second
Amended Joint Chapter 11 Plan of Reorganization ("Cecil Supplemental Report") (Ex. 1399); Declaration and
Second Supplement to the Expert Report of David Cecil in Support of the Debtors' Second Amended Joint Chapter
11 Plan of Reorganization ("Cecil Second Supplemental Report") [Dkt. No. 1323] (Ex. 1409).

[44]      The following were filed in support of the Plan:  Brief of Wells Fargo Bank, N.A., as RBL Agent, in (I)
Support of Confirmation of Debtors' Second Amended Joint Chapter 11 Plan of Sabine Oil & Gas Corporation and
its Debtor Affiliates and (II) Response to Objections Thereto ("RBL Agent Br.") [Dkt. No. 1226]; Joinder of
Barclays Bank PLC and Barclays Capital Inc. to Brief of Wells Fargo Bank, N.A., as RBL Agent, in (I) Support of
Confirmation of Debtors' Second Amended Joint Chapter 11 Plan of Sabine Oil & Gas Corporation and its Debtor

IV.    **Estimates of Adequate Protection Claims and Potential Bucket II Claims Recoveries**

The principal dispute in these cases centers on the two most significant aspects of the Settlement: the estimated amount of the Adequate Protection Claims and the estimated recoveries potentially available to unsecured creditors if the Bucket II Claims were litigated. The Committee argues that (i) the Debtors have failed to value the Bucket II Claims properly and, as a result, the Debtors are essentially abandoning the pursuit of claims that would significantly enhance unencumbered value and (ii) the Settlement rests on a significantly overstated estimate of the amount of the Adequate Protection Claims.[45]  The Debtors contend that the settlement of the Bucket II Claims is unquestionably reasonable because, even adopting in large measure the Committee's view of the value of the Bucket II Claims, the Adequate Protection Claims (as calculated by the Debtors) are so large that they will "swamp any recovery for such claims."[46]  The Debtors maintain that even in the best possible scenario for unsecured creditors (*i.e.*, a scenario that (i) ignores litigation risk and assumes 100 percent chance of success on the merits on each and every Bucket II Claim and (ii) ignores litigation costs and business costs), the collateral diminution suffered by the RBL Lenders entitles them to *all* of the value of the Debtors' unencumbered assets on account of the RBL Lenders' Adequate Protection

---

Affiliates and (II) Response to Objections Thereto [Dkt. No. 1227]; Statement of the First Reserve Parties in Support of the Second Amended Joint Chapter 11 Plan of Reorganization of Sabine Oil & Gas Corporation and Its Debtor Affiliates [Dkt. No. 1230]; Second Lien Agent's Reply to Official Committee of Unsecured Creditors' Objection to Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization ("Second Lien Agent Reply") [Dkt. No. 1229]; Statement of Former Forest Oil Corporation Directors and Officers in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of Sabine Oil & Gas Corporation and its Debtor Affiliates [Dkt. No. 1232]; and Statement of Sabine Directors Duane Radtke, David Sambrooks, and John Yearwood in Support of Confirmation of Debtors' Second Amended Joint Chapter 11 Plan of Reorganization of Sabine Oil & Gas Corporation [Dkt. No. 1228].
[45]    Committee Obj. ¶ 7.
[46]    Debtors' Conf. Br. ¶ 20.

Claim (as defined below).[47]  A discussion of the parties' positions with respect to the Adequate

Protection Claims and the Bucket II Claims follows.

### A.    Estimates of the Adequate Protection Claims

Pursuant to the Code, a secured creditor is entitled to adequate protection of its interest in

a debtor's property to the extent that such interest declines in value during the course of a

bankruptcy case.[48]  Consistent with the Code's requirements, in the early stages of these cases,

the Debtors negotiated with the Prepetition Secured Lenders and the Committee to, among other

things, reach agreement as to the Debtors' use of the Prepetition Secured Lenders' prepetition

collateral during the course of the bankruptcy case and the form of adequate protection the

lenders would receive from the Debtors.[49]  One of the forms of adequate protection provided to

the Prepetition Secured Lenders pursuant to the Final Cash Collateral Order is the right to assert

a claim against the Debtors' property pursuant to section 507(b) of the Code in an amount that is

primarily determined by calculating the "Collateral Diminution," defined in the Final Cash

Collateral Order as the "amount equal to the decrease in the value of the Prepetition Secured

Lenders' interest in the Prepetition Collateral[50] (including Cash Collateral) from and after

---

[47]    Debtors' Conf. Br. ¶ 27.

[48]    *See* 11 U.S.C. § 361 (referring to sections 362, 363, and 364 as providing the basis for a claim for adequate protection); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203-04 (1983).

[49]    *See Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507, Bankruptcy Rules 2002, 4001 and 9014 and Local Bankruptcy Rule 4001-2 (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Modifying the Automatic Stay* [Dkt. No. 339] (the "Final Cash Collateral Order") ¶¶ 3-5; *see also Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.3d 1017, 1019 (11th Cir. 1984) (describing the balance struck in the Bankruptcy Code between a debtor's "compelling need to use 'cash collateral' in its effort to rebuild" and a secured creditor's "valid concern that free use of secured 'property' may result in the dissipation of the estate"); *In re M.D. Moody & Sons, Inc.*, No. 09-06247 (JAF), 2010 WL 6982486, at *7 (Bankr. M.D. Fla. Mar. 5, 2010) ("The concept of adequate protection is a fundamental tenet of the equitable balance between a debtor's right to reorganize and a secured creditor's right to protect its interest in collateral during the course of the bankruptcy case.").

[50]    Final Cash Collateral Order ¶ F(i) (defining "Prepetition Collateral" as "the cash and noncash proceeds and other rights arising from all prepetition collateral (including any cash held by the Debtors that constitutes Cash Collateral and the setoff rights described in the First Lien Loan Documents, the Swap Agreements (as defined in the RBL Credit Agreement), or arising by operation of law)[.]").

the Petition Date, resulting from the use, sale or lease of the Prepetition Collateral (including Cash Collateral), or the imposition of the automatic stay."[51]

The Settlement among the Debtors and their Prepetition Secured Lenders embodied in the Plan settles, among others things, the amount of the Adequate Protection Claims.  The Debtors submit that the Collateral Diminution would be an amount that, absent a settlement, entitles the RBL Lenders "to all of the value of the Debtors' unencumbered assets on account of their Adequate Protection Claims."[52]  The Debtors therefore argue that the settlement of the Adequate Protection Claims creates value for the Debtors' other creditors.   The Committee asserts, however, that the Debtors have vastly overestimated the amount of the Adequate Protection Claim of the RBL Lenders (the "RBL Lenders' Adequate Protection Claim"), and that the Adequate Protection Claims, absent a settlement, would not exceed the value of the Debtors' unencumbered assets.  The Committee therefore objects to the reasonableness of the Settlement and the Plan on the grounds that the Settlement deprives the Debtors' unsecured creditors of value that they could otherwise receive through litigation.

The Supreme Court of the United States has explained that a secured creditor's interest in a debtor's property is measured as the value of the collateral securing the debtor's obligations to such creditor under section 506(a).[53]   Section 506(a)(1) of the Code provides that in valuing a secured creditors' interest in collateral, "[s]uch value shall be determined in light of the purpose

---

[51]    Pursuant to the Final Cash Collateral Order, the Prepetition Secured Lenders are entitled to assert (i) adequate protection liens on all of the Debtors' property (including encumbered and unencumbered assets) to the extent set forth in the Final Cash Collateral Order and (ii) superpriority administrative claims against the Debtors that have recourse to the Debtors' prepetition and postpetition property to the extent set forth in the Final Cash Collateral Order ((a) and (b) together, the "Adequate Protection Claims").  *See* Final Cash Collateral Order ¶¶ 3-5.
[52]    Debtors' Conf. Br. ¶ 19.
[53]    *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372 (1988); *see also In re Delta Res., Inc.,* 54 F.3d 722, 728 (11th Cir. 1995) ("[T]he phrase 'value of such creditor's interest' in § 506(a) means the value of the collateral."); *see also In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 74 (1st Cir. 1995).

of the valuation and of the proposed disposition or use of such property;" in the seminal case of *Assocs. Commercial Corp. v. Rash*, the Supreme Court explained that the latter prong of the section 506(a)(1) determination is "of paramount importance to the valuation question."[54]  A number of courts have interpreted the language of section 506(a)(1) to mean that collateral must be valued "in the hands of the Debtors."[55]  The legislative history of section 506(a) confirms that the valuation methodology varies on a case-by-case basis, and that courts should take into consideration the facts and competing interests of each case.[56]

The parties agree that Collateral Diminution should be calculated using (i) the going-concern value of the Debtors' encumbered oil and gas assets (the "Reserve Collateral Value") and (ii) the value of other assets on which the Prepetition Secured Lenders hold valid and perfected liens[57] ("Other Collateral Asset Value," and together with the Reserve Collateral Value, the "Total Collateral Value") at the Petition Date and at the anticipated Effective Date of June 30, 2016 (the "Forecasted Effective Date").[58]  To calculate the Reserve Collateral Value, the Debtors and the Committee each first calculated the value of all of the Debtors' oil and gas

---

[54]     *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997) (hereinafter "*Assocs. Commercial Corp.*"); *see also In re SK Foods, L.P.*, 487 B.R. 257, 262 (E.D. Cal. 2013) (hereinafter "*SK Foods*") (requiring going-concern valuation for collateral subject to a going-concern sale pursuant to section 363); *see* STN Ruling, 547 B.R. at 578 (the proper method to value the RBL Lenders' adequate protection claim is "the fair market or going concern value of the New RBL Lenders' interest in the prepetition collateral as of the Petition Date less the fair market or going concern value of the prepetition collateral as of the effective date of a confirmed plan of reorganization or the closing date of a sale . . . .").

[55]     *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital LLC)*, 501 B.R. 549, 591-92 (Bankr. S.D.N.Y. 2013) (hereinafter "*ResCap*") (holding that the collateral should be valued "based on the fair market value of the collateral in the hands of the Debtors").

[56]     H.R. Rep. No. 95-595, at 356 (1977) ("'Value' [in the section 506(a) context] does not necessarily contemplate forced sale or liquidation value of the collateral; nor does [in] always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interest in the case.").

[57]     In addition to holding liens on the Reserve Collateral Value, the Prepetition Secured Lenders hold valid and perfected liens on (i) oil and gas receivables, to the extent these receivables relate to the sale of the prepetition collateral; (ii) joint interest billing receivables, to the extent these receivables relate to the production and sale of the prepetition collateral; and (iii) cash, to the extent that it represents net proceeds from the sale of the prepetition collateral.  *See* Mitchell Rebuttal Report, Ex. A1.

[58]     *Id.* at ¶ 29.

18

assets, encumbered and unencumbered (the "Reserves"), by performing the following steps:[59] (i)

calculating an estimate of the going-concern value of the Debtors' oil and gas reserves using a

net asset value ("NAV") approach to determine the present value ("PV-10") of the future cash

flows of the Reserves, net of certain expenses;[60] (ii) risk-adjusting the estimated present value of

each reserve based on its categorization into one of five predictability categories (as indicated in

the Debtors' reserves report)[61] by applying a "Reserve Adjustment Factor" ("RAF");[62] (iii)

applying the results of an encumbrance analysis to calculate the estimated risk-adjusted Reserve

Collateral Value;[63] and (iv) calculating the Collateral Diminution by quantifying the difference

between the Reserve Collateral Value on the Petition Date and the Reserve Collateral Value on

the Forecasted Effective Date.

While they generally agree on the steps required to calculate the Collateral Diminution,

the parties do not agree on the methodology for calculating the Adequate Protection Claims once

the Petition Date Reserve Collateral Value and the Forecasted Effective Date Reserve Collateral

Value have been estimated.  Their disagreement is largely driven by the fact that the Debtors and

the Supporting Parties take the position, based on their expert's estimate of the Petition Date

Reserve Collateral Value, that the RBL Lenders were oversecured as of the Petition Date and the

---

[59]     Although the parties' valuation experts each performed the following steps to some extent, they did not
perform them in the same order or in exactly the same manner.  In addition, the Debtors' valuation expert, Mr. Cecil,
also performed a "comparable companies" analysis to determine the value of the Reserves.  A "comparable
companies" analysis requires the identification of publicly-traded companies with similar operating and financial
characteristics and of observable trading multiples for such companies, and the application of those multiples to a
company's financial metrics in order to estimate value.
[60]     As discussed in greater detail below, the parties do not agree as to the categories of expenses that should be
netted out of the projected future cash flows.
[61]     The categories of reserves are "Proved" (or "1P"), "Probable" (or "2P"), and "Possible" (or "3P").  Within
the Proved category, reserves are further categorized into "Proved Developed Producing," "Proved Developed Non-
Producing," and "Proved Undeveloped."
[62]     The RAFs are provided and recommended by the Society of Petroleum Evaluation Engineers ("SPEE") in
its 34th annual "Survey of Parameters Used in Property Evaluation," dated June 2015, by which survey respondents
provide their views as to the proper discount to apply to different reserve categories (Ex. 1278).
[63]     As discussed in greater detail below, the parties applied different methodologies to their encumbrance
analyses.

Second Lien Lenders were undersecured. In contrast, the Committee takes the position, based on its expert's estimate of the Petition Date Reserve Collateral Value, that the RBL Lenders were undersecured as of the Petition Date and the Second Lien Lenders were thus entirely unsecured as of the Petition Date. Therefore, while each side's expert calculates the Adequate Protection Claims (i) based on the Reserve Collateral Value on the Petition Date and as of the Forecasted Effective Date, and (ii) by giving effect to certain postpetition payments made to the Prepetition Secured Lenders,[64] they do not use the same methodology for doing so.

Relying on their estimates of the value of the Reserves, the Debtors and the Supporting Parties submit that the Total Collateral Value as of the Petition Date exceeded the principal amount of the RBL Lenders' claim of $926.8 million and that the RBL Lenders were oversecured on the Petition Date. Accordingly, both the RBL Lenders and the Second Lien Lenders have sizable Adequate Protection Claims against the Debtors' estates.[65] The Debtors estimate that, depending on whether value as of the Forecasted Effective Date is calculated using commodity prices as of March 22, 2016, May 20, 2016, June 10, 2016, or July 7, 2016, (i) the Collateral Diminution is between $417.5 million and $313.5 million and (ii) the RBL Lenders' Adequate Protection Claim is between $227.9 million and $123.9 million.[66] The Debtors estimate that, regardless of which commodity prices are used, the Adequate Protection Claim of

---

[64]    As discussed in greater detail below, the parties do not agree on the amounts of such postpetition payments to be included in the calculation of the Adequate Protection Claims or the methodology for doing so.

[65]    Mitchell Initial Report ¶ 50.

[66]    The Debtors estimate that the Reserve Collateral Value as of the Petition Date was $1,003.4 million and that the Total Reserve Collateral Value as of the Petition Date was $1,051.3 million. As reflected herein, the Debtors estimate the Other Collateral Asset Value to be $47.9 million   As for the Reserve Collateral Value as of the Forecasted Effective Date, the Debtors have provided four different estimates reflecting commodity prices as of four different dates: using March 22, 2016 prices, an estimate of $563.2 million; using May 20, 2016 prices, an estimate of $632.0 million; using June 10, 2016 prices, an estimate of $665.8 million; and using July 7, 2016 prices, an estimate of $667.2 million. The Debtors estimate the Other Collateral Asset Value as of the Forecasted Effective Date to be $70.6 million, which results in a Total Collateral Value as of the Forecasted Effective Date as follows: using March 22, 2016 prices, an estimate of $633.8 million; using May 20, 2016 prices, an estimate of $702.6 million; using June 10, 2016 prices, an estimate of $736.4 million; and using July 7, 2016 prices, an estimate of $737.8 million.

the Second Lien Lenders (the "Second Lien Lenders' Adequate Protection Claim") is $112.3 million.[67]  The Debtors argue that, absent the Settlement, the RBL Lenders' Adequate Protection Claim would "swamp" the Debtors' unencumbered assets, and that therefore the Settlement, which provides value to the Second Lien Lenders and to the Debtors' unsecured creditors, is reasonable and satisfies the standards under Bankruptcy Rule 9019.[68]

The Committee disagrees.  It disputes the Debtors' valuation of the Reserves at both the Petition Date and the Forecasted Effective Date, as well as the Debtors' methodology for calculating the Adequate Protection Claims.   It argues that (i) the RBL Lenders were undersecured at the Petition Date; (ii) the Second Lien Lenders were unsecured at the Petition Date; and (iii) the Collateral Diminution does not exceed $86 million.  As explained below, the Committee challenges on a number of grounds the Debtors' calculations of the value of the Reserves on both the Petition Date and the Forecasted Effective Date and the Debtors' methodology for quantifying the Adequate Protection Claims.

### 1.   The Debtors' Estimate of the Adequate Protection Claims

As explained above, the Debtors assert that the Plan reasonably settles the Adequate Protection Claims as part of an overall settlement between the Debtors and the Prepetition Secured Lenders.  More specifically, the Debtors have estimated the Adequate Protection Claims for the purpose of evaluating the Settlement embodied in the Plan.[69]  At the Confirmation Hearing, the Debtors elicited testimony from four witnesses relating to the Debtors' approach to

---

[67]    In the Debtors' calculations, the Second Lien Lenders' Adequate Protection Claim does not change based on which commodity prices are used for purposes of calculating values as of the Forecasted Effective Date because the Second Lien Lenders are entirely unsecured as of the Forecasted Effective Date, and therefore only have an Adequate Protection Claim in the amount in which they held an interest in the Prepetition Collateral as of the Petition Date.

[68]    Debtors' Conf. Br. ¶¶ 20, 52; Mitchell Rebuttal Report ¶ 49.

[69]    See June 22, 2016 Hr'g Tr. 55:18-56:18 (Mitchell) (testifying that he estimated the likely adequate protection claim for purposes of evaluating the reasonableness of the Settlement).

quantifying the Adequate Protection Claims: Mr. Cecil, the Debtors' oil and gas asset valuation expert, who calculated the value of the Reserves; Mr. Sambrooks, who provided testimony about the Company's reserves database (the "ARIES Database"), the predictability of the Debtors' wells in certain geographical regions, and the appropriateness of Mr. Cecil's application of a customized range of RAFs; Mr. Magilton, who supervised the Debtors' encumbrance review and analysis; and Mr. Mitchell, who calculated the Collateral Diminution and estimated the Adequate Protection Claims for purposes of assessing the reasonableness of the Settlement.

The Debtors' valuation expert, Mr. Cecil of Lazard, testified that his approach was to calculate a "going concern value for assets . . . as prescribed by the development plan that's put in place for those assets."[70] Accordingly, Mr. Cecil calculated the value of the Reserves using an NAV approach, which the Debtors assert is industry-standard and customary for valuing oil and gas assets.[71] Mr. Cecil used the financial information included in the ARIES Database as of the Petition Date and as of the Forecasted Effective Date, respectively, to conduct his NAV analysis. Specifically, he began with the Debtors' projected future production volumes of the Reserves and the applicable strip price[72] to calculate future cash flows for each Reserve.[73]

---

[70]     June 20, 2016 Hr'g Tr. 18:12-18 (Cecil).

[71]     Cecil Initial Report ¶ 21.  The Debtors' expert also reviewed precedent transactions for oil and gas assets similar to those of the Debtors, but concluded that "[g]iven volatile (and distressed) market conditions in the oil and gas industry, there are no reliable precedent transactions that warranted formal inclusion" in the valuation of the Debtors' Reserves. Cecil Initial Report ¶ 11.

[72]     "Strip pricing" is a commonly used and widely accepted industry forecasting tool.  The strip price represents prices "at which actual commodity volumes are being contracted for future delivery."  Cecil Initial Report ¶ 23.  The Reserves Database as of the Petition Date assumed a strip price for Henry Hub natural gas and WTI crude oil as of July 15, 2015.  As discussed above, *see* n. 66, *supra*, the Debtors have analyzed the value of the Reserves as of the Forecasted Effective Date using four different strip prices.

[73]     At the Confirmation Hearing, the Debtors adduced extensive testimony from Mr. Sambrooks and Mr. Magilton that approximately 225 of the Debtors' probable undeveloped drilling locations in the Haynesville play were not included in the ARIES Database as of the Petition Date but were included in the Reserves database as of the Forecasted Effective Date, even though the Debtors owned the rights to drill those locations at the Petition Date. According to Mr. Cecil, these Haynesville locations were not reflected in the ARIES Database as of the Petition Date because, as of the Petition Date, the Debtors were in the process of determining the extent of their rights in these locations; they were subsequently included in the January 2016 business plan.  *See* June 20, 2016 Hr'g Tr.

The projected net cash flows of the Debtors' Reserves are summarized in the ARIES Database. The gross cash flows are calculated using the Debtors' projection of volume production by each well and the Debtors' commodity price forecasts. Mr. Cecil testified that the Debtors categorize their projected expenses as one of two types: (i) operating expenses and capital expenditures incurred by an individual well ("Direct Costs"), or (ii) expenses that are not incurred by an individual well ("Indirect Costs"). The net cash flow for each well in the ARIES Database is net of (a) Direct Costs for that well and (b) an allocation to that well of a portion of the Indirect Costs pursuant to standards disseminated by the Council of Petroleum Accountants Societies, Inc. ("COPAS", and such expenses, "COPAS Charges").[74] As discussed *infra*, the parties disagree as to whether the COPAS guidelines are appropriate to use in this way.

At the Confirmation Hearing, Mr. Cecil explained that the Direct Costs are operating expenses that are recorded as well-level lease operating expenses ("LOE"):[75] capital expenditures, workover expenses, taxes, and lease operating expenses. The COPAS Charges, on the other hand, represent overhead costs indirectly associated with "field-level" activities that are necessary to maintain and preserve the value of the Debtors' oil and gas assets which were accounted for, according to the Debtors, consistent with COPAS standards.[76] For example, COPAS recommends including in COPAS Charges a portion of expenses associated with

---

67:1-9 (Cecil). Mr. Cecil performed an illustrative valuation of these Haynesville locations as of the Petition Date and estimated the value of these locations to be between $90 million and $155 million. Mr. Mitchell explained in his expert reports that, assuming fifty percent of these locations were encumbered, an additional $45 million to $75 million could be included in the Reserve Collateral Value as of the Petition Date. Mitchell Rebuttal Report ¶ 28.

[74] Cecil Initial Report ¶ 22. Mr. Cecil did not include in his valuation any "Land Expense" because (i) it was not included in the Debtors' Reserves databases; and (ii) the estimated land expense figure in place as of the Petition Date was materially higher than the actual "go-forward" cost. "Land Expense" refers to costs incurred in maintaining the Debtors' mineral rights under existing leases covering undeveloped reserves. Typically, a lessee has a specified period of time to drill a well, and if the deadline for drilling is not met, the lessee must make payments to prevent the lease from terminating.

[75] According to the Debtors' witnesses, LOE costs include field office rent, field vehicle expenses, and payroll costs for employees who commit a percentage of time to "field level" activities.

[76] *See* Cecil Rebuttal Report ¶¶ 13, 18.

administration, human resources, legal services, management, accounting and auditing, and warehousing. The Debtors take the position that the COPAS Charges are the only Indirect Costs that should be included in the NAV valuation of the Reserves.[77]

At the Confirmation Hearing, the Debtors elicited testimony from both Mr. Sambrooks and Mr. Cecil that the allocation of costs associated with COPAS categories is a matter of negotiation between the Debtors and their joint working partners. As explained by Mr. Sambrooks, one of the terms of a joint operating agreement is the amount of the operator's costs incurred in COPAS categories that will be charged to the non-operating partner. For those wells for which the Debtors do not have a joint interest partner, the amount of COPAS Charges deemed attributable to such wells is estimated by reviewing the allocation of COPAS Charges for comparable wells.[78] The Debtors maintain that burdening the projected value of the Reserves with Direct Costs and COPAS Charges accurately captures the projected net cash flows for each of the Debtors' wells consistent with the industry standards for evaluating the going-concern value of oil and gas assets.[79]

Using the Debtors' projected net cash flows, Mr. Cecil then applied the industry-standard PV-10 to calculate the present value of the future cash flows. Next, Mr. Cecil risk-adjusted the PV-10 cash flows using the RAFs provided by SPEE to account for "the varying degrees of risk associated with projected volumes within each reserve category."[80] Mr. Cecil applied a customized range of RAFs – the mid-RAFs and high-RAFs – "to capture the specific risk profile

---

[77]    This position is challenged by the Committee, which argues (as discussed below) that all Indirect Costs should be included in the valuation of the Prepetition Collateral, resulting in a lower value at the Petition Date, and thus, smaller Adequate Protection Claims.

[78]    June 13, 2016 Hr'g Tr. 178:5-12 (Sambrooks).

[79]    Cecil Rebuttal Report ¶ 5.

[80]    Cecil Initial Report ¶ 25.

of the assets being evaluated."[81]    Both Mr. Cecil and Mr. Sambrooks testified that using only the

mid-RAFs and high-RAFs is appropriate here because the majority of the Reserves that comprise

the Prepetition Collateral are located in plays[82] that are highly predictable and can be

characterized as having low geologic risk, thus justifying a lower risk-adjustment.[83]    Moreover,

according to Mr. Cecil, it is common industry practice to apply a customized range of RAFs

based on the predictability of well production when performing an NAV analysis.[84]

After calculating the risk-adjusted value of the Debtors' oil and gas assets, the Debtors

then determined the Reserve Collateral Value as of the Petition Date and as of the Forecasted

Effective Date by applying the results of the encumbrance review conducted by Mr. Magilton

and his land team.    This analysis identified which of the Reserves were part of the Prepetition

Collateral securing the Debtors' obligations to the Prepetition Secured Lenders.    Mr. Magilton

testified that the Debtors' land team, working with the Debtors' advisors, conducted a

comprehensive review of leases, mortgages, acquisition schedules, and other documents to

determine whether each well was encumbered or unencumbered as of the Petition Date and as of

the Forecasted Effective Date.[85]    Mr. Mitchell then used this well-by-well encumbrance review

to calculate the Reserve Collateral Value as of the Petition Date and as of the Forecasted

Effective Date.[86]    Mr. Mitchell employed what he has described as a "bottom-up" approach, in

---

[81]    Cecil Initial Report ¶ 27. The Committee challenges Mr. Cecil's use of only the mid-RAFs and high-RAFs.

[82]    At the Confirmation Hearing, Mr. Sambrooks testified that a "play" is generally a reservoir that spans over a large area and noted that the Haynesville and Cotton Valley plays overlap geographically to a large extent.  *See* June 13, 2016 Hr'g Tr. 165:4-14 (Sambrooks).

[83]    *See* June 20, 2016 Hr'g Tr. 40:8-42:11 (Cecil); 42:24-43:6 (Cecil); *see also* June 13, 2016 Hr'g Tr. 189:7-12 (Sambrooks); 190:4-12 (Sambrooks); 191:16-23 (Sambrooks); 192:13-18 (Sambrooks).

[84]    *See* June 20, 2016 Hr'g Tr. 39:8-21 (Cecil); Cecil Initial Report ¶ 27; *see also* July 7, 2016 Hr'g Tr. 186:3-187:21 (Zelin) (confirming that he had used a customized RAF range in prior valuation work based on an "assessment of the projections").

[85]    *See* June 21, 2016 Hr'g Tr. 154:3-12 (Magilton); 161-171 (Magilton).

[86]    *See* Mitchell Initial Report ¶¶ 33-37; Cecil Initial Report ¶¶ 23-25; Mitchell Rebuttal Report, Ex. A1.

which he included, as part of the calculation of the Reserve Collateral Value, the value of only those Reserves that were reflected as "encumbered" in Mr. Magilton's analysis.[87]

In his expert reports and at the Confirmation Hearing, Mr. Mitchell explained that, to the extent there are disputes as to whether certain Reserves are encumbered or unencumbered, for purposes of estimating the Adequate Protection Claims, he assumed that (i) Reserves that are subject to the Second Lien Lenders' Preference Claims (as defined below) or the County Leases issue (as defined below) are unencumbered, while (ii) the Reserves that are subject to other encumbrance disputes were encumbered.[88]   Importantly, this is a more conservative (*i.e.*, Committee-favorable) approach to the encumbrance classification of the wells than an approach which classifies the encumbrance of the Reserves based on the Debtors' view of the estimated chance of success on each encumbrance issue.  This is especially so with respect to the County Leases issue, which has the greatest risked and unrisked notional value of all of the Bucket II Claims and to which the Debtors attribute a fifty percent chance of success.[89]

Mr. Mitchell then calculated the RBL Lenders' Adequate Protection Claim by subtracting from the $926.8 million in outstanding principal owed to the RBL Lenders (i) $24.3 million of postpetition payments made by the Debtors to the RBL Lenders pursuant to the Final Cash Collateral Order,[90] comprising proceeds of the Debtors' terminated swap agreements (the "Swap Payments"); (ii) $40.8 million of postpetition payments made by the Debtors to the RBL Lenders as adequate protection payments after the RBL Lenders became undersecured and no longer

---

[87]    As discussed below, this approach differs from the approach taken by the Committee's experts, who attempted to calculate the aggregate encumbrance percentage of the Reserves and apply that percentage to the total value of the Reserves to calculate the Reserve Collateral Value.

[88]    Mitchell Initial Report ¶ 35; June 22, 2016 Hr'g Tr. 99:7-18 (Mitchell); 100:5-10 (Mitchell).

[89]    Mitchell Rebuttal Report ¶ 29.  Mr. Mitchell explained that if the Debtors applied a fifty percent chance of success to the County Leases issue instead of assuming 100 percent success for purposes of estimating the Adequate Protection Claims, the Reserve Collateral Value as of the Petition Date would increase by over $50 million.

[90]    *See* Final Cash Collateral Order ¶ 3(g).

entitled to adequate protection, which the Debtors estimate occurred in October 2015; and (iii) the Total Collateral Value as of the Forecasted Effective Date, which ranges from $633.8 million to $737.8 million depending on which strip pricing assumptions are used. This calculation resulted in an estimate of the RBL Lenders' Adequate Protection Claim of $227.9 million (using strip pricing data as of March 22, 2016) and $123.9 million (using strip pricing data as of July 7, 2016).

Mr. Mitchell then estimated the Second Lien Lenders' Adequate Protection Claim by calculating the difference between the Total Collateral Value as of the Petition Date and the amount of the RBL Lenders' claim (to wit, $1,051.3 million less $926.8 million); thus, the value of the Second Lien Lenders' interest in the Prepetition Collateral as of the Petition Date was $124.5 million. As of the Forecasted Effective Date, no matter which strip pricing data is used, this value has been entirely eliminated, resulting in a $124.5 million decrease in the Second Lien Lenders' interest in the Prepetition Collateral over that period. Consistent with his approach to calculating the RBL Lenders' Adequate Protection Claim, Mr. Mitchell then reduced that amount by $12.2 million of postpetition adequate protection payments made by the Debtors to the Second Lien Lenders during the period that the Debtors estimate the Second Lien Lenders were undersecured and therefore not entitled to receive adequate protection payments. As a result, Mr. Mitchell estimated the Second Lien Lenders' Adequate Protection Claim to be $112.3 million.

### 2. The Committee's Challenges to the Debtors' Estimate of the Adequate Protection Claims

The Committee challenges the Debtors' estimates of the value of the Reserves as of the Petition Date and as of the Forecasted Effective Date primarily with respect to three issues: (i) whether, when calculating the value of the Reserves for purposes of calculating the Adequate

Protection Claims, all general and administrative expenses ("G&A") as well as "Land Expense" should be deducted from the cash flows of the Reserves; (ii) whether the use of the mid-point between the mid-RAFs and high-RAFs, rather than the midpoint of the low-RAFs, mid-RAFs, and high-RAFs is appropriate for risk-adjusting the value of the Reserves; and (iii) whether the consideration of commodity prices other than prices as of June 10, 2016 is appropriate for purposes of calculating the value of the Reserves as of the Forecasted Effective Date.[91]    In addition to the foregoing, the Committee also challenges the Debtors' estimate of the Adequate Protection Claims with respect to (a) the application of the Debtors' Encumbrance Review (as defined below); (b) adjustments to the Adequate Protection Claims based on certain postpetition payments the Debtors made to the RBL Lenders and the Second Lien Lenders; and (c) the Debtors' failure to adjust the RBL Lenders' Adequate Protection Claim for postpetition payments made with respect to certain alleged mineral liens.[92]

### a. Deduction of All Indirect Costs (Whether or Not Included In COPAS Charges) from the Value of the Reserves

As described above, the Debtors' valuation of the Reserves applies an NAV methodology to the future cash flows of the Reserves and nets out Direct Costs and COPAS Charges.  While the Committee also uses an NAV methodology, the Committee's valuation expert, Mr. Zelin, used the NAV methodology to calculate an enterprise valuation (as opposed to an asset

---

[91]    The Committee's challenges to the Debtors' valuation has its primary impact on the calculation of the Petition Date Reserve Collateral Value, which accounts for more than seventy-five percent of the discrepancy between the Debtors' calculation of the Adequate Protection Claims and the Committee's calculation.

[92]    The Committee provided to the Court, both at the Confirmation Hearing and in Mr. Zelin's expert reports, what the Committee identified as a "Diminution in Value Bridge" chart, reflecting the adjustments advocated by the Committee to the Debtors' calculation of the Adequate Protection Claims (Ex. 754, Ex. V) (the "Zelin Bridge"). The Court includes the Zelin Bridge for reference as Appendix A hereto.

valuation) based on the value of the Reserves.[93]  The Committee argues that, in light of the Debtors' pursuit of a restructuring through a plan of reorganization, an enterprise value, rather than the Debtors' Reserves value, reflects the true going concern value of the Reserves in the hands of the Debtors.  The Committee maintains that the Debtors' Reserves valuation is in essence a sale valuation, not a going concern valuation, and does not reflect the "intended use" of the collateral in the hands of the Debtors as of the Petition Date because it ignores the overhead necessary to operate the business and realize the value of the Reserves pursuant to the Debtors' business plan.[94]

The Committee submits that Mr. Zelin's valuation of the Reserves in this context properly burdens the value of the Reserves with Direct Costs and with all Indirect Costs[95] rather than only with Direct Costs and COPAS Charges as Mr. Cecil did.  Mr. Zelin calculated total Indirect Costs by capitalizing the Debtors' projected 2016 aggregate G&A run-rate using a multiple of 4.5x.[96]  Using that approach, Mr. Zelin estimated that including all Indirect Costs (*i.e.*, costs of operating the Debtors' business, all G&A, and Land Expense that are not directly attributable to specific Reserves) results in a $189 million downward adjustment to the Debtors' valuation of the Reserves as of the Petition Date.[97]

---

[93]    July 7, 2016 Hr'g Tr. 118:22-119:1 (Zelin) (Q: "And it's your opinion that the enterprise value of Sabine is the exact same thing as the value of the company's oil and gas reserves, true?"  A: "The value of the business is made up of the value of its assets, so that is true.").

[94]    Committee Obj. ¶ 28.

[95]    Zelin Initial Report ¶ 20(a).

[96]    *Id.* ¶ 21, n. 1.  Mr. Zelin used the 4.5x multiple based on Mr. Cecil's use of a range of multiples of 4x to 5x in calculating the capitalized G&A for purposes of his enterprise analysis.  *See* July 7, 2016 Hr'g Tr. 36:2-7 (Zelin).

[97]    In his expert reports and testimony, Mr. Zelin refers to "Unallocated Overhead" and "Unallocated Land Expense," whereas Mr. Cecil, in his expert reports and testimony, refers to "Unallocated G&A."  Unfortunately, Mr. Zelin's terms do not have the same meaning as Mr. Cecil's.  Mr. Zelin refers to "Unallocated Overhead" and "Unallocated Land Expense" to mean all Indirect Costs.  *See* Zelin Initial Report ¶ 20(a).  Mr. Cecil, on the other hand, uses "Unallocated G&A" to refer to those Indirect Costs not included as COPAS Charges.  Cecil Rebuttal Report ¶ 14.  Adding additional complexity to the terminology, Mr. Cecil's "Unallocated G&A" refers to different G&A costs than does the Debtors' term "Bucket II Unallocated G&A."  For the sake of clarity, to the extent possible, the Court uses the term "Unallocated G&A" only in the context of the Bucket II Claims, and uses the terms

The Committee argues that these additional costs must be included in the valuation of the Reserves as a going concern because they would necessarily be incurred as a cost of generating the Debtors' projected cash flows.  The Committee challenges the appropriateness of limiting the deduction of Indirect Costs to COPAS Charges in light of what it views as certain "anomalies" resulting from the Debtors' calculations: (i) Mr. Cecil's calculations resulted in a higher valuation for the Reserves than for the entirety of the enterprise; (ii) Mr. Cecil's calculation of COPAS Charges as of the Forecasted Effective Date reflects an increase in COPAS Charges of $24 million from the Petition Date to the Forecasted Effective Date despite the Debtors' reduction in annual run-rate G&A of $40 million during that time; and (iii) Mr. Cecil's calculation of COPAS Charges as of the Forecasted Effective Date results in an implied G&A multiple of 9.5x when compared to the Debtors' projected 2016 G&A run-rate, more than twice the multiple that Mr. Cecil used for his own calculation of capitalized G&A.  Stated more succinctly, the Committee argues that the Debtors' valuation methodology inappropriately includes 100 percent of the value of the Reserves but only a portion of the costs associated with generating that value and is therefore inconsistent with the Debtors' own business plan and with applicable standards for valuing collateral in the context of sizing the Adequate Protection Claims.

### b.  Reserve Adjustment Factors (RAFs)

While the parties agree that an RAF adjustment is appropriate to reflect the probabilities that the Reserves, as classified as 1P (Proved), 2P (Probable), or 3P (Possible),[98] will produce, or

---

Direct Costs, Indirect Costs, and COPAS Charges in the context of the valuation of the Adequate Protection Claims. Accordingly, as used by the Court, Mr. Cecil's "Unallocated G&A" means those Indirect Costs that are not COPAS Charges; Mr. Zelin's "Unallocated Overhead" and "Unallocated Land Expense" mean all Indirect Costs.

[98]    Within the Proved category, reserves are further categorized into "Proved Developed Producing," "Proved Developed Non-Producing," and "Proved Undeveloped."  *See* n. 61, *supra*.

continue to produce, hydrocarbons as predicted, the second basis on which the Committee challenges the Debtors' valuation of the Reserves is the Debtors' use of only the mid-RAFs and high-RAFs to risk-adjust the value of the Reserves.

The Committee argues that while Mr. Cecil's NAV analysis incorporates risk adjustment factors that are technically "within the range" provided by SPEE, the Debtors' exclusion of the low-RAFs is not appropriate here.  The Committee rejects what it describes as Mr. Cecil's only rationale for excluding the low-RAFs: that the Haynesville and Cotton Valley wells are more "predictable."  More specifically, the Committee asserts that (i) Mr. Cecil does not have sufficient expertise on the use of RAFs to make an independent determination of an appropriate customized RAF range; (ii) Mr. Cecil did not rely on any authority to justify basing such a determination only on the predictability of the Reserves; and (iii) Mr. Cecil did not independently verify the accuracy of the Debtors' projections to determine if the use of only the mid-RAFs and high-RAFs was appropriate.

In support of the Committee's position that a proper valuation of the Reserves must include the low-RAFs, Mr. Zelin testified that he relied on the report of the Committee's expert, Mr. Adrian Reed,[99] and on a report by industry consultant Wood Mackenzie, dated April 2016, entitled "Haynesville Core Shale Gas Unconventional Play" (the "Wood Mackenzie Report").[100] At the Confirmation Hearing, the Committee sought to introduce the expert testimony of Mr. Reed with respect to his assessment of, among other things, the quality and predictability of the Reserves for the purposes of determining the appropriate RAF range to use in valuing the Reserves.  After Mr. Reed was questioned by counsel to the Debtors, however, the Committee

---

[99]    In the Reed Declaration, Mr. Reed sets forth his opinion that the Debtors' assets are, at best, no better than the broader universe of oil and gas assets represented by the SPEE guidelines.
[100]    Zelin Initial Report ¶ 20(b).

largely acknowledged significant deficiencies in the reliability of Mr. Reed's testimony and opinions. Moreover, as discussed *infra*, to the extent the Court has concluded that certain of Mr. Reed's opinions are admissible, such opinions shall not be afforded any evidentiary weight.[101] Relying on Mr. Reed's opinions and the Wood Mackenzie Report, the Committee (per Mr. Zelin) submits that the valuation of the Debtors' Reserves must include the low-RAFs and that doing so reduces the Adequate Protection Claims by approximately $33 million.

### c.  Strip Pricing

A key variable in estimating the value of the Reserves is the prevailing commodity price applicable to the Reserves. Both the Debtors' experts and the Committee's experts relied on the "strip pricing" of oil and natural gas to conduct their analyses.[102] The strip price represents prices "at which actual commodity volumes are being contracted for future delivery."[103] In other words, while not a projection, strip prices are considered an appropriate source of information as to future movement in the commodity price because they are based on the pricing of commodity future contracts.

More than three months have now passed since the Debtors filed the Disclosure Statement, and more than three months have passed since the first expert reports were filed in anticipation of the Confirmation Hearing. Not surprisingly, commodity prices have changed on a daily basis over that time period. In his initial expert report dated May 13, 2016, Mr. Cecil, the Debtors' valuation expert, estimated the value of the Reserves as of the Forecasted Effective Date using the strip pricing of oil and natural gas as of March 22, 2016 to be approximately $580

---

[101]    *See* Section V.B.2, *infra*.
[102]    Cecil Initial Report ¶ 46; Zelin Initial Report ¶ 20(b).
[103]    Cecil Initial Report ¶ 23; Zelin Initial Report ¶ 20(c).

million to $760 million (with a midpoint of $670 million).[104]    The Committee's expert, Mr.

Zelin, then submitted his analysis, dated May 25, 2016, using the strip pricing of oil and natural

gas as of May 20, 2016, estimating the value of the Reserves as of the Forecasted Effective Date

to be approximately $365 million to $880 million (with a midpoint of $687 million).[105]    Pursuant

to a so-called "Strip Pricing Protocol" agreement between the Committee and the Debtors,[106]

both Mr. Cecil and Mr. Zelin then provided updated estimates of the value of the Reserves as of

the Forecasted Effective Date using the strip pricing of oil and natural gas as of June 10, 2016:

Mr. Cecil estimated the value of the Reserves to be approximately $700 to $900 million (with a

midpoint of $800 million) and Mr. Zelin estimated the value of the Reserves to be $726

million.[107]    Finally, both Mr. Cecil and Mr. Zelin provided updated reports on July 11, 2016

indicating that (i) strip pricing had not materially changed between June 10, 2016 and July 7,

2016 and (ii) accordingly, the estimates generated using the June 10, 2016 strip pricing did not

require updating.[108]    The Court therefore has been provided with different estimates of the value

of the Reserves at the Forecasted Effective Date based on strip pricing data as of multiple dates

between March 2016 and July 2016.[109]

    While the Debtors urge the Court to focus primarily on the calculations based on the

March 22, 2016 strip price but also to give consideration to the calculations based on the more

recent strip price, the Committee argues that the Court must rely exclusively on the "most up to

---

[104]        *See* Cecil Initial Report ¶ 11.
[105]        *See* Zelin Initial Report, Ex. IV.
[106]        *See* Committee's July 11, 2016 Letter [Dkt. No. 1322] (the "Committee's Strip Pricing Brief") (referencing the Strip Pricing Protocol); Debtors' July 11, 2016 Letter [Dkt. No. 1323] (the "Debtors' Strip Pricing Brief") (same).
[107]        *See* Cecil Supplemental Report; Zelin Supplemental Report, Ex. II.
[108]        *See* Cecil Second Supplemental Report; Zelin Second Supplemental Report.
[109]        The Committee urges the Court to use estimates based on the June 10, 2016 strip pricing to the exclusion of estimates based on pre-June 10 strip pricing, while the Debtors submit that the Court should review and consider all of the estimates to determine the reasonableness of the Settlement.

date" strip pricing available.[110]  Although the Confirmation Hearing did not conclude until July

13, 2016, the Committee takes the position that, in the absence of a material change in pricing,

the appropriate strip price to use in considering confirmation of the Plan is the June 10, 2016

strip price because it was the "most up-to-date information available . . . as of the start of the

confirmation hearing."[111]  As reflected in the various calculations of the value of the Reserves

based on various strip pricing assumptions identified above, use of the June 10, 2016 strip price

(instead of the March 22, 2016 strip price) results in an increase in the value of the Reserves as

of the Forecasted Effective Date and a downward adjustment to the Collateral Diminution of

$102 million.[112]

### d. Encumbrance Analysis

In order to calculate the portion of the value of the Reserves that constitutes value of the

Collateral, the Committee engaged the law firm of Porter Hedges LLP ("Porter Hedges") to

conduct an encumbrance review of the Debtors' records and related mortgage documentation.[113]

Based on Porter Hedges' encumbrance review, Mr. Kearns states that he determined, in the

aggregate, that 81.7 percent of the Reserves were encumbered as of the Petition Date.[114]  Mr.

Kearns did not reach any conclusion with respect to the aggregate percentage of wells that were

encumbered as of the Forecasted Effective Date.  Mr. Zelin, purporting to rely on the work of

Porter Hedges and Mr. Kearns,[115] applied an 84 percent aggregate encumbrance percentage as of

---

[110]    Committee's Strip Pricing Brief [Dkt. No. 1322].
[111]    *Id.*
[112]    *See* Zelin Bridge, Appendix A.
[113]    *See generally* Gibson Decl. (describing the work performed by Porter Hedges).
[114]    Kearns Initial Report ¶ 21.
[115]    Zelin Initial Report ¶ 26(d) (stating that "[a]t counsel's direction, PJT relied upon the lien analysis undertaken by Porter Hedges and BRG" and did "not independently validate[] the conclusions reached by Porter Hedges or BRG.").

the Petition Date and a 79 percent aggregate encumbrance percentage as of the Forecasted Effective Date.[116]

In arriving at these encumbrance percentages, the Committee adopted Mr. Mitchell's assumption that Reserves subject to the Second Lien Lenders' Preference Claims and the County Leases issue are unencumbered but also assumed that the Reserves subject to the Potentially Defective Recording Leases, the Unitized Leases, and the RBL Lenders' Preference Claims (each as defined below) are unencumbered.[117]   According to the Committee, the use of its encumbrance analysis instead of that of the Debtors results in a downward adjustment of approximately $16 million to the amount of the Collateral Diminution.

### e.   Postpetition Adequate Protection Payments and Application of Swap Payments

As described above, the Debtors deducted from the RBL Lenders' Adequate Protection Claim $40.8 million of postpetition payments made by the Debtors to the RBL Lenders as adequate protection payments after the RBL Lenders became undersecured in October 2015, as estimated by the Debtors.  Because the Committee takes the position that the RBL Lenders were undersecured as of the Petition Date, it argues that an additional $15 million of postpetition payments made prior to October 2015 should also be deducted from the RBL Lenders' Adequate Protection Claim.

In addition, the Committee argues that the $24.3 million of Swap Payments that Mr. Mitchell deducted from the outstanding principal amount of the RBL Lenders' claim should

---

[116]        *See* Zelin Supplemental Report, Ex. IV.  The Debtors argue that Mr. Zelin's encumbrance percentage as of the Forecasted Effective Date is not supported by the analyses of either BRG, which analyzed only the Petition Date encumbrance, or Porter Hedges, which has not provided any opinion with respect to aggregate encumbrance percentages.
[117]        *See* July 13, 2016 Hr'g Tr. 259:11-15 (Weiner) ("The bottom line, we would say, is if you take Mr. Mitchell['s encumbrance analysis] and you adjust for these three issues – defective recording leases, unrecorded leases, and unitized leases – that gets you to the Zelin percentages.").

instead be deducted from the RBL Lenders' Adequate Protection Claim. Doing so would have no net effect on Mr. Mitchell's calculations; however, because the Committee posits that the RBL Lenders were undersecured as of the Petition Date, deducting the amount of the Swap Payments from the RBL Lenders' claim for amounts owed pursuant to the RBL Credit Agreement, under the assumption that the Committee is correct, would reduce by $24.3 million the RBL Lenders' deficiency claim, not their Adequate Protection Claim. The Committee argues that the Debtors' interpretation of the Final Cash Collateral Order ignores the proviso to the requirement that the Swap Payments reduce the RBL Lenders' claim, which states that the Swap Payments should be "unwound if the Court . . . finds that such payments unduly disadvantaged the Debtors or unsecured creditors."[118]    Because the RBL Lenders were undersecured at the Petition Date, the Committee contends, merely reducing the RBL Lenders' unsecured deficiency claim by the amount of the Swap Payments would unduly disadvantage unsecured creditors in comparison to reducing the RBL Lenders' claim. Therefore, the Committee contends that the $24.3 million of Swap Payments should reduce the RBL Lenders' Adequate Protection Claim, not the amount of the RBL Lenders' claim for outstanding principal due and owing pursuant to the RBL Credit Agreement.

### f.    Postpetition Mineral Lien Payments

The Committee further challenges the Debtors' Collateral Diminution calculation on the basis that $17 million in certain postpetition payments made by the Debtors to lienholders whose liens arguably have priority over the liens of the RBL Lenders in effect increased the value of the Prepetition Collateral. The Committee argues the $17 million paid pursuant to a Court order[119]

---

[118]    Final Cash Collateral Order ¶ 3(g).
[119]    *See* Amended Final Order Authorizing Payment of (I) Operating Expenses, (II) Joint Interest Billings, (III) Shipper and Warehousemen Claims, and (IV) Section 503(b)(9) Claims [Dkt. No. 419].

has not been reimbursed, and, therefore, the RBL Lenders' Adequate Protection Claim must be reduced dollar-for-dollar by that amount. Mr. Zelin testified that he deducted $17 million from the RBL Lenders' Adequate Protection Claim based on advice of counsel for the Committee, and that he did not conduct his own analysis of the issue.[120] The Committee cites no authority for its position.[121]

**B.    Estimates of Potential Bucket II Claims Recoveries**

In addition to settling the Adequate Protection Claims, the Settlement resolves all disputes included in the Bucket II Claims. The Debtors maintain that a settlement of the Bucket II Claims provides significant value to unsecured creditors that would otherwise not be available due to the size of the RBL Lenders' Adequate Protection Claim.[122] According to the Debtors, a resolution of the Bucket II Claims avoids the significant cost and delay associated with litigating these issues with the RBL Agent, the RBL Lenders, the Second Lien Agent, and the Second Lien Lenders, each of whom would vigorously defend its positions with respect to the Bucket II Claims.[123] Based on Mr. Cecil's $550 million total enterprise value, the Debtors estimate that (i) the maximum potential amount which could be recovered on account of the Bucket II Claims is $192.7 million without accounting for any risk and (ii) the risk-adjusted maximum amount which could be recovered on account of the Bucket II Claims is $89.1 million. Based on Mr. Zelin's $726 million total enterprise value, the Debtors estimate that (a) the maximum potential amount which could be recovered on account of the Bucket II Claims is $230.4 million without accounting for any risk and (b) the risk-adjusted maximum amount which could be recovered on account of the Bucket II Claims is $108.8 million.

---

[120]    *See* July 7, 2016 Hr'g Tr. 197:8-18; 197:19-23 (Zelin).
[121]    *See* Committee Obj. ¶ 43.
[122]    Disclosure Statement, p. 49.
[123]    *Id.*

The Committee does not dispute these maximum potential amounts; indeed, Mr. Kearns testified that he did not disagree with the methodology used by Mr. Mitchell in calculating them. The Committee, however, contends that the Debtors understate the risk adjustments (*i.e.*, the Committee's chance of success on the merits) and in doing so, underestimate the amounts that could be recovered from litigating the Bucket II Claims. The Committee did not provide its own risk-adjusted amounts for the Bucket II Claims based on Mr. Cecil's $550 million enterprise value; however, based on Mr. Zelin's $726 million enterprise value, the Committee estimates that the risk-adjusted maximum amount which could be recovered on account of the Bucket II Claims should be $120.1 million. Mr. Kearns' calculations of the risk-adjusted amounts of the Bucket II Claims utilized the same risk adjustments that the Debtors used for nine of the ten Bucket II Claims. The only Bucket II Claim for which Mr. Kearns assumed a chance of success different from the Debtors' proposed chance of success (100 percent instead of the Debtors' five percent) is the RBL Lenders' Preference Claim (as defined below), based on the Committee's position that the RBL Lenders were undersecured as of the Petition Date. The Committee did not present an independent view of the estimated chances of success for the other Bucket II Claims.

Neither the Debtors nor the Committee disputes that (i) the potentially recoverable amounts on account of the Bucket II Claims must be reduced by litigation costs;[124] and (ii) the value of certain Bucket II Claims is directly tied to the value of the Reserves (*i.e.*, the potentially

---

[124]     At the Confirmation Hearing, Mr. Mitchell estimated that the cost of litigating the Bucket II Claims and the Adequate Protection Claims would amount to $25 million in litigation costs. According to Mr. Mitchell, $25 million was a reasonable midpoint based on Zolfo Cooper's "recent experience with the cost of litigation" and based on "discussions with counsel." *See* June 22, 2016 Hr'g Tr. 124:23-125:9 (Mitchell); *see* Mitchell Rebuttal Report ¶ 45 ("Second, these unencumbered assets would be subject to a reduction for forecasted litigation costs and additional professional fees of approximately $15 million to $20 million on behalf of Bucket Two Claims and $5 million to $10 million on behalf of adequate protection claims, for a total of approximately $25 million in costs."). Although the Committee presented a view that litigation costs would amount to $5 million, none of the Committee's experts provided testimony to support the proposition that $5 million was a reasonable estimate.

recoverable amounts on account of certain Bucket II Claims increase when the value of the Reserves increases). The Bucket II Claims that are directly tied to the value of the Reserves are: Bucket II Unencumbered Assets, Unitized Leases and After-Acquired Unitized Leases, Potentially Defective Recording Leases, County Leases, RBL Lenders' Preference Claims, and Second Lien Lenders' Preference Claims (each as defined below). A discussion of each of the Bucket II Claims, including the parties' positions with respect thereto, is outlined below. For each Bucket II Claim summary, the maximum amount potentially recoverable on account of each Bucket II Claim and the risk-adjusted amount potentially recoverable on account of each Bucket II Claim are based on Mr. Zelin's $726 million enterprise value using June 10, 2016 strip pricing.

### 1. Bucket II Unencumbered Assets

This Bucket II Claim ("Bucket II Unencumbered Assets") relates to allegedly unencumbered wells located in counties in which no mortgage was filed by the Prepetition Secured Lenders. According to Mr. Mitchell, these unencumbered wells are primarily located in the Debtors' Woodardville field in Red River, Louisiana.[125] The Debtors and the Committee agree that the total maximum amount potentially recoverable on account of this Bucket II Claim is $24.3 million. Neither the Debtors nor the Committee provided an estimated chance of success on this issue.

### 2. Disputed Cash

On February 25, 2015, the Company drew down substantially all of the remaining availability under the RBL Credit Agreement in an attempt to secure additional liquidity, fund ordinary course business operations, and preserve optionality in the event of a restructuring (the

---

[125]    Mitchell Initial Report ¶ 105.

"Revolver Draw").  The Debtors placed the funds from the Revolver Draw into the Debtors'

main operating account (the "Operating Account").  Between the time of the Revolver Draw and

the Petition Date, (i) the funds from the Revolver Draw; (ii) the Debtors' unencumbered cash

from operations; and (iii) the Debtors' encumbered cash proceeds of Prepetition Collateral were

commingled in the Operating Account.  As of the Petition Date, the Operating Account had a

balance of approximately $252 million, which amount the Debtors contend comprised the

"Disputed Cash."  The RBL Agent disagrees with the position of the Debtors and the Committee

with respect to whether the Disputed Cash was encumbered or unencumbered, arguing that its

liens on the Debtors' personal property include the Disputed Cash and that the Disputed Cash is

subject to a constructive trust.  The Debtors and the Committee, however, assert that all of the

Disputed Cash was unencumbered as of the Petition Date.

       The Committee also contends that the Disputed Cash balance will be approximately

$21.3 million as of the Forecasted Effective Date.[126]  The Kearns Initial Report explains that the

Company's cash is segregated in a separate account for the benefit of the RBL Lenders on a

monthly basis and is calculated as monthly net operating results, less capital expenditures

attributable to encumbered wells for the postpetition period, as determined by the Debtors.[127]

According to Mr. Kearns, the Committee's lien analysis concluded that 81.7 percent of proved

reserves were encumbered as of the Petition Date.[128]  As a result of the Committee's lien

analysis, Mr. Kearns calculated that the Disputed Cash balance would be approximately $21.3

million as of the Forecasted Effective Date.  However, for purposes of his analysis of the Bucket

---

[126]     Committee Obj. ¶ 48.
[127]     Kearns Initial Report ¶ 19.
[128]     Kearns Initial Report ¶ 21.

II Claims, Mr. Kearns stated that he did not utilize this $21.3 million figure and instead adopted the $8.4 million figure forecasted by the Debtors.[129]

Although the RBL Lenders continue to disagree with both the Debtors' analysis and the Committee's analysis, they have agreed to settle this claim as part of the Plan. The Debtors state that the total maximum amount potentially recoverable on account of this Bucket II Claim is $8.4 million (which is disputed by Mr. Kearns but nonetheless adopted by him for the purpose of his Bucket II Claims analysis). After applying a ninety percent chance of success, the Debtors estimate that a maximum of $7.6 million is recoverable on account of this Bucket II Claim.

### 3. Bucket II Unallocated G&A

This Bucket II Claim ("Bucket II Unallocated G&A") represents a claim for general and administrative expenses incurred by the Debtors after the Petition Date that were paid by the Debtors using Disputed Cash. Paragraph 11 of the Final Cash Collateral Order provides that the Debtors and the Committee reserved their respective rights to assert that a portion of the Unallocated G&A (as defined in the Final Cash Collateral Order)[130] should be, or should have been, payable from the Segregated Cash Collateral[131] and the Prepetition Secured Lenders reserved their rights to oppose such relief.[132] The Committee argues that general and administrative costs incurred by the estates during the case that are not otherwise allocated at the well-by-well level should be charged to the Segregated Cash Collateral. The Committee contends that this approach is appropriate because the general costs of the business (including

---

[129]    Kearns Initial Report ¶ 22.
[130]    *See* Final Cash Collateral Order ¶ 11 (defining "Unallocated G&A" as 100 percent of the Debtors' other general and administrative expenses as permitted by and in accordance with the Budget).
[131]    *See* Final Cash Collateral Order ¶ 12 (defining "Segregated Cash Collateral" as "all cash proceeds of the Prepetition Collateral (other than the Disputed Cash) (i) held in the Operating Account on the Petition Date (including the proceeds of joint interest billings arising under joint operating agreements related to the Hydrocarbon Properties) or (ii) received by the Debtors on or after the Petition Date as determined based on net lease operating statements and net accrued capital expenditures beginning with the month of June 2015[.]").
[132]    *See* Final Cash Collateral Order ¶ 11.

corporate overhead and senior executive compensation programs that the RBL Lenders supported) should not be borne solely by unsecured creditors who are receiving a minimal recovery under the Plan. Therefore, the Committee asserts that the costs of the case should be borne proportionately to the benefit received – in this case, by the ratio of encumbered to unencumbered asset value. The RBL Lenders disagree.

At the STN Hearing, the Committee asserted that 82 percent of the Debtors' Unallocated G&A (as defined in the Final Cash Collateral Order) should be allocated to the encumbered wells. The Debtors posit that, if the Committee is correct, there would be $27.4 million of Disputed Cash on the Forecasted Effective Date in addition to the approximately $8.4 million of Disputed Cash reflected in the Debtors' forecast. The Debtors have adopted the Committee's $27.4 million figure in their analysis of this Bucket II Claim issue, despite the fact that the Debtors do not agree that 82 percent of the Unallocated G&A (as defined in the Final Cash Collateral Order) can or should be allocated to the encumbered wells. After applying a fifty percent chance of success, the Debtors estimate that a maximum of $13.7 million is recoverable on account of this Bucket II Claim.

### 4.  Unitized Leases and After-Acquired Unitized Leases

Certain of the Debtors' predecessors-in-interest granted security interests in favor of the RBL Agent in properties that now belong to the Debtors pursuant to several mortgage documents (collectively, the "RBL Mortgages") and granted mortgages on substantially the same properties to the Second Lien Agent (collectively, the "Second Lien Mortgages"). Each of the RBL Mortgages and the Second Lien Mortgages at issue contains a clause that specifically grants a security interest in "[a]ll rights, titles, interests and estates now owned or hereafter acquired by [the Debtors] in and to (i) the properties now or hereafter pooled or unitized with the

42

Hydrocarbon Property" (each such clause, a "Unitization Clause").[133]   The Unitization Clause relates to certain "unitized" oil and gas leases (collectively, the "Unitized Leases").   The Unitization Clause also purports to grant a security interest in all after-acquired leases pooled or unitized with such Hydrocarbon Properties (collectively, the "After-Acquired Unitized Leases" and, together with the Unitized Leases, the "Unlisted Leases").

The RBL Agent and the Second Lien Agent assert that they have valid, perfected mortgages on all of the Unlisted Leases under Texas law.   The Committee, on the other hand, argues that, as a matter of Texas law, the liens held by the RBL Agent and the Second Lien Agent do not extend to any of the Unlisted Leases; the Committee did not present any evidence at the Confirmation Hearing relating to this Bucket II Claim.

The Debtors have estimated that there is an approximately fifteen percent chance that the Debtors would be successful in demonstrating that the prepetition liens held by the RBL Agent and the Second Lien Agent do not extend to the Unitized Leases, and a fifty percent chance of demonstrating that the prepetition liens held the RBL Agent and the Second Lien Agent by do not extend to the After-Acquired Unitized Leases, for a blended success rate of 32.5 percent.   Per the Debtors, the total maximum amount potentially recoverable on account of this Bucket II Claim, without accounting for litigation risk, is $19 million.   After applying a 32.5 percent chance of success, the Debtors estimate that a maximum amount of $6.2 million would be recoverable on account of this Bucket II Claim.

### 5.   Potentially Defective Recording Leases

Certain of the Debtors' predecessors-in-interest filed mortgages on their oil and gas leases and wells in favor of the Prepetition Secured Lenders.   The Committee has identified 199

---

[133]       Post-Merger Sabine Oil & Gas Deed of Trust, Fixture Filing, Assignment of As- Extracted Collateral, Security Agreement and Financing Statement (Ex. 1397) p. 2.

of such leases that were or may have been included in the lease schedules attached to the RBL Mortgages or the Second Lien Mortgages, but allegedly include defective descriptions of the property covered by such mortgages (collectively, the "Potentially Defective Recording Leases").

The Debtors have concluded that any errors or omissions are minor and insufficient to render the mortgages ineffective inasmuch as the collateral is still clearly identifiable, and they assert that the total maximum amount potentially recoverable on account of this Bucket II Claim, without accounting for litigation risk, is $5.5 million.  After applying a thirty percent chance of success, the Debtors estimate that a maximum of $1.6 million would be recoverable on account of this Bucket II Claim.

### 6.  County Leases

This Bucket II Claim (the "County Leases issue") arose as a result of the Prepetition Secured Lenders' assertion that they hold a valid mortgage on all 3,338 of the leases located in the counties in which the RBL Mortgages and the Second Lien Mortgages were filed (the "County Leases").  The Prepetition Secured Lenders assert that the broadly-drafted granting clauses in each of the RBL Mortgages and the Second Lien Mortgages provide the Prepetition Secured Lenders with perfected blanket liens on all of the Debtors' real property interests located in the counties in Texas in which an RBL Mortgage or a Second Lien Mortgage has been recorded and that the RBL Mortgages and the Second Lien Mortgages satisfy the Statute of Frauds under Texas law.

The Debtors acknowledge that the granting clause in the RBL Mortgages and the Second Lien Mortgages is broadly drafted.  In light of the recent decision of the United States

Bankruptcy Court for the District of Delaware in *In re Quicksilver Res., Inc.*,[134] which applied Texas law in upholding a blanket lien on real property interests, the Debtors have revised their earlier conclusion and now believe that a court would likely find that the County Lease Granting Clause (as defined below) effectively covers and grants a lien in all of the Debtors' oil and gas leases in each county in which an RBL Mortgage and a Second Lien Mortgage were filed – not just those counties set forth on Exhibit A to the RBL Mortgages and the Second Lien Mortgages. The Committee challenges the Debtors' reliance on *Quicksilver* and contends that the critical facts and underlying mortgages here are substantially different from those in *Quicksilver*.

The total maximum amount potentially recoverable on account of this Bucket II Claim, without accounting for litigation risk, is $93.1 million. After applying a fifty percent chance of success, the Debtors estimate that a maximum of $46.5 million is recoverable on account of this Bucket II Claim.

### 7. Personal Property Liens

The RBL Lenders assert that they have blanket liens on all of the Debtors' personal property, including general intangibles, accounts, inventory, and as-extracted collateral, whether or not related to hydrocarbons. According to the Debtors, the language of the RBL Mortgages and the Second Lien Mortgages includes only personal property related to the mortgaged hydrocarbons in the Prepetition Secured Lenders' collateral package and, accordingly, the Prepetition Secured Lenders would likely not prevail in asserting liens over personal property unrelated to the mortgaged hydrocarbons. The personal property at issue consists of (i) unused pipe for transporting oil and gas; (ii) undeveloped leased and owned acreage; (iii) office equipment; (iv) various field locations; and (v) thirty-seven trucks used by field personnel. At

---

[134]    *In re Quicksilver Res., Inc.*, 544 B.R. 781 (Bankr. D. Del. 2016) (LSS) (hereinafter "*Quicksilver*").

the outset of the negotiations with the RBL Lenders, the Debtors estimated that the total value of

such personal property could be as much as $15 million.  However, after further analysis, the

Debtors adjusted this figure to $6.8 million.  The Committee has not disputed the Debtors' $6.8

million figure.[135]  Neither the Debtors nor the Committee has provided an estimated chance of

success on this issue.

### 8. RBL Lenders' Preference Claims and Second Lien Lenders' Preference Claims

The Debtors have considered whether the liens granted to the RBL Lenders (the "RBL

90-Day Mortgages") and the Second Lien Lenders (the "Second Lien 90-Day Mortgages" and

together with the RBL 90-Day Mortgages, the "90-Day Mortgages") pursuant to their respective

forbearance agreements could be avoided as preferential transfers under section 547(b) of the

Code.  These two buckets of claims are (i) the "RBL Lenders' Preference Claims," which refers

to litigation involving potential preferential transfer claims on account of the RBL 90-Day

Mortgages and (ii) the "Second Lien Lenders' Preference Claims," which refers to litigation

involving potential preferential transfers on account of the Second Lien 90-Day Mortgages.

The Debtors' estimated maximum amount potentially recoverable on account of the RBL

Lenders' Preference Claims, without accounting for litigation risk, is $12 million.  The Debtors

estimate that they would have less than a five percent chance of success on this issue and

conclude that $0.6 million is the risk-adjusted maximum potential amount recoverable on

account of this Bucket II Claim.  The RBL Lenders' Preference Claims are the only Bucket II

Claim for which the Committee provided a risk-adjusted amount different from that proposed by

the Debtors.  Because the Committee asserts that the RBL Lenders were undersecured as of the

---

[135]    July 5, 2016 Hr'g Tr. 165: 10-12 (Kearns) (Q: "Do you have a view as to whether the 6.8 is the right number?" A: "I've adopted the Debtors' 6.8 number.").

Petition Date, the Committee forecasts a 100 percent chance of success on this claim, resulting in a risk-adjusted total maximum amount of $12 million.

While the Debtors and the Committee do not provide an estimated chance of success with respect to avoiding the liens granted to the Second Lien Lenders on account of the Second Lien 90-Day Mortgages, the Debtors have forecasted that the total maximum amount recoverable with respect to the Second Lien Lenders' Preference Claims is $1.5 million.

### 9.  Swap Payments

Prior to the Petition Date, the Company or one of its predecessors-in-interest entered into ISDA Master Agreements (collectively, and as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Swap Agreements") with seven financial institutions (collectively, the "Swap Counterparties") to hedge the pricing risk associated with floating commodity prices.   Prior to or shortly after the Petition Date, each of the Swap Counterparties terminated their Swap Agreements with Sabine.  Two of the Swap Counterparties – Huntington National Bank ("Huntington") and Merrill Lynch Commodities ("ML Commodities") – terminated their Swap Agreements on July 16, 2015 and July 15, 2015, respectively.   Both Huntington and ML Commodities remitted to the Debtors the Swap Payments, cash proceeds that resulted from the termination of their respective Swap Agreements. Upon receiving the Swap Payments, the Debtors remitted the Swap Payments to the RBL Agent, who then applied such proceeds to reduce the principal amount outstanding under the RBL Credit Agreement.

Pursuant to the Final Cash Collateral Order, the postpetition payment of swap amounts to the RBL Lenders, and concomitant reduction in the principal amount owed to the RBL Lenders under the RBL Credit Agreement, can only be unwound if such payments "unduly

disadvantaged" the unsecured creditors.[136]  The Debtors assert that the Swap Payments did not unduly disadvantage unsecured creditors because (i) such payments were contemplated, and approved, as adequate protection payments to the RBL Lenders and were made pursuant to the Final Cash Collateral Order; (ii) the RBL Lenders were oversecured on the Petition Date and the Swap Payments reduced the principal amount of the RBL Lenders' claims and therefore, the Swap Payments are net neutral to, rather than disadvantageous to, unsecured creditors; and (iii) due to the substantial adequate protection liens and claims of the Prepetition Secured Lenders, even if the Swap Payments were to be unwound or clawed back, the RBL Lenders' adequate protection liens and claims would increase in an amount equal to the unwound amount and, thereafter, the RBL Lenders would recover such amounts with respect to their adequate protection liens and claims.

The Debtors argue that the Committee, in its analysis, erroneously reduces the RBL Lenders' Adequate Protection Claim by reducing such claim by the $24 million Swap Payments, pointing out that under the Final Cash Collateral Order, it is the RBL Lenders' claim for principal amounts due and owing under the RBL Credit Agreement as of the Petition Date that should be reduced (from $927 million to $903 million).  Notwithstanding the disagreement, the Debtors and the Committee agree that the total amount of the Swap Payments is $24.3 million. The Debtors estimate that they would have a less than a 2 percent chance of success on this issue and estimate that $0 is recoverable on account of this Bucket II Claim.

## V.    The Confirmation Hearing

The confirmation hearing on the Plan (the "Confirmation Hearing") took place over twelve days, beginning on June 13, 2016, and concluding with approximately ten hours of

---

[136]    *See* Final Cash Collateral Order ¶ 3(g).

closing arguments held on July 13, 2016.   At the Confirmation Hearing, the following nine witnesses gave live testimony: (i) Mr. David J. Sambrooks; (ii) Mr. David Cecil; (iii) Mr. James Seery; (iv) Mr. Brandon Aebersold; (v) Mr. Michael Magilton; (vi) Mr. Jonathan (Joff) A. Mitchell; (vii) Mr. Adrian A. Reed; (viii) Mr. Christopher J. Kearns; and (ix) Mr. Steven M. Zelin.   Admitted into the record were the declarations of each of the witnesses as well as the Declaration of Anders T. C. Gibson in Support of the Committee Objection[137] and deposition designations of Mr. Gibson.   Finally, several hundred exhibits and hundreds of pages of demonstratives were made part of the record of the Confirmation Hearing.

On July 27, 2016, the Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* [Dkt. No. 1358, as corrected by Dkt. No. 1359] (the "Confirmation Order").[138]   The Committee has filed an appeal of the Confirmation Order [Dkt. No. 1360][139] and the following indenture trustees have also appealed the Confirmation Order:  (i) The Bank of New York Mellon Trust Company, N.A., as Indenture Trustee for the 2017 Notes [Dkt. No. 1374]; (ii) Wilmington Savings Fund Society, FSB, as Indenture Trustee for the 2019 Notes [Dkt. No. 1375]; and (iii) Delaware Trust

---

[137]     Dkt. No. 1331.

[138]     At the July 27, 2016 hearing, counsel for the Committee made an oral motion for a stay pending appeal of the Confirmation Order.  After hearing argument from the Committee, the Debtors, and the RBL Agent, the Court denied the Committee's oral motion.  *See* July 27, 2016 Hr'g Tr. 40:2-80:12.  The Committee then moved for a stay pending appeal in the United States District Court for the Southern District of New York.  Following expedited briefing and oral argument held on August 8, 2016, District Judge Koeltl denied the Committee's motion.  *See Official Comm. of Unsecured Creditors v. Sabine Oil & Gas Corp., et al. (In re Sabine Oil & Gas Corp.)*, No. 1:16-cv-06054 (JGK) [Dkt. No. 29] (S.D.N.Y. Aug. 9, 2016).  The Committee then moved for an emergency stay of the Confirmation Order in the United States Court of Appeals for the Second Circuit; the Committee's motion was denied.  *See Official Comm. of Unsecured Creditors v. Sabine Oil & Gas Corp., et al. (In re Sabine Oil & Gas Corp.)*, No. 16-2187 [Dkt. No. 113] (2d Cir. Aug. 10, 2016).

[139]     *See Official Comm. of Unsecured Creditors v. Sabine Oil & Gas Corp., et al. (In re Sabine Oil & Gas Corp.)*, No. 1:16-cv-06054 (JGK).

Company, as Indenture Trustee for the 2020 Notes [Dkt. No. 1376]. A motion to consolidate the aforementioned appeals has been filed.[140]

### A.    Confirmation Testimony

### 1.    Mr. David J. Sambrooks

Mr. Sambrooks is the President, Chief Executive Officer, and Chairman of the Board of Sabine. His thoughtful and deliberate testimony over the course of two days included (i) a summary of the negotiation process leading up to the Plan; (ii) his understanding of the standards developed by COPAS for evaluating the allocation of various operating expenses on a well-by-well basis; and (iii) a comprehensive overview of the Debtors' process for evaluating the predictability of production for the wells located in the Haynesville and Cotton Valley plays in East Texas. Reflecting his unflagging commitment to the reorganization of Sabine, Mr. Sambrooks was present in the courtroom for the entirety of the Confirmation Hearing.

Mr. Sambrooks provided a brief description of the Debtors' business, stating that natural gas reserves comprise eighty-five percent of the Company's reserves and the majority of the value lies in the Company's proved, developed producing (1P) wells.[141] Mr. Sambrooks explained that the Company's reservoir engineers employ the SPEE industry-standard methodology to evaluate the predictability of the Company's wells, the majority of which are located in "unconventional"[142] plays concentrated in East Texas.[143] The projections are then

---

[140]    *See In re Sabine Oil & Gas Corp.*, No. 1:16-cv-06385 (UA) [Dkt. No. 6].

[141]    *See* June 13, 2016 Hr'g Tr. 164:15-168:17 (Sambrooks).

[142]    Generally, unconventional plays are areas in which hydrocarbons still in the ground are spread over a large area of homogenous geology and where extraction of the hydrocarbons requires drilling and completion methods beyond what a typical play requires, such as hydraulic fracturing techniques. *See* June 13, 2016 Hr'g Tr. 165:15-23 (Sambrooks); June 20, 2016 Hr'g Tr. 13:1-7 (Cecil).

[143]    *See* Sambrooks Rebuttal Report ¶¶ 16-22; June 13, 2016 Hr'g Tr. 165:1-3 (Sambrooks).

entered into the ARIES Database and are typically updated at the end of each year.[144]    Mr.

Sambrooks testified that the Debtors verify the accuracy of their projections for the proved

reserves by submitting the ARIES Database to an independent reservoir engineering consultant,

Ryder Scott Petroleum Consultants ("Ryder Scott").    Once Ryder Scott completes its

independent evaluation of the Company's proved reserves, it returns the ARIES Database to the

Company and provides the Company with a certified reserve report.    The Company typically

conducts a variance analysis upon receiving Ryder Scott's evaluation; Mr. Sambrooks stated that

the variance analysis for 2015 resulted in a .5 percent variation, meaning that the production

projections of the Company and Ryder Scott were "essentially the same."[145]

Moreover, based on his extensive experience as a reservoir engineer, Mr. Sambrooks

stated his opinion that the Haynesville and Cotton Valley plays are among the "most predictable

plays" that he has seen in his career due to their geologic characteristics and the substantial

amount of subsurface and production information available with respect to these plays.[146]    In his

rebuttal report to the report of Mr. Reed, Mr. Sambrooks explained that the industry-standard

methodology to assess the predictability of unconventional assets is provided by the SPEE[147] and

instructs using ratios measuring well performance generally normalized for lateral length of the

well in the case of horizontal wells.[148]    In that same report, Mr. Sambrooks explained that Mr.

Reed's method of assessing predictability of the Debtors' assets using the number of wells

---

[144]    *See* June 13, 2016 Hr'g Tr. 168:25-171:16 (Sambrooks).  According to Mr. Sambrooks, the Debtors utilize the ARIES Database for various functions including, but not limited to (i) managing the Debtors' business; (ii) valuing the Debtors' assets; (iii) creating an annual budget; and (iv) storing historical information on a well-by-well basis.

[145]    June 13, 2016 Hr'g Tr. 194:23-196:7 (Sambrooks).  Mr. Sambrooks testified that the team who prepares the projections for the Debtors' proved reserves also prepares the projections for the Debtors' probable (2P) and possible (3P) reserves.

[146]    June 13, 2016 Hr'g Tr. 188:18-189:22 (Sambrooks).

[147]    Sambrooks Rebuttal Report ¶¶ 16-18 (citing SPEE Monograph 3, "Guidelines for the Practical Evaluation of Undeveloped Reserves In Resource Plays").

[148]    Sambrooks Rebuttal Report ¶ 18.

drilled in certain plays does not conform to the SPEE's industry-standard methodology.[149]  Mr. Sambrooks also stated his opinion that there is no basis to use, as Mr. Reed did, the Wood Mackenzie Report's classification of certain Haynesville assets as "Tier II" to conclude that such assets are less predictable than other Haynesville assets because "Wood Mackenzie's tiers relate to productivity, not predictability" based on a review of the well economics and natural geological constraints" of Tier II assets as compared to Tier I Haynesville assets.[150]

Furthermore, in the Sambrooks Rebuttal Report, Mr. Sambrooks challenged the validity of Mr. Reed's "regression analysis" which, according to Mr. Reed, was based on data from sixty-one wells.  Mr. Sambrooks expressed his opinion that Mr. Reed's conclusions were in fact based on only two data points within that regression.[151]  Mr. Sambrooks also challenged Mr. Reed's conclusions arising from a comparison of type curves, explaining that Mr. Reed simply compared the Debtors' type curves to type curves that he himself had generated for wells in Haynesville and Cotton Valley, a comparison that does not demonstrate how the Debtors' type curve projections compare to recent well results.[152]  Mr. Sambrooks opined that Mr. Cecil's use of the mid-RAF and high-RAF customized range was appropriate.

Mr. Sambrooks pointed out that among the costs included in the cash flow projections of the ARIES Database are COPAS Charges.  According to Mr. Sambrooks, COPAS establishes guidelines for assigning indirect overhead costs on a well-by-well basis and such overhead costs include, among other things, inventory, human resources, and procurement.  Mr. Sambrooks explained that pursuant to the COPAS guidelines, only overhead costs that relate to the

---

[149]     Sambrooks Rebuttal Report ¶ 24.
[150]     Sambrooks Rebuttal Report ¶¶ 27-33.
[151]     Sambrooks Rebuttal Report ¶ 35.
[152]     Sambrooks Rebuttal Report ¶ 38.

maintenance and operation of the Company's reserves are allocated to the wells.[153]  Moreover,

the amount of COPAS Charges that is reflected in the ARIES Database for a particular well

depends, in part, on whether the well is jointly operated (*i.e.*, owned and operated by a third

party) or owned and operated entirely by Sabine.  With respect to wells that are jointly operated,

Mr. Sambrooks explained that the categories and allocation of COPAS Charges are negotiated

with the Company's joint interest partners and subsequently memorialized in a joint operating

agreement.  With respect to wells that are not jointly operated, Mr. Sambrooks explained that the

amount of COPAS Charges for such wells is determined by Sabine's reviewing COPAS Charges

allocated to comparable wells and then, in essence, charging itself an appropriate COPAS-based

amount.

Mr. Sambrooks briefly described the negotiation process leading up to the proposal of the

Plan.  He stated that, in the fall of 2015, the Debtors engaged in negotiations with their secured

lenders about the terms of a potential plan of reorganization.[154]  However, when the Debtors met

with the Committee in the fall of 2015, Mr. Sambrooks learned that the Committee wanted to

pursue a sale of the Debtors' assets in lieu of pursuing a plan of reorganization.[155]  Although the

RBL Lenders and the Second Lien Lenders had not supported the Standalone Plan filed in

January 2016, all of the Prepetition Secured Lenders supported the March 2016 Plan.  Mr.

Sambrooks explained that, unlike the Standalone Plan, the March 2016 Plan (i) did not

---

[153]    *See* June 13, 2016 Hr'g Tr. 178:20-180:12 (Sambrooks) (Q: "Then are you suggesting that there's a perfect dollar for dollar measurement of every hour that's spent at the corporate level that relates to an individual well and its operating management?" A: "No, it would, that would be very difficult to do and basically that's why, you know, over the years COPAS has developed these guidelines . . . that have been industry accepted for making that determination.").

[154]    According to Mr. Sambrooks' testimony and Debtors' Demonstrative 2, the board of directors of Sabine met nine times between August 2015 and March 2016 in order to "discuss the restructuring process."  *See* June 13, 2016 Hr'g Tr. 211:8-19 (Sambrooks); *see also* Debtors' Demonstrative 2.

[155]    *See* June 13, 2016 Hr'g Tr. 218:3-8 (Sambrooks) (Q: "Mr. Sambrooks, did representatives of the Committee communicate to you personally what course of action they thought the company should take?" A: "Yes, they did." Q: "And what did they communicate?" A: "They thought we should sell the company immediately.").

contemplate the allowance of a deficiency claim for the RBL Lenders and (ii) contained a provision for the distribution of the Tranche 1 Warrants for the Second Lien Lenders and the Tranche 2 Warrants for unsecured creditors.  Mr. Sambrooks stated that the Debtors continued negotiations and ultimately filed the Plan in April 2016, which was "materially consistent" with the March 2016 Plan.[156]  Mr. Sambrooks expressed his view that without a settlement of the Bucket II Claims, there would be no plan of reorganization and that the "plan would not be feasible without this settlement."[157]  Mr. Sambrooks believes that the Plan strikes a fair balance among the interests of the various creditor groups and provides a valuable distribution to unsecured creditors in light of his understanding that the RBL Lenders have an adequate protection claim that absorbs the entire value of the Debtors' unencumbered assets.

Lastly, Mr. Sambrooks gave testimony regarding strip pricing.  He explained that the "strip price" for oil and natural gas reflects market forecasts for prices based on forward contracts and is not necessarily a predictor of oil and gas market prices going forward.[158]  Upon questioning from counsel to the Committee, Mr. Sambrooks confirmed his understanding that commodity prices have increased in 2016; however, Mr. Sambrooks stated that such increases have not been material.  Moreover, although changes in commodity prices are taken into consideration when deciding whether to modify the Company's business plan, Mr. Sambrooks stated that commodity prices are merely one of several factors that are considered.[159]  Mr. Sambrooks also testified to the unpredictability of commodity prices and stated that it is difficult to predict how long an increase in commodity prices is going to continue or be sustained.[160]

---

[156]    June 13, 2016 Hr'g Tr. 233:19-21 (Sambrooks).
[157]    June 13, 2016 Hr'g Tr. 246:17-21 (Sambrooks).
[158]    June 14, 2016 Hr'g Tr. 15:18-16:14 (Sambrooks).
[159]    June 14, 2016 Hr'g Tr. 82:21-83:11; 83:22-84:4; 120:3-7; 121:22-24 (Sambrooks).
[160]    June 14, 2016 Hr'g Tr. 125:18-22 (Sambrooks).

Mr. Sambrooks' testimony reflected broad knowledge of the exploration and production industry and a deep mastery of virtually every facet of the Debtors' business, including the financial, strategic, and scientific aspects. It is also worth noting that Mr. Sambrooks pioneered horizontal drilling techniques,[161] a fact which underscores the credibility of his testimony about the quality and predictability of the Company's Reserves.

### 2. Mr. David Cecil

Mr. Cecil is a Managing Director at Lazard Frères & Co. LLC ("Lazard"). Over the past seventeen years, he has been involved in over 100 energy-related mergers and acquisitions, asset acquisitions and divestitures, financings, and other transactions, totaling over $25 billion in transaction value. Prior to testifying at the Confirmation Hearing, Mr. Cecil had never served as a testifying expert. The majority of Mr. Cecil's experience relates to asset acquisitions and divestitures, in which he has advised clients in connection with the purchase and sale of discrete oil and natural gas assets. Mr. Cecil's testimony comprehensively covered Lazard's calculation of the value of the Reserves as of the Petition Date and the Forecasted Effective Date, relying upon a NAV analysis as his principal methodology. Mr. Cecil also testified as to the total enterprise value of the Reorganized Debtors as of the Forecasted Effective Date, relying upon an NAV analysis as his principal methodology and a comparable company analysis as a secondary methodology.[162]

In performing the valuations described below, Mr. Cecil relied on the information in the ARIES Database that was provided to Lazard by the Debtors. Mr. Cecil stated that upon

---

[161]    *See* June 13, 2016 Hr'g Tr. 166:12-18 (Sambrooks) (Q: "I think you were described in the opening as being a pioneer or helping to pioneer the horizontal drilling. Is that a fair characterization?" A: "I suppose so. I drilled one of the first wells in the Austin Chalk for Oryx Energy, South Texas, and that began the first large-scale onshore unconventional development in the U.S.").
[162]    *See generally* June 20, 2016 Hr'g Tr.

receiving the ARIES Database, his team conducted due diligence to (i) analyze the reasonableness of various cost assumptions and (ii) evaluate the reasonableness of the Reserves data reflected in the ARIES Database.  The ARIES Database was used to prepare (a) the Company's April 2015 business plan, which serves as the basis for valuation of the Reserves as of the Petition Date, and (b) the Company's January 2016 business plan, which serves as the basis for valuation of the Reserves as of the Forecasted Effective Date.[163]  Mr. Cecil stated that he calculated the value of the Debtors' assets based on a going-concern value, which is consistent with "the fair market value of the same assets in a non-duress sale between a willing buyer and a willing seller under [non-constrained] market conditions."[164]

In conducting his NAV analysis, Mr. Cecil first identified the projected cash flows of the Debtors' reserves using the ARIES Database, which reflects cash flow projections on a well-by-well basis.  According to Mr. Cecil, the ARIES Database applied strip pricing as of (i) July 15, 2015 to calculate cash flows as of the Petition Date and (ii) March 22, 2016 to calculate cash flows as of the Forecasted Effective Date.  Mr. Cecil explained that once he identified the projected cash flows, he applied an industry-standard PV-10 in order to estimate the present value of the cash flows.  Lastly, Mr. Cecil stated that he applied a customized RAF range in order to risk-adjust the cash flows for each reserve category.  According to Mr. Cecil, RAFs, which are formulated by the SPEE, reflect a suggested range of risk adjustments.[165]

Mr. Cecil applied the midpoint between the mid-RAFs and the high-RAFs to the Reserves because it is industry practice to apply a customized RAF range based on the particular assets that are being evaluated; moreover, the application of the mid-RAFs and high-RAFs is

---

[163]    *See* June 20, 2016 Hr'g Tr. 24:15-20 (Cecil).
[164]    June 20, 2016 Hr'g Tr. 99:1-7 (Cecil); *see* Cecil Rebuttal Report ¶ 10.
[165]    *See* June 20, 2016 Hr'g Tr. 34:2-36:11 (Cecil).

consistent with Mr. Cecil's prior experience with the Haynesville and Cotton Valley plays. Mr. Cecil noted that SPEE does not require that all three RAF ranges be applied when performing an asset evaluation. Although Mr. Cecil stated that the RAF ranges are based on results from an annual SPEE survey,[166] he failed to clearly articulate how the results from the survey inform the risk adjustments that are applied in each RAF category.

Mr. Cecil gave a detailed explanation of how his NAV analysis took account of certain costs and expenses included in the ARIES Database, such as the costs and expenses associated with preserving and maintaining the value of the Debtors' oil and gas assets. Examples of such costs and expenses include (i) capital expenditures;[167] (ii) workover expenses;[168] (iii) lease operating expenses;[169] and (iv) COPAS Charges.[170] According to Mr. Cecil, however, certain other costs and expenses are not accounted for in the ARIES Database because they are "unrelated to the operation" and maintenance of the Debtors' wells.[171] Such costs and expenses are those Indirect Costs that the Debtors do not include in the ARIES Database as COPAS Charges, including the costs associated with (i) acquisition and divestitures; (ii) investor relations; (iii) public company reporting; and (iv) remaining overhead not allocated to the field

---

[166]    *See SPEE 34th Annual Survey of Parameters Used in Property Evaluation* (June 2015) (Ex. 1278).

[167]    *See* June 20, 2016 Hr'g Tr. 47:3-13 (Cecil) (Q: "What are the capital expenditures that are associated with the individual wells, which are taken account of in the reserve database?" A: "Sure. These would be drilling and completion costs. Drilling being for the actual drilling of the well, which would -- and one of the bigger costs is the cost of the rig. Completion costs would be -- would actually be the cost of opening up the -- the zone, so that it could be produce, so this would be like fracturing, fracture stimulation would be completion cost.").

[168]    *See* June 20, 2016 Hr'g Tr. 47:14-18 (Cecil) ("So the workover expenses, these are typically expenses associated with -- with wells that are already producing.").

[169]    *See* June 20, 2016 Hr'g Tr. 48:19-25 (Cecil) (Q: "Okay. Second item from the bottom on slide 12, what are lease operating expenses?" A: "Sure. So lease operating expenses would be four level expenses directly associated with, you know, operating and maintaining that -- that well." Q: "Are these direct costs?" A: "Yes." Q: "At the well level?" A: "Yes.").

[170]    *See* June 20, 2016 Hr'g Tr. 51:14-22 (Cecil) ("COPAS charges are field level expenses that are accumulated at the corporate level that are related to the operation, preservation and maintenance of the – of the -- of the well. So these would be costs, things like administration, human resources, legal services, management's time, accounting, again, legal, as I mentioned. Those would be an example of costs that would be accumulated at the corporate level that would be applied to the field based upon the COPAS rate.").

[171]    June 20, 2016 Hr'g Tr. 53:25-54:11 (Cecil).

level.[172]    Another category of expenses that is excluded from the ARIES Database is the capitalized general and administrative costs ("Capitalized G&A"), which represent pre-drilling costs for activities performed on a well before the well produces any cash flow.  Mr. Cecil testified that it is not customary to account for those costs, like Capitalized G&A, that are not field-level expenses relating to maintaining the value of assets in an oil and gas asset valuation, citing an excerpt from an SPEE handbook which states that "costs projected in the economic evaluation [of oil and gas reserves] are generally field-level expenses and exclude general and administrative overhead costs."[173]    Moreover, Mr. Cecil pointed out that, unlike the Committee's expert, Mr. Zelin, Mr. Cecil did not include Land Expense[174] costs in his NAV analysis. According to Mr. Cecil, Land Expense is not typically accounted for in the standard methodology for valuing oil and gas assets.  Moreover, Mr. Cecil deemed it inappropriate to account for Land Expense based on the fact that the Debtors' Land Expense projections were merely "placeholders" in the Debtors' budget.[175]

Mr. Cecil explained that a significant difference exists between the Petition Date and Forecasted Effective Date NAV calculations due to the value of approximately 225 locations in the Haynesville play (the "Additional Haynesville Locations") that was accounted for in the Forecasted Effective Date NAV analysis but excluded from the Petition Date NAV analysis. According to Mr. Cecil, the Additional Haynesville Locations were not reflected in the ARIES Database as of the Petition Date because (i) as of the Petition Date, the Debtors were in the process of determining the extent of their rights in the Additional Haynesville Locations and (ii)

---

[172]    *See* Cecil Rebuttal Report ¶ 14.  As explained above, Mr. Cecil refers to these costs as "Unallocated G&A."
[173]    June 20, 2016 Hr'g Tr. 59:15-60:13 (Cecil); *see also* Petroleum Engineering Handbook Volume 5 (Chapter 19) (Ex. 1347).
[174]    *See* n. 74, *supra.*
[175]    June 20, 2016 Hr'g Tr. 62:6-21 (Cecil).

the Debtors did not include the Additional Haynesville Locations in the April 2015 business plan. The Additional Haynesville Locations were subsequently included in the January 2016 business plan.  Nonetheless, Mr. Cecil conducted an illustrative valuation of the Additional Haynesville Locations and, after adjusting for risk, concluded that the value of the Additional Haynesville Locations fell within the range of $90 million to $155 million.  Mr. Cecil stated that including the Additional Haynesville Locations in the Petition Date NAV analysis would have increased the value of the Reserves as of the Petition Date; therefore, omitting the value of the Additional Haynesville Locations from the Petition Date NAV analysis resulted in a "conservative" valuation.[176]  The NAV analysis applied by Mr. Cecil to value the Debtors' oil and gas assets resulted in midpoint values of (i) $1.13 billion as of the Petition Date; (ii) $670 million as of the Forecasted Effective Date based on a March 22, 2016 strip price; (iii) $745 million as of the Forecasted Effective Date based on a May 20, 2016 strip price; and (iv) $800 million as of the Forecasted Effective Date based on a June 10, 2016 strip price.

Mr. Cecil testified that, in conducting an enterprise valuation, he utilized an NAV analysis as his primary methodology and a comparable company analysis as a secondary methodology.  Mr. Cecil explained that the NAV analysis for the Forecasted Effective Date enterprise valuation considered the same reserves, PV-10 discounted cash flow calculations, and risk adjustment factors as the NAV analysis for the Forecasted Effective Date asset valuation. Unlike the NAV analysis for the Forecasted Effective Date asset valuation, however, the NAV analysis for purposes of determining enterprise value took into account *all* of the Indirect Costs over the life of the wells, including the portion not covered by the COPAS Charges which, according to Mr. Cecil's estimate, totaled $154 million.  The NAV analysis applied by Mr. Cecil

---

[176]        June 20, 2016 Hr'g Tr. 68:20-69:2 (Cecil).

indicated a value range of approximately $425 million to $600 million (with a midpoint of $515 million) as of the Forecasted Effective Date.

Given the lack of truly comparable companies, Mr. Cecil "deemed the comparable company analysis to be a less reliable value indicator for purposes of an enterprise valuation" and "relied upon the comparable company analysis as a secondary methodology" in forming his opinion about the total enterprise value of the Reorganized Debtors.[177]  The comparable company analysis performed by Mr. Cecil indicated a value range of approximately $480 million to $1.1 billion (with a midpoint of $780 million).   Based on his NAV analysis and the comparable company analysis, Mr. Cecil concluded that the total enterprise value of the Reorganized Debtors is approximately $450 million to $650 million (with a midpoint of $550 million).

On cross-examination by counsel for the Committee, Mr. Cecil was asked about the apparent increase in COPAS Charges between the Petition Date and the Forecasted Effective Date reflected in his analyses despite the overall decrease in the Company's total G&A costs during that same time period.  Mr. Cecil explained that at the time the Company was preparing its April 2015 business plan, the Company was in the process of integrating the businesses of Legacy Forest and Legacy Sabine post-Combination and was reviewing the COPAS Charges that Legacy Forest had applied to the assets that it had owned prior to the Combination.  After the Company finalized its April 2015 business plan, the Company realized that the COPAS Charges of Legacy Forest "were understated" and as a result, the Company corrected the issue "when they put together the January plan."[178]  In addition, when questioned about the inclusion of $154 million of Indirect Costs in his Forecasted Effective Date enterprise valuation that he did not

---

[177]    Cecil Initial Report ¶ 66.
[178]    June 20, 2016 Hr'g Tr. 128:23-129:4 (Cecil).

include in his NAV assets valuation, Mr. Cecil explained that he arrived at this estimate using
two methods.  Under the PV-10 of G&A approach, Mr. Cecil used the Debtors' G&A forecast
through 2018 and essentially "took the present value using a ten percent discount rate."[179]  Under
the capitalization of G&A approach, Mr. Cecil applied a 4x to 5x multiple using the Company's
2016 G&A forecast, noting that this multiple range is a "typical G&A valuation range" based on
"public research reports."[180]

Mr. Cecil's significant experience performing valuations, especially valuations of oil and
gas assets, lends considerable weight to his testimony and to the various methods he applied in
this case.  Although Mr. Cecil has admittedly limited experience performing valuations for the
purpose of calculating an adequate protection claim, his extensive experience in the oil and gas
industry is notable and his testimony will be afforded substantial weight by the Court.

### 3.  Mr. James Seery

Mr. Seery is the President of River Birch Capital ("River Birch"), which is a long-short
credit fund with offices in New York and London.  River Birch currently holds approximately
$60 million of debt under the Second Lien Credit Agreement.  Mr. Seery's testimony provided
an overview of (i) the credit bid proposal submitted to the Company by the Second Lien Lenders
shortly before the Petition Date and (ii) the settlement between the Debtors and the Second Lien
Lenders that is incorporated in the Plan.[181]

Mr. Seery testified that the Second Lien Lenders presented a credit bit proposal ("Second
Lien Credit Bid Proposal") to the Company shortly before the Petition Date in an effort to
establish a framework for a pre-arranged plan of reorganization.  Pursuant to the Second Lien

---

[179]    June 20, 2016 Hr'g Tr. 138:8-14 (Cecil); *see* Cecil Initial Report ¶ 53.
[180]    June 20, 2016 Hr'g Tr. 137:13-17 (Cecil); *see* Cecil Initial Report ¶ 54.
[181]    *See generally* June 21, 2016 Hrg' Tr.

61

Credit Bid Proposal, the Second Lien Lenders sought to (i) exchange the secured portion of their debt for equity in reorganized Sabine; (ii) contribute cash to pay down the RBL Lenders; and (iii) provide the Company with new capital in the range of $120 million to $300 million, depending on the form of the transaction. According to Mr. Seery, the Second Lien Lenders sought to achieve these objectives through a chapter 11 plan of reorganization or through a section 363 sale. Mr. Seery stated that the Second Lien Credit Bid Proposal was premised on an estimated total asset value of approximately $1.3 billion; Mr. Seery believed that the Company's assets were worth more than $1.3 billion.[182]

Mr. Seery testified that River Birch performed its own analysis to value the Company's oil and gas assets. In conducting his valuation analysis, Mr. Seery reviewed the Company's reserve report and analyzed the Company's G&A costs that were included within the report. Mr. Seery explained that based on his experience valuing oil and gas companies, his valuation included only G&A costs that were directly related to the Company's wells. Although the Second Lien Lenders and the Company engaged in discussions following the Second Lien Credit Bid Proposal, Mr. Seery stated that the Company did not respond with a counter-proposal of any kind.

Mr. Seery also provided an overview of the material terms of the Settlement between the Debtors and the Second Lien Lenders. In exchange for settlement of the adequate protection claim of the Second Lien Lenders (which Mr. Seery valued at $150 million to $200 million), Mr. Seery stated that the Second Lien Lenders will receive five percent of the equity of the Reorganized Debtors and the Tranche 1 Warrants. As a settlement of the Second Lien Lenders'

---

[182]    *See* June 21, 2016 Hr'g Tr. 20:23-21:2 (Seery) (Q: "In your view, was the $1.3 billion the value of the company at the time?" A: "No, I think we valued these assets to be higher than 1.3. We would not have bid 1.3 if we thought that was the top value.").

deficiency claim, Mr. Seery stated that the Second Lien Lenders will receive Tranche 2 Warrants and share in two percent of the equity of the Reorganized Debtors.  Mr. Seery expressed his view that the Warrants "certainly have value" based on several factors.[183]  First, Mr. Seery noted that the Warrants have enhanced value in part due to the minority protections that were negotiated between the Debtors and the Second Lien Lenders, which protections "weren't given away freely."[184]  Mr. Seery described the most valuable protection the Warrants have as the "Black-Scholes cash out," which, upon the occurrence of a "trigger event" (such as a change of control of the company), allows for an independent third party to value the Warrants using the Black-Scholes formula and requires that the Company cash out the warrant holders.[185]  According to Mr. Seery, this type of minority protection, which he insisted on in the settlement negotiations, is not common because such protection can be "very valuable to the warrant holder versus the majority equity holder."[186]  Moreover, Mr. Seery explained that the ten-year maturity of the Warrants provides value because "it gives [the holder of the Warrant] more opportunity for [the] option to come into the money."[187]  When questioned about the quantitative value of the Tranche 1 Warrants, he testified that, depending on the volatility percentage applied, the value of the Tranche 1 Warrants "could range anywhere from $15-$25 million,"[188] and that he believed a fifty percent volatility figure was fair.  He also stated that he supports the Settlement and the Plan, opining that "it's not an ideal outcome from our perspective," but, in his view "this is a fair settlement."[189]

[183]    June 21, 2016 Hr'g Tr. 31:16-18 (Seery) (Q: "And do you believe that the Tranche 1 warrants and the Tranche 2 warrants have value?" A: "They certainly have value.").
[184]    June 21, 2016 Hr'g Tr. 31:23-32:2 (Seery).
[185]    June 21, 2016 Hr'g Tr. 32:2-24 (Seery).
[186]    June 21, 2016 Hr'g Tr. 33:5-9 (Seery).
[187]    June 21, 2016 Hr'g Tr. 29:23-30:7 (Seery).
[188]    June 21, 2016 Hr'g Tr. 64:19-65:10 (Seery).
[189]    June 21, 2016 Hr'g Tr. 33:10-22 (Seery).

On cross-examination, Mr. Seery testified that at the time the Second Lien Credit Bid Proposal was delivered to the Company, he strongly disagreed with the Company's view that it could avoid the liens that were previously granted to the Second Lien Lenders. According to Mr. Seery, the additional liens "were required to be given to [the Second Lien Lenders] under the second lien credit agreement that had been in place since 2012."[190] Although the Debtors expressed a view that they had a fraudulent conveyance claim against the Second Lien Lenders, Mr. Seery stated that the Debtors did not provide him with a view on the value of such claim. In describing the compromises that the Second Lien Lenders were making with respect to their adequate protection claim, Mr. Seery testified that "but for the settlement, [the Second Lien Lenders] would have a position in this case that [they] could try to enforce that claim."[191] In other words, Mr. Seery stated that "it would be very difficult to confirm a plan without paying [the Second Lien Lenders] in full" and in the absence of a settlement, Mr. Seery believed the remaining options were either a foreclosure or a liquidation of the Company.[192]

### 4. Mr. Michael Magilton

Mr. Magilton is the Senior Vice President and Chief Financial Officer of Sabine. His testimony principally outlined the process by which his land team performed an extensive encumbrance analysis of the Company's wells and also described the Company's treatment of COPAS Charges in the ARIES Database.[193] Like Mr. Sambrooks, Mr. Magilton was in attendance for the duration of the Confirmation Hearing.

---

[190]    June 21, 2016 Hr'g Tr. 46:24-47:8 (Seery) (Q: "And, Mr. Seery, was it--did you have an understanding that in the context of a forbearance agreement, that the second lien lenders received additional liens on certain leases?" A: "I don't believe we received any additional liens on certain leases as part of the forbearance. I believe those were required to be given to us under the second lien credit agreement that had been in place since 2012. So I don't think there was every [sic] any additional leases that were given as part of the forbearance.").

[191]    June 21, 2016 Hr'g Tr. 71:1-4 (Seery).

[192]    June 21, 2016 Hr'g Tr. 71:4-6 (Seery).

[193]    *See generally* June 21, 2016 Hr'g Tr. and June 22, 2016 Hr'g Tr. (Magilton).

Mr. Magilton explained that the Company is required to pledge at least eighty percent of the value of its total proved reserves under its existing credit agreement with the RBL Lenders.[194]  Mr. Magilton stated that because the Company needed to understand the allocation of value between its encumbered assets and unencumbered assets, his land team conducted a bottom-up review that involved reviewing the Company's assets on a well-by-well basis rather than a lease-by-lease basis.  Mr. Magilton provided a thorough description of the lien and mortgage review his land team conducted in order to determine which wells were encumbered (the "Encumbrance Review").   According to Mr. Magilton, the Company undertook the Encumbrance Review because (i) the Company was in the midst of restructuring discussions that were developing quickly; and (ii) the Company was aware that the Independent Directors Committee would be reviewing potential causes of action relating to the Company's liens and mortgages.

As Mr. Magilton and his land team reviewed the mortgages covering the Company's oil and gas properties, the language of the granting clause contained in each mortgage informed the Encumbrance Review in two ways.  First, Mr. Magilton stated that if a "unit"[195] was listed on an exhibit to a mortgage, Mr. Magilton's team assumed that all leases in that particular unit were mortgaged.  Second, if a lease was listed on an exhibit to a mortgage, Mr. Magilton's team

---

[194]    *See* June 21, 2016 Hr'g Tr. 154:22-155:2 (Magilton); Magilton Decl. ¶ 18.
[195]    June 21, 2016 Hr'g Tr. 157:6-158:2 (Magilton) (Q: "We've been talking a little bit about units.  Can you please describe what a unit is?" A: "Sure.  A unit is something that's relatively typical in the oil and gas industry that helps facilitate field development, where you can have multiple leases that are pooled together to promote more efficient exploitation of the hydrocarbons.  If you think about it from a horizontal joint perspective, when a horizontal well is drilled it starts vertical but then it goes horizontal.  And so that lateral length can go thousands and thousands of feet, and it can go under multiple leases. . . . It's formed via a unit designation where the various leases that would be included in my hypothetical example would basically be pooled together into a unit.  The unit designation, again, would list those leases and then that unit designation would be filed in the appropriate county recorder's office.  And from that perspective, it's kind of looked at like, one property effectively.").

65

assumed that all leases of wells existing within the unit relating to such lease were also mortgaged.[196]

Mr. Magilton thoroughly explained the process by which his land team classified the Company's wells as encumbered or unencumbered. He testified that the Company's oil and gas properties in Louisiana, North Dakota, and Wyoming were designated as unencumbered because no mortgages on those properties were recorded. With respect to potentially encumbered properties, Mr. Magilton and his land team sorted such properties into three separate categories: (i) Legacy Sabine properties located in East Texas; (ii) Legacy Sabine properties located in North Texas and South Texas; and (iii) Legacy Forest properties.

Mr. Magilton explained that Legacy Sabine acquired a substantial number of its wells in East Texas through acquisitions. Each acquisition contained a bill of sale, which was subsequently attached to the mortgages of the RBL Lenders and filed with a county recorder's office; each bill of sale contained a complete list of the leases, units, and wells that were acquired by Legacy Sabine pursuant to such acquisitions. Rather than assuming that the wells acquired by the Company in East Texas were encumbered, Mr. Magilton and his land team performed a cross-check to confirm that the bill of sale exhibits were attached as exhibits to the mortgages.

Unlike the process for East Texas wells, the mortgage exhibits for wells located in North Texas and South Texas were created internally through the Company's BOLO system,[197] which includes a list of all of the leases owned by the Company. The Company printed out the leases for the wells that Legacy Sabine owned in North Texas and South Texas and provided these leases to the RBL Lenders, who subsequently attached them to the mortgages as exhibits. In

---

[196]    June 21, 2016 Hr'g Tr. 156:23-157:5 (Magilton).
[197]    *See* June 21, 2016 Hr'g Tr. 166:3-10 (Magilton); Magilton Decl. ¶¶ 22, 34 (stating that the "Company's BOLO system is a commercial enterprise resource planning ("ERP") system that integrates accounting, land, production and operational functions . . . for exploration and production companies in the oil and gas industry.").

order to confirm that the North Texas and South Texas leases were listed on the mortgages, Mr. Magilton's land team performed a cross-check of the information contained on the BOLO system against the mortgage exhibits filed in the North Texas and South Texas counties.

Mr. Magilton testified that the wells owned by Legacy Forest were mortgaged in the same way as the Company's wells located in North Texas and South Texas. Using the Legacy Forest BOLO system, the land team at Legacy Forest had produced a list of the leases, units, and wells owned by Legacy Forest in each county in which the RBL Lenders intended to file mortgages; the list was delivered to the RBL Lenders, who subsequently attached the list to the mortgages. Mr. Magilton's land team performed a cross-check of the information listed in the mortgage exhibits against a comprehensive list of the Legacy Forest leases, wells, and units listed in the Company's BOLO system. Mr. Magilton noted that at the time of the Combination, there were two categories of Legacy Forest properties that were not mortgaged: (i) certain leases that were associated with a purchase by Legacy Forest in late 2014; and (ii) certain leases that the Company intended to sell shortly after the Combination.

Mr. Magilton's thoughtful and methodical testimony readily supports a finding that the Encumbrance Review resulted in a comprehensive list of the Company's encumbered and unencumbered wells on a well-by-well basis. Yet, according to Mr. Magilton, the Company performed further encumbrance analyses following the Encumbrance Review. In the fall of 2015, the Company received a list from the Committee regarding specific leases that it believed were unencumbered. The Company investigated such claims and, in many cases, provided the Committee with evidence that the leases in question were actually listed on mortgages.[198] The Company performed another analysis in connection with generating an encumbrance list for the

---

[198]    *See* June 21, 2016 Hr'g Tr. 168:16-169:11 (Magilton); Magilton Decl. ¶ 40.

Forecasted Effective Date; such analysis included updating the ARIES Database with changes that had occurred throughout the pendency of the Debtors' chapter 11 cases (*e.g.*, proved undeveloped (2P) wells that had become proved developed producing (1P) wells or the addition of new probable or possible locations as a result of continued engineering work).[199]  Lastly, Mr. Magilton stated that the Company updated the encumbrance list in late March in connection with filing the Plan.

Mr. Magilton also gave extensive testimony regarding the Company's G&A cost structure.  He explained that the total G&A costs of the Company decreased between the Petition Date and the Forecasted Effective Date due to the effect of the Combination as well as due to challenging market conditions.  The decrease in total G&A costs of the Company, however, does not necessarily mean that COPAS Charges will decrease over time because, as Mr. Magilton explained, COPAS Charges are a function of well count and the Company's well count has maintained relatively static.  Therefore, even though the Company's January 2016 business plan does not reflect the operation of any rigs, Mr. Magilton stated that the Company continues to incur COPAS Charges for its approximately 1,600 producing wells.

Mr. Magilton also described Lazard's treatment of COPAS Charges in the ARIES Database for the purposes of its Petition Date and Forecasted Effective Date valuations.  When the team at Lazard initially analyzed the ARIES Database as part of its due diligence process, they informed the Company that the treatment of COPAS Charges differed between the Petition Date reserve report and the Forecasted Effective Date reserve report.  In order to reflect accurately the treatment of COPAS Charges, Lazard ensured that each database reflected COPAS Charges for the economic life of the wells, which is approximately fifty years.

---

[199]    *See* June 21, 2016 Hr'g Tr. 170:1-14 (Magilton).

When questioned by counsel as to why COPAS Charges had increased from the Petition
Date ($155 million) to the Forecasted Effective Date ($179 million) despite the overall decrease
in the Company's total G&A costs, Mr. Magilton explained that the discrepancy largely resulted
from the integration process of Legacy Sabine and Legacy Forest.  Following the completion of
the April 2015 business plan, the Company discovered that Legacy Forest had not charged itself
COPAS Charges for all of the wells that Legacy Forest operated.  The Company subsequently
adjusted the COPAS Charges for the Legacy Forest properties in its October 2015 business plan.
Mr. Magilton also stated that the inputs in the ARIES Database are based on the Company's
intended treatment of the assets.

Lastly, when questioned by counsel as to whether the favorable market conditions prior
to the Confirmation Hearing changed his view on the appropriateness of the January 2016
business plan, Mr. Magilton stated that such conditions did not change his view, for two reasons.
First, Mr. Magilton stated that "in the [exploration and production] industry you need to see
sustained higher prices for a period of time."[200]   Therefore, although prices increased in the
weeks preceding the Confirmation Hearing, Mr. Magilton stated that he needed "to see sustained
prices" because thus far, he has "seen a lot of volatility."[201]   Second, Mr. Magilton explained that
although "near term changes are important . . . the curve going out multiple years is also very,
very important" and he has not seen "a lot of change as you go out in time in 2018, '19, '20 to
the price curve."[202]   Because the Company is not "picking up a rig" until 2017, Mr. Magilton
stated that the near term price increases will not change the Company's business plan "from a

[200]    June 21, 2016 Hr'g Tr. 151:18-20 (Magilton).
[201]    June 21, 2016 Hr'g Tr. 151:21-23 (Magilton).
[202]    June 21, 2016 Hr'g Tr. 152:1-4 (Magilton).

69

new drilling perspective."[203]   Mr. Magilton's testimony was remarkably detailed and thorough; as was the case at the STN Hearing, his candor and credibility are noteworthy.

### 5.  Mr. Jonathan (Joff) A. Mitchell

After serving as an advisor to the Company beginning in March 2015, Mr. Mitchell, a Senior Managing Director at Zolfo Cooper, became the Chief Restructuring Officer of the Debtors on the Petition Date.  At the Confirmation Hearing, the Debtors offered Mr. Mitchell as an expert in restructuring and bankruptcy reorganization.  Mr. Mitchell submitted three expert reports[204] – the first to provide opinions relating to confirmation matters; the second to serve as a rebuttal to the rebuttal reports of Mr. Kearns and Mr. Zelin; and the third to update his opinions to reflect changes in strip pricing as of June 10, 2016.  His testimony and expert reports covered four areas: (i) the Plan and the Settlement; (ii) the Adequate Protection Claims; (iii) calculations of the maximum and risk-adjusted value of each of the Bucket II Claims; and (iv) a liquidation analysis.

Mr. Mitchell's testimony evidenced a detailed understanding of a number of critical subjects, including the Company's operations and financial condition; the positions of the parties in the "acrimonious" and "tense"[205] negotiations leading to the Settlement; and the components of his analysis and estimation of the value of the claims and potential causes of action being settled by the Plan and Settlement.

Mr. Mitchell described the claims being settled, including the Adequate Protection Claims and the Bucket II Claims, and his involvement in negotiations and discussions with all

---

[203]    June 21, 2016 Hr'g Tr. 152:4-9 (Magilton).
[204]    *See* Mitchell Initial Report, Mitchell Rebuttal Report, and Mitchell Supplemental Report.
[205]    June 22, 2016 Hr'g Tr. 40:22-41:3 (Mitchell) (stating that the negotiations that took place shortly postpetition and up until the first mediation hearing were "acrimonious" and "tense," evidenced "by the pain that all of the creditor constituencies were feeling.").

creditor groups both prepetition and postpetition regarding potential settlements. After observing that there has been "a very fundamental difference of view where value is" in this case as between the Committee and the Debtors, Mr. Mitchell continued to emphasize the Company's and his view that restructuring the Company and settling the Adequate Protection Claims and the Bucket II Claims "provides much more value to all creditors than a foreclosure, liquidation, [and/or] disposal of assets" and "pursuit of expensive litigation [which] we've evaluated at tremendous expense and detail and concluded that there's not realistic value there."[206]

Mr. Mitchell testified that while, mathematically, the RBL Lenders are entitled to all of the value of the enterprise,[207] the lenders have agreed, as part of the Settlement, to (i) give up seven percent of the New Common Stock in the Reorganized Debtors as well as two tranches of warrants that have a 10-year life and significant minority protections; (ii) accept payment of their Adequate Protection Claims in equity, notwithstanding their statutory entitlement to cash on account of such claims; (iii) convert a substantial portion of their debt to equity; (iv) compromise the Bucket II Claims; (v) waive their deficiency claims; (vi) provide the Exit Facility on the Effective Date; and (vii) support the Plan.[208] Regarding the conversion of debt to equity, Mr. Mitchell emphasized that it is "very unusual" to see an RBL lender converting debt to equity and that getting the RBL Lenders to support a plan with this term "is a significant achievement."[209]

---

[206]    *See* June 22, 2016 Hr'g Tr. 51:16-23; 163:14-164:1 (Mitchell) (Q: "Why in your experience is it highly unusual for RBL or ABL Lenders to convert their debt to equity?" A: "ABLs and RBLs are generally referred to . . . colloquially as being super secured, super senior secured debt. In most capital structures, it's very unusual for distress to get to the level where it actually impacts those lenders.").

[207]    *See* June 22, 2016 Hr'g Tr. 43:8-12 (Mitchell) ("So the RBL lenders, as I briefly touched on earlier, but in terms of the combination of their secured claim and the – our estimate of what their likely adequate protection claims are, on a mathematical basis, are entitled to all of the value of this enterprise.").

[208]    *See* June 22, 2016 Hr'g Tr. 43:1-44:20 (Mitchell).

[209]    June 22, 2016 Hr'g Tr. 44:3-12 (Mitchell).

71

In exchange for all of these "gives,"[210] which Mr. Mitchell views as "substantial contributions,"[211] the RBL Lenders will receive releases from the Debtors and from all third parties. Mr. Mitchell described the Company's discussions with the RBL Lenders, which began in the early part of 2015, as "very, very challenging."[212] The key provisions of the Plan – the conversion of debt to equity, the debt for debt exchange, the provision of new liquidity – were "key needs that the Debtor had in order to fix . . . its balance sheet, restructure the business and get out. . . ."[213] He recalled that "the RBLs have been adamant since the beginning of this process that the only basis [on which] they were prepared to support a plan . . . is if the Debtors provide not only Debtor releases, but mandatory third party releases" and that this was a "heavily negotiated but absolute condition of the [S]ettlement."[214] He testified that, after (i) the extensive investigation conducted by the Independent Directors Committee and the Debtors' professionals into the Fraudulent Conveyance Claims (Bucket I), the Bad Acts Claims (Bucket III), and the Bucket II Claims; (ii) the STN Hearing; and (iii) the Court's STN Ruling with respect to the Fraudulent Conveyance Claims and the Bad Acts Claims, the Debtors believe both the Debtor Release and the RBL Release are fair and appropriate to include in the Plan.[215] Mr. Mitchell stated his belief that the Settlement reflects a reasonable compromise with the RBL Lenders, and

---

[210]     See June 22, 2016 Hr'g Tr. 43:5-44:13 (Mitchell).

[211]     June 22, 2016 Hr'g Tr. 48:6-9 (Mitchell).

[212]     June 22, 2016 Hr'g Tr. 47:18-20 (Mitchell).

[213]     June 22, 2016 Hr'g Tr. 167:7-12 (Mitchell). Mr. Mitchell also testified that the Company is unable to satisfy any adequate protection claims of the RBL Lenders in cash if the Settlement fails. See June 22, 2016 Hr'g Tr. 167:25-168:3 (Mitchell).

[214]     June 22, 2016 Hr'g Tr. 47:23-48:5 (Mitchell).

[215]     See June 22, 2016 Hr'g Tr. 46:24-47:17 (Mitchell) ("We had an extensive trial with testimony. . . . And the Court . . . opined that at least in the case of the Bucket 1 and the Bucket 3 claims, that they lacked color and were not in the best interest of the estate to pursue. The Bucket 2 claims, the court viewed should be, and the Debtor agreed, . . . settled in the context of a plan. So that is my . . . long-winded answer to say, 'Look, we've spent millions of dollars investigating these claims, massive amounts of time. We've concluded that they're either without merit or not in the best interests to pursue. And so, it is appropriate that we release all of the parties that may be defendants in these claims and make sure that litigation that is costly and disruptive and meritless does not get pursued.").

he noted that his "impression is that . . . the RBLs are not that happy with where they've ended up"[216] but that, "ultimately [the negotiations] got to a point here where, frankly, no one is happy;"[217] so "what we as the Debtor tried to do was broker a middle ground between the parties."[218]

Mr. Mitchell also testified to the key components of the Settlement with respect to the Second Lien Lenders, who have agreed to settle their Adequate Protection Claims and to support the Plan in exchange for receiving five percent of the New Common Stock in the Reorganized Debtors and the Tranche 1 Warrants. In response to questioning by counsel for the Second Lien Agent, Mr. Mitchell acknowledged that any allowed Adequate Protection Claim of the Second Lien Lenders would be an administrative priority claim which, in order to confirm a plan, the Debtors would need to pay in full in cash unless the Second Lien Lenders agreed to different treatment.[219] The Second Lien Lenders will also share in the recovery of unsecured creditors under the Plan to the extent of their deficiency claim and will receive releases from the Debtors and optional releases from third parties. Pursuant to the Settlement, unsecured creditors will receive two percent of the New Common Stock in the Reorganized Debtors, Tranche 2 Warrants, and releases from the Debtors in exchange for "a very conservative and realistic settlement value [of the Bucket II Claims] and a value likely greater than they would expect to receive in a

---

[216]    June 22, 2016 Hr'g Tr. 54:1-3 (Mitchell).
[217]    June 22, 2016 Hr'g Tr. 41:4-8 (Mitchell).
[218]    June 22, 2016 Hr'g Tr. 40:15-17 (Mitchell).
[219]    *See* June 22, 2016 Hr'g Tr. 197:16-198:1 (Mitchell) (Q: "If there was no value left to settle the second lien lenders' adequate protection claim, do you understand that the second lien lenders would still hold an administrative priority claim equal to your adequate protection claim which you conservatively have valued at $124 million?" A: "Yes, I believe that's correct." Q: "And do you understand that you could not confirm a plan unless that administrative claim was paid in full in cash or the second lien lenders agreed to different treatment?" A: "I do, I understand that.").

contested litigation scenario, especially after risking [the Bucket II Claims] and deducting litigation costs."[220]

Repeatedly during his testimony, Mr. Mitchell described the manner in which the Plan and the Settlement, in his view, position the Debtors to maximize value for stakeholders going forward. He noted that the Debtors' current capital structure is "unsustainable" in the current commodity price environment. The Plan, he emphasized, enables the Debtors to resolve their capital structure problems and eliminate the overhang of litigation so that, on the Effective Date, management and the new board will be able to focus on running the business and maximizing value.[221] He testified credibly regarding the possibility of liquidation were the Settlement to fall apart and the parties were to litigate the claims being settled, stating that, "we focus on all of these claims and the details and . . . we ignore the impact on the business. Firstly, in my opinion, without the settlement the likelihood is that the RBLs walk from their plan support. And so we're in a scenario where we're facing a probable liquidation along with an extended, costly litigation. . . . [I]t's just a scenario that doesn't even bear contemplating."[222]

Regarding the Adequate Protection Claims, Mr. Mitchell testified that assessing the size of the Adequate Protection Claims helped him evaluate the reasonableness of the Settlement because, "in all the years I've been doing this . . . I've never seen an adequate protection claim this large . . . ."[223] Looking at the time period between the Combination and when the Company filed for chapter 11, Mr. Mitchell observed that there has been "a tremendous diminution of value during the pendency of the bankruptcy," and, consequently, adequate protection has

---

[220]    June 22, 2016 Hr'g Tr. 45:12-19 (Mitchell).
[221]    June 22, 2016 Hr'g Tr. 49:1-13 (Mitchell).
[222]    June 22, 2016 Hr'g Tr. 136:7-15 (Mitchell).
[223]    June 22, 2016 Hr'g Tr. 55:23-25 (Mitchell).

become "a much, much bigger issue in this case than I think we would normally see in a case with RBL or ABL lenders."[224]

Bearing this in mind and purposefully taking a conservative approach to sizing the Adequate Protection Claims since his estimation of such claims was for settlement purposes,[225] Mr. Mitchell quantified the likely amount of Collateral Diminution and the concomitant size of the Adequate Protection Claims of the Prepetition Secured Lenders, in part relying on information from Mr. Magilton and analysis from Mr. Cecil. As discussed above, Mr. Mitchell determined that the Adequate Protection Claims would consume any unencumbered value that would be available to unsecured creditors in a chapter 7 liquidation, or in a reorganization absent the Settlement embodied in the Plan. In response to a question as to how changes in the strip prices affect his conclusions, Mr. Mitchell testified that, while he views it as "worthwhile" to re-run the numbers to provide an illustration of the effect of more recent strip prices in the context of the Settlement, "they really have no significant impact on the settlement we're proposing or the outcome of the case" and that "the bottom line is, it hasn't changed my conclusions."[226]

Mr. Mitchell described in detail the manner in which he estimated Reserve Collateral Value (i) as of the Petition Date and (ii) as of the Forecasted Effective Date, employing as inputs into the analysis (a) the NAV calculated by Mr. Cecil on a well-by-well basis and (b) the "bottom-up" well-by-well Encumbrance Review of Mr. Magilton and his land team. Mr. Mitchell testified that he believes this "bottom-up" approach – identifying each well and

---

[224]    June 22, 2016 Hr'g Tr. 56:1-11 (Mitchell).

[225]    *See* June 22, 2016 Hr'g Tr. 56:13-24 (Mitchell) (Q: "Did you attempt to calculate a precise adequate protection claim amount, to which the secured lenders would be entitled in the event that the issue would ever be adjudicated?" A: "No, my approach was to estimate the likely adequate protection claim. And look, frankly, in doing that, understanding that the reason I was doing this was for settlement purposes, I tried to take a conservative position. So I know that [counsel to the RBL Lenders] would argue with some of my assumptions, and I'm sure if [the financial advisor to the RBL Lenders] was calculating an adequate protection claim, that their number would be substantially larger.").

[226]    June 22, 2016 Hr'g Tr. 39:17-40:4 (Mitchell).

determining on a well-by-well basis whether that well is encumbered – provides "the most accurate analysis of encumbered value,"[227] instead of a "top-down" approach such as the one on which he believes the Committee's experts relied.

The Reserve Collateral Value was added to the Debtors' estimated Other Collateral Asset Value, consisting of accounts receivable, joint interest billing, and encumbered cash,[228] to arrive at the estimated Total Collateral Value as of (i) the Petition Date and (ii) the Forecasted Effective Date. Subtracting the Total Collateral Value as of the Forecasted Effective Date from the Total Collateral Value as of the Petition Date, Mr. Mitchell arrived at his estimated total Collateral Diminution of $417.5 million.[229] Mr. Mitchell subsequently re-ran his analysis with May 20, 2016 and June 10, 2016 strip pricing assumptions, which altered only the Reserve Collateral Value as of the Forecasted Effective Date. He testified that, notwithstanding a decrease in Collateral Diminution from $417.5 million (employing the March 22, 2016 strip pricing assumptions) to $314.9 million (employing the June 10, 2016 strip pricing assumptions), he continues to conclude that "[t]here's still a very large diminution in collateral value" under any of the strip pricing assumptions.[230]

Mr. Mitchell then explained in detail the manner in which he calculated the Adequate Protection Claims of the RBL Lenders: to wit, from the total outstanding principal amount owed

---

[227]    June 22, 2016 Hr'g Tr. 91:5-15 (Mitchell). For the purposes of his calculation, Mr. Mitchell made certain assumptions with respect to those Bucket II Claims that were linked to collateral value; for example, on the "County Leases" issue (which Mr. Mitchell described as "the big value bucket") he assumed that all of the leases that related to that dispute were unencumbered. June 22, 2016 Hr'g Tr. 63:17-64:6 (Mitchell). Mr. Mitchell described this as "a conservative approach that favored the Committee, or the unsecured creditors." June 22, 2016 Hr'g Tr. 64:12-15 (Mitchell).

[228]    Because the Debtors' position on this issue is that such costs is disputed, Mr. Mitchell assumed that it was encumbered for purposes of his analysis and assumed $0 as of the Petition Date. His Forecasted Effective Date value was calculated using the cash tracing and segregation process set forth in the Final Cash Collateral Order. *See* June 22, 2016 Hr'g Tr. 67:15-68:4 (Mitchell).

[229]    This estimated number utilizes March 22, 2016 strip pricing assumptions for the Forecasted Effective Date valuation, consistent with the Mitchell Initial Report and the financials that were filed with the Plan and Disclosure Statement.

[230]    June 22, 2016 Hr'g Tr. 69:21-25 (Mitchell).

to the RBL Lenders, he subtracted (i) the Swap Payments ($24 million); (ii) postpetition adequate protection payments made to the RBL Lenders after the date the Debtors estimate such lenders became undersecured ($40 million); and (iii) the Total Collateral Value as of the Forecasted Effective Date, resulting in an estimated amount of Adequate Protection Claims of the RBL Lenders between $227.9 million and $123.9 million, depending on the strip pricing assumptions employed.    Combining this amount with his net estimated Adequate Protection Claims of the Second Lien Lenders of $112.3 million,[231] Mr. Mitchell arrived at total Adequate Protection Claims of at least $340.2 million (using March 22, 2016 strip pricing assumptions) and at least $238 million (using June 10, 2016 strip pricing assumptions).[232]   He emphasized that he continues to conclude that, regardless of the strip pricing assumptions used, the Adequate Protection Claims are "a very large claim that, likely, on [a] mathematical basis, entitles the first lien lenders to all of the value."[233]

At the Confirmation Hearing, Mr. Mitchell provided thorough and detailed explanations for each of the differences between his analysis of the Adequate Protection Claims and the analysis conducted by the Committee's expert, Mr. Zelin, using as a demonstrative the comparison chart annexed as Appendix B hereto (the "Mitchell Bridge").   The Mitchell Bridge contains "bars" depicting issues Mr. Zelin raised with respect to Mr. Mitchell's estimation of the Adequate Protection Claims which "bridge" from Mr. Mitchell's $238 million estimate[234] to Mr.

---

[231]        This estimate includes a deduction of $12.2 million of postpetition payments to the Second Lien Lenders, which Mr. Mitchell assumed was appropriate given that such lenders were undersecured during the bankruptcy case. *See* June 22, 2016 Hr'g Tr. 71:10-16 (Mitchell); June 23, 2016 Hr'g Tr. 173:7-17 (Mitchell).  The estimated Adequate Protection Claim of the Second Lien Lenders does not change with different assumptions as to strip pricing because Mr. Mitchell assumed that the Second Lien Lenders had no collateral as of the Forecasted Effective Date.  *See* June 23, 2016 Hr'g Tr. 173:19-174:20 (Mitchell).

[232]        June 22, 2016 Hr'g Tr. 57:23-58:15 (Mitchell).

[233]        June 22, 2016 Hr'g Tr. 79:4-14 (Mitchell).

[234]        This estimate for the Adequate Protection Claims is based on June 10, 2016 strip pricing numbers.

Zelin's $6 million estimate of the Adequate Protection Claims and monetize each issue at an estimated dollar amount.

The Mitchell Bridge also depicts "bars" which represent Mr. Mitchell's view of some of the issues that the Prepetition Secured Lenders could assert that would increase Mr. Mitchell's estimated Adequate Protection Claims; these bars bridge to a higher potential secured lender estimate of the Adequate Protection Claims of $318 million.  Mr. Mitchell denominated these two issues as "Weighted Bucket II Approach" and "Additional Haynesville Locations," describing them as issues that he believes "would potentially substantially increase an adequate protection claim" given that the Debtors' approach to the Adequate Protection Claims "was in the context of . . . [a] Committee-friendly approach or Committee-biased approach to estimating an adequate protection claim from which we could potentially settle."[235]

Mr. Mitchell also discussed his rationale for not including in the Mitchell Bridge an adjustment for the Swap Payments.  The Final Cash Collateral Order provides that, to the extent the swap transactions underlying the Swap Payments are unwound, any payments received by the Debtors on account of the Swap Payments reduce the prepetition indebtedness of the RBL Lenders.  Because Mr. Mitchell concluded that the RBL Lenders were oversecured as of the Petition Date, whether the amount of the Swap Payments was deducted from the prepetition indebtedness of the RBL Lenders before or after a calculation of Adequate Protection Claims does not affect his calculation.[236]  In contrast, Mr. Mitchell observed that because Mr. Zelin

---

[235]    June 22, 2016 Hr'g Tr. 84:11-19 (Mitchell).  Mr. Mitchell testified that he anticipates that, absent the Settlement, the lenders may take positions even less conservative than the two blue-bar adjustments in the Mitchell Bridge (which lead to an estimate of $318 million for the Adequate Protection Claims).  *See* June 22, 2016 Hr'g Tr. 172:4-17 (Mitchell).

[236]    *See* June 22, 2016 Hr'g Tr. 97:1-98:6 (Mitchell) (Q: "Why, in your opinion, was it appropriate for you to reduce adequate protection by $24.3 million for the swap payments, but it was not appropriate for Mr. Zelin to do so?" A: "Because, in my assumption, the lenders are over-secured.  And whether I had reduced the amount of their prepetition indebtedness in order to calculate the starting point for adequate protection or whether I calculated

opines that the RBL Lenders were undersecured as of the Petition Date, Mr. Zelin's adequate

protection analysis inappropriately deducts the Swap Payments; if this mistake were corrected

and the Swap Payments were properly deducted from the RBL Lenders' prepetition indebtedness

prior to calculating their estimated Adequate Protection Claims, Mr. Zelin's estimated Adequate

Protection Claim amount would increase from $6 million to $30 million.[237]

With respect to the Bucket II Claims, Mr. Mitchell also discussed his conclusion that the

Settlement provides more value to unsecured creditors than they would likely receive litigating

the Bucket II Claims.  A team of professionals from Zolfo Cooper and Kirkland worked together

with employees of Sabine to analyze each such claim, determine its likelihood of success, and

risk-adjust each possible Bucket II Claim outcome, producing both a "total amount" and a "risk-

adjusted value" for each category of claims.  Mr. Mitchell emphasized that the "total amount" of

$192.7 million (which increases to $222 million and $230 million[238] if higher strip pricing

assumptions are utilized in calculating Total Enterprise Value[239]) is an "unrealistic maximum" in

that it assumes a one hundred percent chance of success on all of the Bucket II Claims, without

adjusting for cost of litigation or risk to the Debtors' business that would result from a protracted

restructuring.[240]  Mr. Mitchell confirmed that the Committee does not dispute the Debtors' (i)

total amounts or (ii) risk-adjusted values for the Bucket II Claims with the exception of the RBL

Lenders' Preference Claims category; as to these claims, the Debtors believe they have a very

---

adequate protection first and then deducted the swap, it comes to the same answer.  It has no effect on the calculation.").

[237]    *See* June 22, 2016 Hr'g Tr. 96:7-18 (Mitchell); 98:7-13 (Mitchell).

[238]    Mr. Mitchell noted that such increases result from increased value attributable in those Bucket II Claims that are affected by changes in the value of the collateral.  *See* June 22, 2016 Hr'g Tr. 106:9-18 (Mitchell).

[239]    *See* June 22, 2016 Hr'g Tr. 104:21-105:18 (Mitchell).  When asked why he used asset value to calculate adequate protection and enterprise value to estimate the Bucket II Claims, Mr. Mitchell responded with a hypothetical example regarding car dealership selling Ferraris; the Court believes this example is not analogous.

[240]    June 22, 2016 Hr'g Tr. 108:11-109:6 (Mitchell) (noting that "the one critical thing that . . . you didn't mention . . . was the potential impact of this Chapter 11 and the  . . . devastating impact a prolonged extension of the Chapter 11 process would have on the Debtor . . . .").

low chance of success.[241]   Mr. Mitchell estimates the maximum recovery for this category of claims to be approximately $12 million (utilizing Mr. Zelin's $726 million total enterprise value); Mr. Mitchell also emphasized that any potential recovery on such claims would first be utilized to satisfy administrative and other priority claims prior to satisfaction of any secured or unsecured claims.[242]

After comparing the Debtors' risk-adjusted value of the Bucket II Claims of $108.8 million (which does not take into account litigation costs) to the Debtors' estimate of the Adequate Protection Claims of the Prepetition Secured Lenders, Mr. Mitchell concluded that "the settlement is fair and reasonable and in the best interests of all creditors.  I believe that based on this analysis, that – and with any reasonable view of . . . litigation risk and cost, that the unsecured creditors actually get more under the settlement that we're proposing than they would likely get [] to the extent these claims were litigated."[243]

During his testimony, Mr. Mitchell presented several so-called "waterfall" analyses to illustrate his analysis of Adequate Protection Claims and potential Bucket II Claims recoveries compared to recoveries under the Plan and Settlement.  He began with a list of twenty issues – ten for "Adequate Protection" and ten for "Bucket II Claims" – and explained that the Committee would have to "win" on essentially all of the issues listed in order to obtain value for unsecured creditors that exceeds the settlement value being distributed to unsecured creditors under the Plan.  This scenario would (i) assume Adequate Protection Claims of $0 (even more favorable than Mr. Zelin's analysis) and (ii) ignore any risk to the business or impact of the chapter 11 process and would result, per Mr. Mitchell's estimation, in a "best case" recovery to

---

[241]    *See* June 22, 2016 Hr'g Tr. 113:2-115:6 (Mitchell).
[242]    *See* June 23, 2016 Hr'g Tr. 205:18-207:13 (Mitchell).
[243]    June 22, 2016 Hr'g Tr. 115:14-20 (Mitchell).

unsecured creditors of $116 million, which, in the Debtors' view, is an $87 million premium over undersecured creditors' recoveries under the Plan.[244]  Mr. Mitchell emphasized that, while useful for illustrative purposes, this hypothetical scenario depicts an "unrealistic outcome," as it is unlikely that anyone could conclude that there is a one hundred percent likelihood of success of every one of the Bucket II Claims and that the Adequate Protection Claims would be zero – and that there would not be massive disruption and cost to the business associated with this litigation.[245]

Mr. Mitchell next detailed a second "waterfall" scenario in which the Committee would prevail on nineteen of the twenty issues, losing only on Mr. Zelin's position that all Indirect Costs should burden the Debtors' collateral value in calculating the Adequate Protection Claims. In this scenario, after deducting litigation costs but ignoring any risk to the Debtors' business, the maximum recovery available for unsecured creditors, according to Mr. Mitchell, would be $21 million – an amount which is less than the value that unsecured creditors are to receive pursuant to the Plan.[246]

Finally, Mr. Mitchell outlined a scenario that depicted what he described as "a reasonable analysis of the likely outcome if the Debtors took kind of a middle of the road view, in the spirit of settlement" on each of the twenty issues.[247]  He began with a $109 million value for the Bucket II Claims (corresponding to the Debtors' "risk-adjusted value" for such claims), from which Mr. Mitchell subtracted the Debtors' $223 million estimate of the Adequate Protection

---

[244]    The demonstrative employed by Mr. Mitchell to illustrate this "best case" scenario for unsecured creditors is annexed hereto as Appendix C.

[245]    June 22, 2016 Hr'g Tr. 126:3-25 (Mitchell).

[246]    See June 22, 2016 Hr'g Tr. 129:1-10 (Mitchell).

[247]    June 22, 2016 Hr'g Tr. 131:16-21 (Mitchell).  The demonstrative employed by Mr. Mitchell to illustrate this scenario is annexed hereto as Appendix D.

Claims,[248] resulting in a negative number of -$139 million, meaning that recovery to unsecured creditors in this scenario would be zero. This analysis compelled him to conclude, as to the reasonableness of the Settlement, "it's not even close" and that the Settlement as proposed "is truly fair and really is the only opportunity for unsecureds to . . . create value here."[249]

Mr. Mitchell also responded to the Committee's criticisms of his liquidation analysis, which he prepared in order to demonstrate that the Plan satisfies the "best interests test" set forth in section 1129(a)(7) of the Code. Mr. Mitchell concluded that all creditor groups receive more value under the Plan than under a hypothetical liquidation scenario because all proceeds in such a scenario could not possibly exceed the claims of the Prepetition Secured Lenders.[250]

Mr. Mitchell, who was on the witness stand for two days, gave detailed and credible testimony bolstering the Debtors' position that the Settlement is fair, reasonable, and in the best interests of the Debtors' estates.

### 6.  Mr. Christopher J. Kearns

Mr. Kearns is a Managing Director and a member of Berkeley Research Group, LLC ("BRG"). He has over thirty-five years of financial experience as an auditor, corporate officer, and, for approximately the past twenty-five years, as an advisor in bankruptcy and turnaround matters. Mr. Kearns has served as a financial advisor in various cases in the energy sector including Quicksilver, Magnum Hunter, and SemGroup. His testimony at the Confirmation

---

[248]    Mr. Mitchell explained the way in which he arrived at the $223 million amount for purposes of this scenario, as he had to make a different assumption to account for the adjustment to unencumbered cash when risk-adjusting the Bucket II Claims. *See* June 22, 2016 Hr'g Tr. 134:18-135:12 (Mitchell); 202:13-203:10 (Mitchell).
[249]    June 22, 2016 Hr'g Tr. 135:21-136:6 (Mitchell); *see also* Mitchell Initial Report ¶ 10 ("Without the Settlement, the Secured Lenders' adequate protection claims would swallow the value of any unencumbered assets, including the proceeds that could be realized from pursuing virtually all of the Bucket Two claims.").
[250]    *See* June 22, 2016 Hr'g Tr. 139:9-23 (Mitchell); 140:2-7 (Mitchell) ("And just to put my earlier response into context, liquidation proceeds would have to be more than double the high end of my liquidation range to even get close to satisfying the secured lender[s'] claim. I mean, even at that point there would still be nothing for unsecureds.").

Hearing principally addressed the risk-adjusted and non-risk-adjusted values of the Bucket II Claims. Mr. Kearns explained that, out of the ten Bucket II Claims at issue, the value of six of the Bucket II Claims is directly tied to the value of the Company's Reserves: Unencumbered Assets, Unitized Leases and After-Acquired Unitized Leases, Potentially Defective Recording Leases, County Leases, RBL Lenders' Preference Claims, and Second Lien Lenders' Preference Claims. Mr. Kearns agreed with Mr. Mitchell's conclusion that the maximum amount that could be recovered on the Bucket II Claims would be approximately $230.4 million (based on PJT's enterprise value of $726 million), and stated that he did not disagree with the methodology used by Mr. Mitchell in calculating this estimate.

Although Mr. Kearns did not provide extensive testimony regarding each and every Bucket II Claim, he clarified various discrepancies that appeared within his expert reports. When asked why the value of Disputed Cash decreased from $21.3 million in his initial expert report to $8.4 million in his amended expert report, Mr. Kearns explained that he ultimately adopted the amount of Disputed Cash that Mr. Zelin applied in his adequate protection calculation in order to avoid a potential "double count" of the Disputed Cash.[251] With respect to the Swap Payments, Mr. Kearns explained that the total amount of the Swap Payments is not at issue – both the Debtors and the Committee agree that the total amount of the Swap Payments is $24.3 million. However, because Mr. Zelin considered the amount of the Swap Payments in his

---

[251]    *See* July 5, 2016 Hr'g Tr. 106:11-25 (Kearns) (Q: "Okay, so you can explain what led to a change from 21.3 million in disputed cash to the 8.4 million in your amended report?" A: "Sure. Quite simply, Your Honor, Mr. Mitchell in his report pointed out that there is an interplay between the amount of disputed cash in the Bucket II claim and the amount of other collateral and the calculation of adequate protection that he used and that Mr. Zelin used. And he pointed out that there is -- there was potential to be a double count with me using a higher Bucket II claim as against the cash assumption that Mr. Zelin utilized in his calculation of adequate protection. So, to correct for that double count, I amended my declaration to adopt the amount of disputed cash considered by Mr. Zelin, thereby eliminating the double count.").

calculation of the Adequate Protection Claims, Mr. Kearns subtracted the Swap Payments from his Bucket II Claims total order to avoid a double count.[252]

When questioned by counsel about the risk-adjusted values of the Bucket II Claims, Mr. Kearns stated that counsel to the Committee had instructed him to adopt the Debtors' chances of success for nine of the ten Bucket II Claims. The only Bucket II Claim for which Mr. Kearns deviated from the Debtors' risk adjustments was the RBL Lenders' Preference Claims, to which he attributed a 100 percent chance of success "based on guidance from counsel" to the Committee.[253] Mr. Kearns explained that he performed a liquidation analysis as of April 30, 2015 and June 30, 2015 at the direction of counsel to the Committee in order to evaluate whether the RBL Lenders were oversecured as of those two dates. In preparing the liquidation analysis, Mr. Kearns adopted the methodology and assumptions applied by Mr. Mitchell, as he did not disagree with such assumptions. Although Mr. Kearns performed a liquidation analysis for purposes of analyzing the RBL Lenders' Preference Claims, he stated that he was never asked by the Committee to perform a liquidation analysis as of the Forecasted Effective Date. Moreover, although Mr. Kearns testified that the "most critical" Bucket II Claims issue is that of the County Leases, Mr. Kearns did not provide an independent estimate of the Committee's chance of

---

[252]    *See* July 5, 2016 Hr'g Tr. 165:19-166:9 (Kearns) (Q: "Okay. Now, in addition, we see swap payments are shown as zero under the Debtors' risk-adjusted amount. We may have -- you may have addressed this earlier this morning, but can you just refresh us all on why that's at zero?" A: "Sure. . . . The issue, as I understand it, is the way in which that amount is applied by Mr. Zelin or Mr. Mitchell in the calculations of adequate protection. So, because, from my perspective, Mr. Zelin considered this amount in his determination of adequate protection, I agree with the Debtors in terms of the risk-adjusted treatment of this amount. It really is no import now on Bucket II because it has been considered in the adequate protection, so I need to avoid a double count, as we talked about with the cash issue.").

[253]    *See* July 6, 2016 Hr'g Tr. 23:15-19 (Kearns) (Q: "You do not deviate from the debtors' estimated chance of success for any of the Bucket 2 claims except for the RBL preference claim where you believe you had grounds to do so, true?" A: "Based on guidance from Counsel, that's correct.").

84

success on that issue because Mr. Kearns was not asked to determine independently any risk-adjusted values for nine of the ten Bucket II Claims.[254]

In addition to analyzing the value of the Bucket II Claims, Mr. Kearns identified two additional claims that he believes could potentially increase the value of the Debtors' unencumbered assets – the adequate protection payments made to the Second Lien Lenders (approximately $12.2 million) and a portion of the Debtors' professional fees that could potentially be treated as a surcharge pursuant to section 506(c) of the Code (approximately $44.9 million). Mr. Kearns stated that the $12.2 million and $44.9 million estimates do not reflect litigation costs and each estimate assumes a 100 percent chance of success on the issue. With respect to the Debtors' professional fees, Mr. Kearns explained that he arrived at the $44.9 million estimate by applying an encumbrance percentage to the Debtors' total estimated professional fees. Mr. Kearns testified that he characterized the $44.9 million estimate as a potential surcharge based solely on advice from counsel to the Committee.[255] Moreover, when questioned by counsel to the Debtors as to whether he considered the amount of the Debtors' fees that had been incurred in response to litigation brought by the Committee, Mr. Kearns responded that he had not evaluated how the Debtors' fees had been incurred or for what purpose they had been incurred.

Lastly, Mr. Kearns testified that he was asked to evaluate (i) the Debtors' Encumbrance Review, which indicates that approximately ninety percent of the Debtors' proved reserves were encumbered as of the Petition Date and (ii) the value of the Bucket II Claims that are linked to

---

[254]    *See* July 6, 2016 Hr'g Tr. 24:9-13 (Kearns) (Q: "For nine of the ten Bucket 2 claims you did not independently determine any risk-adjusted value based on estimated chances of success as determined by the Committee, right?" A: "Correct.").

[255]    *See* July 6, 2016 Hr'g Tr. 82:19-22 (Kearns) (Q: "Other than advice from counsel for the Committee, you don't have any basis for treating the $44.9 million as a surcharge, do you?" A: "That's correct.").

the unencumbered value of the Debtors' Reserves.[256]  In order to address these two issues, Mr.

Kearns explained that, notwithstanding the extensive work performed by Mr. Magilton and his

land team, the Committee performed its own lien review.  According to Mr. Kearns, the Porter

Hedges firm, the Committee's Texas oil and gas and conflicts counsel, reviewed the liens

asserted by the Prepetition Secured Lenders by reviewing "approximately 22,000 leases."[257]  He

stated that Porter Hedges identified "approximately 7,500 leases as unencumbered," which is

comprised of unlisted unit leases, unlisted non-unit leases, defective recording leases, and leases

that were granted to the Prepetition Secured Lenders within ninety days of the Petition Date.[258]

After receiving the results from Porter Hedges and distilling such information into a single

database, Mr. Kearns concluded that 18.3 percent of the value of the Debtors' proved reserves

was unencumbered as of the Petition Date, which is greater than the corresponding percentage

calculated by Lazard at the Petition Date (*i.e.*, ten percent).[259]

Although Mr. Kearns' testimony with respect to the value of the Bucket II Claims was

credible, it is clear that, with respect to the RBL Lenders' Preference Claims and other

unencumbered value, Mr. Kearns was simply asked to apply assumptions provided by counsel to

the Committee.  In similar fashion, Mr. Kearns was directed by counsel to apply the risk

adjustments that were used by Mr. Mitchell and the Debtors in order to analyze the value of the

Bucket II Claims.  Although the Committee repeatedly has argued that the Debtors underestimate

the amounts that could be recovered from litigating the Bucket II Claims, it is unclear why the

Committee failed to ask a highly qualified expert such as Mr. Kearns to perform an independent

---

[256]     *See* July 5, 2016 Hr'g Tr. 184-185 (Kearns).
[257]     July 5, 2016 Hr'g Tr. 185:11-22 (Kearns).
[258]     July 5, 2016 Hr'g Tr. 185:11-22 (Kearns).
[259]     *See* July 5, 2016 Hr'g Tr. 185:23-187:14 (Kearns); *see* Kearns Amended Report, Appendix B, ¶ 6.

evaluation in order to support the Committee's position.  That the Debtors had the burden of proof of these issues is not an adequate explanation.

### 7.  Mr. Steven M. Zelin

Mr. Zelin is a Partner at PJT Partners LP ("PJT"), the financial advisor to the Committee; he has decades of experience in major chapter 11 bankruptcies and out-of-court restructurings, and has a well-deserved reputation as a leader in his field.  Mr. Zelin was called (i) to testify regarding his analysis of the Reserve Collateral Value as of the Petition Date and the Forecasted Effective Date, respectively, for purposes of estimating the Collateral Diminution and the Adequate Protection Claims, as reflected more fully in his expert reports, and (ii) to respond to the testimony of the Debtors' valuation expert, Mr. Cecil, as well as that of Mr. Mitchell.[260]  Mr. Zelin's testimony was consistent with the conclusions set forth in the Zelin Reports. Unfortunately, however, Mr. Zelin was once again in the position of having to apply untenable assumptions supplied to him by counsel for the Committee.

Mr. Zelin testified that, in order to estimate the enterprise value of the Debtors' business, he first used an NAV methodology to estimate the value of the Reserves, calculating the value of the assets based on the financial and operational information contained in the ARIES Database.[261]  Accordingly, Mr. Zelin calculated the present value of the Debtors' cash flow projections, net of all direct operating costs and capital expenditures, and risk-adjusted pursuant to the full range of RAFs.[262]  Then, Mr. Zelin reduced the aggregate risk-adjusted present value of the Reserves' cash flows by the entirety of the Debtors' Indirect Costs, including all G&A.[263]

---

[260]    See Zelin Initial Report, Zelin Supplemental Report, and Zelin Second Supplemental Report (collectively, the "Zelin Reports").

[261]    See July 7, 2016 Hr'g Tr. 21:21-22:4 (Zelin).

[262]    Zelin Initial Report ¶ 17(a).

[263]    Zelin Initial Report ¶ 20(a).  As described above, Mr. Zelin refers to these costs as "Unallocated Overhead" and "Unallocated Land Expense" in his expert reports and testimony.

Mr. Zelin testified that he did not use either a comparable companies analysis or a precedent transactions analysis to estimate the value of the Reserves because the distressed nature of companies in the industry severely limits the reliability of the values generated by those methodologies.[264]  Mr. Zelin's failure to use a comparable company analysis was questioned by counsel for the Debtors and counsel for the RBL Lenders.   In particular, counsel elicited testimony from Mr. Zelin that PJT had identified companies comparable to Sabine for purposes of a "pitch" presentation to the Second Lien Lenders in March 2015; nonetheless, Mr. Zelin testified that he now believes that it was not appropriate to look at those comparable companies in performing his enterprise valuation.[265]   Mr. Zelin also confirmed that in that pitch presentation, PJT identified the Second Lien Lenders as the "fulcrum" security, which is an indication that PJT had estimated the RBL Lenders to be fully secured and the Second Lien Lenders to be partially secured at the time.[266]

As discussed in greater detail above and as reflected in the Zelin Bridge annexed hereto as Appendix A, Mr. Zelin's approach to valuing the Reserves differs from that of the Debtors in three principal respects: (i) Mr. Zelin used an enterprise valuation to estimate the value of the Reserves for purposes of estimating the Adequate Protection Claims, burdening the value of the Reserves with all Indirect Costs (as opposed to only Direct Costs and COPAS Charges); (ii) Mr. Zelin applied the full range of RAFs to risk-adjust the projected cash flows of the Reserves (rather than just the mid-RAFs and high-RAFs); and (iii) relying on counsel for the Committee, Mr. Zelin based his final opinion on the value of the Reserves on the June 10, 2016 strip

---

[264]    *See* July 7, 2016 Hr'g Tr. 61:23-62:8 (Zelin).
[265]    *See* July 8, 2016 Hr'g Tr. 11:21-24; 13:16-19 (Zelin).
[266]    July 8, 2016 Hr'g Tr. 10:24-11:9 (Zelin).

pricing.[267]  Mr. Zelin's valuation opinion also differs from the Debtors' approach to valuation with respect to (a) the proper methodology and amount of an adjustment to the Adequate Protection Claims based on certain postpetition payments made to the RBL Lenders and (b) certain additional adjustments based on advice from counsel to the Committee.[268]  Mr. Zelin provided extensive testimony explaining the basis for the approach he took in valuing the Prepetition Collateral, quantifying the amount of Collateral Diminution, including the assumptions he made and the opinions of other experts retained by the Committee on which he relied, and criticizing the Debtors' valuation approach, especially with respect to Mr. Cecil's use of COPAS guidelines to determine the amount of Indirect Costs that should be included in the analysis.

As a result of these differences, Mr. Zelin concluded that the RBL Lenders were undersecured at the Petition Date[269] and estimates that the RBL Lenders' Adequate Protection Claim is approximately $6 million.[270]  Mr. Zelin further concluded that the Second Lien Lenders were entirely unsecured at the Petition Date and therefore do not have any claim associated with the Collateral Diminution.

At the Confirmation Hearing, Mr. Zelin provided additional testimony about the methodology he employed for estimating the Adequate Protection Claims in contrast to the methodology he employed at the STN Hearing (the "STN Adequate Protection

---

[267]    *See* July 6, 2016 Hr'g Tr. 130:19-132:6 (Zelin).
[268]    *See* Section IV.A.2, *supra.*
[269]    Mr. Zelin estimates the Reserve Collateral Value to be $728 million at the Petition Date, which is less than the principal amount of the secured claim of the RBL Lenders.
[270]    Zelin Supplemental Report ¶ 2.  Mr. Zelin initially estimated the Reserve Collateral Value at the Forecasted Effective Date, based on May 20, 2016 strip pricing, to be $613 million, which results in an Adequate Protection for the RBL Lenders of $35 million.  In the Zelin Supplemental Report (and the Zelin Second Supplemental Report), Mr. Zelin updated his analysis to reflect June 10, 2016 strip pricing and estimated the Reserve Collateral Value to be $642 million, resulting in an Adequate Protection Claim for the RBL Lenders of $6 million.

89

Methodology").[271]   In the STN Ruling, the Court found that Mr. Zelin's methodology for estimating the size of the RBL Lenders' Adequate Protection Claim was based on "untenable assumptions" provided to him by counsel to the Committee.[272]   In particular, based on those assumptions, the Court rejected Mr. Zelin's testimony that, for purposes of estimating the RBL Lenders' Adequate Protection Claim, (i) the Collateral Diminution should be calculated for the time period only between September 1, 2015 and November 23, 2015, rather than the time period between the Petition Date and the Forecasted Effective Date and (ii) the beginning collateral value (*i.e.*, as of September 1, 2015) should be calculated as a distressed foreclosure sale value.[273]   The Court also rejected Mr. Zelin's conclusion that the RBL Lenders' Adequate Protection Claim was properly estimated between $0 and $50 million.[274]

However, despite the flawed assumptions on which he based his testimony at the STN Hearing, Mr. Zelin testified that for purposes of the "ending" Prepetition Collateral value, he used a going-concern valuation methodology, the methodology that the Court found was appropriate then[275] and which the parties have both applied in the context of the Confirmation Hearing.  Nevertheless, Mr. Zelin's STN Adequate Protection Methodology differs in a number of significant respects from the going-concern methodology he employed for the Confirmation Hearing,[276] including, most notably, that in his STN calculation, Mr. Zelin performed an asset

---

[271]        *See* July 7, 2016 Hr'g Tr. 220:18-231:6 (Zelin).

[272]        *See* STN Ruling, *In re Sabine Oil & Gas Corp.*, 547 B.R. at 576.

[273]        *Id.*at 575-78.

[274]        *Id.*

[275]        *Id.*

[276]        Mr. Zelin testified that among the differences between his estimate of Adequate Protection Claims at the STN Hearing and the estimate he performed for purposes of the Confirmation Hearing are his reduction of the Adequate Protection Claims of the RBL Lenders in the amount of the Mineral Lien Payments and the Swap Payments in his calculation for confirmation.

valuation rather than an enterprise valuation, and, relatedly, did not burden the value of the Debtors' Reserves with any Indirect Costs.[277]  These inconsistencies are telling.

At the Confirmation Hearing, Mr. Zelin testified that the difference between his STN Adequate Protection Methodology and the methodology he has used for purposes of confirmation is attributable to the different purpose for which he was performing his calculation.[278]  According to Mr. Zelin, at the time of the STN Hearing, he was estimating the size of the RBL Lenders' Adequate Protection Claim premised on the Committee's view that the Debtors' assets should be sold and transferred outside the bankruptcy estate,[279] whereas the directive for the Confirmation Hearing was to estimate not the sale value of the assets, but the value "in the hands of the debtors."  As stated in the Zelin Initial Report, Mr. Zelin believes that a valuation "in the hands of the debtors" should be an enterprise valuation and should burden the value of the assets with all Indirect Costs.[280]  Mr. Zelin acknowledged that his estimates of the Collateral Diminution for purposes of the STN Hearing, on the one hand, and for purposes of the Confirmation Hearing, on the other, coincidentally resulted in similar estimates of the size of the RBL Lenders' Adequate Protection Claim, despite a number of significant changes to the facts and the methodology he used to perform both analyses.[281]

### B.    Evidentiary Matters Relating to Certain Confirmation Testimony

---

[277]    In the expert report he prepared in connection with the STN Motions, Mr. Zelin noted that, although his estimate did not burden the value of the Debtors' assets with any Indirect Costs, it may be appropriate to burden the value of the assets with "some."  *See* Expert Report of Steven M. Zelin, dated January 27, 2016 (Ex.1361), p. 35.

[278]    *See* July 8, 2016 Hr'g Tr. 94:15-95:16 (Zelin).

[279]    *See id.*  On cross-examination, Mr. Zelin confirmed that his decision to calculate the ending value for his collateral valuation for the STN Hearing using a going concern methodology was based on his understanding that the Debtors intended to use the Prepetition Collateral to continue to operate as a going concern pursuant to a plan of reorganization.  *See* July 8, 2016 Hr'g Tr. 106:12-17 (Zelin).

[280]    Zelin Initial Report ¶ 20(a).

[281]    *See* July 7, 2016 Hr'g Tr. 230:17-25 (Zelin).

The Court now turns to the confirmation testimony of Messrs. Brandon Aebersold and Adrian Reed and the evidentiary issues raised by the parties with respect to these witnesses.

### 1. The Committee's Motion to Exclude the Declarations and Testimony of Mr. Brandon Aebersold

Brandon Aebersold is a Managing Director at Lazard and is a senior member of the Lazard financial advisory team working on the Debtors' chapter 11 restructuring. Mr. Aebersold has substantial experience working on restructurings, reorganization, workouts, and other transactions of distressed companies.

At the Confirmation Hearing, Mr. Aebersold principally testified about his analysis of the value of the Warrants based on certain assumptions about the Plan.[282] Mr. Aebersold testified that to estimate the value of the Warrants, he applied the Black-Scholes option pricing formula ("Black-Scholes"), which, according to Mr. Aebersold, is the standard approach used to calculate the value of warrants.[283] There is no dispute that this is indeed so.[284] As he explained in his June 1, 2016 declaration, Mr. Aebersold testified that the basic inputs for a Black-Scholes calculation are (i) the per-share price of the equity underlying the warrant; (ii) the standard deviation of the returns of the equity underlying the warrant (*i.e.*, volatility); (iii) the time to maturity of the warrant; (iv) the exercise (or strike) price of the warrant; (v) the risk-free interest rate; and (vi) the dividend yield of the equity underlying the warrant.[285] His valuation analysis of the Warrants does not take into account potential trading restrictions on the equity of the

---

[282] Mr. Aebersold also provided testimony about the discussions between the Debtors and the Second Lien Lenders in the Spring of 2015 with respect to the Second Lien Lenders' proposed credit bid.
[283] *See* June 21, 2016 Hr'g Tr. 92:20-22 (Aebersold).
[284] July 8, 2016 Hr'g Tr. 124:16-20 (Qureshi) ("Your Honor, there is no dispute that Black-Scholes properly applied . . . is the right methodology to value warrants.").
[285] Aebersold Decl. ¶ 7.

Reorganized Debtors or on the Warrants, nor does it take into account the value, if any, of the minority protections governing the Warrants.[286]

Mr. Aebersold explained that because the equity underlying the Warrants is that of the Reorganized Debtors, he made certain calculations based on certain valuation assumptions and provisions of the Plan.  First, in his initial report, in order to calculate an implied per-share equity price, Mr. Aebersold adopted the midpoint of the Debtors' estimate of the total enterprise value of the Reorganized Debtors, as provided in the Plan, of $550 million less the estimated funded net debt as of the Forecasted Effective Date of $160 million, which resulted in a derived aggregate equity value of $390 million.  He then used that $390 million value to calculate the implied per-share equity value for purposes of calculating the value of the Warrants.  Second, in order to derive the implied exercise price of the Warrants, Mr. Aebersold similarly adopted the total enterprise values of $1 billion and $1.25 billion for the Tranche 1 Warrants and the Tranche 2 Warrants, respectively, specified in the Plan.  Third, Mr. Aebersold estimated the standard deviation of the return on the underlying equity using the estimated volatility of the underlying equity.  Mr. Aebersold estimated volatility to be sixty percent.  For the other inputs into Black-Scholes, Mr. Aebersold used a ten-year time to maturity based on the contemplated terms of the Warrants, a risk-free interest rate of 1.91 percent, and a dividend yield of 0 percent.[287]

According to the calculations contained in his initial report, the estimated value of the Tranche 1 Warrants is $32.4 million and the estimated value of the Tranche 2 Warrants is $19.7

---

[286]      In his declaration, Mr. Aebersold explained that the Warrants include protections requiring the Reorganized Debtors to redeem the Warrants upon the occurrence of a Redemption Event (as defined in the Warrant Agreements), which includes a Change of Control Event (as defined in the Warrant Agreements) or a sale or disposition of all or substantially all of the Reorganized Debtors' assets.  *See* Aebersold Decl. ¶ 4.

[287]      Aebersold Decl. ¶ 7.

million.[288]    Mr. Aebersold provided updated calculations in his supplemental declaration, modifying two of the inputs into Black-Scholes as follows: (i) increasing the estimated total enterprise value to $726 million (from $550 million)[289] and decreasing the risk-free rate to 1.64 percent (from 1.91 percent).[290]    As a result of these adjustments, the estimated value of the Tranche 1 Warrants was $52.4 million and the estimated value of the Tranche 2 Warrants was $32.2 million.[291]

Mr. Aebersold testified that the only input that is not "readily observable" is the volatility input; he explained that he used two methods to estimate the appropriate volatility to use in the calculation of the value of the Warrants – historical volatility and implied volatility, both of which look to the volatility of equity issued by other "reference" companies to estimate the volatility of the equity of the Reorganized Debtors.[292]    Mr. Aebersold testified that he and his team identified companies appropriate for the analysis by selecting oil and gas companies similar in size to Sabine.    Using the historical volatility method, Mr. Aebersold and his team analyzed publicly available historical volatility data with respect to twenty-two reference companies deemed sufficiently comparable to the Reorganized Debtors (collectively, the "Reference Companies").[293]    Using the implied volatility method, Mr. Aebersold identified the trading prices of options issued by the Reference Companies, identifying the readily observable Black-Scholes inputs other than volatility for those options, and solving for (or "goal seeking") volatility.[294]    Mr. Aebersold testified that he and his team reviewed various iterations of the "data analytics"

---

[288]    *See* June 21, 2016 Hr'g Tr. 92:23-93:1 (Aebersold).
[289]    Mr. Aebersold's use of an estimated total enterprise value of $726 million is consistent with the Committee's estimated total enterprise value based on the June 10, 2016 strip price.
[290]    Aebersold Supplemental Decl. ¶ 1.
[291]    Aebersold Supplemental Decl. ¶ 2.
[292]    June 21, 2016 Hr'g Tr. 109:7-110:8 (Aebersold).
[293]    June 21, 2016 Hr'g Tr. 109:7-110:8 (Aebersold).
[294]    June 21, 2016 Hr'g Tr. 110:3-8 (Aebersold).

for the Reference Companies and performed various sorting exercises in order to confirm the

volatility analysis and to ensure that none of the Reference Companies was distorting the

analysis as an outlier.[295]

Mr. Aebersold displayed a mastery of Black-Scholes and warrant valuation, and the

Court finds him to be a very knowledgeable and forthcoming witness. However, the Committee

has objected to and has moved to exclude the declaration and testimony of Mr. Aebersold[296] on

the grounds that he failed to provide adequate facts and data underlying his opinion of the value

of the Warrants such that (i) the Committee was unable to test Mr. Aebersold's assertions, in

violation of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure[297] and (ii) the Court, as the

trier of fact, does not have a basis to determine the reliability of his expert testimony, as required

by Rule 702 of the Federal Rules of Evidence.[298]  Specifically, the Committee argues that Mr.

Aebersold failed to produce, or describe in sufficient detail, the data and sorting analyses he and

his team performed in order to estimate the volatility of the Reorganized Debtors' equity and

therefore his opinions about the value of the Warrants are inadmissible.[299]  The Committee

argues that the inconsistency between, on the one hand, Mr. Aebersold's testimony about his

review and use of data analytics in reaching his conclusions about volatility, and, on the other

---

[295]    *See* June 21, 2016 Hr'g Tr. 111:8-13 (Aebersold).  For example, Mr. Aebersold testified that he recalled "doing a run of data where we excluded the very highly levered ones, the ones with very low market caps, those in distress[]."  June 21, 2016 Hr'g Tr. 123:6-9 (Aebersold).

[296]    *Official Committee of Unsecured Creditors' Motion to Exclude the Declaration and Testimony of Brandon Aebersold*, dated June 24, 2016 [Dkt. No. 1293] (the "Motion to Exclude").

[297]    Rule 26(a)(2)(B) ("Disclosure of Expert Testimony") requires a party proffering an expert witness to produce a written report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the fact and data considered by the witness in forming them."  Fed R. Civ. P. 26(a)(2)(B).

[298]    Rule 702 mandates that expert testimony be "the product of reliable principles and methods" and that the expert "reliably appl[y] the principles and methods to the facts of the case."  Fed R. Evid. 702.

[299]    The Debtors provided the names of the Reference Companies that Mr. Aebersold "as best [he] could reconstruct them" to the Committee on or around June 14, 2016.  *See Debtors' Opposition to the Committee's Motion to Exclude the Declaration and Testimony of Brandon Aebersold*, dated June 28, 2016 [Dkt. No. 1297] ("Opp. to Motion to Exclude"), Ex. A, ¶ 21.

hand, the Debtors' failure to provide to the Committee or the Court any of the actual data analytics that Mr. Aebersold reviewed and used renders Mr. Aebersold's opinions improper.[300]

In response, the Debtors do not dispute the Committee's factual assertions that Mr. Aebersold did not produce the spreadsheets that he and his team prepared when Mr. Aebersold was estimating the volatility of the equity of the Reorganized Debtors, and acknowledge that those spreadsheets were not retained by Mr. Aebersold or Lazard.[301]  Rather, the Debtors argue that there is no basis to exclude Mr. Aebersold's testimony because Mr. Aebersold's disclosure of his use of sixty percent volatility and, generally, the methods by which he determined to use that number (i) at his deposition, (ii) in his declaration, and (iii) through document production to the Committee of the list of Reference Companies is sufficient for purposes of Rule 26(a) and Rule 702.  The Debtors argue that the Committee could have "readily assemble[d] and evaluate[d] the data that Mr. Aebersold considered" by "accessing publicly available information and utilizing standard Excel functions like mean, median, and standard deviation"[302] such that any alleged deficiency in Mr. Aebersold's disclosures does not warrant what the Debtors refer to as the "drastic" remedy of exclusion under Rule 26(a).

While there is no dispute that Mr. Aebersold disclosed his opinion that a sixty percent volatility assumption was appropriate to use to value the Warrants, the Court agrees with the Committee that the Debtors' failure to produce or elicit sufficiently detailed testimony as to exactly what numbers (as distinct from the type of data) Mr. Aebersold reviewed with respect to the Reference Companies and exactly how Mr. Aebersold used those numbers to arrive at a sixty

---

[300]    Motion to Exclude ¶ 6.

[301]    Opp. to Motion to Exclude, p. 9 ("Admittedly, Mr. Aebersold did not produce the Excel spreadsheet showing the publicly available information that he used in March 2016 to value the Warrants").  The Debtors explain that Mr. Aebersold and his team did not retain the spreadsheets containing the grouped and sorted data because "Mr. Aebersold performed his analysis…before it was contemplated that he would be asked to provide expert testimony about that calculation."  Opp. to Motion to Exclude, p. 4.

[302]    Opp. to Motion to Exclude, p. 2.

percent volatility renders Mr. Aebersold's declarations and testimony, solely as to the volatility estimate, inadmissible.  As the Court stated on the record, there is no dispute that Black-Scholes is the appropriate methodology for estimating the value of the Warrants; nor is it disputed that the inputs that Mr. Aebersold used, other than the volatility input, to estimate the value of the Warrants using Black-Scholes were reasonable and appropriate, and do not raise any evidentiary issues.[303]

But the fact that Mr. Aebersold has identified the type of "data and mathematical functions that were reflected on [a] spreadsheet and has recreated the comparable companies list" on which he relied in estimating the appropriate volatility to use in his Black-Scholes calculation does not satisfy the requirements of Rule 702.  Because Mr. Aebersold has not identified the methodology he used to synthesize the data analytics to arrive at the volatility range that he included in his report and testimony, the Court has no means "by which to assess the reliability of his opinions" as to that volatility range.[304]  For example, the Court does not know whether all of the data points that Mr. Aebersold reviewed for the volatility of the equity of the Reference Companies fell within the fifty percent to seventy percent range, whether a majority fell within a much smaller range, or whether a majority fell outside that range.  As a result, the Court cannot conclude that Mr. Aebersold's fifty percent to seventy percent range, and, consequently, the sixty percent mid-point of that range, is a reasonable conclusion to draw based on the Reference Companies' data analytics or otherwise.

---

[303]    *See* July 8, 2016 Hr'g Tr. 124:1-9 (The Court: "[E]veryone, I think, agreed that the only input into Black-Scholes that required analytics was volatility . . . [T]he rest of it wasn't challenged. The debtor's view, obviously, is that for a whole variety of reasons, the volatility can come in too. Your argument is no go on volatility and therefore no go on everything." Mr. Qureshi: "Correct.").

[304]    *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, No. 1:00-1898, 2008 WL 2324112, at *4 (S.D.N.Y. June 5, 2008) (finding that real estate valuation expert's testimony with respect to a decrease in the value of plaintiffs' property was not admissible under Rule 702 because the expert "merely compiled market data and then offered his conclusions, yet he has failed to explain the relationship between the two.").

Furthermore, the Court rejects the Debtors' arguments that Mr. Aebersold's volatility opinions are admissible as lay testimony pursuant to Rule 701.  Although a witness can provide both lay and expert testimony in a single case,[305] and Mr. Aebersold did provide lay testimony as to certain discussions between the Debtors and the Second Lien Lenders in the Spring of 2015, any lay testimony provided by Mr. Aebersold with respect to the "technical" means by which he determined the value of the Warrants, which includes the basis for his conclusion that the use of sixty percent volatility was appropriate, is improper.[306]  Moreover, any fact testimony by Mr. Aebersold as to the Debtors' reliance on his determination of the value of the Warrants is insufficient to overcome the Rule 702 deficiency identified above;[307] rather, such testimony simply goes to the good faith and reasonableness of the Debtors' assessment of the value of the Warrants.  It does not provide the Court with a basis on which to determine that Mr. Aebersold's volatility estimate is reliable.

In concluding that Mr. Aebersold's volatility estimate must be excluded under Rule 702, the Court makes no determination as to the Debtors' compliance with Rule 26(a).  However, the Court notes that the Committee has not put forward any argument as to the prejudice that the Committee would suffer if Mr. Aebersold's testimony were allowed into the record or as to any bad faith or willfulness on the Debtors' part in purportedly failing to comply with the Rules.  Even if the Committee had argued these issues, the Court would likely find such arguments not only unpersuasive but disingenuous, in light of positions the Committee took at the Confirmation

---

[305]     *See Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004).

[306]     *Id.* (holding that testimony that reflects "specialized knowledge [the expert] has because of his extensive experience" in a field is not admissible pursuant to Rule 701).

[307]     *Id.* (holding that testimony that requires "technical" knowledge and that may be admissible pursuant to Rule 702 must satisfy the reliability requirements of that Rule).

Hearing with respect to the admissibility of certain of Mr. Zelin's expert testimony that had not been disclosed in any form prior to Mr. Zelin's taking the witness stand.

Finally, the Court reiterates that it is not excluding Mr. Aebersold's testimony with respect to any element of his analysis other than his use of the sixty percent volatility, including his testimony explaining the calculation of the value of the Warrants using the sixty percent volatility, which input the Court considers a calculation assumption rather than expert opinion. As discussed *infra*, the record contains other evidence with respect to the approximate overall value of the Warrants. Because the Court is not required to find an exact value of the Warrants in order to assess the reasonableness of the Settlement and the Plan,[308] the exclusion of Mr. Aebersold's volatility opinion does not preclude the Court from ascribing some value to the Warrants as part of its overall analysis of the reasonableness of the Settlement.

## 2. The Debtors' Motion to Exclude the Testimony of Mr. Adrian Reed

Mr. Adrian Reed, a Managing Director and member of BRG, has worked in the energy industry for twenty-five years both as a petroleum engineer and as a consultant. After the Committee called Mr. Reed as a witness at the Confirmation Hearing and elicited testimony regarding his qualifications, counsel for the Debtors conducted an extensive *voir dire* of Mr. Reed, during which Mr. Reed stated that, notwithstanding his general experience in the oil and gas sector, he has never professionally valued oil and gas assets in the Haynesville, Cotton Valley, or "ArkLaTex" regions, and he performed no oil and gas valuations at all between 1999 and 2014.[309] In addition, Mr. Reed has never been hired to perform a valuation in which he

---

[308]    *See, e.g., Ahuja v. LightSquared Inc. (In re LightSquared Inc.)*, 534 B.R. 522, 535 (S.D.N.Y. 2015) (holding that the bankruptcy court did not err in determining that there was insufficient equity cushion in the absence of finding a particular valuation number when bankruptcy court based its determination on combined findings regarding likely value), *aff'd, Ahuja v. Lightsquared Inc.*, 2016 U.S. App. LEXIS 5508 (2d Cir. 2016).

[309]    *See* June 27, 2016 Hr'g Tr. 22:25-24:3 (Reed). The "ArkLaTex" region refers to Arkansas, Louisiana, and Texas.

99

applied RAFs to unconventional resources, and he has never prepared a valuation applying RAFs to oil and gas assets in the ArkLaTex region.

After eliciting this testimony, counsel for the Debtors made an oral motion to preclude Mr. Reed from offering expert opinions (i) regarding the predictability of the Debtors' assets in the Cotton Valley and Haynesville plays and (ii) that, in valuing the Debtors' assets, Mr. Cecil should have applied the lower end of the SPEE range of RAFs[310] because, the Debtors argue, Mr. Reed lacks the qualifications necessary to render a reliable opinion on either subject.[311]  Mr. Reed's declaration states that he reviewed (i) the Haynesville and Cotton Valley plays relative to other unconventional plays; (ii) the Haynesville properties within the overall Haynesville play; and (iii) the Debtors' existing well performance results in the Haynesville and Cotton Valley plays to "analyze[] the risk and predictability of Debtors' wells for purposes of assessing whether there is any basis for exclusion of the P90 (Low) RAF for purposes of valuing the Debtors' reserves."[312]  His analysis led him to conclude that Mr. Cecil erroneously excluded low-RAFs in his valuation.[313]

Because Mr. Reed has no professional experience either with applying RAFs for unconventional resources or with valuing oil and gas assets in the Haynesville and Cotton Valley plays (or in the entire ArkLaTex region), the Debtors argue that his opinions should not be admitted because he lacks sufficient expertise as to the two subjects on which he proposes to opine.[314]  After hearing argument on the Debtors' oral motion, the Court stated that it would permit Mr. Reed to testify, subject to cross examination and to the Debtors' objection, and that

---

[310]    *See* Reed Decl. ¶ 38 ("I find no basis to use only the higher end of the SPEE range for RAFs, as the Debtors do in the Cecil Report, to value the Debtors' oil and gas properties.").
[311]    *See* June 27, 2016 Hr'g Tr. 31:15-32:3 (Reed).
[312]    Reed Decl. ¶ 22.
[313]    Reed Decl. ¶ 22.
[314]    *See* June 27, 2016 Hr'g Tr. 29:9-30:3 (Reed); 35:24-37:7 (Reed).

the Court would determine later whether it would exclude Mr. Reed's testimony or afford it appropriate weight in rendering a decision on confirmation of the Plan.[315]  Mr. Reed's testimony involved four opinions; each is discussed below.

First, Mr. Reed disagreed with Mr. Cecil's conclusion that the Debtors' asset base can be characterized as "relatively lower risk" when compared to similar assets across the oil and gas market.[316]  In order to evaluate the risk profile of the Debtors' oil and gas reserves, Mr. Reed testified that he examined the results of the Debtors' producing wells, the Debtors' projections and plan for their undrilled wells, the location of the Debtors' wells geographically and relative to other operators' wells, and work done by industry consultant Wood Mackenzie;[317] he concluded that (i) the Haynesville and Cotton Valley plays are not more predictable than other unconventional plays;[318] (ii) the Debtors' projections are "very aggressive relative to the actual results from their existing wells" in the Haynesville and Cotton Valley plays; and (iii) therefore, there is no basis for the Debtors to apply only mid-RAFs and high-RAFs for purposes of valuing the Reserves since the Debtors' assets are, at best, no better than the broader universe of oil and gas assets represented by the SPEE guidelines.[319]

In support of his opinion, Mr. Reed pointed to a chart in his declaration captioned "Cumulative wells drilled by industry" which graphically depicts wells drilled in the past ten years in the Haynesville, Cotton Valley, Eagle Ford, Bakken, Marcellus, and Permian plays in order to compare the level of drilling activity in the Haynesville and Cotton Valley plays to other

---

[315]    *See* June 27, 2016 Hr'g Tr. 42:10-24 (Reed).
[316]    Reed Decl. ¶ 9(b).
[317]    *See* June 27, 2016 Hr'g Tr. 47:9-16 (Reed).
[318]    Nearly 80 percent of the Debtors' gas reserves are located in the Haynesville and Cotton Valley plays, and both plays are considered "unconventional."  Reed Decl. ¶ 19.
[319]    June 27, 2016 Hr'g Tr. 47:18-23 (Reed); *see also* Reed Decl. ¶¶ 10-14.

plays in the United States.[320]  This chart of well activity led him to conclude that "more certainty and predictability has been developed in regions other than those where the Debtors' principal assets are located" and "the mere location of Debtors' wells in the Haynesville and Cotton Valley plays does not by itself support an upward adjustment of the RAF valuation factors."[321]

On cross-examination, however, Mr. Reed's testimony revealed that his analysis was skewed in numerous ways, as he admitted that: (i) out of the dozens of unconventional plays in the United States, not all are equally predictable;[322] (ii) the four other plays he selected to include in his analysis (Eagle Ford, Bakken, Marcellus, and Permian) were not randomly selected[323] and were not a representative sampling of all plays in the United States but rather were each selected by him because they were "heavy-drilling" plays;[324] (iii) in conducting his analysis, Mr. Reed did not control for the geographic size of the plays (which he acknowledged would have provided more reliable information as to predictability)[325] and instead used four plays that were substantially larger than the Haynesville and Cotton Valley plays; and (iv) he compared the six plays "only in a cursory way."[326]  After the conclusion of Mr. Reed's testimony, in response to questions from the Court regarding the complete lack of rigor displayed by Mr. Reed in conducting his analysis, counsel for the Committee stated on the record that the Committee

---

[320]    Reed Decl. ¶ 24, Figure 1.
[321]    Reed Decl. ¶ 26.
[322]    *See* June 27, 2016 Hr'g Tr. 109:7-10 (Reed).
[323]    *See* June 27, 2016 Hr'g Tr. 111:2-112:4 (Reed) (Q: "You didn't select these four plays for comparison to Haynesville and Cotton Valley using some randomized selection process, correct?" A: "That's correct." Q: "You don't know, in fact, if you were comparing Haynesville and Cotton Valley to four plays of average predictability, correct?" A: "Correct."  Q: "You made no attempt to choose four plays whose drilling activity was representative of all of the unconventional plays that are covered by the reserve adjustment factors, right?" . . . . A: "I did not.").
[324]    June 27, 2016 Hr'g Tr. 112:5-21 (Reed).
[325]    *See* June 27, 2016 Hr'g Tr. 115:1-116:22 (Reed). Mr. Reed admitted at the Confirmation Hearing that he knew that the plays he chose for comparison were not the same size as Haynesville and Cotton Valley. *See* June 27, 2016 Hr'g Tr. 124:7-11 (Reed).  He also admitted that his report does not mention this flaw in his analysis. *See* June 27, 2016 Hr'g Tr. 125:19-21 (Reed).
[326]    June 27, 2016 Hr'g Tr. 125:25-126:5 (Reed).

would not object to this section of Mr. Reed's opinion being stricken from the record.[327]  This

opinion is stricken.

Mr. Reed's second opinion criticized Mr. Cecil's conclusion that the Haynesville and

Cotton Valley plays can be characterized by "low geologic risk and predictable well results."[328]

To form his opinion, Mr. Reed testified that he created a map of the Haynesville play[329] that

depicts where Sabine's and other operators' existing and proposed wells are located within the

play.[330]  He overlaid the map with the locations of the higher quality (Tier I) and lower quality

(Tier II) areas of the play, as determined by industry consultant Wood Mackenzie.  Because the

majority of the Debtors' wells are located largely in the Carthage sub-play, which was classified

as Tier II by Wood Mackenzie[331] and which Mr. Reed describes as "the less desirable – and thus

less predictable – sections of the Haynesville play," Mr. Reed concluded that there is no basis to

use only the highest range of RAF factors to value the Debtors' assets on a risk-adjusted basis.[332]

At the Confirmation Hearing, Mr. Reed admitted that he relied on Wood Mackenzie's

views of the quality and predictability of oil and gas assets in the play and its identification of the

Tier I and Tier II subplays to *form* his views rather than to corroborate his own findings.[333]  He

performed no analyses of his own to determine whether parts of the Haynesville play merited

---

[327]    June 27, 2016 Hr'g Tr. 189:2-8 (McCaughey) ("And as to that portion, I think he also said that was a piece of his opinion that he provided for some context and that, again, along with the third section, the scatter plot, given the testimony and the understanding of the Court's concerns, those two sections are not sections that we would have an objection to being stricken.").

[328]    Reed Decl. ¶ 9(a).

[329]    Reed Decl. ¶ 28, Figure 3.

[330]    *See* June 27, 2016 Hr'g Tr. 55:16-21 (Reed).

[331]    June 27, 2016 Hr'g Tr. 57:8-19 (Reed).

[332]    Reed Decl. ¶ 29.

[333]    During the Committee's direct examination of Mr. Reed, Debtors' counsel objected to Mr. Reed using Wood Mackenzie as a substitute for his lack of expertise.  *See* June 27, 2016 Hr'g Tr. 58:25-59:9 (Balassa) ("Your honor, if the witness were an expert with respect to those Haynesville and Cotton Valley areas that he's offering testimony about and if he were an expert on reserve adjustment factors then I could see relying on Wood Mackenzie to corroborate his views, but the issue here is that the witness isn't an expert in these matters and so he's reading a document and he's essentially communicating what he's reading in a document and that's not the proper function of an expert who otherwise lacks qualification."); *see also* June 27, 2016 Hr'g Tr. 61:13-18 (Balassa).

Tier I or Tier II classification. On cross-examination, Mr. Reed acknowledged that productivity of a well is not the same as predictability of a well and the fact that Tier I wells are deemed more productive does not render them more predictable, and he conceded that the predictability of the Haynesville wells in Tier I is "roughly equivalent" to the predictability of Haynesville wells in Tier II.[334] Because Mr. Reed (i) did not perform his own analysis and instead relied on the determinations of Wood Mackenzie to form his views; (ii) confuses the concepts of productivity (as analyzed by Wood Mackenzie) and predictability; and (iii) lacks any expertise in valuing assets in the Haynesville play, the Court declines to afford Mr. Reed's second opinion any weight.

Mr. Reed next opined that the Debtors' well performance in the Haynesville and Cotton Valley plays has been inconsistent and "highly unpredictable,"[335] citing to Figure 4 of his declaration in support of his opinion. His declaration states that Figure 4, which depicts in what is commonly referred to a "scatterplot" graph, the well performance of sixty-one of Sabine's horizontal active Haynesville wells over twelve months of production, demonstrates the huge variance among Sabine's existing well performance even after controlling and accounting for well lateral length.[336] In response to questioning from Debtors' counsel at the Confirmation Hearing, Mr. Reed conceded that there is higher uncertainty as to production results with "test wells" versus "production wells;" notwithstanding, he did not know which of the wells included in his Figure 4 graph (which graph includes all of Sabine's recent horizontal wells) is a "test well" as opposed to a "production well."[337] Mr. Reed also was unable to demonstrate that the

---

[334]    June 27, 2016 Hr'g Tr. 130:5-132:24 (Reed).
[335]    Reed Decl. ¶ 31, Figure 4.
[336]    Reed Decl. ¶ 32.
[337]    June 27, 2016 Hr'g Tr. 138:12-140:5 (Reed).

methodology he employed in preparing Figure 4 was supported by any statistical text or guide.[338] After his testimony concluded, counsel for the Committee stated on the record that the Committee would not object to this part of Mr. Reed's declaration being stricken from the record.[339]  This opinion is stricken.

Finally, Mr. Reed discussed his fourth opinion that the Debtors' wells have underperformed their "type curve" projections, attempting to support the assertion in his declaration that "[b]y neglecting to use the P90 (Low) RAF, Cecil ignores recent operating history of the Debtors' wells, and the likelihood that future wells will also deliver production performance below the Debtors' projections."[340]

By way of background information, Mr. Reed explained that an EUR (estimated ultimate recovery) is a measure of the total volume of hydrocarbons that will be produced from a given well or a set of wells; EURs are created (i) to demonstrate the history of production of producing wells[341] and (ii) to predict the future production of undrilled reserves.[342]  For projections for future wells, an EUR can be determined using "type curve" projections of production over time for a well.  According to Mr. Reed, one might create a type curve either (a) by averaging decline curves of multiple existing wells that have analogous characteristics to the undrilled wells in

---

[338]    June 27, 2016 Hr'g Tr. 140:6-141:1 (Reed) (Q: "Now just picking two data points on a graph, that's not a methodology that's set forth in any statistical text or guide that you're aware of for illustrating the dispersion of results, correct?" A: "There are no guides that suggest to do it this way.").

[339]    June 27, 2016 Hr'g Tr. 186:24-187:3 (McCaughey) ("And so it may be because of that scrambling that there are some part of the report like the scatter plot, for example, that the Court views as not sufficiently, you know, backed up by the methodology and we would not object to those parts of it being stricken.").

[340]    Reed Decl. ¶ 37.

[341]    Mr. Reed explained that, for existing wells, a "decline curve" is created for each well to show projections for that well.  *See* June 27, 2016 Hr'g Tr. 68:1-22 (Reed).

[342]    June 27, 2016 Hr'g Tr. 66:10-17 (Reed).

question[343] or (b) as Mr. Reed did, by creating a single decline curve from the average actual

production of several analogous wells.[344]

Figure 5 of Mr. Reed's declaration[345] sets forth the EURs from the "updated" type curves

prepared by Mr. Reed "as compared to the Debtors' Effective Date Plan EURs."[346]  Mr. Reed

failed to include any explanation in his declaration as to why his type curves were different from

those prepared by Sabine.    When permitted to testify on this subject at the Confirmation

Hearing,[347] Mr. Reed was unable to offer a credible explanation as to why, in his view, Figure 5

revealed a disparity between his and Sabine's type curves other than to state that (i) he believes

his data covers a longer time span than the Company's data[348] and (ii) looking at the shape of the

spread of his individual type curves causes him to suggest that the length of time that one uses is

critical in making a reliable projection.[349]  Mr. Reed did not offer any explanation regarding the

particular characteristics or variables associated with the wells he used nor did he provide any

basis on which the Court could conclude that his type curves were more accurate than Sabine's.

Mr. Reed also failed to link his analysis to his conclusion regarding the need to apply low-RAFs

to any risk-adjusted valuation of the Debtors' assets, other than merely stating in a conclusory

manner that, because the Debtors' projections are "aggressive and optimistic," the likelihood of

---

[343]    June 27, 2016 Hr'g Tr. 68:5-69:8 (Reed).  Mr. Reed testified that the longer the time period of actual production data you have, the more certain your projection.  *See* June 27, 2016 Hr'g Tr. 79:9-13 (Reed).

[344]    June 27, 2016 Hr'g Tr. 142:13-143:6 (Reed).

[345]    Reed Decl. ¶ 36, Figure 5.

[346]    *Id*.

[347]    *See* June 27, 2016 Hr'g Tr. 82:15-20; 85:14-86:2 (Balassa) ("I renew my objection to the witness testifying and offering an objection as to why in his view there's a disparity between the Sabine type curves and the type curves that he prepared that doesn't appear in his report.". . . THE COURT: ". . . I agree with Mr. Balassa's observations. . . . You can cross-examine him and then we're going to see where it shakes out. . . . But I think the infirmities in this are being accurately identified.  I'll withhold an ultimate conclusion until the end.").

[348]    June 27, 2016 Hr'g Tr. 86:14-19 (Reed).

[349]    June 27, 2016 Hr'g Tr. 88:15-17 (Reed).  Debtors' counsel also objected to this line of testimony as beyond the scope of Mr. Reed's declaration, and the Court agreed that a discussion of the shape and the spread of Mr. Reed's type curves was not present in the Reed Declaration.  *See* June 27, 2016 Hr'g Tr. 89:19-90-23 (Balassa).

the Debtors' achieving their unrisked total volume "is highly unlikely and so they must be risk-adjusted to account for that."[350]

While Mr. Reed's declaration states that he compared Sabine's type curve projections to its recent production results to determine whether its projections were consistent with its actual production of oil and gas,[351] when questioned at the Confirmation Hearing, he admitted that his analysis does not plot Sabine's actual production data against its type curves; Mr. Reed instead created his own type curves and compared them against Sabine's type curves.[352]   On cross-examination, Mr. Reed testified that he created his type curves (which were then used to generate Figure 5 of his declaration) using data from eight wells, six of which did not match the wells used by the Company to prepare its type curves in its January 2016 business plan.[353]   When presented with the list of wells Sabine utilized,[354] Mr. Reed admitted that, at the time he prepared his analysis, he thought he was using the wells that were used for Sabine's type curves; he noted that there appeared to be some differences, and, although he "had questions about whether [the wells he used] were the right wells to use," he "went ahead and used them anyway."[355]

 After Debtors' counsel renewed his objection to exclude Mr. Reed's opinions following the conclusion of his testimony and emphasized that Figure 5 was not an "apples to apples" comparison that would support any conclusion as to the reliability of Sabine's type curves,[356]

---

[350]     June 27, 2016 Hr'g Tr. 100:11-25 (Reed).
[351]     Reed Decl. ¶ 34.
[352]     June 27, 2016 Hr'g Tr. 145:20-146:24 (Reed).
[353]     June 27, 2016 Hr'g Tr. 154:8-10 (Reed).
[354]     Ex. 749.
[355]     June 27, 2016 Hr'g Tr. 150:19-152:6; 154:22-24 (Reed) ("I had no idea that they had changed their plan and that they had different wells.").
[356]     June 27, 2016 Hr'g Tr. 176:15-24 (Balassa) ("And then finally, with respect to the type curve analysis where he thought he was comparing the same set of wells in apples to apples comparison, he concedes that in fact he was not comparing common sets of wells so he's simply making a comparison of one set of wells' EURs to another set of wells which doesn't support the conclusion that he was advocating as to the reliability or unreliability of Sabine's type curves.  So he does not readily apply principles and methodologies of type curves to the facts of this case.").

107

counsel for the Committee attempted to argue that "there is nothing irrelevant about the older wells that are reflected in his analysis" because "[his analysis] still has a place and it's still informative."[357]  The Court disagrees.  Mr. Reed based two of his primary conclusions on his Figure 5 bar graph in which he improperly compared the EURs of two *different* sets of wells. Because his methodology is not grounded in sound analysis, the Court is unable to accept Mr. Reed's conclusions that (i) the Debtors' wells have underperformed their type curve projections and (ii) the P90 RAF must therefore be used to risk-adjust the value of the Reserves.  The Court will thus afford no weight to this opinion; it is based on a deeply flawed type curve analysis.

Without formally granting the Debtors' request that Mr. Reed be precluded from offering any opinion testimony because he lacks the qualifications to offer the opinions set forth in his declaration, the Court nonetheless finds that all of Mr. Reed's four opinions fail.  Two of his opinions have been stricken from the record, and the Court has declined to give any weight to the other two.  As Debtors' counsel aptly observed in his closing argument at the Confirmation Hearing, "Your Honor, it's four opinions, it's not the three-legged stool, it's a chair.  All the legs are out and there's nothing for Mr. Zelin to sit on."[358]  The Court agrees.

## DISCUSSION

## VI.    Applicable Law

Section 1123 of the Bankruptcy Code states that a chapter 11 plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate" and "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. §§ 1123(b)(3)(A), (b)(6).  Courts analyze settlements under section 1123 by applying the same standard applied under Bankruptcy Rule 9019, which permits

---

[357]    June 27, 2016 Hr'g Tr. 191:4-15 (Reed).
[358]    July 13, 2016 Hr'g Tr. 88:13-15 (Balassa).

a court to "approve a compromise or settlement." *See* Fed. R. Bankr. P. 9019(a); *see, e.g., Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co., Inc.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."), *aff'd*, 68 F.3d 26 (2d Cir. 1995). "Compromises are a normal part of the process of reorganization." *In re NII Holdings*, *Inc., et al.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (hereinafter, "*TMT Trailer Ferry*") (citation omitted)). Indeed, compromises are favored because they "minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *HSBC Bank USA, N.A. v. Fane (In re MF Global Inc.),* 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012); *see also In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012).

A court may approve a settlement under Bankruptcy Rule 9019 if it is fair and equitable and in the best interests of the estate. *See NII Holdings*, 536 B.R. at 98; *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. at 424-25 (1968); *see also In re MF Global Inc.,* 466 B.R. at 247. The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court. *See Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994). The settlement proponent bears the burden "to persuade the court that the settlement is in the best interests of the estate." *MF Global*, 466 B.R. at 248.

In assessing whether a settlement is in the best interests of the estate, "[i]t is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying [each] dispute." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007). Rather,

the court must be "apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment." *Dewey*, 478 B.R. at 640-41. Moreover, courts are to "look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 837 (Bankr. D. Del. 2008) (citation omitted).

In conducting its analysis of a settlement, a court may rely on the opinions of the debtor, the parties to the settlement, and professionals in evaluating the necessary facts, and it should factor in the debtor's exercise of its business judgment in recommending the settlement. *See Dewey*, 478 B.R. at 641; *In re Chemtura Corp.*, 439 B.R. 561, 609 (Bankr. S.D.N.Y. 2010) (hereinafter "*Chemtura*"). While the court may "give weight to the [debtor's] opinion that the settlement is fair and equitable," however, it "may not simply adopt the [debtor's] position without making its own independent inquiry." *In re Soup Kitchen Int'l Inc.*, 506 B.R. 29, 37 (Bankr. E.D.N.Y. 2014); *MF Global*, 466 B.R. at 247, *Dewey*, 478 B.R. at 641 ("The bankruptcy court must exercise its own independent judgment in analyzing the *Iridium* factors"); *In re Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009) ("A court may not simply defer to a debtor in possession's judgment, but must independently evaluate the reasonableness of the settlement.").

Perhaps the best formulation of how the Court should approach the task of evaluating a settlement can be found in the Supreme Court's seminal decision in *TMT Trailer Ferry*:

> [The Court must] apprise [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*In re NII Holdings*, 536 B.R. at 99 (quoting *TMT Trailer Ferry*, 390 U.S. at 424-25).

To be approved, "[t]he settlement need not be the best that the debtor could have obtained." *Adelphia Commc'ns Corp.*, 368 B.R. at 225; *Nellis*, 165 B.R. at 123. Indeed, "[i]f courts required settlements to be perfect, they would seldom be approved." *Official Comm. of Unsecured Creditors v. CIT Grp./Bus. Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 180 (3d Cir. 2015) (affirming bankruptcy court's approval of a settlement pursuant to Rule 9019 of the Bankruptcy Rules even though one of the claims resolved as part of the settlement was "far from compelling"). Rather, "there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972), *cert. denied*, 409 U.S. 1039 (1972); *In re Enron Corp.*, 2004 Bankr. LEXIS 2549 at *91 (approving a settlement where the "distribution formula [was] not a precise mathematical quantification of the likelihood of substantive consolidation of each Debtor into each of the other Debtors, which would be impossible to calculate. Rather, the formula represent[ed] a negotiated compromise of numerous inter-estate issues, including substantive consolidation.").

Instead of focusing on a precise measurement of likely outcomes, a court should instead "canvass the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness." *Adelphia Commc'ns Corp.*, 368 B.R. at 225 (citation omitted); *see also Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) (holding that the settlement need not result in the best possible outcome for the debtor but rather that it must not "fall beneath the lowest point in the range of reasonableness"). In complex settlements, it is appropriate for the court not only to

111

consider each settled claim individually, *see*, *e.g.*, *In re Enron Corp.,* Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004), but also to consider the reasonableness of the settlement agreement as a whole. *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993) ("Since the Settlement Agreement is a global settlement of all the claims, it is not possible to vacate only the portions which affect [certain debtors' abilities to pay].  The appropriate inquiry is whether the Settlement Agreement in it [sic] entirety is appropriate for the . . . estate.").  The court "is not required to assess the minutia of each and every claim." *Nellis*, 165 B.R. at 123.

When courts in this Circuit consider whether a settlement is within the range of reasonableness, they apply the following factors:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits;
> (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay;
> (3) the paramount interests of creditors;
> (4) whether other parties in interest support the settlement;
> (5) the nature and breadth of releases to be obtained by officers and directors;
> (6) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; and
> (7) the extent to which the settlement is the product of arm's-length bargaining.

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (hereinafter "*Iridium*").

## VII.    The Process Undertaken by the Debtors and the Independent Directors Committee

Although in considering approval of a settlement of claims a court may not substitute the debtor's judgment for its own and instead must undertake an independent, reasoned analysis of the claims at issue, *see Soup Kitchen Int'l Inc.*, 506 B.R. at 37, in making its determination, the

court may nonetheless take into account the debtor's business judgment in recommending a settlement.[359]

Here, the Debtors undertook an extensive analysis of (i) certain claims and causes of action that could be asserted by or against the Debtors and the potential maximum recoveries that could be achieved with respect to such claims and (ii) the value of the Debtors' unencumbered assets and the estimated size of the Adequate Protection Claims.  Even in "the best possible scenario" for unsecured creditors – *i.e.*, assuming a total victory for unsecured creditors on each and every Bucket II Claim and ignoring costs to the Debtors' business from continued uncertainty and delay in emerging from chapter 11, opportunity and human costs, and risk of loss[360] – the Debtors determined that (a) the Collateral Diminution suffered by the RBL Lenders entitles them to all of the value of the Debtors' unencumbered assets on account of their Adequate Protection Claims and (b) the Adequate Protection Claims "swamp any recovery" on the Bucket II Claims.[361]  Accordingly, the Debtors concluded that, in their business judgment, the Settlement is reasonable and in the best interests of the Debtors' estates.

The Committee vehemently disagrees.  It argues that the Debtors entered into the Settlement relying on "a significantly overstated view" of the Adequate Protection Claims, while at the same time "disregarding significant unencumbered value available to unsecured creditors and simply capitulating on other disputed elements of unencumbered value."[362]  The Committee alleges that (i) the Prepetition Secured Lenders have never asserted the Adequate Protection Claims in liquidated amounts, and thus, the Settlement purports to settle claims that have never

---

[359]    *See MF Global Inc.*, 2012 Bankr. LEXIS 3701 at *5) (recognizing that although courts have the discretion to approve settlements, the business judgment of the debtor in recommending a settlement should be considered); *see also Dewey*, 478 B.R. at 641; *NII Holdings, Inc.*, 536 B.R. at 100.

[360]    The Debtors submit that these additional costs would further reduce any potential value available to unsecured creditors from the unencumbered assets.

[361]    Debtors' Conf. Br. ¶ 19.

[362]    Committee Obj. ¶ 7.

been formally asserted and (ii) the Settlement rests on flawed valuation methodology. Consequently, not only does the RBL Lenders' Adequate Protection Claim not "consume" what would be the "rightful and proper recovery" to unsecured creditors; "it is not even close."[363]  The Committee asserts that, because of these fundamental flaws in the Debtors' analysis and their failure to pursue unencumbered value potentially available to unsecured creditors, the Settlement should not be approved.

The declarations filed in support of confirmation of the Plan and the evidence presented during the course of the eleven days of testimony at the Confirmation Hearing demonstrate that, during the months-long negotiations that led to the Settlement, the Debtors' management and professionals, the Independent Directors Committee, and Sabine's full board of directors more than adequately informed themselves, through extensive analysis conducted by the Debtors' professionals, of the merits of each of the claims being resolved through the Settlement, including, but not limited to, the Adequate Protection Claims and the Bucket II Claims. Moreover, as discussed more fully in Section VIII.A, *infra*, the Committee's allegations regarding the alleged flaws in the Debtors' valuation methodology and their calculation of the Adequate Protection Claims have no support in the record.

To evaluate the reasonableness of the Settlement vis-à-vis the Bucket II Claims, Mr. Mitchell and his team prepared an extensive analysis of the total amounts that could be asserted for each claim and the risk-adjusted amounts of potential recoveries on each claim based on likelihood of success  Mr. Mitchell and his team also estimated the size of the Adequate Protection Claims by calculating the amount of Collateral Diminution between the Petition Date and the Forecasted Effective Date, employing information provided by Mr. Magilton's

---

[363]     Committee Obj. ¶ 6.

Encumbrance Review and Mr. Cecil's valuation.[364]   As Mr. Mitchell testified in detail, in order

to illustrate his conclusion that "[b]oth the maximum value and risk-adjusted value of the Bucket

Two Claims fall far short of overcoming the Secured Lenders' adequate protection claims to

which substantially all of the Bucket Two recoveries would be subject"[365] he created several so-

called "waterfall" analyses to compare different scenarios for Adequate Protection Claims and

potential Bucket II Claims with recoveries under the Plan and Settlement.   These waterfalls

modeled a wide variety of outcomes for a list of twenty issues – ten for "Adequate Protection"

and ten for "Bucket II Claims" – and further confirmed the Debtors' conclusion that the Plan and

Settlement maximize value for the Debtors' stakeholders under any realistic scenario.

Between May and mid-December 2015, the Independent Directors Committee appointed

by Sabine's board reviewed detailed analyses of the merits of (i) the Fraudulent Conveyance

Claims (as analyzed by Professor Jack Williams in the Williams Report); (ii) the Bucket II

Claims (as presented in detail by Kirkland to the full board of directors at October 27, 2015 and

January 22, 2016 board meetings);[366] and (iii) the Bad Acts Claims (as analyzed by Kirkland in

the December 1 Report).   In addition, as Mr. Sambrooks testified, Sabine's board held nine board

meetings over the course of the eight months of plan negotiations for the board to discuss and, on

March 29, 2016, to approve, what would ultimately become the Plan containing the Settlement.

The Debtors also weighed the risks to the Debtors' business of continued litigation – which

---

[364]   In his testimony, Mr. Mitchell also emphasized that his estimate of the Adequate Protection Claims was conservative. *See* June 22, 2016 Hr'g Tr. 56:13-24 (Mitchell) (Q: "Did you attempt to calculate a precise adequate protection claim amount, to which the secured lenders would be entitled in the event that the issue would ever be adjudicated?" A: "No, my approach was to estimate the likely adequate protection claim.   And look, frankly, in doing that, understanding that the reason I was doing this was for settlement purposes, I tried to take a conservative position.   So I know that [counsel to the RBL Lenders] would argue with some of my assumptions, and I'm sure if [the financial advisor to the RBL Lenders] was calculating an adequate protection claim, that their number would be substantially larger.").
[365]   Mitchell Initial Report ¶ 13.
[366]   June 13, 2016 Hr'g Tr. 243:18-244:11 (Sambrooks).

would extend the length of their chapter 11 cases, further deplete estate resources, create prolonged uncertainty, and likely reduce the value of the Debtors' assets.[367]    The evidence demonstrates that that Debtors and Sabine's board were well aware of the complexity of the claims being resolved through the Settlement and that the board found the Settlement to be reasonable.

Bearing in mind the Debtors' extensive and thorough analysis and their business decision to approve the Settlement as reasonable, the Court next will undertake its own inquiry into the reasonableness of the Settlement.[368]

## VIII.    The Settlement Embodied in the Plan is Fair, Reasonable, and Well Above the Lowest Point in the Range of Reasonableness

Even if the Court were to conclude that the Debtors employed flawed valuation methodology, incorrectly estimated the Adequate Protection Claims, and undervalued the Bucket II Claims, as argued by the Committee, the Court nonetheless could determine, after independently canvassing each of the claims at issue that the Settlement falls within the range of reasonableness and should be approved.    Having conducted an eleven-day evidentiary hearing on confirmation of the Plan and having reviewed hundreds of pages of briefing and declarations filed in connection with confirmation, the Court has familiarized itself with the facts and

---

[367]    Mitchell Initial Report ¶¶ 21-22.

[368]    *See Nellis*, 165 B.R. at 123 ("The experience and knowledge of the bankruptcy court judge is of significance in assessing the propriety of the settlement.").    In determining whether to approve a complex settlement under a plan, bankruptcy courts consider each settled claim individually, while also examining the settlement as a whole.    *See, e.g., Adelphia Commc'ns Corp.*, 368 B.R. at 182-219 (analyzing each individual claim settled under complex plan settlement agreement); *In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928 at *16-23 (Bankr. S.D.N.Y. Oct. 31, 2003) (same); *In re Enron Corp.*, 2004 Bankr. LEXIS 2549 at *84-117 (same); *In re Enron Corp.*, No. 02 Civ. 8489 (AKH), 2003 WL 230838 at *3 (S.D.N.Y. Jan. 31, 2003) (affirming bankruptcy court's decision that a settlement "as a whole was fair and equitable"); *In re Washington Mutual, Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011) ("[E]ach part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable.    This is not to say, however, that this is a mere math exercise comparing the sum of the parts to the whole.    Rather, the Court recognizes that there are benefits to be recognized by a global settlement of all litigation . . . that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately.").

circumstances surrounding the Plan and the Settlement and has conducted an independent review of the Settlement, as follows.

### A.      The Settlement of the Adequate Protection Claims

The Committee argues that the Settlement does not meet the requirements of Bankruptcy Rule 9019 and cannot be approved because the Settlement is based in part on the Debtors' estimate of the size of the Adequate Protection Claims, which the Committee submits is overstated and "fatally flawed."[369]    As discussed above, in support of its challenge to the Debtors' sizing of the Adequate Protection Claims, the Committee identifies a number of downward adjustments to the Debtors' estimate, as reflected in the Zelin Bridge; the Committee's estimate of the Adequate Protection Claims, which reflects those adjustments, is materially lower than the Debtors' estimate, as reflected in the Mitchell Bridge.  Remarkably, in the Committee's view, the Adequate Protection Claims approach zero.

The Debtors and the Prepetition Secured Lenders reject both (i) the Committee's critiques of the Debtors' estimate of the Adequate Protection Claims and (ii) the Committee's estimate. They argue that the Debtors' methodology for estimating the Adequate Protection Claims is supported by the law and consistent with industry practice.   Importantly, contrary to the Committee's position, the Debtors argue that their estimate is in fact conservative because if the Settlement were not approved and the size of the Adequate Protection Claims were litigated, the RBL Lenders and the Second Lien Lenders would have meaningful arguments in support of Adequate Protection Claims in excess of the Debtors' estimate, in particular with respect to the "Weighted Bucket II Approach" and the "Additional Haynesville Locations" issues.[370]   In

---

[369]      Committee Obj. ¶ 24.
[370]      *See* June 22, 2016 Hr'g Tr. 84:11-19 (Mitchell); *see also* Section VIII.A.5, *infra*.

addition, as discussed *infra*,[371] the Debtors also assert that even if this Court concludes that the Committee's challenges to the Debtors' estimate of the Adequate Protection Claims are valid and that the size of the Adequate Protection Claims is in line with the Committee's estimate, the Settlement is nevertheless still reasonable and should be approved.

Having heard testimony from the Debtors' experts and the Committee's experts as to the legal and factual bases for each of their estimates of the size of the Adequate Protection Claims, and having considered the arguments that the RBL Lenders and the Second Lien Lenders would assert if the issue of the Adequate Protection Claims was litigated, the Court is persuaded that the Debtors' methodology for calculating the Adequate Protection Claims is well supported by applicable law and relevant facts.  The Court concludes that the Debtors' estimate of the size of the Adequate Protection Claims is reasonable and avoids litigation in which the Prepetition Secured Lenders would pursue substantially larger Adequate Protection Claims.

As indicated above, the Committee has advanced a number of critiques of the Debtors' methodology for estimating the size of the Adequate Protection Claims.  The Court addresses the Committee's principal arguments in turn.

### 1. An "Enterprise" Valuation In Which All Indirect Costs Are Deducted from the Value of the Reserves is Not Appropriate for Purposes of Estimating Collateral Diminution and the Adequate Protection Claims

The Debtors and the Committee disagree as to whether the Debtors' burdening the value of the Reserves with the Direct Costs and the COPAS Charges, rather than with the Direct Costs and all Indirect Costs, as the Committee advocates, is appropriate for purposes of estimating Collateral Diminution and the Adequate Protection Claims.[372]  As illustrated in the Zelin Bridge,

---

[371]    *See* Section VIII.D, *infra*.

[372]    The Committee identifies two types of Indirect Costs that it argues must be included in the valuation: (i) "Unallocated Overhead" and (ii) "Unallocated Land Expense."

this methodological disagreement has the largest mathematical impact on the difference between the estimate calculated by Mr. Mitchell and the estimate calculated by Mr. Zelin.[373]  The Committee argues that properly burdening the value of the Reserves with all Indirect Costs results in a reduction of the Debtors' estimate of the Collateral Diminution, and, therefore, the Adequate Protection Claims, by $189 million.[374]

The Debtors and the Supporting Parties argue that the valuation approach used by Mr. Cecil is consistent with applicable law and with industry-standard methods to value oil and gas assets, while Mr. Zelin's approach is "inconsistent with common sense"[375] because it improperly uses an enterprise valuation to value assets.  The Committee argues that Mr. Zelin's use of an enterprise valuation to estimate asset value is appropriate because the value of the Debtors' Reserves cannot be assessed without considering the costs the Debtors will incur in generating that value.  The Court concludes that burdening the value of the Reserves with Direct Costs and COPAS Charges is reasonable and consistent with applicable law and industry standards.  Moreover, even if the Court agreed with the Committee's assertions that Mr. Cecil's use of COPAS Charges in his valuation underestimates the appropriate amount of Indirect Costs that should be deducted from the value of the Reserves, the Court finds no basis to adopt the Committee's alternative approach of burdening the value of the Reserves with *all* of the Indirect Costs.

Neither party has identified any authority directly on point as to what costs should burden the value of the Reserves in this context.  Rather, each party cites to, among other cases, the

---

[373]    *See* Appendix A, Zelin Bridge, "Unallocated Overhead" and "Unallocated Land Expense" columns.
[374]    According to Mr. Zelin, burdening the value of the Reserves with "Unallocated Overhead" results in a $164 million downward adjustment and with "Unallocated Land Expense" in a $25 million downward adjustment. *See* Appendix A, Zelin Bridge.
[375]    Second Lien Agent Reply ¶¶ 19-22.

Supreme Court's ruling in *Assocs. Commercial Corp. v. Rash* to support its own interpretation of

section 506(a)(1) with respect to how to value collateral for purposes of an adequate protection

claim.[376]  However, *Rash* stands only for the widely accepted proposition that collateral must be

valued in light of its "proposed disposition or use" for purposes of deciding whether foreclosure

value, going concern value, or some alternative value is most relevant; none of the cases cited

prescribes the specific line items that must be included in the calculation of such value.[377]

      The Committee also cites to another Fifth Circuit decision in support of its argument that

a going concern asset valuation here must include all of the "actual costs of operating [the

Debtors'] business."[378]  The Committee's argument is unavailing.  In that case, the District Court

and the Fifth Circuit affirmed the bankruptcy court's decision to employ a going concern

methodology to value a hotel based on the proposed use of the property and found that it was not

clearly erroneous to include in such going concern valuation a line item for "overhead costs."[379]

Specifically, the Fifth Circuit noted that the bankruptcy court found a "yearly corporate overhead

allocation . . . to be a necessary expense [that] should be accounted for in determining the fair

value of the Hotel."[380]

      Contrary to the Committee's arguments, these decisions do not provide any greater

guidance on the question at issue here than do *Rash* and *ResCap*.  While they confirm, at most,

---

[376]    *See* Committee Obj. ¶ 13; Debtors' Conf. Br. ¶¶ 41-42.

[377]    *See Assocs. Commercial Corp.*, 520 U.S. at 956 (noting that the dispute involved whether "the value of the collateral [should] be determined by (1) . . . (the 'foreclosure-value' standard); (2) . . . ('the replacement-value standard'); or (3) the midpoint between these two measurements"); *ResCap*, 501 B.R. at 591-95 (finding that "fair market value rather than foreclosure value applies" where evidence at trial confirmed that the parties "always intended to market and sell the properties as a going concern"); *SK Foods*, 487 B.R. at 262 (noting that the "sole argument on appeal" was whether the value of certain collateral should have been based on a "liquidation value" or a "going concern" value).

[378]    Committee Obj. ¶ 16 (citing *Fin. Sec. Assurance Inc. v. T-H New Orleans L.P. (In re T-H New Orleans L.P.)*, 116 F.3d 790, 795, n.2, 799-800 (5th Cir. 1997) and *Fin. Sec. Assurance Inc. v. T-H New Orleans L.P. (In re T-H New Orleans L.P.)*, 188 B.R. 799, 807 (E.D. La. 1995)).

[379]    *See In re T-H New Orleans L.P.*, 116 F.3d at 799-800; *In re T-H New Orleans L.P.*, 188 B.R. at 807.

[380]    *In re T-H New Orleans L.P.*, 116 F.3d at 795, n.2.

the appropriateness of including some overhead in a going concern valuation (as the Debtors have done here) and including those expenses that inform the fair and proper valuation of collateral, they do not support the Committee's position that all expenses of the business should be included when calculating the going concern value of the business's assets.[381]

Therefore, applying the guidance provided by the Supreme Court in *Rash* and by other relevant authority, the Court must determine the appropriate methodology to use (and the corresponding line items to include) to value the Reserves with respect to the Indirect Costs. Here, there is no dispute that at all relevant times between the Petition Date and the Forecasted Effective Date, the Debtors have sought to hold and operate their assets through consummation of a chapter 11 plan of reorganization.  As a result, the proper methodology for measuring the value of the Reserves for purposes of estimating the Adequate Protection Claims is a going-concern valuation in the hands of the Debtors pursuing a standalone reorganization.[382]  In the absence of dispositive legal authority or industry guidance, the Court concludes that the Debtors have carried their burden of showing that Mr. Cecil's approach of including all of the Direct Costs and the COPAS Charges is a reasonable method of valuing the Reserves consistent with the above principles.

The Debtors argue that Mr. Cecil's approach values the Reserves "in accordance with the industry standard valuation methodology established by the SPEE to determine fair market value of their oil and gas assets."[383]  They assert that the SPEE provides "that fair market value is the value of the subject assets in a non-duress sale between a willing buyer and a willing seller,

---

[381]    The Court agrees with the Debtors' suggestion that the overhead expense in *T-H New Orleans L.P.*, referred to by the circuit court as an "overhead allocation charge," likely only included a portion, and not all, corporate overhead.  The Fifth Circuit and District Court decisions in *T-H New Orleans L.P.* do not provide any additional specifics on the nature of that line item, including how or by whom that figure was determined.
[382]    *See ResCap*, 501 B.R. at 595 (valuing collateral in the hands of the debtors on a going concern basis in light of the debtors' pursuit of a going-concern sale, but discounting value on account of issues related to sale).
[383]    Debtors' Conf. Br. ¶ 43.

under non-constrained market conditions"[384] and that exploration and production companies generally use the SPEE approach "to assess the value of oil and gas assets" based on an intended use of continued operation under the company's development plan.[385]  Specifically, in addressing valuations of oil and gas assets, the SPEE's Petroleum Engineering Handbook provides that "[t]he costs projected in the economic evaluation are generally field-level expenses and exclude general and administrative (overhead) costs."[386]  Therefore, the Debtors assert that their approach of including the overhead costs encompassed by the COPAS Charges is even more conservative than the approach suggested by SPEE.

In addition, based on ample witness testimony, the Debtors submit that the inclusion of COPAS Charges is an appropriate approach to burdening the value of the Reserves because the COPAS guidelines seek to allocate that portion of Indirect Costs that are incurred in generating the value of the Reserves, while excluding costs that are not generally required to do so.[387]  The COPAS guidelines provide a methodology for estimating Indirect Costs that should be charged to the Reserves, and are designed to avoid the use of resources required to track on a more precise basis the incurrence of Indirect Costs by each individual Reserve.  The Committee has

---

[384]    Cecil Rebuttal Report ¶ 10.  SPEE defines fair market value as "the price a willing buyer will pay and a willing seller will accept for a property, when the property is exposed to the market for a reasonable period and neither party has any compulsion to buy or to sell, and both have reasonable knowledge of relevant facts."  *See* Cecil Rebuttal Report ¶ 10, n.3 (citing *Perspectives on the Fair Market Value of Oil and Gas Interests*, Russ Long, 2002).

[385]    Cecil Rebuttal Report ¶ 15.

[386]    Cecil Rebuttal Report ¶ 15 (citing Petroleum Engineering Handbook Volume V (Section 19.4.5)).

[387]    The Committee acknowledges that the Debtors' valuation already includes $155 million in "direct G&A costs attributable just to the well." (*sic*)  Committee Obj. ¶ 26.  The Debtors argue that to the extent other Indirect Costs are actually incurred for the benefit of secured creditors, section 506(c) of the Code provides a mechanism, in appropriate circumstances, to surcharge such expenses against the secured creditor's collateral.  The Debtors point to the fact that, pursuant to the settlement of the Bucket II Claims, unsecured creditors are credited with $27.4 million in additional Indirect Costs ($13.7 million on a risk-adjusted basis).  The Court agrees with the Debtors that adopting the Committee's position that all costs of the Debtors' businesses should be included in the valuation of the Reserves would render section 506(c) of the Code meaningless because, in that case, all costs and expenses of the Debtors' entire business – not just the "reasonable and necessary" costs of "preserving" a secured lender's collateral as provided for in section 506(c) – could be surcharged against such collateral.

failed to demonstrate that it is unreasonable to use the COPAS guidelines to estimate the portion of Indirect Costs to include in the valuation of the Reserves here.

Moreover, the Committee has entirely failed to substantiate its own approach. For example, the Committee offers no basis for including Indirect Costs that in no way contribute to the generation of value from the Reserves (for instance, costs associated with the acquisition of new leases). Therefore, even if the Court determined that the Debtors' use of COPAS Charges was improper, the Court finds no basis to rely on the Committee's assertion that *all* projected Indirect Costs should burden the value of the Reserves.[388] At the Confirmation Hearing, Mr. Zelin even acknowledged that it is not reasonable to burden the value of an entity's current assets with costs incurred in connection with the acquisition of a potential new asset[389] and that the Debtors' G&A figure, which Mr. Zelin included in his valuation of the Reserves, likely includes such costs, among others.[390]

In addition to that substantial flaw in the Committee's position, Mr. Zelin's methodology for valuing the Reserves is also inconsistent with the approach he took in connection with the STN Hearing, where, for purposes of calculating the "ending" value of the Collateral to estimate

---

[388]    At the Confirmation Hearing, the Committee argued that the Debtors have not shown that any G&A expenses are in fact unrelated to accessing the value of the Reserves. This argument is a red herring. The Debtors had no burden to demonstrate the inadequacy of the Committee's rebuttal valuation methodology. The Debtors did in fact debunk the Committee's valuation methodology while separately satisfying their burden of proof with respect to their own methodology. In addition, Mr. Zelin included a $25 million Land Expense identified in the Debtors' budget in his calculation of the value of the Reserves, which, according to Mr. Cecil, is entirely unreliable because the Debtors did not make projections for each year going forward, but "took one year and just carried it forward" as an accounting "placeholder." June 20, 2016 Hr'g Tr. 62:22-63:9 (Cecil).

[389]    *See* July 7, 2016 Hr'g Tr. 105:21-25 (Zelin) (Q: "Sir, you also agreed, don't you, that if you were asked to value 10 encumbered wells, that it would not be appropriate to include the G&A or other costs associated with acquiring a separate well, right?" A: "In general, that's yes.").

[390]    *See* July 7, 2016 Hr'g Tr. 106:9-107:1 (Zelin) (Q: "You also don't know, sir, whether the unallocated G&A that you've used to burden the assets in this case includes the G&A or other costs of making divestitures, right?" A: "In general, yes." Q: "You don't know?" A: "In general, yes." Q: "And you don't know whether the unallocated G&A of Sabine includes costs of exploration for new sites that are not in the reserve report, correct?" A: "Specifically, no. Q: "You don't know?" A: "I do not know." Q: "You do recognize, though, that unallocated G&A of an oil and gas company can include costs associated – G&A and other costs associated with exploration acquisitions and divestitures, right?" A: "Yes, I would agree with that. In general, that's my understanding.").

the Adequate Protection Claims, he used a going concern valuation, as he did here, but performed an asset valuation (rather than an enterprise valuation) and did not burden the value of the Reserves with *any* Indirect Costs.  Mr. Zelin explained at the Confirmation Hearing that he used a different approach for the STN Hearing than he did for the Confirmation Hearing because the purpose of his calculation had changed: at the STN Hearing, he was calculating an estimate of the size of the RBL Lenders' Adequate Protection Claim premised on the Committee's view that the Debtors' assets should be sold and transferred outside the bankruptcy estate, whereas here, he testifed, he is estimating not the sale value of the assets, but the value "in the hands of the debtors."[391]

The Court finds this explanation unconvincing.  On cross-examination, Mr. Zelin confirmed that his decision at the STN Hearing to calculate the ending value of the Prepetition Collateral using a going concern methodology was based on his understanding that the Debtors intended to use the Prepetition Collateral in a going concern operation of the business pursuant to a plan of reorganization.[392]  That testimony is inconsistent with his explanation that the STN Adequate Protection Methodology was used to estimate the Adequate Protection Claims in contemplation of a sale of the Debtors' assets.  The logical explanation for the shift in Mr. Zelin's methodology is that in preparation for the Confirmation Hearing, the Committee sought to develop a valuation methodology that would not be inconsistent with the principles outlined by the Court in the STN Decision, but would nonetheless result in a *de minimis* estimate of the size of the Adequate Protection Claims.

Despite the myriad deficiencies and inconsistencies in the Committee's estimate of the value of the Reserves, the Committee has urged the Court to accept its critiques of the Debtors'

---

[391]    *See* July 8, 2016 Hr'g Tr. 108:22–109:13 (Zelin).
[392]    *See* July 8, 2016 Hr'g Tr. 106:12–17 (Zelin).

estimate and conclude that such estimate is unreliable for purposes of evaluating the Settlement. In addition to its principal argument, discussed above, that the Debtors are unable to generate the value of the Reserves without incurring all of the costs of the business and therefore such costs should be included in a going-concern asset valuation, the Committee argues that the Debtors' use of COPAS results in two "anomalies" that underscore the inappropriateness of using COPAS Charges as a "proxy" for Indirect Costs: (i) although the Debtors have reduced their projected annual G&A by over approximately $40 million over the course of their bankruptcy cases, Mr. Cecil's COPAS Charges line item increased by $24 million from the Petition Date to the Forecasted Effective Date;[393] and (ii) the use of COPAS Charges in Mr. Cecil's enterprise value analysis for purposes of valuing recoveries under the Plan, which relies on Mr. Cecil's Reserves valuation, results in an overallocation of expenses and consequently a total enterprise value that is less than the total value of the Reserves.[394]

Both "anomalies" are readily explainable, but not in ways that are favorable to the Committee. First, Mr. Magilton testified at the Confirmation Hearing that COPAS Charges increased from the Petition Date to the Forecasted Effective Date because, subsequent to the preparation of the Company's April 2015 business plan, which serves as the basis for Petition Date valuation calculations, the Debtors' management team discovered that the Legacy Forest financial statements were not properly charging the wells that Legacy Forest contributed to the Combination consistent with the COPAS guidelines. The Company corrected that error in its subsequent business plans, resulting in an increase of COPAS Charges for all of the wells that had been owned by Legacy Forest.[395]   Mr. Zelin testified that he had not been aware of this

---

[393]    Zelin Initial Report ¶ 29(a).
[394]    *Id.* at ¶ 29(b).
[395]    *See* June 21, 2016 Hr'g Tr. 128-129, 144-149 (Magilton).

explanation when he prepared his expert report or at any time prior to providing his testimony at the Confirmation Hearing.[396]

Second, Mr. Magilton testified that he understood that the ARIES Database used by Mr. Cecil to calculate the net value of the Reserves at both the Petition Date and the Forecasted Effective Date reflected a fifty-year treatment of COPAS Charges – meaning, that fifty years' worth of COPAS Charges were included in the ARIES Database – because that is the Debtors' estimate of the life of the wells.[397]   In contrast, Mr. Zelin's capitalized G&A approach using a multiple of 4.5x only projects G&A over a four to five year period.   It is logical, then, that Mr. Cecil's expenses line item, which reflects fifty years' of COPAS Charges, is greater than Mr. Zelin's capitalized expenses, which reflect only four to five years of Indirect Costs.   While these explanations in isolation neither support nor detract from the reasonableness of the Debtors' methodology, they render the Committee's critiques unpersuasive as a basis for the Court to conclude that the Debtors' estimate of the value of the Reserves is unreasonable.

Finally, it is worth noting the likely practical impact of adopting the Committee's approach.   As the Prepetition Secured Lenders point out, adopting the Committee's valuation methodology could have a negative impact on the ability of companies facing substantial adequate protection claims to reorganize because a secured lender would be significantly more likely to insist on a sale of a debtor's business on the first day of every chapter 11 case in order to avoid the risk of having its collateral burdened with the capitalized costs of running the entire business.[398]   Secured lenders would also be less likely to permit the debtor's use of collateral

---

[396]    The Court will not speculate as to why Mr. Zelin was not made aware prior to his testimony of Mr. Magilton's explanation even though two weeks elapsed between the date that Mr. Magilton testified on this issue and the date that Mr. Zelin took the stand at the Confirmation Hearing.
[397]    *See* June 21, 2016 Hr'g Tr. 147:8-21 (Magilton).
[398]    *See, e.g.,* RBL Agent Br. ¶ 33.

during a chapter 11 case for similar reasons. Such a framework is inconsistent with the underlying purpose of the Code to enable corporate reorganization and it is also inconsistent with congressional intent.[399] Moreover, such an approach would undoubtedly dramatically change borrowing base calculations in reserve-based lending facilities.

Therefore, the Court rejects the Committee's challenges to the Debtors' Reserves valuation methodology. The approach taken by Mr. Cecil with respect to the burdening of the value of the Reserves with only Direct Costs and COPAS Charges is consistent with applicable law and industry standards; Mr. Cecil's conclusions based on this approach are reasonable.

### 2. Using the Mid-RAFs and High-RAFs to Risk-Adjust the Value of the Reserves is Appropriate

As illustrated in the Zelin Bridge, the Committee also challenges Mr. Cecil's use of only the mid-RAFs and high-RAFs to risk-adjust the value of the Reserves. The Committee asserts that the Debtors have failed to justify that approach and that the appropriate approach would consider the full range of RAFS (*i.e.*, the low-RAFs, mid-RAFs, and high-RAFs) to risk-adjust the value of the Reserves. The Committee submits that using the full RAF range results in a downward adjustment of the risk-adjusted value of the Reserves, and, accordingly, of the Adequate Protection Claims, in the maximum amount of $33 million.

As discussed above, consistent with industry practice, the ARIES Database identifies each individual well with a reserve classification type reflecting the well's relative likelihood of producing hydrocarbons as predicted.[400] To risk-adjust the value of the Reserves, both the Debtors and the Committee use the results of the SPEE's June 2015 annual survey, in which

---

[399] *See, e.g., In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (noting the Code's overriding policy favoring debtor reorganization and rehabilitation).

[400] The future production of wells is projected using production "type curves," which are based on production data from other analogous wells.

industry participants provide their opinions as to what percentage of a hypothetical unrisked value projection is appropriate for estimating the risked value for each reserve classification type. The range of recommended RAFs for unconventional plays[401] provided by the SPEE in connection with its 2015 annual survey is below.

| Reserve Classification | | Range of Survey Responses | | |
| --- | --- | --- | --- | --- |
| | | Low (P90) | Mid (P50) | High (P10) |
| 1P | Proved Developed Producing | 90% | 100% | 100% |
| 1P | Proved Developed Non-Producing | 47% | 75% | 96% |
| 1P | Proved Undeveloped | 50% | 65% | 90% |
| 2P | Probable | 1% | 30% | 50% |
| 3P | Possible | 0% | 10% | 20% |

The low-RAFs reflect respondents' view that a lower percentage is appropriate when there is a higher degree of uncertainty as to whether a well will meet projected production volumes; the high-RAFs reflect a higher percentage to account for a lower degree of uncertainty as to the same.[402]  The low-RAFs reflect the percentage of the projected unrisked value that ninety percent of respondents identified as equal to or less than the percentage that they would apply; the mid-RAFs reflect the percentage of the projected unrisked value that fifty percent of respondents identified as equal to or less than the discount rate that they would apply; and the high-RAFs reflect the percentage of the projected unrisked value that ten percent of respondents identified as equal to or less than the discount rate that they would apply.[403]  By way of example,

---

[401]    Nearly 80 percent of the Debtors' gas reserves are located in plays that are considered "unconventional."  *See* n. 142; n. 318, *supra*.
[402]    *See* Zelin Initial Report ¶ 17(a).
[403]    *Id.*

fifty percent of respondents answered that the risked value of a Proved Undeveloped reserve should be estimated to be sixty-five percent or more of its unrisked value, while ninety percent of respondents answered that the risked value of a Probable reserve should be estimated to be one percent or more of its unrisked value.[404]

Mr. Cecil explained in his expert reports and at the Confirmation Hearing that while the SPEE RAF summary does not distinguish between higher risk and lower risk reserves, it is industry practice to apply "a customized range of RAFs when performing a NAV analysis in order to capture the specific risk profile of the assets being evaluated."[405] Mr. Cecil states that the Debtors' Reserves are primarily located in the Haynesville and Cotton Valley plays, which are in a region that generally is a "mature hydrocarbon producing area in North America and is characterized by low geologic risk and predictable well results. Given the relatively lower risk profile of the Debtors' asset base, I believe that applying RAFs to the Debtors' reserves based on the low end of the SPEE guidelines would be inappropriate."[406] Mr. Sambrooks also testified that the plays in Haynesville and Cotton Valley are "some of the most predictable plays that [he's] ever worked on."[407] Therefore, Mr. Cecil applied only the mid-RAFs and high-RAFs in his risk-adjustment of the value of the Reserves.

In performing his risk-adjustment of the value of the Reserves, Mr. Zelin used the mid-RAFs and high-RAFs, as well as the low-RAFs, because he concluded that excluding the low-RAFs is "inappropriate given the lack of evidence to suggest that the quality of the Debtors' assets" are relatively higher.[408] Mr. Zelin based his conclusions on the expert report of Adrian

---

[404]    *See SPEE 34th Annual Survey of Parameters Used in Property Evaluation* (June 2015) (Ex. 1278), p. 44.
[405]    Cecil Initial Report ¶ 27; *see* June 20, 2016 Hr'g Tr. 39:8-21 (Cecil).
[406]    Cecil Initial Report ¶ 28.
[407]    June 13, 2016 Hr'g Tr. 189:7-12 (Sambrooks).
[408]    Zelin Initial Report ¶ 20(b).

Reed and on the Wood Mackenzie Report.[409]  As discussed above, Mr. Reed's declaration states that he reviewed (i) the Haynesville and Cotton Valley plays relative to other unconventional plays; (ii) the Haynesville properties within the overall Haynesville play; and (iii) the Debtors' existing well performance results in the Haynesville and Cotton Valley plays to "analyze[] the risk and predictability of [the] Debtors' wells for purposes of assessing whether there is any basis for exclusion of the P90 (Low) RAF for purposes of valuing the Debtors' reserves."[410]  Based on his review, he concluded that Mr. Cecil erroneously excluded low-RAFs in his valuation.  The Wood Mackenzie Report[411] on which Mr. Zelin said he relied indicates that reserves in the Haynesville play are of "lower quality" and the Committee submits that this statement supports their argument that the low-RAFs should be included in the analysis.

Based on the admitted testimony and evidence, the Court finds Mr. Cecil's approach of using a customized RAF range of the mid-RAFs and high-RAFs to be reasonable and appropriate here.  There is no dispute that using a customized RAF range is proper.[412]  Mr. Cecil testified that it is his practice to customize based on the nature of the "basins of plays" in which the assets are located[413] and that he has been involved in a number of transactions involving assets in the Haynesville and Cotton Valley plays in which the risked value of the assets is based on the use of the mid-RAFs and high-RAFs only.[414]  In addition, Mr. Cecil testified at the Confirmation Hearing that Wood Mackenzie published a report other than the one on which Mr. Zelin relied that stated that "'[w]ell performance is consistent and predictable" in a sub-play of the

---

[409]    *Id.*  The Wood Mackenzie Report is dated April 2016 and is entitled "Haynesville Core Shale Gas Unconventional Play."
[410]    Reed Decl. ¶ 22.
[411]    *See* Wood Mackenzie Report (Ex. 1305).
[412]    *See* Committee Obj. ¶ 31.  The Committee also acknowledges that Mr. Zelin applied the same customized range of RAFs in his NAV valuation in the *In re Samson* case where a substantial portion of the debtor's assets were located in the Haynesville and Cotton Valley plays.
[413]    June 20, 2016 Hr'g Tr. 39:8-21 (Cecil).
[414]    *See* June 20, 2016 Hr'g Tr. 42:7-11 (Cecil).

Haynesville play in which most of the Debtors' assets are located.[415]  Pursuant to that testimony

and the Sambrooks Rebuttal Report,[416] as well as the report of Wood Mackenzie dated February

2016 entitled "Haynesville Type Curve Review," and in the absence of any testimony from the

Committee's experts to the contrary, the Court finds Mr. Cecil's understanding of the

predictability of the Debtors' Reserves in the Haynesville and Cotton Valley plays to be credible

and affords it substantial weight.

On the other hand, Mr. Zelin's analysis of this issue rests heavily on the excluded or

otherwise unreliable opinions of Mr. Reed.  Indeed, counsel for the Committee acknowledged at

the Confirmation Hearing a number of the deficiencies in the testimony and opinions offered by

Mr. Reed, and, to the extent Mr. Reed's opinions are admissible at all, the Court gives them no

evidentiary weight.[417]  Accordingly, Mr. Zelin's reliance on Mr. Reed's opinion as a basis to

critique the Debtors' application of only the mid-RAFs and high-RAFs can likewise be afforded

no weight.  Moreover, the Court finds no basis to rely in any way on either Mr. Reed's opinions

with respect to the Debtors' type curves or the type curves that Mr. Reed prepared as an

alternative to the Debtors' type curves.

In addition, the validity of Mr. Zelin's reliance on the April 2016 Wood Mackenzie

Report is premised on a conflation of two distinct issues – the predictability of a well, on the one

hand, and the productivity of a well, on the other.  The Wood Mackenzie Report addresses the

latter – the economics and productivity of the reserves in the Haynesville play with respect to the

---

[415]     Cecil Rebuttal Report ¶¶ 34-35.

[416]     *See* Sambrooks Rebuttal Report ¶¶ 31-33 (explaining that Wood Mackenzie's discussion of the predictability of the Carthage sub-play in its February 2016 report supports the Debtors' view that the Reserves in Haynesville and Cotton Valley plays are predictable).

[417]     *See* Section V.B.2, *supra*.

volume of hydrocarbons produced.[418]   It does not address the predictability of those reserves with respect to the likelihood that those reserves will produce consistently with any particular set of projections.   The issue of productivity is taken into account in the cash flow projections in the ARIES Database.[419]   That issue is not, and should not be, a factor in determining how to risk-adjust the wells with respect to predictability of performance, which is what the RAFs are intended to do.[420]

For all of the foregoing reasons, the Court finds that Mr. Cecil's customized RAF range using the mid-RAFs and the high-RAFs is reasonable and appropriate here.  Accordingly, the Committee's proposed $33 million RAF adjustment to Mr. Cecil's valuation of the Reserves is rejected.[421]

### 3.   The Court Must Consider the Most Recent Strip Pricing Data But May Also Consider Additional Strip Pricing Data

The parties have not been able to reach agreement with respect to the appropriate strip pricing to use to calculate the value of the Reserves as of the Forecasted Effective Date.   To provide guidance on this significant valuation issue, the Debtors and the Committee submitted letter briefs pursuant to the Strip Pricing Protocol detailing their positions on the issue.   The Debtors argue that the Court should consider valuations based on strip prices as of the date of the Settlement as well as strip prices as of dates subsequent to the date of the Settlement.[422]   The Debtors submit that any change in strip prices since the date of the Settlement, however, is not a

---

[418]      *See* Wood Mackenzie Report (Ex. 1305).
[419]      *See* Sambrooks Rebuttal Report ¶¶ 32-33 ("Well economics and geologic constraints have no bearing on the predictability (as opposed to the productivity) of the wells … The Debtors' reserve report projects the productivity of individual wells, so any impacts that geological constraints have on productivity are already reflected as lower projected production in the Debtors' reserve reports.").
[420]      Although the SPEE report provides that respondents' choice of the appropriate RAFs are influenced by a number of factors other than predictability, the economics and productivity of a well are not included on that list.
[421]      *See* Appendix A, Zelin Bridge.
[422]       Debtors' Strip Pricing Brief [Dkt. No. 1323] (citing *Chemtura*, 439 B.R. at 599).

"material change" and does not require an updated valuation.[423]  The Committee takes the

position that the only appropriate strip price to use is the "most up-to-date information available .

. . as of the start of the confirmation hearing," which is the strip pricing as of June 10, 2016.[424]

To capture the magnitude of this issue, the following chart illustrates the impact of using

different strip pricing:

| Strip Pricing As of | March 22, 2016 | May 20, 2016 | June 10, 2016 | July 7, 2016 |
|---|---|---|---|---|
| Debtors' Estimate of Adequate Protection Claims | $340.2 million | $271.4 million | $237.6 million | $236.2 million |

The dispute raises the vexing issue of the inherent tension involved in performing a

valuation analysis using data that is subject to constant change, which is highlighted by the fact

that even the strip pricing data that the Committee argues should be the basis for the valuation of

the Reserves could be considered "stale" as of the publication of this Decision because that data

was generated more than two months ago.  Resolving this tension is especially challenging in the

context of a commodity industry such as the oil and gas industry in which the Debtors operate

and in which pricing is subject to significant volatility,[425] seasonality,[426] and other factors that

increase the dynamism of pricing information.[427]  The Court must balance the requirement that it

use information that is sufficiently close to the Forecasted Effective Date with the practical

reality of the delay between the generation of pricing data and the actual Effective Date.

Moreover, the Court must also consider the concern that what may be a temporary shift in

---

[423]    June 23, 2016 Hr'g Tr. 92:17-93:4 (Mitchell).
[424]    Committee's Strip Pricing Brief [Dkt. No. 1322].
[425]    *See* June 14, 2016 Hr'g Tr. 124:12-17 (Sambrooks); *see also* Debtors' Strip Pricing Brief (noting that strip pricing has increased and decreased on a daily basis since March 22, 2016).
[426]    June 14, 2016 Hr'g Tr. 125:24-126:10 (Sambrooks).
[427]    For example, the Court heard extensive testimony throughout the Confirmation Hearing that, as has been widely reported, the oil and gas industries have experienced significant turmoil in recent years.

commodity prices could lead to a determination of value that is inequitable to one or more parties.

In the Committee's Strip Pricing Brief, the Committee cites to a number of cases finding valuation inputs "stale" or "outdated" because they were not generated sufficiently close to the plan confirmation hearing or the effective date.  The Committee urges that these cases support its position that pricing data as of the date closest to the beginning of the Confirmation Hearing is the only appropriate data to use in valuing the Reserves.[428]  Taking into account the guidance provided by these cases and the competing considerations relevant here, the Court agrees with the Committee that strip pricing as of the date closest to the Forecasted Effective Date is the most pertinent pricing data to be used in estimating the value of the Reserves as of such date. However, the Court does not agree with the Committee that all other pricing data is irrelevant and that it would be improper for the Court to consider it.  As the Debtors argue, the Court should give consideration to all of the pricing assumptions submitted by the parties, including those based on strip pricing other than as of June 10, 2016.  Importantly, the Court is reviewing the reasonableness of the settlement of the Adequate Protection Claims and is not required to determine precise amounts for the value of the Reserves or the Adequate Protection Claims.

Indeed, the case law cited by the Committee does not clearly stand for the proposition that a court's consideration, to any extent, of data other than the "most recent" is improper.  First, the Committee mischaracterizes the holding in *TMT Trailer Ferry*.  While the Committee argues that the Supreme Court held that a court must always consider "current value," in that case the Court found that the trial court had committed error because it did not consider the projected *future* value of the post-emergence company and consideration of "future problems and

---

[428]    *See* Committee's Strip Pricing Brief, p. 2 (citing *TMT Trailer Ferry*, 390 U.S. at 444-45).

prospects of the company . . . were necessary to assess its value as a going concern."[429]    Here,
the very nature of strip pricing takes into account projected future value, as do the data in the
ARIES Database, all of which the Court has fully considered.  Moreover, there has been no
suggestion from any party that some undefined post-emergence value of the Debtors' assets is
relevant to the valuations at issue, nor has any evidence of such value been presented to the
Court.

Second, at least one of the cases cited by the Committee holds that an updated valuation
was required only upon an evidentiary showing that an "intervening event caused a significant
increase in the value" of the debtor's property being valued.[430]  Here, there has been no showing
by the Committee that the changes in strip pricing between March 2016 and July 2016 have been
caused by an "intervening event" or are the result of anything other than normal market
movement.

Finally, while the cases cited by the Committee generally hold that a court's failure to
consider updated valuation data may be error, none of those cases precludes a court from
considering additional data that it considers relevant so that it can form a full understanding of
the value of the assets at issue and avoid making a determination with respect to value that leads
to an inequitable or anomalous result.[431]

Therefore, the Court focuses its analysis of the settlement of the Adequate Protection
Claims on the valuations based on the most recent strip pricing data with which it has been
provided (*i.e.*, the June 10, 2016 strip pricing), but also considers the valuations based on other

---

[429]    *TMT Trailer Ferry*, 390 U.S. at 444.

[430]    *See, e.g., In re Moreau*, 140 B.R. 943, 945 (N.D.N.Y. 1992).

[431]    *See, e.g., In re Tribune Co., et al.,* 464 B.R. 126, 149-51 (Bankr. D. Del. 2011) (rejecting as "stale as of
the confirmation  hearing date" chapter 11 plan proponents' expert report based upon a five-month-old
valuation).

strip pricing data submitted by both the Debtors and the Committee as an indication of what the value of the Reserves may be under various pricing assumptions. What's more, as discussed below, even adopting the Committee's position that the June 10, 2016 strip pricing should be the sole pricing data used in evaluating the Debtors' settlement of the Adequate Protection Claims, the Court finds the settlement of these claims to be reasonable.[432]

### 4. The Committee's Other Critiques of the Debtors' Estimate of the Adequate Protection Claims Do Not Withstand Scrutiny and Must be Rejected

While the Committee's arguments with respect to the proper allocation of G&A, the appropriate range of RAFs, and the appropriate strip pricing to use to value the Reserves are the primary critiques asserted by the Committee to argue that the Debtors' estimate of the value of the Reserves is inflated, the Committee also submits additional arguments challenging the reasonableness of the Debtors' estimate of the Adequate Protection Claims, each of which the Court discusses below.

#### a. Encumbrance Analysis

As discussed above, the Debtors conducted a review of the leases, mortgages, schedules, and other relevant documents to determine whether each of the Debtors' wells was encumbered or unencumbered as of the Petition Date and as of the Forecasted Effective Date.[433] That review served as the basis for Mr. Mitchell's well-by-well analysis and conclusions with respect to the value of the Reserves attributable to encumbered Reserves. In contrast, Mr. Zelin applied an aggregate encumbrance percentage, purportedly based on the work of Porter Hedges and BRG, to the value of the Reserves to calculate the value of the encumbered Reserves as of the Petition

---

[432]    As the Debtors argue, and as discussed below, the increase in strip pricing between March 2016 and July 2016 validates and confirms the reasonableness of the settlement of the Adequate Protection Claims because even with what the Committee argues is a significant increase in prices and asset value (and a corresponding drop in the size of the Adequate Protection Claims), the Settlement is still reasonable.

[433]    *See* June 21, 2016 Hr'g Tr. 154:3-12; 161-171 (Magilton).

Date and the Forecasted Effective Date. Mr. Zelin testified that, based on his calculations, the Debtors overestimated the value of the encumbered Reserves by $16 million.

The Committee's challenge to the Debtors' estimate of the value of the encumbered Reserves is not supported by the record.[434] As stated in his expert report, Mr. Zelin applied aggregate encumbrance percentages to determine how much of the value of the Reserves was encumbered as of the Petition Date and the Forecasted Effective Date, and relied on the conclusions reached by Porter Hedges and BRG with respect to the appropriate percentages to apply.[435] But neither Mr. Gibson nor Mr. Kearns provided a coherent and reliable opinion explaining how those aggregate encumbrance percentages were calculated.[436]

Mr. Gibson testified at his deposition that Porter Hedges conducted a "lien review analysis" but did not conduct any analysis to determine an "aggregate percentage of coverage" of the Prepetition Secured Lenders' liens.[437] He also testified that he had no knowledge as to how Mr. Zelin reached the two encumbrance percentages that he used in his valuation.[438] While Mr. Kearns included in his expert report an estimate of the encumbrance percentage on the Petition Date of the Debtors' proved reserves, the number in Mr. Kearns' report was not actually used by

---

[434]    Throughout the Confirmation Hearing, the Committee argued that its calculation, and not the Debtors' calculation, of the aggregate percentage of the value of the Debtors' Reserves that is attributable to Reserve Collateral Value is correct. However, the Debtors did not calculate an aggregate percentage of encumbered value. Rather, the Committee recreated the work performed by Mr. Mitchell, who analyzed the Debtors' Reserves on a well-by-well basis, to calculate the Debtors' "inferred" aggregate encumbrance percentage. *See* June 22, 2016 Hr'g Tr. 89:12-91:15 (Mitchell). The Debtors argue that it is improper to use an aggregate encumbrance percentage and that Mr. Mitchell's well-by-well "bottom-up" approach is appropriate.

[435]    Zelin Initial Report ¶ 26(d).

[436]    *See* July 13, 2016 Hr'g Tr. 259:9-11 (Weiner) ("The encumbrance percentages, it didn't come out very clearly on our side. There's no question about that. That's probably an understatement.").

[437]    June 10, 2016 Gibson Depo. Tr. 23:5-9, 23:11-14.

[438]    *Id.* at 26:4-18, 62:7-13.

Mr. Zelin.  Moreover, Mr. Kearns offered no opinion as to an encumbrance percentage as of the Forecasted Effective Date.[439]

The Committee has not challenged the encumbrance review performed by Mr. Magilton, but attributes the difference between the Debtors' approach and the Committee's approach to different assumptions with respect to the encumbrance classification of wells that are subject to a dispute as to encumbrance.  In particular, Mr. Zelin testified that his encumbrance percentage relied on the same assumptions that Mr. Mitchell made, except that he assumed that the wells subject to the disputes as to Defective Recording Leases, Unrecorded Leases, and Unitized Leases were also unencumbered.[440]  In other words, the Committee acknowledges that Mr. Zelin's encumbrance percentages are even more favorable to the Committee than Mr. Mitchell's already conservative and Committee-favorable approach.  The Court finds that Mr. Zelin did not provide an evidentiary basis for using these additional assumptions.

Rather, the Court finds the Encumbrance Review undertaken by Mr. Magilton and the Debtors, as well as Mr. Mitchell's application of that analysis to his estimate of the Adequate Protection Claims (including his conservative assumptions as to the encumbrance classification of those wells subject to dispute) to be entirely reasonable.  The Committee has failed to substantiate its approach to determining and applying its encumbrance percentages, and thus the Court is not persuaded by the Committee's challenge to the Debtors' estimate of the size of the Adequate Protection Claims on that basis.

### b.  Postpetition Adequate Protection Payments and Application of Swap Payments

---

[439]    See Debtors' Closing Demonstrative, Slide 107 (illustrating the Committee's failure to present reliable expert evidence of the calculation of the Committee's aggregate encumbrance percentages).

[440]    See July 13, 2016 Hr'g Tr. 259:11-15 (Weiner) ("The bottom line, we would say, is if you take Mr. Mitchell['s encumbrance analysis] and you adjust for these three issues – defective recording leases, unrecorded leases, and unitized leases – that gets you to the Zelin percentages.").

Mr. Mitchell calculated the RBL Lenders' Adequate Protection Claim by subtracting from the $926.8 million in outstanding principal owed to the RBL Lenders (i) $24.3 million of the Swap Payments;[441] (ii) $40.8 million of postpetition payments made by the Debtors to the RBL Lenders as adequate protection after the RBL Lenders became undersecured, as estimated by the Debtors, in October 2015, and therefore not entitled to such adequate protection payments;[442] and (iii) the Total Collateral Value as of the Forecasted Effective Date.[443]

The Committee takes the position that the RBL Lenders were undersecured as of the Petition Date and argues that the total amount of postpetition payments made to the RBL Lenders (approximately $55.8 million) should be deducted from the RBL Lenders' Adequate Protection Claim.[444]  Because the Court concludes that the Debtors' conclusion that the RBL Lenders were likely oversecured as of the Petition Date is reasonable, the Court rejects (i) the Committee's argument with respect to the necessity of deducting the total amount of postpetition adequate protection payments from the RBL Lenders' Adequate Protection Claim and (ii) the Committee's resulting additional $15 million deduction from the Debtors' estimate of the Adequate Protection Claims.

In addition, the Committee argues that the $24.3 million of Swap Payments that Mr. Mitchell deducted from the outstanding principal amount of the RBL Lenders' claim should instead be deducted from the RBL Lenders' Adequate Protection Claim itself.[445]  The Committee submits that paragraph 3(g) of the Final Cash Collateral Order reserving the rights of the Debtors and the Committee to seek the unwinding of such payments upon a finding that such payments

---

[441]    Mitchell Rebuttal Report ¶ 15.
[442]    *Id.* ¶ 16.
[443]    Mitchell Initial Report ¶¶ 51-53.
[444]    *See* Zelin Supplemental Report, Ex. IV.
[445]    *Id.*

"unduly disadvantaged the Debtors or unsecured creditors" justifies deducting the Swap Payments from the RBL Lenders' Adequate Protection Claim.[446]

There is no dispute that the Final Cash Collateral Order provides that upon receiving a swap termination payment, the Debtors "shall pay such cash proceeds . . . to the First Lien Agent, which proceeds shall be applied to permanently reduce the First Lien Indebtedness."[447] That language clearly requires the reduction of the RBL Lenders' claim by the amount of any swap payment, with which the Debtors' calculation is consistent. Therefore, the only question is whether the proviso on which the Committee relies requires a different treatment. Because the Court finds it reasonable to estimate that the RBL Lenders were oversecured as of the Petition Date, and because the Committee has failed to demonstrate a likelihood that the Court would conclude that the Swap Payments "unduly disadvantaged" the Debtors or unsecured creditors, the Court finds the Debtors' approach of deducting the $24.3 million of Swap Payments directly from the RBL Lenders' claim, not from the RBL Lenders' Adequate Protection Claim, reasonable and appropriate.[448] Accordingly, Mr. Zelin's calculation of the Adequate Protection Claims, as reflected on the Zelin Bridge, must be increased by $24.3 million.

### c. Postpetition Mineral Lien Payments

The Committee also challenges the Debtors' estimate of the Adequate Protection Claims with respect to certain postpetition payments made by the Debtors on account of liens that the Committee argues would have had priority over the liens of the RBL Lenders ("Mineral Liens"). The Committee argues that, because the Debtors paid $17 million pursuant to a Court order that

---

[446]    Final Cash Collateral Order ¶ 3(g).

[447]    *Id.*

[448]    The Court notes that if the RBL Lenders were oversecured at the Petition Date, deducting the Swap Payments from the RBL Lenders' claim is not mathematically different from reducing the RBL Lenders' Adequate Protection Claim by such amount.

has not been reimbursed, the RBL Lenders' Adequate Protection Claim must be reduced dollar-for-dollar by that $17 million.

Mr. Zelin testified that he included the "Mineral Liens" adjustment based on the assumptions provided to him by counsel for the Committee.[449]  Mr. Zelin did not include any adjustment for these mineral lien payments in his STN valuation of the Adequate Protection Claims.  Neither the Committee nor the Debtors performed any analysis of the rights that could have been asserted by the holders of these mineral liens or the likelihood that they would succeed on asserting the priority of those mineral liens over the liens of the RBL Lenders.

Yet again, the Committee has simply supplied an assumption and has offered no evidence to support it.  The Mineral Liens payments with which the Committee takes issue were made in accordance with the Court's orders approving the Debtors' "first day" motions and with the Final Cash Collateral Order.  In the absence of any substantive analysis of the issues arising from the Debtors' payment on account of the so-called Mineral Liens, the Court declines to adopt the Committee's bald assertion that the holder of those Mineral Liens would have had priority over the claims of the RBL Lenders.  Accordingly, no adjustment to Mr. Mitchell's estimate of the Adequate Protection Claims is appropriate.

### 5.  Additional Considerations Supporting the Reasonableness of the Debtors' Estimate of the Adequate Protection Claims

In assessing the reasonableness of the Debtors' estimate of the Adequate Protection Claims, the Court also acknowledges that the Debtors have made a number of assumptions with respect to their valuation methodology, discussed below, that result in an estimate of the Adequate Protection Claims that is likely lower than the litigated amount of such claims.

---

[449]    *See* July 7, 2016 Hr'g Tr. 197:8-18 (Zelin).

Specifically, in light of the potential arguments that the Prepetition Secured Lenders would make

if the Adequate Protection Claims were litigated, the Debtors' estimate is likely conservative,

and, as such, provides yet another basis on which the Court finds the Debtors' settlement of the

Adequate Protection Claims with the Prepetition Secured Lenders to be reasonable.

### a. The Additional Haynesville Locations

The Committee accurately points out that the Debtors had not confirmed their drilling

rights with respect to the Additional Haynesville Locations as of the Petition Date, and therefore

the Debtors did not include them in the ARIES Database at that time.[450]   The Committee also

appropriately observes that including any value on account of the Additional Haynesville

Locations in the Petition Date Reserve Collateral Value would be difficult given that they were

not included in the Debtors' business plan as of the Petition Date and the value of Reserves is

driven by the treatment of those Reserves in the Debtors' business plan.[451]   But the Committee's

arguments merely support the Debtors' decision not to include any value of the Additional

Haynesville Locations in their estimate of the Adequate Protection Claims.   Such arguments do

not detract at all from the reality that if the Adequate Protection Claims were litigated, the

Prepetition Secured Lenders would assert arguments to support the inclusion of some value on

account of the Additional Haynesville Locations in the Petition Date Reserve Collateral

Value.[452]   Moreover, given the uncontroverted testimony of both Mr. Mitchell and Mr. Magilton

that the Debtors owned the rights to drill the Additional Haynesville Locations[453] and that a

portion of those wells could have been encumbered as of the Petition Date, the Court

---

[450]        *See* June 22, 2016 Hr'g Tr. 100:16-20 (Mitchell).

[451]        Cecil Initial Report ¶¶ 34-35.

[452]        Mr. Mitchell testified that, based on Mr. Cecil's calculations, he estimated that including the Additional Haynesville Locations in the Petition Date Reserve Value would increase the Adequate Protection Claims by $60 million, assuming that fifty percent of those wells were encumbered as of the Petition Date.  *See* Mitchell Initial Report ¶ 48; *see also* June 22, 2016 Hr'g Tr. 101:3-6 (Mitchell).

[453]        *See, e.g.,* June 22, 2016 Hr'g Tr. 100:20-101:6 (Mitchell).

acknowledges that the Prepetition Secured Lenders would have potentially valid claims to add some value to the Petition Date Reserve Collateral Value relating to the Additional Haynesville Locations. The Debtors have avoided having to litigate that issue by settling the Adequate Protection Claims.

### b.  Mr. Mitchell's Conservative, Committee-Favorable "Weighted Bucket II Approach"

Mr. Mitchell explained that, to the extent there are disputes as to whether certain Reserves are encumbered or unencumbered, he assumed, for purposes of estimating the Adequate Protection Claims, that wells that are the subject of either the Second Lien Lenders' Preference Claims or the County Leases issue are unencumbered, while the wells subject to other encumbrance disputes were treated as encumbered.[454] The Debtors submit that this is a more conservative (*i.e.*, Committee-favorable) approach than classifying those wells based on the Debtors' view of the estimated chance of success on each Bucket II issue. This is especially so with respect to the County Leases issue, which has the highest risked and unrisked value of all of the Bucket II claims and to which the Debtors attribute a fifty percent chance of success in their Bucket II analysis.[455] For example, if the Debtors classified the wells subject to the County Leases issue based on their view of the chance of success on that issue, only fifty percent of such wells would be classified as unencumbered for purposes of calculating the Collateral Diminution.

Although the Committee argues that Mr. Mitchell's assumptions in classifying the wells subject to encumbrance disputes were not sufficiently favorable to the Committee and that he

---

[454]    *See* Mitchell Initial Report ¶ 35; *see also* June 22, 2016 Hr'g Tr. 99:7-18 (Mitchell); 100:5-10 (Mitchell).
[455]    Mitchell Rebuttal Report ¶ 29. Mr. Mitchell explained that if the Debtors applied their estimated fifty percent chance of success to the County Leases issue instead of assuming 100 percent success when estimating the Adequate Protection Claims, the Reserve Collateral Value as of the Petition Date would increase by over $50 million.

should have classified wells subject to additional encumbrance disputes as entirely unencumbered, the Court finds that Mr. Mitchell could have reasonably used the risk-adjusted value of all of the Bucket II Claims for purposing of estimating the Adequate Protection Claims. Mr. Mitchell's classification of the wells subject to the County Leases issue and the Second Lien Lenders' Preference Claims as entirely unencumbered resulted in the Adequate Protection Claims being an estimated $20 million less than they would have been had Mr. Mitchell applied the Debtors' likelihood of success estimates. His approach was reasonable.[456]

Based on the Court's review of the issues raised by the Committee, the Court concludes that the Debtors' estimate of the Adequate Protection Claims in the amount of approximately $237 million,[457] using June 10, 2016 strip pricing as advocated by the Committee, is reasonable for purposes of evaluating the Settlement. As detailed above, the Debtors' estimate is a conservative one, and the Committee's critiques are largely either unsupported by applicable law and the evidentiary record or inconsistent with industry standards.

### B.    The Settlement of the Bucket II Claims

After reviewing each of the Bucket II Claims, the Court finds the settlement of each to be reasonable. Recognizing the Court's duty to evaluate each component of the Settlement, the Court's discussion of the Bucket II Claims follows.

#### 1.    The Two "Critical Wins"

The Committee identified two "critical wins" with respect to litigation of the Bucket II Claims. The first "critical win" identified by the Committee is the County Leases issue. According to the Prepetition Secured Lenders, the County Lease Granting Clause grants a

---

[456]     Mitchell Rebuttal Report ¶ 29.
[457]     The Debtors estimate the RBL Lenders' Adequate Protection Claim to be approximately $125 million and the Second Lien Lenders' Adequate Protection Claim to be approximately $112 million.

blanket lien on all of the Debtors' property located in all counties described on Exhibit A to the

RBL Mortgages and the Second Lien Mortgages.  Citing Texas law, the Second Lien Agent

argues that the phrase "all the rights, titles, interests and estates" creates a blanket lien in the

grantor's rights when used in a lien granting clause.  The RBL Mortgages and the Second Lien

Mortgages contain the following language (the "County Lease Granting Clause"):[458]

> Section 1.01 <u>Grant of Liens</u>. To secure the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations (as defined herein) and the performance of the covenants and obligations herein contained, Grantor does by these presents hereby GRANT, BARGAIN, SELL, ASSIGN, MORTGAGE, TRANSFER and CONVEY unto Trustee and Trustee's successors and substitutes, in trust, with power of sale and right of entry and possession for the use and benefit of Beneficiary, the real and personal property, rights, titles, interests and estates described in Section 1.01(a) through (f) (collectively called the "Deed of Trust Property")[.]
>
> (a) All rights, titles, interests and estates now owned or hereafter acquired by Grantor in and to the oil and gas leases and/or oil, gas and other mineral leases and other interests and estates and the lands and premises covered or affected thereby which are described on Exhibit A hereto (collectively called the "Hydrocarbon Property"), including without limitation, the undivided interests of Grantor which are more particularly described on attached Exhibit A.

Moreover, the Prepetition Secured Lenders assert that Section 1.01(b)(v) expands the

grant in subsection (a) to include Hydrocarbon Properties *not* specifically listed on Exhibit A.

Section 1.01(b)(v) provides as follows:

> (b) All rights, titles, interests and estates now owned or hereafter acquired by Grantor in and to . . . (v) the Hydrocarbon Property described on attached Exhibit A and conveyed by this Deed of Trust even though Grantor's interests therein may be incorrectly described or a description of a part or all of such Hydrocarbon Property or Grantor's interests therein be omitted; it being intended by Grantor and Beneficiary herein to cover and affect hereby all interests which Grantor may now own or may hereafter acquire in and to the Hydrocarbon Property

---

[458]    Post-Merger Sabine Oil & Gas Deed of Trust, Fixture Filing, Assignment of As- Extracted Collateral, Security Agreement and Financing Statement (Ex. 1397) p. 2; Second Lien Deed of Trust [Dkt. No. 518-3] Section 1.01.

notwithstanding that the interests as specified on Exhibit A may be limited to particular lands, specified depths or particular types of property interests.[459]

The Debtors considered the County Leases issue in their initial Bucket II Claims analysis and concluded that the RBL Lenders' position is not supported by Texas law, which requires that the description of the particular land to be conveyed be identified with reasonable certainty. Specifically, the Debtors considered two key questions: (i) whether the County Lease Granting Clause was sufficient to grant liens on the County Leases; and (ii) whether the County Lease Granting Clause was sufficient to put third parties on constructive notice of the blanket lien in the County Leases and, therefore, satisfies the Statute of Frauds under Texas law.

According to the Debtors, the recent ruling in *Quicksilver* informed their decision to modify their risk adjustment percentage because the *Quicksilver* court upheld the secured lenders' blanket lien on all property in a given county where such mortgage was filed. Moreover, the Debtors considered whether the County Lease Granting Clause was sufficient to put third parties on constructive notice of the Prepetition Secured Lenders' lien on the County Leases and, therefore, sufficient to satisfy the Statute of Frauds under Texas law. According to the Debtors, the County Lease Granting Clause at issue in the RBL Mortgages and the Second Lien Mortgages does not contain an express geographical limitation on the scope of the blanket lien, unlike in *Quicksilver* where the granting clause at issue specifically limited the blanket lien to a limited geographical area. However, the Debtors note that the County Lease Granting Clause contains an implied geographical limitation, as the RBL Mortgages and the Second Lien Mortgages were only filed in a handful of Texas counties. Given the ambiguity with respect to the geographical scope of the County Lease Granting Clause, the Debtors believe that there is a

---

[459]    Post-Merger Sabine Oil & Gas Deed of Trust, Fixture Filing, Assignment of As- Extracted Collateral, Security Agreement and Financing Statement (Ex. 1397) p. 3; Second Lien Deed of Trust [Dkt. No. 518-3] Section 1.01(b).

chance that the RBL Lenders may not prevail on this issue; accordingly, the Debtors have applied what they believe to be an appropriate risk adjustment.

At the Confirmation Hearing, the Prepetition Secured Lenders argued persuasively that the language in the RBL Mortgages and the Second Lien Mortgages provides the Prepetition Secured Lenders with a blanket lien on all of the Debtors' real property interests located in the counties listed on Exhibit A of the RBL Mortgages and the Second Lien Mortgages and that such language was broader than the language analyzed in *Quicksilver*.[460]  The Prepetition Secured Lenders identified language in the RBL Mortgages and the Second Lien Mortgages to support their position that the granting language should be interpreted broadly.  First, they contend that the phrase "including without limitation" in Section 1.01(a) cannot be interpreted to limit the liens of the Prepetition Secured Lenders solely to real property interests enumerated on Exhibit A.[461]  Next, they argue that the language contained in Section 1.01(b)(v) grants a lien on the Debtors' interest in the Hydrocarbon Property "notwithstanding that the interests as specified on Exhibit A may be limited to particular lands, specified depths or particular types of property interests."  Lastly, they posit that the language in Section 1.01(f), which grants a lien on all property of "every kind of character" that are the same "types of items and property . . . described in Section 1.01(a) through (e)" further expands the grant contained in Section 1.01(a) and supports their position that the Debtors intended to grant blanket liens to the Prepetition

---

[460]     July 13, 2016 Hr'g Tr. 151:14-16 (Schonholtz) ("The difference, Your Honor, is that the granting clauses here are actually broader than under *Quicksilver*.").

[461]     July 13, 2016 Hr'g Tr. 148:16-149:16 (Schonholtz) ("The RBL mortgages are clear on their face that they cover all deed of trust property, including hydrocarbon property located in each of the counties where the mortgages were recorded. . . . Section 101(a) grants a lien on all rights, titles, interests and estates now owned or hereafter acquired by the grantor in and to the hydrocarbon property-here are the important words, Your Honor—including without limitation the undivided interest of grantor . . . The Committee reads out "including without limitation.").

Secured Lenders.[462]    The Committee's argument, on the other hand, hinges on a truncated

reading of Section 1.01(a) and fails to acknowledge that the opening paragraph of Section 1.01

clearly states that the Company grants the real property rights that are described in Section

1.01(a) *through* (f).[463]    Indeed, the Committee entirely ignores provisions that expand the grant

in Section 1.01(a), such as Sections 1.01(b)(v) and 1.01(f), and presents a skewed interpretation

of the granting language contained in the RBL Mortgages and the Second Lien Mortgages.    The

Court has carefully reviewed *Quicksilver* and, given the granting language at issue here,

concludes that *Quicksilver* supports the position of the Prepetition Secured Lenders.

Moreover, the Prepetition Secured Lenders point out that each page of Exhibit A to the

RBL Mortgages and the Second Lien Mortgages expressly identifies the counties in which such

mortgages were filed.    Each of the RBL Mortgages provides in the prefatory language at the

beginning of each mortgage that "[t]his instrument is to be filed for record (including as a fixture

filing), among other places, in the real property records or similar records of the County Records

of the Counties listed on Exhibit A hereto."[464]    Similarly, the Second Lien Agent contends that

Section 1.01(a) refers to Exhibit A for the requisite geographical limitation and that Exhibit A

clearly describes the county at the top of the Mortgage Property exhibit.[465]    The RBL Agent

submits that Mr. Magilton's testimony supports the position of the Prepetition Secured Lenders,

---

[462]    July 13, 2016  Hr'g Tr. 149:11-16 (Schonholtz) ("Section 101(f) expands the grant even further to include all property of every kind and character, all other interest of every kind and character, that are the same types and items of property and interest described in Sections 101(a) through (e), above. It does not get broader than that, Your Honor.").

[463]    Post-Merger Sabine Oil & Gas Deed of Trust, Fixture Filing, Assignment of As- Extracted Collateral, Security Agreement and Financing Statement (Ex. 1397) p. 2; Second Lien Deed of Trust [Dkt. No. 518-3] Section 1.01 ("Grantor does by these presents hereby GRANT, BARGAIN, SELL, ASSIGN, MORTGAGE, TRANSFER and CONVEY unto Trustee and Trustee's successors and substitutes, in trust, with power of sale and right of entry and possession for the use and benefit of Beneficiary, the real and personal property, rights, titles, interests and estates described in Section 1.01(a) through (f)[.]").

[464]    *See* RBL Agent Br. ¶ 21, n. 21.

[465]    *See* Second Lien Agent Reply ¶¶ 31-32.

as Mr. Magilton testified that each page of Exhibit A contained a specific county in which the hydrocarbon property was located.[466]    As a result, the Prepetition Secured Lenders argue convincingly that their mortgages satisfy the Statute of Frauds under Texas law by identifying a geographical limitation on the face of the mortgage.

Based on all of the foregoing, the Court finds that the Debtors' fifty percent estimated chance of success on the County Leases issue is reasonable.  In the absence of a settlement, an adjudication of the County Leases issue would necessarily require an extensive evidentiary hearing and the Court would be required to reconcile the competing views of the Committee, the Debtors, and the Prepetition Secured Lenders.  The Debtors' fifty percent risk adjustment is not only within the range of reasonableness but is conservative based on the persuasive arguments of the Prepetition Secured Lenders.

The second "critical win" identified by the Committee is litigation involving the RBL Lenders' Preference Claims.  The Debtors believe that the RBL Lenders were oversecured at the time the RBL Lenders perfected their interests in the 90-Day Mortgages because oil and gas prices were higher at the time the RBL Lenders were granted liens on the 90-Day Mortgages than at the Petition Date.[467]    In addition, the Debtors believe that a portion of the 90-Day Mortgages may have already been subject to properly perfected prepetition liens under the existing RBL Mortgages and the Second Lien Mortgages.

The Committee, on the other hand, contends that the Debtors' position is based on an incorrect application of the law.  The Committee argues that section 547 of the Code does not

---

[466]    June 22, 2016 Hr'g Tr. 12:3-19 (Magilton) (Q: "Each page has on the top leases, correct?" A: "Yes, yes." Q: "And then, underneath it, it says, 'Harrison County, Texas,' right?" A: "Yes." Q: "And that appears on all 115 pages of the lease list, right?" A: "Yes." . . .Q: "Now the last five pages are lists of wells, right?" A: "Yes." Q: "Okay. And does each page referring to wells also specify a county?" A: "Yes, they all reference Harrison County in Texas.").

[467]    Disclosure Statement, p. 52.

require the Debtors to determine whether the recipient of a transfer "was oversecured" at the time of the transfer or on the Petition Date. Rather, the Committee asserts that section 547(b) instead looks to whether the preference recipient received more than it would have received in a chapter 7 liquidation. In order to determine whether the liens constituted preferences, Mr. Kearns testified that he evaluated whether the RBL Lenders were oversecured on (i) the Petition Date and (ii) the date the Debtors transferred the leases to the RBL Lenders (the "Transfer Date"), which occurred in May 2015.[468] In order to make this determination, at the instruction of counsel, Mr. Kearns prepared his own liquidation analysis, applying certain assumptions used by Mr. Mitchell in his liquidation analysis.[469] Mr. Kearns testified that, based on the assumptions he applied in his liquidation analysis, he concluded that the RBL Lenders were undersecured as of both dates.[470]

The Committee also asserts that the Debtors' estimated value of the RBL Lenders' Preference Claims ($12 million) excludes the cash proceeds of those allegedly preferential leases, which would have been deposited into the Segregated Account. The Committee states that, based on the Debtors' estimate that the preference leases represent approximately 1.6 percent of the total value of the Reserve Collateral Value, a similar portion of the Segregated Cash would be recovered, which would yield a total preference recovery of approximately $10.4 million for the unsecured creditors.

The RBL Agent contends that no preference claim exists, for several reasons. First, the RBL Agent asserts that it already had a properly perfected lien on all of the hydrocarbon properties located in the Texas counties in which the RBL Mortgages were filed and that such

---

[468]    See July 5, 2016 Hr'g Tr.191:10-22 (Kearns).
[469]    See July 5, 2016 Hr'g Tr. 191:23-192:6 (Kearns); see Kearns Initial Report, Ex. III.
[470]    See July 5, 2016 Hr'g Tr. 192:7-24 (Kearns).

liens encompassed the RBL 90-Day Mortgages.  Second, the RBL Agent points to the testimony

of several key witnesses to support its position that it was oversecured as of the Transfer Date.[471]

For example, (i) Mr. Mitchell testified to the fact that the RBL Agent was oversecured in May

2015;[472] (ii) Mr. Zelin testified that, in March 2015, the RBL Lenders were oversecured;[473] (iii)

Mr. Kearns' liquidation analysis states that the Debtors' reserve value as of April 30, 2015 was

$1.143 billion; and (iv) Mr. Seery testified that, in the view of the Second Lien Lenders, the

Company's assets were worth more than $1.3 billion as of July 9, 2015, the day the Second Lien

Lenders submitted a credit bid.[474]

The Debtors do not believe that the Committee would prevail on a preference claim

because (i) the RBL Lenders would have a "new value" defense in the form of the forbearance

and the ongoing use of their collateral;[475] and (ii) the liens did not allow the RBL Lenders to

receive more than they would in a hypothetical chapter 7 liquidation because at the time of the

---

[471]       *See* July 13, 2016 Hr'g Tr. 154:5-24 (Schonholtz).

[472]       June 23, 2016 Hr'g Tr. 205:15-17 (Mitchell) (Q: "Is it your understanding that the RBL lenders were
oversecured at the time that those liens were granted?" A: "Yes.").

[473]       July 8, 2016 Hr'g Tr. 10:24-11:6 (Zelin) (Q: "The first bullet on that page reads, 'Second lien is the
fulcrum security.' Do you see that?" A: "I do. Yes." Q: "So PJT was of the view in March 2015 that the RBL
lenders were over-secured?" A: "Based upon just what we had as facts, public information that was the presentation
we made to the second lien group. Yes.").

[474]       June 21, 2016 Hr'g Tr. 20:23-21:2 (Seery) (Q: "In your view, was the $1.3 billion the value of the company
at the time?" A: "No, I think we valued these assets to be higher than 1.3. We would not have bid 1.3 if we thought
that was the top value.").

[475]       Section 547(c) of the Code provides a defense to a preferential transfer "to the extent that such transfer
was—(a) intended by the debtor and the creditor for whose benefit such transfer was made to be a contemporaneous
exchange for new value given to the debtor and (b) in fact was a substantially contemporaneous exchange."  11
U.S.C. § 547(c).  "New value" is defined in section 547(a)(2) of the Code to mean "money or money's worth in
goods, services or new credit … but does not include an obligation substituted for an existing obligation."  11 U.S.C.
§ 547(a)(2).  The Debtors argue that the granting of the forbearance provided the Company with valuable runway to
continue to negotiate a consensual cash collateral order and adequately prepare for an organized chapter 11 filing.
The Debtors state that this exchange, in turn, amounted to "money worth in services" equal to or greater than the
value of the mortgages granted.  *See generally In re Maxwell Newspapers, Inc.*, 192 B.R. 633. 638 (Bankr. S.D.N.Y.
1996). ("The reported decisions support the notion that augmentation of the estate distinguishes new value from
mere forbearance.").

transfer they were oversecured, and thus the additional value that the liens provided was still less than or equal to the total amount by which they were oversecured.[476]

In light of the various factual disputes at issue with respect to determining whether the RBL Lenders were oversecured as of the Transfer Date, resolving this Bucket II Claim would likely require extensive discovery and an evidentiary hearing. Such litigation would entail significant costs, not to mention the business risk to the Company that would result from a prolonged restructuring. Although the Committee argues that it has a 100 percent chance of success on this issue, the Court disagrees. Based on the extensive testimony presented at the Confirmation Hearing, it is far from certain that the Committee would prevail on this issue. The Debtors estimate that they would have less than a five percent chance of success on this issue; the Court finds that such estimate is reasonable.

### 2.  Other Bucket II Claims

In addition to settling the two "critical win" Bucket II Claims, the Plan includes settlements of numerous other issues which were the subject of significant dispute at the Confirmation Hearing. These settled issues include: (i) Disputed Cash; (ii) Unitized Leases and After-Acquired Unitized Leases; and (iii) Potentially Defective Recording Leases.

### a.  Disputed Cash

Although the Debtors and the Committee assert that all of the Disputed Cash was unencumbered as of the Petition Date, the RBL Agent contends that its liens on the Debtors' personal property include the Disputed Cash. As part of their investigation of the Bucket II

---

[476]    The Debtors cite to various cases to support their position. *See In re Teligent Servs., Inc.,* 2009 WL 2152320, at *4 (S.D.N.Y. July 17, 2009) ("A general rule in preference actions, which derives from the fifth element of the § 547(b) test, is that payments on account of secured debts are not preferential."); *ResCap,* 501 B.R. at 619 (explaining that a payment during the preference period to a creditor with a fully secured claim is not a preference) (citations omitted).

Claims, the Debtors examined various equitable methods for tracing the commingled Disputed Cash in the Operating Account and the likelihood that each such method would be deemed equitable by the Court.[477]   Ultimately, the Debtors determined that the most equitable tracing method in these cases was evidence-based tracing, which the Debtors have been using to trace cash postpetition in accordance with the Final Cash Collateral Order.[478]   After applying the evidence-based tracing method to prepetition cash flows into and out of the Operating Account, the Debtors concluded that this method of tracing was likely to result in all funds in the Operating Account being unencumbered as of the Petition Date.   Based on such tracing, the Debtors forecast that $8.4 million of Disputed Cash will remain as of the Forecasted Effective Date.[479]   The Debtors also reviewed the legal basis for the RBL Agent's constructive trust arguments and concluded that such arguments were not likely to succeed because (i) there is no confidential or fiduciary relationship between the Debtors and the RBL Lenders; (ii) the Revolver Draw did not unjustly enrich the Debtors; and (iii) the Debtors did not act in bad faith.

Under New York state law, to establish a constructive trust there must be:   "(1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment."[480]   The Debtors assert that the relationship between the Debtors and the RBL Lenders is neither confidential nor fiduciary in nature, but

---

[477]     Section 9-315 of the Uniform Commercial Code provides that where the cash proceeds of collateral become commingled with other unencumbered property, the encumbered cash is "identifiable . . . to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law[.]"  U.C.C. § 9-315(a)-(b).

[478]     Evidence-based tracing is sometimes referred to as "direct" tracing.  It is a tracing method by which a secured creditor presents records such as receipts, bank account statements, and deposit records to prove the secured status of cash.  *See In re Delco Oil, Inc.*, 365 B.R. 246 (Bankr. M.D. Fla. 2007) (the bankruptcy court permitted a secured creditor to rely on witness testimony that collateral proceeds had been traced through bank deposits and statements to successfully argue that certain deposits into a bank account were identifiable cash proceeds of collateral); *see also In re Dexter Buick-GMC Truck Co.*, 2 B.R. 242 (Bankr. D. R.I. 1980) (a creditor successfully traced cash proceeds from the sale of vehicles by the debtor into the corporation's checking account using evidence "consisting of cash receipt journals, car sale invoices, and bank statements.").

[479]     Debtors' Conf. Br. ¶ 57, n. 107.

[480]     *Rocchio v. Biondi*, 40 A.D.3d 615, 616 (N.Y.A.D. 2d Dept. 2007) (citations omitted).

rather is purely contractual. The Debtors further argue that, based on their business judgment, the Revolver Draw was appropriate and would help stabilize and protect the value of their business. As a result, the Debtors concluded that the Revolver Draw was fully consistent with the Debtors' fiduciary duties to all stakeholders.

In order to demonstrate unjust enrichment, a plaintiff must show that "equity and good conscience require [the] defendant to make restitution."[481]    The Debtors contend that the Committee cannot make this showing because there is no evidence indicating (i) the existence of any bad faith surrounding the Revolver Draw; (ii) that the Debtors' estates would be unjustly enriched by their ownership interest in the Disputed Cash; or (iii) that the Revolver Draw was an attempt to favor one creditor over another. Instead, the Debtors assert that the Revolver Draw was in their business judgment inasmuch as it was needed to fund ordinary course business operations and ensure adequate liquidity and optionality in the event of a restructuring.

The Committee contends that the Debtors' own conclusions and Mr. Kearns' additional work conclusively demonstrate that there is no tracing method that would provide the RBL Lenders with any lien on cash as of the Petition Date. Moreover, the Committee challenges the argument that the Disputed Cash is subject to a constructive trust, arguing that constructive trusts are strongly disfavored and may not be imposed where (i) there was no fiduciary relationship and (ii) there is a written contractual relationship.

An adjudication of this Bucket II Claim would necessarily require resolution of various issues including (i) whether the Debtors' use of the evidence-based tracing method to trace the commingled Disputed Cash in the Operating Account was an appropriate method; (ii) whether the RBL Lenders are entitled to a constructive trust; and (iii) whether the Committee is correct in

---

[481]    *Grund v. Delaware Charter Guarantee & Trust Co.*, 788 F.Supp. 2d 226, 251 (S.D.N.Y. 2011) (citation omitted).

asserting that the total amount of Disputed Cash as of the Forecasted Effective Date should be $21.3 million.  Based on the arguments presented by the Debtors and the Committee, the Court finds that the Debtors' ninety percent estimated chance of success on this issue is reasonable.

### b.  Unitized Leases and After-Acquired Unitized Leases

The RBL Agent and the Second Lien Agent assert that, under Texas law, they have valid, perfected mortgages on all of the Unlisted Leases because the broadly-drafted granting clauses in each of the RBL Mortgages and Second Lien Mortgages expressly provide the RBL Agent and the Second Lien Agent with a lien on all properties then or thereafter unitized with the leases listed on Exhibit A to the RBL Mortgages and the Second Lien Mortgages.  As unit designations are a matter of public record, the RBL Agent and the Second Lien Agent contend that a reasonable person could identify which leases were then or thereafter unitized with the leases listed on Exhibit A to the RBL Mortgages and the Second Lien Mortgages and, therefore, the Unlisted Leases were sufficient to put third parties on constructive notice that liens extended to the Unlisted Leases.  The Committee argues, as a matter of Texas law, that the liens held by the RBL Agent and the Second Lien Agent do not extend to any of the Unlisted Leases.

The Debtors examined the various legal arguments raised by the Prepetition Secured Lenders and the Committee with respect to the Unlisted Leases, including whether a mortgage recorded as to one lease within a unit or pool of leases satisfies the Statute of Frauds and provides constructive notice of the mortgages on all other leases then-existing or thereafter-acquired within the same unit or pool of leases.  The Debtors believe that the Prepetition Secured Lenders likely have valid and perfected liens in the Unitized Leases, even though such leases were not expressly listed on an exhibit to a mortgage, as long as they were subject to publicly filed unit declarations as of the date of the applicable mortgage.  The Debtors, however, believe that the liens held by the Prepetition Secured Lenders may not extend to the After-Acquired

Unitized Leases, as such After-Acquired Unitized Leases would not have been subject to a publicly filed unit declaration as of the date of the applicable mortgage, and, therefore, would not have been identifiable based on publicly available sources.

A resolution of this Bucket II Claim would necessarily involve considerable discovery followed by lengthy litigation involving myriad issues of Texas law. In light of the arguments presented by the Debtors and the counter-arguments presented by the Prepetition Secured Lenders, the Court believes that the Debtors' 32.5 percent estimated chance of success on this issue is reasonable.

### c. Potentially Defective Recording Leases

The Committee asserts that the Potentially Defective Recording Leases were not properly recorded or otherwise suffer from defects that render these leases unencumbered. The Prepetition Secured Lenders disagree, asserting that the broadly-drafted granting clauses in each of the RBL Mortgages and the Second Lien Mortgages provide the Prepetition Secured Lenders with perfected blanket liens on all of the Debtors' real property interests located in the counties in Texas in which an RBL Mortgage or a Second Lien Mortgage has been recorded, regardless of whether there are alleged defects in the recording of those interests. The Prepetition Secured Lenders also note that the RBL Mortgages and the Second Lien Mortgages contain specific language stating that the Prepetition Secured Lenders' liens on the Debtors' property remain valid even though such property has been "incorrectly described."[482]

---

[482]    *See* Post-Merger Sabine Oil & Gas Deed of Trust, Fixture Filing, Assignment of As- Extracted Collateral, Security Agreement and Financing Statement (Ex. 1397) p. 3 ("All rights, titles, interests and estates now owned or hereafter acquired by Grantor in and to . . . (v) the Hydrocarbon Property described on attached Exhibit A and conveyed by this Deed of Trust even though Grantor's interests therein may be incorrectly described or a description of a part or all of such Hydrocarbon Property or Grantor's interests therein be omitted[.]"); *see also* Second Lien Deed of Trust [Dkt. No. 518-3] Section 1.01(b)(v) (same).

As part of their investigation of the Bucket II Claims, the Debtors examined the various legal arguments raised by the Prepetition Secured Lenders and the Committee with respect to the Potentially Defective Recording Leases.   According to the Debtors, the list of Potentially Defective Recording Leases clearly identifies the state and county of the mortgaged property, the lessor, the lessee, the lease number, the lease type, and the lease date and expiration date.   The Debtors state that they conducted a review of public records using such information and found that it was sufficient to identify a majority of the leases at issue.

Based on the broad language in the granting clause and the results of the Debtors' investigation, the Court believes that the Debtors' thirty percent estimated chance of success on this issue is reasonable.

After reviewing each of the Bucket II Claims and the parties' positions thereto, the Court concludes that the Debtors have proposed reasonable risk-adjusted maximum amounts for each of the Bucket II Claims.

### C.    Other Settlements Embodied in the Plan

#### 1.    The RBL Release Satisfies *Metromedia* and is Justified in These Cases

The Plan includes a number of releases, including releases being granted by the Debtors, to which there have been no objections.  The Forest Notes Trustees[483] and the Committee[484] have both lodged objections, however, against the mandatory third-party non-debtor releases embodied in the RBL Release.[485]   In particular, the Forest Notes Trustees challenge the release of the direct claims purportedly held by the holders of the Legacy Forest Notes and the Forest

---

[483]    *See* Forest Objection.

[484]    *See* Committee Obj. ¶ 71.  With respect to the RBL Release, the Committee's objection does not set forth any substantive arguments but simply states that the RBL Release "fail[s] the strict requirements set forth by the Second Circuit and cannot be approved."  As a result, the Court's discussion herein focuses on the substantive arguments against the RBL Release set forth in the Forest Objection.

[485]    As discussed herein, the RBL Release is a mandatory release by holders of claims or interests of certain parties, including the RBL Agent, the RBL Lenders, and their respective affiliates, equity holders, and professionals.

157

Notes Trustees against certain of the RBL Released Parties arising out of the Combination (the "Forest Notes Claims").[486]   The Forest Notes Trustees object to the RBL Release on two grounds.

First, the Forest Notes Trustees argue that the Debtors have not carried their burden to establish that the Court has subject matter jurisdiction to release direct third-party claims because such claims do not meet the nexus requirement of the "conceivable effect" test.[487]   Second, the Forest Notes Trustees submit that, even assuming the Court has subject matter jurisdiction, the Court should not approve the RBL Release because the circumstances here are not unique such that a non-debtor release is justified; the RBL Release, they argue, does not meet the *Metromedia*[488] factors.

The Debtors and the RBL Lenders disagree.  They argue that the Court has subject matter jurisdiction to approve the RBL Release because the claims subject to the RBL Release would directly affect the Debtors' estates based on the RBL Released Parties' indemnification rights against the Debtors' estate arising from the RBL Credit Agreement.  The Debtors and RBL Lenders submit that the RBL Release satisfies *Metromedia* and other applicable law because (i) the RBL Lenders have provided substantial consideration to the Debtors and have agreed to "quintessential give ups" under the Plan that courts consider when evaluating whether circumstances justify a non-debtor release; (ii) the RBL Release enjoins claims that would

---

[486]     The Forest Notes Claims include allegations that the Combination triggered a "Change of Control" under the indentures governing the Legacy Forest Notes, requiring Legacy Forest to pay the holders of the Legacy Forest Notes a redemption payment of 101 percent of their principal, and that Legacy Forest failed to make that redemption payment following consummation of the Combination in breach of such indentures.

[487]     *See* Forest Objection ¶¶ 8-10 (citing *In re Dreier LLP*, 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010) and *Quigley Co. v. Law Office of Peter G. Angelos (In re Quigley Co.)*, 676 F.3d 45, 57 (2d Cir. 2012) (hereinafter "*Quigley*")).

[488]     *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141-42 (2d Cir. 2005) (hereinafter "*Metromedia*").

impact the Debtors' reorganization through indemnity obligations; and (iii) the RBL Release is integral and necessary to the Debtors' reorganization.[489]

In order to approve a non-debtor release included in a plan of reorganization, a bankruptcy court must have subject matter jurisdiction over the released claims, which turns on whether the claims might have "any conceivable effect"[490] on the bankruptcy estate. A third-party claim has a "conceivable effect" on the estate if the "outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate."[491] Specifically, a bankruptcy court has jurisdiction to enjoin third-party, non-debtor claims that directly affect the *res* of the estate.[492]

If it has subject matter jurisdiction to enjoin third-party claims, a bankruptcy court may approve a non-debtor release "under some circumstances, but not as a routine matter"[493] and "only in rare cases."[494] In *Metromedia*, the Second Circuit explained that a non-debtor release should not be approved absent a finding that the circumstances are unique and "render the release terms important to success of the plan."[495] As further provided in *Metromedia* and subsequent decisions in this District, a non-debtor release may be justified in cases where the released parties provide a substantial contribution to the debtor's estate; where the claims are

---

[489]    Debtors' Conf. Br. ¶¶ 174-178.

[490]    *Quigley*, 676 F.3d at 57 ("[T]he touchstone for bankruptcy jurisdiction remains 'whether [a third-party action] might have any 'conceivable effect' on the bankruptcy estate.'") (citations omitted).

[491]    *See Winstar Holdings, LLC v. Blackstone Grp. L.P.*, 2007 WL 4323003, at *1, n. 1 (S.D.N.Y. Dec. 10, 2007) (citing *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984)).

[492]    *See Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville)*, 517 F.3d 52, 66 (2d Cir. 2008) (hereinafter "*Manville III*") ("[A] bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate."); *see also In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 29 (S.D.N.Y. 2011) (hereinafter "*FairPoint*") ("[A] bankruptcy court has jurisdiction to enjoin third party non-debtor claims, but only to the extent that those claims 'directly affect' the *res* of the bankruptcy estate.") (citing *Manville III,* 517 F.3d at 66, *reaff'd,* 600 F.3d 135, 153 (2010)).

[493]    *Adelphia Commc'ns Corp.*, 368 B.R. at 267.

[494]    *Metromedia*, 416 F.3d at 141-42 (citations omitted).

[495]    *Id.* at 143.

"channeled" to a settlement fund rather than extinguished; where the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; where the released party provides substantial consideration; where the plan otherwise provides for the full payment of the enjoined claims; or where creditors consent.[496]   Courts have also found that a non-consensual third-party release can be appropriate where the release plays an important part in the debtor's reorganization.[497]

Applying these legal principles to the facts here, the Court concludes that (i) it has subject matter jurisdiction to approve the RBL Release and (ii) the RBL Release is justified and appropriate under *Metromedia* and other applicable law.

### a.  The Court Has Subject Matter Jurisdiction to Approve the RBL Release

The Forest Notes Trustees argue that the Debtors have not met their burden to establish the Court's subject matter jurisdiction under the "conceivable effect" standard because successful pursuit of the Forest Notes Claims would result in damages payable only by the RBL Released Parties, not by the Debtors.  The Forest Notes Trustees distinguish the facts before the Court from those in *In re Quigley Co.*, in which the Second Circuit found that the bankruptcy court had jurisdiction to enjoin third-party claims because the third-party defendant and the debtor shared a common insurance fund.[498]  The Forest Notes Trustees argue that the Debtors do not share a common insurance fund with the RBL Released Parties and therefore the claims covered by the RBL Release cannot have a "conceivable effect" on the Debtors.  The Forest Notes Trustees also argue that litigation of the Forest Notes Claims would not "alter the Debtors'

---

[496]     *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 269 (Bankr. S.D.N.Y. 2014) (hereinafter "*Genco*"); *Chemtura*, 439 B.R. at 611; *Adelphia Commc'ns Corp.*, 368 B.R. at 268; *In re St. Vincent's Catholic Med. Ctrs.*, 417 B.R. 688, 696–97 (Bankr. S.D.N.Y. 2009); *Metromedia*, 416 F.3d at 142.
[497]     *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992) (hereinafter "*Drexel*").
[498]     Forest Objection ¶ 10.

rights, liabilities, options or freedom of action, nor do they impact the handling and administration of the Debtors' cases," and therefore have no conceivable effect on the Debtors' estates.[499]

The Forest Notes Trustees' argument is not persuasive. First, the Forest Notes Trustees' reliance on *Quigley* is misguided. It is a mischaracterization of the law in the Second Circuit to suggest that a debtor must share a common insurance fund with the released party in order for a non-debtor release to have a "conceivable effect" on the estate. Rather, as is clear in the cases cited by the Debtors, courts have found the "conceivable effect" standard can be satisfied in factual contexts other than those in which the debtor and released party share a common insurance fund.[500]

Second, as those same cases cited by the Debtors demonstrate, a contingent indemnification obligation can be sufficient to satisfy the "conceivable effect" test because such obligation "directly affects the *res* of the bankruptcy estate."[501] Here, the RBL Released Parties are granted broad indemnification rights against the Debtors' estates under the existing RBL Credit Agreement,[502] and the RBL Release includes only those lenders that are RBL Lenders under the RBL Credit Agreement.[503] Therefore, the Court agrees with the Debtors that to the extent an RBL Released Party is held liable on account of the Forest Notes Claims, such party would hold an indemnification claim against the estates. As a result, it is clear that the litigation

---

[499]    *Id.*

[500]    *See* Debtors' Conf. Br. ¶ 171 (citing *FairPoint*, 452 B.R. at 29; *In re Residential Capital, LLC*, 508 B.R. 838, 848-49 (Bankr. S.D.N.Y. 2014) (finding subject matter for a third-party release where the released party filed claims for indemnification against the debtors thus satisfying the standard that the third-party claims "would affect the *res* of the estate, satisfying the jurisdictional underpinnings for the third-party release approved by the Court."); *In re Trinsum Grp., Inc.*, 2013 WL 1821592, at *5 (Bankr. S.D.N.Y. Apr. 30, 2013) (hereinafter "*Trinsum*") ("With respect to the Distributing Agent, any suit against the Distributing Agent also affects the *res* of the estate because the Distributing Agent has indemnification rights against the estate.").

[501]    *FairPoint*, 452 B.R. at 29.

[502]    *See* RBL Credit Agreement, section 12.03(b).

[503]    *See* Plan Art. VIII.B.

of the Forest Notes Claims would have a direct impact on the Debtors' property. The "conceivable effect" standard is satisfied.

Accordingly, the Court concludes that it has subject matter jurisdiction to consider and approve the RBL Release.

### b. The RBL Release Satisfies *Metromedia* and Its Progeny

Having concluded that it has subject matter jurisdiction to consider the RBL Release, the Court turns to the analysis of the RBL Release under *Metromedia* and its progeny to determine whether the RBL Release is justified and should be approved. The Forest Notes Trustees argue that the Debtors have not demonstrated the requisite unique circumstances under which a non-debtor release is appropriate. In addition, the Forest Notes Trustees submit the considerations identified in *Metromedia* militate against approval of the RBL Release because (i) the Forest Notes Claims are extinguished and not channeled to a settlement fund; (ii) the RBL Released Parties have not provided an adequate contribution in exchange for the RBL Release; (iii) the litigation of the Forest Notes Claims would not impact the Debtors' reorganization by way of indemnity because the RBL Released Parties have not asserted indemnification claims against the Debtors' estates on account of the Forest Notes Claims and the Debtors' assumption of such obligations is insufficient to justify the RBL Release; (iv) the Plan does not provide for the full payment of the Forest Notes Claims; and (v) the holders of the released claims have not consented.[504]

The Debtors and the RBL Lenders respond that the substantial contribution made by the RBL Released Parties to the Debtors' reorganization is an integral part of the Plan and is entirely consistent with the type of contribution courts have identified as a basis for approving a non-

---

[504]        Forest Objection ¶¶ 11-20.

debtor release under *Metromedia*.[505]    Moreover, the Debtors and RBL Lenders assert that, contrary to the Forest Notes Trustees' assertion, the RBL Release enjoins indemnification claims that would impact the Debtors' reorganization.    Finally, the Debtors' submit that the RBL Release is not only important for but necessary to the Debtors' reorganization efforts, an assertion amply supported by the evidentiary record before the Court.

There is no dispute that (i) the Forest Notes Claims are extinguished by the RBL Release; (ii) the Plan does not provide for full payment of the Forest Notes Claims; and (iii) the Forest Notes Trustees have not consented to the RBL Release.    Nevertheless, upon review of the other *Metromedia* considerations and examination of the RBL Release, the Forest Notes Claims, and the facts and circumstances of the Debtors' cases, the Court concludes that the RBL Release is justified and therefore approves the RBL Release.

### i.    The RBL Released Parties Have Provided Substantial Consideration to the Debtors' Estates

A non-consensual non-debtor release can be appropriate where a party provides a substantial contribution to the estates.[506]    The Forest Notes Trustees assert that the Debtors have not established that they "are receiving substantial consideration, let alone any consideration, from the RBL Released Parties in exchange for" the RBL Release.[507]    In particular, the Forest Notes Trustees object that there is no "substantial consideration flowing directly from the RBL Released Parties to the estates *on account of the Forest Direct Claims*."[508]

Contrary to the Forest Notes Trustees' assertions, the Court finds that the RBL Released Parties have made a substantial contribution to the Debtors' estates.    First, the RBL Released

---

[505]    Debtors' Conf. Br. ¶ 174 (citing *Genco*, 513 B.R. at 272 (finding that the trio of "give-ups" were "precisely the unique types of circumstances and "give-ups" that meet the requirements of *Metromedia*, in return for which it is appropriate to grant the Third Party Releases").

[506]    *In re XO Commc'ns, Inc.*, 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (hereinafter "*XO Commc'ns*").

[507]    Forest Objection ¶ 14.

[508]    Forest Objection ¶ 15 (emphasis added).

Parties have provided significant consideration to the Debtors' estates in the form of a number of

concessions negotiated as part of the Settlement and the Plan, including (i) agreeing to payment

of their secured claims in the form of equity; (ii) providing exit financing to the Reorganized

Debtors; and (iii) settling their various claims, including their Adequate Protection Claims and

waiving their unsecured deficiency claim, to provide value to unsecured creditors in the form of

two percent of the equity in the Reorganized Debtors and ten-year warrants with significant

minority protections.[509]  It is especially significant that the RBL Released Parties have agreed to

convert their bargained-for secured debt to equity in the Reorganized Debtors,[510] and that the

RBL Released Parties have waived their right to receive cash on account of their Adequate

Protection Claims.[511]

The contributions made by the RBL Lenders are interrelated and consistent with those

made in cases in which courts have approved non-debtor releases.  In particular, in *Genco*,[512] this

Court found that the released parties had provided "significant consideration" by forgoing

consideration to which they were otherwise entitled in order to provide consideration to other

parties, providing new money to the reorganized company to provide liquidity upon emergence,

and converting its prepetition secured debt into equity.[513]  So too here.  The contributions made

by the RBL Released Parties constitute a substantial contribution to the Debtors' estates and

---

[509]    *See* June 22, 2016 Hr'g Tr. 43:5-44:13 (Mitchell); Debtors' Conf. Br. ¶ 168.
[510]    June 22, 2016 Hr'g Tr. 44:3-6 (Mitchell) (stating that it is "very, very unusual to see an ABL or an RBL lender in a position where they're converting debt to equity").
[511]    June 23, 2016 Hr'g Tr. 167:25-168:3 (Mitchell) (testifying that, absent the RBL Lenders' agreement pursuant to the Settlement, the Debtors would not be able to satisfy the RBL Lenders' Adequate Protection Claim in cash); *see* Plan, Art. III.B.3.c.
[512]    *Genco*, 513 B.R. at 272.
[513]    *Id.* (finding "unique circumstances" and upholding third-party releases where released party waived consideration to which it was entitled in order to provide a recovery to equity holders, agreed to provide new money to the reorganized company to ensure that it had sufficient liquidity upon emergence, and agreed to a debt-for-equity exchange which significantly deleveraged the debtor's balance sheet).

164

provide value to creditors who would otherwise receive minimal to no value in the absence of the Settlement.

Moreover, as the RBL Lenders correctly point out, the substantial contribution inquiry does not turn on whether the holders of the released claims receive consideration; it turns on whether the Debtors' estates have received consideration.[514]  As they have done throughout the Debtors' cases, the Forest Notes Trustees insist that there can be no benefit to the Debtors' estates without a benefit to their own pockets.  They are simply wrong.

### ii.    The RBL Release Enjoins Claims that Would Impact the Debtors' Reorganization Through Indemnity Obligations

The Forest Notes Trustees urge the Court to disregard any indemnification claims that the RBL Released Parties may have against the Debtors' estates because "the RBL Released Parties have not asserted they have indemnification or contribution claims against the Debtors on account of the Forest Direct Claims."[515]  The fact that indemnification claims have not yet been asserted against the Debtors is largely irrelevant for purposes of evaluating the RBL Release. The Debtors are obligated under the RBL Credit Agreement to indemnify the RBL Released Parties; accordingly, absent the RBL Release, claims against the RBL Released Parties could result in indemnification claims against the estates.[516]

Furthermore, contrary to the Forest Notes Trustees' argument, this is not an instance in which the indemnification obligations arose out of plan negotiations and were created "simply to

---

[514]      RBL Agent Br. ¶ 12 (citing *Drexel*, 960 F.2d at 293).
[515]      Forest Objection ¶ 16.
[516]      The indemnification obligations provided for in the Credit Agreement are also a basis for an identity of interest between the RBL Released Parties and the Debtors.  *XO Commc'ns*, 330 B.R. at 440 (approving non-debtor release when released parties provided significant consideration, the release was integral to the plan, and the released party had interests that were aligned with the debtors' interest with regard to the claims); *In re Charter Commc'ns*, 419 B.R. 221, 259 (Bankr. S.D.N.Y. 2009) (hereinafter "*Charter Commc'ns*") ("The indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest between the Debtors and the [settling parties].").

gain the protection of a third party release."[517]   The indemnification obligations at issue here were bargained-for in the pre-petition RBL Credit Agreement, and the RBL Released Parties are those lenders that were party to, and thus the beneficiaries, of those indemnification obligations.

Accordingly, the RBL Release enjoins claims that would likely impact the Debtors' reorganization through indemnity obligations, consistent with the teaching of *Metromedia*. [518]

### iii.    The RBL Release Is Integral and Necessary to the Debtors' Reorganization

In *Drexel*, the Second Circuit held that "a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtors' reorganization plan."[519]  As detailed above, in light of the RBL Released Parties' substantial consideration to the Debtors' estates, the RBL Release is an integral and important part of the success of the Debtors' reorganization.[520]  In exchange for the Settlement and inclusion of the Constructive Fraudulent Conveyance Claims, the Bad Acts Claims, and the Bucket II Claims in the RBL Release, the

---

[517]     *See, e.g., Genco*, 513 B.R. at 271; *In re MPM Silicones, LLC*, No. 14-022503-RDD, 2014 WL 4436335, at *33 (Bankr. S.D.N.Y. Sept. 9, 2014).

[518]     *See, e.g., Genco*, 513 B.R. at 271 ("[T]he Court will approve third party releases to align with indemnification obligations of the Debtors that existed before the filing of these bankruptcy cases by virtue of employment agreements, bylaws, retentions, or other loan agreements.  Indeed, the Debtors represented that certain pre-petition credit agreements as well as bylaws covering the directors and officer, which, if respected, would eradicate many of the benefits of the Plan.") (citation omitted); *Charter Commc'ns*, 419 B.R. at 259 (finding that this *Metromedia* factor was satisfied by evidence on the record of indemnification obligations between the Debtors and parties to the settlement and that such satisfaction "supports approving the Third Party Releases")*; Adelphia Commc'ns Corp.*, 368 B.R. at 268 (upholding third party releases for categories of parties including "indemnified persons" as proper because "[s]ome people and entities (*e.g.,* by employment contracts, corporate bylaws, or retention or **loan agreements**) must be indemnified by the estate with respect to their services. To the extent that the third party releases are congruent with the indemnification obligations, and the Debtors would be liable for any liability imposed on such persons, ***third-party releases are acceptable***.  That is so even if they involve professionals for, ***or lenders to***, the estate") (emphasis added).

[519]     960 F.2d at 293.

[520]     *In re Union Fin. Servs. Grp., Inc.*, 303 B.R. 390, 428 (Bankr. E.D. Mo. 2003) ("Where the success of the reorganization is premised in substantial part on such releases, and the failure to obtain releases means the loss of a critical financial contribution to the Debtor's plan that is necessary to the plan's feasibility, such releases should be granted.").

166

RBL Released Parties agreed to negotiate with the Debtors[521] and, thus, these releases are "an important part in the debtor's reorganization plan."[522]

The evidentiary record is clear that in the absence of full releases of the RBL Released Parties, the Debtors would not have obtained the significant debt and equity financing contemplated in connection with the Plan on the same terms or the significant concessions from the RBL Released Parties (*e.g.*, waiver of substantial deficiency claims).[523]  As Mr. Mitchell testified, the RBL Release was "an absolute condition of the [S]ettlement" that the Debtors ultimately reached.[524]  If the Debtors had not been able to secure an agreement with the RBL Released Parties, the Plan would not be feasible[525] and in the absence of a settlement with the RBL Lenders, which hinged on the Debtors granting the RBL Release, the most likely alternative for the Debtors would have been a liquidation.[526]  Therefore, in an effort to obtain the necessary concessions from the RBL Released Parties, the Debtors agreed to the RBL Release.  It is clear

---

[521]    *See* June 22, 2016 Hr'g Tr. 47:23-48:5 (Mitchell) (stating that "the RBL's have been adamant since the beginning of this process, that the only basis that they were prepared to support a plan, and the way that they have ultimately agreed to support the plan, is if the Debtors provide not only Debtor releases, but mandatory third party releases . . . [it] is an absolute condition of the settlement that we've reached").

[522]    *Metromedia*, 416 F.3d at 141; s*ee, e.g., In re Karta Corp.*, 342 B.R. 45, 55 (S.D.N.Y. 2006) (finding that the non-debtor release provisions were "important" to the debtor's plan because (i) the released parties agreed to make a substantial financial contribution to fund the plan *only* if they would be released from claims at issue; (ii) if the releases were not approved, the released parties would not fund the plan; and (iii) without funding, the proposed plan would fail, therefore the releases could not be excised from the plan).

[523]    June 22, 2016 Hr'g Tr. 47:14-48:2 (Mitchell) (Q: "And why does the settlement include mandatory third party releases for the RBL lenders?" A: ". . . You know, we've been in discussions with the RBL lenders since I think the early part of 2015. And those discussions have been at least up until the time we settled, very, very challenging. And they include discussions about potential claims that Creditors may have against the RBL lenders. And the RBL's have been adamant since the beginning of this process, that the only basis that they were prepared to support a plan, and the way that they have ultimately agreed to support the plan, is if the Debtors provide not only Debtor releases, but mandatory third party releases.").

[524]    June 22, 2016 Hr'g Tr. 48:2-5 (Mitchell).

[525]    June 23, 2016 Hr'g Tr. 167:7-24 (Mitchell).

[526]    *See* June 23, 2016 Hr'g Tr. 151:14-19 (Mitchell).

that the RBL Release represents "a portion of a deal that is inextricably intertwined with the Settlement."[527]

In light of the substantial contribution made to the Debtors' estates by the RBL Released Parties – one that is far more significant than a simple "financial contribution" or run-of-the-mill compromise – and the necessity of the RBL Release to the consummation of the Plan, the Court concludes that the circumstances here are unique and render the terms of the RBL Release integral, important, and necessary to the success of the Plan and the Debtors' reorganization. Therefore, the Court approves the RBL Release as consistent with *Metromedia* and other applicable law.

### D.    The *Iridium* Factors Weigh Decisively in Favor of Approval of the Settlement

In evaluating the reasonableness of the Settlement embodied in the Plan, the Court applies the factors outlined by the Second Circuit in *Iridium*, the leading case on the standard for approving Bankruptcy Rule 9019 settlements, and concludes that the Settlement is well within the range of reasonableness.[528]    The Court will address each factor in turn, with the uncontested factors addressed first.

#### 1.    The Uncontested *Iridium* Factors

##### a.    Factor #5: The Competency and Experience of Counsel Supporting, and the Experience and Knowledge of the Judge Reviewing, the Settlement

---

[527]    Debtors' Conf. Br. ¶ 169; *see, e.g., Trinsum*, 2013 WL 1821592, at *6 (approving third-party releases that are "integral to the global settlement" where the releases are relied upon by the released parties as a condition for the funding of the settlement).

[528]    As described *supra*, the *Iridium* factors are as follows: (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay; (iii) the paramount interests of creditors; (iv) whether other parties in interest support the settlement; (v) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (vi) the nature and breadth of releases to be obtained by officers and directors; and (vii) the extent to which the settlement is the product of arm's-length bargaining. *Iridium*, 478 F.3d at 462.

The fifth *Iridium* factor considers the competency of counsel supporting, and the experience and knowledge of the judge reviewing, the settlement. *Iridium*, 478 F.3d at 462. Here, none of the parties disputes the competency and experience of counsel supporting the Settlement, nor do any contest the competency and experience of this Court.

### b.  Factor #7: The Extent to Which the Settlement is the Product of Arm's Length Bargaining

The seventh *Iridium* factor – the extent to which the Settlement was the product of arm's length bargaining – weighs in favor of approval of the Settlement.  The record includes evidence of months of negotiation, beginning in the summer of 2015, among parties with adverse interests, as well as participation by all parties in mediation with the Honorable Allan L. Gropper (Ret.) and with the Honorable Robert D. Drain.  After the Debtors filed the Standalone Plan in January 2016, which no party supported but which the Debtors filed to establish a "framework for the mediation,"[529] the Debtors and the Supporting Parties[530] expended significant time and effort

---

[529]    June 13, 2016 Hr'g Tr. 221:10-22 (Sambrooks) (Q: ". . . Why, if there was no agreement with the RBLs or the second liens, that a Committee wasn't interested in a plan of reorganization, did Sabine plan on January 25th, to file a plan?" A: "I think there were two main aspects. One is that we wanted to definitely push the process along. And you know, we viewed that we needed to get something out there to do that, but I think more specifically, we were going into mediation at the end of January, and we wanted to have a plan that we proposed that we thought was a, you know, a reasonable bid way into discussions that we'd heard to date to use as a framework for the mediation.").

[530]    The evidence indicates that the Debtors attempted to engage with the Committee regarding a potential plan of reorganization but that the Committee did not meaningfully participate in such discussions due to their different view on the correct path for these cases.  *See* June 22, 2016 Hr'g Tr. 51:6-23 (Mitchell) (Q: "Moving forward in time after the petition was filed.  Have . . . the Debtors attempted to engage with the Committee regarding a potential plan of reorganization?" A: "Yeah. Yes, on many, many occasions." Q: "What were the results of those efforts?" A: "Look, I think the Committee has been, you know, very clear that they support a very different strategy. I think the Committee's view pretty consistently has been that they want to see the Debtor sell their assets, not give any releases, and allow the Committee to pursue the litigation that was the subject of the STM [sic] hearings. And there's just been a very fundamental difference of view of where value is."); June 13, 2016 Hr'g Tr. 221:4-9 (Sambrooks) (Q: "Okay. And had the Creditor's Committee's position changed, to your knowledge, by the end of January [2016], as far as their unwillingness to participate in the plan of reorganization?"  A: "It had--their position was the same, as far as I remember."); Mitchell Initial Report ¶ 25 ("I understand that the RBL Lenders and the Second Lien Lenders support the Plan, even though both creditor groups will lose a substantial portion of their investment.  The Committee, however, did not meaningfully participate in Plan discussions and does not support the Plan, despite receiving what I believe to be a fair recovery in light of the difficult economic realities confronting all stakeholders.").

negotiating the terms of the Settlement, multiple parties gave concessions, and agreement ultimately was reached. The record is devoid of evidence that the Settlement was not produced by arm's length negotiations; as Mr. Mitchell testified, the Debtors tried to broker a middle ground between the parties, and no party ended up fully satisfied with the terms of the Settlement,[531] which is the essence of an arm's length negotiation. The Court finds that the extensive arm's length negotiations by parties with differing economic interests, which ultimately resulted in the Settlement, satisfy this *Iridium* factor.

### 2.  The Contested *Iridium* Factors

While the Court discusses each of the *Iridium* factors below, the first three factors – the balance between the litigation's possibility of success and the settlement's future benefits, the likelihood of complex and protracted litigation, and the paramount interests of creditors – weigh most heavily in the Court's inquiry under Bankruptcy Rule 9019. The Committee argues that the Settlement does not fall within the range of reasonableness and cannot be approved under Bankruptcy Rule 9019 because it vastly overstates the Adequate Protection Claims and understates the unencumbered value available for unsecured creditors. The Debtors and the Supporting Parties argue that each of the *Iridium* factors has been satisfied and that the Settlement is well above the lowest point in the range of reasonableness. The Court has independently canvassed the issues surrounding the estimation of the Adequate Protection Claims, the potential recoveries with respect to the Bucket II Claims, the risks and costs of litigation, and the benefits of the Settlement and has considered each of the *Iridium* factors. As

---

[531]    Mr. Mitchell testified that his "impression is that . . . the RBLs are not that happy with where they've ended up" but that, "ultimately [the negotiations] got to a point here where, frankly, no one is happy;" so "what we as the Debtor tried to do was broker a middle ground between the parties." *See* June 22, 2016 Hr'g Tr. 54:1-3 (Mitchell); June 22, 2016 Hr'g Tr. 41:4-8 (Mitchell); June 22, 2016 Hr'g Tr. 40:15-17 (Mitchell).

discussed herein, the Court finds that the Settlement is reasonable and the Plan should be confirmed.

### a. Factor #1: The Balance Between the Litigation's Possibility of Success and the Settlement's Future Benefits

The first *Iridium* factor asks whether the likelihood of the debtor's succeeding in litigating the claims proposed to be settled is outweighed by the future benefits the debtor can enjoy from the settlement. *Iridium*, 478 F.3d at 462.

In considering the likelihood of success on the merits, as mandated by *Iridium*, the Court has reviewed the integrated Settlement and has considered in detail, *supra*, the merits of the two most significant aspects of the Settlement: (i) the Adequate Protection Claims, the amount of which has been estimated by the Debtors and by the Committee, and (ii) the recoveries potentially available to unsecured creditors if the Bucket II Claims were litigated.[532]    The Committee argues that (a) the Settlement rests on a significantly overstated estimate of the amount of the Adequate Protection Claims and (b) the Debtors have failed to value the Bucket II Claims properly; as a result, by the Settlement, the Debtors are abandoning the pursuit of claims that would significantly enhance unencumbered value and lead to a greater recovery for unsecured creditors than under the Plan.    The Debtors contend that the Settlement is unquestionably reasonable not only because the risks and costs of litigating the Bucket II Claims far outweigh any potential benefit to the estates, but more importantly because, absent a settlement, the RBL Lenders are entitled to the entire amount of any recovery on the Bucket II Claims as a result of the RBL Lenders' Adequate Protection Claim.  The Debtors also assert that

---

[532]    The Court notes that the Settlement also includes releases of other litigation claims, including the Constructive Fraudulent Conveyance Claims and the Bad Acts Claims.  By the STN Ruling, the Court denied the Committee standing to pursue such claims and found that the claims were either not colorable or, if colorable, were not in the best interests of the Debtors' estates to pursue.  The District Court has affirmed the STN Ruling. Accordingly, the release of such claims in the Settlement, in the Court's view, is reasonable.

the benefits of the Settlement both to the estates and to unsecured creditors vastly exceed any litigation recovery under any realistic scenario.

In examining the Settlement pursuant to Bankruptcy Rule 9019, the Court need not determine a specific dollar amount for the Adequate Protection Claims; rather, the Court is required to evaluate whether the Settlement, as an integrated compromise, falls below the lowest point in the range of reasonableness. *See Adelphia Commc'ns Corp.*, 368 B.R. at 242 ("In reviewing a compromise, a bankruptcy court need not be aware of or decide the particulars of each individual claim resolved by the settlement agreement, or 'assess the minutia of each and every claim'; rather, the court 'need only canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'") (citations omitted). Accordingly, the Court has undertaken an extensive review of the parties' differing valuation methodologies and their estimates of the Adequate Protection Claims. As discussed *supra*, the Court concludes that the Debtors have marshalled substantial credible evidence supporting the reasonableness of their estimate of the Adequate Protection Claims in the amount of $237 million and have demonstrated that their estimate is in fact conservative in a number of respects. In contrast, the Court finds the approach taken by the Committee in its calculation of the Adequate Protection Claims unsupported by applicable law and the evidentiary record; the Committee's conclusions based on that approach are inaccurate and/or unreliable, and in some instances, illogical. As a result, based on the record established at the Confirmation Hearing, the Court concludes that the Debtors' estimate of approximately $237 million in Adequate Protection Claims is reasonable.

As the evidence establishes, the Debtors' estimate is conservative, as demonstrated by the fact that: (i) if the Adequate Protection Claims were litigated instead of settled, the Prepetition Secured Lenders would assert an entitlement to an amount of Adequate Protection Claims higher

172

than the Debtors' estimate; (ii) Mr. Mitchell made a number of assumptions favorable to the Committee in calculating the Reserve Collateral Value; and (iii) the Debtors' estimate of $237 million is based on strip pricing data as of June 10, 2016, on which date the Committee insists the valuation must be based.[533]    Moreover, each of the downward adjustments to the Debtors' estimate of the Adequate Protection Claims that has been propounded by the Committee is unsupported by the record, as discussed in detail in Section VIII.A, *supra*.    Having examined each of the adjustments set forth by the Debtors in the Mitchell Bridge and by the Committee in the Zelin Bridge, the Court finds that its conclusion as to the reasonableness of the Debtors' approach to valuing the Adequate Protection Claims is well supported by the record.

With respect to the Bucket II Claims, the Debtors analyzed not only the maximum potential recovery on each of the Bucket II Claims (employing the total enterprise values calculated by Mr. Cecil and by Mr. Zelin)[534] but also created, after a diligent investigation into the merits of each claim, "risk-adjusted" Bucket II Claim amounts reflecting the Debtors' view of their chance of success with respect to each claim, if litigated.    Given the parties' differing views on the merits of certain of the Bucket II Claims, the Debtors assigned what they viewed as a realistic probability of success to each claim, mindful of the fact that the Committee may argue that the estimated likelihood of success on certain claims should be higher and, the Prepetition Secured Lenders, lower.    Notably, while Mr. Mitchell also considered additional factors that

---

[533]    Because the Court concludes that the Settlement is reasonable based on strip pricing as of June 10, 2016, which prices were higher than those as of other dates on which both the Debtors and the Committee premised other valuation estimates submitted to the Court, it follows logically that the Court also finds the Settlement to be reasonable based on those lower strip prices, the use of which in the analysis results in larger Adequate Protection Claims.

[534]    As the Debtors point out, the Committee did not dispute Mr. Mitchell's calculations of any of the ten total Bucket II Claim amounts.  *See* June 22, 2016 Hr'g Tr. 110:15-18 (Mitchell) (Q: "In his expert reports, does Mr. Kearns identify any disagreement with your calculation of the total amount of the Bucket 2 claims?" A: "No, he doesn't."); *see also* June 22, 2016 Hr'g Tr. 110:10-14 (Mitchell) (Q: "Does Mr. Kearns in fact, in his expert report, present numbers, of the total amount of Bucket 2 claim amounts, that correspond with the amounts that you determined in your expert report?" A: "Yes, they're identical.").

could impact any potential recovery obtained through litigation, such as (i) the cost of litigating the Bucket II Claims, which Mr. Mitchell estimated at approximately $15 million to $20 million;[535] and (ii) the costs to the Debtors' business associated with a prolonged restructuring caused by protracted litigation,[536] the Court notes that the Debtors did not include such costs in their risk-adjusted Bucket II Claim estimates – and each would likely decrease any recovery. The Debtors' resulting risk-adjusted maximum potential amount which could be recovered on account of the Bucket II Claims is $89.1 million (using Mr. Cecil's total enterprise value of $550 million) and $108.8 million (using Mr. Zelin's total enterprise value of $726 million).[537]

Notwithstanding its allegations that the Debtors understate the unencumbered value available for unsecured creditors by litigating the Bucket II Claims, the Committee did not present any risk-adjusted Bucket II Claim amounts different from those prepared by Mr. Mitchell (other than for the RBL Lenders' Preference Claims[538]). Moreover, the Committee did not introduce any evidence or witness testimony to refute the Debtors' $15 million to $20 million estimate of litigation costs, instead repeatedly claiming litigation costs would total only $5 million, an assertion which the Committee subsequently conceded was merely an assumption provided by counsel to Mr. Kearns.[539] Accordingly, in comparing the possibility of success in

---

[535]    *See* Mitchell Rebuttal Report ¶ 45.

[536]    June 22, 2016 Hr'g Tr. 112:16-113:1 (Mitchell) (Q: "Do these risk adjusted Bucket 2 claim amounts factor in litigation costs?" A: "They do not." Q: "What about costs to the business, associated with a prolonged restructuring; are those included?" A: "No.").

[537]    Based on Mr. Cecil's $550 million total enterprise value, the Debtors estimate that the maximum total amount which could be recovered on account of the Bucket II Claims is $192.7 million without accounting for any risk. Based on Mr. Zelin's $726 million total enterprise value, the Debtors estimate that the maximum total amount which could be recovered on account of the Bucket II Claims is $230.4 million without accounting for any risk.

[538]    As discussed in Section IV.B.8, *supra*, the Committee asserts that $12 million is the maximum potential risk-adjusted amount for this claim, as it estimates a 100 percent chance of success. The Debtors' risk-adjusted maximum potential amount, based on a five percent chance of success, is $0.6 million.

[539]    *See* July 5, 2016 Hr'g Tr. 57:10-20 (The Court: "Right. But hold on. Let's take litigation costs because I think it's a very nice example. [Mr. Kearns] doesn't have a view. Why does he have -- he hasn't disclosed a view of the litigation costs." Mr. Weiner: "That's correct. It's not there for purposes of him having a view. It's an assumption that counsel gave him to run his numbers, because we think it's -- it's illustrative and an important

litigation with the future benefits of the Settlement as required by the first *Iridium* factor, the Court finds that the Debtors' risk-adjusted amounts constitute a reasonable assessment of potential litigation recoveries for the Bucket II Claims (which, as stated, do not include litigation cost or risk to the business) and will therefore utilize the Debtors' $108.8 million risk-adjusted maximum amount for its comparison of the potential benefits of litigation to the benefits of the Settlement.

> i. **Potential Recoveries to Unsecured Creditors if the Adequate Protection Claims and Bucket II Claims Were Litigated**

In evaluating the reasonableness of the Settlement, the Court first considers the potential recoveries to unsecured creditors in the absence of the Settlement – that is, if the Adequate Protection Claims and the Bucket II Claims were litigated. As discussed above, the Court finds the Debtors' estimates of $237 million in Adequate Protection Claims and $108.8 million of risk-adjusted maximum litigation recoveries on account of the Bucket II Claims to be reasonable. Accordingly, it is clear that, absent the Settlement, the Adequate Protection Claims would likely exceed any recovery on account of the Bucket II Claims.

During the Confirmation Hearing, the Debtors elicited testimony from Mr. Mitchell regarding this scenario, which he described as "a reasonable analysis of the likely outcome if the Debtors took kind of a middle of the road view, in the spirit of settlement" on each of twenty disputed issues – ten with respect to Adequate Protection Claims and ten for Bucket II Claims.[540] Mr. Mitchell began with the $109 million amount for the Bucket II Claims,[541] from which he

---

toggle, if you will, compared to Mr. Mitchell's $25 million. And all we're doing is saying run the numbers with that assumption. It's no different than any other assumption that counsel directs.").

[540]      June 22, 2016 Hr'g Tr. 131:16-21 (Mitchell). A copy of the Demonstrative utilized by the Debtors to illustrate this scenario is annexed hereto as Appendix D.

[541]      The $108.8 million estimate was rounded up to $109 million in this analysis.

subtracted the Debtors' $223 million estimate of the Adequate Protection Claims,[542] resulting in a "negative recovery" in the amount of $114 million. Subtracting total estimated litigation costs of $25 million,[543] any Bucket II recovery would drop recoveries further to negative $139 million, meaning that recovery to unsecured creditors in this scenario would be zero. This analysis compelled Mr. Mitchell to conclude that the question as to the reasonableness of the Settlement is "not even close" and that the Settlement as proposed "is truly fair and really is the only opportunity for unsecureds to . . . create value here."[544] Notably, the scenario as to which Mr. Mitchell made these comments ignored the business risks, costs, and damage to the Company that would otherwise result from a prolonged restructuring, making the reasonableness of the Settlement that much more stark.

Mr. Mitchell's scenario, which is supported by the record of the Confirmation Hearing, demonstrates that a realistic outcome of litigating rather than settling the Adequate Protection Claims and the Bucket II Claims would be zero recovery for unsecured creditors. As counsel to the Debtors pointed out during closing arguments, the lowest point in the range of

---

[542]    During his testimony, Mr. Mitchell explained the way in which he arrived at the $223 million amount for purposes of this scenario, as he had to make a different assumption to account for the adjustment to unencumbered cash when risk-adjusting the Bucket II Claims; he utilized the Debtors' estimate of $238 million in Adequate Protection Claims and subtracted from it additional encumbered cash of $15 million on account of the risk-adjustment. *See* June 22, 2016 Hr'g Tr. 134:18-135:12 (Mitchell); 202:13-203:10 (Mitchell).

[543]    Mr. Mitchell estimates litigation costs and professional fees of $15 million to $20 million for Bucket II Claims and $5 million to $10 million for Adequate Protection Claims, for a total of approximately $25 million in costs. *See* Mitchell Rebuttal Report ¶ 45 ("This represents the cost the Debtors would incur during a protracted litigation between the Committee, the RBL Lenders and the Second Lien Lenders over the Bucket Two items and the size of the adequate protection claim. This assumption is based upon an estimated $30 million to $40 million spent to date on litigation costs.").

[544]    June 22, 2016 Hr'g Tr. 135:21-136:6 (Mitchell); *see also* Mitchell Initial Report ¶ 10 ("Without the Settlement, the Secured Lenders' adequate protection claims would swallow the value of any unencumbered assets, including the proceeds that could be realized from pursuing virtually all of the Bucket Two claims.").

reasonableness for the Settlement, therefore, is zero; it cannot be negative $139 million.[545]  The

Court agrees.

### ii.    Recoveries to Unsecured Creditors Under the Plan

In contrast to this zero-recovery scenario, the Settlement provides unsecured creditors

with a positive recovery – a portion of the Unsecured Equity Pool[546] in the Plan, which is

comprised of two percent of the New Common Stock and one hundred percent of the Tranche 2

Warrants – which the Debtors value at approximately $29 million.  *See* Mitchell Supplemental

Report, ¶ 46 (estimating the recovery to unsecured creditors under the Plan to be approximately

$28.5 million).

The Debtors' estimate of the value of the recoveries to unsecured creditors under the Plan

is based in part on the expert opinions of Mr. Aebersold with respect to the value of the Tranche

2 Warrants.  As discussed *supra*,[547] the Court has concluded that the opinion of Mr. Aebersold,

solely as to the appropriate volatility to use in calculating the value of the Warrants, is

inadmissible.   Therefore, the Court cannot accept the Debtors' estimate of the value of the

Tranche 2 insofar as it is based in part on Mr. Aebersold's opinion as to volatility.   However,

over the course of the Confirmation Hearing, the Court was provided with additional evidence

which provides a basis for the Court to determine that the Tranche 2 Warrants have material

value.

---

[545]    *See* July 13, 2016 Hr'g Tr. 129:10-14 (Jakola) ("And that means, Your Honor, that the lowest point in the range of reasonableness is zero.  It can't be less than zero.  It can't be negative $139 [million].").
[546]    Holders of Allowed Second Lien Deficiency Claims (Class 4b), Allowed 2017 Senior Notes Claims (Class 5a), Allowed 2019 Senior Notes Claims (Class 5b), Allowed 2020 Senior Notes Claims (Class 5c), and Allowed General Unsecured Claims (Class 6) will share pro rata in the Unsecured Equity Pool under the Plan.
[547]    *See* Section V.B.1.

Specifically, Mr. Seery, who personally valued the Tranche 2 Warrants,[548] testified that

he believes that a fifty percent volatility is "fair" to use in calculating the value of the Warrants

using Black-Scholes.[549]   In addition, in analyzing the value of warrants proposed to be issued by

the Debtors pursuant to the Standalone Plan on file at the time of the STN Hearing (which

warrants contained terms different from the terms of the Warrants), Mr. Kearns testified that he

utilized a forty percent volatility in his Black-Scholes model.[550]   Finally, in their closing

argument at the Confirmation Hearing,[551] the Debtors provided several valuations of the Tranche

2 Warrants based on a $726 million enterprise value which utilized the same inputs as Mr.

Aebersold had used but which toggled the volatility assumption to illustrate the Warrant value

with a forty, fifty, and sixty percent volatility, respectively.[552]

Therefore, without making a determination as to the specific value of the Tranche 2

Warrants, the Court finds it beyond dispute that the Tranche 2 Warrants will have material value

in the hands of their holders.   Moreover, even assuming that the Tranche 2 Warrants have no

value, the Court finds that total recoveries to unsecured creditors under the Plan are clearly

substantially greater than zero.   By providing unsecured creditors with a recovery of any value

which, absent the Settlement, would not be available, the Settlement falls well above the lowest

point in the range of reasonableness.   Accordingly, even assuming that the Debtors' estimate of

---

[548]      June 21, 2016 Hr'g Tr. 66:7-9 (Seery).
[549]      June 21, 2016 Hr'g Tr. 64:16-23 (Seery).
[550]      July 6, 2016 Hr'g Tr. 42:15-20 (Kearns).  For purposes of the STN Hearing, Mr. Kearns valued warrants
issued by the Debtors with a five-year term based on an enterprise value of $439 million and a 40% volatility to be
$13.7 million.  *See* Expert Report of Christopher J. Kearns in Support of the Standing Motions by the Official
Committee of Unsecured Creditors (Ex. 1406), Ex. III.
The Committee did not submit its own valuation of the Warrants at the Confirmation Hearing.
[551]      While the valuation information provided by the Debtors is not evidence, the Court agrees with the
Committee's expert Mr. Kearns that "the math [for warrant valuation] is simple" once all Black-Scholes inputs have
been determined, *see* July 6, 2016 Hr'g Tr. 38:L24-39:4 (Kearns), and therefore regards such valuations as relevant
demonstrative data.
[552]      *See* Debtors' Closing Demonstrative, p. 33 (indicating that the Tranche 2 Warrants have a value of $19.5
million based on a 40% volatility and $26.2 million based on a fifty percent volatility).

the value of the recoveries to unsecured creditors under the Plan in the amount of $29 million is exaggerated, it is beyond dispute that the New Common Stock and the Tranche 2 Warrants have value greater than zero; thus, the Settlement falls above the lowest point in the range of reasonableness.

### iii.    Under Any Scenario, the First *Iridium* Factor is Satisfied

Next, in reviewing the probability of success in pursuing litigation, the Court has carefully considered the Committee's position that the Debtors have understated the unencumbered value available to unsecured creditors through litigation of the Bucket II Claims. The Court finds that, even assuming the Adequate Protection Claims were zero, a scenario that not even the Committee has identified as possible, the record contains no basis on which the Court can conclude that the recoveries to unsecured creditors under the Plan are below the range of reasonableness as compared with a litigated outcome. Specifically, the Committee has not put forth any evidence comparing (i) the estimated value to unsecured creditors of the Settlement to (ii) the potential recoveries available to unsecured creditors on the Bucket II Claims, nor has the Committee estimated Plan recoveries to unsecured creditors at all.[553]    When asked at the Confirmation Hearing whether they were offering any opinions about how the value that unsecured creditors are receiving under the Plan and Settlement compares to value such creditors might receive if any of the Bucket II Claims were litigated, neither of the Committee's experts offered an opinion.[554]    As Mr. Mitchell points out in his rebuttal report, in comparing risk-adjusted maximum recovery amounts for the Bucket II Claims and other claims to the size of the Adequate Protection Claims, the Committee's expert Mr. Kearns does not address (i) the cost of

---

[553]    July 6, 2016 Hr'g Tr. 28:23-29:2 (Kearns) (Q: "Sir, do you -- sitting here today, you do not have an independent expert opinion about the value being provided under the debtors' proposed plan to the unsecured creditors Classes 5 and 6, correct?" A: "Correct.").

[554]    *See* July 6, 2016 Hr'g Tr. 27:2-6 (Kearns); July 7, 2016 Hr'g Tr. 79:14-18 (Zelin).

litigating any of the claims; (ii) the fact that, without the Settlement, the unsecured creditors would have to share a substantial portion of any Bucket II Claims recoveries with the Prepetition Secured Lenders, who would hold sizeable deficiency claims; (iii) the litigation risk associated with the Adequate Protection Claims; and (iv) the fact that the Adequate Protection Claims would reduce the available unencumbered value substantially, or more likely, entirely.[555] Notably, even if the Committee had addressed each of these points, the question of whether the Adequate Protection Claims are *larger* than the Bucket II Claims misses the mark entirely – the inquiry under Bankruptcy Rule 9019 requires the Court to consider whether the Settlement provides the estates with value that is above the lowest point in the range of reasonable litigation outcomes. It does.

In contrast, the Debtors presented additional "waterfall" analyses to illustrate how the maximum recovery available to unsecured creditors for the Bucket II Claims compares to the recovery to unsecured creditors under the Settlement; these analyses demonstrate that even assuming the "best case scenario" for unsecured creditors in litigation, any potential recovery amount above the recoveries to unsecured creditors under the Plan is insufficient to place the Settlement outside of the range of reasonableness.

Using the $218 million in total Bucket II Claim amounts (representing 100 percent success on all of the Bucket II Claims, assuming Mr. Zelin's enterprise value of $726 million[556]), Mr. Mitchell calculated the "best case scenario" for the Committee, which included the following assumptions: (i) no (zero) Adequate Protection Claims; (ii) 100 percent success on

---

[555]    Mitchell Rebuttal Report ¶ 48.
[556]    *See* Appendix C. The Debtors arrived at a figure of $218 million by taking the maximum value of the Bucket II Claims on a non-risk adjusted basis (approximately $230 million), subtracting the Swap Payments (approximately $24 million), and adding the amount of the adequate protection payments made to the Second Lien Lenders (approximately $12 million).

each and every Bucket II Claim; (iii) 100 percent success on each contested issue with respect to the Adequate Protection Claims; and (iv) no business risks to the Company as a result of a prolonged restructuring.  The Debtors then made the following deductions from the $218 million figure of Bucket II Claim total amounts: (i) $25 million in litigation costs and (ii) $78 million in deficiency claims of the Prepetition Secured Lenders.[557]  The results of this "best case scenario" waterfall left unsecured creditors with a maximum potential amount for Bucket II Claims recoveries of $116 million before taking into account any recoveries they are receiving under the Plan.[558]

Although the "best case scenario" could hypothetically result in some additional value to unsecured creditors over the Plan value, the assumptions that underlie such scenario are simply untenable.  Mr. Mitchell emphasized that, while useful for illustrative purposes, this hypothetical scenario depicts an "unrealistic outcome," as it is virtually impossible to conclude that there is a one hundred percent success of every one of the Bucket II Claims, that the Adequate Protection Claims are zero, and that there would not be "massive disruption and cost [to the business] associated with this sort of litigation."[559]  To put a fine point on it, this "best case for unsecured creditors" scenario assumes that the Prepetition Secured Lenders are entitled to zero Adequate Protection Claims, not even the $6 million amount calculated by Mr. Zelin.  If the scenario were altered to include Adequate Protection Claims of $30 million (comprised of $6 million as calculated by Mr. Zelin but corrected to include the $24 million Swap Payments that Mr. Zelin unjustifiably deducted from his calculation), the potential maximum recovery amount for

---

[557]    The RBL Lenders are waiving the right to receive a deficiency claim under the Settlement, therefore, in the absence of the Settlement, the RBL Lenders would participate in the unsecured creditor recovery to the extent of their deficiency claim.

[558]    The Debtors have estimated recoveries to unsecured creditors under the Plan at $29 million; thus, the delta between the $116 million and recoveries under the Plan would be a maximum of $87 million under this unrealistic, "best case" scenario.

[559]    June 22, 2016 Hr'g Tr. 126:3-25 (Mitchell).

unsecured creditors would decrease to only approximately $86 million before taking into account the recoveries provided to unsecured creditors under the Plan.  Regardless, the scenario is wholly unrealistic for a panoply of reasons; it supports a determination that the value being provided to unsecured creditors under the Plan is within the range of reasonableness.

In addition to the fact that the scenario assumes no Adequate Protection Claims, as discussed above, it also ignores the risks of litigation and assumes that the Committee will succeed on each and every Bucket II Claim.  This is pure fantasy.  It is axiomatic that litigation of any kind carries risk; this scenario does not even employ the Debtors' risk-adjusted Bucket II amounts – instead, it assumes that the *total* maximum amounts would be recoverable (*i.e.*, $218 million, instead of the risk-adjusted total amount of $109 million).  The Court need not and will not make specific determinations as to each and every risk adjustment that should be applied; nonetheless, the Court finds that the Debtors' $109 million risk-adjusted figure is reasonable, and based on the record of the Confirmation Hearing, the likelihood that litigation of each of the Bucket II Claim issues would result in 100 percent success across the board is virtually zero.

Second, this "unrealistic" scenario depicting potential amounts available above the Plan value to unsecured creditors ignores the business risks and costs to the Company that would result from a prolonged restructuring.  According to Mr. Mitchell, a prolonged restructuring would likely result in an abandonment of the Plan, which would likely lead to a liquidation of the Company in which unsecured creditors would receive no recovery.[560]

---

[560]    June 22, 2016 Hr'g Tr. 135:21-136:15 (Mitchell) (Q: "Based on this scenario of the Debtors' risk adjusted values, what did you conclude about the reasonableness of the settlement that the Debtors are proposing?" A: "Look, I mean it's –it's not even close. . . . Firstly, in my opinion, without the settlement the likelihood is that the RBLs walk from their plan support.  And so we're in a scenario where we're facing a probable liquidation along with an extended, costly litigation."); *see* Mitchell Rebuttal Report, ¶ 37 ("If the Debtors were to abandon the Plan and instead litigate against the RBL Lenders and the Second Lien Lenders regarding adequate protection claims and Bucket Two Claims, it is my view that there is a real risk that there would not be a business left to reorganize.  In that liquidation scenario, unsecured creditors would receive no recovery.").

After considering the various assumptions embedded within the "best case scenario" waterfall, the Court concludes that it is highly unlikely – indeed virtually impossible – that such a scenario could occur and that recoveries above the value being provided to unsecured creditors under the Plan would be achieved. As stated by Debtors' counsel at closing argument, "[w]e presented it as an illustration of the better than best case scenarios."[561] Even assuming, *arguendo*, that such a scenario was not wholly unrealistic, the Court finds that it would not be in the best interests of the Debtors' estates to "roll the dice" in litigating Bucket II Claims in order to achieve what would be, at best, a modest recovery to unsecured creditors above the value being provided to them under the Plan, or, at worst (and significantly more likely), a liquidation of the Debtors' businesses, no recovery to unsecured creditors, and decreased recoveries to other creditors. As this Court has stated previously, such a gamble is not required by *Iridium* or other applicable law.[562] The Court agrees with the Debtors' pointed observation during closing arguments: the fact that the Committee can imagine a purported scenario under which unsecured creditors could possibly achieve greater recoveries than under the Plan does not translate to a conclusion that the Settlement does not satisfy Bankruptcy Rule 9019.[563]

---

[561]     July 13, 2016 Hr'g Tr. 126:21-22 (Jakola).

[562]     *See In re Ambac Fin. Group, Inc.*, 457 B.R. 299, 305 (Bankr. S.D.N.Y. 2011) ("Nothing in *Iridium* or other applicable case law requires a debtor to gamble with the estate's interest at the behest of an out-of-the-money party who has nothing to lose by a roll of the litigation dice."), *aff'd*, 2011 WL 6844533 (S.D.N.Y. Dec. 29, 2011), *aff'd*, 487 F. App'x 663 (2d. Cir. 2012). The Committee has posited additional scenarios in which it asserts that, were it to prevail on certain "critical" Bucket II Claims, the Committee could achieve increased recoveries for unsecured creditors above those provided by the Plan and that such scenarios are more realistic than the Debtors' "best case scenario." The Court has considered these arguments and is not persuaded that these scenarios, even if viable, demonstrate that the Settlement is not reasonable.

[563]     July 13, 2016 Hr'g Tr. 323:17-324:5 (Balassa) ("And so there are reasonable outcomes. In fact, we think the most reasonable and the most likely outcomes that the unsecured creditors would face would produce a worse result for them in litigation than under the plan. And the fact that the committee can imagine some scenario, again[,] one we don't regard as reasonable, but even if it were reasonable, the fact they can imagine some purportedly reasonable scenario in which the unsecured creditors would do better than under the plan, . . . doesn't overcome the 9019 standard of which the Court is asking, of course, whether the scenario, the settlement that we've proposed is above the lowest end of the reasonable ranges litigation outcomes.").

Finally, the Debtors have presented compelling evidence of the Settlement's significant future benefits to the Debtors' estates and their creditors; these benefits more than tip the balance with respect to the first *Iridium* factor even if it were a close call.  In addition to the equity and warrant contributions worth tens of millions of dollars in the aggregate, the RBL Lenders have agreed to (i) compromise their substantial superpriority adequate protection claim and take equity in satisfaction thereof, despite their entitlement to receive cash on account of such claim; (ii) take equity on account of their secured claim;[564] (iii) waive their deficiency claims; (iv) waive any right to enforce the lien subordination or other turnover rights against any Second Lien Lender under their intercreditor agreement and the Final Cash Collateral Order; and (v) provide the Exit Facility with $200 million of initial commitments to the Reorganized Debtors to fund post-Effective Date operations.  In addition, in exchange for the Debtors' withdrawal of the Adversary Proceeding, the Second Lien Agent has agreed (a) to settle the Second Lien Lenders' Adequate Protection Claim for a sum of $50 million (after accounting for payments made under the Final Cash Collateral Order); (b) that the Debtors may satisfy such claim with stock and warrants; and (c) not to assert liens on the 85 leases included in the Second Lien 90-Day Mortgages.

With respect to the Debtors' business, the Settlement also provides significant benefits that would not be otherwise available.  Approval of the Settlement and confirmation of the Plan permit the Debtors to emerge from chapter 11 and move their business forward without the distractions inherent in the chapter 11 process and the exorbitant costs it entails.  The expense of

---

[564]    The evidence supports a finding that the RBL Lenders' agreement, by the Settlement, to convert their debt to equity, is an uncommon settlement concession for a reserve-based lender and should be viewed as extraordinary. Mr. Mitchell emphasized that it is "very unusual" to see an RBL lender converting debt to equity and that getting the RBL Lenders to support a plan with this term "is a significant achievement."  *See* June 22, 2016 Hr'g Tr. 44:3-12 (Mitchell).

these chapter 11 cases has presented a breathtakingly large financial burden for the Debtors, as professional fees costs have totaled approximately $2 million per week on average – over $100 million in the aggregate.[565]    Mr. Mitchell believes that those expenses would increase by approximately $25 million if the Bucket II Claims and the Adequate Protection Claims proceeded to litigation.[566]  In addition to eliminating the high cost of litigating some or all of the claims included in the Settlement, a significant benefit to the Debtors, the Settlement also permits the Debtors' management to return to focusing their time on operations and new strategic opportunities rather than on litigation and its accompanying distractions.[567]    Further, the Settlement delevers the Company's balance sheet by $2.5 billion[568] and ensures, through the provision of the Exit Facility by the RBL Lenders, that the Company will have adequate liquidity to execute on its business plan.    Finally, the Settlement provides a recovery to the Debtors' current creditors in real time – a recovery that would otherwise be subject to the delay, risk, and uncertainty of litigation and likely would be wholly nonexistent but for the Settlement.

The Debtors have demonstrated that the Settlement is reasonable because the benefits of the Settlement both to the estates and to unsecured creditors vastly exceed litigation recovery under any realistic scenario; the Committee has provided the Court with no basis on which to disagree with this conclusion.  As counsel to the Debtors astutely noted during closing argument, "the silence is deafening."[569]  Balancing the compelling benefits of the Settlement against the possibility of success in litigation (success which the Court has found would likely be swamped

---

[565]    *See* Mitchell Initial Report ¶ 22; RBL Agent Br. ¶ 22; July 13, 2016 Hr'g Tr. 136:14-19 (Schonholtz).
[566]    Mitchell Rebuttal Report ¶ 45.
[567]    *See* June 22, 2016 Hr'g Tr. 49:1-13 (Mitchell).
[568]    *See* June 13, 2016 Hr'g Tr. 24:9-15 (Sambrooks).
[569]    July 13, 2016 Hr'g Tr. 134:19 (Jakola).

by the sizeable Adequate Protection Claims), the Court finds that the first *Iridium* factor decidedly weighs in favor of approval the Settlement.

### b.  Factor #2: The Likelihood of Complex and Protracted Litigation, with its Attendant Expense, Inconvenience, and Delay

The second *Iridium* factor addresses the likelihood of complex and protracted litigation and resulting consequences.  In analyzing this factor, "the judge should form an educated estimate of the complexity, expense, and likely duration of [the] litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.  Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer Ferry*, 390 U.S. at 424-25.

The evidence demonstrates that litigation of the Adequate Protection Claims and the Bucket II Claims would likely be lengthy and protracted and would entail significant costs and risks to the Company with little reward.[570]  Mr. Mitchell estimates that litigation costs for the Bucket II Claims would be between $15 million and $20 million, and litigation costs for the Adequate Protection Claims would be between $5 million and $10 million.[571]  Assuming that the parties would pursue and exhaust all appeals as they have with (i) the Constructive Fraudulent Conveyance Claims and the Bad Acts Claims (which litigation has cost the Debtors' estates $30 million to $40 million to date)[572] and (ii) the Final Cash Collateral Order, prolonged litigation and thus, further expense to the Debtors, is inevitable.

---

[570]    *See* Mitchell Initial Report ¶ 21 ("In addition to securing a recovery for unsecured creditors to which they would otherwise not be entitled, the Settlement avoids the cost, inconvenience, and delay associated with litigating the Bucket Two Claims.  Litigation with respect to the Bucket Two Claims would be complex and protracted, and, even if successful, would not yield any recovery for unsecured creditors because nearly all of the proceeds would be subject to the Secured Lenders' massive adequate protection claims.").

[571]    Mitchell Rebuttal Report ¶ 45.

[572]    Mitchell Rebuttal Report ¶ 45.

Aside from the tremendous expense to the Debtors, prolonged litigation will substantially delay the Debtors' ability to emerge from chapter 11, further depleting estate resources, reducing the value of the Debtors' assets, and possibly leading to a liquidation of the Company instead of the restructuring embodied in the Plan.  As discussed more fully in Section VIII.B, *supra*, the Bucket II Claims involve contested questions of law and fact that would likely require substantial and prolonged discovery and expert testimony and would likely involve more than one adversary proceeding given the different disputed issues encompassed in the Bucket II Claims.  The length and uncertainty of such litigation would result in real peril to the Debtors' business.  At the Confirmation Hearing, Mr. Mitchell testified credibly regarding the possibility of liquidation were the Settlement to fall apart and the parties were to litigate the claims being settled, stating that, "we focus on all of these claims and the details and . . . we ignore the impact on the business.  Firstly, in my opinion, without the settlement the likelihood is that the RBLs walk from their plan support.  And so we're in a scenario where we're facing a probable liquidation along with an extended, costly litigation. . . . [I]t's just a scenario that doesn't even bear contemplating."[573]

After reviewing the full record and canvassing the claims at issue, the Court finds that there is a high likelihood that litigation of the Adequate Protection Claims and the Bucket II Claims would be difficult, protracted, and costly.  In stark contrast, approval of the Settlement will resolve such claims here and now; it will enable Sabine to emerge from chapter 11 protection and focus on its business without having to continue to suffer value-depleting costs

---

[573]    June 22, 2016 Hr'g Tr. 136:7-15 (Mitchell); *see* Mitchell Rebuttal Report ¶ 37 ("[i]f the Debtors were to abandon the Plan and instead litigate against the RBL Lenders and the Second Lien Lenders regarding adequate protection claims and Bucket II Claims, it is [the Debtors'] view that there is a real risk that there would not be a business left to reorganize.").

and further business risks.  The second *Iridium* factor weighs heavily in favor of approval of the Settlement.

### c.  Factor #3: The Paramount Interests of Creditors

The third *Iridium* factor examines whether the settlement being evaluated is in the paramount interests of the debtor's creditors, "including each affected class's relative benefits 'and the degree to which creditors either do not object to or affirmatively support the proposed settlement.'"  *Iridium*, 478 F.3d at 462 (citations omitted).

As the foregoing discussion of the first two *Iridium* factors indicates, the Settlement provides numerous benefits to unsecured creditors, including the principal benefit of a recovery which would likely be nonexistent absent the Settlement.  The Settlement also eliminates significant risks to all creditors in the Debtors' capital structure that would accompany litigation of the Bucket II Claims and the Adequate Protection Claims.  Litigation of any or all of such claims likely would harm creditors by extending the length of the Debtors' restructuring and eroding the Debtors' enterprise value as liquidity is allocated away from the Debtors' operations and to litigation and related administrative costs, and it would force the Debtors' management to divert resources away from operating the business and toward distracting litigation.[574]

As discussed, *supra*, the Committee, joined by the Forest Notes Trustees and the Legacy Sabine Notes Trustee, insists that the Settlement does not treat unsecured creditors fairly, asserting that it is based on an overstatement of the Adequate Protection Claims and an understatement of unencumbered value for unsecured creditors and, therefore, it does not fall within the range of reasonableness.  The Debtors vehemently disagree.  So too does this Court.  And so it bears repeating that the Debtors' estimate of the Adequate Protection Claims is

---

[574]    *See* Mitchell Initial Report ¶ 22.

reasonable and that there is no realistic scenario in which the Adequate Protection Claims would not exceed litigation recoveries on the Bucket II Claims.  Mr. Mitchell's testimony on this point is credible and compelling.[575]  Given that the Settlement provides unsecured creditors with a recovery above zero, which the Court has found is the lowest point in the range of reasonableness here, the Court concludes that the recovery to unsecured creditors under the Settlement embodied in the Plan is fair and reasonable and satisfies Bankruptcy Rule 9019.

Finally, as discussed herein, the Debtors have demonstrated peril to their business which must be taken into account when considering the risk to creditors in litigating the Bucket II Claims and the Adequate Protection Claims.  Because of the likely length (including the time for appeals) and uncertain outcome, any such litigation could significantly decrease all creditors' recoveries below the current Plan recoveries (including those of other creditors in the Debtors' capital structure), all for a gamble on an increased recovery for unsecured creditors that the Court has already determined is highly unlikely.  The Court finds that avoiding such a gamble through entry into the Settlement is in the paramount interests of creditors.  *See Adelphia Commc'ns, Corp.*, 327 B.R. at 166-67 ("[A]ny settlement must be evaluated in light of the strengths and weaknesses of the settling entity's case, and the downside risks in the event of an adverse outcome. . . . Gauging downside risk is a critical aspect of the litigation (and settlement) process. When the consequences of a wrong decision are so huge, it is not unreasonable to hedge against them."), *aff'd*, 337 B.R. 475 (S.D.N.Y. 2006).  For all of these reasons, the Court finds that the Settlement is in the paramount interests of the Debtors' creditors, including unsecured creditors.

### d.  Factor #4: Whether Other Parties in Interest Support the Settlement

---

[575]    When discussing the Settlement during his testimony at the Confirmation Hearing, Mr. Mitchell emphasized his view that the Settlement "provides much more value to all creditors than a foreclosure, liquidation, [and/or] disposal of assets" and "pursuit of expensive litigation [which] we've evaluated at tremendous expense and detail and concluded that there's not realistic value there."  *See* June 22, 2016 Hr'g Tr. 51:16-23 (Mitchell).

The fourth *Iridium* factor asks a court to consider the level of support for the settlement among other parties-in-interest in the case.[576]   As is clear from the voting results, the Plan received support from a number of impaired classes of creditors, including the Debtors' secured creditors, the creditors that elected convenience class treatment, and the general unsecured creditors (other than noteholders) for every Debtor, all of whom will be affected by the Settlement.[577]   Tellingly, only the three classes of unsecured creditors that hold the Legacy Sabine Notes and the Legacy Forest Notes voted to reject the Plan.   Viewing the solicitation results by the number of unsecured creditors who voted, a total of (i) 180 unsecured creditor votes were received rejecting the Plan and (ii) 293 unsecured creditor votes were received accepting the Plan – indicating that over seventy percent (in number) of unsecured creditors voted to accept.[578]   Given that a significant percentage of the Debtors' voting creditors support the Plan, the Settlement satisfies this *Iridium* factor.

### e.   Factor #6: The Nature and Breadth of Releases to Be Obtained by Officers and Directors

The Plan also provides for (i) the Debtor Release as set forth in Article VIII.F of the Plan; (ii) a third-party release by holders of claims or interests (who did not elect on their ballot to opt out of such release) of the Debtors, the Reorganized Debtors, the Committee, and other released parties as set forth in Article VIII.G of the Plan; and (iii) the mandatory RBL Release of the RBL Released Parties, as set forth in Article VIII.B of the Plan.   Encompassed in these releases are releases of claims and causes of action that the Committee sought standing to pursue via the STN Motions – claims that the Independent Directors Committee concluded were meritless and that

---

[576]      At least one court has noted that "this factor, which has its origin in nonbankruptcy litigation (and particularly the review of class action settlements, which usually focus on fairness to the plaintiff and class member communities, as contrasted to the defendant putting value on the table), has limited applicability in bankruptcy cases." *Chemtura*, 349 B.R. at 116.

[577]      *See* Voting Certification.

[578]      *See* Voting Certification.

this Court (and the District Court) have determined are not colorable or are not in the estates' best interests to pursue.

In Section VIII.C.1, *supra*, the Court discussed in detail the objections to the RBL Release and found that the RBL Release is consistent with applicable law and should be approved for the reasons stated therein.

With respect to the Debtor Release, the Court finds that this release by the Debtors represents a valid settlement and release of claims the Debtors may have against the Released Parties and the RBL Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, is a valid exercise of the Debtors' business judgment, and is in the best interests of the estates. It is well-settled that debtors are authorized to settle or release claims in a chapter 11 plan.[579] Debtor releases are approved by courts in the Second Circuit when the Debtors establish that such releases are in the "best interests of the estate;"[580] as this Court has noted, debtors have leeway in releasing claims that the debtors themselves own.[581] Here, the Debtor Release is an integral component of the Settlement that was negotiated at arms' length, and, in light of the STN Ruling, continuing to prosecute further meritless litigation is not in the best interests of the Debtors' estates. While the Bucket II Claims were not included in the STN Ruling, the Court has found that the benefits of settlement to the estates and to the Debtors' creditors more than outweigh any benefit which could be achieved through litigating such claims. Moreover, without the Debtors' agreement to provide releases, the Debtors would have been unable to attract the meaningful new funding commitments provided under the Exit Revolver Credit

---

[579]    *Adelphia Commc'ns Corp.*, 368 B.R. at 263 n. 289, 269 (debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[580]    *See Charter Commc'ns.*, 419 B.R. at 257 ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.").

[581]    *Adelphia Commc'ns Corp.*, 368 B.R. at 263, n. 289 ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own.").

Facility and New Second Lien Credit Facility.  The Court concludes that the Debtor Release is appropriate and that this factor weighs in favor of approval of the Settlement.

After considering each of the *Iridium* factors and canvassing the factual and legal issues implicated by each component of the Settlement as well as considering the Settlement as an integrated whole, the Court finds that the Settlement is fair and reasonable, falls well above the lowest point in the range of reasonableness, and should be approved.  Regarding the likelihood of success in litigation, the Court has found that the Debtors reasonably concluded that any recovery achieved through litigation of the Bucket II Claims would be swallowed by the Adequate Protection Claims and would not yield a recovery for unsecured creditors, who are receiving value through the Unsecured Equity Pool under the Plan.  Moreover, the benefits of the Settlement strongly outweigh the likelihood of success and any rewards of litigation, particularly given the sizable costs of litigation, the risk of damage to the Debtors' business, and the depletion of asset value which would likely result from remaining in chapter 11 during any such protracted litigation.  The Court finds that the Settlement (i) is fair, reasonable, and well above the lowest point in the range of reasonableness; (ii) provides the best means of maximizing value for the Debtors and all of their creditors; and (iii) provides a viable and critical path forward for the Debtors to emerge from chapter 11.

## IX.    The Plan Complies with Sections 1129(a) and (b) of the Bankruptcy Code and Other Confirmation Standards

For the reasons set forth in detail below, the Plan satisfies the requirements for confirmation under sections 1129(a) and (b) of the Bankruptcy Code and it does not effect a *de facto* substantive consolidation.

### A.    Section 1129(a)(1)

Section 1129(a) of the Code establishes the requirements for confirmation of a chapter 11 plan of reorganization and a debtor must satisfy the provisions of section 1129 by a preponderance of the evidence.[582]  Section 1129(a)(1) of the Code requires that a plan of reorganization comply with the applicable provisions of the Code, including the rules governing classification of claims and interests.[583]  In order to determine whether a plan complies with section 1129(a)(1) of the Code, a court must ensure that the requirements of sections 1122 and 1123 are met.

Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[584]  However, the requirement of substantial similarity does not mean that claims or interests within a particular class must be identical or that all similarly situated claims must receive the same treatment under a plan.[585]  Courts generally will approve placement of similar claims in different classes provided there is a "rational" or "reasonable" basis for doing so.[586]  In

---

[582]      *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.").

[583]      *See* 11 U.S.C. § 1129(a)(1); *Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988) (hereinafter "*In re Johns-Manville Corp.*") (suggesting that Congress intended the phrase "'applicable provisions' in [section 1129(a)(1)] to mean provisions of Chapter 11 . . . such as section 1122 . . . ."); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (noting that "[t]he legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan") (citations omitted); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 595, 95th Cong., lst Sess. 412 (1977).

[584]      11 U.S.C. § 1122(a).

[585]      *See In re DRW Prop. Co.*, 60 B.R. 505, 511 (Bankr. N.D. Tex. 1986).

[586]      *See, e.g., In re Lightsquared Inc.*, 513 B.R. 56, 82- 83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification."); *Frito-Lay, Inc. v. LTV Steel Co.* (*In re Chateaugay Corp.*), 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational basis"); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 ("Courts frequently interpret § 1122 to permit separate classification of different groups of unsecured claims where a reasonable basis existed for the classification. . . . Courts have found that the Bankruptcy Code only prohibits the

---

this case, the Plan's classification of claims and interests into eleven different classes satisfies the flexible requirements of section 1122 because a valid business, factual, and/or legal reason exists for separately classifying the various classes of claims and interests created under the Plan. Article III.B of the Plan reasonably provides for the separate classification of claims against and interests in the Debtors into eleven distinct classes based upon, among other things, the security position of such claims or interests and their legal priority against the applicable Debtor's assets. Generally speaking, the classification scheme follows the Debtors' capital structure.    For example, debt and equity are classified separately and secured debt is classified separately from unsecured debt.    Other aspects of the classification scheme reasonably recognize the different legal or factual nature of claims or interests.    The claims or interests within each particular class are substantially similar to each other, and where claims or interests of the same priority are separately classified, such claims or interests are either dissimilar or another good business reason exists for such classification.    There is a legitimate basis for the classification scheme under the Plan and it "does not offend one's sensibility of due process and fair play."[587]    Thus, the classification scheme proposed under the Plan is consistent with the flexible standard of section 1122(a) of the Code.

The Court also finds that the Plan satisfies the requirements of sections 1123(a)(1) through (a)(7) because the Plan (i) designates classes of claims and interests; (ii) identifies unimpaired classes of claims and interests; (iii) specifies treatment of impaired classes of claims and interests; (iv) provides the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to less favorable treatment of such particular claim

---

identical classification of dissimilar claims.  It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes.") (citations omitted).

[587]    *Adelphia Commc'ns Corp.*, 368 B.R. at 247 (quoting *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993)).

or interest; (v) provides adequate means for its implementation; (vi) provides for the prohibition of non-voting equity securities and provides an appropriate distribution of voting power among the classes of securities; and (vii) is consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the Reorganized Debtors' directors and officers.[588]

## B.    Section 1129(a)(2)

Section 1129(a)(2) of the Code requires that the proponent of a plan of reorganization comply with the applicable provisions of the Code.  The case law and legislative history to section 1129(a)(2) reflect that this provision is intended to encompass the disclosure and solicitation requirements set forth in section 1125 of the Code and the plan acceptance requirements set forth in section 1126 of the Code.[589]  Section 1125 of the Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[590]  The Court finds that the Debtors satisfied section 1125 as the Debtors, with the assistance of the Debtors' Notice and Claims Agent, distributed solicitation packages to over 3,887 creditors holding claims in the voting classes;[591]  a printed copy of the

---

[588]    *See* Plan, Arts. III, IV, IV.G, IV.H.

[589]    *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1988) ("Objections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the [Bankruptcy] Code.") (citations omitted); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (stating that to comply with section 1129(a)(2), "the proponent must comply with the ban on postpetition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with [Bankruptcy] Code §§ 1125 and 1126.") (citation omitted); *see also* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

[590]    11 U.S.C. § 1125(b).

[591]    *See* Voting Certification [Dkt. No. 1231].

195

confirmation hearing notice was also mailed to over 64,024 parties-in-interest.[592]    Section 1126

of the Code provides that only holders of allowed claims and equity interests in impaired classes

that will receive or retain property under a plan on account of such claims or equity interests may

vote to accept or reject a plan.[593]    As set forth in the Plan, the Disclosure Statement, the

Disclosure Statement Order, and the Voting Certification:  (i) Classes 1 and 2 are unimpaired

under the Plan and therefore are conclusively presumed to have accepted the Plan pursuant to

section 1126(f); (ii) Classes 8 and 11 are impaired and not receiving any recovery under the Plan

and therefore are deemed to have rejected the Plan pursuant to section 1126(g); and (iii) Class 4a

is impaired but not entitled to vote on the Plan.    As evidenced by the Voting Certification,

except for classes of claims presumed to accept or deemed to reject the Plan, the Plan has been

accepted by all of the voting classes other than Classes 5a, 5b, and 5c.    Based on the foregoing,

the Court finds that the Debtors' solicitation of votes was undertaken in conformity with section

1126 of the Code.

### C.    Section 1129(a)(3)

Section 1129(a)(3) of the Code requires a bankruptcy court to reject a plan if it is not

proposed in "good faith" or is "forbidden by law."[594]    The Second Circuit has construed the good

faith standard as requiring a showing that "the plan was proposed with 'honesty and good

intentions' and 'with a basis for expecting that a reorganization can be effected.'"[595]

Additionally, courts generally hold that "good faith" should be evaluated in light of the totality of

---

[592]    *Id.*

[593]    *See* 11 U.S.C. § 1126.

[594]    11 U.S.C. § 1129(a)(3); *see also In re Gaston & Snow*, Nos. 93-8517 (JGK), 93 Civ. 8628 (JGK), 1996 WL 694421, at *9 (S.D.N.Y. Dec. 4, 1996).

[595]    *Johns-Manville*, 843 F.2d at 649 (citations omitted); *In re Texaco, Inc.*, 84 B.R. 893, 901-907 (Bankr. S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1998) ("[I]n the context of a Chapter 11 reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.") (citations and quotations omitted).

the circumstances surrounding confirmation.[596]  The Court finds that the Plan has been proposed

by the Debtors in good faith and with a desire to effectuate a full, fair, and feasible restructuring

of its liabilities while maximizing value for the benefit of all stakeholders.  The Plan is the

product of extensive arm's-length negotiations and numerous mediation sessions among the

parties.  The Plan negotiations were difficult and contentious.  The Plan reflects a series of

compromises that do not provide for a perfect outcome for any of the Debtors' constituents, but

represents a good faith effort to provide the highest available recoveries to the various

stakeholders under the totality of the circumstances.   Importantly, the Plan provides for

recoveries to unsecured creditors because the RBL Lenders agreed to cede a portion of their

recoveries in connection with the Settlement.   Accordingly, the Court finds that the Plan was

proposed in good faith and satisfies all of the requirements of section 1129(a)(3) of the Code.

### D.    Section 1129(a)(4)

Section 1129(a)(4) of the Code requires that certain professional fees and expenses be

subject to approval of the bankruptcy court as reasonable.   Specifically, section 1129(a)(4)

provides that:

> Any payment made or to be made by the proponent, by the debtor, or by a
> person issuing securities or acquiring property under the plan, for services
> or for costs and expenses in or in connection with the case, or in
> connection with the plan and incident to the case, has been approved by,
> or is subject to approval of, the court as reasonable.[597]

This section of the Code has been construed to require that all payments of professional fees that

are made from estate assets be subject to review and approval by a bankruptcy court for

reasonableness.[598]  The Court finds that the Plan fully complies with the requirements of section

---

[596]    *See In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994).
[597]    11 U.S.C. § 1129(a)(4).
[598]    *See, e.g., In re Worldcom, Inc.*, 2003 WL 23861928, at *54; *In re Drexel*, 138 B.R. at 760.

1129(a)(4) because all payments made or to be made by the Debtors for services rendered and expenses incurred in connection with these cases, including all Accrued Professional Compensation Claims, have been approved by, or are subject to, approval by the Court as reasonable.   The Plan provides that, after notice and a hearing, and in accordance with the procedures established by the Code and prior Court orders, the allowed amounts of Accrued Professional Compensation claims shall be determined by the Court.

### E.       Section 1129(a)(5)

Section 1129(a)(5)(A) of the Code requires that, before confirmation, the proponent of a plan must disclose the identities and affiliations of the proposed directors and officers of the reorganized debtors, and that the appointment or continuance of such directors and officers be consistent with the interests of creditors and equity security holders and with public policy.[599]   In addition, section 1129(a)(5)(B) of the Code requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the "nature of any compensation for such insider."[600]   The Court finds that the Plan satisfies section 1129(a)(5)(A)(i) of the Code because the Debtors have disclosed the identities of proposed members of the management team as well as the board of the Reorganized Debtors.[601] The Court also finds that the Plan complies with section 1129(a)(5)(A)(ii) of the Code because the members of current management are competent, and together with the rest of the new board, will provide both continuity and fresh insights into running the reorganized business.   Finally, the Court finds that the Plan satisfies section 1129(a)(5)(B) of the Code because the Debtors disclosed the identities and affiliations of insiders to be employed or retained by the Reorganized

---

[599]    *See* 11 U.S.C. § 1129(a)(5)(A).
[600]    11 U.S.C. § 1129(a)(5)(A).
[601]    *See* Dkt. No. 1195.

Debtors as directors and officers, and the nature and amount of their compensation, as applicable.[602]

### F.    Section 1129(a)(6)

Section 1129(a)(6) of the Code permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.[603]   The Plan does not provide for any rate changes; section 1129(a)(6) of the Code is therefore inapplicable here.

### G.    Section 1129(a)(7)

In its objection and at the Confirmation Hearing, the Committee argued that the requirements of section 1129(a)(7) were not satisfied.   The so-called "best interests of creditors" test of section 1129(a)(7) of the Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.[604]

The Committee argues that the Debtors have not met their burden under Section 1129(a)(7), for two reasons.   First, the Committee (as discussed extensively above) asserts that the amount of the Adequate Protection Claims does not exceed the value of the unencumbered assets, even if the Debtors' risk adjustments are applied to the Bucket II Claims.[605]   Assuming the Debtors' litigation-risk adjusted $89.1 million Bucket II Claim amount, the Committee

---

[602]      *See* Dkt. No. 1195; *see also In re Texaco Inc.*, 84 B.R. at 908 (finding requirements of section 1129(a)(5)(B) satisfied where the plan discloses existing officers and directors who will continue to serve after plan confirmation).

[603]      *See* 11 U.S.C. § 1129(a)(6).

[604]      *See* 11 U.S.C. 1129(a)(7).

[605]      Committee Obj. ¶ 59.

contends that, in a liquidation, "after satisfaction of the maximum RBL Lenders' Adequate Protection Claim of $35 million,"[606] unsecured creditors would receive substantially more than the value being distributed to unsecured creditors under the Plan.  Second, the Committee argues that, with respect to the parent company estate (*i.e.*, Legacy Forest), the value of the RBL Lenders' Preference Claim alone significantly exceeds the value of plan distributions to the Legacy Forest unsecured creditors.  The Committee contends that the RBL Lenders' Preference Claim is of particular importance to the best interests test for Legacy Forest unsecured creditors because (i) the RBL preferences were mortgages that were granted solely on leases of Legacy Forest, not on leases of the Legacy Sabine Subsidiaries; and (ii) under the terms of the Final Cash Collateral Order, the proceeds of this avoidance action are not subject to the adequate protection lien.[607]  According to the Committee, unencumbered assets would be available for distribution to unsecured creditors if the Debtors were to succeed on the avoidance actions against the RBL Lenders.  Therefore, the Committee concludes that the value which the Debtors propose to distribute to the Legacy Forest unsecured creditors is less than the $10 million that the Legacy Forest unsecured creditors would receive on account of the preference recoveries.[608]

The Debtors, on the other hand, contend that the Plan satisfies the best interests test with respect to holders of claims and interests that did not accept the Plan because it provides such parties with the same or greater recoveries than they would receive in a hypothetical chapter 7 liquidation.[609]  Under the Debtors' hypothetical chapter 7 liquidation (the "Liquidation Analysis"), attached as Exhibit E to the Disclosure Statement, the estimated proceeds available for distribution (net of required costs and expenses) would total between approximately $391.2

---

[606]    Committee Obj. ¶ 61.
[607]    Committee Obj. ¶ 63.
[608]    Committee Obj. ¶ 63, n. 20.
[609]    Debtors' Conf. Br. ¶ 128 (citing Mitchell Initial Report ¶¶ 55-56).

million and $447.1 million, with a mid-point of $419.2 million.[610]   The Debtors cite Mr.

Mitchell's testimony for the proposition that any amount that the Debtors realize on a preference

claim against the RBL Lenders would be "substantially less" than $12 million in a liquidation.[611]

Moreover, according to Mr. Mitchell, any recovery from the RBL Lenders' Preference Claim

would first be used to satisfy the approximately $20 million in administrative and other priority

claims before those proceeds would be available to unsecured creditors.[612]   Based on the

Liquidation Analysis, the Debtors conclude that no claims would be paid in full and claim

holders other than RBL Secured Claims would not receive *any* recovery, which is less than what

is provided under the Plan since the Plan provides for recoveries to holders of Classes 4 through

7.[613]   According to the Debtors, the Committee's position "misstates Mr. Mitchell's liquidation

analysis and does not demonstrate that the best interest of creditors [test] is not satisfied."[614]

The Court finds that the Debtors have carried their burden to demonstrate that the Plan

meets the requirements of section 1129(a)(7) of the Code.   Notably, the Committee failed to

present its own liquidation analysis as of the Forecasted Effective Date, and Mr. Kearns himself

testified that he did not dispute Mr. Mitchell's conclusion that unsecured creditors are receiving

more value under the Plan than they would under a hypothetical chapter 7 liquidation.[615]   Based

on Mr. Mitchell's testimony, it is far from certain that the Debtors would actually recover $12

---

[610]    Debtors' Conf. Br. ¶ 130.
[611]    *See* June 23, 2016 Hr'g Tr. 206:13-17 (Mitchell) (Q: "Would the amount that the debtors would realize on any claim against the RBL lenders for preference be more or less than $12 million in a liquidation?" A: "I would estimate, if they were successful, that it would be substantially less.").
[612]    *See* June 23, 2016 Hr'g Tr. 207:3-13 (Mitchell) (Q: "Looking at your liquidation summary which we talked about yesterday, which is Figure 8 in your report, do you estimate under Class 1 the administrative and other priority claims that the debtors would face in the event of a liquidation?" A: "Yes, at approximately $20 million." Q: "Do you understand that any recovery from the RBL preference claims would first be used to satisfy the administrative and other priority claims before those proceeds would be available to any unsecured creditors?" A: "Yes, I do.").
[613]    Debtors' Conf. Br. ¶ 130.
[614]    *See* July 13, 2016 Hr'g Tr. 348:17-19 (Marcus).
[615]    *See* July 6, 2016 Hr'g Tr. 65:21-24 (Kearns) (Q: "You don't dispute Mr. Mitchell's conclusion that unsecured creditors receive more value under the debtors' plan than they would under a hypothetical liquidation, true?" A: "I think that's correct.").

million as a preference claim against the RBL Lenders.  Moreover, the allocation of such recovery to satisfy approximately $20 million in administrative and other priority claims sharply undercuts the Committee's position that unsecured creditors would receive more value in a chapter 7 liquidation.  Section 1129(a)(7) is satisfied.

### H.     Sections 1129(a)(8) through (a)(13)

The remaining subsections of section 1129(a) are either inapplicable to the Plan or have been satisfied.

### I.     Section 1129(b)

Section 1129(b) of the Code provides that, if a chapter 11 plan satisfies all applicable requirements of section 1129(a) other than section 1129(a)(8), the plan may be confirmed so long as it does not discriminate unfairly and it is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.[616]  Courts in the Second Circuit have ruled that "[u]nder section 1129(b)  of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment."[617]  Furthermore, a plan is considered "fair and equitable" pursuant to sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Code if, with respect to a class of impaired unsecured claims or interests, the plan provides that no holder of any junior claim or interest will receive or retain under the plan on account of such junior claim or interest any property.[618]  This rule, known as the "absolute priority rule," requires that if the holders of

---

[616]     *See* 11 U.S.C. § 1129(b)(1).
[617]     *See Worldcom*, 2003 WL 23861928, at *59 (requiring a reasonable basis to justify disparate treatment).
[618]     11 U.S.C. § 1129(b)(2)(B).

claims in a particular class receive less than the full value of their claims, no holders of claims or interests in a junior class may receive any property under the plan.[619]

The Court finds that the Plan satisfies all applicable requirements of section 1129(b) necessary to "cram down" the impaired classes that did not accept the Plan (Classes 5a, 5b, and 5c). First, the Court finds that the Plan does not unfairly discriminate among classes of claims and interests because holders of claims with similar legal rights will not be receiving materially different treatment under the Plan. Furthermore, the Court finds that the Plan complies with the "absolute priority rule" because there is no unsecured class junior to Class 5 that is receiving or retaining any property on account of a claim or interest under the Plan. In addition, the Plan satisfies the "absolute priority rule" with respect to each of the non-voting impaired classes – Class 8 (Section 510(b) Claims), Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), and Class 11 (Sabine Equity Interests) – which classes are receiving no recovery and are, therefore, deemed to reject the Plan. Accordingly, the Court finds that the Plan fully complies with section 1129(b) of the Code.

**J.        The Plan Does Not Effect a *De Facto* Substantive Consolidation**

Substantive consolidation "has the effect of consolidating the assets and liabilities of multiple debtors and treating them as if the liabilities were owed by, and the assets held by, a single entity." *ACC Bondholder Group v. Adelphia Commc'ns Corp. (In Adelphia Commc'ns Corp.)*, 361 B.R. 337, 359 (S.D.N.Y. 2007) (citations omitted). Although a bankruptcy court's power to effect a substantive consolidation stems from its general equitable powers, the court may do so only upon making a determination that substantive consolidation would "ensure the equitable treatment of all creditors." *Id.* (citing *Union Sav. Bank v. Augie/Restivo Baking Co.,*

---

[619]        *See Bank of America Nat'l Tr. & Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42 (1999).

*Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir. 1988)).    A Court's determination to effect a substantive consolidation is appropriate where one of two "critical factors" exists: (i) creditors dealt with the debtors as "a single economic unit and did not rely on their separate identity in extending credit;" or (ii) the "affairs of the debtors are so entangled that consolidation will benefit all creditors."    *Adelphia Commc'ns Corp.*, 361 B.R. at 359. Consolidation is undertaken sparingly because of its effect on parties' substantive rights.  *Id.*

The Committee argues, without force, that the Plan impermissibly effectuates a *de facto* substantive consolidation of the Debtors' estates.[620]  Specifically, the Committee notes that the Plan (i) eliminates all joint and several liability and guarantees in Article VI.B; (ii) gives the Debtors a full option to "cancel or otherwise eliminate" intercompany claims in Article III.B.12.b; and (iii) provides for a single distribution to creditors in respect of any claims against any of the various estates without any allocation to the relative values of the various estates in Articles III.B. and VI.B.  Lastly, the Committee submits that the voting mechanisms utilized reflect substantive consolidation, with ballots requiring the same vote for all Debtors.

The Debtors contend that they are not substantively consolidating their estates.[621]  Each claim against each of the Debtors is "treated as a separate Claim against each applicable Debtor's Estate for all purposes including voting and distribution."[622]  In accordance with this provision, the Plan ballots were generated on a debtor-by-debtor basis and the voting results for all classes were tabulated in the same manner.  The Debtors note that the Plan explicitly states that the Debtors are not being substantively consolidated and contemplates removal of any Debtor as to which the Plan cannot be confirmed for whatever reason.  Specifically, Article III.D of the Plan

---

[620]        Committee Obj. ¶ 71(B).
[621]        Debtors' Conf. Br. ¶ 192.
[622]        *See* Plan, Article III.C.

states that "[i]f the Plan is not confirmed as to one or more of the Debtors," then the Debtors as to which the Plan is not confirmed will be "severed." Moreover, the Debtors contend that they are not diluting any claims by pooling all of the Debtors' assets and liabilities – instead, the Plan provides for the same recoveries to all unsecured creditors as part of the Settlement. In response to the Committee's argument that the intercompany claims are being cancelled or eliminated without any allocation to the relative values of the estates, the Debtors state that the intercompany claims are either being cancelled or reinstated solely for purposes of maintaining the existing corporate structure; any interest in any non-debtor subsidiaries owned by a Debtor will continue to be owned by the applicable Reorganized Debtor.[623]

The Court agrees with the Debtors; the Plan does not effectuate a *de facto* substantive consolidation of the Debtors' estates. As the Debtors point out, the Plan treats each claim as a separate claim against each applicable Debtor as demonstrated by (i) the ballots and voting tabulation, which were generated on a debtor-by-debtor basis, and (ii) the distribution scheme under the Plan. The Debtors have not sought substantive consolidation at any time during these bankruptcy cases; the Court finds no basis for holding that the Plan's terms result in a *de facto* substantive consolidation.

## **CONCLUSION**

For all of the foregoing reasons, the Settlement is approved and the Plan is confirmed.[624]

Dated: August 18, 2016
New York, New York

/s/ Shelley C. Chapman_____
UNITED STATES BANKRUPTCY JUDGE

---

[623]     Debtors' Conf. Br. ¶ 192, n. 331.
[624]     On July 27, 2016, the Court entered the Confirmation Order [Dkt. No. 1358, as corrected by Dkt. No. 1359].

Appendix A



# Diminution in Value Bridge – Petition Date Through June 10, 2016



Source: Zelin Supplemental Report June 18, 2016, Exhibit V
(1)  The effects of each adjustment are presented independently. Eliminations represent the net impact of presenting all adjustments in aggregate.

PJT Partners    35

Appendix B

# Adequate Protection Bridge

Source: Ex. 1400 (based on June 10, 2016 strip pricing)



Appendix C



Appendix D

# APPENDIX 3:
## *Debtors' Risk Adjusted Values*

| | |
|---|---|
| **Assumptions** | ▪ $238M adequate protection estimate, less additional encumbered cash of $15M due to Bucket Two risk adjustment = $223M<br>▪ Risk-adjusted Bucket Two values |
| **Step 1** | ▪ Risk adjust Bucket Two claim amount<br><br>**$218M - $109M = $109M** |
| **Step 2** | ▪ Reduce Bucket Two value by adequate protection claim recovery<br><br>**$109M - $223M = ($114M)** |
| **Step 3** | ▪ Reduce Bucket Two claim amount to reflect litigation cost<br><br>**($114M) - $25M = ($139M)** |
| **Results** | **$0M** — **$29M** = **$29M**<br>Max        Settlement        Less<br>Bucket Two Value        Value        than Plan |